No. 24-5375

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SCOTT SPEAR, *et al.*,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

_____

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
RELIEF IS NEEDED BY SEPTEMBER 10, 2024**

**APPELLANT'S EMERGENCY MOTION TO STAY HIS SELF-
SURRENDER DATE PURSUANT TO FEDERAL RULE OF APPELLATE
PROCEDURE 8 AND CIRCUIT RULE 27-3; DECLARATION OF
COUNSEL AND EXHIBITS**

_____

Alyssa D. Bell
COHEN WILLIAMS LLP
*724 South Spring Street, 9th Floor*
*Los Angeles, CA 90014*
*(213) 232-5160*
*abell@cohen-williams.com*

*Attorneys for Scott Spear*

Pursuant to Federal Rule of Appellate Procedure 8(a)(2) and Circuit Rule 27-3, Counsel for Defendant-Appellant Scott Spear respectfully requests that the Court **grant an emergency stay** of the district court's order requiring his self-surrender to the custody of the Bureau of Prisons on or before **September 11, 2024**, to begin serving the 120-month sentence imposed on August 28, 2024, and **order that he remain released on his own recognizance subject to conditions** pending this Court's order granting or denying his forthcoming motion for bail pending appeal.  As set forth herein, Mr. Spear will suffer irreparable harm if he is forced to serve any portion of his sentence while his eligibility for bail pending appeal is litigated before this Court.

The instant motion is based upon the attached memorandum of law, Form 16 certificate, declaration of counsel, exhibits, and any further briefing that the Court may request.  To avoid unnecessary repetition of issues in multiple briefs, pursuant to Federal Rule of Appellate Procedure 28(i), Mr. Spear hereby joins in the arguments made in favor of an emergency stay of self-surrender set forth in Codefendant and Appellant Michael Lacy and Codefendant and Appellant John Brunst's forthcoming emergency stay motions.  *See* Case no. 2:18-cr-00422-001-PHX-DJH and Case no. 2:18-cr-00422-004-PHX-DJH.  The government opposes relief.

## **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY.................6

III.  STANDARD OF REVIEW...........................................................11

IV.   ARGUMENT..............................................................................12

    A.   Because Mr. Spear's appeal will raise substantial questions, he
        will suffer irreparable harm if he is forced to serve a term of
        custody while awaiting a ruling from this Court on his
        entitlement to bail pending appeal. ......................................13

        1.   Legal Standard. .......................................................13

        2.   It is at least "fairly debatable" whether the district court
            should have granted Mr. Spear's motion to dismiss the
            Superseding Indictment on First Amendment grounds. ...........13

        3.   It is "fairly debatable" whether the district court's First
            Amendment jury instructions were erroneous. .........................17

    B.   Mr. Spear's age and health also demonstrate that he will suffer
        irreparable harm unless this Court stays his self-surrender date.........20

V.    CONCLUSION..........................................................................233

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ........................................................ 11, 12

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) ...................................................................14

*Backpage.com v. Dart*,
  807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016).............. 7, 8, 15

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013).............................................7

*Backpage.com, LLC v. Hoffman*,
  No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20, 2013) .........7

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012).................................... 7, 15

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
  128 F. Supp. 3d 597 (E.D.N.Y. 2015) ........................................ 19, 20

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
  868 F.3d 104 (2d Cir. 2017)...................................................18

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*,
  949 F.3d 116 (3d Cir. 2020)....................................................19

*Jones v. Barnes*,
  463 U.S. 745 (1983) ............................................................4

*People v. Ferrer*,
  No. 16FE019224, 2016 WL 7237305 (Cal. Sup. Ct. Dec. 9, 2016).............. 8, 15

*Rosales-Mireles v. United States*,
  585 U.S. 129 (2018) ....................................................... 5, 12, 20

*Skilling v. United States*,
  561 U.S. 358 (2010) ...........................................................20

*United States v. Handy*,
  761 F.2d 1279 (9th Cir. 1985) .................................................................... *passim*

*United States v. Lee*,
  725 F.3d 1159 (9th Cir. 2013) ...............................................................22

*United States v. Montoya*,
  908 F.2d 450 (9th Cir. 1990) ..................................................................5

*Valle Del Sol Inc. v. Whiting*,
  709 F3d 808 (9th Cir. 2013) ..................................................... *passim*

**Federal Statutes**

18 U.S.C. § 371 ...........................................................................8

18 U.S.C. § 1952 ..........................................................................8

18 U.S.C. § 1956 ..........................................................................9

18 U.S.C. § 1957 ..........................................................................9

18 U.S.C. § 3143 .........................................................................13

Cir. R. 27-3 .............................................................................11

Fed. R. App. P. 8 .......................................................................11

**Other Authorities**

Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the
  United States* 43-88 (2012) .................................................................22

## I.  **INTRODUCTION**

This case arises from the first-ever prosecution of the executives of a media company for publishing third-party speech on the company's website that allegedly facilitated the criminal activities of the website's customers.  Mr. Spear is the former Executive Vice President of Village Voice Media Holdings, an award-winning newspaper conglomerate dedicated to independent journalism.  To fund its free journalism, in 2004, the conglomerate founded Backpage.com ("Backpage"), a Craigslist-style website that published third-party classified ads online.  Backpage hosted an adult services section where users posted advertisements for, among other things, escorts and strippers.  The government alleged that many of the ads in the adult-oriented sections were associated with prostitution, even though they did not propose facially unlawful transactions.

The government indicted Backpage's owners in 2018, charging them with conspiracy to violate the Travel Act, fifty counts of Travel Act violations, and various money laundering offenses.  (Ex. A[1].)  The charges arose from Backpage's publication of ads that contained only lawful speech, but that allegedly facilitated business enterprises engaged in prostitution.  (*Id.*, ¶ 201.)  With one exception not relevant here, the ads set forth in the indictment did not propose unlawful

---

[1] All exhibits cited herein are attached to the concurrently filed Declaration of Alyssa D. Bell.

1

transactions, and as such, they enjoyed presumptive First Amendment protection. *See Valle Del Sol Inc. v. Whiting*, 709 F3d 808, 821 (9th Cir. 2013) (only "speech [that] proposes an illegal transaction," not merely speech "associated with unlawful activity" is excluded from the protections of the First Amendment). Under the government's overbroad theory of prosecution, however, lawful speech loses First Amendment protection when its publisher is (or should be) on notice that criminal activity is associated with that speech. That novel theory chills broad swaths of protected activity and vastly expands the government's power to police media outlets nationwide, in violation of the basic tenets of our constitution.

Recognizing as much, Backpage's owners moved to dismiss the charges against them on various First Amendment grounds, and well-respected organizations from across the political spectrum—the ACLU, Cato Institute, DKT Liberty Project, and Reason Foundation—filed Amicus briefs that joined in opposing the government's unprecedented attack on the First Amendment. (Exs. B, C, D.) Their motions were denied. (Ex. E.) Jury instructions setting forth the defendants' theory of defense on First Amendment grounds were likewise rejected. (Exs. G, I.) The case proceeded to trial, but the first of two trials ended in a mistrial after the government committed misconduct by making inflammatory, prejudicial arguments and eliciting irrelevant testimony from witnesses. (Ex. F.) The second trial, which took place over the course of three months, ended in a split

verdict. (Ex. H.) Mr. Spear was acquitted on thirty-three of fifty Travel Act counts and six money laundering counts. (*Id.*) The district court subsequently granted his motion for a judgment of acquittal on additional money laundering counts. (Ex. K.)

Mr. Spear's appeal will present substantial questions on matters of first impression in this Circuit, and its resolution will have wide-ranging consequences for publishers of third-party content, both print and online. Those questions include (1) whether the First Amendment bars the criminal prosecution of the publishers of speech that is lawful on its face, even where those publishers know that third parties may use that speech to further their own criminal endeavors, and (2) whether the jury instructions misstated the First Amendment jurisprudence of this Circuit, and thereby deprived Mr. Spear of his Sixth Amendment right to present his theory of defense to the jury. (Ex. M.)

It is beyond dispute that the issues at stake in this appeal are "substantial," "not frivolous." *United States v. Handy*, 761 F.2d 1279, 1281-83 (9th Cir. 1985). The district court has already determined as much. (Ex. P at 9:16-22 (finding, "there are substantial issues that have to be considered by the Ninth Circuit" that "may change the complexity [of the case] or … what the government may or may not be able to pursue with regard to a retrial"); *see also* Ex. W at 15:6-20 (noting, "it may be that on appeal several of [Mr. Spear's] convictions are set aside or

3

remanded back"); *id.* at 16 (opining that Mr. Spear's case might "come[] back in total" for a retrial on all counts).)

Yet, at sentencing, the district court denied Mr. Spear's motion for bail pending appeal and gave him two weeks to self-surrender to the custody of the Bureau of Prisons to begin serving the 120-month sentence imposed. (Ex. Q at 243-44; Ex. N.) In reaching its decision, the district court found that Mr. Spear was neither a flight risk nor a danger, but misapplied the *Handy* standard, concluding that the jury's guilty verdict essentially precluded a finding that Mr. Spear's appeal would raise substantial issues.[2] (Ex. Q at 243 (finding that Mr. Spear's appeal would not raise substantial issues because "these were jury verdicts" and "the circuit has an applicable review process in which a jury conviction is viewed with deference").)

Mr. Spear has already begun the process of preparing a motion for bail pending appeal that will be filed before this Court; however, undersigned counsel was retained approximately ten days ago to represent Mr. Spear on appeal and, given the length of the record—which spans approximately 2,200 docket entries and 8,000 pages of transcripts—and the complexity of the issues, the preparation of Mr. Spear's bail motion is no easy matter. (Bell Decl., ¶ 2.) To afford

---

[2] The district court also denied Mr. Spear's motion to stay or extend his self-surrender date. (Ex. Q at 248.)

Mr. Spear the appellate representation to which he is entitled, *see Jones v. Barnes*, 463 U.S. 745, 752 (1983) ("There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review."); *United States v. Montoya*, 908 F.2d 450, 451 (9th Cir. 1990) (summary presentation of appellate issues is an inadequate basis for a motion for bail pending appeal), undersigned counsel requires a minimum of six weeks to prepare Mr. Spear's bail motion. (Bell Decl., ¶ 3.)

Mr. Spear will suffer irreparable harm if he is forced to serve a term of custody while his bail motion is prepared, given the strength of the issues he will raise therein. As this Court has already recognized, an unjustified term of incarceration, of *any* length, affects a defendant's substantial rights. *Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018) ("To a prisoner, th[e] prospect of additional time behind bars is not some theoretical or mathematical concept. [A]ny amount of actual jail time is significant, and ha[s] exceptionally severe consequences for the incarcerated individual …..") (citations omitted).

What is more, Mr. Spear is seventy-three years old and suffers from a host of serious medical conditions that will make any term of custody especially punitive. (Bell Decl., ¶ 4, Ex. S (under seal filing).) For one such condition, Mr. Spear takes regular medications, and risks suffering devastating consequences (including grand mal seizures) if those medications are incorrectly administered.

5

(*Id.*)  Mr. Spear has good reason to fear that even a brief term of incarceration presents a danger to his health.  During a custodial stint at the outset of this case, he was denied access to his medications and suffered severe health consequences as a result.  (Ex. Q at 242; Bell Decl., ¶ 4.)

These facts also demonstrate the irreparable harm that Mr. Spear will suffer unless this Court grants a temporary stay of his self-surrender date forthwith.

## II.  <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Backpage was formed to fund free, independent journalism, and to compete with internet-based classifieds, such as Craigslist, which dwarfed print-based classified advertising by the early 2000's.  (Ex. B at 3-4.)  Backpage offered advertisement categories that spanned the full spectrum—from auto sales, apartment rentals, and jobs, to adult categories including dating, massage, and escort services—and mirrored the long-established practice of publishing similar content in newspapers and other print-based media.  (*Id.*)

In 2010, Craigslist succumbed to public pressure, including from various State Attorneys General, to shut down the adult services section of its website.  (*Id.* at 5.)  Backpage refused to follow suit, and staunchly maintained that the First Amendment protected its publication of third-party adult content.  (*Id.*)  Public pressure soon turned to legislative action and legal battles, but Backpage's position was repeatedly upheld.  (*Id.* at 5-7.)

For example, federal district courts across the country struck down state laws targeting Backpage, finding that they chilled protected activity in violation of the First Amendment. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268, 1282 (W.D. Wash. 2012) (enjoining enforcement of newly-create state felony for disseminating content online if it contained any "explicit or implicit offer" of sex for "something of value" because it would have "chill[ed] a substantial amount of protected speech," and rejecting arguments that the law affected only speech proposing illegal transactions based on the generalized notion that all adult ads on Backpage were for prostitution); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (holding that third-party ads on Backpage were protected speech under the First Amendment, and rejecting state's argument that the statute "[did] not implicate First Amendment scrutiny because it criminalize[d] only offers to engage in illegal transactions"); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013) (striking down statute targeting Backpage and rejecting arguments that adult-oriented ads on the website were unprotected speech).

The Seventh Circuit soon followed suit, enjoining an Illinois Sherriff's efforts to shutter Backpage—through threats to Visa and Mastercard to cut off use of their cards on the website—holding that he had imposed an unconstitutional

prior restraint on protected speech. *Backpage.com v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ("[A] public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment.") (citation omitted); *see also id.* at 234 (rejecting the contention "that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive.... [N]ot all advertisements for sex are advertisements for illegal sex.").

State efforts to criminally prosecute Backpage's owners for user-posted content fared no better. *See People v. Ferrer*, No. 16FE019224, 2016 WL 7237305, at *10 (Cal. Sup. Ct. Dec. 9, 2016) (dismissing complaints against two Backpage owners on demurrer and rejecting state's argument presuming facially-valid ads for adult services were ads for prostitution, reasoning that "[p]roviding a forum for online publishing is a recognized legal purpose" and "charg[ing] money for the placement of advertisements … qualif[ies] as services rendered for legal purposes").

Despite these rulings, each of which reaffirmed that the First Amendment protected Backpage's publication of facially lawful third-party ads, the government indicted Mr. Spear and his codefendants in March of 2018 for facilitating prostitution in violation of the Travel Act, and returned a Superseding Indictment ("SI") adding additional counts a few months later.  The SI charged Mr. Spear with

one count of Conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371;

fifty counts of violating the Travel Act, in violation of 18 U.S.C. § 1952(a)(3)(A);

one count of Conspiracy to commit Money Laundering, in violation of 18 U.S.C.

§ 1956(h); ten counts of Concealment Money Laundering, in violation of 18

U.S.C. § 1956(a)(1)(B)(i); six counts of International Promotional Money

Laundering in violation of 18 U.S.C. § 1956(a)(2)(A); and, ten counts of

Transactional Money Laundering, in violation of 18 U.S.C. § 1957(a).  (Ex. A.)

The fifty substantive Travel Act counts were premised upon presumptively

lawful ads that appeared on Backpage.  All but one proposed a legal transaction,

and the SI did not allege that Mr. Spear (or any of his codefendants) was aware of

the specific ad in question or knew anything about the individual who posted it.[3]

(Ex. A, ¶ 201 (counts 2-51).)

The SI thus reflected an expansive theory that threatens protected speech

across the internet: it premised federal criminal liability not upon the content of the

speech itself, but upon the publisher's alleged (or presumed) knowledge that third

parties might use that speech for their own criminal purposes.  In other words, the

SI sought to hold Mr. Spear liable for facilitating prostitution based on his

---

[3] The SI's money laundering counts were predicated on the Travel Act counts, and
likewise failed to allege Mr. Spear (or his codefendants') knowledge of, or
participation in, the business enterprises responsible for posting of the fifty ads that
served as Travel Act predicates.  (*See* Ex. A, ¶¶ 205, 207, 209, 210.)

leadership role in a company that hosted third-party ads that might be associated with prostitution, or might not.

At trial, the government's evidence largely tracked the SI's overbroad theory. Though the government adduced what it claimed was evidence that Mr. Spear was on notice that many of the facially-lawful ads posted on Backpage were associated with prostitution, it was undisputed that Mr. Spear never saw any of the ads at issue, nor had contact with any advertiser. (Ex. J at 2.) It was likewise undisputed that marketing techniques that Backpage employed in its early days to compete with Craigslist—and which the government claimed were responsible for attracting ads associated with prostitution to Backpage—were no longer in play by the time the ads at issue were posted. (*Id.*) None of the evidence adduced at trial, in other words, brought Mr. Spear's conduct outside the protection of the First Amendment.

Following three months of testimony and deliberations, the jury returned a split verdict, convicting Mr. Spear on one count of Conspiracy to violate the Travel Act, seventeen counts alleging violations of the Travel Act, one count of Conspiracy to commit Money Laundering, ten counts alleging Concealment Money Laundering, and ten counts alleging Transactional Money Laundering. Mr. Spear was acquitted on thirty-nine counts, which alleged International

Promotional Money Laundering and violations of the Travel Act.[4]  (Ex. H.)  The district court subsequently granted his motion for a judgment of acquittal on ten counts, which alleged Transactional Money Laundering.  (Ex. K.)

Prior to sentencing, Mr. Spear moved for bail pending appeal, arguing that he was not a flight risk or a danger,[5] and that his appeal would raise substantial issues, including whether the district court erred in denying his motion to dismiss the SI on First Amendment grounds, and whether the jury was improperly instructed on First Amendment principles.  (Ex. M at 2-5.)  The district court denied Mr. Spear's motion.  The court imposed a 120-month custodial sentence and set a self-surrender date of September 11, 2024.  (Ex. N.)

## III.    <u>STANDARD OF REVIEW</u>

A party may move to stay a judgment of the district court if, having first moved in the district court, the district court "failed to afford the relief requested." Fed. R. App. P. 8(a)(2)(A)(ii).  Circuit Rule 27-3 allows a defendant to file an emergency motion for a stay of his self-surrender date if he can show (1) he needs relief within 21 days, and (2) irreparable harm will result if he is not afforded such relief.  Circuit Rule 27-3.

---

[4] Mr. Spear was acquitted on Count 23, the sole count premised upon speech that was unlawful on its face.  (Ex. H.)

[5] The PSR concluded that Mr. Spear was neither a flight risk nor a danger (Ex. R at 67), and the district court agreed.  (Ex. Q at 241-42.)

The purpose of Rule 27-3 is to preserve the status quo. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir. 2020) ("A temporary stay … is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits, and does not constitute in any way a decision as to the merits of the motion for stay pending appeal."). Accordingly, this Court must consider whether irreparable harm will result from the denial of a temporary stay, rather than the merits of the issues to be raise on appeal. *Id.*

## IV.  ARGUMENT

Mr. Spear will suffer irreparable harm if he is forced to serve a prison term while he litigates a motion for bail pending appeal before this Court. As the Supreme Court has recently reaffirmed, "any amount of actual jail time," even a single day, has "exceptionally severe consequences for the incarcerated individual." *Rosales-Mireles*, 585 U.S. at 140 (citations omitted). Those consequences are particularly severe here, where Mr. Spear's appeal will raise landmark issues of first impression that implicate protected speech across the internet. What is more, Mr. Spear will suffer undue hardship in custody, given his age and medical conditions.

Under these unique circumstances, a temporary stay of Mr. Spear's self-surrender date is the only means to preserve his rights, and protect his health and safety.

**A.** **Because Mr. Spear's appeal will raise substantial questions, he will suffer irreparable harm if he is forced to serve a term of custody while awaiting a ruling from this Court on his entitlement to bail pending appeal.**

### 1. Legal Standard.

This Court must grant Mr. Spear bail pending appeal if it finds that he:

(1) does not pose a flight risk and does not pose a danger to public safety; (2) the appeal is not for purpose of delay; and (3) the appeal will raise a substantial question of law or fact that, if resolved in his favor, is likely to result in a new trial or reversal. 18 U.S.C. § 3143(b)(1); *Handy*, 761 F.2d at 1283. Substantial questions are those that are "fairly debatable" or "fairly doubtful." *Handy*, 761 F.2d at 1281. The issue must, in other words, be "one of more substance than would be necessary to a finding that it was not frivolous." *Id.* at 1283.

Mr. Spear's appeal will raise multiple First Amendment issues that easily clear *Handy*'s modest threshold.

### 2. It is at least "fairly debatable" whether the district court should have granted Mr. Spear's motion to dismiss the Superseding Indictment on First Amendment grounds.

Mr. Spear filed a motion to dismiss the SI arguing that the First Amendment protected him from criminal liability for the publishing of facially-neutral ads. (Ex. B.) It is at least "fairly debatable" whether the district court erred in denying his motion. *Handy*, 761 F.2d at 1281.

13

"The government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). The First Amendment therefore prohibits the government from declaring that online classified ads for adult services or escorts are unprotected because prosecutors believe they "look like" ads for illegal prostitution. Yet that is the overbroad and unconstitutional premise of the SI. The SI does not allege that the fifty specific ads in question were facially illegal; rather, it characterizes those advertisement as "provocative," "indicative of prostitution," or "obviously for prostitution." (Ex. B at 16-17 (collecting examples).)

In denying Mr. Spear's motion, the district court reasoned that the SI sufficiently alleged that the ads solicited prostitution because they used "code words" associated with prostitution, such as "GFE" (Girlfriend Experience) and "red roses special," and were accompanied by suggestive photos of scantily clad women. (Ex. E at 9-10.) The district court, in other words, endorsed the government's overbroad theory of liability, which premises a publisher's liability for third-party content upon his knowledge (whether actual or presumed) that the third party's speech is associated with criminal activity. (*See id.*)

But it is at least fairly debatable whether, in permitting Mr. Spear's prosecution to proceed, the district court contravened the First Amendment. Under

this Court's precedent, only "speech [that] proposes an illegal transaction," not speech "associated with unlawful activity" may be censored consistent with the First Amendment. *Valle Del Sol*, 709 F3d at 822. What is more, *every* court to address the question—including eight courts addressing adult services ads posted on Backpage—has held that third-party ads do not lose First Amendment protection because they are provocative, or suggestive of prostitution. The Seventh Circuit went so far as to say that the Backpage website, including its "classified ads for 'adult' services," was "an avenue of expression of ideas and opinions" protected by the First Amendment. *Dart*, 807 F.3d at 230-31, 234; *see also McKenna*, 881 F.Supp.2d at 1281-82 (finding that publication of third-party ads— even if they concern illegal transactions—"does not fall within [the] 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection") (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *Ferrer*, 2016 WL 7237305, at *10 (rejecting the state's broad generalization that adult services ads posted on Backpage were unlawful ads for prostitution, and reasoning that "providing a forum for online publishing" and "charg[ing] money for the placement of advertisements," as Backpage did, are "services rendered for legal purposes."); (Ex. B at 17-18 (collecting cases).)

The weight of authority thus holds that the First Amendment protected Backpage's publication of facially-lawful adult services ads, no matter how

suggestive the government might have found them to be. The district court's order permitting Mr. Spear's prosecution to proceed, premised upon his publication of the same facially-neutral ads, stands alone. It is therefore at least fairly debatable whether the First Amendment should have barred Mr. Spear's prosecution altogether.[6]

The additional arguments Mr. Spear raised in his motion to dismiss further underscore this conclusion. Mr. Spear asserted, consistent with basic principles of First Amendment jurisprudence, that the government cannot criminally punish publishers or distributors of speech without sufficient proof of scienter, *i.e.*, proof that the publisher knew the *specific* speech that forms the basis of the criminal charge was illegal. (*Id.* at 28.) The SI failed to meet that standard because, far from alleging Mr. Spear knew that the fifty ads that served as Travel Act predicates proposed an illegal transaction, it did not even allege that he knew the ads existed. In support of his arguments, Mr. Spear relied upon an unbroken line of Supreme Court authority, but the district court found it distinguishable. The district court reasoned that the SI sufficiently alleged Mr. Spear and his codefendants had

---

[6] Compounding the error, the district court precluded Mr. Spear from testifying that he relied in good faith upon the many decisions holding that Backpage's publication of third-party ads was First Amendment protected speech, and precluded his counsel from introducing evidence or making arguments that those decisions informed Mr. Spear's *mens rea*. (Exs. U, V.) It is at least fairly debatable whether the district court thus erred as well.

"specific intent to promote or facilitate prostitution" in violation of state law because their alleged conspiracy "*resulted in* the fifty ads for prostitution" that formed the basis of the Travel Act counts. (Ex. E at 20 (emphasis added).) That relaxed standard allowed for Mr. Spear's conviction even if he had no idea that the *specific speech* at issue in those fifty ads was illegal.

But in the context of a criminal prosecution, the First Amendment requires more. Here, it required the government to allege that Mr. Spear knew the speech at issue was unlawful—*i.e.*, that the fifty specific ads charged as Travel Act predicates were ads for prostitution—not merely that he knew some of the content Backpage published was associated with prostitution, while some was not. (Ex. B 539 at 26-27 (citing *Smith v. California*, 361 U.S. 147 (1959), *Mishkin v. New York*, 383 U.S. 502, 511 (1966), *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994), *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).) Because the district court's ruling is at odds with well-established precedent, it is at least fairly debatable whether the First Amendment barred Mr. Spear's prosecution for this additional reason.

### 3. It is "fairly debatable" whether the district court's First Amendment jury instructions were erroneous.

Mr. Spear requested jury instructions setting forth his theory of defense on First Amendment grounds, but the district court declined to give all but one.

17

(Ex. G at 65-70; Ex. I at 48.)  It is at least "fairly debatable" whether the district court erred and the final instructions misstated the law.  *Handy*, 761 F.2d at 1281.

Mr. Spear proposed a jury instruction defining unprotected speech: "[s]peech that proposes a commercial transaction that necessarily would constitute an illegal act if concluded is unprotected, but, if there are plausible ways to complete a proposed transaction lawfully, the speech proposing that transaction concerns lawful activity and is, therefore, protected commercial speech."  (Ex. G at 67.)  That instruction would have foreclosed a guilty verdict based on his publication of lawful commercial speech, even if plausibly associated with a crime.  The district court refused, instead instructing the jury that "the First Amendment does not protect speech that proposes an illegal transaction."  (Ex. I at 48.)  That instruction was incomplete—it said nothing of speech that is open to interpretation, and left the door open for the jury to convict if the ads in question plausibly proposed *both* lawful and unlawful acts.

It is at least fairly debatable whether the instructions misstated the law. Ample precedent makes clear that "if … there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017); *accord Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949

F.3d 116, 141 (3d Cir. 2020) (rejecting city's argument that speech "concern[ed]" unlawful activity" where it might relate to both lawful and unlawful acts).  Absent an instruction setting forth that principle, the jury was permitted to convict even if it found the ads at issue plausibly proposed a *lawful* transaction, in violation of the First Amendment.

It is likewise well established that, to ascertain whether speech proposes an illegal transaction, only the content of the speech matters—not the circumstances surrounding it.  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 615 (E.D.N.Y. 2015) ("When the legality of a proposed commercial transaction depends on circumstances outside the content of the speech, the activity is lawful and the speech is entitled to protection"), *aff'd*, 868 F.3d 104 (2d Cir. 2017); *accord Valle Del Sol*, 709 F.3d at 821 (rejecting argument that advertising of drug paraphernalia should be unlawful because of its obvious association with illegal drug use).  The jury instructions did not explain this fundamental principle of First Amendment law either.

Not only did the instructions effectively preclude Mr. Spear's defense on First Amendment grounds, they permitted the government to present its overbroad theory to the jury.  In its summation, the government encouraged jurors to convict Mr. Spear if they found that the context and circumstances surrounding the facially lawful ads indicated they were "really for prostitution"—even if plausibly ads for

lawful adult services—because "context matters." (Ex. O at 10:21-11:2; Ex. U at 42:1-14.) That argument, though consistent with the court's instructions, contravened the First Amendment.

"Constitutional error occurs" when a jury "returns a general verdict that may rest on a legally invalid theory," and the jury instructions do nothing to cure the error. *Skilling v. United States*, 561 U.S. 358, 414 (2010). Here, it is fairly debatable whether the jury instructions misstated the tenets of the First Amendment and permitted Mr. Spear's convictions for protected conduct.[7]

### B. Mr. Spear's age and health also demonstrate that he will suffer irreparable harm unless this Court stays his self-surrender date.

Beyond the "exceptionally severe" consequences Mr. Spear will suffer if required to serve an unjustified term of custody during the pendency of bail proceedings before this Court, *Rosales-Mireles*, 585 U.S. at 140, Mr. Spear will suffer irreparable harm while incarcerated due to his age and failing health.

Mr. Spear's decade-long mental health ailments require a "regimen of medications and psychotherapy." (Ex. S at 2.) "It is *extremely dangerous* for [his]

---

[7] In denying Mr. Spear's motion for new trial on this ground, the district court reasoned that photographs and coded terms included in the ads made clear "that the ads were sex for money ads." (Ex. K at 71.) The court also relied on the testimony of each "victim/witness" identifying her ad as one for prostitution. (*Id.*) The district court's analysis thus reflects exactly what this Court precludes—consideration of the circumstances and context surrounding speech to interpret its purpose. *Cf. Valle Del Sol*, 709 F.3d at 821; *Centro*, 868 F.3d at 114.

medicine to be abruptly stopped." (*Id.* (emphasis added).) Risks include grand mal seizures, mood destabilization, and suicidality. (*Id.*) Mr. Spear's concern that his medication *will* be abruptly stopped if he is incarcerated is far from hypothetical—during a brief custodial stint at the outset of this case, Mr. Spear was denied his medications and he suffered serious health consequences as a result. (Ex. Q at 242; Bell Decl., ¶ 4.)

What is more, as expert prison consultant Jane Perdue noted in her declaration in support of Mr. Spear's sentencing memorandum, even a short stay in custody would be particularly harsh for Mr. Spear. (Ex. L (ECF No. 2138-2) at 4-15.) In addition to Mr. Spear's mental health conditions, he also suffers from restrictive lung defect with pulmonary fibrosis and scarring, obstructive sleep apnea, has bouts of urinary frequency and urgency, and suffers from chronic and progressive lower back pain. (*Id.* at 8-25.) In light of these conditions, any lapse in necessary medical care would be devastating to "Mr. Spear's physical health, mental well-being, and certainly life expectancy." (*Id.* at 14.) However, such lapses have become the rule, rather than the exception, because the BOP's "unsurpassed" staffing crisis has "severely hampered [its] ability to provide the most basic level of medical and mental healthcare" to those in Mr. Spear's position. (*Id.* at 10.)

In addition to his health conditions, Mr. Spear's advanced age exacerbates the unnecessarily punitive nature of a term of custody at this juncture. It is well recognized that prison conditions are harsher for older inmates. *See United States v. Lee*, 725 F.3d 1159, 1169 (9th Cir. 2013) (finding district court gave insufficient weight to fact that, for an elderly defendant (72 years old at sentencing), time in custody is more punitive given limited remaining life expectancy); *see also* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States* 43-88 (2012) (describing disproportionate physical and dignitary burdens imposed on older prisoners).[8] At Mr. Spear's age, "two years of life expectancy are lost for every year of imprisonment…. Thus, Mr. Spear is not expected to survive even four years' of imprisonment." (Ex. L (ECF No. 2138-1) at 7.)

For these additional reasons, Mr. Spear will suffer irreparable harm absent a stay of his self-surrender date.

---

[8] *Available at* https://www.hrw.org/report/2012/01/28/old-behind-bars/aging-prison-population-united-states (last visited Aug. 29, 2024).

## V.  __CONCLUSION__

For these reasons, Mr. Spear respectfully requests that the Court stay the district court's order setting a September 11, 2024 self-surrender date, and order that he remain on bail pending this Court's resolution of his forthcoming motion for bail pending appeal.


Dated:  September 3, 2024 **COHEN WILLIAMS LLP**

By: _/s/ Alyssa D. Bell_
Alyssa D. Bell

*Attorneys for Scott Spear*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d)(2)(A) and Ninth Circuit Rule 27-1(1)(d), I certify that this motion brief is proportionally spaced, has a typeface of 14 points, contains approximately 5,190 words.

Dated:  September 3, 2024 **COHEN WILLIAMS LLP**

By: *Alyssa D. Bell*
Alyssa D. Bell
Attorneys for Scott Spear

No. 24-5375

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SCOTT SPEAR, *et al.*,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

———————————

**DECLARATION OF COUNSEL AND EXHIBITS IN SUPPORT OF
APPELLANT'S EMERGENCY MOTION TO STAY HIS SELF-
SURRENDER DATE PURSUANT TO FEDERAL RULE OF APPELLATE
PROCEDURE 8 AND CIRCUIT RULE 27-3**

———————————

Alyssa D. Bell
COHEN WILLIAMS LLP
*724 South Spring Street, 9th Floor*
*Los Angeles, CA 90014*
*(213) 232-5160*
*abell@cohen-williams.com*

*Attorneys for Scott Spear*

## DECLARATION OF ALYSSA D. BELL

I, Alyssa D. Bell, hereby declare and state as follows:

1.      I am an attorney at law, licensed to practice in the State of California and admitted to practice before this Court.  I am counsel of record for Defendant-Appellant Scott Spear in the above-captioned appeal.  Unless otherwise stated, I have personal knowledge of the matters in this declaration.

2.      I was retained to represent Mr. Spear as appellate counsel approximately ten days ago.  My review of the record in that time reveals that it is lengthy and complex.  There are approximately 2,200 docket entries.  Many of those are dispositive motions, or motions that I believe may raise issues that merit inclusion in Mr. Spear's opening brief.  In addition, Mr. Spear was tried twice. The first trial lasted approximately three weeks, and ended in a mistrial due to government misconduct.  The second trial lasted approximately three months, and there are over 8,000 pages of transcripts that require my review.

3.      Given the complexity of the case and the length of the record, I cannot competently prepare and file a motion for bail pending appeal before this Court on Mr. Spear's behalf in fewer than six weeks' time.

4.      Mr. Spear will suffer irreparable harm if he is forced to serve any portion of his sentence while his eligibility for bail pending appeal is litigated before this Court.  Mr. Spear is seventy-three years old and suffers from a host of

1

serious medical conditions that will make any term of custody especially punitive. For one such condition, Mr. Spear takes regular medication, and risks suffering devastating health consequences (including grand mal seizures) if his medication is incorrectly administered. However, during a brief stint of incarceration in 2018, before his release on his own recognizance subject to pretrial supervision, Mr. Spear was denied his medications and suffered severe health consequences as a result. The risk to Mr. Spear from any term of incarceration, even if brief, is therefore real and apparent, not hypothetical.

5. On August 28, 2024, at the conclusion of the sentencing hearing, the district court ordered Mr. Spear to self-surrender to the Bureau of Prisons on September 11, 2024. In response, Mr. Spear requested that the district court stay or extend his self-surrender date. The district court would not entertain argument on the issue and denied Mr. Spear's request for a stay.

6. Mr. Spear's codefendants, John Brunst and Michael Lacey, were also ordered to self-surrender on September 11, 2024. Mr. Brunst and Mr. Lacey plan to file emergency motions to stay their self-surrender dates no later than September 5, 2024. To avoid unnecessary repetition of issues in multiple briefs, pursuant to Federal Rule of Appellate Procedure 28(i), Mr. Spear joins in the arguments made in favor of an emergency stay of self-surrender that will be set forth in Mr. Brunst and Mr. Lacey's motions.

2

7.     Attached hereto as **Exhibit A** is a true and correct copy of the Superseding Indictment, filed on July 25, 2018 (ECF No. 230).

8.     Attached hereto as **Exhibit B** is a true and correct copy of Defendants' Motion to Dismiss Indictment, filed on April 22, 2019 (ECF No. 539).

9.     Attached hereto as **Exhibit C** is a true and correct copy of Brief of *Amici Curiae* The DKT Liberty Project, Cato Institute, and Reason Foundation in Support of Motion to Dismiss the Indictment, filed on May 30, 2019 (ECF No. 624).

10.     Attached hereto as **Exhibit D** is a true and correct copy of ACLU of Arizona *Amicus Curiae* Brief regarding First Amendment Considerations, filed on May 30, 2019 (ECF No. 625).

11.     Attached hereto as **Exhibit E** is a true and correct copy of the Order Denying Defendants' Motion to Dismiss Indictment, issued on October 24, 2019 (ECF No. 793).

12.     Attached hereto as **Exhibit F** is a true and correct copy of the District Judge's Minutes Granting Order for Mistrial, issued on September 14, 2021 (ECF No. 1308).

13.     Attached hereto as **Exhibit G** is a true and correct copy of Defendants' Proposed Jury Instructions, filed on October 23, 2023 (ECF No. 1896).

3

14.     Attached hereto as **Exhibit H** is a true and correct copy of the Verdict, filed on November 16, 2023 (ECF No. 1978).

15.     Attached hereto as **Exhibit I** is a true and correct copy of the Final Jury Instructions, filed on November 16, 2023 (ECF No. 1998).

16.     Attached hereto as **Exhibit J** is a true and correct copy of Defendant Spear's Reply Re: Rule 29 Motion Concerning All Counts of Conviction, filed on January 16, 2024 (ECF No. 2030).

17.     Attached hereto as **Exhibit K** is a true and correct copy of the Order re Defendants' Rule 29 Motion, issued on April 23, 2024 (ECF No. 2063).

18.     Attached hereto as **Exhibit L** is a true and correct copy of Defendant Scott Spear's Sentencing Memorandum, filed on August 19, 2024 (ECF No. 2138).

19.     Attached hereto as **Exhibit M** is a true and correct copy of Defendant Scott Spear's Motion for Release Pending Appeal and/or for Self-Surrender, filed on August 23, 2024 (ECF No. 2155).

20.     Attached hereto as **Exhibit N** is a true and correct copy of the Judgment in a Criminal Case, issued on August 30, 2024 (ECF No. 2180).

21.     Attached hereto as **Exhibit O** is a true correct copy of the Certified Reporter's Transcript of the trial on October 27, 2023.

22.     Attached hereto as **Exhibit P** is a true correct copy of the Certified Reporter's Transcript of the Status Conference on January 29, 2024.

23.     Attached hereto as **Exhibit Q** is a true correct copy of the Certified Reporter's Transcript of the Sentencing Hearing on August 28, 2024.

24.     Attached hereto as **Exhibit R** is a true and correct copy of the Presentence Investigation Report, filed on August 26, 2024 (ECF No. 2164). Which is currently being submitted under seal pursuant to Ninth Circuit Rule 27-13(d).

25.     Attached hereto as **Exhibit S** is a true and correct copy of a Psychiatric Memo from, Dr. Alvin, C. Burstein, M.D. dated June 11, 2024.  Which is currently being submitted under seal pursuant to Ninth Circuit Rule 27-13(d).

26.     Attached hereto as **Exhibit T** is a true and correct copy of the Order re Motions *in Limine*, issued on July 24, 2023 (ECF No. 1643).

27.     Attached hereto as **Exhibit U** is a true correct copy of the Certified Reporter's Transcript of the trial on November 1, 2023.

28.     Attached hereto as **Exhibit V** is a true correct copy of Defendants Spear's Joinder to Defendant Brunst's Motion to Seek Admission of Brunst's Testimony Re: State of Mind, filed on October 22, 2023 (ECF No. 1888).

29.     Attached hereto as **Exhibit W** is a true correct copy of the Certified Reporter's Transcript of the Status Conference on May 13, 2024.

30.     On August 30, 2024, I conferred with counsel for the United States, Assistant United States Attorney Kevin Rapp.  Mr. Rapp informed me that the government opposes the relief sought in Mr. Spear's emergency motion to stay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 3rd day of September, 2024, at Los Angeles, California.

*/s/ Alyssa D. Bell*
Alyssa D. Bell

# EXHIBIT A

FILED _____ LODGED
RECEIVED _____ COPY

JUL 2 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>    v.<br><br>1. Michael Lacey<br>    (Counts 1-70, 81, 83-84, 86, 88-92,<br>    and 94-100)<br><br>2. James Larkin<br>    (Counts 1-68, 80, and 87)<br><br>3. Scott Spear<br>    (Counts 1-68, 71-78, 85, and 93)<br><br>4. John "Jed" Brunst<br>    (Counts 1-70, 78-84, and 86-93)<br><br>5. Dan Hyer<br>    (Counts 1-68)<br><br>6. Andrew Padilla<br>    (Counts 1-51)<br><br>7. Joye Vaught<br>    (Counts 1-51)<br><br>        Defendants. | No. CR 18-422-PHX-SPL (BSB)<br><br>**SUPERSEDING<br>INDICTMENT**<br><br>VIO:  18 U.S.C. § 371<br>       (Conspiracy)<br>       Count 1<br><br>       18 U.S.C. § 1952(a)(3)(A)<br>       (Travel Act—Facilitate Prostitution)<br>       Counts 2-51<br><br>       18 U.S.C. § 1956(h)<br>       (Conspiracy to Commit Money<br>       Laundering)<br>       Count 52<br><br>       18 U.S.C. § 1956(a)(1)(B)(i)<br>       (Concealment Money Laundering)<br>       Counts 53-62<br><br>       18 U.S.C. § 1956(a)(2)(A)<br>       (International Promotional Money<br>       Laundering)<br>       Counts 63-68<br><br>       18 U.S.C. § 1957(a)<br>       (Transactional Money Laundering)<br>       Counts 69-99<br><br>       18 U.S.C. § 1956(a)(2)(B)(i)<br>       (International Concealment Money<br>       Laundering)<br>       Count 100 |

18 U.S.C. §§ 981(a)(1)(C),
982(a)(1) and (b); 21 U.S.C.
§ 853(p); 28 U.S.C. § 2461(c)
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

**A.   Introduction**

1.     The website www.backpage.com ("Backpage") was, until being shut down by federal law enforcement authorities in April 2018, notorious for being the internet's leading source of prostitution advertisements.   Backpage derived the overwhelming majority of its revenue from such ads.   These practices enabled Backpage to earn over $500 million in prostitution-related revenue during its fourteen years of existence.

2.     Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F.  From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction.  Additionally, LACEY and LARKIN retained significant control over the website (and continued receiving tens of millions of dollars of Backpage-related distributions) after purportedly selling their interests in Backpage in 2015.

3.     Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.     Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.     Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.     Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7.     Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.     The defendants identified above are referred to at times in this Superseding Indictment as the "BACKPAGE DEFENDANTS."

9.     As explained in detail below, the BACKPAGE DEFENDANTS were aware that the vast majority of the "adult" and "escort" ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity.   For example, during Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business.   These affirmative content-creation efforts, which were described internally as "content aggregation" or the "Dallas Plan," were vital to Backpage's early growth and success.

10.     Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution.  For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts.  Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

11.     In addition to affirmatively creating prostitution-related content and intentionally soliciting prostitution-related business, Backpage also utilized a variety of strategies to conceal the true nature of the ads being posted on its website.  Most notably, Backpage periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offered sexual services in return for money.  The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming

majority of the website's ads still involved prostitution.  In one internal document, LACEY actually bragged about the company's contributions to the prostitution industry: "Backpage is part of the solution.  Eliminating adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . .  For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."

12.     Notwithstanding these private admissions, the BACKPAGE DEFENDANTS took pains to mislead the public, regulators, and law enforcement officials concerning the supposed sincerity of Backpage's efforts to prevent the publication of prostitution-related ads.  For example, after reviewing LACEY's written description of Backpage's contributions to the prostitution industry and editing practices, LARKIN instructed C.F. to prevent "any of the information in this being made public."  PADILLA, who helped supervise Backpage's moderators, threatened to fire any employee who acknowledged in writing that the "escorts" depicted in the website's ads were actually prostitutes:  "Leaving notes . . . implying that we're aware of prostitution . . . is enough to lose your job over."  And in one internal document, Backpage's media strategy was described simply as "Do not acknowledge the prostitution."

13.     Many of the ads published on Backpage depicted children who were victims of sex trafficking.  Once again, although Backpage sought to create the perception that it was diligently attempting to prevent the publication of such ads, the reality is that Backpage allowed such ads to be published while declining—for financial reasons—to take necessary steps to address the problem.  For example, for several years, Backpage's official policy, when presented with an ad featuring the prostitution of a child, was to delete the particular words in the ad denoting the child's age and then publish a revised version of the ad.  Such editing, of course, did nothing to change the fact the ad featured the prostitution of a child— it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps trafficking children) evade detection.  Similarly, in April 2011, several BACKPAGE DEFENDANTS were warned that the term "New In Town" was a coded phrase used by "pimps who shuttle children to locations where they do not know anyone and cannot get

- 4 -

help." Nevertheless, Backpage continued for the next seven years to permit ads using the phrase "New In Town" to be published on its website.

14.     Backpage also contributed to the proliferation of ads featuring the prostitution of children in other ways. For example, an anti-sex trafficking organization once suggested that Backpage provide an automatic warning message whenever a customer searched for particular terms indicative of the prostitution of a child. In response, C.F. acknowledged the proposal was a good one but declined to adopt it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AGs [state attorneys general] so it has little PR value. It is a low priority." Backpage also claimed it did everything in its power to alert the National Center for Missing and Exploited Children ("NCMEC") whenever it became aware that a child was being advertised on its website. However, the BACKPAGE DEFENDANTS implemented policies to artificially limit such referrals. In one training document, moderators were instructed not to send emergency alerts to NCMEC in response to complaints filed by the grandparents and other extended family members of children being advertised on the website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

15.     Virtually every dollar flowing into Backpage's coffers represented the proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. In response, the BACKPAGE DEFENDANTS pursued an array of money laundering strategies. These strategies included (a) instructing customers to send checks and money orders to a particular Post Office box, depositing those payments in bank accounts held in the name of entities with no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain BACKPAGE DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing

operations), and (c) converting customer payments, and the proceeds of Backpage's business, into cryptocurrency.

16. The BACKPAGE DEFENDANTS also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in July 2016, LACEY wrote an email seeking assistance in "put[ting] some assets in place[s] where . . . government parties . . . can not access my accounts." A few months later, LACEY asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government. Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary. At the time of the Hungarian transfer, LACEY was facing criminal charges in California state court and was aware of the federal grand jury investigation in this matter.

17. For all of these reasons, the BACKPAGE DEFENDANTS are charged in this superseding indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment, transactional, international promotional, and international concealment money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

**B.    Backpage's Origins, Ownership, and Control**

18. LACEY and LARKIN are the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona. Over time, LACEY and LARKIN acquired several other alternative newspapers, which they came to operate through entities called New Times Media and Village Voice Media Holdings (referred to collectively for ease of reference as "VVMH"). Additionally, SPEAR served as VVMH's Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

19. The publications within the VVMH newspaper chain routinely featured illegal prostitution ads. In fact, more than 30 years ago, a federal court affirmed the conviction of the operator of a prostitution business (which masqueraded as a massage parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

1    *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C.

2    § 1952, one of the same crimes charged in this Superseding Indictment.

3          20.    By 2000, the rise of the internet—and, in particular, the website

4    www.craigslist.com ("Craigslist"), which offered free classified ads—began to

5    significantly disrupt VVMH's business model, which depended on classified advertising

6    revenue for survival.

7          21.    LACEY and LARKIN, with assistance from C.F., sought to address this

8    threat by creating Backpage. Their decision to create Backpage was later described in an

9    internal company document as follows: "In 2004, in response to the Craigslist threat that

10    was decimating daily newspapers, VVM launched its own online classified site,

11    Backpage.com, named after the back page of VVM's print publication."

12          22.    During its first few years of operation, Backpage accounted for only a

13    fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that

14    Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage

15    had "tremendous upside potential."

16          23.    This prediction proved prophetic. By 2008, Backpage was generating over

17    $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

18          24.    In 2010, Craiglist chose to shut down its "adult" section due to the prevalence

19    of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS,

20    sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share

21    of this market. In one internal document, LARKIN commented: "Craigslist has folded

22    . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .

23    We have with the Village Voice probably the longest run of adult content advertising in

24    the US and it is, like it or not, in our DNA."

25          25.    This push was successful. In internal documents, Backpage stated that it

26    experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."

27    Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

28    over $78 million in 2012.

26.    These figures dwarfed the profits that VVMH's print publications were generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.   Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

27.    Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

28.    Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

29.    In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

30.    In fact, these Dutch entities were controlled by C.F., who simply "borrowed" most of the $600 million from entities controlled by the sellers to finance the purchase.  Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

31.    LACEY, LARKIN, SPEAR, and BRUNST also retained significant operational control over Backpage following these transactions.  For example, the April 2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to

- 8 –

1   provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited

2   C.F. from opening new bank accounts on Backpage's behalf without the lenders' consent.

3        32.    LARKIN and others also met regularly with C.F. following the April 2015

4   transaction to discuss and direct the operation of Backpage's business, often taking steps

5   (such as avoiding the use of email and holding the meetings in the presence of attorneys)

6   intended to conceal their continued involvement in, and control over, the company.

7   Through these mechanisms, LARKIN and others exerted post-April 2015 control over

8   Backpage's banking relationships, the migration of some of Backpage's operations to the

9   Philippines, the management of Backpage's counsel, Backpage's acceptance of gift cards,

10  Backpage's response to a Senate investigation, and Backpage's licensing agreements.

11  Additionally, LARKIN and others took steps in 2018 to attempt to sell the company to a

12  new buyer.

13  **C.**    **Knowledge And Facilitation Of Prostitution**

14       33.    Prostitution is illegal in 49 states and in most of Nevada.  Advertisements for

15  prostitution services in those locations are, therefore, not protected by the First

16  Amendment.

17       34.    As explained below, the BACKPAGE DEFENDANTS were aware that the

18  overwhelming majority of the website's "adult" and "escort" ads were actually ads for

19  prostitution and took a variety of steps to intentionally facilitate that illegal activity.  These

20  steps evolved over time and included, but were not limited to, creating free ads for

21  prostitutes in an attempt to secure future advertising revenues from them (*i.e.,* "content

22  aggregation"), entering into formal business arrangements with known prostitution

23  services and websites in an attempt to increase the volume of prostitution advertisements

24  being posted on Backpage (*i.e.,* reciprocal link and affiliate programs), and sanitizing ads

25  by editing them—specifically, removing terms and pictures that were particularly

26  indicative of prostitution and then publishing a revised version of the ad (*i.e.,*

27  "moderation").

28

i.    **Aggregation**

35.    On or about April 10, 2007, SPEAR sent an email to HYER and C.F. concerning HYER's aggregation efforts in Dallas. SPEAR encouraged HYER and C.F. to create a "blueprint" for "moving that process to other cities."

36.    Included as an attachment to this email was a document entitled "Dallas success in other markets." This document described Backpage's aggregation process in extensive detail. Among other things, it explained how Backpage employees would "secure content" by running Google searches to identify prostitutes advertising on other websites, then "Call clients. Ask them if they have tried backpage.com. If not, post a free ad with an auto repost for free for six weeks." The document further stated: "Dan Hyer to direct and manage this process for all the cities. [C.F.] to consult and supervise."

37.    Also included, as another attachment to this email, was a document entitled "Class Director Steps to grow Backpage.com visits and revenue." Under the heading "Aggregating Content," it explained: "For the past 6 months we have uploaded 25 adult . . . leads each week. Leads come from Adult websites, the Gay publication here in Dallas, and the daily paper."

38.    On or about June 15, 2007, several Backpage principals, including SPEAR, HYER, and C.F., met in Oregon to discuss various Backpage-related developments. The agenda for this meeting stated that HYER would be presenting on the topic "How Dallas grew to $40K+ per month" and that this revenue growth was driven in part by creating "adult content online for free" by posting "20 free adult ads per week for prospects on other sites with a 6 week auto repost for free."

39.    On July 18, 2007, HYER sent an email that, among other things, summarized Backpage's "Aggregation" efforts. It stated that Backpage's employees were responsible for "Aggregat[ing] new adult content from other sites."

40.    On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments. The agenda for this meeting included a "Dallas aggregation update."

41.     On or about August 20, 2007, SPEAR sent an email to LARKIN, C.F., and another Backpage principal.  Enclosed with that email was an agenda for a meeting to be held later that day.  The agenda provided for another "Dallas aggregation update" and stated that Backpage employees were "Wrapping up [aggregation] in SF, Nashville, KC and OC."

42.     On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST.  Among other things, it stated that Backpage intended to expand the Dallas aggregation efforts to other cities: "Create additional Dallas adult revenue models in LA and NY."  This document also contained a detailed summary of how the aggregation process worked ("Here's the detail on what the backpage staff does to create Dallas like results"), which included "Set up free user posting (250 to 500 postings per market)."

43.     In November 2008, an internal company email was sent to LARKIN, C.F., and others stating that Backpage had just experienced its "best month ever" in terms of revenue.  In response, C.F. sent a series of emails explaining that nearly all of the revenue growth was due to HYER's aggregation efforts in Dallas: "btw: the revenue wasn;t [sic] that great except for dallas. . . . Dallas sure gave us a nice bump.  Hyer's done an awesome job with his marketing crew."

44.     On or about October 25, 2013, C.F. sent an email to SPEAR summarizing his "to do list" for Backpage.  It included a plan to hire "Content creators" in the Netherlands to create free ads on Backpage for potential customers who were posting on "competing sites."

ii.     **Reciprocal Link And Affiliate Programs**

45.     On July 2, 2007, C.F. sent an email to SPEAR entitled "The erotic review."  In this email, C.F. explained that Backpage received "2 million page views, 150,000 visits from the erotic review per month.  They bring in more referrals than the Village Voice."  C.F. also sought permission from SPEAR to initiate a business arrangement with TER under which the two companies would post reciprocal ads on each other's website.

- 11 –

46.    On July 16, 2007, HYER sent an email to SPEAR and C.F. summarizing various criticisms of a particular Backpage employee.  Among other thing, the email chain stated that the employee was deleting adult ads too quickly, which "kills the sites seo [search engine optimization] as in no traffic from TheEroticReview.com. . . .  Why care? Without TheEroticReview traffic you might as well kiss any growth in [that city] good bye."  On August 31, 2007, C.F. sent a follow-up email to HYER concerning this employee that explained:  "We have a deal with the TER.  It's a reciprocal link program where we get an additional million page views from TER. . . .  The TER deal is very big for us.  The internet makes strange bed fellows."

47.    On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments.  The agenda for this meeting stated that Backpage intended to "Trade with TER" in order to "increase traffic in adult."

48.    On or about August 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments.  The agenda for this meeting provided an update on the previous efforts to create a business partnership with The Erotic Review, stating:  "Trade with TER – complete."

49.    On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST.  Among other things, it stated that Backpage intended to "look for more relationships like TER to drive traffic" and to "Expand relationship with TER."  The document also stated that, when seeking to expand Backpage's business in particular cities, Backpage employees would "Set up 100 fresh TER reciprocal links to the specific city" and that a key to Backpage's growth was "Drive traffic via reciprocal links . . . .  Example of PR [public relations] is the posting in the forums in TER talking about us."

50.    On or about December 20, 2007, C.F. provided a document entitled "2008 Budget and Business Plan for Backpage.com" to LARKIN, SPEAR, and potentially others. Among other things, it explained:  "In terms of marketing, we struck a deal with

TheEroticReview (TER) with reciprocal links.  It created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day."

51.    On or about December 14, 2008, C.F. provided SPEAR with a document discussing Backpage's budget.  Among other things, it noted that Backpage was paying $4,000 per month (*i.e.,* nearly $50,000 per year) to place advertisements on The Erotic Review ("4k- banner ad on ter").  The document further noted that "We have made a special buy with TER in terms of high quality referrals."

52.    On or about December 17, 2008, C.F. distributed, to other Backpage principals, a document entitled "How We Are Going To Get There In 2009."  Among other things, this document identified Backpage's top marketing strategy as "TER- high page view per referral" and stated "We have made a special buy with TER in terms of high qualify referrals."

53.    On May 7, 2009, HYER and C.F. exchanged emails concerning how to improve Backpage's business relationship with TER, with C.F. commenting:  "I think we need to move some staff on this project and make one more play to get to 40,000 referrals per day."

54.    On May 11, 2009, LARKIN forwarded a news article to SPEAR and C.F. that described a recent "prostitution bust" in Phoenix in which 43 people were "indicted on charges of having roles in a prostitution syndicate."  The article further noted that some of the defendants had provided reviews on TER, which was described in the article as a "prostitution website."  In the subject line of the email, LARKIN summarized the article's contents as follows: "johns accused of favorably rating escorts on Erotic Review in exchange for discounts."

55.    Between around June 10, 2009, and June 19, 2009, HYER and C.F. exchanged additional emails concerning how to improve Backpage's business relationship with TER.  In one email, C.F. stated:  "I need help creating a wish list to discuss with the TER people. . . .  We can get to 40k in referrals by 2010."

56.    On or about November 1, 2011, C.F. met with LARKIN and SPEAR to

- 13 -

1  discuss Backpage-related developments. The agenda for this meeting noted that Backpage

2  was still obtaining "very strong referral traffic" based on its "Reciprocal link relationships"

3  and stated that Backpage was considering a "move offshore" because such a move would

4  "Minimize restrictions" and "Allow more skin."

5     57.   The BACKPAGE DEFENDANTS were routinely forwarded and/or briefed

6  about "Google Analytics" reports, which provided a monthly snapshot of which other

7  websites were referring users to Backpage. For example, on July 27, 2012, LARKIN sent

8  an email to SPEAR, BRUNST, and C.F. stating: "[C.F], Jed, and Scott: These are the

9  topics I would like to cover in our discussion 10:00 am Wednesday in Phoenix. . . .

10  [A]nalytics . . . ." On December 19, 2012, C.F. sent an email to LARKIN, SPEAR, and

11  BRUNST that included, as attachments, various Google Analytics reports. And on March

12  4, 2014, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email from another

13  executive stating: "I have attached 2 items. An agenda for tomorrow and an excerpt from

14  Google Analytics to show a comparison of January and February."

15     58.   These Google Analytics reports confirmed that TER was playing a crucial

16  role in driving traffic to the Backpage website. For example, the monthly report for January

17  2009 stated that TER was the #1 outside source of referrals and was responsible for over

18  half a million visits that month. The daily report for March 22, 2010 showed that TER was

19  responsible for referring more than 40,000 daily visits to Backpage—more than six times

20  as many as the next-biggest referral source. The daily report for February 1, 2012, again

21  showed that TER was responsible for referring more than 40,000 daily visits to

22  Backpage—more than three times as many as the next-biggest referral source. The

23  monthly report for August 2013 showed that TER was responsible for nearly 1 million

24  visits each month. And the monthly report for November 2014 showed that, once again,

25  TER was the #1 source of non-search engine referrals.

26     59.   In addition to pursuing a formal partnership with TER, Backpage also formed

27  "affiliate" partnerships with other organizations and individuals who were known to be

28  involved in the prostitution industry. One such individual, known as "Dollar Bill," earned

1     fees in return for arranging for prostitutes and pimps to post ads on Backpage.

2         60.     On March 5, 2010, PADILLA received an email from a co-worker that

3 described Dollar Bill as a "super affiliate" and sought PADILLA's assistance in restoring

4 two of Dollar Bill's ads that had been deleted from Backpage. In response, PADILLA

5 stated "i'm working . . . on it now" and forwarded the email chain to C.F.

6         61.     On or around March 18, 2010, Backpage deleted over 4,000 ads that had been

7 presented by Dollar Bill. After Dollar Bill called to complain, PADILLA sent an email to

8 Backpage's computer programmers stating that "4200 ads need to be restored" and

9 explaining that "[t]his is one of our largest adult accounts and the restoration of these ads

10 is a high priority for us."

11         62.     On April 15, 2010, Dollar Bill sent an email to C.F. proposing the creation

12 of a new website called "Dollar Bills Escort Roundup" that would "discuss[] issues in the

13 escort business and give[] insider info from an Editor who knows the biz from both sides

14 via my unique relationship with the girls." The email further stated that the proposed new

15 website "could sell ads in local areas just like best gfe does."

16         63.     On October 24, 2010, Dollar Bill sent an email to C.F. requesting a reduction

17 in the rates that Backpage was him charging for ads. Dollar Bill argued he was entitled to

18 such a reduction because "I've championed Backpage in print and with the girls in the past"

19 and because "I don't feel there should be a statute of limitations on residual benefits

20 Backpage gives me for my previous contributions which by your own admission were

21 consideration. . . . [W]hy would you want to raise my rate when I was so instrumental in

22 building New York, where you're making a bloody fortune?"

23         64.     On October 25, 2010, Dollar Bill sent an email to C.F. complaining about

24 Backpage's decision to refuse one of his ads even though "IT NEVER SAID GFE" and

25 noting that other, even more obvious prostitution ads had been published despite "saying

26 GFE."

27         65.     On December 29, 2010, HYER sent an email to SPEAR and C.F. entitled

28 "Sales & Marketing 2011 Working Agenda." One of the agenda items was "[Dollar] Bill

. . . rate increase."

66.     On February 26, 2011, Dollar Bill wrote an email to C.F. complaining that the nude pictures had been stripped out of one of his ads (which was entitled "real-crazy-party-asian-girl-23"). In response, C.F. advised Dollar Bill that "[t]his user sneaking in nudes may need to be set for forced moderation" and then forwarded the email chain to HYER, who adjusted Backpage's filter accordingly.

67.     On December 21, 2011, Dollar Bill wrote an email to C.F. discussing whether Backpage would publish 15 ads depicting a particular "girl" who "makes about 10 grand a week . . . owns 4 apartments . . . and a store! . . . [A] millionaire several times over at age 28. And all from being an escort!" In response, C.F. stated that the enclosed picture was "a little too nude for us" and provided advice to Dollar Bill on how to wordsmith ads so they wouldn't be rejected by Backpage's moderators.

### iii.     Moderation And Notice

68.     In April 2008, C.F. wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue." Thus, he instructed Backpage's technical staff to edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

69.     On February 26, 2009, C.F. received an email asking why Backpage's terms of service purported to prevent customers from "suggest[ing] an exchange of sexual favors for money" in light of the fact that "[c]learly everyone on the entire backpage network breaks the rules." In response, C.F. didn't dispute the author's characterization and explained that Backpage had simply added the terms of service at the behest of "our attorney in SF" in an attempt to avoid liability in civil lawsuits.

70.     On May 25, 2009, SPEAR received an email summarizing a plan to begin "remov[ing] sex act pics and coded terms" from Backpage ads. Later that day, C.F. forwarded this email to HYER with the explanatory note that "We do not intend to be a

1    craig[slist] here, just get out the most egregious stuff."

2    71.    On March 8, 2010, C.F. testified in federal court (the United States District

3    Court for the Southern District of Florida) in the criminal trial of a pimp who had used

4    Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant

5    had used the email address "Youngpimpin86" when posting the ads.   C.F. also

6    acknowledged that the ads described one so-called escort as "five-foot-three, with a small

7    waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

8    a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

9    girl who absolutely adores a man who understands the many desires of a young beautiful

10   woman and how to accommodate a variety of fantasies."  This episode provided notice to

11   Backpage that it was implausible to pretend such ads were merely offering lawful escort

12   services.

13   72.    On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

14   that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

15   would have their ads deleted and be banned from the website.  However, PADILLA also

16   stated the bans would only be temporary and that "we'll do everything we can to affect

17   only the worst apples."

18   73.    On September 1, 2010, SPEAR received an email acknowledging that

19   Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

20   and "Remove any illegal text in escorts [ads] to include any code words for sex act for

21   money."

22   74.    On September 21, 2010, a group of state attorneys general wrote a letter to

23   Backpage.  This letter observed that "ads for prostitution—including ads trafficking

24   children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will

25   not, adequately screen these ads, it should stop accepting them altogether."  The letter

26   acknowledged that this step would cause Backpage to "lose the considerable revenue

27   generated by the adult services ads" but stated that "no amount of money can justify the

28   scourge of illegal prostitution, and the misery of the women and children who will continue

1    to be victimized, in the marketplace provided by backpage."

2        75.    On September 25, 2010, C.F. wrote an email explaining that Backpage was

3    unwilling to delete ads that included terms indicative of prostitution because doing so

4    would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund

5    those customers' fees. Thus, C.F. announced that Backpage would "go back to having our

6    moderators remove bad content in a post . . . ."

7        76.    On September 30, 2010, C.F. testified in federal court (the United States

8    District Court for the District of Minnesota) in the criminal trial of a pimp who had used

9    Backpage to post prostitution ads.    During his testimony, C.F. acknowledged that

10   Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based

11   defendant had therefore "traveled across state lines."

12       77.    On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd)

13   threatening to fire any Backpage employee who acknowledged, in writing, that a customer

14   was a prostitute:  "Leaving notes on our site that imply that we're aware of prostitution, or

15   in any position to define it, is enough to lose your job over. . . .  This isn't open for

16   discussion. If you don't agree with what I'm saying completely, you need to find another

17   job."

18       78.    On October 16, 2010, PADILLA sent an email to a large group of Backpage

19   employees (including HYER and VAUGHT).    The email had two attachments that

20   provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that

21   displayed a series of 38 nude and partially-nude photographs, some of which depicted

22   graphic sex acts.    Next to each picture was an instruction as to whether it should be

23   approved or disapproved by a Backpage moderator. These instructions included "Approve.

24   Nude rear shots are okay as long the model is not exposing her anus or genitalia." and

25   "Approve.   Rear shot okay.   Transparent wet panties okay."   The second was an Excel

26   spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should

27   be "stripped" from ads before publication.   PADILLA concluded the email by stating:

28   "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are

- 18 -

almost an afterthought to them."

79.     On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

80.     On October 21, 2010, C.F. sent an email to PADILLA stating: "Maybe lighten up on the images moderation. Spear tells me it's the text that is the problem." In response, PADILLA wrote: "[T]hat's the training i've given the staff."

81.     On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

82.     On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender. We will not remove ads with rates under an hour, just the text with the minimum rates. Users need time to react to this change."

83.     On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads. In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language: "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users. Your crew has permission to edit out text violations and images and then approve the ad."

84.     On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.,* state attorneys general] later this week so cleaning up old stuff is important."

85.     On November 17, 2010, HYER and PADILLA received an email

acknowledging that the term Lolita is "code for under aged girl" but explaining that this term could simply be stripped out from ads (as opposed to refusing to publish the ad). The email also explained that customers should be allowed to include their identification numbers from The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

86. On November 30, 2010, LARKIN, SPEAR, and other Backpage representatives participated in a conference call with representatives from NCMEC. During this call, the Backpage representatives were advised that a large portion of the ads on Backpage were blatant prostitution ads, that many of those ads featured children, and that the posting of such ads was illegal in every state.

87. In December 2010, HYER, PADILLA, and others exchanged a series of emails entitled "Deep cleaning strip out." These emails identified a lengthy list of terms that were indicative of prostitution and discussed plans for removing the terms from the old ads in Backpage's archives. During this exchange, C.F. stated that Backpage wasn't willing to delete the old prostitution ads because "our users love" having access them, "[s]o, best to do deep cleaning and not kill a valuable feature." C.F. later encouraged Backpage's staff to complete the project quickly to avoid scrutiny: "This task is urgent since CNN is runing [sic] a report soon."

88. On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff. It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas. I would rather not testify in court as to why my staff 'approved' . . . postings."

89. In January 2011, LARKIN and LACEY met with a representative from NCMEC. During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

90. On January 31, 2011, and February 1, 2011, C.F. engaged in an email

- 20 –

exchange concerning whether to remove links to other prostitution websites (such as TER) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

91.    On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her remaining photos, allowed her ad (which was obviously for prostitution) to remain on the website, and offered her a free upgrade.

92.    On February 8, 2011, C.F. testified in federal court (the United States District Court for the Middle District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads the defendant had placed on Backpage, whose title was "Extra horny sexy newbie," confirmed that Backpage had allowed this ad to be posted multiple times in various East Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This episode provided further notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

93.    On February 16, 2011, PADILLA sent an email to Backpage's India-based moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy on some types of violations." PADILLA acknowledged this approach would "likely" result in more "violations" but emphasized that "moderators should err on the side of the user."

94.    On February 16, 2011, PADILLA sent a separate email discussing whether

several terms should remain on Backpage's "filtered terms" list. During this discussion, PADILLA acknowledged—by placing quote marks around the term "companionship"—that he didn't actually believe the women being advertised on Backpage were providing lawful escort services: "[The term] implies some exchange of bodily fluids which kills our 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

95.     On February 22, 2011, PADILLA received an email requesting Backpage's "list of banned, stripped out adult terms." In response, PADILLA sent an Excel spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest version of the list." The enclosed spreadsheet identified over 660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young"). The spreadsheet explained that most such terms were simply to be "filtered" from the ads in which they appeared.

96.     On February 23, 2011, PADILLA received an email concerning a particular ad that had been edited by Backpage's India-based moderators. The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules. In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published. The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing. To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again: "2 out of 3 pics should have been removed. But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator in Phoenix if they did this."

97.     In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC. During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant

- 22 -

prostitution ads.  The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.

98.     On or about March 9, 2011, C.F. distributed, to other Backpage principals, a document entitled "Backpage Growth Agenda."  Among other things, this document stated that the company intended to renew its focus on "growth and efficiency" by "adjust[ing] content rules to be more flexible" and to permit more coded terms:  "Allow 30 minutes, naughty, etc.  Nipples."  This document also discussed plans to expand to certain countries in Europe, where Backpage would explicitly "Allow nudity and sex for money text."

99.     On April 5, 2011, PADILLA sent an email whose recipients included VAUGHT and the supervisor of Backpage's Indian moderation team.  The email was entitled "relaxed image standards" and included, as an attachment, a document that displayed a series of 30 nude and partially-nude photographs.  Next to each picture was an instruction as to whether it should be approved or disapproved by a moderator.  One picture showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread open and her hand partially covering her crotch.  The caption provided in part:  "okay – but barely."

100.     On April 27, 2011, LARKIN, SPEAR, C.F., and others received an email from a firm that Backpage had hired to assist with "internet safety" issues.  Enclosed with the email was a list of recommended "action items" for the company to pursue.  One such item, listed in the category of "Finding Illegal Ads," warned that "'New In Town' terminology is often used by pimps who shuttle children to different locations where they do not know anyone and cannot get help."  Another item, also listed in the category of "Finding Illegal Ads," recommended that Backpage should "[d]etermine if there is a way to figure out if a [credit] card being used is prepaid; this could be one indicator (of many) . . . as a potential trafficking ad."  And yet another recommendation, under the category of "Finding Illegal Ads," was to "[c]reate a way to figure out if one phone number is being used on numerous different ads . . . [because] this could indicate a prostitution situation or a human trafficking situation."

101.   Backpage disregarded all of these recommendations.  After April 2011, the company continued publishing ads using the phrase "New In Town," continued accepting prepaid credit cards (in fact, such cards supplied a large portion of the company's revenues), and continued allowing a person with a single phone number to post advertisements for multiple "escorts."

102.   Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects."  The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

103.   On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded:  "do it!"

104.   On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person."  C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list.  In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

105.   On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General.  During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website.  In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they

1    called for services would be offering to go out for coffee?"  A Backpage representative

2    responded to this question by looking at C.F., laughing, and acknowledging that Backpage

3    couldn't "deny the undeniable."

4        106.    On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

5    identical email to LARKIN and LACEY, concerning the possibility of using age-

6    verification software.  In this email, C.F. acknowledged the software might be beneficial

7    ("This might be our solution") but recommended against its wholesale adoption because it

8    would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

9        107.    On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage

10   understood."  In this document, LACEY bragged about Backpage's contributions to the

11   prostitution industry:  "Backpage is part of the solution.  Eliminating our adult advertising

12   will in no way eliminate or even reduce the incidence of prostitution in this country. . . .

13   For the very first time, the oldest profession in the world has transparency, record keeping

14   and safeguards."  LACEY also acknowledged that Backpage used an automatic filter to

15   remove particular phrases from ads that were indicative of prostitution but still published

16   the ads after editing them.

17       108.    Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note

18   cautioning against some of LACEY's statements "being made public" because "we need

19   to stay away from the very idea of 'editing' the posts, as you know."  C.F., in turn, revised

20   the editorial to take out the paragraph lauding Backpage's contributions to the prostitution

21   industry.

22       109.    On August 5, 2011, Backpage received a letter from the mayor of Seattle.

23   This letter warned that "Seattle Police have identified an alarming number of juvenile

24   prostitutes advertised on Backpage.com since January 2010" and explained that Backpage

25   was dissimilar from other companies whose products and services are "occasionally or

26   incidentally" utilized by criminals because "[y]our company is in the business of selling

27   sex ads" and "your services are a direct vehicle for prostitution."  The letter also

28   recommended that Backpage require in-person age verification for all of the "escorts"

1   depicted in its ads.  Afterward, Backpage declined to adopt these recommendations.

2   110.   On August 15, 2011, PADILLA received an email containing an updated

3   version of Backpage's moderation guidelines.  This six-page document provided the

4   following instructions concerning photographs:  "Nude rear shots are okay as long the

5   model is not exposing her anus or genitalia," "Transparent wet panties okay should not be

6   able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]."  The

7   document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples

8   are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

9   111.   On August 31, 2011, Backpage received a letter from the National

10  Association of Attorneys General.  This letter characterized Backpage as "a hub" for

11  human trafficking, identified "more than 50 instances, in 22 states over three years, of

12  charges filed against those trafficking or attempting to traffic minors on Backpage.com,"

13  and noted that "[n]early naked persons in provocative positions are pictured in nearly every

14  adult services advertisement on Backpage.com and the site requires advertisements for

15  escorts, and other similar 'services,' to include hourly rates.  It does not require forensic

16  training to understand that these advertisements are for prostitution."

17  112.   In or around September 2011, certain BACKPAGE DEFENDANTS assisted

18  in the creation of a Powerpoint presentation, entitled "Management Presentation," that was

19  intended to describe Backpage's business model to potential buyers.  This presentation

20  acknowledged that the non-adult sections of the Backpage website were simply intended

21  to "allow[] 'plausible deniability,'" to make the website more palatable to "regulatory and

22  law enforcement" officials, and to otherwise make Backpage's adult section more

23  "defensible."

24  113.   On October 6, 2011, C.F. sent an email discussing various proposals for

25  addressing "the under aged issue."  With respect to one particular proposal, C.F.

26  acknowledged it was a good one but recommended against adopting it because Backpage

27  would not derive any public-relations benefit from doing so:  "This is a good idea but it is

28  not visible to AG's [state attorneys general] so it has little PR value.  It is a low priority."

114.   In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C.   On October 12, 2011, C.F. received a written copy of the firm's presentation.   Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail.   The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution."   The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

115.   On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.   This email contained the following joke:   "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

116.   On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:   "Remove ads with teens or remove the text teen from . . . ads."   The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

117.   Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.   These appraisals revealed that many of the moderators did "not report young looking escorts."   Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

118.   On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.   C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.   In one of the ads, a

1    customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/

2    condom" from a woman who "had nice breasts."  In a different ad, a customer stated that,

3    in return for $60, he had oral and vaginal sex with a prostitute.  And in a different ad, a

4    customer stated:  "Her bj was slow and erotic, and she was happy to go with whatever

5    position I wanted."  When C.F. forwarded these materials to Backpage's staff, he was asked

6    whether the corresponding ads appearing on Backpage's website should be removed

7    immediately.  C.F. replied that they should be allowed to remain on Backpage for another

8    few weeks without any modification.

9          119.   On March 15, 2012, HYER received an email concerning the ads with the

10   copyrighted material.  This email stated that the ads shouldn't be deleted and that

11   Backpage's technical staff should merely "strip out" the names of the competing

12   prostitution websites:  "Copyright infringement issue.  We need to strip out every

13   appearance of rubmaps.com and eroticmp.com."  When a staff member sought more

14   guidance, HYER interjected:  "We don't need to delete ads or users."

15         120.   On April 7, 2012, PADILLA was informed that a woman had contacted

16   Backpage to report that one of the "escorts" depicted on the site was only 17 years old.

17   The woman provided the juvenile's full name and birth year and further stated that the

18   juvenile had been attempting to recruit the complaining party's daughter (who was 15).  In

19   response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't

20   claiming her own daughter is in the ad."

21         121.   On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN]

22   and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the

23   prostitution of children on the site were "not perfect, by any means."

24         122.   On April 25, 2012, a Backpage representative spoke at a meeting of the New

25   York City Council's Women's Issues Committee.  During this meeting, the representative

26   stated it was better to have ads for sex work appear on Backpage than have them move to

27   other places on the internet.  The representative further stated:  "I don't deny that Backpage

28   is part of the problem, but the problem is the internet."

123.   On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will.  The email identified the specific phone number associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately:  "This is a drugged and held against her will child who had photos taken under threat and duress . . . .  Please remove."  This email was forwarded to PADILLA by a subordinate, who asked "should we respond?"    PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

124.   On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department.  In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive.  I have yet to receive a reply."  This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

125.   On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department.  In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated:  "I also found a pix of my daughter within this url both girls are in protective custody."  Later that day, the woman received an email from Backpage's support department stating:  "The post is confirmed removed."

126.   Some of these emails were forwarded to LACEY and LARKIN.  In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked:  "this whole rigamarole seems a little odd to me."

127.   On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

- 29 -

128. On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

129. On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

130. Between June 2012 and August 2012, a Backpage representative, E.M., engaged in correspondence with a vendor about potentially acquiring software "that could help Backpage screen for minors." In one email, sent on August 16, 2012, the vendor stated that he understood, from his discussions with E.M., that "Backpage has a problem with pimps phoning in false accusations that another advertiser's women are underage. Do we know if there is any public DB [database] that they might affordably access to solve this?" and further stated that the vendor could not assist with this "problem." In response, E.M. thanked the vendor for the information, sought additional information about the cost of the software, and forwarded the email chain to C.F.

131. In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

132. Between around September 2010 and October 2012, C.F. became aware that

- 30 -

1   a particular Backpage customer, P.R., was posting prostitution ads.  Rather than bar this

2   customer from posting future ads, C.F. repeatedly restored her posting privileges and gave

3   her advice on how to conform to Backpage's publication standards.  The communications

4   involving this woman's ads included the following:

5         •     On September 26, 2010, C.F. received an email from a woman who was

6   obviously posting prostitution ads on Backpage.  The woman, whose email address

7   included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses

8   special – Dont Miss out !!!") had been removed even though "[o]ther women have more

9   explicit ads than me and they are up!" The woman continued: "I can not afford to have

10   this ad removed.  This is the only way I can get by and if its not on all the time I will not

11   be able to pay my bills . . . .  My fiancé is in jail and he is not able to help me at this

12   point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

13         •     On October 6, 2010, C.F. received another email from the same woman.  In

14   this email, she complained that her most recent ad had been removed because it included

15   an explicit picture of her body.  She provided a copy of the picture to C.F. and stated: "If

16   the person [who removed the ad] is such a prude well maybe they should check out the

17   other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to

18   the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing

19   the ad now." After this exchange, the woman was permitted to resume posting ads on

20   Backpage.

21         •     On June 6, 2011, C.F. received another email from the same woman.  It

22   stated: "I would really appreciate it if you would please take the block off my ad for editing

23   . . . .  I wont post any more objectionable pics, ok?" In response, C.F. arranged for the

24   woman's editing and posting privileged to be restored: "You should be able to edit

25   now.  Please let us know if you are still having any trouble." After this exchange, the

26   woman resumed posting ads on Backpage.

27         •     On July 14, 2012, C.F. received another email from the same woman.  It

28   stated: "would you please take the edit block off my ad.  I need to change some info on it

1    and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y

2    ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed

3    to continue posting ads on Backpage.

4         •      On September 17, 2012, C.F. received another email from the same

5    woman. This time, she complained that Backpage was editing her ads (whose title

6    continued to feature the obvious prostitution term "50 Red roses special") to remove the

7    most explicit pictures. She stated: "I would like to know why my ad in the escort section

8    of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics

9    on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There

10   are other woman posting pics on their ads that show more nudity . . . ." After this exchange,

11   the woman was permitted to continue posting ads on Backpage.

12        •      On October 16, 2012, the woman wrote another email to Backpage. In this

13   email, she again complained about how Backpage was editing her ads to remove the most

14   explicit pictures. She stated: "It is very hard for me to make any income from this ad as

15   they continually go into my ad and remove the link from the ad that goes to my

16   pictures. They wont allow me to post my pics on the ad yet other women with other ads

17   show more nudity than my pictures ever did."

18        •      This email was forwarded to VAUGHT and to PADILLA, who asked

19   another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA

20   received a follow-up email from his co-worker stating that the woman's ad had been posted

21   on September 27, was still on the Backpage website, and that the pictures the woman had

22   originally attempted to include in the ad (which had been stripped by Backpage) were

23   "topless shots."

24        •      Following these exchanges, between October 2012 and November 2015, the

25   same customer was allowed to post over a dozen new ads on Backpage, many of which

26   utilized the same identifying information, coded prostitution terms, and contact phone

27   number as before.

28        133.    On January 7, 2013, VAUGHT was informed by a moderator that Backpage

– 32 –

wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored.  They get 'marked as read', but nothing gets done with them.  It's aggravating and irresponsible."

134.   On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children.  The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers.  Backpage declined to follow any of these recommendations.

135.   On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking."  In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

136.   On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking.  Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website.  In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement.  Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites.  During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

137.   On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada.  The email stated that "[w]e have multiple user accounts that are paying for your services for what I

understand to be prostitution advertisements" and sought information about "how you are processing these transactions."

138.   On April 14, 2014, LARKIN and BRUNST received an email from C.F. discussing why Backpage had experienced "past high growth" and identifying various ideas for achieving "future growth."   This email stated that Backpage had been the beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and identified one particular marketplace as a key source of Backpage's customers: "[N]et loss for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the internet."   In other words, the email acknowledged that the supposed "escorts" advertising on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs, hotels, and other brick-and-mortar "gathering spots" during the pre-internet age).   This email also attributed Backpage's success in part to its adoption of policies that allowed customers to post ads without leaving any meaningful identifying information—in a list of Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly," "User can post paid ads without a valid email address," and "bitcoin."

139.   On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while cc'ing PADILLA).   In this email, VAUGHT explained that if a moderator came across an ad containing a link to a "sex for money" website, the moderator should add the link to a list of banned terms but "don't bother removing it from the current ad."

140.   On September 4, 2014, Backpage was served with a brief that had been filed by NCMEC in a lawsuit in Washington state court.   In this brief, NCMEC criticized the sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly claimed in public statements and court filings that it is working to reduce child sex trafficking on its website.   The unpleasant reality is that Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex.   In practice, Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort

ads, including ads selling children for sex."

141.   On March 17, 2015, a law enforcement officer with the California Department of Justice spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage.  In response, the representative did not dispute the officer's characterization and said the internet and prostitution were not going away.

142.   On or about July 19, 2015, LACEY and LARKIN received a "Thank You Letter" from the Sex Worker's Outreach Project ("SWOP").  This letter lauded Backpage's contributions to the prostitution industry ("Backpage has made quite a difference for many of us . . . ."), thanked Backpage for continuing to permit sex workers "to advertise in the 'Adult' area," expressed gratitude for Backpage's willingness to accept alternative payment methods "as a way to pay for ads when MasterCard and Visa abruptly halted processing our credit card payments," and stated that Backpage had provided "our community an opportunity to learn how to use alternative payment methods, like Bitcoin."

143.   On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators.  This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term."  The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

144.   In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department.  In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."  During the same lawsuit in

Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

145. On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

146. On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since 2013, every single girl that was rescued was advertised on Backpage." The email also asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

147. In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites. On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

148. Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE." For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

149. In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the

term "GFE" (girlfriend experience) is a coded term for prostitution.  For example:

• On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained:  "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

• On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

• On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms."  The list included "GFE = girlfriend experience."

• On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not allowed."

150.   HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news.  Many of the news articles identified in these alerts discussed instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

151.   In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads were actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

152.   In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, the prostitution ads simply migrated to other sections of the website, where they remained until the website was shut down by federal law enforcement authorities in April 2018.

**D.    International Operations**

153.    In addition to facilitating prostitution through its U.S. website, Backpage also facilitated prostitution through its websites in foreign countries.  In this context, Backpage (as it did through its domestic "aggregation" efforts and the Dallas Plan) often affirmatively created the content of the prostitution ads being published.

154.    Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations.  Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer.  Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

155.    Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States.  For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST.  Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion."  One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff.  American staff makes contact."

156.    On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage."  This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target.  Backpage also provides sample 'scripts' and examples of phone

calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

157.   On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

158.   On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost." In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well. thanks for your help. I'm traveling today to [London] how can I change my location." This email exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

159.   On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B. This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database] (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) "Staff created free ad for lead (verification email sent)." (5) "Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

- 39 –

**E.    Select Victim Summaries**

160.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia.  Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money).  On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases.   In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words.  Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

161.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana.  Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage.  The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

162.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota.  Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads.  During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute.  During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

163.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington.  During this period, Victim 4 was a juvenile (15 years old).  Victim 4's pimp drafted the ads that were placed on Backpage.  The wording of these ads was edited by Backpage before publication.  The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

164.   Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island.  During much of this period, Victim 5 was a juvenile (14-19 years old).  Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification. On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old.  In response, the ad was simply resubmitted with a new (false) age of 19.  On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published.  Victim 5's Backpage ads included words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex).  Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

165.   In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona.  Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build.  On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

166.   Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon.  Victim 7's pimp drafted the ads that were placed on Backpage.  The wording of these ads was edited by Backpage before publication.  The ads contained provocative nude pictures of Victim 7.

167.   Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts.  During this period, Victim 8 was a juvenile (15 years old).  Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as

1  well as "out-calls" (where she was raped at other locations chosen by the men paying for

2  her).

3      168.   In or around 2013, Victim 9 was sold for sex, through the use of Backpage

4  ads, in Florida.  Victim 9's pimp taught her how to use code words in her Backpage ads to

5  indicate how much she was charging for certain sex acts.  Victim 9 was brutally attacked

6  by her trafficker, causing bruises and a fractured cheek bone.

7      169.   Between in or around 2014 and 2015, Victim 10 was sold for sex, through

8  the use of Backpage ads, in California and Arizona.  During some of this period, Victim

9  10 was a juvenile (17 years old).  An associate of Victim 10's pimp took pictures of her

10  and drafted the ads that were placed on Backpage.  The Backpage ads contained words and

11  phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like

12  fire" and included pictures of Victim 10 in provocative positions showing her legs,

13  stomach, shoulder, and buttocks.

14      170.   Between in or around 2014 and 2015, Victim 11 was sold for sex, through

15  the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana,

16  Nevada, New Mexico, and Utah.  The Backpage ads contained words and phrases

17  indicative of prostitution and included pictures of Victim 11 in provocative positions.  On

18  some occasions, Backpage would remove certain explicit photos from the ads but publish

19  the remaining text and other photos.  Victim 11's trafficker gave her drugs, took her

20  identification documents, sexually assaulted her with a firearm, and forced her to work full-

21  time as a prostitute.

22      171.   In or around 2015, Victim 12 was sold for sex, through the use of Backpage

23  ads, in California and Arizona.  Victim 12 was first advertised on Backpage in San

24  Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was

25  being held there.  Victim 12's advertisements on Backpage contained words and phrases

26  such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}"

27  and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

28      172.   In or around 2015, Victim 13 was sold for sex, through the use of Backpage

ads, in California.  During this period, Victim 13 was a juvenile (15 years old).  Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body.  On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

173.   In or around June 2015, Victim 14 was sold for sex, through the use of a Backpage ad, in Texas.  This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks.  On or around June 20, 2015, Victim 14 was murdered by a customer.  Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire.  Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed.  Backpage did not immediately comply with this request.

174.   In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana.  These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks.  On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will.  In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

175.   In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan.  These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face.  On August 15, 2015, Victim 16 was murdered by a customer.  Afterward, the customer dumped her corpse in a park.

176.   Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California.  Victim 17 averaged ten customers a

day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp.  An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage.  The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

### F.   Money Laundering Activities

177.   Backpage's customers overwhelmingly used the proceeds of criminal activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on Backpage.  In addition, because Backpage's publication of such ads was an independent crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collected from customers posting prostitution ads—estimated at more than $500 million—constituted the proceeds of unlawful activity.

178.   For these and other reasons, banks and financial institutions repeatedly refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS pursued a variety of money laundering strategies.  For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions.  One customer wrote:  "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?"  C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

179.   During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment.  Another "solution" was to "allow users to fund an account thru several other sites" that

1    "have no adult or images."

2        180.    On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email

3    entitled "Options for the future of Backpage." This email discussed various strategies for

4    creating new entities to process Backpage-related payments "without ever disclosing ties

5    to Backpage."

6        181.    On April 1, 2015, BRUNST and C.F. were informed that Mastercard was

7    "snooping around" Backpage and might stop processing payments for Backpage. In

8    response, C.F. offered several suggestions for setting up new payment channels that would

9    conceal Backpage's involvement. One such proposal was to begin routing Backpage-

10   related transactions through banks located in the country of Mauritius. In response,

11   BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same

12   issue with our content?"

13       182.    Notwithstanding these strategies, the three major credit card companies

14   stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that

15   American Express would no longer allow its cards to be used for any purchases in

16   Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would

17   no longer allow its cards to be used for Backpage-related transactions. When discussing

18   this decision, MasterCard stated that it "has rules that prohibit our cards from being used

19   for illegal activities." Around the same time, Backpage learned that Visa would no longer

20   allow its cards to be used for Backpage-related transactions. When discussing this

21   decision, Visa stated that its "rules prohibit our network from being used for illegal

22   activity."

23       183.    Similarly, some banks closed accounts that were held by Backpage (or

24   Backpage-related entities) out of concern the accounts were being used for illegal purposes.

25   For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was

26   addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that

27   we have elected to close your Account with us."

28       184.    Backpage responded to these developments in several ways. One was to

- 45 -

encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage. For example, on July 31, 2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

185. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT—that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

186. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

187. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments,

1  email)." During this exchange, one person stated "[C.F.] and I were just discussing
2  company names and the possibility of updating our email addresses to
3  websitetechnologies.com." In response, BRUNST cautioned: "We need to think this thru
4  or all the work to separate it from BP will be lost." Similarly, on April 3, 2014, BRUNST
5  sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of
6  US Bank. We will move all banking under Website Technologies at [a different bank,
7  BMO Harris]."

8     188.   In many instances, Backpage-related money that was initially deposited into
9  accounts held by Posting Solutions was later transmitted to accounts held by Website
10  Technologies. For example:

11     •   On October 27, 2015, C.F. received an email entitled "Two packages coming
12  your way! (Money Orders)." The email stated that two UPS packages filled with money
13  orders were being sent—one containing $47,647.25 of money orders made out to Backpage
14  and the other containing $52,251.48 of money orders made out to Posting Solutions.

15     •   Similarly, on November 16, 2015, C.F. received an email entitled "Three
16  packages sent today $441,408.69." The email stated that three packages filled with money
17  orders were being sent—one containing $129,193.61 of money orders made out to
18  Backpage, another containing $244,353.63 of money orders made out to Posting Solutions,
19  and the last containing an additional $67,861.75 of money orders made out to Posting
20  Solutions.

21     •   And again, on January 29, 2016, a Posting Solutions account wired $2.4
22  million to a Website Technologies account. PADILLA and C.F. were both authorized
23  signers on the recipient account.

24     189.   In addition to receiving millions of dollars from Posting Solutions, the
25  Website Technologies accounts also served as the repository for millions of dollars of wires
26  from international bank accounts controlled by Backpage-associated entities. For example,
27  between January 2015 and December 2016, Website Technologies accounts received over
28  $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein,

over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland, and over $3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

190.   In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC ("Cereus Properties").   The authorized signers on the Cereus Properties accounts included SPEAR and BRUNST.   Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties.

191.   Accounts held by Cereus Properties also received money directly from international bank accounts controlled by Backpage-associated entities.   For example, between around August 2016 and November 2016, Cereus Properties accounts received over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

192.   After money reached Cereus Properties, large portions of it were funneled back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over $30.3 million and LARKIN separately received distributions totaling over $21 million.

193.   Backpage also furthered its money laundering efforts through the use of bitcoin processing companies.   Over time, Backpage utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies.

194.   Backpage also furthered its money laundering efforts by developing ways for customers to purchase ads using gift cards issued by third-party vendors.   This process was described in a July 23, 2015, email exchange between various Backpage employees on which HYER and others were copied.   This exchange included the following: "[W]hat if we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells?   From the user's perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

195.   The factual allegations in Paragraphs 1-194 are incorporated by reference and re-alleged as though fully set forth herein.

196.   Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

a.   18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

197.   The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

198.   The manner and means of the conspiracy are described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

199.   Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

## COUNTS 2-51

### (Travel Act—Facilitate Prostitution)

200.   The factual allegations in Paragraphs 1-199 are incorporated by reference and re-alleged as though fully set forth herein.

- 49 –

201.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – 19" after deleting one picture from originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| | | |
|---|---|---|
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after deleting pictures from originally-submitted ad |
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| --- | --- | --- |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |

| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model  2016 Special  'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |
| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |

| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy  . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!!  I'm a GFE.  OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG   Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real  &  Reviewed  Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |
| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |

| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!   Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160 H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE   Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A).

## COUNT 52

### (Conspiracy To Commit Money Laundering)

202.   The factual allegations in Paragraphs 1-201 are incorporated by reference and re-alleged as though fully set forth herein.

203.   Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and

HYER, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.    18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

        b.    18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

        c.    18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

        d.    18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

        e.    18 U.S.C. § 1957(a) (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

204.   The factual allegations in Paragraphs 1-203 are incorporated by reference and re-alleged as though fully set forth herein.

205.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## COUNTS 63-68

### (International Promotional Money Laundering)

206.   The factual allegations in Paragraphs 1-205 are incorporated by reference and re-alleged as though fully set forth herein.

207.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and

- 57 –

through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

## COUNTS 69-99

### (Transactional Money Laundering)

208.   The factual allegations in Paragraphs 1-207 are incorporated by reference and re-alleged as though fully set forth herein.

209.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property Trust |
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |
| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |

| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 94. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 95. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 96. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 97. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 98. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 99. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1957(a).

## COUNT 100

### (International Concealment Money Laundering)

210.    The factual allegations in Paragraphs 1-209 are incorporated by reference and re-alleged as though fully set forth herein.

211.    On or about the date set forth below, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 100. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1956(a)(2)(B)(i).

## FORFEITURE ALLEGATION ONE

### [18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.      The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

2.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Superseding Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.      All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:

1.      10647 N. State Route 89A, Sedona, AZ 86336

2.      1100 Union St. #700, San Francisco, CA 94109

3.      1308 E. 56th Street, 2, Chicago, IL 60637

4.      14, rue Saint Guillaume, Paris, France 75007

5.      2043 Pleasant Hill Rd, Sebastopol, CA 95472

6.      2416 N. Foote Dr., Phoenix, AZ 85008

7.      2531 Tumbleweed Way, Frisco, TX 75034

8.      2755 Fillmore St, San Francisco, CA 94123

9.      3300 E. Stella Lane, Paradise Valley, AZ 85253

10.     3304 E. Stella Lane, Paradise Valley, AZ 85253

11.     3308 E. Stella Lane, Paradise Valley, AZ 85253

12.     3311 E. Stella Lane, Paradise Valley, AZ 85253

13.     3353 Red Robin Road, Pinetop, AZ 85935

14.     343 Presidio Ave, San Francisco, CA 94115

15. 3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16. 493 Zinfandel Lane, Saint Helena, CA 94574

17. 4931 E. White Gates Drive, Phoenix, AZ 85018

18. 5245 Evening Sun Dr., Frisco, TX 75034

19. 5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20. 5751 N. 77th Place, Scottsdale, AZ 85250

21. 5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22. 6300 N. 33rd Street, Paradise Valley, AZ 85253

23. 6314 N. 33rd Street, Paradise Valley, AZ 85253

24. 7409 Kingsbarns, The Colony, TX 75056

25. 8604 E. San Ardo Dr., Scottsdale, AZ 85258

26. 948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1. Prosperity Bank account number XXXXX7188

2. Compass Bank Account number XXXXXX3873

3. Compass Bank Account number XXXXXX3825

4. National Bank of Arizona Account number XXXX0178

5. National Bank of Arizona Account number XXXX0151

6. National Bank of Arizona Account number XXXX3645

7. Live Oak Bank Account Number x6910

8. Ascensus Broker Dealer Services Account Number XXXXX6943-01

9. Ascensus Broker Dealer Services account Number XXXXX5280-01

10. First Federal Savings & Loan of San Rafael account number XXXX3620

11. Republic Bank of Arizona account number XXXX1889

12. Republic Bank of Arizona account number XXXX2592

13. Republic Bank of Arizona account number XXXX2500

14. Republic Bank of Arizona account number XXXX1938

1    15.    Bank of America Account number XXXXXXXXXXXX8225

2    16.    Bank of America Account number XXXXXXXXXXXX7054

3    17.    Bank of America Account number XXXXXXXXXXXX9342

4    18.    Bank of America Account number XXXXXXXXXXXX0071

5    19.    San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

6    20.    Ally Bank Account Number XXXXXX6292

7    21.    Branch Banking and Trust Bank account number XXXXXXXXX0218

8    22.    Green Bank Account number XXX4832

9    23.    Green Bank Account number XXXXXX4293

10   24.    Perkins Coie Brokerage Account number xxxxxx7012

11   25.    Perkins Coie Liquid Assets xxxxxxx0012

12   26.    Alliance Bernstein Brokerage Account number xxxx6878

13   27.    Alliance Bernstein Brokerage Account number xxxx4954

14   28.    Alliance Bernstein Brokerage Account number xxxx7892

15   29.    Alliance Bernstein Brokerage Account number xxxx7888

16   30.    Alliance Bernstein Brokerage Account number xxxx6485

17   31.    Republic Bank of Arizona Brokerage Account number xxxx2485

18   32.    Republic Bank of Arizona Brokerage Account number xxxx1897

19   33.    Republic Bank of Arizona Brokerage Account number xxxx3126

20   34.    Republic Bank of Arizona Certificate of Deposit xxxxxx8316

21   35.    Republic Bank of Arizona Certificate of Deposit xxxxxx8324

22   36.    Republic Bank of Arizona Certificate of Deposit xxxxxx8332

23   37.    Republic Bank of Arizona Certificate of Deposit xxxxxx8103

24   38.    Republic Bank of Arizona Certificate of Deposit xxxxxx8162

25   39.    Republic Bank of Arizona Certificate of Deposit xxxxxx8189

26   40.    Paul Hastings LLP Account number xxxxx0457

27   41.    Global Trading Solutions xxx7177

28   42.    K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxxx1210

| 1  | 43. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5803 |
| 2  | 44. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5801 |
| 3  | 45. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5805 |
| 4  | 46. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2226 |
| 5  | 47. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2231 |
| 6  | 48. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2230 |
| 7  | 49. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4194 |
| 8  | 50. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4196 |
| 9  | 51. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4198 |
| 10 | 52. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8083 |
| 11 | 53. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8086 |
| 12 | 54. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8080 |
| 13 | 55. | Bank Frick Account number xxxxxxxxxxxxxxx LI090x |
| 14 | 56. | Bank Frick Account number xxxxxxxxxxxxxxx LI300x |
| 15 | 57. | Bank Frick Account number xxxxxxxxxxxxxxx LI740x |
| 16 | 58. | Bank Frick Account number xxxxxxxxxxxxxxx LI900x |
| 17 | 59. | Knab Bank Account number xxxxxxxxxxxxxx7664 |
| 18 | 60. | Rabo Bank Account number xxxxxxxxxxxxx2452 |
| 19 | 61. | Rabo Bank Account number xxxxxxxxxxxxx4721 |
| 20 | 62. | Acacia Conservation Fund Brokerage Account number x2020 |
| 21 | 63. | Saxo Payments Account number x1262 |
| 22 | 64. | AS LHV Pank Account number xxxxxxxxxxxxxxxx4431 |
| 23 | 65. | Bitcoin Wallet -6Lix5 in the amount of 6 BTC |
| 24 | 66. | Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC |
| 25 | 67. | Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC |
| 26 | 68. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940 |
| 27 | 69. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41 |
| 28 | 70. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910 |

71.  JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000

72.  Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH

73.  Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC

74.  Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC

75.  Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH

76.  Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC

77.  Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC

78.  Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC

79.  Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH

80.  Litecoin Wallet –goaeV in the amount of 783.9735116 LTC

81.  Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

82.  Crypto Capital account number x1124

83.  Crypto Capital account number x1933

84.  Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV.

85.  JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

86.  Alliance Bernstein Brokerage account x7889

87.  Alliance Bernstein Brokerage account x0582

88.  Midfirst Bank account x4139

89.  Crypto Capital account number x6886

Such property further includes, but is not limited to, the following domain names:

1.  admoderation.com (Versio)

2.  admoderators.com (Versio)

3.  adnet.ws (NetNames)

4.  adplace24.com (Versio)

5.  adplaces24.com (Versio)

6.  adpost24.com (Versio)

7.  adpost24.cz (GoDaddy)

8.     adquick365.com (Versio)

9.     adreputation.com (NetNames)

10.    ads-posted-mp.com (Versio)

11.    adsplace24.com (Versio)

12.    adspot24.com (Versio)

13.    adspots24.com (Versio)

14.    adsspot24.com (Versio)

15.    adtechbv.co.nl (NetNames)

16.    adtechbv.com (NetNames)

17.    adtechbv.nl (NetNames)

18.    advert-ep.com (Versio)

19.    adverts-mp.com (Versio)

20.    axme.com (GoDaddy)

21.    back0age.com (NetNames)

22.    backpa.ge (NetNames)

23.    backpaee.com (NetNames)

24.    backpage-insider.com (NetNames)

25.    backpage.adult (NetNames)

26.    backpage.ae (NetNames)

27.    backpage.at (NetNames)

28.    backpage.ax (NetNames)

29.    backpage.be (NetNames)

30.    backpage.bg (European domains)

31.    backpage.bg (NetNames)

32.    backpage.ca (NetNames)

33.    backpage.cl (NetNames)

34.    backpage.cn (European domains)

35.    backpage.cn (NetNames)

| 1 | 36. | backpage.co.id (NetNames) |
| 2 | 37. | backpage.co.nl (European domains) |
| 3 | 38. | backpage.co.nl (NetNames) |
| 4 | 39. | backpage.co.nz (NetNames) |
| 5 | 40. | backpage.co.uk (NetNames) |
| 6 | 41. | backpage.co.ve (NetNames) |
| 7 | 42. | backpage.co.za (NetNames) |
| 8 | 43. | backpage.com (NetNames) |
| 9 | 44. | backpage.com.ar (NetNames) |
| 10 | 45. | backpage.com.au (NetNames) |
| 11 | 46. | backpage.com.ph (NetNames) |
| 12 | 47. | backpage.cz (NetNames) |
| 13 | 48. | backpage.dk (NetNames) |
| 14 | 49. | backpage.ec (NetNames) |
| 15 | 50. | backpage.ee (European domains) |
| 16 | 51. | backpage.ee (NetNames) |
| 17 | 52. | backpage.es (NetNames) |
| 18 | 53. | backpage.fi (European domains) |
| 19 | 54. | backpage.fi (NetNames) |
| 20 | 55. | backpage.fr (European domains) |
| 21 | 56. | backpage.fr (NetNames) |
| 22 | 57. | backpage.gr (European domains) |
| 23 | 58. | backpage.gr (NetNames) |
| 24 | 59. | backpage.hk (European domains) |
| 25 | 60. | backpage.hk (NetNames) |
| 26 | 61. | backpage.hu (European domains) |
| 27 | 62. | backpage.hu (NetNames) |
| 28 | 63. | backpage.ie (NetNames) |

| | | |
|---|---|---|
| 1 | 64. | backpage.in (NetNames) |
| 2 | 65. | backpage.it (NetNames) |
| 3 | 66. | backpage.jp (NetNames) |
| 4 | 67. | backpage.kr (NetNames) |
| 5 | 68. | backpage.lt (NetNames) |
| 6 | 69. | backpage.lv (European domains) |
| 7 | 70. | backpage.lv (NetNames) |
| 8 | 71. | backpage.me (NetNames) |
| 9 | 72. | backpage.mx (NetNames) |
| 10 | 73. | backpage.my (NetNames) |
| 11 | 74. | backpage.net (NetNames) |
| 12 | 75. | backpage.nl (NetNames) |
| 13 | 76. | backpage.no (European domains) |
| 14 | 77. | backpage.no (NetNames) |
| 15 | 78. | backpage.nz (NetNames) |
| 16 | 79. | backpage.pe (NetNames) |
| 17 | 80. | backpage.ph (NetNames) |
| 18 | 81. | backpage.pk (NetNames) |
| 19 | 82. | backpage.pl (NetNames) |
| 20 | 83. | backpage.porn (NetNames) |
| 21 | 84. | backpage.pt (NetNames) |
| 22 | 85. | backpage.ro (European domains) |
| 23 | 86. | backpage.ro (NetNames) |
| 24 | 87. | backpage.se (NetNames) |
| 25 | 88. | backpage.sex (NetNames) |
| 26 | 89. | backpage.sg (NetNames) |
| 27 | 90. | backpage.si (European domains) |
| 28 | 91. | backpage.si (NetNames) |

| | | |
|---|---|---|
| 1 | 92. | backpage.sk (European domains) |
| 2 | 93. | backpage.sk (NetNames) |
| 3 | 94. | backpage.sucks (NetNames) |
| 4 | 95. | backpage.tw (NetNames) |
| 5 | 96. | backpage.uk (NetNames) |
| 6 | 97. | backpage.uk.com (NetNames) |
| 7 | 98. | backpage.us (NetNames) |
| 8 | 99. | backpage.vn (NetNames) |
| 9 | 100. | backpage.xxx (NetNames) |
| 10 | 101. | backpage.xyz (NetNames) |
| 11 | 102. | backpagecompimp.com (NetNames) |
| 12 | 103. | backpagecompimps.com (NetNames) |
| 13 | 104. | backpagepimp.com (NetNames) |
| 14 | 105. | backpagepimps.com (NetNames) |
| 15 | 106. | backpagg.com (NetNames) |
| 16 | 107. | backpagm.com (NetNames) |
| 17 | 108. | backpagu.com (NetNames) |
| 18 | 109. | backpaoe.com (NetNames) |
| 19 | 110. | backpawe.com (NetNames) |
| 20 | 111. | backqage.com (NetNames) |
| 21 | 112. | backrage.com (NetNames) |
| 22 | 113. | backxage.com (NetNames) |
| 23 | 114. | bakkpage.com (NetNames) |
| 24 | 115. | bcklistings.com (NetNames) |
| 25 | 116. | bestofbackpage.com (NetNames) |
| 26 | 117. | bestofbigcity.com (NetNames) |
| 27 | 118. | bickpage.com (NetNames) |
| 28 | 119. | bigcity.com (NetNames) |

1    120.    bpclassified.com (NetNames)

2    121.    bpclassifieds.com (NetNames)

3    122.    carlferrer.com (NetNames)

4    123.    clasificadosymas.com (NetNames)

5    124.    clasificadosymas.net (NetNames)

6    125.    clasificadosymas.org (NetNames)

7    126.    classifiedsolutions.co.uk (NetNames)

8    127.    classifiedsolutions.net (NetNames)

9    128.    classyadultads.com (Versio)

10    129.    columbusbackpage.com (NetNames)

11    130.    connecticutbackpage.com (NetNames)

12    131.    cracker.co.id (NetNames)

13    132.    cracker.com (NetNames)

14    133.    cracker.com.au (NetNames)

15    134.    cracker.id (NetNames)

16    135.    cracker.net.au (NetNames)

17    136.    crackers.com.au (NetNames)

18    137.    crackers.net.au (NetNames)

19    138.    ctbackpage.com (NetNames)

20    139.    dallasbackpage.com (NetNames)

21    140.    denverbackpage.com (NetNames)

22    141.    easypost123.com (Versio)

23    142.    easyposts123.com (Versio)

24    143.    emais.com.pt (NetNames)

25    144.    evilempire.com (NetNames)

26    145.    ezpost123.com (Versio)

27    146.    fackpage.com (NetNames)

28    147.    fastadboard.com (Versio)

| | | |
|---|---|---|
| 1 | 148. | guliettagroup.nl (Versio) |
| 2 | 149. | htpp.org (NetNames) |
| 3 | 150. | ichold.com (NetNames) |
| 4 | 151. | internetspeechfoundation.com (nameisp) |
| 5 | 152. | internetspeechfoundation.org (nameisp) |
| 6 | 153. | loads2drive.com (NetNames) |
| 7 | 154. | loadstodrive.com (NetNames) |
| 8 | 155. | loadtodrive.com (NetNames) |
| 9 | 156. | losangelesbackpage.com (NetNames) |
| 10 | 157. | mediafilecloud.com (NetNames) |
| 11 | 158. | miamibackpage.com (NetNames) |
| 12 | 159. | minneapolisbackpage.com (NetNames) |
| 13 | 160. | mobileposting.com (Versio) |
| 14 | 161. | mobilepostings.com (Versio) |
| 15 | 162. | mobilepostlist.com (Versio) |
| 16 | 163. | mobilposting.com (Versio) |
| 17 | 164. | naked.city (NetNames) |
| 18 | 165. | nakedcity.com (NetNames) |
| 19 | 166. | newyorkbackpage.com (NetNames) |
| 20 | 167. | paidbyhour.com (NetNames) |
| 21 | 168. | petseekr.com (NetNames) |
| 22 | 169. | petsfindr.com (NetNames) |
| 23 | 170. | phoenixbackpage.com (NetNames) |
| 24 | 171. | posteasy123.com (Versio) |
| 25 | 172. | postfaster.com (NetNames) |
| 26 | 173. | postfastly.com (NetNames) |
| 27 | 174. | postfastr.com (NetNames) |
| 28 | 175. | postonlinewith.com (Versio) |

| | | |
|---|---|---|
| 1 | 176. | postonlinewith.me (Versio) |
| 2 | 177. | postseasy123.com (Versio) |
| 3 | 178. | postsol.com (GoDaddy) |
| 4 | 179. | postszone24.com (Versio) |
| 5 | 180. | postzone24.com (Versio) |
| 6 | 181. | postzones24.com (Versio) |
| 7 | 182. | rentseekr.com (NetNames) |
| 8 | 183. | results911.com (NetNames) |
| 9 | 184. | sandiegobackpage.com (NetNames) |
| 10 | 185. | sanfranciscobackpage.com (NetNames) |
| 11 | 186. | seattlebackpage.com (NetNames) |
| 12 | 187. | sellyostuffonline.com (Versio) |
| 13 | 188. | sfbackpage.com (NetNames) |
| 14 | 189. | simplepost24.com (Versio) |
| 15 | 190. | simpleposts24.com (Versio) |
| 16 | 191. | svc.ws (NetNames) |
| 17 | 192. | truckrjobs.com (NetNames) |
| 18 | 193. | ugctechgroup.com (NetNames) |
| 19 | 194. | universads.nl (Versio) |
| 20 | 195. | villagevoicepimps.com (GoDaddy) |
| 21 | 196. | websitetechnologies.co.uk (NetNames) |
| 22 | 197. | websitetechnologies.com (NetNames) |
| 23 | 198. | websitetechnologies.net (NetNames) |
| 24 | 199. | websitetechnologies.nl (NetNames) |
| 25 | 200. | websitetechnologies.org (NetNames) |
| 26 | 201. | weprocessmoney.com (GoDaddy) |
| 27 | 202. | wst.ws (NetNames) |
| 28 | 203. | xn--yms-fla.com (NetNames) |

| 1 | 204. | ymas.ar.com (European domains) |
| 2 | 205. | ymas.br.com (European domains) |
| 3 | 206. | ymas.br.com (NetNames) |
| 4 | 207. | ymas.bz (European domains) |
| 5 | 208. | ymas.bz (NetNames) |
| 6 | 209. | ymas.cl (European domains) |
| 7 | 210. | ymas.cl (NetNames) |
| 8 | 211. | ymas.co.bz (European domains) |
| 9 | 212. | ymas.co.bz (NetNames) |
| 10 | 213. | ymas.co.cr (European domains) |
| 11 | 214. | ymas.co.cr (NetNames) |
| 12 | 215. | ymas.co.ni (European domains) |
| 13 | 216. | ymas.co.ni (NetNames) |
| 14 | 217. | ymas.co.ve (European domains) |
| 15 | 218. | ymas.co.ve (NetNames) |
| 16 | 219. | ymas.com (NetNames) |
| 17 | 220. | ymas.com.br (European domains) |
| 18 | 221. | ymas.com.br (NetNames) |
| 19 | 222. | ymas.com.bz (European domains) |
| 20 | 223. | ymas.com.bz (NetNames) |
| 21 | 224. | ymas.com.co (European domains) |
| 22 | 225. | ymas.com.co (NetNames) |
| 23 | 226. | ymas.com.do (European domains) |
| 24 | 227. | ymas.com.do (NetNames) |
| 25 | 228. | ymas.com.ec (European domains) |
| 26 | 229. | ymas.com.ec (NetNames) |
| 27 | 230. | ymas.com.es (European domains) |
| 28 | 231. | ymas.com.es (NetNames) |

| | | |
|---|---|---|
| 1 | 232. | ymas.com.gt (European domains) |
| 2 | 233. | ymas.com.gt (NetNames) |
| 3 | 234. | ymas.com.hn (European domains) |
| 4 | 235. | ymas.com.hn (NetNames) |
| 5 | 236. | ymas.com.mx  (NetNames) |
| 6 | 237. | ymas.com.ni (European domains) |
| 7 | 238. | ymas.com.ni (NetNames) |
| 8 | 239. | ymas.com.pe (European domains) |
| 9 | 240. | ymas.com.pe (NetNames) |
| 10 | 241. | ymas.com.pr (European domains) |
| 11 | 242. | ymas.com.pr (NetNames) |
| 12 | 243. | ymas.com.pt  (NetNames) |
| 13 | 244. | ymas.com.uy (European domains) |
| 14 | 245. | ymas.com.uy (NetNames) |
| 15 | 246. | ymas.com.ve (European domains) |
| 16 | 247. | ymas.com.ve (NetNames) |
| 17 | 248. | ymas.cr (European domains) |
| 18 | 249. | ymas.cr (NetNames) |
| 19 | 250. | ymas.do (European domains) |
| 20 | 251. | ymas.do (NetNames) |
| 21 | 252. | ymas.ec (European domains) |
| 22 | 253. | ymas.ec (NetNames) |
| 23 | 254. | ymas.es (European domains) |
| 24 | 255. | ymas.es (NetNames) |
| 25 | 256. | ymas.org (NetNames) |
| 26 | 257. | ymas.pe (European domains) |
| 27 | 258. | ymas.pe (NetNames) |
| 28 | 259. | ymas.pt (NetNames) |

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

265. atlantabackpage.com (NetNames)

266. backpage.com.br (NetNames)

267. chicagobackpage.com (NetNames)

268. tampabackpage.com (NetNames)

b.      To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

## FORFEITURE ALLEGATION TWO

### [18 U.S.C. § 982(a)(1)]

1.      The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

2.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under Counts 52 through 100 of this Superseding Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.      All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Counts 52 through 100 of this Superseding Indictment.  Such property includes, but is not limited to, the real property located at the following addresses:

1.      10647 N. State Route 89A, Sedona, AZ 86336

2.      1100 Union St. #700, San Francisco, CA 94109

3.      1308 E. 56th Street, 2, Chicago, IL 60637

4.      14, rue Saint Guillaume, Paris, France 75007

5.      2043 Pleasant Hill Rd, Sebastopol, CA 95472

6.      2416 N. Foote Dr., Phoenix, AZ 85008

7.      2531 Tumbleweed Way, Frisco, TX 75034

8.      2755 Fillmore St, San Francisco, CA 94123

9.      3300 E. Stella Lane, Paradise Valley, AZ 85253

10.     3304 E. Stella Lane, Paradise Valley, AZ 85253

11.     3308 E. Stella Lane, Paradise Valley, AZ 85253

12.     3311 E. Stella Lane, Paradise Valley, AZ 85253

13.     3353 Red Robin Road, Pinetop, AZ 85935

14.     343 Presidio Ave, San Francisco, CA 94115

15.     3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16.     493 Zinfandel Lane, Saint Helena, CA 94574

17.     4931 E. White Gates Drive, Phoenix, AZ 85018

18.     5245 Evening Sun Dr., Frisco, TX 75034

19.     5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20.     5751 N. 77th Place, Scottsdale, AZ 85250

21.     5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22.     6300 N. 33rd Street, Paradise Valley, AZ 85253

23.     6314 N. 33rd Street, Paradise Valley, AZ 85253

24.     7409 Kingsbarns, The Colony, TX 75056

25.   8604 E. San Ardo Dr., Scottsdale, AZ 85258

26.   948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1.   Prosperity Bank account number XXXXX7188

2.   Compass Bank Account number XXXXXX3873

3.   Compass Bank Account number XXXXXX3825

4.   National Bank of Arizona Account number XXXX0178

5.   National Bank of Arizona Account number XXXX0151

6.   National Bank of Arizona Account number XXXX3645

7.   Live Oak Bank Account Number x6910

8.   Ascensus Broker Dealer Services Account Number XXXXX6943-01

9.   Ascensus Broker Dealer Services account Number XXXXX5280-01

10.   First Federal Savings & Loan of San Rafael account number XXXX3620

11.   Republic Bank of Arizona account number XXXX1889

12.   Republic Bank of Arizona account number XXXX2592

13.   Republic Bank of Arizona account number XXXX2500

14.   Republic Bank of Arizona account number XXXX1938

15.   Bank of America Account number XXXXXXXXXXX8225

16.   Bank of America Account number XXXXXXXXXXX7054

17.   Bank of America Account number XXXXXXXXXXX9342

18.   Bank of America Account number XXXXXXXXXXX0071

19.   San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

20.   Ally Bank Account Number XXXXXX6292

21.   Branch Banking and Trust Bank account number XXXXXXXXX0218

22.   Green Bank Account number XXX4832

23.   Green Bank Account number XXXXXX4293

24.   Perkins Coie Brokerage Account number xxxxxx7012

| 1 | 25. | Perkins Coie Liquid Assets xxxxxxx0012 |
| 2 | 26. | Alliance Bernstein Brokerage Account number xxxx6878 |
| 3 | 27. | Alliance Bernstein Brokerage Account number xxxx4954 |
| 4 | 28. | Alliance Bernstein Brokerage Account number xxxx7892 |
| 5 | 29. | Alliance Bernstein Brokerage Account number xxxx7888 |
| 6 | 30. | Alliance Bernstein Brokerage Account number xxxx6485 |
| 7 | 31. | Republic Bank of Arizona Brokerage Account number xxxx2485 |
| 8 | 32. | Republic Bank of Arizona Brokerage Account number xxxx1897 |
| 9 | 33. | Republic Bank of Arizona Brokerage Account number xxxx3126 |
| 10 | 34. | Republic Bank of Arizona Certificate of Deposit xxxxxx8316 |
| 11 | 35. | Republic Bank of Arizona Certificate of Deposit xxxxxx8324 |
| 12 | 36. | Republic Bank of Arizona Certificate of Deposit xxxxxx8332 |
| 13 | 37. | Republic Bank of Arizona Certificate of Deposit xxxxxx8103 |
| 14 | 38. | Republic Bank of Arizona Certificate of Deposit xxxxxx8162 |
| 15 | 39. | Republic Bank of Arizona Certificate of Deposit xxxxxx8189 |
| 16 | 40. | Paul Hastings LLP Account number xxxxx0457 |
| 17 | 41. | Global Trading Solutions xxx7177 |
| 18 | 42. | K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxxx1210 |
| 19 | 43. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5803 |
| 20 | 44. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5801 |
| 21 | 45. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5805 |
| 22 | 46. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2226 |
| 23 | 47. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2231 |
| 24 | 48. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2230 |
| 25 | 49. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4194 |
| 26 | 50. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4196 |
| 27 | 51. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4198 |
| 28 | 52. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8083 |

1   53.   Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8086

2   54.   Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8080

3   55.   Bank Frick Account number xxxxxxxxxxxxxxxx LI090x

4   56.   Bank Frick Account number xxxxxxxxxxxxxxxx LI300x

5   57.   Bank Frick Account number xxxxxxxxxxxxxxxx LI740x

6   58.   Bank Frick Account number xxxxxxxxxxxxxxxx LI900x

7   59.   Knab Bank Account number xxxxxxxxxxxxxx7664

8   60.   Rabo Bank Account number xxxxxxxxxxxxxx2452

9   61.   Rabo Bank Account number xxxxxxxxxxxxxx4721

10   62.   Acacia Conservation Fund Brokerage Account number x2020

11   63.   Saxo Payments Account number x1262

12   64.   AS LHV Pank Account number xxxxxxxxxxxxxxxx4431

13   65.   Bitcoin Wallet -6Lix5 in the amount of 6 BTC

14   66.   Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC

15   67.   Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC

16   68.   JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940

17   69.   JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41

18   70.   JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910

19   71.   JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000

20   72.   Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH

21   73.   Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC

22   74.   Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC

23   75.   Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH

24   76.   Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC

25   77.   Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC

26   78.   Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC

27   79.   Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH

28   80.   Litecoin Wallet –goaeV in the amount of 783.9735116 LTC

81. Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

82. Crypto Capital account number x1124

83. Crypto Capital account number x1933

84. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV.

85. JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

86. Alliance Bernstein Brokerage account x7889

87. Alliance Bernstein Brokerage account x0582

88. Midfirst Bank account x4139

89. Crypto Capital account number x6886

Such property further includes, but is not limited to, the following domain names:

1. admoderation.com (Versio)

2. admoderators.com (Versio)

3. adnet.ws (NetNames)

4. adplace24.com (Versio)

5. adplaces24.com (Versio)

6. adpost24.com (Versio)

7. adpost24.cz (GoDaddy)

8. adquick365.com (Versio)

9. adreputation.com (NetNames)

10. ads-posted-mp.com (Versio)

11. adsplace24.com (Versio)

12. adspot24.com (Versio)

13. adspots24.com (Versio)

14. adsspot24.com (Versio)

15. adtechbv.co.nl (NetNames)

16. adtechbv.com (NetNames)

17. adtechbv.nl (NetNames)

| 1 | 18. | advert-ep.com (Versio) |
| 2 | 19. | adverts-mp.com (Versio) |
| 3 | 20. | axme.com (GoDaddy) |
| 4 | 21. | back0age.com (NetNames) |
| 5 | 22. | backpa.ge (NetNames) |
| 6 | 23. | backpaee.com (NetNames) |
| 7 | 24. | backpage-insider.com (NetNames) |
| 8 | 25. | backpage.adult (NetNames) |
| 9 | 26. | backpage.ae (NetNames) |
| 10 | 27. | backpage.at (NetNames) |
| 11 | 28. | backpage.ax (NetNames) |
| 12 | 29. | backpage.be (NetNames) |
| 13 | 30. | backpage.bg (European domains) |
| 14 | 31. | backpage.bg (NetNames) |
| 15 | 32. | backpage.ca (NetNames) |
| 16 | 33. | backpage.cl (NetNames) |
| 17 | 34. | backpage.cn (European domains) |
| 18 | 35. | backpage.cn (NetNames) |
| 19 | 36. | backpage.co.id (NetNames) |
| 20 | 37. | backpage.co.nl (European domains) |
| 21 | 38. | backpage.co.nl (NetNames) |
| 22 | 39. | backpage.co.nz (NetNames) |
| 23 | 40. | backpage.co.uk (NetNames) |
| 24 | 41. | backpage.co.ve (NetNames) |
| 25 | 42. | backpage.co.za (NetNames) |
| 26 | 43. | backpage.com (NetNames) |
| 27 | 44. | backpage.com.ar (NetNames) |
| 28 | 45. | backpage.com.au (NetNames) |

| | | |
|---|---|---|
| 1 | 46. | backpage.com.ph (NetNames) |
| 2 | 47. | backpage.cz (NetNames) |
| 3 | 48. | backpage.dk (NetNames) |
| 4 | 49. | backpage.ec (NetNames) |
| 5 | 50. | backpage.ee (European domains) |
| 6 | 51. | backpage.ee (NetNames) |
| 7 | 52. | backpage.es (NetNames) |
| 8 | 53. | backpage.fi (European domains) |
| 9 | 54. | backpage.fi (NetNames) |
| 10 | 55. | backpage.fr (European domains) |
| 11 | 56. | backpage.fr (NetNames) |
| 12 | 57. | backpage.gr (European domains) |
| 13 | 58. | backpage.gr (NetNames) |
| 14 | 59. | backpage.hk (European domains) |
| 15 | 60. | backpage.hk (NetNames) |
| 16 | 61. | backpage.hu (European domains) |
| 17 | 62. | backpage.hu (NetNames) |
| 18 | 63. | backpage.ie (NetNames) |
| 19 | 64. | backpage.in (NetNames) |
| 20 | 65. | backpage.it (NetNames) |
| 21 | 66. | backpage.jp (NetNames) |
| 22 | 67. | backpage.kr (NetNames) |
| 23 | 68. | backpage.lt (NetNames) |
| 24 | 69. | backpage.lv (European domains) |
| 25 | 70. | backpage.lv (NetNames) |
| 26 | 71. | backpage.me (NetNames) |
| 27 | 72. | backpage.mx (NetNames) |
| 28 | 73. | backpage.my (NetNames) |

| | | |
|---|---|---|
| 1 | 74. | backpage.net (NetNames) |
| 2 | 75. | backpage.nl (NetNames) |
| 3 | 76. | backpage.no (European domains) |
| 4 | 77. | backpage.no (NetNames) |
| 5 | 78. | backpage.nz (NetNames) |
| 6 | 79. | backpage.pe (NetNames) |
| 7 | 80. | backpage.ph (NetNames) |
| 8 | 81. | backpage.pk (NetNames) |
| 9 | 82. | backpage.pl (NetNames) |
| 10 | 83. | backpage.porn (NetNames) |
| 11 | 84. | backpage.pt (NetNames) |
| 12 | 85. | backpage.ro (European domains) |
| 13 | 86. | backpage.ro (NetNames) |
| 14 | 87. | backpage.se (NetNames) |
| 15 | 88. | backpage.sex (NetNames) |
| 16 | 89. | backpage.sg (NetNames) |
| 17 | 90. | backpage.si (European domains) |
| 18 | 91. | backpage.si (NetNames) |
| 19 | 92. | backpage.sk (European domains) |
| 20 | 93. | backpage.sk (NetNames) |
| 21 | 94. | backpage.sucks (NetNames) |
| 22 | 95. | backpage.tw (NetNames) |
| 23 | 96. | backpage.uk (NetNames) |
| 24 | 97. | backpage.uk.com (NetNames) |
| 25 | 98. | backpage.us (NetNames) |
| 26 | 99. | backpage.vn (NetNames) |
| 27 | 100. | backpage.xxx (NetNames) |
| 28 | 101. | backpage.xyz (NetNames) |

| 1 | 102. | backpagecompimp.com (NetNames) |
| 2 | 103. | backpagecompimps.com (NetNames) |
| 3 | 104. | backpagepimp.com (NetNames) |
| 4 | 105. | backpagepimps.com (NetNames) |
| 5 | 106. | backpagg.com (NetNames) |
| 6 | 107. | backpagm.com (NetNames) |
| 7 | 108. | backpagu.com (NetNames) |
| 8 | 109. | backpaoe.com (NetNames) |
| 9 | 110. | backpawe.com (NetNames) |
| 10 | 111. | backqage.com (NetNames) |
| 11 | 112. | backrage.com (NetNames) |
| 12 | 113. | backxage.com (NetNames) |
| 13 | 114. | bakkpage.com (NetNames) |
| 14 | 115. | bcklistings.com (NetNames) |
| 15 | 116. | bestofbackpage.com (NetNames) |
| 16 | 117. | bestofbigcity.com (NetNames) |
| 17 | 118. | bickpage.com (NetNames) |
| 18 | 119. | bigcity.com (NetNames) |
| 19 | 120. | bpclassified.com (NetNames) |
| 20 | 121. | bpclassifieds.com (NetNames) |
| 21 | 122. | carlferrer.com (NetNames) |
| 22 | 123. | clasificadosymas.com (NetNames) |
| 23 | 124. | clasificadosymas.net (NetNames) |
| 24 | 125. | clasificadosymas.org (NetNames) |
| 25 | 126. | classifiedsolutions.co.uk (NetNames) |
| 26 | 127. | classifiedsolutions.net (NetNames) |
| 27 | 128. | classyadultads.com (Versio) |
| 28 | 129. | columbusbackpage.com (NetNames) |

| | | |
|---|---|---|
| 1 | 130. | connecticutbackpage.com (NetNames) |
| 2 | 131. | cracker.co.id (NetNames) |
| 3 | 132. | cracker.com (NetNames) |
| 4 | 133. | cracker.com.au (NetNames) |
| 5 | 134. | cracker.id (NetNames) |
| 6 | 135. | cracker.net.au (NetNames) |
| 7 | 136. | crackers.com.au (NetNames) |
| 8 | 137. | crackers.net.au (NetNames) |
| 9 | 138. | ctbackpage.com (NetNames) |
| 10 | 139. | dallasbackpage.com (NetNames) |
| 11 | 140. | denverbackpage.com (NetNames) |
| 12 | 141. | easypost123.com (Versio) |
| 13 | 142. | easyposts123.com (Versio) |
| 14 | 143. | emais.com.pt (NetNames) |
| 15 | 144. | evilempire.com (NetNames) |
| 16 | 145. | ezpost123.com (Versio) |
| 17 | 146. | fackpage.com (NetNames) |
| 18 | 147. | fastadboard.com (Versio) |
| 19 | 148. | guliettagroup.nl (Versio) |
| 20 | 149. | htpp.org (NetNames) |
| 21 | 150. | ichold.com (NetNames) |
| 22 | 151. | internetspeechfoundation.com (nameisp) |
| 23 | 152. | internetspeechfoundation.org (nameisp) |
| 24 | 153. | loads2drive.com (NetNames) |
| 25 | 154. | loadstodrive.com (NetNames) |
| 26 | 155. | loadtodrive.com (NetNames) |
| 27 | 156. | losangelesbackpage.com (NetNames) |
| 28 | 157. | mediafilecloud.com (NetNames) |

| 1 | 158. | miamibackpage.com (NetNames) |
| 2 | 159. | minneapolisbackpage.com (NetNames) |
| 3 | 160. | mobileposting.com (Versio) |
| 4 | 161. | mobilepostings.com (Versio) |
| 5 | 162. | mobilepostlist.com (Versio) |
| 6 | 163. | mobilposting.com (Versio) |
| 7 | 164. | naked.city (NetNames) |
| 8 | 165. | nakedcity.com (NetNames) |
| 9 | 166. | newyorkbackpage.com (NetNames) |
| 10 | 167. | paidbyhour.com (NetNames) |
| 11 | 168. | petseekr.com (NetNames) |
| 12 | 169. | petsfindr.com (NetNames) |
| 13 | 170. | phoenixbackpage.com (NetNames) |
| 14 | 171. | posteasy123.com (Versio) |
| 15 | 172. | postfaster.com (NetNames) |
| 16 | 173. | postfastly.com (NetNames) |
| 17 | 174. | postfastr.com (NetNames) |
| 18 | 175. | postonlinewith.com (Versio) |
| 19 | 176. | postonlinewith.me (Versio) |
| 20 | 177. | postseasy123.com (Versio) |
| 21 | 178. | postsol.com (GoDaddy) |
| 22 | 179. | postszone24.com (Versio) |
| 23 | 180. | postzone24.com (Versio) |
| 24 | 181. | postzones24.com (Versio) |
| 25 | 182. | rentseekr.com (NetNames) |
| 26 | 183. | results911.com (NetNames) |
| 27 | 184. | sandiegobackpage.com (NetNames) |
| 28 | 185. | sanfranciscobackpage.com (NetNames) |

| | | |
|---|---|---|
| 1 | 186. | seattlebackpage.com (NetNames) |
| 2 | 187. | sellyostuffonline.com (Versio) |
| 3 | 188. | sfbackpage.com (NetNames) |
| 4 | 189. | simplepost24.com (Versio) |
| 5 | 190. | simpleposts24.com (Versio) |
| 6 | 191. | svc.ws (NetNames) |
| 7 | 192. | truckrjobs.com (NetNames) |
| 8 | 193. | ugctechgroup.com (NetNames) |
| 9 | 194. | universads.nl (Versio) |
| 10 | 195. | villagevoicepimps.com (GoDaddy) |
| 11 | 196. | websitetechnologies.co.uk (NetNames) |
| 12 | 197. | websitetechnologies.com (NetNames) |
| 13 | 198. | websitetechnologies.net (NetNames) |
| 14 | 199. | websitetechnologies.nl (NetNames) |
| 15 | 200. | websitetechnologies.org (NetNames) |
| 16 | 201. | weprocessmoney.com (GoDaddy) |
| 17 | 202. | wst.ws (NetNames) |
| 18 | 203. | xn--yms-fla.com (NetNames) |
| 19 | 204. | ymas.ar.com (European domains) |
| 20 | 205. | ymas.br.com (European domains) |
| 21 | 206. | ymas.br.com (NetNames) |
| 22 | 207. | ymas.bz (European domains) |
| 23 | 208. | ymas.bz (NetNames) |
| 24 | 209. | ymas.cl (European domains) |
| 25 | 210. | ymas.cl (NetNames) |
| 26 | 211. | ymas.co.bz (European domains) |
| 27 | 212. | ymas.co.bz (NetNames) |
| 28 | 213. | ymas.co.cr (European domains) |

| | |
|---|---|
| 1 | 214.   ymas.co.cr (NetNames) |
| 2 | 215.   ymas.co.ni (European domains) |
| 3 | 216.   ymas.co.ni (NetNames) |
| 4 | 217.   ymas.co.ve (European domains) |
| 5 | 218.   ymas.co.ve (NetNames) |
| 6 | 219.   ymas.com (NetNames) |
| 7 | 220.   ymas.com.br (European domains) |
| 8 | 221.   ymas.com.br (NetNames) |
| 9 | 222.   ymas.com.bz (European domains) |
| 10 | 223.   ymas.com.bz (NetNames) |
| 11 | 224.   ymas.com.co (European domains) |
| 12 | 225.   ymas.com.co (NetNames) |
| 13 | 226.   ymas.com.do (European domains) |
| 14 | 227.   ymas.com.do (NetNames) |
| 15 | 228.   ymas.com.ec (European domains) |
| 16 | 229.   ymas.com.ec (NetNames) |
| 17 | 230.   ymas.com.es (European domains) |
| 18 | 231.   ymas.com.es (NetNames) |
| 19 | 232.   ymas.com.gt (European domains) |
| 20 | 233.   ymas.com.gt (NetNames) |
| 21 | 234.   ymas.com.hn (European domains) |
| 22 | 235.   ymas.com.hn (NetNames) |
| 23 | 236.   ymas.com.mx  (NetNames) |
| 24 | 237.   ymas.com.ni (European domains) |
| 25 | 238.   ymas.com.ni (NetNames) |
| 26 | 239.   ymas.com.pe (European domains) |
| 27 | 240.   ymas.com.pe (NetNames) |
| 28 | 241.   ymas.com.pr (European domains) |

242. ymas.com.pr (NetNames)

243. ymas.com.pt  (NetNames)

244. ymas.com.uy (European domains)

245. ymas.com.uy (NetNames)

246. ymas.com.ve (European domains)

247. ymas.com.ve (NetNames)

248. ymas.cr (European domains)

249. ymas.cr (NetNames)

250. ymas.do (European domains)

251. ymas.do (NetNames)

252. ymas.ec (European domains)

253. ymas.ec (NetNames)

254. ymas.es (European domains)

255. ymas.es (NetNames)

256. ymas.org (NetNames)

257. ymas.pe (European domains)

258. ymas.pe (NetNames)

259. ymas.pt (NetNames)

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

265. atlantabackpage.com (NetNames)

266. backpage.com.br (NetNames)

267. chicagobackpage.com (NetNames)

268. tampabackpage.com (NetNames)

b.      To the extent such property is not available for forfeiture, a sum of money

1    equal to the total value of such property.

2        3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

3    Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52

4    through 100 of this Superseding Indictment shall forfeit substitute property, if, by any act

5    or omission of that defendant, the property described in the preceding paragraph, or any

6    portion thereof, cannot be located upon the exercise of due diligence; has been transferred,

7    sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court;

8    has been substantially diminished in value; or has been commingled with other property

9    that cannot be divided without difficulty.

10

11                          A TRUE BILL

12

13                      *S/*
                  FOREPERSON OF THE GRAND JURY

14                      Date:  July 25, 2018

15    ELIZABETH A. STRANGE
     First Assistant United States Attorney

16    District of Arizona

17    BRIAN BENCZKOWSKI Assistant Attorney General
     Criminal Division, U.S. Department of Justice

18

19    *S/*
     KEVIN M. RAPP

20    MARGARET PERLMETER
     PETER KOZINETS

21    ANDREW STONE
     Assistant U.S. Attorneys

22

23    JOHN J. KUCERA
     Special Assistant U.S. Attorney

24    REGINALD E. JONES
     Senior Trial Attorney

25    U.S. Department of Justice, Criminal Division
     Child Exploitation and Obscenity Section

26

27

28

# EXHIBIT B

Robert Corn-Revere (D.C. Bar No. 375415, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone:    (202) 973-4225
Facsimile:    (202) 973-4499
Email:          robertcornrevere@dwt.com

James C. Grant (Wash. Bar No. 14358, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104-1610
Telephone:    (206) 757-8096
Facsimile:    (206) 757-7096
Email:          jamesgrant@dwt.com

*Counsel for Michael Lacey and James Larkin*

Additional counsel listed on following pages

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-422-PHX-SMB |
|---|---|
| Plaintiff, | **DEFENDANTS' MOTION TO DISMISS INDICTMENT** |
| v. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Paul J. Cambria, Jr. (Cal. Bar No. 177957, admitted *pro hac vice*)
Erin E. McCampbell (N.Y. Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite #120
Buffalo, NY 14202
Telephone:    (716) 849-1333
Facsimile:    (716) 855-1580
Email:        pcambria@lglaw.com
              emccampbell@lglaw.com

*Counsel for Defendant Michael Lacey*

Thomas H. Bienert, Jr. (Cal. Bar No. 135311, admitted *pro hac vice*)
Whitney Z. Bernstein (Cal. Bar No. 304971, admitted *pro hac vice*)
BIENERT KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone:    (949) 369-3700
Facsimile:    (949) 369-3701
Email:        tbienert@bmkattorneys.com
              wbernstein@bmkattorneys.com

*Counsel for Defendant James Larkin*

Gary S. Lincenberg (Cal. Bar No. 123058, admitted *pro hac vice*)
Ariel A. Neuman (Cal. Bar No. 241594, admitted *pro hac vice*)
Gopi K. Panchapakesan (Cal. Bar No. 279586, admitted *pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone:    (310) 201-2100
Facsimile:    (310) 201-2110
Email:        glincenberg@birdmarella.com
              aneuman@birdmarella.com

Michael Kimerer (Ariz. Bar No. 002492)
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, AR 85014
Telephone:    (602) 279-5900
Facsimile:    (602) 264-5566
Email:        mdk@kimerer.com

*Counsel for Defendant John Brunst*

Bruce Feder (Ariz. Bar No. 004832)
Feder Law Office, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, AR 85016
Telephone:    (602) 257-0135
Facsimile:    (602) 954-8737
Email:        bf@federlawpa.com
              fl@federlawpa.com

*Counsel for Defendant Scott Spear*

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ........................................................................... 1

II.   BACKGROUND ........................................................................... 3

      A.    History of Backpage.com. ....................................................... 3

      B.    Court Decisions Rejecting Government and Other Challenges to
            Adult-Oriented Advertising on Craigslist and Backpage.com. ............... 4

      C.    Criminal Prosecution in Arizona and Asset Seizures in the Central
            District of California. ........................................................ 8

      D.    Progress of the Prosecution and Litigation to Date. ...................... 10

III.  LEGAL STANDARDS ................................................................... 11

      A.    Motion to Dismiss Indictment. ............................................. 11

      B.    First Amendment Requirements Governing Prosecution of
            Publishers. ................................................................. 13

      C.    *Mens Rea* Requirements ..................................................... 15

IV.   ARGUMENT ............................................................................ 15

      A.    The Indictment and the Government's Theory of Prosecution Are
            Fatally Deficient. .......................................................... 15

            1.    Impermissibly Presuming that Ads Are Illegal. ...................... 16

            2.    Repeating Others' Accusations. .................................... 18

            3.    Attacking Traditional, Protected Publisher Functions............... 20

            4.    Attacking Efforts to Promote or Advertise a Website to Users.. 24

      B.    The Indictment Fails to Allege Any Requisite *Mens Rea*. .................. 26

            1.    The Government's Prosecution is Governed by a Specific Intent
                  Standard. ......................................................... 26

            2.    The Indictment Fails to Allege Specific Intent..................... 31

            3.    Case Law Compels Dismissal of the Indictment...................... 34

      C.    The Travel Act is Unconstitutional as Applied in the Indictment......... 37

1.   Indictment Bases Travel Act Allegations as Generalized Crimes 38

2.   Government's Broad Reading of the Travel Act Conflicts With the First Amendment. ................................................................ 39

3.   The Indictment Must be Dismissed Because it is Predicated on an Unconstitutional Application of the Travel Act ........................ 41

V.   CONCLUSION ................................................................................ 43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Reno*,
  929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) ...............................41

*Amusement Devices Ass'n v. Ohio*,
  443 F. Supp. 1040 (S.D. Ohio 1977) .......................................................................40

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) ................................................................................ 14, 16

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ......................................................... *passim*

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) .................... *passim*

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. Aug. 20, 2013) ........................................................ 6, 18

*Backpage.com, LLC v. Lynch*,
  216 F. Supp. 3d 96 (D.D.C. 2016) ................................................................. 29, 41

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ....................................................... *passim*

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ....................................................................21

*Barrett v. Rosenthal*,
  40 Cal. 4th 33, 146 P.3d 510 (2006) .............................................................25

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ....................................................................21

*Bd. of Trs. v. State Univ. of N.J. v. Fox*,
  492 U.S. 469 (1989) ..............................................................................16

*Bennett v. Google, Inc.*,
  2017 WL 2692607 (D.D.C. June 21, 2017), *aff'd sub nom.*, *Bennett v.
  Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).......................................................21

*Craigslist, Inc. v. McMaster*,
  2010 WL 11640195 (D.S.C. 2010) ......................................................... 19, 23, 36

iii

*Dart v. Craigslist, Inc.*,
 665 F. Supp. 2d 961 (N.D. Ill. 2009)................................................................. *passim*

*Doe ex rel. Roe v. Backpage.com, LLC*,
 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub. nom.*, *Jane Doe No. 1*
 *v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137
 S. Ct. 622 (2017) ................................................................. 8, 17, 23, 24

*Doe v. GTE Corp.*,
 347 F.3d 655 (7th Cir. 2003) ................................................................. 14, 36

*Doe v. MySpace, Inc.*,
 528 F.3d 413 (5th Cir. 2008)................................................................. 23

*Elonis v. United States*,
 135 S. Ct. 2001 (2015) .................................................................39

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) .................................................................41

*Green v. Am. Online (AOL)*,
 318 F.3d 465 (3d Cir. 2003) .................................................................21

*In re Aimster Copyright Litig.*,
 334 F.3d 643 (7th Cir. 2003).................................................................36

*Jane Doe No. 1 v. Backpage.com, LLC*,
 817 F.3d 12 (1st Cir. 2016) .................................................................23

*Jones v. Dirty World Entm't Recordings LLC*,
 755 F.3d 398 (6th Cir. 2014).................................................................21

*Lacey v. Maricopa Cty.*,
 693 F.3d 896 (9th Cir. 2012) .................................................................3

*Langdon v. Google, Inc.*,
 474 F. Supp. 2d 622 (D. Del. 2007) .................................................................21

*M.A. ex rel. P.K v. Village Voice Media Holdings, LLC*,
 809 F. Supp. 2d 1041 (E.D. Mo. 2011) ................................................................. *passim*

*Miami Herald Publ'g Co. v. Tornillo*,
 418 U.S. 241 (1974) ................................................................. 14, 20

*Mishkin v. New York*,
 383 U.S. 502 (1966) ................................................................. 15, 28

*NAACP v. Button,*
   371 U.S. 415 (1963) ..................................................................... 40, 41

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ........................................................... 13, 16, 41

*People v. Ferrer,*
   2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016) ........................... *passim*

*People v. Ferrer,*
   No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) ..................................8

*Reno v. ACLU,*
   521 U.S. 844 (1997) ..................................................................... 20

*Russell v. United States,*
   369 U.S. 749 (1962) ................................................................ 12, 13

*Search King, Inc. v. Google Tech., Inc.,*
   2003 WL 21464568 (W.D. Okla. 2003) ..............................................21

*Smith v. California,*
   361 U.S. 147 (1959) ........................................................ 14, 15, 28, 39

*Smith v. Goguen,*
   415 U.S. 566 (1974) ..................................................................... 40

*United States v. Bennett,*
   95 F.3d 1158 (9th Cir. 1996) ..........................................................38

*United States v. Brown,*
   186 F.3d 661 (5th Cir. 1999) ..................................................... 15, 27

*United States v. Buddenberg,*
   2010 WL 2735547 ............................................................... *passim*

*United States v. Carbajal,*
   42 F. App'x 954 (9th Cir. 2002) ......................................................37

*United States v. Cassidy,*
   814 F. Supp. 2d 574 (D. Md. 2011) ............................................ 13, 42

*United States v. Cecil,*
   608 F.2d 1294 (9th Cir. 1979) ........................................................12

*United States v. Coia,*
   719 F.2d 1120 (11th Cir. 1983) ......................................................12

*United States v. Du Bo*,
   186 F.3d 1177 (9th Cir. 1999) ............................................................37

*United States v. Gibson Specialty Co.*,
   507 F.2d 446 (9th Cir. 1974) ................................... 15, 26, 27, 39

*United States v. Kaiser*,
   660 F.2d 724 (9th Cir. 1981) ............................................................27

*United States v. Keith*,
   605 F.2d 462 (9th Cir. 1979) ............................................................12

*United States v. Landham*,
   251 F.3d 1072 (6th Cir. 2001) ................................................. 13, 42

*United States v. Miller*,
   379 F.2d 483 (7th Cir. 1967) ............................................................38

*United States v. Morrison*,
   536 F.2d 286 (9th Cir. 1976) ............................................................37

*United States v. P.H.E., Inc.*,
   965 F.2d 848 (10th Cir. 1992) ..........................................................12

*United States v. Perkins*,
   850 F.3d 1109 (9th Cir. 2017) ..........................................................17

*United States v. Pernillo-Fuentes*,
   252 F.3d 1030 (9th Cir. 2001) ..........................................................37

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ..........................................................................16

*United States v. Sineneng-Smith*,
   910 F.3d 461 (9th Cir. 2018) ............................................................41

*United States v. Stevens*,
   559 U.S. 460 (2010) ..........................................................................40

*United States v. Stock*,
   728 F.3d 287 (9th Cir. 2013) ............................................................13

*United States v. Trejo*,
   610 F.3d 308 (5th Cir. 2010) ..................................................... 15, 27

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994) ..................................................................... 28, 39

*Washington Post v. McManus*,
   355 F. Supp. 3d 272 (D. Md. 2019) ........................................20

*Watts v. United States*,
   394 U.S. 705 (1969) ...............................................................13

*Wayte v. United States*,
   470 U.S. 598 (1985) ...............................................................12

*Woodhull Freedom Found. v. United States*,
   No. 18-5298 (D.C. Cir. Apr. 15, 2019) .....................31, 35, 41

*Worldwide, LLC v. Google, Inc.*,
   2017 WL 2210029 (M.D. Fla. Feb. 8, 2017).................. 14, 21

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) .........................................20, 21

*Zhang v. Baidu.com Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) ......................................20

**Federal Statutes**

18 U.S.C. § 2 .............................................................. 7, 23

18 U.S.C. § 371 ................................................................9

18 U.S.C. § 1591 ............................................... 23, 29, 36

18 U.S.C. § 1595 ................................... 7, 8, 18, 23

18 U.S.C. § 1952 ............................................. 9, 27, 38

18 U.S.C. § 1956 ............................................... 9, 27

18 U.S.C. § 1957 ................................................................9

18 U.S.C. § 2252 ..............................................................28

18 U.S.C. § 2261A ...........................................................42

47 U.S.C. § 230 ............................................... 5, 8, 30

**State Statutes**

Ala. Code § 13A-6-184 ...................................................17

Ariz. Rev. Stat. § 13-1422 ..............................................17

Ark. Code Ann. § 14-1-302(9), (10) ...................................................17

Kan. Stat. Ann. § 12-770(a)(8), (9) ....................................................17

Tenn. Code Ann. §§ 7-51-1102(11) & (12) ........................................17

Utah Code Ann. §§ 59-27-101 to 108 .................................................17

# I.  INTRODUCTION

The government seeks to prosecute the former publishers of an online classified advertising service, Backpage.com, under a novel theory of vicarious liability never embraced by any federal court.  The government is seeking to punish the providers of the platform because of the content of ads posted by its users, and is a claiming it may accomplish this objective without *any* consideration of the First Amendment implications of its actions.  Beginning with the premise that it can close down the website and criminally prosecute all who were involved with it, the government has attempted to build a case based on broad generalizations and invective that starts with the improper assumption the First Amendment does not apply and fails to allege any criminal acts by the Defendants.[1]

This case is the culmination of a decade's worth of efforts by law enforcement officials and policymakers at various levels of government to prohibit adult-oriented online advertising.  It began with actions by state attorneys general and other officials to intimidate the website Craigslist, which succumbed to the pressure and closed its erotic services section in 2010.  The campaign immediately turned to Backpage.com, then the second-largest classified ad website, with similar demands to shutter categories for adult content.  Backpage.com, however, challenged the government's unconstitutional claims that equate advertising for escorts and other adult services with prostitution, and won a series of court victories affirming that providing such a platform for third-party speech is protected by the First Amendment.  Federal courts struck down state legislation that sought to prohibit such advertising, enjoined governmental use of nuisance suits and veiled threats to close down adult ad sections, and dismissed state prosecutions based on the same vicarious liability theory upon which this federal case is based.

---

[1] Movants Michael Lacey, James Larkin, John Brunst, and Scott Spear are referred to here as "Defendants."

These decisions only led authorities to escalate their efforts to "crush Backpage." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016). Here, federal prosecutors are proceeding under the same flawed vicarious liability theory that California courts rejected twice in dismissing criminal charges against two of the Defendants. The 100-count Indictment[2] starts from the erroneous assumption that all ads on the platform are constitutionally unprotected, that government may presume the ads relate to unlawful conduct simply by looking at them and by parroting accusations often repeated (and rejected) in previous cases, and that the government can prosecute based on a theory of generalized awareness that does not depend on specific knowledge or intent. The government's conduct of this case reflects an alarming disregard for the rule of law and constitutional norms. It seized Defendants' assets presumptively protected by the First Amendment without a hearing, has sought to deprive the Defendants of assistance of counsel, has distorted the record and refused to disclose exculpatory information, and has resisted efforts to subject its overreaching to judicial oversight.

The Indictment must be dismissed because it fails to set forth facts constituting the offenses charged, as required by the Fifth and Sixth Amendments. Additionally, because this prosecution targets publishing activities, the government must more specifically identify the precise conduct alleged to fall outside the First Amendment's protection. Rather than allege specific requisite facts to meet this obligation, the Indictment is a tapestry of generalized claims, recycled accusations, and miscellaneous assertions regarding activities that are constitutionally protected. The Indictment charges Defendants with crimes that require a showing of specific intent (even in cases not implicating the First Amendment), yet utterly fails to allege *mens rea*. The absence of this essential element is especially remarkable because the government previously has acknowledged the specific intent requirements applicable to publishers

---

[2] The operative pleading in this case is the superseding indictment (Doc. 230), which, for simplicity, is referred to in this motion as the "Indictment" and is cited as "SI."

1   of third-party content in numerous other settings – including in other pending litigation

2   where it currently is touting those requirements as the controlling standard for Travel

3   Act prosecutions implicating the First Amendment.  These defects in the Indictment

4   are fatal; it must be dismissed.

## II.      BACKGROUND

### A.      History of Backpage.com.

7   Defendants are former owners of a newspaper conglomerate that, at one time,

8   published and distributed 17 weekly papers across the country, including the *Phoenix*

9   *New Times*, the *SF Weekly*, and New York's *Village Voice.*  Lacey and Larkin founded

10  and built the *Phoenix New Times*, SI ¶ 18, which began publication in 1970 to "ke[ep]

11  the Valley of the Sun's feet to fire" through independent investigative journalism, *see*

12  *Lacey v. Maricopa Cty.*, 693 F.3d 896, 907 (9th Cir. 2012) (*en banc*) (upholding Civil

13  Rights Act complaint against Sheriff Joe Arpaio and special prosecutor for pursuing

14  and arresting Larkin and Lacey in retaliation for publishing critical articles).  The

15  newspapers featured articles on political and cultural issues not typically covered by

16  mainstream media sources and received numerous awards for excellence in journalism,

17  including the Pulitzer Prize.[3]

18  Lacey and Larkin are the majority owners of the corporate parent of Village

19  Voice Media Holdings, LLC ("VVMH"),[4] and Brunst and Spear hold minority

20  interests in the company.  Lacey served as Chief Editor of the VVMH papers, Larkin

21  was CEO of VVMH, Scott Spear was an Executive Vice President, and John Brunst

22  was the CFO.  SI ¶ 18.

23  Like other alternative weeklies, the VVMH papers were free to readers, so they

24  depended on advertising revenues, including from classified ads.  By the early 2000s,

25  the Internet – and particularly Craigslist – was undermining the economic viability of

26

27  [3] *See* https://en.wikipedia.org/wiki/Village_Voice_Media#Philosophy_of_journalism.

28  [4] The company is now known as Camarillo Holdings, LLC, but is referred to here (as it is in the Indictment) as "VVMH" for clarity.

newspaper classified advertising.  SI ¶ 20.  In response, in 2004 VVMH launched a website ("Backpage.com") to publish third-party classified ads online.  *Id.* ¶ 21.  Categories of advertisements on the site spanned the full spectrum – including for auto sales, real estate, apartment rentals, and jobs, as well as adult categories including dating, massage, and escort services – as had been published in newspapers, yellow pages and other media for decades.  *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) (noting "numerous states license, tax and otherwise regulate escort services as legitimate businesses").  Over time, Backpage.com grew to become the second largest online classified advertising website in the United States (after Craigslist), with users posting millions of ads each month.  *See id.* at 1266.

In 2013, VVMH sold its interests in the newspapers to a group of long-time executives from the papers.  In April 2015, VVMH sold its interests in Backpage.com to entities owned by Carl Ferrer (Backpage.com's CEO).  SI ¶ 29-30.  Both of these transactions were seller-financed.  VVMH ceded ownership and control of the papers and the website, respectively, to the new owners, and in return VVMH received (and holds) installment promissory notes for the purchase prices of the sales, secured by security interests in the businesses and assets sold.  *See* SI ¶ 30-31.

## B. Court Decisions Rejecting Government and Other Challenges to Adult-Oriented Advertising on Craigslist and Backpage.com.

As Internet advertising grew, various government authorities and interest groups attacked adult-oriented advertising, first targeting Craiglist.org ("Craigslist") and then Backpage.com.  Cook County Sheriff Thomas Dart brought a nuisance suit against Craigslist, alleging that all adult services ads on the site were for prostitution or sex trafficking and that Craigslist violated federal and state laws prohibiting the facilitation of prostitution, including the Travel Act.  *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 963 (N.D. Ill. 2009).  The U.S. District Court for the Northern District of Illinois rejected the sheriff's claims under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), but also because websites are intermediaries

like phone companies and ISPs, which "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id.* at 967.

Nonetheless, a group of state attorneys general continued to pressure Craigslist to eliminate its adult services category, and in September 2010 Craigslist relented, removing the category from the website and declaring that it had been "censored."[5] Less than a week later, the AGs targeted Backpage.com, demanding that it too shut down its adult category.[6] Backpage.com attempted to work with the attorneys general – explaining its review and moderation of user content and cooperation with law enforcement – but the AGs continued to make publicized demands that the website eliminate all adult services ads, as Craigslist had done.[7] Backpage.com was unwilling to succumb to censorship, and its position was upheld repeatedly in a number of lawsuits.

In 2012, the Washington State legislature enacted a statute targeting Backpage.com and creating a new state-law felony for disseminating content online if it contained a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value." *McKenna*, 881 F. Supp. 2d at 1268. The U.S. District Court for the Western District of Washington enjoined enforcement of the statute, rejecting the state's arguments that the law affected only unprotected speech proposing illegal transactions based on the assumption that all adult ads on Backpage.com were for prostitution or trafficking. *Id.* at 1282. The court struck down the law under the First Amendment because it would have "chill[ed] a substantial amount of protected speech." *Id.* at 1282.

---

[5] Claire Miller, "Craigslist Says It Has Shut Its Section for Sex Ads," N.Y. TIMES (Sept. 15, 2010), https://www.nytimes.com/2010/09/16/business/16craigslist.html.

[6] *See* Connecticut Attorney General press release (Sept. 21, 2010), https://portal.ct.gov/-/media/AG/Other/Backpageletterpdf.pdf?la=en.

[7] *See* Letter of National Ass'n of Attorneys General (Aug. 31, 2011), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf.

Tennessee passed a similar law shortly after Washington, but the U.S. District Court for the Middle District of Tennessee enjoined enforcement of that statute as well, likewise holding that third-party ads on Backpage.com were protected speech under the First Amendment. *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (rejecting state's argument that the statute "[did] not implicate First Amendment scrutiny because it criminalize[d] only offers to engage in illegal transactions"). Despite invalidation of the Washington and Tennessee laws, the New Jersey legislature enacted a similar statute, which the U.S. District Court for the District of New Jersey struck down, again rejecting arguments that adult-oriented ads on the website were unprotected speech. *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013).

At the same time, the DOJ also pursued a grand jury investigation of Backpage.com in the Western District of Washington, but the U.S. District Court there quashed a number of grand jury subpoenas premised on the government's novel theory of vicarious liability.[8]

After Washington, Tennessee, and New Jersey failed in their efforts to censor Backpage.com, Sheriff Dart came up with a new tack, threatening Visa and MasterCard to cut off use of their cards on the website.[9] The Seventh Circuit directed entry of an injunction against the sheriff, holding that he imposed an unconstitutional informal prior restraint. *Backpage.com v. Dart*, 807 F.3d at 231 (citing *Bantam*

---

[8] The court's orders in that case, *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash.), are provided in an accompanying submission under seal.

[9] The Indictment alleges that the "credit card companies stopped processing payments for Backpage … out of concern they were being used for illegal purposes," SI ¶ 15, but fails to mention the Seventh Circuit found that Visa and MasterCard blocked use of their cards "within days of receiving the [Sheriff Dart's] letter," and "were victims of government coercion aimed at shutting up or shutting down Backpage's adult section [or] more likely aimed at bankrupting Backpage …." *Backpage.com v. Dart*, 807 F.3d at 233.

*Books, Inc. v. Sullivan*, 372 U.S. 58, 64-72 (1963)).  Again in that case, the court rejected the contention that all ads in the adult section of Backpage.com were unlawful and held, to the contrary, that First Amendment protections applied.  *Id.* at 234 ("Nor is Sheriff Dart on solid ground in suggesting that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive.... [N]ot all advertisements for sex are advertisements for illegal sex.") (emphasis in original).  As Judge Posner wrote, "a public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment." *Id.* at 230 (citation and internal quotation marks omitted).

Private plaintiffs also sued Backpage.com for tort claims premised on the website's alleged violation of federal criminal law, asserting that all adult ads on the website were for prostitution or sex trafficking and that the site's design and practices were meant to promote such unlawful activity.  Courts summarily rejected these claims too.  In *M.A. ex rel. P.K v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011), the U.S. District Court for the Eastern District of Missouri dismissed the plaintiff's claims (based on alleged violations of 18 U.S.C. §§ 2, 1595, and 2255) asserting that Backpage.com's posting rules and editorial practices were designed to veil illegal ads, that Backpage.com was "made aware of minors being trafficked on their website," and that it therefore "facilitated" trafficking.  809 F. Supp. 2d at 1044-45, 1050 (plaintiff alleged "no reasonable person could review the postings in the adult categories and deny prostitution was the object of almost each and every ad").  Even under liberal civil pleading standards, the court held that the plaintiff's allegations failed to "describe the specific intent required for aiding and abetting," *i.e.*, that a defendant acted with the intent to bring about "a *certain* crime" and "participated in an unlawful venture … to bring it about."  809 F. Supp. 2d at 1054 (internal quotation marks omitted; emphasis in original).

In *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub. nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017), the U.S. District Court for the District of Massachusetts reached a similar result in dismissing plaintiffs' claims brought under 18 U.S.C. § 1595 attacking Backpage.com's practices (including as to review and editing of ads), stating: "Singly or in the aggregate, the allegedly sordid practices of Backpage … amount to neither affirmative participation in an illegal venture nor active web content creation." 104 F. Supp. 3d at 157.

And, most recently, the California Attorney General's Office – which has been working in concert with the DOJ for many years to pursue Backpage.com for many years – twice brought criminal charges against Defendants Larkin and Lacey (and Ferrer) for promoting and receiving proceeds from prostitution, but two different state judges dismissed the charges on demurrer. *People v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).[10] These courts rejected the same presumptions (*e.g.*, that all ads on Backpage.com were for prostitution) and the same vicarious liability theory that other courts rejected before, and held that the defendants could not be prosecuted for facilitating or promoting prostitution or for money laundering based on users' payments for ads. As the courts held, "[p]roviding a forum for online publishing is a recognized legal purpose" and "charg[ing] money for the placement of advertisements … qualif[ies] as services rendered for legal purposes." 2016 WL 7237305, at *10; *see also id.* at *3 (court's rulings enforcing Section 230 implicate and enforce First Amendment rights).

**C.    Criminal Prosecution in Arizona and Asset Seizures in the Central District of California.**

---

[10] The second of these opinions is unpublished, and so is provided with the attachments to this motion as Exhibit A.

Undeterred by the numerous rulings discussed above, the government commenced a prosecution against Defendants and three other individuals for their respective roles with Backpage.com.[11]   On March 28, 2018, the government obtained a 93-count grand jury indictment charging these defendants with violations of the Travel Act (18 U.S.C. § 1952), money laundering (18 U.S.C. §§ 1956, 1957), and conspiracy (18 U.S.C. § 371), all based on the defendants' prior involvement, in general, with Backpage.com (Doc. 3).

At the same time, the government negotiated and entered into a plea agreement with Backpage.com's owner and CEO, Carl Ferrer.   On April 5, 2018, Ferrer pled guilty to one count of conspiracy to launder money and violate the Travel Act, *see United States v. Ferrer*, No. CR-18-464-PHX-DJH (Doc. 7), and caused Backpage.com and his other corporate entities to plead guilty to one count of money laundering, *see United States v. Backpage.com, LLC, et al*., No. CR-18-465-PHX-DJH (Doc. 8).   Ferrer agreed to cooperate with the government in its prosecution of Defendants.

On April 6, 2018, the government seized and shut down the Backpage.com website, *see* http://www.backpage.com (government's notice of seizure).   Also on that day, the government arrested Defendants and searched Lacey's and Larkin's homes, seizing computers, jewelry, artwork and other assets (using warrants authorizing the seizure of, among other things, any "evidence of wealth").   On a parallel track, in the Central District of California, the government obtained *ex parte* warrants to seize bank accounts and personal assets of Defendants and their families.   Through multiple waves of such warrants (issued from March 28 through November 2018), the government has seized many millions of dollars from Defendants and has encumbered

---

[11] The other individuals named as defendants in the Indictment are Andrew Padilla (Backpage.com's former operations manager), Joye Vaught (its former assistant operations manager), and Dan Hyer (its former sales and marketing manager).   SI ¶¶ 5-7.   Hyer has since entered into a plea agreement with the government (Doc. 271).

their real property through *lis pendens* filings.  The government's theory for its vast seizures is that any and all revenues of Backpage.com (and any assets directly or indirectly connected to those revenues) constitute criminal proceeds.

On July 25, 2018, the government filed a superseding indictment, which added seven counts (making the total now 100 counts) and additional forfeiture allegations (Doc. 230).  The Indictment now runs to 92 pages, containing 211 paragraphs of allegations and additional forfeiture allegations.  It purports to rely on documentary evidence, but the government has not identified the documents cited.  The Indictment asserts 50 counts of alleged violations of the Travel Act premised on 50 user-submitted ads that appeared on Backpage.com (most of which the government alleges were posted *after* VVMH sold Backpage.com to Ferrer), but the overnment does not allege that any Defendant ever saw or knew of any of those ads, that any Defendant ever had anything to do with any of the ads, or that any Defendant knew anything about the persons who posted the ads.  *See* SI ¶ 201 (counts 2-51).  Similarly, the Indictment's money laundering counts merely (which are predicated on the Travel Act counts) allege that funds were transferred from one party to another, with no alleged knowledge, participation or involvement of any Defendant in any specific unlawful activity.  *See* SI ¶¶ 205, 207, 209, 210.

**D.     Progress of the Prosecution and Litigation to Date.**

Since commencing this prosecution, the government has pursued a number of actions that have occupied Defendants, requiring them to devote considerable efforts to preserve their rights and ability to defend the case.  This is discussed in more detail in Defendants' Joint Status Report (Doc. 527), but it is relevant to note here that, among other things, the government has (1) seized nearly all of Defendants' assets and used procedural machinations to prevent judicial review of the First Amendment

and other constitutional violations of the seizures;[12] (2) also seized retainer funds held by counsel for Defendants (and others);[13] (3) sought to disqualify Defendants' longstanding counsel for First Amendment and Internet speech issues (motion denied by the Court, Doc. 338); (4) repeatedly sought to invade Defendants' attorney-client privileges by accessing privileged communications and joint representation agreements (largely rejected by the Court, *see* Docs. 345, 441); and (5) refused to provide any *Brady* or *Giglio* material or all of the *Jencks* Act materials in its possession (including, notably, the statements of its key cooperator, Ferrer), despite court deadlines, requiring Defendants to pursue such disclosures (*see, e.g.*, Doc. 273).

With the recent reassignment of this case following Judge Logan's recusal, Defendants bring the present motion, because, before addressing issues of *how* this case might proceed (*e.g.*, resolving the government's disclosure obligations, delaying tactics, and other issues) it is logical to address, first, *whether* the case can proceed at all.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss Indictment.

"In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation," and a defendant may be charged based only on matters actually presented to the grand jury.  U.S. CONST. amends. V, VI.  The Federal Rules implement these guarantees by requiring an indictment to set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  Pursuant to Rule 12, a defective

---

[12] These issues are pending before the Ninth Circuit in *In re:  Any and All Funds Held in Republic Bank of Arizona Accounts XXXX1889, XXXX2592, XXXX1938, XXXX2912, and XXXX2500*, No. 18-56455 (9th Cir.), in which the court has ordered expedited argument for July 2019.

[13] These seizures are also subject to pending motions, in *In re:  The Seizure Up to and Including $10,000 in Bank Funds Held in JP Morgan Chase Account #XXXXX9285, etc.*, No. 18-MJ-02875 (C.D. Cal.).

indictment must be dismissed if:  (1) it fails to allege a crime on its face, taking into account statutory elements and constitutional requirements; or (2) there is grave doubt that the grand jury's decision to indict was based on errors in the process, such as where the government's instruction on the law was wrong or misleading, or the prosecutor's conduct improperly sought to infringe speech rights.  *See United States v. Buddenberg*, 2010 WL 2735547, at *2-6; Fed. R. Crim. P. 12(b)(3)(A)-(B).[14]  "It is perfectly proper, and in fact mandated, that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense."  *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983).

　　To be sufficient, an indictment must "set forth the elements of the offense charged and contain a statement of the facts and circumstances that will inform the accused of the specific offense with which he is charged."  *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); *see United States v. Keith,* 605 F.2d 462, 464 (9th Cir. 1979) ("The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect.").  The indictment "must furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge."  *Cecil*, 608 F.2d at 1296.  It is thus essential "that every ingredient of the offense charged must be clearly and accurately alleged in the indictment" so that the court can decide "whether the facts alleged are sufficient in law to withstand a motion

---

[14] *See Russell v. United States*, 369 U.S. 749, 764 (1962); *Wayte v. United States,* 470 U.S. 598, 608 (1985) ("[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard' ... including the exercise of protected statutory and constitutional rights."); *United States v. P.H.E., Inc.*, 965 F.2d 848, 857-58 (10th Cir. 1992) (indictment dismissed where it was a step in a "pattern of prosecutorial conduct dating back some five years that suggests a persistent and widespread campaign to coerce the appellants into surrendering their First Amendment rights").

to dismiss the indictment or to support a conviction in the event one should be had." *Russell*, 369 U.S. at 768 n.15.  To be sufficient, an indictment must set forth what each defendant is alleged to have done in violation of a specified statute, to whom, and where or when it occurred.  *Buddenberg*, 2010 WL 2735547, at *3.

In addition to Fifth and Sixth Amendment requirements set forth above, it is also necessary under Rule 12(b)(3)(B) to review the sufficiency of an indictment in light of First Amendment considerations.  *United States v. Stock*, 728 F.3d 287, 301 (9th Cir. 2013).  While the court cannot evaluate the evidence upon which an indictment is based, it must review whether the alleged statements at issue constitute unprotected speech.  It is not enough for an indictment merely to claim speech is unprotected; it is "incumbent on the Government to make that context clear in such an indictment."  *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001).  Where charges have First Amendment implications, as they do here, the government must "more specifically identify the precise conduct" alleged to fall outside constitutional protection.  *Buddenberg*, 2010 WL 2735547 at *9; *accord United States v. Cassidy*, 814 F. Supp. 2d 574, 582-83 (D. Md. 2011).  And, given the government's theory of prosecution, the Court must consider whether the stated charges render the statute at issue unconstitutional facially or as applied.  *E.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737-38 (2017); *Watts v. United States*, 394 U.S. 705, 707 (1969) (charge "must be interpreted with the commands of the First Amendment clearly in mind").

### B.    First Amendment Requirements Governing Prosecution of Publishers.

The Indictment in this case requires particular First Amendment scrutiny because government is seeking to prosecute Defendants for their roles as publishers of third-party speech.  The government is *not* prosecuting the individuals who authored and posted ads on Backpage.com for unlawful activities they might have committed, but is instead seeking to impose vicarious liability on the parties who owned the online forum where the ads were posted.  No reported (or contested) case has ever accepted such a theory of vicarious criminal liability, while many courts have rejected

it, including numerous cases concerning Backpage.com (as discussed below).

In the context of a prosecution such as this – seeking to impose criminal liability on a publisher for publishing – several fundamental First Amendment principles apply and govern the Court's role in determining whether the Indictment impermissibly challenges protected speech rights.  More specifically:

- Adult-oriented online ads, including escort ads, are presumptively legal and constitutionally protected speech.  *See McKenna*, 881 F. Supp. 2d at 1282; *People v. Ferrer*, 2016 WL 7237305, at *10.

- The government may not presume that protected speech is unprotected "merely because it resembles the latter.  The Constitution requires the reverse."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). Whether made by the government or by third-parties, claims that adult-oriented ads are "obviously" prostitution ads fall far short of this First Amendment standard.

- The government cannot base criminal liability on a publisher's exercise of "editorial control and judgment," including decisions about whether to allow, block or edit third-party content, as this is protected conduct under the First Amendment.  *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017).

- The government cannot impose vicarious liability based on allegations that a publisher had notice that third parties had misused a website for unlawful conduct.  *See Backpage.com v. Dart*, 807 F.3d at 231; *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).  The First Amendment does not permit civil or criminal liability based on allegations of generalized knowledge of illegal third-party conduct.

- To hold a party liable for publishing a third-party's speech, the First Amendment requires that the government allege (and ultimately prove) the defendant knew the specific speech involved illegality, the defendant nonetheless published that speech, *and* that the defendant intended to participate in and further the illegality.  *See Smith v. California*, 361 U.S. 147 (1959).

- The government cannot satisfy its obligation to allege specific facts sufficient to satisfy First Amendment pleading standards by repeating conclusory claims made by politicians, advocacy organizations, and some law enforcement officials asserting that Backpage.com was "known" for promoting prostitution.

The Indictment in this case violates each and all of these principles.

### C.   *Mens Rea* Requirements

Both statutory and First Amendment considerations require the indictment to meet a specific intent standard of *mens rea* requiring showings that defendants knew the content of a *specific* ad was illegal and intended to further that particular crime.  A prosecution under the Travel Act requires the government to allege "that the accused formed a specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  The same *mens rea* standard governs allegations of money laundering. *See United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999); *United States v. Trejo*, 610 F.3d 308, 314, 317 (5th Cir. 2010).  In addition, it is a basic proposition of First Amendment law that the government cannot criminally punish publishers or distributors of speech without sufficient proof of *scienter*, *i.e.*, that a defendant knew the *specific* speech that is the basis for criminal charges was unlawful and had specific *intent* to violate the law.  *Smith v. California*, 361 U.S. at 153-54; *Mishkin v. New York*, 383 U.S. 502, 511 (1966); *Cooper*, 939 F. Supp. 2d at 830.

## IV.   ARGUMENT

### A.   The Indictment and the Government's Theory of Prosecution Are Fatally Deficient.

The government's Indictment is a prolix pleading that is long on aspersions and innuendo but devoid of any bases to charge crimes against Defendants.  In terms of actual fact allegations, the Indictment attacks First Amendment-protected conduct common among websites – *e.g.*, screening and editing third-party content, reposting user-created content – and the only whiff of illegality is the government's improper presumptions (and mischaracterizations) that all adult ads on Backpage.com were for prostitution.  The Indictment is also completely bereft of any constitutionally sufficient basis to allege *mens rea*.  It asserts no fact allegations that any Defendant ever even saw any of the specific ads the government alleges were for criminal activities (*see* SI ¶ 201), much less that any Defendant intended to participate in and further illegal conduct of the third-party posters.

### 1.   *Impermissibly Presuming that Ads Are Illegal.*

The Indictment assumes from the outset – and throughout – that all advertisements in the adult or escort categories on Backpage.com were illegal and unprotected by the First Amendment.  This ignores the principle that speech must be presumed to be protected unless and until the government proves otherwise.  "The government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002); *accord Packingham*, 137 S. Ct. at 1738.  The burden of proving that speech is unlawful *always* falls to the government.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion … must rest with the Government, not with the citizen."); *Bd. of Trs. v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions").  Just as the government cannot assume books are obscene if they are sold in an adult bookstore, it cannot presume escort ads are for prostitution.[15]

The government simply cannot assume its conclusion that speech is unlawful or unprotected, nor can an Indictment based on such an unconstitutional presumption survive.  The Indictment does not allege that any specific ads on Backpage.com were facially illegal.[16]  Instead it offers the government's characterizations (scores of times)

---

[15] This is true regardless of the form of regulation or proscription of speech the government pursues – whether enacting legislation, *see, e.g.*, *Cooper*, 939 F. Supp. 2d at 837; threatening punishment because of published speech, *see Backpage.com v. Dart*, 807 F.3d at 229; or pursuing criminal charges, *see, e.g.*, *People v. Ferrer*, 2016 WL 7237305, at *3.

[16] The Indictment alleges that ads on Backpage.com contained "provocative" photos of women showing "buttocks" or "breasts" (albeit clothed) or terms such as "sexy," "fun," "young," and "exotic," *see, e.g.*, SI ¶¶ 163, 168, 173, 174, 175, 176.  Perhaps

that all ads in adult categories on Backpage.com were for "prostitution" or "obviously for prostitution" or "indicative of prostitution." *See, e.g.*, SI ¶¶ 1, 9, 34, 68, 74, 78, 86, 87, 90, 91, 95, 96, 97, 104, 107, 109, 111, 128, 131, 132, 136, 141, 143, 144, 151, 152, 153, 154, 159, 160, 161, 162, 164, 167, 170, 177.[17]

The First Amendment prohibits the government from declaring that online classified ads for adult services or escorts are unprotected simply because it thinks they "look like" ads for illegal prostitution. Yet that is the mistaken premise of the government's case. *Every court* to address this question – and this includes eight courts addressing Backpage.com – has held that the government cannot presume such ads are unprotected. As the Seventh Circuit put it: Backpage.com was "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services." *Backpage.com v. Dart*, 807 F.3d at 230-31, 234. As the court recognized in *McKenna*, 881 F. Supp. at 1282, escort ads have long been permitted, and escort services are licensed and regulated in many states.[18] Having an escorts section in a classified ad service is legal. *Doe v. Backpage.com LLC*, 104 F. Supp. 3d at 156-57.[19] "Providing a forum for online publishing" and "charg[ing] money for the placement of advertisements," as Backpage.com did, are "services rendered for legal purposes." *People v Ferrer*, 2016 WL 7237305, at *10; *accord People v. Ferrer*, No. 16FE024013, slip op. at 13.

---

obviously, speech containing sexual references or innuendo has been protected for decades.

[17] *Cf. United States v. Perkins*, 850 F.3d 1109, 1118 (9th Cir. 2017) (vacating conviction after *Franks* hearing, holding that search warrant affidavit was deficient and misleading where agent described his conclusion that images found on defendant's computer were child pornography but withheld the images, thus "usurp[ing] the magistrate's duty to conduct an independent evaluation of probable cause").

[18] *See, e.g.*, Tenn. Code Ann. §§ 7-51-1102(11) & (12); 7-51-1116; Utah Code Ann. §§ 59-27-101 to 108; Ariz. Rev. Stat. § 13-1422; Ala. Code § 13A-6-184; Kan. Stat. Ann. § 12-770(a)(8), (9); Ark. Code Ann. § 14-1-302(9), (10).

[19] *See also Dart v. Craigslist*, 665 F. Supp. 2d at 968 (Craiglist's "adult services" section "is not unlawful in itself nor does it necessarily call for unlawful content").

In sum, courts have uniformly held that escort and other adult ads on Backpage.com were protected under the First Amendment, providing a forum for such ads is likewise protected, and *the government cannot presume otherwise. See Backpage.com, LLC v. Dart*, 807 F.3d at 234 (rejecting sheriff's presumption that ads on Backpage.com were illegal); *McKenna*, 881 F. Supp. 2d at 1281-82 (rejecting similar presumption of state AG defending law targeting Backpage, and noting that publication of third-party ads – even if they concern illegal transactions – "does not fall within [the] 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection" (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *Cooper*, 939 F. Supp. 2d at 816, 833-34 (rejecting state's argument that escort ads on Backpage.com were unprotected speech); *Hoffman*, 2013 WL 4502097, at *9-11 (same); *M.A.*, 809 F. Supp. 2d at 1049-50 (rejecting similar presumption in dismissing plaintiff's civil claims based on 18 U.S.C. §§ 2, 1595, and 2255); *People v Ferrer*, 2016 WL 7237305, at *9 (dismissing state's pimping charges against Larkin and Lacey; noting that the only "whiff of illegality" in the AG's complaint improperly "require[ed] the presumption that illegal content was contained in the ads," yet the website's actions in posting the ads "would not be illegal").[20]

Despite that courts have uniformly rejected the government's presumption that all (or the "vast majority") of escort ads on Backpage.com must have been illegal ads for prostitution, the Indictment trots out the same theory again. This is a direct and impermissible attack on First Amendment-protected speech and publishing activities.

## 2.    *Repeating Others' Accusations.*

The Indictment recycles and repeats government officials' and others' condemnations of Backpage.com in years past. *See, e.g.*, SI ¶ 74 (2010 letter from

---

[20] The presumption the government offers now was also addressed in the earlier decision of the U.S. District Court of the Western District of Washington in *In re Grand Jury Subpoenas*, No. GJ12-172RAJ (W.D. Wash.), at 19-20, which is submitted with this motion under seal.

state AGs); ¶ 109 (letter from Seattle mayor); ¶ 111 (letter from National Association of Attorneys General); ¶ 140 (amicus brief filed by NCMEC); ¶ 131 (ASU publication). Such assertions are improper and, in any event, cannot constitute fact allegations necessary to satisfy First Amendment standards.

For many years, government officials have made publicized accusations about online content they dislike, for example, attacking Craigslist[21] and then Backpage about adult ads,[22] and more recently pressuring Facebook and Twitter about violent videos, allegations of fake news, liberal bias, and other charges.[23] If merely repeating officials' accusatory press releases about online content could provide bases for a criminal indictment, speech across the Internet would be at risk.

Indeed, the same public accusations noted in the Indictment (including, specifically, the 2010 letter from state AGs, *see* SI ¶ 74) have been cited before by government authorities seeking to impose criminal penalties on Backpage. *See, e.g.*, *Cooper*, 939 F. Supp. 2d at 815-16. But courts have rejected such "evidence" and struck down state efforts aimed at Backpage.com as being inconsistent with the First Amendment, *see id*. at 831-32, *McKenna*, 881 F. Supp. 2d at 1280-83. Politicians' denunciations cannot substitute for allegations of fact sufficient to satisfy First Amendment scrutiny that charges do not target or infringe protected speech.

---

[21] *Attorneys General Want Craigslist 'Adult Services' Shut Down*, Reuters (Aug. 26, 2010), https://www.reuters.com/article/urnidgns002570f3005978d80025778b004b29ff/attorneys-general-want-craigslist-adult-services-shut-down-idUS419264813320100826; *see also Craigslist, Inc. v. McMaster*, 2010 WL 11640195 (D.S.C. 2010).

[22] *Attorney General Leads 21 States In Calling On Backpage To Close Adult Services Section* (Sept. 21, 2010), https://portal.ct.gov/AG/Press-Releases-Archived/2010-Press-Releases/Attorney-General-Leads-21-States-In-Calling-On-Backpage-To-Close-Adult-Services-Section.

[23] *See, e.g.*, Zach Wichter, *2 Days, 10 Hours, 600 Questions: What Happened When Mark Zuckerberg Went to Washington*, N.Y. TIMES (Apr. 12, 2018), https://www.nytimes.com/2018/04/12/technology/mark-zuckerberg-testimony.html; Cecilia Kang, et al., *Twitter's Dorsey Avoids Taking Sides in Partisan House Hearing*, N.Y. TIMES (Sept. 5, 2018), https://www.nytimes.com/2018/09/05/technology/facebook-twitter-congress.html.

### 3.     Attacking Traditional, Protected Publisher Functions.

The Indictment contains numerous allegations attacking Backpage.com's efforts to screen, block or edit content – attempting to cast these practices as nefarious and criminal.  However, screening and editing third-party content is common among websites; Congress has expressly encouraged such self-policing (by enacting the CDA).  More importantly, website's editorial decisions about what third-party content to allow, block or edit are recognized publisher functions protected under the First Amendment.  Here again, the Indictment fails because it attacks First Amendment-protected conduct.

The Supreme Court long ago made clear that the First Amendment protects "editorial control and judgment." *Tornillo*, 418 U.S. at 258.  This principal applies to speech on the Internet. *Reno v. ACLU*, 521 U.S. 844, 868-70 (1997) ("[O]ur cases provide no basis for qualifying the level of First amendment scrutiny that should be applied to this medium.").  Such protection is particularly important for online publishers, which have millions of users and cannot possibly be charged with an obligation to screen "each of their millions of postings for possible problems." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).  As has become well recognized, editorial activities of online intermediaries are protected by the First Amendment.  *See*, *e.g.*, *Washington Post v. McManus*, 355 F. Supp. 3d 272, 300 (D. Md. 2019) (enjoining Maryland statute that required social media and news websites to self-publish information about political ads, holding that the statute infringed editorial judgments; "This respect for a publisher's right to exercise 'editorial control and judgment' … applies with equal force to outlets that publish content on the Internet") (quoting *Tornillo*, 418 U.S. at 258), *appeal filed*, No. 19-1132 (4th Cir. Feb. 4, 2019); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438 (S.D.N.Y. 2014) ("a 'search engine's editorial judgment is much like many other familiar editorial judgments,'

1    such as the newspaper editor's judgment of which wire-service stories to run and

2    where to place them in the newspaper").[24]

3          A website's "decisions relating to the monitoring, screening, and deletion of

4    content [are] actions quintessentially related to a publisher's role."  *Green v. Am.*

5    *Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003).  "[D]eciding whether to publish,

6    withdraw, postpone, or alter content" is the "exercise of a publisher's traditional

7    editorial functions."  *Zeran*, 129 F.3d at 330; *accord Jones v. Dirty World Entm't*

8    *Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("a publisher's traditional editorial

9    functions" include "deciding whether to publish, withdraw, postpone or alter content");

10   *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) ("removing content is

11   something publishers do").  In fact, 23 years ago, Congress set out not only to protect

12   but to encourage online providers to engage in such editorial practices of monitoring,

13   limiting, and/or editing user-submitted content, with the intent that self-policing would

14   better "maintain the robust nature of Internet communication, and … keep government

15   interference in the medium to a minimum."  *Batzel v. Smith*, 333 F.3d 1018, 1027-28

16   (9th Cir. 2003) (quoting *Zeran*, 129 F.3d at 330).[25]

17

18   _____

19   [24] *See also e-ventures Worldwide, LLC v. Google, Inc*., 2017 WL 2210029, at *4 (M.D.
     Fla. Feb. 8, 2017) ("A search engine is akin to a publisher, whose judgments about

20   what to publish and what not to publish are absolutely protected by the First
     Amendment"; holding that "Google's actions in … determining whether certain

21   websites are contrary to Google's guidelines and thereby subject to removal are the
     same as decisions by a newspaper editor regarding which content to publish, which

22   article belongs on the front page, and which article is unworthy of publication.  The
     First Amendment protects these decisions, whether they are fair or unfair, or motivated

23   by profit or altruism."); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-630 (D.
     Del. 2007) (First Amendment protects decisions about placement, ranking, or rejection

24   of online advertisements); *Search King, Inc. v. Google Tech., Inc*., 2003 WL 21464568

25   *4 (W.D. Okla. 2003) ("Google's PageRanks are entitled to 'full constitutional

26   protection.'").

27   [25] *See Bennett v. Google, Inc.*, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017)
     ("holding Google liable for establishing standards and guidelines would ultimately

28   create a powerful disincentive for service providers to establish any standards or ever

                                            21

The government ignores all of this established law to allege that protected editorial practices for reviewing and blocking user-submitted content should instead be the basis for criminal liability.  In terms of fact allegations, the Indictment alleges that "Backpage periodically used computerized filters and human 'moderators' to edit the wording of (or block) ads," but then adds the conclusory assertion that this was done to "remov[e] particular terms that were indicative of prostitution."  SI ¶¶ 11, 68.  This is a mischaracterization contrary to the very documents upon which the government purports to rely.[26]  *See McKenna*, 881 F. Supp. 2d at 1266-67 (Backpage used automated filters to screen for 26,000 terms, phrases, email addresses, URLs and IP addresses, and employed 100 personnel to review and block ads violating the website's terms of use); *Cooper*, 939 F. Supp. 2d at 814 (Backpage.com's monitoring blocked or removed one million ads in April 2012).  But, regardless, these and similar allegations of the Indictment[27] reflect that the government impermissibly disregards First

---

decide to remove objectionable content, which the CDA was enacted to prevent"), *aff'd sub nom.*, *Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).

[26] For example, the Indictment refers to an April 2008 email from Ferrer as allegedly stating that "he was unwilling to delete prostitution ads" and so instructed staff to "edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website."  SI ¶ 68.  However, the actual email does not say this, does not refer to "prostitution ads" nor that the terms to be blocked were "indicative of prostitution," but rather stated that blocking ads could lead to user complaints and chargebacks.  *See* DOJ-BP-0000192778.

Additionally, the Indictment's allegations about Backpage.com editing ads (to eliminate words and photos that violated the website's terms of use) concern only a period of months at the end of 2010, *see* SI ¶¶ 72-87 (allegations all from September 1, 2010 to December 2010), which was immediately after Craigslist removed its category for "adult services" in response to pressure from government officials, and Backpage.com significantly expanded its moderation efforts to deal with an influx of submissions.  Significantly, none of the ads that are the bases for the Indictment's Travel Act counts were published during this time period.

[27] The Indictment similarly casts aspersions that Backpage.com failed to adopt other rules or review practices for user content.  *See, e.g.*, SI ¶¶ 14, 90, 100, 101, 106, 131.  But, deciding *not* to implement practices are protected editorial decisions every bit as

Amendment principles to base charges on editorial practices that are common among websites[28] and constitutionally protected.

In fact, courts have expressly rejected the government's theory in others' attempts to ascribe criminal liability to Backpage.com. In *M.A.*, 809 F. Supp. 2d at 1041, the court dismissed outright the plaintiff's claims against Backpage.com predicated on 18 U.S.C. § 2 (for allegedly aiding and abetting sex trafficking by users who posted ads on the site). *Id.* at 1054. Rejecting accusations that Backpage.com was designed to promote prostitution and sex trafficking, *id.* at 1044, the court held that Backpage.com could not be liable based on users' misuse of its services, and merely asserting that such misuse occurred could not establish that the website had the requisite specific intent, *i.e.*, that it knew of and shared the user's intent to commit specific sexual offenses, *id.* at 1054. In *Doe v. Backpage.com,* the court rejected claims based on the federal Trafficking Victims Protection Act (18 U.S.C. § 1591, *see* 18 U.S.C. § 1595), noting that allegations about Backpage.com's editorial practices (much the same as the Indictment's allegations here), whether viewed "[s]ingly or in

---

much as decisions *to* implement practices. *See Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (allegations seeking to hold MySpace liable for not adopting safety measures were merely another way of improperly claiming the website operator was liable for its "role as a publisher of third-party-generated content"); *accord Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016).

[28] For example, Craigslist's posting rules for adult ads were essentially the same as Backpage.com's, prohibiting terms that "suggest or imply an exchange of sexual favors for money" including use of "any and all code words" (providing examples) or any "attempt to avoid detection of forbidden language by using spelling variations" (again providing examples), https://web.archive.org/web/20100526124651/www.craigslist.org/about/help/Adult_Services_Posting_Guidelines (Craigslist Adult Service Posting Guidelines, May 26, 2010); *see also craigslist, Inc. v. McMaster*, 2010 WL 11640195, at *2 (D.S.C. Aug. 6, 2010) (quoting rules); Match.com, https://web.archive.org/web/20100627072807/www.match.com/registration/membagr.aspx (June 27, 2010 Terms of Use: "Match.com may review and delete any content, messages … photos or profiles …, in each case in whole or in part, that in the sole judgment of Match.com violate this Agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Members.").

the aggregate" cannot "amount to … affirmative participation in an illegal venture." 104 F. Supp. 3d at 157; *see also People v. Ferrer*, 2016 WL 7237305, at *3, *10 (taking into account First Amendment interests, holding that Backpage.com's provision of "a forum for online publishing" and receiving payments for ads "qualify as services rendered for legal purposes," insufficient to support charges of pimping, facilitating prostitution or money laundering).

### 4. *Attacking Efforts to Promote or Advertise a Website to Users.*

In a similar vein, the Indictment offers accusations about efforts Backpage.com made in its early years to promote customer usage through advertising and by offering free ads to users. There is nothing illegal about such practices, and here again the government's allegations are based entirely on its assumptions that all adult ads are for prostitution.

For example, the Indictment attacks a Backpage.com marketing effort in 2007 whereby representatives contacted individuals who had posted ads elsewhere (*e.g.*, Craigslist), asked if they would be interested in posting their ads on Backpage.com, and, if the user agreed, the representative would upload the same ad (as written by the user) to Backpage.com. SI ¶ 36; *see generally id.* ¶¶ 35-44 (referring to this as "aggregation"). Purporting to rely on Backpage.com emails and other documents, the Indictment alleges, however, that "Backpage employees would … *identify prostitutes* advertising on other websites" and seek to post their ads. SI ¶ 36 (emphasis added); *see also id.* ¶ 9. Yet the cited documents say nothing of the sort, instead referring to identifying leads from "employment," "therapeutic massage," and "adult" ads posted elsewhere. DOJ-BP-0004602206. Otherwise, the Indictment merely alleges that this marketing effort was successful and helped generate "new adult content" to the website. *See, e.g.*, SI ¶ 39.

The Indictment further presumes that adult ads on Backpage were for prostitution because the website received page views from individuals who had visited

another site – theeroticreview.com – and, for a time,[29] Backpage.com ran banner ads on that site. SI ¶ 10 (referring to this as a "reciprocal link" arrangement).  The Indictment then notes that a May 2009 newspaper article referred to theeroticreview.com as a "prostitution website," SI ¶ 54, and from this premise asserts that Backpage.com "employed … business strategies that were specifically intended to promote and facilitate prostitution," SI ¶ 10.[30]  Here, the government's accusations amount to presumptions piled atop presumptions – in effect charging Backpage.com (and therefore Defendants) with complicity not only for everything that persons posting ads on the website might have done (albeit unknown) but also based on which other websites individuals reading ads on Backpage.com might have visited.

As noted, online adult content is presumptively protected speech, and the government cannot equate it to prostitution or unlawful speech.  As is true throughout the Indictment, stripping out the government's improper presumptions, these allegations describe actions that are legal *and* recognized publisher functions. Reposting third-party content from another website is "a traditionally protected editorial function."  *People v. Ferrer*, 2016 WL 7237305, at *7; *see also Barrett v. Rosenthal*, 40 Cal. 4th 33, 63, 146 P.3d 510, 517 (2006).  Banner ads on websites are ubiquitous and one of the largest forms of online advertising.[31]  Successful marketing to online customers is legal and common for websites.  In its role of ensuring that the

---

[29] Again, this was in the early days of Backpage.com, from 2007-2009, according to the Indictment, *see* SI ¶¶ 45-55, years before any of the alleged ads and transactions that form the Indictment's Travel Act and money laundering counts.

[30] The rest of what the Indictment alleges about theeroticreview is that Backpage ran banner ads on that site for a few years and believed that they helped increase user visits and page views.  *See* SI ¶¶ 46-53.  Of course, the government no more assume that all content on theeroticreview.com was unlawful than it can make such an assumption as to Backpage.com.

[31] *US Digital Display Ad Spending to Surpass Search Ad Spending in 2016* (Jan. 11, 2016), https://www.emarketer.com/Article/US-Digital-Display-Ad-Spending-Surpass-Search-Ad-Spending-2016/1013442 (2016 spending on online display advertising was $32.17 billion, with banners and similar ads accounting for the largest percentage).

Indictment is not based on challenges to protected speech or practices, the Court should reject these allegations as well.

**B.      The Indictment Fails to Allege Any Requisite *Mens Rea*.**

The premise of the Indictment is that Backpage.com "facilitated" prostitution by providing an online forum where third-party users could post adult ads, and Defendants can be held criminally liable if they knew that some (or many) users used the website for prostitution.  The government's theory – that Defendants may be criminally responsible for *general awareness* that third parties used Backpage.com for criminal purposes – has been universally rejected.  Under both First Amendment and statutory standards, the government cannot prosecute on this basis – the law requires the government allege and prove specific intent.  The Indictment contains no allegations of the requisite *mens rea*, or anything remotely close.

**1.      *The Government's Prosecution is Governed by a Specific Intent Standard.***

A prosecution under the Travel Act requires the government to allege "that the accused formed a specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  In *Gibson*, the government asserted charges under the Travel Act against several manufacturers that sold punchboards and pulltabs to businesses in Montana, where the mere possession of those items was illegal under the state's gambling laws.  Even assuming the defendants knew their customers would violate Montana law by purchasing those items, the Ninth Circuit affirmed dismissal of the charges, holding that such knowledge could not satisfy the specific intent requirement of the Travel Act.  *Id.* at 450.[32]  Instead, the Ninth Circuit held that, to show specific intent, "the prosecutor must show that the manufacturer in some significant manner

---

[32] As the Ninth Circuit explained, and *apropos* to the government's prosecution theory here:  "It is as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser."  507 F.2d at 450 n.8.

1   associated himself with the purchaser's criminal venture for the purpose of its

2   advancement." *Id.* at 449.[33]  No lesser showing of *mens rea* can be sufficient under

3   the Travel Act, because otherwise "the act would be plagued by the very

4   overexpansiveness which Congress sought to rule out …." *Id.*

5        Similar *mens rea* standards of intent (rather than generalized awareness)

6   govern allegations of money laundering.  *See United States v. Brown*, 186 F.3d 661,

7   670 (5th Cir. 1999) ("This element is not satisfied by mere evidence of promotion, or

8   even knowing promotion, but requires evidence of *intentional* promotion."); *United

9   States v. Trejo*, 610 F.3d 308, 314, 317 (5th Cir. 2010) ("Nor may the government rest

10  on proof that the defendant engaged in "knowing promotion" of the unlawful

11  activity."  ""[K]nowing promotion' is not enough for a conviction under the federal

12  money laundering statute."); *see also* R. Jones, Becker, K., *Whoever Knowingly*

13  *Advertises: Considerations in Prosecuting Sex Trafficking*, U.S. Attorneys' Bulletin

14  (Nov. 2017), https://www.justice.gove/usao/page/file/108856/download (DOJ counsel

15  for this case explaining that "[t]he specific intent to promote requirement" is "the

16  gravamen" of a money laundering charge under 18 U.S.C. § 1956 and is subject to a

17  "stringent" *mens rea* requirement (internal quotations and citations omitted).

18  

19  [33] With respect to prostitution offenses, the Travel Act requires not only that a

20  defendant intended and took action to promote or facilitate a prostitution offense or
    offenses; but that the promotion or facilitation was of a "business enterprise" involved

21  in prostitution.  18 U.S.C. § 1952(b)(1); *see Gibson*, 507 F.2d at 449.  A "business
    enterprise" is a continuous course of criminal conduct, not just a single incident.  This

22  element of the Travel Act thus requires a showing that a defendant knew of the

23  *criminal enterprise* and intended to promote or facilitate it.  *See United States v.

24  Kaiser*, 660 F.2d 724, 731 (9th Cir. 1981) ("The Travel Act proscribes … interstate
    travel to promote unlawful 'business enterprises' [and] "[t]he words 'business

25  enterprise' refer to a continuous course of criminal conduct rather than sporadic or
    casual involvement in a proscribed activity." (internal citations omitted).  As discussed

26  above, the Indictment does not allege that any Defendant knew anything about any of
    the ads that are the bases of the government's charges or had any dealings with the

27  third parties who posted the ads, much less that any Defendant knew of any "business
    enterprise" of an individual poster (whom they did not know) and intended to further

28  that enterprise (through the publication of ads they never saw).

More fundamentally, it is a basic proposition of First Amendment law that the government cannot criminally punish publishers or distributors of speech without sufficient proof of *scienter*, *i.e.*, that a defendant knew the *specific* speech that is the basis for criminal charges was illegal. This basic principle dates back 60 years, to *Smith v. California*, 361 U.S. at 147, in which the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books. Even though the First Amendment does not protect obscene speech, the Court held that a bookseller could not be prosecuted without proof it had knowledge of the contents of *a given book*. *Id.* at 153-54. Absent such scienter, First Amendment rights would be severely chilled – the bookseller could not fairly be charged with "omniscience" as to everything in its store, and the bookseller's burden "would become the public's burden" because speech would be suppressed for fear of liability. *Id.*; *see also Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ...."); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (interpreting 18 U.S.C. § 2252 to require proof that defendant knew that one or more specific performers in video were under 18, because a statute "bereft of [such] a scienter requirement … would raise serious constitutional doubts").[34]

The DOJ itself has admitted that a website operator cannot be liable under federal criminal laws absent proof that it knew of, and intentionally participated in, illegal conduct of *specific* individuals using the website. The DOJ has said this not once, but many times.

In 2010, the DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction was asked in Congressional hearings: "[W]hat laws apply to Internet

---

[34] As courts have also recognized, the First Amendment burden imposed by self-censorship is magnified on the Internet, because "websites … will bear an impossible burden to review all of their millions of postings or, more likely, shut down their adult services section entirely." *Cooper*, 939 F. Supp. 2d at 830.

28

providers like craigslist that would make them criminally liable for the postings?"  She responded:

> I am not aware of any laws that would make them liable [for third-party postings], unless there was evidence that craigslist was a participant … conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws.…  I am not aware of any Federal statutes anyway with respect to neglect being the standard.  In Federal law, the standard for prosecution would be knowing or willful….  I am not aware of anything that shows us that craigslist might be criminally liable….  [A]t this point, we have the proper tools.  We have what we need to prosecute the guilty, that is, the people who are using the Internet ….  And I don't think anyone … here would propose closing the Internet."

*Domestic Minor Sex Trafficking:  Hearing Before Subcomm. on Crime, Terrorism, & Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 215-16 (2010)), attached as Exhibit B.

More recently, in 2016, when Congress amended 18 U.S.C. § 1591 in what was called the "SAVE Act," (which added "advertising" as a predicate act for sex trafficking if done "knowingly"), in order to withstand Backpage.com's constitutional challenge to the act, the government insisted that a website publisher could not be liable absent specific knowledge of and participation in an incident of sex trafficking:

> Even if an advertisement for illegal sex trafficking appeared on [its] website, [Backpage] could not be convicted under [the law] without proving that [it] knew that the advertisement at issue related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion.

DOJ Reply in Support of Motion to Dismiss, at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155(RBW (D.D.C. Apr. 15, 2016) (ECF No. 13).  The district court agreed with this interpretation and dismissed Backpage.com's challenge, concluding the website faced no credible threat of prosecution given its practices and that the statutory amendments *increased* the *mens rea* requirement for liability so as to protect websites.  *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 108-09 (D.D.C. 2016); *see also* 161 Cong. Rec. H596, H598-H600 (daily ed. Jan. 27, 2015) (intent of amendments was to "raise the bar" by requiring proof that websites had knowledge that given ads were unlawful, so as to avoid constitutional problems).

In Congress's most recent attempt to target Backpage.com – the "Fight Online Sex Trafficking Act" (or "FOSTA"), which amended federal sex trafficking laws and Section 230 – legislators also recognized that the law does not allow criminal liability based on allegations of "generalized knowledge."

> Though under 18 U.S.C. § 1591, a website may be held criminally liable for knowingly advertising sex trafficking, this knowledge standard is difficult to prove beyond a reasonable doubt.  This is so because online advertisements rarely, if ever, indicate that sex trafficking is involved.  The advertisements neither directly nor implicitly state that force, fraud, or coercion was used against the victim, nor do they say that the person depicted being prostituted is actually under the age of 18.  … Further, *general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim.*

Report on H.R. 1865, No. 115-572 at 5, https://www.congress.gov/115/crpt/hrpt572/CRPT-115hrpt572-pt1.pdf (emphasis added). And writing to the House about that legislation, DOJ acknowledged the high burden of proof for advertising, given First Amendment implications:

> Section 1591 already sets an appropriately high burden of proof, particularly in cases involving advertising.  Under current law, prosecutors must prove that the defendant knowingly benefitted from participation in a sex trafficking venture, knew that the advertisement related to commercial sex, and knew that the advertisement involved a minor or the use of force, fraud, or coercion.

Letter from DOJ Assistant Attorney General Stephen E. Boyd to Congressman Robert W. Goodlatte (Feb. 27, 2018)), Exhibit C.

The government has acknowledged in other cases it has the burden to prove not just that the Defendants knew that *particular ads* were for prostitution, but that they had the *specific intent to facilitate those particular acts* of prostitution.  In *Woodhull Freedom Foundation v. United States*, the government argued that for prosecutions under the Travel Act, the prosecutor must prove "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act."  334 F. Supp. 3d 185, 199-201 (D.D.C. 2018), *appeal filed*, No. 18-5298 (D.C. Cir. Oct. 12, 2018).  The court

agreed with the government and held that the law applies only to "specific unlawful acts with respect to a particular individual, not the broad subject-matter of prostitution." *Id*. Most recently, in defending the district court decision in that case, DOJ repeated its position that in a prosecution under the Travel Act, the government must allege that the defendant acted to intentionally promote or facilitate a "specific, unlawful instance of prostitution." Brief for the United States in *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc. #1782997) at 21-22.

### 2. The Indictment Fails to Allege Specific Intent.

The essential premise of the Indictment is that the Defendants had general knowledge that Backpage.com was used by third parties to advertise prostitution and that they took steps to encourage and promote such uses. The charges are false, but for the purpose of reviewing the indictment under Rule 12(b)(3)(B), the allegations are defective as a matter of law because the government fails to allege the necessary *mens rea* as to any specific acts, either for the website or for any of the individual Defendants.

The overwhelming premise of the Indictment is that the Defendants had a general awareness that "the vast majority" of advertisements in the adult and escort sections of Backpage.com were for prostitution and a general intent to promote such ads. SI ¶¶ 1, 9, 10, 11, 13, 15, 19, 24, 34, 52, 59, 68, 69, 71, 75, 91, 92, 98, 114. The Indictment lists a series of specific instances involving seventeen individuals it describes as "victims," SI ¶¶ 160-176, but in no case does it assert that any Defendant had any awareness of ads involving the alleged victims, or any intent to facilitate prostitution of those persons. Rather than specific knowledge or intent, the Indictment claims the requisite *mens rea* can be imputed to the Defendants because of general allegations leveled by law enforcement officials, SI ¶¶ 74, 105, 109, 111, 136, 141, 144; characterizations in news stories, *id*. ¶¶ 127, 146; statements by advisory bodies and advocacy groups, *id*. ¶¶ 122, 134, 136, 140; allegations by congressional

committees, *id*. ¶ 151, and others.  *Id*. ¶¶ 69, 131, 135.  The Indictment even suggests that the fact Backpage.com's former CEO cooperated with law enforcement and testified in criminal prosecutions of individual pimps somehow supports an allegation of *mens rea* for all other ads on the website.  SI ¶¶ 71, 76, 91.  None of these allegations are relevant to the type of showing required for *mens rea* that the government has acknowledged repeatedly – just not in this case.

Nor do allegations against the individual Defendants attempt to satisfy the specific intent requirement.  Even apart from the government's distortions about what the Defendants purportedly said or did, the Indictment fails even to allege that any Defendant was aware of any of the ads identified in the Indictment, SI ¶ 201, that any Defendant knew any of those ads was for prostitution, that any Defendant was involved in the decision to publish any such ad, or that any Defendant made such a decision with the intent to further any illegal acts.

For Michael Lacey, for example, the Indictment alleges that various groups or individuals had told him (or forwarded their claims) that they believed that a high proportion of ads on Backpage.com were for prostitution.  SI ¶¶ 97, 131, 146, 147. After one such allegation was made in a meeting with representatives from the National Center for Missing and Exploited Children ("NCMEC"), Lacey is alleged to have told them "adult prostitution is none of your business." [35]  Lacey also is alleged to have once received a letter from an organization that represents sex workers thanking Backpage.com "for continuing to permit sex workers 'to advertise in the 'Adult' area.'"  SI ¶ 142.  Finally, Lacey allegedly was on an email chain in which Backpage staff members reported deleting an ad for which a complaint had been received

---

[35] SI ¶ 89.  The Indictment also alleges that Lacey "believe[s] in legalized prostitution," SI ¶ 121, and that he once drafted an editorial that the government characterizes as "brag[ging] about the company's contributions to the prostitution industry."  SI ¶ 11, 107.  According to the Indictment, Lacey wrote that Backpage.com was "part of the solution" because it provides "transparency, recordkeeping and safeguards."  SI ¶ 11, 107.

1   (although the removal apparently was not made quickly enough in the government's

2   estimation), SI ¶ 126, and allegedly was sent an email in which the former CEO

3   recommended against adopting one of NCMEC's suggested reforms.  SI ¶ 106.  The

4   Indictment also alleges that Lacey once transferred funds to an overseas bank at a time

5   when charges in a California case had been dismissed, and no other charges were

6   pending.  SI ¶ 16.  That's it.

7        The allegations regarding James Larkin likewise fail to include any suggestion

8   that he was aware of any of the ads identified, that he knew any of those ads was for

9   prostitution, that he was involved in deciding to publish any such ad, or that he made a

10  decision with the intent to further any illegal acts.  As with Lacey, the Indictment

11  alleges that various groups of individuals made general claims to Larkin that

12  prostitution ads were prevalent on Backpage.com.  SI ¶¶ 86, 89, 97, 100, 135.  The

13  Indictment alleges that Larkin was aware of efforts to grow the business of

14  Backpage.com through "aggregation," "reciprocal links" and banner advertising on

15  other websites that contained adult content.  SI ¶¶ 41-43, 47, 49, 50, 56-58, 138.  It

16  alleges that Larkin was aware of, and helped edit the editorial in which Lacey claimed

17  Backpage.com was "part of the solution."  SI ¶¶ 12, 107, 108.  The Indictment claims

18  that Larkin also was a recipient of the "thank you letter" allegedly sent by an

19  organization that represents sex workers, SI ¶ 142, and that he, too, was on the email

20  chain in which Backpage staff members reported deleting an ad that purportedly

21  involved a minor.  SI ¶ 126.  Likewise, the Indictment alleges that the former CEO

22  copied Larkin on an email in which he recommended against adopting one of

23  NCMEC's suggested reforms.  SI ¶ 106.  It also alleges Larkin agreed to have a

24  contractor assist with enforcing website rules that banned posting nude photos.  SI

25  ¶ 103.

26       The Indictment's allegations against John Brunst, as CFO, are entirely barren of

27  anything that resembles *mens rea*.  He allegedly was sent documents describing the

28  "Backpage strategic plan" and other presentations that discussed plans to grow the

33

1   business through "aggregation" and "reciprocal links" with other sites that contained

2   adult content, SI ¶¶ 42, 49, 138, 155, 157, and allegedly attended meetings in which

3   Google Analytics analyses of web traffic were discussed.  SI ¶¶ 57-58.  The Indictment

4   also alleges that Brunst received an email saying that Chase Bank was discontinuing

5   accepting transactions from Backpage.com due to allegations about the site.  SI

6   ¶ 135.[36]  The Indictment contains no other allegations regarding Brunst.

7        Finally, nothing in the Indictment alleges *mens rea* on the part of EVP Scott

8   Spear.  Most of the allegations focus on claims that Spear was involved in efforts to

9   expand Backpage.com's business through "aggregation" and "reciprocal links" with

10  other sites with adult content.  SI ¶¶ 35, 38, 41, 42, 45, 46, 47, 49, 50, 51, 56, 57, 58,

11  65.  The Indictment also alleges that Spear heard or was sent general claims that

12  prostitution ads were prevalent on Backpage.com.  SI ¶¶ 97, 100, 135.  It claims that

13  Spear received emails describing Backpage.com's enforcement of terms of service,

14  including the banning of images depicting sex acts, SI ¶¶ 70, 73, 81, 103, and that he

15  was on email chains in which certain recommended changes in website policies were

16  rejected.  SI ¶ 90.  Finally, without reference to any particular ad, the Indictment

17  alleges that Spear was aware that certain words are "code" for prostitution.  SI ¶ 149.

18  As with all the other Defendants, there are no allegations that Spear was aware of any

19  of the ads identified, that he knew any of those ads were for prostitution, that he was

20  involved in any decision to publish the such ads, or that he made a decision with the

21  intent to further any illegal acts.

22          ### 3.    *Case Law Compels Dismissal of the Indictment.*

23        The Indictment is a mash-up of broad, generalized allegations coupled with a

24  complete absence of specific allegations that go to the essential element of *mens rea*.

25  _____

26  [36] Allegations about banks or credit card issuers deciding not to process transactions on
    Backpage.com, *see, e.g.*, SI ¶¶ 178, 179, 181, 183, presumably for perceived

27  reputational reasons, do not suffice as allegations that Brunst specifically intended to
    promote or facilitate publishing ads for prostitution, let alone that he ever had any

28  knowledge of or involvement with any of the ads cited in the Indictment.

1    There is not a single allegation of fact against any Defendant that shows awareness of

2    a particular illegal ad, much less the necessary intent to facilitate any illegality.  An

3    indictment must be dismissed where the government attempts to "rely on the

4    defendants' conduct as a whole." *Buddenberg*, 2010 WL 2735547 at *10.  Especially

5    in this context, where the government is seeking to impose criminal liability on a

6    publisher for content provided by others, given the First Amendment implications, it

7    must "more specifically identify the precise conduct upon which it seeks to hold each

8    defendant criminally liable." *Id.* at *9.  Even without regard to First Amendment

9    principles, the indictment must be dismissed in any event based on a failure to allege

10   specific intent, given the *mens rea* standard under the Travel Act and money

11   laundering statute.  *E.g.*, *Woodhull Freedom Found.*, 334 F. Supp. 3d at 199-201.  *See*

12   *supra* Sections III.C, IV.B.1.

13        The essential allegations of the Indictment are that Backpage.com provided a

14   platform for escort and adult-themed ads (which the government equates with

15   illegality), that it actively sought to promote that aspect of the business, that the

16   Defendants failed to heed warnings or take adequate steps to prevent such postings,

17   and that moderation practices implementing Backpage.com's terms of service

18   generally "facilitated" prostitution.  Even if the Indictment contained specific

19   allegations of fact to support such claims against each Defendant (which it does not),

20   none of this amounts to culpable criminal behavior, or that Defendants had the

21   necessary *mens rea*, as numerous courts have held.

22        In *Dart v. Craigslist*, 665 F. Supp. 2d 961, for example, the sheriff of Cook

23   County charged that the "erotic services" section of Craigslist constituted a "public

24   nuisance" that violated "federal, state, and local prostitution laws," including

25   specifically, the Travel Act.  *Id.* at 963.  Sheriff Dart made the very familiar-sounding

26   allegations that Craigslist was "the single largest source for prostitution, including

27   child exploitation, in the country," that users posted "obvious" ads for prostitution

28   using coded language with "nude or nearly nude pictures," that Craigslist assisted

these postings through its moderation process, and that the overall allegations were supported by the opinions of advocacy groups and other law enforcement bodies. *Id.* at 962-63. Like the Indictment in this case, "Sheriff Dart's lengthy complaint relie[d] heavily on a few conclusory allegations to support the contention that [the website] induces users to post ads for illegal services." *Id.* at 969. Nevertheless, the court held that "[t]he phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content," and websites that host such content "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id.* at 967-68 ("Plaintiff is simply wrong when he insists that these terms are synonyms for illegal sexual services."). The court observed that these types of allegations may be characterized as "negligent publishing," *id.* at 967, a notion that could never satisfy the strict criminal pleading standard of specific intent. [37]

Other courts have made the same point that some level of "general awareness" does not satisfy the *mens rea* requirement. *See*, *e.g.*, *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet … prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers…?"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not

---

[37] *See*, *e.g.*, *M.A.*, 809 F. Supp. 2d at 1054 (Backpage could not be liable based on allegations it aided violations of federal criminal statutes such as 18 U.S.C. § 1591, because publishing third-party ads cannot establish the specific intent required); *McKenna*, 881 F. Supp. 2d at 1277-79 ("[W]here an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that.… However, if the offer is implicit, how can a third party ascertain that which is being offered before the transaction is consummated?"); *cf. McMaster*, 2010 WL 11640195, at *10 (dismissing as moot constitutional challenge to threatened prosecution of Craigslist after Attorney General abandoned "generalized" theory of prosecution).

guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes….").  Of particular relevance here, the Seventh Circuit observed that "Backpage is an intermediary between the advertisers of adult services and visitors to Backpage's website," and intermediaries "do not become liable for the sponsor's [*i.e.*, advertiser's] deeds" "[e]ven [if they] know the information's content." *Backpage.com v. Dart*, 807 F.3d at 234.

The Indictment contains no allegations as to Backpage.com as a website, and certainly not for any of the individual Defendants, that could satisfy a specific intent standard.  This "complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment."  *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (an indictment failing to allege the requisite *mens rea* "on its face is deficient" because "implied, necessary elements, not present in the statutory language, must be included in an indictment"); *accord United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (indictment dismissed for failure to allege specific intent); *United States v. Carbajal*, 42 F. App'x 954, 954-55 (9th Cir. 2002) (same).  Without an express statement of the required level of *mens rea*, an indictment fails to ensure that the defendant is being prosecuted only "on the basis of the facts presented to the grand jury."  *Du Bo*, 186 F.3d at 1179 (quoting *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994)).  In the absence of specific allegations, it is impossible to know "if the grand jury would have been willing to ascribe criminal intent" to the Defendants.  *Id.* at 1179-80.  *See Buddenberg*, 2010 WL 2735547, at *9.  Such a defective indictment requires dismissal because it fails to "properly allege an offense against the United States."  *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir. 1976).

**C.      The Travel Act is Unconstitutional as Applied in the Indictment**

### 1.    Indictment Bases Travel Act Allegations as Generalized Crimes

As set forth in detail above, the Indictment alleges that the Defendants had general knowledge that Backpage.com was used by third parties to advertise prostitution and that they took steps to encourage and promote such uses. The Indictment makes no allegations that any Defendant was aware of any of the ads identified, that he knew in advance that any of those ads was for prostitution, or that he was involved in decisions to publish any of the ads and did so with the intent to further illegal acts. If the Travel Act could be interpreted and applied so expansively, there would be no clear restrictions on its scope and no way to understand its terms. The Travel Act would thus be plainly unconstitutional, as the government seeks to apply it in this case.

The theory of prosecution is that the Defendants used facilities in interstate commerce (a website) to promote or facilitate prostitution as prohibited by state law. If the Travel Act can be applied to such generalized actions, there are few limits to its reach. The statutory language is expansive, potentially prohibiting any action in interstate commerce that would "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" as identified by the law. 18 U.S.C. § 1952(a)(3). The terms "promote" or "facilitate the promotion of" have been interpreted quite broadly to mean doing "any act that would cause the unlawful activity to be accomplished or to assist in the unlawful activity in any way." *United States v. Bennett*, 95 F.3d 1158, at *5 (9th Cir. 1996). *See also United States v. Miller*, 379 F.2d 483, 485-86 (7th Cir. 1967) (the term "facilitate" in the Travel Act interpreted to mean "to make easy or less difficult"). As the court observed in *Dart v. Craigslist*, "'[f]acilitating' and 'assisting' encompass a broad[] range of conduct, so broad in fact that they include the services provided by intermediaries like phone companies, ISPs, and computer manufacturers." 665 F. Supp. 2d at 967. However, that court rejected such an expansive reading and

concluded that such intermediaries "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id*.

The Ninth Circuit likewise has rejected such a broad reading of the Travel Act, explaining that "intent to facilitate a criminal venture is expressly made part of the offense," and concluding "we cannot extend the statute by holding that proof of a lesser mens rea is sufficient to establish the crime." *Gibson Specialty Co*., 507 F.2d at 449. The scope of the Travel Act is thus cabined by the requirement that the prosecutor show that the defendant had specific knowledge of, and associated himself with a criminal venture for the purpose of its advancement. If not so limited, the court found "the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express mens rea requirement." *Id*.

### 2. Government's Broad Reading of the Travel Act Conflicts With the First Amendment.

Major First Amendment problems arise if the Travel Act can be applied to the operation of a website as set forth in the Indictment. As noted above, the failure to incorporate and apply a specific intent requirement is a First Amendment problem in its own right.[38] In addition, if the law is applied without this important limiting principle, the statutory terms become boundless, and the law itself is invalid as being both vague and overly broad. As applied in this case, the Travel Act would allow the prosecution of any website operator whose actions could be said to "make easier" or to "assist in the unlawful activity in any way." That cannot be the law.

As applied in this Indictment, the Travel Act is unconstitutionally overbroad. The law does not define what it means to "promote" or "facilitate the promotion" of prostitution, and without some enforceable limits it could be applied to a broad range

---

[38] *See supra* Section IV.B.1. Laws used to target expressive activity require a heightened *mens rea*, *Smith v. California*, 361 U.S. at 151-53; *X-Citement Video*, 513 U.S. at 78 ("It is [] incumbent upon us to read the statute to eliminate [constitutional] doubts"), and in particular, knowing conduct, *i.e.*, that any "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) .

of communicative activities – as the government is seeking to do here.  *See Dart v. Craigslist*, 665 F. Supp. 2d at 967 (*e.g.*, "they include the services provided by intermediaries like phone companies, ISPs, and computer manufacturers").  Such unbounded application runs afoul of the principle that a law is "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  First Amendment freedoms need "breathing space" to survive, and this means the "government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  In reading the Travel Act to impose vicarious liability on a website for hosting online content without a specific intent requirement, the government has made the law overbroad as applied.

The government's interpretation of the Travel Act is also unconstitutionally vague as applied.  In this Indictment, the government is seeking to impose massive criminal liability on the Defendants by applying the Travel Act's undefined terms "promote" or "facilitate the promotion" of prostitution.[39]  This application of the Travel Act to expressive activities raises particular First Amendment concerns.  As the Supreme Court has explained, "[w]here a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974).  When applied to speech, vague laws offend due process because they fail to give people of ordinary intelligence fair warning of what conduct is prohibited, allow arbitrary and discriminatory enforcement, and delegate basic policy matters to policemen, judges and juries for resolution on an ad hoc and

---

[39] *E.g.*, *Amusement Devices Ass'n v. Ohio*, 443 F. Supp. 1040, 1043, 1051 (S.D. Ohio 1977) (invalidating state law prohibiting provision of legal services to criminal syndicate with a purpose of "establishing or maintaining" the syndicate or "facilitating any of its activities" because the language "fails to specify with reasonable clarity which kind or kinds of conduct it prohibits.").

subjective basis.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Where penal statutes are involved as they are here, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *NAACP v. Button*, 371 U.S. at 433.  Of particular importance to this case, the "unique nature of the [Internet] medium cannot be overemphasized in discussing and determining the vagueness issue."  *ACLU v. Reno*, 929 F. Supp. 824, 865 n.9 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997).

The Department of Justice has avoided overbreadth and vagueness problems in other cases by interpreting the challenged statutes narrowly and by insisting that strict *mens rea* requirements limit the respective statutes' applications.  As noted above, in First Amendment challenges to the SAVE Act and FOSTA, the government took the position that those laws were consistent with the First Amendment *because of these specific limits*.[40]  In both cases, the courts agreed that these narrow readings of the law and strict *mens rea* requirements were essential to the constitutional analysis.  *See Lynch*, 216 F. Supp. 3d at 109; *Woodhull Freedom Found.*, 334 F. Supp. 3d at 199-201 (under the Travel Act, the prosecutor must prove that the "defendant intended to 'explicitly further[]' a specified unlawful act" ).  In this case, however, by abandoning any such requirement, the government is applying the Travel Act in a way that is unconstitutionally vague and overbroad.

### 3. *The Indictment Must be Dismissed Because it is Predicated on an Unconstitutional Application of the Travel Act*

An indictment based on an unconstitutional law, either on its face or as applied, must be dismissed.  *Packingham*, 137 S. Ct. at 1737-38; *United States v. Sineneng-Smith*, 910 F.3d 461, 479-85 (9th Cir. 2018).  To be legally sufficient, an indictment "must assert facts which in law constitute an offense; and which, if proved, would

---

[40] *See* DOJ Reply in Support of Motion to Dismiss at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155(RBW), (D.D.C. Apr. 15, 2016) (ECF No. 13); Brief for the United States at 21-22, *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc. #1782997).

1  establish prima facie the defendant's commission of that crime." *Landham*, 251 F.3d

2  at 1079 (citations omitted).  This requires the government to specify "the precise

3  conduct upon which it seeks to hold each defendant criminally liable" so that the court

4  can determine "whether the specific conduct charged is protected by the First

5  Amendment." *Buddenberg*, 2010 WL 2735547, at *9.  A charge that is brought under

6  an overly broad application of a law regulating speech cannot satisfy this standard.

7        The court applied this principle to dismiss an indictment in *United States v.*

8  *Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011).  The government had charged the

9  defendant with violating a federal law against "cyber stalking," 18 U.S.C. § 2261A

10  (2)(A), through a series of postings on Twitter and on a blog.  The law had been

11  amended so that it did not require a showing of intent to kill or injure the subject of the

12  online postings, but instead included the intent to "harass or place under surveillance

13  with intent to … harass, or intimidate, *or cause substantial emotional distress*."

14  *Cassidy*, 814 F. Supp. 2d at 581.  So broadened, the court found that "the

15  Government's Indictment is not limited to categories of speech that fall outside of First

16  Amendment protection" and held that the statute was unconstitutional as applied.  *Id.*

17  at 583, 587.  Because it resolved the constitutional question as applied, the court found

18  it unnecessary to rule on the law's facial validity.  *Id.* at 587.

19        This Court should reach the same conclusion about the government's misuse of

20  the Travel Act and money laundering statute to prosecute publishers.  The issue here

21  does not go to the statute's facial validity because the Travel Act, on its face, does not

22  criminalize speech.  But the government has indicted the Defendants using the Travel

23  Act by targeting their actions as publishers, and doing so without alleging specific

24  intent.  The use of the statute in this case violates both the *mens rea* standard that must

25  be applied in First Amendment cases, and it removes the boundaries that otherwise

26  prevent the Travel Act from being unconstitutionally vague and overbroad.

27  Accordingly, the Court should hold that the Travel Act is unconstitutional as applied

28  and dismiss the Indictment.

## V.    CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court dismiss the Indictment.

DATED this 22nd day of April, 2019.

DAVIS WRIGHT TREMAINE LLP
*s/ James C. Grant*
*s/ Robert L. Corn-Revere*
Attorneys for Michael Lacey and James Larkin

LIPSITZ GREEN SCIME CAMBRIA LLP
*s/ Paul J. Cambria, Jr.*
Attorneys for Michael Lacey

BIENERT KATZMAN, PLC
*s/ Thomas H. Bienert, Jr.*
Attorneys for James Larkin

BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG AND RHOW
*s/ Ariel A. Neuman*
Attorneys for John Brunst

FEDER LAW OFFICE PA
*s/ Bruce Feder*
Attorney for Scott Spear

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2019, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the District of Arizona by using the CM/ECF system, and that service will be accomplished by the CM/ECF system to all counsel of record.

*s/ James C. Grant*
Attorney for Michael Lacey and James Larkin

# EXHIBIT C

Jessica Ring Amunson (*pro hac vice*)
Tassity Johnson (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
1099 New York Avenue NW Ste 900
Washington, DC 20001
jamunson@jenner.com
tjohnson@jenner.com
*Attorneys for the DKT Liberty Project,*
*Cato Institute, and Reason Foundation*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No.  CR-18-422-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | **BRIEF OF *AMICI CURIAE* THE DKT LIBERTY PROJECT, CATO INSTITUTE, AND REASON FOUNDATION IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT** |
| Michael Lacey, *et al.*, | |
| Defendants. | |

The DKT Liberty Project, Cato Institute, and Reason Foundation, by and through counsel, submit this Brief as *Amici Curiae* in support of the Defendants' Motion to Dismiss the Indictment. *Amici* are nonprofit organizations dedicated to protecting individual liberties, and especially those liberties guaranteed by the Constitution of the United States, against all forms of government interference. *Amici* have a particular interest in this case because the government's indictment threatens to silence Defendants for offering a forum for protected sexually oriented speech, by simply assuming, without establishing, that the First Amendment does not protect the speech on Backpage.com. The government's prosecution of Defendants as publishers of third-party speech poses a grave threat to individual liberty and the rights guaranteed by the First Amendment. *Amici* submit that their expressed views may assist the Court in its task of deciding Defendants' Motion to Dismiss the Indictment.

## I.    INTRODUCTION

This case presents questions of critical importance under the First Amendment that are of great concern to *Amici*. The Supreme Court has held that the Constitution presumptively protects *all* speech from government infringement. The burden for rebutting that presumptive protection rests with the government. It is a heavy burden, as it must be to safeguard the protections of the First Amendment. As a consequence, the government may not prosecute a speaker for his or her speech unless and until the government establishes that the speech is *not* protected. To ensure a robust, thriving marketplace of ideas, this presumption must reach even unpopular speech, such as the sexually oriented speech featured in advertisements on Backpage.com. The indictment, however, turns this basic presumption on its head by simply *assuming* the illegality of the speech on Backpage.com solely because it looks like speech that might concern illegal conduct.

*Amici* write to amplify the danger that the government's inversion of the constitutional presumption protecting speech poses to free expression. The government has indicted Defendants, exposing them to costly prosecution and potential prison sentences and fines, on nothing more than the government's spurious assumption that third-party speech on Backpage.com that *resembled* unlawful speech *was* unlawful speech. The government, moreover, has charged Defendants with criminal liability for speech engaged in by third-party advertisers on Backpage.com without alleging that Defendants had anything more than general knowledge of the alleged unlawfulness of such speech. Absent a meaningful judicial check on the government here, nothing can stop it from prosecuting other speakers by shifting its burden to rebut the First Amendment's presumptive protection of speech to the speakers themselves, or from prosecuting publishers for their generic knowledge of third-party misconduct. Though the government will certainly argue that it has met its minimal standards for pleading an indictment, judicial vigilance should be at its height when the First Amendment is at stake. Perhaps no act of government is more inimical to free and open expression than

prosecution—and thus the possible loss of liberty and property—for simply offering a forum for speech.

Unfortunately, the government's conduct here is not new. The history of government efforts to suppress and censor disfavored speakers, particularly speakers who offer sexually oriented expressive materials, is long. Along with overseeing censorship boards and organizing adult bookstore raids, the government has previously mounted a multistate prosecutorial campaign designed to intimidate the adult entertainment industry—including the founder of one of the *Amici*—into silence. *See United States v. PHE, Inc.*, 965 F.2d 848 (10th Cir. 1992). Throughout this history, however, the government's efforts to silence these speakers largely have been thwarted by the Supreme Court's clear instruction on the breadth of the First Amendment and the limits of government censorship over protected speech. This Court should follow the Supreme Court's instruction and dismiss the indictment as an unconstitutional intrusion on Defendants' First Amendment rights.

## II.   THE FIRST AMENDMENT PRESUMPTIVELY PROTECTS THE SPEECH AT ISSUE.

As detailed by Defendants, the indictment's many allegations all rest on the same erroneous assumption: that advertisements that include sexually oriented depictions and descriptions are advertisements for illegal sexual activity. *See* Defs.' Mot. to Dismiss Indictment at 16-17 & n.16, *United States v. Lacey*, No. CR-18-422-PHX-SMB (D. Ariz. Apr. 22, 2019), ECF No. 539 (noting the government's characterization of Backpage.com adult section advertisements as "obviously for" and "indicative of" illegal prostitution without any showing that the advertisements actually are for illegal prostitution).  By equating "adult" services with prostitution, the indictment presumes that advertisements in the adult or escort categories on Backpage.com are illegal and unprotected by the First Amendment simply because they *look like* advertisements for illegal prostitution. That presumption is exactly backwards. Backpage.com's advertisements, and the website more generally, are plainly speech. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31, 234

(7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) (holding that Backpage.com was "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services."). Accordingly, the government's prosecution of Defendants, based on their publication of third-party advertisements on Backpage.com, is presumptively unconstitutional. The First Amendment protects all speech from content-based government proscription—even speech that *looks like* it *might* be unprotected—unless and until the government proves that the speech *actually* is unprotected, or that the proscription can survive strict scrutiny. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse."); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("The First Amendment presumptively places [content-based burdens on speech] beyond the power of the government.").

The First Amendment presumptively shields popular and unpopular speech alike from government censorship. "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *United States v. Stevens*, 559 U.S. 460, 470 (2010); *see also, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) ("[T]he Government's disapproval of a subset of messages it finds offensive . . . is the essence of viewpoint discrimination."); *Ashcroft*, 535 U.S. at 245 ("It is . . . well established that speech may not be prohibited because it concerns subjects offending our sensibilities."); *Playboy Entm't Grp.*, 529 U.S. at 813 ("Where the designed benefit of a content-based speech restriction is to shield the

sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting our eyes." (internal quotation marks and alterations omitted)); *id.* at 826 ("The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly."); *see also Perez v. Ledesma*, 401 U.S. 82, 117 n.10 (1971) (Brennan, J., concurring and dissenting in part) ("The deterrence emanating from the existence of a [criminal] statute purporting to prohibit constitutionally protected expression is itself plainly inconsistent with the First Amendment . . . which was intended to protect vigorous, robust, and unpopular speech without a threat of punishment under state law." (internal citations omitted)).

The First Amendment's presumptive protection of unpopular speech applies with full force to sexually oriented expression. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."); *see also Playboy Entm't Grp.*, 529 U.S. at 816-17 (applying presumption to regulation targeting sexually oriented television channels). As the Court observed in construing a statute that prohibited traffic of "visual depiction[s]" of minors engaged in sexually explicit conduct, "[p]ersons do not harbor settled expectations that the contents of magazines and film are generally subject to stringent public regulation. In fact, First Amendment constraints presuppose the opposite view." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 65-66, 71-72 (1994). This presumption also applies to the Internet, and applies to protect even sexually oriented expression that *looks like* it *might* be tied to illegal conduct. The "prospect of crime" arising from sexually oriented speech, or the "mere tendency" of such speech "to encourage unlawful acts," cannot "justify laws suppressing protected speech." *Ashcroft*, 535 U.S. at 245, 253. Nor can the government prohibit sexually oriented speech simply "because it increases the chance an unlawful act will be committed at some indefinite future time." *Id.* at 253 (internal quotation marks omitted). Because sexually oriented speech is presumptively protected,

1  it can be restricted only if the government first establishes that the speech falls within the

2  narrowly and carefully circumscribed categories of unprotected speech, or that the

3  restriction is narrowly tailored to promote a compelling state interest. *Sable*, 492 U.S. at

4  126; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963) ("[R]egulation by the States

5  of obscenity [must] conform to procedures that will ensure against the curtailment of

6  constitutionally protected expression, which is often separated from obscenity only by a

7  dim and uncertain line.").

8          The government must overcome this heavy burden before it may regulate sexually

9  oriented speech because there is no margin for error in such regulation, especially when,

10  as here, the speakers are at peril of losing their liberty and property for exercising their

11  right to publish constitutionally protected expression. *See Ashcroft*, 535 U.S. at 244 ("[A]

12  law imposing criminal penalties on protected speech is a stark example of speech

13  suppression."). The line between sexually oriented speech that is legal and

14  "unconditionally guaranteed," and sexually oriented speech that "may legitimately be

15  regulated, suppressed, or punished," must be "finely drawn" because "[e]rror in marking

16  that line exacts an extraordinary cost." *Playboy Entm't Grp.*, 529 U.S. at 817 (internal

17  quotation marks omitted). That cost is the "abridgment of the right of the public in a free

18  society to unobstructed circulation" of constitutionally protected expression. *A Quantity

19  of Copies of Books v. Kansas*, 378 U.S. 205, 213 (1964). The Supreme Court has drawn

20  such fine lines to cordon unprotected from protected sexually oriented speech because the

21  unpopularity of the latter can make it especially vulnerable to unconstitutional

22  government encroachment, pursued under the misguided aegis of moral authority. The

23  Constitution, however, "no more enforces a relativistic philosophy or moral nihilism than

24  it does any other point of view. The Constitution exists precisely so that opinions and

25  judgments, including esthetic and moral judgments about art and literature, can be

26  formed, tested, and expressed. What the Constitution says is that these judgments are for

27  the individual to make, not for the Government to decree, even with the mandate or

28  approval of a majority." *Playboy Entm't Grp.*, 529 U.S. at 818.

**III.    THE FIRST AMENDMENT DEMANDS THAT THE GOVERNMENT PROVE DEFENDANTS' KNOWING PUBLICATION OF SPECIFIC UNPROTECTED SPEECH.**

As established above, "sensitive tools," *Bantam Books*, 372 U.S. at 66 (quotation marks and alteration omitted), must be used to separate legitimate sexually oriented speech—which must be protected from all but the most compelling and narrowly tailored restrictions—from illegitimate sexually oriented speech that may be outlawed without threat to free expression. "[T]o avoid the hazard of self-censorship of constitutionally protected material" posed by criminal statutes that target unprotected speech, *Mishkin v. State of New York*, 383 U.S. 502, 511 (1966), the Supreme Court has recognized scienter as one such "sensitive tool." In *Smith v. California*, 361 U.S. 147 (1959), the Court considered a local ordinance that made it unlawful "for any person to have in his possession any obscene or indecent writing or book" in any bookstore, but did not require that a bookseller have any knowledge of the obscene or indecent contents of the writing or book. *Id.* at 148-49 (quotation marks and alterations omitted).  The ordinance, the Court observed, imposed strict liability on booksellers for having obscene books on their shelves; thus, a bookseller with no knowledge of a given book's obscene or indecent contents could still be ensnared by the ordinance and subject to penalty.  *Id.* at 150.

The Court held that the Constitution could not tolerate strict liability in an ordinance regulating speech, because the ordinance had "the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Id.* at 150-51. The Constitution's guarantees of free speech placed the ordinance in a category apart from strict liability criminal statutes for food and drug regulations; unlike food or drug distributors, booksellers possessed a constitutional right to distribute their wares without regulation. *Id.* at 152-53. The booksellers' exercise of that right redounded to the benefit of the public more broadly by affording the public access to all constitutionally protected materials. *Id.* at 153. The absence of scienter in the ordinance, however, incented booksellers to sell only those books they had personally inspected,

7

severely attenuating the ability of booksellers and their patrons to engage in the marketplace of ideas. *Id.* "The bookseller's self-censorship, compelled by the State," the Court wrote, "would be a censorship affecting the whole public," reaching books both protected and unprotected. *Id.* at 154. The State could not indirectly erode the public's right to free expression—by coercing booksellers to act as censor boards, scrutinizing every book in their shops for obscenity, or risk criminal penalty—any more than it could directly. *Id.*; *see also United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech . . . ."). The ordinance, then, could only constitutionally apply to those booksellers who sold obscene books with full knowledge of their obscenity. The possibility that booksellers might "falsely disclaim knowledge" or "falsely deny reason to suspect" the obscenity of books in their possession as a defense did not persuade the Court to dispense with the requirement for scienter in the ordinance, given how grave and insidious a threat the ordinance without scienter posed to a freethinking society. *Smith*, 361 U.S. at 154.

Over thirty years after *Smith*, to guard against government infringement of constitutionally protected speech, the Court again affirmed that scienter is a necessary element in criminal statutes that prohibit sexually oriented speech. In *X-Citement Video*, the Court construed a statute that prohibited interstate transportation, shipping, receipt, distribution, and reproduction of visual depictions of minors engaged in sexually explicit conduct. 513 U.S. at 65-66. The statute, as written, required that an offender knowingly traffic in those visual depictions. *Id.* at 68. But the "most natural grammatical reading" of the statute, and the one adopted by the Ninth Circuit, did not require that the offender know the age of the minors depicted, or the sexually explicit nature of the depictions. *Id.* at 68-69. Despite the consistency of this construction with the statute's plain language, the Court declined to affirm it "because of the respective presumptions that some form of

scienter is to be implied in a criminal statute even if not expressed, and that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions." *Id.*

Absent a scienter requirement for the age-of-minority and sexually-explicit-conduct elements, the Court found, the statute produced "absurd" results by sweeping within its ambit "actors who had no idea that they were even dealing with sexually explicit material." *Id.* at 69. Such results could not be reconciled with the Court's practice of reading "broadly applicable scienter requirements" into statutes silent on scienter, the harsh penalties of prison time and substantial fines for violating the statute, or the First Amendment's presumption that expressive material—including the visual depictions at issue in the statute—would not be subject to "stringent public regulation." *Id.* at 70-72. A scienter requirement, moreover, had to apply to the age-of-minority element because the "age of the performers" depicted was the "crucial element separating" sexually explicit expression protected by the First Amendment from "wrongful conduct." *Id.* at 72-73. A statute "completely bereft of a scienter requirement" on the age of the performers would thus have "raise[d] serious constitutional doubts." *Id.* at 78.

Like the statute in *X-Citement Video*, the instant indictment—which alleges only Defendants' general awareness that allegedly illegal activity was being advertised on Backpage.com—raises "serious constitutional doubts." *Id.* But unlike the statute there, the indictment cannot be read to avoid such unconstitutionality.[1] Under the government's theory of the case set forth in the indictment, the only distinction between protected sexually oriented speech and the unlawful speech Defendants are alleged to have promoted is Defendants' purported ambient awareness of the speech's general unlawfulness. *See* Defs.' Mot. to Dismiss Indictment at 31-34. And Defendants' purported ambient awareness is almost entirely based on claims that other people said the advertisements were illegal, ranging from State Attorneys General, the Senate Permanent

---

[1] For all of the reasons explained by Defendants, the Indictment fails not only as a constitutional matter but also as a statutory matter, because it fails to allege the requisite specific intent required for a prosecution under the Travel Act or the federal money laundering statute. *See* Defs.' Mot. to Dismiss Indictment at 26-37.

Select Committee on Intelligence, Sheriff Dart (and others like him), and CNN. The government seems to believe that if everyone says you are publishing unprotected speech, then you must "know" it and therefore must lose your constitutional protections. But the scienter demanded by the Constitution for speech-related prosecutions is specific knowledge and intent. *Id.* at 13. The indictment does not allege that Defendants were *specifically* aware that any of the advertisements on Backpage.com were illegal, or that Defendants *intended* to further any illegality—only that third parties posting on Backpage.com may have intended to promote illegal activity through their advertisements. Because the Constitution does not demand "omniscience" from Defendants of the content or intention of third-party speakers posting on Backpage.com, *Smith*, 361 U.S. at 153, the government may not impose criminal liability on Defendants for their general knowledge of third-party speaker misconduct. The indictment, then, cannot stand.

**IV.    THE GOVERNMENT HAS ABANDONED THE PRESUMPTION OF CONSTITUTIONALITY AND THE REQUISITE SCIENTER HERE TO SILENCE UNPOPULAR SEXUALLY ORIENTED SPEECH.**

This case is simply the latest chapter in a long history of government attempts to suppress and censor disfavored speakers, especially those disfavored for offering sexually oriented expressive materials. For decades, the government has been trying to silence these disfavored speakers by abusing its prosecutorial powers to drive the speakers out of "polite" society. However, the Supreme Court has long recognized that such attempts are invidious to the First Amendment and has erected extensive bulwarks to protect against them. *See, e.g.*, *Ashcroft*, 535 U.S. at 250 (finding law criminally prohibiting non-obscene sexually explicit images that appear to depict minors but were produced without using real children unconstitutional); *Playboy Entm't Grp.*, 529 U.S. at 812-14 (finding blanket law requiring cable television operators to block signals for channels dedicated to non-obscene sexually oriented programming during set time periods unconstitutional); *Reno v. ACLU*, 521 U.S. 844, 870-79 (1997) (finding law criminally prohibiting transmission

1  of non-obscene "indecent" communications to persons under age 18 unconstitutional); *X-*
2  *Citement Video*, 513 U.S. at 70-73, 78 (requiring scienter in law criminally prohibiting
3  traffic in sexually explicit depictions of children); *Sable Communications*, 492 U.S. at
4  126-28 (finding statute imposing blanket ban on "indecent" but non-obscene "dial-a-
5  porn" telephone messages unconstitutional); *Smith*, 361 U.S. at 152-54 (requiring scienter
6  in law criminally prohibiting possession of obscene books).[2]

7      Despite the Supreme Court's clear instruction on the breadth of sexually oriented
8  speech protected by the First Amendment, the government's overzealous and overbroad
9  efforts to prosecute those who offer a forum for protected sexually oriented speech
10  continues. In recent years, the campaign against Backpage.com and its publishers—and
11  particularly the government's decision to indict Defendants for offering a forum for
12  protected speech without even attempting to show that Defendants specifically and
13  intentionally published unprotected speech—is reminiscent of the government's "Project
14  PostPorn" campaign in the 1980s targeting *Amicus* The DKT Liberty Project's founder,
15  among others. As detailed in *United States v. PHE*, the government in the 1980s
16  undertook a "coordinated, nationwide prosecution strategy against companies that sold
17  obscene materials" aimed at driving the adult entertainment industry to extinction by
18  undermining its profitability. 965 F.2d at 850. In executing this "strategy," prosecutors

19
20  [2] *See also Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63, 65-66 (1989) (finding
seizure of thousands of adult bookstores' "presumptively protected books and films,"
21  without adversarial hearing, unconstitutional); *Lee Art Theatre, Inc. v. Virginia*, 392 U.S.
636, 636-67 (1968) (finding seizure of films for alleged obscenity, without adversarial
22  hearing, unconstitutional); *Dombrowski v. Pfister*, 380 U.S. 479, 493-94 (1975) (finding
law permitting criminal prosecution for "subversive activities" chilling of protected
23  speech and unconstitutionally overbroad); *A Quantity of Copies of Books*, 378 U.S. at
207, 210-11 (finding seizure of thousands of novels for burning or other destruction due
24  to alleged obscenity, without adversarial hearing, unconstitutional); *Bantam Books*, 372
U.S. at 61-63, 64, 70-71 (finding obscenity commission's practice of notifying book
25  distributors of "objectionable" material within their books, alluding to prosecution in their
26  notice, and circulating lists of "objectionable" publications to local police departments,
unconstitutional); *Marcus v. Search Warrant*, 367 U.S. 717, 723, 731-33 (1961) (finding
27  seizure of tens of thousands of copies of publications for destruction due to alleged
28  obscenity, without adversarial hearing, unconstitutional).

attempted to extort plea agreements from defendants by threatening them with "multiple prosecutions" if they did not cease distribution "of all sexually oriented materials, not simply those that were obscene"—prosecutions that would bankrupt the defendants. *Id.* at 851. The prosecutors made these threats with full knowledge that, if the defendants took the plea, they would be required to "stop sending material that was protected by the First Amendment." *Id.* Defendants did not take the plea; as a consequence, they were subjected to costly prosecutions, "intrusive and intimidating" investigations, and "harass[ing]" subpoenas—all in an effort to stop defendants from distributing materials that the government knew were, in part, constitutionally protected. *Id.* at 851-52 (quotation marks omitted). Following the Supreme Court's instruction that "[t]he First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech," a federal appellate court halted the government's many abuses of prosecutorial power by ordering remand. *Id.* at 849, 860-61.

The campaign against Defendants for their publication of Backpage.com is quite similar. Backpage.com has been repeatedly subjected to prosecutorial attempts to impose criminal liability for what courts have repeatedly recognized is constitutionally protected expression. *See* Defs.' Mot. to Dismiss Indictment at 4-8, 17-18. The government's attempt here to prosecute Defendants for publishing Backpage.com, by pursing a theory of criminal liability that defies constitutional limits on its prosecutorial powers, is simply one more attempt to erode the First Amendment's carefully erected bulwarks around free expression. *See Bantam Books*, 372 U.S. at 66-67. This Court should not countenance this attempt.

## V.   CONCLUSION

For the forgoing reasons, *Amici* respectfully request that this Court grant Defendants' Motion to Dismiss the Indictment.

DATED this 28th day of May, 2019.

JENNER & BLOCK LLP


By:/s/ Jessica Ring Amunson
Jessica Ring Amunson (*pro hac vice*)
   *Counsel of Record*
Tassity Johnson (*pro hac vice* forthcoming)
1099 New York Ave., NW, Suite 900
Washington, DC  20001

*Attorneys for The DKT Liberty Project, Cato Institute, and Reason Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/ Jessica Ring Amunson

# EXHIBIT D

Paul F. Eckstein (#001822)
PEckstein@perkinscoie.com
Daniel C. Barr (#010149)
DBarr@perkinscoie.com
John H. Gray (#028107)
JHGray@perkinscoie.com
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000
DocketPHX@perkinscoie.com

Kathleen E. Brody (#026331)
KBrody@acluaz.org
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  602.650.1854

*Attorneys for Amicus ACLU of Arizona*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>Michael Lacey, et al.,<br><br>                    Defendants. | No. CR-18-422-PHX-SMB<br><br>**ACLU OF ARIZONA'S *AMICUS CURIAE* BRIEF REGARDING FIRST AMENDMENT CONSIDERATIONS** |

**I.**    **Amicus ACLU of Arizona's Interest**

The ACLU of Arizona, the state affiliate of the national American Civil Liberties Union ("ACLU"), is a statewide nonpartisan, nonprofit organization of over 14,000 members throughout Arizona dedicated to protecting the constitutional rights of all. The fight for freedom of speech has been a bedrock of the ACLU's mission since the organization was founded in 1920, driven by the need to protect the constitutional rights of conscientious objectors and anti-war protesters. The ACLU's work to protect freedom of expression has continued over the last century, including consistent efforts to combat censorship of private citizens and the media. The ACLU of Arizona frequently files amicus curiae briefs in state and federal courts on a wide range of civil liberties and civil rights issues. The ACLU of Arizona files this amicus brief to advise the Court on important First Amendment principles implicated by this prosecution.

**II.**    **Introduction**

The First Amendment's guarantee of freedom of speech prohibits the government from prosecuting someone for making another person's speech available to the public without proving that the defendant either specifically intended to further unlawful activity or knew the specific contents of the unlawful speech. The Supreme Court protected those freedoms during the newspaper, bookstore, and periodical age (the "Print Age"). That precedent has stood into the Internet Age and should not be washed away simply because the speech at issue here appeared in an online forum rather than in a newspaper classified section, magazine advertisement, or adult section of a bookstore. Rather, that precedent is even more relevant and more justified in the Internet Age, where the volume of material published each hour exceeds the material published in the Print Age each year.

If people fear the sword of criminal liability when they provide an online forum where others might post both protected and unprotected speech, then they will self-censor and restrict even protected speech out of fear of prosecution. Alternatively, they will shut down their websites completely because the burden of manually checking every single third-party post and trying to judge for themselves which posts can stay or go would be

impractical to any business. To avoid this chilling effect, the Court should refuse to impose criminal liability absent proof beyond a reasonable doubt that the defendants specifically intended to further unlawful activity or knew the content of each allegedly illegal post.

### III. The First Amendment's longstanding protection against criminal liability for distributing speech should apply no matter the medium.

The Supreme Court has long cautioned against imposing criminal liability against a person for distributing others' speech without showing something more than mere high-level knowledge or risk that the speech might relate to illegal conduct. In *Smith v. California*, the Supreme Court considered whether the government could impose criminal liability on a bookseller for selling obscene books without first showing that the bookseller knew the contents of those particular books. 361 U.S. 147, 150–54 (1959). The Court held it unconstitutional to "dispens[e] with any requirement of knowledge of the contents of the book on the part of the seller." *Id.* at 153.[1]

By explaining the free speech concerns of imposing criminal liability on a person who distributes another's speech, the Court indicated that the First Amendment protects a defendant who does not know what *each* allegedly obscene book said. According to the Court, under the fear of criminal prosecution, the bookseller would "tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature." *Id.*; *see also id.* at 150-51 (cautioning against applying criminal statutes where doing so has "the collateral effect of inhibiting the freedom of expression, by making the individual more reluctant to exercise it"). In other words, the First Amendment forecloses criminal liability when the bookseller's only alternative is to "make himself aware of the contents of *every book* in his shop" and try to guess if he or she will face criminal liability for allowing that speech to reach the public's eye. *See id.* (emphasis added). That demand "would be altogether unreasonable." *Id.*

---

[1] Specific intent to further unlawful activity may also pass muster under the First Amendment as an alternative mens rea standard.

But, as *Smith* found, the cost does not end with the one who distributes the speech: the true cost falls on the public. "[B]y restricting [the bookseller,] the public's access to reading matter would be restricted. If the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed." *Id.* The bookseller would self-censor to allow only that "material with which he could familiarize himself" "in the face of his absolute criminal liability." *Id.* The end result is that the public is deprived of *both* protected and unprotected speech. *See id.*

That *Smith* examined a strict liability statute does not disrupt its guidance here. The Supreme Court outlined the chilling effect on speech where the government imposes criminal liability without showing that the defendant at least knew about the allegedly unlawful speech at issue. *Id.* ("By dispensing with any requirement of knowledge of the contents of the book on the part of the seller . . . [e]very bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop. It would be altogether unreasonable to demand so near an approach to omniscience.") (citation omitted); *see also Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962) (extrapolating from *Smith* that the First Amendment requires that the allegedly improper speech was "shown to" the defendant to allow the "opportunity to judge for himself as to its alleged obscenity").

The Supreme Court's warning in *Smith* has stood the tests of time and practical application. Of particular relevance here, the Supreme Court addressed the free speech consequences of objectionable advertisements in periodicals in *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962). The *Manual Enterprises* Court analyzed the Comstock Act, which imposed criminal and civil penalties against anyone who transmitted obscene periodical advertisements through the mail. The Court held that the company's president could not be liable under the law where there was "no evidence that any of this material was shown to him" so that he "was afforded no opportunity to judge for himself as to its alleged obscenity." *Id.* Channeling *Smith*'s warning, the Court explained, "Since publishers cannot practicably be expected to investigate each of their advertisers, and since the economic

consequences of an order barring even a single issue of a periodical from the mails might entail heavy financial sacrifice, a magazine publisher might refrain from accepting advertisements from those whose own materials could conceivably be deemed objectionable by the Post Office Department." *Id.* As with the bookstore in *Smith*, the end result is to "deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public." *Id.*

Courts have built on *Smith* in similar contexts, consistently recognizing the chilling effect on speech of imposing liability on distributors who do not know the contents of each item of allegedly unlawful speech.[2] *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 67, 69 (1994) (striking down statute that prohibited distributing visual images of minors engaged in sexually explicit conduct, noting first that Supreme Court precedent required that "the defendant possess knowledge of the *particular* fact that *one performer* had not reached the age of majority at the time the visual depiction was produced" and that "some form of scienter is to be implied in a criminal statute even if not expressed") (emphasis added); *Hunt v. State of Okl.*, 683 F.2d 1305, 1307–08 (10th Cir. 1982) (requiring that the government prove that a criminal defendant "had knowledge of the contents of the material he distributed, and that he knew the character and nature of the materials"); *cf. Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687-90 (8th Cir. 1992) (relying on *Smith* in civil context, striking down statute that prohibited renting or selling violent videos to minors without requiring knowledge or intent, noting that "any statute that chills the exercise of First Amendment rights must contain a knowledge element" and warning that a defendant wanting "to avoid criminal liability" would "have to view the contents of *every video* in their stores" and instead would choose to "limit videos available to the public to the videos the dealers have viewed") (emphasis added).[3]

---

[2] Whether the solicitation advisements cited in the superseding indictment are protected under the First Amendment is beyond the scope of this brief.

[3] The First Amendment standard in civil cases might be lower than in criminal cases, but civil cases are at least instructive by analogy where courts found that statutes infringe on free speech rights *even* in the civil context.

Only the medium has changed—from the bookstores and periodical pages to the Internet—but the First Amendment should still protect a defendant from liability where that defendant did not at least know the specific contents of the speech at issue. Commentators have echoed this view and urged courts not to restrict First Amendment protections in the online criminal context. The prime example appeared in the *Stanford Law & Policy Review* and referenced the ongoing Backpage dispute. Lawrence G. Walters, *Shooting the Messenger: An Analysis of Theories of Criminal Liability Used Against Adult-Themed Online Service Providers*, 23 Stan. L. & Pol'y Rev. 171 (2012). That article explained that "criminal liability has never been extended to mere advertisers of individuals who later engage in prostitution." *Id.* at 194. Rather, the First Amendment should protect an online "advertising forum for such individuals that may later engage in unlawful conduct." *Id.* Issuing the same warning that *Smith* gave decades ago for booksellers, the article explained that online service providers would behave no differently than the Supreme Court anticipated booksellers would behave if under the threat of criminal prosecution for the material they distribute. When internet companies face "uncertain or intolerable legal exposure," they would be "inclined to cease offering a forum for communication if the risks are too high to justify the anticipated profit. The forum of communication will then cease to exist." *Id.* at 174. The article emphasized the importance of this First Amendment battle, arguing that potential "criminal liability for [online service providers] . . . must be clarified if the Internet is to continue to function, free of government-encouraged self-censorship." *Id.* at 190-91.

## IV.   Conclusion

The Court should hold the government to its burden to prove beyond a reasonable doubt that the defendants knew that specific advertisements in question solicited illegal conduct: it should not to open the door to criminal liability merely for providing an online forum where others might have posted improper content. Because the "fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth[,] . . . [t]he door barring

federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." *Smith*, 361 U.S. at 155. Even when the government aims at preventing prurient conduct, the Court should not "open[] that door too far." *Id.* This is not to say that every website operator can escape criminal liability. But the Supreme Court has long established that the proper amount to "open the door" is to require at least knowledge of the specific problematic content, if not also specific intent to further criminal conduct, and not to impose an impossible burden leading to state-mandated self-censorship.

Dated:  May 28, 2019

**PERKINS COIE LLP**

By:  *s/ Daniel C. Barr*
Paul F. Eckstein (#001822)
Daniel C. Barr (#010149)
John H. Gray (#028107)
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

**ACLU FOUNDATION OF ARIZONA**
Kathleen E. Brody
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013

*Attorneys for Amicus ACLU of Arizona*

**CERTIFICATE OF SERVICE**

☒　　I hereby certify that on May 28, 2019, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Marie van Olffen*

78204-0012/144495907.3

# EXHIBIT E

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

The issue before the Court is Defendants Michael Lacey, James Larkin, Scott Spear, and John Brunst's Motion to Dismiss Indictment.  (Doc. 561, "Mot.").  Codefendants Andrew Padilla and Joye Vaught joined the Motion.  (Docs. 615, 617).  The Government filed a Response.  (Doc. 649, "Resp.").  Lacey, Larkin, and Spear filed a reply.  (Doc. 697). Brunst separately filed a reply.  (Doc. 700).  Various groups also motioned for leave to file amici curiae briefs, which the Court granted.[1]

## I.    BACKGROUND

On July 25, 2018, a federal grand jury returned a 100-count superseding indictment against Defendants alleging they engaged in criminal acts while operating the website Backpage.com ("Backpage").  The charges include conspiracy, violations of the Travel

[1] The DKT Liberty Project, Cato Institute, and Reason Foundation submitted a brief in support of the motion to dismiss the indictment. (Doc. 624). The ACLU of Arizona submitted an *Amicus Curiae* Brief Regarding First Amendment Considerations. (Doc. 625). Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionists, Inc., and National Coalition against Domestic Violence submitted a brief in support of the Government. (Doc. 641).

Act, and money laundering.  (Doc. 230, the "SI").  This is one of multiple cases involving Backpage.  In another case before this Court, Backpage itself (the corporate entity) and related entities have pleaded guilty to Money Laundering Conspiracy, 18 U.S.C. § 1956(h).  (CR-18-465-PHX-SMB, Docs. 8, 10, 20).  In still another, the CEO of Backpage, Carl Ferrer has pleaded guilty to Conspiracy, 18 U.S.C. § 371.  (CR-18-464-PHX-SMB, Docs. 7, 12, 20).  Both of those cases are awaiting sentencing and forfeiture proceedings.

The first count in the SI is conspiracy, 18 U.S.C. § 371, to commit a violation of the Travel Act, 18 U.S.C. § 1952(a)(3)(A), against all defendants.  (SI ¶¶ 195–99).  Counts 2– 51 are violations of the Travel Act, 18 U.S.C. § 1952(a)(3)(A), against all defendants.  (SI ¶¶ 200–01).  Count 52 is conspiracy to commit money laundering, 18 U.S.C. § 1956(h), against Lacey, Larkin, Spear, Brunst, and Hyer. (SI ¶¶ 202–03).  Counts 53–62 are charges for concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), against Lacey, Larkin, Spear, Brunst, and Hyer.  (SI ¶¶ 204–05).  Counts 63–68 are charges of international money laundering, 18 U.S.C. § 1956(a)(2)(A), against Lacey, Larkin, Spear, Brunst, and Hyer.  (SI ¶¶ 206–07).  Counts 69–99 are charges of transactional money laundering, 18 U.S.C. § 1957(a).[2]  (SI ¶¶ 208–09).  Finally, Count 100 is a charge of international concealment money laundering, 19 U.S.C. § 1956(a)(2)(B)(i), against Lacey.  (SI ¶¶ 210–11).  One defendant in this case, Dan Hyer, has pleaded guilty to Count 1 and awaits sentencing.  (Docs. 270, 284, 520).

### 1. The Alleged Facts

At this stage of the proceedings, the Court must "accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  The Court does "not consider evidence not appearing on the face of the indictment." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (quoting *United States v. Marra*, 481 F.2d 1196, 1199 (6th Cir. 1973)).  Further,

---

[2] The defendants for each count of transactional money laundering are designated by a table in the SI that includes the transaction at issue and which defendant or defendants are charged in connection to that transaction. Lacey, Larkin, Brunst, and Spear all appear as defendants in the table.

Defendants "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *Id.* (quoting *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)). The proper forum for challenging whether there is adequate evidence is at trial. *See id.* ("By basing its decision on evidence that should only have been presented at trial, the district court in effect granted summary judgment for the defendants. This it may not do."); *see also United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("Nor do the [criminal] rules provide for a pre-trial determination of sufficiency of the evidence."). Accordingly, the below summary of relevant facts is assumed as true for the purpose of this motion.

The SI contains a lengthy summary of the alleged facts. Lacey, Larkin, and a third individual known as "C.F" created Backpage in 2004. (SI ¶ 2). Spear and Brunst had executive positions at Backpage or related entities and held ownership interests. (SI ¶¶ 3–4). Padilla and Vaught were employees of Backpage, with Padilla serving as operations manager and Vaught as assistant operations manager. (SI ¶¶ 6–7). Lacey, Larkin, Spear, and Brunst "purportedly" sold their interests in Backpage in 2015, but retained "significant control" afterward. (SI ¶¶ 2, 29). They sold their interests in Backpage to Dutch entities controlled by C.F., who "borrowed" most of the purchase price from Lacey, Larkin, Spear, and Brunst. (SI ¶ 30). Even after the sale, Lacey, Larkin, Spear, and Brunst retained significant control over Backpage, including its finances, and required C.F. to provide them with an annual accounting of his personal assets. (SI ¶ 31).

Lacey and Larkin are the founders of the *Phoenix New Times* newspaper and owned several other newspapers, including the *Village Voice*. (SI ¶ 18). They created Backpage as an online classified ad site that competed with the likes of craigslist.com ("Craigslist"). (SI ¶¶ 20–21). When Craigslist shut down its "adult" section in 2010, Backpage began implementing strategies to capture Craigslist's share of the market. (SI ¶ 24). Larkin noted in one internal document that Craigslist folding could mean "a deluge of adult content ads for backpage.com." (*Id.*). Financially, Backpage was very successful. In its own words, it was experiencing "explosive growth" by "capitalizing on displaced Craigslist ad

volume." (SI ¶ 25).  Backpage profits grew annually: $26 million in 2010, over $52 million in 2011, over $78 million in 2012, over $112 million in 2013, and over $134 million in 2014.  (SI ¶¶ 25, 28).

The SI alleges that all defendants "were aware that the overwhelming majority of the website's 'adult' and 'escort' ads were actually ads for prostitution." (SI ¶ 34).  The SI points to three strategies Backpage used to attract more prostitution ads.  (*Id.*).  It refers to them as content aggregation, reciprocal link and affiliate programs, and moderating ads to "sanitiz[e]" them.  (SI ¶ 34).

The SI describes Defendants' aggregation efforts in paragraphs 35–44.  It alleges Spear encouraged Hyer and C.F. to create a plan to move prostitution ads onto Backpage. The plan was to "identify prostitutes advertising other websites," contact the prostitutes, and create free trial ads for them if they were not already using Backpage.  First tested in Dallas, Texas, this strategy became known as the "Dallas aggregation" plan soon spread to other locations.  Spear, Hyer, Larkin, C.F., and Brunst are alleged to have been aware of this strategy through emails, email attachments, other documents, and meetings where the plan was on the agenda.

The SI describes the "reciprocal link and affiliate programs" strategy in paragraphs 45–67.  It alleges Defendants sought to create a business relationship with TheEroticReview.com ("TER"), a "prostitution website" where "johns" could rate escorts. Backpage paid TER for banner ads, and Hyer and C.F. saw TER as essential to business growth.  Google Analytics reports provided to Defendants also showed TER was the number one source of outside referrals to Backpage.  The "affiliate programs" alleged in the SI involve partnerships with "organizations and individuals who were known to be involved in the prostitution industry." One such individual went by the name "Dollar Bill." Dollar Bill was described as a "super affiliate," and Backpage once deleted over 4,000 ads that he posted.  Padilla helped him restore those ads.  Emails show that Dollar Bill was aware of Backpage's moderation practices and C.F. coached him how to avoid deletion by Backpage moderators.

The SI describes Backpage's moderation practices in paragraphs 68–70, 72–73, 75, 77–96, 98–104, 108, 110, 112, 116–26, 128–30, 132–34, 136, 139, 143, 145, and 148.  C.F. explained the strategy: "We do not intend to be a craig[slist] here, just get out the most egregious stuff."  Padilla emailed Hyer and C.F. that posters who repeatedly violated Backpage's posting rule would have their ads deleted and banned, though the bans were only temporary and aimed at the "worst apples."  Another Padilla email cc'd Vaught and threatened to fire any Backpage employee who acknowledged in writing that a customer was a prostitute.  Attachments to an October 16, 2010 email from Padilla to a large group of Backpage employees, including Hyer and Vaught, explained how to moderate ads.  The instructions allowed nude and partially-nude photographs, some of which depicted graphic sex acts.  The other attachment identified fifty terms that should be "stripped" from ads before publication.  In another email, C.F. told Padilla to "lighten up on the images moderation.  Spear tells me it's the text that is the problem."  In January 2011, Lacey and Larkin met with representatives from the National Center for Missing and Exploited Children ("NCMEC") where Lacey told them "adult prostitution is none of your business."

According to the SI, these moderation efforts were made not to stop the underlying illegal activity, but to create a "veneer of deniability" and evade detection.  (SI ¶ 13).  Defendants stripped coded terms they allegedly knew indicated prostitution or underage prostitution—such as "GFE/Girlfriend Experience," "Lolita," and "New in Town"—from ads but still posted them with their underlying message unchanged.  The moderation practices also allowed identification numbers from TER to be used and permitted pictures with "nude rear shots" and "transparent wet panties."  A PowerPoint presentation created by some defendants acknowledged the non-adult sections of Backpage existed to show "plausible deniability" and make the website more palatable to "law enforcement."

A large portion of the SI is dedicated to showing Defendants knew their efforts to market to prostitution advertisers were successful.  Spear received emails summarizing these moderation practices.  (SI ¶¶ 70, 73, 81).  Larkin, Spear, Brunst, Hyer, and C.F. received an email notifying them that Chase Bank would no longer process transactions

for Backpage because of Backpage's "involvement in human trafficking." (SI ¶ 135).  C.F. testified in a number of criminal trials of pimps who had used to Backpage to post prostitution ads.  (SI ¶¶ 71, 76, 92).  C.F., Padilla, and Vaught helped one Backpage customer, P.R., restore her prostitution ads after they were taken down.  (SI ¶ 132).  P.R.'s ads included the phrase "50 Red Roses special."  "Roses" is a commonly-used in prostitution to mean money.  (SI ¶¶ 160–61).  Lacey wrote a draft editorial claiming Backpage had provided "the oldest profession in the world . . . transparency, record keeping and safeguards" and acknowledging that Backpage used an automatic filter to remove certain phrases from ads that indicated prostitution but still published the ads after editing.  (SI ¶ 107).  Larkin forwarded the editorial to C.F. "cautioning against some of Lacey's statements 'being made public' because 'we need to stay away from the very idea of editing the posts.'"  (SI ¶ 108).

The SI includes "victim summaries" of women who were sold for sex on Backpage. (SI ¶¶ 160–176).  Ads depicting Victims 5, 8, 10, 12, 11, 15, 17, 13, and 16 are among the alleged ads in the indictment.  (SI ¶ 201, Counts 2, 4–5, 12–17, 19–24).  One ad by Victim 5 was rejected by Backpage because it listed her age as seventeen.  It was accepted after it was "simply resubmitted with a new (false) age of 19."  (SI ¶ 164).  Victim 8 was fifteen years old when her uncle and his friends posted ads on Backpage using terms indicative of prostitution like "roses," and "150 for 1/2 hour, 200 for full hour."  (SI ¶ 167). Victim 10 was seventeen years old when her pimp posted Backpage ads containing the phrase "NEW IN TOWN" and pictures of her provocatively posed.  (SI ¶ 169).  Backpage occasionally removed certain explicit photos from Victim 11's ads but published the remaining text and other provocative photos.  (SI ¶ 170).  Victim 12's advertisements contained phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}." (SI ¶ 171).  Victim 13 was a juvenile when she and her trafficker posted Backpage ads, which falsely represented she was nineteen years old.  At least once, a Backpage representative contacted her with instructions on how to fix an ad so it could be published.  (SI ¶ 172). Victim 15 was sold for sex using phrases such as "Thick Glass of Chocolate Milk Looking

for a GoodTime!!!" and "sexy certified freak." After her trafficker attempted to take her to Texas against her will, she jumped out of the vehicle and was killed after being hit by several vehicles on Interstate 10. (SI ¶ 174). Victim 16 was murdered by a customer after she posted Backpage ads containing the phrases "outcalls only," "Juicy Caramel Lady on Duty," and including provocative pictures. (SI ¶ 175). Victim 17 was sold for sex, averaged ten customers a day, and was forced to turn over all of her prostitution earnings to her pimp. An associate of her pimp took pictures of her and drafted Backpage ads with the phrases "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true," and "Sorry, but NO BLACK MEN." The ads included pictures of Victim 17's buttocks and face. (SI ¶176).

The SI's factual allegations regarding money laundering appear in paragraphs 177–194. They detail that most of Backpages' earnings came from pimping and prostitution, and that banks, credit card companies, and other financial institutions refused to do business with Backpage because of its connection to prostitution. (SI ¶ 177–78, 182). C.F., Larkin, Spear, and Brunst discussed creating shell companies to fool credit card companies. (SI ¶ 179). They utilized entities such as Posting Solutions LLC, Website Technologies LLC, and Cereus Properties LLC. (SI ¶¶ 184–85, 187–92). They also used cryptocurrencies. (SI ¶¶ 193–94).

The SI identifies fifty specific ads by date and description in paragraph 201. Fifteen of the ads depict specific victims found in the victim summaries. Ten of the ads were posted by P.R, the prostitute who had extensive communications with C.F. (SI ¶ 201, Counts 3, 6–11, 18, 25–26). In the remaining twenty-five examples, Backpage published ads containing "GFE." (SI ¶ 201, Counts 27–51).

## II. LEGAL STANDARD

The Fifth Amendment demands that "no person be held to answer for "a capital, or otherwise infamous crime" unless indicted by a Grand Jury. U.S. Const., amend. V. This indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It is considered sufficient if it

"contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 116 (1974).  An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quoting *United States v. King*, 200 F.3d 1207, 1217 (9th Cir. 1999).  Language of a statute may be used to describe the accused defense, but it must be accompanied with enough "facts and circumstances" to "inform the accused of the specific offence . . . with which he is charged." *Hamling*, 418 U.S. at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).  "On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *Boren*, 278 F.3d at 914.  An indictment cannot be challenged "on the ground that the allegations are not supported by adequate evidence." *Jensen*, 93 F.3d at 669 (quoting *United States v. Mann*, 517 F.2d at 267).

The First Amendment provides additional protections in prosecutions based on speech.  *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).  But these protections are not unlimited. "Congress is allowed to restrict certain types of speech, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *United States of America v. Sinneneng-Smith*, 910 F.3d 461, 480 (9th Cir. 2018) (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)).  The government carries the burden to show that the speech is unprotected.  *See Ashcroft*, 535 U.S. at 255.

## III.   DISCUSSION

Defendants repeatedly argue that the government is pursuing a theory of vicarious liability for merely hosting third party content.  That argument is not supported by the SI, which goes through a long and fact-specific description of the Defendants participation in a conspiracy to facilitate and promote prostitution.  The SI sufficiently explains why defendants in this case are not just merely hosting third party content.  Defendants also

argue that the SI is based entirely on the assumption that the advertisements are for illegal activity. Again, Defendants ignore the specific facts alleged in the SI. While the SI does contain some language that could support that accusation, it is replete with specific facts that support finding that the conspirators knew the ads were for prostitution.

Defendants argue the SI should be dismissed for three reasons. First, they argue the SI is deficient because it presumes the ads in the indictment are illegal, merely repeats others' accusations, attacks protected publisher functions, and attacks legal business practices. Second, they argue SI fails to allege specific intent, which Defendants argue is the required *mens rea*. Third, they argue the Travel Act is unconstitutional as applied in the SI because the allegations are based on "generalized crimes" and conflict with the First Amendment. The Court is unpersuaded by these arguments and will deny Defendants' motion to dismiss the indictment.

1. The SI is not deficient.

   a. *The SI does not presume ads are illegal nor does it merely repeat others' accusations.*

Defendants first argue that the SI impermissibly presumes the alleged offending ads are unlawful. "The Government may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft*, 535 U.S. at 255. In their view, Backpage was "an avenue of expression of ideas and opinions" with First Amendment protections. (Mot. at 17) (quoting *Backpage.com v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015)). That is, because Backpage contained at least some ads that were not for prostitution, the Government's prosecution of these defendants necessarily attacks protected speech unless it shows the speech at issue was unlawful. *See Dart*, 807 F.3d at 234. The Government "bears the burden of proving the constitutionality of its actions" when it restricts speech. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *see Bd. of Trustees v. State Univ. of N.J.*, 492 U.S. 469, 480 (1989) ("[T]he State bears the burden of justifying its restrictions[.]").

Here, taking the allegations in the SI as true, as the Court must, the Government has met its burden of showing the fifty ads in the SI are for prostitution. Counts 3, 6–11, 18,

and 25–26 concern ads posted by P.R. The SI lays out P.R.'s history of working with C.F. in detail.  (SI ¶ 132).  C.F. knew P.R.'s posts advertised prostitution, repeatedly allowed P.R. to post those ads, and advised P.R. on how to meet Backpage's publications standards. P.R.'s ads contained a phrase indicative of prostitution, "50 red roses special," and Backpage moderators sometimes deleted her nude pictures.  In emails to C.F., P.R. complained that other ads had more nudity than her own.  Vaught and Padilla also received emails from P.R.  They instructed another Backpage employee to "dig into" her difficulty posting such pictures.  P.R. posted ads through November 2015.  Construing the SI in its entirety according to common sense, the alleged facts sufficiently show that the ads posted by P.R. were for prostitution.

The ads in Counts 27–51 contain the phrase "GFE." The SI explains in multiple paragraphs that GFE, short for "girlfriend experience," is a "coded term for prostitution." At one point, GFE was temporarily banned from use in Backpage ads. Defendants Spear, Hyer, Padilla, C.F., and Vaught exchanged emails discussing its use as a "code word" or a "solid sex for money term[]."  (SI ¶ 149).  Dollar Bill once complained that Backpage refused one of his ads even though "IT NEVER SAID GFE" while other, more obvious prostitution ads had been published despite "saying GFE."  (SI ¶ 64).  Backpage's moderators were instructed to stop removing ads containing "GFE" in or around January 2016, a decision Padilla and a moderator discussed and communicated to Vaught.  (SI ¶ 148).  Again, taking the allegations in the SI as true, which the Court must, the SI's alleged facts sufficiently show the GFE ads were for prostitution.

Counts 2, 4–5, 12–17, and 19–24 depict ads of Victims 5, 8, 10, 11, 12, 13, 15, 16, and 17.  Victims 5, 8, 10 were "sold for sex, through the use of Backpage ads."  (SI ¶¶ 164, 167, 169–72, 174–76).  Each of these ads, construed according to common sense, and interpreted to include facts necessarily implied, and read in context of the entire SI, are ads for prostitution.  The ad in Count 2 depicted Victim 5 and was titled "Get freaky Tuesday. . . Come spend ur day with us–19" and had accompanying text saying "Doin incalls and outcalls."  Victim 8 was depicted in the ad for Count 4, titled "Puerto Rican mami in

Walpole area INCALLS—19." A similar ad depicting her makes up Count 5. The ads depicting Victims 10 and 12 (Counts 12–15) contained the phrase "New In Town," a "coded phrase used by pimps who shuttle children to locations where they do not know anyone and cannot get help." (SI ¶ 13). Victim 11 was featured in ads titled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy—26" and "Alexis Foxx the HOTTEST in town!!!!!—26" (Counts 16–17). Victim 15 and 17's ads, among other suggestive text, included a disclaimer that by contacting them, prospective customers agreed they were not affiliated with law enforcement (Counts 19–21). Victim 17 offered in/calls only (Counts 21–22). Victim 13's ad included prices for particular services: "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" (Count 23). Victim 16's ad offered "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW—23."

Again, at this point of the proceeding, the Court must take the SI at its face. The Government may eventually fail to prove the facts alleged in the SI, but, at this stage of the proceeding, the Court cannot consider the adequacy of the evidence; that job is reserved for the fact finder. The Court is convinced the factual allegations in the SI are sufficient to show the ads were for prostitution.

Additionally, Defendants argue the SI's use of government officials' and others' "accusations" against Backpage are improper. (Mot. at 18–19); *see, e.g.*, (SI ¶ 74 (2010 letter from state AGs); SI ¶ 109 (letter from Seattle mayor); SI ¶ 111 (letter from National Association of Attorneys General); SI ¶ 140 (amicus brief filed by NCMEC); SI ¶ 131 (ASU publication)). Defendants cite two previous cases Backpage was involved in for the proposition that Courts have "rejected such 'evidence'" in the past. (Mot. at 19); *see Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012). Neither case stands for such a proposition;[3] even if they did, the SI contains enough factual information outside of these

---

[3] In the portions of *McKenna* cited by Defendants, the district court analyzed a state statute under vagueness and overbreadth doctrines. 881 F. Supp. 2d at 1280–83. The *Cooper* court

1    "condemnations" to be sufficient.

2        b.  *The SI does not attack protected editorial functions or protected business*
3            *advertising practices.*

4        Defendants argue the SI attacks Backpage's protected editorial judgment and
5    business advertising practices.  The First Amendment protects "editorial control and
6    judgment."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  The First
7    Amendment also protects speech on the Internet.  *Reno v. ACLU*, 521 U.S. 844, 870 (1997).
8    Defendants, however, are unable to overcome the alleged facts in the SI.[4]

9        The SI alleges Defendants participated in moderation not merely to edit, but to
10   "conceal the true nature of the ads being posted on its website."  (SI ¶ 11).  When a post
11   advertised child prostitution, their "official policy" was to delete particular words in the ad
12   that indicated the child's age and publish the revised version.  (SI ¶ 13).  This "only created
13   a veneer of deniability and helped Backpage's customers (*i.e.*, pimps trafficking children)
14   evade detection."  (SI ¶¶ 13, 78).  Backpage permitted users to include TER ID numbers,
15   "just no live links."  (SI ¶ 85).  In February 2011, Padilla responded to a request for
16   Backpage's list of banned adult terms. Padilla then provided an Excel spreadsheet that
17   identified over "660 words or phrases that are indicative of prostitution, including an array
18   of terms that are suggestive of child prostitution (*e.g.,* 'Lolita,' 'fresh,' 'high school,'
19   'tight,' 'young').  The spreadsheet explained that most such terms were simply to be
20   'filtered' from the ads in which they appeared."  (SI ¶ 95).  The SI also alleges the "non-
21   adult sections" were simply intended to provide "plausible deniability" and to make the
22   website "defensible" and more palatable to law enforcement.  (SI ¶ 112).  A Backpage

23   _____

24   discusses the September 2010 letter from state AGs, but held a state statute similar to the
     one in *McKenna* was likely unconstitutional under the overbreadth doctrine. 939 F. Supp.
25   2d at 815–16, 831–32. Neither considered the sufficiency or use of the contested
26   statements.

27   [4] Defendants also argue the SI's allegations are not supported by underlying documents.
     Again, per *Boren* and *Jensen*, *supra*, the Court takes the allegations on their face and does
28   not consider the adequacy of the evidence when reviewing whether an indictment is
     sufficient.

training document specifically instructed Backpage moderators not to remove photographs of a person who looks like a minor, unless the ad also contained a banned term.  (SI ¶ 143). The training manual instructed moderators to allow phrases like "99% CUM BACK FOR MORE," "car service," and "lollipop special."  (SI ¶ 143).  Backpage also taught customers how to word their ads to avoid moderator restrictions.  (SI ¶ 59–67).

The cases Defendants rely on do not persuade the Court that the above practices alleged in the SI were merely traditional, editorial functions.   First, many of the cases were decided under the Communications Decency Act ("CDA"), which grants immunity from civil liability to "interactive computer service" providers when information on its service originates from "another information content provider." 47 U.S.C. § 230(c); *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) ("To summarize, we hold that section 230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that Yahoo undertook to provide"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 469–71 (3d Cir. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014); *Batzel v. Smith*, 333 F.3d 1018, 1026–30 (9th Cir. 2003) *superseded by statute on other ground as recognized in Breazeale v. Victim Serv., Inc.*, 878 F.3d 759 (9th Cir. 2017); *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015); *M.A. ex rel P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).  This case, however, does not concern civil liability, and the CDA has "no effect" on "any other Federal criminal statute."  47 U.S.C. § 230(e)(1).

Second, the facts alleged in the SI are qualitatively different than the protected activities in those cases.  In *Batzel*, for example, the Ninth Circuit held that an individual's minor edits of another's email before forwarding the email to a listserv did not make that individual responsible for the "development" of the content (and thus subject to civil liability).  333 F.3d at 1031; *see also Jones*, 755 F.3d at 415–16 (holding defendant website

and operator were not liable under the CDA because they did not "materially contribute[] to the defamatory content"). In *Barnes*, 570 F.3d at 1098–99, and *Zeran*, 129 F.3d at 330, websites failed to remove information at the request of victims of hoaxes and harassment perpetrated by third parties, but the websites took no affirmative steps to conceal or facilitate its users' illegal conduct. In *Green*, the Third Circuit held that § 230(c)(2) immunized AOL for its "good faith efforts to restrict effort to restrict access to material they consider to be objectionable." 318 F.3d at 472.

Defendants' argument that its efforts to promote its website was protected activity similarly fails. Prostitution ads are ads for illegal transactions. *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 285, 297 (2008) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."); *Erotic Serv. Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459–60 (9th Cir. 2018) ("[P]rostitution has not been a lawful activity in California since it was banned in 1872 . . . . On this basis alone, [the plaintiff's] claim fails because commercially motivated speech that involves unlawful activity is not protected speech under the First Amendment."). The First Amendment does not protect "offers to engage in illegal transactions." *United States v. Williams*, 553 U.S. 285, 297 (2008).

The SI does not allege Defendants are criminally liable because they unknowingly and unintentionally operated a website used by third parties to post prostitution ads. Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business. (SI ¶¶ 9, 36). Hyer directed the project, and Spear, Hyer, C.F., and Larkin participated in meetings where the project was on the agenda. (SI ¶¶ 36, 38, 40). The plan was also described in a document C.F. gave to Larkin, Spear, and Brunst. (SI ¶42). Defendants also sought to expand their traffic through TER, a "prostitution website" where "johns" could rate and review escorts including the "prices charged for particular sex acts." (SI ¶¶ 10, 54). As alleged, Backpages' efforts to promote its website facilitated prostitution and were

not protected business practices.

### 2. The SI alleges sufficient *mens rea*.

Defendants are charged with fifty counts of violating the Travel Act by promoting or facilitating prostitution.  To obtain a conviction under the Travel Act, the Government must show defendants had "specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); *accord United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981) ("An indictment under the Travel Act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity."); *United States v. Polizzi*, 500 F.2d 856, 876–77 (9th Cir. 1974) (Required intent under the Travel Act is "specific intent to facilitate an activity which the accused knew to be unlawful under state law.").  Defendants argue that to comply with the First Amendment and satisfy the Travel Act's specific intent requirement, the SI must allege each defendant "knew the *specific* speech that is the basis for criminal charges was illegal." (Mot. at 28) (emphasis in original).  That is, Defendants argue the First Amendment requires the Government to prove that each Defendant was aware of each ad that make up the fifty Travel Act counts and knew that each ad proposed illegal transactions.  The Court is not persuaded that the First Amendment demands such a standard.

In their argument on this issue, Defendants largely rely on four cases—*Smith v. California*, 361 U.S. 147 (1959), *Mishkin v. New York*, 383 U.S. 502, 511 (1966), *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994), *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974)—and previous statements made by the Government or legislators in Congressional testimony and other cases.  The Court concludes none of these cases mandate the *mens rea* requirement described by Defendants, and, instead, agrees with the Government that intent to promote or facilitate prostitution is sufficient.

In *Smith*, an owner of a bookstore was convicted of violating a Los Angeles City

ordinance that made it illegal for a bookseller to possess "any obscene or indecent writing or book." 361 U.S. at 148. The ordinance did not have a scienter element and "imposed a strict or absolute criminal responsibility on appellant." *Id.* at 151. The Supreme Court noted that obscene speech and writings are not protected by the First Amendment, but the "ordinance's strict liability feature" could "restrict the dissemination of books which are not obscene." *Id.* at 153. The Court struck down the ordinance, but in doing so did not consider "what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock" and explicitly left open the possibility of prosecution for something less than specific knowledge of the contents of a particular book. *Id.* at 154–55.

Likewise, *Mishkin* upheld a scienter standard less demanding than the one proposed by defendants. There, the defendant was convicted of violating a New York Penal Law prohibiting possession of obscene books with intent to sell and hiring others to prepare and publish obscene books. *Mishkin*, 383 U.S. at 503. The Court upheld the scienter standard used by the New York Court of Appeals, requiring the State show defendants were "in some manner aware of the character of the material they attempt to distribute." *Id.* at 510. The Court reasoned, "proof of scienter" is required "to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." *Id.* at 511. The scienter standard used in the prosecution "amply serve[d] those ends, and therefore fully [met] the demands of the Constitution." *Id.*

*X-Citement* concerned a federal statute that prohibited "the interstate transportation, shipping, receipt, distribution, or reproduction of visual depictions of minors engaged in sexually explicit conduct." 513 U.S. at 65–66. The statute had a scienter requirement of "knowingly" but was worded in such a way that it was not clear whether the knowingly requirement only applied to the verbs immediately following "knowingly"—transports, ships, receives, distributes, or reproduces—or also applied to the "elements of the minority of the performers, or the sexually explicit nature of the material." *Id.* at 68. The Court held the knowledge requirement also applied to the age of the performers and the sexually

- 16 -

explicit nature of the material, because, among other reasons, "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 72. "[N]onobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment. . . .Therefore, the age of the performers is the crucial element separating legal innocence from wrongful conduct." *Id.* at 72–73. Thus, "a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts." *Id.* at 78. Nevertheless, *X-Citement*'s holding "was not a constitutional" one, but "one of statutory interpretation." *United States v. Smith*, 459 F.3d 1276, 1287 (11th Cir. 2006). Consequently, its application here is limited. The Government does not advance a theory of prosecution that is "completely bereft of a scienter requirement" such that innocent conduct is swept up in criminal liability, and the statute here contains an intent requirement.

*Gibson* described the Travel Act's specific intent requirement: "the prosecutor must show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement." 507 F.2d at 449. There, manufacturers of gambling paraphernalia sold products to Montana distributors, where such products were illegal. *Id.* at 448. The Ninth Circuit held the manufactures failed to form a specific intent to violate the Travel act because "[t]here is no evidence in the record, direct or circumstantial from which one could infer the defendants associated with, participated in or sought to make succeed the Montana operations." *Id.* at 450. The manufacturers had merely "produced catalogues, filled orders for punchboards and pulltabs from Montanans, billed the buyers and received payments." *Id.*

Lastly, the previous statements made by the Government in other cases are not binding on the Court, not relevant to this prosecution, and, in any case, not inconsistent with the Government's current theory regarding the Travel Act. In 2010, the DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction testified in a congressional hearing that a website would only be liable for third-party postings if "there was evidence" that a website "was a participant . . . conspiring with those who were

misusing their site, that is knowingly conspiring to violate the laws." (Mot. at 29) (quoting *Domestic Minor Sex Trafficking: Hearing Before Subcomm. On Crime, Terrorism, & Homeland Security of the H. Comm. on the Judiciary*, 11th Cong. 215–16 (2010)). The SI alleges Defendants conspired with third parties, such as P.R. and Dollar Bill, to promote prostitution and edited other prostitution ads to "conceal their true nature." (SI ¶¶ 10–11, 59–67, 132). The remaining statements used in Defendants' motion concerned different statutes, the Fight Online Sex Trafficking Act and the SAVE Act 18 U.S.C. § 1591.

The Government's proposed *mens rea* standard, specific intent to promote or facilitate prostitution, is consistent with *Gibson*, *Tavelman*, and *Polizzi*—the Ninth Circuit cases discussing intent requirements of the Travel Act. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business. (SI ¶¶ 9, 36). They also helped known prostitution advertisers (Dollar Bill and P.R.) avoid their decency filters and attempted to "conceal the true nature of the ads being posted on" Backpage. (SI ¶¶ 11, 59–67, 132). Unlike the defendants in *Gibson*, where there was "no evidence . . . from which one could infer that the defendants associated with, participated in or sought to make succeed" the criminal venture, the SI meets *Gibson*'s test of requiring Defendants to in "some significant manner associate[]" themselves with the "criminal venture for the purpose of its advancement." 507 F.2d at 450.

Defendants argument that the First Amendment demands a scienter requirement more exacting than that offered by the Government is unpersuasive. Unlike in *Smith*, there is not a strict liability standard sweeping lawful acts in with unlawful acts because the activity here must be connected to a specific intent to promote or facilitate the crime of prostitution. As in *Mishkin*, where a defendant in an obscenity case only had to be "in some manner aware of the character of the material they attempt to distribute," specific intent to promote prostitution "avoid[s] the hazard of self-censorship of constitutionally protected material." Additionally, unlike in *Mishkin*, the intent standard does not have to compensate for the "ambiguities inherent in the definition of obscenity." *See Miller v.*

1   *California*, 413 U.S. 15, 24 (1973) ("obscenity" requires assessing whether the work (a)

2   under "contemporary community standards...appeals to the prurient interest"; (b) depicts

3   sexual conduct "in a patently offensive way"; and (c) "lacks serious literary, artistic,

4   political, or scientific value").

5          The SI contains sufficient factual allegations to implicate all Defendants.

6   Additionally, when there is a "continuous conspiracy," the "overt act[s] of one partner may

7   be the act of all without any new agreement specifically directed to that act." *United States

8   v. Pinkerton*, 328 U.S. 640, 646–47 (1946); *see United States v. Long*, 301 F.3d 1095, 1103

9   (9th Cir 2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator

10  criminally liable for the substantive offenses committed by a co-conspirator when they are

11  reasonably foreseeable and committed in furtherance of the conspiracy."); *United States v.

12  Fonseca-Caro*, 114 F.3d 906, (9th Cir. 1997) ("[A] co-conspirator is vicariously liable for

13  reasonably foreseeable substantive crimes committed by a co-conspirator in furtherance of

14  the conspiracy.").   The pleadings and this order are replete with the relevant factual

15  allegations against the defendants, so the Court will only briefly repeat them here.  Taken

16  as true, they show Defendants had a specific intent to promote prostitution.

17         Defendants Lacey and Larkin created Backpage with C.F. in 2004.  (SI ¶ 2).  They

18  retained significant control throughout the time Backpage was operating.  (SI ¶ 2).  Their

19  control over Backpage and their financial interest in it continued even after they

20  purportedly sold Backpage.  (SI ¶¶ 29–30).  Spear was the Executive Vice President of one

21  of Backpage's parent companies and owned approximately 4% of Backpage.  Brunst was

22  the Chief Financial Officer and owned approximately 6% of Backpage.  Spear and Brunst

23  also retained significant control over Backpage after the purported sale.  (SI ¶ 31).  Padilla

24  was Backpage's Operations Manager and Vaught was the assistant Operations Manager.

25  (SI ¶¶ 7–8).

26         Larkin regularly met with C.F. after the purported sale to discuss and direct the

27  operation of Backpage.  (SI ¶ 32).  Larkin, Spear, Hyer, and C.F. attended meetings where

28  the Dallas aggregation plan or the business relationship with TER was on the agenda.  (SI

¶¶ 38–42, 47–48).  Lacey sent Larkin a draft editorial arguing Backpage brought "the oldest profession in the world . . . transparency."  (SI ¶ 137).  Larkin reviewed the editorial, forwarded it to C.F., and instructed him to remove any references to editing posts.  (SI ¶¶ 107–08).  Padilla helped supervise Backpage's moderators.  (SI ¶ 12).  Larkin, Spear, and C.F. met to discuss trade with TER.  (SI ¶ 47).  C.F. sent Larkin, Spear, and Brunst a "Backpage strategic plan" that included "expand relationship with TER."  (SI ¶ 49).  Padilla emailed (with Vaught cc'd or as a recipient) Backpage's India-based moderators to tell them to be "more lenient."  (SI. ¶¶ 93, 99).  Padilla and Vaught were sent an email informing them that their credit card processing company expressed concern about prostitution ads.  Vaught directed a moderator to not remove "sex for money" links from ads. (SI ¶ 139).  Vaught received an email from a moderator indicating that Padilla said to allow "GFE" in ads. (SI ¶ 148).  Larkin, Spear, Brunst, Hyer, and C.F. received an email in August 2013 notifying them that Chase Bank would no longer accept transactions from Backpage because of it "involvement in Human Trafficking."  (SI ¶ 135).  Larkin, Spear, C.F., and Brunst discussed strategies for fooling credit card companies into processing payments using shell companies.  (SI ¶¶ 178–80).

The alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act.  They conspired together to do so. The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act.

3.  The Travel Act is not unconstitutional as applied.

Defendants argue the Travel Act is unconstitutional as applied in the SI.  In their view, the SI merely alleges the defendants only had "general knowledge that Backpage.com was used by third parties to advertise prostitution."  (Mot. at 38).  Again, taking the SI's allegations as true, which the Court must, the SI tells a different story.  Nevertheless, the Court considers whether the Travel Act is unconstitutional as applied to the SI.

Defendants' argue the Travel Act is overbroad and vague as applied to the SI. Conviction under the Travel Act requires: (1) interstate commerce or use of an interstate

facility; (2) with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"; and (3) a subsequent overt act in furtherance of that unlawful activity. 18 U.S.C. § 1952(a); *Tavelman*, 650 F.2d at 1138. The Ninth Circuit has interpreted the second prong quite broadly. "Facilitate" is given its "ordinary meaning: to make easy or less difficult." *Gibson*, 507 F.2d at 446.

Defendants argue the Travel Act is overbroad as applied in the SI because without the specific intent standard they propose, "the statutory terms become boundless." A law is overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). Given the standard the SI applies—specific intent to promote and facilitate prostitution (SI ¶ 10)—the Court does not agree.

Defendants do not provide any examples of how such a standard could criminalize protected speech. The statute, as applied in the SI, requires Defendants to have intended to facilitate prostitution, which is a crime. *See* A.R.S. § 13-3214. This limits its purview to criminal activity and distinguishes it from cases relied on by Defendants. For example, in *United States v. Sineneng-Smith*, the Ninth Circuit considered a statute that made it a felony when a person "'encourages or induces an alien to come to, enter, or reside in the United States' if the encourage knew or reckless disregarded 'the fact that such coming to, entry, or residence is or will be a in violation of law." 910 F.3d 461, 467 (9th Cir. 2018), *cert. granted*, No. 19-67, 2019 WL 4889927 at *1 (October 4, 2019) (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)). The Ninth Circuit, in disagreeing with a Fourth Circuit decision that compared the statute to aiding and abetting, struck it down. They reasoned the statute criminalized speech that applied to both criminal and civil violations, speech that merely "encouraged" violating civil and criminal immigration laws (as opposed to the aiding and abetting requirement of "assisted or participated"), and did not require that a principal commit an underlying offense (as required in aiding and abetting). *Id.* at 480–82; *see also*

- 21 -

*United States v. Freeman*, 761 F.2d 549 (9th Cir. 1985) (defendant was entitled to jury instruction concerning a First Amendment defense for 12 counts where he may have generally advocated for the filing of false tax returns, but not for the two counts where he "also assisted in the filing of false returns"). Such concerns are not relevant here. Defendants are accused of intending to promote or facilitate an activity they knew to be criminal under state law. They then assisted and participated in the violation of the state law, resulting in fifty prostitution ads cited by the SI. As applied in the SI, the Travel Act is not unconstitutionally overbroad.

Defendants argue the SI is unconstitutionally vague because the Travel Act's undefined terms do not sufficiently narrow criminal conduct to give people a fair warning of what conduct is prohibited and allows arbitrary and discriminatory enforcement. (Mot. at 40) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). As Defendants recognize, however, "strict *mens rea* requirements" can limit a statute's application. (Mot. at 41).

As applied in the SI, the Travel Act does limit its application to unprotected speech. The statute requires use of an interstate facility, with the intent to facilitate an unlawful activity, and a subsequent act in furtherance of that unlawful activity. Here, the SI alleges Defendants used a website with the intent to facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations in the SI do not give fair warning that facilitating a criminal act is itself a crime. As applied in the SI, the Travel Act is not unconstitutionally vague.

**IV. CONCLUSION**

For the foregoing reasons, the SI is not constitutionally deficient. It contains the elements of the offense charged and fairly informs Defendants of the charges against which they must defend. It enables them to plead an acquittal or conviction in bar of future

prosecutions for the same offense. Read in its entirety, construed according to common sense, and accepting the truth of the allegations, the SI gives Defendants enough facts and circumstances to inform the accused of the charged offenses. Defendants arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing, as the *mens rea* standard of specific intent to promote prostitution does not criminalize lawful activity.

Accordingly, Defendants' Motion to Dismiss the Indictment (Doc. 561) is **DENIED.**

Dated this 24th day of October, 2019.

Honorable Susan M. Brnovich
United States District Judge

# EXHIBIT F

**DISTRICT JUDGE'S MINUTES**
## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA – PHOENIX

| | |
|---|---|
| **U.S. District Judge: Susan M. Brnovich** | **Date:** September 14, 2021 |
| **USA v. Lacey et al** | **Case Number: CR-18-00422-PHX-SMB** |

**Assistant U.S. Attorneys:** Andrew Stone, Peter Kozinets, Margaret Perlmeter, Kevin Rapp, Reginald Jones and Daniel Boyle

**Defendant-1:** Michael Lacey, Released – Present
**Attorney for Defendant (1):** Paul Cambria, Jr., Retained
**Defendant-2:** James Larkin, Released – Present
**Attorney for Defendant (2):** Thomas Bienert, Jr. and Whitney Bernstein, Retained
**Defendant-3:** Scott Spear, Released-Present
**Attorney for Defendant (3):** Bruce Feder, Retained
**Defendant-4:** John Brunst, Released-Present
**Attorney for Defendant (4):** Gary Lincenberg and Gopi Panchapakesan, Retained
**Defendant-6:** Andrew Padilla, Released - Present
**Attorney for Defendant (6):** David Eisenberg, CJA Appointment
**Defendant-7:** Joye Vaught, Released – Present
**Attorney for Defendant (7):** Joy Bertrand, CJA Appointment

**JURY TRIAL – DAY 8:**

9:03 a.m. Court is in session. Counsel and defendants are present. The jury is not present. For reasons set forth on the record, the Defendants' oral motion for mistrial is granted. 9:09 a.m. Court is in recess.

9:16 a.m. Court reconvenes. Counsel and defendants are present. The jury is present. The jury is advised that a mistrial has been declared. 9:17 a.m. The jury is released from the admonition and is excused. Court remains in session. The Court states for the record that Defendants' impeachment exhibit IM 16, although not admitted into evidence, was marked for identification as Exhibit 6157.

**IT IS ORDERED** setting an in-person Status Hearing re: New Trial for October 5, 2021 at 11:00 a.m.

9:19 a.m. Court is adjourned.

| | |
|---|---|
| **Court Reporter** Christine Coley (AM) | **Total: 9 mins** |
| **Deputy Clerk** Elaine Garcia | **Start: 9:03 AM** |
| | **Stop: 9:19 AM** |

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CR-18-00422-PHX-DJH |
| Plaintiff, | |
| vs. | **DEFENDANTS' PROPOSED JURY INSTRUCTIONS** |
| Michael Lacey, et al., | |
| Defendants. | |

**I.      MODEL INSTRUCTIONS**

1.      <u>Preliminary Instructions</u>

ST      1.1      Duty of Jury

PL      1.2      The Charge – Presumption of Innocence*

DF      1.2      The Charge – Presumption of Innocence*

ST      1.3      What Is Evidence

ST      1.4      What Is Not Evidence

ST      1.5      Direct and Circumstantial Evidence

ST      1.6      Ruling on Objections

ST      1.7      Credibility of Witnesses

ST      1.8      Conduct of the Jury

ST      1.9      No Transcript Available to Jury

ST      1.10     Taking Notes

ST      1.11     Outline of Trial

PL      1.13     Separate Consideration for Each Defendant

DF      1.13     Separate Consideration for Each Defendant*

1        ST    1.16    Bench Conferences and Recesses

2   2.     <u>Instructions In The Course Of Trial</u>

3        ST    2.1     Cautionary Instruction – First Recess

4        ST    2.2     Stipulated Testimony [if necessary]

5        ST    2.3     Stipulations of Fact [if necessary]

6        ST    2.12    Evidence for Limited Purpose [if necessary]

7   3.     <u>Consideration of Particular Evidence</u>

8        ST    3.9     Testimony of Witnesses Involving Special Circumstances—Immunity,

9                          Benefits, Accomplice, Plea

10       ST    3.14    Opinion Evidence, Expert Witness

11       ST    3.15    Dual Role Testimony

12       ST    3.16    Charts and Summaries Not Admitted into Evidence [if necessary]

13       ST    3.17    Charts and Summaries Admitted into Evidence

14   4.     <u>Responsibility</u>

15       PL    4.8     Knowingly

16       PL    4.9     Deliberate Ignorance*

17       DF    4.11    Advice of Counsel*

18   5.     <u>Specific Defenses</u>

19       DF    5.12    Mere Presence*

20   6.     <u>Jury Deliberations</u>

21       ST    6.1     Duties of Jury to Find Facts and Follow Law

22       PL    6.2     Charge Against Defendant Not Evidence—Presumption of

23                          Innocence—Burden of Proof

24       DF    6.2     Charge Against Defendant Not Evidence—Presumption of

25                          Innocence—Burden of Proof*

26       ST    6.3     Defendant's Decision Not to Testify [if necessary]

27       ST    6.4     Defendant's Decision to Testify [if necessary]

28       PL    6.5     Reasonable Doubt—Defined

| | | | |
|---|---|---|---|
| 1 | DF | 6.5 | Reasonable Doubt—Defined* |
| 2 | ST | 6.6 | What Is Evidence |
| 3 | ST | 6.7 | What Is Not Evidence |
| 4 | ST | 6.8 | Direct and Circumstantial Evidence |
| 5 | ST | 6.9 | Credibility of Witnesses |
| 6 | ST | 6.10 | Activities Not Charged |
| 7 | PL | 6.13 | Separate Consideration of Multiple Counts—Multiple Defendants |
| 8 | DF | 6.13 | Separate Consideration of Multiple Counts—Multiple Defendants* |
| 9 | ST | 6.18 | On or About—Defined |
| 10 | ST | 6.19 | Duty to Deliberate |
| 11 | ST | 6.20 | Consideration of Evidence—Conduct of the Jury |
| 12 | ST | 6.21 | Use of Notes |
| 13 | ST | 6.22 | Jury Consideration of Punishment |
| 14 | ST | 6.23 | Verdict Form |
| 15 | ST | 6.24 | Communication with Court |

16    11.    <u>Conspiracy</u>

| | | | |
|---|---|---|---|
| 17 | PL | 11.1 | Conspiracy—Elements (Count 1)* |
| 18 | DF | 11.1 | Conspiracy—Elements (Count 1)* |
| 19 | DF | 11.3 | Multiple Conspiracies (Count 1)* |
| 20 | DF | 11.3 | Multiple Conspiracies (Count 52)* |
| 21 | PL | 11.4 | Conspiracy—Knowledge of and Association with Other Conspirators |
| 22-23 | DF | 11.4 | Conspiracy—Knowledge of and Association with Other Conspirators* |
| 24-25 | PL | 11.6 | Conspiracy—Liability for Travel Act Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| 26-27 | DF | 11.6 | Conspiracy—Liability for Travel Act Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| 28 | PL | 11.6 | Conspiracy—Liability for Concealment Money Laundering |

|  |  |  | Committed by Co-Conspirator (*Pinkerton* Charge)* |
|--|--|--|--|
|  | DF | 11.6 | Conspiracy—Liability for Concealment Money Laundering Committed by Co-Conspirator (*Pinkerton* Charge)* |
|  | PL | 11.6 | Conspiracy—Liability for International Promotional Money Laundering Committed by Co-Conspirator (*Pinkerton* Charge)* |
|  | DF | 11.6 | Conspiracy—Liability for International Promotional Money Laundering Committed by Co-Conspirator (*Pinkerton* Charge)* |
| 18. |  |  | Money Laundering and Racketeering Offenses |
|  | PL | 18.1 | Travel Act—Interstate or Foreign Travel in Aid of Racketeering Enterprises* |
|  | DF | 18.1 | Travel Act—Interstate or Foreign Travel in Aid of Racketeering Enterprises* |
|  | PL | 18.4 | Laundering Monetary Instruments* |
|  | DF | 18.4 | Laundering Monetary Instruments* |
|  | PL | 18.5 | Transporting or Attempting to Transport Funds to Promote Unlawful Activity* |
|  | DF | 18.5 | Transporting or Attempting to Transport Funds to Promote Unlawful Activity* |
|  | PL | 18.6 | Transporting or Attempting to Transport Monetary Instruments for the Purpose of Laundering* |
|  | DF | 18.6 | Transporting or Attempting to Transport Monetary Instruments for the Purpose of Laundering* |
|  | PL | 18.7 | Money Laundering* |
|  | DF | 18.7 | Money Laundering* |
|  | PL | 18.7A | Money Laundering Conspiracy* |
|  | DF | 18.7A | Money Laundering Conspiracy* |

**II.    NON-MODEL STIPULATED INSTRUCTIONS**

**III.  NON-MODEL INSTRUCTIONS REQUESTED BY THE UNITED STATES**

PL  1.  State Law Need Not Be Violated for Defendants to Be Found Guilty Under the Travel Act

PL  2.  "Business Enterprise" Defined

PL  3.  "Uses Any Facility in Interstate Commerce" Defined

PL  4.  "Facilitate" Defined

PL  5.  Specific Intent Defined

PL  6.  Proof of Knowledge or Intent

**IV.  NON-MODEL INSTRUCTIONS REQUESTED BY DEFENDANTS WITH THE UNITED STATES' OBJECTIONS**

DF  1.  Specific Intent

DF  2.  Defendant's Good Faith

DF  3.  Defense Theory of the Case

DF  4.  Conspiracy – Willfulness Defined

DF  5.  Business Enterprise Explained

DF  6.  Business Enterprise Defined

DF  7.  First Amendment Protection—Speech Presumed Protected

DF  8.  First Amendment Protection—Speech Presumed Protected

DF  9.  First Amendment Protection—Offensive and Sexual Speech

DF  10.  First Amendment Protection—Protected Free Speech

DF  11.  First Amendment Protection—Ads Presumed Protected

DF  12.  First Amendment Protection—Coded Advertisement Language

DF  13.  First Amendment Protection—Examples of Legal "Adult" Services

DF  14.  First Amendment Protection—Ads Presumed Protected

DF  15.  First Amendment Protection—Government's Burden to Overcome Presumption

DF  16.  First Amendment Protection—Ads Presumed Protected

DF  17.  First Amendment Protection—No Requirement to Investigate

DF    18.    First Amendment Protection—No Requirement to Shut Down

DF    19.    First Amendment Protection—Website has the Right to Exercise Editorial Control and Judgment

DF    20.    First Amendment Protection—Government's Burden of Proof

## 1.2 THE CHARGE—PRESUMPTION OF INNOCENCE

This is a criminal case brought by the United States government. The United States charges defendants with conspiracy, violations of the Travel Act, and money laundering. The charges against defendants are contained in the indictment. The indictment[1] simply describes the charges the United States brings against each defendant. The indictment is not evidence and does not prove anything.

Each defendant has pleaded not guilty to the charges and is presumed innocent unless and until the United States proves that defendant guilty beyond a reasonable doubt. In addition, each defendant has the right to remain silent and never has to prove innocence or present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes that the United States must prove to make its case against each charged defendant:

*Count 1: Conspiracy*

Defendants are charged in Count 1 of the indictment with conspiring to facilitate prostitution in violation of the Travel Act under Section 1952(a)(3(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, beginning on or about 2004 and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.

---

[1] All references to "indictment" in these instructions refer to the United States' superseding indictment (Doc. 230).

*Counts 2–51: Travel Act Violations*

Defendants are charged in Counts 2–51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant used the mail or any facility in interstate or foreign commerce with the intent to promote, or facilitate the promotion of, a business enterprise involving prostitution offenses in violation of the laws of the State in which those offenses were committed; and

Second, after doing so each defendant performed an act in connection with the publication on Backpage.com of the ad that is the subject of each Count.

Further, you may find a given defendant guilty of a Travel Act offense as charged in Counts 2–51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, one defendant committed a Travel Act offense as charged in Counts 2-51 of the indictment;

Second, the defendant who committed the charged Travel Act offense was a member of the conspiracy as charged in Count 1 of the indictment;

Third, the defendant who committed the charged Travel Act offense did so in furtherance of the charged conspiracy;

Fourth, another defendant was a member of the same conspiracy at the time the Travel Act offense charged in Counts 2-51 was committed; and

Fifth, the charged Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by that other defendant to be a necessary or natural consequence of the unlawful agreement.

*Count 52: Conspiracy to Commit Money Laundering*

Defendants are charged in Count 52 of the indictment with money laundering conspiracy in violation of Section 1956(h) of Title 18 of the United States Code.  For a

defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, there was an agreement to commit money laundering;

Second, the defendant knew the objective of the agreement;

Third, the defendant joined the agreement with the intent to further its unlawful purpose.

### Count 53–62: Concealment Money Laundering

Defendants Lacey, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act charged in Counts 2-51 of the indictment;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the Travel Act violation(s).

### Count 63–68: International Promotional Money Laundering

Defendants Lacey, Brunst, and Spear are charged in Counts 63–68 of the indictment with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through

a place outside the United States; and

Second, the defendant acted with the intent to promote a violation of the Travel Act charged in Counts 2-51 of the indictment.

*Count 69–99: Transactional Money Laundering*

One or more of Defendants Lacey, Brunst, and Spear each are charged in Counts 69–99 of the indictment with transactional money laundering in violation of Section 1957 of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction.

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from violations of the Travel Act charged in Counts 2-51 of the indictment; and

Fifth, the transaction occurred in the United States.

*Count 100: International Concealment Money Laundering*

Defendant Lacey is charged in Count 100 of the indictment with transporting money for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United States Code.  For defendant Lacey to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, defendant Lacey transported money from a place in the United States to or through a place outside the United States;

Second, defendant Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act charged in Counts 2-51 of the indictment; and

Third, defendant Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act violation(s) to avoid a transaction reporting requirement under state or

federal law.

## 1.13 SEPARATE CONSIDERATION FOR EACH DEFENDANT

Although the defendants are being tried together, you must give separate consideration to each defendant. In doing so, you must determine which evidence in the case applies to each defendant, disregarding any evidence admitted solely against some other defendants. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendants.

**2.12 Evidence for Limited Purpose**

Throughout this case you have heard evidence that was received for the limited purpose of showing that defendants or other persons were aware of certain claims by third parties.  That evidence includes Exhibits _____ and any testimony that consisted of reading the content of those exhibits or characterizing the witness' view of those contents.

I instruct you that that evidence was admitted only for the limited purpose of showing notice of those claims and, therefore, you must consider it only for that limited purpose and not for any other purpose.  In particular, you must not consider that evidence for the truth of the claims asserted in the evidence, as those claims may not be true.

**Supporting Authorities**

Fed. R. Evid. 105; *cf. United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004) ("We have repeatedly held that a district court's careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered, can reduce or eliminate any possibility of prejudice arising from a joint trial.") (internal citations omitted).

Ninth Circuit Manual of Model Criminal Jury Instructions 2.12 (modified to fit the case).

**3.8 Impeachment Evidence—Witness**

You have heard evidence that Carl Ferrer, a witness, made prior statements under oath that were inconsistent with his testimony at trial.  You may consider this evidence in deciding whether or not to believe this witness and how much weight to give to the testimony of this witness.

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 3.8.

## 3.9 Testimony of Witnesses Involving Special Circumstances—
## Immunity, Benefits, Accomplice, Plea

You have heard testimony from Carl Ferrer and Daniel Hyer, witnesses who received favored treatment and benefits from the government in connection with this case and pleaded guilty to a crime arising out of the same events for which the defendants are on trial.  Those guilty pleas are not evidence against the defendants, and you may consider them only in determining those witnesses' believability.

For these reasons, in evaluating the testimony of Carl Ferrer and Daniel Hyer, you should consider the extent to which or whether their testimony may have been influenced by any of these factors.  In addition, you should examine the testimony of Carl Ferrer and Daniel Hyer with greater caution than that of other witnesses.

### Supporting Authorities

Ninth Circuit Manual of Model Criminal Jury Instructions3.9.

## UNITED STATES' PROPOSED INSTRUCTION
## 4.9 DELIBERATE IGNORANCE

You may find that the defendant acted knowingly if you find beyond a reasonable doubt that:

First, the defendant was aware of a high probability that the vast majority of the "adult" and "escort" ads appearing on Backpage.com were actually ads for prostitution, and

Second, the defendant deliberately avoided learning the truth.

You may not find such knowledge, however, if you find that the defendant actually believed that the vast majority of the "adult" and "escort" ads appearing on Backpage.com were not ads for prostitution, or if you find that the defendant was simply negligent, careless, or foolish.

## DEFENDANTS' OBJECTION

The government's proposed *Jewell* instruction is inappropriate for numerous reasons.

First, the Government's proof at trial does not provide a basis for the instruction. In the Ninth Circuit, in order for a court to provide a deliberate ignorance (*Jewell*) instruction, the "government must present evidence supporting an inference that [Defendants] avoided obtaining actual knowledge." *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1987) ("If the evidence indicates that [Defendants] had either actual knowledge or lacked any knowledge of the presence of the cocaine, then giving the *Jewell* instruction was inappropriate."); *see also United States v. Nicholson*, 677 F.2d 706, 711 (9th Cir. 1982) ("The government presented substantial evidence indicating that Nicholson deliberately avoided obtaining positive knowledge of the nature of the deal in which he invested his money, and that this deliberate avoidance was 'solely and entirely' his own fault."); *United States v. McMahan*, 394 F. App'x 453, 460 n.3 (10th Cir. 2010) (providing deliberate ignorance instruction in Travel Act case where FBI agent testified defendant said during

- 15 -

interview that 'he didn't ask [his wife] about the cash because [he] didn't want to know."). Here, the Government's proof at trial has been precisely the opposite – namely that Defendants knew the escort ads on the Backpage site were for prostitution and that third parties consistently told them so.  There has been no evidence presented that any Defendant was deliberately ignorant about the nature of the escort ads on the site, let alone as to the fifty charged ads.  In any event, the instruction makes no sense on its face – even if a jury were to find that a given Defendant knew the "vast majority" of escort ads on the site were for prostitution, such a finding would not establish any element of the Travel Act charges as to the fifty charged ads.  The Government cites no instance in which a district court in the Ninth Circuit has provided such an instruction in a Travel Act case.

Second, as discussed below, the Travel Act is a specific intent crime.  As such, the United States needs to prove that each defendant specifically intended to promote, or facilitate the promotion of, a particular business enterprise involved in activity that the defendant knew to be unlawful under state law, specifically prostitution offenses.  The government's proposed instruction is untethered to any evidence that: a defendant was aware of a particular business enterprise; that defendant had a means to ascertain whether the business enterprise was or was not involved in unlawful activity; and that defendant deliberately avoided learning the truth.  Indeed, the government presented absolutely no evidence that any defendant knew of any of the charged ads before the indictment, that any defendant knew anything about the persons associated with any of the charged ads before the indictment, or that any defendant deliberately avoided learning the truth about the activities of a business enterprise connected with any charged ad.  Rather, the government seeks to use the deliberate ignorance instruction to suggest to the jury that the Travel Act charges are general intent crimes.

- 16 -

Third, the government's deliberate ignorance argument is just a backdoor request that this Court apply the Travel Act in a patently unconstitutional manner, as it would put defendants in criminal jeopardy for publishing facially lawful adult advertising based on the unsubstantiated claims of third parties saying that advertising looks like unprotected speech. The government, in effect, claims that it can do indirectly through the Travel Act what three federal courts previously have held that the government cannot do directly— criminalize the publication of third-party speech because it looks like speech associated with criminal activity. *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1268, 1277 (W.D. Wash. 2012) (striking down, under First Amendment, state statute criminalizing "'directly or indirectly' caus[ing] content to be published, disseminated or displayed if it contains a 'depiction of a minor' and any 'explicit or implicit offer' of sex for 'something of value'" because, among other things, the statute was unconstitutionally vague: "'[A] speaker may not be put at complete peril in distinguishing between protected and unprotected speech. Otherwise, he could only be certain of avoiding liability by holding his tongue, causing him 'to make only statements which 'steer far wide [ ] of the unlawful zone.''"); *accord Backpage.com, LLC v. Hoffman*, Case No. 13–cv–03952 (DMC)(JAD), 2013 WL 4502097 (D.N.J. Aug. 20, 2013) (striking down, under First Amendment, state statute criminalizing the publication of advertisements "that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act…with a minor" and rejecting state's claim that the statute "regulates illegal advertisements…not protected by the First Amendment" because, among other things, "[d]escribing criminal conduct as anything that is 'implicit' is inherently vague, because it means '[n]ot directly expressed [and] existing [only] inferentially' and 'fails to clearly mark the boundary between what is permissible and impermissible'"); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) (striking down, under First Amendment, state statute criminalizing the publication of advertisements "that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act…with a minor" and rejecting state's claim that the statute did not "not implicate First Amendment scrutiny

because it criminalize[d] only offers to engage in illegal transactions" because, among other things, "the statute as written does not 'criminalize only offers to engage in illegal transactions' because—as discussed above—the statute's potential reach extends to notices related to legal, consensual activity by adults").

The Constitution does not permit the government to suggest to the jury either that defendants were obligated to stop publishing facially lawful third-party speech on Backpage.com because some of that speech might be later turn out to be associated with unlawful activity (at least absent actual knowledge that specific ads were tied to prostitution or other crimes before the ads were published or while they remained live on the site) or that the jury can find that defendants intended to violate the law because Backpage.com refused to stop publishing speech presumptively protected by the First Amendment in the face of the calls from third parties that it do so. *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 142 & fn.170 (3d Cir. 2020) (rejecting city's argument that speech "concern[ed] unlawful activity" where the speech *might* relate to unlawful activity because "commercial speech should not lose the protection of the First Amendment simply because a legislature has prohibited one of many uses of the regulated speech," unlike restricting "advertising of the sale of cocaine, for example, [which] would present a speech restriction that *always* and *only* related to illegal activity because there are no other legal uses/purposes behind the sale of cocaine") (emphasis in original); *IMDB.com Inc. v. Bacerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) ("*Pittsburgh Press* implicates only those instances when the state restricts *speech that itself proposes an illegal transaction*...SAG's interpretation of *Pittsburgh Press* would require this court to permit the restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct.   But as the Supreme Court has noted, 'it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.' *Bartnicki v. Vopper*, 532 U.S. 514, 529–30, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001)…Rather than restrict truthful speech, the typical 'method of deterring unlawful conduct is to  impose an

appropriate punishment on the person who engages in it.' *Bartnicki*, 532 U.S. at 529, 121 S.Ct. 1753.") (emphasis added); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F3d 104, 114 (2d Cir. 2017) ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would *necessarily* constitute an illegal act. However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.") (emphasis in original); *Valle Del Sol Inc. v. Whiting*, 709 F3d 808, 822 (9th Cir. 2013) ("*Central Hudson's* legality requirement [] has traditionally focused *on the content of affected speech—i.e., whether the speech proposes an illegal transaction*—instead of whether the speech is *associated with unlawful activity*.") (emphasis added)); *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 904 fn.7 (9th Cir. 2009) ("Central Hudson asks if the commercial speech is 'related to unlawful activity.' Thus, *in the context of advertising, one must ask whether the goods or services the party advertises are illegal*.") (emphasis added, citation omitted); *Pruett v. Harris Cty. Bail Bond Bd.*, 499 F.3d 403, 414 (5th Cir. 2007) (the "threshold inquiry" asks whether "the product or service spoken about is illegal," not whether a commercial solicitation might lead to a violation of the law); *Eimann v. Soldier of Fortune Mag., Inc.*, 880 F.2d 830, 837-38 (5th Cir. 1989) (publishers are not required to reject "any suspicious, ambiguous ad that might cause serious harm," because "in the constitutional arena we have noted that the possibility of illegal results does not necessarily strip an ad of its commercial speech protection"); *Dunagin v. City of Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) (*en banc*) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally."); *Art & Antique Dealers League of Am., Inc. v. Seggos*, 394 F. Supp. 3d 447, 459 (S.D.N.Y. 2019) ("Although the First Amendment does not protect speech proposing a transaction that 'necessarily constitute[s] an illegal act,' if 'there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.'"); *Centro De La*

1  *Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 615

2  (E.D.N.Y. 2015) ("When the legality of a proposed commercial transaction depends on

3  circumstances outside the content of the speech, the activity is lawful and the speech is

4  entitled to protection under *Central Hudson*."), *aff'd*, 868 F.3d 104 (2d Cir. 2017).

5

6

7          **UNITED STATES' RESPONSE**

8          Defendants are wrong that a *Jewell* instruction can't be given when the alleged

9  crimes require specific intent.  As the Ninth Circuit recently recognized:

10         We have repeatedly held that a *Jewell* instruction is proper in specific-intent
           cases (including conspiracy cases). *See United States v. Ramos-Atondo*, 732
11         F.3d 1113, 1120 (9th Cir. 2013) (rejecting appellants' argument that "it is
           impossible to conspire to be deliberately ignorant" and holding that "the
12         *Jewell* standard eliminates the need to establish such positive knowledge to
           obtain a conspiracy conviction"); *United States v. Heredia*, 483 F.3d 913,
13         922 & n.13 (9th Cir. 2007) (en banc) (approving of *Jewell* instruction in
           possession-with-intent-to-distribute prosecution, and observing that "willful
14         blindness is tantamount to knowledge"); *United States v. Nosal*, 844 F.3d
           1024, 1039–40 (9th Cir. 2016) (approving *Jewell* instruction in aiding-and-
15         abetting case).… [T]he district court did not err in instructing the jury.
16
17
18  *United States v. Asefi*, 788 F. App'x 449, 452 (9th Cir. 2019).

19         The "theory of deliberate ignorance need not be exclusive, it may be an argument

20  alternative to actual knowledge."  *Ramos-Atondo*, 732 F.3d 1113, 1120.  The instruction

21  does not "risk[] lessening the state of mind that a jury must find" and is appropriately given

22  when a jury could rationally find willful blindness.   *Heredia*, 483 F.3d at 922 & 924.

23         Defendants' comment that the charges are based on "presumptively protected and

24  lawful speech" is misplaced in this case, which concerns prostitution advertising (a form

25  of commercial speech that is categorically excluded from First Amendment protection), as

26  more fully explained in the United States' objections to Defendants' case-specific

27  instructions in Part IV, *infra*.  The SI clearly alleges that Defendants had ample notice that

28  prostitution advertising was rampant on Backpage, and that Defendants took numerous

1   steps to expand and capitalize on Backpage's role as the internet's primary source of

2   prostitution advertising.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEFENDANTS' PROPOSED INSTRUCTION

## 4.11 ADVICE OF COUNSEL

One element that the government must prove beyond a reasonable doubt is that each defendant had the unlawful intent to violate the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they were committed. Evidence that a defendant in good faith followed the advice of counsel would be inconsistent with such an unlawful intent. Unlawful intent has not been proved if a defendant, before acting, made full disclosure of all material facts to an attorney, received the attorney's advice as to the specific course of conduct that was followed, and reasonably followed the attorney's recommended course of conduct or advice in good faith.

## Supporting Authorities

Ninth Circuit Manual of Model Criminal Jury Instructions 4.11. *See United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987) (defendant entitled to an advice of counsel instruction if it has some foundation in the evidence); *United States v. DeFries*, 129 F.3d 1293, 1296 (D.C. Cir. 1997) (holding instruction required when there is even minimal foundation in the evidence, and defense applies to advice given about how to implement a business plan in a legally acceptable manner).

## UNITED STATES' OBJECTIONS

Defendants aren't entitled to an advice of counsel defense. As the United States articulated in its recent motion (Doc. 1599), there are certain prerequisites that Defendants need to establish before an advice of counsel defense may be invoked. *Id.* at 3 (citing *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2021 WL 2044470, at *51 (N.D. Cal. May 22, 2021). The most critical piece of an advice of counsel defense is demonstrating that the defendants told their attorneys all relevant and material facts. Defendants agree with this point. Doc. 1250 at 10. Defendants have failed to do so. To establish this point, Defendants need to waive the privilege. *Holmes*, 2021 WL 2044470, at *51. They haven't. And at this point, more than five years after the case has been charged, they should be

precluded from doing so. To permit Defendants to waive the privilege now, would lead to a voluminous disclosure that would either (a) unfairly prejudice the United States, or (b) have the effect of delaying trial while the United States (and potentially the Court) reviewed the communications to determine if Defendants told their attorneys all relevant and material facts.

1
2

## DEFENDANTS' PROPOSED INSTRUCTION
### 5.12 MERE PRESENCE

3
4
5
6
7
8
9

Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that a defendant committed the crime of violating the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they were committed or the crime of money laundering.  The defendant must be a participant and not merely a knowing spectator.  If a defendant was present, that defendant's presence may be considered by the jury along with other evidence in the case.

10

### Supporting Authorities

11
12
13
14
15
16
17
18
19
20
21
22
23

Ninth Circuit Manual of Model Criminal Jury Instructions 5.12, 18.1 (modified to reflect charges); *Woodhull Freedom Foundation v. United States*, 334 F. Supp. 3d 185, 199-201 (D.D.C. 2018), rev'd. 948 F.3d 363 (D.C. Cir. 2020); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

24

### UNITED STATES' OBJECTIONS

25
26
27
28

The Comment to this Model Criminal Jury Instruction demonstrates why this instruction is unnecessary for this case.  "Such a 'mere presence' instruction is unnecessary if the government's case is not solely based on the defendant's presence and the jury has been instructed on the elements of the crime."  *See United States v. Tucker*, 641 F.3d 1110,

1123 (9th Cir. 2011); *see also United States v. Gooch*, 506 F.3d 1156, 1160 (9th Cir. 2007). The evidence at trial will demonstrate that each defendant was more than "merely present" for the alleged crimes.  *See United States v. Howell*, 231 F.3d 615, 629 (9th Cir. 2000).

**6.2 INSTRUCTION CHARGE AGAINST DEFENDANT NOT EVIDENCE—
PRESUMPTION OF INNOCENCE—BURDEN OF PROOF**

The indictment is not evidence.  Defendants have pleaded not guilty to the charges.
Each defendant is presumed to be innocent unless and until the United States proves the
defendant guilty beyond a reasonable doubt.  In addition, the defendant does not have to
testify or present any evidence.  The defendant does not have to prove innocence; the
United States has the burden of proving every element of the charges beyond a reasonable
doubt.

**6.5 INSTRUCTION REASONABLE DOUBT—DEFINED**

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the United States prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

**6.9 Credibility of Witnesses**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account the following:

First, the opportunity and ability of the witness to see or hear or know the things testified to;

Second, the witness's memory;

Third, the witness's manner while testifying;

Fourth, the witness's interest in the outcome of the case, if any;

Fifth, the witness's bias or prejudice, if any;

Sixth, whether other evidence contradicted the witness's testimony;

Seventh, the reasonableness of the witness's testimony in light of all the evidence; and

Eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

- 28 -

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 6.9.

## 6.13 INSTRUCTION SEPARATE CONSIDERATION OF MULTIPLE COUNTS—MULTIPLE DEFENDANTS

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial.  You must decide the case of each defendant on each crime charged against that defendant separately.  Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant or count.

**11.1 CONSPIRACY—ELEMENTS**

The defendants are charged in Count 1 of the indictment with conspiring to violate the Travel Act in violation of Section 1952(a)(3)(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment by promoting, or facilitating the promotion of, a business enterprise or enterprises involving prostitution offenses in violation of the laws of the State in which they were committed, in violation of 18 U.S.C. § 1952(a)(3)(A) and § 1952(b)(i)(1);

Second, the defendant became a member of the conspiracy knowing of at least one of its illegal objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime, *i.e.* the Travel Act violation, which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The United States is not required to prove that the defendant personally did one of the overt acts.

### Unanimity Requirements

For a defendant to be found guilty of Count 1 (Conspiracy to Violate the Travel Act), you must find beyond a reasonable doubt that the defendant joined in a plan to commit at least one illegal object of the alleged conspiracy – specifically intending to promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise upon which you all agree, as alleged in Counts 2 - 51.

**11.3 MULTIPLE CONSPIRACIES**

**(Count 1 – Multiple Conspiracies)**

Count 1 of the indictment alleges a single conspiracy to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment by promoting, or facilitating the promotion of, particular business enterprises involving prostitution offenses in violation of the laws of the State in which they were committed, in violation of 18 U.S.C. § 1952(a)(3)(A) and § 1952(b)(i)(1).

You must decide whether the single conspiracy to violate the Travel Act as charged in Count 1 of the indictment existed, and, if it did, who at least some of its members were. If you find that the single conspiracy to violate the Travel Act charged in Count 1 did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy or conspiracies existed. For example, if you find that Count 1 concerns two or more conspiracies, you must find each defendant not guilty of the single conspiracy alleged in Count 1.

Similarly, if you find that any defendant was not a member of the conspiracy to violate the Travel Act charged in Count 1, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy or conspiracies.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 11.3 (modified to reflect the charges in the indictment); Model Crim. Jury Instr. 9th Cir. 11.3 cmt. ("When the evidence establishes multiple conspiracies, failure to give a specific unanimity instruction may be plain error and the court may have a duty to *sua sponte* give the instruction requiring the jurors to unanimously agree on which conspiracy the defendant participated in. *United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) (failure to give specific unanimity instruction was plain error because half of jury could have found defendant guilty of joining one conspiracy while other half of jury could have found defendant guilty of joining second, completely independent conspiracy)."). The government's evidence plainly provides a basis for the

jury to find one or more conspiracies, including conspiracies that do not involve defendants, particularly as relates to Carl Ferrer and Dan Hyer and their interactions with both the so-called "Super Posters" William "Dollar Bill" Mersey, Sean Kim, SOMAD, and New York Platinum and also with David Elms and The Erotic Review.

S*ee also United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

## UNITED STATES' OBJECTIONS

This instruction should only be given when Defendants raise a multiple conspiracy defense. *United States v. Job*, 871 F.3d 852, 867 (9th Cir. 2017). To support such an instruction, evidence would need to be presented at trial in which a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. *Id.* That's not the case here. The conspiracy charged in Count One would not give rise to a reasonable juror believing that multiple conspiracies occurred. *Id.* at 868 ("Although a single conspiracy can include 'several subagreements or subgroups of conspirators,' that does not mean there are separate conspiracies.") "A single conspiracy exists, as compared with multiple conspiracies, where there is 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Bauer,* 84 F.3d 1549, 1560 (9th Cir. 1996).

Defendants' instruction also incorrectly states that Count One "alleges a single conspiracy to commit *a violation* of the Travel Act by promoting, or facilitating the

promotion of, prostitution offenses *committed by a particular business enterprise* in violation of the laws of the State in which they were committed." (Emphasis added.) But Count One is not limited to a conspiracy to commit a single Travel Act violation, committed by a particular business enterprise. Indeed, the indictment alleges that Defendants engaged in a conspiracy to promote, or facilitate the promotion of *many different* business enterprises. Doc. 230 at ¶¶ 1, 9, 160-176. Even though the United States has alleged that Defendants' criminal conspiracy involved a vast number of business enterprises, the underlying conspiracy remains the same—to violate the Travel Act. The evidence at trial will not show that Defendants engaged in any subagreements that are "separate" from and "unrelated" to the overall charged conspiracy. *Job*, 871 F.3d at 868. This instruction is not necessary and should be not given. The United States' conspiracy charge contemplates Defendants conspiring with many different business enterprises to violate the Travel Act.

**11.3 MULTIPLE CONSPIRACIES**

**(Count 52 – Multiple Conspiracies)**

Count 52 of the indictment alleges a single conspiracy involving defendants Lacey, Spear, Brunst, James Larkin, and Dan Hyer to commit concealment money laundering in violation of Section 1956(a)(1)(B)(i), international promotional money laundering in violation of Section 1956(a)(2)(A), transactional money laundering in violation of Section 1957(a), and international concealment money laundering in violation of Section 1956(a)(2)(B)(i).

You must decide whether the single conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52 of the indictment existed, and, if it did, who at least some of its members were. If you find that the single conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52 of the indictment did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. For example, if you find that Count 52 concerns two or more conspiracies, you must find the defendants not guilty of the single conspiracy alleged in Count 52.

Similarly, if you find that any defendant was not a member of the conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 11.3 (modified to reflect the charges in the indictment); Model Crim. Jury Instr. 9th Cir. 11.3 cmt. ("When the evidence establishes multiple conspiracies, failure to give a specific unanimity instruction may be plain error and the court may have a duty to *sua sponte* give the instruction requiring the jurors to unanimously agree on which conspiracy the defendant participated in. *United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) (failure to give specific unanimity instruction was

plain error because half of jury could have found defendant guilty of joining one conspiracy while other half of jury could have found defendant guilty of joining second, completely independent conspiracy).").  The government's evidence plainly provides a basis for the jury to find one or more conspiracies, including conspiracies that do not involve defendants, particularly as relates to so-called "Super Posters" William "Dollar Bill" Mersey, Sean Kim, SOMAD, and New York Platinum and with respect to David Elms and The Erotic Review.

## UNITED STATES' OBJECTIONS

"A defendant is entitled to a multiple conspiracies instruction only if the defendant's theory of multiple conspiracies is supported by law and has some foundation in the evidence." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989) (internal citations and quotations omitted).  As discussed above, "[a] single conspiracy exists, as compared with multiple conspiracies, where there is 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy."  *United States v. Bauer,* 84 F.3d 1549, 1560 (9th Cir. 1996).

This instruction should be evaluated after the evidence has been presented in order to better understand "Defendants' theory of multiple conspiracies."

## 11.4 CONSPIRACY – KNOWLEDGE OF AND ASSOCIATION WITH OTHER CONSPIRATORS

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with every other defendant or every other conspirator in the overall scheme, that defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, that a defendant directly conspired with one or more conspirators to carry out at least one of the illegal objects of the conspiracy;

Second, that a defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, that a defendant had reason to believe that whatever benefits the defendant might get from the conspiracy probably were dependent upon the success of the entire enterprise.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

### 11.6 CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE (TRAVEL ACT) COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2-51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 1 of the indictment;

Third, that person committed the Travel Act offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and

Fifth, that Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

## 11.6 CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE (CONCEALMENT MONEY LAUNDERING) COMMITTED BY CO-CONSPIRATOR
### (*PINKERTON* CHARGE)

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Concealment Money Laundering crime as charged in Counts 53-62 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Concealment Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the Concealment Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Concealment Money Laundering offense was committed; and

Fifth, the Concealment Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

## 11.6 CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE (INTERNATIONAL PROMOTIONAL MONEY LAUNDERING) COMMITTED BY CO-CONSPIRATOR
### (*PINKERTON* CHARGE)

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing an International Promotional Money Laundering crime as charged in Counts 63-68 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed an International Promotional Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the International Promotional Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the International Promotional Money Laundering offense was committed; and

Fifth, the International Promotional Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

## 18.1 TRAVEL ACT—INTERSTATE OR FOREIGN TRAVEL IN AID OF RACKETEERINGENTERPRISE (18 U.S.C. § 1952(a)(3))

Each defendant is charged in Counts 2-51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code, a statute also referred to as "the Travel Act." For a defendant to be found guilty of those charges, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant used a facility in interstate commerce with the intent to promote, or facilitate the promotion of, a business enterprise involving prostitution offenses in violation of the laws of the State in which those offenses were committed (as specified below); and

Second, after doing so each defendant performed an act in connection with the publication on Backpage.com of the ad that is the subject of each Count.

Counts 2, 4, 27, 29-30, 33, 35, 37, 40 and 43 concern prostitution offenses in violation of the laws of the State of Massachusetts. A prostitution offense in Massachusetts occurs when a person engages, agrees to engage or offers to engage, in sexual conduct with another person in return for a fee. The term "sexual conduct" includes sexual intercourse; anal intercourse; fellatio, or oral sex involving contact between the mouth of one person and the penis of another person; cunnilingus, or oral sex involving contact between the mouth of one person and the female sex organs—the vagina, vulva or labia—of another person; masturbation of another person; or any intrusion of a part of one person's body or some other object into the genital or anal opening of another person's body.

Counts 3, 6-11, 18, 25-26, and 28 concern prostitution offenses in violation of the laws of the State of Washington. A prostitution offense in Washington  occurs when a person engages or agrees or offers to engage in sexual conduct with another person in return for a fee. "Sexual conduct" means sexual contact or sexual intercourse. "Sexual contact" means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party. "Sexual intercourse:" has its

ordinary meaning and occurs upon any penetration, however slight; also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes; and also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

Counts 14-15, 21-22, and 31 concern prostitution offenses in violation of the laws of the State of Arizona.  A prostitution offense in Arizona occurs when a person knowingly engages in or agrees or offers to engage in sexual conduct under a fee arrangement with any person for money or any other valuable consideration.  "Sexual conduct" means sexual contact, sexual intercourse, oral sexual contact, or sadomasochistic abuse.  "Sexual contact" means any direct or indirect fondling or manipulating of any part of the genitals, anus, or female breast.  "Sexual intercourse" means penetration into the penis, vulva, or anus by any part of the body.  "Oral sexual contact" means oral contact with the penis, vulva, or anus.  "Sadomasochistic abuse" means flagellation or torture by or on a person who is nude or clad in undergarments or in revealing or bizarre costume or the condition of being fettered, bound, or otherwise physically restrained on the part of one so clothed.

Counts 12-13, 23, and 34 concern prostitution offenses in violation of the laws of the State of California.  A prostitution offense in California occurs when an individual solicits, or agrees to engage in, or engages in any act of prostitution with the intent to receive compensation, money, or anything of value from another person.  An act of prostitution is sexual intercourse or a lewd act with someone else in exchange for money or other compensation.  A lewd act means touching the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification.

Counts 45-47 and 51 concern prostitution offenses in violation of the laws of the State of New York.  A prostitution offense in New York occurs when:

A person engages or agrees or offers to engage in sexual conduct with another person for a fee.  The term prostitution involves the areas of sexual intercourse, deviate sexual intercourse, and masturbation.

Counts 19-20 and 50 concern prostitution offenses in violation of the laws of the State of Texas.  A prostitution offense in Texas occurs when a person knowingly offers or agrees to receive a fee from another to engage in sexual conduct.  "Sexual conduct" includes deviate sexual intercourse, sexual contact, and sexual intercourse.  "Sexual intercourse" means any penetration of the female sex organ by the male sex organ.  "Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.  "Fee" means the payment or offer of payment in the form of money, goods, services, or other benefit.  "Deviate sexual intercourse" means any contact between the genitals of one person and the mouth or anus of another person.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Counts 16-17 concern prostitution offenses in violation of the laws of the State of Colorado.  A prostitution offense occurs in Colorado when a person performs or offers or agrees to perform any act of sexual intercourse, fellatio, cunnilingus, masturbation, or anal intercourse with any person not his spouse in exchange for money or other thing of value.  "Anal intercourse" means contact between human beings of the genital organs of one and the anus of another.  "Fellatio" means any act of oral stimulation of the penis.  "Cunnilingus" means any act of oral stimulation of the vulva or clitoris.  "Masturbation" means stimulation of the genital organs by manual or other bodily contact exclusive of sexual intercourse.  "Thing of value" includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information,

medical records information, and any rights of use or enjoyment connected therewith.

A prostitution offense also occurs in Colorado when a person solicits another for the purpose of prostitution.

Counts 38 and 42 concern prostitution offenses in violation of the laws of the State of Ohio.  A prostitution offense occurs in Ohio when:

A person engaged in sexual activity for hire.

Or when:

A person recklessly induces, entices, or procures another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person.

Ohio law provides the following definitions:

"Sexual activity" means sexual conduct or sexual contact, or both.

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"For hire" means for pay or compensation.

Counts 36 and 49 concern prostitution offenses in violation of the laws of the State of Nevada.   A prostitution offense in Nevada occurs when:

A person engaged in prostitution or solicitation therefor, except in a licensed house of prostitution.

"Prostitution" means engaging in sexual conduct with another person in return for a fee, monetary consideration, or other thing of value.

"Sexual conduct" means sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person.

Counts 24 and 44 concern prostitution offenses in violation of the laws of the State of Michigan.  A prostitution offense in Michigan occurs when:

A person engaged or offered to engage the services of another person, not his or her spouse, for the purpose of prostitution, lewdness, or assignation, by the payment in money or other forms of consideration.

Count 32 concerns prostitution offenses in violation of the laws of the State of Louisiana.  A prostitution offense in Louisiana occurs when:

A person engaged in indiscriminate sexual intercourse for compensation, or solicited another with the intent to engage in indiscriminate sexual intercourse for compensation.

"Sexual intercourse" means anal, oral, or vaginal sexual intercourse.

Count 48 concerns prostitution offenses in violation of the laws of the State of Florida.  A prostitution offense in Florida occurs when:

A person offered to commit, committed, or engaged in prostitution, lewdness, or assignation.

-OR-

A person solicited, induced, enticed, or procured another to commit prostitution, lewdness, or assignation.

"Prostitution" is the giving or receiving of the body for sexual activity for hire but excludes sexual activity between spouses.

"Lewdness" is any indecent or obscene act. "Indecent" means wicked, lustful, unchaste, licentious, or sensual intention on the part of the person doing the act.

"Sexual activity" means oral, anal, or vaginal penetration by, or union with, the sexual organ of another; anal or vaginal penetration of another by any other object; or the handling or fondling of the sexual organ of another for the purpose of masturbation; however, the term does not include acts done for bona fide medical purposes.

"Assignation" includes the making of any appointment or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement.

To "solicit" means to command, encourage, hire, or request another person to engage in specific conduct.

To "procure" means to persuade, induce, prevail upon, or cause a person to do something.

Count 39 concerns prostitution offenses in violation of the laws of the State of Alabama. A prostitution offense in Alabama occurs under any of the following:

(1)    A person commits an act of prostitution, which is .  any natural or unnatural sexual act, sodomy, or sexual contact for monetary consideration or other thing of value.

(2)    A person solicited, compelled, or coerced any person to have sexual intercourse or participate in any natural or unnatural sexual act, deviant sexual intercourse, or sexual contact for monetary consideration or other thing of marketable value.

(3)    A person agreed to engage in sexual intercourse, deviant sexual intercourse, or sexual contact with another or participate in the act for monetary consideration or other thing of marketable value and give or accept monetary consideration or other thing of value in furtherance of the agreement.

(4)    A person knowingly did any of the following:

      a)    Caused or aided a person to commit or engage in prostitution.

      b)    Procured or solicited patrons for prostitution.

      c)    Provided persons or premises for prostitution purposes.

      d)    Received or accepted money or other thing of value pursuant to a prior agreement with any person whereby he or she participated or is to

1    participate in the proceeds of any prostitution activity.

2        e)  Operated or assisted in the operation of a house of prostitution or a

3            prostitution enterprise.

4

5    <u>Count 41</u> concerns prostitution offenses in violation of the laws of the State of

6    Arkansas.  A prostitution offense in Arkansas occurs when:

7        A person engaged in, agreed, or offered to engage in sexual activity with any other

8    person in return for or in expectation of a fee.

9        "Sexual activity" means sexual intercourse, deviate sexual activity, or sexual

10   contact.

11       "Sexual intercourse" means penetration, however slight, of the labia majora by a

12   penis.

13       "Deviate sexual activity" means any act of sexual gratification involving: (A) the

14   penetration, however slight, of the anus or mouth of a person by the penis of another person;

15   or (B) the penetration, however slight, of the labia majora or anus of a person by any body

16   member or foreign instrument manipulated by another person.

17       "Sexual contact" means any act of sexual gratification involving the touching,

18   directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast

19   of a female.

20

21       <u>Count 5</u> concerns prostitution offenses in violation of the laws of the State of Maine.

22   A prostitution offense in Maine occurs when:

23       A person engages in, or agrees to engage in, or offers to engage in a sexual act or

24   sexual contact in return for a pecuniary benefit to be received by the person engaging in

25   prostitution or a 3rd person.

26       "Sexual act" means: (1) Any act between 2 persons involving direct physical contact

27   between the genitals of one and the mouth or anus of the other, or direct physical contact

28   between the genitals of one and the genitals of the other; (2) Any act between a person and

an animal being used by another person which act involves direct physical contact between the genitals of one and the mouth or anus of the other, or direct physical contact between the genitals of one and the genitals of the other; or (3) Any act involving direct physical contact between the genitals or anus of one and an instrument or device manipulated by another person when that act is done for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

"Sexual contact" means any touching of the genitals or anus, directly or through clothing, other than as would constitute a sexual act, for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

### "SPECIFIC INTENT" DEFINED

The Travel Act is a specific intent crime and that means, with respect to each Count alleging a violation of the Travel Act, for a defendant to be found guilty of violating the Travel Act the United States needs to prove that the defendant specifically intended to promote, or facilitate the promotion of, a particular business enterprise involved in activity that the defendant knew to be unlawful under state law, specifically prostitution offenses. A defendant cannot have intended to promote/facilitate a business enterprise the defendant did know to exist.  To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with a particular business enterprise's criminal venture for the purpose of its advancement.

### Supporting Authorities

Order Denying Motion to Dismiss Indictment on Failure to Allege the Necessary Elements of the Travel Act, Doc. 946, pp. 15-16 ("Defendants claim their intent to facilitate unlawful activity is not alleged. (Mot. at 14; Reply at 10.) Their main concern is summed up in a question they pose to the Court: 'how could one specifically intend to promote/facilitate a business enterprise one does not know to exist? … To answer Defendants' question posed to the Court:  one cannot intend to promote/facilitate a business enterprise one does not know exists.  But this factual hypothetical has no bearing on whether Defendants are *alleged* to have intended to promote unlawful activity by illicit prostitution businesses, which is clearly alleged here.") (emphasis in original).

*United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  In *Gibson*, the government brought Travel Act charges against manufacturers of gambling implements who shipped their implements to distributors in Montana.  At that time, most forms of gambling were unlawful virtually everywhere in the country and the manufacturers stipulated for purposes of their motion to dismiss that the government could prove that they knew the purchasers of their gambling implements would violate Montana law merely by possessing those implements.  In affirming the dismissal of the government's charges, the Ninth Circuit held that the Travel Act is a specific intent crime, that "intent to facilitate a

- 50 -

criminal venture is expressly made part of the offense," and, therefore, "the prosecutor must show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement." *Id*. The Ninth Circuit did not use the terms accomplice liability or aiding and abetting in the *Gibson* decision, but supported its holding with citations to: Model Penal Code Section 2.06(3)(a) (which addresses accomplice liability, including aiding and abetting); *United States v. Peoni*, 100 F.2d 401 (2nd Cir. 1938) (the seminal aiding and abetting decision authored by Justice Learned Hand holding that to aid and abet a crime, a defendant must not just "in some sort associate himself with the venture," but also must "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed."); *United States v. Greer*, 467 F.2d 1064 (7th Cir. 1972) (another aiding and abetting decision); and *United States v. Sin Nagh Fong*, 490 F.2d 527 (9th Cir. 1974) (a decision discussing *Peoni*). Despite assuming the defendants "knew they were vending goods to violators of state law," the Ninth Circuit held it could not find that "the defendants by selling to Montanans intended, within the meaning of the travel act, to facilitate a violation of state law," noting there was "no evidence in the record, direct or circumstantial, from which one could infer that the defendants associated with, participated in or sought to make succeed the Montana operations." *Gibson*, 507 F.2d at 450. The Ninth Circuit also noted that it was "as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser." *Id*. at 450 fn.8.

**"BUSINESS ENTERPRISE" IN THE TRAVEL ACT DEFINED**

"Business enterprise," as used in the Travel Act, 18 U.S.C. 1952(b), means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation.

**"USES ANY FACILITY IN INTERSTATE COMMERCE" DEFINED**

The phrase "uses any facility in interstate commerce" as used in the Travel Act, 18 U.S.C. § 1952(a), means employing or utilizing any method of communication or transportation between one state and another, and includes, for example, the use of telephones, mails, and the Internet.

**"PROMOTE" AND "FACILITATE THE PROMOTION OF" DEFINED**

In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" mean to "aid and abet." To "aid and abet" means intentionally to help someone else commit a crime.

To prove that a defendant aided and abetted a business enterprise involved in prostitution offenses in violation of state law, the government must prove that the defendant aided, counseled, commanded, induced, or procured a person involved in the business enterprise with respect to at least one element of a prostitution offense in violation of state law and the defendant acted with the intent to facilitate that prostitution offense.

It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit that prostitution offense. A defendant acts with the intent to facilitate a crime when the defendant actively participates in a criminal venture with advance knowledge of the crime.

**Supporting Authorities**

*United States v. Hansen,* 599 U.S. 762, ___, 143 S. Ct. 1932, 1940 (2023) ("Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission … [and] require[s] an intent to bring about a particular unlawful act."); *Rosemond v. United States*, 572 U.S. 65, 76-77 (2014) ("To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'…We have previously found that intent requirement satisfied when a person *actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense* . . . . What matters for purposes of gauging intent, and so what jury instructions should convey, is that the defendant has chosen, *with full knowledge*, to participate in the illegal scheme . . . .") (emphasis added); *id*. at 81 (holding that the jury must have been instructed that "*Rosemond*

- 54 -

*needed advance knowledge of [each element of the charged offense]*") (emphasis added); *see also United States v. Encarnacion-Ruiz*, 787 F.3d 581, 588 (1st Cir. 2015) ("Under *Rosemond*, to establish the mens rea required to aid and abet a crime, the government must prove that the defendant participated *with advance knowledge of the elements that constitute the charged offense*.").

Ninth Circuit decisions pre-dating *Hansen* and holding that the terms "promote" and "promote the facilitation of" mean to make easier or less difficult have no ongoing vitality after *Hansen*, except where the defendant was a principal in the underlying state law offense and, therefore, by definition, had advance knowledge of each element and acted with intent to bring about a particular illegal act.

Model Crim. Jury Instr. 9th Cir. 4.1 (modified to reflect the charges in the indictment).

1
2

## STATE LAW NEED NOT BE VIOLATED FOR DEFENDANTS TO BE FOUND GUILTY UNDER THE TRAVEL ACT

3
4
5
6
7
8
9
10

The United States does not have to prove that a referenced state's laws actually were violated, only that each defendant used a facility in interstate commerce with the specific intent to promote, or facilitate the promotion of, a particular business enterprise that the defendant knew involved prostitution offenses in violation of the laws of the State in which those offenses were committed and, after doing so, the defendant committed a subsequent overt act in furtherance of that business enterprise's unlawful activity, namely an act in connection with the publication on Backpage.com of the ad that is the subject of each Count.

## 18.4 LAUNDERING MONETARY INSTRUMENTS
### (18 U.S.C. § 1956(a)(1)(B))

Defendants Lacey, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act charged in Counts 2-51 of the indictment;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the Travel Act violation(s).

A financial transaction is a transaction involving the movement of funds by wire or other means that affects interstate or foreign commerce in any way.

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.  I instruct you that violating the Travel Act is a felony.

1

2
3
4

## 18.5 TRANSPORTING FUNDS TO PROMOTE
## UNLAWFUL ACTIVITY
### (18 U.S.C. § 1956(a)(2)(A))

5 Defendants Lacey, Brunst, and Spear are charged in Counts 63–68 of the indictment

6 with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A)

7 of Title 18 of the United States Code.  For a defendant to be found guilty of that charge,

8 the United States must prove, for each Count, each of the following elements beyond a

9 reasonable doubt with respect to that defendant:

10 First, the defendant transported money from a place in the United States to or

11 through a place outside the United States or to a place in the United States from or through

12 a place outside the United States; and

13 Second, the defendant acted with the intent to promote a violation of the Travel Act

14 charged in Counts 2-51 of the indictment.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 18.6 TRANSPORTING MONETARY INSTRUMENTS FOR THE
## PURPOSE OF LAUNDERING
### (18 U.S.C. § 1956(a)(2)(B))

Defendant Lacey is charged in Count 100 of the indictment with transporting money for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United States Code.  For defendant Lacey to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, defendant Lacey transported money from a place in the United States to or through a place outside the United States;

Second, defendant Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act charged in Counts 2-51 of the indictment; and

Third, defendant Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act violation(s) to avoid a transaction reporting requirement under state or federal law.

## 18.7 MONEY LAUNDERING

### (18 U.S.C. § 1957)

Defendant Lacey is charged in Counts 69-70, 81, 83-84, 86, 88-92, and 94-99; Defendant Spear is charged in Counts 71-78, 85, and 93; and Defendant Brunst is charged in Counts 69-70, 78-84, and 86-93 of the indictment with transactional money laundering in violation of Section 1957 of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction. An act is done knowingly if the defendant is aware of the act, and does not act or fail to act through ignorance, mistake, or accident. You may consider evidence of the defendants' words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from violations of the Travel Act charged in Counts 2-51 of the indictment; and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution. The term "financial institution" means an insured bank, commercial bank, or credit union. The term "criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense. The United States must prove that each defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that each defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented

the proceeds of a violation of the Travel Act charged in Counts 2-51 of the indictment. Although the United States must prove that, of the property at issue, more than $10,000 was criminally derived, the United States does not have to prove that all the property at issue was criminally derived.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 18.7A MONEY LAUNDERING CONSPIRACY
### (18 U.S.C. § 1956(h))

Defendants Lacey, Larkin, Spear, and Brunst are charged in Count 52 the indictment with money laundering conspiracy in violation of Section 1956(h) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, there was an agreement to commit money laundering;

Second, the defendant knew the objective of the agreement;

Third, the defendant joined the agreement with the intent to further its unlawful purpose.

### Unanimity Requirements

For a defendant to be found guilty of Count 52 (Conspiracy to Commit Money Laundering), you must find beyond a reasonable doubt that the defendant joined in a plan to commit at least one illegal object of the alleged conspiracy, one of the money laundering offenses charged in Counts 53 to 99, upon which you all agree.

**DEFENDANTS' GOOD FAITH**

The government has the burden to prove to you, beyond a reasonable doubt, that a defendant acted with criminal intent and lacked good faith. The burden of proving good faith does not rest with a defendant because a defendant does not have any obligation to prove anything in this case. If the government fails to meet its burden to prove a defendant lacked good faith, its failure to do so is a complete and absolute defense to the charges in this case and you must return a not guilty verdict.

If a defendant carried out his or her actions in good faith, there was no criminal intent.

A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under the charges in the indictment merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held and an absence of malice or ill will.

If the evidence in the case leaves the jury with a reasonable doubt as to whether a defendant acted with criminal intent and lacked good faith, the jury must acquit that defendant.

**Supporting Authorities**

*See* 1A Fed. Jury Prac. & Instr. § 19:06 (6th ed.), 1A Fed. Jury Prac. & Instr. § 19:06 (6th ed.).

**UNITED STATES' OBJECTIONS**

"A defendant is not entitled to a separate good faith instruction when the court adequately instructs on specific intent." *United States. v. Bonanno*, 852 F.2d 434, 439–40 (9th Cir. 1988) (citing *United States v. Green,* 745 F.2d 1205, 1209 (9th Cir.

- 63 -

1  1984), and *United States v. Cusino,* 694 F.2d 185, 188 (9th Cir. 1982)); *see also United*

2  *States v. Dees,* 34 F.3d 838, 842 (9th Cir. 1994) (same); *United States v. Rushton,* 963 F.2d

3  272, 274 (9th Cir. 1992) (same).  Here, the parties have already stipulated to the appropriate

4  "specific intent" instruction.  Doc. 1311 at 7; Doc. 1432 at 31-36.  Because the parties have

5  stipulated to specific intent instruction, a "good faith" instruction should not be given.

6       The instruction also should not be given to the extent Defendants are attempting to

7  use it to circumvent invoking an "advice of counsel" defense.  If Defendants claim that

8  their asserted "good faith" is based in any way on legal advice, then they should be required

9  to comply with the requirements of the "advice of counsel" defense, and the jury should

10  receive an appropriate "advice of counsel" instruction instead of the proposed "good faith"

11  instruction.[2]

---

[2] *See* Ninth Circuit Model Criminal Jury Instruction 4.11.

- 64 -

1

## DEFENSE THEORY OF THE CASE

2          Defendants intend to request instructions on the defense's theories of the case.

3   Defendants reserve their right to submit that request at the close of the trial.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**FIRST AMENDMENT PROTECTION—SPEECH PRESUMED PROTECTED**

3

All speech is presumptively protected by the First Amendment to the United States

4

Constitution.  Accordingly, you must presume that speech is protected.

5

The government has the burden to establish that the particular expressions of speech

6

at issue are not protected by the First Amendment.  You may consider any direct or

7

circumstantial evidence in assessing whether Backpage.com's publication of any ads that

8

underlie the charges in this case was not protected by the First Amendment.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST AMENDMENT PROTECTION—UNPROTECTED SPEECH

Offers to give or receive what it is unlawful to possess enjoy no First Amendment protection.

Although the First Amendment permits the government to restrict speech that proposes an illegal activity, the government may not restrict facially inoffensive speech that a third-party might use to facilitate its own illegal conduct.

Speech that proposes a commercial transaction that necessarily would constitute an illegal act if concluded is unprotected, but, if there are plausible ways to complete a proposed transaction lawfully, the speech proposing that transaction concerns lawful activity and is, therefore, protected commercial speech.

Escort services, massage services, and dating are lawful activity. The publication of advertisements for escort services, massage services, and dating are, therefore, legal and constitutionally protected speech, unless such an ad proposes a transaction that necessarily would constitute an illegal act if concluded or unless the publisher of the ad has actual knowledge that such an ad is associated with unlawful activity and, in either case, nonetheless publishes the ad with the intent to facilitate the unlawful activity.

## Supporting Authorities

*United States v. Williams*, 553 U.S. 285, 288 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relation*s, 413 U.S. 376, 388 [] (1973)… [T]he rationale for the categorical exclusion…is based…on the principle that offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection, *see Pittsburgh Press*, *supra*, at 387–389, 93 S.Ct. 2553.").

*Metro Lights, L.L.C. v. City of L.A.*, 551 F.3d 898, 904 n.7 (9th Cir. 2009) (the district court 'relied in part on the observation that '[a]dvertising is indisputably a lawful activity.' That is not the point, since not all advertisements receive First Amendment protection. *Central Hudson* asks if the commercial speech is 'related to unlawful activity.' 447 U.S. at 564. Thus, in the context of advertising, one must ask whether the goods or services the party advertises are illegal.")

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821-22 (9th Cir. 2013)("Commercial speech merits First Amendment protection only if 'the communication is neither misleading nor related to unlawful activity.'  Arizona argues that the day labor provisions are permissible because they regulate speech only when associated with the unlawful activity of blocking or impeding traffic.  Arizona's proposed rule would be a novel extension of *Central Hudson*'s legality requirement, which has traditionally focused on the content of affected speech - *i.e.*, whether the speech proposes an illegal transaction - instead of whether the speech is associated with unlawful activity…. Some decisions have expressly phrased the legality requirement as whether 'the transactions proposed in the forbidden [communication] are themselves illegal in any way.'…However it is formulated, we think it clear that *Central Hudson*'s legality requirement requires us to evaluate the content of a commercial message … Nothing in *Pittsburgh Press* or any other case Arizona cites suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether the affected speech is conducted in a lawful manner.").

*IMDb.com Inc. v. Bacerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) ("Pittsburgh Press implicates only those instances when the state restricts speech that itself proposes an illegal transaction.  *See, e.g., United States v. Williams*, 553 U.S. 285, 297 [] (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citing *Pittsburgh Press Co.*, 413 U.S. at 388 [])); *Valle Del Sol Inc.*, 709 F.3d at 822 ("Nothing in *Pittsburgh Press*…suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction….")….If accepted, SAG's interpretation of *Pittsburgh Press* would require this court to permit the restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct.  But as the Supreme Court has noted, 'it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.' *Bartnicki v. Vopper*, 532 U.S. 514 [] (2001)…")

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Ba*y, 868 F.3d 104, 114 (2d Cir. 2017) ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would necessarily constitute an illegal act.  However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.") (emphasis in original);

*Greater Philadelphia Chamber of Comm. v. City of Philadelphia*, 949 F.3d 116, 142 & n.170 (3d Cir. 2020) ((rejecting city's argument that speech "concern[ed] unlawful activity," where the speech might relate to unlawful activity, because "commercial speech should not lose the protection of the First Amendment simply because a legislature has prohibited one of many uses of the regulated speech," unlike

restricting "advertising of the sale of cocaine, for example, [which] would present a speech restriction that *always* and *only* related to illegal activity because there are no other legal uses/purposes behind the sale of cocaine") (emphasis in original)).

**COURT'S INSTRUCTION NO. \_\_\_\_**

**DEFENDANTS' JOINTLY PROPOSED INSTRUCTION NO. \_\_\_\_**

**FIRST AMENDMENT PROTECTION—GOVERNMENT CANNOT PUNISH**

**PROTECTED SPEECH TO SUPPRESS UNPROTECTED SPEECH**

The First Amendment prohibits the government from restricting or punishing protected speech in an effort to eliminate unprotected speech. The possible harm to society from permitting unprotected speech to go unpunished is outweighed by the possibility that protected speech will be suppressed.

The First Amendment prohibits the government from prosecuting a defendant based on that defendant's or Backpage.com's refusal to cease publishing ads for escort services, massage services, or dating, even if eliminating all adult-oriented ads would have reduced the number of ads associated with illegal conduct on the Backpage.com website, unless the prosecution is based on the publication of an ad proposing a transaction that necessarily would constitute an illegal act if concluded or unless the publisher of the ad has actual knowledge that an ad is associated with unlawful activity and, in either case, nonetheless publishes the ad with the intent to facilitate the unlawful activity.

**Supporting Authorities**

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017) ("as a general rule, the Government 'may not suppress lawful speech as the means to suppress unlawful speech'"); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The government may not suppress lawful speech as the means to suppress unlawful speech.").

# EXHIBIT H

1

2

3

4

5

```
┌─────────────────────────────────┐
│ ✓ FILED      ___ LODGED          │
│ ___ RECEIVED  ___ COPY           │
│                                   │
│      NOV 1 6 2023                 │
│                                   │
│  CLERK U S DISTRICT COURT        │
│    DISTRICT OF ARIZONA           │
│  BY_____DEPUTY        │
└─────────────────────────────────┘
```

6

## IN THE UNITED STATES DISTRICT COURT

7

## FOR THE DISTRICT OF ARIZONA

8

9

10

United States of America,

|  |  |
|---|---|
| Plaintiff, | No. CR-18-00422-PHX-DJH |
|  | **VERDICT** |

11

v.

12

Michael Lacey, et al.,

13

Defendants.

14

15

16     We, the Jury, find the defendants, Michael Lacey, Scott Spear, John "Jed" Brunst,

17 Andrew Padilla, and Joye Vaught, as to the charges of the Indictment:

18

19                          <u>**CONSPIRACY**</u>
                           **18 U.S.C. § 371**
20                             **COUNT 1**

21

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | _____ NOT GUILTY | ☒ GUILTY |
| John "Jed" Brunst | _____ NOT GUILTY | ☒ GUILTY |
| Andrew Padilla | ☒ NOT GUILTY | _____ GUILTY |
| Joye Vaught | ☒ NOT GUILTY | _____ GUILTY |

26

27

28

**Travel Act – Facilitate Prostitution**
**18 U.S.C. § 1952(a)(3)(A)**
**COUNTS 2-51**

## Count 2:

| Date | Exhibits | State |
|------|----------|-------|
| Sept. 10, 2013 | 212, 212a | Massachusetts |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | _____ NOT GUILTY | X _____ GUILTY |
| John "Jed" Brunst | X _____ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | X _____ NOT GUILTY | _____ GUILTY |
| Joye Vaught | X _____ NOT GUILTY | _____ GUILTY |

## Count 3:

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 27, 2014 | 504 | Washington |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | _____ NOT GUILTY | X _____ GUILTY |
| John "Jed" Brunst | X _____ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | X _____ NOT GUILTY | _____ GUILTY |
| Joye Vaught | X _____ NOT GUILTY | _____ GUILTY |

- 2 -

**Count 4:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 29, 2014 | 214 | Massachusetts |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     ___X___ GUILTY

John "Jed" Brunst     ___X___ NOT GUILTY     _____ GUILTY

Andrew Padilla     ___X___ NOT GUILTY     _____ GUILTY

Joye Vaught     ___X___ NOT GUILTY     _____ GUILTY

**Count 5:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 31, 2014 | 214a | New Hampshire |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     ___X___ GUILTY

John "Jed" Brunst     ___X___ NOT GUILTY     _____ GUILTY

Andrew Padilla     ___X___ NOT GUILTY     _____ GUILTY

Joye Vaught     ___X___ NOT GUILTY     _____ GUILTY

**Count 6:**

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 6, 2014 | 505 | Washington |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     ✗ GUILTY

John "Jed" Brunst     ✗ NOT GUILTY     _____ GUILTY

Andrew Padilla     ✗ NOT GUILTY     _____ GUILTY

Joye Vaught     ✗ NOT GUILTY     _____ GUILTY

**Count 7:**

| Date | Exhibit | State |
|------|---------|-------|
| Apr. 20, 2014 | 506 | Washington |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     ✗ GUILTY

John "Jed" Brunst     ✗ NOT GUILTY     _____ GUILTY

Andrew Padilla     ✗ NOT GUILTY     _____ GUILTY

Joye Vaught     ✗ NOT GUILTY     _____ GUILTY

- 4 -

**Count 8:**

| Date | Exhibit | State |
|------|---------|-------|
| May 7, 2014 | 507 | Washington |

Michael Lacey        _____ NOT GUILTY        _____ GUILTY

Scott Spear          _____ NOT GUILTY        \_\_\_X\_\_\_ GUILTY

John "Jed" Brunst    \_\_X\_\_ NOT GUILTY        _____ GUILTY

Andrew Padilla       \_\_X\_\_ NOT GUILTY        _____ GUILTY

Joye Vaught          \_\_X\_\_ NOT GUILTY        _____ GUILTY

**Count 9:**

| Date | Exhibit | State |
|------|---------|-------|
| May 31, 2014 | 508 | Washington |

Michael Lacey        _____ NOT GUILTY        _____ GUILTY

Scott Spear          _____ NOT GUILTY        \_\_\_X\_\_\_ GUILTY

John "Jed" Brunst    \_\_X\_\_ NOT GUILTY        _____ GUILTY

Andrew Padilla       \_\_X\_\_ NOT GUILTY        _____ GUILTY

Joye Vaught          \_\_X\_\_ NOT GUILTY        _____ GUILTY

## Count 10:

| Date | Exhibit | State |
|------|---------|-------|
| July 1, 2014 | 509 | Washington |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear _____ NOT GUILTY ⤬ GUILTY

John "Jed" Brunst ⤬ NOT GUILTY _____ GUILTY

Andrew Padilla ⤬ NOT GUILTY _____ GUILTY

Joye Vaught ⤬ NOT GUILTY _____ GUILTY

## Count 11:

| Date | Exhibit | State |
|------|---------|-------|
| Aug. 19, 2014 | 510 | Washington |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear _____ NOT GUILTY ⤬ GUILTY

John "Jed" Brunst ⤬ NOT GUILTY _____ GUILTY

Andrew Padilla ⤬ NOT GUILTY _____ GUILTY

Joye Vaught ⤬ NOT GUILTY _____ GUILTY

1

2    **Count 12:**

3

4    | Date | Exhibit | State |
     |------|---------|-------|
5    | Nov. 23, 2014 | 215a | California |

6    Michael Lacey          _____ NOT GUILTY          _____ GUILTY

7    Scott Spear            _____ NOT GUILTY          ___✗___ GUILTY

8    John "Jed" Brunst      ___✗___ NOT GUILTY          _____ GUILTY

9    Andrew Padilla         ___✗___ NOT GUILTY          _____ GUILTY

10   Joye Vaught            ___✗___ NOT GUILTY          _____ GUILTY

11

12   **Count 13:**

13

14   | Date | Exhibit | State |
     |------|---------|-------|
15   | Jan 29, 2015 | 217a | California |

16   Michael Lacey          _____ NOT GUILTY          _____ GUILTY

17   Scott Spear            _____ NOT GUILTY          ___✗___ GUILTY

18   John "Jed" Brunst      ___✗___ NOT GUILTY          _____ GUILTY

19   Andrew Padilla         ___✗___ NOT GUILTY          _____ GUILTY

20   Joye Vaught            ___✗___ NOT GUILTY          _____ GUILTY

21

22

23

24

25

26

27

28

- 7 -

**Count 14:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 31, 2015 | 215 | Arizona |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | _____ NOT GUILTY | ___X___ GUILTY |
| John "Jed" Brunst | __X__ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | __X__ NOT GUILTY | _____ GUILTY |
| Joye Vaught | __X__ NOT GUILTY | _____ GUILTY |

**Count 15:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 31, 2015 | 217 | Arizona |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | _____ NOT GUILTY | ___X___ GUILTY |
| John "Jed" Brunst | __X__ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | __X__ NOT GUILTY | _____ GUILTY |
| Joye Vaught | __X__ NOT GUILTY | _____ GUILTY |

**Count 16:**

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 4, 2015 | 216 | Colorado |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          _____ NOT GUILTY          __✗__ GUILTY

John "Jed" Brunst          __✗__ NOT GUILTY          _____ GUILTY

Andrew Padilla          __✗__ NOT GUILTY          _____ GUILTY

Joye Vaught          __✗__ NOT GUILTY          _____ GUILTY

**Count 17:**

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 18, 2015 | 216a | Colorado |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          _____ NOT GUILTY          __✗__ GUILTY

John "Jed" Brunst          __✗__ NOT GUILTY          _____ GUILTY

Andrew Padilla          __✗__ NOT GUILTY          _____ GUILTY

Joye Vaught          __✗__ NOT GUILTY          _____ GUILTY

- 9 -

1

2 **Count 18:**

3

4

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 26, 2015 | 511 | Washington |

5

6 Michael Lacey     _____ NOT GUILTY     _____ GUILTY

7 Scott Spear     _____ NOT GUILTY       X\_\_\_\_ GUILTY

8 John "Jed" Brunst     X\_\_\_\_ NOT GUILTY     _____ GUILTY

9 Andrew Padilla     X\_\_\_\_ NOT GUILTY     _____ GUILTY

10 Joye Vaught     X\_\_\_\_ NOT GUILTY     _____ GUILTY

11

12 **Count 19:**

13

14

| Date | Exhibit | State |
|------|---------|-------|
| May 18, 2015 | 220 | Texas |

15

16

17 Michael Lacey     _____ NOT GUILTY     _____ GUILTY

18 Scott Spear     X\_\_\_\_ NOT GUILTY     ~~X~~ GUILTY

19 John "Jed" Brunst     X\_\_\_\_ NOT GUILTY     _____ GUILTY

20 Andrew Padilla     X\_\_\_\_ NOT GUILTY     _____ GUILTY

21 Joye Vaught     X\_\_\_\_ NOT GUILTY     _____ GUILTY

22

23

24

25

26

27

28

**Count 20:**

| Date | Exhibit | State |
|------|---------|-------|
| May 19, 2015 | 220a | Texas |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     X NOT GUILTY     GUILTY

John "Jed" Brunst     X NOT GUILTY     _____ GUILTY

Andrew Padilla     X NOT GUILTY     _____ GUILTY

Joye Vaught     X NOT GUILTY     _____ GUILTY

**Count 21:**

| Date | Exhibit | State |
|------|---------|-------|
| July 1, 2015 | 222 | Arizona |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     X NOT GUILTY     GUILTY

John "Jed" Brunst     X NOT GUILTY     _____ GUILTY

Andrew Padilla     X NOT GUILTY     _____ GUILTY

Joye Vaught     X NOT GUILTY     _____ GUILTY

**Count 22:**

| Date | Exhibit | State |
|---|---|---|
| July 2, 2015 | 222a | Arizona |

Michael Lacey       _____ NOT GUILTY      _____ GUILTY

Scott Spear          __X__ NOT GUILTY      __✗__ GUILTY

John "Jed" Brunst    __X__ NOT GUILTY      _____ GUILTY

Andrew Padilla      __X__ NOT GUILTY      _____ GUILTY

Joye Vaught         __X__ NOT GUILTY      _____ GUILTY

**Count 23:**

| Date | Exhibit | State |
|---|---|---|
| Aug. 13, 2015 | 218 | California |

Michael Lacey       _____ NOT GUILTY      _____ GUILTY

Scott Spear          __X__ NOT GUILTY      __✗__ GUILTY

John "Jed" Brunst    __X__ NOT GUILTY      _____ GUILTY

Andrew Padilla      __X__ NOT GUILTY      _____ GUILTY

Joye Vaught         __X__ NOT GUILTY      _____ GUILTY

- 12 -

**Count 24:**

| Date | Exhibit | State |
|------|---------|-------|
| Aug. 15, 2015 | 221 | Michigan |

Michael Lacey        _____ NOT GUILTY       _____ GUILTY

Scott Spear          X\_\_\_\_ NOT GUILTY       _____ GUILTY

John "Jed" Brunst    X\_\_\_\_ NOT GUILTY       _____ GUILTY

Andrew Padilla      X\_\_\_\_ NOT GUILTY       _____ GUILTY

Joye Vaught          X\_\_\_\_ NOT GUILTY       _____ GUILTY

**Count 25:**

| Date | Exhibit | State |
|------|---------|-------|
| Sept. 13, 2015 | 512 | Washington |

Michael Lacey        _____ NOT GUILTY       _____ GUILTY

Scott Spear          X\_\_\_\_ NOT GUILTY       _____ GUILTY

John "Jed" Brunst    X\_\_\_\_ NOT GUILTY       _____ GUILTY

Andrew Padilla      X\_\_\_\_ NOT GUILTY       _____ GUILTY

Joye Vaught          X\_\_\_\_ NOT GUILTY       _____ GUILTY

**Count 26:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 28, 2015 | 513 | Washington |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

**Count 27:**

| Date | Exhibit | State |
|------|---------|-------|
| Apr. 21, 2016 | 1718 | Massachusetts |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          \_\_\_X\_\_\_ NOT GUILTY          _____ GUILTY

**Count 28:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 3, 2016 | 1719 | Washington |

Michael Lacey    _____ NOT GUILTY    _____ GUILTY

Scott Spear    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

John "Jed" Brunst    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

Andrew Padilla    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

Joye Vaught    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

**Count 29:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 11, 2016 | 1720 | Massachusetts |

Michael Lacey    _____ NOT GUILTY    _____ GUILTY

Scott Spear    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

John "Jed" Brunst    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

Andrew Padilla    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

Joye Vaught    \_\_\_X\_\_\_ NOT GUILTY    _____ GUILTY

**Count 30:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 14, 2016 | 1721 | Massachusetts |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | __X__ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | __X__ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | __X__ NOT GUILTY | _____ GUILTY |
| Joye Vaught | __X__ NOT GUILTY | _____ GUILTY |

**Count 31:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 14, 2016 | 1735 | Arizona |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | __X__ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | __X__ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | __X__ NOT GUILTY | _____ GUILTY |
| Joye Vaught | __X__ NOT GUILTY | _____ GUILTY |

**Count 32:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 19, 2016 | 1722 | Louisiana |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear \_\_X\_\_\_ NOT GUILTY _____ GUILTY

John "Jed" Brunst \_\_X\_\_\_ NOT GUILTY _____ GUILTY

Andrew Padilla \_\_X\_\_\_ NOT GUILTY _____ GUILTY

Joye Vaught \_\_X\_\_\_ NOT GUILTY _____ GUILTY

**Count 33:**

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 24, 2016 | 1723 | Massachusetts |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear \_\_X\_\_\_ NOT GUILTY _____ GUILTY

John "Jed" Brunst \_\_X\_\_\_ NOT GUILTY _____ GUILTY

Andrew Padilla \_\_X\_\_\_ NOT GUILTY _____ GUILTY

Joye Vaught \_\_X\_\_\_ NOT GUILTY _____ GUILTY

## Count 34:

| Date | Exhibit | State |
|------|---------|-------|
| Nov. 26, 2016 | 1724 | California |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          X\_\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          X\_\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          X\_\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          X\_\_\_\_ NOT GUILTY          _____ GUILTY

## Count 35:

| Date | Exhibit | State |
|------|---------|-------|
| Dec. 20, 2016 | 1725 | Massachusetts |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          X\_\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          X\_\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          X\_\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          X\_\_\_\_ NOT GUILTY          _____ GUILTY

**Count 36:**

| Date | Exhibit | State |
|---|---|---|
| Jan. 15, 2017 | 1726 | Nevada |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

Scott Spear            X    NOT GUILTY      _____ GUILTY

John "Jed" Brunst      X    NOT GUILTY      _____ GUILTY

Andrew Padilla        X    NOT GUILTY      _____ GUILTY

Joye Vaught            X    NOT GUILTY      _____ GUILTY

**Count 37:**

| Date | Exhibit | State |
|---|---|---|
| Apr. 4, 2017 | 1727 | Massachusetts |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

Scott Spear            X    NOT GUILTY      _____ GUILTY

John "Jed" Brunst      X    NOT GUILTY      _____ GUILTY

Andrew Padilla        X    NOT GUILTY      _____ GUILTY

Joye Vaught            X    NOT GUILTY      _____ GUILTY

**Count 38:**

| Date | Exhibit | State |
|------|---------|-------|
| Apr. 11, 2017 | 1728 | Ohio |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear ✗ NOT GUILTY _____ GUILTY

John "Jed" Brunst ✗ NOT GUILTY _____ GUILTY

Andrew Padilla ✗ NOT GUILTY _____ GUILTY

Joye Vaught ✗ NOT GUILTY _____ GUILTY

**Count 39:**

| Date | Exhibit | State |
|------|---------|-------|
| July 3, 2017 | 1729 | Alabama |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear ✗ NOT GUILTY _____ GUILTY

John "Jed" Brunst ✗ NOT GUILTY _____ GUILTY

Andrew Padilla ✗ NOT GUILTY _____ GUILTY

Joye Vaught ✗ NOT GUILTY _____ GUILTY

**Count 40:**

| Date | Exhibit | State |
|------|---------|-------|
| July 15, 2017 | 1730 | Massachusetts |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          X          NOT GUILTY          _____ GUILTY

John "Jed" Brunst          X          NOT GUILTY          _____ GUILTY

Andrew Padilla          x          NOT GUILTY          _____ GUILTY

Joye Vaught          X          NOT GUILTY          _____ GUILTY

**Count 41:**

| Date | Exhibit | State |
|------|---------|-------|
| July 15, 2017 | 1731 | Arkansas |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          X          NOT GUILTY          _____ GUILTY

John "Jed" Brunst          X          NOT GUILTY          _____ GUILTY

Andrew Padilla          X          NOT GUILTY          _____ GUILTY

Joye Vaught          X          NOT GUILTY          _____ GUILTY

**Count 42:**

| Date | Exhibit | State |
|------|---------|-------|
| July 21, 2017 | 1732 | Ohio |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     **X** NOT GUILTY     _____ GUILTY

John "Jed" Brunst     **X** NOT GUILTY     _____ GUILTY

Andrew Padilla     **X** NOT GUILTY     _____ GUILTY

Joye Vaught     **X** NOT GUILTY     _____ GUILTY

**Count 43:**

| Date | Exhibit | State |
|------|---------|-------|
| July 23, 2017 | 1733 | Massachusetts |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     **X** NOT GUILTY     _____ GUILTY

John "Jed" Brunst     **X** NOT GUILTY     _____ GUILTY

Andrew Padilla     **X** NOT GUILTY     _____ GUILTY

Joye Vaught     **X** NOT GUILTY     _____ GUILTY

**Count 44:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 26, 2018 | 223 | Michigan |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | ___X___ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | ___X___ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | ___X___ NOT GUILTY | _____ GUILTY |
| Joye Vaught | ___X___ NOT GUILTY | _____ GUILTY |

**Count 45:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 30, 2018 | 224 | New York |

| | | |
|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | ___X___ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | ___X___ NOT GUILTY | _____ GUILTY |
| Andrew Padilla | ___X___ NOT GUILTY | _____ GUILTY |
| Joye Vaught | ___X___ NOT GUILTY | _____ GUILTY |

- 23 -

**Count 46:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 31, 2018 | 225 | New York |

Michael Lacey      _____ NOT GUILTY       _____ GUILTY

Scott Spear       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

John "Jed" Brunst       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

Andrew Padilla       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

Joye Vaught       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

**Count 47:**

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 30, 2018 | 226 | New York |

Michael Lacey      _____ NOT GUILTY       _____ GUILTY

Scott Spear       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

John "Jed" Brunst       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

Andrew Padilla       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

Joye Vaught       \_\_\_X\_\_\_ NOT GUILTY       _____ GUILTY

## Count 48:

| Date | Exhibit | State |
|------|---------|-------|
| Jan. 31, 2018 | 227 | Florida |

Michael Lacey            NOT GUILTY            GUILTY

Scott Spear      X      NOT GUILTY            GUILTY

John "Jed" Brunst      X      NOT GUILTY            GUILTY

Andrew Padilla      X      NOT GUILTY            GUILTY

Joye Vaught      X      NOT GUILTY            GUILTY

## Count 49:

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 1, 2018 | 228 | Nevada |

Michael Lacey            NOT GUILTY            GUILTY

Scott Spear      X      NOT GUILTY            GUILTY

John "Jed" Brunst      X      NOT GUILTY            GUILTY

Andrew Padilla      X      NOT GUILTY            GUILTY

Joye Vaught      X      NOT GUILTY            GUILTY

**Count 50:**

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 6, 2018 | 229 | Texas |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

**Count 51:**

| Date | Exhibit | State |
|------|---------|-------|
| Feb. 6, 2018 | 230 | New York |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

John "Jed" Brunst          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

Andrew Padilla          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

Joye Vaught          **X**\_\_\_\_\_ NOT GUILTY          _____ GUILTY

**Conspiracy To Commit Money Laundering**
**18 U.S.C. § 1956(h)**
**COUNT 52**

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

Scott Spear          _____ NOT GUILTY          **X**\_\_\_\_\_ GUILTY

John "Jed" Brunst          _____ NOT GUILTY          **X**\_\_\_\_\_ GUILTY

**Concealment Money Laundering**
**18 U.S.C. § 1956(a)(1)(B)(i)**
**COUNT 53-62**

Count 53:

| Date | Amount | Description |
|------|--------|-------------|
| May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

Scott Spear      _____ NOT GUILTY      __X__ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

Count 54:

| Date | Amount | Description |
|------|--------|-------------|
| May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

Scott Spear      _____ NOT GUILTY      __X__ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 55:**

| Date | Amount | Description |
|------|--------|-------------|
| May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     <u>  X  </u> GUILTY

John "Jed" Brunst     _____ NOT GUILTY     <u>  X  </u> GUILTY

**Count 56:**

| Date | Amount | Description |
|------|--------|-------------|
| May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

Scott Spear     _____ NOT GUILTY     <u>  X  </u> GUILTY

John "Jed" Brunst     _____ NOT GUILTY     <u>  X  </u> GUILTY

1

2    **Count 57:**

3

4
| Date | Amount | Description |
|------|--------|-------------|
| June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

5

6

7

8    Michael Lacey          _____ NOT GUILTY          _____ GUILTY

9    Scott Spear            _____ NOT GUILTY          ✗ GUILTY

10   John "Jed" Brunst      _____ NOT GUILTY          ✗ GUILTY

11

12   **Count 58:**

13

14
| Date | Amount | Description |
|------|--------|-------------|
| June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |

15

16

17   Michael Lacey          _____ NOT GUILTY          _____ GUILTY

18   Scott Spear            _____ NOT GUILTY          ✗ GUILTY

19   John "Jed" Brunst      _____ NOT GUILTY          ✗ GUILTY

20

21

22

23

24

25

26

27

28

1

2   **Count 59:**

3

4

| Date | Amount | Description |
|------|--------|-------------|
| July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |

5

6

7

8   Michael Lacey          _____ NOT GUILTY          _____ GUILTY

9   Scott Spear            _____ NOT GUILTY          \_\_\_✕\_\_\_ GUILTY

10  John "Jed" Brunst      _____ NOT GUILTY          \_\_\_✕\_\_\_ GUILTY

11

12  **Count 60:**

13

14

| Date | Amount | Description |
|------|--------|-------------|
| July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |

15

16

17

18  Michael Lacey          _____ NOT GUILTY          _____ GUILTY

19  Scott Spear            _____ NOT GUILTY          \_\_\_✕\_\_\_ GUILTY

20  John "Jed" Brunst      _____ NOT GUILTY          \_\_\_✕\_\_\_ GUILTY

21

22

23

24

25

26

27

28

**Count 61:**

| Date | Amount | Description |
|------|--------|-------------|
| Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear _____ NOT GUILTY ___✗___ GUILTY

John "Jed" Brunst _____ NOT GUILTY ___✗___ GUILTY

**Count 62:**

| Date | Amount | Description |
|------|--------|-------------|
| Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

Michael Lacey _____ NOT GUILTY _____ GUILTY

Scott Spear _____ NOT GUILTY ___✗___ GUILTY

John "Jed" Brunst _____ NOT GUILTY ___✗___ GUILTY

### International Promotional Money Laundering
### 18 U.S.C. § 1956(a)(2)(A)
### COUNT 63-68

**Count 63:**

| Date | Amount | Description |
|------|--------|-------------|
| Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |

| | | | |
|---|---|---|---|
| Michael Lacey | ___X___ NOT GUILTY | _____ GUILTY |
| Scott Spear | ___X___ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | ___X___ NOT GUILTY | _____ GUILTY |

**Count 64:**

| Date | Amount | Description |
|------|--------|-------------|
| Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

| | | | |
|---|---|---|---|
| Michael Lacey | _____ NOT GUILTY | _____ GUILTY |
| Scott Spear | ___X___ NOT GUILTY | _____ GUILTY |
| John "Jed" Brunst | _____ NOT GUILTY | ___X___ GUILTY |

1

2   **Count 65:**

3

4   | Date | Amount | Description |
   |------|--------|-------------|
5   | Sept. 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

6

7

8   Michael Lacey          _____ NOT GUILTY          _____ GUILTY

9   Scott Spear          ___✗___ NOT GUILTY          _____ GUILTY

10  John "Jed" Brunst          _____ NOT GUILTY          ___✗___ GUILTY

11

12  **Count 66:**

13

14  | Date | Amount | Description |
   |------|--------|-------------|
15  | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

16

17

18  Michael Lacey          _____ NOT GUILTY          _____ GUILTY

19  Scott Spear          ___✗___ NOT GUILTY          _____ GUILTY

20  John "Jed" Brunst          _____ NOT GUILTY          ___✗___ GUILTY

21

22

23

24

25

26

27

28

1

2  **Count 67:**

3

4

| Date | Amount | Description |
|------|--------|-------------|
| Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

5

6

7

8   Michael Lacey        _____ NOT GUILTY        _____ GUILTY

9   Scott Spear        ___X___ NOT GUILTY        _____ GUILTY

10  John "Jed" Brunst        _____ NOT GUILTY        ___X___ GUILTY

11

12  **Count 68:**

13

14

| Date | Amount | Description |
|------|--------|-------------|
| Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

15

16

17  Michael Lacey        _____ NOT GUILTY        _____ GUILTY

18  Scott Spear        ___X___ NOT GUILTY        _____ GUILTY

19  John "Jed" Brunst        _____ NOT GUILTY        ___X___ GUILTY

20

21

22

23

24

25

26

27

28

**Transactional Money Laundering**
**18 U.S.C. § 1957(a)**
**COUNT 69-99**

<u>Count 69:</u>

| Date | Amount | Description |
|------|--------|-------------|
| Aug. 21, 2013 | $30,000.00 | Bank of America (x9463) to Stewart Title (partial payment for Sedona property) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

John "Jed" Brunst     _____ NOT GUILTY     __X____ GUILTY

<u>Count 70:</u>

| Date | Amount | Description |
|------|--------|-------------|
| Sept. 13, 2013 | $62,491.47 | BMO Harris (x1793) to Stewart Title (partial payment for Sedona property) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

John "Jed" Brunst     _____ NOT GUILTY     __X____ GUILTY

<u>Count 71:</u>

| Date | Amount | Description |
|------|--------|-------------|
| June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |

Scott Spear     _____ NOT GUILTY     __X____ GUILTY

- 35 -

**Count 72:**

| Date | Amount | Description |
|---|---|---|
| June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |

Scott Spear     _____ NOT GUILTY     \_\_X\_\_\_ GUILTY

**Count 73:**

| Date | Amount | Description |
|---|---|---|
| Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to USB Financial |

Scott Spear     _____ NOT GUILTY     \_\_X\_\_\_ GUILTY

**Count 74:**

| Date | Amount | Description |
|---|---|---|
| May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |

Scott Spear     _____ NOT GUILTY     \_\_X\_\_\_ GUILTY

**Count 75:**

| Date | Amount | Description |
|---|---|---|
| May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property Trust |

Scott Spear     _____ NOT GUILTY     \_\_X\_\_\_ GUILTY

**Count 76:**

| Date | Amount | Description |
|------|--------|-------------|
| Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |

Scott Spear            _____ NOT GUILTY     X\_\_\_\_\_ GUILTY

**Count 77:**

| Date | Amount | Description |
|------|--------|-------------|
| Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |

Scott Spear            _____ NOT GUILTY     X\_\_\_\_\_ GUILTY

**Count 78:**

| Date | Amount | Description |
|------|--------|-------------|
| Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

Scott Spear            _____ NOT GUILTY     X\_\_\_\_\_ GUILTY

John "Jed" Brunst      _____ NOT GUILTY     X\_\_\_\_\_ GUILTY

**Count 79:**

| Date | Amount | Description |
|------|--------|-------------|
| Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |

John "Jed" Brunst        _____ NOT GUILTY        X\_\_\_\_ GUILTY

**Count 80:**

| Date | Amount | Description |
|------|--------|-------------|
| Feb. 3, 2016 | $1,507,944.00 | Cereus Properties (x6211) to Charles Schwab |

John "Jed" Brunst        _____ NOT GUILTY        X\_\_\_\_ GUILTY

**Count 81:**

| Date | Amount | Description |
|------|--------|-------------|
| Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |

Michael Lacey        _____ NOT GUILTY        _____ GUILTY

John "Jed" Brunst        _____ NOT GUILTY        X\_\_\_\_ GUILTY

**Count 82:**

| Date | Amount | Description |
|------|--------|-------------|
| Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |

John "Jed" Brunst        _____ NOT GUILTY        X\_\_\_\_ GUILTY

- 38 -

**Count 83:**

| Date | Amount | Description |
|------|--------|-------------|
| June 27, 2016 | $397,500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

John "Jed" Brunst     _____ NOT GUILTY     \_\_X\_\_ GUILTY

**Count 84:**

| Date | Amount | Description |
|------|--------|-------------|
| July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |

Michael Lacey     _____ NOT GUILTY     _____ GUILTY

John "Jed" Brunst     _____ NOT GUILTY     \_\_X\_\_ GUILTY

**Count 85:**

| Date | Amount | Description |
|------|--------|-------------|
| July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |

Scott Spear     _____ NOT GUILTY     \_\_X\_\_ GUILTY

**Count 86:**

| Date | Amount | Description |
|------|--------|-------------|
| Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

Michael Lacey     _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 87:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 88:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |

Michael Lacey     _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 89:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 90:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 91:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      __X__ GUILTY

**Count 92:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      \_\_\_X\_\_\_ GUILTY

**Count 93:**

| Date | Amount | Description |
|------|--------|-------------|
| Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

Scott Spear      _____ NOT GUILTY      \_\_\_X\_\_\_ GUILTY

John "Jed" Brunst      _____ NOT GUILTY      \_\_\_X\_\_\_ GUILTY

**Count 94:**

| Date | Amount | Description |
|------|--------|-------------|
| Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |

Michael Lacey      _____ NOT GUILTY      _____ GUILTY

- 42 -

**Count 95:**

| Date | Amount | Description |
|---|---|---|
| Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

**Count 96:**

| Date | Amount | Description |
|---|---|---|
| Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

**Count 97:**

| Date | Amount | Description |
|---|---|---|
| Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |

Michael Lacey          _____ NOT GUILTY          _____ GUILTY

**Count 98:**

| Date | Amount | Description |
|---|---|---|
| Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |

Michael Lacey _____ NOT GUILTY _____ GUILTY

**Count 99:**

| Date | Amount | Description |
|------|--------|-------------|
| Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

Michael Lacey _____ NOT GUILTY _____ GUILTY

**International Concealment Money Laundering**
**18 U.S.C. § 1956(a)(2)(B)(i)**
**COUNT 100**

**Count 100:**

| Date | Amount | Description |
|------|--------|-------------|
| Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

Michael Lacey _____ NOT GUILTY ☒ GUILTY

11/16/2023
DATE

#2
FOREPERSON JUROR NUMBER

- 44 -

# EXHIBIT I

☒ FILED ☐ LODGED

**Nov 16 2023**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
| Plaintiff, | **FINAL JURY INSTRUCTIONS** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

The Court administered the following jury instructions to assist the jury in its deliberations in this case.

Dated this 16th day of November, 2023.

Honorable Diane J. Humetewa
United States District Judge

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return—that is a matter entirely up to you.

1    The indictment is not evidence.  Defendants have pleaded not guilty to the charges.

2    Each defendant is presumed to be innocent unless and until the United States proves the

3    defendant guilty beyond a reasonable doubt.  In addition, none of the defendants have to

4    testify or present any evidence.  The defendants do not have to prove innocence; the United

5    States has the burden of proving every element of the charges beyond a reasonable doubt.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that a defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consists of:

First, the sworn testimony of any witness; and

Second, the exhibits received in evidence.

In reaching your verdict you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are:

1.      Questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.  Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and have said at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2.      Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence in a limited way, you must do so.

3.      Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account the following:

First, the opportunity and ability of the witness to see or hear or know the things testified to;

Second, the witness's memory;

Third, the witness's manner while testifying;

Fourth, the witness's interest in the outcome of the case, if any;

Fifth, the witness's bias or prejudice, if any;

Sixth, whether other evidence contradicted the witness's testimony;

Seventh, the reasonableness of the witness's testimony in light of all the evidence; and

Eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

1   You have heard evidence that Carl Ferrer, a witness, made prior statements under
2   oath that were inconsistent with his testimony at trial.  You may consider this evidence in
3   deciding whether or not to believe this witness and how much weight to give to the
4   testimony of this witness.

You have heard testimony from Carl Ferrer and Dan Hyer, witnesses who received favored treatment from the government in connection with this case and pleaded guilty to a crime arising out of the same events for which the defendants are on trial. These guilty pleas are not evidence against the defendants, and you may consider Carl Ferrer and Dan Hyer's pleas only in determining their believability.

For these reasons, in evaluating the testimony of Carl Ferrer and Dan Hyer, you should consider the extent to which or whether their testimony may have been influenced by their pleas. In addition, you should examine the testimony of Carl Ferrer and Dan Hyer with greater caution than that of other witnesses.

1    You have heard testimony from Kimberly Mehlman-Orozco, who testified about

2   her opinions and the reasons for those opinions.  This opinion testimony is allowed because

3   of the specialized knowledge, skill, experience, training, or education of this witness.

4    Such opinion testimony should be judged like any other testimony.  You may accept

5   it or reject it, and give it as much weight as you think it deserves, considering the witness's

6   knowledge, skill, experience, training, or education, the reasons given for the opinion, and

7   all the other evidence in the case.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the trial, certain charts and summaries were shown to you to help explain the evidence in the case.  These charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

1
2
3

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    You are here only to determine whether the defendants are guilty or not guilty of the

2   charges in the indictment.  The defendants are not on trial for any conduct or offense not

3   charged in the indictment.

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial.  You must decide the case of each defendant on each crime charged against that defendant separately.  Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant and count.

1    The indictment charges that the offenses alleged were committed "on or about" a

2    certain date.

3    Although it is necessary for the government to prove beyond a reasonable doubt that

4    the offense was committed on a date reasonably near the date alleged in the indictment, it

5    is not necessary for the government to prove that the offense was committed precisely on

6    the date charged.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or any other forms of social media. This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings , and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

1    Some of you have taken notes during the trial.  Whether or not you took notes, you

2  should rely on your own memory of what was said.  Notes are only to assist your memory.

3  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

1
2
3
4

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the Courtroom Deputy that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Courtroom Deputy signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

The defendants are charged in Count 1 of the indictment with conspiring to violate the Travel Act in violation of Section 1952(a)(3)(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment by promoting, or facilitating the promotion of, a business enterprise or enterprises involving prostitution offenses in violation of the laws of the State in which they were committed, in violation of 18 U.S.C. § 1952(a)(3)(A) and § 1952(b)(i)(1);

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime, *i.e.* the Travel Act violations, which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the

originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The United States is not required to prove that the defendant personally did one of the overt acts.

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with every other defendant or every other conspirator in the overall scheme, that defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, that a defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

Second, that a defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, that a defendant had reason to believe that whatever benefits the defendant might get from the conspiracy probably were dependent upon the success of the entire enterprise.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2-51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 1 of the indictment;

Third, that person committed the Travel Act offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and

Fifth, that Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Concealment Money Laundering crime as charged in Counts 53-62 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Concealment Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the Concealment Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Concealment Money Laundering offense was committed; and

Fifth, the Concealment Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing an International Promotional Money Laundering crime as charged in Counts 63-68 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed an International Promotional Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the International Promotional Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the International Promotional Money Laundering offense was committed; and

Fifth, the International Promotional Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

The defendants are charged in Counts 2-51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code, a statute also referred to as "the Travel Act."  In order for the defendants to be found guilty of Counts 2-51, the United States must prove, for each count, the following elements beyond a reasonable doubt:

First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below), and

Second, after doing so the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2-51 of the indictment.

To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means intentionally helping someone else commit a prostitution offense in violation of state law.

The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation.

The phrase "uses any facility in interstate commerce" as used in the Travel Act, 18 U.S.C. § 1952(a), means employing or utilizing any method of communication or transportation between one state and another, and includes, for example, the use of telephones, mails, and the Internet.

<u>Counts 2, 4, 27, 29-30, 33, 35, 37, 40 and 43</u> concern prostitution offenses in violation of the laws of the State of Massachusetts. A prostitution offense in Massachusetts occurs when:

> (1) A person engaged, agreed to engage, or offered to engage, in sexual conduct with another person; and
>
> (2) The sexual conduct was, or was to be, done in return for a fee.

The term "sexual conduct" includes sexual intercourse; anal intercourse; fellatio, or oral sex involving contact between the mouth of one person and the penis of another person; cunnilingus, or oral sex involving contact between the mouth of one person and the female sex organs—the vagina, vulva or labia—of another person; masturbation of another person; or any intrusion of a part of one person's body or some other object into the genital or anal opening of another person's body.

<u>Counts 3, 6-11, 18, 25-26, and 28</u> concern prostitution offenses in violation of the laws of the State of Washington. A prostitution offense in Washington occurs when:

> (1) A person engaged, agreed to engage, or offered to engage in sexual conduct with another person; and
>
> (2) The sexual conduct, agreement, or offer was in return for a fee.

"Sexual conduct" means sexual contact or sexual intercourse. "Sexual contact" means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party. "Sexual intercourse" means that the sexual organ of the male entered and penetrated the sexual organ of the female and occurs upon any penetration, however slight, or any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, or any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

Counts 14-15, 21-22, and 31 concern prostitution offenses in violation of the laws of the State of Arizona. A prostitution offense in Arizona occurs when:

A person knowingly engaged, agreed, or offered to engage in sexual conduct with another person under a fee arrangement with any person for money or any other valuable consideration.

"Sexual conduct" means sexual contact, sexual intercourse, oral sexual contact, or sadomasochistic abuse.

"Sexual contact" means any direct or indirect fondling or manipulating of any part of the genitals, anus or female breast.

"Sexual intercourse" means penetration into the penis, vulva or anus by any part of the body or by an object.

"Oral sexual contact" means oral contact with the penis, vulva or anus.

"Sadomasochistic abuse" means flagellation or torture by or on a person who is nude or clad in undergarments or in revealing or bizarre costume or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

Counts 12-13, 23, and 34 concern prostitution offenses in violation of the laws of the State of California.  A prostitution offense in California occurs when:

An individual solicits, or agrees to engage in, or engages in, any act of prostitution with the intent to receive compensation, money, or anything of value from another person.

An act of prostitution occurs when a person has sexual intercourse or does a lewd act with someone else in exchange for money or other compensation.  A lewd act means touching the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification.

Counts 45-47 and 51 concern prostitution offenses in violation of the laws of the State of New York.  A prostitution offense in New York occurs when:

A person engaged, agreed, or offered to engage, in sexual conduct with another

1    person for a fee.

2

3    <u>Counts 19-20 and 50</u> concern prostitution offenses in violation of the laws of the

4    State of Texas. A prostitution offense in Texas occurs when:

5    A person knowingly offers or agrees to receive a fee from another to engage in

6    sexual conduct.

7    "Sexual conduct" includes deviate sexual intercourse, sexual contact, and sexual

8    intercourse.

9    "Sexual intercourse" means any penetration of the female sex organ by the male sex

10   organ.

11   "Sexual contact" means any touching of the anus, breast, or any part of the genitals

12   of another person with intent to arouse or gratify the sexual desire of any person.

13   "Fee" means the payment or offer of payment in the form of money, goods, services,

14   or other benefit.

15   "Deviate sexual intercourse" means any contact between the genitals of one person

16   and the mouth or anus of another person.

17   A person acts knowingly, or with knowledge, with respect to the nature of his/her

18   conduct or to circumstances surrounding his/her conduct when he/she is aware of the nature

19   of his/her conduct or that the circumstances exist.

20

21   <u>Counts 16-17</u> concern prostitution offenses in violation of the laws of the State of

22   Colorado. A prostitution offense occurs in Colorado when:

23   A person performed, offered, or agreed to perform, any act of sexual intercourse,

24   fellatio, cunnilingus, masturbation, or anal intercourse, with any person who was not his or

25   her spouse, in exchange for money or other thing of value.

26   Or when:

27   A person solicited another for the purpose of prostitution.

28   Colorado law provides the following definitions:

"Anal intercourse" means contact between human beings of the genital organs of one and the anus of another.

"Fellatio" means any act of oral stimulation of the penis.

"Cunnilingus" means any act of oral stimulation of the vulva or clitoris.

"Masturbation" means stimulation of the genital organs by manual or other bodily contact exclusive of sexual intercourse.

"Thing of value" includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith.

Counts 38 and 42 concern prostitution offenses in violation of the laws of the State of Ohio.  A prostitution offense occurs in Ohio when:

A person engaged in sexual activity for hire.

Or when:

A person recklessly induces, entices, or procures another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person.

Ohio law provides the following definitions:

"Sexual activity" means sexual conduct or sexual contact, or both.

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"For hire" means for pay or compensation.

Counts 36 and 49 concern prostitution offenses in violation of the laws of the State of Nevada.   A prostitution offense in Nevada occurs when:

A person engaged in prostitution or solicitation therefor, except in a licensed house of prostitution.

"Prostitution" means engaging in sexual conduct with another person in return for a fee, monetary consideration or other thing of value.

"Sexual conduct" means sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person.

Counts 24 and 44 concern prostitution offenses in violation of the laws of the State of Michigan.  A prostitution offense in Michigan occurs when:

A person engaged or offered to engage the services of another person, not his or her spouse, for the purpose of prostitution, lewdness, or assignation, by the payment in money or other forms of consideration.

Count 32 concerns prostitution offenses in violation of the laws of the State of Louisiana.  A prostitution offense in Louisiana occurs when:

A person engaged in indiscriminate sexual intercourse for compensation, or solicited another with the intent to engage in indiscriminate sexual intercourse for compensation.

"Sexual intercourse" means anal, oral, or vaginal sexual intercourse.

Count 48 concerns prostitution offenses in violation of the laws of the State of Florida.  A prostitution offense in Florida occurs when:

A person offered to commit, committed, or engaged in prostitution, lewdness, or assignation.

-OR-

A person solicited, induced, enticed, or procured another to commit prostitution, lewdness, or assignation.

"Prostitution" is the giving or receiving of the body for sexual activity for hire but excludes sexual activity between spouses.

"Lewdness" is any indecent or obscene act. "Indecent" means wicked, lustful, unchaste, licentious, or sensual intention on the part of the person doing the act.

"Sexual activity" means oral, anal, or vaginal penetration by, or union with, the sexual organ of another; anal or vaginal penetration of another by any other object; or the handling or fondling of the sexual organ of another for the purpose of masturbation; however, the term does not include acts done for bona fide medical purposes.

"Assignation" includes the making of any appointment or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement.

To "solicit" means to command, encourage, hire, or request another person to engage in specific conduct.

To "procure" means to persuade, induce, prevail upon or cause a person to do something.

Count 39 concerns prostitution offenses in violation of the laws of the State of Alabama. A prostitution offense in Alabama occurs under any of the following:

(1)     A person commits an act of prostitution, which is . any natural or unnatural sexual act, sodomy, or sexual contact for monetary consideration or other thing of value.

(2)     A person solicited, compelled, or coerced any person to have sexual intercourse or participate in any natural or unnatural sexual act, deviant sexual intercourse, or sexual contact for monetary consideration or other thing of marketable value.

(3)     A person agreed to engage in sexual intercourse, deviant sexual intercourse, or sexual contact with another or participate in the act for monetary consideration or other thing of marketable value and give or accept monetary consideration or other thing of value in furtherance of the agreement.

(4)    A person knowingly did any of the following:

    a)  Caused or aided a person to commit or engage in prostitution.

    b)  Procured or solicited patrons for prostitution.

    c)  Provided persons or premises for prostitution purposes.

    d)  Received or accepted money or other thing of value pursuant to a prior agreement with any person whereby he or she participated or is to participate in the proceeds of any prostitution activity.

    e)  Operated or assisted in the operation of a house of prostitution or a prostitution enterprise.

Count 41 concerns prostitution offenses in violation of the laws of the State of Arkansas.  A prostitution offense in Arkansas occurs when:

A person engaged in, agreed, or offered to engage in sexual activity with any other person in return for or in expectation of a fee.

"Sexual activity" means sexual intercourse, deviate sexual activity, or sexual contact.

"Sexual intercourse" means penetration, however slight, of the labia majora by a penis.

"Deviate sexual activity" means any act of sexual gratification involving: (A) the penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person.

"Sexual contact" means any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female.

Count 5 concerns prostitution offenses in violation of the laws of the State of Maine. A prostitution offense in Maine occurs when:

A person engages in, or agrees to engage in, or offers to engage in a sexual act or sexual contact in return for a pecuniary benefit to be received by the person engaging in prostitution or a 3rd person.

"Sexual act" means: (1) Any act between 2 persons involving direct physical contact between the genitals of one and the mouth or anus of the other, or direct physical contact between the genitals of one and the genitals of the other; (2) Any act between a person and an animal being used by another person which act involves direct physical contact between the genitals of one and the mouth or anus of the other, or direct physical contact between the genitals of one and the genitals of the other; or (3) Any act involving direct physical contact between the genitals or anus of one and an instrument or device manipulated by another person when that act is done for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

"Sexual contact" means any touching of the genitals or anus, directly or through clothing, other than as would constitute a sexual act, for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

The United States does not have to prove that the referenced states' laws were actually violated, only that each defendant had intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in violation of state law, and committed a subsequent overt act in furtherance of the unlawful activity.

Defendants are charged with violating the Travel Act by facilitating state-law prostitution offenses, conspiracy to violate the Travel Act, and money laundering. Although some testimony and evidence in the trial occasionally may refer to "human trafficking," "sex trafficking," or "child sex trafficking," no defendant is charged with crimes of "human trafficking," "sex trafficking," or "child sex trafficking" or with facilitating those crimes. So, you should not conclude from any use of those terms during the trial that any defendant has been charged with a trafficking crime or facilitating a trafficking crime.

Defendants Lacey, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the Travel Act violation(s).

A financial transaction is a transaction involving the movement of funds by wire or other means that affects interstate or foreign commerce in any way.

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.  I instruct you that violating the Travel Act is a felony.

Defendants Lacey, Brunst, and Spear are charged in Counts 63–68 of the indictment with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote a violation of the Travel Act.

Defendant Lacey is charged in Count 100 of the indictment with transporting money for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United States Code.  For defendant Lacey to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, defendant Lacey transported money from a place in the United States to or through a place outside the United States;

Second, defendant Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act; and

Third, defendant Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act violation(s) or to avoid a transaction reporting requirement under state or federal law.

Defendant Lacey is charged in Counts 69-70, 81, 83-84, 86, 88-92, and 94-99; Defendant Spear is charged in Counts 71-78, 85, and 93; and Defendant Brunst is charged in Counts 69-70, 78-84, and 86-93 of the indictment with transactional money laundering in violation of Section 1957 of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant knowingly engaged in a monetary transaction. An act is done knowingly if the defendant is aware of the act, and does not act or fail to act through ignorance, mistake, or accident. You may consider evidence of the defendants' words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from violations of the Travel Act; and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means an insured bank, commercial bank, or credit union.

The term "criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense.

The United States must prove that each defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that each defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of a violation of the Travel Act.

Although the United States must prove that, of the property at issue, more than

1    $10,000 was criminally derived, the United States does not have to prove that all the

2    property at issue was criminally derived.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants Lacey, Spear, and Brunst are charged in Count 52 the indictment with money laundering conspiracy in violation of Section 1956(h) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, there was an agreement to commit money laundering;

Second, the defendant knew the objective of the agreement;

Third, the defendant joined the agreement with the intent to further its unlawful purpose.

The government has the burden to prove beyond a reasonable doubt that a defendant acted with criminal intent and did not act in good faith.  "Good faith" encompasses a belief or opinion honestly held and an absence of malice or ill will.  If a defendant carries out his or her actions in good faith, there is no criminal intent.  A person who acts on a belief or an opinion honestly held is not punishable under the charges in the indictment merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.  If the government fails to meet its burden to prove a defendant lacked good faith, you must return a not guilty verdict.

1   All speech is presumptively protected by the First Amendment to the United States
2   Constitution.  However, the First Amendment does not protect speech that proposes an
3   illegal transaction.  Prostitution is illegal in 49 states and most of Nevada.  It is the
4   government's burden to establish that each of the ads alleged in this case is an ad for
5   prostitution and not for another purpose such as an ad for an escort, dating or massage
6   service.  If you find that an ad proposes an illegal transaction, it is not protected by the First
7   Amendment.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT J

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: 602.257.0135
bf@federlawpa.com
*Attorney/Knapp Counsel for Scott Spear*

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura, Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorney for Scott Spear*

Gary Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Gopi Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD MARELLA BOXER WOLPERT, NESSIM DROOKS LINCENBERG RHOW, PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: 310.201.2100
glincenberg@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Paul J. Cambria (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell Paris (NY Bar No. 4480166, *admitted pro hac vice*)
LIPSITZ GREENE SCHIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: 716.849.1333
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>vs.<br><br> Scott Spear, *et al*.,<br><br>              Defendants. | Case No. CR18-00422-PHX-DJH<br><br>**DEFENDANT SPEAR'S REPLY RE: RULE 29 MOTION CONCERNING ALL COUNTS OF CONVICTION**<br><br>***(ORAL ARGUMENT REQUESTED)***<br><br>*(Assigned to the Hon. Diane J. Humetewa)* |

Defendant Spear, by his attorneys undersigned, hereby files his Reply to his Rule 29 motion, and requests this Court to enter a judgement of acquittal as to the counts of conviction against him.

## I.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT CONVICTION ON ANY COUNT.

**1.   A Review Of The Response Filed By The Government Demonstrates Its Failure To Respond To And Therefore Failure To Prove That:**

a.   Moderation, aggregation, reciprocal link to The Erotic Review ('TER'), publishing super-posters ads are illegal. It is obvious that the moderation of ads is not only legal, but encouraged by Section 230 of the CDA, given that this Court initially ordered that the defense could present the expert testimony of Eric Goldman to state this fact (Doc. 1081); This premise of the government's case constituted legal behavior unless proven otherwise.

b.   any of the ads contained in Counts 2-18 were the product of moderation, aggregation, linked or otherwise connected to TER, or an ad from a super-poster. To the contrary, the testimony was that as of the time Elizabeth MacDougal was hired in spring 2012, moderation of ads stopped, and the aggregation, reciprocal links to TER, ads submitted by super-posters, and all of the other so called "marketing techniques" claimed by the government had been terminated.  In Counts 2-18, there was no demonstration any of these practices affected these ads in any way.

c.   As of 1/1/2013, Mr. Spear was not a supervisor of the ads and/or a participant in the ads that appeared in Backpage given that Elizabeth McDougal's employment. This includes Counts 2-18, and any of the ads after 1/1/2013.

d.   Mr. Spear never saw any of the ads contained in Counts 2-18 or any other ad after 1/1/2013 or had any contact with any advertiser. Interestingly, the email correspondence between the email address carl@backpage.com and Pamela Robinson that were admitted as exhibits were dated before 1/1/2013 (*See* Exhibits 162-165, and 168).

2

The Pamela Robinson ads listed in the indictment were Exhibits 504-513, and were dated substantially after any alleged communications between Carl@backpage.com and Ms. Robinson. There was no correspondence or other proof offered or admitted that the Pamela Robinson ads listed in the Counts were seen by anyone, including Mr. Spear, Mr. Ferrer. or Mr. Hyer.

   e. any evidence that Mr. Ferrer, Mr. Hyer, or any defendant had any discussion with one another to conspire to commit or actually commit Travel Act and Money Laundering violations. A review of the exhibits and trial testimony shows an absence of any such discussion.  Given the willingness of Mr. Ferrer and Mr. Hyer to testify to the minutae of Backpage operations from 2004 to 2018, it is a noticeable omission that the prosecutors failed to elicit or present any such testimony or exhibits demonstrating this basic element.

## 2. The Elements Of The Travel Act Were Not Satisfied.

There also was no evidence to satisfy the elements of the Travel Act, as it pertains to Counts 2-18.  Specifically, in this Court's Travel Act Jury Instruction (Doc. 1998, pg. 30) there must have been evidence that the defendant violated both the first and second elements. Given the acquittals of defendants Brunst, Padilla and Vaught on Counts 2018, and Defendant Lacey's hung jury on these counts, the government must have presumably proven an action by Mr. Spear that he both "used a facility in interstate commerce with specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses…" , and that "…after doing so, the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on backpage.com, the ads listed in Counts 2-18, of the indictment" (Emphasis added).  There was no act, communication, or any other evidence indicating Mr. Spear, distinct from the other defendants satisfied either of these elements. As a matter of fact, there appears to be no acts, communications, or other evidence that was demonstrated to show that even Mr. Ferrer and/or Mr. Hyer violated the statute.

3

### 3. Strict Scrutiny Of The Evidence Against Mr. Spear.

Given the First Amendment backdrop of the superseding indictment and the counts of conviction, this Court must focus on the specific acts of Mr. Spear to determine the sufficiency of the evidence, as opposed to the actions of others. (*See*, <u>Hellman v. United States</u>, 298 F.2d 810, 813 (9th Cir. 1962); <u>United States v. Spock</u>, 416 F.2d. 165, 173, <u>United States v. Montour</u>, 944 F.2d 1019, 1024 (2nd Cir. 1991) (When the ultimate objective of a group, of which the defendant is a member, is legal, but the means chosen to accomplish that end involved both legal and illegal activities, a court will apply *strictissimi juris* to ensure that the defendant was personally involved with the illegal aspects of the group activity.), and <u>United States v. McKee</u>, 506 F.3d 225 (3rd Cir. 2006).

## II. THE FIRST AMENDMENT REQUIRES ACQUITTAL.

This Court's final jury instructions recognized that the First Amendment protected Backpage's publication of adult advertisements unless "an ad propose[d] an illegal transaction." Doc. 1998 at 48:3-7. Spear does not seek to "relitigate" the instruction, but rather he challenges whether the government's evidence cleared that legal hurdle and he contends that it failed to do so, as a matter of law.[1]

The government argued to the jury, and now argues to the Court, that the jury could determine that an otherwise facially lawful ad for escort services "proposed an illegal transaction" if it contained so-called "code words" that might sometimes be associated with prostitution. That position is inconsistent with the United States Supreme Court's holding in <u>Pittsburgh Press</u>,[2] with decisions of the Ninth Circuit construing <u>Pittsburgh</u>

---

[1] Judge Brnovich's denial of Defendants' motion to dismiss on First Amendment grounds has no bearing on Spear's Rule 29 motion. Doc. 793. That ruling only addressed whether the indictment was sufficient and did not address the sufficiency of the government's evidence. "[T]he Court takes the allegations on their face and does not consider the adequacy of the evidence when reviewing whether an indictment is sufficient." *Id*. at 12:27-28. "The proper forum for challenging whether there is adequate evidence is at trial." *Id*. at 3:3-4.

[2] <u>Pitt. Press Co. v. Pitt. Comm. on Human Relations</u>, 413 U.S. 376, 377-80 (1973).

4

_Press_,[3] with decisions of the Second and Third Circuits construing _Pittsburgh Press_,[4] and with the holdings of the United States District Courts in Washington and New Jersey in _McKenna_ and _Hoffmann_.[5]  The government seeks to distinguish these cases but raises either spurious arguments or distinctions without a difference.

In _Pittsburgh Press_, the Supreme Court held that the publication of classified ads proposing facially unlawful transactions (employment ads expressing unlawful sex preferences) were not protected by the First Amendment.  The government argues that _Pittsburgh Press_ created a sweeping exception to the First Amendment but the Supreme Court narrowly cabined its decision to employment ads expressly proposing unlawful transactions, whether directly through the text of an individual ad or indirectly through the placement of an otherwise facially lawful ad in a category expressly proposing an unlawful sex preference (_e.g._, "Male Help Wanted"):

> _We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes.  Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned 'Narcotics for Sale' and 'Prostitutes Wanted' rather than stated within the four corners of the advertisement…We hold only that the Commission's modified order, narrowly drawn to prohibit placement in sex-designated columns of advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of Pittsburgh Press._

_Id._ at 388.  In subsequently construing _Pittsburgh Press_, the Ninth, Second, and Third Circuits all have narrowly construed the First Amendment exception for "speech proposing an illegal transaction" recognized in _Pittsburgh Press_.

Each of Spear's Travel Act convictions is premised on an ad for escort services,

---

[3] _E.g._, _IMDb.com Inc. v. Bacerra_, 962 F.3d 1111, 1123 (9th Cir. 2020) (holding state statute restricting speech unconstitutional); _Valle Del Sol Inc. v. Whiting_, 709 F.3d 808, 821 (9th Cir. 2013) (holding state statute restricting commercial speech unconstitutional).

[4] _Greater Phila. Chamber of Comm. v. City of Phila._, 949 F.3d 116, 142 & n.170 (3d Cir. 2020); _Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay_, 868 F.3d 104, 114 (2d Cir. 2017).

[5] _Backpage.com, LLC v. Hoffman_, 2013 WL 4502097 (D.N.J. Aug. 20, 2013); _Backpage.com, LLC v. McKenna_, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012).

which can encompass a wide range of lawful activities, including sexual services such as stripping and autoeroticism that stop short of prostitution. There can be no dispute that escort services are lawful and that the First Amendment protects both the posting of escort ads and the publication of escort ads, notwithstanding the more limited nature of the First Amendment's protections for commercial speech. Spear's convictions were not predicated on ads expressly proposing sex for money transactions nor on the publication of ads in a facially unlawful category like "Prostitution Services," which puts this case outside of the narrow First Amendment exception recognized in _Pittsburgh Press_.

The government argues that the ads underlying Counts 2-18 satisfy the requirements of _Pittsburgh Press'_ exception for speech proposing an illegal transaction because they contained "coded prostitution transaction terms," such as "clean," "discrete," "hygienic," "real pics," "roses," "donation," "independent," "New in Town," and "in call." Doc. 2021 at 10:16-27. But none of these so-called "code words" are codes for a sex act or for prostitution itself, none of the ads underlying the convictions contained any codes for a sex act (with consideration flowing from the ad being placed in the escort services category) or for prostitution itself, and none of those terms causes any of the ads to _propose_ an illegal act. Rather, the so-called "code words" are just words _associated_ with prostitution or sometimes used by people engaging in prostitution offenses. Regardless of whether the use of such terms may have increased the likelihood that an escort ad was _associated_ with prostitution, an escort ad using one of those terms cannot be said to _propose_ a sex for money transaction.

The government also argues that the ads underlying Spear's convictions proposed illegal transactions: because one ad used text, rather than numbers, to provide a phone number; because Backpage deleted saucy pictures from some of the ads (none of which were sex act pictures); because the ads were on Backpage (which the government says "indicated the ads were for prostitution" (Doc. 2021 at 10:8-11)); and because many of the ads expressly disclaimed being solicitations of prostitution (which the government claims was "proof that the ads offered illegal services" (_id_. at 11:16-17)).

6

Those claims all are absurd and amount to little more than the government saying that the ads proposed illegal transactions because the government says they did.[6]

The difference between an ad proposing prostitution and an ad merely being associated with prostitution (or, more accurately, looking like it might be associated with prostitution) matters because the First Amendment protects the publication of escort ads that might be *associated* with prostitution or that might result in prostitution, provided the ads do not *propose* unlawful sex for money transactions.[7] *Valle del Sol*, 709 F.3d at 821 ("*Central Hudson*'s legality requirement…focused on the content of affected speech—*i.e.*, whether the speech proposes an illegal transaction—instead of whether the speech is associated with unlawful activity.").

In *Valle del Sol*, the State of Arizona defended a state statute proscribing commercial speech on the grounds that the speech was related to unlawful activity.  709 F.3d at 821. The Ninth Circuit distinguished the facts in *Valle del Sol* from *Pittsburgh Press*, saying that the speech at issue in *Pittsburgh Press* "proposed an illegal transaction," whereas the Arizona statute at issue proposed to "regulate speech proposing a legal transaction where the speech is conducted in an unlawful manner." *Id.* at 822.  The Court then held that "[n]othing in *Pittsburgh Press* … suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether the affected speech is conducted in a lawful manner." *Id.*; *accord IMDB*, 962 F.3d 1122 (rejecting an interpretation of *Pittsburgh Press* that would "permit the restriction not only of speech

---

[6]  The government also claims that Ferrer "knew" that Pamela Robinson (who was associated with the ads in Counts 3, 6-11, and 18) was a prostitute, but there is no evidence in the record that Pamela Robinson in fact was a prostitute or that Ferrer "knew" that to be the case.  To the contrary, Ferrer merely testified that, based solely on looking the ads and emails, he was of the *opinion* that Robinson was a prostitute.  9/14/23 Tr. at 80:4-6 (Q. What is your—what is your opinion based upon the e-mail exchanges and postings?  A. That Pamela Robinson was engaged in prostitution.").  Moreover, the government never established that Ferrer reached that opinion *before* he began cooperating with the government.  And, critically, the government never established that Ferrer shared that opinion with Spear or any other defendant before doing so during his testimony.

[7]  The government does not contend that any defendant ever saw any of the charged ads or had actual knowledge of the ads, the persons posting them, or the activities of those persons, so there is no path to a First Amendment exception based on actual knowledge by a defendant.  The same also is true for the cooperators, which forecloses *Pinkerton* liability (as discussed at length in the motion for a new trial, Ferrer was not a party to the emails with Pamela Robinson).

7

that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct").[8]  At trial, the government's evidence largely focused on establishing that adult ads on Backpage.com resulted in prostitution offenses and the government now seeks to bootstrap that evidence into a finding that facially lawful ads proposed illegal transactions, but the government merely invites the Court to do what the Ninth Circuit has instructed it must not—expand its inquiry beyond whether the charged ads proposed lawful transactions.

The government dismisses _McKenna_ and _Hoffman_ as "Section 230" cases, while utterly _ignoring_ the fact that each decision expressly rejected the government's position regarding coded speech and implicit offers of sex for money _on First Amendment grounds_.  _McKenna_, 881 F. Supp. 2d at 1279; Hoffman, 2013 WL 4502097 at *10. Likewise, in dismissing the holding of the Second Circuit construing the "speech proposing an illegal transaction" from _Pittsburgh Press,_ the government claims the case said, "nothing about coded solicitations of illegal transactions" (Doc. 2021 at 13:8-10), but the holding _forecloses_ the government's argument on coded speech.  _Centro de la Comunidad_, 868 F.3d at 114 (narrowly construing _Pittsburgh Press_ to apply only if the consummation of the transaction proposed "would _necessarily_ constitute an illegal act").

The government relies on _United States v. White_, 610 F.3d 956, 960 (7th Cir. 2010), but that case is readily distinguished, as it involved both first party speech (pimp/prostitute) and the solicitation—neither of which are at issue here.  The government cites no authority for the proposition that a publisher can be prosecuted for publishing facially lawful speech that uses coded language to propose an illegal transaction—because there is none.  A prostitute or pimp can be prosecuted for using a facially lawful ad to facilitate their own prostitution crimes, since they would have _actual knowledge_ that the ad was intended to promote their criminal activity, but that does not

_____

[8]  The government argues that neither of these decisions involved coded speech, which is true, but also irrelevant.  Spear cited the cases for their holdings narrowly construing the _Pittsburgh Press_ exception and rejecting the expansive reading of that exception proposed by the government.  The differences in the underlying facts in each case has no bearing on the holdings construing _Pittsburgh Press_ nor on the strictures of the First Amendment when the government seeks to restrict or punish speech.

mean that a third-party publisher of the same ad is not protected by the First Amendment. *McKenna*, 881 F. Supp. 2d at 1279, 1281 ("The pimp that publishes the advertisement certainly 'knows' whether his offer is for sex, whether explicitly or implicitly. However, what does it mean for the website operator to 'know' that an advertisement 'implicitly' offers sex? … The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.").

Finally, to the extent the government's response might be read to suggest that the ads associated with Counts 2-18 initially proposed illegal transactions but that Backpage.com moderators altered the text of the ads so they no longer proposed illegal transactions, there was absolutely no evidence at trial to support that suggestion. Moreover, Ferrer admitted that Backpage.com moderators were not permitted to edit the text of ads after the fall of 2012, well before any of the charged ads were published.

RESPECTFULLY SUBMITTED this 27th day of December, 2023.

**FEDER LAW OFFICE, P.A.**

*s/ Bruce Feder*
Bruce Feder
*Knapp Counsel for Scott Spear*

**KESSLER LAW GROUP**

*s/ Eric Kessler*
Eric Kessler
*Attorneys for Scott Spear*

**BIRD MARELLA BOXER WOLPERT, NESSIM DROOKS LINCENBERG RHOW, PC**

*s/ Gary Lincenberg*
Gary Lincenberg
*Attorneys for Jed Brunst*

**LIPSITZ GREENE SCHIME CAMBRIA, LLP**

*s/ Paul Cambria*
Paul Cambria
*Attorneys for Michael Lacey*

9

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Email: Humetewa_chambers@azd.uscourts.gov

Andrew Stone Andrew.Stone@usdoj.gov
Daniel Boyle Daniel.Boyle2@usdoj.gov
Peter Kozinets Peter.Kozinets@usdoj.gov
Joseph Bozdech Joseph.Bozdech@usdoj.gov
Margaret Perlmeter Margaret.Perlmeter@usdoj.gov
Kevin Rapp Kevin.Rapp@usdoj.gov
Austin Berry berry2.austin@usdoj.gov
*Attorneys for United States of America*

By:  */s/ M. Evans*

# EXHIBIT K

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

A three-month Jury Trial in this matter commenced on August 29, 2023. (Doc. 1741). At the close of the Government's case, Defendants orally moved for a judgment of acquittal on all charges under Federal Rule of Criminal Procedure 29 ("Rule 29"). (Doc. 1903 at 19–93). The Court exercised its discretion under Rule 29(b) to reserve its ruling until after the Jury returned its verdict. (Doc. 1852).

On November 16, 2023, the Jury returned a verdict that found Defendant Michael Lacey ("Mr. Lacey") guilty of one count of International Concealment Money Laundering (Count 100)[1] and not guilty of one count of International Promotional Money Laundering (Count 63). (Doc. 1978). The Jury did not reach a verdict on the remaining counts against Mr. Lacey, which consisted of charges of Conspiracy to Commit Travel Act violations (Count 1); Travel Act violations (Counts 2–51); Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 69, 70, 81, 83–84, 86, 88–92 and 94–99). (*See* Docs. 1978; 1981).

---

[1] All "Count" references are to the Superseding Indictment (Doc. 230).

The Jury found Defendant Scott Spear ("Mr. Spear") guilty of Conspiracy to Commit Travel Act violations (Count 1); the Travel Act violations alleged in Counts 2–18; Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); and Transactional Money Laundering (Counts 71–78, 85, and 93). He was found not guilty as to the Travel Act violations alleged in Counts 19–51, and the money laundering counts alleged in Counts 63–68.

Defendant John Brunst ("Mr. Brunst") was found guilty of Conspiracy to Commit Travel Act violations (Count 1); Conspiracy to Commit Money Laundering (Count 52); domestic Concealment Money Laundering (Counts 53–62), International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 78–84, 86–93). He was found not guilty of all the Travel Act violations alleged in Counts 2–51, and of one count of International Promotional Money Laundering (Count 63).

Defendants Andrew Padilla ("Mr. Padilla") and Joye Vaught ("Ms. Vaught") were acquitted on all charges in the Superseding Indictment.[2]

Following the verdict, Messrs. Lacey, Brunst, and Spear (collectively, "Defendants") asked to supplement their oral Rule 29 Motions, which the Court granted. Those supplemental motions are now fully briefed.[3] Defendants have also jointly filed a Motion for New Trial (Doc. 2009) under Federal Rule of Criminal Procedure 33 ("Rule 33"), which is also fully briefed.[4]

The Court now issues its ruling.[5]

/ / /

---

[2] In light of their acquittal, Mr. Padilla and Ms. Vaught's oral Rule 29 motions are denied as moot.

[3] Each Defendant joined in their co-Defendant's Supplemental Motion. The briefing on Mr. Lacey's Supplemental Rule 29 Motion is at Docs. 2004; 2020; 2033; the briefing on Mr. Spear's Supplemental Rule 29 Motion is at Docs. 2006; 2021; 2030; and the briefing on Mr. Brunst's Supplemental Rule 29 Motion is at Docs. 2007; 2019; 2029.

[4] The Government's Response is at Doc. 2022 and the Defendants' Reply is at Doc. 2031.

[5] Defendants each request oral argument on their Motions. The Court finds that further oral argument will not aid the Court's decisional process. *See e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

# I.      BACKGROUND[6]

Considered in the light most favorable to the Government, its proof at trial established the following:

Launched in 2004 in Phoenix, Arizona, Backpage.com ("Backpage") was an online website offering classified ads for a variety of goods and services. (Trial Tr., Doc. 1786 at 6:6–11). Defendants owned Backpage with Mr. James Larkin ("Mr. Larkin")[7] from its inception in 2004 until the website was sold to Mr. Carl Ferrer ("Mr. Ferrer") in April of 2015. (Trial Tr., Doc. 1786 at 11:23–12:5; 78:25–79:1; Trial Ex. 5). Defendants had leadership roles in Backpage's parent company Village Voice Media ("Village Voice") during that time: Mr. Lacey served as Chief Editorial Officer; Mr. Brunst served as Chief Financial Officer ("CFO"); and Mr. Spear was an Executive Vice President ("VP"). (Trial Ex. 5). Mr. Larkin was the Chief Executive Officer ("CEO"). (*Id.*) From 2004 to 2018, Mr. Ferrer was a project manager at Backpage, then became a sales and marketing director of Backpage. (Trial Tr., Doc. 1786 at 5:25–6:1; 16:4–9). Mr. Spear was Mr. Ferrer's immediate supervisor. (*Id.* at 10:5–20). Mr. Ferrer testified that Messrs. Spear, Larkin and Brunst were his superiors. (*Id.* at 35).

Mr. Ferrer testified that Backpage was started as a competitor to Craigslist, an online advertising site that "was eroding into the revenue of [Village Voice] newspapers." (Trial Tr., Doc. 1786 at 25:24–25). To generate revenue, Backpage initially decided that it would only charge for "Adult" ads. (*Id.* at 26:10–11). The Adult section on Backpage contained the categories "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web." (*Id.* at 6:18–20). Mr. Ferrer characterized the ads in the Female Escort section of Backpage between 2004 and 2009 as prostitution ads. (*Id.* at 7:10–12). These types of ads were profitable because escorts "needed repeat business" so they would often post their ads every day. (Trial Tr., Doc. 1900 at 96:1–15;

---

[6] The Court's review of the trial evidence was significantly hampered by the fact that neither the Government nor Defendants provided specific citations to the Court's docket in their briefings.

[7] Mr. Larkin's death preceded the commencement of trial.

- 3 -

1    95:4–96:19).

2         Messrs. Spear and Ferrer soon realized that Backpage's "Female Escort" section

3    was by far the most profitable section, and so they focused Backpage's growth efforts

4    accordingly.  (Trial Tr., Doc. 1786 at 90:12–91:22; Trial Exs. 1056, 1056a, 1057; Trial Tr.,

5    Doc. 1900 at 96:1–15).   After Craigslist closed its Adult section in 2010, Backpage

6    experienced   exponential   growth   in   "revenue   from   online   prostitution   ads."

7    (Trial Tr., Doc. 1793 at 35:23–36:9).   From 2010 through 2012, Backpage's Adult section

8    yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections, i.e., a

9    94.2% difference in profits.  (Trial Ex. 1480).

10        Mr. Ferrer testified at length about Defendants' involvement in the marketing

11   strategies used to grow and/or maintain Backpage's Female Escort section; Defendants'

12   efforts  to  fend  off  outside  groups'  attempts  to  shut  Backpage  down;  as  well  as  the

13   Defendants' knowledge of Backpage's business practices, Backpage's banking issues, and

14   the sale of Backpage to Mr. Ferrer in 2015.

15        **A.    "Content Aggregation"**

16        Mr.  Ferrer  stated  that  Mr.  Spear  directed  the  roll-out  of  Backpage's  "content

17   aggregation" marketing strategy in the early years of Backpage.  (Trial Tr., Doc. 1786 at

18   26:16–24).  "Content aggregation" was considered the "internal code for stealing ads from

19   Craigslist"—and  more  specifically,  primarily  stealing  ads  from  Craiglist's  "Erotic

20   Services"  section.   (*Id.*)   This strategy required staff to identify an Adult escort ad on

21   Craigslist and repost it on Backpage in hopes that the original posters and any responding

22   users would start paying to post ads on Backpage instead of Craigslist.  (*Id.* at 27:3–14).

23   Mr. Spear and Mr. Ferrer presented the idea to Mr. Brunst as a strategy to meet growth

24   goals in 2009 because Mr. Brunst's approval was needed to fund the staffing needed to

25   execute this strategy.  (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1786 at 30:6–

26   12 and 89:1-90:1–7 (discussing plan to "seed the site, the Female Escorts category, with

27   200 independent escorts")).  Mr. Brunst approved the budget plan and Mr. Spear authorized

28   Mr. Ferrer to use the strategy "in every major metro market in the U.S."  (Trial Tr., Doc.

1   1786 at 29:24–25; Trial Tr., Doc. 1791 at 16:18–20:9; Trial Exs. 10 and 10a).  Around

2   2010, when Craigslist dropped its Adult section, this type of content aggregation strategy

3   was no longer necessary because Backpage then had "the monopoly" on Adult ads.  (Trial

4   Tr., Doc. 1786 at 20–23).

5   **B.      Backpage's Relationship with "The Erotic Review"**

6   The "secret sauce" to increasing Backpage's adult ad revenue, as characterized by

7   Mr. Ferrer, was a hyperlink exchange agreement Backpage had with The Erotic Review

8   ("TER"), a prostitution review website described as "Yelp for prostitution."  (Trial Tr.,

9   Doc. 1786 at 7) ("Johns who frequent prostitutes . . . post reviews in TER").   Starting

10  around 2006 or 2007, when a person posted a review of their experience on TER, TER

11  would include a link to the ad on Backpage, and vice versa.  (Trial Tr., Doc. 1786 at 32:22–

12  33:7; 39:12–15; Trial Tr., Doc. 1853 at 134:20–136:9).   Under increasing pressure from

13  outside groups to remove links to the TER, Backpage ceased including the hyperlinks in

14  their Adult ads in 2011 or 2012, but still allowed posters to include their TER "ID number."

15  (Trial Tr., Doc. 1786 at 39:22–24; 40:7–10).   TER ID numbers remained on Backpage ads

16  through 2017.  (*Id.* at 40:15).  The TER relationship with Backpage also included a "banner

17  ad exchange program" where each website featured banner-like ads for the other on their

18  respective websites.  (*Id.* at 35:18–37:2).  For years, Backpage paid TER $4,000 per month

19  as part of this relationship.  (*Id.*)

20  There was evidence showing Messrs. Spear and Brunst were aware of the nature

21  and importance of Backpage's relationship with TER.  Mr. Ferrer discussed the importance

22  of TER referral traffic with Messrs. Spear and Brunst.  (Trial Tr., Doc. 1786 at 41:1–6).

23  Mr. Spear was an author of the 2008 budget plan that was presented to Messrs. Larkin and

24  Brunst detailing the TER partnership.  That plan noted that Backpage had "struck a deal

25  with TheEroticReview.com, TER, with reciprocal links it created huge brand awareness in

26  this niche industry and increased page views from TER by 120,000 per day."  (Trial Ex.

27  23 at 3; Trial Tr., Doc. 1791 at 70:10–73:20; Trial Tr., Doc. 1972 at 43:12–44:1; Trial Exs.

28  19, 20).  Mr. Ferrer also submitted TER invoices to Messrs. Spear and Brunst for approval.

(Trial Tr., Doc. 1792 at 27:17–28:6, 35:11–12).  Mr. Spear signed the checks for these payments.  (Trial Tr., Doc. 1853 at 142:13–143:5).  Mr. Spear closely tracked the relationship with TER and according to Mr. Ferrer, Mr. Spear understood that "the traffic from The Erotic Review was very, very important for Backpage's success."  (Trial Tr., Doc. 1792 at 65:5–24, 84:24–85:4).

Mr. Ferrer also testified that Messrs. Spear, Brunst, and Larkin regularly received Google Analytics reports showing TER as the number one source of non-search engine referrals to Backpage.  (Trial Tr., Doc. 1786 at 35:6–12, 41:1–7; Trial Tr., Doc. 1791 at 21:21–27:5; Trial Exs. 19, 986, 986a, 1151, 1151a, 1919, 1919a, 1924, 1926).

### C.    "Super Posters"

Backpage also developed an affiliate program with what Mr. Ferrer described as bulk prostitution advertisers, or "super posters."  These super posters would have "thousands of prostitution ads that they could bring to the site."  (Trial Tr., Doc. 1786 at 41:8–19).  Messrs. Larkin and Spear sent Mr. Ferrer to New York City to meet with several of these posters in person.  (*Id.* at 41:20–42:23).  In exchange for posting their ads on Backpage, Backpage gave these super posters VIP treatment, including access to managers like Mr. Ferrer who could provide them advice on how to tailor their ads for Backpage. (Trial Tr., Doc. 1786 at 46:23–47:4).

### D.    Efforts to Moderate Explicit Ad Content

Mr. Ferrer also testified extensively about Backpage's efforts to moderate ads that otherwise contained sexual content or express offers for prostitution.  He told the Jury that these efforts started as early as 2006 with a PowerPoint prepared by Mr. Spear that aimed at getting rid of ad images depicting sex acts, like "a woman giving a man oral sex."  (Trial Tr., Doc. 1786 at 58:2–19 (stating that Mr. Spear coined a standard of "between Hustler and Playboy . . .  [t]hat meant sex act pics needed to go and you could still have full nudity but couldn't have extreme closeups of genitalia"), 65:1).  The removal of such images, however, did not mean the whole ad was removed or that the user was blocked from posting on Backpage.  (*Id.* at 59:3–6, 60:7, 66:7–10).  "[T]he moderation department's main

priority was to not ban prostitution advertisers but to provide tools and mechanisms to coach them. It was about growing revenue and not removing illegal content." (Trial Tr., Doc. 1824 at 25:18–21). Mr. Spear would direct Mr. Ferrer to scrub ads to edit and remove sex act images and sex act language. (Trial Tr., Doc. 1792 at 9–11). Mr. Ferrer told TER that Mr. Spear wanted the ads to be "less escort-ish", meaning that if the ads looked less like prostitution they could maintain credibility. (Trial Tr., Doc. 1792 at 60–61; Trial Ex. 574). Mr. Ferrer explained that "[w]e wanted to keep that veneer of credibility of being like a Craigslist even though we were entirely -- almost entirely prostitution head-based revenue." (Trial Tr., Doc. 1792 at 60:25–61:2).

Backpage also began sanitizing the site of certain "terms [that] made the ads more obvious prostitution[.]" (Trial Tr., Doc. 1786 at 60:8–10, 60:15–17). For example, the terms "incall and outcall" were terms associated with prostitution and indicated whether the prostitute would come to the customer, or the customer would go to the prostitute. (Trial Tr., Doc. 1923 at 60). Mr. Ferrer testified that they "started removing those words from the ad but not deleting the ad." (Id. at 60:17–18). Mr. Spear was responsible for Backpage's terms of use, which he continually modified. (Trial Tr., Doc. 1791 at 14:15–21). He also continued to approve changes to moderation guidelines. (Trial Tr., Doc. 1808 at 92:10–19; Trial Ex. 1612b; Trial Tr., Doc. 1810 at 98:14–19; Trial Exs. 725, 725b). Mr. Ferrer said Mr. Spear approved changes to the terms and images that were allowed and sent Mr. Ferrer specific emails with ads "that need to be cleaned up, edited." (Trial Tr., Doc. 1791 at 92:71–0; Trial Tr., Doc. 1792 at 10:2–8). Messrs. Spear and Ferrer also had knowledge of specific terms that needed to be changed, for example, changing "Greek" to "G-R-3-3-K" (Trial Tr., Doc. 1972 at 85–88; Trial Exs. 585, 585a); "hooker" to "Female Escort" (Trial Tr., Doc. 1786 at 90–91; Trial Exs. 1056 and 1056a); and using the term "roses" for "cash" (Trial Tr., Doc. 1793 at 13–14). Mr. Ferrer would alert Mr. Spear when local papers raised concerns about terms used in Backpage ads, or when advertisers complained that their ads were being removed for including coded terms. (Trial Tr., Doc. 1791 at 27–35; Trial Ex. 2). Mr. Spear was alerted to these issues because he was Mr. Ferrer's boss and had the ability to resolve the conflict. (Id.)

Mr. Ferrer testified that ad content moderation became increasingly challenging as they had to clean up ads in various markets, like South Carolina, where they were under scrutiny. (Trial Tr., Doc. 1792 at 73–75; Trial Ex. 579). Ultimately, Mr. Spear decided to hire a company called El Camino to assist with ad clean-up efforts. (Trial Tr., Doc. 1793 at 86–87). Messrs. Spear, Larkin, and Brunst approved the needed budget increases for content moderation, with Mr. Spear responding to one such request with: "Approved. Go get em." (Trial Tr., Doc. 1792 at 106:21–107:2; Trial Tr., Doc. 1793 at 31:13). Near the end of 2012, Messrs. Larkin, Brunst, and Spear asked Mr. Ferrer to provide a comparison of revenue growth by sections from October 2010 to November 2012. (Trial Tr., Doc. 1811 at 64:6–66:1; Trial Exs. 355, 355b). The comparison showed huge growth in Adult compared to all other sections, which Mr. Ferrer attributed to Backpage's moderation strategy. (Trial Tr., Doc. 1811 at 65:19–20; 65:23–66:1).

In 2012, Backpage hired attorney Elizabeth McDougall to supervise content moderation of Backpage ads.[8] Despite her role, Mr. Ferrer said "she was sidelined a good portion" of the time. (Trial Tr., Doc. 1831 at 59:17–60:7; 60:9–10).

### E.    Responses to Public and Law Enforcement Concerns

Following the shutdown of the Adult escort ads on Craigslist and subsequent migration of ads to Backpage in 2010 and after several State Attorneys Generals ("AGs") began criticizing Backpage's "rampant" prostitution advertising, Backpage started receiving thousands of prostitution investigation subpoenas. (*See, e.g.*, Trial Tr., Doc. 1791 at 62:16–25; Trial Tr., Doc. 1786 at 47:9–49:12; Trial Ex. 52). Messrs. Spear, Ferrer, and Larkin had "watched Craigslist be attacked by the Attorneys General and were very concerned that [they were] next[.]" (Trial Tr., Doc. 1786 at 48:18–25, 49:7–15).

The number of subpoenas became so plentiful that Messrs. Spear and Brunst approved hiring staff to respond to them. (Trial Tr., Doc. 1791 at 62:11–15, 63:11–21, 65:4–9). Mr. Lacey became aware that Backpage was receiving such subpoenas and in April 2010, he asked Mr. Spear whether there was evidence of child trafficking on the site.

---

[8] Defendants refused to waive the attorney-client privilege regarding their communications with Ms. McDougall.

1    Mr. Spear replied that: "[w]e have had subpoenas that deal with this exact issue. . . . We

2    get a ton of subpoenas that we comply with on a daily basis."  (Trial Ex. 804).

3         Mr. Ferrer testified that they discussed a "slow dance strategy with the Attorney

4    Generals" that Mr. Ferrer described as giving the AGs "very, very little but creat[ing] the

5    impression that we're doing something," without harming revenue.  (Trial Tr., Doc. 1792

6    at 93:9–22, 94:1–4).  To gain the AGs' "blessing," Messrs. Larkin and Spear directed Mr.

7    Ferrer to "not throw the baby out with the bathwater" and "implement the changes

8    gradually, [so] we won't lose revenue[.]"  (Trial Tr., Doc. 1795 at 25:20–26:7; Trial Ex.

9    1021; Trial Tr., Doc. 1809 at 30:3–4).  Mr. Ferrer continued to meet with Messrs. Larkin

10   and Spear about these changes, communicated the results to staff, and solicited further

11   changes "to get approved by [Mr. Spear]."  (Trial Tr., Doc. 1808 at 20:11–14, 22:11–12;

12   Trial Exs. 73, 610).

13        In late 2010, Backpage learned CNN was planning an exposé on Backpage.  (Trial

14   Tr., Doc. 1793 at 80:20–21).  It showed CNN reporter Amber Lyon posting an ad of herself

15   on Backpage's Escorts section, using text from an old Backpage ad offering a 12-year-old

16   girl for sex.  (Trial Ex. 1052b1).  When Lyon posted her ad, her phone immediately

17   "start[ed] ringing off the hook." (Trial Tr., Doc. 1808 at 59:16–23).  Messrs. Lacey, Spear,

18   and Brunst tried to stop rebroadcasts of the story.  (*Id.* at 60:10–62:13).  Backpage

19   management watched and discussed the CNN report in early 2011.  (*Id.* at 43:15–44:7).

20        Following the broadcast, Backpage faced more pressure to remove any references

21   to TER.  (Trial Tr., Doc. 1808 at 82:7–16).  By January 2011, Messrs. Spear and Ferrer

22   agreed that moderators should remove "TER links in ads," though they still allowed "users

23   to put [in] TER IDs (just no live links)."  (Trial Tr., Doc. 1808 at 24:10–19; 82; Trial. Exs.

24   73, 647).  Mr. Ferrer testified that removing the links would not hurt revenue because the

25   johns responding to Backpage prostitution ads knew "that when it says 'highly reviewed'

26   and then an ID number that [TER] is the place to go" to look for the advertiser's review.

27   (Trial Tr., Doc. 1808 at 25:12–19).

28        Backpage also hired internet safety experts, who recommended screening ads

1   bought with prepaid cards because this was an "indicator [of] a potential trafficking ad."

2   (Trial Tr., Doc. 1809 at 36:2–8).  Messrs. Spear, Larkin, and Ferrer rejected that change,

3   because "up to 70 percent of our transactions came from prepaid cards[.]"  (*Id.* at 36:9–

4   19).  They also ignored recommendations to completely remove ads visited from TER.  (*Id.*

5   at 37:13–38:11).

6       **F.**    **Backpage's Banking Problems**

7         By 2012, U.S. financial institutions were dropping Backpage as a customer due to

8   its reputation for hosting ads that were resulting in prostitution and human trafficking.

9   (Trial Ex. 2042).  In 2013, Backpage was dropped by its U.S.-based credit card processor,

10   Litle.  (Trial Tr., Doc. 1786 at 69:17–70:8).  That same year, Chase Bank informed

11   Backpage that it "was no longer accepting transactions from Backpage.com, due to their

12   involvement in human trafficking."  (Trial Ex. 173).  The banks' refusal to do business

13   with Backpage meant Backpage had to expend tremendous efforts in finding ways for users

14   to pay for ads.  (Trial Tr., Doc. 1812 at 29:7–16).  One example that proved successful was

15   Backpage's acceptance of the cash for credit Vanilla Visa card which enabled anonymous

16   payment for ads.  (Trial Tr., Doc 1786 at 75–76).

17         Mr. Ferrer testified that he worked closely with Messrs. Brunst, Spear, and Larkin

18   during this time "to secure credit card processing from Europe."  (Trial Tr., Doc. 1812 at

19   14:22–15:7).  For example, after Chase Bank stopped accepting Backpage transactions,

20   Backpage directed Chase credit card purchasers to e-Merchant Pay ("EMP"), a European

21   processor that would "use a different billing descriptor that won't say Backpage.com on

22   it." (Trial Tr., Doc. 1812 at 21:7–22; Trial Exs. 173; 1110).  In September 2013, Mr. Ferrer

23   wrote Messrs. Brunst and Spear about using Netcash, a Cyprus-based credit card processor.

24   (Trial Tr., Doc. 1812 at 13:3–8; Trial Ex. 1092).  In October 2013, Mr. Ferrer exchanged

25   emails with Mr. Brunst, copying Messrs. Larkin and Spear, about getting the CCBill

26   contract signed, and Mr. Ferrer's discussions with "JetPay" regarding other banking

27   solutions that would enable users to pay for Backpage ads.  (Trial Tr., Doc. 1812 at 31:12–

28   37:23; Trial Ex. 752).

Backpage also sought the assistance of an outside consultant.  In November 2013, Mr. Ferrer sent Messrs. Larkin, Brunst, and Spear the consultant's recommendations on credit card transactions.  (Trial Tr., Doc. 1812 at 37:24–40:13; Trial Ex. 175).  Those recommendations included using names, internet addresses, and billing descriptors that would not include the name "Backpage."  (Trial Tr., Doc. 1812 at 38:24–42:22; Trial Ex. 175).  The recommendations also included "load balancing across many banks with different billing descriptors." (*Id.* at 38:10–23; Trial Ex. 175).  Mr. Ferrer explained that this meant "adding a lot of banks" and "distributing . . . transactions" to stay below thresholds that would otherwise trigger reviews by Mastercard and Visa.  (Trial Tr., Doc. 1812 at 38:10–23).  In implementing these recommendations, Backpage formed an entity called Classified Solutions in England that could do credit card processing with EMP in Bulgaria; it then spread payments from EMP across other banks including Borgun in Iceland and Bank Frick in Liechtenstein.  (*Id.* at 43:18–44:6; Trial Tr., Doc. 1814 at 76:3; Trial Ex. 6189).  Mr. Brunst, who continued to serve as Backpage's CFO, avoided using a "backpage.com" email address because of the "reputational risk" of being associated with Backpage.  (Trial Tr., Doc. 1812 at 14:2–9; 13:9–14:1).  Indeed, when a Backpage employee asked Mr. Brunst whether they could replace their "backpage.com" email addresses with "websitetechnologies.com," Mr. Brunst replied: "We need to think this thru or all the work to separate it from BP will be lost."  (Trial Ex. 177).

Backpage executives also "opened up holding companies with innocuous names like Classified Solutions, Payment Solutions, just general-sounding companies" that did not say Backpage.  (Trial Tr., Doc. 1812 at 15:12–23; Trial Tr., Doc. 1853 at 74:13–14).  Mr. Ferrer testified that Mr. Brunst created a separate "shell company" called Website Technologies, for the purpose of opening bank accounts under a name that was not Backpage.  (Trial Tr., Doc. 1814 at 89:8–10; *see also* Trial Tr., Doc. 1812 at 28:19–26 ("We needed a name other than Backpage . . . . Brunst asked me for names and I suggested Website Technologies and that's the name we ended up using."); Trial Tr., Doc. 1812 at 71:17–72:4 ("[Brunst] set up Website Technologies to handle payroll, 401(k) and to do

leases so he wants to ensure that its reputation is protected, not affiliated with Backpage.");
Trial Tr., Doc. 1814 at 89:8–10 ("Posting Solutions was another shell company similar to,
like, Website Technologies, very generic sounding company that we could open bank
accounts with."). The money that flowed through Website Technologies, which Mr. Ferrer
described as "the same company" as Backpage, derived "from postings in the Female
Escorts section primarily." (Trial Tr., Doc. 1814 at 90:16–22; 11:23–12:4; *see also* Trial
Tr., Doc. 1923 at 138 (Mr. Thai confirming that Website Technologies held Backpage.com
revenue)).

When US Bank gave notice in April 2014 that it was dropping Backpage, Mr. Brunst
informed Messrs. Spear, Ferrer, and others that Backpage would be moving "all banking
under Website Technologies at BMO." (Trial Tr., Doc. 1812 at 72:5–73:4; Trial Exs. 178,
178a). That same month, Mr. Ferrer emailed Messrs. Brunst and Spear to tell them that
Chase had "figured . . . out" that Backpage had temporarily succeeded in allowing
customers to use Chase credit cards for adult ads by using "a different billing descriptor,"
"so we just have to change again." (Trial Ex. 1120; Trial Tr., Doc. 1812 at 90:17–24,
91:25–92:4).

### G.     Sale of Backpage to Mr. Ferrer in 2015

As early as 2011, the Backpage owners were looking to sell the website, efforts that
were led by Mr. Brunst. (Trial Tr., Doc. 1810 at 16:4–16:6, 17:11–18:2). Mr. Brunst asked
Mr. Ferrer to help create a PowerPoint presentation to give to Backpage's potential buyers.
(Trial Tr., Doc. 1810 at 15:17–16:6). That PowerPoint included a slide on revenue, which
showed that nearly 80% of Backpage's revenue derived from the Female Escorts section
and over 94% of the revenue was generated from the Adult category. (Trial Exs. 120 at
15, 17). Mr. Ferrer testified that "[i]n order to sell the site, we couldn't sell it as a
prostitution review site so we had to make it look and sound like a general classified site."
(Trial Tr., Doc. 1810 at 21:23–25). The PowerPoint presentation Brunst created and
presented to buyers contained the statement that: "[m]aintaining a vibrant general purpose
classifieds site strengthens Backpage's defensible market position in the Adult category:

1   Creates mainstream environment for site participants and allows 'plausible deniability' for

2   exposure." (Trial Ex. 120 at 17).  The Defendants discussed not sharing information of the

3   "prostitution ad marketing activities" with potential buyers.  (Trial Tr. Doc. 1786 at 76–

4   77).  These early attempts to sell Backpage were ultimately unsuccessful.

5          Mr. Ferrer testified that Backpage revenue from 2014 through 2015 was annually

6   around $150 to $160 million.  (Trial Tr., Doc. 1786 at 80:10–17).  In April 2015, Messrs.

7   Lacey, Larkin, Brunst, and Spear sold Backpage to Mr. Ferrer for approximately $600

8   million.  (Trial Tr., Doc. 1814 at 15:21; Trial Tr., Doc. 1923 at 130:19–21).  The sale

9   consisted of two loan agreements: a larger loan representing the sale of the U.S. portion of

10  Backpage (Trial Ex. 5427) and a smaller loan representing the sale of the foreign portion

11  of Backpage (Trial Ex. 5459).  Cereus Properties, a company owned by Messrs. Lacey,

12  Larkin, Brunst, and Spear, collected the interest and debt payments from the $600 million

13  loan. (Trial Tr., Doc. 1814 at 90:24–91:3).  Mr. Ferrer testified that the source of the money

14  that went to Cereus Properties "was the prostitution ads posted on Backpage."  (*Id.* at

15  91:16–17).

16         Mr. Ferrer testified that the sale of Backpage was intended to distance the

17  Defendants from Backpage's business of selling illegal ads for prostitution.  But Mr. Ferrer

18  also testified that even after the sale, both Messrs. Brunst and Spear stayed involved in the

19  business of Backpage.  For example, after Visa, Mastercard, and American Express

20  dropped Backpage in the middle of 2015, Mr. Brunst assisted Backpage in trying to obtain

21  credit card processing.  (Trial Tr., Doc. 1786 at 81:7–16).  Mr. Ferrer testified that Mr.

22  Brunst "was involved in the financial problems the company was having and wanted to

23  understand the revenue that was coming in and what our options were for banking and

24  when we might, you know, get the reserves coming from these other credit card

25  processors[.]" (*Id.* at 81:2–82:3).  Either Mr. Ferrer or Backpage's CFO had contact with

26  Mr. Brunst "[a] minimum of a few times a week" from July 2015 going forward.  (Trial

27  Tr., Doc. 1786 at 82:4–8).  Mr. Brunst also helped find alternative methods for receiving

28  money from posters on Backpage, including receiving payment by cryptocurrency.  (Trial

Ex. 897; Trial Tr., Doc. 1814 at 78:19–79:19; 93:24–94:20).   Evidence showed that in January 2015, revenue from cryptocurrency amounted to $35,540.68, but by May 2016, it had reached a high of $3,564,376.24.  (Trial Ex. 1545).

## H.   Money Transfers and Transactions

Starting in 2015, the year that Backpage was sold to Mr. Ferrer, revenue from Backpage was split between Backpage, Website Technologies, and Ad Tech BV, a company registered in the Netherlands.  (Trial Tr. Doc. 1923 at 129–30; Trial Ex. 1481). Following the sale, and until the Backpage website was shut down by the federal government in 2018, revenue from Backpage was only sent to and divided between Website Technologies and Ad Tech BV.  (Trial Tr., Doc. 1923 at 131:23–132:1).

Mr. Ferrer testified that following the 2015 sale, Backpage proceeds going to Website Technologies derived "from postings in the Female Escort section primarily." (Trial Tr., Doc. 1814 at 90:20–22).  The Government's financial expert Quoc Thai ("Mr. Thai") described how money "relating to funds from Backpage.com and through the various entities ultimately land[ed] in the accounts of the defendants."  (Trial Tr., Doc. 1923 at 135:6-8).  Mr. Thai did not provide testimony as to the purpose of the transfers. His testimony, along with Mr. Ferrer's, formed much of the basis of the money laundering counts against the Defendants.

### 1.   18 U.S.C. § 1956 Charges: Counts 53–62 and 64–68

Mr. Thai testified that the transfers in Counts 53–62 for concealment money laundering against Messrs. Lacey, Brunst, and Spear were made from a Website Technologies bank account to a bank account held by Cereus Properties at Arizona Bank & Trust.  (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479).  He said the transfers in these Counts occurred between the three-month period of May 18, 2016, and August 16, 2016, and totaled close to $17 million.  (*Id.*)  Cereus Properties "collected the interest and debt payments from the $600 million loan" from the sale of Backpage.  (Trial Tr., Doc. 1814 at 91:2–3).  Mr. Ferrer testified that the source of the monies paid to Cereus Properties "was

the prostitution ads posted on Backpage and/or Cracker.[9]" (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–17). Mr. Thai testified that between December 31, 2015, to August 31, 2016, Website Technologies transferred a total of $39,249,211.37 to Cereus Properties. (Trial Tr., Doc. 1923 at 148:22; Trial Ex. 1691).

Mr. Thai testified that the transfers in Counts 64–68 against Messrs. Lacey and Brunst for international promotional money laundering were made from a Netherlands bank account of Ad Tech B.V. to a bank account held by Cereus Properties. (Trial Tr., Doc. 1928 at 150–51; Trial Ex. 1479). These transfers occurred between August 5, 2016, and November 15, 2016, and totaled approximately $11.3 million. (*Id.*)

### 2. 18 U.S.C. § 1957 Charges: Counts 69–99

#### a. Camarillo Holdings Transfers

Counts 69–77, and 85 charge Defendants with transactional money laundering related to transfers made from an entity called Camarillo Holdings, LLC ("Camarillo Holdings"). Mr. Thai testified that Camarillo Holdings was an entity owed by Defendants that would receive funds derived from Backpage to pay "the various owners and the various payroll responsibilities of, you know, the Backpage.com as a whole." (Trial Tr., Doc. 1923 at 153:13–18; Trial Tr., Doc. 1898 at 15:2–3). Mr. Brunst was the CFO of Camarillo Holdings. (*Id.* at 153:23). The evidence showed that between February 4 and 25, 2013, $6.5 million was transferred from a US Bank account held by Backpage.com to a BMO Harris Bank account held by Camarillo Holdings. (Trial Ex. 1479). Mr. Thai stated that between February 4, 2013, and June 9, 2014, transfers from this Backpage.com account to Camarillo Holdings amounted to approximately $99 million. (Trial Tr., Doc. 1898 at 12:6–7). All of these funds were Backpage proceeds. (*Id.* at 12:8–9).

The specific transfers at issue in Counts 69–77, and 85 are transfers Messrs. Lacey and Spear made out of their personal bank accounts after receiving deposits from Camarillo Holdings.

---

[9] Mr. Ferrer testified that Cracker was a classified Australian site "that like Backpage, was predominantly prostitution." (Trial Tr., Doc. 1813 at 24–25).

Counts 69 and 70 are against Messrs. Lacey and Brunst (presumedly because there was evidence that Mr. Brunst was CFO of Camarillo Holdings and a signor on that entity's bank account). Trial evidence showed that on May 17, 2013, and August 30, 2013, Camarillo Holdings transferred $10,194.87 to Mr. Lacey's Bank of America account and $3,0171,687.50 to Mr. Lacey's BMO Harris Bank account, respectively. (Trial Ex. 1479). Mr. Lacey subsequently transferred a check in the amount of $30,000.00 out of his Bank of America account and a cashier's check in the amount of $62,491.47 from his BMO Harris account to Stewart Title. (Trial Ex. 1479). Mr. Lacey's transfers to Stewart Title are the bases for Counts 69 and 70.

Counts 71–77 and 85 are against Mr. Spear. Trial evidence showed that between April 12, 2013, and June 11, 2014, in over 13 transactions, Camarillo Holdings transferred $2,672,770.54 to Spear's account at National Bank of Arizona. (Trial Ex. 1479). Mr. Thai testified that between April 12, 2013, to November 2, 2015, Camarillo Holdings transferred a total of $6,279,188.53 to Spear's account at National Bank of America. (Trial Tr., Doc. 1898 at 16–17; Trial Ex. 1689). The transfers forming the basis of Counts 71–77 were made between June 11, 2014, and December 1, 2015, out of Mr. Spear's National Bank of Arizona account. Count 71 is a $300,000.00 transfer to the Scott G. Spear & Ellona Spear Family Trust; Count 72 is a $200,000.00 transfer to Scott G. Spear TD Ameritrade; Count 73 is a $1,000,000.00 transfer to UBS Financial Services; Count 74 is a $250,000.00 transfer to Lincoln National Life; Count 75 is a $50,000.00 transfer to Industrial Property Trust; Count 76 is a $300,000.00 transfer to Ally Bank; and Count 77 is a $200,000.00 transfer to Wells Fargo Advisors. (Trial Ex. 1479). Count 85 relates to a July 22, 2016, $50,000.00 transfer from Mr. Spear's National Bank of Arizona account to a Strategic Storage Trust II, Inc. (*Id.*)

### b. Cereus Properties Transfers

Counts 78–84 and 85–93 charge Messrs. Lacey, Brunst, and Spear with transactional money laundering related to transfers made from Cereus Properties. Mr. Brunst was Cereus Properties' CFO and was a signatory on its bank accounts. (Trial Tr.,

1    Doc. 1898 at 20:8–25; 21:1–4).  Mr. Thai testified that Cereus Properties obtained all of its

2    funds from Website Technologies, which in turn obtained all of its funds from Backpage

3    proceeds.  (*Id.* at 19:22–25).

4            Counts 78–84 and 85–93 stem from transfers Cereus Properties made to bank

5    accounts owned by Defendants and Mr. Larkin.  Mr. Thai testified that between January

6    11, 2016, and January 4, 2017, Cereus Properties transferred a total of $22,941,500.83 to

7    Mr. Spear's National Bank of America account.  (Trial Ex. 1690; Trial Tr., Doc. 1898 at

8    19:13–15).  His review also showed that during the same period, Cereus Properties

9    transferred a total of $30,353,596.20 to Mr. Lacey's accounts at Arizona Bank and Trust.

10   (Trial Ex. 1693; Trial Tr. Doc. 1898 at 23; Trial Ex. 1479).

11           Counts 78 and 93 are against Messrs. Spear and Brunst.  Mr. Thai testified that

12   Cereus Properties transferred $133,045.00 to Spear's National Bank of America account

13   on January 11, 2016 (Count 78), and another $141,444.00 on October 6, 2016 (Count 93).

14   (Trial Exs. 1479, 1690; Trial Tr., Doc. 1898 at 20; 29:6–9).

15           Counts 79, 80, 82, 87 are against Mr. Brunst.  Evidence showed that in the first

16   month of 2016, Website Technologies had transferred $3,126,033.07 to Cereus Properties.

17   (Trial Exs. 1479; 1691; Trial Tr., Doc. 1898 at 21:8).  On January 26, 2016, Cereus

18   Properties transferred $101,974.00 to Mr. Brunst's account at Wells Fargo Bank (Count

19   79) and on April 1, 2016, it transferred another $220,944.00 ) (Count 82).  (Trial Ex. 1479;

20   Trial Tr., Doc. 1898 at 21:7–10).  Counts 80 and 87 relate to a $1,507,944.00 transfer on

21   February 3, 2016, and a $1,206,356.00 transfer on October 6, 2016, from Cereus Properties

22   to the accounts of Mr. Larkin.  (Trial Ex. 1479).

23           Counts 81, 86, 88, 89, 90, 91, and 92 are against Messrs. Lacey and Brunst.  They

24   reflect transfers from Cereus Properties to various accounts of Mr. Lacey at Bank of

25   America, Wells Fargo, and Arizona Bank and Trust between March 1, 2016, and October

26   6, 2016.  (Trial Ex. 1479; Trial Tr. Doc. 1898 at 22; 27–29).

27           Counts 83 and 84 are against Messrs. Lacey and Brunst.  They reflect transfers from

28   Mr. Lacey's Arizona Bank and Trust account to Fidelity National Title Company.  (Trial

1   Ex. 1479).  The first transfer on June 27, 2016, for $397,500.00, was earnest money on a

2   property Mr. Lacey purchased in San Francisco.  (Trial Ex. 1479; Trial Tr., Doc. 1898 at

3   25).  The second transfer on July 20, 2016, for $12,859,152.57, was the balance on the

4   property.  (*Id.*)  Mr. Thai testified that these funds, like others, traced back to transfers that

5   Website Technologies made to Cereus Properties, and Cereus Properties subsequently

6   transferred to Mr. Lacey.  (Trial Tr., Doc. 1898 at 26:3–5).

7           **3.    18 U.S.C. §§ 1956 and 1957 Charges Against Mr. Lacey:**

8                   **Counts 94–100**

9           Counts 94–99 consist of five wire transfers made on January 29, 2016, each in the

10  amount of $3.3 million, from Mr. Lacey's five annuity trust accounts at Arizona Bank and

11  Trust to an IOLTA[10] account held by Mr. Lacey's attorney's firm at Johnson Bank.  On

12  January 3, 2017, Mr. Lacey, through his attorney, transferred $16.5 million from the

13  IOLTA account at Arizona Johnson Bank to a Primus Trust Company in Hungary for the

14  benefit of Mr. Lacey at a Hungarian bank, K& H Bank.  (Trial Tr., Doc. 1898 at 30:10–

15  12).  This transfer forms the basis of Count 100.

16  **II.    DEFENDANTS' RULE 29 MOTIONS**

17          Rule 29 obligates the Court to "enter a judgment of acquittal of any offense for

18  which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c).

19  However, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the

20  evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

21  "When evaluating a sufficiency challenge, 'the relevant question is whether, after viewing

22  the evidence in the light most favorable to the prosecution, any rational trier of fact could

23  have found the essential elements of the crime beyond a reasonable doubt.'" *United States*

24  *v. Singh*, 995 F.3d 1069, 1075 (9th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307,

25  319 (1979)).  In so considering, the court "must bear in mind that it is the exclusive function

26  of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw

27

28  _____
    [10] An IOLTA is an "Interest on Lawyers' Trust Account" which is a non-interest-bearing
    account a lawyer holds on behalf of a client for services not yet performed.

1    reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th

2    Cir. 1977) (internal quotation marks and citation omitted).   Stated differently, "the

3    government does not need to rebut all reasonable interpretations of the evidence that would

4    establish the defendant's innocence, or 'rule out every hypothesis except that of guilt

5    beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010)

6    (quoting *Jackson*, 443 U.S. at 326).  "[A]ny conflicts in the evidence are to be resolved in

7    favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02

8    (9th Cir. 2000).

9        Defendants' Rule 29 Motions challenge the sufficiency of evidence on all the

10   Counts on which they were charged and/or found guilty.  They also make various legal

11   challenges to their convictions.  The Court will address each Count in turn.

## A.    Conspiracy to Facilitate the Promotion of Prostitution (Count 1)

13       The Jury found Messrs. Spear and Brunst guilty of conspiracy to commit Travel Act

14   violations under 18 U.S.C. § 371 but did not reach a verdict on this charge as to Mr. Lacey.

15   "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an

16   agreement to engage in criminal activity, (2) one or more overt acts taken to implement the

17   agreement, and (3) the requisite intent to commit the substantive crime." *United States v.*

18   *Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citation and internal quotation marks

19   omitted).

20       The Government's theory for this count was that between 2004–2018, there was an

21   agreement among the Defendants to facilitate the promotion of prostitution businesses by

22   posting their sex for money ads on Backpage, as charged in the Travel Act Counts; that

23   each Defendant became a member of the conspiracy knowing of at least one of its objects—

24   "to make money"—and intending to help accomplish it; and that one of the members of

25   the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose

26   of carrying out the conspiracy.  (Doc. 1998 at 24).

27       Defendants argue that they are entitled to judgments of acquittal on Count 1.  They

28   contend the Government did not establish the existence of a conspiracy specifically related

to the ads charged in Counts 2–51. (Doc. 2007 at 6–8). Defendants also argue that they cannot be guilty of conspiracy to violate the Travel Act because the alleged purpose of the charged conspiracy—to make money—is entirely lawful and it is impossible to tell if the Jury convicted Messrs. Spear and Brunst on a legally permissible object of the conspiracy. (*Id.* at 9–10).

### 1.    Agreement to Publish One of the 50 Travel Act Ads

Defendants first argue that the Government failed to show there was a specific agreement to commit the substantive crimes tied to the 50 Travel Act ads charged in Counts 2–51. (Doc. 1903 at 30; Doc. 2007 at 11). They state it is not sufficient for the Government to vaguely proffer there may have been ads that were posted between 2013 and 2018 that could have been for prostitution. (Doc. 1903 at 31).

Defendants' proffered standard for a specific, detailed agreement tied to the 50 ads is too stringent. The Superseding Indictment alleged that the Defendants conspired to facilitate prostitution in violation of the Travel Act. (Doc. 230 at 49). Unlike the substantive Travel Act counts, the conspiracy allegations were not specifically tied to the 50 ads. To establish the conspiracy, the Government had to show there was an agreement to facilitate the promotion of prostitution businesses by posting sex for money ads on Backpage. (*Id.*)

Viewing the evidence in the light most favorable to the Government, the Court finds there is sufficient evidence supporting the existence of an agreement among the Defendants, as framed by the Government, to work together toward the goal of making money by helping prostitution posters make their ads look less obviously like prostitution ads. The Government argued that this collective effort was a "deliberate and intentional effort to allow the continued promotion and facilitation of prostitution and to assist Backpage's customers by helping them . . . use Backpage as a platform for doing that." (Doc. 1903 at 79).

"An agreement to commit a crime can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence."

*Kaplan*, 836 F.3d at 1212 (quotation marks and citation omitted); *see also United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) (noting that a tacit agreement is sufficient for a conspiracy conviction). "[I]t is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citing *United States v. Romero*, 282 F.3d 683, 687 (9th Cir. 2002)).   "Typically, the inference of an overall agreement is drawn from proof of a single objective, or from proof that the key participants and the method of operation remained constant throughout the conspiracy." *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999) (internal citations omitted).

Here, the alleged objective of the conspiracy was to make money through the unlawful means of posting prostitution ads for prostitution businesses.   At trial, the Government offered evidence that Messrs. Lacey, Spear, and Brunst knew the demand for Adult ads was especially high in proportion to Backpage's total business; that Backpage derived the majority of its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution ads; and that the sale of ads that led to prostitution offenses became the dominant portion of Backpage's business.

There was also evidence that each of these Defendants were on notice by law enforcement, State Attorneys General, non-profits, and the media that a portion of Backpage's escort ads were in fact leading to prostitution offenses.  *Direct Sales Co. v. United States*, 319 U.S. 703, 707 (1943) (where the manufacturer had sold quantities of morphine to the physician "*so frequently* and *over so long a period* it must have known he . . . was therefore distributing the drug illegally").[11]  Mr. Ferrer further testified that this

---

[11] Noting that an overt act in furtherance of a conspiracy must occur within the applicable statute of limitations, Mr. Spear argues that "the substantial majority" of evidence was improperly considered because it occurred before March 28, 2013.  (Doc. 2006 at 13).  *See also Grunewald v. United States*, 353 U.S. 391, 396–97 (1957).  The Jury was properly instructed to consider whether "one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy." (Doc. 1989 at 24).  This does not mean, however, that the Jury improperly considered facts related to the existence of the conspiracy that occurred prior to March 28, 2013, which was alleged to have spanned from 2004 to 2018.  (*See* Doc. 1643 at 4 ("[T]he Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy.")).

knowledge resulted in the "slow dance" strategy of pretending to work with law enforcement by responding to subpoenas while simultaneously modifying Backpages moderation practices to ensure it could continue to be used as a prostitution advertisement platform. (Trial Tr., Doc. 1792 at 93–94). Evidence was also offered that suggested Defendants' structured Backpage in a way to ensure the majority of its revenues were derived from prostitution ads to their financial benefit. (Trial Tr., Doc. 1903 at 65–66).

With regard to Mr. Brunst, Mr. Ferrer testified that he and Mr. Spear presented their content aggregation marketing strategy to Mr. Brunst and had to obtain Mr. Brunst's approval for the budget needed to staff the plan. (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1791 at 20:6–13). Mr. Brunst argues that his participation in Backpage's annual budget meetings is insufficient proof of his agreement to violate the Travel Act. But the Supreme Court has stated that a defendant's stake in making the profits which he knew could come only from its encouragement of illicit operations evinces "informed and interested cooperation, stimulation, instigation." *Direct Sales Co.*, 319 U.S. at 713. Again, the Government offered evidence that the sale of Backpage ads that ultimately led to prostitution offenses became the dominant portion of Backpage's business, and Mr. Brunst's participation in structuring Backpage to maintain its longevity and maximize profits from these sales was sufficient.

With regard to Mr. Spear, the Government offered evidence showing Mr. Spear knew that removing certain words and replacing them with certain coded words and phrases made escort ads less susceptible to appearing like blatant prostitution ads. The Government also adduced evidence showing that Messrs. Ferrer, Spear, and Brunst internally knew the purpose of TER and knew that Adult escort ads published on Backpage were linked to the reviews on TER for an illegal purpose—namely, prostitution. (Trial Tr., Doc. 1903 at 78). Mr. Ferrer testified to discussing TER with Mr. Spear, and they decided to remove the hyperlinks and "the words TER but leav[e] in the ID numbers so people could look up the reviews on their own." (*Id.*) This directive was disseminated to moderation staff, evidence that showed that Mr. Spear joined in the conspiracy to make its

accomplishment possible.  (Trial Ex. 647).

> When the evidence discloses such a system, working in prolonged cooperation with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible.  The step from knowledge to intent and agreement may be taken.  There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern.  There is informed and interested cooperation, stimulation, instigation.  And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.

*Direct Sales*, 319 at 713.

The evidence for Mr. Lacey is more attenuated but meets the low threshold on a Rule 29 motion.  The Government introduced testimony and evidence that by 2009, Mr. Lacey's newspaper enterprises were economically declining while Backpage's adult section revenues were exploding.  (Trial Tr., Doc. 1792 at 44).  Mr. Ferrer testified that Mr. Lacey was a 'hands on' editor whose New Times paper ran a detailed story about the TER's "prostitution reviews."  (Trial Tr., Doc. 1792 at 51–57; Trial Ex. 573a).  As early as 2010, Mr. Lacey was notified by a group of State Attorneys General that "blatant prostitution ads are rampant" on Backpage and they requested that Backpage take down the "adult services portion of Backpage."  (Trial Ex. 52).  As owner and CEO of Backpage's parent company, Village Voice, Mr. Lacey was routinely confronted by non-governmental agencies ("NGOs") including the Auburn Theological Seminary, POLARIS, and the National Center for Missing and Exploited Children, who alleged that Backpage was a platform for prostitution ads.  An NGO witness who testified at trial recalled that when Mr. Lacey was confronted with these allegations, he essentially stated "consenting adults can do what consenting adults want to do" leaving an impression that he knew prostitution was occurring on Backpage "and that it was legitimate." (Trial Tr., Doc. 1921 at 65:20–25; 67:21–22).  News outlets, including the New York Times, also ran stories on Backpage's Adult section, and Mr. Lacey watched the Amber Lyon expose on CNN.  (Trial Ex. 633).  Taken together, there is sufficient evidence from which a reasonable juror could

find that Mr. Lacey was aware of and implicitly agreed to the conspiracy's alleged objective to make money by providing a platform for prostitutes and prostitution businesses to post prostitution ads on Backpage.

The Court finds there is sufficient evidence that Messrs. Lacey, Brunst, Spear and Ferrer joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money, including in states where prostitution is illegal. Those efforts helped the advertisers make ads look less obviously like offers for prostitution. They also developed a facade of aiding law enforcement in investigating prostitution through responding to subpoenas. Even so, there is sufficient evidence that the sale of ad space leading to prostitution offenses was the primary focus of Backpage's business and each Defendant reaped substantial financial benefit from knowingly providing Backpage's service.

## 2.  Object of the Conspiracy

Messrs. Spear and Brunst argue, as they did during trial, that their conspiracy convictions cannot stand because the Government improperly argued to the Jury that one of the objects of the conspiracy was to make money, which is an entirely lawful object. (Doc. 2007 at 9).[12]  They argue that "a federal conspiracy conviction [cannot] be upheld when non-federal offenses as well as federal offenses were submitted to the jury as objects of the conspiracy, and it [is] impossible to determine on which basis the jury convicted." (Doc. 2007 at 9 citing *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997)).

The Court rejects the Defendants' improper object argument, again. As discussed with the parties while finalizing jury instructions on this point, in the Ninth Circuit, a conspiracy is a "combination of two or more persons to accomplish some unlawful purpose, *or some lawful purpose by unlawful means*." *United States v. Caplan*, 633 F.3d 534, 542 (9th Cir. 1980) (emphasis added). In its closing arguments, the Government clarified for the Jury that the crime here was not merely making money and stated that Defendants crime was *how* they made that money: "off the backs of people engaged in

---

[12] Defendants make the same argument in their Rule 33 Motions for New Trial, as discussed *infra*.

illegal prostitution business enterprises." (Trial Tr., Doc. 1961 at 40:12–21). Moreover, the only object alleged here was to make money through an agreement to violate the Travel Act. *Cf. United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995) (overturning a conspiracy conviction where two of the underlying objects alleged were insufficient as a matter of law and the general verdict form used by the jury made it impossible for court to determine which object or objects formed the basis of their decision); *United States v. Johnson*, 44 F. App'x 752 (9th Cir. 2002) (same). There is no basis to Defendants' argument that both federal and non-federal offenses were submitted to the Jury as objects of the conspiracy.

### B. Sufficiency of Travel Act Charges (Counts 2–51)

Mr. Spear was found guilty of committing the Travel Act violations charged in Counts 2–18; Mr. Brunst was acquitted on Counts 2–51; and the Jury could not reach a decision as to Mr. Lacey on Counts 2–51. Both Messrs. Spear and Lacey argue the Court must enter a judgment of acquittal on the Travel Act charges, Mr. Spear with regard to 2–18 and Mr. Lacey with regard to 2–51.

The Travel Act makes it a federal offense for a person to use a facility in interstate commerce with the intent to promote or facilitate the promotion of an unlawful activity— here, facilitating the promotion of prostitution. 18 U.S.C. § 1952(a)(3). To convict, the Government had the burden of showing that Messrs. Spear and Lacey (1) used Backpage.com; (2) with intent to facilitate the promotion of prostitution businesses; and (3) did a subsequent overt act in furtherance of that unlawful activity, by, for example, publishing the prostitution ad or editing the ad to make it look less like an ad for prostitution. *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981).

Before assessing the sufficiency of evidence arguments made as to these counts, the Court will address the First Amendment legal arguments Messrs. Spear and Lacey make with regard to the Travel Act Counts.

### 1. First Amendment Protections of the Backpage Ads

Defendants argue that the Government failed to establish that any of the 50 ads charged in the Superseding Indictment were not protected by the First Amendment. Mr.

Spear specifically asserts that the Government failed, as a matter of law, to show that Backpage's publication of the Ads in Counts 2–18 were unprotected by the First Amendment. (Doc. 2006 at 5). Mr. Lacey similarly asserts that the Government "failed to overcome the presumption that the ads were 50 instances of protected expression." (Doc. 2004 at 13). Mr. Lacey states that "even if he had been involved with Backpage's operation . . . its operations understood that the operation of a platform for third-party speech and the third-party speech itself was First Amendment protected." (*Id.*) He orally posited that any Jury instruction on the First Amendment would have to draw a distinction from the ad creator and the third-party publisher. (Trial Tr., Doc. 1931 at 69).

Prior to trial, the Court considered Defendants' similar First Amendment arguments. In so doing, the Court iterated that the First Amendment does not protect "offers to engage in illegal transactions." (Doc. 793 at 14 *citing United States v. Williams*, 553 U.S. 285, 297 (2008)). Applying the requisite pre-trial standards of review, the Court found, as to the ads in Counts 2–51, that "the factual allegations in the [Superseding Indictment] are sufficient to show the ads were for prostitution" and "[p]rostitution ads are ads for illegal transactions." (*Id.* at 11; 14). Therefore, facts existed to support that the ads were not First Amendment protected. (*Id.*) The Court will not second-guess its prior and consistently held rulings, rulings that well informed the Defendants on this issue.

However, the Court did conclude that at trial the Government still bore the burden to prove to the fact finder that the ads were for an illegal purpose, and therefore unprotected. At the conclusion of trial, the Court observed that the parties had fully briefed their respective positions on the First Amendment Jury Instruction. The Court determined that the Government's theory was that the Defendants all knew that the ads were sex for money ads, so it held "based on the totality of the case [as] presented in court to this jury" that it would give them a modified First Amendment instruction. (Doc. 1931 at 64–73). The Jury was provided the following instruction:

> All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech

- 26 -

1       that proposes an illegal transaction. Prostitution is illegal in 49 states and
2       most of Nevada. It is the government's burden to establish that each of the
3       ads alleged in this case is an ad for prostitution and not for another purpose
4       such as an ad for escort, dating or massage services. If you find that an ad
      proposes an illegal transaction, it is not protected by the First Amendment.

5 (Doc. 1998 at 48).

6       Though Defendants say they do not wish to "relitigate" the Court's instruction, they

7 essentially argue that the ads are protected by the First Amendment because they were for

8 lawful escort services and that use of "coded words" did not revert them into facially

9 unlawful prostitution ads. (Doc. 2030 at 4–5). On consideration of the evidence,

10 particularly the victims' testimony that (1) their ads were what the Government purported

11 them to be; (2) all of the ads used at least some language the Government established was

12 indicative of prostitution; (3) ads 3, 6–11, and 18 were posted by a person known to be a

13 prostitute by Mr. Ferrer; and (4) the photos in the ads initially submitted in Counts 4, 5, 12,

14 13, 15, 16, and 17 were removed or otherwise moderated by Backpage, the Court finds

15 sufficient evidence for the Jury to find that these were offers of sex for money ads. Given

16 the Jury's verdict as to Mr. Spear, they apparently found that each of the 18 ads were in

17 fact ads for prostitution and not for some other purpose such as a lawful escort ad.[13] Thus,

18 applying the instruction, they necessarily found that the ads in Counts 2–18 were

19 unprotected speech.

20       Reviewing the evidence in comparison to the holding in *Pittsburgh Press v Pitt,*

21 *Comm. on Human Relations*, 413 U.S, 376, 377–80 (1973) does not change the Court's

22 analysis here because Mr. Ferrer and several victims and witnesses who created or helped

23 to create each ad in the Superseding Indictment testified that they were posting sex for

24 money ads on Backpage. (*See e.g.*, Trial Tr., Doc. 1786 at 7) (testimony from Mr. Ferrer

25 that the ads posted on Backpage from 2004 through 2009 were "prostitution ads"); Trial

26 Tr., Doc. 1922 at 76 (testimony from victim in Count 23 ad that ads posted in Los Angeles

27 area in 2015 were posted "to get customers or to get people to pay for sex"); Trial Tr., Doc.

28 _____
[13] The Court will not speculate about whether the Jury concluded that the ads in counts 19 – 50 were First Amendment protected.

1920 at 124, 131 (testimony from victim that she posted on Backpage from 2012 through 2015 for the purpose of selling "acts of prostitution"); *see also infra* Section III.B.2, (testimony from victims that their ads were posted to offer sex for money).  There is sufficient evidence for a reasonable juror to find that each Superseding Indictment ad was illegal and therefore not protected by the First Amendment.  Consequently, the Defendants' Motion for Acquittal based on First Amendment grounds is denied.

> ## 2. Sufficiency of Evidence to Support the Travel Act Counts (Counts 2–51)

The Jury was instructed that to find the Defendants guilty of a Travel Act offense, they would have to find each of the following elements beyond a reasonable doubt:

> First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below[14]), and
>
> Second, after doing so the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2–51 of the indictment.

(Doc. 1998 at 30).  This instruction went on to explain:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.
>
> In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means intentionally helping someone else commit a prostitution offense in violation of state law.
>
> The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation. . . .

---

[14] The Jury Instructions provided the relevant state law for each Travel Act Count alleged.

(*Id*. at 30).

The Government also advanced a theory of liability for the Travel Act counts under *Pinkerton v. United States*, 328 U.S. 640 (1946). *Pinkerton* liability is "a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002). In that regard, the Jury Instructions explained:

> Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.
>
> Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2–51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:
>
> First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;
>
> Second, that person was a member of the conspiracy charged in Count 1 of the indictment;
>
> Third, the person committed the Travel Act offense in furtherance of the conspiracy;
>
> Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and
>
> Fifth, that the Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

(Doc. 1998 at 27).

Messrs. Spear and Lacey argue there is an insufficiency of evidence showing their personal association with the prostitution businesses that posted the ads. They argue that there was no testimony or exhibit that shows that they ever had any contact with the advertisers in these ads; ever saw or knew the content of any of the ads before they were published; moderated the ad; or knew an ad was associated with a super poster. (Doc. 2006 at 3). They also point out that none of the ads in Counts 2–18 contain TER links or even a TER number. (*Id.*) Mr. Spear asserts that there is only evidence of TER association in the

1    charged ads *after* Mr. Ferrer purchased Backpage in 2015.[15]   Therefore, Mr. Spear asserts

2    that his convictions are legally unsupported.

3           As explained by the jury instructions, to show that Messrs. Spear and Lacey violated

4    the Travel Act by selling and publishing prostitution ads on Backpage, the Government

5    was required to establish that Messrs. Spear and Lacey "in some significant manner

6    associated" themselves with the ad poster's prostitution business enterprise.  (Doc. 1998 at

7    30); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  Thus, unlike

8    conspiracy to violate the Travel Act, to convict on a Travel Act charge, the Government

9    had to show that Defendants—or one of their co-conspirators—in some significant manner

10   associated themselves with the prostitution businesses that posted the ads in each Count.

11          With regards to Mr. Spear, the Government points to his work in overseeing

12   Backpage's growth and development, and the strategies he helped implement to ensure the

13   adult escort section of Backpage flourished.   It argues that "[w]hen the pimps and

14   prostitutes who posted the ads in Counts 2–18 used Backpage to advertise their illegal

15   commercial services, they utilized a website tailored-made to promote, and facilitate the

16   promotion of, prostitution enterprises like theirs."  (Doc. 2021 at 16).   Viewing the

17   testimony and evidence in a light most favorable to the Government, the Court agrees that

18   Mr. Spear's role in making Backpage a platform from which prostitution could be

19   advertised is sufficient to establish his specific intent to facilitate the promotion of the

20   prostitution businesses posting the ads in Counts 2–18.   Evidence sufficiently shows that

21   Mr. Spear, in the interest of making money, directly helped develop moderation and editing

22   policies that facilitated the promotion of prostitution and allowed Backpage to continue to

23   accept payment from pimps, traffickers, and prostitutes for posting the illegal ads.   The

24   Court also finds, as detailed below, that there was sufficient evidence adduced that Mr.

25   Ferrer, a co-conspirator, also significantly associated himself with and helped promote the

26   poster's enterprises such that his acts in relation to the ads in Counts 2–18 were fairly

27

28   _____

[15] The ads in Counts 2–18 are dated from September 10, 2013, to April, 2015, just before the sale of Backpage to Mr. Ferrer.  The ads in Counts 19–51 post-date the sale of Backpage to Mr. Ferrer.  No Defendant was found guilty of Counts 19–51.

attributed to Mr. Spear under a *Pinkerton* theory of liability.

With regard to Mr. Lacey, the Court finds there is an insufficiency of trial evidence supporting a direct theory of liability for any of the Travel Act charges brought against him. Specifically, the Government did not put forth sufficient evidence of Mr. Lacey's specific intent to facilitate the promotion of the posters or prostitution businesses comprising Counts 2 through 51, as that *mens rea* is defined by the Ninth Circuit. Though the Government put forth some evidence that Mr. Lacey had knowledge that Backpage's Adult section evolved into an on-line prostitution advertising platform operating in states that outlaw prostitution and that he extraordinarily benefited financially therefrom, there was no evidence that he was involved with developing or overseeing Backpage's moderation or aggregation practices for the ads in Counts 2–51.[16]  Among other evidence, the Government's evidence of Mr. Lacey's reaction to an arrest of a Backpage user (*see* Trial Ex. 940 ("[a]re the perps different than the rest of Backpage?"), and his stated support for legalized prostitution, among other evidence, suggests he knew of Backpage's intended purpose. (Trial Ex. 1911b). Indeed, the Government's argument that Mr. Lacey's wealth depended on the success of Backpage's Adult section was clearly established. This evidence may suffice for the conspiracy count but a conviction on a Travel Act count requires more. *See Gibson*, 507 F.2d at 449 ("Were we not to define intent in the travel act in this manner, the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express *mens rea* requirement."). (*See also* Doc. 1998 at 30). The Government offered no evidence or testimony that Mr. Lacey exerted control over the advertisers in Counts 2–51 or how they published their ads. *Gibson*, 507 F.2d at 450 (dismissing Travel Act counts where prosecution conceded that defendant manufacturers of gambling paraphernalia had "no financial interest in or control over the Montana distributorships to which the [gambling paraphernalia] were sold"). To the

---

[16] Without much more, the Government's brief largely tracks the Superseding Indictment's allegations in which Mr. Lacey is referenced in the "Knowledge And Facilitation of Prostitution" paragraphs related to his broad knowledge that Backpage had a reputation as an on-line prostitution advertisement platform. (*See* Doc. 230 at ¶¶ 89; 97; 106, 107; 121; 126).

contrary, the evidence showed that Mr. Lacey was rarely pulled into the business side of Village Voice or the day-to-day operations of Backpage, and unlike Messrs. Spear and Ferrer, he had no occasion to review or perfect ads or coach the advertisers how to successfully code sex act terms so they could appear on Backpage's Adult section.

Though the Court finds that there was insufficient evidence of Mr. Lacey's intent, the Court will nonetheless deny his Motion as to Counts 2–18 because there was sufficient evidence under *Pinkerton*, as described below, for a rational juror to find him guilty through the acts of one of his co-conspirators, namely Mr. Ferrer and Mr. Spear.

### a. Commission of Travel Act Violation in Count 2

The Jury convicted Mr. Spear of violating the Travel Act in Count 2 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey on this Count. Count 2 alleges that the Defendants used Backpage.com to post a prostitution ad on September 10, 2013, in Massachusetts. (Doc. 230 at 50). Prostitution is illegal in Massachusetts. (Doc. 1998 at 31).

Brian Griffin, a Sergeant with the Northborough Police Department ("Sgt. Griffin"), testified that in September 2013 he was alerted to suspicious circumstances of two females loitering around a hotel room. (Trial Tr., Doc. 1923 at 62–70). Believing that they may be involved in prostitution, Sgt. Griffin went to Backpage.com[17] and found an ad depicting one of the females. (Trial Tr., Doc. 1923 at 64–65; Trial Exs. 212, 212a). This ad is the subject of Count 2. Sgt. Griffin called the ad number and made an appointment to see "Destinee," to pay her for oral sex. (Trial Tr., Doc. 1923 at 66). Upon entering the hotel room, Sgt. Griffin observed a male "John" in the bathroom and learned that he paid for the hotel room in exchange for sex. (*Id.* at 70). Based on this testimony, there is sufficient evidence from which a reasonable juror could find that the ad in Count 2 was a sex for money ad on Backpage posted in violation of Massachusetts law.

There is also sufficient evidence for a reasonable juror to find that the moderation

---

[17] Backpage.com was known in various Massachusetts law enforcement communities as "a new place . . . to go to investigate these crimes." (Trial Tr., Doc. 1923 at 52–53).

efforts taken by Messrs. Ferrer and Spear evince sufficient association with the poster and amounted to the Travel Act offense alleged in Count 2.  Viewing the ads used by Sgt. Griffin (Trial Exs. 212 and 212a), Mr. Ferrer identified them as Backpage.com ads that would have been viewable on a mobile phone.  (Trial Tr., Doc. 1812 at 52:2–3 ("This is the time when we were moving to a mobile phone experience so the page is built for a mobile phone view."); 68:17–69:3).[18]  The ad read: "Our dazzling smile & stunning personality will keep you coming back for more.  We keep ourselves well manicured, hygienically correct & always classy!  Doin incalls and outcalls.  2 girl for 1 or 2 girl special.  Call or text us five0eight-nine33-eight52one."  (Trial Tr., Doc. 1812 at 57; Trial Ex. 212).  Observing that the telephone number was spelled out in the ad, Mr. Ferrer testified that in the moderation process, they learned that if a prior user was banned, the user would revert to spelling out a telephone number to avoid the ad being rejected.  (*Id.* at 58:9–12).  The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and Spear, through their moderation development and oversight, committed the Travel Act offense alleged in Count 2 by helping to facilitate and promote the advertiser's business.

### b.    Commission of Travel Act Violations in Counts 3, 6–11, 18

The Jury convicted Mr. Spear of violating the Travel Act in Counts 3, 6–11 and 18 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey.  The ads in these Counts were posted by a woman named Pamela Robinson ("Ms. Robinson").  Each Count alleges that the Defendants helped Ms. Robinson post prostitution ads on Backpage in Washington on January 27, 2014 (Count 3), February 6, 2014 (Count 6), April 20, 2013 (Count 7), May 7, 2014 (Count 8), May 31, 2014 (Count 9), July 1, 2014 (Count 10), August 19, 2014 (Count 11), and February 26, 2015 (Count 18).  (Doc. 230 at 50–51).

---

[18] Mr. Ferrer testified that he "worked with [a man] in Dallas to design this look . . . I approved the wire frames and then we launched this mobile view of postings." (*Id.* at 51-52:15–17).  He further testified about changes that were made to enable better viewing of the ads' texts and images for mobile phones versus desktop ads which include a large Backpage.com logo.  (*Id.* at 52–53).  Mr. Ferrer identified the ads' features that he approved, that he is familiar with how it all looks because at that time they were trying to increase their "page views and mobile and it went to nearly 90 percent."  (*Id.* at 53:20–54:5).

1    Prostitution is illegal in Washington.  (Doc. 1998 at 31).

2            Mr. Ferrer testified that he communicated with Ms. Robinson from 2010 through

3    2018 using his email address carl@Backpage.com.  (Trial Tr., Doc. 1795 at 79).  Ferrer

4    identified each ad set forth in Trial Exhibits 504–513 that are listed in Counts 3, 6–11, 18,

5    and 25–26 as Ms. Robinson's Backpage ads.  (*Id.* at 79–87; Trial Exs. 162 –165; 168, 504–

6    511).  He testified that he believed Ms. Robinson was engaged in prostitution and solicited

7    her services by posting ads on Backpage.  (Trial Tr., Doc. 1795 at 79–81).  He explained

8    how he provided Ms. Robinson with a "promo code" for discounts on escort ads, and that

9    he restored her editing rights so she could post ads on Backpage for prostitution.  (*Id.* at

10   81, 87).  He also testified to his personal knowledge of her ads posted on Backpage from

11   2014 to 2015, and that she threatened to complain to the Better Business Bureau because

12   her ads were being rejected.  (*Id.* at 105–08).  Ferrer described the ads' rejection as part of

13   Backpage's moderation process.  (*Id.* at 87–88).

14           Mr. Ferrer's testimony undermines the Defendants' contention that there is no

15   evidence that he was personally interacting with Ms. Robinson.  (*See* Doc. 1867 at 103–

16   04).  Mr. Ferrer testified that he communicated directly with Ms. Robinson through his

17   email address at Backpage.  The Jury must have found this testimony credible.  The

18   Defendants' argument that this and other Backpage ads are not Travel Act violations

19   because they may or may not have resulted in sex acts for money is also unconvincing

20   because each state statute makes "offers" to engage in sex illegal.  Therefore, the Court

21   finds that there is sufficient evidence from which a reasonable juror could find that Mr.

22   Ferrer and co-conspirator Mr. Spear, violated the Travel Act as alleged in Counts 3, 6–11,

23   and 18.

24           **c.      Commission of Travel Act Violations in Counts 4 and 5**

25           The Jury convicted Mr. Spear of committing Travel Act offenses in Counts 4 and 5

26   but did not reach a verdict as to Mr. Lacey on these Counts.  Count 4 is a Backpage ad

27   posted on January 29, 2014, and Count 5 is a Backpage ad posted on January 31, 2014.

28   (Doc. 230 at 50).  Both ads were posted on Backpage.com in Massachusetts, where

1    prostitution is illegal.

2          Naiomy Figueroa ("Ms. Figueroa") identified the ads from Counts 4 and 5 (Trial

3    Exs. 214 and 214a, respectively) as ads her pimp posted of her on Backpage.  (Trial Tr.,

4    Doc. 1898 at 96–98).  Ms. Figueroa testified that she became familiar with Backpage when

5    she saw her pimp use it to post her ads.  (*Id.* at 82).  She believed Backpage was a website

6    "for girls to use [] to escort and to get trafficked."  (*Id.*)  According to her, "escort" meant

7    "to exchange a sexual act for money or a gift." (*Id.*)  She testified that she would not create

8    her ads, that her pimp created and posted them.  (*Id.*)  She understood that she was

9    advertised for sex acts for money "so my pimps could make money off of me." (*Id.* at 83).

10   She testified that she saw her pimps purchase "vanilla cards" from convenience stores and

11   use them to purchase her ads.  (*Id.*) Ms. Figueroa testified that her ads included terms like

12   "fetish friendly" and "satisfying your cravings" and included photos of her in lingerie,

13   pantyhose and in seductive poses.  (*Id.* at 84).  Photos for the ads would be taken in hotel

14   rooms paid for by pimps because she was not old enough to pay.  (*Id.* at 85).  Once posted,

15   she said her phone would ring within minutes.  (*Id.* at 86).  When the calls tapered off,

16   "they would post another ad to get me to the top of the list so that the calls keep coming

17   in." (*Id.*)  The caller would ask "what are the prices per hour." (*Id.* at 87).  In discussing

18   rates, she would use words like "roses" as a code word for money.  (*Id.* at 92).  She was

19   also familiar with the term "in-call" as "when the john comes to you."  (*Id.* at 96).  She

20   testified that upon meeting, she would "ask them to touch us somewhere like in the private

21   parts to confirm that they were not a cop." (*Id.* at 92).  Ms. Figueroa testified that every ad

22   posted of her was an offer of sex for money.  (*Id.* at 99).  She testified that she would not

23   keep the money but that the pimps would.  (*Id.* at 94–95).  This evidence is sufficient to

24   show that the ads in Counts 4 and 5 were ads for prostitution.

25         Mr. Ferrer identified Trial Exhibit 214 from Count 4 "as the administrative view of

26   a posting in the Boston Escort Section of Backpage." (Trial Tr. Doc. 1812 at 60:3–8).  He

27   explained that the "administrative view" would show "the email address, the payment

28   information, and other information gathered in even what we called Object Editor.  It's all

1    kind of an internal printout of an ad in admin view." (*Id.*)  He explained that the page

2    showed transactions and customer data as well as various customer invoices. (*Id.* at 61:3–

3    25).[19]  From this data, he testified that one page of exhibit 214 was "an image that was

4    deleted.  And in this administrative view, an administrator could restore or remove that

5    image and then hit 'updates.'" (*Id.* at 61:24 to 62:1).  From the administrative view, he

6    could tell the transaction was ultimately approved. (*Id.*)  Mr. Ferrer similarly testified that

7    the data in Trial Exhibit 214a from Count 5 showed that an image had been deleted. (*Id.*

8    at 63:1–10).[20]

9         The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and

10   Spear, through their moderation development and oversight of Ms. Figueroa's ads,

11   committed the Travel Act offenses alleged in Counts 4 and 5.

12                    **d.      Commission of Travel Act in Counts 12, 13, 14 and 15**

13        Count 12 is a California Backpage ad posted on November 23, 2014, and Count 13

14   is a California Backpage ad posted on January 29, 2015. (Doc. 230 at 51).  Prostitution is

15   illegal in California. (Doc. 1998 at 32).  Count 14 is an Arizona Backpage ad posted on

16   January 31, 2015, and Count 15 is an Arizona Backpage ad posted on January 31, 2015.

17   (Doc. 230 at 51).  Prostitution is illegal in Arizona. (Doc. 1998 at 32).

18        Astrid Cervantes ("Ms. Cervantes") testified that she was advertised for an

19   "exchange of money for sex acts" on Backpage.com from November 2014 through January

20   2015 in Oceanside, San Diego, and other places in California and in Phoenix. (Trial Tr.,

---

21   [19]   In distinguishing Trial Exhibits 212 and 212a (the ads in Count 2) from exhibit 214

22   (Count 4), Mr. Ferrer explained that Trial Exhibit "212a was a view from a mobile phone.
     [Trial Exhibit 214] would be viewed -- from a desktop computer that was looking at the ad

23   with somebody having admin access at Backpage and then making a PDF of that data." (*Id.* at 60:12–15).

24   [20] Mr. Ferrer also stated that he was familiar with the postings in Trial Exhibits 214 and

25   214a because "the person posted in this ad was in a Nicholas Kristof column in the 'New York Times.'" (Trial Tr. Doc. 1812 at 65:1–2).  Mr. Ferrer testified that the New York

26   Times article "discussed how a juvenile was prostituted and then how they were able to recover this juvenile by finding the person on Backpage." (*Id.* at 65:18–20).  Ferrer said

27   that after he received an email from a producer at Dateline he went to find the records of the victim in the story "so we [could] do our standard operating procedure of when was the

28   ad posted, by who, what payment data was gathered." (*Id.* at 67:3–7).  He said that data would also tell him whether they had sent NCMEC a report. (*Id.*)

Doc. 1897 at 30–38). Ms. Cervantes identified herself and a woman called "Storm" in the ads associated with Counts 12–15. (*Id*. at 32–35, 47–48).[21] She said Storm was part of a group she was in that was "being trafficked" by a man she referred to as "L.G." (*Id*.) She testified that L.G. was her pimp and that L.G. and a woman named Star, another girl that was being trafficked by L.G., would create and post her ads on Backpage. (*Id*. at 32–33). Ms. Cervantes testified that L.G. and Star took pictures of her in lingerie and then used those photos in her Backpage ads. (*Id*. at 33–34). Ms. Cervantes said L.G. would post her ad using his cell phone. (*Id*. at 34). Upon the ad being posted, "clients"—meaning "the men that would want to exchange money for sex"—would call and text for sex. (*Id*. at 35). After engaging in sexual intercourse with the client, Ms. Cervantes would text L.G. and he would arrive and retrieve the money. (*Id*. at 37–39). Ms. Cervantes testified that she did not observe L.G. to have a job other than being a pimp. (*Id*. at 45). Ms. Cervantes testified that L.G. thought they could make a lot of money during the Super Bowl so she, L.G., Storm, and Star traveled from California to Arizona in January. (*Id*. at 37-38). She testified that L.G. or Star provided the car, and once in Arizona, L.G. purchased a hotel room and Storm began writing her Backpage ad profile. (*Id*. at 41). Ms. Cervantes had a few "dates" while in Phoenix. Eventually, she and Storm agreed to meet a customer who requested "a two-girl special." (*Id*. at 43). The customer ended up being an undercover police officer. After that, Ms. Cervantes stopped working for L.G. (*Id*. at 54).

Viewing Trial Exhibits 217 and 217a, Mr. Ferrer identified each as Backpage ads, the market they were posted in, and as examples of "somebody who is posting in two different markets." (Doc. 1813 at 25:14–15). Mr. Ferrer said he could tell Trial Exhibit 217 was printed out by an administrator, and that it contained a deleted image. (Doc. 1813

---

[21] Ms. Cervantes identified herself in Trial Exhibits 215 and 215a, which are respectively the January 31, 2015, Backpage ad posted in Phoenix, Arizona associated with Count 14 (Trial Tr., Doc. 1897 at 47–48); and the November 23, 2014, ad posted on Backpage.com in San Diego, California that is associated with Count 12. (*Id*. at 47). She testified that her acquaintance "Storm" is the person in the ad at Trial Exhibit 217a, the January 29, 2015, Backpage ad posted in Inland Empire, California that is associated with Count 13 (*id*. at 46), and in Trial Exhibit 217, the January 31, 2015, Backpage ad posted in Phoenix, Arizona that is associated with Count 15. (*Id*. at 46–47).

at 22:24–23:2).  Mr. Ferrer explained that the options of "Keep deleted," "Restore," and "Removed" displayed on the exhibit meant the administrator/moderator had the "option to…update the ad and restore it, or [] update it and permanently remove it.  Right now the ad is deleted, but it could be restored."  (*Id.* at 23:20–25).  Mr. Ferrer said he thought the image of Storm was violative of Backpage policies because it was "too much of a butt shot . . ."  (*Id.* at 24:3).

The titles of the ads in Trial Exhibits 215 and 215a read "New In Town," a term that NGOs like NCMEC and Polaris told Defendants were indicative of prostitution and trafficking.  (*Id.* at 21–24).  Mr. Ferrer described exhibit 215 as a Backpage ad that you could view on a mobile device that had "been created into a pdf with admin access."  (*Id.* at 17).  He said the exhibit included "object editor data" and that he could tell from the exhibit that an image from the ad had been deleted again, "because "it's just too much of a butt shot on a hotel bed mattress."  (*Id.* at 19).

There is sufficient evidence and testimony from which a reasonable juror could find that the ads depicted in Counts 12 through 15 are Backpage.com ads advertising sex acts for money in violation of California and Arizona state laws, and that Messrs. Ferrer and Spear facilitated the promotion of prostitution ads through their moderation efforts.

### e.   Commission of Travel Act Violations in Count 16 and 17

Counts 16 and 17 allege that prostitution ads were posted on Backpage in Colorado on February 4 and 18, 2015, respectively.  (Doc. 230 at 51).  Prostitution is illegal in Colorado.  (Doc. 1998 at 33–34).

Breahannah Leary ("Ms. Leary") testified that she posted herself on Backpage.com in Denver, Colorado from approximately 2012 through 2015.  (Trial Tr., Doc. 1920 at 122–24).  She copied and pasted other ads and used the "lingo" on Backpage.com to create her own ads.  (*Id.*)  She testified that her ad would often appear differently than as she originally posted; that sometimes her picture was removed, or the ad would be pushed to the bottom and require her to repost it so it would go to the top.  (*Id.* at 124).  She stated that even when her picture was removed, the rest of the ad's content would remain.  (*Id.* at 125).

1   Once posted, she said her telephone would ring and she would "go and have dates with the
2   gentlemen" which she said meant "acts of prostitution." (*Id.*).

3       In January 2015, Ms. Leary began to work for Brock Franklin ("Mr. Franklin"), who
4   wanted to post her on Backpage.com. (*Id.* at 128–29). When she arrived at his home, she
5   observed other women living there. (*Id.*). Mr. Franklin and "one of his girls" Isis, took
6   photos of her in a hotel room in Denver where she posed in various positions wearing
7   lingerie. (*Id.* at 131). She testified that for the four to five months she was involved with
8   Franklin, she engaged in daily acts of prostitution for him and that he only permitted her to
9   perform acts of oral sex. (*Id.* at 132–34). Once she received money for the act, it would
10  be immediately handed over to Franklin. (*Id.*).  Ms. Leary identified herself in Trial
11  Exhibit 216 as the photos that were taken of her the first night she moved in with Franklin.
12  (*Id.* at 138). She stated that the ad was posted on February 4, 2015, in Denver. (*Id.*). She
13  also identified herself in Trial Exhibit 216a as an ad posted in Ft. Collins, Colorado on
14  February 18, 2015. She testified that both advertisements lead to acts of prostitution. (*Id.*).

15      Based on direct and circumstantial evidence about how Ms. Leary's ads were
16  moderated e.g., photos being deleted, terms removed, her ad moved to the bottom—there
17  is sufficient evidence for a rational juror to find Messrs. Spear's and Ferrer's
18  implementation of their moderation policies resulted in the Travel Act violations alleged
19  in Counts 16 and 17.

20      In sum, there is sufficient evidence that Messrs. Ferrer and Spear committed the
21  Travel Act charges in Counts 2–18 via their moderation efforts.

22          **f.    *Pinkerton* Liability and the Travel Act Counts 2–18**

23      Citing *United States v. Castaneda*, Defendants argue "that due process constrains
24  the application of *Pinkerton* where the relationship between the defendant and the
25  substantive offense is slight." 9 F.3d 761 (9th Cir. 1993), *overruled by United States v.*
26  *Nordby*, 225 F.3d 1053 (9th Cir. 2000). Messrs. Lacey and Spear maintain that, although
27  they were aware of the moderation function at Backpage, they were not directly involved
28  in the moderation practices, and the connection between that fact and Mr. Ferrer's acts in

facilitating the publication of these ads is too slight for *Pinkerton* to apply.  In other words, Defendants assert that the Travel Act offenses in the Superseding Indictment are just a few examples out of millions of ads published by Backpage, and it is not reasonably foreseeable to Defendants that the publication of a specific ad might be moderated in some improper way to facilitate prostitution.  (Doc. 1903 at 34).

But the question is not whether it is reasonably foreseeable that Messrs. Lacey or Spear knew a specific Travel Act ad would occur among millions of other ads.  The question is whether publication of the Travel Act ads "could reasonably have been foreseen to be a necessary or natural consequence *of the unlawful agreement*." *Pinkerton*, 328 U.S. at 647–48 (emphasis added); *Alvarez-Valenzuela*, 231 F.3d at 1202.  As mentioned, the unlawful agreement among the Defendants and Mr. Ferrer as identified by the Government is making Backpage ads look less obviously like prostitution to continue profiting off of ads for illegal sex acts.  So, the question is whether it was reasonably foreseeable that Messrs. Ferrer, Spear, or other members of the conspiracy, would help an advertiser of prostitution post an ad for prostitution in Backpage by moderating an ad.  The evidence supports that conclusion for Counts 2–18.  As discussed, sufficient evidence was adduced showing each Defendant knew that prostitution was occurring through Backpage ads, and that the vast majority of Backpage's revenue came from prostitution ads.  It is reasonable that a member of the conspiracy would have foreseen (indeed, expected), another member to take steps to further their unlawful agreement—for example, to moderate submitted prostitution ads or "slow dance" responses to law enforcement subpoenas to make it look like Backpage was not publishing prostitution ads so Defendants could continue to profit from that illegal revenue.

### g.    Travel Act Violations in Counts 19–51

The Government put forth sufficient evidence that the Backpage ads in Counts 19–51 were prostitution ads violating the associated state laws.  However, Messrs Spear, Brunst, Padilla, and Ms. Vaught were acquitted of these Counts.  In so finding, the Jury necessarily concluded that no Defendant committed a Travel Act violation related to each

1    Count, nor did *Pinkerton* liability attach to any Defendant through a co-conspirator's act.

2    Notably, each ad in Counts 19–51 post-dates the sale of Backpage from its owners to Mr.

3    Ferrer.   Considering  the  evidence  and  testimony,  the  Court  finds  that  there  is  an

4    insufficiency of evidence showing any acts by Mr. Ferrer, or any other co-conspirator,

5    taken *after* the sale of Backpage was a reasonably foreseeably consequence of the unlawful

6    agreement.   The  evidence  accords  with  the  Jury's  likely  conclusion  that  the  sale  of

7    Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel

8    Act.  At best, the Government's evidence showed that Mr. Ferrer used Backpage's profits

9    after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase.   For

10   that reason, the Court finds that there is insufficient evidence to convict Mr. Lacey of

11   Counts 19–51, even under a *Pinkerton* theory of liability.  The Court will therefore grant

12   Mr. Lacey's motion for acquittal of the Travel Act violations alleged in Counts 19–51.

13         **C.     Money Laundering Counts**

14         Defendants were charged with conspiracy to commit money laundering (Count 52),

15   money laundering under 18 U.S.C. § 1956, relating to the laundering of monetary

16   instruments (Counts 53–68, 100), and money laundering under 18 U.S.C. § 1957, relating

17   to engaging in monetary transactions in property derived from specified unlawful activity

18   (Counts 69–99).   They challenge the sufficiency of the evidence supporting the charges

19   on which the Jury found them guilty.  The Court will first assess the Defendants' arguments

20   regarding the substantive money laundering counts and then will address the conspiracy to

21   commit money laundering count.

22              **1.     Money Laundering Counts Under 18 U.S.C. § 1956**

23         "18 U.S.C. § 1956 prohibits specified transfers of money derived from unlawful

24   activities.  Subsection (a)(1) makes it unlawful to engage in certain financial transactions,

25   while subsection (a)(2) criminalizes certain kinds of transportation." *Regalado Cuellar v.*

26   *United States*, 553 U.S. 550, 557 (2008) ("*Cuellar*").  Defendants here were charged under

27   both Subsections.[22]  Counts 53–62 charge violations of Subsection 1956(a)(1)(B)(i), aimed

28   _____

[22] Unless where otherwise noted, all Section and Subsection references are to Chapter 18
of the United States Code.

at financial transactions that are intended to conceal the source of illegal proceeds. Counts 63–68 charged violations of Subsection 1956(a)(1)(A)(i), which prohibits transporting funds internationally for the purpose of promoting specified unlawful activities. Count 100 against Mr. Lacey charged a violation of Subsection 1956(a)(2)(B)(i), which prohibits transporting funds internationally that are intended to conceal the source of illegal proceeds.

### a. Counts 53–62: Transactional Concealment Money Laundering under Subsection 1956(a)(1)(B)(i) (Messrs. Lacey, Brunst & Spear)

Defendants were charged in Counts 53–62 with money laundering under Subsection 1956(a)(1)(B)(1). The Superseding Indictment states that Website Technologies transferred the funds in these transactions to Cereus Properties; that Defendants knew the funds represented proceeds of some form of unlawful activity; and that Defendants made the transfers in whole or in part to conceal the source of the proceeds of the unlawful activity. (Doc. 230 ¶¶ 204–205).

At trial, it was established that after 2016, Backpage proceeds were collected and divided between Website Technologies and Ad Tech B.V., a company registered in the Netherlands. (Trial Ex. 1479). Mr. Thai testified that the transfers from Website Technologies in Counts 53–62 all occurred between the three-month period of May 18, 2016, and August 16, 2016, and totaled close to $17 million. (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479). Each transfer was made from a Website Technologies bank account at Branch Banking & Trust to a bank account held by Cereus Properties at Arizona Bank & Trust. (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479). Mr. Thai and Mr. Ferrer both testified that Cereus Properties "collected the interest and debt payments from the $600 million loan" from the sale of Backpage, and that Defendants were owners of Cereus Properties. (Trial Tr., Doc. 1814 at 91:2–3).

Subsection 1956(a)(1)(B)(i) states in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction

represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(B) knowing that the transaction is designed in whole or in part—

. . .

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

shall be sentenced to a fine. . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i). *See also United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (holding that "[t]o convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew 'that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'") (internal citations omitted)).

Defendants argue the Government's evidence was insufficient in showing (1) the funds in these transfers were proceeds of Travel Act violations; and (2) they had an intent to conceal the nature or source of the funds.

### i.        Specified Unlawful Activity

Defendants first argue that a judgment of acquittal is warranted on Counts 53–62 because the Government did not provide sufficient evidence showing the funds at issue were the proceeds of any prostitution ad sales during the timeframe of these Counts. (Doc. 2007 at 14).  The Government says this argument is a red herring.  It argues Ninth Circuit law is clear that a defendant may be convicted of money laundering even if the defendant is not charged or convicted of the underlying specified unlawful activity. (Doc. 2019 at 12).

The Court agrees with the Government.  A defendant need not actually be convicted of the specified unlawful activity—what here would be Travel Act offenses—before a money laundering conviction can be had under Section 1956(a)(1)(B)(i).  *See e.g.*, *United*

- 43 -

1    *States v. Golb*, 69 F.3d 1417, 1422 (9th Cir. 1995).  In fact, even if evidence of the

2    underlying activity is insufficient to convict a defendant, where there is evidence from

3    which a jury could infer the source of the funds was from the underlying unlawful activity,

4    a Section 1956(a)(1)(B)(i) conviction can stand.  *Id.*  This was precisely the case in *United*

5    *States v. Golb*, where the Ninth Circuit Court of Appeals affirmed the convictions for

6    money laundering where there was evidence from which a jury could have inferred that the

7    source of laundered proceeds was illegitimate—even though the jury found that the same

8    evidence was insufficient to convict the defendant for the actual "specified unlawful

9    activity." *Id.  See also United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990)

10   (affirming conviction where the jury could infer that the funds came from the "specified

11   unlawful activity"); *United States v. Mankarious*, 151 F.3d 694, 702 (7th Cir. 1998)

12   (affirming conviction and noting "money laundering statute does not require the

13   government to trace the laundered proceeds to a specific predicate offense"); *United States*

14   *v. Yagman*, 2007 WL 9724388, at *20 (C.D. Cal. May 3, 2007) (noting out-of-circuit case

15   law standing for the same).

16          Defendants have also objected to the time difference between the Travel Act Counts

17   on which Mr. Spear was convicted and the first transaction in Court 53.  The Travel Act

18   ads in Counts 2–18 are dated September 10, 2013, to February 26, 2015.  The transactions

19   in Counts 53–62 are dated May 18, 2016, to August 31, 2016.   The Court finds the time

20   difference here immaterial.  The Jury need not necessarily have found that it was the Travel

21   Act violations alleged in Counts 2–18 that specifically created the unlawful proceeds.  The

22   federal money laundering statute criminalizes transactions in proceeds, not the transactions

23   that create the proceeds. *Wilkes*, 662 F.3d at 545; *see also United States v. Garcia*, 37 F.3d

24   1359, 1365 (9th Cir. 1994) (finding that under Section 1956, "due to the fungibility of

25   money, it is sufficient [to] prove that the funds in question came from an account in which

26   tainted proceeds were commingled with other funds").

27          The requirements under Section 1956 are that Defendants knew the proceeds

28   derived from unlawful activity and that the proceeds "in fact" derived from unlawful

1    activity.  18 U.S.C. § 1956(a)(1).  This accords with what the Jury was instructed.  (*See*

2    Doc. 1998 at 41 (stating that the Government had to prove beyond a reasonable doubt for

3    each of these counts that "the defendant conducted a financial transaction involving

4    property that represented the proceeds of a violation or violations of the Travel Act").

5         Although the Government did not trace the funds in Counts 53–62 to particular

6    Travel Act violations—i.e., sale proceeds from the sale of particular prostitution ads—there

7    was sufficient evidence from which a jury could infer that the funds were proceeds from

8    Backpage's sales of sex-for-money ads and that Defendants or their conspirators knew they

9    were proceeds from sex-for-money ads.  As has been discussed, evidence relating to

10   Defendants' knowledge that Backpage sold prostitution ads was more than sufficiently

11   adduced.  Mr. Ferrer told the Jury that following the 2015 sale, the ultimate source of the

12   monies paid to Cereus Properties from Website Technologies "was the prostitution ads

13   posted on Backpage and/or Cracker."  (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–

14   17).  Mr. Thai explained the movement of these funds: from Backpage ad sales to Website

15   Technologies to Cereus Properties.  A rational jury could have concluded that the funds

16   transferred in Counts 53–62 were proceeds from Backpage's sale of illegal prostitution ads.

17                    **ii.    Intent to Conceal**

18        Defendants also argue that there was insufficient evidence of their intent to conceal

19   the source of these transactions to convict them of these charges.  Defendants maintain that

20   "[t]here was no testimony that the sale of Backpage and associated loan was consummated

21   for the *purpose* of concealing from financial institutions the source of the funds."

22   (Doc. 2007 at 16).

23        "[A] conviction under this provision requires proof that the purpose—not merely

24   effect—of the transportation was to conceal or disguise a listed attribute."  *Cuellar*, 553

25   U.S. at 567.[23]  "In other words, that a transaction is structured to hide its source is not

26   enough.  The government must prove that the transaction had the purpose of concealing

27   ――――――――――――――――
     [23] The Subsection at issue in *Cuellar* concerned concealment under the statute's
28   transportation prong(A)(2)(B)(ii), however, various circuit courts of appeal have applied
     *Cuellar* to cases involving concealment under the statute's transaction prong (A)(1)(B)(i).
     *See Singh*, 995 F.3d at 1075 (collecting cases).

the source." *Singh*, 995 F.3d at 1075. "Where a defendant takes no steps to disguise or conceal the source or destination of the funds, leaving an easy-to-follow trail in moving money around, those transactions conspicuously lack the 'convoluted' character associated with money laundering." *Wilkes*, 662 F.3d at 545–46 (cleaned up). *See also United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds."). The Eleventh Circuit has opined the following:

> Evidence to consider in determining whether a transaction was designed to conceal includes, among other things: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) (cleaned up). "Another important consideration is whether the money is better concealed or concealable after the transaction than before." *Id.* (internal quotation omitted).

Defendants argue that the only testimony as to these transactions came from Mr. Ferrer, who testified that these transfers were loan payments in connection with the sale of Backpage. (Doc. 2007 at 16). They say the sale and loan documents were prepared by attorneys and accountants and clearly reference the sale of Backpage, not a "shell" company. (Trial Exs. 5427, 5364). They say that witness testimony simply asserting that the transactions in these counts "involve" Backpage proceeds is insufficient to prove concealment. (Doc. 2029 at 10).

The Court disagrees. Mr. Ferrer testified that Mr. Brunst formed Website Technologies as a shell company with the purpose of concealing that the proceeds going to Website Technologies was revenue from the sale of Backpage ads. (Trial Tr., Doc. 1814 at 89:8–10; Trial Ex. 1481). He also testified that the primary source of money that flowed from Backpage ads was revenue from prostitution ads and that Defendants owned the

- 46 -

1   recipient entity Cereus Properties.  (Trial Tr., Doc. 1814 at 91:16–17).  From this evidence,

2   a rational jury could infer that the purpose of the transactions, at least in part, was to conceal

3   that the source of the proceeds flowing through Website Technologies to Cereus were

4   illegal proceeds of prostitution ads sold on Backpage.  *See Golb*, 69 F.3d at 1423–24

5   (noting that jury did not have to accept defendant's explanation that "the convoluted

6   payment methods were only used to avoid Colombian currency exportation laws," and not

7   to conceal the source of the funds).

8        Defendants' requests for judgment of acquittal on Counts 53–62 are denied.

9
10       **b.    Counts 64–68:    International Promotional Money
         Laundering Under Subsection 1956(a)(2)(A) (Messrs.
11       Lacey and Brunst)**

12       Messrs. Lacey and Brunst were charged with violation of international promotional

13   money laundering in Counts 64–68.  Mr. Brunst was convicted of each charge and no

     verdict was returned on Mr. Lacey.

14
15       To satisfy the requirements of Subsection 1956(a)(2)(A), evidence must establish

16   that a defendant or co-conspirator transferred funds internationally with "the intent to

     promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  At

17   trial, it was established that Ad Tech B.V. made these transfers from its Netherlands bank

18   account to Cereus Properties' Arizona Bank & Trust account between August 5, 2016, and

19   November 15, 2016, and that they totaled approximately $11.3 million.  (Trial Tr., Doc.

20   1928 at 150–51; Trial Ex. 1479).  Defendants argue that there is insufficient evidence of

21   their intent to promote Travel Act violations from which a jury could convict on these

22   Counts.  The Court again disagrees.

23
24       A jury may infer intent to promote the illegal activity from evidence that illicit

25   proceeds have been transferred.  *United States v. Barragan,* 263 F.3d 919 (9th Cir. 2001)

     (noting that in the Ninth Circuit, government is not required to prove that a defendant

26   reinvested illegal proceeds into the illegal enterprise to show intent to promote).  For

27   example, courts have found sufficient intent to promote where evidence showed that funds

28   were distributed to co-conspirators, *Manarite*, 44 F.3d at 1415–16 (holding that evidence

that defendants distributed proceeds from illegal chip-cashing scheme was sufficient to support conviction for money laundering because the "scheme could not benefit its participants unless the chips were cashed"); were used to pay persons integral to the success of the illegal activity, *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995) (finding evidence that defendant made payments to suppliers of contraband cigarettes was evidence of intent to promote on grounds that the defendant "could not have continued the illegal trafficking without paying his. . . suppliers"); and even where the defendant simply deposited a check in his own bank account, *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991), *rev'd on other grounds, McCormick v. United States*, 500 U.S. 257 (1991) (holding that depositing a check in a bank account evidenced an intent to promote on the grounds that defendant could only make use of the funds if he deposited the check).

Here, Mr. Thai testified that Ad Tech B.V. received revenue from Backpage following the April 2015 sale of Backpage to Ferrer. (Trial Tr., Doc. 1923 at 129: 4–17; Trial Ex. 1481). The transfers at issue show Ad Tech B.V. sending funds to Cereus Properties, funds that then "almost immediately" went to Defendants. (Trial Tr., Doc. 1923 at 136–37). The Court finds that these transfers sufficiently evidence Defendants' intent to promote the carrying on of Travel Act offenses. Construing the evidence in the light most favorable to the prosecution, the Jury could have divined an intent to promote the Travel Act offenses from Ad Tech B.V.'s deposit of funds into Cereus Properties' account. *Mararite*, 44 F.3d at 1415. A rational jury could also have concluded that Mr. Ferrer, as the co-conspirator in control of Ad Tech B.V., could not have continued selling prostitution ads on Backpage without making these payments to Cereus Properties, which was owned by Defendants. *Baker*, 63 F.3d at 1494.[24] Defendants' requests for judgments of acquittal on Counts 64–68 are denied.

/ / /

/ / /

---

[24] This reasoning applies whether or not Cereus Properties was used for Backpage payroll purposes or solely functioned to collect the balance and interest on the loan.

### c. Count 100: International Concealment Money Laundering Under Section 1956(a)(2)(B)(i) (Mr. Lacey)

Mr. Lacey was convicted of international concealment money laundering in Count 100. The Superseding Indictment states that on January 3, 2017, Mr. Lacey transferred $16.5 million from his Johnson Bank of Arizona account to a Primus Trust Co./K&H Bank in Hungary. (Doc. 230 ¶¶ 210–11). It alleges that Mr. Lacey knew the funds represented proceeds of some form of unlawful activity; and that he made the transfer in whole or in part to conceal the source of the proceeds of the unlawful activity. (*Id.* ¶ 211).

Section 1956(a)(2)(B)(i) provides in relevant part,

> (2) Whoever transports or attempts to transport a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
> . . .
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that the transportation, transmission, or transfer is designed in whole or in part - -
> . . .
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .
> shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2)(B)(i); *United States v. Monroe*, 943 F.2d 1007, 1015 (9th Cir. 1991).

The evidence at trial showed that upon receiving his share of the loan payments to Cereus Properties, Mr. Lacey put his funds into five (5) two-year annuity trusts that he controlled.[25] In July 2016, Mr. Lacey sent a letter to his attorney John Becker ("Mr. Becker") asking Mr. Becker to connect him with another attorney "who has expertise in off-shore." (Trial Ex. 1). The letter stated, "to revisit for just a moment, I am not interested in any tax avoidance, I just want to put some assets in place where litigious parties,

---

[25] These transfers for the basis of Counts 94–99.

including government parties, cannot access my accounts." (*Id.*) Then, sometime in November 2016, Mr. Lacey met with bank officer Lin Howard at Arizona Bank & Trust, seeking advice on how assets were seized and could be protected. (Trial Tr., Doc. 1925 at 11:1–7). During that meeting, which Ms. Howard testified made her "very uncomfortable," Mr. Lacey made it clear that he was not looking to avoid paying taxes on the assets but was looking to move some assets "offshore in order to protect them from government seizure." (*Id.* at 15:10–11; 11:11–13). After this exchange, Arizona Bank & Trust ceased doing business with Mr. Lacey. (*Id.*).

Mr. Lacey's five (5) annuity trusts were ultimately consolidated into Mr. Becker's IOLTA account and on January 3, 2017, Mr. Lacey, through Becker, transferred $16.5 million from the IOLTA account at Arizona Johnson Bank to Primus Trust Company/K&H Bank in Hungary to create a trust for the benefit of Mr. Lacey's two sons. (Trial Ex. 1479). Thereafter, Mr. Becker, on behalf of Mr. Lacey, timely filed with the United States government a "Foreign Bank Account Report," or "FBAR" related to the Hungary account, but only after obtaining extension of time for Mr. Lacey to do so.

As with Counts 53–62, Mr. Lacey argues that there was insufficient evidence at trial to show (1) he actually concealed or intended to conceal any attribute of the funds at issue in Count 100; or (2) that he knew the funds at issue were the proceeds of specified unlawful activity. (Doc. 2004 at 2). The Court will address each argument in turn.

### i.    Concealment

Mr. Lacey argues that there was insufficient evidence that his international transfer was designed to conceal that the source of the funds were illegal proceeds of prostitution ads. He compares his case to that of the drug courier in *Cuellar*. In that case, Mr. Cuellar was charged with international concealment money laundering after authorities discovered him transporting $81,000 of drug proceeds into Mexico. *Id.* at 552. The funds were found in a secret compartment of his car, covered in plastic bags and animal hair. *Id.* The Supreme Court agreed that this evidence showed Mr. Cuellar intended to conceal the money *to transport it* into Mexico but held that that evidence was insufficient to uphold

Mr. Cuellar's concealment conviction because it did not show that it was his ultimate purpose to conceal an attribute of the funds. *Id.* The Court found the evidence showed Mr. Cuellar's ultimate purpose was to "compensate the leaders of the operation," not to conceal its source. *Id.* at 566 (explaining "*how* one moves the money is distinct from *why* one moves the money"). *See also id.* ("The evidence suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation . . . , but not necessarily that secrecy was the *purpose* of the transportation.").

Mr. Lacey argues that his international transfer to the Hungarian account similarly had no concealment purpose. He says the purpose of the transfer was to put the funds "into a bank that would not close the account thereby causing further banking instability, and to fund a trust that had been created for Mr. Lacey's sons." (Doc. 2004 at 8). He further argues that his stated interest in placing funds where government entities could not access them does not evidence an intent to conceal the source of the funds because the word "access" does not mean the same thing as to "conceal," and the Government has pointed to no authority supporting this "analytical leap." (Doc. 2033 at 2). He points out that the Court defined "concealment" for the Jury as "the act of preventing disclosure or refraining from disclosing." (Doc. 1999 at 4). He says his transactions relating to Count 100 were entirely "open and obvious," showing only an intent to disclose the attributes of the transfer. For support, he points out that all the bank accounts at issue clearly belonged to him because he was the owner or the beneficiary of each of them; that Mr. Thai confirmed as much when he testified that he could follow each transaction with ease due to the names on the accounts; and that the existence of the Hungarian account, its location, value, and associated taxpayer (Mr. Lacey), were timely reported to the United States government via a required "FBAR." (*Id.* at 6). He says that his statements to Mr. Becker and Ms. Howard that he had no interest in seeking a tax shelter in moving his assets off-shore further reflect an intention to disclose the attributes of the funds, not to conceal them.

Although Mr. Lacey raises some plausible characterizations of the trial evidence, the Court ultimately disagrees that a rational juror could not have found the purpose of his

- 51 -

1    international transfer was to conceal the source of the funds.  The money laundering statute

2    is violated if the transaction in question is "designed in whole or *in part*" to conceal.  18

3    U.S.C. § 1956(a)(2)(B)(i) (emphasis added).  Unlike in *Cuellar*, the Government provided

4    sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungary

5    account, at least in part, was to conceal that the true source of the funds stemmed from

6    sales of Backpage prostitution ads.

7            The Jury could possibly have divined this intent from Mr. Lacey's statements to his

8    attorney and Ms. Howard that he wanted to put his assets somewhere the government

9    "could not access them."  Though the Government has not provided the Court with a case

10   in which a defendant's intent to shield assets from government seizure amounted to

11   concealment under Subsection 1956(a)(2)(B)(i), the Court nonetheless finds that a rational

12   Jury could have interpreted Mr. Lacey's statements to mean that he thought the

13   international transfer would further conceal the origin of the funds and thus prevent the

14   government from accessing them.  The Court rejects Mr. Lacey's suggestion that this is an

15   improper analytical leap to make.

16           Moreover, the jurors could have also been persuaded by the fact that Mr. Lacey's

17   transfer to Hungary was the last transfer in a series of unusual transactions that had the

18   effect of distancing the funds from Backpage proceeds.  In *United States v. Wilkes*, the

19   defendant was convicted of bribery for making payments to a congressman in exchange

20   for government contracts and transactional money laundering concealment under

21   § 1956(a)(1)(B)(i).  662 F.3d at 547.  In upholding the defendant's conviction, the Ninth

22   Circuit noted that certain transactions that "provided additional buffers between the corrupt

23   contract and the [payoffs]" were evidence of intent to conceal the source of the funds

24   because these transactions were "convoluted" and not "simple transactions."  *Compare id.*

25   *with Adefehinti*, 510 F.3d at 323 (finding no evidence of intent to conceal where a

26   fraudulent check was negotiated at a bank and most of the proceeds "were either cashed or

27   went directly into accounts in the name of defendants or their associates without passing

28   through any other person's account").

As in *Wilke*, the Government here provided evidence of similar "buffer" transactions that a rational jury could have found were indicative of an intent to conceal the source of the funds. Specifically, there was evidence showing that Mr. Lacey and his alleged co-conspirators created Website Technologies and Cereus Properties to insulate those entities from the tainted Backpage proceeds. The Government's expert witness showed how these funds flowed through these entities before being distributed to Mr. Lacey, who then sent the funds to five separate annuity trusts he controlled. From there, Mr. Lacey wired the funds in the trusts to Mr. Becker, who consolidated the money into his IOLTA account before transferring it to Hungary to create a trust for the benefit of Mr. Lacey's two sons. Even though the Government's expert testified that he could follow the trail of funds with relevant ease, there is enough here to suggest that these transfers, including the one charged in Court 100, were not the type of "simple transactions" that fall outside of the money laundering statute. *Accord United States v. Chang*, 2020 WL 5702131, * (N.D. Cal. Sept. 24, 2020) (denying defendant's Rule 29 motion where the Government introduced evidence that transfers of improperly solicited donations were made to an illegitimate enterprise entity in order to conceal that defendant used the money on personal expenses). *See also United States v. Tekle*, 329 F.3d 1108, 1113–14 (9th Cir. 2003) (rejecting the defendant's argument "that the government did not prove that he intended to conceal the illegal nature of [drug trafficking] funds because the 'transactions in question were open, notorious, and did not disguise defendant's identity'" as "[t]he necessary concealment. . . is that of the source of the funds, not the identity of the money-launderer"). And though the FBAR that Mr. Lacey filed suggests that he intended to pay his taxes on the funds therein, the filing does not necessarily negate the fact that the transfer concealed the source of the funds more than it did before the funds were transferred. *Johnson*, 440 F.3d at 1291. Based on these facts, a rational jury could have found that the purpose of Mr. Lacey's Hungary transfer was at least in part to conceal that the funds found their source in the proceeds of illegal Backpage prostitution ads.

/ / /

###### ii.     Knowledge

Mr. Lacey also says the Government adduced insufficient evidence that he knew "the funds at issue were proceeds of specified unlawful activity in the form of Travel Act violations for the facilitation of prostitution business enterprises." (Doc. 2033 at 9). Not so. The Court finds that there was substantial evidence from which a rational juror could have inferred Mr. Lacey's knowledge that the funds were proceeds from Backpage prostitution advertisements.

First, the Government provided sufficient evidence from which a juror could infer that Mr. Lacey knew Backpage sold ads for prostitution. As has been discussed, *supra*, such evidence included Mr. Lacey's article on Backpage's business practice, in which he writes that Backpage is providing "the oldest profession in the world" with transparency (Trial Ex. 113a) and his public statement that he believed "in legalized prostitution" (Trial Ex. 1911b). The Government also introduced evidence of statements made during meetings Mr. Lacey and the other owners of Backpage had with NCMEC. During that meeting, NCMEC representatives presented Mr. Lacey and others with Backpage ads from the Adult escort section that contained links to TER. This evidence could have led a rational juror to infer that Mr. Lacey was aware that all or some of the Adult escort ads on Backpage were illegal sex for money ads. *See Singh*, 995 F.3d at 1075. In doing so, the Jury could have also found that the ads were not deserving of any First Amendment protections that may otherwise have insulated Mr. Lacey from liability.

Second, as described above, testimony from Messers. Ferrer and Thai provided sufficient evidence from which the Jury could have concluded that the funds at issue in Count 100 came from Backpage's prostitution ads. Mr. Lacey argues his statement to his lawyer that the source of the funds was revenue from the sale of Backpage "cannot be equated with knowledge that the funds at issue were the proceeds of specified unlawful activity, meaning the proceeds from one of the 50 charged ads." (Doc. 2004 at 11). But again, there is also no requirement that the Government must show that Mr. Lacey had knowledge that the funds that were transferred were proceeds from the specific 50 ads

1   charged.  Where there is evidence from which a jury could infer the source of the funds

2   was from violations of the Travel Act—here, in the form of selling sex for money ads, Mr.

3   Lacey's Subsection 1956(a)(1)(B)(i) conviction can stand.

4       Defendants' Motions for a Judgment of Acquittal on the Section 1956 Counts are

5   denied.

6   ### 2.   Money Laundering Counts Under 18 U.S.C. § 1957

7       Defendants argue that judgments of acquittal should enter in their favor on the

8   Section 1957 Counts because the prosecution failed to prove that any alleged laundered

9   money in Counts 69–99 "derived from specified unlawful activity"—in this case,

10  violations of the Travel Act.  (Doc. 2007 at 18).  All of the transfers at issue in Counts 69–

11  99 are alleged to derive from unlawful Backpage proceeds.

12      "A conviction for money laundering under 18 U.S.C. § 1957 requires the

13  government to show: (1) the defendant knowingly engaged in a monetary transaction; (2)

14  he knew the transaction involved criminal[ly derived] property; (3) the property's value

15  exceeded $10,000; and (4) the property was derived from a specified unlawful activity."

16  *United States v. Roger*, 321 F.3d 1226, 1229 (9th Cir. 2003).[26]  The statute defines

17  "criminally derived property" as "any property constituting, or derived from, proceeds

18  obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).  "In a prosecution for an offense

19  under this section, the Government is not required to prove the defendant knew that the

20  offense from which the criminally derived property was derived was specified unlawful

21  activity." *Id.* § 1957(c).  Indeed, the "statute applies to the most open, above-board

22  transaction." *United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997).

23      Unlike Section 1956 charges, the Ninth Circuit imposes a tracing requirement in

24  Section 1957 cases due to Section 1957's potentially broad reach.  Under this view, the

25  prosecution can succeed on a Section 1957 charge in one of three ways: (1) by establishing

26  that the entire business from which the funds derived was an illegal enterprise; (2) by

27  showing that a deposit of at least $10,000 of criminally derived proceeds were made into

28

---

[26] Travel Act violations qualify as "specified unlawful activity." 18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

defendant's account; or (3) in the case of a withdrawal transaction, by showing that all of the funds were transferred out of the account. *Rutgard*, 116 F.3d at 1292; *United States v. Yagman*, 502 F.Supp.2d 1084 (C.D. Cal. Aug. 17, 2007). In contrast to other circuits, the Ninth Circuit rejects the presumption that proof that some criminally derived funds exist in an account means that a subsequent transfer of funds out of that account involves those criminally derived funds. *Rutgard*, 116 F.3d at 1292–93 (explaining that "[t]he statute does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds . . . and [t]o create such a presumption in order to sustain a conviction under § 1957 would be to multiply many times the power of that draconian law").

Here, the Government's theory was that *all* proceeds from Backpage were criminally derived from Defendants' Travel Act violations, and thus *all* subsequent transfers stemming from Backpage and/or Website Technologies and Ad Tech B.V. were unlawful under Section 1957.[27] The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation such that a rational jury could have traced the funds back to a criminally-derived source. Even the fact that the Government offered evidence showing that the majority of Backpage's revenue—at times up to 96%—stemmed from sales of ads posted in the Adult Escort section of Backpage is insufficient to sustain these convictions. A nearly identical argument was unsuccessfully advanced in *United States v. Hanley*, 190 F.3d 1017, 1024, 1025–26 (9th Cir. 1999), *superseded in part by* U.S.S.G. § 2S1.1 (2001) (rejecting the government's argument that the tracing requirement was satisfied where the

---

[27] The Court asked Government counsel to clarify this point during oral argument on the Rule 29 Motions:

**Court:** So is it your position that, essentially then, any proceeds that were received from the operation of Backpage at that time then - - because they were considered illegals proceeds, then whatever was used with that money to purchase then could be alleged?
**Mr. Kozinets:** Absolutely, Your Honor.
**Court:** That's the – that's the position?
**Mr. Kozinets**: Absolutely.

(Doc. 1903 at 69).

1  government had proven that the great majority of the funds in the account were criminally

2  derived funds).  And because the Government made no attempt to trace the proceeds that

3  derived from a particular Travel Act violation or violations, it cannot be said that a rational

4  jury could have concluded "beyond mere speculation" that at least $10,000 of criminally

5  derived proceeds were transferred to Defendants in any of the Section 1957 charges.

6  *Yagman*, 502 F.Supp.2d at 1089.

7      Because Counts 69–99 all suffer from this evidentiary deficiency, the Court will

8  enter judgments of acquittal on each of these charges.

9          **3.      Conspiracy to Commit Money Laundering (Count 52)**

10     To convict an offender of money laundering conspiracy under Subsection 1956(h),

11  the government must prove the following elements beyond a reasonable doubt: (1) there

12  was an agreement to commit money laundering; (2) the defendant knew the objective of

13  the agreement; and (3) the defendant joined the agreement with the intent to further its

14  unlawful purpose.  *United States v. Jaimez*, 45 F.4th 1118, 1124 (9th Cir. 2022), *cert.*

15  *denied*, 143 S. Ct. 1038 (2023).  Here, the object of the alleged conspiracy was to commit

16  the substantive money laundering offenses alleged in the Superseding Indictment.

17  (Doc. 230 ¶ 203(a)–(e)).

18     Defendants reiterate many of the arguments they made relating to the alleged

19  deficiency of evidence supporting the substantive money laundering offense to argue they

20  are entitled to a judgment to acquittal on the conspiracy to commit money laundering

21  charge.  (*See* Doc. 2007 at 20–21).  They also argue there was insufficient evidence of an

22  agreement to launder money as alleged.  As discussed above, the Court finds that there is

23  sufficient evidence to convict Defendants on all of the Section 1956 money laundering

24  charges.  As explained, *supra*, the Government was not required to "link" a particular

25  Travel Act violation to a violation of Section 1956 in order for those charges to stand.  *See*

26  *e.g.*, *Golb*, 69 F.3d at 1422 (stating that a defendant need not actually be convicted of the

27  underlying specified unlawful activity for a money laundering conviction to stand where

28  there is evidence from which a jury could have inferred that the source of laundered

1    proceeds was illegitimate).

2          Moreover, a rationale juror could have inferred that Defendants agreed to form

3    entities and structure the sale of Backpage to distance themselves from the unlawful

4    proceeds stemming from Backpage's sale of prostitution ads, i.e., violations of the Travel

5    Act by facilitating the promotion of prostitution. *Kaplan*, 836 F.3d at 1212 (holding that

6    an agreement "can be proved by direct or circumstantial evidence, including inferences

7    from circumstantial evidence").

8          The Court will therefore deny Defendants' request to enter a judgment of acquittal

9    on Count 52.

10   **III.   DEFENDANTS' RULE 33 MOTION FOR NEW TRIAL[28]**

11         Defendants have also filed a joint Motion for a New Trial.  Rule 33 permits the

12   Court to vacate a judgment and grant a new trial "if the interest of justice so requires."

13   Fed. R. Crim. P. 33(a).  Although a court's power to grant a motion for a new trial is "much

14   broader than its power to grant a motion for judgment of acquittal," it may not grant the

15   motion unless it finds that "despite the abstract sufficiency of the evidence to sustain the

16   verdict, the evidence preponderates sufficiently heavily against the verdict" such that "a

17   serious miscarriage of justice may have occurred." *United States v. Kellington*, 217 F.3d

18   1084, 1097 (9th Cir. 2000) (citation omitted); *United States v. Alston*, 974 F.2d 1206,

19   1211–12 (9th Cir. 1992).  The "burden of justifying a new trial rests with the defendant."

20   *United States v. Saya*, 101 F.Supp.2d 1304, 1307 (D. Haw. 1999) (citing *United States v.*

21   *Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986)).  "[T]he government bears the burden of

22   proving beyond a reasonable doubt that an error was harmless." *United States v. Benamor*,

23   925 F.3d 1159, 1166 (9th Cir. 2019) (citation omitted).  In general, motions for new trial

24   "are not favored by the courts and should be viewed with great caution." *United States v.*

25   *Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (internal quotation omitted).

26         The Court will review Defendants' arguments in turn.

---

27   [28] The Court notes that the parties, again, omit record support for their assertions, and quite
     often mischaracterize the record testimony.  The Court declines to scour the months-long
28   trial record or years long case docket to find support for their unsupported assertions.

1

**A.      Jencks & *Brady* Violations**

Making some of the same arguments that they did in their unsuccessful post-trial Motions to Dismiss (Docs. 1958; 1967; 1972), Defendants first argue that a new trial is warranted because the Government failed to make timely disclosures to the Defendants as required by the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*").[29]  They argue the Government failed to timely produce (1) emails between Mr. Ferrer and government witness postal inspector Lyndon Versoza; and (2) documents disclosing "the factual information the government developed during its investigation of Backpage.com in Western District of Washington in 2012–2013 [(the "WDWA Investigation")]." (Doc. 2009 at 3).

**1.      Mr. Ferrer's Emails to Lyndon Versoza**

The Court's February 7, 2024, Order denying Defendants' Motion to Dismiss (Doc. 2042) addressed certain of Mr. Ferrer's emails, finding that they were "signed or otherwise approved or adopted" by him and therefore qualified as Jencks material under 18 U.S.C. § 3500(e).  (*Id*. at 8).  However, the Court also determined that the Government's late disclosure did not warrant dismissal of the case or striking Mr. Ferrer's testimony because the material had been previously disclosed. (*Id*. at 9).  Defendants do not advance any new grounds in their Rule 33 Motion.  Thus, for the reasons stated in its February 7, 2024, Order, the Defendants' Motion for a New Trial based on these grounds is denied.

**2.      Presumed *Brady* Information From the 2012–13 WDWA Investigation of Backpage**

Defendants next argue the Government failed "to produce nearly all the factual information developed during the WDWA Investigation . . . [which] did not result in a prosecution of Backpage or its owners." (Doc 2009 at 2).  The Government responds that this argument "speculate[s] about what that investigation 'determined' and assert[s], without support that unspecified materials from the investigation are plainly exculpatory

---

[29] The Defendants asserted this argument without benefit of the Court's February 7, 2024, Order (Doc. 2042) and the Court incorporates its findings from that Order because their arguments are mostly duplicative.

1    and impeaching" and that Defendants have already litigated and lost this argument.

2    (Doc. 2022 at 3).

3          The Defendants' Motion is indeed based on speculative findings of the WDWA

4    Investigation and the reasons why it did not result in a prosecution of Backpage or its

5    owners.    Defendants speculate that the WDWA Investigation included potential

6    *Brady* material because it likely determined that "though many people who saw

7    Backpage.com adult ads might conclude the ads related to prostitution, their conclusions

8    would be unsound because so many activities involving sex and money are lawful;" and

9    because "Backpage.com's moderation practices were consistent with industry standards."

10   (Doc. 2009 at 5).  They do not cite to any record evidence or testimony to support these

11   claims.  Nonetheless, they accuse the Government of failing to produce this material under

12   *Brady* and say this failure warrants a new trial.  (Doc. 2009 at 5 ("[T]he government's

13   refusal to produce to the defense *these plainly exculpatory and impeaching materials*

14   warrants, at minimum, a new trial.") (emphasis added)).

15         As best as the Court can glean, Defendants assert that they were prejudiced by the

16   non-production because in their absence they were unable to adequately defend against

17   Mr. Ferrer's statement at trial that in 2012 Backpage was experiencing "pressure" due to

18   "another prostitution investigation of the site."  (Trial Tr., Doc. 1971 at 80:5–8; *see*

19   Doc. 2009 at 4 (arguing that when the Government elicited this statement it "used the

20   investigation as a sword at trial while seeking to shield disclosures relating to that

21   investigation")).  They argue that, without the WDWA disclosure, they were hampered

22   from offering that the WDWA Investigation exonerated Backpage and its owners from

23   illegality.  (*See* Doc. 2009 at 4–5).

24         From the outset of the case, Defendants have strenuously litigated the Government's

25   discovery production relating to the WDWA Investigation.  In addressing Defendants'

26   November 1, 2021, Motion to Dismiss the Superseding Indictment (Doc. 1355), this Court

27   reviewed their assertion that the Government failed to produce exculpatory evidence

28   related to the WDWA investigation.  (*See* Doc. 1444 (the Court's December 29, 2021

- 60 -

Order)).  Earlier, in Defendants' September 9, 2021, Motion to Compel (Doc. 1281), Defendants sought an order compelling the Government to produce all materials from its WDWA investigation that were relied upon when its attorneys concluded that there was no evidence of criminality and asserting that they sought all evidence from the investigation, noting that it is likely exculpatory.  (*Id.* at 6).  This Court found that these same arguments had been previously considered and ruled upon.  Two previously-assigned courts had already found "[i]t is clear to the Court that the investigation that took place in the Western District of Washington is wholly separate from the criminal case before the Court . . . and [t]he Defendants have failed to demonstrate how the mental impressions and legal analyses from attorneys that are not involved in this case could potentially be considered exculpatory evidence."  (*See* Doc. 1444 (citing Doc. 449)).  Those courts also found that the attorney memos were irrelevant to the indictment and proceedings in *this* criminal case.  That the Court has now heard the case in its totality does not give it reason to change these rulings or grant Defendants a new trial based on alleged *Brady* violations.

During the trial, the Court permitted the Government to introduce testimony of the Defendants' knowledge that Backpage was being used to promote prostitution.  For example, Mr. Ferrer was allowed to testify that several NGOs repeatedly informed Defendants that their website was selling girls and women for money and that Backpage was receiving thousands of subpoenas relating to prostitution and trafficking on Backpage.  Mr. Ferrer's brief statement that Backpage and its owners were "pressured" was another example of testimony that suggested Defendants knew their website was facilitating the promotion of prostitution.  Defendants, in turn, had ample opportunity to solicit testimony from the Government and their witnesses about whether the Travel Act counts were actually offers of sex for money or that the Defendants were on notice that they were sex for money ads.  Indeed, the Defendants' own expert witness, Dr. Kimberly Mehlman Orozco, testified that no one could be certain that any ad, irrespective of where it was posted, is an actual sex for money ad.  Trial Tr., Doc. 1930 at 50:12–20.  The Defendants have not convinced this Court (or any other, previously-assigned court) that the presumed

*Brady* material from the WDWA Investigation would have been material to the issues at trial, could have been used to impeach witnesses, or that a new trial would likely have resulted in acquittal.  *United States v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991).  Defendant's Rule 33 Motion is therefore denied on that basis.

### B.  Mr. Ferrer's Testimony Relating to Ms. Robinson

Defendants next argue that they are entitled to a new trial because the Government "elicited false or misleading testimony from Carl Ferrer" relating to his communications with Ms. Robinson, the poster in ads from Counts 3, 6–11, and 18.  (Doc. 2009 at 6); *see also supra* Section II.B(2)(b) ("Commission of Travel Act Violations in Counts 3, 6–11, 18").  When, as here, a defendant asserts a new trial is warranted because the prosecution used perjured testimony, additional standards apply.  If the perjury was used knowingly the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have [a]ffected the judgment of the jury." *United States v. Young,* 17 F.3d 1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)).  If the defendants cannot show that the Government knowingly used false testimony, then the conviction will be set aside "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir. 1989) (citing *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

Upon review of the record, the Court does not find evidence that Mr. Ferrer's testimony about his communications with Ms. Robinson were false or misleading.  The Government introduced hundreds of exhibits and testimony through Ferrer about his email communications.  Mr. Ferrer testified that he used several email addresses including carl.ferrer@backpage.com and carl@backpage.com.  Mr. Ferrer testified that he recalled having email exchanges with Ms. Robinson using carl@backpage.com "from 2010–2018" and that "there were a lot of emails."  (Trial Tr., Doc. 1795 at 79).

Defendants say a new trial is required because Mr. Ferrer stated on cross-examination that carl@backpage.com "really wasn't my email address."  From this

1    statement they conclude that his testimony that he communicated with Ms. Robinson

2    through that email address "was false (or at least highly misleading)." (Doc. 2009 at 8).

3    They contend "Mr. Ferrer admitted on cross-examination that the emails to and from the

4    carl@backpage.com email address were *received by and responded to by his staff, not by*

5    *him*, contrary to his testimony on direct examination." (Doc. 2009 at 8) (emphasis added).

6         These contentions are unsupported by the record and conveniently ignore other

7    testimony Mr. Ferrer gave about his communications. The Court's scrutiny of Mr. Ferrer's

8    testimony fails to find a statement that Mr. Ferrer did not respond to emails sent to

9    carl@backpage.com. The record reflects that Mr. Ferrer acknowledged his *primary* email

10   address was carl.ferrer@backpage.com, but that he also received emails at

11   carl@backpage.com. (*See* Trial Tr., Doc. 1867 at 106–07). Though Mr. Ferrer testified

12   he used carl@backpage.com primarily for marketing and that others also used it, he also

13   testified that "they would often bring emails to my attention if they needed help with it."

14   (Doc. 1867 at 104). Significantly, Mr. Ferrer recognized certain email exchanges as emails

15   that he personally responded to. For example, when asked whether Trial Exhibit 163 was

16   "also an e-mail exchange between you and Pamela Robinson?" he answered "Yes, it is."

17   (Trial Tr., Doc. 1795 at 86). He further acknowledged that Trial Exhibit 164 was a

18   responsive email he drafted to Ms. Robinson, and that he had to have Mr. Spear approve it

19   before he sent it because the email addressed Backpage's safety and security

20   enhancements, decisions he said were at Mr. Spear's pay grade. (*Id.* at 89–90).

21        Based on these circumstances, the Court does not find that Mr. Ferrer's testimony

22   recalling eight years of email exchanges between carl@backpage.com and Ms. Robinson

23   was perjury. The Defendants merely anchor their Rule 33 Motion to Mr. Ferrer's

24   acknowledgment that others had access to that email address. Without more, the Court

25   cannot find that this one statement "could have affected the judgment of the jury" in

26   convicting Mr. Spear on Counts 3, 6–11, and 18. Thus, Defendants Rule 33 Motion is

27   denied on this basis.

28   / / /

### C.    The Government's Opening and Closing Statements

Defendants next argue they are entitled to a new trial because "the Government repeatedly made improper arguments in its opening and closing statements." (Doc. 2009 at 9).  They claim the Government improperly urged the Jury to convict them on improper grounds including: (1) on a legally insufficient object of conspiracy, that is "to make money;"[30] (2) an impermissible boundless conspiracy; (3) on the grounds of "promoting prostitution" (where statute only proscribes facilitating the promotion of prostitution);  (4) without a showing of specific intent, and (5) because it improperly "exhorted" the Jury to convict Defendants on publication of ads protected by the First Amendment.  (*Id*. at 9–16).  Defendants also argue that the Government improperly referenced evidence in its closing argument that was admitted under hearsay exceptions for truth of the matter.

As an initial matter, the Court notes that the Jury was instructed that "statements . . . and arguments by the lawyers are not evidence." (Doc. 1998 at 7).  The Jury was clearly instructed on the substantive Conspiracy count and on the meaning of "promote" or "facilitate the promotion of" as those terms are defined in the Travel Act. (*Id*. at 24–25, 30).  Without new and/or material evidence to the contrary, a jury is regularly presumed to accept the law as stated by the court, not as stated by counsel.  *See United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998).  So, this Court presumes that the Jury adhered to its instructions, rather than the attorneys' arguments, in its decisional process.

Nonetheless, a criminal conviction can be overturned based on a prosecutor's comments if they affected the fundamental fairness of the trial.  *United States v. Young*, 470 U.S. 1, 11 (1985).  A "trial Judge has broad discretion in controlling closing argument, and improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Navarro*, 608 F.3d 529, 535–36 (9th

---

[30] This is the same argument asserted in their Rule 29 Motions.  To the extent previously discussed, the Court incorporates its related findings for purposes of their Rule 33 Motion.

Cir. 2010) (internal quotations and citations omitted).  Furthermore, it is not misconduct for the Government to argue reasonable inferences based on the record.  *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

### 1.    Legally Insufficient Object of the Conspiracy

As they did in their Rule 29 Motions, Defendants maintain the Government improperly told the Jury it was enough to convict Defendants of conspiracy to commit the Travel Act when the prosecutor stated that the object of the conspiracy was to make money, which Defendants contend is a legally insufficient object on which to convict for conspiracy.  (Trial Tr., Doc. 1933 at 6–7).[31]  The Court has repeatedly addressed and rejected this argument.  The Ninth Circuit recognized that the object of a conspiracy can be to accomplish an unlawful purpose, or a "lawful purpose by unlawful means." *Caplan*, 633 F.3d at 542.  In its rebuttal closing argument, the Government clarified this point for the Jury:

> The defendants say, "Hey, it's not illegal in the United States of America to make money." We haven't charged them with that.  There is no federal statute that says it's illegal to make hundreds of millions of dollars.  That is not the charge.  That is not the crime.  They are not charged with making money.  They are charged with *how* they made money.  Money was the object of the conspiracy. They are charged with *how* they made money, and that was off the backs of people engaged in illegal prostitution business enterprises.

(Trial Tr., Doc. 1961 at 40:12–20) (emphasis added).  The Government's rebuttal demonstrates that it did not ask the Jury to convict on a legally insufficient object of conspiracy.

### 2.    Boundless Conspiracy

The Court need not address Defendants' boundless conspiracy argument because nothing in the Government's summation supports that claim.  In reminding the Jury of the evidence supporting each Travel Act count, the Government adhered to the Court's prior orders that Defendants were not "indicted for the amorphous notion of

---

[31] The record does not reflect that any Defendant objected to the Government's statement.

1   'prostitution' . . . they were indicted for facilitating (via publishing ads) on fifty distinct

2   occasions where prostitutes, prostitution-related business, or other groups were involved

3   in the business of prostitution." (Doc. 946 at 13).

### 3.   Promoting Prostitution and Specific Intent

5   The Court rejects Defendants' arguments that the Government urged the Jury to

6   convict them on the grounds of promoting prostitution and without a showing of specific

7   intent.   Defendants identify statements made by the Government during opening and

8   closing arguments that they say inferred the Jury could convict Defendants on promoting

9   prostitution as opposed to facilitating the promotion of prostitution.   However, the Court

10  will not hold the Government to a standard that requires the prosecutors to quote the

11  language of the Travel Act each time they refer to it.   As discussed, the Jury was properly

12  instructed on the elements of the Travel Act.   (Doc. 1998 at 30).   The same is true with

13  regard to the legal definition of specific intent.   (*Id.*)   The Jury is presumed to follow the

14  Court's instructions, including that they apply the law as given to them.   (*Id.* at 2).

### 4.   Reference to Evidence Admitted Under Exceptions to Hearsay

16  Defendants next argue a new trial is warranted because the Government improperly

17  told the Jury during its closing that (1) Defendants "know about the Attorneys Generals

18  letters, and they know they are not on solid ground;" and (2) that the CNN documentary

19  showed that Backpage had "cornered the market on prostitution advertisement" and "all

20  you had to do was go to Backpage.com and post an ad and the phone started ringing in

21  minutes." (Doc. 1009 at 17).   Defendants say in doing so, the Government improperly

22  referenced evidence "for the truth"—e.g., "that all the adult ads on Backpage.com were

23  prostitution ads, and that nearly all of the Backpage.com's revenues were from prostitution

24  ads"—when at trial, the State Attorneys General letters and CNN documentary were only

25  admitted to prove Defendants were on notice that Backpage posted ads for prostitution.

26  (*Id.*)[32]

---

[32] Defendants also state that the Government used "that evidence for its truth throughout the trial . . ." (Doc. 2009 at 17).   However, Defendants offer no trial record citation for this assertion, so the Court declines to consider it.

Upon review of the record, the Court rejects this kitchen sink argument. As acknowledged, the Government sought the admission of the AG letters and the CNN documentary to show that Defendants were aware of Backpage's prostitution ad platform. Relevant evidence is admissible so long as it is "probative of the proposition it is offered to prove, and . . . the proposition to be proved must be one that is of consequence to the determination of the action" and the Government is permitted to argue reasonable inferences based on the record. *Necoechea*, 986 F.2d at 1276; *United States v. Click*, 807 F.2d 847, 850 (9th Cir. 1989). The Government introduced evidence, including co-conspirator statements, to show Defendants' knowledge or absence of mistake that sex for money ads were being posted on Backpage. There was nothing grossly prejudicial about the Government's closing references to these categories of evidence, especially considering the Court's instructions and admonishment that attorneys' arguments are not evidence.

Indeed, the Jury's mixed verdict supports an inference that they adhered to the Jury Instructions by applying the evidence and testimony to the law. The Court finds nothing in the Government's closing argument affected the fundamental fairness of the Defendants' trial. The Court denies the Defendants' Rule 33 Motion on these grounds.

### D. Jury Instruction Changes

Defendants next argue that they should receive a new trial because the Court, after receiving briefing from the parties, made modifications to two of the Jury Instructions prior to closing arguments. Though Defendants "welcomed" the changes, they claim the changes "severely prejudiced" them in three ways, namely because (1) they were unable to make use of the instructions in their opening statements; (2) they were unable to shape testimony elicited on cross-examination; and (3) they were unable to assess the witnesses they would call in the defense case. (Doc. 2009 at 17–19). The Court is not persuaded.

### 1. First Amendment Jury Instruction

Prior to trial, the Court approved a First Amendment-related jury instruction that stated in part that "the First Amendment does not protect speech relating to illegal activity." (*Id*. at 18). After the close of evidence, but prior to closing arguments, the parties were

allowed to argue their positions as to certain Jury Instructions. With regard to the First Amendment instruction, the Court replaced the statement that "the First Amendment does not protect speech relating to illegal activity," with a sentence that read, "[i]f you find that an ad proposes an illegal transaction, it is not protected by the First Amendment." (Doc. 1998 at 48).[33]

Defendants first argue, without explanation, that "the instruction ultimately given would have allowed for a viable advice of counsel defense" at trial. (Doc. 2009 at 19). Whether Defendants could raise an advice of counsel defense was an issue that was litigated extensively and *ad nauseum* in pre-trial motions, on the eve of trial, and again at various points during trial. The Court told Defendants, in no uncertain terms, that the defense was theirs to raise if they could first meet the four preconditions laid out in *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977). (*See* e.g., Doc. 1643 at 12–13 (stating that "to the extent [Defendants] intended to raise this argument, whether in opening statement, closing argument, or their case in chief, they must first proffer a showing of all four factors.")).[34] Defendants steadfastly refused to waive the attorney-client privilege with regards to their communications. (Doc. 1643 at 12–13). The Defendants *never* attempted to clear the *McLennan* hurdles, so they cannot now claim prejudice over their own inaction by somehow placing blame on changes to the First Amendment Jury Instruction.

In an equally unspecific manner, Defendants also argue that the Court admitted

---

[33] The complete Jury Instruction states:

All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech that proposes an illegal transaction. Prostitution is illegal in 49 states and most of Nevada. It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for an escort, dating or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

(Doc. 1998 at 48).

[34] The factors include: (1) they made a complete disclosure to counsel; (2) they requested counsel's advice as to the legality of the contemplated action; (3) they received advice that it was legal; and (4) they relied in good faith on the advice. 563 F.2d at 946.

"large quantities of evidence that was highly prejudicial to the defense that arguably could have been relevant under a 'speech relating to illegal activity' standard, but which would not have been under the "speech that poses an illegal transaction" standard. (Doc. 2009 at 19). They say that if they knew the case would go to the Jury under "speech that proposes an illegal transaction" standard, they would have "had much stronger arguments to exclude most, if not all, of the 'notice' evidence," which they say "could have dramatically altered the evidence admitted." (*Id.*) Defendants entirely fail to specify what "notice" evidence they say would not have been admitted. They also say they "objected to all of this evidence," but do not give a description or record citations to support their contention. (*Id.*) The Court refuses to sift through the lengthy trial record and make guesses on Defendants' behalf. The Court does note that Mr. Spear, in closing, asserted "[t]hese ads are not on their face anywhere close to being prostitution ads. You've heard the witnesses tell you that." (Trial Tr., Doc. 1959 at 16).[35] But in sum, Defendants have not met their Rule 33 burden.

### 2. Travel Act Jury Instruction

Defendants also claim they were prejudiced because the Court did not provide the Jury with the following instructions:

> [T]o satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with the particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise.

(Doc. 2009 at 1718). Instead, the Court instructed the Jury as follows:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

---

[35] Notably, Defendants omit reference to the Jury being instructed that they can apply the direct and circumstantial evidence instruction to determine if each ad was protected by the First Amendment.

1    (Doc. 1998 at 30).

2          First, the Defendants argue that, had the Court settled on their proposed instruction,

3    they would have been able to "mount the specific intent defense they intended – an aiding

4    and abetting defense – whether in their openings or through eliciting evidence during the

5    trial." (Doc. 2009 at 18). Here too, Defendants do not explain why they were prevented

6    from mounting an aiding and abetting defense under the Court's instruction, and the Court

7    will not attempt to define their argument. So, again, the Court cannot make a prejudice

8    determination.

9          Defendants further assert that they learned of these two changes "on the cusp of

10   closing" and so they had no time to prepare. Not so. As the Government points out, the

11   closing statements took place over the course of several days—October 27 through

12   November 2, 2023—due to juror circumstances and to enable the defense counsel to

13   prepare. Moreover, Mr. Lacey's counsel sought and received his preferred

14   First Amendment jury modification so he cannot now fain prejudice. The Court is not

15   persuaded that these assertions suggest that "a serious miscarriage of justice may have

16   occurred." *Alston*, 974 F.2d at 1211–12. The Defendants have not met their burden of

17   demonstrating that standard is met and thus, a new trial will not be granted on this basis.

18   *Endicott*, 869 F.2d at 454.

19         **E.     Insufficient First Amendment and Travel Act Jury Instructions**

20         Defendants next assert that, though the First Amendment instruction "included the

21   correct legal standard," more was needed. Relating to the Travel Act instruction, they

22   claim that "although the Court added language looking somewhat like an aiding and

23   abetting instruction" that language materially "eroded what was required for the jury to

24   find specific intent." (Doc. 2009 at 20). They urge that these flaws require a new trial.

25         A Rule 33 motion may be granted for failure to give proper jury instructions.

26   However, an instructional error does not automatically warrant a new trial because a

27   defendant must show that the error affects substantial rights. *See* Fed. R. Crim. P. 52(a);

28   *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). "[A]n error in misdescribing

1   or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond
2   a reasonable doubt that a rational jury would have found the defendant guilty absent the
3   error.'" *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009) (quoting *Neder v.*
4   *United States*, 527 U.S. 1, 18 (1999)).  When applying this standard, a court should consider
5   "the jury instructions and the trial record as a whole."  *United States v. Espino*, 892 F.3d
6   1048, 1053 (9th Cir. 2018).  Where the evidence actually presented at trial and "other
7   language in the jury instructions" assures the court that the jury could not have based its
8   verdict on the erroneous language in the instruction, the Ninth Circuit has found the error
9   to be harmless. *Miller*, 953 F.3d at 1103; *see also Espino*, 892 F.3d at 1053; *United States*
10  *v. Perez*, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not
11  specifically mentioned [in the jury instructions], it remains possible the jury made the
12  necessary finding.").

### 1.      First Amendment Jury Instruction

14          With regard to the First Amendment instruction, the Defendants would have
15  preferred the Court to have told the Jury that "the speech must be evaluated from the
16  content of the speech alone, and speech is presumptively protected unless it proposes a
17  transaction [sic] would necessarily constitute an illegal act." (Doc. 2009 at 19).  Because
18  the Jury was not told as much, they say Mr. Spear was convicted on Travel Act counts
19  "even though the publication of the ads underlying those counts were protected by the First
20  Amendment." (*Id.* at 20).  But when viewing the Court's instruction in light of the entire
21  trial record, the Court disagrees.  As discussed *supra* in Section II.B of this Order, co-
22  conspirators and law enforcement witnesses understood the terms in the Government's
23  Travel Act ad exhibits to be sex for money ads because the ads were accompanied by
24  photos of barely clad females and because they included coded terms like "roses", "GFE"
25  (girl-friend experience), "in-call and out-call," "clean," "hygienic" and "G-R-3-3-K."
26  Moreover, each victim/witness that testified identified her ad and stated that the ads were
27  sex for money ads.  So, an instruction stating "the speech must be evaluated from the
28  content of the speech alone" would not have altered Mr. Spear's outcome.  Therefore, a

1   new trial on these grounds is not warranted.

2   **2.      Travel Act Jury Instruction**

3           Finally, the Court's Travel Act instruction adhered to the Ninth Circuit's precedent.

4   The instructions clearly stated that to show that Messrs. Spear and Lacey violated the

5   Travel Act by selling and publishing prostitution ads on Backpage, the Government was

6   required to establish that Messrs. Spear and Lacey "in some significant manner associated"

7   themselves with the prostitution business seeking to post an ad on Backpage.  (Doc. 1998

8   at 30); *see also Gibson Specialty Co.*, 507 F.2d at 449 (requiring the government to show

9   each defendant "had specific intent to promote, manage, establish, carry on or facilitate

10  one of the prohibited activities"); *United States v. Polizzi*, 500 F.2nd 856, 876–77 (9th Cir.

11  1974) (stating the required *mens rea* under the Travel Act is the "specific intent to facilitate

12  an activity which the accused knew to be unlawful under state law").  Given the Court's

13  adherence to this Circuit's precedent, it is hard to see how the jury instructions

14  misdescribed or omitted an element of the offense, such that a rational jury would have

15  acquitted a defendant absent the error.

16          Having considered each argument advanced in the Defendants' Rule 33 Motion for

17  a New Trial, the Court is not persuaded that a serious miscarriage of justice may have

18  occurred.  Accordingly, the Rule 33 Motion is denied.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

## IV.     CONCLUSION

In conclusion, after viewing the record in the light most favorable to the Government, the Court finds there is insufficient of evidence to support convictions under Counts 19–51 as to Mr. Lacey and Counts 66–99 as to Messrs. Lacey, Brunst, and Spear. The Court will issue judgments of acquittal for those Counts.  In all other respects, Defendants' Rule 29 Motions are denied.  Moreover, the Court does not find cause to grant a new trial for any of the reasons stated in Defendants' Rule 33 Motion.  That Motion will be denied in its entirety.

Accordingly,

**IT IS ORDERED** that Defendants' Oral and Supplemental Rule 29 Motions (Docs. 2004; 2006; 2007) are **granted in part and denied in part**.  The Clerk is directed to issue Judgments of Acquittal for Defendant Michael Lacey on Counts 19–51 and 66– 70, 81, 83–84, 86, 88–92 and 94–99; for Defendant John Brunst on Counts 66–68, 78–84, 86–93; and for Defendant Scott Spear on Counts 71–78, 85 and 93.  In all other respects, the Motions are **denied**.

**IT IS FURTHER ORDERED** that Defendants' Rule 33 Motion for New Trial (Doc. 2009) is **denied** as stated herein.

Dated this 23rd day of April, 2024.

Honorable Diane J. Humetewa
United States District Judge

- 73 -

# EXHIBIT L

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura, Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorneys for Scott Spear*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. CR18-00422-PHX-DJH-003 |
| Plaintiff, | **DEFENDANT SCOTT SPEAR'S SENTENCING MEMORANDUM** |
| vs. | |
| Scott Spear, *et al*., | *(Assigned to the Hon. Diane J. Humetewa)* |
| Defendants. | |

The defendant, Scott Spear, by and through his attorneys undersigned, and pursuant to 18 U.S.C. §3553, hereby files his sentencing memorandum and submits that a sentence of probation or time served with supervised release, to include community service hours is the appropriate result. As more fully set forth in the memorandum below, this request is supported by 18 USC 3553, the incongruent and unconstitutional sentencing guideline application, and the First, Fifth, Sixth & Eighth Amendments to the U.S. Constitution.

RESPECTFULLY submitted this 19th day of August, 2024.

FEDER LAW OFFICE P.A.

*s/ Bruce Feder*
Bruce Feder
*Attorneys for Scott Spear*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

Our criminal justice system is meant to punish people who knowingly and intentionally violate the law. Sex traffickers, particularly those who prey on children, deserve serious punishment. But Scott Spear is no sex trafficker, and this is not a sex trafficking matter. He is not remotely close to the category of offenders these laws and a tortured interpretation of the guidelines seek to punish. To be sure, Mr. Spear did not intentionally break any law; indeed, he believed wholeheartedly that his actions conformed to the law, consistent with the principled and law-abiding life he has lived. Notwithstanding this truth, he now faces a sentence that, if imposed, will inevitably result in an actual sentence of death by prison.

## I.    OVERVIEW.

The government wants this Court to believe that Backpage.com is akin to the worst pimp in the nation. Mr. Spear and his co-defendants wrongly became the scapegoats in a time of unprecedented hysteria surrounding sex trafficking. The government relentlessly pursued men who made every effort to ensure that their conduct conformed to the law. Now, continuing its scorched earth approach, the government asks this Court to condemn *a 73-year-old man, who has never been in trouble a day in his life,* to die in prison.

Ultimately now, this case is about sparing a life. That is because if this Court sends Scott Spear to prison, his life is effectively over. This is true from a statistical and practical standpoint, where lack of medical and mental health care, advanced age, and an ugly and unwarranted sex offender/sex trafficker label will make prison not just unbearable, but almost certainly un-survivable.

This has been an unprecedented prosecution. It has been a case fueled by politics, hysteria, and personal animus. This is a case where, time and time again, competent lawyers advised Mr. Spear that what Backpage was doing was legal. This is a case where Backpage went to courts across the land and won every case, typically on First Amendment grounds. In short, they had every reason to believe they were operating within the boundaries of the law. The fact that a jury has determined, in a case of first impression, that they did not, has no bearing on the ever-important intent requirement that is central to every criminal prosecution.

In truth, an ordinary citizen might have caved under the relentless pressure and pursuit of the federal government. But these are not ordinary people; and it's not because they are

2

unabashed outlaws. Rather, they have long been First Amendment warriors who were doing their level best to operate within the law. Their continued conduct wasn't about flouting the law, it was about holding fast to the rights and protections they wholeheartedly believed, and were legally advised, were guaranteed to them under the law.

Mr. Spear did not simply discover "First Amendment religion" when he was affiliated with Backpage. His identity, indeed, the entire culture of the company, was always premised on the unwavering belief in the First Amendment. They have always been ready, willing, and able to fight to uphold those beliefs and stand up for First Amendment principles.

The government is champing at the bit to put Scott Spear in a cage. Its previous request for immediate custody, a decades-long sentence, and a higher-level prison classification, confirms what those who follow the case have long since known to be true: This is a vendetta years in the making, and Scott Spear may now suffer the pains of conviction for alleged crimes he did not even know he was committing. It appears the government hopes the defendant's appeals will never be heard it the onerous prison conditions the government is obviously aware of causes their deaths (*See*, Declarations of Mark Allenbaugh and Jane Perdue, attached hereto as **Exhibits 1** and **2**).

The sentence imposed must be "sufficient, but not greater than necessary to comply with the provisions of law". 18 U.S.C §3553(a). Generally, the district courts are granted the authority to engage in individualized sentencing. Circumstances must indicate that the sentence was substantively reasonable. <u>Gall v. United States</u>, 128 S. Ct. 586, 597 (2007).

II.     **18 U.S.C. § 3553 FACTORS**

    **A.  The Nature & Circumstances of the Offense**

This is a case of first impression, with myriad substantial issues for appeal. The convictions occurred after a 3+ month (second) trial in 2023, and extensive motion practice since April, 2018. As the Court is aware, this case involves the first completed trial of the government's attempt to criminally prosecute owners of a social media site for ads published by third parties on that site. The offense conduct parallels some of the many issues to be resolved on appeal that will result in dismissal of all of the charges or a new trial if found in favor of the defendants:

    1) the third-party ads forming the basis of the Travel Act and money-laundering

convictions are protected by the First Amendment;

2) the First Amendment jury instructions given by the Court violate the First Amendment;

3) the government was improperly allowed to argue and the convictions were improperly based on a defendant's general intent instead of requiring proof of specific intent as required. (*See, Backpage v. Lynch*, 216 F.Supp.3d 96 (2016)).

4) notwithstanding prior rulings by Judge Brnovich before the first trial, and this Court's preliminary conspiracy instructions to the jury, the government was allowed to improperly argue a boundless conspiracy, unconnected to the 50 Travel Act ads listed in the superseding indictment;

5) the ads in counts 2-18 do not overtly solicit any illegal sex act and cannot constitute criminal act as a matter of law;

6) the insufficiency of evidence demonstrating Mr. Spear never met an alleged advertiser, never saw the ads contained in counts 2-18, and was not in charge of the moderation of ads in Backage as of February, 2012;

7) the government's repeated presentation of evidence alleging child sex trafficking violated Sixth Amendment fair trial rights;

8) the improper and prejudicial admission of the so-called 'notice' evidence argued by the government as substantive evidence;

9) the improper preclusion of the defense 'evidence responding to the notice' evidence violated fair trial rights of the defendants, and Rule 106 of the Federal Rules of Evidence;

10) the improper preclusion of the defense to present evidence of good faith and their theory of defense, including the defendants' 6th Amendment's right to testify;

11) the improper preclusion of the defense use and discovery of government disclosures demonstrating the governments knowledge of the impropriety of its prosecution and prosecuting theory (*See,* article from Reason Magazine attached hereto as **Exhibit 3**);

12) the multiple *Brady* violations involving the improper non-disclosure of impeaching information that could have been used to cross-examine the government's primary witness.

13) Notwithstanding prior rulings, the defendants were precluded from using Section 230 and the First Amendment to cross-examine and present expert testimony.

This is not an exhaustive list, but should be considered as it pertains to Mr. Spear's offense conduct.

When considering how Mr. Spear ends up involved in the Back Page controversy, the history of his career is pertinent. Specifically, Mr. Spear began working for the New Times Weekly newspapers in Phoenix in the 1980s. A fundamental part of its founders' vision for New Times, the protection and advocacy of the First Amendment freedoms, was an important part of these newspapers' media position, and the newspapers often wrote controversial stories that the traditional news media avoided.  As a result, New Times and then Village Voice Media took provocative positions that sometimes necessitated litigation and lawyers advice on the legal balance of their media content. The revenue of the New Times/Village Voice Media companies was ad based.

Mr. Spear became a 'jack of all trades' for these companies, using his real estate, and record business promotion acumen and experience. As has been indicated, the creation of Backpage occurred when James Larkin and Carl Ferrer decided to compete with Craigslist for ad sales in the relatively new Internet media atmosphere. Backpage began by merely posting the ads that used to appear on the 'back' pages of the New Times/Village Voice Media newspapers.

Among his other duties for the majority owners, Mr. Spear was tasked with supervising Carl Ferrer and Ferrer's creation of Backpage as it pertained to building the site, obtaining ads, and ultimately crafting detailed rules meant to ensure that the language of those ads were not only legal, but that the 'Playboy' graphics standard the Backpage executives agreed was appropriate was adhered to.

Because of the relative newness of the Internet, and the legal standard that would apply to advertising on this new media, Backpage frequently sought and received legal advice as to the application of the First Amendment, and Section 230 of the Communications Decency Act "(CDA 230)" (enacted 1996). In this regard, Mr. Spear and the other defendants read and/or were told by Don Moon no later than 1/1/2013 that the advertising published in Backpage was protected by the First Amendment and CDA 230, as (admitted Trial Exhibit 171, attached hereto as **Exhibit 4**). Similarly, the written opinion letters of Mark Sableman, a St. Louis based First Amendment lawyer with the law firm of Thompson Colburn, LLP, advised Mr. Spear and the

other defendants that Backpage and its practices and ads were similarly protected by the First Amendment from both civil litigation and state and federal criminal prosecution (**Exhibits 5A-B**).

The assurances of legality did not stop with the given specific legal advice that they received or were told about by these and other prominent lawyers in the media and First Amendment fields. Mr. Ferrer testified to other similar legal advice received. The Backpage litigation against civil litigants, and public officials regarding state statutes and/or efforts to enjoin or criminalize the Backpage business model were uniformly successful and corroborated the legal advice. This includes the *Dart* decision (which unequivocally asserted that as long as some of the ads in Backpage were not *overtly* for prostitution, there was First Amendment protection) (the *Dart* decision was recently cited with approval by the United States Supreme Court, _NRA v. Vullo_, 602 U.S. 11, 18 (5/2024)). The Seventh Circuit and numerous Federal District Court, including the Court decisions in *McKenna*, *Hoffman* and others similarly indicated First Amendment and CDA 230 protection (indicating for example that requiring personal contact with advertisers violated the First Amendment).

In an effort to assure that Backpage was in legal compliance, Backpage hired, in-house compliance lawyers to advise them (Steve Suskin). Elizabeth McDougall and Don Moon took over supervision of the moderation of the ads in February, 2012 (**Attachment 6A-F**) and (Trial Transcript 9/26/23, A.M. Session, pgs. 92-93). As the Court will remember, as of 2/2012, any adult aggregation effort by Backpage had stopped, The Erotic Review was no longer substantially advertising on Backpage, and any super posters had been terminated as advertisers. The focus of aggregation then turned to non-adult advertising with millions of dollars allocated to the sales and aggregation efforts of the company.  Ms. McDougall, a former lawyer for Craigslist and at the national law firm *Perkins Coie*, had assumed the role Mr. Spear had in regard to moderation of ads on Backpage. Given these circumstances, Mr. Spear had every reason to believe Backpage was in legal compliance. Notwithstanding the unsupported convictions on counts 2 through 18, there is no evidence at trial that Mr. Spear knew of the ads contained in these counts, knew the advertisers, saw these ads, knew they had been posted on Backpage, or had anything whatsoever to do with them. There was no evidence presented that demonstrated the specific intent required (*See*, _Backpage v. Lynch,_ 216 F.Supp.3d 96 (2016)).

Mr. Spear's role at Backpage was substantially reduced to being cc'd on emails, and handling various budgetary, real estate, vendor contracts and other miscellaneous jobs after early 2012.

This reduction in role coincided with the mental health concerns discovered/identified in 2011 by Dr. Alvin Burstein regarding Mr. Spears additional diagnoses, and prescribed medications to address mental health conditions.

**B. History and Characteristics of Scott Spear**

Scott Spear is a 73-year-old man who comes before the Court with an unblemished criminal history, a life of good works, service to his community and family, and a host of medical and mental health issues. The several letters of support submitted for sentencing uniformly describe Mr. Spear as honest, caring, law-abiding, generous, industrious, and hard-working.

Mr. Spear came from a modest background, that was not without trauma. His parents marriage ended when he was four years old. His biological father attempted to kidnap him at age five, grabbing him off his bicycle and taking him to the Cleveland airport. Thankfully, he was returned to his mother a day later. Within a year, she re-married to a good man whom Mr. Spear has always considered to be his true dad.

Mr. Spear was a bright child, but he never reached his full potential in school, likely because what we now know was a lifetime of suffering from ADHD. He struggled with this for decades, but only received an official diagnosis in 2011. He struggled with his weight and his coordination as a young person, and was teased and bullied at school.

Through hard-work and perseverance, he earned a scholarship to Occidental College, graduating cum laude in 1972. After graduation, he began his professional life. He has always had an entrepreneurial spirit. His first business was a record store in Phoenix, "World Records." It was there he learned about business, marketing, sales and promotional events. This is the first instance where he understood one of his strengths: recognizing opportunities others did not see, and doing battle with large competitors and surviving. Along with his partner, he expanded the business to include seven stores. Unfortunately, the market was soon overtaken by the big record retailers, but he was 'proud' that when the stores were sold, he left with $1500 in his pocket. In other words, notwithstanding the immense competition, he left with the business in the black.

Mr. Spear then spent a year in commercial real estate sales where he learned the fundamentals and nuances of the real estate business.

He put his marketing, promotional and real estate savvy to great use when he began his career with the New Times in 1980. There he helped build the paper into a national publication, known for its reputation for hard-hitting journalism, free speech principles, and publishing controversial pieces that mainstream media outlets were to afraid to touch. The paper also contributed significantly to the community by running events such as the New Times 10K race, which grew to more than 10,000 participants annually, and generated revenues for multiple charities. He was proud of this work and for the paper's community contributions and its relentless efforts to fight for First Amendment principles (**Exhibit 7**).

Among his other accomplishments, Mr. Spear also organized a national trade association for newspaper similar to the New Times, started a telephone company that significantly increased earnings for the company and built a successful well organized circulation system for the papers.

Eventually, as one the paper's main revenue source of classified ads was being overrun by another large competitor, Craigslist, New Times created Backpage.com. The mission of this endeavor was to take on Craigslist, secure a portion of the free classified ad market, and to survive and thrive in the new digital world. These endeavors, like much of the traditional print media going back to the 1950's, included advertisements for adult services. Mr. Spears' talent for finding "adapt or die" business models in a rapidly changing and highly competitive environment had always been his superpower. But in this case, it became his kryptonite.

Scott Spear has never been a law breaker. He is not a man who has ever been motivated simply by money, nor is he someone who ever had to resort to criminal activity of any kind to make a living. Had he believed that he and his colleagues were committing crimes with Backpage.com, he would have either made efforts to shut down that side of the business, or left the company altogether. No amount of compensation would have been worth the ordeal he has experienced at the hands of the federal government over the last six years. His life of good works and clean criminal history is the best evidence of this.

Mr. Spear has always made efforts to contribute to his community, with his time, his money, and his expertise. He has donated countless dollars and hours to organizations such as

the Arizona School for the Arts, Desert Stages Theatre, Greasepaint Youth Theatre, Valley Youth Theatre (downtown Phoenix), Childsplay (Tempe), Fountain Hills Youth Theatre, and Theatreworks (Peoria).

In just one example, Scott procured theatre-grade seats installed at Desert Stages and at Greasepaint Youth Theatre. He worked for a number of years on both short and long term projects for these theaters, and joined Greasepaint's Board of Directors in 2010, becoming board President in late 2011.  Both theaters continue to thrive due in part to his contributions over the years. **(See Exhibit 8A-)**.

Supporting local youth theatre is near and dear to Mr. Spear because of his daughter's love of theatre and performance, starting at age three. His daughter was named the "Youth Actress of the Year" for Arizona in 2012 for her performance in Greasepaint's production of *Les Miserables*.  She went on to earn a B.A. from Occidental College, that included a minor in theatre. From there she earned a Masters in directing from Essex University in London.

Scott Spear has also given generously to other educational institutions, such as his and his daughter's alma mater. Along with much other financial support for Occidental, he also funded a summer internship in 2015.

It is no accident that "history and characteristics" of the accused is first on the list of 3553 factors.  A person must be judged by the totality of his life's work.  The fact that he has done his level best to live a law abiding, productive, humble, and generous life should weigh heavily in this Court's decision as to whether to end his life by sending him to prison.   This claim is not hyperbole given, among other things, his age and his medical and mental health conditions.

Mr. Spear's medical and mental health issues are well documented in the Pre-Sentence Report. (Doc. 2120) What is not reflected in the PSR is Mr. Spears' life expectancy, and the BOP's total inability to care for an inmate like Scott Spear. Life expectancy is different, and not surprisingly, worse, for incarcerated individuals, as documented in Exhibits 1 and 2.    Mr. Spears' typical life expectancy would be exponentially reduced if he is imprisoned.  Given the peer-reviewed, widely accepted study by Evelyn Patterson, his life expectancy is reduced by two years for every year of incarceration.  Consequently, any sentence of imprisonment means Scott Spear will likely die in prison, as indicated in Exhibits 1 and 2.

The chaos, understaffing, and lack of medical and mental health care is well-documented,

as is the problems that would be caused by the government orchestrated an improper effort to designate the defendants as sex offenders. Recently, some district courts have refused to send defendants to local prisons that had documented improper prison conditions (*See*, <u>*U.S. v. Colucci*</u> (E.D.N.Y. 8/5/2024)).

Courts have recognized the onerous conditions of confinement as a ground for a variance. As the Supreme Court held long ago on a related issue, "susceptibility to prison abuse and the burdens of successive prosecutions" can serve as grounds for a downward departure. Koon v. United States, 518 U.S. 81, 113 (1996). Other courts have held similarly. *See United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wisc. 2003) ("For a defendant who faces more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect. A departure is warranted because at least one of the purposes of sentencing -- just punishment -- is satisfied by a shorter sentence."); *United States v. Pressley*, 473 F. Supp. 2d 1303, 1315 (N.D. Ga. 2006) ("As the Eleventh Circuit had authorized a departure for the lengthy and onerous conditions of confinement to which the defendant was subject in the multi-year sentencing process,, this Court had indicated that it would depart down approximately 30 months for those condition.").

It should also be noted that not only will Mr. Spear suffer from the BOPs inability to pay full attention to his special needs, he will suffer as a result of the inevitable unwanted attention he will attract from his fellow inmates. He will not be given a "camp" placement due to the orchestrated nature of the charge. He will therefore be housed with more sophisticated, more dangerous, and more predatory class of inmates. To make matters worse, he will be entering the system with the unwarranted "sex trafficking" label. This will make him the target of other offenders. (See Exhibits 1 and 2). Indeed, he may end up spending the majority of his sentence in protective custody (i.e. solitary confinement). It's hard to imagine a more excruciating and sad end of a life well-lived. This Court simply cannot countenance such a cruel and unusual result under these circumstances.

Given the congressional and executive recognition of conditions in Federal prisons, a sentence of imprisonment in this case will amount to an 8th Amendment violation. (*See*, <u>*Estelle v. Gamble*</u>, 429 U.S. 97 (1976); <u>*Hutto v. Finney*</u>, 437 U.S. 678, 685 (1978); <u>*Rhodes v. Chapman*</u>,

452 U.S. 337 (1981); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Farmer v. Brennan*, 511 U.S. 825 (1994).

It shouldn't escape notice that NAAG, NCMEC, Polaris, and others allowed to testify at the 2023 Trial were unsuccessful in changing CDA 230 until after the relevant indictment in this case. The news were characterized as the "anti-Backpage" laws, implying there should have been no criminalization of the ads that are at issue in this case.

**C. The Need for the Sentenced Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense.**

Although this case, as this court frequently asserted before and during trial, was not charged as a prostitution or sex offense, the government improperly made it into one. The subject matter of prostitution is too long-standing, and too controversial to use as a gauge for assessing the seriousness of the offense in the present case.

This case involves the novel prosecution of a social media site accused of improperly allowing third-party advertisers to post suggestive ads purportedly for prostitution. It is obvious from the trial evidence that some of the very ads that form the basis of some of the convictions were obtained by Backpage from Google, and were/are similar to ads published in Facebook, X, and many of the large and small social media sites existent before and after the demise of Backpage. The substantial trial evidence, given by the law enforcement witnesses, and Ferrer's testimony that United States attorneys around the United States used the testimony and cooperation of Carl Ferrer, Andrew Padilla, Joye Vaught, and others at Backpage to assist law enforcement, indicates Backpage attempted to be a good citizen, not a bad one. The demise of Backpage at the instance of the United States government, has obviously not reduced prostitution or made it any easier to investigate and prosecute. Mr. Ferrer's aspersions notwithstanding, Backpage spent substantial assets and allocated numerous employees to help law enforcement. Most persons engaged in criminal wrongdoing attempt to hide their actions from the attention of law enforcement, and do not assist them in prosecuting lawbreakers.

It appears the government knew it had insufficient proof to support a prosecution. The government 'inadvertently' disclosed documents showing the lack of evidence **(See Exhibit 3).** As such, to impose such an egregious sentence in a case of first impression would actually serve to promote *disrespect* for the law.

11

Punishment is not measured merely in years in prison; it comes in all forms.  Indeed, Mr. Spear has suffered massive consequences because of this prosecution.   He has lost his home, his marriage, his relationship with friends and family, and potentially his life savings He now lives a modest existence in a small Phoenix condominium **(Exhibit 10)**.  He has a deeply uncertain financial future even if he does not end up in prison.  The stress and strain of the multi-year ordeal have deteriorated his already vulnerable body and mind.

Given all of the circumstances, a sentence of probation with community service will acknowledge the novelty of the prosecution, and promote respect for the law and just punishment given the substantial punishment already implemented against Mr. Spear and the other defendants – seizure of assets, cessation of Backpage, negation of the sales contract indebtedness, divorce, alienation of family relationships, and exacerbation of physical and mental health concerns.

**D. The Need for the Sentenced Imposed To Afford Adequate Deterrence To Criminal Conduct And To Protect The Public From Further Crimes Of The Defendant.**

The government's seizure of Backpage has deterred it from any further operation.  This prosecution will *never* deter others from engaging in similar publications.  Indeed, the evidence shows that result will be to increase the prevalence of these publications, because those who seek to engage in this business have moved their efforts out of the country, and likely beyond the reach of U.S. law enforcement.  Moreover, there was ample evidence that Mr. Spear and his colleagues provided substantial assistance to law enforcement to identify child victims and those who would exploit them.    According to various sources, that kind of assistance to help stem the tide of sex trafficking has been diminished or demolished as nefarious actors will be well beyond the reach of American law enforcement.  Thus, as for general deterrence, it's quite questionable as to what if any effect convicting or incarcerating Mr. Spear will have.

In terms of specific deterrence, Mr. Spear never set out to commit crimes in the first instance, and he certainly has no plans to do so in the future.   His age, physical (spine and respiratory) ailments and mental health concerns foreclose any ability to engage in any improper conduct even if this 73-year-old person who had never engaged in any improper conduct prior to the present indictment was so inclined.

RESPECTFULLY SUBMITTED this 19th day of August, 2024.

**FEDER LAW OFFICE P.A.**

*s/ Bruce Feder*
Bruce Feder
*Attorneys for Scott Spear*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Email: Humetewa_chambers@azd.uscourts.gov

Erin E. McCampbell, emccampbell@lglaw.com
Paul J. Cambria, pcambria@lglaw.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
Eric Kessler, Eric@Kesslerlawgroup.net
Bruce Feder, bf@federlawpa.com
*Attorneys for Defendants*

Kevin Rapp, Kevin.Rapp@usdoj.gov
Aron Ketchel, Aron.Ketchel@usdoj.gov
Margaret Perlmeter, Margaret.Perlmeter@usdoj.gov
John Kucera, John.Kucera@usdoj.gov
Austin Berry, berry2.austin@usdoj.gov
Peter Kozinets, Peter.Kozinets@usdoj.gov
*Attorneys for United States of America*

By:  */s/ M. Evans*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,

                    Plaintiff,

vs.                                             NO. CR-18-00422-DJH-3

Scott Spear,

                    Defendant.

**DECLARATION OF MARK H. ALLENBAUGH,**
**CHIEF RESEARCH OFFICER & CO-FOUNDER, SentencingStats.com, Inc.**

**EXECUTIVE SUMMARY**

- From fiscal year 2019 through and including 2023, nearly one-third of defendants sharing Mr. Spear's Guidelines' calculation received non-custodial sentences, even though none were 73 or older at the time of their sentencings.

- In light of his age, Mr. Spear is far from the typical federal defendant. Only 3% of the current BOP population is aged 65 or older.

- If imprisoned, Mr. Spear is expected to barely survive four years, which is far less than his 86.5-year life expectancy.

- The BOP continues to be dangerously over-populated and continues to suffer from high staff turnover, poor management and crumbling infrastructure.

Ex. 1

**INTRODUCTION**

I, Mark H. Allenbaugh, having personal knowledge of the matters set forth below, do declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the Chief Research Officer and Co-Founder of SentencingStats.com, Inc. ("SSINC"), a data analytics and research firm that provides statistical analyses of U.S. Sentencing Commission sentencing, Bureau of Prisons and Bureau of Justice Statistics data and other pertinent data sources to legal professionals across the country. I am a former staff attorney in the Office of General Counsel to the U.S. Sentencing Commission. I hold a B.A. from the University of Southern California, an M.A. from Ohio University, and a J.D. from American University's Washington College of Law where I was an editor for the Law Review. I have also performed Ph.D. work in the Philosophy of Science at the University of Maryland, College Park. My biography is attached hereto.

2.      SSINC was retained by defense counsel regarding the matter of *United States v. Scott Spear*, 2:18cr422 (D. AZ), to analyze the U.S. Sentencing Commission's publicly available datafiles[1] for similarly situated defendants matching various sentencing scenarios identified further below. SSINC also reviewed pertinent filings and documents in the case.

3.      SSINC utilized the SPSS version of the Commission's datafiles, which contain sentencing data on over four hundred thousand individuals sentenced under the U.S. Sentencing Guidelines from fiscal years 2019 through and including 2023, the latest datafile currently available.

4.      Each individual sentence reported in the datafiles is assigned hundreds of variables reporting a variety of relevant information including the actual sentence imposed, the final applicable sentencing guideline as determined by the court, the final (i.e., total) offense level, the

---

[1] The Commission's public datafiles are available at https://www.ussc.gov/research/ datafiles/commission-datafiles. SSINC currently has access to the Commission's datafiles from fiscal year 2002 through and including fiscal year 2023. Courts may independently run limited statistical analyses of the same data, but only back to FY 2019. *See* U.S. Sentencing Comm'n, *Judiciary Sentencing Information*, at https://www.ussc.gov/guidelines/judiciary-sentencing-information.

criminal history category, and whether the sentence was the result of a government motion for a departure or a court-initiated downward variance, among many other factors including demographics factors regarding the defendant.

     5.     All the variables reported in the datafiles are defined in the U.S. Sentencing Commission's Variable Codebook for Individual Offenders (1999-2023) (revised Apr. 25, 2024).[2] The relevant variables SSINC generally utilizes and analyzes are listed and defined below, although not all may have been utilized for the instant analyses.  Some of the variables are proprietary to SSINC and are indicated by italics, meaning they are variables generated by SSINC based on data otherwise contained within the Commission's datafiles.

| Variable | Definition | Note |
|---|---|---|
| *Year* | Datafile in which sentence was found. | For example, if variable reports 2008, the sentence was found in the U.S. Sentencing Commission's datafile for fiscal year 2008. |
| *Guideline* (GDLINEHI) | Final sentencing guideline utilized after all grouping performed. | |
| DISTRICT | The federal district where the sentence was imposed. | |
| STATMAX | The total statutory maximum term of imprisonment for all counts of conviction. | |
| STATMIN | The statutory minimum term of imprisonment for all counts of conviction. | If there was no applicable minimum, the value is 0. |
| FIREMIN | The statutory minimum term of imprisonment due to a 924(c) conviction. | |
| GLMIN | The bottom of the applicable guidelines sentencing range in months. | |
| GLMAX | The top of the applicable guidelines sentencing range in months. | |
| CRIMHIST | Whether the defendant had any criminal history. | 1 means some criminal history including criminal history that otherwise may not be scoreable. 0 means none. |
| USSCIDN | The unique serial number assigned to this defendant by the U.S. Sentencing Commission. | |

---

[2] The Codebook is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/datafiles/USSC_Public_Release_Codebook_FY99_FY23.pdf.

| Variable | Definition | Note |
|---|---|---|
| CRIMPTS | The total number of criminal history points determined by the Court. | Not to be confused with the criminal history category. |
| DISPOSIT | The manner of conviction (disposition) whether by trial or plea. | 1 means plea. 2 means nolo contendere. 3 means jury trial. 4 means bench trial. |
| BOOKERCD[3] | Determines whether and nature of any departure or variance. | 0 = Within Range<br>1 = Upward Departure<br>2 = Upward Departure w/Booker<br>3 = Above Range w/Booker<br>4 = Remaining Above Range<br>5 = 5K1.1/Substantial Assistance<br>6 = Early Disposition/5K3.1<br>7 = Government Sponsored - Below Range<br>8 = Downward Departure<br>9 = Downward Departure w/Booker<br>10 = Below Range w/Booker<br>11 = Remaining Below Range |
| SENTYR | Fiscal year sentence was imposed. | |
| NWSTAT1-NWSTAT5 | The offenses of conviction. | |
| XFOLSOR | The final (or total) offense level as found by the Court. | |
| XCRHISSR | The final criminal history category as found by the Court | |
| AMENDYR | The version of the Guidelines Manual applied by the Court as identified by its year of publication. | |
| DSPLEA | The type of disposition, i.e., specific manner of conviction. | 0 = Not Received<br>1 = Received<br>2 = Received Alternate Document<br>3 = Oral Plea Agreement<br>5 = Straight up Plea, No Agreement<br>8 = Trial<br>9 = Guilty Plea, Type Indeterminable |
| MWEIGHT | The marijuana weight equivalency, in grams, of all the drug types coded. | |

---

[3] The Commission renamed this variable to SENTRNGE in FY 2018 and changed the values. For consistency purposes and to allow for comparison to earlier fiscal years' datafiles, SSINC has recreated this variable by translating the new values reported at SENTRNGE to old values reported at BOOKERCD. Some minor fidelity in the data necessarily was reduced as a result.

4

**STATISTICAL ANALYSES OF FEDERAL SENTENCING DATA**

6.      The PSR deploys an incredibly complicated Guidelines' calculation utilizing unusual nomenclature that is difficult to follow. The chart below provides a visualization of what appears to be how the PSR calculated the Guidelines. As indicated, the PSR utilized six different Guidelines (including USSG §2X1.1) across three separate groups (one of which had two subgroups) and multiple cross-references (moving from one Guideline to another to another). For example, for the (pseudo) B Group in purple, which pertains to the convictions involving conspiracy to commit money laundering, the PSR first references 2S1.1, then moves to 2E1.2 then finally to 2G1.3 before adding additional enhancements. Given the unusual complexity of the calculation, it was not surprising to find a fundamental and significant double-counting error as indicated by the red arrows below: the role in the offense adjustment was assigned four separate times and double counted in the Count Group 1 calculation. At most, Count Group 1 should have been at a Total Offense Level of 40.



7.  Based upon information provide and review Mr. Spear's objections to the PSR, his Total Offense Level is, in fact, no greater than 14 under USSG §2S1.1, and he is in Criminal History Category I. This yields an advisory range of 15 to 21 months.

8.  Mr. Spear is not subject to any mandatory minimum or mandatory consecutive penalty.

9.  The Federal Judicial Center in conjunction with the U.S. Sentencing Commission recently created a "Judicial Sentencing INformation" [sic] Platform (JSIN).[4] The JSIN "provides five years of cumulative data for people who were convicted of a similar or the same crime, have a similar criminal history, and have been convicted of an offense that falls under the same sentencing guideline."[5] Dozens of district courts across the United States have begun to routinely incorporate the results of JSIN runs into PSRs.[6]

10.  According to JSIN,[7] "[d]uring the last five fiscal years (FY2019-2023), there were 29 defendants whose primary guideline was §2S1.1, with a Final Offense Level of 14 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 20 defendants (69%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 10 month(s) and the median length of imprisonment imposed was 12 month(s). For all 29 defendants in the cell, the average sentence imposed was 8 month(s) and the median sentence imposed was 8 month(s)."

11.  Thus, nine defendants (31%) received a non-cusotdial sentence.

12.  None were 73 years of age or older at the time of sentencing.

---

[4] https://www.uscourts.gov/news/2023/01/25/judiciary-studies-use-online-tool-presentence-reports.

[5] *Id.*

[6] *Id.*

[7] SSINC selected "Include Sentence Length Data" when running JSIN under the identified parameters.

6

1

**LIFE EXPECTANCY**

2          13.      According to an oft-cited, published, peer-reviewed study by Dr. Evelyn J.

3    Patterson,[8] there is, on average, "a 2-year decline in life expectancy for each year served in

4    prison."[9] Dr. Patterson's findings are consistent with findings by the U.S. Department of Justice

5    itself.[10]

6          14.      Mr. Spear is now nearly 73.6 years old. According to the Social Security

7    Administration, he is expected to live to 87.3 years of age.[11] Of course, this does not take into

8    consideration the generally adverse effects of incarceration.  The chart on the following page,

9    therefore, applies Dr. Patterson's finding that two years of life expectancy are lost for every year

10   of imprisonment to Mr. Spear's life expectancy. Thus, Mr. Spear is not expected to survive even

11   four years' of imprisonment.

12         15.      To be sure, the *Patterson* study is consistent with what the DOJ itself has found

13   with respect to the adverse affects of incarceration on an inmates health and life expectancy.[12]

14

15

16

---

17          [8] See Evelyn J. Patterson, *The Dose Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. Pub. Health 523 (2013), available online,

18   https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148 (cited in support in *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017); *State v. Haag*, 198 Wn.2d 309, 329, 495 P.3d 241, 251 (Wash. 2021); *People v.*

19   *Contrearas*, 4 Cal. 5th 349,362-63 (Cal. 2018); *People v. Wines*, 323 Mich. App. 343, 351 n.6 (Mich. 2018)).

20          [9] *Id.* at 523.

21          [10] U.S. Dept. of Justice, Nat. Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 9-10 (2004),

22   https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf (stressing that incarceration intensifies health problems and accelerates aging processes).

23

24          [11] *See* Social Security Administration, *Retirements & Survivors Benefits: Life Expectancy Calculator*, https://www.ssa.gov/cgi-bin/longevity.cgi (last visited Apr. 11, 2023).

25          [12] *See* U.S. Dept. of Justice, Nat. Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 9-10 (2004),

26   https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf (stressing that incarceration intensifies health problems and accelerates aging processes).

27

28                                                                7

**Estimated Life Expectancy for Scott Spear Applying *Patterson Study***

Source: Social Security Admin., *Retirement & Surivors Benefits: Life Expectancy Calculator*, https://www.ssa.gov/cgi-bin/longevity.cgi

**BUREAU OF PRISON'S STATISTICS**

16.     For the past several years, the Bureau of Prisons (BOP) has housed an inmate population far greater than the cumulative rated capacity of its 189 facilities and higher than the cumulative design capacity, as shown in the trend chart on the following page. Not shown is the fact that as of June 20, 2024, 103 of BOP's 189 facilities are at or over their respective rated capacities.

[INTENTIONALLY LEFT BLANK]

8



17.     As of June 22, 2024, only 4,704 inmates or just 3.0% of the BOP's total inmate population are aged 65 or older.[13]

18.     The BOP has been long plagued with significant operational problems that have created well-document health and safety issues for both inmates and staff. As the Department of Justice's Office of Inspector General has found, the BOP is plagued with "limited institution staff and inadequate staff training [which] affect the BOP's ability to address the needs of . . . inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing."[14]

_____

[13] See BOP, *Inmate Age*, available at https://www.bop.gov/about/statistics/statistics_inmate_age.jsp.

[14] Ofc. of Insp. Gen., Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* i (Rev. Feb. 2016), available at https://oig.justice.gov/reports/2015/e1505.pdf.

19. The Inspector General's concerns have not abated since these reports were published. According, to a recently published "Compendium of Federal Bureau of Prisons Oversight Products,"[15] "BOP staffing issues are pervasive and remain a long-standing concern for the OIG. . . . [OIG Reports]. . . have identified BOP staffing challenges touching on the following topics: inadequate BOP assessments of institution staffing level needs . . . ; use of augmentation . . . and staff discipline issues . . . ; impacts of insufficient medical staffing during the pandemic . . . ; staffing shortfalls . . . ; and staff hiring efforts . . . ."

20. So bad are the conditions at the BOP, the Government Accountability Office recently placed it on its "high risk list" because "there's been problems with staffing," including that it has "consistently experienced several leadership changes," which has raised concerns "about inmate and staff safety and also their efforts to evaluate programs that are intended to help deal with the recidivism issue."[16]

21. All this was recently independently confirmed by a *60 Minutes* exposé on the BOP, which aired on January 28, 2024.[17] *60 Minutes* found that "the Bureau of Prisons is so inadequately staffed it is struggling to fulfill its mission: rehabilitating inmates and keeping its prisons safe. Government watchdogs have documented disrepair in all of its institutions – requiring more than $2 billion in fixes. And employees rank the Bureau of Prisons the worst place to work in the federal government."[18]

---

[15] DOJ, OIG, *Compendium of Federal Bureau of Prisons Oversight Products* 8 (Feb. 27, 2024), https://oig.justice.gov/sites/default/files/2024-02/24-048.pdf.

[16] Courtney Bublé, Gov't Exec., *Management of the Federal Prisons System Is Added to GAO's High-Risk List* (Apr. 20, 2023), https://www.govexec.com/management/2023/04/management-federal-prisons-system-added-gaos-high-risk-list/385440/.

[17] Cecilia Vega, 60 Minutes, *Inside the Bureau of Prisons, a federal agency plagued by understaffing, abuse, disrepair*, Jan. 28, 2024, https://www.cbsnews.com/news/bureau-of-prisons-understaffing-abuse-disrepair-60-minutes-transcript/.

[18] *Id.*

22.  According to Shane Fausey, the recently retired president of the federal prison employees' union interviewed during the segment, "the Bureau of Prisons is down about 40% of the correctional officers it needs," which "results in one of us losing our lives. And it's that bad. We can't continue with this course."[19] So desperately understaffed is the BOP, that it has to resort to using "[t]eachers, nurses-- doctors, food service people, the people that maintain facilities" to "supervis[e] offenders."  Colette Peters, the new Director of the BOP admitted on the record that this practice is being used "to solve a long-term retention and recruitment problem. And that isn't right."[20]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 28, 2024

Mark H. Allenbaugh,
Chief Research Officer & Co-Founder
SentencingStats.com, Inc.

---

[19] *Id.*

[20] *Id.*

11

# ALLENBAUGH BIOGRAPHY

Mark H. Allenbaugh, a sentencing and mitigation consultant, is a nationally recognized expert on federal sentencing matters.  He is a co-founder of SentencingStats.com, Inc., which provides attorneys and their clients with expert statistical analyses of data and trends reported by the U.S. Sentencing Commission, the Bureau of Prisons, the Bureau of Justice Statistics and other entities. Sentencing Stats, LLC has access to the U.S. Sentencing Commission's sentencing datafiles from 2002 to the present.  These datafiles contain thousands of variables for every defendant sentenced under the U.S. Sentencing Guidelines nationwide, which report pertinent information regarding the offender and the sentence imposed. These data allow him to provide precise statistical and trend analyses for clients and counsel.

Mr. Allenbaugh holds three B.A.s from the University of Southern California in Philosophy, English, and Religion; an M.A. in Philosophy from Ohio University; and a J.D. from American University's Washington College of Law, where he served as an editor on the Law Review.  Mr. Allenbaugh also has completed coursework toward a Ph.D. in the History and Philosophy of Science at the University of Maryland, College Park.

Prior to entering the private sector, Mr. Allenbaugh served as a Staff Attorney for the U.S. Sentencing Commission.  He has published numerous articles on sentencing policy and criminal justice, which have been cited over 100 times in top U.S. law reviews and journals, and over a dozen times in published federal district and appellate court opinions.  *See, e.g.*, *United States v. Musgrave*, 647 Fed. Appx. 529, 538 (6th Cir. 2016) (quoting Mark H. Allenbaugh, "Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data, 26 Fed. Sent'g Rep. 19, 19 (2013)); *United States v. Spencer*, 700 F.3d 317, 327 (8th Cir. 2012) (Bright, J., dissenting) (quoting Alan Ellis, John R. Steer & Mark H. Allenbaugh, *At a "Loss" for Justice*, 25 Crim. Just. 34, 35 (2011)); *United States v. Garthus*, 652 F.3d 715, 718 (7th Cir. 2011) (quoting Paul J. Hofer & Mark H. Allenbaugh, "The Reason behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines," 40 Am. Crim. L. Rev. 19, 26-36 (2003)).

Mr. Allenbaughs is quoted frequently in the press such as by the Washington Post, Wall Street Journal, New York Times, Chicago Tribune and others.  Below is a sample of his publications.

*Alan Ellis' Federal Prison Guidebook—Federal Sentencing and Post Conviction Remedies*, forthcoming James Publishing (co-editor).

*Supreme Court Must End Acquitted Conduct Sentencing*, Law360, July 19, 2023, https://www.law360.com/articles/1700307/        supreme-court-must-end-acquitted-conduct-sentencing (co-author).

*Sentencing in Chaos: How Statistics Can Harmonize the "Discordant Symphony,"* 32 Fed. Sent. R. 128 (Feb. 2020)

*Unwarranted Disparity: Effectively Using Statistics in Federal Sentencing*, The Criminal Law Reporter, 101 Cr.L. 71, (2017) (co-author)

Caught in the Web of the Criminal Justice System, "Tilting At Windmills, The Misplaced War on Child Pornography," ch. 6, 151-174 (2017) (Dubin, Lawrence J., & Horowitz, Emily eds.)(contributed chapter)

*Plea Bargain vs. Open Pleas: What the Data Reveal*, 31 White Collar Crime Rpt. 1 (2017) (co-author)

*The U.S. Sentencing Commission's 2017 Amendment Cycle: Acceptance of Responsibility and Relevant Conduct*, 12 White Collar Crime Rpt. 288 (2017) (co-author)

*"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. R. 19 (2013)(cited as authority in *United States v. Musgrave*, 647 Fed. Appx. 529, 538 (6th Cir. 2016)).

*Federal Sentencing Tips*, 37 Champion 40 (2013)(co-author)

*Trends and Practice Tips for Representing Child Pornography Offenders at Sentencing*, 27 Crim. Justice 29 (2012)(co-author)

*At a "Loss" for Justice: Federal Sentencing for Economic Offices*, 25 Crim. Justice 22 (Winter 2011)(co-author)

Sentencing, Sanctions, and Corrections: Federal and State Law, Policy, and Practice, 2nd ed., Foundation Press (2002).

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,
Plaintiff,
vs.

SCOTT SPEAR,
Defendant.

Case No.: 2:18-CR-00422-DJH-3

**DECLARATION OF
JANET MARIE PERDUE**

I, Janet M. Perdue, declare that the following statements are true:

### BACKGROUND OF DECLARANT

1.  I am an independent prison consultant. From May 1988 through May 2022, over 34 years, I was employed by the Department of Justice, Federal Bureau of Prisons, and served in many capacities. I most recently began work as a corrections consultant in matters related to federal confinement following my retirement in May 2022. My last four positions held were Residential Reentry Manager, Chicago, Illinois; Associate Warden, Metropolitan Correctional Center, Chicago, Illinois; Executive Assistant, North Central Regional Office, Kansas City, Kansas; Assistant Correctional Programs Administrator, North Central Regional Office, Kansas City, Kansas.

2.  These assignments gave me broad experience and expertise from the moment a defendant is indicted, throughout the service of sentence, and eventually placement in a residential reentry center. In my capacity as Associate Warden, I was generally responsible for the overall operation and all components throughout the facility. My professional experience of working in federal corrections includes many areas.

Ex. 2

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

3. While assigned to a BOP Regional Office, one of my duties included classifying and designating newly committed inmates and reviewing and approving inmate transfers to other federal prisons. Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison.

4. Another one of my duties when I was assigned to the Regional Office, was to review and respond to inmate grievances, regarding all topics pertaining to correctional programs, including appeals related to the discipline policy. Throughout my career, in many of my positions, I was required to assess an inmate's risk formally and informally. This risk assessment was especially critical when an inmate was being considered for a lesser security prison transfer or a community program.

5. Since my retirement from the Bureau of Prisons, I have maintained contact with many former colleagues. Since February 2023, I have worked as an independent prison consultant. I have kept abreast of new policies and laws that directly impact the Bureau of Prisons.

6. Most recently, I have been preparing reports for filing in various United States District Courts throughout the country. These reports are prepared for Compassionate Release consideration or for inmates being considered for release under the Incarceration Reduction Amendment Act (IRAA). In preparation for these reports, I am required to review all the prison records of each inmate so I can provide a concise and thorough report for the Court.

7. I have previously been qualified as an expert government witness in federal courts in the areas of prison management, prison practices, and prison adjustment. I also have been

qualified as an expert defense witness on federal prison matters. A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

## **SCOPE OF REPORT**

8.  Baird Perdue & Associates, LLC, was contacted by Eric Kessler & Bruce Feder, who are representing Mr. Spear in a criminal matter in the District of Arizona. Mr. Spear is scheduled to be sentenced on August 27, 2024. The attorneys requested an overview of Mr. Spear's likely classification and designation status based on Bureau of Prisons standard classification procedures, as well as an accurate picture of the conditions of incarceration faced by Mr. Spears, should he be sentenced to a term of imprisonment in the Federal Bureau of Prisons. It is this expert's opinion that Mr. Spear will likely receive a designation rendering the status of Sex Offender as result of his current offense, which will require no less than a low security designation. The Court will be provided with information that explains the difficulties Mr. Spear will face at a low security prison, and the dangers of serving time labeled as a Sex Offender. Additional information will be discussed about the difficulties Mr. Spear will encounter in receiving basic health care given his significant health concerns and the obstacles he will face in the BOP, which is facing a staffing crisis and struggles to deliver basic healthcare.

9.  In preparation for my declaration, I reviewed the following documents:

    a.  Draft Presentence Investigation Report (PSR)

    b.  Various medical/psychological records regarding Mr. Spear

10. Additionally, I calculated a preliminary security classification assessment utilizing the BOP's Program Statement 5100.08, Inmate Security Designation and Custody

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

Classification, Exhibit B. An initial security classification and designation will be completed by the BOP following sentencing if a sentence of imprisonment is imposed.

## EXECUTIVE SUMMARY

11. Mr. Spear, age 73, is facing a potentially lengthy prison term and will likely be designated to a low-security prison at the very least, despite the absence of a criminal record of arrest or conviction. He does not suffer from drug or alcohol addiction. He suffers from many medical and mental health conditions which seem chronic and unlikely to abate in intensity given his advanced age. Receiving baseline medical care will be a significant challenge for Mr. Spear given the well-documented problems the BOP is facing with respect to health services, which I will elaborate on later in the body of this report.

12. Mr. Spear's life expectancy will be hastened by incarceration. His already advanced age and poor health will compound and advance in a sharp trajectory due to term of confinement. Indeed, based on the available research of life expectancy for incarcerated individuals, any term of imprisonment greater than ten years could very well amount to a life sentence.

13. Mr. Spear, as an elderly offender, is likely to be labeled as a Sex Offender and in doing so serving time will be onerous for him. Sex Offenders are held in the lowest regard among prison populations by staff and inmates alike. Those with this label are often met with bullying, disdain, intimidation, violence, ostracization, and unfortunately sometimes become the victim of homicide.

14. On April 6, 2018, Scott Spear self-surrendered to the United States Marshals Service in Phoenix, AZ, and was released on personal recognizance on April 9, 2018, with conditions under U.S. Pre-trial Services supervision. He has been convicted of Count one of the

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

indictment for Travel Act – Facilitating Prostitution. There have been no concerns associated with his supervision status and he has complied with all conditions imposed. Due to this compliance, it is recommended he be given the opportunity to self-surrender. Granting this will significantly impact his classification score that will be completed by the BOP. I will elaborate on this later in this report.

15. Mr. Spear has been cooperative with all court proceedings, the Pre-Sentence Investigation Report, and the conditions of his pre-trial supervision.

16. As previously mentioned, Scott Spear is a 73-year-old offender. He will enter incarceration with a great degree of naivety. He has no criminal history and likely no prison or street savvy to help him navigate the complicated and dangerous world of imprisonment. Given his numerous medical conditions, he will appear frail and weak. Other inmates with lengthy criminal backgrounds and a degree of street savvy will prey upon him. This may take the form of extortion, intimidation or threats of harm in exchange for money, sex, or other forms of currency. He could easily be targeted as one to hide or hold in safe keeping, a contraband item such as a phone or drugs, in his personal belongings. This provides cover for the extorting inmate and if the items are discovered, Mr. Spear will be forced to keep the truth silent and be held accountable for the rule infraction and resulting punishments or suffer consequences for "snitching".

17. It is highly likely the BOP will classify Mr. Spear as a Sex Offender due to the fact the charge of conviction contains the term "prostitution". While it has been noted by the Court this case is not a sex trafficking case, the BOP will classify this as a sex offense, which effectively bars Mr. Spear from placement in a minimum-security camp regardless of the length of his sentence. In addition, should he be sentenced to a term of greater than ten

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

years, a designation will be made to a low-security or higher facility based on the length of the term.

18. His Sex Offender status will be difficult to keep private.  This case has received notoriety locally and it is customary for other inmates to learn about the crimes of others.  Inmates may have heard of his name and his crime in the news, or they may ask people in the community to conduct a simple internet search on Mr. Spear and it will be quickly realized he is tied to an offense involving prostitution.  Once an inmate has the label of a Sex Offender, the hope for an uneventful term of confinement is dashed.

19. Incarceration is difficult on any inmate as physical and mental stress are part of adjusting to prison, and especially for someone facing a lengthy sentence. As much as Mr. Spear may try to conceal the nature of his crime, other inmates will learn of it, one way or another, and they will likely not be concerned with the details of the crime.  Oftentimes inmates will pressure other inmates to provide "paper" (proof) of their conviction and sentence.  If Mr. Spear refuses to provide documentation, other inmates will make assumptions about the nature of his crime.  The crime of being a Sex Offender has perhaps the most negative stigma within the prison walls and it will compromise his safety for the duration of his sentence.

20. When an inmate is targeted as mentioned above, they oftentimes seek out a staff member and request protective custody. When this occurs, an inmate's housing status dramatically changes with placement in the Special Housing Unit (SHU).  Their prison world will become very small, isolated, psychologically and physically arduous. Some inmates never return to the general population of a prison after seeking protective custody and literally finish their sentences in this housing status.  Research has shown prolonged periods of time

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

spent in SHU housing can lead to a serious mental health crisis and general physical malaise. Time spent in this housing status is extremely isolating. Offenders have very little contact with others. Staff are required to make periodic rounds of the SHU to check in with those assigned there, but from my professional experience, I know all too well, those brief contacts with staff are fleeting, and if an offender is asleep when staff make an appearance, one may have to wait several days to speak with a specific staff member to address problems or concerns. Mr. Spear's medical and mental health conditions could easily be exacerbated by lack of timely and appropriate attention while housed in the SHU. I predict Mr. Spear may eventually be housed in SHU due to his criminal offenses, and the stigma attached will ultimately lead to him being unsafely housed in the general population. He may be being singled out violently due to his status as a Sex Offender, and unfortunately, this is often par for the course for offenders labeled as such. All too often in my years with the BOP I have witnessed Sex Offenders as the subject of bullying, physical and sexual assaults, extortion for protection, and isolation from other inmates.

21. An offender labeled as a Sex Offender, who is also elderly experiences compounded vulnerability by the fact their age often makes them appear to be weak, fragile, and easily manipulated. These factors also will heighten the likelihood of the aforementioned bullying, physical and sexual assaults, extortion for protection, and isolation from other inmates.

22. It is also not uncommon for offenders labeled as Sex Offenders to lead isolated lives while remaining in general population. This status causes one to be ostracized and so to avoid aggression from others, or physical or verbal altercations, one tends to recess into their cell and try to serve their sentences as far below the radar as possible. Coupled with the

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

separation from family and loved ones, this can lead to highly negative medical and mental health outcomes.

23. Mr. Spear will be one of the oldest inmates in prison. Of the approximately 160,000 federal inmates, those over 65 years old make up only 3% of the total population. In addition to his advanced age, Mr. Spear already has numerous health challenges. In 2018, he had emergency thoracic surgery for a severe lung infection resulting in the partial removal of his right lower lung and the lining of the same lung. He now has restrictive lung defect with pulmonary fibrosis and scarring. He is winded easily with exertion and he ambulates slowly.

24. Obstructive sleep apnea is a medical condition for which Mr. Spear has been diagnosed. One of the treatment modalities approved for obstructive sleep apnea by both Medicare and the American Academy of Sleep Medicine is oral appliance therapy when implemented using a custom fabricated and fitted mandibular advancement device or splint. In Mr. Spear's case, a mandibular advancement device was provided to him. Oral appliance therapy is a medical treatment for a medical condition. It is not a dental treatment. The oral appliance therapy is indicated because Mr. Spear was not able to tolerate CPAP therapy and would need this mandibular device while in prison. Ordinarily, the BOP does not allow for private medical equipment to be brought and used in prison. It may take several weeks or months for Mr. Spear to have access to the proper device to address this issue.

25. Mr. Spear has been recently advised he needs shoulder replacement surgery. He currently undergoes a regimen of cortisone and does not use his left arm for any significant lifting. He practices stretching exercises and is prescribed anti-inflammatory medication. The

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

current crisis in health care in the BOP gives little hope he will receive this much needed surgery.

26. Mr. Spear, in 2017, underwent a procedure where a laser was used to remove tissue blocking urine flow through the prostrate. While this procedure was initially effective, it has flared up recently. It is unknown if this bout of urinary frequency and urgency is due to previous damage already done to the bladder or perhaps from stress stemming from his legal circumstances. Frequent urination can become a security issue, especially if he is assigned a job while incarcerated. Nearly all inmates are expected to work and frequent urination may become a difficult issue to navigate if he does not have immediate access to a restroom at any given time. Correctional officers and work detail supervisors will have little patience for an offender who needs to leave a work detail to urinate frequently. This likely will be a very stressful situation for Mr. Spear to address.

27. Mr. Spear also suffers from severe spinal narrowing and moderate spinal canal effacement. This condition has been decades long. He has suffered lower back pain for 19 years and it has become progressively worse over the past seven years. It is likely another spinal fusion will be necessary to relieve nerve impingement and correct new spondylolisthesis that has been observed. He clearly suffers from mobility issues. In addition, he suffers from neuropathy in both feet. He will be expected to traverse a prison compound several times a day. Most prison compounds are designed in a manner that separates the housing units from the dining hall by a significant distance and this will be a daily hurdle for Mr. Spear. Many federal prison compounds have distances of at least a ¼ mile from housing units to the dining hall. He will likely be assigned to an upper bunk initially and will have to wait perhaps several weeks for the medical assignment of a lower bunk. However, lower bunks

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

are not always available and there is no guarantee he will be assigned one. Prison beds are not designed for someone with persistent spinal issues and constant pain. He will not have access to a physically therapeutic bed or chair that will allow for the easing of persistent back pain. To exacerbate his medical condition, he is diagnosed with bipolar and attention deficit disorder. He is also currently medicated with psychotropic medication, Lamotrigine (Lamictal), Lisdexamamfetamine and clonazepam, to treat depression and anxiety. He will need medication management and ongoing psychiatric treatment and counseling to assist with his mental health diagnoses. The BOP is currently experiencing a staffing crisis unsurpassed in its history, and this has severely hampered the BOP's ability to provide the most basic level of medical and mental healthcare.

28. Knowing his long list of documented medical and mental health concerns and current need for surgical intervention, gives me great pause against the backdrop of the horrendous state of affairs that currently exists in the BOP with respect to health care. The BOP is suffering the most severe staffing crisis in its history as an agency. The lack of staff is a national crisis and not a regional one. The cascading effects of not having enough correction staff and medical staff are devastating.

29. In an NPR article dated December 13, 2023, an investigation regarding preventable deaths of offenders in the BOP was spotlighted by two key Senators, Dick Durbin and Chuck Grassley, both members of the Senate Judiciary Committee. They both expressed deep alarm by reports that the BOP has demonstrated foot dragging when it comes to providing medical care to those in its custody and that the BOP needs to be held responsible for this failure and take action to raise its standards. The comments came after a National Public Radio investigation detailed numerous accounts of federal prisoners nationwide going

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

without needed medical care. Many waited months or even years for treatment. The investigation revealed this is a systemic problem facing the Agency and not simply isolated to just one prison facility. The issues are pervasive and nationwide. These consistent failures are due to the BOP's dangerous, unaddressed staffing shortages of correctional officers and health services staff.

30. Equally concerning, until NPR published its investigation, the BOP stated on its website that it was accredited by the Joint Commission, which accredits most U.S. hospitals, when in fact its certification had lapsed two years prior. The claim has since been deleted from its website. https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-[1]

31. In another recent National Public Radio investigation published on January 2, 2024, it was revealed an offender had died just weeks before his anticipated release due to untreated Methicillin-Resistant Staphylococcus Aureus, better known as MRSA. It is usually regarded as harmless but unchecked it can lead to sepsis or death. This offender had a diagnosis of MRSA for two years preceding his death. The BOP ruled his death as one of natural causes, but it could be easily argued this offender died of neglect to address this usually harmless condition. Important to note, the BOP does not investigate deaths ruled as "natural causes". We can expect no inquiry as to how this simple medical issue resulted in death and therefore no accountability. This is indicative of the BOPs current inability to manage even the most benign of health conditions, such as MRSA. https://www.npr.org/2024/01/02/1219667393/there-

---

[1] Anderson, Meg. 2023. "Senators push Bureau of Prisons to address reports of inadequate health care." NPR. https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

is-little-scrutiny-of-natural-deaths-behind-

bars#:~:text=MBD%20for%20NPR-,Autopsies%20are%20not%20required%

20for%20federal%20prison%20deaths%20that%20are,families%20were%2

0given%20little%20information.[2]

32.  In Senator Dick Dubin's public hearing on February 28, 2024, regarding the Office of

Inspector General's (IG) Report, Deaths in Custody, he directed the IG to investigate 344

non-medical deaths of federal offenders from 2014 to 2021, a period of only seven years.

These are deaths due to unnatural causes. We learned that over 50% of the deaths were the

result of suicide, and half of those occurred while offenders were housed in a Special

Housing Unit and were single cell housed. Two-thirds of those suicides were offenders

who had been assigned the lowest mental health care level, which reveals a huge margin

of error in assigning a proper mental health level. It was also noted that one third of all

deaths involved contraband to include drugs and/or weapons and appeared to have

contributed to their deaths.  Mr. Spear will require ongoing mental health treatment and I

fear the BOP will be unable to address his needs properly.

33. During this same testimony, Senator Durbin offered the following in further exasperation

of the lack of action taken by the BOP to put corrective action in place:

Durbin:

"In recent years, more than 300 people have died of unnatural causes in custody of the Bureau of

Prisons—deaths that too often have been the result of mismanagement and operational failures."

---

[2] Christopher, Tirzah. 2024. "Young people are dying 'natural deaths' in prisons." NPR.
https://www.npr.org/2024/01/02/1219667393/there-is-little-scrutiny-of-natural-deaths-behind-
bars.

Case: 24-5375, 09/03/2024, DktEntry: 5.1, Page 526 of 1023

Case 2:18-cr-00422-DJH   Document 2138-2   Filed 08/19/24   Page 13 of 25
Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

"After media reports late last year alleged that some adults in custody died while waiting for necessary medical care, I called on BOP to change its procedures, staff, and supply medical units so that incarcerated adults can receive the care they need."

"Director Peters, I understand that many of the issues we are discussing today have been problems for years, long before you arrived. But it is time for solutions and change. The lives of hundreds of Americans in the Bureau of Prisons' custody are at risk."

Peters: "Our agency is in crisis as it relates to recruitment and retention".

34. In IG Horowitz's opening statement in his February 28, 2024, testimony regarding the Deaths in Custody Report, he led with disconcerting information that the BOP has been placed on the list of top agencies with management and performance challenges facing the Department of Justice, for 12 straight years. He stressed the issues are not new to the BOP and they have gone unchecked and unaddressed, which echoed the sentiments and exasperation of Senator Durbin. He pointed out there have been over 100 investigations conducted by the Inspector General's Office since 2002, and deep systematic failures continue two decades later. Inspector General Horowitz mentioned that the high-profile deaths of Jeffrey Epstein and Whitey Bulger, although highly publicized, are not outliers. They are not unique, and these events can be linked to the years of areas of concern that have been reported and repeatedly ignored. He listed areas of deficiencies that remain unaddressed as follows: under-staffing concerns in correctional services staff, staffing issues in health services departments which directly impacts the medical care and treatment of inmates, contraband, use of single cell housing, inappropriate mental health designations, ineffective contraband interdiction, outdated camera systems, staff inability to follow

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

policy, and lack of holding staff accountable and meaningful staff discipline. The IG suggested the unnatural deaths reviewed in this report are directly linked to the staffing crisis.

https://oig.justice.gov/news/testimony/statement-michael-e-horowitz-inspector-general-us-department-justice-us-senate-1#:~:text=Our%20review%20of%20records%20provided,homicides%20the%20next%20most%20prevalent.[3]

35. The systematic deficiencies facing the BOP will have a negative effect on Mr. Spear's physical health, mental well-being, and certainly life expectancy.  He will not receive the necessary care and medical attention that he requires.  His medical conditions are likely to be ignored, or in the very least, treatment will be delayed. At his advanced age, failing health will continue at an accelerated pace.

36. According to an oft-cited, published, peer-reviewed study by Dr. Evelyn J. Patterson, there is, on average, "a 2-year decline in life expectancy for each year served in prison." *See* Evelyn J. Patterson, *The Dose Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. Pub. Health 523 (2013), available online, https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148[4] (cited in support in *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017); *State v. Haag*, 198 Wn.2d 309, 329, 495 P.3d 241, 251 (Wash. 2021); *People v. Contreras*, 4 Cal. 5th 349,362-63 (Cal. 2018); *People v. Wines*, 323 Mich. App. 343, 351 n.6 (Mich. 2018)). Dr. Patterson's

---

[3] "Statement of Michael E. Horowitz Inspector General, U.S. Department of Justice before the U.S. Senate Committee on the Judiciary concerning Examining and Preventing Deaths of Incarcerated Individuals in Federal Prisons." n.d. DOJ OIG. https://oig.justice.gov/news/testimony/statement-michael-e-horowitz-inspector-general-us-department-justice-us-senate-1.

[4] n.d. Wikipedia. https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148.

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

findings are consistent with findings by the U.S. Department of Justice itself. [1] U.S. Dept. of Justice, Nat. Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 9-10 (2004), https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf [5] (stressing that incarceration intensifies health problems and accelerates aging processes). Statistically, due to the deleterious effects of incarceration, it is estimated he will die within a little over five years of imprisonment.

37. Exposure to risks while incarcerated, increase of disadvantage after release, and protections from external risks due to imprisonment, involve a direct causal impact on long-term adult health status and mortality. Given his current age, his existing medical and mental health issues, and his advanced age there remains a very real risk that regardless of the sentence imposed, Mr. Spear might not survive it.  To the extent he does, the quality of the rest of his life will be exponentially diminished by his BOP experience.

38. Based on my own observations of inmates who spend long terms in prison, prison environments expose individuals to both chronic and acute stress and promote unhealthy behaviors, trigger mental health problems and physical injury. Behaviors such as drug abuse, depression, chronic anxiety, poor self-rated health, and reduced life satisfaction. Additionally, extreme exposures, such as solitary confinement, increase the risk of fatal self-harm.

## SECURITY CLASSIFICATION

---

[5] Dunn, William. `. "Health." NIC Micro-Sites. https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf.

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

39. There are five security levels utilized by the BOP to classify federal prisons. Those security levels include Minimum, Low, Medium, High, and Administrative. Sentenced inmates are usually designated to federal prisons which are commensurate with their security levels. Pre-trial/pre-sentence detention facilities and federal medical prisons are classified as Administrative and are comprised of inmates of all security levels.

40. Following sentencing, inmates are initially classified and designated for service of their sentence by staff assigned at the Designations and Sentence Computation Center (DSCC), in Grand Prairie, TX. The documents utilized by the DSCC during the initial classification are the Presentence Investigation Report, Judgment in a Criminal Case, disciplinary record from prior or current commitment, and any additional relevant documents from various law enforcement agencies.

41. Several factors are considered when an inmate is initially classified. Some of the factors that impact classification include age, pending charges/detainers, seriousness of current offense, history of violence and escape, sentence length, and voluntary surrender status. Each of these areas have a corresponding point value, which is then totaled, to determine an inmate's overall security level. For Mr. Spear, if he were allowed to voluntarily surrender, the BOP will reduce his security score by three points, which depending on the length of his sentence, could make the difference between a designation to a low-security facility from a medium-security facility. This factor is highly significant as the contrasts between a low-security facility and a medium-security facility are starkly different. Given his lack of criminal history, if he were to be designated to a medium-security facility, it would not be commensurate with his security needs and expose Mr. Spear to a startling level of violence, aggression, and drug use that he would not experience in a low-security

facility. Which is not to say, violence, aggression, and drug use do not exist in a low-security facility, however, it happens with much less frequency.

42. DSCC staff also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for additional security considerations, not captured in the other categories. The MGTV's and PSF's are used to justify an inmate's designation to an institution which is not commensurate with his numeric security point total. There are specific factors, which if applicable to an inmate, would indicate his need for increased security to protect society. In most cases, the PSF's impact the inmate's security level, causing an increase, which overrides the security point score. The PSF's for male offenders include Disruptive Group, Greatest Severity Offense, Sex Offender, Threat to Government Officials, Deportable Alien, Sentence Length, Serious Escape, Prison Disturbance, Juvenile Violence, and Serious Telephone Abuse.

43. Custody Classification reviews are conducted annually by an inmate's case manager. Many of the same factors utilized to score the initial security classification are used when scoring an inmate's custody level. Additional criteria utilized in the Custody Classification are percentage of time served, drug/alcohol abuse history, type and frequency of misconduct reports, responsibility demonstrated during the period of incarceration, and family/community ties. The outcome of the Custody Classification is used to determine if an inmate warrants a transfer to a lesser or greater security prison, or whether the current institution is appropriate to address his security needs and concerns.

44. As stated earlier in this declaration, I believe Mr. Spear would score no less than a low-security classification, based upon the likely application of a Public Safety Factor for Sex Offender. By BOP policy, this requires placement in a low security prison, which, in my

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

opinion, would be a more stressful experience for someone of his age and with his existing ailments and future medical and mental health needs.

## THE FIRST STEP ACT

45. The First Step Act (FSA) was signed into law in December 2018.  FSA provides that an eligible inmate in BOP custody, who successfully participates in EBRR Programs or PAs, will earn FSA ETCs, which can be applied toward:

   a. prerelease custody (i.e., transfer to a Residential Reentry Center (RRC) or home confinement for service of a portion of the inmate's sentence) or

   b. transfer to supervised release (i.e., early satisfaction of the inmate's term of imprisonment) under 18 U.S.C. 3624(g).

Due to Mr. Spear's crime, he will not be able to take advantage of the benefits of the FSA, most notably, the time-credits afforded for participating in programming.

## CONCLUSION

46. Being in prison is difficult but it is more difficult for elderly offenders like Mr. Spear, with the added dangers of the Sex Offender label. He also faces significant health challenges, which will likely worsen over the remainder of his life. If a long term of imprisonment is imposed, not only will Mr. Spear spend a longer term in prison, but he faces the possibility of doing so in a higher security prison with much younger inmates.

47. Long-term incarceration would likely mean Mr. Spear's health issues will be exacerbated and could lead to placement in a BOP medical facility.  It is expensive to house such inmates, and their health conditions leave them vulnerable to infections and disease.

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

48. As previously discussed, he will be designated to no less than a low-security facility. It would be beneficial for him to serve his sentence close to the Phoenix area to allow for meaningful contact and visitation from friends and family. Contact with family and friends helps to lessen the negative effects on incarceration. A recommendation for placement at FCI Safford, FCI Tucson or FCI Terminal Island, all low-security facilities, would allow visitation on a regular basis.

49. It is hopeful he may be permitted to voluntarily surrender to his assigned facility once a designation has been completed. This would give him more time to attend to his medical and mental health needs before a potentially lengthy sentence and reduce his security point total.

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

Executed on this 9th day of August 2024.

Janet M. Perdue

**EXHIBIT A**

## Janet M. Perdue

### <u>Professional Profile</u>

I currently work as a Corrections Consultant specializing in the area of Federal Corrections. I have provided Expert Witness testimony while employed by the Federal Bureau of Prisons on institutional operational issues. As an Independent Consultant I provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Public Defenders Offices, individuals, and family members of those facing the possibility of serving a federal prison sentence or those individuals who have already been sentenced or incarcerated.

My career in Adult Corrections/law enforcement began with my appointment as a Probation Officer in the state of Pennsylvania in 1987. Shortly thereafter, I embarked on a 34-year career with the Federal Bureau of Prisons. I began as a Correctional Officer, progressed through several positions in the field of case management providing direct services to the inmate population. Following several years working in the field, I was promoted to Assistant Correctional Programs Administrator, and then an Executive Assistant for the Regional Director, working from a regional office in Kansas City, KS.

These positions afforded me with a global perspective of agency operations, to include designations and transfers processes of federal offenders, auditing processes to include those employed by the American Correctional Association (ACA), of which I am a member. I was appointed to a team of staff to develop execution protocols when the Bureau of Prisons was tasked with the execution of Timothy McVeigh, the Oklahoma City Bomber, and was also appointed to a media management team regarding the same offender. I conducted Control Unit Hearings for offenders being considered for placement in the Bureau of Prison's Supermax facility.

I served as Associate Warden for eight years at the Metropolitan Correctional Center, Chicago, Illinois, housing approximately 750 offenders. I was responsible for the day-to-day activities of ensuring offenders made prompt court appearances while also providing a safe environment for staff and offenders to work while affording programming opportunities for the inmate population. During my tenure, I managed cases with Special Administrative Measures, (SAM), successfully managed several international and domestic terrorists, and drug cartel leaders. I worked closely with our local FBI, US Attorneys office, Federal Judges from the Northern District of Illinois, and the United States Marshals Service.

Most recently my career focused on Residential Reentry Centers. I managed a region encompassing seven federal sentencing districts, over $25 million in contract awards annually, involving bed space of 800+ offenders. I was responsible for placement processes for offenders nearing the end of their sentences, ensuring placement in the most appropriate locations with a wide variety of programming options to afford offenders with tools for a successful return to their communities. Under my leadership, my staff provided contract oversight of residential reentry centers to ensure the operation of safe and secure facilities while offering cutting edge reentry

initiatives to the offender population.  Under my leadership, we processed and managed record numbers of offenders throughout the pandemic under the auspices of the CARES Act of 2020.

I retired from the Bureau of Prisons in May 2022.

## Janet Perdue: Professional Experience

Residential Reentry Manager                                    May 2010-May 2022

Chicago Residential Reentry Office, Chicago, IL

- Managed all residential reentry activities for seven federal sentencing districts providing over 800 beds for placement of offenders
- Provided contract oversight management for over 20 residential reentry centers (RRCs) and 10 county jail facilities
- Delivered training and mentoring to new staff
- Provided training to all local institution staff regarding residential reentry matters
- Provided management oversight of day-to-day activities of over 20 residential reentry centers
- Determined when to remove offenders from the community for public safety
- Determined when to return offenders to the RRCs to continue on the path of reentry
- Collaborated extensively with US Probation and US Marshals officials
- Routinely inspected all RRCs and detention facilities for policy compliance

Associate Warden                                             July 2002-May 2010

Metropolitan Correctional Center, Chicago, IL

- Second in command in a pre-trial federal prison which employed 350 staff and housed 750 offenders, running the gamut of all security level pre-trial inmates, with a small cadre of designated offenders, and a housing unit of female offenders
- Was assigned both Operations and Programs Associate Warden giving me comprehensive management experience of full facility operations
- Assisted in the management of a $20 million annual budget
- Oversaw staffing, inmate programs, institution security, staff training, both staff and inmate internal investigations, and discipline
- Implemented new policy and procedural changes
- Developed excellent relationships with federal entities to include the FBI, US Court personnel, US Attorney's Office, US Probation, US Marshals Service, and Federal Public Defenders
- Directed the management of high-profile cases to include SAM cases; cartel members and leaders; and foreign and domestic terrorists
- Prepared facility for American Correctional Association (ACA) reaccreditation

Regional Executive Assistant                                  July 1999-July 2002

Bureau of Prisons, North Central Regional Office - Kansas City, KS

- Worked closely as a member of the Regional Director's management team providing oversight to 21 federal prisons, to include the agency's one Supermax facility, the federal death row unit, two medical facilities for federal offenders, and six penitentiaries
- Conducted Institution Character Profiles of each facility to assess organizational climate of the institution by examining the following areas:  staff and inmate morale, professionalism, communication, and community relations
- Was a member of a work group to develop execution protocols which were implemented in the execution of Timothy McVeigh
- Led a media management team to navigate the volume of media interest generated by this execution and others to come
- Conducted Control Unit Hearings for placement of offenders at the Supermax facility in Florence, CO
- Prepared the Regional Director for quarterly agency meetings which included research and review of data relevant to performance indicators for the region
- Provided training to institution executive assistants in the area of data collection and uses of internal agency search engines to generate reports
- Acted as the Senior Deputy Regional Director on numerous occasions
- Served as a quality controller of documents
- Served as a reviewer of Use of Force actions occurring in the region

Regional Assistant Correctional Programs Admin            June 1997-July 1999

Bureau of Prisons, North Central Regional Office - Kansas City, KS

- Oversaw 21 federal prisons located in the North Central Region of the United States
- Primarily targeted the development and training of correctional programs staff assigned to the institutions within the region
- Developed training agendas for on-site training at the institutions with a focus on policy compliance and guidance
- Coordinated annual conferences with case management coordinators from 21 facilities
- Participated on several Institution Character Profile teams to assess organizational climate
- Routinely prepared institution staff for internal audits

## Additional Work Experience

Unit Manager                                        April 1995-June 1997

Federal Correctional Institution, Fort Dix, NJ

Case Management Coordinator                          May 1992-April 1995

Federal Correctional Institution, Fort Dix, NJ

Case Manager                                        December 1988-May 1992

Federal Prison Camp, Allenwood, PA

Correctional Officer                                May 1988-December 1988

Docusign Envelope ID: 1DF37CE2-4AAC-4F23-824F-4BA035A7F4CB

Federal Prison Camp, Allenwood, PA

## **Education**

Lycoming College - Williamsport, PA

Bachelor of Arts Criminal Justice and Sociology

Activities

- Member of ACA
- Work with autistic children
- Volunteer for the Meals on Wheels program
- Proud mom of two sons

## EXHIBIT B

BP-A.337
FSLC /.
**INMATE LOAD AND SECURITY DESIGNATION** CDFRM
**U.S. DEPARTMENT OF JUSTICE**                                  **FEDERAL BUREAU OF PRISONS**

### INMATE LOAD DATA

| | | | |
|---|---|---|---|
| 1. REGISTER NUMBER: | | | |

| 2. LAST NAME SPEAR | 3. FIRST NAME SCOTT | 4. MIDDLE | 5. SUFFIX |
|---|---|---|---|

| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | 9. DATE OF BIRTH |
|---|---|---|---|

10. OFFENSE/SENTENCE

| 11. FBI NUMBER | 12. SSN NUMBER |
|---|---|

| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP |
|---|---|---|

16. ADDRESS-STREET

| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|

| 21. HEIGHT   FT         IN | 22. WEIGHT         LBS | 23. HAIR COLOR | 24. EYE COLOR |
|---|---|---|---|

25. ARS ASSIGNMENT:

### SECURITY DESIGNATION DATA

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|---|---|---|---|

| 5. VOLUNTARY SURRENDER STATUS | 0 = NO | (-3) = YES | | |
|---|---|---|---|---|
| IF YES, MUST INDICATE: | 5a. VOLUNTARY SURRENDER DATE: | | | -3 |
| | 5b. VOLUNTARY SURRENDER LOCATION: | | | |

6. MONTHS TO RELEASE :

| 7. SEVERITY OF CURRENT OFFENSE | 0 = LOWEST  1 = LOW MODERATE | 3 = MODERATE  5 = HIGH | 7 = GREATEST | 7 |
|---|---|---|---|---|

| 8. CRIMINAL HISTORY SCORE | 0 = 0-1  2 = 2-3 | 4 = 4-6  6 = 7-9 | 8 = 10-12  10= 13 - | 0 |
|---|---|---|---|---|
| 8a. SOURCE OF DOCUMENTED | - PRESENTENCE INVESTIGATION REPORT or | | - NCIC III | |

| 9. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | 0 |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

| 10. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | 0 |
| | SERIOUS | 0 | 3(S) | 3(S) | 3(S) | 3(S) | |

| 11. TYPE OF DETAINER | 0 = NONE  1 = LOWEST/LOW MODERATE | 3 = MODERATE  5 = HIGH | 7 = GREATEST | 0 |
|---|---|---|---|---|

| 12. AGE | 0 = 55 and over  2 = 36 through 54 | 4 = 25 through 35  8 = 24 or less | | 0 |
|---|---|---|---|---|

| 13. EDUCATION LEVEL | 0 = Verified High School Degree or GED  1 = Enrolled in and making satisfactory progress in GED Program  2 = No verified High School Degree/GED and not participating in GED Program | 0 |
|---|---|---|
| 13.a HIGHEST GRADE COMPLETED | | |

| 14. DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 Years | 1 = <5 Years | 0 |
|---|---|---|---|

15. SECURITY POINT TOTAL

| 16. PUBLIC SAFETY FACTORS | A-NONE  B-DISRUPTIVE GROUP (males only)  C-GREATEST SEVERITY OFFENSE (males only)  F-SEX OFFENDER  G-THREAT TO GOVERNMENT OFFICIALS  H-DEPORTABLE ALIEN | I-SENTENCE LENGTH (males only)  K-VIOLENT BEHAVIOR (females only)  L-SERIOUS ESCAPE  M-PRISON DISTURBANCE  N-JUVENILE VIOLENCE  O-SERIOUS TELEPHONE ABUSE | F |
|---|---|---|---|

17. REMARKS

18. OMDT REFERRAL (YES/NO)

**FILE IN SECTION 2 UNLESS APPROPRIATE FOR PRIVACY FOLDER**            **SECTION 2**

PDF                          Prescribed by P5100                    Replaces BP-S337 of FEB 02



**BACKPAGE**

# Secret Memos Show the Government Has Been Lying About Backpage All Along

Sealed memos fought over in federal court last week show authorities have known for years that claims about Backpage were bogus.

**ELIZABETH NOLAN BROWN** | 8.26.2019 12:48 PM



(Mirrorpix / MEGA / Newscom)

For nearly a decade, Backpage has been demonized by politicians, denounced in legislatures, and dramatically mischaracterized by the press, Hollywood, and well-funded activist groups. As early as 2010, top prosecutors from 21 states claimed the classified-ad platform was "exploiting women and children." In 2012 Washington state passed the first (but not last) law aimed specifically at toppling Backpage, and by 2015 U.S. senators were investigating the company.

Though the Department of Justice shut down Backpage.com in 2018, it still activates strong scorn in some corners. ("They were selling children," the California senator and Democratic presidential candidate Kamala Harris said in March.) Several founders and former executives of the company—arrested last year on federal charges of conspiracy, facilitating prostitution, and money laundering—are now awaiting a 2020 trial, as they try to fend off prosecutors eager to seize their assets and disqualify their lawyers.

"For far too long, Backpage.com existed as…a place where sex traffickers frequently advertised children and adults alike," said then–Attorney General Jeff Sessions upon their April 2018 arrest. U.S. Attorney Elizabeth Strange alleged that Backpage made "hundreds of millions" by "placing profits over the well-being and safety" of victims.

Advertisement

AD

Claims like these have always been bogus. Now, thanks to memos obtained by *Reason*, we have proof that prosecutors understood this all along.

### A TALE OF TWO MEMOS

In April 2012, two federal prosecutors sent their boss a memo about Backpage, the site that had, since 2004, been operating

Ex. 3

The memo—subject: "Backpage.com Investigation"—reveals that six years before Backpage leaders were indicted on federal criminal charges, prosecutors had already begun building a "child sex trafficking" case against the company. But this case was hampered by the fact that Backpage kept trying to help *stop* sex trafficking.

"Information provided to us by [FBI Agent Steve] Vienneau and other members of the Innocence Lost Task Force confirm that, unlike virtually every other website that is used for prostitution and sex trafficking, Backpage is remarkably responsive to law enforcement requests and often takes proactive steps to assist in investigations," wrote Catherine Crisham and Aravind Swaminathan, both assistant U.S. attorneys for the Western District of Washington, in the April 3 memo to Jenny Durkan, now mayor of Seattle and then head federal prosecutor for the district. Vienneau told prosecutors that "on many occasions," Backpage staff proactively sent him "advertisements that appear to contain pictures of juveniles" and that the company was "very cooperative at removing these advertisements at law enforcement's request."

"Even without a subpoena, in exigent circumstances such as a child rescue situation, Backpage will provide the maximum information and assistance permitted under the law," wrote Crisham and Swaminathan.

Over the next year, their office would undertake a large investigation into Backpage's internal processes and potential criminality.

This included a "preliminary review of more than 100,000 documents," subpoena responses "from more than a dozen entities and individuals," interviews with around a dozen witnesses, and "extended grand jury testimony from an additional six witnesses," mainly Backpage employees. Still, it failed to produce "the kind of smoking gun admissions which we had hoped would propel this investigation to indictment," wrote Swaminathan and another assistant U.S. attorney, John T. McNeil, in a January 2013 memo.

This memo—subject: "Backpage.com Investigation Update"—and the earlier one from Crisham and Swaminathan would wind up being accidently sent by federal prosecutors to Backpage defense lawyers last year. But both would be ruled off-limits for defense use, placed under seal, and only subject to public courtroom discussion last week after prosecutors tried to sanction defendants for a few paragraphs from the memos appearing in a June *Wired* article.

"At the outset of this investigation, it was anticipated that we would find evidence of candid discussions among [Backpage] principals about the use of the site for juvenile prostitution which could be used as admissions of criminal conduct," wrote McNeil and Swaminathan in their 2013 update. "It was also anticipated that we would find numerous instances where Backpage learned that a site user was a juvenile prostitute and Backpage callously continued to post advertisements for her. To date, the investigation has revealed neither."

They recommended that bringing criminal charges would be unwise. But the matter didn't stop there.

Washington-based federal prosecutors kept trying to compel more internal documents from Backpage. A few people whose ads were posted on the site when they were underage began to sue (and lose) in civil court. In 2015, Illinois Sheriff Tom Dart threatened sanctions against credit card companies that kept doing business with Backpage, forcing the company to sue for relief. Backpage won that one too, but not before being forced to first make ads free and then find alternative payment methods, like accepting checks and bitcoin, for ad payment (moves prosecutors will later use against them in the money laundering case).

Also in 2015, Congress passed the "Stop Advertising Victims of Exploitation" (SAVE) Act relying almost exclusively on anti-Backpage rhetoric, and the Senate Subcommittee on Permanent Investigations started subpoenaing Backpage records and testimony. The following year, Kamala Harris (at that point still top prosecutor for California) twice had Backpage CEO Carl Ferrer and former owners Michael Lacey and James Larkin arrested on (unsuccessful) pimping charges.

Backpage leadership started 2017 being hauled before Congress to testify on their supposed "knowing facilitation" of child sex trafficking and ended the year the subject of a propaganda film ("I Am Jane Doe") promoted by the likes of comedians Amy Schumer and Seth Meyers and narrated by actress Jessica Chastain. Josh Hawley—then the newly-elected attorney general of Missouri and now an anti-technology crusader in the U.S. Senate—also went after Backpage that year, saying it "directly and actively promoted illegal sex trafficking."

By the time the FBI raided Lacey and Larkin's homes, tossed them in jail, and seized the site in April 2018, few public figures would defend Backpage or those associated with it. Years of much-hyped horror stories about the site and heinous

Which is why these memos from 2012–13 pose such a problem. They show that years' worth of hand-wringing and hysteria over Backpage has been built on lies.

## "BACKPAGE GENUINELY WANTED TO GET CHILD PROSTITUTION OFF OF ITS SITE"

The core claim against Backpage has always been that it enables underage prostitution. Over time, this evolved from a more modest assertion—that any site allowing adult ads would inevitably attract some posts by minors—to claims that Backpage was uniquely negligent in this capacity, indifferent to the plight of victims, and perhaps even actively encouraging sex traffickers to use the site. ("We [tried to] make them realize it was not only legally but also morally wrong to sell children," but "they wouldn't hear of it," Cindy McCain told *The Arizona Republic* in 2016.)

Back in 2012 and 2013, federal prosecutors privately expressed a quite different outlook.

But first—lest anyone think the more recent rhetoric reflects changes at Backpage since 2013—it's important to note that most of the actions covered in the Senate investigative report and much of the subsequent criminal indictment come from this 2012–13 time period or earlier. And, since then, neither civil court cases nor a variety of official investigations has uncovered anything wildly different than what was found by the Washington-based U.S. attorneys.

In 2012, Crisham and Swaminathan seemed impressed by how cooperative Backpage was with police and other members of law enforcement. Backpage data offer "a goldmine of information for investigators," they noted. In general, staff would respond to subpoenas within the same day; "with respect to any child exploitation investigation, Backpage often provides records within the hour." Staff regularly provided "live testimony at trial to authenticate the evidence against defendants who have utilized Backpage," and the company held seminars for law enforcement on how to best work with Backpage staff and records.

"Witnesses have consistently testified that Backpage was making substantial efforts to prevent criminal conduct on its site, that it was coordinating efforts with law enforcement agencies and NCMEC [the National Center for Missing and Exploited Children], and that it was conducting its businesses in accordance with legal advice," wrote Swaminathan and McNeil in 2013. Furthermore, they noted, their investigation failed "to uncover compelling evidence of criminal intent or a pattern or reckless conduct regarding minors." In fact, it "revealed a strong economic incentive for Backpage to rid its site of juvenile prostitution."

Ultimately, it was their assessment that "Backpage genuinely wanted to get child prostitution off of its site."

Ernie Allen, then in charge of NCMEC, thought so too. He had told prosecutors he believed Backpage was genuinely trying to combat underage ads, although "use of the Internet to market commercial sex was so fluid that any system of moderation and reporting was destined to fail" (as prosecutors paraphrased).

Backpage executives—including CEO Ferrer and then-owners Lacey and Larkin (who sold Ferrer the company in 2015)—had been working closely with the quasi-governmental children's group to establish best practices. They weren't about to give up on *all* adult advertising, which Lacey and Larkin had been publishing in the back pages of their weekly print newspapers since the 1970s. But Backpage took to heart other steps suggested by authorities.

For instance, not only did all ads featured a "Report Ad" button, with an expedited process for folks reporting suspected sexual exploitation, but the site also featured prominent links to the NCMEC CyberTipline. And while most sections of Backpage were free for users, "Backpage followed Craigslist's policy, initiated at the suggestion of NAAG, of charging a fee for each adult services advertisement," something NAAG championed for its ability to reduce ad volume and yield evidentiary data for law enforcement.

In 2011, Backpage staff flagged 2,695 ads for NCMEC review, according to the NCMEC president's testimony before Congress. He also said that at the group's request, Backpage leaders had begun stepping up the number of reported ads

Later, Allen and NCMEC would insinuate that the increase was evidence of a spike in child sex trafficking and/or of Backpage being the biggest online proponent of it. But back then, Allen admitted Backpage had done more monitoring and proactive reporting than any other site in adult advertising.

Backpage seems to have been taking an especially cautious approach. Operations manager Andrew Padilla told moderators

Many adult ads used only partial photos. And some teens "may simply appear to look older" than they are, states the 2012 memo. "It is difficult for even trained investigators to conclude" age from photos, making it hard to say Backpage monitors should have been capable of this "extraordinarily difficult" task.

Interestingly, investigators found Ferrer had proposed authorities provide Backpage with phone numbers of those "known to be involved in juvenile prostitution," so it could use filters to flag and automatically report attempted use of those numbers. Such a system "might be more useful than just look at the pic and saying the model looks too young," Ferrer reportedly told Agent Vienneau in 2012. It could also help find minors no matter what part of the site—adult, services, dating, etc.—on which their ads were placed.

Authorities declined to follow up on Ferrer's idea. (McNeil and Swaminathan do suggest moderators should have been given more "specific criteria," whether this "be body fat, breast development, or other features," for determining from photos if someone is under age 18—a proposal that manages to come across both creepy and clueless.)

Later, critics would suggest that Backpage was uniquely reckless in its age verification processes. (The <u>Senate report even claims</u> the whole point of telling users they must be 18-plus to post was so minors would know to lie about their age.) But back in 2012, prosecutors admitted that Backpage measures "were standard across the tech industry and online content purveyors." Mandating "additional age verification protocols or procedures is both impractical" and a "limitation on free speech," which implemented broadly "would bring online business to a halt, as it threatens the very fabric of the internet."


## ILLEGALITY OF ADULT ADS "IS NOT SO PLAIN"

Since child sex trafficking charges were a non-starter, prosecutors wondered if a case could be made that Backpage recklessly promoted and profited off of prostitution. While prostitution itself is not a federal crime, sex for pay is criminalized in most of the country, so using a tool of interstate commerce (the internet) with the intent to facilitate prostitution could count.

But there was a problem with this theory, too. Several, in fact.

"Remarkably," the 2013 memo said, no one in or outside Backpage would "admit the company knowingly accepted adult prostitution advertisements."

This wasn't the only surprise for the investigators—who, to their credit, seemed willing to actually check their initial assumptions. In so doing, they highlighted how many supposedly illicit activities on Backpage may not have been illegal at all.

"As we are learning in this investigation, women posing in sexually suggestive poses, wearing virtually nothing and advertising various forms of sexual massage and other 'good times'" does not necessarily imply exploitation or even illegal prostitution, noted McNeil and Swaminathan:

> Upon closer analysis of the adult web market, it is clear that there are many adult services which come very close to prostitution, but which are lawful. For instance, it is legal to advertise to pay actors to have sex in a film....It is also legal to offer or solicit sex, so long as it is not in exchange for money. Thus, Backpage permitted express references to sexual acts in its adult personal section. It is also legal to offer to be a 'sugar daddy' [and] likewise, strippers or escorts may be paid to simulate sex for a fee, to dance or perform solo sex acts, to provide companionship, and to give 'sensual' massages. There are no rules which prohibit strippers or genuine escorts from posing in sexually explicit positions or from giving hands-on therapy. While someone who has little experience with the adult services market may readily conclude that Backpage's escort advertisements offer prostitution services, such a conclusion is not so plain after one recognizes how much sexually explicit commercial conduct is lawful.

In any event, Backpage did try to ban outright illegal activity in ads. Overall, the company's conscientiousness and cooperation on this front presented "a very substantial hurdle to any prosecution," wrote McNeil and Swaminathan in 2013.

"In the course of introducing evidence about what Backpage did not do to monitor its site and exclude prostitutes, much evidence would be admitted about what Backpage did do to monitor its site," they said. The court would likely hear about the "express warnings placed on the site and circulated in the company prohibiting advertisements for illegal conduct" and

If the Justice Department *did* want to claim Backpage was reckless, the memo suggested, it could possibly use Backpage's ample responses to subpoenas and reports to NCMEC to establish the company *knew* that minors were sometimes advertised and that this would continue.

This is not a standard we apply to other digital platforms or to other crimes. People are robbed, assaulted, defrauded, extorted, harassed, discriminated against, and much more via digital classified ads, social media, and popular apps of all sorts. These cases wind up yielding criminal cases and suits in civil court, sometimes very serious ones. But few suggest that this means Yelp, Tinder, Twitter, Facebook, etc. should cease entirely.

It also offends on a basic level of fairness. Because Backpage worked so closely with authorities to stop bad actors, it had given the government all the goods it needed to prosecute—even as prosecutors ignored the many sex-ad hubs that weren't working with authorities.



The Rise and Fall of Backpage

## "RELIANCE ON THIS TYPE OF EVIDENCE WOULD BE EXTRAORDINARY IN A CRIMINAL CASE"

Since nabbing Backpage on knowingly facilitating illegal sex work would be a stretch, the 2013 memo suggested that the best way to prosecute might be to bring conspiracy and money laundering charges.

This is what the Justice Department did last year. And much in the current theory of prosecution against Lacey, Larkin, and other former Backpage leaders is laid out in the 2013 memo.

Money laundering charges would "not focus on Backpage as a publisher of on-line advertisements or as a co-venturer with pimps, but as a launderer of funds derived from adult prostitution," the memo said. But, again, the authors ran into "several substantial proof issues" in showing that any promotion, facilitation, or funding from prostitution per se was *intentional*.

Proving "the company knew that the advertising fees being paid by adult 'escorts' were criminally derived property" would be difficult, they noted. So too proving that any particular $10,000 came from prostitution proceeds (as required by some money laundering statutes).

"We would be required to rely on expert testimony, statistical analysis and inferences to prove that," they wrote. "While relying on such evidence in a civil case may be common, reliance on this type of evidence would be extraordinary in a criminal case."

The Justice Department could try for conspiracy to commit money laundering charges, suggest the prosecutors. But again, there's the *intent* problem. The state would "be left to argue inferences of a specific criminal intent in the face of evidence that Backpage was engaging in extensive monitoring" to the opposite effect.

The most concrete evidence available of *intent* to promote adult prostitution were two short statements made by executives. In 2011, board member Don Bennett Moon allegedly said he could not "deny the undeniable" when pressed whether the site

That same year, during a meeting between Backpage leadership and NCMEC, Ernie Allen was—by his own account—pressing Backpage to get rid of all "Adult" ads when Michael Lacey said that *adult* prostitution was none NCMEC's business. According to the memo, "Allen responded that 'at least you know what business you are in,' to which Lacey did not reply."

The memos suggested that these statements *might* work for proving intent but were not much to go on. Doing so would raise "substantial issues" of concern and amount to relying on "inferences drawn from obtuse statements and silences to prove an element of the offense."

Nonetheless, these statements would find their way into the Senate investigation of Backpage and the current criminal indictment. *This* is the sort of iffy evidence that everyone decided to run with.


## POLITICS OVER PROTECTION

The memos and the investigation that produced them should have tamped down enthusiasm for the crusade against Backpage. By almost all accounts, the productive relationship between Backpage and those in power was a symbiotic one, in which the site served as a partner in preventing and punishing exploitation.

Instead, officials kept pursuing sanctions against Backpage and spreading tales of alleged depravity among its staff.

Since the time when the memos were first drafted, officials have figured out ways to frame any positive parts of Backpage operations into legal liabilities and points of public horror. The meetings with NCMEC and the efforts to help police? Proof that Backpage knew of the problem. Preventing explicit offers of sex for money? The Senate said that was just Backpage wanting to "conceal the true nature" of ads. Filtering out open-to-interpretation words? Banning underage ads? Same, said the senators. Their report portrayed the fact that Backpage used moderation at all as some sort of seedy ploy.

Requiring card payments for adult ads—as NAAG suggested, since cards can be traced—was spun as a deliberate effort to profit off exploitation. Accepting bitcoin after Dart threatened card companies? Evidence of subterfuge. Accepting checks after the Dart harassment? That let prosecutors tie specific ad buys to real identities and transactions, thus helping them fulfill a previously-lacking element necessary for money laundering charges.

In effect, everything the company did to enhance protection and legality was twisted into evidence of criminality and moral failure. And, for years, folks have promoted these topsy-turvy explanations. Yet in these 2012 and '13 memos—in statements *not* made for political posturing—we see something else entirely.

Backpage lawyers in the criminal case have been barred from using the memos as part of their clients' defense. The previous judge handling the case (who recused himself) agreed with the prosecution that the memos, which had been filed under seal in the Western District of Washington, must remain sealed and that the defense must destroy its copies.

At an August 19 hearing, Judge Susan M. Brnovich ruled that they will stay that way. But Brnovich denied the state's request to sanction defendants over quotes from the memos appearing in the June *Wired* story.

At the hearing, lawyers for defendants had pointed out that there were months when the memos were not under seal and that many people had viewed or had access to them both before and during that time. In issuing her order, Brnovich agreed that the memos had "clearly been distributed to many people," including "other people that the government was working with," and said any suggestion Backpage defendants or lawyers had supplied the memos to *Wired* was pure "speculation."

Brnovich did not rule last week on defendants' motion to dismiss the case. For now, the trial is scheduled to start on May 5, 2020.

It's worth noting that since Backpage was seized by the feds (April 2018), and the federal law against prostitution ads became law (later that month), we've seen cops across the country complain that it's harder to find and prosecute cases involving underage prostitution. Federal "rescue" numbers are also down in recent years, as are the total number of sex trafficking of children prosecutions by the feds.

Some will call this evidence that shutting down Backpage actually *did* put a dent in trafficking. But research on the online ad market says that after an initial drop last spring, adult ads levels have rebounded. And since the vast majority of these

Cops can still peruse these sites, as they did with Backpage. But the adult ad market is now more decentralized and thus harder to monitor, and has also undergone some switching to encrypted or just less visible platforms (or, alternately, moved to mainstream platforms like Instagram but with more tame public posts). More importantly, many of these other sites don't proactively report, provide data, and work with law enforcement like Backpage did.

With Backpage.com's shutdown, "we have taken a major step toward keeping women and children across America safe," Jeff Sessions claimed when the site was seized.

Reading these memos, it seems clear the government put the political usefulness of a crusade against a caricatured evil tech company above the genuine safety of American women and children. Soundbite salvation came at the cost of actually fighting endangerment, exploitation, and abuse.

Page 1 of Backpage DOJ 2013 Memo

Contributed to
**DocumentCloud** by
Katherine Mangu-Ward of
Reason Magazine •
View document or
read text

Page 1 of Backpage DOJ 2012 Memo

Contributed to
**DocumentCloud** by
Katherine Mangu-Ward of
Reason Magazine •
View document or
read text

Start your day with *Reason*. Get a daily brief of the most important stories and trends every weekday morning when you subscribe to *Reason Roundup*.

Email Address                    Submit

## *NEXT:* Ex-Sheriff and Failed Senate Candidate Joe Arpaio Announces He Will Run for Maricopa County Sheriff Again

**ELIZABETH NOLAN BROWN** is a senior editor at *Reason*.

BACKPAGE    SEX TRAFFICKING    ADVERTISING    INTERNET    LAW ENFORCEMENT    CRIMINAL JUSTICE    HUMAN TRAFFICKING    SOCIAL MEDIA    FEDERAL GOVERNMENT
SEX WORK    FREE SPEECH    TECHNOLOGY

MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (78)

## RECOMMENDED

### Backpage Defense Lawyers Call for Mistrial After 'Inflammatory' Opening Statements

### Maggy Krell Repackages Her Bogus Backpage Prosecution Into a Book

### The Backpage Scandal Isn't What You Think

### The Backpage Defendants Never Stood a Chance

### James Larkin, Backpage Publisher and Free Speech Warrior, Has Died

About

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

Amazon

    

© 2024 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.



NATIONAL
CENTER FOR
**MISSING &**
**EXPLOITED**
C H I L D R E N®

Charles B. Wang International
Children's Building
699 Prince Street
Alexandria, VA  22314-3175
U.S.A.

Telephone 703.224.2150

Facsimile 703.224.2122

www.missingkids.com

www.cybertipline.com

From the desk of
John Ryan
Chief Executive Officer

June 6, 2013

BY HAND
Don Moon, Esq.

Dear Mr. Moon,

As you know, the National Center for Missing & Exploited Children
(NCMEC) is the nation's congressionally-designated resource center on
issues of missing and exploited children.  In the fourteen years since we
began operation of the CyberTipline, a centralized mechanism for reporting
suspected child sexual exploitation, NCMEC has worked closely with the
online industry and law enforcement to reduce the proliferation of child
pornography on the Internet.  This collaboration has led to the development
of sound practices and techniques with regard to online child pornography.
Many of these sound practices may be applicable to combating the problem
of child sex trafficking through online classified ad websites.

The operation of online classified ad websites that include an "adult" section,
or advertisements related to adult entertainment, escorts, body
rubs/massages, BDSM/fetish, or other similar categories, creates risks for
children to be exploited and trafficked online.  However, there are steps that
can help prevent the victimization of these children.

NCMEC offers the following recommendations to companies that own or
operate online classified ad websites and want to take measures to reduce the
likelihood of child sex trafficking on their websites.  The recommendations
listed below should be considered as part of a dynamic approach that will
evolve as technology changes and offenders develop new strategies to exploit
and traffic children online.

Companies that want to optimize preventative measures should both enforce
their terms of service and implement the following:

1) At the time an ad is created and submitted by a user, but prior to the
ad being posted online:
- Take steps internally to verify the identity and age of the user
who has submitted the ad
- Take steps internally to verify the identity and age of any
individual depicted in the ad
  - For example, develop an internal process to compare
the visual characteristics of an individual depicted in
an ad with their photo in a government issued
identification card that they provide

Other Offices
California
Florida
New York
Texas

*Ex. 4*

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000059

DOJ-BP-0004601955

Don Moon, Esq.
June 6, 2013
Page 2

- Prohibit the use of gift cards, pre-paid credit cards or other anonymous purchasing tools as a form of payment for the ads
- Require and validate a user's email address when they are creating/submitting an ad
- Require and validate a phone number when a user is creating/submitting an ad
- Capture the user's IP address at the time an ad is created/submitted
- Ensure the ad is compliant with established Terms of Service
- Enforce a no nudity policy for images contained within ads
- Implement a moderator review system to examine all submitted ads for possible child sexual exploitation
- If a user changes an existing ad, prior to the ad being re-posted, capture the updated IP address and conduct an additional moderator review for Terms of Service violations

2) Prior to an ad being posted, if a possible minor is believed to be featured within a submitted ad or an ad is believed to involve possible child sexual exploitation:
- Not post the ad or allow it to go "live" on the site
- Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
- Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)
- Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
- Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations
- Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future Terms of Service violations

3) Once an ad has been posted publicly, if there is suspected child sexual exploitation within the ad:
- Remove the ad from public view
- Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
- Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000060

DOJ-BP-0004601956

Don Moon, Esq.
June 6, 2013
Page 3

- Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
- Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations.
- Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future terms of service violations

NCMEC recognizes that there is not a single solution to eliminate child sex trafficking and addressing this problem requires a multi-faceted approach. Based on NCMEC's experiences, robust enforcement of terms of service combined with the implementation of these operational recommendations will have a significant impact on combating child sex trafficking within online classified ad sites.

We strongly urge all classified ad website operators with an interest in preventing their sites from being used to victimize children to implement these recommendations.

Sincerely,


John D. Ryan
Chief Executive Officer

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000061**

## **M E M O R A N D U M**

To: John D. Ryan

CC: Staca Shehan

From: Don Bennett Moon

Re: Technology and Adult Advertising Standards

**1.    Introduction**

I appreciated the opportunity for Liz McDougall and me to meet with Staca and other NCMEC staff to discuss the first-cut online adult advertising standards proposals you provided to me in our meeting with Senator DeConcini in June. Health issues have taken me out of service for much of the time since, but those have now been attended to and I look forward to resuming our dialogue.

It has long been my view that a close collaboration between stakeholders on crafting a set of industry standards has much to offer in terms of minimizing child exploitation and more effectively identifying, arresting and prosecuting those who prey on children. As I indicate in the Conclusion, I believe the involvement of a public interest public policy concern, The O'Connor House, founded by retired Justice Sandra Day O'Connor, might provide a valuable platform to move the search for meaningful, workable, standards forward.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000062**

DOJ-BP-0004601958

As noted in a discussion of your first-cut proposals with Staca and NCMEC staff, I do not believe online standards can be productively separated from the First Amendment concerns of the Internet speech and privacy communities, nor from the unambiguous pronouncements of the federal courts on these issues. However, when I promised Staca that I would furnish a Memo setting out where I think those pronouncements would most impact potential industry standards, it did not occur to me that I was volunteering for a task that would cause the repeated destruction of draft after draft—as being too preachy, or too dense, or insufficiently optimistic about the road ahead. What follows does not completely arrest those concerns but I am hopeful it might be of modest worth as we move forward.

Please permit me to begin with a little history.

**2.      Background**

Following the Kent State shootings in 1970, Michael Lacey and Jim Larkin (with colleagues who would later depart for other pursuits) founded a free mimeographed anti-war newspaper called *New Times* at Arizona State University. At the time, the local daily newspapers—the *Arizona Republic* and *Phoenix Gazette*—were firmly pro-war and traditional advertisers had no interest in patronizing the *New Times* in a state with the highest percentage of military retirees in the nation and a multi-billion dollar military base and defense contractor-driven economy. Consequently, the advertisers needed to sustain *New Times* weekly exercise in free speech were small nightclubs, stereo stores, music and movie venues, and other concerns catering to a younger clientele. The "backpage" referred to the classified advertising section at the back of the paper.

Over a decade after beginning *New Times*, Lacey and Larkin acquired their second paper—*Westward* in Denver. Other papers followed and a merger of *New Times* holdings with five *Village Voice* newspapers in 2006 brought the national total to 16 papers in all. The combined company—Village Voice Media

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000063**

Holdings—has won four Pulitzer Prizes and numerous other awards for excellence in journalism and public service. I joined the board of the company as its only outside director following the 2006 merger.

From its inception, the company has vigorously defended First Amendment rights in a variety of contexts across the country. It successfully challenged on First Amendment grounds a misdemeanor conviction for publishing an advertisement for abortion services[1]. It successfully challenged a regulation restricting the distribution of its newspapers on university campuses[2]. And no media company in America has been more aggressive in pursuing the public's right to public information and public records exposing the decisions and conduct of public officials[3]. The company successfully argued a seminal case before the Texas Supreme Court reaffirming and expanding the right to publish satire that holds public officials up to ridicule[4]. And Lacey and Larkin recently won a far-reaching victory in the Ninth Circuit United States Court of Appeals, under the Civil Rights Act, constricting police and prosecutor immunity for First Amendment retaliatory conduct—a case that arose after they published grand jury information and were subjected to late-night arrests at their homes for an alleged violation of grand jury secrecy laws[5].

The foregoing is by no means an exhaustive list of the fights Lacey and Larkin have fought in furtherance of First Amendment values over many years. It does, however, speak to the basic proposition that their commitment to First Amendment values is neither situational nor of recent vintage.

[1] See *State v. New Times, Inc.*, 511 P.2d 196 (Ariz. App. 1973).

[2] See *New Times, Inc. v. Arizona Bd. of Regents*, 519 P. 2d 169 (Ariz., 1974).

[3] See, e.g., *Phoenix New Times, L.L.C. v. Arpaio,* 177 P.3d 275 (Ariz. App. 2008).

[4] *New Times, Inc. v. Isaacks*, 146 S.W. 3d 144 (2004)

[5] *Lacey v. Maricopa County*, 693 F. 3d 896 (2012)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000064**

Earlier this year, Lacey and Larkin sold their newspapers and online news platforms. Their company retains Backpage.com.

It has been said by critics that all the owners of Backpage care about is money. I would note that the reason I agreed to sit on the company's board is that I know better than that. I watched this journalistic enterprise lose large, lucrative, national advertising accounts over the years—Anheuser Busch, J.C. Penney, Coors—because they wouldn't soften or sacrifice their principles or content even when they knew a given story, or series, or review, would cause their profit arrow to point south. I have had differences of opinion with Lacey and Larkin over the years—I am probably less a First Amendment absolutist than they—but I respect their views, and their willingness to fight for them, enormously.

## 3.      Legal and Political Context for Industry Standards

As a host of third-party generated content, Backpage has voluntarily implemented reasonable measures to counter use of its service to exploit men, women and children—and is constantly looking for ways to improve. But it has steadfastly refused to succumb to statutory and regulatory censorship of its hosted content.

The company has established its immunity from civil claims under the Communications Decency Act 6. It has enjoined the enforcement of three state criminal statutes on CDA and First Amendment grounds— laws the courts found would plainly chill free speech rights by subjecting Backpage and other online hosts to state criminal liability for not ascertaining the age of persons depicted in advertisements posted by users 7. And it has established that the First Amendment is not a stranger to the attempted

6 *M.A. v. Village Voice Media Holdings*, LLC, 809 F. Supp. 2d 1041 (2011)

7 *Backpage.com, L.L.C. v. McKenna*, 881 F. Supp. 2d 1262 (2012); *Backpage.com. L.L.C. v. Cooper,* 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013); *Backpage.com, L.L.C. v. Hoffman,* 2013 WL 4502097 (D. N.J. Aug. 20 2013). The Internet Archive—the online equivalent of the American Library Association—was

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

application of federal criminal law to online user content, that First Amendment anonymity rights are not a stranger to online adult advertising, and that the authority of government to investigate in First Amendment space is fundamentally more constricted than in normal investigative contexts.

I am not new to politics or public policy. I have run for and held public office as an elected prosecutor. I have prosecuted crimes against children. I have written statutes and industry regulations. And I have put forward First Amendment values in trial and appellate courts. So I understand why Backpage's ability to assert the importance of Internet speech and privacy rights in the political and public policy arenas, or gain the slightest acknowledgement of its efforts to rescue trafficked children and aid law enforcement, is nil8. Put another way, I understand why there was not a single "no" vote for blatantly unconstitutional laws intended to protect children by chilling online speech in the Washington, Tennessee and New Jersey legislatures.

That said, it is clear that law enforcement and academic researchers in the area of child sex trafficking and technology9, Internet service providers and technology experts, and the online speech and privacy community, all bring important perspectives to any discussion of industry standards.

represented by the Electronic Frontier Foundation as co-plaintiff with Backpage in consolidated complaints in *McKenna* and *Hoffman*.

8 In this connection, I would be remiss if I did not gratefully acknowledge your pointing out the company's role in generating NCMEC "reports [that] have led to arrests of suspects for child sex trafficking and the rescue of child victims" in your letter to Congressman Frank Wolf of January 28, 2013, and what Liz McDougall informs me were fair comments about the company, and about our differences on a couple of issues, in your keynote speech at the recent Attorneys General Summit in Milwaukee.

9 The work of Dr. Jennifer Lynne Musto, Dr. danah boyd, Dr. Mital Thakor, and Dr. Mark Latonero, among others, in the area of technology and human trafficking, for example, provides valuable insights into the underlying challenges.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000066**

The Electronic Frontier Foundation, the Center for Democracy & Technology, and many other Internet speech and privacy groups, have recently been active both in the federal courts and in the public policy arena. A coalition letter to several members of Congress in opposition to a recent NAAG request to amend the Communications Decency Act—a request aimed squarely at Backpage—is instructive on this point 10. I believe that the increasing strength of the online speech and privacy community and other industry actors makes it impossible to craft and implement widely-applicable industry standards for adult advertising content that ignore how speech and privacy rights have been applied to the Internet by the courts.

Yet it is my view that protecting children and protecting First Amendment values need not be incongruent and there is no reason to fear fact and law-based technological solutions. As the President has said, regarding the promise of technological solutions to fight human trafficking: "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them" 11. This is not to say the task will be easy—I have struggled with the appropriate balance between online speech and privacy rights, and child protection goals—but I believe a balance can be struck.

I also believe that absolutist approaches are inherently destructive of meaningful dialogue and solutions. I appreciate the opportunity to briefly set out some threshold concerns, against the backdrop of the June first-cut list regarding standards you provided, that we believe must inform any collaborative effort aimed at crafting a strong and workable set of industry standards.

4.      **Problem Definition 12**

10 See https://www.cdt.org/letter/coalition-letter-congress-section-230

11 B.H. Obama, *Remarks by the President to the Clinton Global Initiative* (September 25, 2012).

12 Some of the sourcing which underpins this Memo is taken from Liz McDougal's *Submission to the Governor's Task Force on Human Trafficking* in Phoenix on September, 11, 2013.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*                    **NCMEC 000067**

Our discussion with Staca and staff about the initial standards proposal quickly produced what I think was a reasonable consensus that the initial scope of the websites that would be included in your first-cut standards needs refinement. A focus on classified websites that have an "adult" section, and "similar categories", for example, is both vague and under-inclusive.

The defined scope of standards would be improved with more precision and an embrace of the notion that "[t]echnological-facilitated trafficking [has] spread across multiple online sites and digital platforms" [including] "social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, increasingly, mobile technologies"[13].

The same advertisers and the same or similar ads found on Backpage can usually be found among a multitude of other websites, including classified sites such as MyRedBook, AdultSearch, EroticMugShots, LocalEscortPages, MyProviderGuide, FindHotEscorts, and nsaPals[14].

Even the most kid-oriented online services are being used to facilitate minor sex trafficking, including to "make connections with minors, advertise minors for sex, record sexual videos and images of minors for advertising, and transfer payment for commercial sex with a minor[15]". These services include Facebook,

---

13 Id., at 3.

14 Id. This finding is consistent with the results regularly discovered from voluntary work Backpage undertakes and provides to law enforcement. In addition to searching its own databases in response to government requests, Backpage employs researchers to scan the World Wide Web for further evidence to help support a rescue, arrest or conviction. Typically, the same ad or advertiser is found on numerous other websites. Id., at FN 8.

15 M. Latonero, et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, U.S.C. Annenberg School for Communications & Journalism (Nov. 2012), at 8.

---

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000068**

MySpace and Tagged 16. Indeed, research undertaken as early as 2008 identified Facebook as a leading source for sex trade clientele in New York City—providing 25% of clients in the city's sex trade compared to only 3% from Craigslist 17.

So technology standards that apply to Backpage's "adult" section, but not to Craigslist's "casual encounters" section, or to any kind of profile, post, message or image on Facebook or Twitter, for example, would be profoundly under-inclusive and ineffective when, between the Internet and mobile technologies, most content resides on multiple sites and migrates freely between platforms 18.

This definitional issue is an instance in which the perfect is the enemy of the good. I am convinced that defining the scope of standards in a way that proves effective is doable. I would suggest beginning with something along the lines of the CDA's definition of "interactive computer service provider", which would ensure inclusion of social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, potentially, mobile technologies, with the added specification that the service or app include advertisements, solicitations, listings, reviews, profiles, forums or categories related to "adult entertainment, dating, escorts, massage, personals or other similar categories".  I am sure my proffered suggestion would benefit from refinement.

5.    **Imposing an Online Regulatory Obligation to "Know Your Customer"**

16 Id., at 8, 23.

17 See S. Venkatesh, *How Tech Tools Transformed New York's Sex Trade*, Wired Magazine (Jan. 31, 2011).  Dr. Ventatesh expected the Facebook percentage to grow by 2011.

18 d. boyd, *Combating Sexual Exploitation Online:Focus on the Networks of People, Not the Technology*, (Oct. 19, 2010), at 2-3.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000069

DOJ-BP-0004601965

As you know, the courts have been not been indifferent to society's obligation to protect children. The United States Supreme Court has said that there is "a compelling interest in protecting the physical and psychological well-being of minors"19.  No court I am aware of has quarrelled with the basic proposition that "the protection of our young from sexual abuse may be among the most important functions of a civilized society"20. Yet, time and again, courts have struck down content-based laws that chill protected speech despite the laws' child protection goals. In virtually every instance a failure to properly balance competing values, or acknowledge practical effects, underpinned the decision.

Laws imposing age and identity verification requirements for online speech are among those that have repeatedly failed judicial scrutiny.

It has been sixteen years since the United States Supreme Court first considered the constitutional implications of age and identity verification on the Internet21. In striking down the enforcement provisions, i.e. the "decency" provisions, of the Community Decency Act, a 7-2 Court found that the government had "offered no evidence that there was a reliable way to screen [online] recipients and participants for age22". The Court further found, inter alia, that the "prohibitively expensive" cost of trying to verify age and identity would have a catastrophically chilling impact on protected Internet speech rights23. Despite many advancements in Internet-related technologies, this basic finding has not changed and no court has found otherwise.

19 *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)

20 *U.S. v. United States District Court for the Central District of California*, 858 F. 2d 534, 541 (9th Cir. 1988)

21 See *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997)

22 Id., at 855-856.  The Court's holding was unanimous on this absence of screening technology.

23 Id., at 876-877.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000070

DOJ-BP-0004601966

In a successful 2012 injunctive action by Backpage and the Internet Archive against enforcement of a Washington law that imposed on Backpage, and other online services, the Hobson's Choice between criminal liability for publishing third-party content leading to sex with a minor, or conducting age-verification as an affirmative defense to liability, the United States District Court for the Western District of Washington stated the online verification problem thusly:

> *At first blush, requiring publishers to check identification before*
> *publishing an escort ad seems as commonsensical as requiring bar*
> *owners to check identification before allowing patrons to enter the*
> *door. The latter is an identification requirement related to conduct*
> *—drinking alcohol in a bar. The former is an identification requirement...*
> *related to speech. Since there is no constitutional right to drink alco-*
> *hol, courts tasked with upholding the Constitution care little if a bar's*
> *identification process results in a line forming outside the door, or*
> *causes some restaurants to stop serving liquor. However, because*
> *there is a constitutional right to free speech, the Constitution*
> *cannot permit similar collateral consequences in the First Amend-*
> *ment context24.*

It is those "collateral consequences" that I believe cannot be ignored in an effort to craft industry standards to better protect kids and put predators in jail.

The collateral consequences of user age and identification verification regulations for U.S.-based online service providers—who frequently host tens of millions of posts, or more, annually—would include queues of posts awaiting verification for so long that content would be outdated and irrelevant by the

24 *McKenna, supra., at 1277.*

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000071

DOJ-BP-0004601967

time authentication allowed public display. Other services would simply ban the content altogether because they cannot perform or afford a verification process. This is precisely the kind of speech-chilling collateral consequence condemned in cases like *Reno* and *McKenna.*

There is also an endless variety of reasons why law-abiding citizens may want to post adult content, including advertisements, online without their identities being known—may wish to speak anonymously. Fear of public ridicule, family circumstances, or employment considerations, are obvious examples. Even if distasteful to some, this speech is protected. Indeed, adult postings, including specifically those on Backpage, are not run-of-the-mill "commercial speech" entitled to only truncated scrutiny under the First Amendment25.

Popular speech seldom *needs* First Amendment protection. But a website hosting unpopular content that has been conscripted into a "you must know your customer" policy of not allowing—strictly forbidding—anonymous speech will be out of business in short order, and will deserve that fate.

The concept of anonymous speech as a bedrock First Amendment principle is as old as it is well settled26. *Reno* taught that there is "no basis for qualifying the level of First Amendment protection that should be applied" to the Internet27. Accordingly, "the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded28".

Backpage has worked hard to balance the anonymity and free speech rights of users and the protection of children from exploitation and abuse. In working with law enforcement, Backpage has endeavored to operate on the basis that "non-party disclosure is ... appropriate in the exceptional case where the

25 Id., at 1280-82; Cooper, supra., at 20-21.

26 Upon authoring the *Federalist Papers*, Madison, Hamilton and Jay signed them "Publius"

27 *Reno*, <u>supra</u>, at 870.

28 *Doe v 2themart.com Inc.*, 140 F. Supp. 2d 1088, 1097 (W.D. Wash. 2001).

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000072**

DOJ-BP-0004601968

compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker 29". As a company with deep roots in defending the First Amendment, we understand that we have failed when we prepare and send a NCMEC report, out of concern for child protection, only to later learn from law enforcement, as we often do, that our concern was misplaced. But the very nature of balancing competing interests is that failures—whether caused by too much intrusion into the user experience, or too little—will occur.

**6.     Gift or Prepaid Cards and other "Anonymous Purchasing Tools"**

The suggestion in the draft standards for an outright ban on the use of "anonymous purchasing tools", such as gift or prepaid credit cards, also carries with it legal and practical collateral consequences that I do not believe can be ignored in assessing workable and effective industry standards.

As you know, in 2008 NCMEC and NAAG released a Joint Statement with Craigslist under which Craigslist implemented, inter alia, a requirement that, in its "erotic services " (later "adult") category, "[p]ersons wishing to post ads ... will be required to pay a fee using a valid credit card" 30. It was the considered and collective opinion of NCMEC and NAAG that this change would (1) "reduce ad volume significantly", (2) "encourage more responsible use", (3) "provide[] additional identifying information" in order to "enable Craigslist to block the accounts of persons who violate Craigslist's terms of use", and (4) assist law enforcement by providing additional evidence available "through a subpoena process". The 2008 Joint Statement made no distinction between traditional, debit, or prepaid cards.

29 Id., at 1095

30 *Joint Statement between Attorneys General, National Center for Missing and Exploited Children, and Craigslist* (2008).

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000073

Prepaid cards comprise a small percentage of those used for Backpage ads. Some prepaid cards require consumers to provide personal identifying information at point of sale and some do not. In many instances gift cards are used for the direct deposit of government benefits and one common feature of these cards is that a phone number is needed to get regular text updates on their balance.

To verify whether prepaid card data is in fact valuable to investigations, I asked our law enforcement support staff for a few examples of where prepaid card evidence has assisted in cases against pimps and traffickers. Three examples are illustrative of the evidentiary value of prepaid cards that NCMEC and NAAG appear to have foreseen when they demanded card usage in the 2008 agreement with Craigslist.

In the first example, the card used for a Backpage ad was in a trafficker's possession when he was arrested. In the second, the same prepaid card used to pay for an ad was used to pay the defendant's phone bill. And in the third, a card found in the defendant's possession was used for ads in several states and helped provide the evidentiary trail to make an interstate case involving trafficking and money laundering.

The same basic investigative principle—where a prepaid phone number is used and law enforcement can be provided with other ads using the same prepaid phone number, or where a combination of email address, phone number and credit, debit or prepaid card numbers will aid an investigation to find related ads by a user—applies across the board. Pushing this content to free services—such as Craigslist personals, social networking sites, chat forums and offshore sites 31—is at variance with the clear objectives of the 2008 Joint Statement, and its underlying enforcement and prosecutorial goals.

31 A San Francisco Bay Area vice detective who worked on a number of child trafficking cases gave his review of the decision of Craigslist to drop its Adult category. "Craigslist Adult Section gets shut down and what happened? Now they go to RedBook. Now I can't even get a response from RedBook because they're based out of the country." *2012 Annenberg Report, at 26-27.* I would recommend that anyone who sees the migration of US adult advertising content offshore as an abstract threat to protecting children from sexual exploitation and prosecuting traffickers in the US confer with Irish and Finnish law

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000074**

People who commit crimes using the Internet may indeed use a prepaid card in furtherance of those crimes, just as they may use prepaid cell phones or unlicensed guns. But prepaid cards are by no means associated solely with criminal conduct. They are used by people with no access to banks because of poor credit. They are common "thank you" gifts, are used to avoid online identify theft and fraud, and to avoid disclosure of infidelity or sexual preference—and a host of other personal and private reasons unrelated to illegality.

To the extent a user employs a prepaid card to protect his or her anonymity in putting forth lawful online speech, this is an exercise of First Amendment rights in its purest form. How best to balance First Amendment values, the value of the evidentiary trails NAAG and NCMEC hoped to, and did, create as a result of the 2008 Joint Statement with Craigslist mandating credit card usage, and the protection of children from abuse and exploitation, all factor into a search for meaningful industry standards.

## 7.    Conclusion

As you will have gathered by now, I am not of the view that online speech prohibitions of debatable efficacy that are blatantly unconstitutional if dressed as laws ought to be entitled to wholesale online application by virtue of being dressed as "best practices". I do believe, however, that there is considerable room for discussion and negotiation towards feasible measures if we avoid absolutist approaches, share knowledge, involve the speech and privacy and technology communities, and commit to hard work on a complex subject.

enforcement. Both nations succeeded in driving this content offshore by law, with quite striking investigative consequences.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Toward this end, I have been in consultations in recent months with a friend of long-standing, Lucia Fakonas Howard, who is a board member of The O'Connor House in Phoenix, about online technology and adult content standards/best practices. On her website, Justice O'Connor describes O'Connor House as "a center for problem solving and for bringing together groups with divergent views". While I have not spoken with Justice O'Connor directly, Lucia informs me that online standards are something she would like OCH to help move forward. I note in this connection that Justice O'Connor's interest in technology as a potential protector of children was clearly expressed in her concurring and dissenting opinion in *Reno v. ACLU*.

I regard you highly as a policy player who seeks light over heat. Our interactions with your staff have been productive and characterized by collegiality, even in a couple of areas where we do not agree. This is very much in keeping with the overriding theme of OCH and I am hopeful we can talk before I leave for Europe later this month about setting in motion efforts to craft online standards with the participation of OCH and relevant stakeholders.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000076**

DOJ-BP-0004601972

## Why Village Voice Media's Backpage.com Service
## Does Not Create Liability for Promoting Prostitution

Mark Sableman
Anthony F. Blum
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
(314) 552-6000

**I.     VILLAGE VOICE MEDIA LLC IS IMMUNE FROM LIABILITY FOR THE MESSAGES OF USERS OF ITS BACKPAGE.COM SERVICE**

Village Voice Media LLC ("Village Voice") is exempt by virtue of a federal statute from state civil or criminal liability for any illegal content posted on its Backpage.com service that was contributed by third party users of the site.  The Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230 ("Section 230"), sometimes referred to by the title of the chapter in which it was contained, the Communications Decency Act ("CDA"), precludes liability for Internet dissemination or publication of such third party content.

**A.     Congress Created in Section 230 A National Policy To Encourage Internet Use and Growth.**

In 1996, Congress enacted legislation "(1) to promote the continued development of the Internet and other interactive computer services and other interactive media [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b).

Congress at the time made findings that the Internet "offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."  It further noted that "The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a ***minimum of government regulation***."  47 U.S.C. § 230(a) (emphasis added).

Ex. 5A

DEFENSE 017613

CONFIDENTIAL                                                                    BMO_00001377

Based on these findings and policies, Congress made the decision to not hold interactive computer service providers liable for user-generated content. This did not strip the government or wronged parties of redress for problems created by such content, because nothing in Congress' enactment prevents the original culpable party who posted any unlawful or harmful content from being held liable. *See Zeran*, 129 F.3d at 330. However, Congress realized that the "Internet is a unique and wholly new medium of worldwide human communication"; that internet service providers have hundreds of millions of users; and that it is impossible to screen the hundreds of millions of messages posted daily. *Reno v. ACLU*, 521 U.S. 844, 850 (1997); *Zeran*, 129 F.3d at 330.

For these reasons, Congress enacted Section 230, granting a broad immunity to Internet intermediaries from liability arising from user content. Congress found this measure essential to the growth and development of the Internet. If service providers were "[f]aced with potential liability for every message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331. It is impossible to merely weed out the objectionable or unlawful content. Without some law like Section 230, service providers would be forced to eliminate the user-generated content that makes the internet so vibrant, or face liability that would shut them down. *See Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). Useful and constitutionally protected speech would be lost.

Section 230 has directly led to the vibrant and useful internet that Americans enjoy today.

**B.      Section 230 Immunizes Interactive Computer Service Providers From Liability For Third Party Content.**

Section 230 implements congressional policy by broadly immunizing Internet intermediaries from liability based on user content. Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Furthermore, "No

2

DEFENSE 017614

CONFIDENTIAL                                                                    BMO_00001378

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

In *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), the leading and most-cited case construing Section 230, America Online ("AOL") was sued in negligence for failing to remove defamatory messages posted on an AOL bulletin board. *Id.* at 329. The Court found that Section 230 by its plain language created "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Id.* at 330. A service provider cannot be held liable as a publisher of the third party content, nor can it be held liable for exercising "traditional editorial functions," such as deciding whether to publish, withdraw, postpone or alter the content of a third party. *Id.* The Court, therefore, held that the claim was barred by Section 230. *Id.* at 327.

Since *Zeran*, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal cites omitted); *see also Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content."); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]e too find that Section 230 immunity should be broadly construed."); *Almeida v. Amazon, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (following the "consensus developing across other courts of appeals that § 230(c) provides broad immunity for publishing content provided primarily by third parties."); *Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000).

DEFENSE 017615

CONFIDENTIAL

BMO_00001379

Even defamatory, harmful and despicable content is covered by Section 230—with the effect that Internet intermediaries are not liable for that content, and only the originators of it are. In *Zeran*, the content at issue were a series of postings that falsely accused Mr. Zeran of delighting in the Oklahoma City federal building bombing. In *Carafano*, the content at issue was a false dating service posting, portraying Ms. Carafano as sexually promiscuous. In *Blumenthal v. Drudge*, 992 F.Supp. 44 (D.D.C. 1998), the content at issue (content that AOL could have previewed, did in fact edit, and did in fact profit from) allegedly constituted defamation of a top White House official. In all of these cases, courts applied section 230 by its terms, realizing that Congress made the determination that Internet intermediate can and must be immunized for liability for user content, even where that content was wrongful, illegal, and/or harmful.

Section 230 applies to any cause of action, not specifically exempted in the statute, that would hold a service provider liable for the content of another. This immunity defense has been applied to a number of different causes of action, including negligence, defamation, invasion of privacy, misappropriation of the right of publicity, state securities and cyberstalking acts, and violations of the Fair Housing Act. *See, e.g.*, *Carafano*, 339 F.3d 1119 (negligence, defamation, invasion of privacy and misappropriation of right of publicity); *Lycos, Inc.*, 478 F.3d 413 (state securities and cyberstalking acts); *Chicago Lawyers' Comm. For Civil Rights Under Law, Inc.*, 519 F.3d 666 (7th Cir. 2008) (Fair Housing Act). Section 230 is only limited by the specific exclusions in the statute, which do not apply here. *See* 47 U.S.C. § 230(e) (stating the section has no effect on intellectual property, the Electronic Communications Privacy Act, or *federal* criminal law).

While neither Missouri state courts nor the Eighth Circuit have yet addressed Section 230, all district courts within the Eighth Circuit that have confronted the issue have also found broad immunity for any cause of action that would hold a service provider liable for user-generated content. *See Gregerson v. Vilana Finan., Inc.*, No. 06-1164, 2008 WL 451060, at *8 (D. Minn. Feb.

4

CONFIDENTIAL

DEFENSE 017616

15, 2008); *Faegre & Benson, LLP v. Purdy*, 367 F. Supp. 2d 1238, 1249 (D. Minn. 2005);

*PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071–72 (D.S.D. 2001).

### C. Section 230 Prohibits State Criminal Laws and Prosecutions That Would Impose Criminal Liability On An Interactive Computer Service Provider For Third Party Content.

Section 230 provides immunity not only for civil liability but also for liability under state

criminal statutes. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may

be imposed under any State or local law that is inconsistent with this section.").

In *Voicenet Commc'n, Inc. v. Corbett*, 2006 WL 2506318 (E.D. Pa. 2006), the court rejected

arguments by the defendant, the attorney general of Pennsylvania, that Section 230 did not apply

to certain state criminal statutes. 2006 WL 2506318, at *3–4. The court explained that Section

230(e)(3) made it clear that Section 230 applies to state criminal laws. *Id.* at *3. That subsection

states that no "cause of action" may be brought and no "liability" may be imposed under any State

or local law that is "inconsistent with" this section. The court found that the terms "liability" and

"cause of action" in Section 230 encompass criminal as well as civil actions. *Id.* Also, subsection

(e)(3) provides that no liability can be imposed under "any State or local law." By the express

language, Section 230 provides immunity to all inconsistent state laws and not only civil ones.

Furthermore, Section 230 clearly sets forth what areas of the law are excluded from its

coverage. Subsection (e)(1) "provides that nothing in the CDA shall be construed to impair

enforcement of certain federal statutes governing obscenity and the sexual exploitation of

children, 'or any other *Federal* criminal statute.'" *Voicenet*, 2006 WL 2506318, at *3. Congress

could have exempted state criminal laws, but did not do so. *Id.* at *4. *Accord, People v. Gourlay*,

2009 WL 529216, at *2–3 (Mich. App. March 3, 2009) (finding that Section 230 applies to state

criminal law).

### D. Village Voice Satisfies All Requirements for Immunity Under Section 230.

DEFENSE 017617

CONFIDENTIAL

BMO_00001381

Village Voice falls squarely within the requirements of Section 230 and is immune from any state prosecution which would attempt to impose liability on it arising from the content of third party postings. Section 230 immunity exists if: (1) Village Voice is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat Village Voice "as the publisher or speaker" of that information. *See* 47 U.S.C. § 230(c)(1); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007). All of these requirements are plainly met.

1.   **Village Voice Is A "Provider" Of An "Interactive Computer Service," Namely The Backpage.com Website**

First, Village Voice is a "provider" of an "interactive computer service." *See* 47 U.S.C. § 230(c)(1). The term "interactive computer service" is defined in the statute as any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

Village Voice's Backpage.com meets the statutory definition of an "interactive computer service." Backpage.com provides an online service that allow people or companies to post classified ads or messages regarding items for sale; services, both commercial and noncommercial; and other information. Backpage.com is an "information service or system" which enables multiple users to access its "computer server," namely the server that hosts its website. *See Lycos, Inc.*, 478 F.3d at 419. Websites that allow users to post information have always been treated as "interactive computer services" under Section 230. *See, e.g., Lycos, Inc.*, 478 F.3d 413; *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 985 (10th Cir. 2000). For example, craigslist.com, a provider of similar online classified ads, has been found to be an "interactive

6

DEFENSE 017618

CONFIDENTIAL

BMO_00001382

computer service." *See Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008).

      **2.**    **The Ads In Question Are Posted By Users Of Backpage.com And Thus Are
"Information Provided By Another Information Content Provider"**

Second, the ads and other postings on Backpage.com are clearly "information provided by

another information content provider." These ads are not created by Village Voice. The

definition of "information content provider" is "any person or entity that is responsible, in whole

or in part, for the creation or development of information provided through the Internet or any

other interactive computer service." Users of backpage.com who post the ads, messages or

comments clearly are information content providers distinct from Village Voice. *See, e.g., Lycos,*

478 F.3d at 419.

The fact that Backpage.com provides categories for posting does not change the analysis.

Such basic editorial and organizational structures are separate from the content contained within

them. Use of these categories does not make Village Voice "responsible, in whole or in part, for

the creation or development of [the] information . . . ." *See* 47 U.S.C. § 230(f)(3).

In fact, many if not most "interactive computer services" provide some type of

organization or categories for user-generated content. Without such, Internet sites and service

using third party content would be chaotic and useless. For example, in *Chicago Lawyers' Comm.*

*For Civil Rights Under Law, Inc. v. craigslist, Inc.*, craigslist provided a category labeled as

"apartments," where FHA non-compliant ads were posted, but the mere creation of that category

did not, and could not, reasonably be construed as authorship in whole or part for the non-

compliant content posted within that category, and thus it could not support liability for

craigslist. Similarly, in *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095

(M.D. Fla. Feb. 15, 2008), where the website www.ripoffreport.com allowed users to submit

reports on companies under such categories as "con artists", "corrupt companies" and "false TV

DEFENSE 017619

CONFIDENTIAL

BMO_00001383

advertisements," as well as other non-negative categories, the court held that establishment of such categories did not make the defendant the "information content provider." 2008 WL 450095, at *10. *See also Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 832 (2002) (eBay's product categories did not make it responsible for ads created by its users for sale of bootleg materials).

Only where a website publisher *mandates* use of certain content by its users does the publisher become a co-author (or more specifically, in the statutory language, "responsible ... in part, for the creation or development of [the] information"), and hence lose Section 230 immunity. That is what occurred in *Fair Housing Council v. Roommates.com,* 521 F.3d 1157 (9th Cir. 2008). Roommates.com required users in creating postings to select from entries provided in dropdown boxes, some of which required users to include unlawful ad content, such as racial preferences for a roommate. Because Roommates.com mandated use of certain illegal terms, it was at least a co-author of the content of messages when its users used those mandated terms. Thus, in that unusual situation, the allegedly unlawful statements did not originate solely from "another information content provider." *Id.* at 1165–66. Roommates.com in that case was one of the "information content provider[s]" since it was "responsible, in whole or in part, for the creation or development of information." *Id.*

Interestingly, Rommates.com also provided its users with an open-ended textbox, titled "Additional Comments." *Id.* at 1173. Comments entered in this box by users of the Roommates.com service, even when they used illegal terms, were covered by Section 230 such that Roommates.com was immune under Section 230 for that content. The decision likened this textbox to *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. craigslist, Inc.,* 519 F.3d 666 (7th Cir. 2008), where an open-ended text prompt was provided that imparted no structure and did not "induce[] anyone to post any particular listing or express a preference for discrimination . . . ." *Roommates.Com,* 521 F.3d at 1172.

DEFENSE 017620

CONFIDENTIAL

BMO_00001384

Just as Section 230 applies to the "Additional Comments" box in Roommates.com and to ordinary ad text prompts as in *craigslist*, it applies to Backpage.com's user submissions. Backpage.com does not require users to enter inappropriate or illegal content. It does not provide users with illegal terms which they must select from, nor does it direct them in any way to enter illegal or inappropriate content. (In fact, it *prohibits* illegal or inappropriate content, stating directly on the page where ads are entered that users should not advertise illegal services or post obscene images, as explained further below.) Backpage.com only requires users to enter a title, age, description, location, and some other options, such as e-mail address. Any possible unlawful content submitted by users, in violation of Backpage.com's terms, would appear most likely in the title or description which are *developed solely from user entries in open-ended textboxes*. Thus, such content is fully protected by Section 230.

Notably, by structuring its service to isolate sexually related content from other content, Backpage is utilizing a procedure that Congress encouraged and protected in the CDA. Section 230(c)(2) specifically states:

> No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

This portion of Section 230 is known as the "Good Samaritan" provision, and was written specifically to encourage web publishers and intermediaries to use their discretion in taking editorial actions with respect to arguably indecent and inappropriate user content, without facing liability because of those actions. This subsection reversed the prior law, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct., May 24, 1995), which had treated a service provider as a "publisher" solely because it edited and deleted some offensive user material. *Id.* at *4. Congress reversed *Stratton Oakmont* in order to take away disincentives to self-regulation.

9

DEFENSE 017621

CONFIDENTIAL

BMO_00001385

Village Voice takes efforts to isolate sexually related content, by using categories clearly identifying such content, and by requiring users to go through warning and adult-screening entry screens, before entering those categories. It also uses sub-category labels such as "escorts, body rubs, TS, ..." to zone off and separate adult material from family-friendly ads. By these techniques, users can stay clear of such categories they find offensive, and can also use filtering and blocking software to prevent themselves or their children from viewing objectionable material, without also blocking appropriate ads. All of these actions of Village Voice fall within the protection of the Good Samaritan provision of Section 230.

    3.    **Village Voice Is The "Publisher" of User Ads on Backpage.com.**

Since Village Voice is the provider of an "interactive computer service" and the ads and postings on Backpage.com are "information provided by another information content provider," Section 230 provides that it cannot be held liable "as the publisher" under any state or local law for the content of those ads or postings. 47 U.S.C. § 230(3)(1).

Because Village Voice could only be liable for user posted illegal content if it were treated "as the publisher," imposition of any such liability is clearly prohibited by Section 230. This is so because Congress in enacting Section 230 realized that while brick and mortar publishers have a duty to review and screen material, imposition of such requirements on the Internet would be virtually impossible and would effectively shut down the medium, which Congress viewed as essential to the country's growth and future. *See e.g., Zeran,* 129 F.3d at 330, 333 ("the sheer number of postings on interactive computer services would create an impossible burden in the Internet context;" and so "lawsuits seeking to hold a service provider liable for its exercise of a *publisher's traditional editorial functions*—such as deciding whether to publish, *withdraw,* postpone or *alter content—are barred.*") (emphasis added).

10

CONFIDENTIAL

DEFENSE 017622

BMO_00001386

No matter how a cause of action is labeled, or whether it is civil or criminal, Village Voice is immune from any liability for the content of third party information. It cannot be held liable as a publisher, for not removing the material, or for failing to implement better protective measures. *Zeran*, 129 F.3d at 330; *Doe v. Myspace, Inc.*, 528 F.3d 413, 419–20 (5th Cir. 2008).

    **4.**    **The Commercial Nature of Backpage.com Is Irrelevant.**

The fact that Village Voice and its Backpage.com service operate on a for-profit basis is completely irrelevant to the Section 230 analysis. In just about every case involving Section 230, the interactive computer service provider was a for-profit company. It also is irrelevant that Village Voice is potentially making money off of user ads, even if it ultimately develops that some of them contain illegal content.

In *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), AOL entered into a contract for Drudge to create content that would be posted on AOL. Drudge, after writing his Drudge report, would email it to AOL, which would then post it on its services. *Id.* at 48. AOL paid Drudge $3,000 a month. *Id.* at 47. One of the reports contained false and defamatory statements. *Id.* at 47–48. The Court found it irrelevant that Drudge was paid by AOL to create the content, or even that AOL actively and aggressively promoted and advertised it. *Id.* at 51. Section 230 is clear in its broad sweep, and AOL was immune from liability. *Id.* at 53.

By the same token, it is irrelevant that Backpage.com charges to post ads in some of its categories, and thus potentially receives money to post ads which could be illegal. Village Voice is a provider of an "interactive computer service" and these ads are "information created by another information content provider." Therefore, Village Voice cannot be treated as the publisher of the information.

    **E.**    **State Officials Face Liability Under 42 U.S.C. § 1983 If They Violate Village Voice's Statutory Rights Under Section 230.**

DEFENSE 017623

CONFIDENTIAL

BMO_00001387

State action directed against Village Voice based upon its publication of user-generated content on Backpage.com could result in liability to the involved state officials. The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), states:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the ***deprivation of any rights, privileges, or immunities secured by*** the Constitution and ***laws, shall be liable to the party injured*** in an action at law, Suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

In *Voicenet*, state officials executed a search warrant on the premises of plaintiff, a provider of usenet services, regarding a Pennsylvania state statute which criminalizes the knowing distribution and possession of child pornography. 2006 WL 2506318, at *1. Voicenet brought a variety of claims, including violation of Section 1983, against the Pennsylvania attorney general and other state officials.

The court denied a motion to dismiss the Section 1983 claim, holding that Section 230 was a right enforceable by Section 1983. Section 230 met the *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997), test in that (a) it was intended to benefit the plaintiff, (b) it is not too "vague and amorphous" for a court to enforce, and (c) it imposes a binding obligation on the state. *Voicenet*, 2006 WL 2506318, at *2–3.

In finding that Section 230 imposes a binding obligation on the state, the court in *Voicenet* cited to *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), where the Supreme Court held "that a statute that 'denies [a] sovereign the authority to abridge a personal liberty' imposes a binding obligation on the State." *Voicenet*, 2006 WL 2506318, at *2–3 (*quoting Golden State*, 493 U.S. at 112). The National Labor Relations Act ("NLRA") gave parties to a collective-bargaining agreement the right to bargain with each other "free of governmental interference," thus creating a "free zone from which all regulation, whether federal or state, is

12

DEFENSE 017624

CONFIDENTIAL                                                                    BMO_00001388

excluded." *Golden State Transit*, 493 U.S. at 110–11. Where, in *Golden State Transit*, the defendant

city refused to renew a taxicab company's franchise unless it settled a dispute with its union, the

Supreme Court held that the company could enforce this violation of the NLRA through the Civil

Rights Act. *Id.* at 104.

Similarly, Section 230 created a "free zone" that protects service providers from being held

liable by a state for information posted by others. *See Voicenet*, 2006 WL 2506318, at *3. Thus,

Section 230 imposes a ***binding obligation on the State***, which can be enforced through the Civil

Rights Act, to not treat an interactive computer service provider as the publisher or speaker of

information provided by others. *See id.* at *5. The Court in *Voicenet* therefore denied the motion

to dismiss. *Id.* at *1–5 (but holding that state officials had qualified immunity from money

damages since at that time the right was not clearly established).

## II.   EVEN IF SECTION 230 DID NOT APPLY, VILLAGE VOICE WOULD NOT BE LIABLE FOR BACKPAGE.COM CONTENT THAT ALLEGEDLY PROMOTES PROSTITUTION.

### A.   Village Voice's Policies and Practices Prohibit, Monitor for, and Remove Advertisements for Illegal Services

Any analysis of potential liability of Village Voice for the content of Backpage.com ads

must begin by looking at Village Voice's policies and practices for that service. Village Voice does

not encourage, promote, or even acquiesce in ads for illegal services. Village Voice expressly

prohibits illegal ads in its Terms of Use for Backpage.com, emphasizes prohibition to users,

solicits help of all users in reporting ads that violate the service terms or the law, and removes ads

that violate its policies whenever it learns of them. Furthermore, Village Voice works with

appropriate law enforcement officials when requested to do so.

Use of Backpage.com is governed by "Terms of Use" which users must affirmatively agree

to before they can utilize the service. The terms are also linked to from the main Backpage page,

so users can readily consult them. These terms prohibit posting such "material of any kind or

DEFENSE 017625

CONFIDENTIAL

BMO_00001389

nature that encourages conduct that could constitute a criminal offense, give rise to civil liability or otherwise violate any applicable local, state, provincial, national, or international law or regulation, or encourage the use of controlled substances." Furthermore, the terms prohibit "adult content or explicit adult material" unless posted in "designated adult categories and permitted under applicable federal, state, and local law," and the user is not a minor. "Obscene or lewd and lascivious graphics or photographs, or graphics or photographs which depict or simulate sexual acts" are prohibited, as is "[p]osting any solicitation directly or in "coded" fashion for any illegal service exchanging sexual favors for money or other valuable consideration." The terms also again prohibit: "[p]osting any ad for products or services, use or sale of which is prohibited by any law or regulation."

Before any user can enter any category in the "personals" or "adult" section, the Backpage.com site requires the user to read and agree to entry terms. The entry terms for the "personals" section prohibit access to those under 18. They warn that the user "may encounter some sexual content, pictorial nudity or adult language," and request users report inappropriate content. They also link back to the "Terms of Use" and require users to read and agree to them.

Different entry terms are used for all categories in the "adult" section. These entry terms also warn that the "section contains sexual content, including pictorial nudity and adult language," and that the user should not access it unless he or she is over 18 (or of legal age in the user's jurisdiction). These entry terms also link back to the full Backpage.com "Terms of Use," which one is required to read and agree to before using the service. Additionally, the entry terms ask all users to "agree to report any illegal services or activities which violate the Terms of Use," and provide an e-mail address to which such reports should be directed.

When a user attempts to post an ad in the "Escorts," "Body Rubs" or "TS" categories, the following statements appear clearly and visibly at the top of the page in red type: "Do not suggest

14

DEFENSE 017626

CONFIDENTIAL

BMO_00001390

an exchange of sexual favors for money," "Do not use code words such as 'greek', 'bbbj', 'blow', 'trips to greece', etc.," "Do not post obscene images," and "Do not post content which advertises an illegal service." A legend at the top of the page explains that ads not complying with the terms are subject to removal. When a user attempts to post in the "Phones & Websites" category, the following statements appear in red type: "Do NOT post escort, massage ads, or obscene pics here" and "Do NOT post content which advertises an illegal service.

In order to complete a post in any adult service or massage category, Backpage.com requires the use of a credit card. This deters users from posting ads for illegal services, since a record is kept that can be used by law enforcement officials. It also eliminates most prank postings and postings by under-age users.

When users report non-complying material, Backpage.com takes reasonable efforts to promptly remove offending advertisements. Each month, for example, Village Voice removes almost 150,000 ads from among more than one million posted in that time period on Backpage.com.

### B. Village Voice Cannot Be Liable Under Missouri Law For Promoting Prostitution.

Under a standard criminal law analysis, Village Voice cannot be held criminally liable merely because some of its users violate its terms and post advertisements for illegal services, such as prostitution. Statutes relating to promotion of prostitution were not meant to, and cannot, apply to publishers like Village Voice that merely provide an advertising medium for others, prohibit ads for illegal activities, actively screen for and encourage reporting of non-complying ads, and promptly remove any such ads.

#### 1. Village Voice Has No Intent to Aid or Abet or Promote Prostitution, And Thus Has Not Committed These Crimes.

15

DEFENSE 017627

CONFIDENTIAL

BMO_00001391

Village Voice is not liable under Missouri law for promoting prostitution, or for aiding and abetting prostitution, since it has no intent for a crime to occur.[1]

To be found guilty of "promoting prostitution," one must "knowingly promote[] prostitution." Mo. Stat. Ann. § 567.070.  A person promotes prostitution if he "knowingly causes or aids a person to commit or engage in prostitution," or "knowingly engages in any conduct designed to institute, aid or facilitate an act or enterprise of prostitution." Mo. Stat. Ann. § 567.010.  Merely "assist[ing]" prostitution is not enough; one must act "with the purpose of promoting prostitution." *State v. Wilson*, 753 S.W.2d 102, 103 (Mo. App. S.D. 1988).

Village Voice cannot reasonably be accused of violating this statute.  It has no intent or purpose to promote any illegal activities.  Village Voice does not knowingly cause or aid a person to commit or engage in prostitution.  It takes great efforts to make sure its service is not used for prostitution.  Similarly, Village Voice does not "knowingly" engage in conduct "designed to institute, aid or facilitate" prostitution.  Its service is designed neutrally to allow the messages and advertisements to be posted on anything or any services.  It prohibits ads for illegal services, although it is impossible, given electronic posting methods, to prevent all such ads from being posted.

---

[1] Under Missouri law, accomplice liability for aiding and abetting prostitution is preempted by and subsumed into the "promoting prostitution" statute. *See* Mo. Ann. Stat. §§ 567.090, .010, .050–.070 (2009). For that reason, this memo will discuss the "promoting prostitution" statute. However, even under traditional accomplice liability, to be found guilty of "aiding and abetting" a crime, one must "act[] with another with a common intent and purpose in the commission of a crime." *State v. Smith*, 108 S.W.3d 714, 719 (Mo. Ap. W.D. 2003); *see also* Mo. Stat. Ann. § 562.041 (to be held criminally responsible for aiding a crime, one must do so "with the purpose of promoting the commission of an offense").  Furthermore, "the evidence must show that the defendant associated himself or herself with the venture or participated in the crime in some manner." Village Voice would not meet this standard even if "aiding and abetting" applied to prostitution, since it does not intend or have the purpose of promoting any crimes.  In fact, Village Voice prohibits its services for being used for illegal purposes and takes steps to prohibit and remove advertisements for illegal services.

16

DEFENSE 017628

CONFIDENTIAL                                                                                                    BMO_00001392

For example, in *People v. Lauria*, 251 Cal. App. 2d 471, 475 (Cal. App. 1967), California attempted to prosecute the operator of an answering service, charging conspiracy to commit prostitution. Lauria's answering service was provided for any business; however, he knew that it was used by prostitutes. *Id.* at 475. He even allowed them to pay the bills in person rather than to be billed by mail, for secrecy. *Id.* at 474. However, the court absolved him of liability. *Id.* at 483. While he provided a service to prostitutes and knew it, there was no proof that he actually "intended to further their criminal activities." *Id.* at 483. The court analogized the case to *U.S. v. Falcone*, 311 U.S. 205 (1940), where sellers of large quantities of sugar, yeast, and cans were absolved from participation in a moonshining conspiracy, since their knowledge that the supplies would be used for illicit purposes did not constitute criminal intent.

Knowledge that a business's service or liability will be used for criminal purposes is not enough to hold the business criminally responsible, where there is no intent or purpose to further or promote the illegal activities. Such intent can sometimes be inferred, such as where the business has acquired a stake in the illegal venture, where no legal uses exist for the product or service, or where volume of sales for illegal purposes are grossly disproportionate to any legitimate demand. *Lauria*, 251 Cal. App. 2d at 478–80. These exceptions, however, clearly do not apply to Village Voice, which offers legal services and has taken extensive efforts to prevent and remove ads for illegal services. Not only does Village Voice have no intent or purpose to further or promote illegal services; it actively acts to exclude or remove any ads for illegal services. Village Voice no more knowingly promotes prostitution than Verizon aids and abets drug trafficking when dealers use Verizon's cell phones for drug deals.

2.    **Scienter Is An Essential Element Of Criminal Statutes Which Target Even Unprotected Speech.**

The scienter or criminal intent element of criminal offenses is essential where a statute may be applied to speech. While speech promoting illegal conduct can be outlawed, a clear

DEFENSE 017629

CONFIDENTIAL                                                                    BMO_00001393

scienter element is required by the First Amendment for any speech-directed criminal law.

Otherwise, people would over self-censor in fear of criminal liability, and protected speech would

be chilled, in violation of the First Amendment. In *Smith v. California*, 361 U.S. 147, 151–154 (1959),

for example, the Supreme Court held that a bookseller cannot be found criminally liable for

simply having an obscene book in his or her store; rather, criminal laws against sale of obscene

publications can only be applied to booksellers who know of the book's unlawful content. *Id.* The

Supreme Court required scienter in these circumstances to avoid damage to constitutionally

protected speech. The Court noted that unless knowledge of the obscenity of the targeted

publication is required for a prosecution of a bookseller, then booksellers would be required to

pre-read and screen every book. *Id.* Many books containing protected speech would be withheld

from sale as booksellers pro-actively removed borderline books from their shelves, to the harm of

the public and its right of free expression. *Id.*

    The United States Supreme Court recently reaffirmed the need for a scienter requirement

in crimes that address speech, including unprotected speech, like child pornography. In *U.S. v.*

*Williams*, 128 S. Ct. 1830, (2008) the Supreme Court upheld a federal statute making it a crime to

advertise or promote child pornography. *Id.* at 1836–37. The Court in upholding this statute

noted that it included a "scienter requirement," because it required the acts to have been done

"knowingly," and it also required the defendant to actually have held the "belief" that the material

was child pornography, thereby showing that the defendant actually "intended" to promote child

pornography. *Id.* at 1839-40. These very clear scienter requirements prevented the statute from

coming too close to and chilling protected speech.

    Accordingly, even apart from Missouri authorities' precedents requiring scienter, the First

Amendment would require proof of scienter before Village Voice or similar publishers could be

DEFENSE 017630

CONFIDENTIAL

BMO_00001394

convicted of promoting prostitution.  Considering Village Voice's policies and procedures for prohibiting and removing ads for illegal services, this standard cannot be met.

>   **3.      Criminal Laws Must Be Worded Or Construed So That They Do Not Cover Constitutionally Protected Speech.**

Criminal laws must clearly identify the conduct that is prohibited.  *See State v. Young*, 695 S.W.2d 882, 883–86 (Mo. 1985) (holding vague statute unconstitutional in violation of the 14th Amendment and Article I, Section 10, of the Missouri Constitution).  Particularly where an intermediary such as a store owner is involved, criminal laws cannot be so vague and unclear that they force the intermediary to steer clear of legal and permissible conduct.  Thus, while a state can ban the advertisement of unlawful services, it must use clear and narrowly tailored standards that do not bring protected speech within their coverage.  *See Pittsburgh Press Co. v. Pittsburgh Comm. On Human Relations*, 413 U.S. 376, 388 (1973); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 258 (U.S. 2002) (finding a statute unconstitutional as overbroad since it also covered protected speech).

For example, statutes banning the advertisement of drug paraphernalia have been upheld as constitutional under the First Amendment only when they have been narrowly tailored so that advertisements of legal products are not chilled.  *See, e.g., Wash. Mercantile Assoc. v. Williams*, 733 F.2d 687 (9th Cir. 1984); *Camille Corp. v. Phares*, 705 F.2d 223 (7th Cir. 1983).  Products sometimes used as drug paraphernalia may also have other, legal purposes.  For example, a pipe can be used for illegal drugs or legal tobacco.  At least where advertising, a form of speech, is involved, laws must carefully distinguish between advertising for legal uses and advertising for illegal uses.  Specifically, in order to comply with the First Amendment, laws outlawing advertising of purported drug paraphernalia must be carefully worded so that they do not criminalize the advertising of legal products, which is of course constitutionally protected.

DEFENSE 017631

CONFIDENTIAL

BMO_00001395

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561–64 (1980).

*Washington Mercantile* and *Camille Corp.* both upheld laws that criminalized placing ads for drug paraphernalia. *Washington Mercantile*, 733 F.2d at 689; *Camille Corp. v. Phares*, 705 F.2d at 230. However, the statutes included a requirement of scienter—criminalizing a seller's placing ads only where the seller knew or had reason to know that it promoted the sale of drug paraphernalia. *Id.* Furthermore, the statutes, patterned after the Model Drug Paraphernalia Act, also clearly delineated what was drug paraphernalia and thus covered. These statues, therefore, withstood First Amendment challenges because: (1) they only banned advertisements for unlawful activities and not related lawful activities, (2) the statutes clearly identified what they covered, and (3) they required criminal intent on the part of the defendant.

Just like ads for pipes and cigarette papers, ads placed on Backpage.com may relate either to legal services or illegal ones. An escort's ad is legal if no sexual services are offered; it is illegal only if it offers sexual services for money. Often an illegal purpose cannot be discerned merely from the text of the ad. Protected and unprotected speech are "often separated . . . only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). In order to eliminate possible illegal ads, the State cannot sweep too broadly by threatening prosecution over all such ads, because such a prosecution would force publishers like Village Voice to take down legal (and constitutionally protected) ones as well.

This means that liability can never be imposed on the basis of ambiguous ads, because that would chill protected speech by forcing Village Voice and other publishers to "deter[] people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 128 S. Ct. 1830, 1838 (U.S. 2008). Laws that prohibit a substantial amount of protected speech are unconstitutional under the First Amendment and overbreadth doctrine. *See*

DEFENSE 017632

CONFIDENTIAL

BMO_00001396

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 258 (U.S. 2002); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–501 (1985) (obscenity law also reaching material appealing only to normal sexual appetites, which is protected speech, was overbroad).  The State cannot threaten civil or criminal suit against Village Voice for the content of ads on Backpage.com without appropriate guidelines.

Notably, when Village Voice is notified of advertisements which clearly advertise the exchange of sex for money, those ads are removed.  Village Voice hence not only bans clearly illegal ads but always takes them down immediately whenever they are found.  It properly treats differently ads that are not clearly illegal, which describe legal services, and any prosecution of it from allowing such ads would be improper for the reasons set forth above.

4. **Public Provision of a Communications Service Cannot Support Aiding And Abetting Liability, Because The Connection With The Crime Is Too Remote.**

"Aiding and abetting" liability is a form of derivative liability—a situation where one party is held liable for another's conduct.  Derivative liability can be sensitive and troublesome particularly in the criminal law, and accordingly the law sets intent and remoteness limits on derivative liability.  The scienter (intent) requirement set forth in Section II.B.1. above is one such limit.  Additionally, prudential consideration of remoteness also limit derivative liability.  In a felony murder case, a getaway car driver may be convicted even though he did not pull the trigger, because of his intentional involvement in the crime team and the foreseeability of possible harm.  That is, his involvement is sufficiently close to the wrongful conduct that it is fair to make him liable.  But the person who sold the getaway car driver his car, or the store that sold the bank robber his ski mask, are not liable, because such involvement is too remote.

Judge Richard Posner explained that remoteness of an intermediary from another's wrongful conduct can protect the intermediary even if he or she knows or strongly suspects that a wrongful activity will occur:

DEFENSE 017633

CONFIDENTIAL

BMO_00001397

A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes—he may even know which ones are. See *United States v. Giovannetti, supra,* 919 F.2d at 1227; *People v. Lauria,* 251 Cal.App.2d 471, 59 Cal.Rptr. 628 (1967); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 746-47 (3d ed.1982). The extent to which his activities and those of similar sellers actually promote prostitution is likely to be slight relative to the social costs of imposing a risk of prosecution on him. But the owner of a massage parlor who employs women who are capable of giving massages, but in fact as he knows sell only sex and never massages to their customers, is an aider and abettor of prostitution (as well as being guilty of pimping or operating a brothel). See *United States v. Sigalow,* 812 F.2d 783, 784, 785 (2d Cir.1987); *State v. Carpenter,* 122 Ohio App.3d 16, 701 N.E.2d 10, 13, 18-19 (1997); cf. *United States v. Luciano-Mosquera,* 63 F.3d 1142, 1149-50 (1st Cir.1995).

*In re Aimster Copyright Litigation,* 334 F.3d 643, 651 (7th Cir. 2003).

Publishers of Internet services, telephone directories and newspapers can no more be charged with aiding prostitution than "[a] retailer of slinky dresses . . . even if he knows that some of his customers are prostitutes." Similarly, Hilton Hotels does not aid and abet prostitution when a customer takes a prostitute to his hotel room, even if some of the hotel workers suspect or recognize what is occurring. To take another example, it is common and appropriate for escort and other adult services to advertise in telephone directories and newspapers. Just because some of these might turn out to be offering prostitution does not create derivative liability for the telephone directories or newspaper publishers; they merely provide neutral services. *See Doe v. GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003) (offering rhetorical question, "Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?"); *People v. Lauria,* 59 Cal. Rptr. 628 (Cal. App. 1968) (absolving proprietor of telephone answering service from liability for conspiracy to further prostitution where the defendant knew prostitutes used his service, but there was no proof that he actually intended to further the prostitution).

DEFENSE 017634

CONFIDENTIAL

BMO_00001398

If the dress seller and hotel operator are not liable for promoting prostitution, then surely a neutral internet publisher is not. Unlike with the hotel operator and dress seller, any criminal liability for Village Voice would implicate serious First Amendment concerns. If Village Voice is held liable because some prostitutes use its service, it would have no choice but to severely self-censor its service to avoid criminal liability. This would have the adverse effect of chilling protected speech and possibly even eliminating a forum for protected speech. The First Amendment prohibits such derivative liability, especially here, where protected ads for legal adult services and unprotected ads for prostitution are "often separated . . . only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).

Furthermore, unlike the drug paraphernalia cases, there are absolutely no standards to determine whether the ads on Backpage.com are allowed or not. Without any standards "a person of ordinary intelligence" is not provided with "fair notice of what is prohibited." *Williams*, 128 S. Ct. 1845. Any attempt to force Village Voice to remove ads without providing such clear standards would be unconstitutional under the vagueness doctrine in violation of due process and the First Amendment. *See also Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968). Village Voice does not have the manpower, training or any guidance to know what ads the State objects to and those it does not.

III. **EVEN IF SECTION 230 AND THE SCIENTER AND REMOTENESS DOCTRINES OF CRIMINAL LAW DID NOT APPLY, THE FIRST AMENDMENT WOULD PREVENT IMPOSITION OF CRIMINAL LIABILITY ON VILLAGE VOICE IN THIS SITUATION.**

A. **Backpage.com Is Engaged In Protected Speech.**

Village Voice's activities in publishing Backpage.com is protected speech under the First Amendment of the U.S. Constitution. Backpage.com is a classic forum designed for the exchange of information, both commercial and non-commercial. It provides a modern-day counterpart to

DEFENSE 017635

CONFIDENTIAL
BMO_00001399

the personal and commercial ads that the Founders of our country found in the coffeehouse newspapers of their day.

Three different sets of persons have First Amendment interests with respect to Backpage. First, Village Voice as the publisher has a publisher's traditional interest in creating a publication that is useful to, and in demand by, readers and advertisers. Second, advertisers use Backpage as a forum for publication and distribution of their messages, which may be non-commercial (*e.g.* personal ads) or commercial (*e.g.*, ads for legal escort or massage services. Third, readers use Backpage to find and read items of interest. All three of these parties have recognized First Amendment interests. The readers' right to receive information is every bit as worthy of First Amendment protection as the right of publishers of advertisers to publish it. "Where a speaker exists, as is the case here, the protection afforded is to the communications, to its source and to its recipients both *** If there is a right to advertise, there is a reciprocal right to receive the advertising." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). "Freedom to speak publicly and to publish has, as its inevitable and important correlative, the private right to hear, to read, and to think and to feel about what one hears and reads. The First Amendment protects those private rights of hearers and readers." *United States v. Roth*, 237 F.2d 796, 808 (2nd Cir. 1956) (Frank, J., concurring).

Accordingly, any attempt to prosecute Village Voice in connection with Backpage.com must contend with two key foundational facts about the expressive nature of the service: (1) Village Voice carries out a traditional publishing function on Backpage, and (2) Backpage users (both advertisers and readers) utilize the service for their own expressive activities. That is, Village Voice and its readers and advertisers all engage in constitutionally protected expressive activities.

**B.     Normal Backpage Content is Classic Protected Expression, Even If it May be Offensive or "Indecent" To Some.**

DEFENSE 017636

CONFIDENTIAL

BMO_00001400

The fact that many of the posts in the "sex" forum and ads posted in the "personals" section are not family-friendly does not remove their full protection under the First Amendment. No obscene material or child pornography is allowed on the site, and hence the content is presumptively covered by the First Amendment. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245–46 (U.S. 2002) ("[T]he First Amendment bars the government from dictating what we see or read or speak or hear." But it has limits, and "does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). "Indecent" material on the internet, including sexual expression, is fully protected. *See Sable Commc'n of Cal., Inc. v. Fed. Commc'n Comm.*, 492 U.S. 115, 126 (1989). While some parents may wish to shield this material from their children, this is easily done through the use of internet blocking and filtering software, widely available on the market, and through parental supervision. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004).

The content contained within the ads in the "adult" section and "escorts" category which meet Village Voice's terms of service is also constitutionally protected. Many of the ads are non-commercial in nature and fully protected speech, even if some of them contain indecent content. *See Sable Commc'n of Cal., Inc. v. Fed. Commc'n Comm.*, 492 U.S. 115, 126 (1989). Others propose commercial transactions dealing with legal escort services, massages and other legal adult services. Advertisement of such services are best done on specialized sections of the internet where they can be screened away from minors. The First Amendment does not permit restricting or banning such advertisements, especially on the internet. *Cf., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (finding a complete ban on advertising the price of alcohol to be unconstitutional; also stating in a plurality portion of the opinion: "Most obviously, complete speech bans . . . are particularly dangerous because they all but foreclose alternative means of disseminating certain information.").

DEFENSE 017637

CONFIDENTIAL

BMO_00001401

**C.**     **Internet Websites Are Like Bookstores, Which Cannot Be Expected To Pre-Screen All Their Content.**

The internet has allowed the distribution of free and protected speech on a scale unknown in the past. Imposition of liability holding an internet website, such as Backpage.com, liable for the content of its users would disrupt the internet services that Americans enjoy today, and would violate the First Amendment.

In many ways, a website such as Backpage.com is the modern day virtual equivalent of a bookstore. A bookstore cannot be held liable simply because it carries an illegal book. The Supreme Court in *Smith v. California* struck down an ordinance holding a bookseller strictly liability for selling obscene books. 361 U.S. 147 (1959). The Court stated that under such a law, "'Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop. It would be altogether unreasonable to demand so near an approach to omniscience." *Id.* at 153. Such a requirement would greatly impede the number of books with protected speech that would be available. *Id.* at 154. This concern is compounded a thousand-fold with the internet. Currently, there are hundreds of millions of users logging onto the internet across the globe, and a large percentage of those are actively creating and posting content to sites such as Backpage.com, eBay, craigslist and Wikipedia. If Village Voice and other internet service providers faced potential liability merely because their users posted illegal content, which was available for a short time before it was removed, such services could not exist, and would have to close down—just like booksellers would have, had not *Smith v. California* clarified the more limited nature of their potential responsibility.

In *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) the Supreme Court struck down a law that made it a crime to transmit certain material to a minor on the internet, since it would disrupt protected adult-to-adult communication. *Id.* at 876. The Court found that given the nature and size of the internet, one could almost always be charged with knowing a minor would

26

CONFIDENTIAL

view material sent. *Id.* In fact, the law would have "confer[red] broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child . . . would be present." *Id.* at 880. The same analysis applies to the threatened prosecution in the instant case.

It is a core constitutional principle that the First Amendment requires "breathing space" for protected expression. *E.g., Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772 (1986). In *Hepps,* the Supreme Court held that plaintiff in a defamation case must prove falsity of the statements when they concern a public matter. *Id.* at 778. The Court recognized that this would necessarily insulate from liability some false statements of fact, which are not constitutionally protected. *Id.; Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974). However, the Court concluded that it was necessary in order to provide "breathing space" so that protected speech is not chilled.[2] *Hepps,* 475 U.S. at 772. Such a tipping of the scales in favor of speech and against regulation that would chill speech is the basis for the time-honored "chilling effect" derivative of First Amendment law, on which *Smith v. California* is based.

The origins of the "breathing space" doctrine trace back to *Speiser v. Randall,* 357 U.S. 513 (1958). A provision of the California constitution made nonadvocacy of overthrow of government by unlawful means a condition precedent to tax exemption. *Id.* at 1338–39. California law providing a tax exemption for World War II veterans enforced this provision by placing the burden of persuasion on claimants to show that they qualify, *i.e.,* that they did not engage in such unlawful speech. *Id.* at 521–22. The Court, while assuming the California constitutional provision was valid, struck down this enforcement procedure as unconstitutional based on due process and the First Amendment. *Id.* at 529. The Court explained:

---

[2] In the same manner, it is possible that some prostitutes advertise on Backpage.com in the guise of legal adult services, but it is impossible to eliminate those without eliminating protected speech.

DEFENSE 017639

CONFIDENTIAL

BMO_00001403

> The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. * * * [T]his procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free.

*Id.* at 526. In short, the government in regulating unprotected speech must do so in a manner which does not deter or unconstitutionally chill protected expression. In order to defend speech on the edge of protected speech, the First Amendment requires that some speech on the other side go unpunished. *See also New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (holding that a public official must prove falsity and actual malice to win damages in defamation so as not to chill protected speech).

If Village Voice is not held responsible for content posted by its users, some ads promoting illegal services are likely to slip by. However, this is a necessary evil, and indeed it is part of the process by which free speech is protected. Otherwise, because it is virtually impossible for Village Voice to screen all user-posted content on Backpage.com, Village Voice would face uncertainty regarding the scope of the unlawful zone, resulting in it avoiding liability, either by shutting down, or by over self-regulating, thereby either cutting off or limiting protected speech.

> **D.    An Internet Provider Cannot Be Held Liable for Conducting a Communications Service That Has "Substantial Lawful Uses."**

The First Amendment and the nature of the internet require websites to be immune from any non-intentional and remote derivative liability based on postings of its users. Judge Easterbrook of the Seventh Circuit has stated:

> A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the

28

DEFENSE 017640

CONFIDENTIAL

BMO_00001404

> advertisers make money from that activity? How about Verizon, which furnishes
> pagers and cell phones to drug dealers and thus facilitates their business? GTE
> does not want to encourage the surreptitious interception of oral communications,
> nor did it profit from the sale of the tapes. It does profit from the sale of server
> space and bandwidth, but these are lawful commodities whose uses
> overwhelmingly are socially productive. That web hosting services likewise may be
> used to carry out illegal activities does not justify condemning their provision
> whenever a given customer turns out to be crooked.

*Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).  Although made in the context of Section 230,

this opinion demonstrates why it would be improper under criminal law to construe offering of

services for legal purposes as conduct that could be prosecuted, merely because some users

misuse the services provided.

In copyright law, the Supreme Court held that copying equipment is not liable for

contributory copyright infringement if it is "capable of substantial noninfringing uses." *Sony*

*Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984); *see also* 35 U.S.C. § 271(c)

(statutorily providing the same for patent law).  By the same token, a website that provides a

service allowing user-generated content should not be held liable for unlawful content of some

users if the service has "substantial lawful uses."  Indeed, the danger of limiting speech protected

by the First Amendment is of a much greater concern than the policies at play in copyright law.

Backpage.com is a useful internet service that has many substantial legal uses.  Almost all

of its categories contain ads and information regarding appropriate and non-objectionable

speech.  Others, while objectionable to some, are still fully protected.  It is only in a small number

of categories where some users post ads for illegal services and those ads generally have only a

short life, since Village Voice takes them down when it becomes aware of them.

In these circumstances, given the legality of the substantial uses of Village Voice's services,

derivative liability against Village Voice would be inappropriate

     **E.**     **Forcing Village Voice to Eliminate the "Escorts" Category or to Block**
                **Ambiguous Ads Would Constitute An Unlawful "Prior Restraint."**

DEFENSE 017641

CONFIDENTIAL

BMO_00001405

Serious threats of civil or criminal suits by the State would present Village Voice with the choice of either eliminating much protected speech or facing serious liability. Such threats would essentially constitute the State using Village Voice as its censor to eliminate and prevent constitutionally protected speech. *Bantam Books,* 372 U.S. 58. This is a prior restraint of speech in violation of the First Amendment.

Requiring Backpage.com to block lawful speech or eliminate entire categories on its site that carry substantial amounts of protected speech is a prior restraint. This would shut down an entire forum of speech, and would essentially be giving "public officials the power to deny use of a forum in advance of actual expression," which is a classic example of prior restraint. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975).

Prior restraints are "particularly disfavored" and bear a heavy burden against constitutional validity. *Id.* at 558 (internal citations omitted); *CBS, Inc. v. Davis,* 510 U.S. 1315, 1317 (1994). The "gagging of publication has been considered acceptable only in 'exceptional cases.'" *Id.* (*citing Near v. Minnesota,* 283 U.S. 697, 716 (1931)). Even where national security is concerned, see *New York Times Co. v. United States,* 403 U.S. 713 (1971), courts are reluctant to grant this "most extraordinary remed[y]" unless "the evil that would result . . . is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc.,* 510 U.S. at 562 (internal citations omitted).

The State cannot justify a prior restraint under the "exceptional case" standard. The users posting ads can readily be punished after-the-fact, and the ads can readily be removed if reported to Village Voice and determined under appropriate standards to be for illegal services. In fact, removing escort ads would be counter-productive and would actually make law enforcement even more difficult, because prostitutes advertising their services would place their ads in other places,

DEFENSE 017642

CONFIDENTIAL

BMO_00001406

where they are more difficult to identify, and where the operators do not retain credit card information which can be traced.

## Conclusion

As more fully explained above, prosecution of Village Voice for its Backpage.com service would be improper for three independent reasons:

(1)    Section 230 of the Federal Communications Act, 47 U.S.C. § 230, specifically bars civil or criminal liability of Internet intermediaries based upon the content of their users' messages.

(2)    Missouri criminal law relating to promoting and aiding and abetting prostitution applies only to those who have specific criminal intent to promote or aid prostitution, and such intent is clearly lacking in the circumstances where a communications provider makes available a forum for posting communications, but also bans, screens for, and promptly deletes messages that offer prostitution.

(3)    The First Amendment limits prosecutions of information providers such as bookstore operators and communications providers to the rare situations where (a) the prosecution is confined to illegal content, (b) the publisher has knowledge and intent to provide illegal content, (c) the prosecution is conducted after-the-fact and does not chill or restrain ongoing protected speech.

4964961.10

DEFENSE 017643

CONFIDENTIAL                                                                                    BMO_00001407

## Analysis of Washington State Legislation
## Directed at Providers of Internet Personal Ads

Washington Senate Bill 6251, as originally proposed and as modified in several amendments, seeks to criminalize the publication of adult advertisements if those ads are used by the advertiser for illegal purposes such as prostitution or sexual abuse of a minor. Each version of the bill attempts to make the operator of *the intermediary advertising medium* criminally liable whenever perpetrators of the prescribed illegal acts use its facilities.

Each of the versions of the bill to date exempt advertising media from liability only if they take the extraordinary practice of verifying that any persons portrayed in the ad are not minors—an unusual and unprecedented requirement that is clearly impractical in the sphere of automated Internet advertising.

However framed, and certainly in all of its versions to date, such a law would unconstitutionally abridge core First Amendment freedoms, would be void under the federal statute immunizing Internet intermediaries for their users' content, and would improperly stretch the limits of criminal law by penalizing legal and protected communicative activities, merely because an unforeseen third party misuses them.

Each of the versions of Senate Bill 6251 to date violates multiple core limitations on a state's power to criminalize conduct. Each, if enacted, could not criminalize the conduct of entities like Backpage LLC, which engage in lawful business and advertising practices, and which maintain proper and careful procedures to prevent misuse of its services. For multiple reasons, summarized here and described more fully in Sections I through IV below, Senate Bill 6251 ("the Proposed Act") cannot constitutionally be applied to Backpage's activities:

| Reason | Key Authorities |
|---|---|
| The federal statute protecting Internet intermediaries bars such laws. | 47 U.S.C. § 227, the Communications Decency Act |
| The federal "dormant commerce clause" doctrine prohibits state laws which would regulate the Internet on a national basis. | *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) |
| The First Amendment protects expressive activities including advertising. Publishers may not be prosecuted in situations (1) where the publisher had no criminal intent, or (2) where the prosecutions would have a chilling effect on expressive activity. | *Smith v. California*, 361 U.S. 147 (1959); *United States v. Williams*, 553 U.S. 285 (2008) |
| Parties may not be criminally prosecuted for taking ordinary and legal actions that allegedly "further," "promote," or "accelerate" other's bad acts, even if those activities are in some manner exploited by criminals. | *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003); *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) |

The Proposed Act further ignores Backpage's policies and terms of use (which prohibit illegal uses of its services), its practice of screening for and removing illegal content, and its

Ex. 5B

DEFENSE 016650

BP00257669

record of assisting law enforcement in the unusual cases where illegal content is posted. (See Section V.)

**Versions of S.B. 6251**

1.     *Original Senate Bill 6251*, introduced on January 16, 2012, would have made it illegal to "knowingly sell or offer to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be commercial sexual abuse of a minor, if occurring in this state." The bill would apply if a minor was depicted in the ad, or if "commercial sexual abuse of a minor … occur[s] as a result of the advertisement." By that language, an advertiser would be criminally liable if it published an ad, regardless of whether the ad purported to advertise legal activity, and regardless of whether the advertiser believed it to be advertising legal activity, if, after a terrible crime occurred, a judge or jury in hindsight determined that a "reasonable person" would have viewed the ad as proposing illegal activity.

       The publisher would have a defense only if it proved that it attempted to verify the minor's age by reviewing government age identification documents. It is not stated how this defense could apply in the case of an ad that did not depict a minor.

       This version clearly violates Section 230 (Argument I below) because it seeks to criminalize the conduct of an Internet intermediary based on the content of its users. It also violates the Dormant Commerce Clause (Argument II below) because it would apply to all persons who place advertisements that somehow later lead to the prescribed consequences in Washington State, and thus would purport to regulate interstate activities on the Internet. It would also chill First Amendment activity, penalize expressive activity carried out with no criminal intent, and extend criminal liability to a party taking customary and legal actions. (Arguments III and IV, below.)

2.     *Substitute Senate Bill 6251*, approved on February 2, 2012, would:
   - make it a felony for any person or company to sell an advertisement if that advertisement "results" in an act of prostitution or sexual abuse of a minor
   - *unless,* prior to publication of the ad, the advertiser personally meets the subject of the ad and verifies that she or he is not a minor.

Although the preamble of the bill describes prevention of child sexual abuse as its purpose, the operative text of the bill, section 2(1), applies to *any and all advertisements in any media*, not even just advertisements that mention or portray minors. Ads for accommodations, apparel, loans, childcare, and/or transportation, regardless of where they were published, if judged after the fact to have somehow "resulted" in an act of prostitution or sexual abuse of a minor in Washington State, would subject the advertiser to felony prosecution.

       The publisher would have a defense only if it proved that it attempted to verify the minor's age by having the minor appear in person and present government age identification documents. It is not stated how this defense could apply in the case of an ad that did not depict a minor.

       This version clearly violates Section 230 (Argument I below) because it seeks to criminalize the conduct of an Internet intermediary based on the content of its users. It also violates the Dormant Commerce Clause (Argument II below) because it would apply to all persons who place advertisements that somehow later lead to the prescribed consequences in Washington State, and thus would purport to regulate interstate activities on the Internet. It

DEFENSE 016851 GSI00257670

would also chill First Amendment activity, penalize expressive activity carried out with no criminal intent, and extend criminal liability to a party taking customary and legal actions. (Arguments III and IV, below.)

3.      *Engrossed Substitute Senate Bill 6251*, introduced and approved by the Senate on February 8, 2012 is directed at the "knowing" publication, dissemination or display of "any advertisement for a commercial sex act, which is to take place in the state of Washington and that includes the depiction of a minor." It defines "advertisement for a commercial sex act" as any ad that "includes either an explicit or implicit offer for a commercial sex act to occur in Washington." Thus, as with the original bill, advertisers would be subjected to the hindsight judgment of judges or juries as to what they should have concluded was "implicit" in an ad that may on its face appear fully legal.

As with version #1, the publisher would have a defense only if it proved that it attempted to verify the minor's age by reviewing government age identification documents. It is not stated how this defense could apply in the case of an ad that did not depict a minor.

This version clearly violates Section 230 (Argument I below) because it seeks to criminalize the conduct of an Internet intermediary based on the content of its users. It would also chill First Amendment activity, penalize expressive activity carried out with no criminal intent, and extend criminal liability to a party taking customary and legal actions. (Arguments III and IV, below.)  While this version purports to limit its reach to advertisements that relate to conduct in Washington State, the very sentence that contains that purported limitation also makes the advertiser liable for non-explicit assertions in the ad, as judged in hindsight, and thus as a practical matter it may affect the conduct of all persons who offer Internet advertisements nationwide, because of the possibility that their conduct may be ultimately held to involve an ad that "implicitly" targets Washington state; in that regard, it may also violate the Dormant Commerce Clause (Argument II below).

I.      **THE PROPOSED ACT WOULD BE VOID BECAUSE OF SECTION 230, WHICH MAKES INTERNET ADVERTISING SERVICES IMMUNE FROM LIABILITY FOR THE MESSAGES OF USERS OF THEIR SERVICES.**

Internet advertising services are exempt by virtue of a federal statute from state civil or criminal liability for any illegal content posted on their services that was contributed by third-party users of the site. Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230 ("Section 230"), sometimes referred to by the title of the chapter in which it was contained, the Communications Decency Act ("CDA"), precludes liability for Internet dissemination or publication of such third-party content.

A.      **To Encourage Internet Use and Growth, Congress Enacted Section 230, Which Immunizes Intermediaries From Liability for Third-Party Content.**

In 1996, Congress enacted legislation "(1) to promote the continued development of the Internet and other interactive computer services and other interactive media [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b). Section 230

3

 00257671

states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Furthermore, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Section 230 has directly led to the vibrant and useful internet that Americans enjoy today.

Section 230 immunizes interactive computer service providers from liability for user-generated content. This does not strip the government or wronged parties of redress for problems created by such content, because the original culpable party who posted any unlawful or harmful content remains liable. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). However, if service providers were "[f]aced with potential liability for every message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Id.* at 331. Since it is impossible for providers to precisely weed out objectionable or unlawful content, without some law like Section 230, they would be forced to eliminate the user-generated content that makes the internet so vibrant, or face liability that would shut them down. *See Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).

The "interactive computer services" that qualify for the immunity include not only Internet service providers but also website hosts, message board providers, social networks, paid online content services, search engines, and advertising boards. A service provider cannot be held liable as a publisher of the third-party content, nor can it be held liable for exercising "traditional editorial functions," such as deciding whether to publish, withdraw, postpone or alter the content of a third party. *Zeran*, 129 F.3d at 327. Providers of user-posted advertising clearly qualify. And the immunity that such intermediaries receive under Section 230 is very broad.

Since *Zeran*, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal cites omitted); *accord Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *Almeida v. Amazon, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Green v. Am. Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000). This applies across the board, even where the content is wrongful, despicable, illegal, and/or harmful. *See, e.g., Zeran*, 129 F.3d 327; *Carafano*, 339 F.3d 1119; *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998).

Section 230 applies to any legal claim, not specifically exempted in the statute, that would hold a service provider liable for the content of another. This immunity defense has been applied to many different claim theories, including negligence, defamation, invasion of privacy, misappropriation of the right of publicity, state securities and cyberstalking acts, and violations of the Fair Housing Act. *See, e.g., Carafano*, 339 F.3d 1119 (negligence, defamation, invasion of privacy and misappropriation of right of publicity); *Lycos*, 478 F.3d 413 (state securities and cyberstalking acts); *Chicago Lawyers' Comm. For Civil Rights Under Law, Inc.*, 519 F.3d 666 (7th Cir. 2008) (Fair Housing Act). Section 230 is limited only by certain specific exclusions, which do not apply here. *See* 47 U.S.C. § 230(e) (exempting intellectual property, the Electronic Communications Privacy Act, or *federal* criminal law from Section 230's coverage).

DEFENSE 016653 00257672

**B.**     **Section 230 Overrides State Criminal Laws That Attempt to Make Internet Intermediaries Liable Based Upon Their Users' Content.**

Section 230 immunity applies to liability created under state criminal statutes.  47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").  In *Voicenet Commc'n, Inc. v. Corbett*, 2006 WL 2506318 (E.D. Pa. 2006), the court rejected arguments by the defendant, the attorney general of Pennsylvania, that Section 230 did not apply to certain state criminal statutes, because subsection 203(e)(3) states that no "cause of action" may be brought and no "liability" may be imposed under any State or local law that is "inconsistent with" this section.  *Id.* at *3–4.  The court found that the terms "liability" and "cause of action" in clearly encompass criminal as well as civil actions.  *Id.*  Subsection (e)(3) further provides that no liability can be imposed under "any State or local law."  By its express language, then, Section 230 provides immunity to all inconsistent state laws, not only civil ones.

Section 230 makes no exception for any state criminal laws, no matter how well intentioned they may be.  Subsection (e)(1) "provides that nothing in the CDA shall be construed to impair enforcement of certain federal statutes governing obscenity and the sexual exploitation of children, 'or any other *Federal* criminal statute.'"  *Voicenet*, 2006 WL 2506318, at *3.  Congress could have similarly exempted state criminal laws, but did not do so.  *Id.* at *4.  *Accord, People v. Gourlay*, 2009 WL 529216, at *2–3 (Mich. App. 2009) (finding that Section 230 applies to state criminal law).

**C.**     **Backpage Satisfies All Requirements for Immunity Under Section 230.**

Backpage falls squarely within the requirements of Section 230 and is immune from any state prosecution which would attempt to impose liability on it arising from the content of third-party postings.  Section 230 immunity exists if:  (1) Backpage is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat Backpage "as the publisher or speaker" of that information.  *See* 47 U.S.C. § 230(c)(1); *Lycos*, 478 F.3d at 418.  All of these requirements are plainly met.

**1.**     **Backpage is a "Provider" of an "Interactive Computer Service," Namely the Backpage.com Website.**

Backpage meets the statutory definition (47 U.S.C. § 230(f)(2)) of an "interactive computer service."  It provides an online service that allows people or companies to post classified ads or messages regarding items for sale; commercial and non-commercial services; and other information.  Backpage is thus an "information service or system" that enables multiple users to access its "computer server," namely the server that hosts its website.  *See Lycos*, 478 F.3d at 419.  Websites that allow users to post information have always been treated as "interactive computer services" under Section 230.  *See, e.g., id.* at 413; *Ben Ezra*, 206 F.3d at 985.  For example, craigslist.com, a provider of similar online classified ads, has been found to be an "interactive computer service."  *See Chicago Lawyers'*, 519 F.3d 666.

DEFENSE 016654 BP-GJ-00257673

2.   **The Ads in Question are Posted by Users of Backpage and Thus are "Information Provided by Another Information Content Provider."**

The ads and other postings on Backpage are clearly "information provided by another information content provider." These ads are not created by Backpage. Users of Backpage.com who post the ads, messages or comments clearly are information content providers distinct from Backpage. *See, e.g., Lycos*, 478 F.3d at 419.[1]

3.   **Backpage is the "Publisher" of User Ads on Backpage.com.**

Since Backpage is the provider of an "interactive computer service" and the ads and postings on Backpage.com are "information provided by another information content provider," Section 230 provides that it cannot be held liable "as the publisher" under any state or local law for the content of those ads or postings. 47 U.S.C. § 230(3)(1). No matter how a cause of action is labeled, or whether it is civil or criminal, Backpage is immune from any liability for the content of third-party information. It cannot be held liable as a publisher, for not removing the material, or for failing to implement better protective measures. *See Zeran*, 129 F.3d at 330; *Myspace*, 528 F.3d at 419–20.

4.   **Backpage Has Been Found Protected by Section 230.**

The Proposed Act cannot avoid Section 230 on the theory that the evil of sexual abuse of minors is so great that Section 230 should be disregarded. Section 230's broad preemptive scope does not depend on the nature or gravity of the evil the State has attempted to prevent or redress. A federal judge thus ruled last year that Backpage's advertising—even with respect to an ad that involved the "horrific victimization" of a minor—was fully covered by Section 230.

In *M.A. v. Village Voice Holdings, LLC*, 2011 WL 3607660 (E.D. Mo. 2011), Magistrate Judge Thomas Mummert dismissed as barred by Section 230 a civil action against Backpage and its parent company, even though the plaintiff alleged that Backpage was complicit in her criminal victimization. For purposes of Backpage's motion to dismiss, the court accepted as true the plaintiff's allegations that while she was a 14-year-old runaway, she was sexually trafficked by an adult woman, who displayed photos of the plaintiff on Backpage, all for purposes of arranging sexual liaisons. The plaintiff further alleged that Backpage aided and abetted several specific crimes committed. Despite these allegations, the court in a careful and exhaustive ruling found that Section 230 clearly protected Backpage. It found that Backpage was a "service provider"

---

[1] The fact that Backpage.com provides categories for posting does not change the analysis. Such basic editorial and organizational structures are separate from the content contained within them. Use of these categories does not make Backpage "responsible, in whole or in part, for the creation or development of [the] information ...." *See* 47 U.S.C. § 230(f)(3). *Chicago Lawyers'*, 519 F.3d 666 (mere creation of category could not reasonably be construed as authorship in whole or part for the non-compliant content posted within that category); *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, at *10 (M.D. Fla. 2008) (establishment of categories on ripoffreport.com did not make the defendant the "information content provider"); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 832 (2002) (eBay's product categories did not make it responsible for ads created by its users for sale of bootleg materials).

DEFENSE 016650 USA00257674

under Section 230 and that the ads in question were created by the adult woman, not Backpage. *Id.* at *6.

It did not matter that Backpage created "adult" classified categories, acted with a profit motive, actively sought advertisers, and marked its website; none of these activities transformed it into an "information content provider" under Section 230. *Id.* at 7-8. As in another case involving a sex crime that an Internet intermediary allegedly facilitated (*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008)), the Court ruled that as long as the content in question comes from a third-party user, Section 230 immunizes the intermediary. Similarly, even notice to Backpage that others had used its site for sexual trafficking of minors did not change the picture; Section 230 immunity applies "even if a service provider knows that third parties are posting illegal content." *Id.* at *8.

Finally, not even the assertion that the underlying conduct violated federal criminal statutes could avoid Section 230 immunity; the court found that misuse of a service by its customers did not implicate the service provider in the customer's criminality, in part because criminality requires specific criminal intent that the provider lacks. *Id.* at *11. And, in any event, the court noted that Congress in enacting Section 230 determined (quoting another Section 230 decision involving child sexual abuse) that "the parties to be punished and deterred are not the internet service providers but rather are those who created and posted the illegal material." *Id.* at *12, *quoting Doe v. Bates*, 2006 WL 3813758 (E.D. Tex. 2006).

\*\*\*

In sum, as shown above, the liability that the Proposed Act would create falls squarely on practices that Section 230 protects. As federal law and the supreme law of the land, Section 230 preempts and prohibits the liability that the Proposed Act would create. Backpage is fully immunized under federal law from any state act or judicial action that would impose liability on it, civil or criminal, based on content supplied by its users. The Proposed Act, if enacted by the Washington State legislature, would violate Section 230 and hence would be void and ineffective as applied to Internet intermediaries like Backpage from the date it was enacted.

## II. THE PROPOSED ACT WOULD NOT STAND BECAUSE THE COMMERCE CLAUSE PREVENTS A STATE LAW FROM REGULATING NATIONAL COMMERCE.

The Commerce Clause of the U.S. Constitution grants the federal government the power to regulate interstate commerce. U.S. Const. Art. 1, § 8, cl. 3. Courts have interpreted this to mean that states cannot adopt statutes that have the "practical effect" of regulating conduct beyond state borders. *Healy v. The Beer Inst.*, 491 U.S. 324, 336 (1989). Courts refer to this limitation imposed by the Commerce Clause, restricting state statutes with impermissible extraterritorial effect, as the "dormant" Commerce Clause. *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 169 (S.D.N.Y. 1997).

The Proposed Act seeks to criminalize all paid advertising, wherever it occurs, that, in some versions, "results" in certain specified sex crimes in the State of Washington, and in another version, relates to conduct "which is to take place in the state of Washington". This broad legislation sweeps into its net not only statutorily protected intermediary conduct, as discussed above, but also interstate commerce. Particularly as to advertising on the Internet, which is an

7

USAO00257675

intrinsically nationwide network of commerce, the legislation would impermissibly regulate commerce outside Washington. The Commerce Clause forbids this extraterritorial effect.

"Typically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet." *Pataki*, 969 F. Supp. at 169. Instead, "the internet's boundary-less nature means that internet commerce does not quite" occur wholly inside, nor wholly outside, a single state. *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003). Thus, even where states have legitimate—indeed, laudable—reasons to regulate commerce inside their borders, the very nature of the Internet "makes state regulation impracticable." *Id.* at 104. Put simply, restrictions on website content by definition regulate interstate commerce. *See, e.g., id.* (striking down, as *per se* violative of the Commerce Clause, Vermont statute prohibiting dissemination to minors of material that is "harmful to minors" where the disseminator has "actual knowledge" that the recipient is a minor); *Pataki*, 969 F. Supp. 160 (striking down similar New York statute on Commerce Clause grounds).

Comparing application of the Proposed Act to a traditional print ad actually underscores this impermissible extraterritorial effect with respect to Internet media. The "results" focused versions of the Proposed Act could readily sweep under its coverage thousands of legitimate ads across the country. A regional New England magazine may publish a hotel chain advertisement. A reader in Connecticut may respond by booking a room in Seattle with that hotel chain for an upcoming trip. If the reader then hires a prostitute while in Seattle, and consummates the act in his hotel room, the magazine publisher would, under the Proposed Act, have committed a Class C felony. The regional magazine "knowingly" sold an advertisement, and an act of prostitution "result[ed] in this state." Such an effect on ads and activities occurring far outside the boundaries of Washington State is impermissible under the dormant commerce clause doctrine. Even as applied to traditional media, then, Washington's proposed legislation runs afoul of the Commerce Clause by "project[ing] its legislation into other states, and directly regulat[ing] commerce" outside its borders. *Booksellers*, 342 F.3d at 104 (quotations omitted).

Even the somewhat more restrictive version of the Proposed Act that focuses on ads that are later viewed as ones "for a commercial sex act" "which is to take place in the state of Washington" has broad extraterritorial effect. Many ads on their face advertise legal goods or services that can be purchased anywhere—for example, hotel rooms, transportation, clothing, escort services. But the Proposed Act takes a hindsight focus; it comes into play after an act of sexual abuse of a minor occurs, and the state then scrutinizes the original ad with a view to proving that it made an "implicit offer for a commercial sex act to occur in Washington." An ad posted in Florida for a nanny who is willing to relocate could, under this hindsight focus, later subject the operator of the Florida advertising medium to criminal liability on the theory that the ad really depicted a minor and implicitly offered a commercial sex act in Washington state. Clearly the Proposed Act has extraterritorial effect in each of its versions.

This intolerable out-of-state effect is increased exponentially in the case of the Internet because "[t]he Internet is wholly insensitive to geographic distinctions." *Pataki*, 969 F. Supp. at 170. The advertising content of any website is immediately accessible to millions of users—including potential sex offenders or sex crime victims—in every state across the nation. A web

8

site operator or content provider "cannot prevent [out-of-staters] from accessing that page and will not even know from what state visitors to that state hail." *Id.* at 171.

These examples aren't simply hypotheticals. Internet transactions have become common place, and we know from experience that a Connecticut businessman is in fact much more likely to choose his hotel from an ad on Hotels.com, Priceline.com, or even a Google "AdWords" ad than from a print ad in a regional magazine. Simply put, the ubiquitous "nature of the Internet makes it impossible to restrict the effects" of one state's statute to conduct occurring wholly in that state. *Id.* at 177. The Commerce Clause forbids as impermissibly extraterritorial a statute that advances Washington's policies regarding advertisements to the exclusion of out-of-state policies, which may reasonably "favor[] freedom of expression over a more protective stance." *Id.*

A website operator simply cannot know in advance what acts might result from its advertisements, neither posted in nor specifically directed toward Washington, much less *where* those acts of a third party might occur. This case is thus completely unlike *State v. Heckel*, 24 P.3d 404 (Wash. 2001), which addressed email, not website content, that was specifically directed at Washington. Instead, the facts here fall under the authority of *Pataki*, which addressed a state statute potentially criminalizing website content that could be posted anywhere, even where it was not specifically targeted at the regulating state.

Because, like the regulation in *Pataki*, the Proposed Act reaches all website content, across the country, website operators would be forced to adopt precautions for all ads, posted anywhere. As the court in *Pataki* explained, an ad publisher would have to "self-censor or risk prosecution, a Hobson's choice *that imposes an unreasonable restriction on interstate commerce.*" *Id.* at 180 (emphasis added). Alternatively, the publisher would need to undertake precautionary measures to comply with Washington's affirmative defense for every advertisement nationally, i.e., attempt to ascertain the age of anyone appearing in advertisements.[2] *Cf. Consol. Cigar Corp. v. Reilly*, 218 F.3d 30 (1st Cir. 2000) (striking down advertising restriction as violating the Commerce Clause because it would effectively require a warning be carried on national advertisements that just happened to be viewed from Massachusetts). Any of these consequences would have the "practical effect" of "control[ling]" conduct beyond the boundaries of the State," and would thus impermissibly regulate commerce beyond its borders. *Healy*, 491 U.S. at 336.

---

[2] Even taking these precautionary measures on a national basis would not save ad publishers from liability, because the affirmative defense does not apply as against numerous ads that could result in a violation. A limited defense of confirming the true age of "the minor appearing in the advertisement" seemingly provides no defense for the thousands of advertisements—whether for a service legal or illegal on its face— in which a minor does not appear, and which may result in an act of sexual abuse of a minor or prostitution in the state of Washington. For instance, the defense likely would not apply to the hotel advertisement discussed above. Nor would it seem to apply to an advertisement for a legal escort service that does not reference or picture specific individuals. Even a classified advertisement by an *adult* offering babysitting services could, tragically, result in the sexual abuse of a minor. The ad publisher apparently would have no defense to its on-line posting in any of these examples. To the contrary, because the advertiser would have "knowingly" sold the advertisement, liability would result in each instance.

9

Like the statutes in *Booksellers* and *Pataki*, the Proposed Act "represents an unconstitutional projection of [Washington] law onto conduct that occurs wholly outside" the state. *Pataki*, 969 F. Supp. at 169. If the legislation passes, Washington will have "deliberately imposed its legislation on the Internet, and by doing so, projected its laws into other states whose citizens use the Net." *Id.* at 177.

## III. THE FIRST AMENDMENT PREVENTS IMPOSITION OF CRIMINAL LIABILITY ON BACKPAGE IN THIS SITUATION.

Publishers, advertisers, and readers all have a free speech interest in the advertisements potentially criminalized under the Proposed Act, and the Proposed Act targets protected as well as unprotected speech. Against that background, the Proposed Act violates the First Amendment based on its overbreadth and chilling effect on unprotected speech. Additionally, the Proposed Act is constitutionally infirm for its failure to require criminal intent on the part of the defendant.

### A. Backpage Is Engaged in Protected Speech and the Content of its Ads is Classic Protected Expression.

Backpage's publishing activities constitute protected speech under the First Amendment of the U.S. Constitution. Backpage is a classic forum designed for the exchange of information, both commercial and non-commercial. It provides a modern-day counterpart to the personal and commercial ads that the Founders of our country found in the coffeehouse newspapers of their day.

Three different sets of persons have First Amendment interests with respect to Backpage. First, Backpage as the publisher has a publisher's traditional interest in creating a publication that is useful to, and in demand by, readers and advertisers. Second, advertisers use Backpage as a forum for publication and distribution of their messages, which may be non-commercial (*e.g.* personal ads) or commercial (*e.g.* ads for massage services). Third, readers use Backpage to find and read items of interest. "Freedom to speak publicly and to publish has, as its inevitable and important correlative, the private right to hear, to read, and to think and to feel about what one hears and reads. The First Amendment protects those private rights of hearers and readers." *United States v. Roth*, 237 F.2d 796, 808 (2d Cir. 1956) (Frank, J., concurring). Thus, Backpage and its readers and advertisers all engage in constitutionally protected expressive activities.

These protected express activities include, for starters, ordinary, every-day transactions, which the Proposed Act potentially criminalizes. For example, the Proposed Act could encompass an advertisement seeking nanny services on Care.com; an "AdWords" ad for Hilton Hotels on Google; a PayPal sponsored ad on Facebook; or a banner ad for Hertz rental cars on Expedia. No one could question that these advertisements all constitute protected commercial speech under *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561–64 (1980). Yet, sadly, it is possible to imagine each of these advertisements "resulting" in child sex abuse or prostitution in Washington State. Respectively, they could constitute advertisements connecting the sex offender and the victim, or facilitating the crime's location or payment method, or transportation to or from the crime.

10

 USAO00257678

But the scope of protected speech swept into the Proposed Act's web extends further, even to content that some might find morally objectionable, though it is legally permissible. Posts by adults on Backpage's "sex" forum and ads in its "personals" section are fully protected under the First Amendment. No obscene material or child pornography is allowed on the site, and hence the content is presumptively covered by the First Amendment. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245–46 (2002) ("[T]he First Amendment bars the government from dictating what we see or read or speak or hear." But it has limits, and "does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). Barring only these limited, enumerated carve-outs, First Amendment protection extends to "indecent" material on the Internet, including sexual expression. *See Sable Commc'n of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The Supreme Court has also confirmed that protection is afforded to commercial transactions, such as those dealing with legal escort services, massages and other legal adult services. *Central Hudson*, 447 U.S. at 561–64. The First Amendment does not permit restricting or banning such advertisements, especially on the Internet. *Cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (finding a complete ban on advertising the price of alcohol to be unconstitutional; also stating in a plurality portion of the opinion: "Most obviously, complete speech bans . . . are particularly dangerous because they all but foreclose alternative means of disseminating certain information.").

**B.      A Statute Criminalizing or Requiring an Intermediary to Screen for Both Protected and Unprotected Speech Has an Impermissible "Chilling Effect."**

In many ways, websites such as Backpage are the modern-day virtual equivalent of bookstores, allowing broad distribution of expressive content and communications. A bookstore cannot be held liable simply because it carries an illegal book. The Supreme Court in *Smith v. California* struck down an ordinance holding a bookseller strictly liable for selling obscene books. 361 U.S. 147 (1959). The Court stated that under such a law, "'[e]very bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop. It would be altogether unreasonable to demand so near an approach to omniscience." *Id.* at 153. Such a requirement would greatly impede the number of books with protected speech that would be available. *Id.* at 154.

This concern is compounded a thousand-fold with the Internet. Currently, there are hundreds of millions of users logging onto the Internet across the globe, and a large percentage of those are actively creating and posting content to sites such as Backpage.com, eBay, craigslist and Wikipedia. Millions more may not be posting, but instead affirmatively seeking out what others post, or else being targeted by sponsored ads on Google, Facebook, and the like. If Backpage and other Internet service providers faced potential liability merely because their users posted illegal content, or legal content that ultimately "resulted" somehow in illegal conduct, such services could not exist. The Internet as we know it—a thriving forum for free expression with content provided by scores of millions of individual and entities on websites operated by others—would be sorely undercut.

*Smith*'s holding regarding the First Amendment and booksellers is but one application of the core constitutional principle that the First Amendment requires "breathing space" for protected expression. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986). Laws that prohibit a substantial amount of protected speech are unconstitutional under the First

11

USAO00257679

Amendment's overbreadth doctrine. *See Free Speech Coalition*, 535 U.S. at 258; *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–501 (1985) (obscenity law also reaching material appealing only to normal sexual appetites, which is protected speech, was overbroad). Such a tipping of the scales in favor of speech and against regulation that would deter protected speech is the basis for the time-honored "chilling effect" doctrine. This requires that the government, in regulating *unprotected* speech, must do so in a manner which does not deter or unconstitutionally chill *protected* expression. *Speiser v. Randall*, 357 U.S. 513 (1958). In order to defend speech on the edge of protection, the First Amendment requires that some speech on the other side go unpunished. *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) (holding that a public official must prove falsity and actual malice to win damages in defamation so as not to chill protected speech). Here, the Proposed Act covers speech on both sides of the line. It may criminalize advertisements affirmatively, and quite explicitly, promising illegal services.[3] It may also, as discussed above, criminalize ads for hotels, childcare service, credit cards, and the like.

Courts have often had opportunity to consider other advertising restrictions on illegal products or services, and upheld them *only where* they do not also prohibit advertisements of legal products or services. For instance, courts have upheld statutes banning the advertisement of drug paraphernalia against First Amendment challenge only when they have been narrowly tailored so that advertisements of legal products are not chilled. *See, e.g., Wash. Mercantile Assoc. v. Williams*, 733 F.2d 687 (9th Cir. 1984); *Camille Corp. v. Phares*, 705 F.2d 223 (7th Cir. 1983). Just like ads for pipes and cigarette papers, ads placed on Backpage may relate either to legal services or illegal ones. Even considering only "adult" services, an escort's ad is legal if no sexual services are offered; it is illegal only if it offers sexual services for money. Often an illegal purpose cannot be discerned merely from the text of the ad. Protected and unprotected speech are "often separated . . . only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). In order to eliminate possible illegal ads, the State cannot sweep too broadly by threatening prosecution over all such ads, because such a prosecution would force publishers like Backpage to take down legal (and constitutionally protected) ones as well.

Requiring any publisher to provide a 100% guarantee of the legality of content from third parties would necessarily inhibit publication of lawful information, because of the uncertainty regarding the scope of the unlawful zone. Under such a standard, any publisher would face significant uncertainty, since ads for many lawful, even benign, products and services could "result" in crimes, and could thus constitute illegal advertising under the Proposed Act. Backpage could thus avoid liability only by either shutting down, or over self-regulating, thereby cutting off or limiting protected speech. This violates the First Amendment. *See Free Speech Coalition*, 535 U.S. at 258 (finding a statute unconstitutional as overbroad since it also covered protected speech). The Proposed Act would chill protected speech by forcing Backpage and other publishers to "deter[] people from engaging in constitutionally protected speech, inhibiting the

---

[3] Notably, when users notify Backpage of advertisements that clearly advertise the exchange of sex for money, Backpage removes those ads. (See Part V, discussing these policies in more detail.) Backpage hence not only bans clearly illegal ads but takes them down immediately whenever they are found. It properly treats differently ads describing legal services, and any prosecution of it from allowing such ads would be improper for all the reasons set forth herein.

DEFENSE 01660 USAO-BP-00257680

free exchange of ideas," and thus fails under the First Amendment. *United States v. Williams*, 553 U.S. 285, 292 (2008).

### D.   A Statute Criminalizing Speech Must Include a Clear Criminal Intent Element.

In addition to the limitation on states chilling protected speech, the First Amendment also imposes a requirement on statutes criminalizing speech that they clearly identify the regulated conduct and include a criminal intent requirement on the part of defendant.

Criminal intent, sometimes called "scienter," must be proven whenever a criminal offense is charged based on a party's speech. While speech promoting illegal conduct can be outlawed, a clear intent element is required by the First Amendment for any such laws. This requirement serves the same underlying purpose as the prohibition against "overbroad" statutes, i.e., otherwise people would over self-censor in fear of criminal liability, and protected speech would be chilled, in violation of the First Amendment. Thus, in *Smith v. California*, for example, the Supreme Court held that a bookseller cannot be found criminally liable for simply having an obscene book in his or her store; rather, criminal laws against sale of obscene publications can only be applied to booksellers who *know* of the book's unlawful content. 361 U.S. at 151-54. The Supreme Court required criminal intent in these circumstances to avoid damage to constitutionally protected speech. The Court noted that unless knowledge of the obscenity of the targeted publication is required for a prosecution of a bookseller, then booksellers would be required to pre-read and screen every book. *Id.* Many books containing protected speech would be withheld from sale as booksellers pro-actively removed borderline books from their shelves—to the harm of the public and its right of free expression. *Id.*

The United States Supreme Court has reaffirmed the need for a criminal intent requirement in crimes that address speech, including unprotected speech, like child pornography. In *Williams*, the Supreme Court upheld a federal statute making it a crime to advertise or promote child pornography. 553 U.S. at 309. The Court in upholding this statute noted that it included a "scienter requirement," because it not only required the acts to have been done "knowingly," but also required the defendant to actually have held the "belief" that the material was child pornography, thereby showing that the defendant actually "intended" to promote child pornography. *Id.* at 294. These very clear intent requirements prevented the statute from coming too close to, and thereby chilling, protected speech. *See also Wash. Mercantile*, 733 F.2d at 689; *Camille*, 705 F.2d at 230 (upholding laws that criminalized placing ads for drug paraphernalia where they included a requirement of scienter, i.e., only where the seller knew or had reason to know that it promoted the sale of drug paraphernalia).

Accordingly, even apart from a state's own case law requiring criminal intent for criminal liability, the First Amendment would require proof of intent before Backpage or similar publishers could be convicted of advertising and promoting prostitution or child sex abuse. The Proposed Act skirts normal intent requirements. The first two versions contained no real intent requirement, and version three contains only a nominal intent requirement in that the violator must "knowingly" publish an advertisement for a commercial sex act—but it then defines the key phrase "advertisement for a commercial sex act" in a way that permits an after-the-fact determination. Specifically, after an act of sexual abuse of a minor occurs, this version of the

13

DEFENSE 016662

20257681

Proposed Act would permit a criminal prosecution of the advertising medium to be based on the charge that even though the ad on its face (an "explicit" review) made no offer of commercial sex, such an offer was somehow "implicit" in the ad—with the outcome proving that interpretation of "implicitness", even though the advertiser had no way of knowing that it would occur. This kind of after-the-fact Catch-22 intent is not allowable in criminal law. The Proposed Act contains no requirement that the seller of advertising know that the ad will result in a sex crime in Washington State, much less that it *intend* this result. This omission—particular together with Backpage's policies and procedures for prohibiting and removing ads for illegal services (see Part V)—mean that the Proposed Act fails to include an intent requirement that comports with the First Amendment. The Proposed Act is thus unconstitutional on this additional ground.

Furthermore, unlike the drug paraphernalia cases, there are absolutely no standards to determine whether the ads on Backpage are allowed or not. Without any standards "a person of ordinary intelligence" is not provided with "fair notice of what is prohibited." *Williams*, 553 U.S. at 304. Any attempt to force Backpage to remove ads without providing such clear standards would be unconstitutional under the vagueness doctrine in violation of both due process and the First Amendment. *See also Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968).

## IV.  A PARTY CANNOT BE LIABLE FOR "FACILITATING," "AIDING," OR "ACCELERATING" ANOTHER'S WRONGDOING WHEN IT MERELY UNDERTAKES STANDARD AND LEGAL ACTIONS, SUCH AS SELLING ADVERTISING.

Perhaps in frustration at the difficulty of reaching those who are responsible for offering sexual services of minors, persons concerned about such conduct often target parties they label as "facilitators," such as Backpage. However, the connection between Backpage and the targeted illegal sexual abuse of minors cannot support direct or derivative liability for criminal conduct. That is, Backpage cannot be held responsible for sexual abuse of a minor merely because its ad services were somehow used in connection with that abuse, any more than a hotel can be held liable for acts of prostitution that occur within its rooms, or an airline or telephone company for conduct facilitated by its network.

Put simply, one who offers legal goods or services for sale, and sells those goods or services under reasonable controls, cannot be liable under a theory of "facilitation" merely because those legal goods or services were somehow involved in the chain of events that led to an unfortunate and illegal act. Ford Theater was not responsible for President Lincoln's assassination even though it provided the venue in which that infamous crime occurred. The apparel manufacturer whose police uniforms were used by the shooters in the St. Valentine's Day massacre was not criminally responsible for those murders. Neither the truck rental company nor the fertilizer supplier who sold to Timothy McVeigh was responsible for the Oklahoma City bombing. Facebook was not criminally liable merely because it failed to prevent one of its users from posting messages that drove another user to suicide. Google's search engine, and the Internet pipelines of AT&T and Verizon, are daily used by dealers in obscenity and child pornography, copyright infringers, sellers and buyers of illegal merchandise, and fraudsters and con artists from Nigeria to Nebraska—but none of those criminal acts of users may be laid on Google, AT&T or Verizon, merely because those companies supply services and facilities that are useful (indeed, essential) to the criminally inclined. Similarly, even though the highways of the State of

DEFENSE 016653 00257682

Washington certainly "facilitate" many crimes, no one would seriously consider the state to thereby be responsible for those crimes.

Backpage sells legal and proper advertising, on backpage.com, including personal ads and ads for legal services such as massages and escort services. Its website terms expressly prohibit use of its services for illegal conduct, and it maintains policies and procedures designed to enforce those terms. Under any standard criminal law analysis, Backpage cannot be held criminally liable merely because some of its users violate its terms and post advertisements for illegal services, such as prostitution or child sexual abuse. Nor can it be held liable because other users post ads for legal products and services, but an act of prostitution or child sex abuse somehow "results." Nor in the rare cases of ads that explicitly offer legal services, but are actually used by wrongdoers as part of an illegal scheme, can the state reasonably contend that the advertiser could have reasonably foreseen that the ads did not mean what they "explicitly" said, but instead "implicitly" called for illegal conduct. Regardless whether the offeror of legal services is labeled an "aider," "abettor," "facilitator," or, as described by the Seattle Mayor with respect to the Proposed Act, an "accelerant," criminal statutes simply cannot apply to these service providers who have no criminal intent and take no actions to promote or aid the illegal uses of its services.

    1.    **Backpage Has No Intent to Aid or Abet or Promote Prostitution or Child Sexual Abuse, And Thus Has Not Committed These Crimes.**

Backpage is not liable for promoting or aiding and abetting prostitution or sexual abuse of minors merely by offering its advertising services to the public, since it offers legitimate and lawful ads on its Backpage.com service, and has no intent for a crime to occur.

Washington State law recognizes, for example, that liability for criminal acts extends only to those who actively and knowingly assist the crime. For accomplice liability (often known as "aiding and abetting" liability), it must be proven that the accused accomplice "aided in the planning or commission of the crime and that he had knowledge of the crime." *State v. Fitzpatrick,* 2011 WL 198702 (Wash App. 2011). That knowledge must be specific knowledge of the crime in question; as stated in *State v. Brown,* 58 P.3d 889 (Wash. 2002), it is insufficient if the alleged accomplice "acts with knowledge that his or her actions will promote *any* crime"; rather, "for accomplice liability to attach, a defendant must not merely aid in any crime, but must knowingly aid in the commission of the specific crime charged." Similarly, it is not sufficient, as the Proposed Act would have it, that the crime merely "result" in some way from the accused accomplice's action or non-action. In *State v. Schooley,* 2006 WL 3629388 (Wash. App. 2006), for example, the court reversed the conviction of the defendant as an accomplice to a drug dealer, where, while the defendant's acts may have had the "result" of allowing the dealer to escape from police, the defendant lacked criminal intent, and there was no evidence that she knew her inaction would promote or facilitate the criminal activity.

Similarly, in *People v. Lauria,* 251 Cal. App. 2d 471, 475 (1967), California attempted to prosecute the operator of an answering service, charging conspiracy to commit prostitution. Lauria's answering service was provided for any business; however, he knew that it was used by prostitutes. *Id.* at 475. He even allowed them to pay the bills in person rather than to be billed by mail, for secrecy. *Id.* at 474. The court nevertheless absolved him of liability. *Id.* at 483. While he provided a service to prostitutes and knew it, there was no proof that he actually "intended to

DEFENSE 016664        USAO0257683

further their criminal activities." *Id.* The court analogized the case to *United States v. Falcone*, 311 U.S. 205 (1940), where sellers of large quantities of sugar, yeast, and cans were absolved from participation in a moonshining conspiracy, since their knowledge that the supplies would be used for illicit purposes did not constitute criminal intent.

Backpage has no intent or purpose to promote any illegal activities. Backpage does not knowingly cause or aid any person to commit or engage in prostitution or sexual abuse of minors. In fact, it takes great efforts to make sure its service is not used for illegal acts. Among other things, it prohibits ads for illegal services, although it is impossible, given electronic posting methods, to prevent all such ads from being posted. Similarly, Backpage does not "knowingly" engage in conduct "designed to institute, aid or facilitate" prostitution or sexual abuse of minors. Its service is designed neutrally to allow messages and advertisements to be posted on any subject or service. Because knowledge that a business's service will be used for criminal purposes is not enough to hold the business criminally responsible where there is no intent or purpose to further or promote the illegal activities, the Proposed Act fails as applied to Backpage.

> **2.     Public Provision of a Communications Service Cannot Support Aiding and Abetting or "Facilitating" Liability, Because the Connection With the Crime is Too Remote.**

"Aiding and abetting" liability is basic derivative liability—a situation where one party is held liable for another's conduct. Derivative liability can be sensitive and troublesome particularly in the criminal law, and accordingly the law sets intent and remoteness limits on derivative liability. The scienter (criminal intent) requirement is one such limit. Additionally, prudential considerations of remoteness also limit derivative liability. In a felony murder case, a getaway car driver may be convicted even though he did not pull the trigger, because of his intentional involvement in the crime team and the foreseeability of possible harm. That is, his involvement is sufficiently close to the wrongful conduct that it is fair to make him liable. But the automobile dealer that sold the getaway car driver his car, or the department store that sold the bank robber his ski mask, are not liable, because such involvement is too remote.

Judge Richard Posner explained that remoteness of an intermediary from another's wrongful conduct can protect the intermediary even if he or she knows, or strongly suspects, that a wrongful activity will occur:

> A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes—he may even know which ones are. The extent to which his activities and those of similar sellers actually promote prostitution is likely to be slight relative to the social costs of imposing a risk of prosecution on him. But the owner of a massage parlor who employs women who are capable of giving massages, but in fact as he knows sell only sex and never massages to their customers, is an aider and abettor of prostitution (as well as being guilty of pimping or operating a brothel).

*In re Aimster Copyright Litig.,* 334 F.3d 643, 651 (7th Cir. 2003) (internal citations omitted).

DEFENSE 016665 BP00257684

A state may not avoid the limits on derivative liability merely by claiming that an actor is responsible for everything that "results" from his or her actions. "When crimes are defined to require both conduct and a specified result of that conduct, the defendant's conduct generally must be the 'legal' or 'proximate' cause of the result." *State v. Christman*, 160 Wash.App. 741, 753, 249 P.3d 680, 686 (Wash. App., 2011). Legal causation depends on two elements, (1) "but for" or factual causation (whether the crime would not have occurred but for defendant's conduct), *and* (2) "the fairness of holding a defendant responsible." *Id.*, 249 P.3d at 687. The fairness analysis in turn "rests on policy considerations as to how far the consequences of a defendant's acts should extend" – that is, the same policy considerations that have long rejected extreme derivative liability theories, especially for publishers exercising First Amendment freedoms.

Publishers of Internet services, telephone directories and newspapers can no more be charged with aiding prostitution and sexual abuse of minors than "[a] retailer of slinky dresses ... even if he knows that some of his customers are prostitutes." *Id.* Similarly, Hilton Hotels does not aid and abet prostitution when its guest takes a prostitute to his hotel room, even if some of the hotel workers suspect or recognize what is occurring. To take another example, it is common and appropriate for escort and other adult services to advertise in telephone directories and newspapers. Just because some of these might turn out to be offering prostitution does not create derivative liability for the telephone directories or newspaper publishers; they merely provide neutral services. *See Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003). The Proposed Act impermissibly turns this universally recognized legal principle on its head, and cannot impose criminal liability on Backpage.

### 3.   An Internet Provider Cannot be Held Liable for Conducting a Communications Service That Has "Substantial Lawful Uses."

The First Amendment and the nature of the internet require websites to be immune from any non-intentional and remote criminal derivative liability based on postings of its users. Judge Easterbrook of the Seventh Circuit has stated:

> A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers and thus facilitates their business? GTE does not want to encourage the surreptitious interception of oral communications, nor did it profit from the sale of the tapes. It does profit from the sale of server space and bandwidth, but these are lawful commodities whose uses overwhelmingly are socially productive. That web hosting services likewise may be used to carry out illegal activities does not justify condemning their provision whenever a given customer turns out to be crooked.

*GTE Corp.*, 347 F.3d at 659. Although made in the context of Section 230, this opinion demonstrates why it would be improper under criminal law to construe offering of services for legal purposes as conduct that could be prosecuted merely because some users misuse the

DEFENSE 016666 00257685

services provided.  Backpage no more knowingly promotes prostitution than Verizon aids and abets drug trafficking when dealers use Verizon's cell phones for drug deals.

Similarly, in copyright law, the Supreme Court has held that copying equipment manufacturers are not liable for contributory copyright infringement if the equipment is "capable of substantial noninfringing uses."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984); *see also* 35 U.S.C. § 271(c) (statutorily providing the same for patent law).  By the same token, a website that provides a service allowing user-generated content cannot be held liable for unlawful content of some users if the service has "substantial lawful uses."  Indeed, the danger of limiting speech protected by the First Amendment is of a much greater concern than the policies at play in copyright law.

Backpage is a useful internet service that has many substantial legal uses.  Almost all of its categories contain ads and information regarding appropriate and non-objectionable speech. Others, while objectionable to some, are still fully protected.  It is only in a small number of categories where some users post ads for illegal services and those ads generally have only a short life, since Backpage takes them down when it becomes aware of them.

In these circumstances, given the legality of the substantial uses of Backpage's services, derivative liability against Backpage would be inappropriate.

V.   **BACKPAGE'S POLICIES AND PRACTICES PROHIBIT, MONITOR FOR, REMOVE, AND REPORT ADVERTISEMENTS FOR ILLEGAL SERVICES.**

Even apart from the legality of Backpage's practices, and the unconstitutionality of the Proposed Act, persons concerned about sexual abuse of minors should consider Backpage's policies and practices for that service.  Backpage does not encourage, promote, or even acquiesce in ads for illegal services.  Backpage expressly prohibits illegal ads in its Terms of Use for Backpage.com, emphasizes prohibition to users, solicits help of all users in reporting ads that violate the service terms or the law, and removes ads that violate its policies whenever it learns of them.  Importantly, Backpage employs over 100 site monitors who manually review each and every adult ad for compliance before such ads are available to the public.  Ads that are suspected to involve minors are immediately reported to the National Center for Missing and Exploited Children (NCMEC).

Furthermore, Backpage works with appropriate law enforcement officials when requested to do so.  Backpage responds to approximately 100 subpoenas each month from state, local, and federal law enforcement agencies, providing important evidence for prosecutors to hold criminals accountable for their conduct.

Use of Backpage.com is governed by "Terms of Use" which users must affirmatively agree to before they can utilize the service.  These terms prohibit posting "material of any kind or nature that encourages conduct that could constitute a criminal offense, give rise to civil liability or otherwise violate any applicable local, state, provincial, national, or international law or regulation, or encourage the use of controlled substances."  Furthermore, the terms prohibit "adult content or explicit adult material" unless posted in "designated adult categories and permitted under applicable federal, state, and local law," and the user is not a minor.  Among

DEFENSE 016687
GRJ00257686

other things, they ban "[p]osting any solicitation directly or in 'coded' fashion for any illegal service exchanging sexual favors for money or other valuable consideration."

Before any user can enter any category in the "personals" or "adult" section, the Backpage.com site requires the user to read and agree to entry terms. The entry terms for the "personals" section prohibit access to those under 18. Different entry terms are used for all categories in the "adult" section. The entry terms ask all users to "agree to report any illegal services or activities which violate the Terms of Use," and provide an e-mail address to which such reports should be directed.

When a user attempts to post an ad in the "Escorts," "Body Rubs" or "TS" categories, the following statements appear clearly and visibly at the top of the page in red type: "Do not suggest an exchange of sexual favors for money," "Do not use code words such as 'greek', 'bbbj', 'blow', 'trips to greece', etc.," "Do not post obscene images," and "Do not post content which advertises an illegal service." A legend at the top of the page explains that ads not complying with the terms are subject to removal. When a user attempts to post in the "Phones & Websites" category, the following statements appear in red type: "Do NOT post escort, massage ads, or obscene pics here" and "Do NOT post content which advertises an illegal service."

In order to complete a post in any adult service or massage category, Backpage also requires the use of a credit card. This deters users from posting ads for illegal services, since a record is kept that can be used by law enforcement officials. It also eliminates most prank postings and postings by under-age users. When users report non-complying material, Backpage takes reasonable efforts to promptly remove offending advertisements. Each month, for example, Backpage removes almost 150,000 ads from among more than one million posted in that time period on Backpage.com.

Notably, many of these policies isolate sexually related content from other content by using precisely the sort of procedures that Congress encouraged and protected in the CDA's so-called Good Samaritan provision. *See* 47 U.S.C. § 230(c)(2) (providing immunity to providers or users for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected"). These policies, moreover, reflect Backpage's good-faith attempts to take reasonable measures to remove or avoid altogether potentially unprotected speech, without strangling protected speech at the same time.

Backpage, in short, carefully runs its service in a manner which is legal and appropriate and assists law enforcement in the case of situations where users have not followed its terms.

***

No one disputes that the evils posed by child sexual abuse are real, and grave. But the Washington legislature must address those evils in a way that comports with the Constitution, and targets the offenders themselves rather than innocent intermediaries. The recently publicized efforts of the Seattle Police Department in investigating child prostitution should be applauded, and should serve as a model for appropriate methods of law enforcement with respect

19

DEFENSE 016668
BP00257687

to these abhorrent crimes.  Attempting to criminalize lawful advertising services, on the other hand, cannot stand.  First Amendment principles of free speech—particularly where, as here, they intersect with criminal law principles and Congressional policies about promoting the continued vibrancy of the Internet as a forum for speech—are paramount here.  Application of the Proposed Act to Backpage's advertising services would violate the CDA, the Commerce Clause, the First Amendment, and basic principles of derivative liability.

5486459

DEFENSE 016669          AGG00257688

From: Carl Ferrer carl.ferrer@backpage.com
Subject: Friday update
Date: February 8, 2013 at 6:06 PM
To: Jim Larkin jim.larkin@villagevoicemedia.com, Jed Brunst Jed.Brunst@VillageVoiceMedia.com, Scott Spear scott.spear@villagevoicemedia.com



-----------------
Moderation
-----------------
I spoke to Liz. We are in agreement about getting clarity to the moderators.
Next step, Monday phone call with Andrew to approve a training pictorial guide.

-----------------
PPI- PCI AUDIT
-----------------
VMG was unable to run scans and vulnerability tests so we will have are missing hole of data for PCI compliance.
VMG hoped cyber trails could do it. Cybertrails cannot.
Cybertrails has no documentation on PPI from VMG.
The former employee at VMG, Rashid, left VMG.
Cybertrails has no Linux experience. Not one customers who uses MySQL.
Cybertrails misrepresented their capabilities.


Solution:
1. Contract hire: Rashid
We found him. He is the one that managed PPI's infrastructure.

2. Terminate Cyber trails
We have a 6 month contract with Cybertrails at $1,400 per month.

3. Hire John Nash's group
Joe to meet this weekend and work out details. Essentially, we need to replace infrastructure VMG provided.
John Nash is another Wil Gerken.

4. Meet with our PCI Audit company (Secure State), make sure they understand our situation, gibe us a break and finalize our agreement.
Joe to meet on Monday.

5. I will need a signature on Statement of Work for SecureState on Tuesday.

This is a pretty complicated task with some important deadlines. We have Joe Kaiping managing this and he will get it done.
I will need your help in moving quickly when he delivers agreements from Nash and SecureState.

Whew...

-carl

6A

**From:** **Jim Larkin** jim.larkin@villagevoicemedia.com
**Subject:** Re: liz macdougall
**Date:** February 16, 2012 at 11:21 AM
**To:** Scott Spear scott.spear@villagevoicemedia.com
**Cc:** Jed Brunst Jed.Brunst@VillageVoiceMedia.com, Michael Lacey Michael.Lacey@VillageVoiceMedia.com



SS:

no numbers, I don't want you to waste any time on numbers with her.
the history, milestones, events, changes in policies, procedures, yes.
she has had a complete 2 hour moderation and mediation tutorial by Carl
any detailed discussion of numbers with her will be had by brunst.
Larkin

On Feb 16, 2012, at 11:17 AM, Scott Spear wrote:

J,

I assume she is privvy to all the numbers at BP? I'll plan to go through with her (assuming she wants this) its history, the major
milestone dates, events, changes we made in terms of our policies, procedures and operations and when they happened.

S

Scott Spear
Executive Vice President
Village Voice Media Holdings, LLC
602-271-0040

This message contains information from Village Voice Media Holdings, LLC that is confidential and may be privileged and protected
from disclosure. If you are not the intended recipient, please be advised that any use, dissemination, distribution or copying is
strictly prohibited. If you think you have received this message in error, please contact me immediately at 602-271-0040 or at
scott.spear@villagevoicemedia.com Thank you.

On Feb 15, 2012, at 8:14 PM, Jim Larkin wrote:

guys;
we are not making a public announcement about Liz's hiring until next week.
so, not a problem to discuss internally if necessary but no comment to press or public.
thanks
Larkin

6B

From: **Jim Larkin** Jim.Larkin@VillageVoiceMedia.com
Subject: general counsel
Date: February 21, 2012 at 4:55 PM
To: Carl Ferrer Carl.Ferrer@backpage.com, Scott Spear Scott.Spear@VillageVoiceMedia.com, Steve Suskin
Steve.Suskin@VillageVoicemedia.com, Kenny Stocker kstocker@seattleweekly.com, Mike Seely mseely@seattleweekly.com,
Patricia Calhoun Patricia.Calhoun@westword.com
Cc: Michael Lacey Michael.Lacey@VillageVoiceMedia.com, Liz McDougall lizmcd4@gmail.com, Jed Brunst
Jed.Brunst@VillageVoiceMedia.com, Scott Tobias Scott.Tobias@VillageVoiceMedia.com

Gentlemen:

Starting today we do not want any more direct legal contact with SNR Denton (Sam Fifer et al.), Sitrick and Associates (Mike Sitrick or Tony Knight), or Ed McNally at Kasowitz in New York.

Liz McDougall is now on board full blast as VVM General Counsel and will handle all legal and media inquiries whether in emergency or in the regular course of business. We will issue a general press release next week.

Liz' immediate legal mandate will include everything but Corporate Business matters and Editorial Defamation. Any legal or media matter dealing with the internet will be run through Liz. She is eager for the information and I've found very quick to respond. McDougall will also vet all legal bills and if she has not initiated the legal action the billing amount will be challenged.

Liz will have VVM email soon but for now her email address and phone numbers:

Liz McDougall <lizmcd4@gmail.com>
Liz McDougall cel: 206-669-0737

thanks
Larkin

6C



**From:** Jim Larkin Jim.Larkin@villagevoicemedia.com
**Subject:** Scott Tobias: a little clarification as to job roles.
**Date:** February 28, 2012 at 4:30 PM
**To:** Scott Tobias Scott.Tobias@VillageVoiceMedia.com
**Cc:** Jed Brunst Jed.Brunst@VillageVoiceMedia.com, Diana Fraser Diana.Fraser@VillageVoiceMedia.com, Scott Spear Scott.Spear@VillageVoiceMedia.com

Andy:

Re: Suskin, he's VVM Legal Counsel and is responsible for all editorial, personnel and defamation issues. Liz is VVM General Counsel and is responsible for all digital and most day to day business issues.

Larkin

On Feb 28, 2012, at 1:36 PM, Andy Van De Voorde wrote:

Short and sweet. Let me know if this works and when you would want it placed online.

Also, between us, the editors are going to ask: Does this mean she replaces Suskin?

<McDougall2-28.docx>



**From:** Liz McDougall  liz.mcdougall@villagevoicemedia.com
**Subject:** Scott Spear Meeting Summary
**Date:** March 2, 2012 at 12:53 AM
**To:** Jim Larkin  jim.larkin@villagevoicemedia.com
**Cc:** Don Bennett Moon  don.moon@azbar.org, Scott Spear  Scott.Spear@villagevoicemedia.com

Jim,

Quick update -- Scott and I had a good lunch meeting this afternoon.  He summarized and we discussed the legal-related matters that he oversees, including IP issues, contact matters, real estate agreements and corporate transactions, as well as BP and VVM issues that would wisely be re-reviewed for legal compliance (e.g., email and text message marketing policies, practices and terms).  We identified a number of matters that I can take over from law firms when the immediate BP onslaught has subsided.  In the meantime, he will blindcopy me on key substantive communications so I can start to get up to speed and will alert me to any litigation or potential litigation.

Scott also introduced me to Pam and Kenny in the Seattle Weekly office.  The office is great.  (My only disappointment is that Seattle Weekly will be leaving the gorgeous space and downtown area next January.)  Pam is helping to get everything set up so I can move in ASAP.  I'll bring my own office furniture so computer, phone and other tech equipment are the main essentials.

As a temporary measure, my former Perkins Coie secretary is going to provide my admin support on a part-time basis.  I don't know the going rate for high-quality, vastly experienced legal secretaries (law firms pay by annual salary, not by hour), but propose $50/hour for her.  VVM can pay her directly or can pay her rate as a disbursement through me -- whichever is easiest on your end, just let me know.  Pam is also arranging the necessary equipment for her.  Once settled, I will begin to look for a full-time assistant.

On the issue of pay, I appreciated your email requesting my account information so that VVM can pay me.  I need to incorporate and establish a corporate bank account before being paid, which I will do this weekend.  If you agree, I will send an invoice for February and March as soon as the corporate account is active and those amounts and future monthly retainer fees as well as disbursement payments can be directly wired into that account.  Please let me know if I should direct the fee invoice and disbursement requests to you or someone else.

In sum, it was time well spent and a pleasure to get to know Scott and to learn more about VVM, and I am looking forward to moving into the Seattle Weekly offices.

Best,

Liz

--
Liz McDougall
General Counsel
Village Voice Media Holdings, LLC

6E



**From:** Andrew Backpage
**Sent:** Tuesday, September 25, 2012 6:18 PM
**To:**

**Cc:** Carl D18492-P18587; Tamara 18578; Joye 18570; Dan Hyer 18489; Liz McDougall
**Subject:** updated terms list 092512
**Attachments:** banned092512.xls

All:

Here's an updated list of banned terms in the Adult Section.

Andrew Padilla
Backpage.com
Operations Manager
Phone:
Fax:

1

App.000368

6F

| | |
|---|---|
| 2 plays | |
| 3 openings (variations) | |
| 3 way | |
| 69 as a term (not as age) | |
| all doors open | |
| all the way | |
| anal | |
| ass up panties down | |
| back door | |
| bang | context |
| bareback | |
| barely legal | alert |
| bend me over | |
| blow job, bj, beejay, bbbj | |
| boning, bone (variations) | |
| boyfriend experience - bfe | |
| brain (act) | |
| brain doctor | |
| brown eye | |
| brown shower | |
| bukkake | |
| cardate | |
| cim (cum in mouth) | |
| climax | context |
| cock | |
| condom (variations) | |
| cum (variations) | |
| cunt | |
| daty | |
| deep throat | |
| dick | |
| dildo | |
| doggie style | |
| double pentration | |
| ejaculation | |
| everything on the menu | |
| face down ass up | |
| face special | |
| felatio | |
| fisting | |
| foreign languages (variations) (act) | |
| freak (act) | |
| fuck | |
| fuck buddy | |
| full | context |
| full release | |
| full service | |
| gag relex | |
| get off | |
| girlfriend experience, gfe | |
| give it to me (variations) | |
| golden showers | |
| greek (variations) | |
| hand job, hj | |
| happy ending | |

App.000369

BP-PSI-052284- A1
Document Native File Produced to PSI

| hard | context |
| head doctor (variations) | |
| highschool | alert |
| holes | |
| human trafficking | alert |
| in bed (variations) | |
| inclusive | |
| inside me | |
| kitty | |
| let me sit on it | |
| lick | |
| load | context |
| lube (variations) | |
| make love | |
| milking | |
| missionary | |
| multiples, multi | |
| no restrictions | |
| nut (act) | |
| nympho | |
| on my knees | |
| oral | |
| orgasm | |
| pegging | |
| pops | |
| porn star experience - pse | |
| pound (act) | |
| prostitute | |
| pussy | |
| quicky | |
| rape | alert |
| ride | context |
| ripe | alert |
| school girl | alert |
| sexual | context |
| sloppy | |
| slut | |
| squirting | |
| strap on (variations) | |
| sucking | |
| super soaker | |
| swallow | |
| taste me | |
| teen | alert |
| teenage | alert |
| tender | alert |
| tongue massage | |
| transexual experience - tse | |
| trip to the islands (variations) | |
| uncovered services | |
| vagina | |
| virgin | alert |
| wet | |
| whore | |
| xxx | |

BP-PSI-052284- A2
Document Native File Produced to PSI



Ex. 7

**00**

Larkin also announced the addition of Scott Spear, as the *NEW TIMES* marketing director, and Jerry Jankowski as the new Art Director.

Spear, 29, will develop new outlets for the free newspaper, which currently is distributed throughout downtown Phoenix, on all area campuses and in more than 700 retail outlets in the Valley, including Scottsdale, Tempe, Mesa and Glendale.

Before joining the newspaper, Spear was president and general manager of World Records, Inc.; general operations manager at Compton Terrace; operations manager for P.S.R. Corp., which handled recording artist Jerry Riopelle, and a commercial real estate agent for Arnold Cook Real Estate, Ltd.

"Scott's broad experience in a variety of businesses in Phoenix make him particularly valuable to the newspaper," Larkin said. "Besides pinpointing new markets for the paper, he will help us maximize this latest expansion."



Ex. 8

| From: | Ernie Allen |
|---|---|
| Sent: | Friday, July 19, 2013 2:49 PM |
| To: | 'Yeager, Joyce' |
| Cc: | 'Sheree Reece'; 'jonathan.bell@cor.org' |
| Subject: | RE: Kansas Contacts on Slavery and Human Trafficking |
| Attachments: | Talking Points.NAAG Letter on CDA July 24, 2013.docx; NAAG Letter on CDA.Sample Release July 24, 2013.docx |

Joyce:

Thank you for the introduction.

Sheree, Jonathan:

It is great to meet you, albeit via e-mail.  Let me provide a little background on what we are trying to accomplish.  As Joyce mentioned, I am trying to assist Missouri AG Chris Koster and his office through informing and mobilizing anti-trafficking NGOs and concerned organizations in connection with the release of a letter next week calling upon Congress to amend the Communications Decency Act (CDA).

I retired as President of the National Center for Missing & Exploited Children last November after 28 years.  I am continuing to serve as President of our International Centre.  For many years, I have focused on the movement of human trafficking from the streets to the Internet.  Five years ago, I worked closely with the AGs in the effort to address the sale of kids for sex on Craigslist, ultimately leading to the shut-down of their adult ads.

Two years ago I met with the owners of Backpage, the next largest site, in an effort to undertake a similar process.  After a tense exchange, one of their owners said to me, "we will do everything we can to keep kids off our site, but adult prostitution is none of your business."  I responded, "well, at least you know what business you are in."  Backpage is not going to do what Craigslist did.  In fact, in my multiple meetings with their owners, board members, legal counsel, etc., they make it very clear that they will not.  In fact, they just announced that they are taking Backpage global.  They also feel that they are bullet-proof, effectively having both civil and criminal immunity.  And there are many other sites in the same business.

Two years ago, I met with Attorney General Eric Holder on this.  The sites were blatant.  The young women in the ads were nude, there were graphic images of sex acts, and there was advertising and links to the so-called "John boards," like Erotic Review, which provide detailed reviews of the services provided by each young woman.  I asked how anyone could argue that the operators of these sites didn't know the purpose for which they were used.  The Attorney General sent some Criminal Division prosecutors over to meet with me, and I laid out my arguments.  They concluded that the mens rea standard (the legal standard that requires that an act be knowing and intentional) could not be overcome for a site like Backpage which by that time had eliminated nudity in the ads, eliminated pornographic images, stopped links to the John boards, and was making a good faith effort to screen, monitor and report.  However, they indicated that they agreed with my analysis regarding some of the smaller, sexually oriented, more blatant sites, and they agreed to investigate.  However, I was also told that they felt that state prosecutors could do this more easily than the federal government.

So, I began to speak to state AGs and District Attorneys.  I met with a lot of them.  What I found is that there are a number of prosecutors who are eager to bring these prosecutions and think they are a "slam dunk."  However, they feel that they are barred by the language of Section 230 of the Communications Decency Act, which effectively creates preemption for the federal government and precludes state prosecutions.  The latest estimate is that Backpage alone is

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000212

Ex. 9

making $5 million per month on these ads, and have become the information infrastructure for the prostitution and child trafficking industry in this country, and increasingly the world.

There is not great enthusiasm in Congress for touching the CDA.  However, Joyce's boss, Chris Koster, the AG of Missouri, has drafted a letter, joined by the AGs of Washington and South Dakota, which proposes a narrow, surgical, two-word amendment, simply to make it clear that states are able to proceed criminally in these cases if the facts make it appropriate.  That letter is being circulated via NAAG to every state AG.  General Koster's staff asked if I would mobilize anti-trafficking NGOs to generate statements in support of the letter on the day it is released, July 24th.  I am trying to do that.

A number of the NGOs with whom I have spoken asked for talking points, and several even asked that I give them a sample release.  I have done that (attached).

I am very hopeful and encouraged about this effort.  The letter has already been joined by the Attorney General of Kansas, and more than 30 other AGs.  I hope you will do what you can to help us mobilize NGOs and the faith-based community to issue statements and releases in support of this important action.

Thanks,

Ernie

Ernie Allen
President & CEO
International Centre for Missing & Exploited Children
1700 Diagonal Road, Suite 625
Alexandria, VA 22314
(703)837-6305
Eallen@icmec.org


-----Original Message-----
From: Yeager, Joyce [mailto:Joyce.Yeager@ago.mo.gov]
Sent: Wednesday, July 17, 2013 1:11 PM
To: Ernie Allen
Cc: 'Sheree Reece'; 'jonathan.bell@cor.org'
Subject: RE: Kansas Contacts on Slavery and Human Trafficking

Ernie, I also hoped to put you in contact with Sheree Reece and Jonathan Bell at UMC Church of the Resurrection (COR).  I am copying them on this message.  COR has multiple congregations in Kansas and Missouri.

Sheree and Jonathan, Ernie Allen is coordinating information flow among non-profits and the faith community pertaining to the potential amendment of the Communications Decency Act (CDA).  I spoke briefly with Sheree about the largest advertiser in this field, Backpage.  (Sheree, I also spoke with Debie Nixon about this.)  I thought of the involvement of COR and the UMC in the human trafficking arena and thought you might be interested in connecting to discuss the way in which these issues overlap with this potential amendment of the CDA.

Best personal regards to all.


Joyce Yeager
joyce.yeager@ago.mo.gov
573.751.6733

2

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Assistant Attorney General, Consumer Protection Division Missouri Attorney General's Office PO Box 899 Jefferson City, MO  65102

This email message, including the attachments, is from the Missouri Attorney General's Office. It is for the sole use of the intended recipient(s) and may contain confidential and privileged information, including that covered by § 32.057, RSMo.  Any unauthorized review, use, disclosure or distribution is prohibited.

If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.  Thank you.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000214**



Ex. 10

# EXHIBIT M

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura, Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorney for Scott Spear*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>vs.<br><br>Scott Spear, *et al*.,<br><br>            Defendants. | Case No. CR18-00422-PHX-DJH-003<br><br>**DEFENDANT SCOTT SPEAR'S MOTION FOR RELEASE PENDING APPEAL AND/OR FOR SELF-SURRENDER**<br><br>*(Assigned to the Hon. Diane J. Humetewa)* |

**I. SUMMARY/NO FLIGHT RISK OR COMMUNITY DANGER.**

The defendant, Scott Spear, seeks release pending appeal pursuant to 18 U.S. Code § 3143(b). Mr. Spear is a 73-year-old man who has lived the majority of his life in Phoenix Arizona, has no criminal history, but does have long-standing serious and permanent physical and mental health concerns. As the Court is aware, Mr. Spear was extended on his release status after conviction but pending sentencing without objection by the government. Pursuant to 18 U.S. Code § 3143(a), such release pending sentencing requires a judicial finding that there be a 'substantial likelihood a motion for acquittal or a new trial will be granted', and that by 'clear and convincing evidence that the person is not likely to flee or pose a danger to any other person in the community'. This Court did grant some but not all of Mr. Spears Rule 29 Motion For

Acquittal. Based on the Court's finding then, and by the recently filed pretrial services report (DOC. 2142) and the presentence report filed July 29, 2024 (DOC. 2120) confirming he is and never has been a flight risk or danger to the community, Mr. Spear is demonstrably not a flight risk or a danger to the community. The government's failure to object is an admission that no flight risk or community danger exists.  As a result, the only criteria to be met to allow Mr. Spear's release pending appeal is whether the appeal '[it] is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial...' 18 U.S.C. § 3143(b)(i)(ii). This Court has seemingly already acknowledged this case presents "substantial issues that have to be considered by the Ninth Circuit" (DOC. 2070 at 9:16-22), and thus meeting the *Handy* criteria for release.

## II.     SUBSTANTIAL ISSUES ON APPEAL.

In the Ninth Circuit, 'substantial questions' are those that are only "fairly debatable" or "fairly doubtful" United States v. Handy, 761 F.2d 1279, 1281 (9th Cir. 1985). It is a simple inquiry whether an issue on appeal "is one of more substance than would be necessary to a finding that it was not frivolous." 761 F.2d at 1283. It does not require a Court to critique his own rulings, but merely to acknowledge the appellate issues raised are not frivolous. *See, United States v. Garcia*, 340 F.3 1013, 1020 n.3 (9th Cir. 2003); Handy, 761 F.2d at 1280-81. It seems beyond question there are numerous appellate issues that can or will be raised that are not frivolous, fairly debatable, and that will result in a dismissal of the charges and/or a new trial if granted by the appellate court.

As of August 20, 2024, there are 2142 docket entries in this case that began approximately March 28, 2018. Many of these docket entries are motions filed by the defense, or responses filed by the defense in regard to motions filed by the government. Mr. Spear cannot possibly articulate all of the potential appellate issues from these pleadings easily meeting the "*Handy*" standard, but there are many. Some of the most obvious appellate issues that would cause dismissal and/or a new trial if successful are, in addition to the issues raised by defendants Brunst and Lacey, which Mr. Spear joins:

### A. The Indictment And The Trial Evidence Violated The First Amendment.

1) Defendants Spear, Brunst and Lacey filed their **Defendants' Motion To Dismiss Indictment** in April/May 2019 (DOC. 539/561) alleging that the government's theory of

prosecution was fatally deficient because it violated the First Amendment, that the indictment failed to allege the requisite *mens rea*, and that the Travel Act as applied in the indictment was unconstitutional. The ACLU (DOC. 625) and the DKT LIBERTY PROJECT, CATO INSTITUTE and REASON FOUNDATION (DOC. 624) filed Amicus briefs joining in opposing the unprecedented attack on the First Amendment that the government's indictment presented. This motion challenged the essence of the government's indictment, and its ultimate evidence presentation at trial, in that it: 1) impermissibly presumed that ads are illegal; 2) attempted to use so-called 'notice' evidence as a basis of imputing knowledge; 3) attacked traditional, protected publisher functions; 4) attacked legitimate efforts to promote or advertise a website to users; 5) failed to allege any requisite *mens rea;*  6) failed to allege the required specific intent; and 7) that the Travel Act was unconstitutional as applied in the indictment. The indictment's factual allegations and conclusory assertions of criminal law violations were contrary to core First Amendment law, and to Federal District and Circuit Court decisions that determined the same or similar ads on Backpage (and Craigslist previously) being targeted by the indictment were protected First Amendment speech. *Backpage.com v. Dart*, 807 F.3rd 229 (7th Cir., 2015); *Backpage v. Cooper*, 939 F.Supp. 2d 805 (M.D. Tenn. 2013); *Dart v. Craigslist*, 665 F.Supp. 2d 961 (N.D. Ill. 2009); *Backpage v. Mckenna*, 881 F.Supp. 2d 1262 (W.D. Wash. 2012); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002; *Smith v California*, 361 U.S. 147 (1959). Obviously, if the Ninth Circuit determines the indictment does violate the First Amendment, dismissal of all charges will result;

2) Defendants Spear, Brunst and Lacey filed their ***Defendants Motion To Dismiss Indictment Based On Section 230 of the Communications Decency Act ('CDA 230') or, Alternatively, As Void For Vagueness*** in October, 2019 (DOC. 783) alleging that the government's use of the Travel Act to allege a violation of state crimes was prohibited given that CDA 230 disallows state law prosecutions of publishers such as Backpage. Alternately, if the government were allowed to attempt to bootstrap state law prosecutions under cover of the Travel Act, such attempt would impermissibly make CDA 230 void for vagueness. *United States v. Skilling*, 561 U.S. 358 (2010). In the present prosecution, the government asserts that State prostitution or other types of sex crimes statutes formed the basis of the Travel Act violation in Federal Court. The vagaries of CDA 230, designed to protect publishers like Backpage and its

executives from unwarranted prosecutions when they are publishers of presumptively protected speech contained in the ads published by third parties. Of course, if this motion is found to be well taken by the Ninth Circuit, the indictment would be dismissed, and convictions reversed against all defendants;

3) Defendants Spear, Brunst and Lacey filed their ***Defendant's Joint Motion To Dismiss Indictment For Grand Jury Abuse or, In The Alternative, For Disclosure of Grand Jury Transcripts*** in October, 2019 (DOC. 782) alleging that the government engaged in misconduct before the grand jury, by its assertions that defendants engaged in child sex trafficking, misstated the evidence upon which the charges were based, and misstated the law applicable to the charges against the defendant by ignoring the First Amendment and the requisite *mens rea*. This motion was based on the allegations contained in the indictment including repeated assertions that the defendants had engaged in child sex trafficking and knowingly publishing ads for sex with underage children when the government knew these allegations were improperly prejudicial and irrelevant to the charged Travel Act and money-laundering violations. The motion also asserted that the grand jury could not have been properly instructed on the presumptive legality of the speech contained in the charged ads and could not have been properly instructed about the required specific intent element given the allegations in the indictment. As the court is aware, a mistrial was granted in the first trial in this case based on the governments continued presentation of evidence asserting child sex trafficking notwithstanding the orders of the trial court. It was obvious on the face of the indictment, and obvious throughout the recently completed trial that the government's intention was always to avoid having to prove the required element of specific intent. <u>United States v. The Gibson Specialty Co.,</u> 507 F.2d 446, 449 (9th Cir. 1974).  If this motion is found to have been improperly denied, the indictment will be dismissed and the convictions reversed against all defendants;

4) Defendants Spear, Brunst and Lacey submitted their ***Defendants' Proposed Jury Instructions*** (DOC. 1896) in October, 2023. Among the numerous proposed jury instructions that the government opposed, and that the trial court refused to give and/or gave to such an inadequate degree as to be synonymous with refusal were the substantial number of proposed jury instructions on the First Amendment. The First Amendment was central to the defendants' defense. In addition to the trial court's preclusion of the defendants' ability to argue, cross-

4

examine and testify in regard to the First Amendment, the failure to adequately instruct the jury on the application of the First Amendment and the protections afforded by the First Amendment will be a key argument on appeal. If the appeals court decides the jury instructions on the First Amendment were inadequate or improperly omitted, a new trial as to all defendants on all counts would be ordered.

The trial court's jury instructions on the First Amendment adversely implicated the holding in *IMDb.com Inc. v. Bacarra*, 962 F.3d 1111, 1123 (9th Cir. 2020) which holds that implicated speech must be illegal on its face, and not merely suggestive of illegality and/or that might be used to facilitate illegality, "But as the Supreme Court has noted, 'it would be quite remarkable to hold that speech by a law abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third-party..." 962 F.3d at 1123; *Greater Philadelphia Chamber of Comm. v. City of Philadelphia*, 949 F.3d 116 (3rd Cir. 2020).

Mr. Spear should be released pending appeal.

RESPECTFULLY SUBMITTED this 23rd day of August, 2024.

**FEDER LAW OFFICE P.A.**

s/ Bruce Feder
Bruce Feder
*Attorneys for Scott Spear*

**KESSLER LAW GROUP**

s/ Eric Kessler
Eric Kessler
*Attorneys for Scott Spear*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Email: Humetewa_chambers@azd.uscourts.gov

Erin E. McCampbell, emccampbell@lglaw.com
Paul J. Cambria, pcambria@lglaw.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
Eric Kessler, Eric@Kesslerlawgroup.net
Bruce Feder, bf@federlawpa.com
*Attorneys for Defendants*

Kevin Rapp, Kevin.Rapp@usdoj.gov
Margaret Perlmeter, Margaret.Perlmeter@usdoj.gov
John Kucera, John.Kucera@usdoj.gov
Austin Berry, berry2.austin@usdoj.gov
Peter Kozinets, Peter.Kozinets@usdoj.gov
*Attorneys for United States of America*

By:  */s/ M. Evans*

# EXHIBIT N

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **United States of America** | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987) |
| **Scott Spear** | **No. CR-18-00422-003-PHX-DJH** |
| | Bruce S. Feder (Retained) |
| | Eric W. Kessler (CJA) |
| | Attorneys for Defendant |

USM#: 91634-408

**THERE WAS A VERDICT OF** guilty on 11/16/2023 as to Counts 1, 2-18, 52, and 53-62 of the Superseding Indictment.

**ACCORDINGLY, THE COURT HAS ADJUDICATED THAT THE DEFENDANT IS GUILTY OF THE FOLLOWING OFFENSE(S):** violating Title 18, U.S.C. § 371, Conspiracy, a Class D Felony offense, as charged in Count 1 of the Superseding Indictment; Title 18, U.S.C. §1952(a)(3)(A), Travel Act-Facilitate Prostitution, a Class D Felony offense, as charged in Counts 2-18 of the Superseding Indictment; Title 8, U.S.C. §1956(h), Conspiracy to Commit Money Laundering, a Class C Felony offense, as charged in Count 52 of the Superseding Indictment; Title 18, U.S.C. §1956(a)(1)(B)(i), Concealment of Money Laundering, a Class C Felony offense, as charged in Counts 53-62 of the Superseding Indictment.

**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is committed to the custody of the Bureau of Prisons for a term of **ONE HUNDRED TWENTY (120) MONTHS**, which consists of **SIXTY (60) MONTHS** on Counts 1-18 and **SIXTY (60) MONTHS** on Count 52, said counts to run concurrently; **SIXTY (60) MONTHS** on Counts 53-62 which shall run concurrent to Count 52 and consecutive to Counts 1-18. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **THREE (3) YEARS**, which consists of **THREE (3) YEARS** on Counts 1-18 and Counts 52-62, said counts to run concurrently.

The Court recommends that the defendant be placed in an institution or satellite with no higher than a medium security classification in or near Arizona.

The Court provides notice that the Defendant was not convicted of any offense under Chapters 109A (18 U.S.C. §§ 2241-2247) or 110 (18 U.S.C. §§ 2251- 2252C).

## CRIMINAL MONETARY PENALTIES

The defendant shall pay to the Clerk the following total criminal monetary penalties:

**SPECIAL ASSESSMENT:** $2,900.00   **FINE:** WAIVED   **RESTITUTION:** TBD

CR-18-00422-003-PHX-DJH                                    Page 2 of 5
USA vs. Scott Spear

The Court finds the defendant does not have the ability to pay a fine and orders the fine and the assessment pursuant to 18 U.S.C. 3014(a) waived.

The defendant shall pay a special assessment of $2,900.00 which shall be due immediately.

If incarcerated, payment of criminal monetary penalties are due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118. Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c). The total special assessment of $2,900.00 shall be paid pursuant to Title 18, United States Code, Section 3013 for Counts 1, 2-18, 52-62 of the Superseding Indictment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, (10) costs, including cost of prosecution and court costs.

Any unpaid balance shall become a condition of supervision and shall be paid within 90 days prior to the expiration of supervision. Until all restitutions, fines, special assessments and costs are fully paid, the defendant shall immediately notify the Clerk, U.S. District Court, of any change in name and address. The Court hereby waives the imposition of interest and penalties on any unpaid balances.

## SUPERVISED RELEASE

The drug testing condition is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

It is ordered that while on supervised release, the defendant must comply with the mandatory and standard conditions of supervision as adopted by this court, in General Order 17-18, which incorporates the requirements of USSG §§ 5B1.3 and 5D1.2. Of particular importance, the defendant must not commit another federal, state, or local crime during the term of supervision. Within 72 hours of sentencing or release from the custody of the Bureau of Prisons the defendant must report in person to the Probation Office in the district to which the defendant is released. The defendant must comply with the following conditions:

## MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance. The use or possession of marijuana, even with a physician's certification, is not permitted.
3) You must refrain from any unlawful use of a controlled substance. The use or possession of marijuana, even with a physician's certification, is not permitted. Unless suspended by the Court, you must submit to one drug test within 15 days of release and at least two periodic drug tests thereafter, as determined by the court.

CR-18-00422-003-PHX-DJH                                                    Page 3 of 5
USA vs. Scott Spear

## STANDARD CONDITIONS

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of sentencing or your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4) You must answer truthfully the questions asked by your probation officer.

5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

8) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

9) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

10) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

11) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

12) You must follow the instructions of the probation officer related to the conditions of supervision.

## SPECIAL CONDITIONS

The following special conditions are in addition to the conditions of supervised release or supersede any related standard condition:

1) You must submit your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search. You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. Failure to submit to a search may be ground for revocation of release. A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation. You must consent to and cooperate with the seizure and removal of any hardware and/or data storage media for further analysis by law enforcement or the probation officer with reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct. Any search will be conducted at a reasonable time and in a reasonable manner.

2) You must submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

3) You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

4) You are prohibited from making major purchases, incurring new financial obligations, or entering into any financial contracts over $500.00 without the prior approval of the probation officer.

5) You must participate in a mental health assessment and participate in outpatient mental health treatment as determined to be necessary by a medical or mental health professional and follow any treatment directions by the treatment provider. You must take medicine as prescribed by a medical professional providing mental health treatment, unless you object, in which event you must immediately notify the probation officer. You must contribute to the cost of treatment in an amount to be determined by the probation officer.

6) You must cooperate in the collection of DNA as directed by the probation officer.

7) You must not communicate or otherwise interact with any of the coconspirators without first obtaining the permission of the probation officer.

8) You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A, or any other statute authorizing a sentence of restitution.

9) You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines or special assessments.

CR-18-00422-003-PHX-DJH                                       Page 5 of 5
USA vs. Scott Spear

10)   You must consent, at the direction of the probation officer, to have installed on your computer(s)
      as defined at 18 U.S.C. § 1030(e)(1), including internet capable devices at your own expense, any
      hardware or software to monitor your computer use.

**THE DEFENDANT IS ADVISED OF DEFENDANT'S RIGHT TO APPEAL BY FILING A
NOTICE OF APPEAL IN WRITING WITHIN 14 DAYS OF ENTRY OF JUDGMENT.**

The Court may change the conditions of probation or supervised release or extend the term of
supervision, if less than the authorized maximum, at any time during the period of probation or
supervised release.  The Court may issue a warrant and revoke the original or any subsequent sentence
for a violation occurring during the period of probation or supervised release.

The Court orders commitment to the custody of the Bureau of Prisons and recommends that the defendant
be placed in an institution or satellite camp with no higher than a medium security classification in or
near Arizona.

The defendant shall self-surrender for service of sentence at the institution designated by the Bureau of
Prisons or United States Marshal by 12:00 PM on September 11, 2024.

Date of Imposition of Sentence:  **Wednesday, August 28, 2024**

Dated this 29th day of August, 2024.

Honorable Diane J. Humetewa
United States District Judge

**RETURN**

I have executed this Judgment as follows: _____

_____, the institution

defendant delivered on _____ to _____ at _____

designated by the Bureau of Prisons with a certified copy of this judgment in a Criminal case.

_____          By:    _____
United States Marshal                                      Deputy Marshal

CR-18-00422-003-PHX-DJH- Spear        8/28/2024 - 1:49 PM

# EXHIBIT O

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 27, 2023 |
| | ) 8:44 a.m. |
| Defendants. | ) |
| _____ | ) |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL – DAY 26**

**A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<pre>
 1                    A P P E A R A N C E S

 2    For the Government:
           UNITED STATES ATTORNEY'S OFFICE
 3         By:  Mr. Kevin M. Rapp, Esq.
                Mr. Andrew C. Stone, Esq.
 4              Mr. Peter Shawn Kozinets, Esq.
                Ms. Margaret Wu Perlmeter, Esq.
 5         40 North Central Avenue, Suite 1800
           Phoenix, Arizona  85004-4408
 6         kevin.rapp@usdoj.gov
           peter.kozinets@usdoj.gov
 7         andrew.stone@usdoj.gov
           margaret.perlmeter@usdoj.gov
 8         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 9         By:  Mr. Austin Berry, Esq.
           1301 New York Avenue NW, 11th Floor
10         Washington, DC  20005
           austin.berry2@usdoj.gov
11
      For the Defendant Michael Lacey:
12         LIPTSITZ GREEN SCIME CAMBRIA, LLP
           By:  Mr. Paul J. Cambria, Esq.
13         42 Delaware Avenue, Suite 120
           Buffalo, New York  14202
14         pcambria@lglaw.com

15    For the Defendant Scott Spear:
           KESSLER LAW OFFICE
16         By: Mr. Eric Walter Kessler, Esq.
           6720 North Scottsdale Road, Suite 210
17         Scottsdale, Arizona  85253
           eric.kesslerlaw@gmail.com
18         - and -
           FEDER LAW OFFICE, PA
19         By:  Mr. Bruce S. Feder, Esq.
           2930 East Camelback Road, Suite 160
20         Phoenix, Arizona  85016
           bf@federlawpa.com
21

22

23

24

25
</pre>

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
     BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
     By:  **Mr. Gopi K. Panchapakesan, Esq.**
          **Mr. Gary S. Lincenberg, Esq.**
     1875 Century Park E, Suite 2300
     Los Angeles, California  90067
     gpanchapakesan@birdmarella.com
     glincenberg@birdmarella.com
     aneuman@birdmarella.com

For the Defendant Andrew Padilla:
     DAVID EISENBERG, PLC
     By:  **Mr. David S. Eisenberg, Esq.**
     3550 North Central Avenue, Suite 1155
     Phoenix, Arizona  85012
     david@deisenbergplc.com

For the Defendant Joye Vaught:
     JOY BERTRAND, ESQ, LLC
     By:  **Ms. Joy Malby Bertrand, Esq**
     P.O. Box 2734
     Scottsdale, Arizona  85252-2734
     Joy@joybertrandlaw.com

UNITED STATES DISTRICT COURT

4

1                              **I N D E X**

2        **SUMMARY OF COURT PROCEEDINGS:**                    **PAGE**

3        Closing Arguments
             Government                                       6
4            Defendant Lacey                                 36
         Proceedings Outside the Presence of the Jury        35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2         (Court was called to order by the courtroom deputy.)

 3         (Proceedings commence at 8:44 a.m.)

 4         (Jury not present at 8:44 a.m.)

 5             THE COURT:  All right.  Are our jurors present,      08:45:07

 6     Liliana?

 7             MR. RAPP:  Could you give me just one second?

 8         (Brief pause.)

 9             THE COURT:  Okay.  All right.  We will wait for them.

10             THE COURTROOM DEPUTY:  Let me go check to see.       08:45:22

11             THE COURT:  Okay.  Thank you.

12         (Brief pause.)

13             THE COURT:  Okay.  We're waiting for one juror, who's

14     approximately five minutes out, and so Liliana will let us know

15     when she arrives.                                            08:47:42

16         (Brief pause.)

17             THE COURTROOM DEPUTY:  All rise.

18         (Recess from 8:48 a.m. to 8:58 a.m.)

19         (Jury not present at 8:59 a.m.)

20             THE COURTROOM DEPUTY:  All rise.                     08:59:15

21             THE COURT:  All right.  Please be seated.

22             Let's have the jury in.

23             All rise for the jury.

24         (Jury present at 9:00 a.m.)

25             THE COURT:  All right.  Please be seated.            09:00:35
```

```
 1          Welcome back, members of the jury.

 2          And, Mr. Rapp, whenever you're ready.

 3          MR. RAPP:  Thank you.

 4          We're in the homestretch.  Thank you for staying with

 5   me yesterday.                                              09:00:48

 6          Before we left, we were about to talk about

 7   conspiracy.

 8          Three elements to conspiracy.  There was an agreement

 9   between two or more persons to commit violations of the Travel

10   Act.  That's all we need, is two people.  But you know from the   09:01:01

11   testimony and the evidence that there were more than two.

12   There's these five defendants.  There's Mr. Ferrer.  Mr. Hyer.

13   There's Mr. Adams.  There's even Dollar Bill, Mr. Mersey.

14   There's David Elms, who was running The Erotic Review.  Those

15   were the conspirators.  Then every pimp who posted on          09:01:25

16   Backpage.com and used the money to run their criminal --

17   their -- their small criminal enterprise of prostitution, they

18   are your conspirators.

19          Defendant became members of the conspiracy knowing of

20   at least one of its objects and intending to help             09:01:50

21   accomplishment -- accomplish it.

22          What is the object in this case?  Well, one of the

23   object is to make money.  And they did.

24          And one of the members performed at least one overt

25   act for the purpose of carrying on the conspiracy.            09:02:05
```

1    What's the overt act?  Well, for a 14-year conspiracy,

2  there's probably a hundred overt acts per day.  Just turning on

3  the computer and engaging in moderation.  Going down and

4  meeting with NCMEC or Polaris, or whomever, and not disclosing

5  the internal prostitution marketing strategies.  Wiring money.    09:02:30

6  Those are the millions of acts that furthered this conspiracy.

7    The Travel Act.  So the conspiracy is to violate the

8  Travel Act.  They used the Internet with the specific intent to

9  promote or facilitate the promotion of any business enterprise

10 involving prostitution offenses in violation of state law.  Any    09:02:57

11 business enterprise.  The pimps, their own little business

12 enterprise.

13    Remember, we were asking questions of some of the

14 witnesses.  Well, what happened to the money?

15    Well, he used the money to pay for hotels.    09:03:15

16    Remember Jessika's Svengard?  He used the money to buy

17 clothes for me, to take pictures.  He used the money for my

18 hair, for my nails, for the gas for the car, to take me to

19 these dates where I engaged in acts of prostitution.

20    Defendant performed an act that did promote or    09:03:36

21 facilitate the promotion of any business enterprise involved --

22 involving prostitution offenses by publishing on Backpage the

23 ads listed in Counts 2 through 51.

24    Well, what's Counts 2 through 51?  Those are the

25 postings.    09:04:00

1           Let's just talk about a couple fundamentals of

2    conspiracy before we talk about the actual acts.

3           Conspirators do not have to make a formal agreement or

4    agree on every detail of the conspiracy.  In other words, they

5    don't sit around at a conference table and say, how are we          09:04:13

6    going to further this criminal enterprise?  It doesn't really

7    work like that.

8           It's not necessary for all members of the conspiracy

9    to join at the same time.  We heard that Mr. Padilla and

10   Ms. Vaught, in particular, came on later, 2009, 2010.  They         09:04:26

11   started Backpage in 2004.  They joined an ongoing conspiracy

12   and became the engine room of moderation.

13          One may became -- become a member of the conspiracy

14   without knowing the full knowledge of every detail.  Yeah, you

15   can be part of a conspiracy, and you don't have to know what        09:04:49

16   all the other co-conspirators are doing to further the

17   conspiracy.

18          Mr. Lacey might not know what a moderator in

19   particular is doing on a given day, and the moderator, in turn,

20   doesn't know that Mr. Lacey's going down to NCMEC or meeting        09:05:01

21   with the Auburn Theological Seminary.  They don't have to know

22   every detail.

23          You remember this posting.  This is Jessika Svengard.

24   This is a 2010 posting.  This is still very much part of the

25   conspiracy.  The conspiracy started in 2004.  This is one of        09:05:23

UNITED STATES DISTRICT COURT

1    the postings.  This is one of the victims that we put on the

2    stand that talked about this posting.  This is Exhibit 11 --

3    211c.

4            2036a.  This is the posting of Megan Lundstrom.  You

5    can hardly even see this.  You remember she got on the stand                09:05:45

6    and testified that, yes, I was -- I was prostituted for a

7    number of years.  She now, coincidentally, works for Polaris.

8    You remember her testifying.  She testified.  She was the last

9    witness.  She's part of the conspiracy.  Her posting was part

10   of the conspiracy.  The pimps that posted her on Backpage.com               09:06:02

11   are part of the promoting a business enterprise.

12           Andrea Benson.  You might remember Andrea Benson.

13   When she took the stand, she had a cold.  She had a master's

14   degree.  She talked about her involvement in -- in prostitution

15   acts.                                                                        09:06:26

16           Count 2.  These are now the substantive counts.  These

17   are the counts after March of 2013.  You might remember

18   Lieutenant Brian Griffin, Northborough, Massachusetts.

19   Remember he's outside of Motel 6 and he sees a couple women,

20   and he's -- he does vice investigations.  He investigates this.             09:06:49

21   Eventually he arrives at the hotel room, and he encounters a

22   woman by the name of Destinee Ortiz.  Do you remember?  And

23   they were engaged in prostitution.  In fact, there was actually

24   a john inside the -- the hotel -- the motel room.

25           This is Count 2.  And you could see -- this is                      09:07:10

Exhibit 212 and 212a.  You see some of the text in the -- in

the posting; incalls and outcalls, the 2 girl for 1 or 2 girl

special.  All indicative of prostitution.

On Count 2, these five defendants are guilty.

You remember this bit of testimony with Mr. Ferrer.                    09:07:34

He talked about this email exchange.  There's a number of email

exchanges between a woman by the name of Pamela Robinson.  Her

email address is clprovider@yahoo.com.  This is one of the

emails.  This is Exhibit 164.  She says:  I don't do this

because I want to.  I do it because I have to.                         09:07:58

And you can look at her postings.  Look at a few -- at

least one of them.  You will see all the indicators of

prostitution.  You also know from the email exchange she had

problems with them deleting her posts -- her picture.

So is there any question that this -- these postings          09:08:14

related to this woman are for prostitution?  Here is picture.

Count 2 -- or Count 3, rather.  This is a Pamela

Robinson posting.  You'll see the indicators here.  The 50 red

roses.  We heard testimony that 50 red roses is code for $50.

100 percent independent and safe.                                     09:08:41

This -- this is -- they have this term that you see in

a lot of these things because this is trying to give them, you

know, some type of plausible deniability and smoke out law

enforcement.  This is not an offer for prostitution.

All donations are for my time and companionship only.         09:08:56

1          We saw that in some form in a lot of the postings.

2     It's nonsense, though; right?  This is really for prostitution.

3          This is Exhibit 1737.

4          On Count 3, these five defendants are guilty.

5          Now, there's a series of Pamela Robinson postings all          09:09:11

6     basically saying the same thing.  The 50 red roses.

7          Count 7, Count 8, Count 9, Count 10, Exhibits 505,

8     507, 508, and 509, all taking place in Washington State.

9          Counts 11, 18, 25, 26, Exhibits 510, 511, 512, and

10    513.                                                          09:09:37

11         On the Pamela Robinson series of postings that are

12    part of the verdict in this case, the defendants are guilty.

13         Count 4.  This is Naiomy Figueroa.  You might recall

14    her.  She testified.  You might recall when she testified she

15    had something in her hand -- just so you can put this in          09:10:00

16    context.  I know it's been a couple months on a lot of

17    witnesses.  The thing broke in her hand, and she -- we had to

18    take a little break.  This is Naiomy Figueroa.  And she

19    explained, you know, that she was -- she had a pimp.  The pimp

20    posted her on Backpage.com.  She went through that in detail          09:10:19

21    with us.

22         This is Exhibit 214.  You'll see that also in her

23    posting at 214 is the incalls, indicative of prostitution.

24         These defendants on this Count 4 are guilty.

25         Naiomy Figueroa is also Count 5.  Same thing.  Same          09:10:35

1  postings.  Pictures indicative of prostitution.  Doing

2  30-minute specials.  She's actually in two places.  It becomes

3  a little bit in court; right?  She's being posted in two

4  different markets, Walpole and New Hampshire.

5         On Count 5, these defendants are guilty.                    09:10:57

6         You might remember this.  There was some testimony

7  between both Mr. Ferrer and Naiomy Figueroa.  They never laid

8  eyes on each other, but they talked about this individual by

9  the name of Nick Kristof.  And Naiomy, who went by the name

10 Emily in the Nick Kristof article, talked about this.  And so   09:11:18

11 did Mr. Ferrer.

12        Yes, Nick Kristof did an article on somebody named

13 Emily.

14        And then there's this email.  This is an email from

15 somebody, a producer who is doing a story on Nick Kristof's     09:11:32

16 documentary A Path Appears, which focuses on sex trafficking in

17 America.  And one of the scenes from the documentary, which was

18 filmed on February 3rd, 2014, Nick Kristof and others are

19 looking for a woman who is missing when they discover her

20 photographs in the -- in a listing in the adult services escort 09:11:52

21 section on Backpage.com in the Boston area of Walpole.

22        This gets forwarded up to Joye Vaught and to Andrew

23 Padilla.  They're put on notice of this particular broadcast

24 and this particular victim.

25        Count 12.  Now, it looks like we skipped some counts,    09:12:13

but this is where the Pamela Robinson substantive counts have

come in, and now we're on Count 12.  And this is Astrid

Cervantes.  You might remember her.  Very long hair.  She

testified.  She also testified to the fact that she had been

prostituted.  She talked about her pimp and the money that was                09:12:33

spent on her.  Obviously the photographs are indicative of

prostitution.

          On Count 12, these defendants are guilty.  And this is

Exhibit 215a.

          This is somebody that Astrid Cervantes talked about.        09:12:55

This is Count 13.  This is both terms and images indicative of

prostitution.  You'll see that the deleted images of some -- of

the woman who is mostly nude, you'll also see that within her

ad tile was this reference to new in town.  And that becomes

somewhat significant.                                                 09:13:21

          On this Count 13, the defendants are guilty.

          You might remember -- let's talk about something in

relationship to Count 13.  You remember there was testimony

about this individual, Hemu Nigam.  Hemu Nigam was their safety

and security expert.  He came in 20- -- latter part of 2010.          09:13:37

Got them the meeting with Polaris and NCMEC.  And then, in the

words of Mr. Ferrer, he was put on a shelf.  They stopped

listening to him, and eventually they terminated the

relationship with him.  But he sends out -- in April of 2011,

he sends out a -- some recommendations.  And Scott Spear gets        09:13:59

these recommendations.  And one of the recommendations is new

in town is indicative of prostitution.  And they -- they let

them know, hey, your moderators should know about this.  Here

it is.  New in town.

Count 14, the defendants are guilty.

New in town.  This is Exhibit 215.  This is, again,

another Astrid Cervantes new in town.

Count 15.  Guilty.

Count 16, this is Breahannah Leary.  You might

remember Breahannah Leary.  She talked about how she was

prostituted out.  These are her postings.  Obviously indicative

of -- of prostitution.  You can see the postings on my left.

Those are the ones that actually make it.  The ones are deleted

images on the right.  The difference is almost inconsequential.

Those are what the moderators are deleting.  The other ones

also very much indicative of prostitution.  They allow those to

be posted.

On Count 16, the defendants are guilty.

Count 17, another Breahannah Leary one.  Same type of

images.  Same type of -- of text of -- of -- of coded terms

in -- in her text.

Count 17, the defendants are guilty.

Count 19.  This is a couple of counts.  The images are

obviously indicative of prostitution, a woman in a -- in

lingerie.  The texts are very -- also indicative.  They also

UNITED STATES DISTRICT COURT

1  have this -- this sort of CYA thing that they put in -- often

2  the pimps put in the postings, by contacting me, you agree that

3  you are not affiliated with any form of law enforcement.

4  　　　　That's to smoke out law enforcement coming after them.

5  　　　　On Count 19, the defendants are guilty.　　　　　　　　09:15:56

6  　　　　Count 20 is the same person as featured.  Same coded

7  terms.  Same images.  Deleted images indicative of

8  prostitution.

9  　　　　On Count 20, the defendants are guilty.

10 　　　　Counts 21.  This is Jordan Thurman.  Do you remember  09:16:12

11 she testified.  Terms within her posting indicative of

12 prostitution.  100 percent in- -- independent.  Incalls only.

13 　　　　She talked about her -- herself engaging in

14 prostitution acts.

15 　　　　The defendants are guilty on Count 21.　　　　　　　　09:16:32

16 　　　　Mr. Spear, Ms. Vaught, and Mr. Padilla absolutely,

17 because of their involvement in moderation, Mr. Spear directing

18 moderation, they know what incall/outcall know -- means.

19 　　　　But what about Mr. Lacey?  Remember, if you go back --

20 this is Exhibit 113a.  This is the article he's writing called  09:16:53

21 Backpage Understood.  He actually acknowledges -- even up at

22 his level, as a majority owner, he knows what incall and

23 outcall means.

24 　　　　This is Count 22.  Another Jordan Thurman count.

25 Defendants are guilty of this count as well.　　　　　　　　　09:17:14

1    Anya Beck.  You might remember her.  She was the young
2    woman.  She wore a -- a black -- a turtleneck.  She testified
3    that she had a pimp.  The pimp would take all the money.  He
4    would then, in turn, use that money -- he had no other
5    legitimate employment.  He would use that money to buy things          09:17:35
6    for her that were in furtherance of her prostitution acts;
7    hotels, gas for cars, stuff that would -- that she could wear
8    during -- when he was taking pictures.
9         On -- on Count 23, the defendants are guilty.
10        Count 24.  This was -- this is Exhibit 221.  This          09:17:58
11   is -- shows outcalls only.  Indicative of prostitution.
12        Now, the -- the person featured in this ad didn't
13   testify, but her sister testified.  If you remember that, she
14   testified, yes, I saw her buying Vanilla Visa cards.
15        I saw her going on dates where she would come out and          09:18:21
16   she -- I would observe her with money.  I actually did see her
17   posting on Backpage.
18        You might remember her testimony.  Defendants are
19   guilty on this count as well, Count 24.
20        Now let's talk about the girlfriend experience and the          09:18:37
21   porn star experience.  You heard lots of evidence as that these
22   two coded terms are indicative of prostitution.  And at one
23   point they stripped them out.  Okay?  That doesn't mean the ads
24   weren't for prostitution; right?  That means that we know
25   they're for prostitution.  Let's take them out and then post          09:18:55

1  the ad.  So it went back and forth.  But -- but GFE and PSE are

2  indicative of prostitution.

3      And this is an ad between Mr. Padilla and Mr. Ferrer:

4  Should I put the cruded look for misspellings of these or start

5  to remove the stuff that happened before I stripped out the          09:19:14

6  terms, because that will mean that I have to edit every ad on

7  the site?

8      Here's another exhibit, 201.  No act for money.  No

9  coded sex -- this is with Scott Spear:  No coded sex act for

10 money.                                                                09:19:30

11     Take out these terms.  GFE and PSE.

12     This is into 2016.  As far as I'm aware, we're no

13 longer removing ads for GFE.  I only saved the specific

14 example, but I've seen multiple removed ads where appears GFE

15 was the removal cause.                                                09:19:50

16     Now, they're just kind of adding it back in,

17 Exhibit 198.  But, to be clear, when they were taking it out,

18 it was still an ad that was strongly indicative of

19 prostitution.  This is an email that Joye Vaught is on.

20     Here's another one, Exhibit 199.  Andrew and I talked          09:20:01

21 about the GFE thing.  Going forward, we will not be removing

22 ads for GFE or any variation of GFE.  If you have any

23 questions, please let me know.

24     Another one.  This is March 25th of 2016, 18 --

25 Exhibit 1819.  We've identified a few more terms that are             09:20:22

UNITED STATES DISTRICT COURT

1  allowed but your team is removing.  Hey, you need to keep these

2  in.

3          Joye Vaught and Andrew are both on this ad.  This is a

4  smoking gun.  This note -- this demonstrates that they know

5  that these terms are for prostitution.                          09:20:35

6          Counts 27 through 31.  These -- each one of these ads

7  has GFE or PSE in it.  You'll see that.  Exhibit 17, 18, 19,

8  20, 21, and then Exhibit 1735.  Counts 27, 28, 29, 30, and 31.

9  All of these have references to GFE.  Some of them, as you see

10  the one down there on the bottom, Count 31, this also has --    09:21:05

11  and I'll talk about this in a minute.  These also -- some of

12  these ads also have references to The Erotic Review, which, as

13  we know, is 100 percent prostitution.

14          On these ads, 27 through 31, these defendants are

15  guilty.                                                         09:21:23

16          Counts 30 and 33.  These, again -- again, these

17  also -- this is 1721 and 1723.  These have the GFE, but they

18  also have -- they have incall and outcall.  They also have --

19  30 and 33 have a TER profile.  This is Exhibit 1953.

20          Do you see that?  Reviews.  These are the reviews that  09:21:44

21  correlate to those counts, 30 and 33.

22          Counts 32 through 36.  These are all GFE/PSE ads.

23  Some of these actually have the 30 minutes for $180; one hour

24  $200.  All indicative of prostitution.  Exhibit 1722, 1723,

25  1724, 25, and 26 support these counts.                          09:22:11

1    On these counts, Counts 32 through 36, the defendants

2    are guilty.

3    Counts 37 through 41.  They're guilty on these counts

4    as well.  37 -- Counts 37, 38, 39, 40, 41, all PSE counts.

5    Exhibits 17, 27, 28, 29, 30, and 31.  They also have some    09:22:32

6    references to new in town.

7    Counts 42 through 46.  Once again, GFE and PSE ads.

8    42, 43, 44, 45, 46 all have references to GFE or PSE in their

9    ads.  Exhibits 1732, 33.  Exhibit 223, 20 -- 224, 225.

10    They're guilty on these counts as well.    09:22:55

11    47 through 51.  All GFE/PSE postings.  Exhibit 226,

12    227, 228, 229, 230.  You will see that some of these counts are

13    not entirely in the escort section.  They are in the

14    therapeutic massage.  You recall from Brad Myles, his testimony

15    that this is where you saw a lot of prostitution.  You can look    09:23:23

16    at those ads.  You can see the indicators that he talked about

17    during his testimony present in those ads.

18    They're guilty on Counts 47 through 51.

19    Here is 49.  Here's an example of a TER review.  See

20    this?  Goes -- goes to the review.    09:23:44

21    19- -- Exhibit 288 and 1967.  This is in 2018.  So if

22    there's any question that this relationship, this -- this

23    allowance of the reference to TER remained beyond 2010, all the

24    way up to 2018.  You would find references to The Erotic

25    Review.    09:24:08

1          Here's 49.  And here's the actual review.  1967b.

2          So on the conspiracy, the conspiracy to violate the

3   Travel Act, each one of those postings we looked at are in

4   furtherance of this conspiracy.

5          Michael Lacey, Scott Spear, John "Jed" Brunst, Andrew          09:24:26

6   Padilla, and Joye Vaught are not only guilty of Count 2 through

7   52, but they are guilty of Count 1, the conspiracy.

8          Money laundering.  What did they do with all this

9   money; right?  We said at the beginning, when it's not about

10  the money, really it is about the money.  Well, they had to do   09:24:49

11  something with this not inconsequential amount of money.

12  $100 million.  In 2014 at their peak, almost $140 million.

13  What are they going to do with it?

14         Well, moving money that is dirty, that is derived from

15  a criminal offense, like a violation of the Travel Act, like     09:25:12

16  running a criminal enterprise, which Backpage was.  They either

17  used the money to continue to promote the website, they plow it

18  back in, take the money, just like any legitimate business

19  takes the revenue and they put it back in to -- to grow it.

20  They did it here.  They have to conceal it.                      09:25:35

21         You heard lots of evidence that they were having

22  banking issues, so they have to engage in activities that

23  conceal the origin, the source, the nature of that money.

24         And transactional.  They're just spending the money.

25  Just transferring the money to themselves is transactional       09:25:57

1    money laundering.

2           So let's talk about it.

3           Well, we know that MasterCard, Visa, and American

4    Express shut them down.  Can't use them.  So they had to --

5    they had to pivot; right?  They had to find some other way for      09:26:10

6    credit processing.

7           Those methods stopped after 2015, so they had to

8    switch to money orders, to Bitcoin, to both gift cards and the

9    Visa cards.  You heard even when they had credit card

10   processing -- remember this company Litle?  This -- the credit      09:26:34

11   card company Litle said, hey, 70 percent of your transactions

12   are these Visa cards, are these Vanilla Visa cards with

13   nobody's name on it.  So they already knew that -- that this is

14   what their customers were using.

15          You could see here -- this is Exhibit 17- -- 178a.          09:26:53

16   This is in 2014.  Dear Jed, please be advised that we've

17   elected to close your account with us.

18          This is US Bank.  This is 6189.  This is a defense

19   exhibit.  It's interesting.  It's a merchant application form.

20   This is where eMerchantPay, this is where they had to go           09:27:13

21   overseas, in this case, United Kingdom, to find credit card

22   processing.

23          Mr. Lacey, of course, is the beneficial owner.

24   Mr. John Brunst, as the -- also as a beneficial owner.  Here he

25   is as the director.  Cereus Properties' email address.  We'll      09:27:33

UNITED STATES DISTRICT COURT

1   talk about that in a bit.  This is -- this is important.

2   Because remember what Jessika Svengard said.  Remember what

3   Anya Beck said, and others:  We -- to -- to -- to really get

4   the phone calls, we had to move it to the top.  We had to move,

5   refresh, auto repost, and we had to pay for that.  We had to          09:27:56

6   pay to have our ad moved to the top.

7          And this is exactly what Mr. Brunst is saying in this

8   application.  Ads and premius -- premium placement option.

9   This means move to the top.

10         Here he is again.  This is Mr. Brunst.  This is 2015.          09:28:15

11  This is even after he sold -- this sort of shows the control

12  that Mr. Brunst, in particular, but also Mr. Lacey and

13  Mr. Spear, as the owners who unloaded it, still had over this

14  website.  Here they're saying to this person at BDO, which is

15  this consulting company:  Move to the top and re- -- and auto          09:28:39

16  repost.  Customers now only pay for premium upgrade features

17  such as those.

18         And -- and we know that.  Why?  Because also Eric

19  Murry, who testified, Exhibit 2044, he talks about move to the

20  top listings and how important that is.  So Mr. Brunst has a          09:28:58

21  real understanding.  Of course, he does.  He's the chief

22  financial officer.  He knows where the revenue is generated.

23         But we -- again, we know from these two women, and

24  others who testified, Jessika Svengard and Anya Beck.  Remember

25  Anya Beck said:  Yeah, I didn't actually post- -- I didn't pay          09:29:16

1   to post my ad.  I didn't pay.  We only paid in 2015 to move it

2   to the top.

3          All right?  And, remember, everybody really didn't

4   know what revenue Backpage was generating.  Remember there was

5   this AIMS report.  They sort of -- Backpage ownership and          09:29:33

6   Mr. Ferrer, they were sort of happy that they under-reported

7   their revenue.  They said:  We only made 20 million that year.

8   We made quite a bit more because they didn't know about the

9   charges we made for the move to the top.

10         Buy credits.  This is Mr. Ferrer and Mr. Brunst.  This     09:29:54

11  is where you had to buy credits.  And remember Mickey Hansen

12  testified this -- as this -- to this as well from

13  MasterCard [sic]:  Hey, they have this system of buying

14  credits.

15         And he kind of smoked that out on them.  Hey, what are     09:30:17

16  you using our cards for buying credits?

17         And this is an email exchange between Mr. Brunst and

18  Mr. Ferrer about rolling out buying credits.  We'll roll out

19  this in coming week to Backpage sites.

20         And who talks about this?  Well, Anya Beck does in her      09:30:35

21  posting, buy credits.  Oh, you know, I remember that.  I

22  remember, when I asked her:  Is it your testimony that you

23  recall going somewhere you would use this?  It references buy

24  credits.  You would purchase some type of credits to post your

25  ads?                                                               09:30:52

1        Well, no, not to post my add.  I didn't have to pay to

2   post it.

3        But to have it, like, stay at the top or keep it moved

4   up?

5        Yes.                                                        09:30:59

6        There's a direct line between this email Mr. Brunst

7   and Mr. Ferrer are having and Anya Beck on the buying of the

8   credits.  And this is -- this is the alternative now.  This is

9   what they have to do because they're not getting banking.

10       Mr. Brunst.  Is there any question Mr. Brunst doesn't       09:31:12

11  know about the content of the website where he was the CFO?

12  Didn't we go down to the Mauritius path once and the banks had

13  the same issue with our content?  Do we have a bank that we

14  know will take the transactions?

15       Exhibit 792.                                                09:31:31

16       They eventually switch to cash, right, because they

17  couldn't get banking.  And to prostitute bought ads on

18  Backpage, they paid with money orders, the money orders were

19  deposited to shell company bank accounts, and the money was

20  moved to other Backpage shell companies.  All about the        09:31:48

21  concealment of money laundering.

22       All right.  Counts 53 to 62.  Defendants conducted a

23  financial transaction involving property that represented the

24  proceeds of the violations of the Travel Act.  Plain English,

25  defendants sent Backpage funds to another bank.                 09:32:09

1    Now, you want to look at your notes.  Exhibit 1479.

2  This is the summary chart of all the money laundering counts.

3  And with testimony of Quoc Thai, it demonstrates that the funds

4  were wired from Website Technologies.  They changed Backpage to

5  Website Technologies to conceal the fact that Backpage was                09:32:29

6  actually receiving the revenue to Cereus Properties.  And what

7  do we know about Cereus Properties?  Mr. Brunst was in charge

8  of Cereus Properties.

9    Second, the defendants knew that the property

10  represented the proceeds of some form of unlawful activities.           09:32:42

11  The plain English is this.  The defendants knew -- they knew

12  that their money was coming from Backpage.com.  It was coming

13  from the female escort section.

14    The defendants knew that the transaction was designed,

15  in whole or in part, to conceal and disguise the nature, the            09:32:59

16  location, and, importantly, the source, ownership, or control

17  of the proceeds of the specified unlawful activity.  Defendants

18  knew that the funds from Website Technologies in plain English

19  was revenue from Backpage.

20    Financial transactions.  This is a transaction                        09:33:18

21  involving the movement of funds by wire or other means that

22  affects interstate or foreign commerce in any way.

23    These funds were wired from the Website -- Website

24  Technologies' bank in Texas, where Backpage was now

25  headquartered because they couldn't get -- they couldn't get           09:33:35

1   a -- a property here to operate Backpage, and then it was wired

2   to the defendants' bank account in Arizona.  Here's how it

3   looks.  Either Bitcoin or money going through Website

4   Technologies to the bank.

5          And here's what Quoc Thai says:  All right.  You have          09:33:53

6   testified about Website Technologies.  I don't think we've

7   heard anything about Cereus Properties.  From your review of

8   the reports, do you have any understanding of what Cereus

9   Properties is?

10         Well, Cereus Properties appears to be an entity used          09:34:05

11   to pay the various payroll expenses.

12         This is the promotional money laundering.  Plowing the

13   money back in or the activity related to Backpage.com.

14         Do you know -- do you know if Cereus Properties had a

15   chief financial officer?                                           09:34:23

16         I do know that it was Mr. Brunst.

17         Okay.  Here's the counts, Counts 53, 54, 55, and 56.

18   These are wires from the Website Technologies to the Cereus

19   Properties bank account.

20         Counts 57, 58, 59, 60.  Once again, wires from Website       09:34:38

21   Technologies disguising the source of the money going to

22   Backpage, going to Cereus Properties, an account controlled by

23   Mr. Brunst.

24         For Counts 53 to -- through 62, these defendants are

25   guilty.                                                            09:35:02

 1          What's the next set of counts?  Well, the defendant

 2   transported money from a place in the United States to or

 3   through a place outside the United States or to a place in the

 4   United States from or through a place outside the United

 5   States.  The defendants acted with the intent to promote a          09:35:17

 6   violation of the Travel Act.

 7          So here's just one count.  This is Count 63.  And you

 8   remember Carl Ferrer's testimony.

 9          And did you pay for that feed?

10          These were those feeds they were putting on the site.       09:35:33

11   This is a payment to an India-based web developer.

12          We didn't pay for the feeds, but we had to pay to have

13   the feeds normalized.  That is what this developer did in India

14   and his company, is that would take the feeds and put them into

15   a format that would be compatible for Backpage to import.          09:35:47

16          This $6,000 payment is promotional money laundering.

17   Count 63.

18          This is Defense Exhibit 5364.  This shows sort of the

19   web of concealment; right?  You see down here Backpage.com,

20   Website Technologies.  They -- they created all these holding      09:36:07

21   companies at the sale with the idea that they would actually

22   conceal the source of the money.

23          Here's this Ad Tech BV.  This is this Netherlands bank

24   company.  There was a bank account there.  Remember I asked

25   Mr. Ferrer:  Well, how many employees were over there?            09:36:27

1    We didn't have anybody.  This was just a shell.  And

2  when we sold this company, this was supposed to sort of conceal

3  the fact that it was Backpage income revenue.

4    So Count 64, this is this $5,000 payment.  You'll see

5  this in Exhibit 783.  This is from Jed Brunst.          09:36:43

6    Oh, this just appeared in our account today.  This is

7  part of the payment, $5 million.  Count 64.

8    Count 65, coming from the Netherlands to Cereus

9  Properties controlled by Mr. Brunst.

10    Same with Count 66, 67, 68.  The defendants are guilty  09:36:59

11  of those counts.

12    Now, transactional money laundering.  It's also the

13  easiest of money laundering because you just have to show that

14  this was money that was generated by Backpage.com from the

15  female escort section and then they did something with the    09:37:17

16  money.  They just transferred the money.  Monetary transaction.

17  Criminally derived property.  Worth more than $10,000.  Derived

18  from Travel Act violations.  It occurred in the United States.

19    The first element, any financial transaction involving

20  a financial institution.  This was from one bank to another.   09:37:37

21  All 69 through 70 -- 99 counts all involve bank transactions.

22    Was it criminally derived property?  Absolutely.  The

23  defendants knew the money was derived from criminal offense.

24  They knew, and we proved during the course of this trial, that

25  they obtained the money from Travel Act violations, the        09:37:59

UNITED STATES DISTRICT COURT

1    promotion of prostitution on Backpage.com.  Each one of these

2    transactions is in excess of $10,000.  And then all the money,

3    all the money had to be -- be derived, in whole or in part,

4    from Travel Act violations.

5         So Count 69 and 70.  This is from Backpage.com to          09:38:20

6    Camarillo Holdings and then from Camarillo Holdings to

7    Mr. Lacey.  This is a $30,000 check and a $60,000 check --

8    $62,000 check.

9         Count 71 through 77.  The money emanates from

10   Backpage.com.  This is Exhibit, again, 1479.  Each one of these  09:38:41

11   counts, 71, 72, 73, 74, 75, 76, 77, these are all Scott Spear

12   transactions.  These are all payments that he's receiving from

13   Backpage revenue.

14        And this Camarillo Holdings -- in case you want to

15   know who's the CFO of Camarillo Holdings, because this is also   09:39:06

16   an account that becomes a pass-through for money, it's

17   Mr. Brunst.  This is Exhibit 8, page 11.

18        Count 78, 79, 80, 81, these are all transfers of money

19   post-sale, 2015.  Some of them are prior to the sale, but then

20   mostly after the sale in -- in April of 2015.  These are        09:39:31

21   transfers from Website Technologies through Cereus Properties.

22   You'll notice that you'll see Mr. Spear and Mr. Brunst.  You'll

23   also see Mr. Larkin and Mr. Lacey.  But Cereus Properties, who

24   control that account, was Mr. Brunst as the person who was --

25   you can infer from the testimony that because he was the person  09:39:55

emailing Mr. Ferrer, hey, where's our money, you need to send

us money, he was the one controlling this account and directing

these wires.

Count 82.  Count 82.  This is also a Website

Technology through Cereus Property to John Brunst for 20 -- 09:40:31

$220,000.

Counts 83 through 84.  These are all Mr. Lacey counts.

Emanates from Website Technologies to the Cereus Properties.

You see this in the middle.  Mr. Brunst in charge of -- of

Cereus Properties.  Making sure that the owners, including 09:40:48

himself, get paid.  These go out to Mr. Lacey.

Counts 80 -- Counts 85 -- Counts 85, 86, and 87.

Website Technologies through Cereus Properties.  Either

Mr. Spear or Mr. Lacey or Mr. Larkin are the beneficiaries, but

Mr. Brunst is the one directing these wires. 09:41:15

88, 89, 90, 91.  Website Technologies, again, through

Cereus Properties.  Mr. Lacey on -- on all of these.

92, 93.  Again, Website Technologies to Cereus

Properties, Mr. Lacey, and Mr. Spear.

Here's some of the emails that are going on during 09:41:37

that time.  This is Mr. Brunst emailing Mr. Ferrer and asking

him for the money.  Hey, we need to talk about our cash

position after the -- we should add -- ask this guy, Chris

Kempel.  This is Exhibit 1238.

1239.  This is in February of 2017.  This kind of 09:42:01

shows that the ownership, including Mr. Brunst, still control

Backpage.com.  They're telling Carl Ferrer, who supposedly who

is now the owner, they're telling him that you can now pay

yourself.

1246.  I think you should send all you can.                    09:42:20

This is in 2018.  This is when things are beginning to

wind down.  Mr. Brunst continuing to make sure he gets that

money so it can be funneled through Cereus Properties, out to

himself, and out to the other ownership.

I think you should send all you can as a debt payment     09:42:39

rather than risk some unplanned event.

Counts 94 through 100.  This is Mr. Lacey.  These are

the -- the -- the counts that deal with the money -- remember

Mr. Thai testified to this.  This is the money that went into

this IOLTA account.  This is the lawyer who testified for the     09:43:06

defense.  Now, remember, you're relying for proof in this case

on the -- the United States' case.  But the defense put on a

witness, and this was the lawyer, and he talked about this.

So these are these -- these charges; right?  And these

are these -- these are the counts where the money is aggregated    09:43:37

into the lawyer's account and then it's sent out to Budapest,

Hungary, to this bank account.

So this is how it looks.  And we remember the

testimony in this regard; right?  This is in the -- the wire

takes place in 2017.  And there's a lot of things that have      09:44:00

1    happened up and to this point in 2017; right?  Lots of pressure

2    from the National Attorney Generals Association, all of these

3    law enforcement, NCMEC, Polaris, CNN, Wall Street Journal, and

4    in January of 2017, the United States Senate.

5         So Mr. Lacey wires money from -- not from his bank                09:44:20

6    account, not in his name, but in -- from his lawyer's IOLTA

7    account to Hungary.

8         Here it is.

9         So all of these accounts, all of these Counts, from 52

10   all the way to 100, some of the defendants are charged           09:44:46

11   singularly in those counts, some of them are charged in a

12   number of those counts, but they're all charged in Count 52

13   with conspiracy to commit money laundering.  Every one of them

14   did something, received the money in some fashion, to be part

15   of the conspiracy and knew that the money was being concealed.    09:45:08

16        They are guilty not only on the substantive money

17   laundering counts, but they are also guilty of the conspiracy

18   count.

19        And now, without further ado, the last count, 100.

20   It's also charged -- the same transaction is charged in          09:45:37

21   Count 99, transactional money laundering.  Mr. Lacey had

22   $16.5 million of Backpage revenue that he sent to Budapest,

23   Hungary, to this Primis bank account.  He's guilty on that.

24   It's Backpage.  It's dirty money from Backpage, and he's

25   committing a financial transaction, and it's going overseas.      09:46:01

1        The second -- the 100 deals with international

2    concealment money laundering.  He transported money from a

3    place in the United States to or through a place outside the

4    United States.  He knew that the money represented the proceeds

5    of a violation or violations of the Travel Act, and he knew          09:46:19

6    that the transportation was designed, in whole or in part --

7    the whole thing doesn't have to be concealed -- to disguise the

8    nature, the location, and, importantly, the source, Backpage

9    revenue or the control of the proceeds of the Travel Act.

10       And you remember the testimony in this regard.  First          09:46:40

11   you had this email.  This is the -- this is the -- the

12   individual, Mr. Becker.  Remember, the guy didn't want to be

13   hassled on Tuesday.  Do you remember this guy?  He -- he's --

14   this is his email.  Mr. Lacey's emailing him, you know:  Hey,

15   I -- I think I'd like to put this money away from governmental     09:46:59

16   agencies.

17       And you remember this woman, Lin Howard, the bank.  He

18   went down:  Hey, I want to get this money out of the country.

19   I don't want the government involved in that.

20       This is the concealment money laundering.  And, you            09:47:12

21   know, there was this -- some testimony in the opening statement

22   and through cross-examination and a little bit in the defense

23   witness, well, you know, they did this thing called the FBAR.

24       But this thing was not filed.  The toothpaste was out

25   of the tube by the time they filed that.  This was in August of    09:47:30

UNITED STATES DISTRICT COURT

2018.  Mr. Lacey was charged in April of 2018.  The money had
gone to Mr. Becker's account, not from Mr. Lacey's account to
an account, and then went from Mr. Becker's account to an
account, Primis Bank in Hungary, and put in the name not of
Mr. Lacey, but in a trust for his kids.

09:47:50

That is Count 100.  The defendant, Mr. Lacey, is
guilty of Count 100.

That is the United States' case, ladies and gentlemen.

So what -- where are we?  Well, the defense does not
have a right to run a criminal enterprise that facilitates

09:48:17

prostitution because prostitution is illegal.  They don't have
a right to claim that this was protected speech or that they
were helping out law enforcement.  They don't have that right.
But they do have a right to have their day in court, and they
got that two months ago.  They have a right to a fair and

09:48:40

impartial jury, and they got that, too.

But what are we entitled to?  What is the United
States entitled to on the evidence in this case and on the law?
We are entitled to a guilty verdict on each one of these
counts.

09:49:09

MS. BERTRAND:  Objection, Your Honor.  Misstates the
law.  Fifth and Sixth Amendment.

THE COURT:  Your objection is noted.  And -- your
objection is noted, Ms. Bertrand.

Let's continue, Mr. Rapp.

09:49:24

UNITED STATES DISTRICT COURT

```
 1              MR. RAPP:  That's all I have.  Thanks for listening.

 2              THE COURT:  Members of the jury, we will now hear from

 3    defense counsel.  Let me just ask you if you feel like you need

 4    a -- a break for about ten minutes.  You can give me a thumbs

 5    up if any one of you need that break.                          09:49:49

 6              Okay.  Let's stand in recess for about ten minutes.

 7              And please all rise for the jury.

 8        (Jury not present at 9:49 a.m.)

 9              THE COURT:  All right.  Please be seated.

10              And, Ms. Bertrand, when the jury comes back, I'll just  09:50:32

11    remind them that counsel's statements are argument.  And I

12    think the record will reflect what Mr. Rapp included.  And I

13    don't mind at this juncture that he erred in the context of his

14    statement.

15              And so we'll stand in a brief recess.                  09:50:57

16              Mr. Cambria, you're going to be ready to go?

17              MR. CAMBRIA:  Oh, yeah.

18              THE COURT:  Okay.

19              THE COURTROOM DEPUTY:  All rise.

20        (Recess from 9:51 a.m. to 9:59 a.m.)                          09:51:05

21        (Jury not present at 9:59 a.m.)

22              THE COURT:  All right.  Counsel, you may be seated.

23              And let me just remind you, as I failed to do with

24    Mr. Rapp.  He -- he was speaking very quickly.  And so just

25    remember to keep your cadence at an even pace so that our court   10:01:50
```

```
 1   reporter can last through arguments.
 2            All right.  So let's bring the jury in.
 3            All rise for the jury.
 4        (Jury present at 10:03 a.m.)
 5            THE COURT:  All right.  Please be seated.        10:03:32
 6            And, members of the jury, as I instructed you
 7   yesterday, what the lawyers say in their closing summation is
 8   not evidence, and so, again, your memory of the testimony and
 9   evidence controls.
10            With that, is the defense ready?                  10:03:53
11            MR. CAMBRIA:  Yes, Your Honor.  Thank you.
12            THE COURT:  You may proceed, Mr. Cambria.
13            MR. CAMBRIA:  Thank you.
14            Good morning, everyone.
15            May it please the Court, ladies and gentlemen of the  10:04:05
16   jury, fellow counsel.
17            Obviously, Mr. Rapp wasn't there.  He wasn't a
18   witness.  And, as His Honor has indicated to you -- as Her
19   Honor has indicated to you, what the lawyers say, obviously, is
20   not evidence.  What you heard on the witness stand and what you  10:04:30
21   are able to read in the exhibits are what you make your final
22   decision on.
23            First, thank you so much.  All of us appreciate your
24   sacrifice to be here as citizens to judge other people.  It's
25   no accident that the jury stands between the accusers, the      10:04:51
```

UNITED STATES DISTRICT COURT

1  government, and another citizen.  And you have the last word.

2  And we all have confidence in you that you'll do the job here

3  and justice will be done.  Justice will be done, I believe, if

4  my client is acquitted of every count.  And I'm going to go

5  through with you what I think that the evidence established or          10:05:25

6  failed to establish and why that is an appropriate verdict in

7  this case.

8           And you heard Her Honor read some law to you.  The law

9  only comes from the Court.  And they talked about presumption

10 of innocence and the burden of proof's on them and proof beyond          10:05:51

11 a reasonable doubt and so on.  Those aren't just slogans.

12 Those are the building blocks of our system of justice.  And

13 we're proud, as Americans, to have that system of justice

14 because we have a situation where citizens can come in off the

15 street and delay and impose -- and -- have an imposition on          10:06:12

16 their personal lives, but get to make a judgment for another

17 citizen that obviously will have an impact on him or her

18 forever.

19          And so let me begin this way:  Mr. Lacey relied in

20 good faith on Carl Ferrer and others that they operated          10:06:38

21 Backpage lawfully.  Her Honor read you a charge that she is --

22 has given you, and will maybe repeat it, but I'd like to read

23 it now as kind of a backdrop to my comments the rest of this

24 morning.

25          She said:  The government has the burden to prove          10:07:02

38

1   beyond a reasonable doubt that a defendant act -- acted with

2   criminal intent and did not act in good faith.  Good faith

3   encompasses a belief or opinion honestly held and in absence of

4   malice -- malice or ill will.  If a defendant carries out his

5   or her actions in good faith, there's no criminal intent.  A     10:07:27

6   person who acts on a belief or an opinion honestly held is not

7   punishable under the charges in the indictment merely because

8   the belief or the opinions turn out to be inaccurate,

9   incorrect, or wrong.  If the government fails to meet its

10   burden to prove the defendant lacked good faith, you must     10:07:48

11   return a not guilty verdict.

12        What's the proof, and what substantiates my client's

13   good-faith belief that the people running Backpage were doing

14   it legally and correctly?  Because he was not one of the

15   individuals who was running Backpage.  I don't even think the     10:08:12

16   government disagrees with that one.  Maybe.

17        But, in any event, first of all, Mr. Rapp, of course,

18   dwells on large amounts of money because I think that he hopes

19   that you'll be so distracted by those large numbers that you

20   won't listen to exactly what the evidence, or lack of evidence,     10:08:36

21   was in this case.  Yes, there were large numbers.  There were

22   21 newspapers at one time.  They were profitable.  The Backpage

23   was sold to Ferrer.  Yes, they're large numbers, but large

24   numbers are not proof of guilt.  And that's not what he's on

25   trial here for.     10:09:00

```
 1            The indictment alleges 50 ads, 50 specific ads.  He
 2    referred to them this morning.

 3            I'm sorry.  I got you in the wrong place there.

 4            He referred to them this morning.  There is no proof
 5    in this case that prior to this trial my client has even seen    10:09:17
 6    any of those 50 ads and the content of those ads.

 7            The government has to prove beyond a reasonable doubt
 8    that he had a specific intent and intentionally facilitated a
 9    prostitution business or enterprise and they did it through
10    ads, because that was the business that Backpage was in.        10:09:46

11            There is no proof in this case that Mike Lacey took
12    any steps to make this crime that they've charged here occur.
13    There's no proof that he conspired or agreed with anyone.  He
14    talks about conspiracy.  He says it requires an agreement.  It
15    does.  There is no testimony here of any agreement that he made 10:10:13
16    with anyone for purposes of violating the law.

17            You heard the testimony.  The logical person to --
18    that you would expect would have had that testimony would have
19    been Ferrer and -- or maybe Hyer, but there was no such thing.
20    And of course he'll say, well, it doesn't mean that you have    10:10:40
21    to, you know, sit down and say A, B, C.

22            There isn't anything.  There isn't even a sit-down.
23    There is no proof of any kind of agreement.

24            The -- Mr. Lacey, I said in my opening statement, was
25    an old-time newspaper guy.  And I don't think there's any       10:11:05
```

1    question that that's exactly what the proof demonstrated here.

2    We had a couple of reporters and editors who were involved in

3    the papers who testified.  Nobody challenged their testimony

4    that Mr. Lacey's world was writing newspapers.  That was his

5    whole world.  Maybe he was a dinosaur, actually.  Maybe Carl          10:11:34

6    Ferrer, when he came up with, you know, getting into the

7    Internet business, took it to a place where Mr. Lacey

8    probably -- if you think about newspapers these days and how

9    quickly they're falling by the wayside because of electronics.

10   Newspapers and the Internet aren't bedfellows.  All right?          10:11:56

11   I -- there's obviously kind of a -- a hate, a resentment there.

12   Being left in the dust as a dinosaur, so to speak.

13          So he was the editor-in-chief for the newspapers.

14   There were like 17 of them nationwide.  You saw what the proof

15   was here, that he traveled all over the country visiting the       10:12:26

16   other journalists.  He was a hands-on editor.  He was a writer.

17   You saw all of the advertise -- all of the awards that they

18   got, including the Pulitzer Prize.  I mean, that's a big deal.

19   Everybody knows that's a big deal.  And -- and that little

20   conglomerate of newspapers there figured out a way to do it.       10:12:50

21          And there was no conflicting testimony by anybody on

22   the prosecution's side that disputed the fact that he was the

23   editor-in-chief, and so on, of the newspapers.  As a matter of

24   fact, you might remember when Mr. Ferrer got on the witness

25   stand, I asked him:  Did you give a statement to the               10:13:11

UNITED STATES DISTRICT COURT

```
 1    prosecutors in the many interviews that you had?

 2              He said:  Yes.

 3              And I said.  Didn't you characterize Mr. Lacey as the

 4    editor and so on?

 5              And the answer would -- yes.                        10:13:25

 6              And so now let's talk about what is it that supplies,

 7    if you will, or supports this good-faith belief that Mr. Lacey

 8    had that Ferrer and others were running this paper legally?

 9              Well, first of all, Lacey, the proof shows, wasn't the

10    person who created Backpage.  The testimony was that there was  10:13:51

11    a man named Jim Larkin, who was the business guy, and Carl

12    Ferrer.  And they sent Ferrer to San Francisco, and he then

13    came back and created Backpage.  And he was the CEO of

14    Backpage.  He was the boss.  He was the last word, if you will,

15    the hands-on business day-to-day guy.  That's -- that's what he  10:14:17

16    did.

17              And the proof demonstrated that Backpage was on the

18    so-called business side.  And you remember the two editor

19    reporters who testified here, and they said, there's in iron

20    curtain, if you will, between the business side and the        10:14:35

21    editorial side in newspaper world.  And the reason for that is

22    so that somebody who wants to write something about a business

23    isn't going to be stopped from doing that because that business

24    is a big advertiser.

25              So there's this wall, if you will.  And the -- the    10:14:54
```

1  person who testified, Dougherty, the first guy, he talked about

2  where Lacey was.  Lacey was across the hall from him in the

3  editorial part, the news part, if you will.

4         And then there was a -- some testimony -- and, in

5  fact, Mr. Rapp put up a chart and demonstrated.  It was a chart   10:15:23

6  of where everybody was in the business.  And Lacey was over on

7  the side with the newspapers, and then there was the business

8  side and the rest of it.

9         And could we put up 6243, please.

10        Now, 6243, if you remember this, it quite clearly         10:15:44

11 shows a division.  And way over to the left, you will -- there

12 you go.  Thank you.

13        Way over to the left you will see that there's

14 Mr. Lacey, and he's there with other people who are involved in

15 the writing aspect.  And then there's the middle area, which     10:16:09

16 includes, obviously, Mr. Larkin.  And then there's Backpage is

17 in that area.

18        So there were two of these that were created -- one

19 put on by Mr. Rapp, and the other put on now by me --

20 demonstrating exactly the separation that I just was discussing  10:16:32

21 with you.

22        So Carl Ferrer, the testimony was, reported to Jim

23 Larkin.  Carl Ferrer said -- and this is another piece of

24 information that supports the separation of Mr. Lacey from

25 Backpage.  Carl testified that Mike Lacey was a layer away from  10:16:58

1   Backpage.  And where he said that was he was interviewed by the

2   agents and by the attorneys here and at that time described

3   where Lacey fit in everything and -- and characterized him as a

4   layer away.  And, obviously, that layer was the newspapers.

5           And it's graphically demonstrated here with this chart   10:17:26

6   that was created long before this trial ever was put into play.

7   So it wasn't something that somebody just created shortly.  It

8   was something the company put out indicating whose spot was

9   where.

10          And remember this:  Mr. Ferrer and Mr. Hyre, they have   10:17:48

11  all the incentive in the world to try to testify in a way that

12  makes the prosecution happy.  You remember that their deal was

13  such that they were told that if the prosecution decided, in

14  its discretion, to file a motion asking the judge to be lenient

15  with them, that was solely in their discretion, in the         10:18:22

16  government's discretion.  So they were testifying here with

17  prison bars rattling in their ears because they want the

18  government to make an application to reduce his sentence.

19          Now, remember, Ferrer has all the connection in the

20  world with Backpage.  He's obviously the one who started it.   10:18:45

21  He ran it.  He -- he made all the decisions.

22          Think about this for a while:  When the moderators

23  were taking out terms, there would be times when Carl would

24  come back in and say:  No.  Put those terms back in, because

25  the advertiser called me and got mad.  Put them back in.       10:19:01

UNITED STATES DISTRICT COURT

1    He's the boss.  He was the one who did it.  And you

2  remember that it was sold to him in 2015.  And I know they're

3  trying to downplay that and say, oh, no, it wasn't really sold.

4  But then you found out that as part of his plea bargain, he

5  gave Backpage to the government.                                    10:19:20

6    Well, if he didn't have control over Backpage, he must

7  have been, you know, Houdini or something.  How did he give

8  Backpage to the government?  He obviously had 100 percent

9  control over it.  And -- and that's what happened.

10    So, in any event, so now he had all the incentive in       10:19:35

11  the world to exaggerate in any way he could regarding Mr. Lacey

12  or Mr. Lacey's knowledge or his role or anything else.  And it

13  never happened.  He said he was a layer away and never put him

14  into any day-to-day business.  Never with regard to ads or song

15  or made rules about the -- how they ran Backpage or anything     10:20:04

16  like that.  None of that ever happened.  And this graphic is

17  consistent with that testimony of him being a layer away.

18    And it's -- it's important because the next thing that

19  we find out is that Mr. Hyre says -- and, now, Mr. Hyre, if you

20  recall, had a very high role at Backpage.  And, again, he's      10:20:31

21  another person who made a plea bargain.  And part of that plea

22  bargain, same thing.  Would like a motion made on his behalf so

23  that he has a lenient sentence.  And he even gave you his

24  knowledge as to what he thought he was -- he was originally

25  facing, these -- the charges that are here, 20 years, what have   10:20:58

```
 1    you, to what he is now facing.  And he obviously wants the
 2    government to be going to the judge and making a motion on his
 3    behalf.
 4           But what did he say?  And, remember, he was a
 5    high-level person at Backpage.  What did he say?  He said:  I      10:21:19
 6    worked there 12 years, and I never, ever talked to or met
 7    Michael Lacey.
 8           Now, ask yourself, how would that be possible if
 9    Mr. Lacey played any role of any significance in Backpage?  How
10    would that be possible?                                            10:21:47
11           That's over -- that's almost 5,000 days, and nothing.
12    He -- he would have known the cleaning people more than he
13    would have known Michael Lacey.  And he never met him.  And he
14    said:  The first time I ever met him, we were in court.
15           So what I'm saying is, is it logical to conclude,          10:22:07
16    then, that there really was a separation of Mr. Lacey from
17    Backpage?
18           We have the reporters and editors telling you that.
19    We have this chart.  We have Carl Ferrer saying he's a layer
20    away.  We have Mr. Hyre saying, never even met the guy in         10:22:24
21    12 years.  I think you could pretty much conclude that it's
22    true that he was zero involved in Backpage.
23           So -- and, of course, well -- the government says,
24    well, but he owned a piece of a company that owned Backpage.
25           Well, that's great.  I own stock in, you know, General     10:22:46
```

1    Motors, too, and I don't have a thing to do with them.  And I'm

2    sure you know people who have ownership interest in things, and

3    they have nothing to do with the day-to-day business.

4         And that's exactly what the situation was here.  No

5    proof at all that in any way he was involved in, like,     `10:23:05`

6    hiring/firing, setting the rules of the policies, any monthly

7    meetings.  He wasn't involved with moderation.  Had no reason

8    to review these ads.  There's no proof that he ever saw them

9    before looking at this indictment.  He wasn't involved in the

10   financial aspects, the day-to-day sort of things like that.  No   `10:23:30`

11   proof that he told anyone what to do and that he had any sort

12   of a day-to-day role in the business.

13        As we've indicated, obviously Ferrer's the one who --

14   who had the power.  And I -- I'll repeat it.  But the thing

15   that demonstrated that more than anything is when the     `10:23:56`

16   moderators did their job and they took out words that were a

17   problem, he'd come back and say:  Oh, no, no, no, no.  I talked

18   to, you know, this advertiser.  Put that back in.

19        And you notice that he bought -- in 2015 he bought the

20   place.  Before he bought the place, they had taken out nudity,   `10:24:18`

21   they took out The Erotic Review, they took out GFE.  And what

22   happened when Carl bought the place?  He put them all back in.

23   Put them all back in.  It shows you exactly what his mindset

24   was, what his temperament was.  That's what he did.

25        So it appears that Lacey was the kind of person that   `10:24:44`

```
 1   if somebody had an article or something had to be written or
 2   something had to be responded to, he was the newspaper guy, and
 3   that's where we see him show up.  We see a -- would you put
 4   up -- let's see here.
 5            You recall there was a mention here that Mr. Lacey had      10:25:15
 6   written an article called Backpage Understood.  And I don't
 7   know if you recall this testimony or not, but it turned out
 8   that at some point in time Ferrer reviewed it.  And Ferrer
 9   said:  I don't have prostitution ads.  I don't have
10   prostitution ads.  I, not we.  I don't have prostitution ads.      10:25:45
11            That's what he said.  So that's the information, the
12   guy that ran it day by day, said to Mr. Lacey.
13            Carl indicated, and he admitted when he was on the
14   stand, that he said that Backpage was working with the police
15   to prosecute others, pimps and so on.  You hear the fact that,      10:26:13
16   you know, he went out and testified.  And then we have the fact
17   that, again, Lacey knew that he was helping law enforcement.
18   And this is part of the basis for Michael Lacey to reasonably
19   believe in good faith that they were following the law.
20            Can we put up Exhibit 662, please.                         10:26:42
21            I might have to move this a little closer to these
22   eyes.  There we go.
23            This particular exhibit -- sorry to turn my back to
24   you.
25            This particular exhibit is from -- it's in evidence.       10:27:12
```

UNITED STATES DISTRICT COURT

```
 1    It says Carl Ferrer.  It is in 2011.  And he is sending it to a
 2    number of people, Larkin, who was the business guy, and a copy
 3    to Mike Lacey.  And it was about this Brian [sic] Fassett, who
 4    it turns out was a sergeant.  And he headed up a high-risk
 5    victims and trafficking unit.  And he would gather people to          10:27:45
 6    have a conference, and they would exchange information and so
 7    on.
 8            But the thing that is very important about this is he
 9    now is communicating to Michael Lacey:  Here's what we're doing
10    with the authorities.                                                  10:28:03
11            This is part of Michael Lacey's good faith, if you
12    will, belief.
13            Here's what we're doing with the authorities.
14            And we can read through this.  And I'll just highlight
15    a couple of things.  But one of the things he talked about is          10:28:16
16    that you had to actually respond to ads as opposed to just look
17    at them to in some way act affirmatively.  You had to respond.
18    And you'll see in here he makes a reference to that, that you
19    have to do that.
20            But the most important thing, in my opinion, starts at         10:28:39
21    the bottom.  And at the bottom he says -- this is --
22    Fassett says to the people on this, including Lacey, they would
23    like Backpage to do the following.
24            They would like Backpage.  Now, think about this.  If
25    you got this email and you're the guy that's running Backpage          10:29:03
```

UNITED STATES DISTRICT COURT

1  says that he's at this legal conference, he's dealing with an

2  expert police officer in this area, and they are now asking

3  Backpage to do seven different things, seven different things,

4  would it not be reasonable for you to think that a police

5  organization would not work with you if there was any thought          10:29:35

6  in their mind that you were violating the law?

7          And what they're saying is, we'd like you to do these

8  things.  Okay?  Build a tool law enforcement can access.

9          I'm reading parts of it.

10          Build an image hash so we can find and remove images.        10:29:56

11          Include Backpage user name.

12          Ask Backpage person to provide you with, et cetera.

13  All these things.

14          And my point is, put yourself in the -- in Mike's

15  shoes.  Here's the guy running it.  He's working with police.        10:30:13

16  They're asking him to do things.  Why would you think you're

17  breaking the law if the police are asking you to work with

18  them?  And that's what they're doing.

19          And you also know that we've introduced -- and it's

20  not here this morning.  I'm not going to bore you with it.           10:30:34

21  We'll be here another year and a half if we had to go through

22  it, but it's all these thank you's from police officers around

23  the country that Backpage helped.

24          Now, there was a plan here on the prosecution side to

25  say, and you witnessed it anytime somebody brought up something      10:30:53

UNITED STATES DISTRICT COURT

1    to do with police, Hyer or Carl, or whatever, would then be

2    asked:  Oh, did you tell them about Dollar Bill?  Oh, did you

3    tell them about The Erotic Review?  Oh.

4          Well, like all of a sudden that would cancel

5    everything that Backpage did for the police.  Oh, Dollar Bill?    `10:31:19`

6    Huh?  I'm sorry I rescued that person.  Oh, Dollar Bill?  What

7    a shame.  I can't believe I arrested that person and they got

8    convicted for being a pimp.

9          That's silly.  It's nuts.

10         And there wasn't a single one of those officers who        `10:31:38`

11   came in from any of those places around the country and said:

12   Oh, well, Mr. Cambria, as soon as I found out about Dollar

13   Bill, that was it.  Thank you.  Return it to me.

14         Never happened because Backpage helped them.

15         Another thing that Mike Lacey was told and knew that       `10:32:04`

16   enforced -- reinforced his good faith, that they were working

17   with the police.

18         And you remember Ferrer testified.  I said:  Did you

19   go testify on behalf of the prosecution against pimps?

20         Yes.                                                       `10:32:26`

21         Were they convicted?

22         Yes.

23         Did you provide records?

24         Yes.

25         That's another thing.  They want to diminish the value     `10:32:32`

1    of the records.

2            Oh, they responded to subpoenas.  They had no choice.

3            Yes, they did.  Number 1, they kept the records.

4    There was no law that required them to keep records.  They kept

5    the records.                                                          10:32:53

6            Do you remember there was a -- a reference by Mr. Rapp

7    to my client talking to his wife at the time and saying:  Jim

8    and I -- Jim Larkin, you know, we believe in legalized

9    prostitution.

10           And then there was another comment which was:  For the       10:33:10

11   first time, one of the oldest professions, prostitution, got

12   recordkeeping and transparency.

13           Yes.  What Mike Lacey meant by that was, we kept

14   records on people who got charged as prostitutes and as

15   johns -- I'm sorry -- as pimps and so on.                            10:33:33

16           The transparency was that Backpage gave the police

17   these records.  That's the transparency.  Here.  Here's what

18   we've got.  Here are the ads.  Here is the credit card

19   information.  Here is another thing cross-references.

20           Remember that?  I asked Carl about that.  And I said:        10:33:55

21   Well, but if they asked you for a particular operator, a

22   website, or whatever, did you then search your base to see if

23   there was anything related to that?

24           Yes.

25           And did you give them that?                                  10:34:10

UNITED STATES DISTRICT COURT

1           Yes.

2           That was the extra stuff that they gave them.  So it

3   wasn't just a situation of, oh, you had no choice to respond to

4   the subpoena.  No.  They were proactive.  Proactive.

5           Mike Lacey knew that, knew they were testifying and so    10:34:28

6   on.  And that was a legitimate thing to say in good faith

7   they're doing the right thing.  Okay?

8           So now we have this with -- with Fassett, and that's

9   important.

10          And let's talk about -- let's talk a little bit about    10:34:58

11  the police officers and the cooperation and what we learned

12  about that.  And the most significant thing -- would you put up

13  6142, please.

14          6142, United States Department of Justice.  Federal

15  Bureau of Investigation.  Proud to recognize Carl Ferrer, Vice   10:35:38

16  President, Backpage.com, for your outstanding cooperation and

17  assistance in connection with an investigation of great

18  importance.  The FBI's ability to carry out its investigative

19  responsibilities to the American people has been greatly

20  enhanced through your help, and you can be very proud of your    10:36:02

21  valuable contributions to the success.  Robert Mueller, III,

22  director, as high as high as it gets.

23          Was it fair for Mike Lacey to believe that if the very

24  director of the FBI was thanking them for helping them in an

25  important investigation that they were doing, that they were     10:36:32

UNITED STATES DISTRICT COURT

1    breaking the law?

2         Now, let's ask that question.  Would they have asked

3    the FBI if they came in here, would they have said, well, if

4    you knew about Dollar Bill, you knew about The Erotic Review,

5    if you knew about the super posters?  Well, guess what?  They          `10:36:55`

6    knew about all those things.

7         This nice lady right here, Mrs. Tolhurst, she's an FBI

8    agent.  Sat here through the whole case, interviewed the

9    witnesses, was --

10         MR. RAPP:  Objection.  Facts not in evidence.                     `10:37:13`

11         THE COURT:  Sustained.

12         MR. CAMBRIA:  Was there a single, single individual

13    who -- I'm sorry?  Was there an objection.

14         THE COURT:  Yes.  Yes.

15         MR. CAMBRIA:  I'm sorry.  I don't have my hearing aid            `10:37:24`

16    on.

17         THE COURT:  Yes.  And I sustained it.

18         And, again, the jury's memory controls of what was in

19    evidence.

20         MR. CAMBRIA:  Right.                                              `10:37:35`

21         And you do recall that when we talked about the

22    interviews of the various witness they identified FBI agents,

23    one named Tolhurst.  Do you recall that?  It was in the

24    statements that -- and in the questions about Mr. Ferrer, I

25    asked him:  Were you interviewed, et cetera, et cetera?              `10:37:51`

1    So think about this for a second:  We're talking about

2 the most elite crime-fighting organ- -- organization in the

3 entire world, the FBI.  And you can bet that they knew about

4 Dollar Bill and The Erotic Review and every other thing.  You

5 can bet.  You can bet they knew what Dollar Bill --                     10:38:19

6    MR. RAPP:  I'm going to object to this.  This is not

7 in evidence.  This is misstating the facts of this case.

8    THE COURT:  Again, members of the jury, and -- and

9 this is summation, closing argument.  And, again, your memory

10 of all of the evidence and testimony controls.  What the             10:38:38

11 counsel say is not evidence.  It's not testimony.  It's merely

12 summation and argument.

13    And let's --

14    MR. CAMBRIA:  Thank you.

15    THE COURT:  -- move forward, Mr. Cambria.                        10:38:52

16    MR. CAMBRIA:  Yes.

17    What I'm saying is you have knowledge of the -- we all

18 know what the FBI is; right?  We all know what they do.  And so

19 for one second to think that they didn't know about Dollar Bill

20 or the The Erotic Review or all this other stuff is ridiculous.      10:39:07

21 It's ridiculous.  Okay?

22    And could they send somebody in here and testify and

23 say, whoa, wait a minute, you know, when our head sent this

24 out, he didn't know about Dollar Bill, Mersey, and whatever --

25 whoever the other individuals were name-wise, Elms, Mr. Elms         10:39:34

1    and others?  No.  Why?  Because they actually did help law

2    enforcement.

3            Now, what does that mean, if they help law

4    enforcement?  Remember the charge?  The charge is facilitating

5    a prostitution business or enterprise.  Facilitating.                    10:39:55

6            If you are working with the authorities who are

7    prosecuting the pimps and the people who are in the

8    prostitution business, you aren't facilitating any kind of

9    business like that.  You are prosecuting them.  You are

10   bringing them to justice.                                               10:40:21

11           You heard Ferrer testify that he testified in, like,

12   three cases that got convicted and went to jail.  That's the

13   opposite of facilitating.

14           Every time that they responded with records, with

15   financial records, with testimony, every single time they did          10:40:38

16   that, they weren't facilitating it.  They were not in any way

17   facilitating it.

18           And now we have the highest, highest, highest

19   law-fighting organization that we're all proud of commending

20   their help.  Why for one second would somebody like Mr. Lacey,          10:41:05

21   who's not in the day-to-day of Backpage, not be entitled to

22   rely in good faith on that and say, we got to be doing the

23   right thing?  We got to be doing the right thing.

24           So -- so we have that.

25           All right.  Now, we had some police officers in here           10:41:32

1    who testified, and we have some statements like Fassett and so

2    on.  And what did they tell you about ads?  They said every one

3    of them, we can't arrest just by looking at the ads.  And what

4    do we know about the ads?  We had testimony, including

5    Fassett -- or the -- the email here from Fassett, and we also          10:42:03

6    had testimony.  And the testimony basically said that the ads

7    are unreliable.  Can't rely on the ads.

8              Why?

9              Well, people lie about their age.

10             What else?                                                    10:42:20

11             They put in pictures and they aren't pictures of them.

12             What else?

13             You really don't know what you're going to get unless

14   you answer the ad.  That's the only way.

15             And that's what the police officers said.  They said:        10:42:34

16   We can't arrest people just based on looking at an ad.  We need

17   to meet them, and we need to then get propositioned.

18             But they want you to convict these people over here on

19   the face of an ad.  And there's -- and there's no proof they

20   even saw the 20 that are in this particular indictment that are        10:43:00

21   the basis of the -- or part of the basis of this charge.

22             And so -- and you heard the testimony about, well,

23   what do you mean the ads are not reliable?

24             Well, sometimes one provider will make something up

25   about another one to either get them in trouble or to have             10:43:20

1   people not patronize them.  We find out that we -- we heard

2   testimony the other day that sometimes they're scammed, and,

3   you know, the people get assaulted.  They respond, and they

4   wind up getting assaulted.

5       Do you remember in my opening I did the Driving                10:43:39

6   Miss Daisy thing, you know, like the old days with the

7   newspapers?  You had ads in the back page of the newspapers,

8   you know, advertising cars saying it's wonderful and all that,

9   and then you go there, and the car's a piece of junk.  And so

10  you can't just rely on the ads.                                    10:43:56

11      And we found out that, you know, the reviews, that

12  people write fake reviews.  They try to, you know, say

13  somebody's bad or -- or that they're -- maybe they say they're

14  really good hoping they get arrested.  There are lots of

15  different things going on.  So they're not in any way reliable.    10:44:20

16  And the police told you that, because they told you:  We do not

17  and have not arrested anybody based on an ad.

18      The police officer who came in and testified said:

19  It's a step.  It's a first step.  Okay?

20      But they're asking you to convict these people of             10:44:46

21  serious lights-out felonies here based on an ad and what

22  picture is, if you will, in -- in the ad and the language.

23      And that's another thing.  Incall/outcall.  You know,

24  it's like every word they're trying to turn into prostitution.

25  Incall, you go there.  Outcall, they come to you.  Really?         10:45:17

UNITED STATES DISTRICT COURT

1    Obviously that's what that means.  And I -- today, even, the

2    indication was that that in some way was some kind of sex term.

3    I don't know where that came from.

4        And the other thing, they tried to downplay this

5    moderation.  And, again, moderation doesn't promote                    10:45:45

6    prostitution.  Moderation is something that hurts prostitution.

7    Why?  All right.  Well, their favorite example was Greek.  You

8    know, and Stavros in, and he's looking for Greek.  And so he

9    looks through ads and sees the term Greek and calls the

10   individual.  And then if they meet and there's an offer of sex       10:46:18

11   for money, okay, well, that's prostitution.

12       You wouldn't know that except you see this word Greek.

13   Okay?  But if they took the word Greek out of the ad, Stavros

14   doesn't call that number.  Okay?  And that means that there's

15   no connection.  That means they don't do anything that's              10:46:43

16   against the law, because the moderators took out the word that

17   would attract the individual.  Gone.

18       And they try to make this sound like a moderation

19   isn't something that fights prostitution.  Moderation is the --

20   is the enemy of prostitution because it takes out any words           10:47:06

21   that might attract somebody that might want to engage in some

22   kind of, you know, illegal conduct, if you will.

23       Another thing.  Mr. Shehan testified and -- and

24   Mr. Luria.  I almost forgot his name.  Isaac Luria.  They were

25   from religious groups.  Well, obviously, you know, they have a        10:47:38

1    different perspective on things.  They look at it from a

2    religious standpoint.  We're looking at it from a legal

3    standpoint.  But he said something interesting.  He said even

4    in their group of people there are two schools of thought, if

5    you will.  There are the abolitionists, and there are the          10:47:58

6    reformers.  The abolitionists say:  If there's any of this

7    going on, kill it.  Cancel it.  Put it out.  Gone.  The

8    reformers say:  Wait a minute.  Let's deal with it.  Let's use

9    the information.  Let's help the police and so on.

10           Because, you see, every single thing that you kill,        10:48:28

11   all the millions of people in the United States that don't

12   commit crimes with these platforms are punished because it's

13   gone.  All right?

14           Now, think about it.  In the -- in the days before the

15   Internet, telephones are invented.  Okay?  Well, people we        10:48:47

16   know -- and it's common knowledge that people commit crimes

17   with telephones.  Everybody knows that.  Do we kill the

18   telephones?  Do we outlaw them?  No.  We regulate it.  We

19   regulate it.  In fact, federal government has what they call

20   wire fraud.  And that works with telephones also.  So we don't    10:49:14

21   just eliminate it because a few people abuse it.

22           So Mr. Shehan talked about that.  And he said:  Yep.

23   In our group there's, like, two schools of thought.  Okay?

24   Well, one school is if somebody commits a crime with something,

25   we eliminate it.  It's gone.  Take it out.  Kill it.  And the     10:49:40

1   other is, let's work with it.

2        Backpage worked with the authorities here.  Look, this

3   wasn't, like, two or three authorities.  There were, like, over

4   a hundred.  And we're talking the FBI.  Okay?  So this was,

5   like, serious stuff.                                           10:49:59

6        You know, Ferrer.  What did he say?  Oh, a ven- -- a

7   plausible denial, a veneer.

8        What was the other one?  The slow lock.

9        Baloney.  They went and testified at trials.  People

10  got convicted.  They had hundreds of people.  Remember there    10:50:15

11  was testimony about the ad?  They had hundreds of people that

12  would go through these terms and take them out.  And as, you

13  know, it was like Whac-A-Mole, you know, where you hit it and

14  the thing pops up.  And that's what was happening.  It was like

15  they'd take a term out, and somebody would write the same       10:50:36

16  thing, but this time there'd be dollar signs instead of Ss or

17  things like that.  And then they saw that, and they'd take that

18  out.  And then they did something else, and they took that out.

19        And you saw what happened.  They met with NCMEC at one

20  point, and apparently NCMEC requested that nudity be taken out.  10:50:52

21  They wanted The Erotic Review out and so on.  They took nudity

22  out, they took The Erotic Review out, and then Carl decided to

23  put it back in when Carl bought the various -- bus- -- bought

24  the business.

25        So -- so, anyway, as it turns out, we know a few           10:51:16

things for sure.  We -- we definitely had testimony from, for

example, Mr. Luria, where they would come in and say, oh, we

told you you've got this and you've got that.

        And he was particularly interesting, because I said --

as you might recall, I said:  Wait a minute.  Don't you have          10:51:45

all these various religious leaders who signed this letter?

        Yes.

        And isn't this one particular person the one who hired

a known priest pedophile?

        Yes.          10:52:03

        Really?  Did you write them a letter?  Did you take

out an ad in the New York Times?

        No.

        Well, why?

        Well, because I guess -- you know what, in fact, I          10:52:11

think with him I said something about throw the first stone or

cast the first stone, or something.  And he -- I don't think he

liked that.  But my point was that, yes, people have views

about things, but what do they do to make a difference?  Okay?

        And I asked him:  Any people in your group testify for          10:52:33

the prosecution?  Did they ever give them any records or

anything?

        No, none of that.

        But Backpage, at least the way Carl was running it,

was cooperating with the authorities.  And to my client's          10:52:47

1  knowledge, to -- who's not a person that's there working in

2  Backpage, that was something that he in good faith believed was

3  contributing to the legality of running Backpage.

4  And that -- and ask yourself, just in your own

5  situation, if police were working with you, like Fassett giving     10:53:11

6  you seven things they want you to do for them, okay, or you got

7  the -- this citation and so on, would you not think that you

8  must not be doing something illegal?  Otherwise they'd be

9  going, well, we're not going to work with you.

10  Or do we think this, that all these police agencies     10:53:32

11  were so inept that they couldn't figure out what was going on?

12  You know, you talk about The Erotic Review and so on.

13  They -- they -- it was right on the site at one point, and then

14  it got taken off after a while because of the requests.  It was

15  taken off.  But it was there for people to see.  It was there     10:53:53

16  for them to see.  And so there wasn't anything hidden.  It

17  wasn't concealed.

18  Now, let's see.  We get to another subject.  You know,

19  there's the so-called concealment money laundering.  And a lot

20  of these charges that had to do with money use the word     10:54:30

21  conceal.

22  Now we all know what conceal means.  Hide in some way.

23  Correct?  Okay.

24  Anytime you look at one of these counts that they ask

25  you to find them guilty of and you see the word concealed I     10:54:52

1    think should be an automatic not guilty.  Why?

2           Well, let's start with Quoc Thai.  He is trained to

3    find things apparently.  His background is the IRS.  Okay?  And

4    he came in here.  And he's the one who had a chart, and he was

5    showing you this account and that account, and the money went     10:55:22

6    here and the money went there.

7           There's nothing illegal, by the way, about money going

8    here or money going there.  Whether or not it is, as his word,

9    dirty money on -- or illegal money, that's a different story.

10          But let's start with concealed.  Okay?  There wasn't      10:55:38

11   anything concealed.  Quoc Thai was the proof there was no

12   concealment.  Remember the questions I asked him:  Mr. Quoc

13   Thai, were the names accurate?

14          Yes.

15          Were the names of the companies accurate?               10:55:57

16          Yes.

17          Was there any problem in finding these accounts and

18   whose name they were in and the names of the -- of the -- of

19   the businesses and so on?

20          No.  There was no problem with that whatsoever.         10:56:15

21          So where's the concealment?  Where's the concealment?

22          The other thing -- and this -- this bothers me, and

23   I -- and I'll tell you why.  Count 100 is the trust that's over

24   in Hungary.  Okay?  That requires concealment.  That requires

25   concealment.  And we all know, and you saw the proof, there was   10:56:40

UNITED STATES DISTRICT COURT

64

 1   nothing concealed there.

 2        But think about this for a second:  Quoc Thai isn't

 3   the one who found the FBAR.  Remember the FBAR is the document

 4   that you have to file if you make some kind of investment

 5   outside the United States.  You have to file this document.          10:57:05

 6   And what it does is it puts the Department of Treasury on

 7   notice that there is this existing investment.  And there's

 8   also a corresponding form that you file with the IRS.

 9        Now, Quoc Thai worked for the IRS before he had his

10   present job.  Do you not think that the first thing he would           10:57:33

11   say is, well, we have an investment out of the United States.

12   Let's see if there's an FBAR?  He said he didn't do that.

13        Well, wait a minute here.  If you're trying to be fair

14   and thorough and you know that an FBAR has to be filed for it

15   to be legal, why wouldn't you look to see if it's there?             10:58:08

16        Because once you found it and it was there, there is

17   no crime.  A person does not get charged.  They don't get

18   hauled into court on a charge.

19        And I asked him:  Did you -- did you look?  Did you

20   find it?                                                              10:58:29

21        No.

22        Did they give it to you, the prosecution?  Didn't they

23   tell you that there was an FBAR?

24        No.

25        It came from me.  I had to find the FBAR and put it in         10:58:40

```
 1    evidence.  And they're all in evidence.  Okay?  And -- and
 2    let's get right to that.  That's Count 100.  All right.
 3            That requires concealment.  There was nothing
 4    concealed.  They filed five FBARs.  And the FBAR, it identifies
 5    Mr. Lacey.  You have a -- you can look at them.  It identifies    10:59:11
 6    Mr. Lacey.  It identifies where the money went.  It identifies
 7    the beneficiaries.  It identifies everybody.  All the
 8    information is in the FBAR.
 9            And I want to then show you a couple of other things
10    here about that.                                                  10:59:31
11            All right.  First and foremost, the testimony -- and
12    this was in Exhibit 1.  Exhibit 1 has a number of different
13    emails in it.  And in Exhibit 1, Mr. Lacey tells Mr. Becker,
14    who's an attorney, that, look, I'm not trying to hide any taxes
15    or anything.  I want to put my money in a place where it's not    11:00:15
16    going to be interrupted by litigious parties and so on,
17    including the government.
18            And Becker tells you:  He came to me and told me they
19    were closing his bank accounts.
20            Well, you can't operate with -- can you imagine          11:00:31
21    operating without a bank account; right?  So he was tired of
22    that.  Didn't want it to happen.
23            And Becker even told you that after he did this
24    transaction, they closed his bank account.  And -- and nobody
25    claims he did anything wrong; right?                             11:00:48
```

1       So he says, Lacey:  I'm not trying to avoid any taxes

2   or anything.

3       And then you recall that there was another text

4   message from Mr. Lacey -- 6264, please.

5       And in this text message -- could you scroll down --       11:01:13

6   down to the first message.  Hang on.  There's one before this.

7       Well, all right.  This is the second message, but

8   let's look at it for a second.

9       Lacey specifically asks Becker -- you may recall this

10  when I had him on the stand -- who is going to take care of the     11:01:53

11  reporting that's required for this investment?

12      And then in this email, you get:  I believe Jacob --

13  Jacob Stein will receive the information needed for the report,

14  and your accountants will prepare it and file it.

15      There is no way that you can be guilty of concealing       11:02:19

16  this trust when you filed several, several FBARs, all of which

17  are in evidence for you to see with all the information

18  necessary.  Everything.  Amount.  People.  Everything.  Where

19  it went.  All the rest of it.

20      And you recall the testimony was there was no lien on       11:02:47

21  his money.  There were no restraints on it.  There were no

22  judgments on it.  There was no seizure of it.  He was free to

23  do whatever he wanted with the money.

24      And as far as when he filed it, he filed it on time.

25  There isn't any question that he filed it on time.  And        11:03:09

1   Mr. Becker told you that he and the accountants, apparently,

2   asked for this extension to file.  But that wasn't something

3   that Lacey did.  He didn't ask for it.  It was Becker.

4           And he mentions this IOLTA account to you.  That's

5   just a lawyer's account.  It's all it is.  Lawyer's account.      11:03:31

6   And Becker told you what he did.  He got the money from these

7   trusts which had been created as part of Mr. Lacey's estate.

8   He got estate planning.  He got the money from the trusts.  He

9   put it in his IOLTA account, and then he sent one check over

10  for the trust.                                                    11:03:55

11          Everything in everybody's name.  No hiding.  No

12  secrets.

13          So there wasn't a single person who testified here

14  that somebody tried to conceal something in any of the money

15  laundering or in this trust.  There was just no concealment.      11:04:12

16          There would have been testimony.  They would have

17  said, oh, well, I went in and it was under, you know, Mr. Blue

18  or it was under, you know, Sally X.

19          No.  There was none of that.  Everything was in

20  everybody's name.  Everybody -- every business was the real      11:04:28

21  business.  There wasn't anything like that that was

22  concealment.

23          Pardon me.

24          So -- and the other thing.  The other money laundering

25  counts that he talks about here, Mr. Lacey believed in good      11:04:48

UNITED STATES DISTRICT COURT

1    faith -- and we've gone through all the reasons why that makes

2    sense, and there's proof that supports it from the FBI, from

3    the police, from Carl Ferrer's statements, from Fassett's

4    statements, from all the things they were doing, the seven

5    things, all that stuff, if in good faith he believed that, he's          11:05:08

6    not guilty of the crimes that have been charged about

7    facilitating prostitution; and, therefore, the proceeds are not

8    dirty proceeds to be part of a money laundering count.  They're

9    simply not.

10         And I think you have a substantial basis here to see          11:05:31

11    why someone who was not connected with the day-to-day of

12    Backpage and who had all this information about working with

13    the authorities, which was substantiated by the authorities

14    thanking them, it was substantiated by the FBI report and so

15    on, that it was reasonable for him to believe that things were          11:05:57

16    being operated correctly and legally.

17         A couple of other things.

18         Mr. Dougherty testified, and I asked him about a -- an

19    email that he had sent where he made a -- a comment about they

20    traded that legacy in for a chase -- for a chase of gold          11:06:29

21    derived from prostitution.

22         What Mr. Dougherty explained was that comment related

23    to an article that he cited, which was in Reuters.  And it was

24    an article Backpage Chief Pleads Guilty.  And he was talking

25    about the fact that when Ferrer pled guilty, that somebody          11:06:56

1  obviously -- I think you can see what he was saying, that that

2  guilty plea would in some way, you know, tarnish their

3  reputation of the newspapers, or whatever.

4      But there was certainly no indication there that there

5  was some sort of admission, if you will, that -- by Lacey that      11:07:11

6  he engaged in any kind of illegal conduct.

7      We had another thing.  I think I mentioned this, but

8  maybe not.  There was another communication for -- with his

9  wife, and it was about:  Jim and I believe in legalized

10  prostitution.                                                       11:07:38

11      That's different than I would violate the law.  Okay?

12  I believe in the Second Amendment, but I would have a license,

13  a permit.

14      And so, you know, you can have a belief.  There are a

15  lot of people who believe -- in fact, some people -- and when     11:07:57

16  we were selecting the jury, it indicated they believe in things

17  like prostitution should be legalized and regulated,

18  healthcare, and all the rest of it.  That doesn't mean you're

19  going to break the law.

20      And there was nothing in here, in this statement read        11:08:11

21  by Mr. Dougherty, that would indicate some kind of admission by

22  Mr. Lacey that they were committing a crime.  He was referring

23  to this article.

24      They never put the article in, so you couldn't get all

25  the details.  All it said is that, you know, the chief, Ferrer,    11:08:29

1    pled guilty.

2          Another thing.  And this -- there was an -- an

3    Exhibit 171, who was -- which was put in.  And I believe at the

4    time that the point that Mr. Rapp was making, that this was

5    some request maybe by -- let's see.  What's the company here?          11:08:53

6    By NCMEC.  This was some kind of request that Backpage do

7    certain things.

8          And he said that they rejected those things, meaning

9    Backpage.  But what he left out was the -- the following

10   language.  And -- well, let me preface it first by saying this:          11:09:21

11   What he left out was that this was a meeting with Mr. Moon, a

12   person named Don Moon, who they've identified as a director or

13   somebody on behalf -- lawyer, director, I forgot how you

14   classified him.  But, anyway, that -- that this was a

15   conversation with Moon.  And there was suggestions from NCMEC          11:09:44

16   about some things to do, and they didn't adopt those

17   suggestions.

18         Well, what he didn't tell you is that there's a long

19   memo in here from Moon, and there's an indication to --

20         MR. RAPP:  I'm going to object to this.          11:10:03

21         MR. CAMBRIA:  An indication --

22         MR. RAPP:  Object.  This didn't come into evidence.

23         MR. CAMBRIA:  This is in evidence.

24         THE COURT:  But let me --

25         MR. CAMBRIA:  This is -- this is in evidence.          11:10:11

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Let me -- let me rule first.
 2              I will overrule the objection.
 3              But let's move on, Mr. Cambria.
 4         MR. CAMBRIA:  What was the last part, Your Honor?
 5         THE COURT:  Let's move on.                            11:10:29
 6         MR. CAMBRIA:  Oh.  Thank you.  Okay.
 7         What he left out is the fact that Moon said:  Why
 8    don't we get together and -- and create some national standards
 9    for these platforms so that everybody's following those
10    national standards, and then that will help -- you know,       11:10:52
11    help -- help children and so on.  He says like -- well, let me
12    read this to you.
13         MR. RAPP:  Wait a minute.  This did not come into
14    evidence.
15              THE COURT:  Well, yes.                             11:11:06
16         Mr. Cambria, let's identify what it is you're reading
17    from to make sure that it is an exhibit that is in evidence.
18              MR. CAMBRIA:  Your Honor, I'm reading from a
19    memorandum to John Ryan.
20              THE COURT:  All right.  Let's identify the exhibit  11:11:19
21    number.
22              MR. CAMBRIA:  Oh.  171.
23              MR. RAPP:  Right.  That part of 171 didn't come in.
24              THE COURT:  Well --
25              MR. CAMBRIA:  Pardon?  Recheck the exhibits.        11:11:30
```

72

```
1          THE COURT:  Let me have my courtroom deputy confirm.

2     (The Court and the courtroom deputy confer.)

3     (Discussion held off the record.)

4          THE COURT:  We have it as fully admitted.

5          Mr. Rapp, would you like to look at the exhibit?        11:13:15

6          MR. RAPP:  All right.

7          THE COURT:  What does that mean, "all right"?

8          MR. RAPP:  I guess this came in.

9          THE COURT:  All right.

10         MR. RAPP:  But it wasn't our attempt --               11:14:10

11         THE COURT:  And, members of the jury --

12         MR. CAMBRIA:  I can finally use it, Your Honor?

13         THE COURT:  And, members of the jury, it is important

14    that we try to be as accurate as possible.

15         And so, Mr. Cambria, yes, the exhibit was admitted.    11:14:20

16    You may refer to it.

17         MR. CAMBRIA:  Thank you.

18         May I read it?

19         THE COURT:  Yes, you may.

20         MR. CAMBRIA:  All right.  Thank you.                   11:14:29

21         What Mr. Rapp did not disclose to you is this

22    particular communication.  What he was talking about was that

23    Backpage refused to take some suggestions that were made, but

24    he didn't tell you about the rest of this.

25              Don Moon said as follows:  I appreciated the      11:14:54
```

 1   opportunity for Liz McDougall and me to meet with Staca and

 2   other NCMEC staff to discuss the first-cut online adult

 3   advertising standards proposals you provided to me in our

 4   meeting with Senator DeConcini in June.  Health issues have

 5   taken me out of service for such -- much of the time since, but    11:15:24

 6   those have now been attended to and I look forward to resuming

 7   our dialogue.

 8        It has long been my view that a close collaboration

 9   between stakeholders on crafting a set of industry standards

10   has much to offer in terms of minimizing child exploitation and   11:15:42

11   more effectively identifying, arresting and prosecuting those

12   who prey on children.  As I indicated to -- in the Conclusion,

13   I believe the involvement of a public interest, public policy

14   concern, The O'Connor House, founded by Retired Justice Sandra

15   Day O'Connor, might provide a valuable platform to move the       11:16:08

16   search for meaningable -- meaningful workable standards

17   forward.

18        As noted in a discussion of your first-cut proposals

19   with Staca and NCMEC staff, I do not believe online standards

20   can be productively separated from the First Amendment concerns   11:16:28

21   of the Internet speech and privacy communities, nor from the

22   unambiguous pronouncement of the federal courts on these

23   issues.  However, when I promised Staca that I would furnish a

24   memo setting out where I think those pronouncements --

25   pardon?                                                           11:16:53

1          Yeah, I -- I suppose I could do that.

2          Can we just publish this, please?  Maybe that would be

3    easier.

4          MR. RAPP:  This actually was not published during the

5    trial.                                                          11:17:03

6          THE COURT:  Well --

7          MR. CAMBRIA:  It could have.

8          THE COURT:  It was not.  You can continue on.

9          MR. CAMBRIA:  Just reading?  Okay.  That's fine.

10         THE COURT:  The jurors will have it with them.           11:17:11

11         MR. CAMBRIA:  Let's see here.  Where was I?

12         I would furnish a memo setting out where I think those

13   pronouncements would most impact potential industry standards.

14   It did not occur to me that I was volunteering for a task that

15   would cause the repeated destruction of draft after draft" --   11:17:28

16   now let me skip down to Background.

17         Following Kent State's shootings in the '70s, Michael

18   Lacey and Jim Larkin (with colleagues who would later depart

19   for other pursuits) founded a free mimeographed anti-war

20   newspaper called the New Times at Arizona State University.  At  11:17:47

21   the time, the local daily newspapers, the Arizona Republic and

22   Phoenix Gazette, were firmly pro-war and traditional

23   advertisers and had no interest in patronizing the New Times in

24   a state with the highest percentage of retirees -- military

25   retirees in the nation.  New Times weekly exercised the free    11:18:10

1    speech for small nightclubs, et cetera.

2         Let me skip on.

3         Well, let's see here.

4         Over a decade after beginning New Times, Lacey and

5    Larkin acquired their second paper, Westward in Denver.  Other    11:18:36

6    papers followed and a merger of New York -- of New Times

7    Holdings with five Village Voice newspapers in 2006 brought a

8    national total of 16 papers in all.  The combined company,

9    Village Voice Media Holdings, has won four Pulitzer Prizes and

10   numerous other awards for excellence in journalism and public    11:19:02

11   service.  I joined the board of the company as its only outside

12   director following the 2006 merger.

13        From its inception, the company has vigorously

14   defended First Amendment rights in a variety of contexts across

15   the country.  They've successfully challenged on First          11:19:20

16   Amendment grounds conviction for publishing an advertisement

17   for abortional [sic] services.  It successfully challenged a

18   regulation restricting the distribution of newspapers on

19   university campuses.  And no media company in America has been

20   more aggressive in pursuing the public right to public          11:19:39

21   information and public records exposing the decisions and

22   conduct of public officials.  The company successfully argued a

23   seminal case before the Texas Supreme Court reaffirming and

24   expanding the right to publish satire that holds public

25   officials up to ridicule.  And Lacey and Larkin recently won a  11:20:00

1　far-reaching victory in the Ninth Circuit Court of -- United

2　States Court of Appeals under the Civil Rights Act,

3　constricting police and prosecutor immunity for First Amendment

4　retaliatory conduct, a case that arose after they published

5　grand jury information, were subjected to late-night arrests at　　11:20:20

6　their homes for an alleged violation of grand jury secrecy.

7　　　　　The foregoing is by no means exhaustive of the fights

8　Lacey and Larkin have fought in furtherance of First Amendment

9　values over many years.  It does, however, speak to the basic

10　proposition that their commitment to First Amendment values is　　11:20:39

11　neither situational nor of recent vintage.

12　　　　　It has been said by critics that all the owners of

13　Backpage care about is money.  I would note the reason I agreed

14　to sit on the company's board is that I know better than that.

15　I watched this journalistic enterprise loose large　　　　　　　11:21:05

16　lucrative -- lose large lucrative advertisement accounts over

17　the years (Anheuser-Busch, J.C. Penney, Coors) because they

18　wouldn't soften or sacrifice their principles or content even

19　when they knew a given story or a series or review would cause

20　their profit arrow to point south.  I've had differences of　　11:21:27

21　opinion with Lacey and Larkin over the years.  I am probably

22　less a First Amendment absolutist than they, but I respect

23　their views and their willingness to fight for them enormously.

24　　　　　As a host of third-party generated content, Backpage

25　has voluntarily implemented reasonable measures to counter the　　11:21:47

UNITED STATES DISTRICT COURT

```
 1   use of its service to exploit men, women, children, and is

 2   constantly looking for ways to improve.  But it has steadfastly

 3   refused to succumb to statutory and regulatory censorship of

 4   hosted content.

 5          The company has established its immunity from civil        11:22:08

 6   claims under the Communications Decency Act 6 and has enjoyed

 7   the enforcement of three state criminal statutes on CDA and

 8   First Amendment ground laws the courts found would plainly kill

 9   free speech rights by subjecting Backpage and other online

10   hosts to state criminal liability for not ascertaining the age   11:22:29

11   of persons depicted in advertisements posted by its users.  It

12   has established that the First Amendment is not a stranger to

13   the attempted application of federal criminal law to online use

14   conduct, that First Amendment anonymity rights are not a

15   stranger to online adult advertising, and that the authority of  11:22:53

16   government to investigate the First Amendment space is

17   fundamentally more constricted than in normal investigative

18   contexts.

19          I'm not new to politics or public policy.  I've run

20   for and held public office.  As an elected prosecutor, I have    11:23:09

21   prosecuted crimes against children.  I've written statutes and

22   industry regulations.  I put forth First Amendment values in

23   trial and appellate courts.  So I understand why Backpage's

24   ability to assert the importance of Internet speech and privacy

25   rights in the political and public policy area --                11:23:30
```

 1          MR. RAPP:  Are we --

 2          MR. CAMBRIA:  -- arenas --

 3          MR. RAPP:  I'll object.

 4          THE COURT:  Well, let -- there's -- what is the

 5   objection?                                                11:23:37

 6          MR. RAPP:  The objection --

 7          THE COURT:  Please stand.

 8          MR. RAPP:  Yes.  The objection was this document

 9   wasn't shown to the jury during the trial.  He's just reading,

10   and it's something that wasn't published to the jury.     11:23:45

11          THE COURT:  And -- and, Mr. Cambria, again, this is

12   summation.  And to the extent you want to refer or summarize, I

13   think that would be the better course rather than reading an

14   entire multipage document to the jury.

15          MR. CAMBRIA:  All right.  Your Honor, I -- I obviously  11:24:05

16   can shift a little bit here.

17          So this will be available for you to read.  It's 171.

18   It gives a history of the company, and it gives a history of

19   the things that they were doing to help fight any kind of

20   illegal activity.  And, again, this -- it -- when you get the  11:24:30

21   opportunity to read this, you'll be able to have the full

22   picture of all of the things that have been done proactively by

23   this company through Ferrer and the people who ran it to not

24   facilitate prostitution, but to fight it.  And that's a big

25   deal.  Because unless they can prove that my client knowingly,  11:25:05

1   intentionally, and so on, violated these laws, there are no

2   illegal proceeds if there is no money laundering.  There is no

3   guilt.

4          Now, Mr. Rapp went down count by count:  Count 1,

5   guilty; Count 2, guilty.  Count -- I'm not going to do that to          11:25:25

6   you.  I'm just going to say in a collective mode that we, I

7   believe, have demonstrated a good-faith belief on the part of

8   Mr. Lacey, supported by all the various things that I

9   indicated, starting with the memo from Fassett asking them to

10  do the seven things, coupled with all of the police officers          11:25:52

11  who thanked them over the years, coupled with the highest law

12  enforcement person in the United States, the director of the

13  FBI.

14         If you had all of those, would you not think that you

15  were not violating the law?  And would it not be reasonable to          11:26:13

16  have that belief?  Would it not be reasonable?  It would be

17  reasonable to have that belief.

18         And all I can do is ask you to listen, to look at what

19  you've heard.  Look at what you've heard?  Think about what

20  you've heard and what you see -- and you'll have access to any          11:26:44

21  of these exhibits that you would like -- and realize that this

22  man should not be convicted of any of these offenses.

23         And I would ask you, as jurors, those of you who are

24  with us on this and feel that this good faith -- and, remember,

25  they have the burden of disproving good faith beyond a          11:27:09

UNITED STATES DISTRICT COURT

1    reasonable doubt.  That is their burden.  And they haven't done

2    that, because, you see, they haven't shown that something was

3    concealed, which would, you know, give you some pause about the

4    honesty.  They haven't demonstrated that at all.  Nothing was

5    concealed.  They have not refuted the fact that all of these        11:27:35

6    police authorities thanked them for their assistance.

7         Now, look, if you want to think that all of these

8    police authorities got fooled, okay, but it's impossible to

9    believe.  It's just not possible to believe that.  And

10   especially the FBI, and especially when the FBI has a person      11:27:53

11   that's been all over the testimony and the statements and so on

12   sitting right here.  And -- and so that's never happened.

13        So now my words are sort of at an end here.  Mr. Rapp

14   does get a chance to speak again to you, and that's because

15   they have the burden of proof.  And I can't get up.  I'm          11:28:23

16   probably going to be over there, you know, doing -- twisting

17   and turning and -- and, you know -- I can't help it, Your

18   Honor.  I'm Italian.

19        That I'm sure I'm going to be twisting and turning

20   over there when he's -- when he's talking.  But I ask -- I ask     11:28:41

21   you this:  Assume somebody near and dear to you is on trial

22   here.  Give them that same trial you would expect for somebody

23   close to you.  Just the same trial.  And -- and say to

24   yourself, is it unreasonable for somebody to think that when

25   they are working all of these various facets with various          11:29:10

1  police agencies and not one of them said, hey, wait, we're not

2  working with you, you guys are breaking the law?

3          That never happened.  And -- and when you know you're

4  helping them -- because people are going to jail.  These pimps

5  that prey on people are going to jail.  Why in any possible way          11:29:34

6  would you think you're doing something wrong and that you're

7  breaking the law?

8          And that's basically where we are.

9          So Michael has been with me for the last three years.

10  Been my baby.  And I'm proud to have represented him.  Very          11:30:01

11  proud.  I did my best.  And I -- I hope I haven't done anything

12  to offend you.  But if I have, tell me when we're out in the

13  hall.

14          But the last words that are going to be spoken in this

15  case that'll affect him will be yours.  And I hope that they          11:30:27

16  consist of two words.  Two words:  Not guilty on all counts.

17  Every one of these counts is a legal grenade.  Don't

18  compromise.  If you're with us, stay with us.

19          In a case where's there's doubt, in a case where

20  there's good faith, a not guilty verdict is the just verdict.          11:31:03

21  It is the sincere verdict.  It's the citizens standing between

22  the government and another citizen being accused.

23          I did my best.  I hope that I have persuaded you that

24  they haven't persuaded you beyond a reasonable doubt that my

25  client was guilty of any one of these charges.          11:31:32

1          And the last thing I do is thank you so much for your

2  service.

3          And I thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Cambria.

5          Members of the jury, I think at this juncture it's not          11:31:45

6  reasonable to expect that any additional counsel will be able

7  to complete their summation by noon, as I promised we would

8  release you.  And so what we will do is resume those summation

9  arguments on Tuesday morning at 9:00.

10          But, again, at this juncture, even though we're in the          11:32:06

11  middle of the summation arguments of counsel, all counsel are

12  permitted to have their last summation made to you without you

13  having already come to conclusions simply because one counsel

14  has spoken on behalf of their client or because the government

15  has.                                                                    11:32:29

16          The case has not been officially handed over to you

17  yet for deliberation, so you remain under the admonishment not

18  to come to any conclusions yet, not to discuss the matter

19  amongst yourselves, or to conduct any research, but to continue

20  to have that open mind until the very end when I do hand the          11:32:47

21  case over to you, along with those instructions.

22          And so I expect you to be here promptly at 9:00 so we

23  can complete the summation arguments.  And with that, I wish

24  you a very good weekend.

25          And please all rise for the jury.                             11:33:06

UNITED STATES DISTRICT COURT

83

1      (Jury not present at 11:33 a.m.)

2           THE COURT:  All right.  Please be seated.

3           And, again, those of you who are present in the public

4      area of the courtroom, please remain for a few minutes so our

5      jury can leave the building without any interruption.          11:33:41

6           And we will resume closing arguments.

7           I assume, Mr. Feder, you will be ready to go at

8      9:00 a.m.?

9           MR. FEDER:  I will be ready to go at 9:00 a.m.

10          THE COURT:  All right.                                     11:33:56

11          MR. FEDER:  What -- what was Mr. Cambria's comment?

12     He was born -- "I'm born ready."

13          I'm not born ready, but I'll do that.

14          THE COURT:  Okay.  Well, you can work on that.

15          All right.  We will stand in adjournment.                  11:34:07

16          THE COURTROOM DEPUTY:  All rise.

17     (Proceedings adjourn at 11:34 a.m.)

18                            ---oOo---

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

84

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 27th day of October, 2023.

*/s/ Cathy J. Taylor*
Cathy J. Taylor, RMR, CRR, CRC

## $

**$10,000** [2] - 28:17, 29:2
**$100** [1] - 20:12
**$140** [1] - 20:12
**$180** [1] - 18:23
**$200** [1] - 18:24
**$220,000** [1] - 30:6
**$30,000** [1] - 29:7
**$5,000** [1] - 28:4
**$50** [1] - 10:19
**$6,000** [1] - 27:16
**$60,000** [1] - 29:7
**$62,000** [1] - 29:8

## '

**'70s** [1] - 74:17

## /

**/s/Cathy** [1] - 84:19

## 1

**1** [7] - 10:2, 20:7, 51:3, 65:12, 65:13, 79:4
**10** [1] - 11:7
**100** [12] - 10:20, 15:12, 18:13, 31:12, 32:10, 32:19, 33:1, 34:6, 34:7, 44:8, 63:23, 65:2
**10:03** [1] - 36:4
**11** [3] - 9:2, 11:9, 29:17
**113a** [1] - 15:20
**1155** [1] - 3:8
**11:33** [1] - 83:1
**11:34** [1] - 83:17
**11th** [1] - 2:9
**12** [5] - 12:25, 13:2, 13:8, 45:6, 45:21
**120** [1] - 2:13
**1238** [1] - 30:24
**1239** [1] - 30:25
**1246** [1] - 31:5
**13** [3] - 13:11, 13:16, 13:18
**1301** [1] - 2:9
**14** [1] - 14:5
**14-year** [1] - 7:1
**14202** [1] - 2:13
**1479** [2] - 25:1, 29:10
**15** [1] - 14:8
**16** [3] - 14:9, 14:18, 75:8
**16.5** [1] - 32:22
**160** [1] - 2:19

**164** [1] - 10:9
**17** [6] - 14:19, 14:22, 18:7, 19:5, 21:15, 40:14
**171** [4] - 70:3, 71:22, 71:23, 78:17
**1721** [1] - 18:17
**1722** [1] - 18:24
**1723** [2] - 18:17, 18:24
**1724** [1] - 18:25
**1732** [1] - 19:9
**1735** [1] - 18:8
**1737** [1] - 11:3
**178a** [1] - 21:15
**18** [3] - 11:9, 17:24, 18:7
**1800** [1] - 2:5
**1819** [1] - 17:25
**1875** [1] - 3:4
**19** [4] - 14:23, 15:5, 18:7, 19:21
**1953** [1] - 18:19
**1967** [1] - 19:21
**1967b** [1] - 20:1
**198** [1] - 17:17
**199** [1] - 17:20

## 2

**2** [10] - 7:23, 7:24, 9:16, 9:25, 10:2, 10:4, 10:17, 20:6, 79:5
**20** [9] - 13:20, 15:6, 15:9, 18:8, 19:9, 23:7, 30:5, 44:25, 56:20
**20005** [1] - 2:10
**2004** [2] - 8:11, 8:25
**2006** [2] - 75:7, 75:12
**2009** [1] - 8:10
**201** [1] - 17:8
**2010** [4] - 8:10, 8:24, 13:20, 19:23
**2011** [2] - 13:24, 48:1
**2013** [1] - 9:17
**2014** [3] - 12:18, 20:12, 21:16
**2015** [7] - 21:7, 22:10, 23:1, 29:19, 29:20, 44:2, 46:19
**2016** [2] - 17:12, 17:24
**2017** [4] - 30:25, 31:25, 32:1, 32:4
**2018** [5] - 19:21, 19:24, 31:6, 34:1
**2023** [2] - 1:8, 84:16
**2036a** [1] - 9:4
**2044** [1] - 22:19
**21** [4] - 15:10, 15:15,

18:8, 38:22
**210** [1] - 2:16
**211c** [1] - 9:3
**212** [1] - 10:1
**212a** [1] - 10:1
**214** [2] - 11:22, 11:23
**215** [1] - 14:6
**215a** [1] - 13:9
**22** [1] - 15:24
**221** [1] - 16:10
**223** [1] - 19:9
**224** [1] - 19:9
**225** [1] - 19:9
**226** [1] - 19:11
**227** [1] - 19:12
**228** [1] - 19:12
**229** [1] - 19:12
**23** [1] - 16:9
**230** [1] - 19:12
**2300** [1] - 3:4
**24** [2] - 16:10, 16:19
**25** [2] - 11:9, 18:25
**25th** [1] - 17:24
**26** [3] - 1:14, 11:9, 18:25
**27** [5] - 1:8, 18:6, 18:8, 18:14, 19:5
**2734** [1] - 3:12
**27th** [1] - 84:15
**28** [2] - 18:8, 19:5
**288** [1] - 19:21
**29** [2] - 18:8, 19:5
**2930** [1] - 2:19
**2:18-cr-00422-DJH** [1] - 1:5

## 3

**3** [2] - 10:17, 11:4
**30** [6] - 18:8, 18:16, 18:19, 18:21, 18:23, 19:5
**30-minute** [1] - 12:2
**31** [6] - 1:22, 18:6, 18:8, 18:10, 18:14, 19:5
**312** [1] - 1:21
**32** [2] - 18:22, 19:1
**322-7249** [1] - 1:23
**33** [4] - 18:16, 18:19, 18:21, 19:9
**35** [1] - 4:4
**3550** [1] - 3:8
**36** [3] - 4:4, 18:22, 19:1
**37** [3] - 19:3, 19:4
**38** [1] - 19:4
**39** [1] - 19:4
**3rd** [1] - 12:18

## 4

**4** [2] - 11:13, 11:24
**40** [2] - 2:5, 19:4
**401** [1] - 1:22
**41** [2] - 19:3, 19:4
**42** [3] - 2:13, 19:7, 19:8
**43** [1] - 19:8
**44** [1] - 19:8
**45** [1] - 19:8
**46** [2] - 19:7, 19:8
**47** [2] - 19:11, 19:18
**49** [2] - 19:19, 20:1

## 5

**5** [3] - 11:25, 12:5, 28:7
**5,000** [1] - 45:11
**50** [6] - 10:18, 10:19, 11:6, 39:1, 39:6
**505** [1] - 11:7
**507** [1] - 11:8
**508** [1] - 11:8
**509** [1] - 11:8
**51** [4] - 7:23, 7:24, 19:11, 19:18
**510** [1] - 11:9
**511** [1] - 11:9
**512** [1] - 11:9
**513** [1] - 11:10
**52** [3] - 20:7, 32:9, 32:12
**53** [3] - 24:22, 26:17, 26:24
**5364** [1] - 27:18
**54** [1] - 26:17
**55** [1] - 26:17
**56** [1] - 26:17
**57** [1] - 26:20
**58** [1] - 26:20
**59** [1] - 26:20

## 6

**6** [3] - 4:3, 9:19, 77:6
**60** [1] - 26:20
**602** [1] - 1:23
**6142** [2] - 52:13, 52:14
**6189** [1] - 21:18
**62** [2] - 24:22, 26:24
**6243** [2] - 42:9, 42:10
**6264** [1] - 66:4
**63** [2] - 27:7, 27:17
**64** [2] - 28:4, 28:7
**65** [1] - 28:8
**66** [1] - 28:10
**662** [1] - 47:20

**67** [1] - 28:10
**6720** [1] - 2:16
**68** [1] - 28:10
**69** [2] - 28:21, 29:5

## 7

**7** [1] - 11:7
**70** [3] - 21:11, 28:21, 29:5
**71** [2] - 29:9, 29:11
**72** [1] - 29:11
**73** [1] - 29:11
**74** [1] - 29:11
**75** [1] - 29:11
**76** [1] - 29:11
**77** [2] - 29:9, 29:11
**78** [1] - 29:18
**783** [1] - 28:5
**79** [1] - 29:18
**792** [1] - 24:15

## 8

**8** [2] - 11:7, 29:17
**80** [2] - 29:18, 30:12
**81** [1] - 29:18
**82** [2] - 30:4
**83** [1] - 30:7
**84** [1] - 30:7
**85** [2] - 30:12
**85003-2151** [1] - 1:22
**85004-4408** [1] - 2:5
**85012** [1] - 3:9
**85016** [1] - 2:20
**85252-2734** [1] - 3:12
**85253** [1] - 2:17
**86** [1] - 30:12
**87** [1] - 30:12
**88** [1] - 30:16
**89** [1] - 30:16
**8:44** [3] - 1:8, 5:3, 5:4
**8:48** [1] - 5:18
**8:58** [1] - 5:18
**8:59** [1] - 5:19

## 9

**9** [1] - 11:7
**90** [1] - 30:16
**90067** [1] - 3:4
**91** [1] - 30:16
**92** [1] - 30:18
**93** [1] - 30:18
**94** [1] - 31:12
**99** [2] - 28:21, 32:21
**9:00** [5] - 5:24, 82:9, 82:22, 83:8, 83:9
**9:49** [1] - 35:8
**9:51** [1] - 35:20

**9:59** [2] - 35:20, 35:21

## A

**a.m** [16] - 1:8, 5:3, 5:4, 5:18, 5:19, 5:24, 35:8, 35:20, 35:21, 36:4, 83:1, 83:8, 83:9, 83:17
**A.M** [1] - 1:15
**ability** [2] - 52:18, 77:24
**able** [3] - 36:21, 78:21, 82:6
**abolitionists** [2] - 59:5, 59:6
**abortional** [1] - 75:17
**above-entitled** [1] - 84:12
**absence** [1] - 38:3
**absolutely** [2] - 15:16, 28:22
**absolutist** [1] - 76:22
**abuse** [1] - 59:21
**access** [2] - 49:8, 79:20
**accident** [1] - 36:25
**accomplish** [1] - 6:21
**accomplishment** [1] - 6:21
**account** [28] - 21:17, 26:2, 26:19, 26:22, 27:24, 28:6, 29:16, 29:24, 30:2, 31:15, 31:21, 31:22, 32:6, 32:7, 32:23, 34:2, 34:3, 34:4, 63:5, 65:21, 65:24, 67:4, 67:5, 67:9
**accountants** [2] - 66:14, 67:1
**accounts** [5] - 24:19, 32:9, 63:17, 65:19, 76:16
**accurate** [4] - 63:13, 63:15, 72:14, 84:11
**accused** [1] - 81:22
**accusers** [1] - 36:25
**acknowledges** [1] - 15:21
**acquired** [1] - 75:5
**acquitted** [1] - 37:4
**Act** [14] - 6:10, 7:7, 7:8, 20:3, 20:15, 24:24, 27:6, 28:18, 28:25, 29:4, 33:5, 33:9, 76:2, 77:6
**act** [9] - 6:25, 7:1, 7:20, 17:8, 17:9, 38:1, 38:2, 48:17,

84:8
**acted** [2] - 27:5, 38:1
**actions** [1] - 38:5
**activities** [2] - 20:22, 25:10
**activity** [3] - 25:17, 26:13, 78:20
**acts** [8] - 7:2, 7:6, 7:19, 8:2, 9:15, 15:14, 16:6, 38:6
**actual** [2] - 8:2, 20:1
**Ad** [1] - 27:23
**ad** [18] - 13:14, 16:12, 17:1, 17:3, 17:6, 17:18, 18:3, 22:6, 23:1, 56:14, 56:16, 56:19, 57:17, 57:21, 57:22, 58:13, 60:11, 61:12
**Adams** [1] - 6:13
**add** [2] - 24:1, 30:23
**adding** [1] - 17:16
**additional** [1] - 82:6
**address** [2] - 10:8, 21:25
**adjourn** [1] - 83:17
**adjournment** [1] - 83:15
**admission** [2] - 69:5, 69:21
**admitted** [3] - 47:13, 72:4, 72:15
**admonishment** [1] - 82:17
**ado** [1] - 32:19
**adopt** [1] - 70:16
**ads** [37] - 7:23, 16:23, 17:13, 17:14, 17:22, 18:6, 18:12, 18:14, 18:22, 19:7, 19:9, 19:16, 19:17, 22:8, 23:25, 24:17, 39:1, 39:6, 39:10, 44:14, 46:8, 47:9, 47:10, 48:16, 51:18, 56:2, 56:3, 56:4, 56:6, 56:7, 56:23, 57:7, 57:10, 58:9
**adult** [2] - 12:20, 73:2, 77:15
**advertise** [1] - 40:17
**advertisement** [2] - 75:16, 76:16
**advertisements** [1] - 77:11
**advertiser** [3] - 41:24, 43:25, 46:18
**advertisers** [1] - 74:23
**advertising** [3] - 57:8, 73:3, 77:15

**advised** [1] - 21:16
**affect** [1] - 81:15
**affects** [1] - 25:22
**affiliated** [1] - 15:3
**affirmatively** [1] - 48:17
**age** [2] - 56:9, 77:10
**agencies** [3] - 33:16, 62:10, 81:1
**agent** [1] - 53:8
**agents** [2] - 43:2, 53:22
**aggregated** [1] - 31:20
**aggressive** [1] - 75:20
**ago** [1] - 34:15
**agree** [2] - 8:4, 15:2
**agreed** [2] - 39:13, 76:13
**agreement** [5] - 6:8, 8:3, 39:14, 39:15, 39:23
**aid** [1] - 53:15
**Aided** [1] - 1:24
**AIMS** [1] - 23:5
**al** [1] - 1:8
**alleged** [1] - 76:6
**alleges** [1] - 39:1
**allow** [1] - 14:16
**allowance** [1] - 19:23
**allowed** [1] - 18:1
**almost** [4] - 14:14, 20:12, 45:11, 58:24
**alternative** [1] - 24:8
**Amendment** [14] - 34:22, 69:12, 73:20, 75:14, 75:16, 76:3, 76:8, 76:10, 76:22, 77:8, 77:12, 77:14, 77:16, 77:22
**America** [3] - 1:5, 12:17, 75:19
**American** [1] - 21:3, 52:19
**Americans** [1] - 37:13
**amount** [2] - 20:11, 66:18
**amounts** [1] - 38:18
**Andrea** [2] - 9:12
**Andrew** [6] - 2:3, 3:7, 12:22, 17:20, 18:3, 20:5
**andrew.stone@ usdoj.gov** [1] - 2:7
**aneuman@ birdmarella.com** [1] - 3:6
**Angeles** [1] - 3:4
**Anheuser** [1] - 76:17
**Anheuser-Busch** [1] -

76:17
**anonymity** [1] - 77:14
**answer** [2] - 41:5, 56:14
**anti** [1] - 74:19
**anti-war** [1] - 74:19
**Anya** [6] - 16:1, 22:3, 22:24, 22:25, 23:20, 24:7
**anytime** [1] - 49:25, 62:24
**anyway** [2] - 60:25, 70:14
**Appeals** [1] - 76:2
**appeared** [1] - 28:6
**appellate** [1] - 77:23
**application** [4] - 21:19, 22:8, 43:18, 77:13
**appointed** [1] - 84:8
**appreciate** [1] - 36:23
**appreciated** [1] - 72:25
**appropriate** [1] - 37:6
**April** [3] - 13:24, 29:20, 34:1
**area** [6] - 12:21, 42:15, 42:17, 49:2, 77:25, 83:4
**arenas** [1] - 78:2
**argued** [1] - 75:22
**argument** [3] - 35:11, 54:9, 54:12
**arguments** [5] - 36:1, 82:9, 82:11, 82:23, 83:6
**Arguments** [1] - 4:3
**ARIZONA** [1] - 1:2
**Arizona** [12] - 1:7, 1:22, 2:5, 2:17, 2:20, 3:9, 3:12, 26:2, 74:20, 74:21, 84:9, 84:15
**arose** [1] - 76:4
**arrest** [2] - 56:3, 56:16
**arrested** [3] - 50:7, 57:14, 57:17
**arresting** [1] - 73:11
**arrests** [1] - 76:5
**arrives** [2] - 5:15, 9:21
**arrow** [1] - 76:20
**article** [9] - 12:10, 12:12, 15:20, 47:1, 47:6, 68:23, 68:24, 69:23, 69:24
**ascertaining** [1] - 77:10
**aspect** [1] - 42:15
**aspects** [1] - 46:10
**assaulted** [2] - 57:3,

57:4
**assert** [1] - 77:24
**assistance** [2] - 52:17, 80:6
**Association** [1] - 32:2
**assume** [2] - 80:21, 83:7
**Astrid** [3] - 13:2, 13:10, 14:7
**attempt** [1] - 72:10
**attempted** [1] - 77:13
**attended** [1] - 73:6
**attorney** [1] - 65:14
**Attorney** [1] - 32:2
**ATTORNEYS** [1] - 2:2
**attorneys** [1] - 43:2
**attract** [1] - 58:17, 58:21
**Auburn** [1] - 8:21
**August** [1] - 33:25
**Austin** [1] - 2:9
**austin.berry2@ usdoj.gov** [1] - 2:10
**authorities** [10] - 48:10, 48:13, 55:6, 60:2, 60:3, 61:25, 68:13, 80:6, 80:8
**authority** [1] - 77:15
**auto** [2] - 22:5, 22:15
**automatic** [1] - 63:1
**available** [1] - 78:17
**Avenue** [2] - 2:5, 2:9, 2:13, 3:8
**avoid** [1] - 66:1
**awards** [2] - 40:17, 75:10
**aware** [1] - 17:12

## B

**baby** [1] - 81:10
**backdrop** [1] - 37:23
**Background** [1] - 74:16
**background** [1] - 63:3
**Backpage** [72] - 7:22, 8:11, 15:21, 16:17, 20:16, 23:4, 23:5, 23:19, 24:18, 24:20, 24:25, 25:4, 25:5, 25:19, 25:24, 26:1, 26:22, 27:15, 28:3, 29:13, 32:22, 32:24, 33:8, 37:21, 38:13, 38:15, 38:22, 39:10, 41:10, 41:13, 41:14, 41:17, 42:16, 42:25, 43:1, 43:20, 44:5, 44:6, 44:8, 44:15, 44:20, 45:5, 45:9,

45:17, 45:22, 45:24, 47:6, 47:14, 48:23, 48:24, 48:25, 49:3, 49:11, 49:12, 49:23, 50:5, 50:14, 51:16, 55:21, 60:2, 61:24, 62:2, 62:3, 68:12, 68:24, 70:6, 70:9, 72:23, 76:13, 76:24, 77:9
**Backpage's** [1] - 77:23
**Backpage.com** [13] - 6:16, 9:10, 11:20, 12:21, 25:12, 26:13, 27:19, 28:14, 29:1, 29:5, 29:10, 31:2, 52:16
**bad** [1] - 57:13
**baloney** [1] - 60:9
**Bank** [2] - 21:18, 34:4
**bank** [18] - 24:13, 24:19, 24:25, 25:24, 26:2, 26:4, 26:19, 27:23, 27:24, 28:20, 28:21, 31:22, 32:5, 32:23, 33:17, 65:19, 65:21, 65:24
**banking** [3] - 20:22, 24:9, 24:17
**banks** [1] - 24:12
**bargain** [3] - 44:4, 44:21, 44:22
**bars** [1] - 43:17
**base** [1] - 51:22
**based** [4] - 27:11, 56:16, 57:17, 57:21
**basic** [1] - 76:9
**basis** [4] - 47:18, 56:21, 68:10
**BDO** [1] - 22:14
**became** [3] - 6:19, 8:12, 8:13
**Beck** [6] - 16:1, 22:3, 22:24, 22:25, 23:20, 24:7
**Becker** [8] - 33:12, 65:13, 65:18, 65:23, 66:9, 67:1, 67:3, 67:6
**Becker's** [2] - 34:2, 34:3
**become** [1] - 8:13
**becomes** [3] - 12:2, 13:14, 29:16
**bedfellows** [1] - 40:10
**BEFORE** [1] - 1:12
**begin** [1] - 37:19
**beginning** [3] - 20:9, 31:6, 75:4

**behalf** [5] - 44:22, 45:3, 50:19, 70:13, 82:14
**belief** [10] - 38:3, 38:6, 38:8, 38:13, 41:7, 48:12, 69:14, 79:7, 79:16, 79:17
**beneficial** [2] - 21:23, 21:24
**beneficiaries** [2] - 30:14, 65:7
**Benson** [2] - 9:12
**Berry** [1] - 2:9
**BERTRAND** [2] - 3:11, 34:21
**Bertrand** [3] - 3:11, 34:24, 35:10
**best** [2] - 81:11, 81:23
**bet** [3] - 54:3, 54:5
**better** [2] - 76:14, 78:13
**between** [10] - 6:9, 10:7, 12:7, 17:3, 23:17, 24:6, 36:25, 41:20, 73:9, 81:21
**beyond** [6] - 19:23, 37:10, 38:1, 39:7, 79:25, 81:24
**bf@federlawpa.com** [1] - 2:20
**big** [4] - 40:18, 40:19, 41:24, 78:24
**Bill** [10] - 6:13, 50:2, 50:5, 50:6, 50:13, 53:4, 54:4, 54:5, 54:19, 54:24
**BIRD** [1] - 3:2
**bit** [7] - 10:5, 12:3, 22:1, 23:8, 33:22, 52:10, 78:16
**Bitcoin** [2] - 21:8, 26:3
**black** [1] - 16:2
**blocks** [1] - 37:12
**blue** [1] - 67:17
**board** [2] - 75:11, 76:14
**bore** [1] - 49:20
**born** [3] - 83:12, 83:13
**boss** [2] - 41:14, 44:1
**Boston** [1] - 12:21
**bothers** [1] - 63:22
**bottom** [3] - 18:10, 48:21
**bought** [7] - 24:17, 46:19, 46:20, 46:22, 60:23
**Box** [1] - 3:12
**BOXER** [1] - 3:2
**Brad** [1] - 19:14
**Breahannah** [3] -

14:9, 14:10, 14:19
**break** [4] - 11:18, 35:4, 35:5, 69:19
**breaking** [4] - 49:17, 53:1, 81:2, 81:7
**Brian** [2] - 9:18, 48:3
**Brief** [3] - 5:8, 5:12, 5:16
**brief** [1] - 35:15
**bring** [1] - 36:2
**bringing** [1] - 55:10
**broadcast** [1] - 12:23
**broke** [1] - 11:17
**brought** [2] - 49:25, 75:7
**Bruce** [1] - 2:19
**Brunst** [26] - 3:2, 20:5, 21:24, 22:7, 22:10, 22:12, 22:20, 23:10, 23:17, 24:6, 24:10, 25:7, 26:16, 26:23, 28:5, 28:9, 29:17, 29:22, 29:24, 30:5, 30:9, 30:15, 30:21, 31:1, 31:7
**Budapest** [2] - 31:21, 32:22
**Buffalo** [1] - 2:13
**build** [2] - 49:8, 49:10
**building** [2] - 37:12, 83:5
**burden** [6] - 37:10, 37:25, 38:10, 79:25, 80:1, 80:15
**Bureau** [1] - 52:15
**bus** [1] - 60:23
**Busch** [1] - 76:17
**business** [27] - 7:9, 7:11, 7:21, 9:11, 20:18, 39:9, 39:10, 40:7, 41:11, 41:15, 41:18, 41:20, 41:22, 41:23, 42:6, 42:7, 44:14, 46:3, 46:12, 48:2, 55:5, 55:8, 55:9, 60:24, 67:20, 67:21
**businesses** [1] - 63:19
**buy** [6] - 7:16, 16:5, 23:10, 23:11, 23:21, 23:23
**buying** [5] - 16:14, 23:13, 23:16, 23:18, 24:7
**BV** [1] - 27:23

**C**

**cadence** [1] - 35:25

**California** [1] - 3:4
**Camarillo** [4] - 29:6, 29:14, 29:15
**CAMBRIA** [25] - 2:12, 35:17, 36:11, 36:13, 53:12, 53:15, 53:20, 54:14, 54:16, 70:21, 70:23, 70:25, 71:4, 71:6, 71:18, 71:22, 71:25, 72:12, 72:17, 72:20, 74:7, 74:9, 74:11, 78:2, 78:15
**Cambria** [2] - 2:12, 35:16, 36:12, 50:12, 54:15, 71:3, 71:16, 72:15, 78:11, 82:4
**Cambria's** [1] - 83:11
**Camelback** [1] - 2:19
**campuses** [1] - 75:19
**cancel** [2] - 50:4, 59:7
**car** [1] - 7:18
**car's** [1] - 57:9
**card** [4] - 21:9, 21:11, 21:21, 51:18
**cards** [6] - 16:14, 21:8, 21:9, 21:12, 23:16
**care** [2] - 66:10, 76:13
**Carl** [20] - 27:8, 31:2, 37:20, 40:5, 41:11, 42:22, 42:23, 42:25, 43:23, 45:19, 46:22, 47:13, 48:1, 50:1, 51:20, 52:15, 60:22, 60:23, 61:24, 68:3
**carries** [1] - 38:4
**carry** [1] - 52:18
**carrying** [1] - 6:25
**cars** [2] - 16:7, 57:8
**case** [21] - 6:22, 11:12, 21:21, 29:14, 31:16, 31:17, 34:8, 34:18, 37:7, 38:21, 39:5, 39:11, 53:8, 54:7, 75:23, 76:4, 81:15, 81:19, 82:16, 82:21
**cases** [1] - 55:12
**cash** [2] - 24:16, 30:22
**cast** [1] - 61:17
**CATHY** [1] - 84:7
**Cathy** [2] - 1:21, 84:20
**CDA** [1] - 77:7
**censorship** [1] - 77:3
**Central** [2] - 2:5, 3:8
**Century** [1] - 3:4
**CEO** [1] - 41:13
**Cereus** [20] - 21:25, 25:6, 25:7, 25:8, 26:7, 26:8, 26:10, 26:14, 26:18, 26:22,

28:8, 29:21, 29:23, 30:5, 30:8, 30:10, 30:13, 30:17, 30:18, 31:8
**certain** [1] - 70:7
**certainly** [1] - 69:4
**certify** [1] - 84:7
**CERTIFY** [1] - 84:10
**Cervantes** [3] - 13:3, 13:10, 14:7
**cetera** [4] - 49:12, 53:25, 75:1
**CFO** [2] - 24:11, 29:15
**challenged** [2] - 40:3, 75:15, 75:17
**chance** [1] - 80:14
**changed** [1] - 25:4
**characterize** [1] - 41:3
**characterized** [1] - 43:3
**charge** [7] - 25:7, 30:9, 37:21, 55:4, 56:21, 64:18
**charged** [10] - 32:10, 32:11, 32:12, 32:20, 34:1, 39:12, 51:14, 64:17, 68:6
**charges** [6] - 23:9, 31:19, 38:7, 44:25, 62:20, 81:25
**chart** [6] - 25:2, 42:5, 43:5, 45:19, 63:4
**chase** [2] - 68:20
**check** [5] - 5:10, 29:7, 29:8, 67:9
**chief** [5] - 22:21, 26:15, 40:13, 40:23, 69:25
**Chief** [1] - 68:24
**child** [1] - 73:10
**children** [4] - 71:11, 73:12, 77:1, 77:21
**choice** [2] - 51:2, 52:3
**Chris** [1] - 30:23
**Circuit** [1] - 76:1
**citation** [1] - 62:7
**cited** [1] - 68:23
**citizen** [3] - 37:1, 37:17, 81:22
**citizens** [3] - 36:24, 37:14, 81:21
**Civil** [1] - 76:2
**civil** [1] - 77:5
**claim** [1] - 34:12
**claims** [2] - 65:25, 77:6
**classified** [1] - 70:14
**cleaning** [1] - 45:12
**clear** [1] - 17:17
**clearly** [1] - 42:10

**client** [6] - 37:4, 39:5, 51:7, 78:25, 81:25, 82:14
**client's** [2] - 38:12, 61:25
**close** [3] - 21:17, 73:8, 80:23
**closed** [1] - 65:24
**closer** [1] - 47:21
**Closing** [1] - 4:3
**closing** [4] - 36:7, 54:9, 65:19, 83:6
**clothes** [1] - 7:17
**clprovider@yahoo. com** [1] - 10:8
**CNN** [1] - 32:3
**co** [1] - 8:16
**co-conspirators** [1] - 8:16
**code** [1] - 10:19
**coded** [5] - 14:20, 15:6, 16:22, 17:9
**coincidentally** [1] - 9:7
**cold** [1] - 9:13
**collaboration** [1] - 73:8
**colleagues** [1] - 74:18
**collective** [1] - 79:6
**combined** [1] - 75:8
**coming** [5] - 15:4, 23:19, 25:12, 28:8
**commence** [1] - 5:3
**commending** [1] - 55:19
**comment** [4] - 51:10, 68:19, 68:22, 83:11
**comments** [1] - 37:23
**commerce** [1] - 25:22
**commit** [4] - 6:9, 32:13, 59:12, 59:16
**commitment** [1] - 76:10
**commits** [1] - 59:24
**committing** [2] - 32:25, 69:22
**common** [1] - 59:16
**communicating** [1] - 48:9
**communication** [2] - 69:8, 72:22
**Communications** [1] - 77:6
**communities** [1] - 73:21
**companies** [3] - 24:20, 27:21, 63:15
**companionship** [1] - 10:25
**company** [18] - 21:10,

21:11, 22:15, 24:19, 27:14, 27:24, 28:2, 43:8, 45:24, 70:5, 75:8, 75:11, 75:13, 75:19, 75:22, 77:5, 78:18, 78:23
**company's** [1] - 76:14
**compatible** [1] - 27:15
**complete** [2] - 82:7, 82:23
**compromise** [1] - 81:18
**computer** [1] - 7:3
**Computer** [1] - 1:24
**Computer-Aided** [1] - 1:24
**conceal** [9] - 20:20, 20:23, 25:5, 25:15, 27:22, 28:2, 62:21, 62:22, 67:14
**concealed** [10] - 32:15, 33:7, 62:17, 62:25, 63:10, 63:11, 64:1, 65:4, 80:3, 80:5
**concealing** [1] - 66:15
**concealment** [13] - 24:21, 27:19, 33:2, 33:20, 62:19, 63:12, 63:21, 63:24, 63:25, 65:3, 67:15, 67:22
**concern** [1] - 73:14
**concerns** [1] - 73:20
**conclude** [2] - 45:15, 45:21
**Conclusion** [1] - 73:12
**conclusions** [2] - 82:13, 82:18
**conduct** [6] - 58:22, 69:6, 75:22, 76:4, 77:14, 82:19
**conducted** [1] - 24:22
**confer** [1] - 72:2
**conference** [3] - 8:5, 48:6, 49:1
**confidence** [1] - 37:2
**confirm** [1] - 72:1
**conflicting** [1] - 40:21
**conglomerate** [1] - 40:20
**connected** [1] - 68:11
**connection** [3] - 43:19, 52:17, 58:15
**consist** [1] - 81:16
**consistent** [1] - 44:17
**conspiracy** [26] - 6:7, 6:8, 6:19, 6:25, 7:1, 7:6, 7:7, 8:2, 8:4, 8:8, 8:11, 8:13, 8:15,

8:17, 8:25, 9:9, 9:10, 20:2, 20:4, 20:7, 32:13, 32:15, 32:17, 39:14
**conspirators** [4] - 6:15, 6:18, 8:3, 8:16
**conspired** [1] - 39:13
**constantly** [1] - 77:2
**constitute** [1] - 84:10
**constricted** [1] - 77:17
**constricting** [1] - 76:3
**consulting** [1] - 22:15
**Cont'd** [1] - 3:1
**contacting** [1] - 15:2
**contained** [1] - 84:12
**content** [6] - 24:11, 24:13, 39:6, 76:18, 76:24, 77:4
**context** [2] - 11:16, 35:13
**contexts** [2] - 75:14, 77:18
**continue** [4] - 20:17, 34:25, 74:8, 82:19
**continuing** [1] - 31:7
**contributing** [1] - 62:3
**contributions** [1] - 52:21
**control** [8] - 22:11, 25:16, 29:24, 31:1, 33:9, 44:6, 44:9, 84:14
**controlled** [2] - 26:22, 28:9
**controlling** [1] - 30:2
**controls** [3] - 36:9, 53:18, 54:10
**conversation** [1] - 70:15
**convict** [2] - 56:18, 57:20
**convicted** [5] - 50:8, 50:21, 55:12, 60:10, 79:22
**conviction** [1] - 75:16
**cooperating** [1] - 61:25
**cooperation** [2] - 52:11, 52:16
**Coors** [1] - 76:17
**copy** [1] - 48:2
**correct** [1] - 62:23
**correctly** [2] - 38:14, 68:16
**correlate** [1] - 18:21
**corresponding** [1] - 64:8
**counsel** [8] - 35:3, 35:22, 36:16, 54:11, 82:6, 82:11, 82:13

**counsel's** [1] - 35:11
**Count** [57] - 9:16, 9:25, 10:4, 10:17, 11:4, 11:7, 11:13, 11:24, 11:25, 12:5, 12:25, 13:2, 13:8, 13:11, 13:16, 13:18, 14:5, 14:8, 14:9, 14:18, 14:19, 14:22, 14:23, 15:5, 15:6, 15:9, 15:15, 15:24, 16:9, 16:10, 16:19, 18:10, 20:6, 20:7, 27:7, 27:17, 28:4, 28:7, 28:8, 28:10, 29:5, 29:9, 29:18, 30:4, 32:12, 32:21, 34:6, 34:7, 63:23, 65:2, 79:5
**count** [11] - 15:24, 15:25, 16:19, 27:7, 32:18, 32:19, 37:4, 68:8, 79:4
**counter** [1] - 76:25
**country** [5] - 33:18, 40:15, 49:23, 50:11, 75:15
**Counts** [21] - 7:23, 7:24, 11:9, 15:10, 18:6, 18:8, 18:16, 18:22, 19:1, 19:4, 19:7, 19:18, 24:22, 26:17, 26:24, 30:7, 30:12, 31:12, 32:9
**counts** [31] - 9:16, 9:17, 12:25, 13:1, 14:23, 18:21, 18:25, 19:1, 19:3, 19:4, 19:10, 19:12, 25:2, 26:17, 26:20, 27:1, 28:11, 28:21, 29:11, 30:7, 31:13, 31:20, 32:11, 32:12, 32:17, 34:20, 62:24, 67:25, 81:16, 81:17
**couple** [8] - 8:1, 9:19, 11:16, 14:23, 40:2, 48:15, 65:9, 68:17
**coupled** [2] - 79:10, 79:11
**course** [7] - 21:23, 22:21, 28:24, 38:17, 39:20, 45:23, 78:13
**court** [5] - 12:3, 34:14, 35:25, 45:14, 64:18
**COURT** [43] - 1:1, 4:2, 5:5, 5:9, 5:11, 5:13, 5:21, 5:25, 34:23, 35:2, 35:9, 35:18, 35:22, 36:5, 36:12,

53:11, 53:14, 53:17, 54:8, 54:15, 70:24, 71:1, 71:5, 71:15, 71:20, 71:24, 72:1, 72:4, 72:7, 72:9, 72:11, 72:13, 72:19, 74:6, 74:8, 74:10, 78:4, 78:7, 78:11, 82:4, 83:2, 83:10, 83:14
**Court** [11] - 1:20, 1:24, 5:2, 36:15, 37:9, 72:2, 75:23, 76:1, 76:2, 84:8, 84:9
**Courthouse** [1] - 1:21
**courtroom** [4] - 5:2, 72:1, 72:2, 83:4
**COURTROOM** [5] - 5:10, 5:17, 5:20, 35:19, 83:16
**courts** [3] - 73:22, 77:8, 77:23
**crafting** [1] - 73:9
**CRC** [2] - 1:21, 84:20
**create** [1] - 71:8
**created** [7] - 27:20, 41:10, 41:13, 42:18, 43:6, 43:7, 67:7
**credit** [5] - 21:6, 21:9, 21:10, 21:21, 51:18
**credits** [9] - 23:10, 23:11, 23:14, 23:16, 23:18, 23:21, 23:24, 24:8
**crime** [5] - 39:12, 54:2, 59:24, 64:17, 69:22
**crime-fighting** [1] - 54:2
**crimes** [4] - 59:12, 59:16, 68:6, 77:21
**criminal** [12] - 6:16, 6:17, 8:6, 20:15, 20:16, 28:23, 34:10, 38:2, 38:5, 77:7, 77:10, 77:13
**criminally** [2] - 28:17, 28:22
**critics** [1] - 76:12
**cross** [2] - 33:22, 51:19
**cross-examination** [1] - 33:22
**cross-references** [1] - 51:19
**CRR** [2] - 1:21, 84:20
**cruded** [1] - 17:4
**curtain** [1] - 41:20
**customers** [2] - 21:14, 22:16

**cut** [2] - 73:2, 73:18
**CYA** [1] - 15:1

# D

**daily** [1] - 74:21
**Daisy** [1] - 57:6
**date** [1] - 84:13
**DATED** [1] - 84:15
**dates** [2] - 7:19, 16:15
**DAVID** [1] - 3:7
**David** [2] - 3:8, 6:14
**david@**
  **deisenbergplc.com**
  [1] - 3:9
**DAY** [1] - 1:14
**day-to-day** [7] - 41:15,
  44:14, 46:3, 46:10,
  46:12, 55:21, 68:11
**days** [4] - 40:8, 45:11,
  57:6, 59:14
**DC** [1] - 2:10
**deal** [6] - 31:13, 40:18,
  40:19, 43:12, 59:8,
  78:25
**dealing** [1] - 49:1
**deals** [1] - 33:1
**dear** [2] - 21:16, 80:21
**debt** [1] - 31:10
**decade** [1] - 75:4
**Decency** [1] - 77:6
**decided** [2] - 43:13,
  60:22
**decision** [1] - 36:22
**decisions** [2] - 43:21,
  75:21
**DeConcini** [1] - 73:4
**defendant** [6] - 6:19,
  7:20, 27:1, 34:6,
  38:1, 38:4, 38:10
**Defendant** [6] - 2:11,
  2:15, 3:2, 3:7, 3:10,
  4:4
**Defendants** [1] - 1:9
**defendants** [30] -
  6:12, 10:4, 11:4,
  11:12, 11:24, 12:5,
  13:8, 13:16, 14:5,
  14:18, 14:22, 15:5,
  15:9, 15:15, 15:25,
  16:9, 16:18, 18:14,
  19:1, 24:22, 24:25,
  25:9, 25:11, 25:14,
  25:17, 26:24, 27:5,
  28:10, 28:23, 32:10
**defendants'** [1] - 26:2
**defended** [1] - 75:14
**defense** [7] - 21:18,
  31:16, 31:17, 33:22,
  34:9, 35:3, 36:10

**Defense** [1] - 27:18
**definitely** [1] - 61:1
**degree** [1] - 9:14
**Delaware** [1] - 2:13
**delay** [1] - 37:15
**deleted** [3] - 13:12,
  14:13, 15:7
**deleting** [2] - 10:14,
  14:15
**deliberation** [1] -
  82:17
**demonstrated** [7] -
  40:1, 41:17, 42:5,
  43:5, 46:15, 79:7,
  80:4
**demonstrates** [2] -
  18:4, 25:3
**demonstrating** [1] -
  42:20
**deniability** [1] - 10:23
**denial** [1] - 60:7
**Denver** [1] - 75:5
**depart** [1] - 74:18
**DEPARTMENT** [1] -
  2:8
**Department** [2] -
  52:14, 64:6
**depicted** [1] - 77:11
**deposited** [1] - 24:19
**deputy** [3] - 5:2, 72:1,
  72:2
**DEPUTY** [5] - 5:10,
  5:17, 5:20, 35:19,
  83:16
**derived** [7] - 20:14,
  28:17, 28:22, 28:23,
  29:3, 68:21
**described** [1] - 43:2
**designed** [2] - 25:14,
  33:6
**Destinee** [1] - 9:22
**destruction** [1] -
  74:15
**detail** [4] - 8:4, 8:14,
  8:22, 11:20
**details** [1] - 69:25
**developer** [2] - 27:11,
  27:13
**dialogue** [1] - 73:7
**DIANE** [1] - 1:12
**difference** [2] - 14:14,
  61:19
**differences** [1] - 76:20
**different** [8] - 12:4,
  49:3, 57:15, 59:1,
  63:9, 65:12, 69:11
**diminish** [1] - 50:25
**dinosaur** [2] - 40:5,
  40:12
**direct** [1] - 24:6

**directing** [3] - 15:17,
  30:2, 30:15
**direction** [1] - 84:14
**director** [7] - 21:25,
  52:22, 52:24, 70:12,
  70:13, 75:12, 79:12
**dirty** [4] - 20:14,
  32:24, 63:9, 68:8
**disagrees** [1] - 38:16
**disclose** [1] - 72:21
**disclosing** [1] - 7:4
**discover** [1] - 12:19
**discretion** [3] - 43:14,
  43:15, 43:16
**discuss** [2] - 73:2,
  82:18
**discussing** [1] - 42:20
**Discussion** [1] - 72:3
**discussion** [1] - 73:18
**disguise** [2] - 25:15,
  33:7
**disguising** [1] - 26:21
**disproving** [1] - 79:25
**disputed** [1] - 40:22
**distracted** [1] - 38:19
**distribution** [1] -
  75:18
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 84:9
**division** [1] - 42:11
**document** [4] - 64:3,
  64:5, 78:8, 78:14
**documentary** [2] -
  12:16, 12:17
**dollar** [1] - 60:16
**Dollar** [10] - 6:13,
  50:2, 50:5, 50:6,
  50:12, 53:4, 54:4,
  54:5, 54:19, 54:24
**Don** [2] - 70:12, 72:25
**donations** [1] - 10:22
**done** [5] - 37:3, 78:22,
  80:1, 81:11
**doubt** [6] - 37:11,
  38:1, 39:7, 80:1,
  81:19, 81:24
**Dougherty** [4] - 42:1,
  68:18, 68:22, 69:21
**down** [14] - 7:3, 8:20,
  18:10, 21:4, 24:12,
  27:19, 31:7, 33:18,
  39:21, 39:22, 66:5,
  66:6, 74:16, 79:4
**downplay** [1] - 44:3,
  58:4
**draft** [1] - 74:15
**Driving** [1] - 57:5
**DROOKS** [1] - 3:2
**duly** [1] - 84:7
**during** [6] - 16:8,

  19:17, 28:24, 30:20,
  74:4, 78:9
**dust** [1] - 40:12
**dwells** [1] - 38:18

# E

**ears** [1] - 43:17
**easier** [1] - 74:3
**easiest** [1] - 28:13
**East** [1] - 2:19
**edit** [1] - 17:6
**editor** [3] - 40:13,
  40:16, 40:23, 41:4,
  41:18
**editor-in-chief** [2] -
  40:13, 40:23
**editorial** [3] - 41:21,
  42:3
**editors** [2] - 40:2,
  45:18
**effectively** [1] - 73:11
**EISENBERG** [1] - 3:7
**Eisenberg** [1] - 3:8
**either** [4] - 20:16,
  26:3, 30:13, 56:25
**elected** [2] - 21:17,
  77:20
**electronics** [1] - 40:9
**element** [1] - 28:19
**elements** [1] - 6:8
**eliminate** [2] - 59:21,
  59:25
**elite** [1] - 54:2
**Elms** [2] - 6:14, 54:25
**elms** [1] - 54:25
**email** [16] - 10:6, 10:8,
  10:13, 12:14, 17:19,
  21:25, 23:17, 24:6,
  33:11, 33:14, 48:25,
  56:5, 66:12, 68:19
**emailing** [3] - 30:1,
  30:21, 33:14
**emails** [1] - 10:9,
  30:20, 65:13
**emanates** [2] - 29:9,
  30:8
**eMerchantPay** [1] -
  21:20
**Emily** [2] - 12:10,
  12:13
**employees** [1] - 27:25
**employment** [1] - 16:5
**encompasses** [1] -
  38:3
**encounters** [1] - 9:21
**end** [2] - 80:13, 82:20
**enemy** [1] - 58:20
**enforced** [1] - 50:16
**enforcement** [11] -

**10:24, 15:3, 15:4,
  32:3, 34:13, 47:17,
  49:8, 55:2, 55:4,
  77:7, 79:12
**engage** [2] - 20:22,
  58:21
**engaged** [3] - 7:19,
  9:23, 69:6
**engaging** [2] - 7:3,
  15:13
**engine** [1] - 8:12
**English** [3] - 24:24,
  25:11, 25:18
**enhanced** [1] - 52:20
**enjoyed** [1] - 77:6
**enormously** [1] -
  76:23
**enterprise** [12] - 6:17,
  7:9, 7:11, 7:12, 7:21,
  8:6, 9:11, 20:16,
  34:10, 39:9, 55:5,
  76:15
**entire** [2] - 54:3, 78:14
**entirely** [1] - 19:13
**entitled** [5] - 34:17,
  34:18, 34:19, 55:21,
  84:12
**entity** [1] - 26:10
**Eric** [2] - 2:16, 22:18
**eric.kesslerlaw@**
  **gmail.com** [1] - 2:17
**Erotic** [11] - 6:14,
  18:12, 19:24, 46:21,
  50:3, 53:4, 54:4,
  54:20, 60:21, 60:22,
  62:12
**erred** [1] - 35:13
**escort** [4] - 12:20,
  19:13, 25:13, 28:15
**especially** [2] - 80:10
**Esq** [12] - 2:3, 2:3, 2:4,
  2:4, 2:9, 2:12, 2:16,
  2:19, 3:3, 3:3, 3:8,
  3:11
**ESQ** [1] - 3:11
**establish** [1] - 37:6
**established** [3] - 37:5,
  77:5, 77:12
**estate** [2] - 67:7, 67:8
**et** [5] - 1:8, 49:12,
  53:25, 75:1
**event** [3] - 31:11,
  38:17, 44:10
**eventually** [3] - 9:21,
  13:23, 24:16
**evidence** [24] - 6:11,
  16:21, 20:21, 34:18,
  36:8, 36:9, 36:20,
  37:5, 38:20, 47:25,
  53:10, 53:19, 54:7,

54:10, 54:11, 65:1, 66:17, 70:22, 70:23, 70:25, 71:14, 71:17
**exactly** [6] - 22:7, 38:20, 40:1, 42:20, 46:4, 46:23
**exaggerate** [1] - 44:11
**examination** [1] - 33:22
**example** [4] - 17:14, 19:19, 58:7, 61:2
**excellence** [1] - 75:10
**except** [1] - 58:12
**excess** [1] - 29:2
**exchange** [4] - 10:6, 10:13, 23:17, 48:6
**exchanges** [1] - 10:7
**exercised** [1] - 74:25
**exhaustive** [1] - 76:7
**exhibit** [8] - 17:8, 21:19, 47:23, 47:25, 71:17, 71:20, 72:5, 72:15
**Exhibit** [33] - 9:2, 10:1, 10:9, 11:3, 11:22, 13:9, 14:6, 15:20, 16:10, 17:17, 17:20, 17:25, 18:7, 18:8, 18:19, 18:24, 19:9, 19:11, 19:21, 21:15, 22:19, 24:15, 25:1, 27:18, 28:5, 29:10, 29:17, 30:24, 47:20, 65:12, 65:13, 70:3
**exhibits** [3] - 36:21, 71:25, 79:21
**Exhibits** [4] - 11:7, 11:9, 19:5, 19:9
**existing** [1] - 64:7
**expanding** [1] - 75:24
**expect** [4] - 39:18, 80:22, 82:6, 82:22
**expenses** [1] - 26:11
**experience** [2] - 16:20, 16:21
**expert** [2] - 13:20, 49:2
**explained** [2] - 11:19, 68:22
**exploit** [1] - 77:1
**exploitation** [1] - 73:10
**exposing** [1] - 75:21
**Express** [1] - 21:4
**extension** [1] - 67:2
**extent** [1] - 78:12
**extra** [1] - 52:2
**eyes** [2] - 12:8, 47:22

**F**

**face** [1] - 56:19
**facets** [1] - 80:25
**facilitate** [3] - 7:9, 7:21, 78:24
**facilitated** [1] - 39:8
**facilitates** [1] - 34:10
**facilitating** [7] - 55:4, 55:5, 55:8, 55:13, 55:16, 55:17, 68:7
**facing** [2] - 44:25, 45:1
**fact** [15] - 9:23, 13:4, 25:5, 28:3, 40:22, 40:24, 42:5, 47:15, 47:16, 59:19, 61:15, 68:25, 69:15, 71:7, 80:5
**facts** [2] - 53:10, 54:7
**failed** [2] - 35:23, 37:6
**fails** [1] - 38:9
**fair** [3] - 34:15, 52:23, 64:13
**faith** [19] - 37:20, 38:2, 38:5, 38:10, 38:13, 41:7, 47:19, 48:11, 50:16, 52:6, 55:22, 62:2, 68:1, 68:5, 79:7, 79:24, 79:25, 81:20
**fake** [1] - 57:12
**falling** [1] - 40:9
**far** [3] - 17:12, 66:24, 76:1
**far-reaching** [1] - 76:1
**fashion** [1] - 32:14
**Fassett** [8] - 48:3, 48:22, 52:8, 56:1, 56:5, 62:5, 79:9
**Fassett's** [1] - 68:3
**favorite** [1] - 58:7
**FBAR** [9] - 33:23, 64:3, 64:12, 64:14, 64:23, 64:25, 65:4, 65:8
**FBARs** [2] - 65:4, 66:16
**FBI** [12] - 52:24, 53:3, 53:7, 53:22, 54:3, 54:18, 60:4, 68:2, 68:14, 79:13, 80:10
**FBI's** [1] - 52:18
**featured** [2] - 15:6, 16:12
**features** [1] - 22:16
**February** [2] - 12:18, 30:25
**FEDER** [3] - 2:18, 83:9, 83:11

**Feder** [2] - 2:19, 83:7
**federal** [3] - 59:19, 73:22, 77:13
**Federal** [1] - 52:14
**feed** [1] - 27:9
**feeds** [4] - 27:10, 27:12, 27:13, 27:14
**fellow** [1] - 36:16
**felonies** [1] - 57:21
**female** [2] - 25:13, 28:15
**Ferrer** [38] - 6:12, 10:5, 12:7, 12:11, 13:22, 17:3, 23:6, 23:10, 23:18, 24:7, 27:25, 30:1, 30:21, 31:2, 37:20, 38:23, 39:19, 40:6, 40:24, 41:8, 41:12, 42:22, 42:23, 43:10, 43:19, 45:19, 47:8, 48:1, 50:18, 52:15, 53:24, 55:11, 60:6, 68:25, 69:25, 78:23
**Ferrer's** [3] - 27:8, 46:13, 68:3
**few** [5] - 10:11, 17:25, 59:21, 60:25, 83:4
**fifth** [1] - 34:22
**fight** [3] - 76:23, 78:19, 78:24
**fighting** [2] - 54:2, 55:19
**fights** [2] - 58:19, 76:7
**Figueroa** [4] - 11:13, 11:18, 11:25, 12:7
**figure** [1] - 62:11
**figured** [1] - 40:20
**file** [6] - 43:14, 64:4, 64:5, 64:8, 66:14, 67:2
**filed** [8] - 33:24, 33:25, 64:14, 65:4, 66:16, 66:24, 66:25
**filmed** [1] - 12:18
**final** [1] - 36:21
**finally** [1] - 72:12
**financial** [9] - 22:22, 24:23, 25:20, 26:15, 28:19, 28:20, 32:25, 46:10, 55:15
**fine** [1] - 74:9
**firmly** [1] - 74:22
**First** [12] - 73:20, 75:14, 75:15, 76:3, 76:8, 76:10, 76:22, 77:8, 77:12, 77:14, 77:16, 77:22
**first** [18] - 28:19, 33:10, 36:23, 38:17,

41:9, 42:1, 45:14, 51:11, 57:19, 61:16, 61:17, 64:10, 65:11, 66:6, 70:10, 71:1, 73:2, 73:18
**first-cut** [2] - 73:2, 73:18
**fit** [1] - 43:3
**five** [6] - 5:14, 6:12, 10:4, 11:4, 65:4, 75:7
**Floor** [1] - 2:9
**focuses** [1] - 12:16
**followed** [1] - 75:6
**following** [6] - 47:19, 48:23, 70:9, 71:9, 74:17, 75:12
**follows** [1] - 72:25
**fooled** [1] - 80:8
**FOR** [1] - 1:2
**foregoing** [2] - 76:7, 84:10
**foreign** [1] - 25:22
**foremost** [1] - 65:11
**forever** [1] - 37:18
**forgot** [2] - 58:24, 70:13
**form** [5] - 11:1, 15:3, 21:19, 25:10, 64:8
**formal** [1] - 8:3
**format** [1] - 27:15
**forth** [2] - 17:1, 77:22
**forward** [4] - 17:21, 54:15, 73:6, 73:17
**forwarded** [1] - 12:22
**fought** [1] - 76:8
**founded** [2] - 73:14, 74:19
**four** [1] - 75:9
**Francisco** [1] - 41:12
**fraud** [1] - 59:20
**free** [4] - 66:22, 74:19, 74:25, 77:9
**full** [3] - 8:14, 78:21, 84:11
**fully** [1] - 72:4
**fundamentally** [1] - 77:17
**fundamentals** [1] - 8:1
**funds** [5] - 24:25, 25:3, 25:18, 25:21, 25:23
**funneled** [1] - 31:8
**furnish** [1] - 73:23, 74:12
**FURTHER** [1] - 84:10
**furtherance** [3] - 16:6, 20:4, 76:8
**furthered** [1] - 7:6

**G**

**Gary** [1] - 3:3
**gas** [2] - 7:18, 16:7
**gather** [1] - 48:5
**Gazette** [1] - 74:22
**General** [1] - 45:25
**Generals** [1] - 32:2
**generated** [3] - 22:22, 28:14, 76:24
**generating** [1] - 23:4
**gentlemen** [2] - 34:8, 36:15
**GFE** [13] - 17:1, 17:11, 17:13, 17:14, 17:21, 17:22, 18:7, 18:9, 18:17, 19:7, 19:8, 46:21
**GFE/PSE** [2] - 18:22, 19:11
**gift** [1] - 21:8
**girl** [2] - 10:2
**girlfriend** [1] - 16:20
**given** [4] - 8:19, 37:22, 76:19
**glincenberg@ birdmarella.com** [1] - 3:5
**gold** [1] - 68:20
**good-faith** [3] - 38:13, 41:7, 79:7
**Gopi** [1] - 3:3
**Government** [2] - 2:2, 4:3
**government** [16] - 33:19, 37:1, 37:25, 38:9, 38:16, 39:7, 43:18, 44:5, 44:8, 45:2, 45:23, 59:19, 65:17, 77:16, 81:22, 82:14
**government's** [1] - 43:16
**governmental** [1] - 33:15
**gpanchapakesan@ birdmarella.com** [1] - 3:5
**grand** [2] - 76:5, 76:6
**graphic** [1] - 44:16
**graphically** [1] - 43:5
**great** [2] - 45:25, 52:17
**greatly** [1] - 52:19
**Greek** [5] - 58:7, 58:8, 58:9, 58:12, 58:13
**GREEN** [1] - 2:12
**grenade** [1] - 81:17
**Griffin** [1] - 9:18
**ground** [1] - 77:8

**grounds** [1] - 75:16
**group** [3] - 59:4, 59:23, 61:20
**groups** [1] - 58:25
**grow** [1] - 20:19
**guess** [3] - 53:5, 61:15, 72:8
**guilt** [2] - 38:24, 79:3
**guilty** [44] - 10:4, 11:4, 11:12, 11:24, 12:5, 13:8, 13:16, 14:5, 14:8, 14:18, 14:22, 15:5, 15:9, 15:15, 15:25, 16:9, 16:19, 18:15, 19:2, 19:3, 19:10, 19:18, 20:6, 20:7, 26:25, 28:10, 32:16, 32:17, 32:23, 34:7, 34:19, 38:11, 62:25, 63:1, 66:15, 68:6, 68:25, 69:2, 70:1, 79:5, 81:16, 81:20, 81:25
**Guilty** [1] - 68:24
**gun** [1] - 18:4
**guy** [13] - 30:23, 33:12, 33:13, 39:25, 41:11, 41:15, 42:1, 45:20, 47:2, 47:12, 48:2, 48:25, 49:15
**guys** [1] - 81:2

### H

**hair** [2] - 7:18, 13:3
**half** [1] - 49:21
**hall** [2] - 42:2, 81:13
**Hampshire** [1] - 12:4
**hand** [3] - 11:15, 11:17, 82:20
**handed** [1] - 82:16
**hands** [2] - 40:16, 41:15
**hands-on** [2] - 40:16, 41:15
**hang** [1] - 66:6
**Hansen** [1] - 23:11
**happy** [2] - 23:6, 43:12
**hardly** [1] - 9:5
**hash** [1] - 49:10
**hassled** [1] - 33:13
**hate** [1] - 40:11
**hauled** [1] - 64:18
**head** [1] - 54:23
**headed** [1] - 48:4
**headquartered** [1] - 25:25
**health** [1] - 73:4
**healthcare** [1] - 69:18
**hear** [2] - 35:2, 47:15

**heard** [15] - 8:9, 10:19, 16:21, 20:21, 21:9, 26:7, 36:20, 37:8, 39:17, 55:11, 56:22, 57:1, 79:19, 79:20
**hearing** [1] - 53:15
**held** [4] - 38:3, 38:6, 72:3, 77:20
**help** [11] - 6:20, 52:20, 55:1, 55:3, 55:20, 59:9, 71:10, 71:11, 78:19, 80:17
**helped** [2] - 49:23, 50:14
**helping** [4] - 34:13, 47:17, 52:24, 81:4
**Hemu** [1] - 13:19
**hereby** [1] - 84:7
**herein** [1] - 84:12
**herself** [1] - 15:13
**hidden** [1] - 62:16
**hide** [2] - 62:22, 65:14
**hiding** [1] - 67:11
**high** [5] - 44:20, 45:5, 48:4, 52:22
**high-level** [1] - 45:5
**high-risk** [1] - 48:4
**highest** [5] - 55:18, 74:24, 79:11
**highlight** [1] - 48:14
**himself** [2] - 30:11, 31:9
**hired** [1] - 61:8
**hiring/firing** [1] - 46:6
**history** [2] - 78:18
**hit** [1] - 60:13
**holding** [1] - 27:20
**Holdings** [6] - 29:6, 29:14, 29:15, 75:7, 75:9
**holds** [1] - 75:24
**homes** [1] - 76:6
**homestretch** [1] - 6:4
**honestly** [2] - 38:3, 38:6
**honesty** [1] - 80:4
**Honor** [12] - 34:21, 36:11, 36:18, 36:19, 37:8, 37:21, 71:4, 71:18, 72:12, 78:15, 80:18, 82:3
**HONORABLE** [1] - 1:12
**hope** [3] - 81:11, 81:15, 81:23
**hopes** [1] - 38:18
**hoping** [1] - 57:14
**host** [1] - 76:24
**hosted** [1] - 77:4
**hosts** [1] - 77:10

**hotel** [2] - 9:21, 9:24
**hotels** [2] - 7:15, 16:7
**Houdini** [1] - 44:7
**hour** [1] - 18:23
**House** [1] - 73:14
**Howard** [1] - 33:17
**HUMETEWA** [1] - 1:12
**hundred** [2] - 7:2, 60:4
**hundreds** [2] - 60:10, 60:11
**Hungary** [5] - 31:22, 32:7, 32:23, 34:4, 63:24
**hurts** [1] - 58:6
**Hyer** [3] - 6:12, 39:19, 50:1
**Hyre** [4] - 43:10, 44:19, 45:20

### I

**idea** [1] - 27:21
**identified** [3] - 17:25, 53:22, 70:12
**identifies** [5] - 65:4, 65:5, 65:6, 65:7
**identify** [2] - 71:16, 71:20
**identifying** [1] - 73:11
**Ill** [1] - 52:21
**ill** [1] - 38:4
**illegal** [8] - 34:11, 58:22, 62:8, 63:7, 63:9, 69:6, 78:20, 79:2
**image** [1] - 49:10
**images** [8] - 13:11, 13:12, 14:14, 14:20, 14:23, 15:7, 49:10
**imagine** [1] - 65:20
**immunity** [2] - 76:3, 77:5
**impact** [2] - 37:17, 74:13
**impartial** [1] - 34:16
**implemented** [1] - 76:25
**import** [1] - 27:15
**importance** [2] - 52:18, 77:24
**important** [8] - 22:1, 22:20, 44:18, 48:8, 48:20, 52:9, 52:25, 72:13
**importantly** [2] - 25:16, 33:8
**impose** [1] - 37:15
**imposition** [1] - 37:15
**impossible** [1] - 80:8
**improve** [1] - 77:2

**inaccurate** [1] - 38:8
**incall** [3] - 15:22, 18:18, 57:25
**incall/outcall** [2] - 15:18, 57:23
**incalls** [3] - 10:2, 11:23, 15:12
**incentive** [2] - 43:11, 44:10
**inception** [1] - 75:13
**include** [1] - 49:11
**included** [1] - 35:12
**includes** [1] - 42:16
**including** [6] - 30:10, 31:1, 40:18, 48:22, 56:4, 65:17
**income** [1] - 28:3
**inconsequential** [2] - 14:14, 20:11
**incorrect** [1] - 38:9
**independent** [2] - 10:20, 15:12
**India** [2] - 27:11, 27:13
**India-based** [1] - 27:11
**indicate** [1] - 69:21
**indicated** [7] - 36:18, 36:19, 46:13, 47:13, 69:16, 73:12, 79:9
**indicating** [1] - 43:8
**indication** [4] - 58:2, 69:4, 70:19, 70:21
**indicative** [17] - 10:3, 11:23, 12:1, 13:6, 13:11, 14:2, 14:11, 14:16, 14:24, 14:25, 15:7, 15:11, 16:11, 16:22, 17:2, 17:18, 18:24
**indicators** [3] - 10:12, 10:18, 19:16
**indictment** [4] - 38:7, 39:1, 46:9, 56:20
**individual** [6] - 12:8, 13:19, 33:12, 53:12, 58:10, 58:17
**individuals** [2] - 38:15, 54:25
**industry** [3] - 73:9, 74:13, 77:22
**inept** [1] - 62:11
**infer** [1] - 29:25
**information** [11] - 42:24, 47:11, 48:6, 51:19, 59:9, 65:8, 66:13, 66:17, 68:12, 75:21, 76:5
**innocence** [1] - 37:10
**inside** [1] - 9:24
**instead** [1] - 60:16

**institution** [1] - 28:20
**instructed** [1] - 36:6
**instructions** [1] - 82:21
**intending** [1] - 6:20
**intent** [5] - 7:8, 27:5, 38:2, 38:5, 39:8
**intentionally** [2] - 39:8, 79:11
**interest** [3] - 46:2, 73:13, 74:23
**interesting** [3] - 21:19, 59:3, 61:4
**internal** [1] - 7:5
**international** [1] - 33:1
**Internet** [7] - 7:8, 40:7, 40:10, 59:15, 73:21, 77:24
**interrupted** [1] - 65:16
**interruption** [1] - 83:5
**interstate** [1] - 25:22
**interviewed** [3] - 43:1, 53:8, 53:25
**interviews** [2] - 41:1, 53:22
**introduced** [1] - 49:19
**invented** [1] - 59:15
**investigate** [1] - 77:16
**investigates** [1] - 9:20
**Investigation** [1] - 52:15
**investigation** [2] - 52:17, 52:25
**investigations** [1] - 9:20
**investigative** [2] - 52:18, 77:17
**investment** [4] - 64:4, 64:7, 64:11, 66:11
**involve** [1] - 28:21
**involved** [8] - 7:21, 33:19, 40:2, 42:14, 45:22, 46:5, 46:7, 46:9
**involvement** [3] - 9:14, 15:17, 73:13
**involving** [5] - 7:10, 7:22, 24:23, 25:21, 28:19
**IOLTA** [4] - 31:15, 32:6, 67:4, 67:9
**iron** [1] - 41:19
**IRS** [3] - 63:3, 64:8, 64:9
**Isaac** [1] - 58:24
**issue** [1] - 24:13
**issues** [3] - 20:22, 73:4, 73:23
**Italian** [1] - 80:18

## J

**J.C** [1] - 76:17
**Jacob** [2] - 66:12, 66:13
**jail** [3] - 55:12, 81:4, 81:5
**January** [1] - 32:4
**Jed** [3] - 20:5, 21:16, 28:5
**Jessika** [3] - 8:23, 22:2, 22:24
**Jessika's** [1] - 7:16
**Jim** [6] - 41:11, 42:22, 51:7, 51:8, 69:9, 74:18
**job** [3] - 37:2, 46:16, 64:10
**john** [2] - 9:24, 21:24
**John** [4] - 3:2, 20:5, 30:5, 71:19
**johns** [1] - 51:15
**join** [1] - 8:9
**joined** [2] - 8:11, 75:11
**Jordan** [2] - 15:10, 15:24
**Journal** [1] - 32:3
**journalism** [1] - 75:10
**journalistic** [1] - 76:15
**journalists** [1] - 40:16
**JOY** [1] - 3:11
**Joy** [1] - 3:11
**joy@joybertrandlaw. com** [1] - 3:13
**Joye** [5] - 3:10, 12:22, 17:19, 18:3, 20:6
**JUDGE** [1] - 1:12
**judge** [3] - 36:24, 43:14, 45:2
**judgment** [1] - 37:16
**judgments** [1] - 66:22
**juncture** [1] - 35:13, 82:5, 82:10
**June** [1] - 73:4
**junk** [1] - 57:9
**juror** [1] - 5:13
**jurors** [3] - 5:5, 74:10, 79:23
**JURY** [1] - 1:14
**Jury** [8] - 4:4, 5:4, 5:19, 5:24, 35:8, 35:21, 36:4, 83:1
**jury** [24] - 5:22, 5:23, 6:1, 34:16, 35:2, 35:7, 35:10, 36:2, 36:3, 36:6, 36:16, 36:25, 54:8, 69:16, 72:11, 72:13, 76:5, 76:6, 78:9, 78:10,

78:14, 82:5, 82:25, 83:5
**jury's** [1] - 53:18
**justice** [5] - 37:3, 37:12, 37:13, 55:10
**JUSTICE** [1] - 2:8
**Justice** [2] - 52:14, 73:14

## K

**keep** [4] - 18:1, 24:3, 35:25, 51:4
**Kempel** [1] - 30:24
**Kent** [1] - 74:17
**kept** [3] - 51:3, 51:4, 51:13
**Kessler** [1] - 2:16
**KESSLER** [1] - 2:15
**Kevin** [1] - 2:3
**kevin.rapp@usdoj. gov** [1] - 2:6
**kids** [1] - 34:5
**kill** [5] - 59:7, 59:10, 59:17, 59:25, 77:8
**kind** [15] - 17:16, 23:15, 30:25, 37:23, 39:23, 40:11, 46:25, 55:8, 58:2, 58:22, 64:4, 69:6, 69:21, 70:6, 78:19
**Kingdom** [1] - 21:21
**knowing** [2] - 6:19, 8:14
**knowingly** [1] - 78:25
**knowledge** [6] - 8:14, 44:12, 44:24, 54:17, 59:16, 62:1
**known** [3] - 45:12, 45:13, 61:9
**knows** [4] - 15:22, 22:22, 40:19, 59:17
**Kozinets** [1] - 2:4
**Kristof** [4] - 12:9, 12:10, 12:12, 12:18
**Kristof's** [1] - 12:15

## L

**Lacey** [69] - 1:8, 2:11, 4:4, 8:18, 15:19, 20:5, 21:23, 22:12, 29:7, 29:23, 30:7, 30:11, 30:14, 30:17, 30:19, 31:12, 32:5, 32:21, 34:1, 34:5, 34:6, 37:19, 39:11, 39:24, 40:7, 41:3, 41:7, 41:9, 42:2, 42:6, 42:14, 42:24,

42:25, 43:3, 44:11, 45:7, 45:9, 45:13, 45:16, 46:25, 47:5, 47:12, 47:17, 47:18, 48:3, 48:9, 48:22, 50:15, 51:13, 52:5, 52:23, 55:20, 65:5, 65:6, 65:13, 66:1, 66:4, 66:9, 67:3, 67:25, 69:5, 69:22, 74:18, 75:4, 75:25, 76:8, 76:21, 79:8
**lawyer's** [4] - 31:21, 32:6, 67:5
**lawyers** [2] - 36:7, 36:19
**layer** [6] - 42:25, 43:4, 44:13, 44:17, 45:19
**leaders** [1] - 61:6
**learned** [1] - 52:11
**Leary** [3] - 14:9, 14:10, 14:19
**least** [4] - 6:20, 6:24, 10:12, 61:24
**leave** [1] - 83:5
**left** [8] - 6:6, 14:12, 40:12, 42:11, 42:13, 70:9, 70:11, 71:7
**legacy** [1] - 68:20
**legal** [4] - 49:1, 59:2, 64:15, 81:17
**legality** [1] - 62:3
**legalized** [3] - 51:8, 69:9, 69:17
**legally** [3] - 38:14, 41:8, 68:16
**legitimate** [3] - 16:5, 20:18, 52:6
**lenient** [2] - 43:14, 44:23
**less** [1] - 76:22
**letter** [2] - 61:6, 61:11
**level** [2] - 15:22, 45:5
**liability** [1] - 77:10
**license** [1] - 69:12
**lie** [1] - 56:9
**lien** [1] - 66:20
**Lieutenant** [1] - 9:18
**lights** [1] - 57:21
**lights-out** [1] - 57:21
**Liliana** [2] - 5:6, 5:14
**Lin** [1] - 33:17
**Lincenberg** [1] - 3:3
**line** [1] - 24:6
**lingerie** [1] - 14:25
**LIPTSITZ** [1] - 2:12
**listed** [1] - 7:23
**listen** [2] - 38:20, 79:18
**listening** [2] - 13:23, 35:1
**listing** [1] - 12:20
**listings** [1] - 22:20
**litigious** [1] - 65:16
**Litle** [2] - 21:10, 21:11
**lives** [1] - 37:16
**Liz** [1] - 73:1
**LLC** [1] - 3:11
**LLP** [1] - 2:12
**local** [1] - 74:21

**location** [2] - 25:16, 33:8
**lock** [1] - 60:8
**logical** [2] - 39:17, 45:15
**look** [19] - 10:11, 17:4, 19:15, 25:1, 48:16, 59:1, 60:2, 62:24, 64:15, 64:19, 65:5, 65:14, 66:8, 72:5, 73:6, 79:18, 79:19, 80:7
**looked** [1] - 20:3
**looking** [7] - 12:19, 46:9, 56:3, 56:16, 58:8, 59:2, 77:2
**looks** [4] - 12:25, 26:3, 31:23, 58:9
**loose** [1] - 76:15
**Los** [1] - 3:4
**lose** [1] - 76:16
**lucrative** [1] - 76:16
**Lundstrom** [1] - 9:4
**Luria** [2] - 58:24, 61:2

## M

**mad** [1] - 43:25
**majority** [1] - 15:22
**Malby** [1] - 3:11
**malice** [2] - 38:4
**man** [2] - 41:11, 79:22
**March** [2] - 9:17, 17:24
**MARELLA** [1] - 3:2
**Margaret** [1] - 2:4
**margaret.perlmeter @usdoj.gov** [1] - 2:7
**marketing** [1] - 7:5
**markets** [1] - 12:4
**Massachusetts** [1] - 9:18
**massage** [1] - 19:14
**master's** [1] - 9:13
**MasterCard** [2] - 21:3, 23:13
**matter** [2] - 40:23, 82:18
**Mauritius** [1] - 24:12
**McDougall** [1] - 73:1
**mean** [8] - 16:23, 17:6, 39:20, 40:18, 55:3, 56:23, 69:18, 72:7
**meaning** [1] - 70:8
**meaningable** [1] - 73:16
**meaningful** [1] - 73:16
**means** [10] - 15:18, 15:23, 16:24, 22:9, 25:21, 58:1, 58:14, 58:15, 62:22, 76:7

**keep** rows... 

**laundering** [18] - 20:8, 21:1, 24:21, 25:2, 26:12, 27:16, 28:12, 28:13, 32:13, 32:17, 32:21, 33:2, 33:20, 62:19, 67:15, 67:24, 68:8, 79:2
**law** [29] - 7:10, 10:23, 15:3, 15:4, 32:3, 34:13, 34:18, 34:22, 37:8, 39:16, 47:17, 47:19, 49:6, 49:8, 49:17, 51:4, 53:1, 55:1, 55:3, 55:19, 58:16, 69:11, 69:19, 77:13, 79:11, 79:15, 81:2, 81:7
**LAW** [2] - 2:15, 2:18
**law-fighting** [1] - 55:19
**lawfully** [1] - 37:21
**laws** [2] - 77:8, 79:1
**lawyer** [3] - 31:15,

meant [1] - 51:13
measures [1] - 76:25
Media [1] - 75:9
media [1] - 75:19
meet [4] - 38:9, 56:17, 58:10, 73:1
meeting [5] - 7:4, 8:20, 13:21, 70:11, 73:4
meetings [1] - 46:7
Megan [1] - 9:4
member [1] - 8:13
members [10] - 6:1, 6:19, 6:24, 8:8, 35:2, 36:6, 54:8, 72:11, 72:13, 82:5
memo [4] - 70:19, 73:24, 74:12, 79:9
memorandum [1] - 71:19
memory [3] - 36:8, 53:18, 54:9
men [1] - 77:1
mention [1] - 47:5
mentioned [1] - 69:7
mentions [1] - 67:4
merchant [1] - 21:19
merely [2] - 38:7, 54:11
merger [2] - 75:6, 75:12
Mersey [2] - 6:13, 54:24
message [4] - 66:4, 66:5, 66:6, 66:7
met [5] - 45:6, 45:13, 45:14, 45:20, 60:19
methods [1] - 21:7
Michael [10] - 1:8, 2:11, 20:5, 45:7, 45:13, 47:18, 48:9, 48:11, 74:17, 81:9
Mickey [1] - 23:11
middle [3] - 30:9, 42:15, 82:11
might [17] - 8:18, 9:12, 9:17, 11:13, 11:14, 12:6, 13:3, 13:17, 14:9, 16:1, 16:18, 40:24, 47:21, 58:21, 61:5, 73:15
Mike [7] - 39:11, 42:25, 48:3, 50:15, 51:13, 52:5, 52:23
Mike's [1] - 49:14
military [1] - 74:24
million [5] - 20:12, 23:7, 28:7, 32:22
millions [2] - 7:6, 59:11

mimeographed [1] - 74:19
mind [3] - 35:13, 49:6, 82:20
mindset [1] - 46:23
minimizing [1] - 73:10
minute [6] - 18:11, 54:23, 59:8, 61:5, 64:13, 71:13
minutes [5] - 5:14, 18:23, 35:4, 35:6, 83:4
Miss [1] - 57:6
missing [1] - 12:19
misspellings [1] - 17:4
misstates [1] - 34:21
misstating [1] - 54:7
mode [1] - 79:6
moderation [10] - 7:3, 8:12, 15:17, 15:18, 46:7, 58:5, 58:6, 58:18, 58:19
moderator [2] - 8:18, 8:19
moderators [5] - 14:3, 14:15, 43:22, 46:16, 58:16
Mole [1] - 60:13
monetary [1] - 28:16
money [94] - 6:16, 6:23, 7:5, 7:14, 7:15, 7:16, 7:17, 13:5, 16:3, 16:4, 16:5, 16:16, 17:8, 17:10, 20:8, 20:9, 20:10, 20:11, 20:14, 20:17, 20:18, 20:23, 20:24, 20:25, 21:1, 21:8, 24:18, 24:19, 24:21, 25:2, 25:12, 26:3, 26:12, 26:13, 26:21, 27:2, 27:16, 27:22, 28:12, 28:13, 28:14, 28:16, 28:23, 28:25, 29:2, 29:3, 29:9, 29:16, 29:18, 30:1, 30:2, 30:22, 31:8, 31:13, 31:14, 31:20, 32:5, 32:13, 32:14, 32:15, 32:16, 32:21, 32:24, 33:2, 33:4, 33:15, 33:18, 33:20, 34:1, 38:18, 58:11, 62:19, 62:20, 63:5, 63:6, 63:7, 63:8, 63:9, 65:6, 65:15, 66:21, 66:23, 67:6, 67:8, 67:14, 67:24, 68:8, 76:13, 79:2

monthly [1] - 46:6
months [2] - 11:16, 34:15
moon [1] - 70:11
Moon [5] - 70:12, 70:15, 70:19, 71:7, 72:25
morning [6] - 36:14, 37:24, 39:2, 39:4, 49:20, 82:9
most [4] - 48:20, 52:12, 54:2, 74:13
mostly [2] - 13:13, 29:20
Motel [1] - 9:19
motel [1] - 9:24
motion [2] - 43:14, 44:22, 45:2
Motors [1] - 46:1
move [12] - 22:4, 22:9, 22:15, 22:19, 23:1, 23:9, 47:21, 54:15, 71:3, 71:5, 73:15
moved [3] - 22:6, 24:3, 24:20
movement [1] - 25:21
moving [1] - 20:14
MR [43] - 5:7, 6:3, 35:1, 35:17, 36:11, 36:13, 53:10, 53:12, 53:15, 53:20, 54:6, 54:14, 54:16, 70:20, 70:21, 70:22, 70:23, 70:25, 71:4, 71:6, 71:13, 71:18, 71:22, 71:23, 71:25, 72:6, 72:8, 72:10, 72:12, 72:17, 72:20, 74:4, 74:7, 74:9, 74:11, 78:1, 78:2, 78:3, 78:6, 78:8, 78:15, 83:9, 83:11
MS [1] - 34:21
Mueller [1] - 52:21
multipage [1] - 78:14
multiple [1] - 17:14
Murry [1] - 22:19
must [3] - 38:10, 44:6, 62:8
Myles [1] - 19:14

## N

nails [1] - 7:18
Naiomy [5] - 11:13, 11:18, 11:25, 12:7, 12:9
name [13] - 9:22, 10:7, 12:9, 21:13, 32:6, 34:4, 49:11, 54:25,

58:24, 63:18, 67:11, 67:20
name-wise [1] - 54:25
named [4] - 12:12, 41:11, 53:23, 70:12
names [3] - 63:13, 63:15, 63:18
nation [1] - 74:25
National [1] - 32:2
national [3] - 71:8, 71:10, 75:8
nationwide [1] - 40:14
nature [3] - 20:23, 25:15, 33:8
NCMEC [10] - 7:4, 8:20, 13:21, 32:3, 60:19, 60:20, 70:6, 70:15, 73:2, 73:19
near [1] - 80:21
necessary [2] - 8:8, 66:18
need [8] - 6:10, 18:1, 30:1, 30:22, 35:3, 35:5, 56:16, 56:17
needed [1] - 66:13
NESSIM [1] - 3:2
Netherlands [2] - 27:23, 28:8
never [11] - 12:7, 44:13, 44:14, 45:6, 45:13, 45:20, 50:14, 69:24, 80:12, 81:3
new [7] - 13:14, 14:1, 14:4, 14:6, 14:7, 19:6, 77:19
New [10] - 2:9, 2:13, 12:4, 61:12, 74:20, 74:23, 74:25, 75:4, 75:6
news [1] - 42:3
newspaper [4] - 39:25, 41:21, 47:2, 74:20
newspapers [15] - 38:22, 40:4, 40:8, 40:10, 40:13, 40:20, 40:23, 42:7, 43:4, 57:7, 69:3, 74:21, 75:7, 75:18
next [2] - 27:1, 44:18
nice [1] - 53:7
Nick [5] - 12:9, 12:10, 12:12, 12:15, 12:18
Nigam [2] - 13:19
night [1] - 76:5
nightclubs [1] - 75:1
Ninth [1] - 76:1
nobody [2] - 40:3, 65:24
nobody's [1] - 21:13

none [3] - 44:16, 61:23, 67:19
nonsense [1] - 11:2
noon [1] - 82:7
normal [1] - 77:17
normalized [1] - 27:13
North [3] - 2:5, 2:16, 3:8
Northborough [1] - 9:18
note [2] - 18:4, 76:13
noted [3] - 34:23, 34:24, 73:18
notes [1] - 25:1
nothing [7] - 45:11, 46:3, 63:7, 64:1, 65:3, 69:20, 80:4
notice [4] - 12:23, 29:22, 46:19, 64:7
nude [1] - 13:13
nudity [3] - 46:20, 60:20, 60:21
number [5] - 9:7, 10:6, 32:12, 48:2, 51:3, 58:14, 65:12, 71:21
numbers [4] - 38:19, 38:21, 38:23, 38:24
numerous [1] - 75:10
nuts [1] - 50:9
NW [1] - 2:9

## O

O'Connor [3] - 1:21, 73:14, 73:15
object [6] - 6:22, 6:23, 54:6, 70:20, 70:22, 78:3
objection [9] - 34:21, 34:23, 34:24, 53:10, 53:13, 71:2, 78:5, 78:6, 78:8
objects [1] - 6:20
observe [1] - 16:16
obtained [1] - 28:25
obviously [17] - 13:6, 14:11, 14:24, 36:17, 36:19, 37:17, 40:11, 42:16, 43:4, 43:20, 44:8, 45:1, 46:13, 58:1, 58:25, 69:1, 78:15
occur [2] - 39:12, 74:14
occurred [1] - 28:18
October [2] - 1:8, 84:15
OF [4] - 1:2, 1:13, 2:8, 4:2
offend [1] - 81:12

**offense** [2] - 20:15, 28:23
**offenses** [3] - 7:10, 7:22, 79:22
**offer** [3] - 10:24, 58:10, 73:10
**office** [1] - 77:20
**OFFICE** [3] - 2:2, 2:15, 2:18
**officer** [4] - 22:22, 26:15, 49:2, 57:18
**officers** [6] - 49:22, 50:10, 52:11, 55:25, 56:15, 79:10
**Official** [2] - 1:20, 84:8
**officially** [1] - 82:16
**officials** [2] - 75:22, 75:25
**often** [1] - 15:1
**old** [2] - 39:25, 57:6
**old-time** [1] - 39:25
**oldest** [1] - 51:11
**once** [4] - 19:7, 24:12, 26:20, 64:16
**one** [61] - 5:7, 5:13, 6:20, 6:22, 6:24, 8:13, 8:25, 9:1, 10:8, 10:12, 12:17, 14:1, 14:19, 16:22, 17:20, 17:24, 18:6, 18:10, 18:23, 20:3, 27:7, 28:20, 29:1, 29:10, 30:2, 30:15, 32:13, 34:19, 35:5, 38:14, 38:16, 38:22, 42:18, 43:20, 44:1, 46:13, 48:15, 50:10, 51:11, 53:23, 54:19, 55:20, 56:2, 56:24, 56:25, 59:24, 60:8, 60:19, 61:8, 62:13, 62:24, 63:4, 64:3, 66:6, 67:9, 81:1, 81:17, 81:25, 82:13
**ones** [3] - 14:13, 14:15
**ongoing** [1] - 8:11
**online** [5] - 73:2, 73:19, 77:9, 77:13, 77:15
**oOo** [1] - 83:18
**open** [1] - 82:20
**opening** [3] - 33:21, 39:24, 57:5
**operate** [2] - 26:1, 65:20
**operated** [2] - 37:20, 68:16
**operating** [1] - 65:21
**operator** [1] - 51:21
**opinion** [4] - 38:3,

38:6, 48:20, 76:21
**opinions** [1] - 38:8
**opportunity** [2] - 73:1, 78:21
**opposed** [1] - 48:16
**opposite** [1] - 55:13
**option** [1] - 22:8
**order** [1] - 5:2
**orders** [3] - 21:8, 24:18
**organ** [1] - 54:2
**organization** [3] - 49:5, 54:2, 55:19
**origin** [1] - 20:23
**originally** [1] - 44:24
**Ortiz** [1] - 9:22
**otherwise** [1] - 62:8
**outcall** [3] - 15:23, 18:18, 57:25
**outcalls** [2] - 10:2, 16:11
**outlaw** [1] - 59:18
**Outside** [1] - 4:4
**outside** [6] - 9:19, 27:3, 27:4, 33:3, 64:5, 75:11
**outstanding** [1] - 52:16
**overrule** [1] - 71:2
**overseas** [2] - 21:21, 32:25
**overt** [5] - 6:24, 7:1, 7:2
**own** [7] - 7:11, 45:25, 62:4
**owned** [2] - 45:24
**owner** [4] - 15:22, 21:23, 21:24, 31:3
**owners** [3] - 22:13, 30:10, 76:12
**ownership** [5] - 23:5, 25:16, 31:1, 31:9, 46:2

**P**

**P.O** [1] - 3:12
**PA** [1] - 2:18
**pace** [1] - 35:25
**Padilla** [6] - 3:7, 8:9, 12:23, 15:16, 17:3, 20:6
**page** [2] - 29:17, 57:7
**PAGE** [1] - 4:2
**pages** [1] - 84:10
**paid** [3] - 23:1, 24:18, 30:11
**Pamela** [5] - 10:7, 10:17, 11:5, 11:11, 13:1

**Panchapakesan** [1] - 3:3
**paper** [2] - 41:8, 75:5
**papers** [3] - 40:3, 75:6, 75:8
**pardon** [2] - 67:23, 71:25, 73:25
**Park** [1] - 3:4
**part** [24] - 8:15, 8:24, 9:9, 9:11, 11:12, 13:20, 25:15, 28:7, 29:3, 32:14, 33:6, 42:3, 44:4, 44:21, 47:18, 48:11, 56:21, 67:7, 68:8, 71:4, 71:23, 79:7
**particular** [11] - 8:10, 8:19, 12:23, 12:24, 22:12, 47:23, 47:25, 51:21, 56:20, 61:8, 72:22
**particularly** [1] - 61:4
**parties** [1] - 65:16
**parts** [1] - 49:9
**party** [1] - 76:24
**pass** [1] - 29:16
**pass-through** [1] - 29:16
**path** [1] - 24:12
**Path** [1] - 12:16
**patronize** [1] - 57:1
**patronizing** [1] - 74:23
**Paul** [1] - 2:12
**pause** [4] - 5:8, 5:12, 5:16, 80:3
**pay** [12] - 7:15, 22:5, 22:6, 22:16, 22:25, 23:1, 24:1, 26:11, 27:9, 27:12, 31:3
**payment** [5] - 27:11, 27:16, 28:4, 28:7, 31:10
**payments** [1] - 29:12
**payroll** [1] - 26:11
**pcambria@lglaw. com** [1] - 2:14
**peak** [1] - 20:12
**pedophile** [1] - 61:9
**Penney** [1] - 76:17
**people** [36] - 6:10, 36:24, 38:13, 42:14, 45:12, 46:2, 48:2, 48:5, 48:22, 51:14, 52:19, 55:7, 56:9, 56:16, 56:18, 57:1, 57:3, 57:12, 57:20, 59:4, 59:11, 59:15, 59:16, 59:21, 60:9, 60:10, 60:11, 61:18, 61:20, 62:15, 66:18,

69:15, 78:23, 81:4, 81:5
**per** [1] - 7:2
**percent** [5] - 10:20, 15:12, 18:13, 21:11, 44:8
**percentage** [1] - 74:24
**performed** [2] - 6:24, 7:20
**Perlmeter** [1] - 2:4
**permit** [1] - 69:13
**permitted** [1] - 82:12
**person** [22] - 15:6, 16:12, 22:14, 29:24, 29:25, 38:6, 39:17, 41:10, 42:1, 44:21, 45:5, 46:25, 49:12, 50:6, 50:7, 61:8, 62:1, 64:17, 67:13, 70:12, 79:12, 80:10
**personal** [1] - 37:16
**persons** [2] - 6:9, 77:11
**perspective** [1] - 59:1
**persuaded** [2] - 81:23, 81:24
**Peter** [1] - 2:4
**peter.kozinets@ usdoj.gov** [1] - 2:6
**Phoenix** [7] - 1:7, 1:22, 2:5, 2:20, 3:9, 74:22, 84:15
**phone** [1] - 21:4
**photographs** [2] - 12:20, 13:6
**picture** [4] - 10:14, 10:16, 57:22, 78:22
**pictures** [5] - 7:17, 12:1, 16:8, 56:11
**piece** [3] - 42:23, 45:24, 57:9
**pimp** [7] - 6:15, 11:19, 13:5, 16:3, 50:8
**pimps** [5] - 7:11, 9:10, 15:2, 47:15, 50:19, 51:15, 55:7, 81:4
**pivot** [1] - 21:5
**place** [14] - 11:8, 27:2, 27:3, 27:4, 31:25, 33:3, 39:3, 40:7, 46:20, 46:22, 65:15
**placement** [1] - 22:8
**places** [2] - 12:2, 50:11
**plain** [3] - 24:24, 25:11, 25:18
**plainly** [1] - 77:8
**Plaintiff** [1] - 1:6
**plan** [1] - 49:24
**planning** [1] - 67:8

**platform** [1] - 73:15
**platforms** [2] - 59:12, 71:9
**plausible** [2] - 10:23, 60:7
**play** [1] - 43:6
**played** [1] - 45:9
**PLC** [1] - 3:7
**plea** [4] - 44:4, 44:21, 69:2
**Pleads** [1] - 68:24
**pled** [2] - 68:25, 70:1
**plow** [1] - 20:17
**plowing** [1] - 26:12
**point** [9] - 16:23, 32:1, 47:8, 49:14, 60:20, 61:18, 62:13, 70:4, 76:20
**Polaris** [4] - 7:4, 9:7, 13:21, 32:3
**police** [24] - 47:14, 49:2, 49:4, 49:15, 49:17, 49:22, 50:1, 50:5, 50:17, 51:16, 52:11, 55:25, 56:15, 57:16, 57:18, 59:9, 62:5, 62:10, 68:3, 76:3, 79:10, 80:6, 80:8, 81:1
**policies** [1] - 46:6
**policy** [3] - 73:13, 77:19, 77:25
**political** [1] - 77:25
**politics** [1] - 77:19
**pops** [1] - 60:14
**porn** [1] - 16:21
**portion** [1] - 84:11
**position** [1] - 30:23
**possible** [5] - 45:8, 45:10, 72:14, 80:9, 81:5
**post** [7] - 16:25, 22:25, 23:1, 23:24, 24:1, 24:2, 29:19
**post-sale** [1] - 29:19
**posted** [6] - 6:15, 9:10, 11:20, 12:3, 14:17, 77:11
**posters** [1] - 53:5
**posting** [11] - 8:23, 8:24, 9:2, 9:4, 9:9, 10:2, 10:18, 11:23, 15:11, 16:17, 23:21
**postings** [13] - 7:25, 9:1, 10:11, 10:15, 11:1, 11:5, 11:11, 12:1, 14:11, 14:12, 15:2, 19:11, 20:3
**posts** [1] - 10:14
**potential** [1] - 74:13

**power** [1] - 46:14
**preface** [1] - 70:10
**premium** [2] - 22:8, 22:16
**premius** [1] - 22:8
**prepare** [1] - 66:14
**prepared** [1] - 84:14
**Prepared** [1] - 1:24
**Presence** [1] - 4:4
**present** [11] - 5:4, 5:5, 5:19, 5:24, 19:17, 35:8, 35:21, 36:4, 64:10, 83:1, 83:3
**President** [1] - 52:16
**pressure** [1] - 32:1
**presumption** [1] - 37:9
**pretty** [1] - 45:21
**prey** [2] - 73:12, 81:5
**priest** [1] - 61:9
**Primis** [2] - 32:23, 34:4
**principles** [1] - 76:18
**prison** [1] - 43:17
**privacy** [2] - 73:21, 77:24
**Prize** [1] - 40:18
**Prizes** [1] - 75:9
**pro** [1] - 74:22
**pro-war** [1] - 74:22
**proactive** [2] - 52:4
**proactively** [1] - 78:22
**problem** [3] - 46:17, 63:17, 63:20
**problems** [1] - 10:14
**proceed** [1] - 36:12
**PROCEEDINGS** [2] - 1:13, 4:2
**proceedings** [1] - 84:12
**Proceedings** [4] - 1:24, 4:4, 5:3, 83:17
**proceeds** [8] - 24:24, 25:10, 25:17, 33:4, 33:9, 68:7, 68:8, 79:2
**processing** [3] - 21:6, 21:10, 21:22
**producer** [1] - 12:15
**productively** [1] - 73:20
**professions** [1] - 51:11
**profile** [1] - 18:19
**profit** [1] - 76:20
**profitable** [1] - 38:22
**promised** [2] - 73:23, 82:7
**promote** [5] - 7:9,

7:20, 20:17, 27:5, 58:5
**promoting** [1] - 9:11
**promotion** [3] - 7:9, 7:21, 29:1
**promotional** [2] - 26:12, 27:16
**promptly** [1] - 82:22
**pronouncement** [1] - 73:22
**pronouncements** [2] - 73:24, 74:13
**proof** [20] - 31:16, 37:10, 38:12, 38:24, 39:4, 39:11, 39:13, 39:23, 40:1, 40:14, 41:9, 41:17, 46:5, 46:8, 46:11, 56:19, 63:11, 63:25, 68:2, 80:15
**proof's** [1] - 37:10
**Properties** [18] - 25:6, 25:7, 25:8, 26:7, 26:9, 26:10, 26:14, 26:19, 26:22, 28:9, 29:21, 29:23, 30:8, 30:10, 30:13, 30:17, 30:19, 31:8
**Properties'** [1] - 21:25
**Property** [1] - 30:5
**property** [5] - 24:23, 25:9, 26:1, 28:17, 28:22
**proposals** [2] - 73:3, 73:18
**proposition** [1] - 76:10
**propositioned** [1] - 56:17
**prosecute** [1] - 47:15
**prosecuted** [1] - 77:21
**prosecuting** [3] - 55:7, 55:9, 73:11
**prosecution** [6] - 43:12, 43:13, 49:24, 50:19, 61:21, 64:22
**prosecution's** [1] - 40:22
**prosecutor** [2] - 76:3, 77:20
**prosecutors** [1] - 41:1
**prostitute** [1] - 24:17
**prostituted** [3] - 9:6, 13:5, 14:11
**prostitutes** [1] - 51:14
**prostitution** [56] - 6:17, 7:5, 7:10, 7:19, 7:22, 9:14, 9:23, 10:3, 10:13, 10:16, 10:24, 11:2, 11:23,

12:1, 13:7, 13:12, 14:2, 14:12, 14:16, 14:24, 15:8, 15:12, 15:14, 16:6, 16:11, 16:22, 16:24, 16:25, 17:2, 17:19, 18:5, 18:13, 18:24, 19:15, 29:1, 34:11, 39:9, 47:9, 47:10, 51:9, 51:11, 55:5, 55:8, 57:24, 58:6, 58:11, 58:19, 58:20, 68:7, 68:21, 69:10, 69:17, 78:24
**protected** [1] - 34:12
**proud** [6] - 37:13, 52:15, 52:20, 55:19, 81:10, 81:11
**prove** [4] - 37:25, 38:10, 39:7, 78:25
**proved** [1] - 28:24
**provide** [3] - 49:12, 50:23, 73:15
**provided** [1] - 73:3
**provider** [1] - 56:24
**PSE** [6] - 17:1, 17:11, 18:7, 19:4, 19:7, 19:8
**public** [12] - 73:13, 75:10, 75:20, 75:21, 75:22, 75:24, 77:19, 77:20, 77:25, 83:3
**publish** [2] - 74:2, 75:24
**published** [3] - 74:4, 76:4, 78:10
**publishing** [2] - 7:22, 75:16
**Pulitzer** [2] - 40:18, 75:9
**punishable** [1] - 38:7
**punished** [1] - 59:12
**purchase** [1] - 23:24
**purpose** [1] - 6:25
**purposes** [1] - 39:16
**pursuing** [1] - 75:20
**pursuits** [1] - 74:19
**put** [37] - 9:1, 11:15, 12:23, 13:22, 15:1, 15:2, 17:4, 20:19, 27:14, 31:17, 33:15, 34:4, 42:5, 42:9, 42:19, 43:6, 43:8, 43:24, 43:25, 44:13, 46:18, 46:22, 46:23, 47:3, 47:20, 49:14, 52:12, 56:11, 59:7, 60:23, 64:25, 65:15, 67:9, 69:24, 70:3, 77:22

**puts** [1] - 64:6
**putting** [1] - 27:10

## Q

**qualified** [1] - 84:8
**questions** [4] - 7:13, 17:23, 53:24, 63:12
**quickly** [2] - 35:24, 40:9
**quite** [2] - 23:8, 42:10
**Quoc** [7] - 25:3, 26:5, 63:2, 63:11, 63:12, 64:2, 64:9

## R

**ran** [4] - 43:21, 44:15, 47:12, 78:23
**Rapp** [15] - 2:3, 6:2, 34:25, 35:12, 35:24, 36:17, 38:17, 42:5, 42:19, 51:6, 70:4, 72:5, 72:21, 79:4, 80:13
**RAPP** [17] - 5:7, 6:3, 35:1, 53:10, 54:6, 70:20, 70:22, 71:13, 71:23, 72:6, 72:8, 72:10, 74:4, 78:1, 78:3, 78:6, 78:8
**rather** [3] - 10:17, 31:11, 78:13
**rattling** [1] - 43:17
**re** [1] - 22:15
**reaching** [1] - 76:1
**read** [10] - 36:21, 37:8, 37:21, 37:22, 48:14, 69:20, 71:12, 72:18, 78:17, 78:21
**reading** [6] - 49:9, 71:16, 71:18, 74:9, 78:9, 78:13
**ready** [7] - 6:2, 35:16, 36:10, 83:7, 83:9, 83:12, 83:13
**reaffirming** [1] - 75:23
**real** [2] - 22:21, 67:20
**realize** [1] - 79:21
**really** [11] - 8:6, 11:2, 20:10, 22:3, 23:3, 44:3, 45:16, 56:13, 57:14, 57:25, 61:11
**reason** [3] - 41:21, 46:7, 76:13
**reasonable** [12] - 37:11, 38:1, 39:7, 49:4, 68:15, 76:25, 79:15, 79:16, 79:17, 80:1, 81:24, 82:6

**reasonably** [1] - 47:18
**reasons** [1] - 68:1
**receive** [1] - 66:13
**received** [1] - 32:14
**receiving** [2] - 25:6, 29:12
**recent** [1] - 76:11
**recently** [1] - 75:25
**Recess** [2] - 5:18, 35:20
**recess** [2] - 35:6, 35:15
**recheck** [1] - 71:25
**recognize** [1] - 52:15
**recommendations** [3] - 13:25, 14:1
**record** [2] - 35:12, 72:3
**recordkeeping** [1] - 51:12
**records** [11] - 50:23, 51:1, 51:3, 51:4, 51:5, 51:14, 51:17, 55:14, 55:15, 61:21, 75:21
**red** [3] - 10:18, 10:19, 11:6
**reduce** [1] - 43:18
**refer** [2] - 72:16, 78:12
**reference** [4] - 13:14, 19:23, 48:18, 51:6
**references** [7] - 18:9, 18:12, 19:6, 19:8, 19:24, 23:23, 51:19
**referred** [2] - 39:2, 39:4
**referring** [1] - 69:22
**reflect** [1] - 35:12
**reformers** [1] - 59:6, 59:8
**refresh** [1] - 22:5
**refused** [2] - 72:23, 77:3
**refuted** [1] - 80:5
**regard** [3] - 31:24, 33:10, 44:14
**regarding** [1] - 44:11
**regulate** [2] - 59:18, 59:19
**regulated** [1] - 69:17
**regulation** [1] - 75:18
**regulations** [1] - 77:22
**regulatory** [1] - 77:3
**reinforced** [1] - 50:16
**rejected** [1] - 70:8
**related** [4] - 10:16, 26:13, 51:23, 68:22
**relationship** [3] - 13:18, 13:24, 19:22
**release** [1] - 82:8

**reliable** [2] - 56:23, 57:15
**relied** [1] - 37:19
**religious** [3] - 58:25, 59:2, 61:6
**rely** [3] - 55:22, 56:7, 57:10
**relying** [1] - 31:16
**remain** [2] - 82:17, 83:4
**remained** [1] - 19:23
**remember** [56] - 7:13, 7:16, 8:23, 9:5, 9:8, 9:12, 9:17, 9:19, 9:22, 10:5, 12:6, 13:3, 13:17, 13:18, 14:10, 15:10, 15:19, 16:1, 16:13, 16:18, 21:10, 22:2, 22:24, 23:3, 23:4, 23:11, 23:21, 23:22, 27:8, 27:24, 31:13, 31:16, 31:23, 33:10, 33:12, 33:13, 33:17, 35:25, 40:24, 41:18, 42:10, 43:10, 43:12, 43:19, 44:2, 45:4, 50:18, 51:6, 51:20, 55:4, 57:5, 60:10, 63:12, 64:3, 79:24
**remind** [2] - 35:11, 35:23
**removal** [1] - 17:15
**remove** [2] - 17:5, 49:10
**removed** [1] - 17:14
**removing** [3] - 17:13, 17:21, 18:1
**repeat** [2] - 37:22, 46:14
**repeated** [1] - 74:15
**report** [3] - 23:5, 66:13, 68:14
**reported** [2] - 23:6, 42:22
**Reported** [1] - 1:24
**reporter** [1] - 36:1
**Reporter** [3] - 1:20, 1:24, 84:8
**REPORTER'S** [1] - 1:13
**reporters** [3] - 40:2, 41:19, 45:18
**reporting** [1] - 66:11
**reports** [1] - 26:8
**repost** [2] - 22:5, 22:16
**represented** [4] - 24:23, 25:10, 33:4, 81:10

**Republic** [1] - 74:21
**reputation** [1] - 69:3
**request** [2] - 70:5, 70:6
**requested** [1] - 60:20
**requests** [1] - 62:14
**required** [2] - 51:4, 66:11
**requires** [4] - 39:14, 63:24, 65:3
**rescued** [1] - 50:6
**research** [1] - 82:19
**resentment** [1] - 40:11
**respect** [1] - 76:22
**respond** [4] - 48:16, 48:17, 52:3, 57:3
**responded** [2] - 47:2, 51:2, 55:14
**responsibilities** [1] - 52:19
**rest** [5] - 37:23, 42:8, 66:19, 69:18, 72:24
**restraints** [1] - 66:21
**restricting** [1] - 75:18
**resume** [2] - 82:8, 83:6
**resuming** [1] - 73:6
**retaliatory** [1] - 76:4
**Retired** [1] - 73:14
**retirees** [2] - 74:24, 74:25
**return** [2] - 38:11, 50:13
**Reuters** [1] - 68:23
**revenue** [10] - 20:19, 22:22, 23:4, 23:7, 25:6, 25:19, 28:3, 29:13, 32:22, 33:9
**Review** [11] - 6:14, 18:12, 19:25, 46:21, 50:3, 53:4, 54:4, 54:20, 60:21, 60:22, 62:12
**review** [6] - 19:19, 19:20, 20:1, 26:7, 46:8, 76:19
**reviewed** [1] - 47:8
**reviews** [4] - 18:20, 57:11, 57:12
**ridicule** [1] - 75:25
**ridiculous** [2] - 54:20, 54:21
**Rights** [1] - 76:2
**rights** [4] - 75:14, 77:9, 77:14, 77:25
**rise** [8] - 5:17, 5:20, 5:23, 35:7, 35:19, 36:3, 82:25, 83:16
**risk** [2] - 31:11, 48:4
**RMR** [2] - 1:21, 84:20

**Road** [2] - 2:16, 2:19
**Robert** [1] - 52:21
**Robinson** [5] - 10:7, 10:18, 11:5, 11:11, 13:1
**role** [4] - 44:12, 44:20, 45:9, 46:12
**roll** [1] - 23:18
**rolling** [1] - 23:18
**room** [3] - 8:12, 9:21, 9:24
**roses** [3] - 10:19, 11:6
**rule** [1] - 71:1
**rules** [2] - 44:15, 46:6
**run** [3] - 6:16, 34:10, 77:19
**running** [9] - 6:14, 20:16, 38:13, 38:15, 41:8, 48:25, 49:15, 61:24, 62:3
**Ryan** [1] - 71:19

**S**

**sacrifice** [2] - 36:24, 76:18
**safe** [1] - 10:20
**safety** [1] - 13:19
**sale** [4] - 27:21, 29:19, 29:20
**Sally** [1] - 67:18
**San** [1] - 41:12
**Sandra** [1] - 1:21, 73:14
**sat** [1] - 53:8
**satire** [1] - 75:24
**saved** [1] - 17:13
**saw** [11] - 11:1, 16:14, 16:15, 19:15, 40:14, 40:17, 46:8, 56:20, 60:17, 60:19, 63:25
**scammed** [1] - 57:2
**scenes** [1] - 12:17
**school** [1] - 59:24
**schools** [2] - 59:4, 59:23
**SCIME** [1] - 2:12
**Scott** [5] - 2:15, 13:25, 17:9, 20:5, 29:11
**Scottsdale** [3] - 2:16, 2:17, 3:12
**scroll** [1] - 66:5
**search** [2] - 51:22, 73:16
**seated** [6] - 5:21, 5:25, 35:9, 35:22, 36:5, 83:2
**Second** [1] - 69:12
**second** [10] - 5:7, 25:9, 33:1, 54:1,

54:19, 55:20, 64:2, 66:7, 66:8, 75:5
**secrecy** [1] - 76:6
**secrets** [1] - 67:12
**section** [4] - 12:21, 19:13, 25:13, 28:15
**security** [1] - 13:20
**see** [46] - 5:10, 9:5, 9:25, 10:1, 10:12, 10:18, 10:21, 11:22, 13:12, 13:13, 14:12, 16:16, 18:7, 18:9, 18:20, 19:12, 19:16, 19:19, 21:15, 27:19, 28:4, 29:22, 29:23, 30:9, 42:13, 47:3, 47:4, 48:18, 51:22, 58:12, 59:10, 62:15, 62:16, 62:18, 62:25, 64:12, 64:15, 66:17, 68:10, 69:1, 70:5, 74:11, 75:3, 79:20, 80:2
**sees** [2] - 9:19, 58:9
**seizure** [1] - 66:22
**selecting** [1] - 69:16
**seminal** [1] - 75:23
**Seminary** [1] - 8:21
**Senate** [1] - 32:4
**Senator** [1] - 73:4
**send** [4] - 30:1, 31:5, 31:10, 54:22
**sending** [1] - 48:1
**sends** [2] - 13:24, 13:25
**sense** [1] - 68:2
**sent** [7] - 24:25, 31:21, 32:22, 41:12, 54:23, 67:9, 68:19
**sentence** [2] - 43:18, 44:23
**separated** [1] - 73:20
**separation** [2] - 42:20, 42:24, 45:16
**sergeant** [1] - 48:4
**series** [3] - 11:5, 11:11, 76:19
**serious** [2] - 57:21, 60:5
**service** [4] - 73:5, 75:11, 77:1, 82:2
**services** [2] - 12:20, 75:17
**SESSION** [1] - 1:15
**set** [2] - 27:1, 73:9
**setting** [3] - 46:6, 73:24, 74:12
**seven** [5] - 49:3, 62:6, 68:4, 79:10
**several** [2] - 66:16

**sex** [5] - 12:16, 17:9, 58:2, 58:10
**shame** [1] - 50:7
**Shawn** [1] - 2:4
**Shehan** [2] - 58:23, 59:22
**shelf** [1] - 13:22
**shell** [3] - 24:19, 24:20, 28:1
**shift** [1] - 78:16
**shoes** [1] - 49:15
**shootings** [1] - 74:17
**shortly** [1] - 43:7
**show** [3] - 28:13, 47:3, 65:9
**showing** [1] - 63:5
**shown** [2] - 78:9, 80:2
**shows** [7] - 16:11, 22:11, 27:18, 31:1, 41:9, 42:11, 46:23
**shut** [1] - 21:4
**sic** [3] - 23:13, 48:3, 75:17
**side** [7] - 40:22, 41:18, 41:20, 41:21, 42:7, 42:8, 49:24
**signed** [1] - 61:6
**significance** [1] - 45:9
**significant** [2] - 13:15, 52:12
**signs** [1] - 60:16
**silly** [1] - 50:9
**simply** [2] - 68:9, 82:13
**sincere** [1] - 81:21
**single** [6] - 50:10, 53:12, 55:15, 59:10, 67:13
**singularly** [1] - 32:11
**sister** [1] - 16:13
**sit** [4] - 8:5, 39:21, 39:22, 76:14
**sit-down** [1] - 39:22
**site** [3] - 17:7, 27:10, 62:13
**sites** [1] - 23:19
**sitting** [1] - 80:12
**situation** [4] - 37:14, 46:4, 52:3, 62:5
**situational** [1] - 76:11
**Sixth** [1] - 34:22
**skip** [2] - 74:16, 75:2
**skipped** [1] - 12:25
**slogans** [1] - 37:11
**slow** [1] - 60:8
**small** [2] - 6:17, 75:1
**smoke** [2] - 10:23, 15:4
**smoked** [1] - 23:15

**smoking** [1] - 18:4
**so-called** [2] - 41:18, 62:19
**soften** [1] - 76:18
**sold** [5] - 22:11, 28:2, 38:23, 44:2, 44:3
**solely** [1] - 43:15
**someone** [1] - 68:11
**sometimes** [2] - 56:24, 57:2
**somewhat** [1] - 13:15
**somewhere** [1] - 23:23
**song** [1] - 44:14
**soon** [1] - 50:12
**sorry** [6] - 39:3, 47:23, 50:6, 51:15, 53:13, 53:15
**sort** [10] - 15:1, 22:11, 23:5, 23:6, 27:18, 28:2, 46:10, 46:11, 69:5, 80:13
**sound** [1] - 58:18
**source** [5] - 20:23, 25:16, 26:21, 27:22, 33:8
**south** [1] - 76:20
**space** [1] - 77:16
**Spc** [1] - 1:22
**speaking** [1] - 35:24
**Spear** [11] - 2:15, 13:25, 15:16, 15:17, 17:9, 20:5, 22:13, 29:11, 29:22, 30:14, 30:19
**special** [1] - 10:3
**specials** [1] - 12:2
**specific** [4] - 7:8, 17:13, 39:1, 39:8
**specifically** [1] - 66:9
**specified** [2] - 25:17, 84:13
**speech** [5] - 34:12, 73:21, 75:1, 77:9, 77:24
**spending** [1] - 20:24
**spent** [1] - 13:6
**spoken** [2] - 81:14, 82:14
**spot** [1] - 43:8
**Ss** [1] - 60:16
**Staca** [3] - 73:1, 73:19, 73:23
**staff** [2] - 73:2, 73:19
**stakeholders** [1] - 73:9
**stand** [11] - 9:2, 9:5, 9:13, 35:6, 35:15, 36:20, 40:25, 47:14, 66:10, 78:7, 83:15

**standards** [7] - 71:8, 71:10, 73:3, 73:9, 73:16, 73:19, 74:13
**standing** [1] - 81:21
**standpoint** [2] - 59:2, 59:3
**stands** [1] - 36:25
**star** [1] - 16:21
**start** [3] - 17:4, 63:2, 63:10
**started** [3] - 8:11, 8:25, 43:20
**starting** [1] - 79:9
**starts** [1] - 48:20
**state** [4] - 7:10, 74:24, 77:7, 77:10
**State** [2] - 11:8, 74:20
**State's** [1] - 74:17
**statement** [5] - 33:21, 35:14, 39:24, 40:25, 69:20
**statements** [6] - 35:11, 53:24, 56:1, 68:3, 68:4, 80:11
**STATES** [3] - 1:1, 2:2, 2:8
**States** [17] - 1:5, 27:2, 27:3, 27:4, 27:5, 28:18, 32:4, 33:3, 33:4, 34:18, 52:14, 59:11, 64:5, 64:11, 76:2, 79:12, 84:9
**States'** [2] - 31:17, 34:8
**statutes** [2] - 77:7, 77:21
**statutory** [1] - 77:3
**Stavros** [2] - 58:8, 58:13
**stay** [2] - 24:3, 81:18
**staying** [1] - 6:4
**steadfastly** [1] - 77:2
**Stein** [1] - 66:13
**Stenographic** [1] - 1:24
**step** [2] - 57:19
**steps** [1] - 39:12
**still** [4] - 8:24, 17:18, 22:13, 31:1
**stock** [1] - 45:25
**stone** [2] - 61:16, 61:17
**Stone** [1] - 2:3
**stopped** [3] - 13:22, 21:7, 41:23
**story** [3] - 12:15, 63:9, 76:19
**stranger** [2] - 77:12, 77:15
**strategies** [1] - 7:5

**Street** [2] - 1:22, 32:3
**street** [1] - 37:15
**stripped** [2] - 16:23, 17:5
**strongly** [1] - 17:18
**stuff** [6] - 16:7, 17:5, 52:2, 54:20, 60:5, 68:5
**subject** [1] - 62:18
**subjected** [1] - 76:5
**subjecting** [1] - 77:9
**subpoena** [1] - 52:4
**subpoenas** [1] - 51:2
**substantial** [1] - 68:10
**substantiated** [2] - 68:13, 68:14
**substantiates** [1] - 38:12
**substantive** [3] - 9:16, 13:1, 32:16
**success** [1] - 52:21
**successfully** [3] - 75:15, 75:17, 75:22
**succumb** [1] - 77:3
**sudden** [1] - 50:4
**suggestions** [3] - 70:15, 70:17, 72:23
**Suite** [7] - 1:21, 2:5, 2:13, 2:16, 2:19, 3:4, 3:8
**summarize** [1] - 78:12
**SUMMARY** [1] - 4:2
**summary** [1] - 25:2
**summation** [9] - 36:7, 54:9, 54:12, 78:12, 82:7, 82:8, 82:11, 82:12, 82:23
**super** [1] - 53:5
**supplies** [1] - 41:6
**support** [1] - 18:25
**supported** [1] - 79:8
**supports** [3] - 41:7, 42:24, 68:2
**suppose** [1] - 74:1
**supposed** [1] - 28:2
**supposedly** [1] - 31:2
**Supreme** [1] - 75:23
**sustained** [2] - 53:11, 53:17
**Svengard** [4] - 7:16, 8:23, 22:2, 22:24
**switch** [2] - 21:8, 24:16
**system** [3] - 23:13, 37:12, 37:13

---

**T**

---

**table** [1] - 8:5
**talks** [4] - 22:19,

23:20, 39:14, 67:25
**tarnish** [1] - 69:2
**task** [1] - 74:14
**taxes** [2] - 65:14, 66:1
**TAYLOR** [1] - 84:7
**Taylor** [3] - 1:21, 84:19, 84:20
**team** [1] - 18:1
**Tech** [1] - 27:23
**Technologies** [13] - 25:4, 25:5, 25:18, 26:4, 26:6, 26:18, 26:21, 27:20, 29:21, 30:8, 30:13, 30:16, 30:18
**Technologies'** [1] - 25:24
**Technology** [1] - 30:5
**telephones** [4] - 59:15, 59:17, 59:18, 59:20
**temperament** [1] - 46:24
**ten** [2] - 35:4, 35:6
**TER** [3] - 18:19, 19:19, 19:23
**term** [4] - 10:21, 58:2, 58:9, 60:15
**terminated** [1] - 13:23
**terms** [13] - 13:11, 14:20, 15:7, 15:11, 16:22, 17:6, 17:11, 17:25, 18:5, 43:23, 43:24, 60:12, 73:10
**testified** [29] - 9:6, 9:8, 11:14, 13:4, 15:11, 16:2, 16:13, 16:14, 22:19, 22:24, 23:12, 26:6, 31:14, 31:15, 40:3, 41:19, 42:1, 42:25, 47:16, 50:18, 55:11, 56:1, 57:18, 58:23, 60:9, 67:13, 68:18
**testify** [6] - 16:13, 43:11, 50:19, 54:22, 55:11, 61:20
**testifying** [3] - 9:8, 43:16, 52:5
**testimony** [40] - 6:11, 10:5, 10:19, 12:6, 13:18, 16:18, 19:14, 19:17, 23:22, 25:3, 27:8, 29:25, 31:24, 33:10, 33:21, 36:8, 39:15, 39:17, 39:18, 40:3, 40:21, 41:10, 42:4, 42:22, 44:17, 47:7, 54:10, 54:11, 55:15, 56:4, 56:6,

56:22, 57:2, 60:11, 61:1, 65:11, 66:20, 67:16, 80:11
**Texas** [2] - 25:24, 75:23
**text** [5] - 10:1, 14:20, 14:21, 66:3, 66:5
**texts** [1] - 14:25
**Thai** [8] - 25:3, 26:5, 31:14, 63:2, 63:11, 63:13, 64:2, 64:9
**thanked** [2] - 79:11, 80:6
**thanking** [2] - 52:24, 68:14
**that'll** [1] - 81:15
**themselves** [1] - 20:25
**Theological** [1] - 8:21
**therapeutic** [1] - 19:14
**there'd** [1] - 60:16
**therefore** [1] - 68:7
**therein** [1] - 84:13
**they've** [3] - 39:12, 70:12, 75:15
**third** [1] - 76:24
**third-party** [1] - 76:24
**thorough** [1] - 64:14
**three** [5] - 6:8, 55:12, 60:3, 77:7, 81:9
**throw** [1] - 61:16
**thumbs** [1] - 35:4
**Thurman** [2] - 15:10, 15:24
**tile** [1] - 13:14
**tired** [1] - 65:21
**today** [2] - 28:6, 58:1
**together** [1] - 71:8
**Tolhurst** [2] - 53:7, 53:23
**took** [11] - 9:13, 39:11, 40:7, 46:16, 46:21, 58:13, 58:16, 60:18, 60:21, 60:22
**tool** [1] - 49:8
**toothpaste** [1] - 33:24
**top** [8] - 22:4, 22:6, 22:9, 22:15, 22:20, 23:2, 23:9, 24:3
**total** [1] - 75:8
**town** [6] - 13:14, 14:2, 14:4, 14:6, 14:7, 19:6
**traded** [1] - 68:20
**traditional** [1] - 74:22
**trafficking** [2] - 12:16, 48:5
**trained** [1] - 63:2
**transaction** [8] - 24:23, 25:14, 25:20, 28:16, 28:19, 32:20,

32:25, 65:24
**transactional** [4] - 20:24, 20:25, 28:12, 32:21
**transactions** [6] - 21:11, 24:14, 25:20, 28:21, 29:2, 29:12
**TRANSCRIPT** [1] - 1:13
**transcript** [2] - 84:11, 84:13
**Transcript** [1] - 1:24
**Transcription** [1] - 1:24
**transferred** [1] - 28:16
**transferring** [1] - 20:25
**transfers** [2] - 29:18, 29:21
**transparency** [3] - 51:12, 51:16, 51:17
**transportation** [1] - 33:6
**transported** [2] - 27:2, 33:2
**Travel** [12] - 6:9, 7:7, 7:8, 20:3, 20:15, 24:24, 27:6, 28:18, 28:25, 29:4, 33:5, 33:9
**traveled** [1] - 40:15
**Treasury** [1] - 64:6
**TRIAL** [1] - 1:14
**trial** [10] - 28:24, 38:25, 39:5, 43:6, 74:5, 77:23, 78:9, 80:21, 80:22, 80:23
**trials** [1] - 60:9
**tried** [2] - 58:4, 67:14
**trouble** [1] - 56:25
**true** [2] - 45:22, 84:11
**trust** [5] - 34:5, 63:23, 66:16, 67:10, 67:15
**trusts** [2] - 67:7, 67:8
**try** [4] - 43:11, 57:12, 58:18, 72:14
**trying** [6] - 10:22, 44:3, 57:24, 64:13, 65:14, 66:1
**tube** [1] - 33:25
**Tuesday** [2] - 33:13, 82:9
**turn** [5] - 8:19, 16:4, 38:8, 47:23, 57:24
**turned** [1] - 47:7
**turning** [3] - 7:2, 80:17, 80:19
**turns** [2] - 48:4, 60:25
**turtleneck** [1] - 16:2
**twisting** [1] - 80:16,

80:19
**two** [15] - 6:9, 6:10, 6:11, 12:2, 12:3, 16:22, 22:23, 34:15, 41:18, 42:18, 59:4, 59:23, 60:3, 81:16
**type** [4] - 10:23, 14:19, 14:20, 23:24

## U

**U.S** [1] - 1:21
**unambiguous** [1] - 73:22
**under** [8] - 23:6, 38:7, 67:17, 67:18, 76:2, 77:6, 82:17, 84:14
**under-reported** [1] - 23:6
**Understood** [2] - 15:21, 47:6
**unit** [1] - 48:5
**UNITED** [3] - 1:1, 2:2, 2:8
**United** [20] - 1:5, 21:21, 27:2, 27:3, 27:4, 28:18, 31:17, 32:4, 33:3, 33:4, 34:8, 34:17, 52:14, 59:11, 64:5, 64:11, 76:1, 79:12, 84:9
**University** [1] - 74:20
**university** [1] - 75:19
**unlawful** [2] - 25:10, 25:17
**unless** [2] - 56:13, 78:25
**unloaded** [1] - 22:13
**unplanned** [1] - 31:11
**unreasonable** [1] - 80:24
**unreliable** [1] - 56:7
**up** [20] - 12:22, 15:21, 19:24, 24:4, 32:1, 35:5, 40:6, 42:5, 42:9, 47:3, 47:4, 47:20, 48:4, 49:25, 52:12, 56:24, 57:4, 60:14, 75:25, 80:15
**upgrade** [1] - 22:16
**US** [1] - 21:18
**user** [1] - 49:11
**users** [1] - 77:11

## V

**valuable** [2] - 52:21, 73:15
**value** [1] - 50:25
**values** [3] - 76:9,

76:10, 77:22
**Vanilla** [2] - 16:14, 21:12
**variation** [1] - 17:22
**variety** [1] - 75:14
**various** [7] - 26:11, 53:22, 60:23, 61:6, 79:8, 80:25
**Vaught** [7] - 3:10, 8:10, 12:22, 15:16, 17:19, 18:3, 20:6
**ven** [1] - 60:6
**veneer** [1] - 60:7
**verdict** [7] - 11:12, 34:19, 37:6, 38:11, 81:20, 81:21
**vice** [1] - 9:20
**Vice** [1] - 52:15
**victim** [1] - 12:24
**victims** [2] - 9:1, 48:5
**victory** [1] - 76:1
**view** [1] - 73:8
**views** [2] - 61:18, 76:23
**vigorously** [1] - 75:13
**Village** [2] - 75:7, 75:9
**vintage** [1] - 76:11
**violate** [3] - 7:7, 20:2, 69:11
**violated** [1] - 79:1
**violating** [3] - 39:16, 49:6, 79:15
**violation** [5] - 7:10, 20:15, 27:6, 33:5, 76:6
**violations** [6] - 6:9, 24:24, 28:18, 28:25, 29:4, 33:5
**Visa** [5] - 16:14, 21:3, 21:9, 21:12
**visiting** [1] - 40:15
**Voice** [2] - 75:7, 75:9
**voluntarily** [1] - 76:25
**volunteering** [1] - 74:14
**vs** [1] - 1:7

## W

**wait** [7] - 5:9, 54:23, 59:8, 61:5, 64:13, 71:13, 81:1
**waiting** [1] - 5:13
**wall** [1] - 41:25
**Wall** [1] - 32:3
**Walpole** [2] - 12:4, 12:21
**Walter** [1] - 2:16
**wants** [2] - 41:22, 45:1
**war** [2] - 74:19, 74:22

**Washington** [3] - 1:22, 2:10, 11:8
**watched** [1] - 76:15
**ways** [1] - 77:2
**wayside** [1] - 40:9
**wear** [1] - 16:7
**web** [2] - 27:11, 27:19
**Website** [16] - 25:4, 25:5, 25:18, 25:23, 26:3, 26:6, 26:18, 26:20, 27:20, 29:21, 30:4, 30:8, 30:13, 30:16, 30:18
**website** [4] - 20:17, 22:14, 24:11, 51:22
**week** [1] - 23:19
**weekend** [1] - 82:24
**weekly** [1] - 74:25
**welcome** [1] - 6:1
**West** [1] - 1:22
**Westward** [1] - 75:5
**Whac** [1] - 60:13
**Whac-A-Mole** [1] - 60:13
**whatsoever** [1] - 63:20
**whoa** [1] - 54:23
**whole** [6] - 25:15, 29:3, 33:6, 33:7, 40:5, 53:8
**wife** [1] - 51:7, 69:9
**willingness** [1] - 76:23
**wind** [2] - 31:7, 57:4
**wire** [3] - 25:21, 31:24, 59:20
**wired** [3] - 25:4, 25:23, 26:1
**wires** [5] - 26:18, 26:20, 30:3, 30:15, 32:5
**wiring** [1] - 7:5
**wise** [1] - 54:25
**wish** [1] - 82:23
**witness** [7] - 9:9, 31:18, 33:23, 36:18, 36:20, 40:24, 53:22
**witnessed** [1] - 49:25
**witnesses** [3] - 7:14, 11:17, 53:9
**WOLPERT** [1] - 3:2
**woman** [8] - 9:22, 10:7, 10:16, 12:19, 13:13, 14:24, 16:2, 33:17
**women** [3] - 9:19, 22:23, 77:1
**won** [2] - 75:9, 75:25
**wonderful** [1] - 57:8
**word** [9] - 37:1, 41:14, 57:24, 58:12, 58:13,

58:16, 62:20, 62:25, 63:8
**words** [8] - 8:4, 13:22, 46:16, 58:20, 80:13, 81:14, 81:16
**wore** [1] - 16:7
**workable** [1] - 73:16
**works** [2] - 9:7, 59:20
**world** [7] - 40:4, 40:5, 41:21, 43:11, 43:20, 44:11, 54:3
**worth** [1] - 28:17
**write** [4] - 41:22, 57:12, 60:15, 61:11
**writer** [1] - 40:16
**writing** [5] - 15:20, 40:4, 42:15
**written** [3] - 47:1, 47:6, 77:21
**Wu** [1] - 2:4

## Y

**year** [2] - 23:7, 49:21
**years** [9] - 9:7, 44:25, 45:6, 45:21, 76:9, 76:17, 76:21, 79:11, 81:9
**yesterday** [2] - 6:5, 36:7
**York** [4] - 2:9, 2:13, 61:12, 75:6
**you's** [1] - 49:22
**young** [1] - 16:1
**yourself** [5] - 31:4, 45:8, 49:14, 62:4, 80:24
**yourselves** [1] - 82:19

## Z

**zero** [1] - 45:22

# EXHIBIT P

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 29, 2024 |
| Michael Lacey, et al. | ) | 9:16 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

   For the Government:
3        UNITED STATES ATTORNEY'S OFFICE
         By:  **Mr. Kevin M. Rapp, Esq.**
4              **Mr. Peter S. Kozinets, Esq.**
               **Mr. Andrew C. Stone, Esq.**
5              **Ms. Margaret Wu Perlmeter, Esq.**
         40 North Central Avenue, Suite 1200
6        Phoenix, Arizona 85004
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov

9    For the Government:
         UNITED STATES DEPARTMENT OF JUSTICE
10       By:  **Mr. Austin Berry, Esq.**  (Appears via Zoom)
         1301 New York Avenue, NW, 11th Floor
11       Washington, DC 20005
         austin.berry2@usdoj.gov

12
     For the Defendant Michael Lacey:
13       LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
         By:  **Mr. Paul J. Cambria, Jr., Esq.**
14       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202
15       pcambria@lglaw.com

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2

3          (Proceedings commence at 9:16 a.m.)

4          COURTROOM DEPUTY:  This is case number CR 18-422,

5     United States of America vs. Michael Lacey, on for status

6     conference.

7          Counsel, please announce your record -- presence for

8     the record.  Sorry.

9          MR. STONE:  Good morning, Your Honor, Andy Stone,

10    Peter Kozinets, Kevin Rapp, Peggy Perlmeter and Austin Berry is

11    on the screen for the United States.

12          THE COURT:  Good morning.

13          MR. CAMBRIA:  Good morning, Your Honor, Paul Cambria

14    for Mr. Lacey.

15          THE COURT:  Good morning to you.  Good morning,

16    Mr. Lacey.

17          Now, I wanted to bring the parties in because having

18    received the notice that the government intends to retry

19    Mr. Lacey on the 84 counts for which there was no verdict, I

20    wanted to get a sense of what you thought the timing would be

21    of all of this in the wake of, I will make you aware, of all of

22    the sort of moving parts that we have here.

23          As you know, and I'm going not to address the matters

24    that are pending before the Court, but you have one count of

25    conviction, which I assume is going to be the subject of an

1   appeal, and the -- what I assume to be the eventual appeal of

2   the jury verdicts by the codefendants. I wanted to get a sense

3   of how you think, from the government's perspective, what the

4   timing of all of this would look like because it seems to me a

5   complex issue in terms of scheduling. Have you thought about

6   that in terms of the Speedy Trial Act and all of what I think

7   are all continuing moving parts?

8         MR. STONE: Yes, Your Honor, and I will do my best to

9   address the Court's concerns. And if you have questions,

10   please interrupt me. Obviously there's a number of moving

11   parts, and this is a complex matter where you have

12   multidefendants and the jury reached verdicts, complete

13   verdicts as to four of the defendants, and with one there were

14   count of acquittal, count of conviction, and then the 84 counts

15   that were hung up.

16         Obviously there's a number of motions pending before

17   Your Honor that have the potential, if leave was given, to --

18   to end this case really, and all of that sort of overlaid with

19   the Speedy Trial Act and the Ninth Circuit law on that, which

20   is dissimilar as to other circuits, and so there are complex

21   issues here, Your Honor.

22         I think if we take them one at a time, we have the

23   Speedy Trial Act that we need to ensure that we are in

24   compliance with. The government's notice demonstrates that

25   there's two scenarios in which we are in compliance with it.

1   Mr. Cambria filed a response on Friday where he's waived his

2   client's time, waived his rights to a speedy trial, so that's a

3   third, a third path to make sure that we're in compliance with

4   the speedy trial.

5         THE COURT:  I have not seen the notice.  I was not

6   aware.

7         MR. STONE:  That was filed at 2038 on January 26th,

8   which I believe was Friday.  On page 3, if Mr. Cambria doesn't

9   mind, I'll just read what he wrote on that.  It says, "Finally,

10   in order to have sufficient time to obtain funds to retain the

11   undersigned as counsel for the third trial, Lacey waives any

12   Speedy Trial Act rights to the extent the time is not tolled by

13   virtue of the pending Rule 29 and 33 motions."

14         THE COURT:  All right.  I appreciate that,

15   Mr. Cambria.

16         MR. STONE:  So there are a couple options here.  One

17   is that we haven't fully explored and we would want a little

18   more time to understand all of the implications, but one

19   scenario, as I laid out, or as we laid out in our motion in

20   Document 2035, and what has been done in other cases that had

21   similar, that had similar facts, would be that Mr. Lacey is

22   sentenced on the count of conviction, it goes up on appeal, the

23   Ninth Circuit does whatever the Ninth Circuit does, and then

24   there's a decision on whether or not the trial will commence on

25   the 84 hung counts.

1          I'm not stating that that's the United States'

2     position as we sit here today.  I think we need to get a trial

3     on the calendar and make sure we're okay with the speedy trial

4     rights, but that is an option that has been done in other cases

5     that may be something that we can look to in this case as well.

6          THE COURT:  So what you're suggesting is wait for the

7     Ninth Circuit to render any decision on the count of conviction

8     and then pursue the trial?

9          MR. STONE:  That is one viable option, Your Honor.

10    That is not the United States' position as we sit here today.

11    We would need more time to explore that, but that is something

12    that has been done in a number of other cases, and I've cited

13    those cases in Document 2035.

14          THE COURT:  All right.  Option two, do you have one?

15          MR. STONE:  Well, option two, first off, we need to

16    understand the rulings on these post-trial motions because

17    there is no sense in having a trial if a Rule 29 motion is

18    going to be successful.  I think --

19          THE COURT:  Well, let's just, for sake of argument,

20    let's assume that, you know, half of your counts remain, you

21    have 84 counts.

22          MR. STONE:  Option two, we have a trial date set on

23    Count 3, Your Honor.

24          THE COURT:  Mr. Cambria, have you given any of this

25    any thought?

1      MR. CAMBRIA:  First off, Your Honor, I agree that the

2  two defendants who were convicted who had nothing to do with

3  this proceeding now, I assume are going to immediately appeal,

4  Brunst and Spear, and go to the Ninth Circuit, and there will

5  be a number of issues that could have an impact on any

6  subsequent trial where Mr. Lacey would be involved in.  And so

7  to that degree, it does make sense to wait to hear from the

8  Ninth Circuit.

9      The other thing is I have not been retained for a

10  third trial.  It appears that you didn't receive the material

11  that we filed.  I apologize.  I don't know why.

12      THE COURT:  Well, I did not look at the docket, so it

13  might -- I am sure you did file it.  I note that you did file

14  it, but I didn't receive it, so...

15      MR. CAMBRIA:  Well, basically what I said there is

16  part of this, that there will be issues the Ninth Circuit would

17  decide that could have an impact on any subsequent trial.  But

18  in addition, we have not been retained because Mr. Lacey's

19  assets have been seized, and we would like to have the

20  opportunity to go and file a Monsanto motion to determine

21  whether or not we could have funds available for a retrial and

22  to retain me for such a trial, and other expenses that we've

23  had, and I would be prepared obviously to do that as soon as

24  possible.

25      A couple of those, I think, have been granted already

8

1    for Brunst, but we haven't made one, but we need to, and so

2    that this way Mr. Lacey can retain me for any retrial, if there

3    is a retrial.

4          So I think from a practical matter, we need to know

5    what the Ninth Circuit says because there's no use trying the

6    case and then they rule a certain way that has an impact on

7    that and then we're doing it again.  Three times is enough as

8    far as I'm concerned.

9          And so what I'm suggesting, and we did specifically

10    waive any speedy trial issue here, so what I'm suggesting is

11    that at minimum you give me the opportunity to make this quick

12    Monsanto motion.  Hopefully it would be granted, and then I

13    could be retained if there is a third trial.

14          And in addition, I do -- I do believe that it's

15    worthwhile from an economic, the Court's time and others to

16    basically hear what the Ninth Circuit has to say.  There are

17    some unique issues in this case, especially as the First

18    Amendment intertwines in this area, and I think it's worthwhile

19    to hear what they have to say about those issues, and I assume

20    that Spear and Brunst, who have no reason to delay an appeal on

21    their part, you know, will be there and these issues will be

22    common and have an impact on anything that might happen with

23    regard to Mr. Lacey in another trial.

24          So at minimum, I'd ask the Court to allow us to make

25    the Monsanto motion.  Hopefully if it's successful, I can be

1    retained and then we can talk about what -- what should be

2    next.  Ideally, we would simply hold things in abeyance and

3    wait for the Ninth Circuit.

4            THE COURT:  Well, you can at any time file a Monsanto

5    motion.

6            MR. CAMBRIA:  I'm sorry?

7            THE COURT:  You can at any time file a Monsanto

8    motion.

9            MR. CAMBRIA:  Yeah.

10           THE COURT:  And so there's no prohibition in having

11   you do that, and having the government, of course, respond to

12   that as well.  In all likelihood we will likely have to have a

13   hearing related to that motion.  So I think if you get that

14   done, we can have that at least settled --

15           MR. CAMBRIA:  I will.

16           THE COURT:  -- in a more orderly fashion.  I guess at

17   this juncture, just understanding the posture of the case and

18   because there are substantial issues that have to be considered

19   by the Ninth Circuit, it may -- I do agree it may change the

20   complexity or the, what the government may or may not be able

21   to pursue with regard to a retrial of the 84 remaining counts

22   against Mr. Lacey.

23           And so I think at this point we'll look for your

24   motion, Mr. Cambria.  And I guess I note too that there are

25   additional named counsel.  I'm assuming that these are

UNITED STATES DISTRICT COURT

1   individuals that are part of your firm who have signed on to

2   the post-trial pleadings, Mr. Cambria?

3         MR. CAMBRIA:  Erin McCampbell Paris has been assisting

4   me.  She has been responsible for research and writing and so

5   on, and so she would be the one who would join with me in

6   filing that Monsanto motion as soon as we practically can do

7   it.

8         THE COURT:  Okay.  And I guess -- well, so at this

9   juncture there's really nothing to be done in terms of setting

10   any sort of hearing status or otherwise, but do pay attention

11   to the docket and I think we'll all move forward in that

12   fashion.

13         Is there anything further from the government at this

14   juncture?

15         MR. STONE:  I think, Your Honor, it would perhaps be

16   easier for the record if we could get a date down for the trial

17   rather than just having it be open-ended.  I know that there's

18   been a waiver of the speedy trial rights, but in most cases

19   when there's a potential for a trial there is at least a date.

20   Sometimes it's just a placeholder, but there is a date that the

21   Court issues so that we at least have that issue and the

22   parties know about it.  That's one thing.

23         The second point, Your Honor, is in terms of the

24   differences of the proposal of waiting to try Mr. Lacey until

25   after the Ninth Circuit has ruled, Mr. Cambria's suggestion is

1  that Mr. Lacey is not sentenced and he doesn't go up on appeal.

2  We don't think that's right.  We think he would need to be

3  sentenced.  He can take his own appeal.  If he has any issues

4  he wants to raise, he can raise.  And then, depending on what

5  the Ninth Circuit does, there can be a determination on his

6  trial.

7         For the four or five cases I cited in Doc 2035, that's

8  the procedure it would be for the defendant to be sentenced on

9  counts of conviction, take his appeal up, and then after that

10 there's the determination on whether there's going to be a

11 retrial on the hung counts.  Those are my two points, Your

12 Honor.

13        MR. CAMBRIA:  My only comment on that, Your Honor, is

14 we do have motions pending in front of Your Honor, and so

15 rather than, you know, push along on that, we know that the

16 other two defendants who were convicted are going to an

17 immediate trial and so, therefore, the Ninth Circuit will have

18 the case and the issues will be up to us.  And so for what they

19 suggest is that you would go forward with your decisions and

20 then we would, if they were against us, if you will, he would

21 be sentenced and then we would go to the Ninth Circuit.  To me

22 it just seems that it's -- we have two defendants who clearly

23 are going to expeditiously go to appeal, so whatever the

24 decisions will be there the issues will become.

25        THE COURT:  Yes, I agree with that, but I do think

UNITED STATES DISTRICT COURT

1    that holding in abeyance a sentencing on the count of

2    conviction really to me doesn't help the matter along.  In

3    fact, I think, unless, Mr. Cambria, you have a reason supported

4    by case law that you think that sentencing should be held in

5    abeyance, then I'll entertain that, but I don't -- I don't

6    think that that's going to be useful to the posture of the

7    case.  I think sentencing -- because, as you know, the

8    triggering mechanism for an appeal is really after the sentence

9    has been imposed.  And so I think we have to move forward in

10   that regard.

11          But in any event, I do agree that we probably should

12   at least have a placeholder date in which we can treat as a

13   non-firm trial date, but it will help keep us on the calendar

14   if something should arise.  But I will tell you that I cannot

15   do that until after May, and just going to my own trial

16   schedule.  So what is your suggestion for a placeholder trial

17   date, if you have one, if you discussed it at all?

18          MR. STONE:  Your Honor, we would just ask based on

19   your availability as soon as possible.  As soon as practicable

20   after your calendar opens up.

21          MR. CAMBRIA:  My trial, the last one will be finished

22   at the end of July.  I have a homicide April 1st, and then a

23   federal, I am sure it's happened in this district as well, PPP

24   bank fraud, et cetera, type case, which is scheduled for

25   July 12th through probably the end of that month, so after July

UNITED STATES DISTRICT COURT

1　there are no trials scheduled at this time.

2　　　　THE COURT:  We're destined to always be in August.

3　And I guess, Mr. Cambria, I was led to believe that you are

4　easing up in your practice, but it seems you are ratcheting up.

5　　　　MR. CAMBRIA:  Not at all.  There may be some people

6　trying to ease me up in my practice, but that's not happening

7　at all.  As a matter of fact, I have a vigorous schedule, as I

8　always have, and I intend to do it that way.  My hope is that I

9　am found some day with my head down on my desk on a winning

10　decision and I passed.

11　　　　THE COURT:  Well, that remains to be seen, but we

12　won't hope that that happens anytime soon.  So as a

13　placeholder -- should we do August the 6th?  We will set August

14　the 6th and we'll use that as our placeholder.  And at some

15　point we probably will meet again in terms of a status hearing

16　or something of that sort before that time depending on how all

17　these moving parts play out, but in any regard, that's what we

18　will do.

19　　　　COURTROOM DEPUTY:  How long?

20　　　　THE COURT:  And I suspect this will be a shorter

21　trial?

22　　　　MR. STONE:  Yes, Your Honor.  We were just discussing

23　that, we think five weeks is a good estimate.

24　　　　THE COURT:  Mr. Cambria, my guess is you've thought

25　about your potential defense case, one week maybe?

UNITED STATES DISTRICT COURT

14

1          MR. CAMBRIA:  We might add two days on to that, a week

2     maybe.

3          THE COURT:  We'll keep a note that it will roughly be

4     about six weeks.

5          Anything further from the government?

6          MR. STONE:  No, Your Honor, just, was there a thought

7     that there would be oral argument scheduled on the pending

8     motions?

9          THE COURT:  I -- right now I -- they are fully

10    briefed, and they are almost overly briefed, and that was the

11    reason for one of my subtle hints that, look, only concentrate

12    on what has been argued and presented and not new argument.  So

13    in any event, I have not contemplated that at this juncture

14    because, again, they are fully briefed.  We have a

15    fully-developed record, which is the reason it's taken some

16    time.

17         And so anything further from you, Mr. Cambria?

18         MR. CAMBRIA:  Not at all, Your Honor.

19         THE COURT:  All right.  Thank you.  Then this matter

20    is adjourned.

21         MR. STONE:  Thank you, Your Honor.

22       (Proceedings concluded at 9:38 a.m.)

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

1

2                           **C E R T I F I C A T E**

3

4          I, HILDA E. LOPEZ, do hereby certify that I am duly

5    appointed and qualified to act as Official Court Reporter for

6    the United States District Court for the District of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 5th day of April,

13   2024.

14

15

16                                   s/Hilda E. Lopez_____

17                                   HILDA E. LOPEZ, RMR, FCRR

18

19

20

21

22

23

24

25

# EXHIBIT Q

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 28, 2024 |
| Michael Lacey, et al. | ) | 9:34 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING - DAY 2**

**PAGES 130-249**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Peter S. Kozinets, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
        **Mr. Joseph Franklin Bozdech, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

132

**APPEARANCES CONTINUED**

For the Defendant John Brunst:
     BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
     LINCENBERG & RHOW, P.C.
     By:  **Mr. Gopi K. Panchapakesan, Esq.**
          **Mr. Gary S. Lincenberg, Esq.**
     1875 Century Park E, Suite 2300
     Los Angeles, CA 90067
     gpanchapakesan@birdmarella.com
     glincenberg@birdmarella.com

<u>**P R O C E E D I N G S**</u>

(Proceedings commence at 9:34 a.m.)

THE COURT:  All right.  Please be seated.

COURTROOM DEPUTY:  We're on the record in CR 18-422, 09:34:18

United States of America vs. Michael Lacey, Scott Spear and

John Brunst, before the Court for sentencing.

MR. RAPP:  Good morning.  Kevin Rapp, Austin Berry,

Peter Kozinets and Joe Bozdech and Margaret Perlmeter on behalf

of the United States. 09:34:41

THE COURT:  Good morning.

MR. CAMBRIA:  Paul Cambria, Erin Paris on behalf of

Mr. Lacey.

THE COURT:  Good morning.

MR. LINCENBERG:  Good morning, Your Honor, 09:34:48

Gary Lincenberg and Gopi Panchapakesan on behalf of Mr. Brunst,

who is present in court.

THE COURT:  Good morning.

MR. KESSLER:  Good morning, Your Honor, Eric Kessler

and Bruce Feder for Mr. Spear.  Mr. Spear is sitting in front 09:34:58

of the bar.

THE COURT:  And good morning, counsel.  We will

proceed.  Is the government ready to go forward?

MR. RAPP:  Yes, Your Honor.  Your Honor, counsel,

first, I want to express the same sentiments I think some of 09:35:19

134

```
 1   counsel made yesterday in thanking the Court for their patience
 2   and their attention to detail over this very lengthy case.  In
 3   particular, I want to thank the staff.  Often the public
 4   doesn't see the late hours and the early mornings it takes to
 5   manage such a large case like this.                              09:35:41

 6          Last, I want to thank the probation office.  This case
 7   is a bit of an anomaly.  It took a lot of work for them to get
 8   it right and, of course, probation is not part of the executive
 9   branch.  It's not part of us, but it's part of the judiciary,
10   so they work very hard in speaking with the Sentencing          09:36:00
11   Commission and working diligently on the presentence reports.

12          In terms of how we intend to proceed today, I will
13   focus my arguments on the points raised by Mr. Cambria and
14   Mr. Lincenberg on behalf of their clients, Mr. Lacey and
15   Mr. Brunst, and my colleague Mr. Berry will address the points  09:36:21
16   Mr. Feder made on behalf of his client Mr. Spear, and also
17   address issues related to surrender and to release pending
18   appeal.

19          In terms of some of the points that Mr. Cambria made,
20   I believe when he started out, and this was just after a number 09:36:45
21   of the victims addressed the Court, he made a statement to the
22   effect of:  Well, we don't really know what the background of
23   these people were and what led them.  I took it to mean what
24   led them to be involved in a life of prostitution.

25          Unfortunately, many of the victims in this case were     09:37:14
```

135

```
 1   led into prostitution because of a variety of factors,
 2   socioeconomics, drug addiction, broken families.  But with
 3   respect to Ms. Ambrose and Ms. Svengard, they are something of
 4   an exception.  They have been a voice for their daughters from
 5   the very beginning.  And of course, Ms. Ambrose has been the        09:37:45
 6   voice of her daughter who is no longer here since literally
 7   Christmas of 2016, and Ms. Svengard shared with you all the
 8   times that she has been there advocating for her daughter who
 9   was trafficked on Backpage at the age of 15, and, of course,
10   remember that she testified.                                        09:38:11
11          So the sad truth about Backpage is that it was sort of
12   a de facto business model that they relied upon pimps having
13   the opportunity to prey upon victims so that they could post
14   multiple times a day.  And these were children in many respects
15   who were runaways and who came from broken homes and, again,        09:38:43
16   lower socioeconomics across the spectrum and across the 450
17   cities that Backpage had a presence in.
18          And not only that, there was evidence at trial and, of
19   course, we heard this from Polaris, that there was not only
20   domestic trafficking, but there was an element of trafficking       09:39:05
21   from other countries into the United States.  And we heard that
22   in terms of deplorable conditions in the Asian massage parlors
23   in the New York area, and so that's just the sad reality, and
24   that's what Backpage was built on, people who could take $4 and
25   post an ad for people who could otherwise not defend                09:39:30
```

1   themselves.

2          And Mr. Lacey in particular was made aware of this at

3   NCMEC.  He was told by numerous law enforcement agencies and

4   the Seattle P.D. in particular.

5          The next point Mr. Cambria made was that, and I think      09:39:50

6   that he stated that he, he himself, has six children and many

7   daughters, and that he expressed that the defendants felt

8   empathy and sympathy for them.  You know, that seems to be at

9   odds with a lot of the evidence in this case.  There doesn't

10  seem to be a lot of e-mails from Mr. Lacey in particular where   09:40:26

11  he's expressing a great deal of sympathy for many of these

12  victims.

13         One that sticks in my mind, and it's in our papers,

14  and certainly was during trial, was Exhibit 1911, and this was

15  an e-mail exchange, I believe, with a woman by the name of      09:40:45

16  Kathleen Ferris that was identified was his ex-wife.  And this

17  is the one, if you remember, this is where he sort of says:

18  Look, Jim and I are in favor of legal prostitution.  But this

19  is within -- this particular e-mail was in the context in

20  responding to one of Nicolas Kristof's many articles           09:41:08

21  criticizing Backpage in the New York Times about their -- the

22  proliferation of child sex trafficking, and just sex

23  trafficking in general on Backpage.

24         And for whatever reason, Mr. Lacey and the rest of the

25  management focused in on this one story of a woman who          09:41:29

1    Mr. Kristof wrote about.  And not only there was a broadcast

2    with her and Mr. Kristof, and they were walking through parts

3    of Manhattan and she was pointing out where she had been

4    trafficked.

5         The one thing that is distinct about this woman is          09:41:49

6    that she had a distinctive scar on her face, and what she

7    related was that a pimp gouged out her face with a potato

8    peeler when they got into an argument on her being resistant to

9    engaging in tricks on a particular occasion.  But in that

10   e-mail, Mr. Lacey refers to this young woman as a hooker.  And   09:42:12

11   so I have to tell you, I really have a hard time believing that

12   Mr. Lacey -- what Mr. Cambria is saying about Mr. Lacey is at

13   odds with a lot of the facts.

14        In terms of the instances of underage trafficking,

15   Mr. Lacey was relentlessly confronted with this by law          09:42:41

16   enforcement, by politicians, and there was always this sort of

17   underlying argument that because of his investigative

18   journalism he sort of pushed back on these powers with

19   politicians on law enforcement, and that he was going to go his

20   own way in this.                                                 09:43:10

21        But there was one instance where a particular

22   organization confronted him, and I think the Court remembers

23   this, this was the Auburn Theological Seminary, the witness was

24   Isaac Luria, and he recounted these meetings they had with

25   Mr. Lacey and the other Backpage management.  And if you         09:43:29

1    recall, you may not know that much about this particular

2    organization because I'm not sure how much it was fleshed out

3    at trial.  I know Mr. Luria talked a little bit about it.  It

4    was a 205-year-old institution, ecumenical group, with leaders

5    of all faiths, Jewish, Christian, Catholic, Episcopalian,                09:43:56

6    Muslim and they had a particular mission to build a community

7    to bridge divides to pursue justice, and in their words, "heal

8    the world."  And they were the ones that identified and, of

9    course, they are based in New York at Columbia University, and

10   they are the ones that identified the fact that there was child          09:44:20

11   sex trafficking proliferating on this site.

12          And if you recall, they posted in the New York Times a

13   letter, open letter, asking Backpage to shut down their site,

14   and part of that letter and the opening of the letter, and this

15   was Exhibit 689 during trial, that it was a basic moral fact of          09:44:46

16   the universe that children should not be sold for sex.  And

17   they asked that Backpage shutter the site.  And then they met

18   with Mr. Lacey and got his views on it.  And by the way, just

19   like NCMEC, this wasn't a situation where they demanded these

20   leaders of all these diverse faiths.  They didn't demand to             09:45:10

21   meet with Mr. Lacey.  Mr. Lacey demanded to meet with them, and

22   they did, and they listened to him and they listened to their

23   rationale.

24          And if you recall what Carl Ferrer said, we showed

25   them this PowerPoint.  This PowerPoint was misleading in that           09:45:30

1   it didn't include any of our internal prostitution marketing

2   strategies that had built Backpage, but after that meeting

3   where there was no introspection by Mr. Lacey and his

4   management, no thoughts of perhaps maybe we should shutter this

5   site, they sent him a letter.  And they said to Mr. Lacey in          09:45:55

6   particular:  Child sex trafficking is not just an issue for us,

7   but a matter of basic justice.  We feel we need give voice to

8   the voiceless, and we are taking action on behalf of human

9   beings, our children.

10          And so this voice to the voiceless sort of resonated        09:46:16

11  with me in particular because I know that Mr. Lacey has spoken

12  publicly about this case in a number of different forums.  He

13  was in an article by a magazine named Reason.  Another magazine

14  by the name of Wired where he would assert his defense to this

15  case.  And then recently he was in a podcast that was produced    09:46:43

16  by two of his own writers that not only chronicled his rise in

17  the alternative newspaper industry, but also this case.  And

18  Mr. Lacey's public defense of this case, among others, is that

19  he was giving a voice to the people who didn't have a voice,

20  and what he meant was sex workers.                                09:47:08

21          And when I listened and went back and read, I tried to

22  square what he was trying to say with what the Auburn

23  Theological Seminary, the point they were trying to make to him

24  in that they were trying to give a voice to the voiceless,

25  which were child sex trafficking victims.  They went on to say:   09:47:27

```
 1   Our commitment is rooted in a belief that all children are our

 2   children, and that person that appears in a Backpage ad could

 3   be any one of our daughters or sons.

 4           They go on to tell Mr. Lacey and the other management

 5   of Backpage, that there is very little moral wiggle room when          09:47:48

 6   one is aware of the real possibility that a terrible crime may

 7   occur.

 8           And so even then in 2012 there was a series of

 9   terrible crimes that implicated Backpage.  And Backpage,

10   because they provided a platform that facilitated prostitution,       09:48:13

11   that they built that platform with internal prostitution

12   marketing strategies.  They are the proximate cause of those

13   crimes.

14           We heard yesterday from Yvonne Ambrose who talked

15   about her own daughter, Desiree Robinson.                             09:48:32

16           But within the four corners of the superseding

17   indictment is Crystal MacMartin, who was murdered posting on

18   Backpage in Scottsdale.

19           Alexus Garcia in Dallas, who was murdered not too far

20   from the headquarters of Backpage in Dallas.                         09:48:48

21           In Louisiana, Jasilas Wright.

22           And importantly, and we laid this out in our papers,

23   is the four women in Detroit during Christmas of 2011.  And so

24   their names are, for the record, Natascha Curtis, Demesha Hunt,

25   Renisha Landers, Vernithea McCrary.  They all four were killed        09:49:13
```

1    within 72 hours by the same john which demonstrates the scale

2    that Backpage had achieved by 2011 in that somebody could order

3    four women off the website as if they were ordering a pizza to

4    their house, and he was able to kill them.

5         And we know, the Backpage management hired a public        09:49:42

6    relations team to try to spin the story on this.  And we know

7    that Mr. Spear e-mailed after Detroit to Mr. Ferrer saying:

8    Hey, there is a lot of pent-up demand after Detroit, which just

9    goes to show you in journalist parlance that no publicity is

10   bad publicity, and that even a publicity of a quadruple murder   09:50:10

11   would draw people to this site.

12        So those are the crimes that the Auburn Theological

13   Seminary was trying to impress upon Mr. Lacey in 2012, and 2011

14   with the open statement, the open letter of the New York Times,

15   and then with the meeting and then the follow-up letter, but     09:50:35

16   nothing.  No change.

17        And in 2015, within the four corners of our

18   indictment, Cynthia Worthy was killed in Detroit.

19        So what voice I would ask -- what voice did Mr. Lacey

20   give to these people by running this site?                       09:50:53

21        The Auburn Theological Seminary, and this is

22   important, says, and this is directly focused on Mr. Lacey:  We

23   understand from your statements that you made in our meeting

24   that your company takes it as a given that a certain number of

25   teens and children will be trafficked for sex in spite of the    09:51:18

1   safeguards that you put in place by those who pay your website

2   a fee, and that is unacceptable to us.

3          Now, this letter comes in 2012, but we know in

4   March 1st of 2011 Mr. Lacey sits in a room with the National

5   Center of Exploited and Missing Children and representatives          09:51:51

6   and he's shown a PowerPoint, a 23-slide PowerPoint, that

7   mentions "children" or "child" 22 times.  And in that

8   PowerPoint they say:  Look, there is this prostitution review

9   site that you have a relationship, or that you, unbeknownst to

10  you, is using your site called The Erotic Review.                     09:52:17

11         And they knew full well that they had this strategic

12  relationship.  What the Auburn Theological Seminary had

13  identified in 2012 that we for sure identified once we received

14  all the e-mails and, of course, once we sat down with the CEO,

15  is that it was a collateral damage that they had to deal with.        09:52:41

16  It was unfortunate collateral damage that was unavoidable, it

17  was uncomfortable, but in the end it was an acceptable cost of

18  doing business that made Mr. Lacey and his compatriots,

19  Mr. Spear and Mr. Brunst, millions.

20         As we know during this time period, the time period of        09:53:07

21  many of these murders and many of these instances of child sex

22  trafficking on his site, he made, between 2012 and 2014, $100

23  million.

24         Now, does Mr. Lacey know about this even though Auburn

25  Theological Seminary confronted him about this?  Well, he says       09:53:31

1    in his e-mail Exhibit 912 to Mr. Ferrer and Mr. Larkin for that

2    matter, even taking their new number, and this is referring to

3    child sex trafficking victims on the site, of 80 in 2010.  If

4    you ran that out to America's 40 biggest cities, 40 times 80,

5    you have 3200 victims; not 100,000 or 300,000.  It's a problem;     09:53:52

6    not an epidemic.

7         You know, they point out in this letter that Jewish

8    tradition teaches if you can save a single life, it's as if you

9    saved the whole world.  And Mr. Lacey's response to this was,

10   and they call him out in this, is that the clergy's moral          09:54:21

11   commitment to our children amounts, in your words, Mr. Lacey,

12   to a simple bumper sticker.  This position, in their words, is

13   at odds with Backpage's public statement.

14        And so when Mr. Cambria says on behalf of Mr. Lacey

15   that he feels some sorrow or some empathy for these, his           09:54:43

16   statements in his e-mails do not support that.

17        And with respect to the other defendants, and of

18   course, Mr. Lacey, there is, we received a lot of letters and

19   from family members, and many of them describing what a great

20   father and what a great inspiration day, and I don't dispute       09:55:11

21   them.  They have highlighted their family in their character.

22   But so what the Auburn Theological Seminary says to Mr. Lacey

23   in this letter, that they would ask him to consider an ethical

24   test, and this is what they say:  One of my colleagues has a

25   simple ethical test.  Ask yourself, how would you feel telling     09:55:39

1    your family what happens on your website?  What would you tell

2    your mother or your child about the 15 and 16-year-olds in

3    Memphis, Tennessee who were lured under the pretext of going to

4    a water park, but instead were sold for sex by pimps who placed

5    ads on Backpage.com?                                            09:56:01

6          And what would they say about the mentally handicapped

7    high school student in Camp Washington who was sold for sex

8    because she wanted to receive a Thanksgiving meal, or about the

9    13-year-old in Brooklyn, New York who was beaten, advertised

10   with photos on Backpage, and forced into prostitution who, when  09:56:18

11   she tried to escape, was tracked down and thrown down a flight

12   of stairs?

13         Well, what is Mr. Lacey's public response to the

14   urging of the Auburn Theological Seminary to their efforts to

15   try to get him to see the better nature of his angels?  This is  09:56:45

16   his response.  This is Exhibit 692b on October 30th of 2011,

17   quoted in the New York Times in an article entitled "Fighting

18   Over Online Sex Ads."  "I'm beginning to like our odds," says

19   Mr. Lacey.  "We have all these practicing politicians and

20   concerned clergy after us.  We must be doing something right."   09:57:14

21   What did Mr. Lacey think that he was doing right?

22         Now, Mr. Cambria today and in previous hearings and at

23   trial makes the point that Mr. Lacey was a longtime journalist

24   and he was a journalist to the end, a defender of the First

25   Amendment, and for most of his career, but that actually isn't   09:57:45

UNITED STATES DISTRICT COURT

1    entirely true because Mr. Lacey stopped being a journalist in

2    2012.  And so Mr. Brunst and Mr. Spear were never really

3    journalists, but they gave up managing newspapers for Backpage.

4         And so I will tell you when we interviewed across the

5    country, the prosecution team interviewed many of the victims          09:58:18

6    in this case to try to get our handle around how they were

7    posted, and I will tell you that these interviews didn't take

8    place on the upper east side or in Beverly Hills or in Lake

9    Shore.  They were in places where there wasn't a lot of

10   opportunity, and many of these people were forced into this           09:58:40

11   life.  But the one thing they could tell us is they knew the

12   exact moment their life changed, and that moment was when they

13   were posted on Backpage.com.  They knew that.  They could

14   isolate that moment.  From there they knew they were posted.

15   All they knew was the phone rang and that they were in an             09:58:58

16   unending, and unspeakable site pool of sex, and if they were

17   underage, with men decades older, sometimes four or five times

18   a day.  They could isolate that second.

19         And so as I started thinking about this case, I

20   wondered if Mr. Lacey, as he sits here before a federal court        09:59:17

21   on the other side of a guilty verdict, when did his life

22   change?  Well, it changed in 2012 for sure.  And his own

23   writers, people who in large part owed their careers to him,

24   they call him out on this.  And one of those writers was a

25   woman by the name of Jana Bommersbach, and we cite a quote from      09:59:42

1   her in our pleadings, but you should know that she was a

2   partner with Mr. Lacey and Mr. Larkin as well in 1990.  She was

3   a writer, and she was a partner in the New Times, and she left

4   the New Times and she went out and she became a well-regarded

5   writer writing books predominantly on events that occur in the          10:00:08

6   State of Arizona.  Her last book was called The Dead Girl in

7   the Vacant Lot, and it's a bit of a cautionary tale to her

8   friend Mr. Larkin -- Mr. Lacey.

9           In that book, and unfortunately Ms. Bommersbach passed

10  away this year, but she says in this book about Mr. Lacey, and       10:00:39

11  this book, the girl in the -- The Dead Girl in the Vacant Lot

12  is about a sex trafficking victim who was trafficked on

13  Backpage, and I think by the title you can tell how it ends up

14  for her, not unlike -- it was probably a composite of many of

15  the stories of real people that we talked about, but she says:      10:01:02

16  I was just naive about Backpage, and I was appalled to discover

17  that the men who had been my business partners, the men that I

18  admired, had become so reviled.  Mike took a no holds bar to

19  journalism to other states until they owned the largest

20  alternative newspaper chain in the nation, including the            10:01:24

21  venerable Village Voice.

22          But in 2004 they started Backpage, and she notes that

23  the Village Voice conglomerate of papers start losing money

24  because of the protest of advertisers, and we heard some of

25  that during trial.                                                  10:01:41

1         But instead of closing it down, Michael Lacey got out

2    of journalism.  They sold the papers to their staff, they kept

3    Backpage, the money pot, for themselves.  And the same

4    sentiment was expressed by John Dougherty, a writer who

5    seemingly was testifying for Mr. Lacey during trial and has    10:02:05

6    submitted a character letter for the Court to consider, but if

7    you recall Exhibit 3000 during his testimony where he says in

8    his Facebook post:  Once upon a time they ran a great newspaper

9    chain, but the arrest of Lacey -- with the arrest of Lacey they

10    traded the legacy for a chase for gold derived from    10:02:28

11    prostitution.

12         I talked about this, you know, not surprising with

13    everything these days, there's a podcast on this case called,

14    not surprising, Hold Fast, and these are two writers,

15    Trevor Aaronson and Sam Eifling, and they also, two writers,    10:02:45

16    they, I think they would admit, they owe in part their careers

17    to Mr. Lacey, but they call him out on this.  And they say in

18    the conclusion in part four of this podcast:  Lacey fell victim

19    to Backpage's success.  By the time he fought the government,

20    he was no longer a journalist.  When he chose to split from    10:03:10

21    Backpage from Village Voice, he could have remained with the

22    newspapers.  He could have remained a newspaper man, but he

23    chose Backpage.  He chose the money, millions and millions, and

24    at that point he didn't have the public's goodwill.

25         That's what his own writers have said about the change    10:03:31

1   that Mr. Lacey made.  And Mr. Lacey wasn't a journalist from

2   2012.  Mr. Lacey was the head of a criminal organization that

3   was a prostitution website.  End of story.

4          Mr. Cambria and I like to call these the greatest

5   hits, but they are really sort of these one-hit wonders that          10:04:01

6   quickly go to the basement.  One is the false equivalencies.

7   This is an oldie but a goodie.  Hey, Backpage is no different

8   than Fed-Ex, the phone or the Yellow Pages.  Then Mr. Lacey

9   says this in some of his e-mails:  Hey, we are just like

10  Fed-Ex.  People are taking -- people are taking advantage of us     10:04:23

11  just like they could take, a drug dealer, I guess, could take

12  advantage of Fed-Ex or the phone.

13         Here's the problem with that argument.  Backpage was

14  singly focused on prostitution revenue.  And they can sit and

15  say, well, we had these other categories.  We had home            10:04:43

16  furnishings and jobs and real estate.  That was all nonsense.

17  That was just a veneer because you they didn't even charge in

18  many of those categories.  The one category that made Mr. Lacey

19  a multi multimillionaire was the female escort section.  That's

20  where the money came from.                                          10:05:08

21         None of these, none of these false equivalencies

22  Fed-Ex, the phone, Yellow Pages, none of them that I know of,

23  and I am old enough to remember Yellow Pages, but I don't

24  remember it having a strategic relationship with a prostitution

25  review site.  It just didn't happen.                                10:05:28

```
 1            And he even underscores -- Mr. Lacey himself
 2   underscores his false equivalency in Exhibit 1714a.  Of course
 3   kids get through the system, comparing to underage teenagers
 4   using fake I.D.s to get into bars, as if an underage
 5   trafficking victim who is being forced into prostitution, and      10:05:53
 6   we heard all the stories how the pimps would take pictures of
 7   them and post them on Backpage, and the phone would ring, as if
 8   that is equivalent to a 17-year-old getting ahold of a fake
 9   I.D. and getting into a bar to have a beer.  So the false
10   equivalencies do not stand up.                                     10:06:15
11            Here's another oldie but goodie, the cooperation with
12   law enforcement.  Here's the bottom line on that.  Law
13   enforcement didn't know that they had these internal
14   prostitution marketing strategies.  They just didn't know that.
15   They didn't know about the relationship with The Erotic Review     10:06:34
16   and all these other things.  They didn't know that moderation
17   was a sham and was designed to increase prostitution postings
18   and not deter them.  And the Senate subcommittee didn't know
19   that and the United States DOJ didn't know that.  In fact, no
20   one knew about these internal strategies until the CEO came in     10:06:55
21   in April of 2018, and in a very lengthy session laid it out,
22   and in subsequent sessions was able to say:  Here are the
23   e-mails that show what we were doing.  No one knew.  So they
24   weren't cooperating.
25            And neither, not these attorneys, the attorneys before    10:07:15
```

UNITED STATES DISTRICT COURT

1    they were indicted, either they knew or they didn't know.  It

2    doesn't matter.  Law enforcement didn't know.  This one is just

3    easily dispensed of.  Well, Mr. Ferrer says, "We don't have

4    prostitution."  Of course they had prostitution.  Mr. Lacey

5    knows that they have prostitution.  He's being confronted on a          10:07:42

6    daily basis, so you can't even take that sort of throwaway even

7    seriously.

8            Even their own person that supposedly they rely upon,

9    Mr. Moon, who meets with the Washington Attorney General, says,

10   "We are not going to deny the undeniable when confronted with          10:08:02

11   prostitution postings."  Did they donate to charity and support

12   political candidates and some of the things that Mr. Cambria

13   was saying to show their good works?  Well, yes, they were

14   making hundreds of millions of dollars running a criminal

15   enterprise called Backpage.  So some of the money they doled          10:08:21

16   out was, you know, kind of a drop in the bucket, so they know,

17   and we know that many of these organizations gave them back,

18   gave the money back because of the taint to Backpage, or sent

19   it to trafficking shelters.

20           Well, the First Amendment, this is -- you talk about          10:08:40

21   ad nauseam, which the Judge, this court aptly characterizes

22   some of the arguments that seem to be just rehashed and

23   recycled over and over, and this one is particularly recycled.

24   Here's the bottom line.  They were running a criminal

25   enterprise.  Mr. Lacey is no different than the don of a               10:09:12

1    criminal family.  He's no different than somebody who is at the

2    very top of a financial, vast financial fraud, or even a drug

3    kingpin.  This was a criminal enterprise.  Backpage was an

4    enterprise, it was criminal, and he was the primary financial

5    beneficiary of it.  He didn't have a First Amendment right.          10:09:44

6    They keep making this argument.  It is the definition, I think,

7    of legal insanity, not legal insanity to defense, to make the

8    same argument, citing the same cases on the same set of facts

9    and expecting some judge, and now we're on the fourth judge, if

10   you include Judge Campbell, where they made the same arguments      10:10:06

11   in the Grand Jury context.  Nothing has changed.

12          The money wired to Hungary.  Well, it puts a lot of

13   emphasis on this John Becker, who also testified that Mr. Lacey

14   withheld information from him, and this is the -- this is the

15   lawyer who didn't want to be hassled on Tuesdays, and that if      10:10:31

16   he had known some of these, he wouldn't have participated in

17   it.

18          Here's the bottom line.  A jury convicted him of this,

19   and he was hiding that money overseas for two reasons.  One, as

20   we said yesterday, he didn't want the government to get it.  As     10:10:48

21   things would turn out, the government has seized quite a bit of

22   his money that is proceeds from Backpage, dirty money.  And

23   importantly, he didn't want litigious parties to get that

24   money, and those litigious monies are the scores of underage

25   trafficking victims who have been suing him or who will be          10:11:10

152

1    testifying against him.  And on January 3rd of 2017, as I noted

2    yesterday, he was spiraling towards trial in just one of those

3    cases.

4         Mr. Brunst.  Mr. Brunst's attorney says there is only

5    one witness that testified against him.  Mr. Ferrer.  It turns        10:11:35

6    out that was all we needed because the best witness against

7    Mr. Brunst was Mr. Brunst in the scores of e-mails.  You know,

8    it's just an objective fact that Mr. Brunst was convicted of

9    more counts, and this is the way the jury saw it, was convicted

10   of more counts than any of the defendants sitting over there.       10:12:05

11   That's the way they saw it.

12        Now, I know that changed slightly after the Court

13   reviewed the transactional money laundering counts, but the

14   jury, based on one witness and his scores of e-mails saw him as

15   more guilty in terms of the number of counts than Mr. Spear or       10:12:28

16   Mr. Lacey.

17        There is probably a lot of reasons for that too

18   because they viewed the CFO more so than perhaps anybody else

19   in an organization, they see the CFO as somebody who is

20   safeguarding the financial well-being and the integrity of the      10:12:50

21   enterprise they serve, and when they violate that trust they

22   are convicted by a jury.  And so Mr. Brunst, he just joins a

23   long line of CFOs who violated their oath like Andrew Fastow,

24   the CFO of Enron; Allen Weisselberg, the CFO of a prominent

25   real estate company in New York; Frank DiPascali, the CFO of        10:13:14

153

1    Madoff's company.  They didn't buy the fact that Mr. Brunst
2    didn't know what was going on.  And you remember that we used
3    an analogy of the baseball team, and Mr. Brunst continues even
4    today to persist in this see no evil hear no evil mantra that
5    as by analogy, if he was the CFO of a baseball team he would          10:13:41
6    just sit in his office and look down and see this -- this green
7    field below and not know really what the players were doing
8    down there, or what that ball had to do with the ball they were
9    throwing around had to do or hitting, hitting the ball or
10   20,000 people showing up.  He didn't know any of that.              10:14:04
11          But you know, Mr. Brunst, just like Mr. Spear for that
12   matter, they fall into the same category.  Even today they make
13   this silly claim, "But why wouldn't the CFO on Backpage?"  Well
14   come on, your own public PowerPoint, Exhibit 20, Management
15   Ownership, CFO of Backpage, they even continue with this             10:14:29
16   argument.  But here's the bottom line.  Mr. Brunst had the same
17   decision, he had the same life choice that Mr. Lacey had in
18   2012.  He could have said, "You know what, I don't like what
19   I'm hearing about this.  All I'm hearing is murders and child
20   sex trafficking in the New York Times, on CNN, on Anderson          10:14:50
21   Cooper, Nicholas Kristof, no thanks.  I am going to stay with
22   the newspapers."  But Mr. Brunst, he goes with Mr. Lacey and
23   Mr. Spear and becomes the CFO, the ultimate manager where the
24   buck stops of Backpage -- of Backpage.
25          Even before the sale of the alternatives he was the         10:15:19

1    ultimate decider at budget meetings in his capacity as the CFO.

2    He was alerted to the relationship of The Erotic Review.  There

3    were decisions made regarding the commissions for super

4    posters.  They knew about aggregation and they knew that they

5    were hiring scores of moderators in the U.S., India and the          10:15:43

6    Philippines all encouraging prostitution, all making sure that

7    thing were coded, but not deterring.

8         Well, Mr. -- the defense claims he is -- he shouldn't

9    be sentenced as a sex trafficker.  Well, he should be sentenced

10   as to what he is.  Mr. Brunst's legacy is being sentenced as        10:16:06

11   the minority owner of a website that promoted prostitution in

12   450 cities in the United States, and that prostitution included

13   child sex trafficking, and it resulted in a score of murders

14   and violent crimes.  And from that, Mr. Brunst made between

15   2012 and 2014, $20 million.                                          10:16:30

16        And so he, more than Mr. Spear and Brunst, had a lot

17   of very meaningful letters from his family members saying that

18   he was a great father.  I do not dispute that.  And this court

19   and myself have any number of cases from violent crimes to drug

20   trafficking, to financial fraud, and people come in and say, my     10:16:56

21   father, or my mother, they were a good parent, they were there

22   for me, and I don't think it's mutually exclusive that you can

23   be the CFO of a criminal organization and not be a good father.

24        But here's what I would suggest.  That during this

25   time period in particular 2012 to 2018 when Mr. Brunst was           10:17:18

1  coordinating the international and domestic money laundering,

2  that the money goes for the same for Mr. Spear and Mr. Lacey,

3  the money that he was doling out to his family, Christmas gifts

4  and trips, college tuition, down payments, whatever it is, they

5  should know that that money came from people like Yvonne          10:17:47

6  Ambrose's daughter, the pimp, and Nacole Svengard, and the pimp

7  that posted.  They should know that that was the source of the

8  money.

9          But Mr. Brunst cannot really plausibly say that he

10  didn't, and the jury found as much, that he didn't watch        10:18:07

11  Selling The Girl Next Door; that he didn't read the Kristof

12  series of articles; that he didn't watch Anderson Cooper

13  interview their attorney on AC 360 about the Detroit murder;

14  that he didn't read the Senate subcommittee report; that he

15  can't really plausibly say that, and that he didn't watch the    10:18:30

16  movie on Netflix, I Am Jane Doe, that featured some of the same

17  victims who testified in this trial.

18          And he was coordinating the payments for legal fees

19  with these plaintiffs in defense of these cases where underage

20  plaintiffs had sued Backpage, and in particular the J.S. case    10:18:54

21  which was Jessika at 15 and the two other plaintiffs were 13.

22          He also makes the point, well, he wasn't originally

23  charged in the first indictment, and then he was thrown into

24  the Travel Act conspiracy in the substantive counts in the

25  superseding indictment.  We didn't lay eyes on Mr. Ferrer until  10:19:16

1    April of 2018 after the first indictment.  It is only then that

2    he explained and was able to show us the e-mails, what they

3    were up to, not only, you know, facilitating prostitution

4    through these internal strategies, but also the very

5    complicated and layered money laundering.                        10:19:40

6         Mr. Brunst, through his attorney, says in his

7    Sentencing Memorandum that he's highly ethical, and that people

8    viewed him as ethical.  I am not sure who is saying that,

9    actually.  It just seems to be coming from him.  There was

10   never anybody in business with him who came forward either      10:20:03

11   during trial or at sentencing and said he was some paragon of

12   ethics.  But I just have to ask you, what about all these

13   e-mails?  Like Exhibit 173, "beginning this month, September,

14   Chase was no longer accepting transactions from Backpage.com

15   due to their involvement in human trafficking."  What ethics    10:20:28

16   would it take when he was copied on that?  Would that not

17   suggest something to him?  And obviously he as the CFO,

18   Exhibit 23, where they talk about the strategic relation with

19   The Erotic Review, it makes you wonder about the ethics.

20        In Exhibit 500 where it talks about the upgrade             10:20:50

21   features of auto report, and move to the top, which was the

22   only way they could make money at one point, and this was in

23   the female escort section, and he knew that.  What about the

24   ethics there?

25        In Exhibit 792 where he says to Ferrer:  Didn't we go       10:21:08

1    down the Mauritius path once the banks had the same problems

2    with our content?  Which suggests that he knew what the content

3    was.  What about his ethics?

4          2042, Exhibit 2042, "the Backpage pressure has reached

5    red hot" in 2012 in the wake of the Detroit murders, in NCMEC,    10:21:27

6    and the Auburn Theological Seminary, all of that pressure, what

7    about his ethics?

8          Exhibit 120, it's an oldie but goodie, the plausible

9    deniability, that we have plausible deniability about the

10   content on our site.  What about all the other things that Mr.    10:21:48

11   Brunst did to make sure that Backpage had the life blood to

12   keep it going and changing the descriptors to Payment Solutions

13   and Classified Solutions so banking wouldn't know that this

14   money was going, being processed for Backpage, or coming up

15   with Website Technology to fool the banks, and the use of gift    10:22:20

16   cards and cash and Bitcoins.

17         The bottom line with Mr. Brunst is he's guilty and the

18   jury found him that, and that ship has sailed.

19         So with respect to all three of these defendants, it

20   is a fantasy.  It is magical thinking to believe that they        10:22:42

21   could run a prostitution website which would, by definition,

22   would be illegal, that prostitution would occur in private

23   places by two consenting adults in some type of cocoon of

24   safety and there never would be this predictable collateral

25   damage.  There would never be homicidal johns or violent pimps    10:23:08

1     or child sex trafficking where unspeakable force and coercion,

2     and the social cost of that for every one of these communities

3     where they were a presence.  It's just delusion.  And the most

4     powerful delusion is self-delusion, and that's what these

5     defendants have had.  But the jury has spoken.          10:23:36

6          And Mr. Berry will take up the issue of whether they

7     should be allowed to self-surrender, but what I will say is

8     they had no right to flout the law or make up their own law,

9     and these victims who have submitted victim impact statements,

10    who have testified at trial, who have appeared here today and   10:24:01

11    who appeared by phone, they have waited a long time.  And to

12    quote Martin Luther King when he was actually in custody

13    waiting for the resolution of justice, "Justice too long

14    delayed is justice denied."  And these people are entitled to

15    justice.  They are entitled to leave this courthouse and leave  10:24:24

16    the phone call and get back to their lives, but these

17    defendants deserve to go to prison, not next week, not next

18    month, not next year, but today.  Thank you.

19          THE COURT:  Thank you, Mr. Rapp.

20          Mr. Berry.                                         10:24:52

21          MR. BERRY:  Thank you, Your Honor.  It's been a few

22    months.  Good to see you.  I want to echo what Mr. Rapp said.

23    A lot of what he said applies to Mr. Spear as well.  I'm not

24    going to re-till that soil.  I want to focus on a few specific

25    things that were raised in declarations attached to their      10:25:15

1    sentencing memo, and they emphasized in oral argument

2    yesterday.

3         I am sensitive to the fact that every federal Judge I

4    have ever talked to says a day like today is the most

5    challenging one where you have to decide how much time a person          10:25:32

6    is going to spend in prison.  And so when they bring up things

7    like life expectancy is going to be reduced by one year for

8    every two years that you put them in prison, that's alarming.

9    That is a shocking number, and it's startling enough that I

10   thought, well, I think we need to address it.          10:25:51

11        And so what I want to point out about that is it's

12   just not true.  The article that they cite, if Your Honor has

13   not had an opportunity to look at what they cited, is an

14   article from 2013, and it is by an author who looked at

15   administrative data from New York State parolees, and what she          10:26:12

16   looked at is was there, what she refers to as a dose-response

17   time.  For however many years they spend in prison, did it

18   reduce or increase their mortality rate after they got out of

19   prison?  She only looked at them on parole.

20        So this notion that if he spends two years in prison          10:26:34

21   he is going to die a year early and, therefore, with his life

22   expectancy, he is only going to live four years in prison is

23   just a complete false and misleading statement.  That is not

24   what this research article says at all.

25        The author took data on this New York State parolees,          10:26:51

UNITED STATES DISTRICT COURT

```
 1   not federal inmates, and it was from 1989 to 2003 is the data
 2   that she was looking at, and what she learned was -- and it's
 3   kind of unsurprising, this is not news, that they have a high
 4   risk of death in their first year on parole.  Well, that's
 5   really unsurprising when you think about the individuals coming   10:27:15
 6   out of a New York State Prison and where they are ending up, so
 7   you're going to have a high number of drug defendants either
 8   traffickers or users that have been sentenced, you're going to
 9   have a high number of violent offenders, and they are being
10   released into a community where they don't have a lot of          10:27:33
11   support sometimes; right?  That is not these people; right?
12   These people have a ton of support look at this courtroom.
13   It's packed with support for these defendants.  These are not
14   people without means, abilities and resources to sustain
15   themselves when they get out of prison.                           10:27:53
16        But even more interesting is what they also don't
17   mention about what that article says or what that research
18   says.  Of course, it says that the findings regarding
19   socioeconomic status went in the expected direction.  Those who
20   were high school graduates had lower odds of death than did       10:28:09
21   those with less than a high school education.  All of these
22   guys are educated, sophisticated individuals.  It also showed
23   that whites had a lower death rate than other races.  All of
24   these men are white.  This is not news.
25        But what is really interesting is that study showed is       10:28:30
```

161

1    called a time to recovery, meaning that after a certain period

2    of time on parole a person's life expectancy returned to

3    normal; in other words, there was a discrete time period

4    immediately after release while on parole with certain types of

5    offenders where, yes, they are at risk of higher death, but          10:28:51

6    that does not mean that Your Honor putting these people in

7    prison for a certain number of years is going to cut their life

8    expectancy by a year for every two years.  That is a grossly

9    misleading representation of that article.

10         And so I think what is a better thing to focus on            10:29:08

11   about that is there was a December 2021 report by the Bureau of

12   Justice Statistics that is available online, and it talks about

13   federal inmates and the mortality rates for federal inmates.

14   And what it pointed out and what it ultimately concluded, and I

15   won't get super into the weeds about this, it looked at the         10:29:34

16   U.S. adult population, every one of us out here in the free

17   world in the U.S. that are above the age of 18, and it bases

18   numbers on per 100,000, so instead of giving a percentage I

19   will give a per 100,000.

20         What they said is in the United States in 2019, that         10:29:50

21   was the most recent data, and this covered mortality rates from

22   2001 to 2019, in prison, state and federal, and in the U.S.

23   population and what they found was that in 2019 there were 1100

24   deaths in the United States per 100,000.  Okay.  So just keep

25   that number in mind.  1100 per 100,000.                            10:30:12

UNITED STATES DISTRICT COURT

162

1          And what they found is in federal prison there is 259

2     deaths per 100,000.  Now, that is less, substantially less.  In

3     fact, you are four times -- going to have a four times higher

4     mortality rate on the outside of a federal prison than you are

5     on the inside of a federal prison.  This idea that this life          10:30:35

6     expectancy is going to go down dramatically by being in prison

7     is just false.

8          Now, if you're really, really clever and you really

9     understand statistics really well, wait a minute, Mr. Berry,

10    there is a whole lot of ways that you can die in the free world      10:30:50

11    that you can't die in prison.  Car accidents, for example.  So

12    the justice report takes that into consideration and says:  All

13    right, we are going to adjust that number.  Let's make sure we

14    are comparing apples to apples and not apples to oranges.  What

15    they find, then, is if you adjust it and you take away those         10:31:07

16    certain type of things, then you find that the death rate in

17    the U.S. adult population adjusted so that it looks like the

18    same demographics of federal inmates is 435 per 100,000.  So

19    that's substantially less.  But remember, in prison it's 259.

20    So you still have a 60 percent higher chance -- 59 percent --        10:31:26

21    let me not engage in too much hyperbole -- 59 percent higher

22    chance of a mortality on the outside of prison than the inside

23    of prison.

24          Now, when we turn to the quality of the health care in

25    prison, so that was another issue that they brought up that          10:31:45

1    they are very concerned about, reasonable to be concerned about

2    the health care of that.  There is an article in the National

3    Academy of Elder Law Journals in 2001 by Stacy Gavin called

4    "What Happens to the Correctional System When a Right to Health

5    care Meets Sentencing Reform?"  That's seven, and the journal          10:32:04

6    name NAELA, stands for National Academy of Elder Law Attorneys,

7    journal, 249 pincite 256, fall of 2011.

8              And what that article says is, quote, "Surprisingly,

9    the growth in geriatric prisoners is also due to the health

10   care received behind bars.  And note, prisoners are the only          10:32:31

11   population in the United States with a constitutionally

12   guaranteed right to medical care."  Now, that comes from a 1976

13   Supreme Court case of *Estelle vs. Gamble* that established that.

14   They are the only population that is guaranteed that medical

15   care, and it is because of that guarantee and because of the          10:32:54

16   medical care that they are receiving in the Bureau of Prisons,

17   we are not talking about New York State Prison, we are not

18   talking about rough-and-tumble state prisons in other places,

19   the Bureau of Prisons, they are receiving very good medical

20   care to the degree that geriatric prisoners are becoming an           10:33:10

21   issue for the Bureau of Prisons because they are living so

22   long.

23              Similarly, there was an article in 2007 by Timothy

24   Curtin in the Elder Law Journal, citation is 15 Elder Law

25   Journal 473 pincite 476 in 2007, and it was titled "The              10:33:29

1    Continuing Problem of America's Aging Prison Population and the

2    Search for Cost-Effective and Socially Acceptable Means of

3    Addressing it."  And he says, quote, "The success of prison

4    health care programs in reducing prison mortality," which is

5    the rates we just talked about, "has led to longer inmate          10:33:51

6    lifespans and ever higher health care costs."  The prisons are

7    paying for that and it is happening.  This notion that he is

8    going to have zero medical care and they are completely

9    incapable of taking care of different patients, different

10   inmates with different medical ailments is just false.          10:34:10

11        If you've talked to any U.S. Marshals in the recent

12   time, they can tell you time and again how many people they see

13   and get brought into prison that have way worse conditions than

14   any of these guys are talking about.

15        Next I want to turn my attention to this notion of the    10:34:27

16   sex offender status.  That was something that was brought up

17   and that they are deeply concerned about being labeled as a sex

18   offender.  First and foremost, I don't think that this Court

19   has the authority to label them a sex offender or not a sex

20   offender.  States determine whether certain crimes qualify for    10:34:52

21   sex offender registration, SORNA is the federal law that it

22   implements that we decide that by.  That is not to say Your

23   Honor couldn't make any kind of recommendation that you want

24   regarding that.

25        But here's what I would like to emphasize:  In the    10:35:07

```
 1   Bureau of Prisons there are two programs that sometimes get
 2   mixed together.  One is the Sex Offender Management Program and
 3   one is the Sex Offender Treatment Program.  The Sex Offender
 4   Treatment Program is for inmates who choose to be part of that
 5   program.  They want to receive some kind of treatment.  The Sex      10:35:25
 6   Offender Management Program is something decided by folks at
 7   the Bureau of Prisons and the designation and computation
 8   center in Grand Prairie, Texas and individually at prison when
 9   they are reevaluated annually.
10          As Your Honor knows, these are the kinds of cases I          10:35:43
11   do.  The only defendants I have are sex offenders, so I am
12   familiar with this issue very well.
13          And the Sex Offender Management Program is something
14   that they look at and they decide whether an inmate should go
15   into that program, and it has nothing to do with the specific      10:35:56
16   offense for which they were convicted.  So, for example,
17   someone could be convicted of a money laundering offense sent
18   to federal prison but they had a sex offense 10 years before,
19   they might get put into the Sex Offender Management Program
20   just because the Court has decided, or the Bureau of Prisons       10:36:12
21   has decided for their safety and protection they need to be.
22          But here's the important point.  The Sex Offender
23   Management Program facilities, which there is about eight to 10
24   of those around the country, I think, they all maintain a
25   40 percent population of sex offenders.  This is in BOP policy     10:36:30
```

1  guidelines that explain this about SOMP facilities.  They have

2  found, of course, that if you maintain a certain critical mass

3  of sex offenders in a particular facility, that they are all

4  protected.  It creates a protective factor kind of like a

5  strength in numbers idea so that they don't have to be isolated    10:36:53

6  in a shoe, as they alluded to.  The only way he is going to be

7  able to make it through prison is to be stuck in a shoe

8  somewhere.  Again, these are all management decisions that the

9  Bureau of Prisons should be doing.  And frankly, I don't think

10  it's something that we should be spending a lot of time talking    10:37:08

11  about for purposes of deciding a sentence.  That's why the

12  Bureau of Prisons is there.

13         But I want to give these facts to you because I am

14  sensitive to the fact that everyone in here is a human and

15  you're concerned about the weight of this decision and what       10:37:22

16  does that really mean.  And I just want you to understand what

17  they are saying and what they are trying to scare you into

18  about this is just simply not true.  The Sex Offender

19  Management Program is designed to protect people who might be

20  decided -- be determined to fit into that category.              10:37:38

21         So even if Your Honor were to say, "I recommend that

22  they not be labeled a sex offender," they have gladly courted

23  the media on this case, have had podcasts, have people

24  following them around giving interviews.  And as they say,

25  somebody can Google their name and figure out what they are in    10:37:57

167

1    for separate and apart from any recommendation you make and

2    separate and apart from any judgement or their indictment or

3    their PSR for that matter.

4         And so there is a risk if you're the BOP looking at

5    them to say, well, maybe they should be in a Sex Offender          10:38:15

6    Management Program for that reason.  And so I question the

7    reason, the logic behind saying to make sure he is not labeled

8    as such so that he doesn't get into a Sex Offender Management

9    Program.  I actually would argue that it might be better for

10   them.  But again, that's not really our place right now.  That    10:38:31

11   is for BOP to decide.

12        Next I want to talk about, Mr. Feder argued that a

13   sentence of 10 years would result in him not being eligible for

14   a camp, which is really called low security -- minimum

15   security, excuse me, and automatically being designated to a      10:38:52

16   low security prison.  Now, this is one of those that has a

17   kernel of truth, but it's still very misleading.  So BOP policy

18   Statement 5100.08, which is available online, talks about in

19   Chapter 4, page 6, how they calculate an inmate's months to

20   release.  That's the way they calculate it; right?  So if Your    10:39:22

21   Honor sentences someone to 120 months, when they walk into

22   prison, let's say they didn't spend three days in jail

23   initially, but they were just on bond the entire time.  So

24   let's deal with it in that scenario.  Even though the day they

25   turn themselves into the marshals they get credit for one day.    10:39:41

1    Mr. Spear is going to get credit for three days.  Let's just

2    say it's zero days.  You sentence someone to 120 months, they

3    don't have 120 months left on their sentence the day they walk

4    into prison.  They have 120 months less 15 percent.  That's the

5    way the BOP calculates it.  So the months to release is          10:39:57

6    calculated by automatically subtracting 15 percent.

7         So saying if you sentence him to 10 years he will

8    automatically go to a low.  That's not true.  It's just simply

9    not true.

10        In fact, you could sentence these defendants to            10:40:10

11   282 months, and 15 percent off of that would put them under 240

12   and would keep them in a low security classification, low

13   security prison classification.  You could sentence them to

14   140 months and their months to release would automatically be

15   119 and they would be eligible for a minimum security.          10:40:30

16        So I just give those facts to you because it's

17   important to make sure that they were not misleading the Court,

18   which I feel like has been done a little bit here.

19        Similarly, the affidavit that they submitted by

20   Ms. Purdue attempted to place these defendants, or Mr. Spear at  10:40:46

21   least, in a high, like the highest security classification.

22   And that's, again, looking at that policy statement, that's not

23   correct.  These are property offenses that are over 250,000, so

24   it was moderate security classification most likely, but that

25   doesn't mean they go to a medium security prison.  That's why   10:41:11

UNITED STATES DISTRICT COURT

169

1    we leave that to the BOP, and we shouldn't be spending a ton of

2    time dealing with that.

3            Finally, as to sentencing specifically, before I turn

4    my attention to detention, what I think is most galling is that

5    Mr. Spear's attorney has asked this Court to give grace to him          10:41:31

6    because he's physically frail and something bad might happen to

7    him in the future.  But Mr. Spear and these other defendants

8    gave exactly zero grace to the young women and girls being

9    trafficked dozens of times a day on Backpage who were in fact

10   suffering real harms far worse than anything that might happen         10:41:57

11   to these defendants in a controlled prison environment.  They

12   used the terms "violence," "aggression" and "drug use" that

13   they are worried about being exposed to in prison.  That was

14   the words, I think, of Ms. Purdue.  He's worried about being

15   exposed to, quote, "violence," "aggression" and "drug use" in          10:42:19

16   prison.  Those are all the things that the victims of his

17   website were actually exposed to multiple times per day.  And

18   he was aware of that actual harm occurring, not just the risk

19   of it, and they all laughed all the way to the bank.

20           For 14 years, as Mr. Rapp pointed out, NCMEC, the               10:42:40

21   Attorneys General, Polaris, Auburn Theological Seminary, and

22   countless others were begging these men to have compassion,

23   compassion for the plight of young women and girls who were

24   constantly being trafficked because they provided, the

25   defendants provided the most convenient marketplace for flesh          10:43:04

UNITED STATES DISTRICT COURT

1    peddlers that buyers to gather.

2           Your Honor, I have no doubt, has more compassion than

3    these men.  I am not asking you to abandon that compassionate

4    tendency in a situation like this.  I'm asking you to direct it

5    at the victims, the survivors, and their family members.  Show          10:43:23

6    them the compassion that these men refused by sentencing them

7    to a significant term of imprisonment.

8           Now, that compassion argument dovetails with our

9    detention argument, with our release pending bail.  All of the

10   defendants have asked, obviously, for probationary sentences,         10:43:45

11   but if they are sentenced to prison they have asked for to be

12   able to be out.  On the one end of the spectrum they want to be

13   out for the entirety of their appeal, on sort of a middle path

14   is that they want to be able to self-surrender.  And, of

15   course, we are asking that they be remanded today.                   10:44:06

16          All of the defendants have continued to enjoy all of

17   the freedoms of people who were not convicted of felonies, and

18   they have continued to enjoy that even after they have been

19   convicted.  That was nine months ago.

20          As we pointed out, we did not ask for the remand at         10:44:29

21   that time because there were several motions pending before

22   Your Honor that we thought were more appropriate to make sure

23   that those are resolved.  They have been resolved.  The time

24   has come.  The risk of flight at this stage after all these

25   years of litigation is too great.  There are huge financial       10:44:45

1    incentives to avoiding the entry of judgement here.

2           Typically a sentencing court, and I don't know exactly

3    how Your Honor does it, but the judgment doesn't get entered

4    for sometimes a few days, and that gives these defendants an

5    opportunity to remain on bond, and if they leave or God forbid          10:45:05

6    they commit suicide, that judgment goes away and they are no

7    longer adjudged guilty.  And that changes a huge number of

8    things, as we saw with Mr. Larkin.

9           All human life is valuable, Your Honor, and silence

10   upon self is just as much a danger to the community as to               10:45:27

11   another.  We certainly don't want to see that.  These folks

12   have a tremendous incentive.  It's not a speculative thing to

13   say given the fact that one of the defendants did precisely

14   that in this case.  And that, of course, is the ultimate risk

15   of nonappearance.  And this is not just me postulating here.            10:45:48

16   The Tenth Circuit has held that in *United States vs. Workman*,

17   680 F. Appendix 699, Tenth Circuit 2017, recognizing the risk

18   of flight by suicide is a proper consideration by the Court in

19   assessing the defendants' risk of nonappearance.

20          The Sixth Circuit has said something similar                     10:46:08

21   recognizing that it is logical to extend rules that treat

22   suicide as a form of flight.  It's *United States vs. Cody,* 498

23   F.3d 582, pincite 591, Sixth Circuit 2007.

24          When thinking about detention or release under 3142,

25   the history and characteristics of the person, including their         10:46:32

UNITED STATES DISTRICT COURT

172

1    mental condition, is important.  Mr. Spear has had several

2    mental issues.  I believe there was an ex parte letter that was

3    provided to the Court.  I only became aware of it because it

4    was obliquely referenced in their response to our Sentencing

5    Memorandum.  I have no idea if Your Honor has received more          10:46:58

6    than that one ex parte communication from the defense.  I asked

7    Mr. Spear's attorneys for access to that because I believed

8    that that's not something that the Court should be considering

9    without our opportunity to review that, and ultimately

10   Mr. Feder brought it over to me yesterday and I have had a          10:47:18

11   chance to review that one ex parte letter.  If there is more, I

12   don't know.

13          But in it, of course, we see things that give us

14   concern about Mr. Spear.  And without going into too much

15   detail about those, because Your Honor has it and it's filed        10:47:37

16   under ex parte, and I haven't been told I could say something,

17   otherwise I would just point Your Honor to that and note that

18   there are psychiatric conditions that give us concern about

19   whether he is a good candidate to remain out or for

20   self-surrender.                                                     10:47:56

21          So the same is similar, something similar for Mr.

22   Lacey who has expressed depressive episodes and has refused

23   medication.

24          All of the defendants are risk of flight in that

25   regard.  They all have substantial means.  The PSR makes clear      10:48:12

UNITED STATES DISTRICT COURT

1    that they all still have quite a bit of money and access to

2    money at this time, and that is of deep concern to us as well

3    as the danger to the community in terms of the way that I spoke

4    about it just a moment ago.

5        So finally, to the extent that this Court is                    10:48:31

6    disinclined to remand them today, we would ask that ankle

7    monitors be put back on them for the ones that have already had

8    it.  And for the ones that haven't, put it on for the first

9    instance for precisely all the same reasons, to ensure that

10   these victims who have waited six and a half long years are not   10:48:54

11   denied the justice that they are owed at this point.

12       And for all those reasons, we ask that you sentence

13   these defendants to a significant term of imprisonment and that

14   they be remanded into custody today.  Thank you.

15       THE COURT:  Thank you.  The Court will be on recess          10:49:13

16   for approximately 20 minutes.

17       (Recess was taken at 10:49 a.m.)

18       (Proceedings reconvened at 11:18 a.m.)

19       COURTROOM DEPUTY:  Judge is going to recess until

20   12:30.                                                           11:18:45

21       (A recess was taken at 11:20 a.m.)

22       (Proceedings reconvened at 12:33 p.m.)

23       COURTROOM DEPUTY:  We're back on the record in CR

24   18-422, United States of America vs. Michael Lacey, Scott Spear

25   and John Brunst, before the Court for sentencing.                12:33:56

1    THE COURT:  All right.  I intend to proceed in the

2  following way:  Each individual is entitled to an individual

3  sentence pronouncement.  They are entitled to understand the

4  considerations of the Court, and so I will proceed in the

5  following way.  I will proceed to the sentencing of Mr. Spear.          12:34:25

6  I will then move to Mr. Brunst, and finally Mr. Lacey.

7    It is true, I think one counsel or two or more

8  indicate that these are difficult responsibilities of a judge,

9  the balancing and weighing the arguments, looking at the case

10  law, and I think it is, in my circumstance, extraordinarily          12:35:00

11  difficult because the case has been so long.  I have not before

12  presided over a criminal trial proceeding that lasted the

13  entirety of a season, nor do I ever hope to.

14    And so I will also remind counsel that I'm not the

15  first judge on this case.  I think at least one judge on this          12:35:41

16  floor and two judges on the floor below me have handled issues

17  related to this.  I have had colleagues who could not get near

18  the case because of Mr. Lacey's and others long status here in

19  Arizona.  But nonetheless, the obligation falls to me, and I do

20  not impose sentence lightly.          12:36:32

21    As I stated at the outset, these are very difficult

22  statutes and they are unique circumstances.  The circumstances

23  have to fit into the application of the statute, and this Court

24  has done the best it can to guide the process.

25    But here, what makes this more heavy is that we need          12:37:10

1  not lose sight of the jurors who were selected, specifically by

2  counsel and their clients and the government and who sat

3  through that season-long trial.  I have to pay deference to

4  their findings by way of their verdicts.

5        I saw how diligently they worked everyday.  At the end   12:37:56

6  of trial what you did not see was the emotional toll it took on

7  every single one of them, every one.  It was as though they

8  didn't know what to do with their lives.  And I think we in

9  this room need to recognize their work, the care and attention

10  that they took to sifting through the arguments, sifting   12:38:47

11  through the testimony, looking at the exhibits, listening to

12  your arguments, observing you and your clients in court.  It is

13  our process, and so my responsibility is to follow what they

14  did.

15        With that, Mr. Spear, please come forward.  Mr. Spear,   12:39:16

16  as we have discussed yesterday, there was --

17        MR. FEDER:  Could I interrupt you for one moment?  Is

18  the Court not going to hear -- your clerk indicated before we

19  took the recess, not hear further argument on release pending

20  appeal.   12:40:00

21        THE COURT:  After my imposition was my instruction to

22  everyone.

23        MR. FEDER:  Sure.

24        THE COURT:  And I caution counsel, I don't want to

25  hear reiteration of argument made yesterday.  I don't want to   12:40:12

1  hear reiteration of argument made in responsive or original

2  pleadings as to the issue.  I've read that all.  If there's

3  something in reply to what Mr. Berry stated, you can be heard

4  on the record, but I think these matters have been fully

5  briefed.                                                    12:40:37

6           MR. FEDER:  Thank you.

7           THE COURT:  Mr. Spear, you have been convicted by a

8  trial jury of conspiracy to commit Travel Act violations in

9  Count 1 of the indictment; Counts 2 through 18, which are

10 specific Travel Act violations; Count 52, which charges you    12:40:57

11 with conspiracy to commit money laundering; and Count 53

12 through 62, concealment money laundering.

13          There was, as we have been discussing, a Presentence

14 Investigation Report that was prepared in your case.  The

15 presentence report writer is here and present.  Did you read    12:41:23

16 the entire presentence report, including the sentencing

17 recommendations made in it?

18          MR. SPEAR:  I did.

19          THE COURT:  Did you review the entirety of the report

20 with your counsel?                                              12:41:39

21          MR. SPEAR:  I don't know the entirety, but we reviewed

22 it.

23          THE COURT:  Your counsel, either Mr. Kessler or

24 Mr. Spear [sic], answered all of your questions about what is

25 written and recommended in that report; is that correct?       12:41:53

1           MR. SPEAR:  That's right.

2           THE COURT:  Now, having resolved all of the objections

3     in your presentence report, and upon jury's verdicts of guilt,

4     I must now impose sentence upon you on those counts of

5     conviction.                                                    12:42:14

6           Now, as to -- let me just say that with regard to your

7     background and character, I'm going to at least refer generally

8     to all of the sentencing consideration that the Court must

9     review in imposing a sentence.  I do this with every individual

10    that comes before me.  They are the factors outlined in Title   12:42:40

11    18 United States Code Section 3553(a).  Those factors include

12    the nature and circumstances of your convictions, your

13    background and character, if there's a sentence in need for

14    deterrence purposes, for rehabilitation purposes, if there's a

15    sentence necessary to promote respect for the law, and what     12:43:04

16    type of sentence would be sufficient but not greater than

17    necessary to achieve all of the sentencing factors in your

18    particular case.

19          Well, having reviewed your presentence report, I know

20    that you are about 73 years of age.  I know that you have a     12:43:23

21    higher degree in sociology and anthropology.  You arrived in

22    Arizona roughly about 1959, and you've lived here for the

23    duration thereafter.  You have no prior criminal history.  In

24    fact, I don't recall reading that you had any sort of

25    infraction with the law.                                       12:43:54

1            I note that you deny having any substance abuse

2    issues, and so the Court finds there is no need to impose a

3    sentence for rehabilitation purposes.

4            I have read the reports that your counsel have

5    attached to your Sentencing Memorandum.  And as noted in your          12:44:14

6    presentence report, I do note all of the health conditions that

7    you have.  I understand that these conditions are not only

8    mental health conditions, but you have physical health

9    conditions as well.

10           I also do not find, one of the other factors I have to          12:44:37

11   consider as to whether or not you present a danger to others,

12   and I do not find, based on all of the information before me,

13   that you impose a danger to others.

14           With respect to the nature and circumstances of the

15   offense, I do need to take some time to make -- make clear what          12:45:01

16   the basis of my sentence relies upon.  And as I mentioned, this

17   is related to the jury verdict.  As to Count 1, the conspiracy

18   to violate the Travel Act, in violation of Title 18 United

19   States Code Section 371, here, it relates to the specific

20   Travel Act postings on Backpage.                                          12:45:37

21           The government was charged and the jury necessarily

22   found that you used Backpage.com with the intent to facilitate

23   the promotion of a prostitution businesses, and that there was

24   an overt act in furtherance of that unlawful activity.  For

25   example, by publishing the prostitution ad or editing the ad to          12:46:08

179

```
1    make it look less like an ad for prostitution.
2           Your role was that of the executive vice president of
3    Backpage's parent company Village Voice Media.  There was
4    testimony that you were the immediate supervisor of your
5    codefendant, Mr. Ferrer, and he operated as the project manager    12:46:36
6    and sales marketer or director of Backpage.
7           There was ample evidence about your role in the
8    aggregation strategy.  You directed the rollout of Backpage's
9    content aggregation; that is, you required staff to identify an
10   adult escort ad on Craigslist, this is at the beginning, and     12:47:14
11   repost it on Backpage in hopes that the original poster and any
12   user would start paying to post ads on Backpage instead of
13   Craigslist.
14          You obtained budget approval from Mr. Brunst, and then
15   you directed Mr. Ferrer to use the content aggregation strategy   12:47:36
16   in every metro market in the United States.  That was the
17   testimony.
18          You also were involved with the relationship developed
19   with The Erotic Review.  We heard ample testimony that the The
20   Erotic Review was a prostitution review site, rating site, if    12:48:05
21   you would.
22          You were the author of a 2008 budget plan that was
23   presented then to Mr. Brunst and Mr. Larkin outlining that TER
24   relationship.  And in that plan it noted that Backpage had,
25   quote, "struck a deal with TheEroticReview.com, TER, with        12:48:34
```

1    reciprocal links.  It created huge brand awareness in this

2    industry, and increased pageviews from TER by 120,000 per day."

3    You signed the checks for these payments, you closely tracked

4    the relationship with TER, and Mr. Ferrer testified that you

5    understood that the traffic from TER was very, very important          12:49:11

6    to Backpage's success.

7           You ignored recommendations to completely remove ads

8    visited from TER.  This was even after the Amber Lyon CNN story

9    about Backpage offering a 12-year-old girl for sex.  You

10   allowed TER identification numbers to remain on the site, but         12:49:49

11   you just removed the links to TER.  That was an important

12   partner to Backpage's success.

13          Mr. Ferrer also testified that you and Mr. Brunst

14   regularly received those Google analytic reports showing that

15   TER was the number one source of non-search engine referrals to       12:50:17

16   Backpage.

17          You sent Mr. Ferrer, you and Mr. Larkin, to New York

18   to meet with bulk prostitution advertisers in person and

19   coordinate efforts to give what is known as super posters

20   preferential treatment on Backpage.                                    12:50:47

21          You also were involved deeply in the moderation

22   efforts.  You prepared a PowerPoint that aimed at getting rid

23   of ad images depicting sex acts like a woman giving a man oral

24   sex.  And according to Mr. Ferrer, you coined a standard of

25   between Hustler and Playboy, which meant sex act pictures need         12:51:19

1    to go, and you could still have full nudity but you couldn't

2    have extreme close-up of genitalia.

3           You directed Mr. Ferrer to scrub ads, to edit and

4    remove sex act images and sex act language.  You wanted the ads

5    to be less escort-ish, meaning that if the ads looked like          12:51:50

6    prostitution, excuse me, less like prostitution then it could

7    maintain some credibility.

8           You are also responsible for Backpage's Terms of Use,

9    which continually changed, and we had ample evidence of that.

10   There was frustration growing at the time as the evidence and      12:52:23

11   testimony reflected that advertisers were being kicked off and

12   so there was an effort made to identify certain terms that need

13   to be thrown out only to have those advertisers modify that

14   language.  You changed terms like "hooker" to "female escort."

15   You decided it was appropriate or okay to use the term "roses"     12:53:07

16   instead of "cash," and you were necessarily alerted to all of

17   this because you were Mr. Ferrer's boss, and you were the

18   person Mr. Ferrer went to to resolve conflicts when people

19   would raise concerns about being kicked off the page.

20          You decided to higher El Camino to assist with the           12:53:53

21   cleanup efforts.  You also rejected Internet safety expert

22   suggestions to screen the ads purchased with prepaid cards

23   because they were concerned this was an indication of potential

24   trafficking and because it was identified and testified to that

25   up to 70 percent of your transactions came from prepaid cards,     12:54:21

1    so you didn't want to lose that business.

2         It was also testified to that you were involved in

3    what was described as the slow dance with the Attorney

4    Generals, and that essentially what that meant was, comply with

5    the subpoena requests, but don't change anything that we're          12:54:49

6    doing to make it look like we're helping law enforcement.

7    There was a directive not to throw the baby out with the bath

8    water, and make these changes gradually so that the revenue

9    loss would not be so great.

10        So essentially you and your direction and your                  12:55:20

11   necessary approval, structured Backpage in a way to ensure that

12   the majority of its revenue that was derived from prostitution

13   ads would not cease.

14        As to each of the Travel Act counts that you have been

15   convicted of, Counts 2 through 18, Count 2 involves the             12:55:49

16   testimony that we heard from Sergeant Griffith of the North

17   Borough Police Department.  He was alerted to, if you will

18   recall, the suspicious activity that was occurring in a near

19   motel room.  There were two women that were seen loitering

20   around the area.  Someone was concerned for them.  Well, after     12:56:21

21   he watched the motel for a period of time, he decided to go on

22   Backpage.com and he found an ad that showed one of the

23   individuals that he had spotted outside of that motel.  He

24   called the ad number, made an appointment, went to that motel

25   room.  When he got there, much to his surprise, there was          12:56:59

183

1    another quote/unquote, john who was just leaving.  This was

2    prostitution that had been illegal, made illegal in the state

3    of Massachusetts.

4            With regard to Counts 3, 6 through 11 and 18, these

5    are Travel Act violations, in violation of Washington state law    12:57:30

6    involving Ms. Robinson.  And we heard the testimony that

7    Ms. Robinson used Backpage.com as her prostitution web page,

8    her advertisement page.  She began to become concerned and

9    reached out to Mr. Ferrer because she was getting kicked off

10   the page, and she was concerned because she needed money.    12:58:07

11           So the multiple ways that Mr. Ferrer and the

12   aggregation and the moderation that was done to facilitate this

13   enabled Ms. Robinson to continue to advertise on Backpage over

14   and over and over again.  Counts 3, 6 through 11 and 18 bear

15   that out.    12:58:51

16           Counts 4 and 5, again, relate to postings in

17   Massachusetts.  In particular, we heard through government

18   counsel this victim's statement.  She testified that she became

19   familiar with Backpage.com because she saw her pimp posting her

20   ads on that page.  She testified that she would not create    12:59:30

21   these ad, but he would, and her testimony was, quote, she

22   understood that she was advertised for sex acts for money

23   because, quote, "so my pimps could make money off of me."  She

24   also testified that she saw her pimps using vanilla cards from

25   a convenience store in order to post her ads.    13:00:00

1          There were multiple exhibits that came in through

2    Ms. Figueroa.  We know the impact that these postings have had

3    on her.

4          Counts 12, 13, 14 and 15, are postings in California

5    and Arizona.  The postings of Ms. Cervantes.  And here                13:00:31

6    Ms. Cervantes, in her own words, said that she was being

7    trafficked -- being trafficked by a man she referred to as

8    L.G., and he, along with another woman, would post, create and

9    post her ads.  They would buy her clothing, put her in certain

10   positions, and then post her ads.                                     13:01:13

11         She also testified that they decided to come here to

12   Arizona because of the Super Bowl, and perhaps, perhaps that

13   was to her benefit because when she was posted here in Arizona

14   the person she met responding to her ad was an undercover

15   officer, and at least at the time of trial she testified that         13:01:53

16   she didn't post -- she wasn't posted on Backpage thereafter.

17         Count 16 and 18 relate to ads posted in Colorado by

18   Ms. Leery.  And here, though you may disagree with the jury

19   finding, the jury was given a particular instruction that said

20   that because of your knowledge or the knowledge of others and         13:02:38

21   the acts of others to develop Backpage in this way, you are

22   liable.

23         With regard to Count 52, the conspiracy to commit

24   money laundering, and all of this relates to around 2012, and

25   the evidence will show around that time this is when there was        13:03:06

1   pressure upon you and Mr. Lacey and Mr. Brunst and Mr. Larkin

2   and Mr. Ferrer from law enforcement and others, and so the

3   financial institutions began dropping Backpage business, and so

4   you had to find ways for users to continue to pay for ads.

5   There was testimony that Mr. Brunst and you and Mr. Larkin          13:03:41

6   worked closely to secure credit card processing from Europe,

7   you began identifying, identifying using Net Cash, cyberspace

8   credit cards.  Mr. Ferrer exchanged e-mails with Mr. Brunst on

9   which you were copied about getting cc bill contract signed,

10  and there was some discussions about using JetPay.  And in         13:04:16

11  November of 2013 Mr. Ferrer sent an e-mail on which you and

12  Mr. Brunst were copied relating to credit card transactions,

13  and those recommendations included using names, Internet

14  addresses and billing descriptions that would not include the

15  name Backpage.                                                     13:04:53

16          At that time -- at the time that you decide to sell,

17  you and others decide to sell to Mr. Ferrer Backpage, from 2014

18  to 2015, it was yielding anywhere from 150 to $160 million, and

19  the amount it cost to posted a single ad was sometimes $4.  You

20  only need to do the math, then, to think about the volume of      13:05:39

21  ads it took to generate that amount of income, and those Google

22  ads do not show furniture, automobiles, contributing this

23  amount to Backpage.com.

24          The money laundering counts really relate to what

25  occurs with the sale of Backpage.  You and Mr. Brunst,             13:06:16

1    Mr. Lacey sold Backpage to Mr. Ferrer for $6 million, and that

2    sale consisted of two loan agreements.  One the U.S. portion of

3    Backpage and a smaller loan was the foreign portion of

4    Backpage.  Now, Cereus Properties, which is the company owned

5    by Mr. Lacey, Mr. Brunst and you, collected the interest and          13:06:53

6    the debt payments from that $6 million loan, and Mr. Ferrer

7    testified that the source of the money went to Cereus

8    Properties was the prostitution ads posted on Backpage.  It was

9    all generated from that.

10         The transactional money laundering counts under              13:07:21

11   section 1956(a), which are Counts 53 through 62, were all

12   transfers made from Website Technologies bank account to branch

13   banking and trust to a bank account held by Cereus Properties.

14   And really, the requirements for this, these set of convictions

15   Counts 53 through 62 were that you knew that the proceeds          13:08:03

16   derived from unlawful activity, and that the proceeds in fact

17   derived from unlawful activity.

18         All of the information related to the conspiracy

19   supports this verdict.  Indeed, by its verdict the jury found

20   that following the 2015 sale, the ultimate source of the monies     13:08:33

21   that were paid to Cereus Properties from Website Technologies

22   was the prostitution ads posted in Backpage.  Those are the

23   nature and circumstances of the offense of conviction.

24         I have already iterated to you the statutory terms --

25   terms of imprisonment that apply, and you are aware of your         13:09:07

1   sentencing guideline calculation. I find the nature and

2   circumstances of the offense to be extremely serious. In

3   considering Mr. Spear, Mr. Brunst and Mr. Lacey, I've also

4   reviewed the multiple victim impact statements that have been

5   provided to the Court. I think that what we heard yesterday in       13:09:37

6   many ways encapsulates many of those statements, and many of

7   those statements include loss of home life, they include

8   suicidal ideation, they include depression, they include

9   anxiety, they include numerous visits to counselors,

10  psychologists. I reviewed letters from psychologists and          13:10:21

11  counselors who have provided services to those individuals who,

12  many of whom, and I will suggest the majority of whom did not

13  voluntarily do this. There were others that were involved.

14          Here, I think Ms. Ambrose's words resonated and serve

15  as a reminder of really what this was about. I will attempt to       13:10:59

16  quote from her, "Backpage and the owners continued teaching

17  pimps how to advertise these women." And I think, Mr. Spear,

18  the evidence bears that out.

19          With regard to deterrence, I'm troubled in one

20  respect. It appears that you refused to inform your probation        13:11:36

21  officer of your source of income today. I do note that you

22  were last employed as an executive vice president of Cereus

23  Properties up through 2018, and in 2013 you were earning

24  something in the neighborhood of $30,000 per month, and at the

25  end of that 2018 period your W-2 showed that you earned            13:12:08

UNITED STATES DISTRICT COURT

```
 1   somewhere in the neighborhood of $80,000 to $2 million
 2   annually.
 3         With regard to promoting respect for the law, there's
 4   ample evidence to show that there is a sentence necessary for
 5   that.  You and your codefendants were routinely put on notice          13:12:45
 6   that Backpage was being used to post sex-for-money ads, in
 7   violation of state prostitution laws.  You received letters
 8   from law enforcement officials, state Attorneys General, and
 9   you were called before Congress to explain these activities,
10   and you knew of these allegations.                                      13:13:18
11         The testimony that also resonated with me, Mr. Spear,
12   is you were described at one point as a hands-on supervisor or
13   a micromanager on all aspects of the business from approving
14   payments to approving staffing, and so I find all these aspects
15   must be balanced and weighed.                                          13:13:56
16         I have considered all of the factors in 18 U.S.C.
17   3553(a), is there any legal cause as to why sentence should not
18   now be imposed, Mr. Rapp?
19         MR. RAPP:  Not that the United States knows of.
20         THE COURT:  Mr. Whoever --                                       13:14:23
21         MR. FEDER:  No.
22         THE COURT:  Pursuant to the Sentencing Reform Act of
23   1984, it is the judgement of the Court that Scott Spear is
24   hereby committed to the Bureau of Prisons for a term of
25   imprisonment of 120 months.                                            13:14:39
```

1    This consists of 60 months on Count 1, conspiracy to

2  commit Travel Act offenses, 60 months on each Count 2 through

3  18, the Travel Act offenses.  Those counts are to run

4  concurrently to Count 1.  And 60 months on Count 52 to run

5  concurrently with a 60-month term on each count, 53 through 62,    13:15:09

6  which are the concealment money laundering counts, and which

7  are to run consecutively to Count 1 through 18.

8    You shall pay a special assessment fee of $2,900 which

9  is due immediately.  The Court finds that you do not have an

10  ability to pay a fine and orders that the fine be waived.    13:15:39

11    You shall pay your criminal monetary penalties during

12  imprisonment at a rate of not less than $25 per quarter, and

13  payment shall be made through the Bureau of Prisons' Inmate

14  Financial Responsibility Program, and the Court does waive the

15  imposition of interest and penalties on any unpaid balance.    13:16:01

16    Now, on release from custody you shall be placed on

17  supervised release for 36 months, and this term consists of

18  36 months on Count 1 through 18, 52 through 62, 71 through 78.

19  That is an error.  On all counts of conviction you will serve a

20  36-month term of supervised release, and those terms are to run    13:16:53

21  concurrently.  Let's modify the language in that.

22    Now, while on supervised release, you shall comply

23  with the mandatory and standard conditions of supervision

24  adopted by this court this General Order 17-18.  And of

25  particular importance, you shall not commit another federal,    13:17:12

UNITED STATES DISTRICT COURT

```
1    state or local crime during the term of supervised release, and
2    the mandatory drug testing provision is suspended.
3            Within 72 hours of being released from custody, you
4    shall report in person to the probation office in the district
5    in which you are released.                              13:17:32
6            Mr. Feder, have you reviewed the mandatory and
7    standard conditions of supervision with your client?
8            MR. FEDER:  I don't know, Judge, but I will, but I
9    can -- I can't tell you that I have or haven't.
10           THE COURT:  Mr. Kessler, have you?                 13:17:47
11           MR. KESSLER:  We have gone through them, yes.
12           THE COURT:  Mr. Spear, do you recall reviewing the
13   mandatory and standard conditions of supervised release?
14           MR. SPEAR:  Only in general terms.  I don't remember
15   any of the specifics.                                  13:18:03
16           THE COURT:  You will comply with the mandatory
17   conditions of supervised release as follows:  You must not
18   commit another federal, state or local crime.
19           You must not unlawfully possess a controlled
20   substance.  The use or possession of marijuana, even with a 13:18:17
21   physician certification, is not permitted.
22           You must refrain from any unlawful use of controlled
23   substances.  Unless suspended by the Court, you must submit to
24   one drug test within 15 days from release from imprisonment and
25   at least two periodic drug tests thereafter as determined by  13:18:39
```

1    the Court.

2         You must comply with the following standard

3    conditions:  You must report to the probation office in the

4    federal judicial district where you are authorized to reside

5    within 72 hours of sentencing or your release from imprisonment          13:18:53

6    unless the probation officer instructs you to report to a

7    different probation office or within a different time frame.

8         After initially reporting to the probation office, you

9    will receive instructions from the Court or the probation

10   officer about how and when you must report to the probation              13:19:15

11   officer, and you must report to the probation officer as

12   instructed.

13        You must not knowingly leave the federal judicial

14   district where you are authorized to reside without first

15   getting permission from the Court or the probation officer.             13:19:28

16        You must answer truthfully the questions asked by your

17   probation officer.

18        You must live at a place approved by the probation

19   officer.  If you plan to change where you live or anything

20   about your living arrangements such as the people you live              13:19:43

21   with, you must notify the probation officer at least 10 days

22   before the change.  If notifying the probation officer in

23   advance is not possible due to the unanticipated circumstances,

24   you must notify the probation officer within 72 hours of being

25   aware of a change or expected change.                                    13:20:02

1      You must allow the probation officer to visit you at

2  any time at your home or elsewhere, and you must permit the

3  probation officer to take any items prohibited by the

4  conditions of your supervision that he or she observes in plain

5  view.                                                                    13:20:22

6      You must work full-time at least 30 hours a week.  Let

7  me change that because, and I will change that as to each

8  defendant that it applies to, because they are all retired.

9  You must not interact with someone that you know is engaged in

10  criminal activity.  If you know someone has been convicted of a   13:20:46

11  felony, you must not knowingly communicate or interact with

12  that person without first getting the permission of the

13  probation officer.

14      If you are arrested or questioned by a law enforcement

15  officer, you must notify the probation officer within 72 hours.   13:20:59

16      You must not own, possess or have any access to a

17  firearm, ammunition, destructive device or dangerous weapon.

18      You must not act or make any agreement with a law

19  enforcement agency to act as a confidential human source or

20  informant without first getting the permission of the court.     13:21:21

21      If the probation officer determines that you pose a

22  risk to another person, including an organization, the

23  probation officer may require you to notify the person about

24  the risk, and you must comply with that instruction.  The

25  probation officer may contact the person and confirm that you    13:21:40

1    have notified the person about the risk.

2            You must follow the instructions of the probation

3    officer related to the conditions of supervision.  You must

4    abide by the following special conditions:  You must submit

5    your person, property, house, residence, vehicle, papers or          13:21:59

6    office to a search conducted by a probation officer.  Your

7    failure to submit to a search may be grounds for revocation of

8    your release, and you must warn any other occupant that the

9    premises may be subject to search under these conditions.

10           You must submit your computers as defined in 18 U.S.C.         13:22:16

11   1030(e)(1) or other electronic communication or data storage

12   device or media to a search.

13           You must warn any other people who use these computers

14   or devices capable of accessing the Internet that the devices

15   may be subject to search pursuant to this condition.  Failure        13:22:38

16   to submit to a search may be grounds for revoking your release.

17   A probation officer may conduct a search pursuant to this

18   condition only when reasonable suspicion exists that there is a

19   violation of condition of supervision, and that the computer or

20   device contains evidence of this violation.                          13:22:57

21           You must consent to and cooperate with the seizure and

22   removal of any hardware and/or data storage media for further

23   analysis by law enforcement or the probation officer with

24   reasonable suspicion concerning a violation of a condition of

25   supervision or unlawful conduct.  Any search will be conducted        13:23:16

UNITED STATES DISTRICT COURT

1    at a reasonable time and in a reasonable manner.

2            You must provide the probation officer with access to

3    any requested financial information and authorize the release

4    of any financial information, and the probation officer may

5    share that financial information with the U.S. Attorney's        13:23:35

6    Office.

7            You are prohibited from making major purchases,

8    incurring new financial obligations, or entering into any

9    financial contracts over $500 without the prior approval of the

10   probation officer.                                              13:23:50

11           You must participate in a mental health assessment and

12   participate in outpatient mental health treatment as determined

13   to be necessary by a medical or mental health professional, and

14   follow any treatment direction by the treatment provider.

15           You must take medicine as prescribed by a medical        13:24:06

16   professional providing mental health treatment, unless you

17   object, in which event you must immediately notify the

18   probation officer.

19           You must contribute to the cost of treatment in an

20   amount to be determined by the probation officer.               13:24:20

21           You must not communicate or otherwise interact with

22   any of the co-conspirators without first obtaining approval

23   from the probation officer.

24           You must cooperate in the collection of DNA as

25   directed by the probation officer.                              13:24:38

1     You must notify the Court of any material change in

2  your economic circumstance that might affect your ability to

3  pay restitution, fines or special assessments.

4     You must make restitution in accordance with 18 U.S.C.

5  Sections 2248, 2259, 2264, 2327, 3663, 3663A and 3664.  The          13:24:57

6  Court has not at this juncture ordered restitution be paid, but

7  that matter will continue to be pending.

8     You must consent, at the direction of the probation

9  officer, to having installed on your computer, as defined at 18

10 U.S.C. 1030(e)(1), including Internet capable devices at your      13:25:28

11 own expense any hardware or software system to monitor your

12 computer use.

13     Now, Mr. Spear, having been convicted by a jury, you

14 do retain all of your rights of appeal.  Now, that is with

15 regard to the jury's verdict and now with regard to the Court's    13:25:53

16 sentencing.  However, if you do intend to appeal, you only have

17 14 days in which to notify the Court of your intention to do

18 so, and your counsel can advise you with regard to that.

19     You may resume your seats, and we will take up the

20 issue of release pending appeal upon the completion of the         13:26:16

21 sentence.

22     MR. FEDER:  Would you like me to ask this Court right

23 now for the recommendation to the Bureau of Prisons that we

24 discussed earlier?

25     THE COURT:  Well, I have reviewed a number of                  13:26:30

196

```
1   statements that I asked the U.S. Probation Office to look at,
2   that coupled with Mr. Berry's statements, and as I inform every
3   individual that comes before me who is ordered to the Bureau of
4   Prisons custody, I will frankly tell Mr. Spear that I will make
5   a recommendation as to your placement here in Arizona.  I will      13:27:00
6   make a recommendation that you be housed in a low level or less
7   than medium, if there is, secure facility; however, it is,
8   under the law, up to the discretion of the Bureau of Prisons to
9   determine, number one, where they have the facility that meets
10  all of your criteria based on the counts of conviction, as well    13:27:30
11  as other considerations.  So while I may make the
12  recommendation, it ultimately will be their decision.
13          MR. FEDER:  There are several other recommendations we
14  would ask, though.  I am sorry.
15          THE COURT:  I wanted to, before I forget, Mr. Spear, I      13:27:49
16  want to make sure that, I know that you asked yesterday that a
17  particular letter accompany the judgement and commitment order,
18  and I didn't recall, was that the letter of Dr. Bernstein or
19  somebody else?
20          MR. FEDER:  The one that was filed under seal.             13:28:07
21          THE COURT:  Yes, Mr. Spear, was there anything
22  further?
23          MR. FEDER:  Yes.  I am sorry.  Mr. Feder, actually.
24  You said Mr. --
25          THE COURT:  I'm sorry, Mr. Feder.                          13:28:27
```

```
1              MR. FEDER:  Forget it.

2              THE COURT:  Mr. Feder.

3              MR. FEDER:  Number one, that you recommend that this

4    is not to be deemed a sex offense in the order, but that's

5    something the government agreed to.                                13:28:40

6              THE COURT:  Well --

7              MR. RAPP:  To be clear, we don't object to it.

8              MR. FEDER:  Sorry, they don't object to it.  As the

9    Court knows from reading Ms. Purdue's declaration, it would be

10   extremely helpful regarding Mr. Spear's service in the Bureau    13:28:54

11   of Prisons.

12             THE COURT:  I hesitate to do so only because I feel

13   that it will call attention on any document to the issue.  And

14   if it calls attention to the issue -- but if that's your

15   request -- and the problem becomes, I don't know where these     13:29:18

16   documents go or where they end up during an incarceration

17   period.  And perhaps it raises a question in some fellow

18   inmate's mind, they start digging through the papers, I don't

19   know.  But if you request it and there's no objection to it, I

20   can put it in the JNC.                                           13:29:46

21             MR. FEDER:  If you would, please.

22             Second, judges are allowed to recommend specific

23   institutions in Arizona.  And typically, as the Court knows,

24   the Bureau of Prisons tries to house people as close as

25   possible to their residence.  The places in Arizona I would ask  13:30:05
```

198

1  the Court to recommend is the prison camp in Phoenix, second in

2  line would be the prison camp in Tucson, and third in line

3  would be the minimum security facility in Safford.

4          THE COURT:  I decline to do that.  I have already

5  stated that I will make a recommendation that he remain here in          13:30:30

6  Arizona.  That's what I will do.

7          MR. FEDER:  I think those are the recommendations,

8  Judge.

9          THE COURT:  All right.  You may be seated.

10          MR. BERRY:  Your Honor, if I could, I believe during          13:31:01

11  your explanation of some of the facts of the case you referred

12  to the sale of Backpage as a $6 million sale on two occasions.

13  We just wanted to correct that record that that was a

14  $600 million sale.

15          THE COURT:  You're correct.  I misread my notes.          13:31:40

16          Mr. Brunst, please come forward.

17          Now, Mr. Brunst, the jury has convicted you of Count

18  1, conspiracy to commit Travel Act violations, in violation of

19  Title 18 United States Code Section 371.  The jury also

20  convicted you of Count 2, conspiracy to commit money          13:32:29

21  laundering --

22          MR. LINCENBERG:  Count 52.

23          THE COURT:  Count 2, conspiracy -- I'm sorry, yes, I

24  keep leaving off the five.  Count 52, conspiracy to commit

25  money laundering, in violation of Title 18 United States Code          13:32:46

```
 1   Section 1956, and that relates to the money laundering counts
 2   of which you were also convicted in Counts 53 through 62
 3   charging you with concealment money laundering, in violation of
 4   Title 18 United States Code Sections 1956(a)(1)(B)(i).
 5          And you were also convicted of the counts listed in 64     13:33:14
 6   through 68 involving international promotional money
 7   laundering, in violation of Title 18 United States Code
 8   Sections 1965(a)(2)(a).
 9          Now, have you reviewed the Presentence Investigation
10   Report which includes the sentencing recommendations made in    13:33:42
11   it?
12          MR. BRUNST:  Yes, Your Honor.
13          THE COURT:  Did you go through the report with your
14   counsel?
15          MR. BRUNST:  Yes, Your Honor.                             13:33:51
16          THE COURT:  Did they answer all of your questions
17   about what is written and recommended in that report?
18          MR. BRUNST:  Yes.
19          THE COURT:  And are you so far satisfied with the
20   services of your counsel?                                        13:34:00
21          MR. BRUNST:  Yes.
22          THE COURT:  Now, having resolved all the objections in
23   your presentence report, and upon the jury's verdicts of guilt,
24   I do now impose sentence on you.
25          As I have for Mr. Spear, I must consider each of the      13:34:18
```

UNITED STATES DISTRICT COURT

1    18 U.S.C. 3553(a) sentencing factors.  As mentioned, they

2    include the nature and circumstances of your convictions, your

3    background and character, if you're in need of a sentence to

4    deter you from future criminal conduct, if you are in need of a

5    sentence for rehabilitation purposes, if there's a sentence to          13:34:42

6    address whether you present a danger to others, if there's a

7    sentence necessary to promote respect for the law, and what is

8    a sufficient but not greater than necessary sentence to achieve

9    all of these factors.

10         Here I know that you're 72 years old and that you have        13:35:06

11   achieved a bachelor's degree as your highest level of

12   education.

13         Though you do not have any dependents, you obviously

14   have a very strong and large family who are present here today.

15   The information also indicates that you retired from Cereus        13:35:32

16   Properties as the Chief Financial Officer, and that you were

17   receiving a salary before you left at approximately $500,000

18   per year.

19         With regard to your health, you don't have any real

20   urgent health issues, and I do know that you have a routine        13:35:57

21   checkup related to a prior issue of health.

22         I have read that you have no substance abuse issues.

23   The Court finds that you do not need a sentence for

24   rehabilitation purposes.

25         Other factors that I've considered are that it              13:36:19

1    appears, at least at present time, that you have a net worth of

2    over $4 million.  Now, I also find that you do not present a

3    danger to others.

4            Now, as to the nature and circumstances of your

5    conviction, with regard to the conspiracy to commit Travel Act    13:36:48

6    violations, you were the Chief Financial Officer of Village

7    Voice Media.  You also supervised Mr. Ferrer, according to his

8    testimony.  You also approved staffing and other budget issues

9    to execute the content aggregation strategy in the early years

10   of Backpage.  There was evidence of you on an e-mail discussing    13:37:26

11   the plan to, quote, seed the site, the female escorts category,

12   with 200 independent escorts.

13           You were also aware of The Erotic Review relationship

14   and the importance of that relationship and the traffic between

15   the The Erotic Review and Backpage.  There was ample testimony    13:38:00

16   about that.

17           With regard to the content moderation, you did approve

18   budget increases that were needed to bring on content

19   moderators.  You reviewed the comparison and growth

20   presentation toward the end of 2012 that showed huge profit    13:38:22

21   growth in adult sections compared to the other sections on

22   Backpage.com.  And this, Mr. Ferrer testified, attributed to

23   the Backpage's moderation strategy.

24           Contrary to what I heard yesterday from your counsel,

25   I find it very difficult to believe that you were in some    13:38:55

UNITED STATES DISTRICT COURT

1    bubble as a CFO approving these decisions because you were on

2    notice of the allegations toward Backpage.com.  You approved

3    the budget to hire staff to respond to the subpoenas from law

4    enforcement, after all.  You were a participant in trying to

5    stop the rebroadcast of the Amber Lyon story.                    13:39:30

6         You participated in the conspiracy by helping

7    structure Backpage to maintain its longevity and to maximize

8    profits from the sale of illegal prostitution ads.

9         As to Count 52, the conspiracy to commit money

10   laundering, again, here, when those financial institutions     13:40:03

11   started shutting down their business with Backpage because of

12   its reputation, you did -- you opened up a holding company with

13   those innocuous names like Classified Solutions, Payment

14   Solutions, general sounding business company names that did not

15   refer to that, did not reference Backpage.com.  And Posting     13:40:36

16   Solutions, it was testified, was another shell company not

17   unlike Website Technologies, and you created Website

18   Technologies as a shell company for the purpose of opening bank

19   accounts under a name that was not affiliated with

20   Backpage.com.                                                   13:41:06

21        There was testimony and evidence produced at trial,

22   and the testimony was of Mr. Ferrer, and he said:  We need a

23   name other than Backpage, so Mr. Brunst asked me for names and

24   I suggested Website Technologies, and that's the name we ended

25   up using.  And the testimony was that you set up Website         13:41:36

1    Technologies to handle the payroll, the 401(k) and to provide

2    for leases.  And the whole idea here was to ensure that its

3    reputation was protected so that it would not show to be

4    affiliated with Backpage.

5            Now, when U.S. banks started giving notice in about                    13:42:17

6    April of 2014 that they were starting to drop Backpage because

7    of all of these notices and the reputational risk, you informed

8    Mr. Spear and Mr. Ferrer that you would be moving all of your

9    banking under Website Technologies at BMO.  You created the

10   PowerPoint presentation for potential buyers before you-all                    13:42:48

11   decided to sell Backpage to Mr. Ferrer.

12           The PowerPoint included statements that stated, quote,

13   "Maintaining a vibrant general purpose classified site

14   strengthens Backpage's defensible market position in the adult

15   category, creates mainstream environment for site                             13:43:17

16   participation, and allows," quote, "plausible deniability for

17   exposure."  And there was indeed a discussion amongst you-all

18   to not share that information of prostitution ad marketing

19   activities with any potential buyer.

20           You were also deeply involved in that $600 million                     13:43:45

21   sale of Backpage in 2015 to Mr. Ferrer, and there was testimony

22   it was done to distance you and the other owners from

23   Backpage's business of selling prostitution ads.

24           And I mention there were those two loan agreements

25   that you helped to structure.  And some of that money, again,                  13:44:14

204

1    flowing through Cereus Properties and these other shell

2    accounts, were owned by Mr. Lacey, Mr. Spear and you, and all

3    of the money that Cereus Properties account collected the

4    interest and the debt payments for that 600 million dollar

5    loan, and Mr. Ferrer testified indeed that the source of the    13:44:47

6    money that went to Cereus Properties was the prostitution ads

7    posted on Backpage.

8          You stayed involved with the -- with Mr. Ferrer and

9    Backpage following the sale.  There was evidence that

10    Mr. Ferrer or the CFO of Backpage contacted you, and the    13:45:19

11    testimony was at a minimum a few times a week after July 2015

12    going forward, and that you were involved in the financial

13    problems that the company was having, and you wanted to

14    understand the revenue that was coming in and what the options

15    were for banking, and how to bring in revenues from other    13:45:49

16    credit card processors.

17          You helped to find alternative methods for receiving

18    money from posters on Backpage, including receiving funds from

19    cryptocurrency.  There is evidence that shows back in

20    January 2015 the revenues from cryptocurrency amounted to over    13:46:19

21    $35 million.

22          With regard to the transactional concealment money

23    laundering counts, Counts 53 through 62, each of the transfers

24    were made from Website Technologies at Branch Banking and Trust

25    to the bank account held by Cereus Properties.    13:46:56

1        And the requirements under the Counts 53 through 62

2  were only that you knew the proceeds derived from unlawful

3  activity, and the proceeds in fact derived from unlawful

4  activity, and clearly the jury found that the proceeds derived

5  from unlawful activity.                          13:47:35

6        You approved the budgeting.  You helped structure the

7  ways the money left Backpage to avoid its detection.  You were

8  also a part owner of it.  In fact, there was a government

9  witness, along with Mr. Ferrer, that testified that Cereus

10  Properties collected the interest and debt payments from the    13:48:12

11  $600 million loan from that sale, and that indeed you and

12  Mr. Spear and others were the owners of Cereus Properties.  At

13  bottom, the source of the money paid to Cereus Properties from

14  Website Technology were derived from the prostitution ads on

15  Backpage.                                         13:48:48

16        As to the international promotional money laundering

17  under subsection 1956(a)(2)(A), here the jury was tasked with

18  determining whether there was an intent to promote the carrying

19  on of the specified unlawful activity, and they so found

20  because at trial it was also established that Ad Tech BV made    13:49:14

21  these transfers from the Netherlands bank account to Cereus

22  Properties in Arizona, and that those transfers totalled

23  approximately $11.3 million.

24        And Ad Tech BV received revenue from Backpage

25  following the April 2015 sale of Backpage to Ferrer.        13:49:43

1    So the transfers that show Ad Tech BV sending funds to

2  Cereus Property funds that were almost immediately then

3  distributed to you and others supports the jury's

4  determination.

5    Now, I do find, Mr. Brunst, that as to deterrence, I          13:50:16

6  think, as to you, Mr. Brunst, your statement I found to be

7  sincere.  And I do believe facing this day you have some

8  remorse.  But I have to consider the totality of these

9  circumstances that led to the jury's determination.  And I want

10 to say that the evidence and the jury's determination is wholly   13:50:58

11 contradictory to your Sentencing Memorandum or your counsel's

12 statement yesterday.  I know they are advocating in your best

13 interest.  All of the evidence shows that you knew and

14 participated in helping Backpage.com continue its operation.

15    You were aware of the allegations that minors were           13:51:28

16 being advertised for sex on that page.  You were aware of

17 Mr. Larkin and Lacey's appearances before the NGOs, NCMEC, the

18 Auburn Theological Seminary, the U.S. Congress, and you knew

19 about the Amber Lyon expose', yet you and the others did

20 nothing to stop it.  You did everything to protect it.  You       13:52:10

21 found creative ways to enable it to survive and continue its

22 operation because it was what was lining your pockets and those

23 of your codefendants.

24    The jury could not have found that you were shielded

25 from all of this activity, and I don't find that.  It's          13:52:42

1   implausible the number of times that you were on those e-mails,

2   the number of times you approved and developed financing, you

3   were deeply involved.

4          I have considered the entirety of the record, I have

5   considered counsel's statements, Mr. Brunst's statement, I have          13:53:16

6   also considered the multiple victim impact statements and the

7   oral statements made here yesterday, is there any legal cause

8   as to why sentence should not now be imposed?

9          MR. LINCENBERG:  No, Your Honor.

10         MR. RAPP:  Not that the United States knows of.          13:53:38

11         THE COURT:  Pursuant to the Sentencing Reform Act of

12   1984, it is the judgement of the Court that John Brunst is

13   hereby committed to the Bureau of Prisons for a term of

14   120 months.  This consists of 60 months on Count 1, the

15   conspiracy to commit Travel Act offenses; 60 months on Count          13:53:56

16   52, the conspiracy to commit money laundering offenses;

17   60 months each on Count 53 through 62, concealment money

18   laundering; 60 months each on Counts 24 through 68,

19   international promotional money laundering, and the sentences

20   for Counts 52, 53 through 62, and 64 through 68 are to run          13:54:26

21   concurrently, but they shall run consecutively to Count 1.

22         You shall pay a special assessment fee of $1,700.  You

23   shall pay a fine of $50,000, which in total you will pay a

24   total fine of $51,700 in criminal monetary penalties, and your

25   payment of criminal monetary penalties is due during          13:55:04

1    imprisonment at a rate of not less than $25 per quarter, and

2    payment shall be made through the Bureau of Prisons' Inmate

3    Financial Responsibility Program, and the Court does waive the

4    imposition of interest and penalties on any unpaid balance.

5            On release from custody, you shall be placed on                   13:55:22

6    supervised release for 36 months, and that term consists of

7    36 months on Counts 1, 52 through 62, 64 through 68, and all

8    such terms shall run concurrently.

9            While on supervised release, you shall comply with the

10   mandatory and standard conditions of supervision adopted by        13:55:48

11   this court in General Order 17-18.

12           And of particular importance, you shall not commit

13   another federal, state or local crime during the term of

14   supervision.  The mandatory drug testing provision is

15   suspended.                                                          13:56:06

16           Within 72 hours of being released from custody, you

17   shall report in person to the probation office in the district

18   in which you are released, and you shall comply with the

19   following conditions.

20           Mr. Lincenberg, have you reviewed the mandatory and        13:56:21

21   standard conditions of supervision with your client?

22           MR. LINCENBERG:  Yes, we have, Your Honor.  There was

23   the one change that the Court indicated with regard to work.

24           THE COURT:  Do you waive reading?

25           MR. LINCENBERG:  Yes.                                       13:56:37

UNITED STATES DISTRICT COURT

1          THE COURT:  Mr. Brunst, do you agree to waive reading?

2          MR. BRUNST:  Yes.

3          THE COURT:  You must follow the -- in addition to the

4    mandatory and standard conditions of supervision, you must

5    comply with the following special conditions:  You must          13:56:50

6    cooperate in the collection of DNA as directed by the probation

7    officer.

8          You must submit your computer as defined in 18 U.S.C.

9    1030(e)(1) or other electronic communications or data storage

10   devices or media to a search, you must warn any other people     13:57:07

11   who use these computers or devices that are capable of

12   accessing the Internet that the device may be subject to search

13   under this condition.

14         Failure to submit to a search may be grounds for

15   revoking your release, and a probation officer may conduct a     13:57:24

16   search pursuant to this condition only when reasonable

17   suspicion exists that there is a violation of a condition of

18   supervision and that the computer or device contains evidence

19   of this violation.

20         You must consent to and cooperate with the seizure and     13:57:42

21   removal of any hardware and/or data storage media for further

22   analysis by law enforcement or the probation officer with

23   reasonable suspicion concerning a violation of a condition of

24   supervision or unlawful conduct.  Any search will be conducted

25   at a reasonable time and in a reasonable manner.                 13:58:02

1         You must submit your person, property, house,

2  residence, vehicle, papers or office to a search conducted by a

3  probation officer.  Your failure to submit to a search may be

4  grounds for revoking your release.

5         You must warn any other occupant that the premises may   13:58:19

6  be subject to search under this condition.

7         You must provide the probation officer with access to

8  any requested financial information, and authorize the release

9  of any financial information.

10         The probation office may share financial information   13:58:35

11  with the U.S. Attorney's Office.

12         You are prohibited from making major purchases over

13  $500, incurring new financial obligations, or entering into any

14  financial contracts without the prior approval of the probation

15  officer.   13:58:56

16         You must notify the Court of any material change in

17  your economic circumstances that might affect your ability to

18  pay restitution, fines or special assessment.

19         You must make restitution in accordance with Title 18

20  United States Code Sections 2248, 2259, 2264, 2327, 3663, 3663A   13:59:10

21  and 3664.  And as indicated previously, a restitution hearing

22  will be held to determine what amount is owed.

23         You must not communicate or otherwise interact with

24  any of the co-conspirators without first obtaining permission

25  of the U.S. Probation Office.   13:59:43

1      And the Court, as indicated for Mr. Spear with regard

2  to the standard conditions, will remove standard condition

3  number seven requiring your employment.

4      Now, Mr. Brunst, here too, because you were convicted

5  by a jury, you do keep all of your appeal rights both with          14:00:12

6  regard to the jury's convictions and now with regard to the

7  Court's imposition of sentence.  However, if you do intend to

8  appeal either of those two matters, you only have 14 days in

9  which to notify the Court of your intention to do so, and your

10 counsel can advise you with regard to that.                         14:00:31

11     As I have done with Mr. Spear, unless you seek

12 otherwise, I will make a recommendation that he be housed in a

13 facility here in Arizona.  I will also make the same

14 recommendation that he be housed in a facility that is not

15 deemed higher than medium security.                                 14:00:55

16     Were there any other particular requests?

17     MR. LINCENBERG:  Your Honor, can I have just a moment?

18 Your Honor, I believe I just conferred with Mr. Feder, I

19 believe the Court's recommendation was not deemed higher than

20 minimum; in other words, below medium.                              14:01:24

21     THE COURT:  I don't recall saying that.  I thought I

22 said no higher than medium.  Well, nevertheless, that's what my

23 intention is, and I see Mr. Berry nodding in agreement.

24     MR. BERRY:  My recollection of what you said is

25 nothing higher than medium security designation at BOP.             14:01:48

UNITED STATES DISTRICT COURT

1     MR. LINCENBERG:  Mr. Feder and I heard it differently.

2     The Court -- I guess I would ask the Court for a recommendation

3     of a prison camp here in Arizona.  Sounds like the Court would

4     decline that, but at least no higher than minimum, Your Honor.

5          THE COURT:  Well, I will maintain the same           14:02:07

6     recommendation as I did for Mr. Spear, not higher than medium.

7          MR. LINCENBERG:  Okay.  Second we would request the

8     same language that Mr. Feder requested about this not being

9     declared a sex offense.

10         THE COURT:  I would suggest, because you're making      14:02:26

11    that specific recommendation, that you-all gather together and

12    come up with whatever that language is that you wish me to

13    include in the judgement and commitment order.

14         MR. LINCENBERG:  Very well.

15         And then the verdict is -- we would request an order    14:02:40

16    that the Bureau of Prisons accept Mr. Brunst's medication, and

17    I can state for the record what his medication is.

18         THE COURT:  I am not going to make that recommendation

19    in my judgement and commitment order.  If you, similar to

20    Mr. Feder, can provide a letter from a physician as to required  14:03:01

21    medication, I suggest you get that to the Court right away, and

22    I can attach that to the judgement and commitment order.

23         MR. LINCENBERG:  Okay.

24         THE COURT:  Is there anything further?

25         MR. LINCENBERG:  No, Your Honor.  Thank you.           14:03:18

1          THE COURT:  You may be seated.

2          Mr. Lacey, will you come forward with your counsel.

3          Mr. Lacey, the jury returned a guilty verdict as to

4    Count 100, which alleges a violation of international

5    concealment money laundering, in violation of Title 18 United          14:04:22

6    States Code Sections 1956(a)(2)(b)(1).

7          It is now my responsibility to impose sentence upon

8    you as to that jury's verdict.  Have you reviewed the

9    Presentence Investigation Report which includes the sentencing

10   recommendations that are made in it?          14:04:47

11         MR. LACEY:  I have.

12         THE COURT:  Did you go through that report with your

13   counsel?

14         MR. LACEY:  I did.

15         THE COURT:  Did they answer all of your questions          14:04:55

16   about what is written and recommended in that report?

17         MR. LACEY:  Yes, Your Honor.

18         THE COURT:  Are you so far satisfied with the services

19   of your counsel?

20         MR. LACEY:  Enormously.          14:05:04

21         THE COURT:  Now, as I have done previously, I have

22   also considered the individual 3553(a) factors as to you,

23   Mr. Lacey.  I have considered the nature and circumstances of

24   the offense of which you are convicted.  I have also considered

25   your background and character.  I have considered whether or          14:05:32

1  not you're in need of a sentence for rehabilitation purposes,

2  whether you present as a danger to others, if there's a

3  sentence that's necessary for promotion and respect for the

4  law.

5       And with regard to your personal circumstances, I do    14:06:00

6  know that you're 76 years of age.  You do also have a number of

7  health-related issues that Mr. Cambria discussed yesterday, as

8  well as are written in paragraphs in the presentence report,

9  but you otherwise appear to be a healthy individual.

10      I read where you require swimming, bike riding to    14:06:28

11 manage your weight in order to address some of your health

12 issues.

13      Though, you have in the last five years indicated

14 using marijuana on occasion, and you do have a prior driving

15 under the influence incident, I don't find the necessity to    14:06:49

16 impose a sentence related to rehabilitation for any sort of

17 substance abuse issues.

18      With regard to your employment status, you at least

19 until this morning I had an idea that you were fully retired,

20 but it sounds as though you are still engaged in some form of    14:07:15

21 journalism, podcast, if that can be called journalism.  I don't

22 know what journalism is anymore.  And your presentence report

23 and indeed the multiple letters that I've reviewed that have

24 been written on your behalf outline the additional background

25 of your employment and the various roles that you played not    14:07:43

1   only with Village Voice, but also New Times here.  So in some

2   respects I guess I consider you semiretired.

3        I don't find that you present as a danger to others.

4   That's given your personal circumstance, in particular your age

5   and your health concerns.                                      14:08:11

6        As to the nature of conviction, and here, Mr. Lacey,

7   you have vigorous advocates on your side and they have ably

8   argued on your behalf, but this count of conviction,

9   international concealment, money laundering, prohibits the

10  transporting of funds internationally that are intended to     14:08:44

11  conceal the source of illegal proceeds.  And here, the jury was

12  instructed to go back and look at the source of funds, and you

13  have sat through the trial and you sat here in my pronouncement

14  of sentence to your colleagues, Mr. Brunst and Mr. Spear.  And

15  the jury found, and I agree with the determination, that the    14:09:19

16  funds derived from Backpage.com, which was launched back in

17  2004.

18        You owned Backpage, whether it was through Village

19  Voice or otherwise, you were a bona fide owner, along with

20  Mr. Larkin, Mr. Spear, Mr. Brunst, from its inception up        14:09:45

21  through the sale in 2015.  You were the Chief Editorial Officer

22  in Village Voice Media, which was Backpage's parent company,

23  and you knew that Backpage published ads for illegal

24  prostitution.  Indeed, you were shown Backpage ads from the

25  adult escort section that contained links to TER, and those     14:10:23

1    were presented to you, as indicated this morning by

2    government's counsel, in meetings with the National Center for

3    Missing and Exploited Children.

4        The testimony reflected that there was an exchange

5    between you and Mr. Spear where you asked whether there was          14:10:54

6    evidence of child trafficking on the site, and he essentially

7    replied, not in a direct way, but he essentially said, "We have

8    had subpoenas that deal with this exact issue.  We get tons of

9    subpoenas that we comply with on a daily basis," meaning, yes,

10   we have been accused of having minors posted for sex ads on        14:11:29

11   Backpage.  You had notice.

12       You wrote articles about Backpage, its business,

13   practices.  You wrote, quote, "The oldest profession in the

14   world with transparency."  That is what Backpage is providing.

15   And in that you also made a public statement that you believed     14:12:04

16   in legalized prostitution.  I want to, again, because it

17   relates specifically to you, that you, Mr. Spear and Brunst,

18   the three of you, you tried to stop the redistribution of that

19   Amber Lyon story on CNN.  And that story, again, specifically

20   spoke about a 12-year-old girl who was sold for sex on             14:12:35

21   Backpage.  You watched it and you discussed it as early as

22   2011.

23       And you had knowledge that the majority of Backpage's

24   revenue came from the sale of these sex-for-money ads.  Again,

25   the revenue just from 2014 through 2015 was around $160            14:13:06

1   million, and that sale to Mr. Ferrer after there were too many

2   inquiries, too many people accusing you of hosting this

3   platform, you finally sold it again for $600 million to

4   Mr. Ferrer.  That was apparently your collective idea of the

5   value of Backpage, $600 million.                                    14:13:42

6          With regard to the funds, I talked about the

7   structures of different accounts Mr. Brunst had a hand in, but

8   here on receiving your share of the loan payments that went to

9   Cereus Properties, you put your funds into five two-year

10  annuity trusts that you controlled.  We've heard and I listened   14:14:19

11  to the testimony of Mr. Becker reluctantly here, and you asked

12  Mr. Becker in 2016 about whether or not he knew an attorney who

13  had expertise in offshore.  And the letter stated, quote, "To

14  revisit for just a moment, I'm not interested in any tax

15  avoidance.  I just want to put some assets in place where        14:14:54

16  litigious parties, including government parties, cannot access

17  my accounts."  That supports the jury's verdict.

18         Sometime in around November of 2016 you met with

19  witness Lin Howard one time.  I recall this testimony --

20  testimony vividly, because I never had a witness so short on    14:15:23

21  the witness stand with such powerful testimony.  And in her

22  short testimony, she said she only met you the one time and

23  that meeting was extraordinarily uncomfortable for her because

24  you made it very clear that you wanted to move your assets

25  offshore to protect them from government seizure.                14:15:52

1  Now, the evidence showed that there were these five

2  wire transfers made on January the 29th of 2016, each in the

3  amount of $3.3 million from your five annuity trust accounts at

4  Arizona Bank & Trust to an IOLTA account held by your

5  attorney's firm.  And then on January 3rd of 2017, through your      14:16:23

6  counsel, you transferred -- not these counsel -- you

7  transferred $16.5 million from the IOLTA account to a Primus

8  trust account, Primus Trust Company in Hungary for the benefit

9  of you, and that forms the basis of Count 1.

10  The jury needed to find that this transfer was                      14:16:56

11  designed in whole or in part, in whole or in part to conceal.

12  And the other element of the statute is that it had to be

13  illegal proceeds.  I've already run through the illegality of

14  the proceeds.  All of those Travel Act violations that your

15  colleagues were convicted of were in violation of a number of      14:17:37

16  state prostitution laws, including Arizona.

17  And we've heard ample evidence about your attitudes

18  toward prostitution.  And to be fair, during the jury selection

19  process there were several individuals that shared your view.

20  But what about the minors?                                          14:18:16

21  I -- Mr. Cambria has been probably one of the most

22  eloquent oratory lawyers that have come before me.  And as I

23  mentioned, he has ably, more than ably, represented you, but I

24  have to take disagreement with him in his presentment to me

25  because, as argued in your Sentencing Memorandum, I don't agree     14:18:52

1    that you have been punished because you were only recently

2    convicted.  Maybe the stress of being indicted, I certainly

3    think that would wear on anybody, and the seizure of your

4    assets contributes to your belief that you've been punished.

5           I don't think Ms. Ortiz, Ms. Svengard and her mother,     14:19:28

6    I don't think Ms. Ambrose or Ms. Figueroa or the others think

7    that there has been a reckoning or a punishment, and I have to

8    take into consideration their views because of the link, the

9    money.

10          I've read all of the letters.  There were mounds of      14:20:08

11   letters.  I have read through the letters of the people who you

12   mentored, who you tutored.  There was one letter from a family

13   member, and I know it has taken its toll on them, it stated,

14   "I'd like to acknowledge just how truly devastating this whole

15   process has been for multiple families, not just our own, and  14:20:40

16   for some families this devastation has become irreversible."

17   And I do hope that she was referring to those individuals that

18   were posted on Backpage not of their own free will.

19          There's many people who wrote about your goodwill and

20   there are individuals who talked about how you came to their   14:21:12

21   aid when they needed someone.  You donated money, as

22   Mr. Cambria indicated, to multiple causes.  But I find somewhat

23   of an irony in some of those letters, unfortunately from your

24   own kin and friends, one of which states:  Mr. Lacey wrote

25   stories about injustice inflicted on people no one knew about  14:21:46

1    until he told us about them in the papers.  His story, I think,

2    made a difference.  Because of Mr. Lacey's work, it became

3    harder for those in power to afflict the powerless.  Harder for

4    those in power to afflict the powerless.

5         The powerless were those many, many individuals who          14:22:33

6    were posted on Backpage.com.

7         Mr. Lacey, to be sure, no one can take away your

8    legacy of journalism in the early days Village Voice, the New

9    Times, the fact that you hired, mentored, tutored multiple

10   writers, journalists.  And I will tell you, you are fortunate      14:23:05

11   to have continuous, as Mr. Brunst is, family support.  It is

12   true on a weekly basis I sentence individuals who are convicted

13   of homicides, of sex offenses, and they are often accompanied

14   by family.  It is what we expect, unconditional love, and it is

15   something that you should be very happy to have at this            14:23:41

16   juncture.

17        They attest to your character, but here during this

18   process, during this trial, I think the other part of Mr. Lacey

19   has to be considered because one of those who thought so highly

20   of you, who you also mentored and tutored, appeared in this        14:24:10

21   courthouse and they testified, again, uncomfortably.  They

22   didn't want to be here.  That gentleman.  And what stood out

23   with me is this unguarded moment of truth that he had when he

24   heard news that Mr. Ferrer had agreed to cooperate with the

25   government.  He sent an e-mail, and he acknowledged sending        14:24:49

UNITED STATES DISTRICT COURT

1    this e-mail in open court, and it says, "After finding out that

2    Backpage insider flips on Lacey and Larkin, bad news for this

3    duo who once ran a great newspaper chain that broke countless

4    stories.  They traded that legacy in for a chase for gold

5    derived from prostitution."                                    14:25:23

6          It's concerning to me when I heard the testimony that

7    around 2016, after the sale had gone through, this same

8    individual and others, multiple others, I don't know how many,

9    then suddenly began receiving checks from you, $5,000.  And

10   simply put, these individuals had been so far removed from     14:25:57

11   working for New Times for years and suddenly they were

12   receiving thank you checks for a job well done.

13         The Court finds it difficult, Mr. Lacey, to impose a

14   sentence for deterrence.  And while it is true that a person is

15   entitled to maintain their innocence, I think that you have     14:26:21

16   shown an inability to at least acknowledge what this is all

17   about.  And had there perhaps been an instance of

18   acknowledgment of what Backpage was contributing to, perhaps we

19   wouldn't be here.

20         And what I mean by that, is that you too were on          14:27:00

21   notice.  There was a draft letter that was introduced where you

22   write to the mayor of Seattle, Mayor McGinn, who became aware,

23   and you write:  That he became aware of Backpage.com because of

24   this Twitter campaign this celebrity had developed.

25         And you write here:  The mayor has since made the odd     14:27:43

1　claim that Backpage is, quote, accelerant for underage

2　prostitution.  He has pulled the City's advertising from

3　Seattle Weekly, and he has said he will hold these funds

4　hostage unless Backpage, quote, steps up to the plate, unquote,

5　and works harder to prevent people from posting ads that might

6　involve underage prostitution.

7　　　　　You were put on notice.  You were put on notice as

8　early as 2010 when multiple state Attorney Generals wrote to

9　you, multiple state Attorney Generals.  And in that letter they

10　say, "We recognize that Backpage may lose the considerable

11　revenue generated by the adult services ads.  Still, no amount

12　of money can justify the scourge of illegal prostitution and

13　the misery of the women and children who will continue to be

14　victimized in the marketplace provided by Backpage.  We

15　sincerely hope Backpage, like Craigslist, will finally hear the

16　voices of the victims, women and children, who plead with it to

17　make this important change."

18　　　　　The point here, Mr. Lacey, is you did nothing in the

19　face of all of this.  You held fast.  You didn't do a thing.

20　There was not a week that you called a meeting of everyone and

21　said, "Hey, let's shut down for a week.  Figure out what's

22　going on here."  You didn't do it.

23　　　　　And so I don't think there's a sentence that can be

24　imposed to deter you with regard to your bona fide held belief

25　that what you were doing was not illegal, but the jury's

14:28:07

14:28:39

14:29:03

14:29:40

14:30:17

223

1    conclusion is otherwise.

2         And I have considered, then, all of these sentencing

3    factors.  Again, I considered the statements that were made

4    here yesterday.  Interestingly, I think Ms. Svengard has been

5    trying to find a way to address these illegalities just as long        14:30:57

6    as you've been in it.  I have considered all of the factors in

7    18 U.S.C. 3553(a), is there any legal cause as to why sentence

8    shall not be imposed?

9         MR. RAPP:  Not that the United States knows.

10        MR. CAMBRIA:  No, Your Honor.        14:31:25

11        THE COURT:  Pursuant to the Sentencing Reform Act of

12   1984, it is the judgement of the Court that Michael Lacey is

13   hereby committed to the Bureau of Prisons for a term of

14   60 months.  You shall pay a special assessment fee of $100

15   which is due immediately.  And the Court finds that you -- the        14:31:40

16   Court orders you pay a fine of $3 million.

17        Your payment of criminal monetary penalties is due

18   during imprisonment at a rate of not less than $25 per quarter,

19   and the Court does waive the imposition of interest and

20   penalties on any unpaid balance.        14:32:08

21        Now, on release from custody, you shall be placed on

22   supervised release for 36 months.  And while on supervised

23   release, you shall comply with the mandatory and standard

24   conditions of supervision adopted by this court in General

25   Order 17-18.        14:32:25

1          And of particular importance, you shall not commit

2     another federal, state or local crime during the term of

3     supervision.

4          Within 72 hours of being released from custody of the

5     Bureau of Prisons, you shall report in person to the U.S.          14:32:39

6     Probation Office in the district in which you will be released.

7          Mr. Cambria, have you reviewed the mandatory and

8     standard conditions of supervision with your client?

9          MR. CAMBRIA:  Yes.  Ms. Paris did, Your Honor.

10          THE COURT:  Do you waive reading?          14:32:57

11          MR. CAMBRIA:  I do.

12          THE COURT:  In addition to the mandatory and standard

13     conditions of supervision, with the exception of standard

14     condition number seven, you shall comply with the following

15     special condition:  You must cooperate in the collection of DNA          14:33:11

16     as directed by your probation officer.

17          You must submit your person, property, house,

18     residence, vehicle, papers or office to a search conducted by a

19     probation officer.  Your failure to submit to a search may be

20     grounds for revoking your release, and you must warn any other          14:33:28

21     occupant that the premises may be subject to search under this

22     condition.

23          You must submit your computer as defined in 18 U.S.C.

24     1030(e)(1), or other electronic communication or data storage

25     device or media to a search.          14:33:44

UNITED STATES DISTRICT COURT

1    You must warn any other people who use these computers

2  or devices capable of accessing the Internet that the device

3  may be subject to search under this condition.  Your failure to

4  submit to a search may be grounds for revoking your release.

5    A probation officer may conduct a search pursuant to          14:34:04

6  this condition only when reasonable suspicion exists and that

7  there is a violation of a condition of supervision, and that

8  the computer or device contains evidence of this violation.

9    You must consent to and cooperate with the seizure and

10 removal of any hardware and/or data storage media for further     14:34:25

11 analysis by law enforcement or the probation officer with

12 reasonable suspicion concerning a violation of a condition of

13 supervision or unlawful conduct.  Any search will be conducted

14 in a reasonable time and in a reasonable manner.

15   You must provide the probation officer with access to       14:34:51

16 any requested financial information and authorize the release

17 of any financial information.  The probation officer may share

18 financial information with the U.S. Attorney's Office.

19   You are prohibited from making major purchases,

20 incurring new financial obligations, or entering into any        14:35:09

21 financial contracts over $1,000 without the prior approval of

22 the probation officer.

23   You must notify the Court of any material change in

24 your economic circumstances that might affect your ability to

25 pay restitution, fines or special assessment.                    14:35:30

UNITED STATES DISTRICT COURT

```
 1              You must not communicate or otherwise interact with

 2    any of the indicted codefendants and co-conspirators without

 3    first obtaining the permission of the probation office.

 4              I have withheld imposing the special condition that

 5    Mr. Lacey make restitution.  I want to research that issue        14:35:49

 6    further, and I will do that and make a final determination at

 7    the, well, before any restitution hearing takes place.

 8              PROBATION OFFICER:  Your Honor, I apologize for

 9    interrupting.  Rochelle Collins with probation.  Because the

10    sentence imposed is outside the guideline range, I just want to   14:36:09

11    make sure I correctly document the factors used to support that

12    sentence in the SOR, could you please restate them for the

13    record?

14              THE COURT:  Want me to reiterate those?  It's with

15    regard to his lack of deterrence.                                 14:36:46

16              Well, I think the observation that there is no

17    deterrence, and because of the gravity of harm related to the

18    proceeds, how the proceeds were derived from Backpage, the

19    nature and circumstances of the origination of the fees; in

20    particular, the knowledge Mr. Lacey had, the repeated and years   14:37:17

21    long knowledge he had as to the allegations that minors were

22    being offered on those advertisements, are egregious so as to

23    warrant an upward variance.

24              All right.  Well, Mr. Lacey, because you were

25    convicted by a jury, you do retain all of your rights of appeal   14:37:49
```

1    both with regard to the jury's conviction and now with regard

2    to my imposition of sentence.  If you do intend to appeal

3    either of those two matters, you only have 14 days in which to

4    notify the Court of your intention to do so, and Mr. Cambria

5    can advise you further as to that.                          14:38:10

6          With regard to the recommendations to the Bureau of

7    Prisons, is it going to be the same as for Mr. Brunst and

8    Mr. Spear.

9          MR. CAMBRIA:  Yes, Your Honor, it was, but they

10   recommend Terminal Island, Lompoc or Safford.              14:38:33

11         THE COURT:  Well, I am not going to, as I did not do

12   for Mr. Spear or Brunst, I am not going to make a

13   recommendation to a specific facility.  I will only make a

14   recommendation that he be housed in something below a medium

15   security facility.                                         14:38:59

16         MR. CAMBRIA:  Fine, Your Honor.  One other thing,

17   though, with regard -- do you want to take it?  She knows more

18   than I do about that in Arizona.

19         MS. PARIS:  We would ask for the same designation.  We

20   would like to confer, as you mentioned earlier, counsel to come   14:39:11

21   up with that sentence about him not being designated a sex

22   offense here.

23         THE COURT:  If that is your request, if you come up

24   with some agreed upon language and provide it to me by the end

25   of today, I will insert it into the judgement and commitment   14:39:26

1    order.

2              MS. PARIS:  Thank you, Your Honor.  The next issue,

3    and this is very minor, you did mention at one point in time

4    that this is Count 1, and it's Count 100.  I wanted to clarify

5    it for the record.                                           14:39:41

6              Finally, it's our understanding that the financial

7    settlement in the civil forfeiture action in the Central

8    District of California, the government agreed not to seek fines

9    either here or in the retrial of Mr. Lacey, and in probation

10   assessment they indicated that he did not have the funds for   14:39:57

11   fines.  So we just wanted to have an understanding if that had

12   been changed in the PSR or --

13             THE COURT:  It's my consideration, and I guess I

14   should have made it very clear on the record, that there is a

15   hierarchy of how funds get distributed generally starting with 14:40:17

16   restitution if it's found that an individual is owing

17   restitution, special assessment, then fines.  This particular

18   case against Mr. Lacey, as I did in terms of identifying a lack

19   of deterrence, and I should add promoting respect for the law,

20   Mr. Lacey has evidenced that his actions are also driven by     14:40:57

21   what is in his wallet, and so the imposition of the fine is

22   structured, in my view, as a punitive measure.

23             There have been years worth of investigations into

24   where all of this hundreds of millions of dollars annually have

25   gone, and I want to ensure that he does not have the benefit of 14:41:32

229

1    the illegally-gotten gains.  That is the reason for my

2    imposition of that fine.  Whatever agreement he has with the

3    government will continue to stand.  This is, and you can make a

4    motion later on, to show he doesn't have the resources, and I

5    can always revisit it.  So that is -- that was my intent.  It        14:42:03

6    was not an error, and those are the reasons for it.

7            MS. PARIS:  Is Your Honor amenable to hearing a

8    request from us to have that fund or have that fine be paid out

9    of the funds that have been forfeited?

10           THE COURT:  I am not.  You can ask the government, but     14:42:25

11   it's my imposition of fines.

12           MS. PARIS:  Thank you, Your Honor.

13           MR. RAPP:  Judge, can I interject for a moment?  Can I

14   have just a minute with the probation officer?  Can we hit

15   pause for a minute, 'cause I think she's asking you something     14:42:43

16   that, I think you're talking by each other, and I would just

17   like to talk to her for a second.

18           THE COURT:  Well, let's take a 15-minute recess.  I

19   will permit you to do so.

20           (Recess was taken at 2:43 p.m.)                          14:44:32

21     (Proceedings reconvened at 3:00 p.m.)

22           THE COURT:  Please be seated.  We are back on the

23   record.  The record will reflect the presence of counsel, the

24   defendants.  Let me just make a couple of clarifying remarks.

25   I did not impose the government's requested sentence as to        15:00:36

1   Mr. Spear, Brunst, and the reason for that is, as the
2   government knows, there would be the potential for unwarranted
3   disparity in terms of the multiple money laundering
4   convictions.  Though I did not consult with the sentencing
5   information that was provided, I do find it useful in making          15:01:18
6   those determinations and necessarily my determination that they
7   are not a danger; that there is no rehabilitation necessary.
8   And considering the statutory term of the conspiracy to commit
9   Travel Act, and the maximum statutory term for the individual
10  Travel Act offenses, I did find a downward variance is               15:01:48
11  necessary.
12          Likewise with Mr. Lacey, I misspoke.  I imposed a
13  substantial downward variance.  And in my mind, that was
14  warranted because he is not convicted of a Travel Act offense
15  or a conspiracy to commit Travel Act.  And so that is the            15:02:08
16  reason for my imposition of sentence that was significantly a
17  downward variance as to each defendant, in particular
18  Mr. Lacey, because he's not convicted of those Counts 1 through
19  18.
20          I see Mr. Lacey's counsel standing present, is there         15:02:32
21  something with regard to sentencing you wish to be heard on?
22          MR. CAMBRIA:  Yes, Your Honor.  I just wanted to
23  correct, well, to supplement something that I said.  When I
24  asked you to make recommendations as to facilities, I wanted to
25  put on the record the reason for that.  I have recommended -- I      15:02:56

UNITED STATES DISTRICT COURT

1  asked you to recommend Terminal Island and Lompock as they are

2  both in California, and that's where my client's sons reside,

3  so that was the reason for that, Your Honor.

4      THE COURT:  I will make that recommendation in my

5  judgment and commitment that he be housed in a facility in          15:03:14

6  California.

7      MR. CAMBRIA:  Thank you so much.

8      THE COURT:  All right.

9      There were -- Mr. Berry has already spoken on behalf

10  of the government.  Again, the matter has been already fully        15:03:28

11  briefed with regard to detention or release pending appeal, and

12  so who wishes to be heard in terms of a reply?  Again, I don't

13  want a reiteration of the memorandum.  I don't want a

14  reiteration of any oral statement that was made to me

15  yesterday.  You may simply reply to Mr. Berry's argument.          15:03:58

16      MR. CAMBRIA:  Thank you, Your Honor.  First off, I

17  cite the Court to U.S. v -- trying to read the handwriting --

18  P-L-A-N-Y, and it's criminal 2012-1606, in that case Mr. Rapp

19  was the prosecutor, from what I understand, and there was a

20  failure to grant bail at the district level, but the Ninth         15:04:36

21  Circuit granted release pending appeal after it was an initial

22  denial, and then he was released per Judge Bolton.

23      With regard to release, our position is that as far as

24  bail pending appeal, I think we have checked all the boxes, if

25  you will.  First of all, with regard to Mr. Lacey, there is        15:05:06

1  certainly no risk of flight or danger to the community.  And

2  probation, from my recollection, even indicated that

3  self-surrender was an option for him.  He's been out for over

4  six years, has made every appearance.  The Court has even

5  decreased his conditions of release ordering removal of the        15:05:31

6  bracelet.  He's been out post conviction for nine months.  He's

7  been authorized to travel outside the state many times, most

8  recently for several weeks.  And none of this would be

9  appropriate, of course, if he was a risk of, a flight risk.

10        There isn't any evidence here of any kind of               15:05:55

11  self-harm, suicide or anything like that with regard to him.

12  As far as we feel, the sentence that's been imposed is not

13  something that would cause him to flee the jurisdiction, if you

14  will, not at all.

15        The other things that are important to bail pending        15:06:19

16  appeal, if you will, are are there substantial issues for the

17  Ninth Circuit to resolve, would it make a difference?  Well,

18  the answer to that is clear.  I mean, the Court has pointed

19  some out in connection with the comments the Court has made

20  over the various proceedings that we've had.  The government     15:06:38

21  has even conceded that there were substantial issues.

22        Our bail motion focused on a number of these.  As

23  particularly as to my client in Count 100, there is no known

24  case that we could discover where there was an FBAR, for

25  example, filed which revealed as opposed to concealed offshore    15:07:03

UNITED STATES DISTRICT COURT

233

```
1    investments that there was a finding of a violation of this
2    statute.  Certainly there are a number of issues that were
3    raised during the course of the case involving the First
4    Amendment, invasion of the privilege, scope of the conspiracy.
5         So I think that when we look at the Ninth Circuit        15:07:28
6    cases with regard to bail pending appeal, we look for
7    substantial issues, and then we look for those issues so that
8    somebody couldn't say this is just some ruse to delay.  It's
9    not that at all.  We do have substantial issues.  If they are
10   decided in our favor, it would make a huge difference in what   15:07:54
11   the outcome of the case would be.
12        So I think that we checked all the boxes, if you will,
13   Your Honor, as far as Ninth Circuit granting bail pending
14   appeal.  For the prosecution to say there shouldn't be any bail
15   sort of cuts out the second stage of any criminal case, which   15:08:14
16   is an appeal, and says, well, let's just -- we're ahead so far
17   at the District Court level, so let's stop here, and it doesn't
18   really work that way.
19        There's a second leg that's not discretionary but
20   mandatory for somebody to have it all reviewed, and it seems to  15:08:36
21   me that since there is substantial issues, there is no evidence
22   here of any kind of fleeing by any of the defendants, that that
23   second leg should be meaningful.  And certainly if we think
24   about it over the years how many Ninth Circuit cases have
25   changed what happens at the District Court level, if it only    15:09:00
```

1    stopped with the District Court, a lot of people would have
2    gone to jail that shouldn't have.

3          So it seems to me that we have, again, checked all of
4    those boxes and we're entitled to bail pending appeal.  And
5    frankly, in all the cases that I've handled, when you can show          15:09:17
6    that there was a real issue and that there was no other indicia
7    of flight, stays of execution were granted.  And so most
8    respectfully, we ask that they be granted here.

9          MR. LINCENBERG:  Your Honor, I am not going to repeat
10   the issues we laid out in the papers between other counsel and          15:09:53
11   us.  I think the Court is well aware of them.  The Court has
12   openly recognized that there's tough calls the Court had to
13   make throughout the trial, and the Court did the Court's best
14   to do so.

15          The only thing I would add in light more of Mr. Rapp's          15:10:09
16   argument than Mr. Berry's, because there seems to be no dispute
17   that there is no danger.  There seems to be no dispute that
18   there's substantial issues.  And so if the Court is considering
19   the flight risk, the argument seems to simply be there's a
20   lengthy sentence and we're at this stage, and so people might          15:10:30
21   have an incentive to flee and so forth.

22          Probation analyzed these issues.  And although they
23   gave a report that was fairly harsh for my client, they
24   nevertheless found that he's not a flight risk.  He is not a
25   flight risk.  The 25 or so people who are here, his community,          15:10:52

235

```
1   his family, are the very reason why he's fighting this.  We
2   certainly recognized during trial when I lost some of my
3   arguments and Mr. Cambria lost some of the First Amendment
4   arguments we made, that there was a good chance this was going
5   to go to appeal.  We knew that would be an important part of        15:11:13
6   the process for us.
7             I would highlight two things for the Court that came
8   up today.  One was, you know, I had made the argument that
9   there was only one witness.  There was also an argument I made
10  at my closing.  It had some success and it didn't have success      15:11:31
11  perhaps with regard to the various verdicts against Mr. Brunst.
12  But it is relevant to the importance of these issues because,
13  for example, one of the issues we raised was when we had sought
14  to introduce certain impeachment evidence that the Court ruled
15  against us on, that with regard to Mr. Ferrer, were the Court        15:11:53
16  of Appeals to differ with Your Honor's view on that, that's the
17  one witness who, the only witness, who really testified about
18  Mr. Brunst.  Didn't try to give some contest even to the
19  various e-mails that were consistent with the prosecution's
20  theory.                                                             15:12:13
21             And so you know, it threads its way through a number
22  of those issues in addition to the invasion of the privilege
23  issue and the like where it's critically important and clear
24  that if we're able to prevail on those issues, that it's not
25  going to be harmless error.  These are -- these are large           15:12:34
```

236

1    monumental issues.

2         The second thing I would bring to the Court's

3    attention in looking back at the six years of litigation is

4    that the Court noted that there were a number of different

5    judges who handled this, and in our view there were differences    15:12:48

6    in the gist of the rulings between some judges.  One of them

7    was before Your Honor came to the case where we feel that when

8    Judge Logan ruled that the government could not invade the

9    privilege, that Mr. Ferrer could not waive certain aspects of

10   the privilege, and that at the same time the government was    15:13:10

11   invading that privilege in its interviews with Mr. Ferrer, we

12   feel Judge Logan and Judge Brnovich's rulings were very

13   different in their outcome.

14        And I raise that not just because I am here to argue,

15   again, that, you know, one is right and one is wrong, but it    15:13:26

16   just shows how tough these issues and certainly how fairly

17   debatable they are.

18        I believe that with regard to the sex trafficking

19   evidence, you know, we had a mistrial on the first trial.  It's

20   certainly the defenses' view that the evidence that was allowed    15:13:48

21   in in the trial before Your Honor was akin to the evidence that

22   resulted in the mistrial --

23        THE COURT:  I don't view it as that.

24        MR. LINCENBERG:  I know.  I know.  It's -- we have a

25   difference of view, but I think it's certainly -- it was a    15:14:08

237

```
 1   significant enough issue that resulted in a mistrial, and it's
 2   certainly something that we want to present to the Court of
 3   Appeals.
 4           There were seem to be differences in, you know,
 5   whether this was tried as a conspiracy for just the 50 ads or    15:14:24
 6   whether it was broader, and what was permissible and not, all
 7   calls that the Court -- the Court, you know, acted as referee,
 8   made the calls --
 9           THE COURT:  And I think, Mr. Lincenberg, I have a 4:00
10   o'clock hearing.  This has been fully briefed.  I asked you to   15:14:40
11   reply to Mr. Berry.
12           MR. LINCENBERG:  Okay.
13           THE COURT:  So I don't want to have new argument that
14   you should have put into your pleading.
15           MR. LINCENBERG:  Well --                                 15:14:54
16           THE COURT:  Move forward.
17           MR. LINCENBERG:  Only relating it to some of the
18   arguments that came up at the sentencing and the arguments from
19   counsel.
20           But I guess what I would really focus on, Your Honor,    15:15:02
21   is that the strength of these issues, the amount of the number
22   of fairly debatable important issues, also negates the idea of
23   any flight risk because certainly all three of the defense
24   counsel in this case have had extensive discussions with our
25   client where we feel that we have very strong issues on appeal.  15:15:23
```

UNITED STATES DISTRICT COURT

238

1    We had a financial settlement in this case for the, you know,

2    one of the big reasons why it was so that there would be money

3    freed up so that we could fight this on appeal.  That is

4    Mr. Brunst's, his intention.  And given that he's satisfied

5    every condition, he is not a flight risk.  He would never do          15:15:47

6    that to his family, and his entire intention is to fight this

7    on appeal.  We think that there's no flight risk here.

8             The last thing I would say, Your Honor, is that

9    Mr. Berry mentioned other things that the Court could do to

10   address some of their concerns, such as an ankle bracelet.  And       15:16:10

11   to the extent that the government is of the view that the

12   current condition are insufficient, and we believe they are

13   sufficient, but that's obviously an option for the Court that

14   is imposed in cases to deal with the issue of any flight risk.

15            So given that there is no danger, there is no flight         15:16:31

16   risk, there are substantial issues, we would -- we would really

17   respectfully urge Your Honor to allow our client to be free to

18   assist us with dealing with the next stage of this case.

19            THE COURT:  Thank you.

20            MR. LINCENBERG:  Thank you.                                  15:16:50

21            MR. FEDER:  Mr. Spear joins in the arguments already

22   made.  I have to say Mr. Berry's discussion about suicide is

23   one of the most bizarre I have heard in 40-plus years of being

24   a lawyer.  As the Court knows from the doctor's letter, that

25   was given to the Court under seal, and Mr. Berry too.  The only       15:17:14

1    concern about suicide with Mr. Spear is if he doesn't get his

2    medication.  And the only reason he's not going to get his

3    medication is if he is incarcerated pending appeal.

4        We submitted -- in Ms. Purdue's report she talked

5    about some various things.  Mr. Berry brings up new studies          15:17:38

6    that for some reason they didn't put in their sentencing

7    response our Sentencing Memorandum, but the Inspector General

8    of the Department of Justice has talked about suicide being the

9    number one reason for death in prison.  They've also, and this

10   is in 2024, they had hearings where a senator was castigating       15:18:00

11   the Department of Justice and the Bureau of Prisons for the

12   lack of improvement over at least 12 years of the Bureau of

13   Prisons because it's underfunded, overcrowded.  I will read it

14   to you, Judge, it's from the -- it's from the declaration of

15   Ms. Purdue:  I.G. Horowitz, Inspector General of the Department    15:18:29

16   of Justice, opening statement February 28, 20 --

17       MR. BERRY:  Your Honor, I am going to object to this.

18   He is literally reading from a document that's before Your

19   Honor that Your Honor has just asked that we not do.  He is

20   rehashing the arguments that are already briefed.                   15:18:49

21       MR. FEDER:  Mr. Berry argued to the contrary with

22   reports in cases that we haven't even been provided, Judge, but

23   here it is in Ms. Purdue's --

24       THE COURT:  I don't want you to read to me an entire

25   document.  Can you summarize it, Mr. Feder?                         15:19:05

240

1          MR. FEDER:  Deficiencies are understaffing, staffing

2     issues in health services departments directly impacts the

3     medical care and treatment of inmates, inappropriate mental

4     health designations, et cetera.

5          The only reason of a concern for suicide for Mr. Spear     15:19:26

6     is if he's incarcerated.  That's number one.

7          Number two, Judge, you mentioned something during

8     sentencing, and I just want to clarify it, she recommended

9     self-surrender in her latest PSR and the other PSR that was

10    filed earlier in August.  The idea that we didn't give her     15:19:58

11    financial information, I just want to make sure it's

12    understood.  We didn't give it -- I mean, it was the lawyers'

13    decision, not Mr. Spear's, because of the information that we

14    had filed under seal with this Court in order for me to become

15    Knapp Counsel and Mr. Kessler to become appointed.  That was     15:20:17

16    the stuff that we didn't want to give or given it was under

17    seal.  We did ultimately give her that information and she

18    changed her recommendation from the original PSR that he was a

19    flight risk only because of not giving her financial

20    information to one where she said she was satisfied and that he     15:20:37

21    is not a flight risk.

22          As the Court knows, Mr. Spear has spent the

23    substantial majority of his life in Arizona.  He has every

24    intention of appealing this to the highest level that he can.

25    He's retained appellate counsel.  And I don't know, is the     15:20:51

UNITED STATES DISTRICT COURT

1    Court considering flight risk or is the Court considering that

2    there are not substantial issues?  Maybe I can address myself

3    specifically and quickly to those issues.

4         THE COURT:  Substantial issues.

5         MR. FEDER:  Well, obviously number one, Judge, is the      15:21:09

6    First Amendment.  And as the Court knows, even though you

7    weren't the judge at that time, there was a Motion to Dismiss

8    based on the indictment violating the First Amendment.  Many of

9    the First Amendment organizations in the country filed an

10   amicus brief at that time, the ACLU, Reason, et cetera.  So     15:21:28

11   it's not an insubstantial issue when some of the biggest First

12   Amendment organizations in this country have lent at least

13   their authority to the fact that there has been a violation of

14   the First Amendment.

15        Obviously if there has been, the indictment is            15:21:46

16   dismissed, the case is reversed and everything goes away.

17   That's in the moving papers of myself and, I think,

18   Mr. Cambria.

19        So I mean, there's a number of other issues in there,

20   the list could go on and on and on.  As the Court knows, this   15:22:02

21   has been, as you commented, a lengthy proceeding.  There have

22   been many, many substantial issues that have been argued that

23   all of which, if reversed, would result in either a new trial

24   or dismissal of the charges, so I would ask the Court to

25   release these gentlemen on appeal.  Failing at that, at the     15:22:21

UNITED STATES DISTRICT COURT

1  very least, to allow them to self-surrender.

2          One other issue, Judge, if for some reason the Court

3  denies those requests, I would ask the Court to allow us to

4  give the marshals Mr. Spear's substantial medications.  I have

5  talked to one of the marshals at the break and they indicated          15:22:48

6  if the Court ordered them to take it they would, as opposed to

7  putting him in a position where he's without medication.  Thank

8  you.

9          THE COURT:  Thank you.  Thank you, counsel, for

10  briefing the issue that I asked you to brief.  It has been a          15:23:04

11  question in my mind that I knew I would have to address on this

12  day.  The factors that the statute requires a court to consider

13  under 3143(B) are whether each defendant has demonstrated by

14  clear and convincing evidence that he is not likely to flee or

15  pose a danger to the safety of others.  I have already found in          15:23:32

16  my sentencing pronouncement that I find none of the defendants

17  pose a danger to self or others.  I didn't necessarily make a

18  finding as to self, but it is nevertheless my finding that they

19  do not pose a danger.

20          The second factor is whether the appeal is not for          15:23:54

21  purposes of delay.  I don't find that any appeal in this matter

22  would be for purposes of delay.

23          The two remaining factors are what caused the Court to

24  have to carefully consider the arguments of release pending

25  appeal.  The third is whether the appeal raises a substantial          15:24:19

```
 1   question of law or fact, and the other is if that substantial
 2   question is determined favorably to the defendant on appeal
 3   that the decision is likely to result in reversal or an order
 4   for a new trial on all counts.
 5        The substantial question has been also parsed out by a      15:24:46
 6   number of various cases in not just the Ninth, but others.  The
 7   Ninth Circuit has held that a substantial question is one that
 8   may be fairly debatable or fairly doubtful.  And the other
 9   guidance is for the court to determine whether there's a
10   likelihood of reversal or new trial, and that goes to the type   15:25:22
11   of question that's raised.
12        The Court must also find whether the question
13   presented to be, quote, so integral to the merits of the
14   conviction on which the defendant is to be imprisoned that a
15   contrary appellate holding is likely to require reversal of the  15:25:49
16   conviction or new trial.
17        I have focused in on with respect to Mr. Spear and
18   Mr. Brunst that they have been convicted of a conspiracy to
19   commit Travel Act violation.  The Court is also mindful that
20   these were jury verdicts.  The Court is mindful that the         15:26:20
21   circuit has an applicable review process in which a jury
22   conviction is viewed with deference.  And having presided over
23   this trial, at a bare minimum, I don't think there is a fairly
24   debatable question as to those verdicts.
25        I also find that there is ample factual development of      15:26:55
```

1   the record to show as to the money laundering counts and the

2   concealment money laundering counts, that the proceeds are

3   traceable to the illegal conspiracy conduct.  And in that way,

4   because of the multiple convictions, and in my view I don't

5   think that, at least with regard to the conspiracy conviction,          15:27:32

6   the conspiracy to commit money laundering, which necessarily

7   ties into Backpage's operation as a predominantly sex-for-money

8   operation, that Count 52 also in my view is firm.

9          And at least with respect to Mr. Brunst and Spear, in

10  my view the statute at least creates attention, but the burden         15:28:26

11  is on the defendant, and I don't think you make the -- you

12  don't meet the burden.

13         As to Mr. Lacey, there too, Count 100 was a jury-

14  rendered verdict.  And as I mentioned in my sentencing, I don't

15  find Mr. Lacey a danger to others or to self.  I don't know            15:29:01

16  what he meant when he talked to probation about his intent to

17  travel after the close of this case.  That has a question mark

18  in my mind.  It raised a flag.  But here too, the statute

19  essentially reads, "making the transfer in whole or in part to

20  conceal."  And in my view, the record evidence, the exhibits,         15:29:34

21  the testimony, all support the jury conviction.

22         And again, I don't think there is a fairly debatable

23  question there.  And though I find that he does not appear as a

24  flight risk or a danger, well, I hesitate with regard to flight

25  risk, I don't find that he would be filing his appeal for             15:30:11

1   purposes of delay, but nevertheless, I am going to deny the

2   request as to each defendant for those reasons.

3           I will, however, order that each defendant turn

4   himself in to the U.S. Marshals Office in this building two

5   weeks from today.  I am going to order -- I am going to          15:30:38

6   order -- well, I guess, Mr. Cambria, with respect to Mr. Lacey,

7   I can order that he turn himself in to the U.S. Marshals Office

8   in, what would be the appropriate District Court with the U.S.

9   Marshals Office in his vicinity?

10          MS. PARIS:  Are you talking about in California?          15:31:03

11          THE COURT:  Yes.

12          MS. PARIS:  I am not sure, but we can get you an

13  answer to that one.

14          MR. CAMBRIA:  One comment, Your Honor.

15          THE COURT:  Well, I am not finished.                      15:31:14

16          In any event, I will order that they turn themselves

17  in to a U.S. Marshals Office if not in this building by noon

18  two weeks from today.

19          Then I will have you, Ms. Paris, inform me by close of

20  business today, the Bureau of Prisons, excuse me, the U.S.       15:31:41

21  Marshals Office that would be most accessible to Mr. Lacey, and

22  I will have him turn himself in there.

23          I will, however, order in the interim period that they

24  be held on ankle monitoring devices.

25          PROBATION OFFICER:  Your Honor, Rochelle Collins.        15:32:09

1    There is a pretrial officer in the courtroom if you have

2    questions.

3            THE COURT:  The Court will order that the location

4    monitoring devices be affixed to the defendants before they

5    leave the building.  And because I'm ordering that for the                    15:32:36

6    period that you are on the location monitoring device, each

7    defendant shall participate in abiding by all of the program

8    requirements.

9            You shall pay all or part of the cost of the

10   participation in the Location Monitoring Program as directed by            15:32:57

11   the Pretrial Services office.

12           You are restricted to your residence as directed by

13   the Pretrial Services officer.

14           The defendants will be restricted to their homes

15   except for attending court proceedings, medical appointments or           15:33:27

16   religious services.

17           You shall submit to the location monitoring technology

18   at the officer's discretion.

19           Is there anything further from the government?

20           MR. BERRY:  No, Your Honor.  Thank you.                              15:33:57

21           THE COURT:  Anything further from you Mr. Cambria?

22   Ms. Paris.

23           MR. CAMBRIA:  Both of us.

24           MS. PARIS:  Your Honor, I wanted to clarify, you

25   expressed a concern with respect to the topic of travel in                    15:34:09

1   Mr. Lacey's PSR report, and that came up in the context of, and

2   please, if I am misstating this, she asked a question like:

3   What are your plans when this is all done, all resolved, you

4   know, post having served a sentence, like what are you

5   interested in doing?  And he basically said:  I have always          15:34:30

6   enjoyed travel, and I would probably want to travel again with

7   my sons.

8           So that was the context of the comment.  I wanted to

9   clarify that for the record.

10          THE COURT:  Thank you, Mr. Lincenberg.  Sorry,              15:34:41

11  Mr. Cambria, were you going to say something?

12          MR. CAMBRIA:  What I wanted to say, Your Honor, when

13  you discussed a lack of substantial issue to be reviewed, in my

14  case of Count 100, the question is, in a case where multiple

15  FBARs have been filed, can there be concealment?  That is a        15:35:05

16  discrete issue that we can find no case on, and it is a very

17  substantial issue because if we win on that issue, there is no

18  conviction.  And here we have unrefuted evidence 'cause there

19  are in evidence FBARs filed by the attorneys with all the

20  details.                                                            15:35:31

21          THE COURT:  I understand, and that was in your moving

22  papers, so I considered the argument already.

23          MR. CAMBRIA:  Well, I ask you to reconsider.

24          THE COURT:  I am not going to super consider anything.

25          MR. CAMBRIA:  I never knew "super consider."  I like        15:35:42

248

```
 1    that.
 2            THE COURT:  Well, it's beyond a motion, a response or
 3    reply.  I don't know what to call it after.
 4            MR. CAMBRIA:  Anyway, I think that satisfies the
 5    element that you found lacking, with all due respect.        15:35:53
 6            THE COURT:  We agree to disagree.
 7            Mr. Lincenberg.
 8            MR. LINCENBERG:  Your Honor, we have nothing further
 9    today.
10            THE COURT:  Mr. Feder.                               15:36:03
11            MR. FEDER:  Judge, would the Court entertain a little
12    bit of a discussion to extend the self-surrender date --
13            THE COURT:  No, I will not.
14            MR. FEDER:  Okay.
15            THE COURT:  Thank you.  This matter is adjourned.    15:36:13
16        (Proceedings concluded at 3:36 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3                          C E R T I F I C A T E

 4

 5              I, HILDA E. LOPEZ, do hereby certify that I am duly

 6     appointed and qualified to act as Official Court Reporter for

 7     the United States District Court for the District of Arizona.

 8              I FURTHER CERTIFY that the foregoing pages constitute

 9     a full, true, and accurate transcript of all of that portion of

10     the proceedings contained herein, had in the above-entitled

11     cause on the date specified therein, and that said transcript

12     was prepared under my direction and control.

13              DATED at Phoenix, Arizona, this 30th day of August,

14     2024.

15

16

17                              s/Hilda E. Lopez_____
                                HILDA E. LOPEZ, RMR, FCRR
18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

# EXHIBIT R

# FILED UNDER SEAL
# CIRCUIT RULE 27-13(d)

# EXHIBIT S

# FILED UNDER SEAL
# CIRCUIT RULE 27-13(d)

# EXHIBIT T

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al. | |
| Defendant. | |

Before the Court are four Motions in Limine filed by Defendants Michael Lacey, James Larkin, Scott Spear, John Brunst, Dan Hyer, Andrew Padilla, and Joye Vaught (collectively "Defendants") (Docs. 1588; 1589; 1591; 1593).  Plaintiff United States of America (the "Government") has filed Responses in Opposition (Docs. 1604; 1613; 1603; 1607).  Additionally, the Government has filed nine Motions in Limine (Docs. 1590; 1592; 1594; 1595; 1596; 1597; 1598; 1599; 1600).  Defendants have filed Responses in Opposition (Docs. 1602; 1612; 1615; 1609; 1610; 1616; 1614; 1608; 1611).  The Court will address each Motion in turn.[1]

## I.    Legal Standard

Motions in limine "allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury."  *Brodit*

---

[1] In this Order, the Court will resolve all of Defendants' Motions in Limine (Docs. 1588; 1589; 1591; 1593) and seven of the Government's Motions in Limine (Docs. 1590; 1594; 1595; 1596; 1597; 1599).  The Court will address the Government's remaining Motions in Limine (Docs. 1592; 1598; 1600) at the Final Pretrial Conference.

1   *v. Cabra*, 350 F.3d 985, 1004–05 (9th Cir. 2003) (citations omitted).  Orders on motions in

2   limine are "entirely within the discretion of the Court."  *Jaynes Corp. v. American Safety*

3   *Indem. Co.*, 2014 WL 1154180, at *1 (D. Nev. March 20, 2014) (citing *Luce v. United*

4   *States*, 469 U.S. 38, 41–42 (1984)).  Moreover, "[a] motion in limine is not the proper

5   vehicle for seeking a dispositive ruling on a claim, particularly after the deadline for filing

6   such motions has pass."  *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1162 (9th Cir.

7   2013), *aff'd*, 135 S. Ct. 907, 190 L. Ed. 2d 800 (2015) (citing *Dubner v. City & Cnty. of*

8   *San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

9        Some of the parties' Motions argue certain evidence should be excluded as

10  irrelevant or unfairly prejudicial.  Federal Rule of Evidence 401 provides that "[e]vidence

11  is relevant if it has any tendency to make a fact more or less probable than it would be

12  without the evidence and the fact is of consequence in determining the action."  Fed. R.

13  Evid. 401.  Under Rule 402,[2] relevant evidence is admissible unless otherwise provided.

14  Fed. R. Evid. 402.  However, all relevant evidence is subject to the balancing test set forth

15  by Rule 403.  That is, a court "may exclude relevant evidence if its probative value is

16  substantially outweighed by a danger of one or more of the following: unfair prejudice,

17  confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

18  presenting cumulative evidence."  Fed. R. Evid. 403.

19       Although styled as "Motions in Limine," certain Motions by the parties' object to

20  words or phrases used in opening statements not yet made. (*See* Docs. 1588; 1590; 1592;

21  1598).  But opening statements are not evidence, *see United States v. Maurice*, 416 F.2d

22  234, 236 (9th Cir.1969), and the Court will advise the jury accordingly.  *See* Crim. Jury

23  Instruction  1.4; 6.7.[3]

24       With these principles in mind, the Court rules as follows:

25  _____

26  [2] Unless otherwise noted, all Rule references are to the Federal Rules of Evidence.

27  [3] A cursory review of the prior opening statements show exhaustive and confusing
    statements—certainly not concise roadmaps, of what the evidence will or will not show.
28  The Court will address the aforementioned Motions at the final pretrial conference but
    cautions the parties that misstating the law or promising evidence and testimony that they
    cannot later produce will result in juror confusion and potential prejudice to a party.

## II.    Discussion

### A.    Defendants' Motions in Limine

#### 1.    Defendants' Motion to Preclude Testimony Statements or Arguments that Escort Services Dating Ads, Massage Services and Adult Advertising Are Unlawful or Presumed to Involve Prostitution (Doc. 1588); the Government's Response (Doc. 1604).

In this Motion, Defendants seek an Order precluding the Government from making statements or arguments that escort services, online dating services, massage services, and adult advertising of such services are unlawful or presumed to involve prostitution because escort, massage, and online dating services are legal under Arizona law.  (Doc. 1588 at 4–5).   The Government counters that in upholding the sufficiency of the Superseding Indictment ("SI") (Doc. 230), the Court has already found that its alleged facts are sufficient to show the ads were for prostitution.   (Doc. 793 at 10).

But at trial, it is the Government's burden to convince the fact finder, beyond a reasonable doubt, that the SI's allegations are true and that Defendants conspired to commit the acts alleged.  The Government's obvious theory is that the specific ads noted in the SI were really ads for prostitution, and not for lawfully sanctioned escort, massage, or online dating services.   The Government is therefore tasked with convincing a jury of that distinction, and that the ads at issue were illegal.  The Government is not precluded from stating that they intend to prove that the ads at issue are illegal.

Accordingly,

**IT IS ORDERED denying** Defendants' Motion in Limine (Doc. 1588).

#### 2.    Defendants' Motion to Preclude Irrelevant and Prejudicial Testimony (Doc. 1589); the Government's Response (Doc. 1613).

"[D]ue to new facts," Defendants' seek an order from this Court to "preclude irrelevant and unfairly prejudicial witness testimony about the experiences of person engaging in prostitution (including as a victim of sex trafficking) and crimes committed by or against such persons."  (Doc. 1589 at 4).  Defendants explain that the new facts arose from the mistrial that occurred when the Government elicited irrelevant and prejudicial

testimony. (*Id*.) So, they state that such evidence should be precluded as irrelevant and prejudicial unless "it relates to one or more of the fifty charged ads and one or more defendants *knew* that the person who was the subject of a charged ad was engaged in prostitution or was being trafficked at the time the charged ad was posted[.]" (*Id*.)

The Government responds that the there are no new facts, and the law of the case permits them to show that Defendants knew about and intended to promote or facilitate prostitution, and that sex trafficking and child sex trafficking are both subsets of prostitution. (Doc. 1613 at 2). They further argue that "[c]onspiracy law does not require proof that a defendant know his fellow co-conspirators . . . [or] that one or more of Defendants here had knowledge that an individual in a charged ad was engaged in prostitution or being trafficked contemporaneous with when the ad was published on Backpage." (*Id*. at 3). The Court agrees with the Government.

First, in the prior Court's May 7, 2021, Order observed that '[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution" and the Government "must prove that Defendants intended to facilitate prostitution through Backpage.com." (Doc. 1156 at 3). The Court noted that "[e]vidence that tends to prove the Defendants were aware that Backpage.com was being used to facilitate sex trafficking and child sex trafficking are extremely probative to show notice to Defendants that the website was being used for illegal purposes." (*Id*.) Though it is necessary for the Government to show that, based on the ads, the sex trafficking and child trafficking victims engaged in sex in exchange for money, the Court cautioned that it "will not allow the Government to linger on the details of the abuse sex trafficking victims suffered as a result of being trafficked." (*Id*. at 4). The Court reasserts that admonishment.

Second, though not clearly stated, Defendants seem to argue that the Government is prohibited from offering testimony or evidence about acts unrelated to a posted ad or witnesses who are not connected to a charged ad. Yet, the Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy. Proof of a conspiracy requires showing that each conspirator is responsible for the acts of the

others pursuant to and in furtherance of the conspiracy, and that "he is liable for the acts of his co-conspirators though he was not aware of the performance of those acts, nor even of the actors involved. *Hernandez v. United States*, 300 F.2d 114, 122 (9th Cir. 1962); *see also Pinkerton v. United States*, 328 U.S. 640 (1946). As Defendants assert, the Government need not show that each defendant *knew* "that the person who was the subject of a charged ad was engaged in prostitution or was being trafficked at the time the charged ad was posted." (Doc. 1589 at 4). The Government need only prove that Defendants were *aware* of the conspiracies objectives and participated in achieving those objectives.

Among the alleged objectives were to "promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States . . . and thereafter performed and attempted to perform an act that  did promote, manage, establish, carry on, and facilitate the promotions, management establishment, and carrying of the unlawful activity" as described in Counts 2–51. (Doc. 230 at 50). As the prior court observed, testimony about how the Backpage ads were created, paid for, and posted, as well as how those ads made it easier for individuals to engage in prostitution is relevant to the allegations charged. As the Court previously cautioned, however, lingering on the details about acts of prostitution or victimization of the individuals who were trafficked or prostituted, though probative of the conspiracy's objective, can become irrelevant and prejudicial to Defendants.

Accordingly,

**IT IS ORDERED denying** Defendants' Motion in Limine (Doc. 1589).

**IT IS FURTHER ORDERED reiterating** the prior court's Order (Doc. 1156) that the Government may not illicit irrelevant and cumulative testimony about the abuse sex trafficking victims suffered as it may result in prejudice to Defendants.

/ / /

/ / /

/ / /

- 5 -

3. **Defendants Motion to Preclude References to Alleged Former "Prostitution" Marketing Strategies (Doc. 1591); the Government's Response (Doc. 1603)**.

In this Motion, Defendants seek an order precluding the Government from introducing "evidence of alleged strategies to increase purported 'prostitution' ads on the site not specific to these fifty ads" because they are not relevant.[4]  (Doc. 1591 at 3).  The evidence of concern include ads that involve "(1) ad moderation (allowing moderators to modify the wording of ads and then allowing the ads to run); (2) Backpage's alleged "reciprocal" advertising/link program with the Erotic Review (TER) (a different website with adult content)[5]; and (3) content "aggregation' alleged to be the provision of free ads 'in an attempt to secure future advertising revenues." (*Id*.)

Given the nature of the SI's allegations, these categories of evidence are relevant to show Defendants knowledge of the ads, how and why they were created and their intended purposes.  Further, it is relevant to show whether Defendants "intended to promote a business of prostitution" by posting the ads.  (*See* Doc. 1272 at 3).  Finally, the Court already found that facts that pre-date the 2013 allegations were relevant as evidence demonstrating "furtherance of the charged conspiracy."  Therefore, evidence of ad moderation,  Backpage's "reciprocal" advertising/link program with the Erotic Review, and content "aggregation' to secure future advertising revenues will not be precluded to the extent that (1) the SI provides notice to Defendants of these acts, and (2) the acts demonstrate Defendants' knowledge, intent and conduct in furtherance of the conspiracy's objective,

Accordingly,

**IT IS ORDERED denying** Defendants' Motion in Limine (Doc. 1591).

/ / /

/ / /

---

[4] Defendants' supporting exhibit is irrelevant to the Court's determination as it is related to a Motion to Recuse considered by the previously assigned court.
[5] *See* Doc.1593, Defendants related motion to preclude evidence of a prior relationship between the owner of TER and Backpage.com, LLC.

> **4.** **Defendants' Motion to Preclude Irrelevant and Inadmissible Evidence Re Mersey and Elms (Doc. 1593); the Government's Response (Doc. 1607).**

In this Motion, Defendants seek an order precluding the Government from introducing statements of William Mersey and David Elms under the co-conspiracy hearsay exception for three reasons: (1) neither Elms nor Mersey are connected to the fifty charged ads; (2) there is no evidence of any conspiracy involving Mersey or Elms and Defendants; and (3) introducing such statements would be prejudicial to Defendants. (Doc. 1593 at 5). The Government states it intends to prove that the conspiracy "lasted from 2004 through April 2018." (Doc. 1607 at 2). The Government alleges that Defendants had relationships with Mersey and Elms during this time, which "played in Backpage's development as a source of online prostitution ads . . . . [including] how to increase referral traffic." (*Id.* at 3). The Government further asserts that during the relevant time, "Mersey received discounts and commissions on thousands of Backpage prostitution ads . . . . [and] Larkin directed Ferrer to develop partners, including Mersey for Backpage's adult section." (*Id.*) The Government proffers that evidence of communications with Mersey and Elms "shows that Defendants knew that their website was in the business of publishing prostitution solicitations." (*Id.* at 4).

Though the Court is not aware of the precise testimony or evidence to be offered, it does find the proffer that Defendants' relationships with Elms and Mersey "were critical to prostitution marketing strategies during the early years of the conspiracy." (*Id.* at 3–4). Whether Defendants had knowledge that either Elms or Mersey were involved in the business of prostitution when they posted their ads and information is relevant to the existence of a conspiracy and acts done in furtherance of the conspiracy. Nonetheless, the Court will withhold ruling on the Motion until the Government lays the proper foundation and explains its relevance.

Accordingly,

**IT IS ORDERED** denying Defendants' Motion in Limine (Doc. 1593).

- 7 -

**B.** **The Government's Motions in Limine**

1. **The Government's Motion to Preclude References to First Amendment and Free Speech (Doc. 1590); the Defendants' Response (Doc. 1602)**

The Government seeks an order precluding Defendants from referring to "the First Amendment and 'free speech' at any time in the presence of the jury" because they repeatedly referenced exercising their First Amendment in this case. (Doc. 1590 at 2). One example offered is Defendants' statement that "[t]his whole case is about the First Amendment." (*Id*. quoting Doc. 1342 at 76). Defendants oppose, stating "the evidence will show Defendants intended to facilitate the First Amendment rights of Backpage.com and its users – not criminal offenses." (Doc. 1602 at 2).

The Court has previously stated that "[t]he First Amendment does not protect 'offers to engage in illegal transaction.'" (Doc. 793 at 14). And "[a]s alleged, Backpages' efforts to promote its website facilitated prostitution and were not protected business practices." (*Id*. at 14–15). The Government will bear the burden of showing as much at trial. Defendants certainly may defend these allegations on the grounds that the ads were for lawful business practices, and thus their publication of lawful ads were protected under the First Amendment. They may not, however, assert that their facilitation of unlawful business practices, i.e., publishing ads for prostitution, is activity that is protected by the First Amendment. It plainly is not and the Court is not aware of any precedent declaring the Travel Act statute at issue violative of the First Amendment on such a basis. A statute may be facially invalid if it prohibits protected speech because the threat of enforcement of an overbroad law deters individuals from engaging in constitutionally protected speech and inhibits the free exchange of ideas. But a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects. *See Virginia v. Hicks,* 539 U.S. 113, 119–120 (2003). Accordingly, to the extent that Defendants seek to invoke their First Amendment rights as a defense to the allegations that they conspired to promote and/or facilitate

prostitution through veiled ads for prostitution, they are prohibited from doing so.

Moreover, should Defendants intend to rely upon "advice of counsel" to assert they were within their First Amendment rights to produce and post the alleged ads, they must set forth the requisite criteria as further discussed below.  Notwithstanding this fine distinction, Defendants are not precluded from referring to their general business of publishing articles and information on Backpage.com, LLC to promote their First Amendment rights.

Accordingly,

**IT IS ORDERED granting, in part,** the Government's Motion (Doc. 1590).  The Motion is granted to the extent that Defendants may not claim they were advised by counsel that they were permitted to post advertisements like those described in the SI under the First Amendment unless they make the requisite production.  The Motion is otherwise denied.

### 2. The Government's Motion to Preclude References to Section 230 of the Communications Decency Act (Doc 1594); Defendants' Response (Doc. 1615)

In this Motion, Government seeks an order precluding Defendants' from "introducing evidence or argument at trial about Section 230 of the Communications Decency Act of 1996" ("CDA")  because courts have "construed Section 230 to provide immunity from civil claims for websites that publish content created by third parties." (Doc. 1594 at 2).  Defendants counter that they "must be permitted to present evidence tending to negate unlawful intent, including by showing that Backpage.com's moderation and aggregation processes were driven by factors other than facilitating crime." (Doc. 1615 at 4).  They assert that "[the Court] cannot bar Defendants from presenting evidence about their contemporaneous understanding of Section 230 and the First Amendment values and interest it advanced[.]"  (*Id.* at 4).  So, Defendants say to prohibit them from doing so would be a violation of their Fifth and Sixth Amendment rights to due process and a fair trial. (*Id.* at 5).

Defendants' reliance on Section 230 of the CDA for their immunity argument is a

misstatement of the law. The trial court has previously analyzed whether the CDA applies to this case and found that the facts in the SI are "qualitatively different" than the Defendants' cited CDA cases. (Doc. 793 at 13). In so doing, the court opined that "[t]his case . . . does not concern civil liability, and the CDA has '*no effect*' on 'any other Federal criminal statute.'" (*Id*. citing 47 U.S.C. § 230(e)(1) (emphasis added)). To date, no party has provided this Court with case precedent holding that the CDA immunizes criminal activity like that alleged here. It follows that a jury should not be told that the CDA does. To do so is a misstatement of law and will lead to jury confusion.

Accordingly,

**IT IS ORDERED granting** the Government's Motion in Limine (Doc. 1594). Defendants may not argue that Section 230 of the CDA immunizes Defendants from Counts 2–51 of the SI for violating the Travel Act.

### 3. The Government's Motion Regarding Introduction of Details of Defendants' family, background, and prior lawsuits (Docs. 1595; 1596; 1597); Defendants' Responses (Doc. 1609; 1610; 1616).

Three of the Government's Motions seek to preclude Defendants from referring to other litigation outside the present matter. First, the Government seeks an order precluding "Defendants, their counsel, and their witnesses from commenting, during opening statements or closing argument, on any fact or evidence or individuals that are not anticipated to be introduced into evidence at the trial." (Doc. 1596 at 2). As an example, the Government represents that introduction of details regarding a Defendant's family, background, and relief obtained in prior lawsuits are improper during opening arguments. (*Id*. at 2–3). Second, the Government seeks to preclude Defendants from referring to "any prior case or legal decision not involving Backpage" because they are inadmissible under Rules 401–403 and 802 (Doc. 1595 at 2). Third, the Government seeks to preclude Defendants referring to "decisions, rulings, or opinions issued in, or the outcomes of any prior litigation in which Backpage.com, LLC (Backpage) or any of its then-owners or parent companies was a plaintiff or defendant[.]" (Doc. 1597 at 2). These Motions will be discussed together because they seek virtually identical rulings for essentially the same

issue.

Though introduction of a Defendant's family and details of their background are irrelevant to the allegations in the SI, such introductions are not prohibited. So, the Court will not preclude Defendants from so doing in a limited and resourceful way. However, statements about prior unrelated civil cases and money judgments are irrelevant to the specific Travel Act violations and will only mislead and confuse the jury.

Relatedly, and as previously discussed, CDA Section 230 does not immunize Defendants from prosecution of Counts 2–51 for Travel Act crimes. Similarly, it follows that Defendants are instructed not to refer to prior court decisions, rulings, opinions or results filed by or against Backpage.Com, LLC, unless those prior cases were adjudications of 18 U.S.C. § 1952(a)(3)(A) offenses. Though some previously referenced cases alleged Backpage.com, LLC, engages in similar acts of posting ads for prostitution, those prior cases are distinguishable because they were (1) civil adjudications; (2) brought by different parties; and (3) reviewed under differing legal standards. Therefore, they are irrelevant because they bear no relation to this case or the criminal issues to be decided. To refer to any prior court case as legally controlling the issues here is are misstatements of the law, would confuse the jury, and would prejudice the Government.

Accordingly,

**IT IS ORDERED granting, in part**, the Government's Motion in Limine to preclude defense from introducing non-witnesses or non-evidence (Doc. 1596). Defendants are precluded from comparing this case to any prior unrelated civil cases and/or money judgements in their opening and closing arguments. The Motion is otherwise denied.

**IT IS FURTHER ORDERED granting** the Governments' Motions in Limine to preclude references to certain other litigation, court decisions, rulings, opinions, or results from prior litigation (Docs. 1595; 1597).

/ / /

/ / /

- 11 -

4.      **The Government's Motion to Preclude Defendants Good Faith Reliance on Advice of Counsel The Advice of Counsel (Doc. 1599); the Defendants' Response (Doc. 1608).**

In this Motion, the Government seeks to preclude Defendants from making statements that they relied upon the advice of counsel in their opening argument. Defendants state that the law of the case, evident by the Court's overruling the Government's objections to their opening statements that they relied upon advice of counsel, forecloses their argument. The Court disagrees. Nowhere in the record is it apparent that this or any prior Court issued a definitive ruling on whether Defendants may rely on an advice of counsel defense.

It is true that Defendants may assert they relied upon the advice of counsel to negate the scienter requirement of the alleged charge, but only if they *first* meet the following factors: (1) they made a complete disclosure to counsel; (2) they requested counsel's advice as to the legality of the contemplated action; (3) they received advice that it was legal; and (4) they relied in good faith on the advice. *See United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977). None of the prior Orders described by Defendants definitively ruled that they could rely upon this argument because so far, no Defendant has waived the attorney/client privilege as it relates to the allegations in the SI. So, to the extent that Defendants intend to raise this argument, whether in opening statement, closing argument, or their case in chief, they must first proffer a showing of all four factors.

For example, the Court will permit Defendants to argue an advice of counsel defense if they show they provided "complete disclosure[s]" about the advice they sought on an ad listed in Counts 2–51 (or similar ad described in the SI); sought advice relating to the legality of the ad; received advice that the contemplated conduct was legal; and relied on that advice. (*See* Doc. 1626-3 at 31) ("[u]nlawful intent has not been proved if a defendant, before acting, made full disclosure of all *material facts* to an attorney . . .."). However, if none of the four factors has been disclosed or produced prior to opening statements, Defendants are precluded from making such early pronouncements. To permit Defendants

- 12 -

to tell the jury that they broadly sought advice on conduct unrelated to the SI's allegations would present irrelevant evidence, could be factually misleading, would result in jury confusion, and would prejudice the Government.

Accordingly,

**IT IS ORDERED granting** the Government's Motion in Limine (Doc. 1599). Defendants may not suggest in opening statements that they relied on advice of counsel until they make a proffer of specific testimony and/or evidence, relevant to the alleged charges.

Dated this 24th day of July, 2023.

Honorable Diane J. Humetewa
United States District Judge

# EXHIBIT U

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,       )
                                )    No. 2:18-cr-00422-DJH
            Plaintiff,          )
                                )
        vs.                     )    Phoenix, Arizona
                                )    November 1, 2023
Michael Lacey, et al.           )    9:01 a.m.
                                )
        Defendants.             )
_____  )


**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 28 - A.M. SESSION**


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
         **Mr. Peter S. Kozinets, Esq.**
         **Mr. Andrew C. Stone, Esq.**
         **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

3

```
 1    For the Defendant John Brunst:
           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2         LINCENBERG & RHOW, P.C.
           By:  Mr. Gopi K. Panchapakesan, Esq.
 3              Mr. Gary S. Lincenberg, Esq.
           1875 Century Park E, Suite 2300
 4         Los Angeles, CA 90067
           gpanchapakesan@birdmarella.com
 5         glincenberg@birdmarella.com

 6
      For the Defendant Andrew Padilla:
 7         DAVID EISENBERG, P.L.C.
           By:  Mr. David S. Eisenberg, Esq.
 8         3550 North Central Avenue, Suite 1155
           Phoenix, AZ 85012
 9         david@deisenbergplc.com

10
      For the Defendant Joye Vaught:
11         JOY BERTRAND, ESQ., L.L.C.
           By:  Ms. Joy M. Bertrand, Esq.
12         P.O. Box 2734
           Scottsdale, AZ 85252
13         joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

4

1                  **P R O C E E D I N G S**

2

3 (Proceedings commence at 9:01 a.m.)

4 (Juror No. 7 is present via Zoom)

5         THE COURT:  Good morning.  Please be seated.      09:01:22

6         MS. BERTRAND:  Good morning.

7         THE COURT:  Well, we have another juror, Juror No. 7

8 has tested positive for COVID.  We have -- we have also, and I

9 will just tell you that we have a number of jurors who are not

10 feeling all that well, but the remainder of the jurors have      09:01:54

11 shown up.

12         Juror No. 7 has indicated her ability to appear by

13 Zoom.  We're prepared to have that happen, and what I would

14 suggest is the following process:  That we conclude with the

15 closing arguments today, and that we, however, not have the      09:02:22

16 jury begin deliberations until next week.  We can select the

17 alternate jurors before we leave today.  That way if Juror No.

18 7 happens to be chosen as an alternate, then that would, I

19 think, cure some of the potential issue.

20         Now, thinking about this a little bit clearer, if she      09:03:05

21 is selected, then there's no reason that they couldn't begin

22 their deliberations today.  If she remains on the panel, then

23 they wouldn't begin their deliberations until Tuesday.

24         MS. BERTRAND:  May I have a moment -- may we have an

25 opportunity to talk?      09:03:30

5

1          THE COURT:  In any event, that's how I propose that we

2     continue.  I don't think at this point it's a good idea to

3     release another.  That would only leave one alternate.  And so

4     in any event, I do intend to finish with the summation

5     arguments today.                                              09:03:56

6          MS. BERTRAND:  Okay.

7          THE COURT:  All right.  So --

8          MS. BERTRAND:  May counsel have an opportunity to

9     talk?

10          THE COURT:  Yes, you may have an opportunity to         09:04:04

11     discuss this.  I'll give you about, you know, ten minutes, and

12     then I'll come back in and we'll have to then test the

13     equipment and make sure her equipment is available.  But in any

14     event, I think that my sense is that if we have two jurors who

15     have tested positive for COVID, I feel certain that we, and we  09:04:32

16     have some individuals who are not feeling all that well, my

17     sense is it's probably the foregone conclusion that we have

18     more than one or more than two I should say that have this.

19          I'll let you meet and confer and I will be back in ten

20     minutes.                                                      09:04:55

21          MR. LINCENBERG:  Before we meet and confer, does the

22     Court have any information about the condition of Juror No. 7?

23     So when we were talking about the other juror, for example, the

24     Court gathered some information, the juror was foggy and so

25     forth, does the Court have any information about that juror's  09:05:11

UNITED STATES DISTRICT COURT

1    symptoms?

2              THE COURT:  The only information I have is she's been

3    willing to continue and participate.  All of the jurors have

4    been very attentive.  This is the juror who sits second to the

5    last chair at the very back row.                                    09:05:27

6              MR. LINCENBERG:  Was she the juror who was wearing the

7    mask yesterday?

8              THE COURT:  Yes, she was wearing a mask yesterday, as

9    was the juror next to her, I think, because she was not feeling

10   well.                                                               09:05:40

11             So in any event, I'll let you meet and confer.

12             MS. BERTRAND:  Thank you, Your Honor.

13             COURTROOM DEPUTY:  All rise.

14        (Court took a recess at 9:05 a.m.)

15        (Proceedings reconvened at 9:16 a.m.)                          09:16:11

16             THE COURT:  Please be seated, and I'll hear from the

17   government first and then whomever wishes to speak on behalf of

18   the defendants.

19             MS. PERLMETER:  Your Honor, it is the United States'

20   strong preference is to have Juror No. 7 participate.  In          09:16:27

21   hearing the closing arguments today, we ask that she be then

22   designated as Alternate No. 2 so that if the Court needs to

23   call her back at least she will have heard all of the case as

24   well as all of the arguments.  That is our strong preference

25   because we would like the jury to have the ability to begin        09:16:48

1   their deliberations as soon as possible.

2          Once the case has been submitted to them, they will be

3   able to choose their own schedule and begin deliberations this

4   afternoon, if they wish.

5          In the alternative, Your Honor, we ask that Juror       09:17:06

6   No. 7 be stricken for her illness.

7          Finally, Your Honor, we just wanted to note that Rule

8   23(B)(3) does allow the Court to allow 11 jurors to return a

9   verdict even without stipulation by the parties if the Court

10  finds that there's good cause to excuse a juror so that we    09:17:30

11  could go down to as few as 11.

12         THE COURT:  All right.  Who wishes to go from the

13  defendants?

14         MR. FEDER:  Short straws appear to be my own.  We

15  would ask that the Court treat this juror the same way the    09:17:46

16  Court treated the last juror and strike her.  I mean, it would

17  be inconsistent not to do that.

18         THE COURT:  Well --

19         MR. FEDER:  There is all kinds of logistical issues

20  about the ability to deliberate.  We're not going to agree at  09:18:02

21  least to remote deliberations.

22         THE COURT:  I never suggested that.

23         MR. FEDER:  That's our position.  If the Court -- I

24  mean, the Court has gotten rid of two other people.  This

25  should be the same.                                            09:18:21

```
 1          THE COURT:  Well, I'm going to have Juror No. 7 appear

 2   remotely for the remainder of the closing summation.  I think

 3   it's a better approach than to release the entire jury once the

 4   government's rebuttal is complete.  I'll give them the

 5   admonition and have them return on Tuesday morning, and then        09:18:49

 6   I'll remind them of a couple of logistical juror instructions,

 7   select the alternates at that time, and let them begin their

 8   deliberations then.  That way, because now we know that we have

 9   COVID present in the jury deliberation room, they are in a --

10   it's not a large room by any means.                                 09:19:19

11          And as I mentioned, and I think some of you saw that

12   there are a couple of them that have been blowing their noses

13   and so on and so forth, and I think for them to get better is

14   the best course of action so that they are all clear-minded.

15   And if by chance someone else has COVID, then they would be        09:19:41

16   within that quarantine period.  And so that's how we would -- I

17   think we should proceed.

18          MR. RAPP:  Can I just inquire, Judge, is there a

19   reason why they couldn't come back on Monday?  Obviously the

20   Court I realize is handling their own calendar, but it seems        09:20:01

21   like they could commence deliberations on that day.  I didn't

22   know if the Court was taking into account a five-day quarantine

23   time period or, because next week is a short week because of

24   the Friday holiday.

25          THE COURT:  Well, I mean, the difficulty there is they       09:20:19
```

1    signed up for Tuesday through half day Friday, and so I know

2    that there are a number of jurors who are reporting to work on

3    Monday, and so that -- I think that's the better course so that

4    they would not begin their deliberations until Tuesday.

5           MR. BERRY:  Is there a concern, Your Honor, about        09:20:45

6    delaying deliberations until next week given that we only have

7    this jury until the 9th and we still have forfeiture as opposed

8    to trying to encourage the deliberations to begin sooner rather

9    than later?

10          THE COURT:  There's multiple concerns.  You know, I     09:20:59

11   I'll be very honest with you, I mean, these are -- we delayed a

12   week for COVID.  We obviously have had jurors not show up on

13   time and so on and so forth, but, you know, we can't predict

14   when these sorts of things are going to occur, and I certainly

15   don't want to force the jurors to be in a situation where they   09:21:27

16   now know that there's the presence of COVID amongst them, that

17   they have been exposed and now they are continuing to have that

18   exposure in the deliberation room.  I have a sense that they

19   probably all be very relieved if they could leave and attend to

20   their own health concerns.                                     09:21:56

21          MS. BERTRAND:  And that raises two points, if I may be

22   heard, Your Honor.  The first is I have concerns about being

23   exposed to people that may have COVID.  I mean, we had one go

24   down yesterday.  We are going to lose one today.  That leaves,

25   what are we down to, 13.  I have concerns.  I have a family     09:22:15

1  member that takes methotrexate, which is an immune-suppressing

2  drug, and I have concerns about asking these poor folks to come

3  in here and sit all morning next to each other listening to

4  closings when they want to get home and deal with their health,

5  and they are already not feeling well.                          09:22:45

6        We noticed juror, I think it's 12, yesterday couldn't

7  keep his eyes open.  I mean, maybe that's our fault, but it

8  also could be he's sick.  So I think that's -- and in terms of

9  when this trial ends, my understanding is we screened this jury

10 sitting here, not the first set of questionnaires that went     09:23:03

11 out, but we screened this jury to be able to go until

12 November 17th if that ended up being necessary.  So I don't

13 think that time can be a concern.  But even if it was a

14 paramount concern, the bigger concern is the health and

15 well-being of both these jurors and every person sitting in     09:23:19

16 this courtroom.

17        That's the concerns I want to raise with the Court,

18 and I guess that would prompt us to say, do we want to close

19 next week?  Of all people to say this, I am the last person to

20 say I want to wait some more, but I also don't want these folks  09:23:41

21 sitting here glaring at us angry that they have to sit here and

22 listen to this when they want to get home and get away from the

23 cootie pool.

24        THE COURT:  Well, they've been very attentive despite

25 their various health issues, and I don't think that sitting     09:24:06

1    through two additional summations will push them over the edge.

2    I don't think so.  They've been very diligent and attentive,

3    and I certainly know that they are the type of jury that if

4    they wanted to go home, they would have let my courtroom deputy

5    know that, and any single one of them would, and so I do think        09:24:35

6    it's the better course to -- well, let me -- Mr. Feder, you

7    didn't address this additional position that the government put

8    forward regarding designating Juror No. 7 as an alternate.

9            MS. BERTRAND:  I can address that, Your Honor.

10           THE COURT:  Yes.                                               09:25:08

11           MS. BERTRAND:  I think the defense decided we object

12   to that too; that this should be treated consistent with the

13   other two jurors who have been sent home and with no -- using

14   this juror as one of the alternates or anything like that.

15   This juror goes home or the jury stays, and we prefer the juror       09:25:28

16   jus go home, or be home and stay home and be excused.

17           THE COURT:  Well, you know, to that point, those were

18   different circumstances, and even yesterday was a different

19   circumstance.  We had no idea that this was going to occur,

20   that we would have the diminishing alternate jury pool, and           09:25:43

21   they -- the release of the prior juror we were trying to

22   accommodate her, but apparently the juror was released over the

23   request or at the request of the defense counsel.

24           And so I think this is the way that we're going to

25   proceed.  We'll have our Juror No. 7 view the last two                09:26:16

12

```
 1    remaining arguments.  I will release the jury with the
 2    admonition, and then bring them back on Tuesday, remind them of
 3    a couple of housekeeping jury instructions, select the
 4    alternates, and then have them begin the deliberation.
 5            I'm going to put aside for the moment the forfeiture      09:26:50
 6    issue because I'd like to set aside time because I have some
 7    questions about that, and so that's how we will proceed.  We
 8    will need some time to set up that equipment, get it tested,
 9    make sure that she's able to connect and hear everyone, and
10    that should take us roughly ten minutes or so.  We have our IT   09:27:19
11    person here available.
12            MR. STONE:  Your Honor, when are you thinking about
13    setting aside time to discuss forfeiture issues?
14            THE COURT:  Tomorrow.  I will have you back tomorrow.
15    I need to look at a couple of items, so just -- I just received  09:27:34
16    your briefing yesterday, so we'll do that tomorrow.  All right.
17    So we will test that equipment.  That will take us about, like
18    I said, ten or so minutes to get her situated and then bring
19    the jury in.
20            (Recess was taken at 9:28 a.m.)                          09:28:00
21         (Proceedings reconvened at 9:57 a.m.)
22            THE COURT:  All right.  Please be seated.  And we'll
23    have the jury in.
24    (Jury is present.)
25    (Juror No. 7 appears by Zoom.)                                   09:59:09
```

13

```
 1          THE COURT:  All right.  Please be seated.  And welcome

 2   back, members of the jury.  As you can see, we are being joined

 3   virtually by one of the your members.  That is so we can continue

 4   on without too much interruption.  After the summation argument

 5   I will describe to you how it is we are going to proceed for          09:59:32

 6   the remainder of the trial.

 7          With all that said, I want to just make sure that our

 8   juror who is appearing virtually you can hear me.  Thumbs up.

 9   Okay.  Thank you.

10          All right.  Ms. Bertrand, you may proceed.                     09:59:50

11          MS. BERTRAND:  Thank you, Your Honor.

12          Good morning.  Nothing is more frightening than a

13   prosecutor stating that they have the right or entitlement to a

14   jury, a guilty verdict.  And combined with the fact that this

15   particular prosecution seeks to turn the First Amendment on its       10:00:18

16   head, this prosecution gives me chills and not in the fun,

17   spooky Halloween way.

18          History has taught us that crusades are incredibly

19   dangerous.  They wrap up in even the most well-intentioned

20   innocent people, and this trial is the result of an                   10:00:41

21   antiprostitution crusade.  Powerful politicians and religious

22   leaders would accept nothing less than Backpage's complete

23   shutdown despite them being on notice that their efforts

24   offended the First Amendment.  Make no mistake about it, some

25   of the most powerful politicians in the country leaned hard on        10:01:10
```

```
 1   Backpage.
 2          Ms. Ellig, can you please show Exhibit 902?  Please go
 3   to the signature page of 902.
 4          Richard Blumenthal, now Senator Blumenthal;
 5   Tom Corbin; Chris Koster; Jim Hood; Lisa Madigan, Attorney      10:01:42
 6   General of Illinois.
 7          And Ms. Ellig, can you please show the jury
 8   Exhibit 52?  Could you please show the signature pages?
 9          We have more on this one, Richard Blumenthal;
10   Joseph R. Biden the III.                                        10:02:07
11          On the next page, Ms. Ellig.
12          More powerful people, Greg Abbott, Attorney General of
13   Texas.  And in addition to these powerful people, we have NCMEC
14   pushing their agenda on Backpage; we have Polaris; the Auburn
15   Theological Seminary, and ultimately you heard some back and     10:02:41
16   forth, the United States senate.
17          And Backpage's response to these demands is set out in
18   Exhibit 171 after the letter from NCMEC is Backpage's response.
19   In essence it's this:  First Amendment protections for
20   platforms of speech, for publishers, are different from what     10:03:06
21   they are for regular people.  And here Backpage starts as part
22   of a newspaper.  There's a reason why we call the press the
23   Fourth Estate in the United States, because the press has a
24   critical role in telling the people what they need to know
25   about their government, in giving them the ability to be         10:03:31
```

1    educated, reasonable rational voters so that they can

2    participate in this democracy.

3            And as part of that, Backpage could not adopt the

4    demands of the powerful and elite, at least not wholesale

5    because that violated the First Amendment.  And what I mean by        10:03:59

6    that is, and you have an instruction about the First Amendment

7    protecting speech.  Speech on these platforms is presumed

8    protected.  The only time the government can start to regulate

9    it is when it is the speech on the page is explicitly,

10   patently, obviously for criminal conduct, and that means as you        10:04:26

11   look at it, not once you meet the person who wrote it and they

12   tell you all about themselves and how they got that point.

13   From the reader looking at it, does it explicitly propose a

14   crime?

15           And I fully expect -- I am sorry, this mic is goofy,          10:04:49

16   Your Honor.

17           I fully expect the government to get up in their

18   rebuttal close and say something like to the effect of:  Well,

19   you can't tell all these coded language.  Obviously --

20   obviously, folks, this was criminal conduct.  Well, you know,         10:05:12

21   we've heard this whole "You can tell about women" many times

22   before.

23           When I was a little girl I didn't have red shoes.  I

24   didn't buy my first pair of red shoes until I was in my 30s

25   because I was raised that only whores wore red shoes.  So it's        10:05:34

1    actually kind of an act of rebellion for me to get my first

2    pair.  As you can see, I've given them a lot of use, but that's

3    not enough.  And you know what else is not enough is what every

4    one of these law enforcement officers got up and told you, it's

5    not enough to look at an ad.  You can't tell.  So we have no    10:06:00

6    idea what is going to happen with that transaction if a

7    transaction occurs.

8          And you can't tell because she's provocatively dressed

9    or because she uses, to the extent it's even a she, provocative

10    language.  All that is facially legal for the publisher.  You    10:06:23

11    want to go after the speaker and look into it more.  You think

12    it's a good lead, have at it.  We'll help you, but don't come

13    to a publisher and tell us to sensor our speech.  That's where

14    we draw the line.

15          In fact, the government didn't want you to hear, I    10:06:47

16    jumped up and down in Mr. Cambria's argument, Backpage did

17    respond to NCMEC and said, "We'll work with you.  We want to

18    work with you.  Let's develop national standards for these

19    platforms.  So it's not just us doing it.  Everyone knows what

20    the deal is, TikTok, Facebook, back in the day MySpace.  Today    10:07:08

21    that would include Pinterest, OnlyFans, Amazon.  We'll work

22    with you, but we have to draw the line at what the First

23    Amendment prohibits.

24          But that wasn't enough for the abolitionists.  It was

25    their way or the highway.    10:07:39

1       Ms. Ellig, can you move the PowerPoint to slide two?

2       During voir dire, and at a couple moments during this

3   trial you've been asked two critical questions, almost a

4   mantra.  Can you be fair and impartial and can you follow the

5   law?  And you all have said repeatedly, yes.  Stop asking me.      10:07:59

6   Yes.  To be clear, when you are asked, "Can you follow the

7   law?"  That doesn't mean, can you do what the government tells

8   you to do.  It means, can you follow the law as it is

9   instructed to you to include insisting that this government,

10  this prosecution, prove their case beyond a reasonable doubt?     10:08:32

11  It is an incredibly high standard, and it's high standard on

12  purpose.

13      Whenever you can say in this case, well, for all we

14  know, it could maybe have been different from what the

15  prosecutor says, I submit to you that's reasonable doubt.  If     10:08:57

16  you can say it without abandoning reason, without abandoning

17  your rational thought.  The prosecution has to rule out every

18  one of those for all "we knows."

19      Ms. Ellig, can you move the PowerPoint slide three?

20      Here's the instruction.  Not going to read it to you.       10:09:24

21  You can read it.  What this means in simple terms is a

22  reasonable doubt is a juror using reason or logic could believe

23  the doubt might be true.  And each of you must accept a

24  reasonable doubt until logic rules it out.  There must be no

25  logical way for the reasonable doubt to exist.                    10:09:55

```
1        And size, I mentioned this in my opening, size doesn't
2   count.  Reasonable doubt doesn't mean moderate doubt.  It
3   doesn't mean we can all come to a consensus about this.  It
4   means any doubt that is reasonable.  A tiny doubt based on
5   reason is still reasonable doubt.  It's about logic; not       10:10:19
6   weight.  A featherweight doubt is a reasonable doubt; a
7   featherweight O-ring blew the space shuttle Challenger; a World
8   Series can be won by an inch; an election by a single vote.  A
9   firm belief is not even enough to convict when accompanied by
10  reasonable doubt.                                              10:10:49
11        Here's an example.  I will give you two examples while
12  we talk this morning, and here's the first one.  When my
13  stepson was a little guy, he loved Halloween.  Now he is too
14  cool to talk to us, but when he was little he loved Halloween.
15  And I've lived in my neighborhood for a long time; knew my     10:11:04
16  neighbors.  We had keys to each other's houses, knew each
17  other's pets.  So when he was little, he would last half a
18  block down and half block back and he is done.  He wants to eat
19  his candy.  I knew everybody.  I trusted them.  They trusted me
20  with their kids.  So when he brought his basket home, "You can  10:11:22
21  have three.  You can have three pieces, buddy."
22        But as he got bigger, his range of trick-or-treating
23  got wider, and all of a sudden we are going around the block.
24  I don't know who moved into that rental down the street.
25  That's an airbnb now.  God help us.  Buddy, I need to look      10:11:41
```

UNITED STATES DISTRICT COURT

```
 1   through your candy before you can have some.  I need to be
 2   sure, because at that point I had a reasonable doubt.  I don't
 3   know who these people are.  I don't know if I can trust them.
 4   I don't know that the candy is sick, so let me check and then
 5   you can have your three pieces.                                  10:12:06
 6          The judge has given you long instructions.  And
 7   here -- we're here to determine the government's case.  The
 8   prosecutor's case is on trial to determine if they can overcome
 9   reasonable doubt, and I suggest to you that the instructions
10   from the Court lead you to reasonable doubt.                     10:12:35
11          Ms. Ellig, can you please advance to slide four?
12          First let's talk about cooperators.  You get two
13   separate instructions about cooperating witnesses.
14          Would you please move to PowerPoint slide five?
15          You heard evidence that Carl Ferrer, a witness, made     10:12:54
16   prior statements under oath that contradicted his testimony
17   here.  It's up to you to decide how much weight to give that.
18   Well, I suggest that your first reasonable doubt is that
19   instruction.  At some point he's lied.  You say two things that
20   contradict themselves under oath, that's a lie.  Which lie it   10:13:32
21   is?  I don't know, but I can tell you it's a problem, and it
22   shows us that we cannot trust a word that comes out of
23   Carl Ferrer's face.  That is reasonable doubt.
24          When it is the witness that this prosecution had up
25   talking to us for three weeks, four weeks, the witness that     10:13:55
```

1  this government has bet the farm on lied.  So for all we know,

2  this was a lie.

3           Would you please move to PowerPoint slide six,

4  Ms. Ellig?

5           In evaluating the testimony of Mr. Ferrer and                    10:14:22

6  Mr. Hyer, consider the extent to which their testimony may have

7  been influenced by other parties.  And who are those other

8  parties?  The United States Government.

9           For all we know, Carl Ferrer had 500 million reasons

10 to lie to you.  Let's remember, he bought Backpage for over          10:14:48

11 $500 million.  He owed $500 million to the seller.  It was a

12 seller-financed sale.  The government comes along after

13 Carl Ferrer ran Backpage into the ground, barely could make

14 payroll, which he didn't tell his employees about either, and

15 says:  We'll cut you a deal.  Not only will we give you some        10:15:20

16 leniency with your sentencing, but your money can go into your

17 attorney's trust account.  And in addition to keeping a bunch

18 of stuff -- I apologize for this, I don't know, whatever -- you

19 get to keep a bunch of stuff and you get to keep the money, and

20 at the end of the case, just give the money to the government.       10:15:42

21 Getting you off the hook with the sellers.

22           And when it comes to Ms. Vaught, for all we know the

23 guy never met her.  Let's remember, when he was testifying he

24 couldn't even say her name correctly.  He called her Joyce.

25 When asked to pick her out in the courtroom, let the record          10:16:16

1    reflect I am blonde, somewhat, Ms. Vaught, also blonde, was

2    sitting next to me, he looked to me like he was using more the

3    powers of deductive reasoning --

4           MR. RAPP:  Objection; improper argument.

5           THE COURT:  And I will overrule the objection, and the   10:16:39

6    jury will use their recollection of what occurred.

7           MS. BERTRAND:  He was guessing.  There are only two

8    women sitting back there and we are both blonde.  So for all we

9    know, Ms. Vaught wasn't involved in any of Carl Ferrer's

10   shenanigans to the extent shenanigans occurred.   10:17:01

11          Please advance to slide seven of the PowerPoint.

12          The Court's conspiracy instructions also lead you to

13   reasonable doubt.

14          Would you please move to slide eight?

15          An agreement between two or more persons to commit at   10:17:24

16   least one Travel Act offense.  To be clear, you have to all

17   agree as to each defendant sitting behind me that each one of

18   them knowingly joined this agreement, this agreement to break

19   the law.  You can conspire to throw someone a surprise birthday

20   party.  That's not a crime.  This conspiracy requires an   10:17:48

21   agreement to break the law and that each person joined it in

22   the first place, knew it was going on and said, "Put me in."

23          As to Ms. Vaught, the prosecution's case has

24   reasonable doubt.  For all we know, there was no agreement.

25   And for all we know, this has all come in from Carl Ferrer   10:18:28

1    trying to save his skin.  For all we know, the millions of

2    dollars Backpage invested in moderation shows he didn't agree

3    to anything of the kind, especially the moderators.

4         This moderation was designed to undercut the same

5    conspiracy Ferrer says occurred, and how do we know that?  We          10:19:02

6    got the moderators going through the ads at various times by

7    different methods catching a bad act, catching one of the bad

8    actors, pulling the ad.  And then who fixes it?  Not

9    moderation.  Moderation doesn't get the complaints.  Sales and

10   marketing does.  You heard that from Dan Hyer.  The two do not        10:19:30

11   meet.

12        So the moderators are over here and, yes, there is a

13   lot of work.  I believe the prosecution referred to it as the

14   engine room of Backpage.  I think it's fair to say it was a

15   sweatshop.  I don't know if I would say it's the engine room of       10:19:50

16   this company.  This group of people doing this nearly

17   impossible job, doing their imperfect best to do what they

18   understood allowed Backpage to function legally.  Whatever they

19   are doing over in marketing is on Carl.

20        Reasonable doubt six, excuse me, four.  This is a                10:20:16

21   four.  Carl Ferrer displayed his FBI award in his office.  That

22   came from Carl.  It would certainly be reasonable, rational for

23   one of his subordinates working in moderation to think they

24   must be on the up and up.  Carl got an award signed by Robert.

25        Would you please advance to slide nine, Ms. Ellig?              10:21:12

1   Oh, sorry next one, slide ten.

2        The defendant became a member of the conspiracy

3   knowing that at least one of his objects intended to help

4   accomplish it.  Reasonable doubt seven, excuse me, six.

5   Reasonable doubt, next one.  They haven't ruled out the          10:21:38

6   possibility that Ms. Vaught joined this company understanding

7   her job was to police the Backpage adult section for illegal

8   sex-for-money ads, for patently illegal ads, in opposition to

9   the promotion of any criminal conduct.

10       Let's remember, Ms. Vaught is hired as part of this          10:22:03

11  wave of moderators when the big Craigslist -- Craigslist -- I

12  don't know what you want to call it -- exodus was occurring.

13  There is nothing in this record that shows there wasn't any

14  side deals, any wink of an eye, go through and go through all

15  this litany of ads everyday to promote anything improper or       10:22:34

16  illegal.  There's no indication that when she was hired they

17  are like, this is what you're going to do, but we all know what

18  is really going on.  None of that.  And Ms. Vaught was so

19  diligent about her job, answering emergencies for the police,

20  assisting in the response to 20,000 subpoenas, getting thank      10:22:59

21  you's -- Backpage getting thank you's for helping.

22       It is rational.  It is reasonable to believe that

23  Ms. Vaught didn't join any criminal conspiracy, and they

24  certainly can't rule out that Ms. Vaught took a job placing the

25  site seriously.                                                   10:23:30

1       Ms. Ellig, can you show Exhibit 6257.  Here's an

2  example.  Colleen is one of the moderators.  And Ms. Vaught

3  comes in, is looking on April 3rd, 2014, reviewing Colleen's

4  work and saying, "You're missing stuff.  Slow down.  Pay

5  attention.  This is the kind of thing that gets someone fired."  10:24:05

6  And that's consistent with Dan Hyer saying no one got fired

7  because they edited, not edited, moderated too many ads.  There

8  is no incentives for the moderators to do anything but strictly

9  follow the rules they were given.

10      If you can show 6258, please.  10:24:34

11      This has been going on with Colleen for a while.  This

12  is two months earlier, or a month and a half earlier, "Colleen,

13  finding some pretty bad violations in the ads you approved.

14  Not the ones you knocked out, the ones you approved.  Please

15  slow down and read carefully.  There is not much room for  10:24:55

16  mistakes." Does that sound like someone is like, Colleen, let

17  whatever goes through go through.  You know what we're all here

18  for?  Not at all.  She is threatening to fire someone for

19  missing illegal ads.

20      Please show the 1217 exhibit.  10:25:16

21      And here you have Mr. Padilla saying, hey, "great job

22  catching bad stuff," and not "great job letting bad stuff in."

23  If you look down about three-quarters of the way down the page,

24  "Please congratulate the crew for me.  I think they are doing a

25  tremendous job keeping up with the volume," which we know was  10:25:47

1    huge, "and removing the bad guys."  That's directly counter to,

2    "Hey, we all know what is really going on, couple get through

3    here and there, makes the user happy."  Not at all.  They're

4    focused on catching the bad guys, at least in moderation.  So

5    reasonable doubt six is, for all we know moderation thought          10:26:16

6    they were hunting bad guys.

7         Reasonable doubt seven, we'll get to in a minute.

8         Would you please -- let me back up.  I apologize.  And

9    we know Ms. Vaught helped law enforcement.  Confirmed he saw

10   her at a convention.  I mean, this starts to really stretch,        10:26:54

11   this idea that they are hiding in plain sight when you're

12   sending your moderators to law enforcement conventions to tell

13   them how they do their job, and the prosecution here hasn't

14   ruled out the possibility.  Ms. Vaught believed that she was

15   helping them.                                                        10:27:19

16        You heard Jeff Adams say, I believe, one of the most

17   rewarding parts of his job was working in moderation and

18   assisting law enforcement.  That is directly contrary to

19   someone whose knowingly joined a conspiracy to violate the law.

20   So reasonable doubt seven is she helped law enforcement.  Well,     10:27:37

21   we will get to that in a minute.

22        Ms. Ellig, could you please advance to the next slide?

23   Thank you.  And the next one, please.

24        My colleagues have touched on this here.  It's really

25   important for Ms. Vaught.  It's not enough that she said -- she     10:28:11

UNITED STATES DISTRICT COURT

1    may have said, we already know she did that, that she discussed

2    matters of common interest like moderating, how we are going to

3    moderate, the new rules that we must follow, these rules

4    changing sometimes on a daily basis, rules coming from Internet

5    security and safety experts like Hemanshu Nigam.  It's not          10:28:35

6    enough, and yet that's exactly what underlies the prosecution's

7    theory about Ms. Vaught of, well, she was there; she must have

8    known.  Clearly she is part of this.

9         It's not clear at all because reasonable doubt eight

10   is, what plan do they say Ms. Vaught joined?  And we haven't        10:29:00

11   ruled out the possibility there was no plan.

12        And reasonable doubt 11, sorry, my numbers are off.

13   Reasonable doubt nine, all this assumes that Ferrer had

14   concocted a plan, and that is a big "if."  This whole story of

15   a plan and a conspiracy comes after the Feds arrest him and        10:29:38

16   charge him, not during, especially not as it pertains to

17   Ms. Vaught.

18        So there is a rational possibility, a very real

19   possibility, that Ferrer, if he did have some plan, never told

20   the moderators about it.  He left them in the dark.  He used       10:30:02

21   them.  It's consistent with Dan Hyer saying moderation and

22   marketing were kept separately and that marketing can undo the

23   work of the moderators.

24        Would you move to slide 12, please?

25        Ms. Vaught has to be shown to have directly conspired         10:30:38

1   with someone else in the conspiracy to carry out as to one of

2   the objects.  Which object?  She's going to this sweatshop

3   everyday trying to stay on top, playing whack-a-ball all day

4   with these people trying to cheat the system, trying to violate

5   the Terms of Use, trying to get around the rules.                    10:31:06

6        Slide 13, please.  And then Ms. Vaught had no reason

7   to know that the other conspirators were involved with those

8   whom the defendant directly conspired; in other words, she had

9   to know she was joining the same conspiracy as everybody else

10  is alleged to have joined, and that's true for each one that     10:31:42

11  they got to prove.  So if there is other things going on and

12  other plans and schemes, we all have to agree on what the

13  scheme was and each one of these defendants joined it, and to

14  me that is a big doubt.

15       So reasonable doubt, what are we on, ten, is for all        10:32:01

16  we know, Ms. Vaught didn't join anything.

17       And you know, they make a big deal about what gets

18  through and the mistakes.  And in reality is, and you heard

19  this story from everybody, moderation is not perfect.  It's a

20  human process, and you got moderators coming in doing their      10:32:35

21  imperfect best everyday with a nearly impossible job.  And we

22  note Ms. Vaught not only did her job in good faith, she did it

23  well, and we can't rule out the possibility Ms. Vaught was

24  doing it in good faith 'cause she believed in what she was

25  doing was righteous.                                             10:32:56

UNITED STATES DISTRICT COURT

1    And imagine the level of perfection being demanded by

2    the government in this case.  By my count, you are going to

3    receive seven pages of instructions on what prostitution means

4    in each state, and that's before the prosecution asks you to

5    infer what might go on in Nevada, a state where prostitution is          10:33:22

6    legal in some areas.  We can't assume.  We cannot assume.  We

7    cannot presume, we cannot infer that what goes on in Nevada

8    isn't a legal part of Nevada.  We can't.

9    Let's talk about some of the other states.  I will

10   compare four states and how different their instructions are.          10:33:46

11   Can you please show slide 14, Ms. Ellig?

12   This is Alabama.  Part of prostitution requires a

13   natural or unnatural sex act or deviant sexual intercourse.

14   Again, all right, I don't know.  You get instructions on this,

15   but that's a lot to guess about from the face of an ad.          10:34:11

16   Could you please move to slide 15, Ms. Ellig?

17   Here's Louisiana.  Indiscriminate sexual intercourse.

18   So if you're discriminating about who you have sexual

19   intercourse for money, it's okay.  I don't know from looking at

20   this.  I am not licensed in Louisiana, but you can tell you          10:34:33

21   from the face of an ad, it would be impossible if someone was

22   going to engage in indiscriminate sexual intercourse.  And

23   you'll notice even the definitions of "sexual intercourse" vary

24   from state to state.

25   Would you please show slide 16?          10:34:51

```
 1              Arkansas.  It counts in Arkansas if you just touch
 2     people through their clothes.  How are you supposed to tell
 3     that from an ad, from the face of an ad if you're the
 4     moderator?  You can't.
 5              Could you please show slide 17?                        10:35:10
 6              Arizona includes this one, which fascinates me,
 7     sadomasochistic abuse.  It's one of the ways they can prove
 8     prostitution.  It means flagellation or torture by or on a
 9     person who is nude or clad in undergarments, whatever those are
10     going to be, or in revealing or bizarre costume.  Who decides    10:35:33
11     that?
12              What if it happened yesterday, who then is the arbiter
13     of what is the bizarre costume?  I saw everything from a
14     Tyrannosaurus Rex to a little old lady last night
15     trick-or-treating.  We don't know, and we certainly don't know   10:35:53
16     from the face of an ad what is going to happen behind the ad.
17     You certainly don't know as a moderator, and there is no
18     evidence that the moderators ever received instructions like
19     you're getting.  None at all.
20              MR. RAPP:  Objection; this is not in the jury           10:36:16
21     instructions.
22              MS. BERTRAND:  Arizona is not?  Okay.  We will move
23     on.  I thought this was included in the instructions.  I pulled
24     it out of the instructions.
25              THE COURT:  I recall reading something to this effect   10:36:28
```

1    to the jury, so --

2              MS. BERTRAND:  We will move on.

3              THE COURT:  Thank you.

4              MS. BERTRAND:  This is for Ms. Vaught, maybe the most

5    important reasonable doubt that you have.  Government must          10:36:44

6    show -- this prosecution must show that this defendant had a

7    reason to believe that whatever benefits she might get from

8    this conspiracy, that we don't think she joined, probably were

9    dependent upon the success of the entire enterprise; that she

10   wins if they win.                                                   10:37:08

11             And here your next reasonable doubt that they cannot

12   counter, is she had nothing to gain from this.  She started at

13   Backpage making $13 an hour along with her fellow $13 an hour

14   moderators.  She worked her way up because she was careful and

15   conscientious, and detail oriented.  That was Ferrer's words.      10:37:38

16   And by the time Backpage was shut down nine years later, she

17   made less than one-tenth of what Carl Ferrer made between his

18   salary and his side hustle.

19             What in God's name did she have to gain from joining

20   this?  I submit to you that they cannot rule out nothing.          10:38:05

21             In fact, your last reasonable doubt as to Ms. Vaught

22   is that the opposite was true for her, and you see that by the

23   way she talks to the moderators, "Your job is on the line if

24   you screw this up.  If you don't catch these illegal ads that

25   we are trying and spending millions of dollars each year trying    10:38:36

1    to catch, you're fired."

2           So after the government is done talking to you, you're

3    going to go deliberate.  The Court is going to tell you how we

4    are going to do that given COVID concerns, but I'm going to ask

5    you to consider this with deliberations:  Reasonable                10:39:09

6    conclusions can contradict.  Each of you have a different world

7    experience that affects your reason and your rational thinking.

8    That's why we have jurors and not one person decide cases like

9    this.  So people are going to weigh the evidence differently.

10   If another juror's best efforts to persuade you do not take        10:39:37

11   away your reasonable doubts, you can't convict.  If the whole

12   group says guilty and you have reasonable doubt, you can't

13   convict.  That's your sworn oath.

14          And if any other juror threatens you to vote guilty

15   and you are uncomfortable with that, tell the judge.  It's that    10:40:00

16   important.  In fact, you can stick to your doubt even if you

17   can't put your finger on it 'cause this is just wrong.  It's

18   not enough.  All you need is there is not enough evidence to

19   prove I am wrong about there being a reasonable doubt.  They

20   haven't ruled it out.  It's possible.  And if it's your honest    10:40:26

21   belief, you have a right and duty not to compromise it away.

22          And your colleagues are allowed only to show you that

23   your honest belief is wrong, not to bully you or push you in

24   any way to change your mind.  Deliberations are not bullying

25   sessions.  You're jurors; not politicians.  When you have an       10:40:53

1  honest belief that there might be, just might be a reasonable

2  doubt, you're required to stand your ground.  This might be the

3  most powerful you are in public life ever.

4      And just as important, don't try to get another juror

5  to convict in spite of his or her honest belief.  Part of what                    10:41:20

6  happens in deliberation that's so important and gets overlooked

7  so much is mutual respect, in talking to each other one on one

8  from a place of honesty and from the heart, and that can't

9  happen if one group is going to bully another.

10     And if you think that a reasonable doubt is based on                           10:41:40

11  logic, then a reasonable doubt exists.  Even if you don't share

12  it, even if your logic is different, 'cause you cannot convict

13  when a reasonable doubt exists.  You have the right as a juror

14  to go home after this trial ends knowing that you've been on a

15  jury that followed the oath you personally took to obey the                       10:42:10

16  law, especially this law about reasonable doubt.  You must not

17  give it up to please anybody else, them, us, the Court, public

18  opinion.  Your honest belief in this context is sacred under

19  the law.

20     And to be clear, we're the people.  The government is                         10:42:33

21  not the people here.  When we created the United States, we

22  didn't transform ourselves into the government of the United

23  States.  We created a government entirely separate from the

24  people.  There's no use of the word "people."  The Declaration

25  of Independence or the constitution makes the people the                         10:43:04

1    government.  Quite the opposite.

2         To the Founders, the government and the people were

3    potential antagonists.  That's why the Founders gave us

4    protections, the Bill of Rights; First Amendment, big one;

5    Second Amendment; Third Amendment we don't talk a lot about now        10:43:23

6    in modern times, but that prohibited the government from

7    quartering troops in your home without your consent.  As you

8    can imagine in 1776, they found that particularly rude and

9    really important.  Fourth Amendment, search and seizure, limits

10   government conduct; Fifth Amendment, due process; Sixth        10:43:42

11   Amendment that governs criminal cases, all limit the

12   government's power and the government's reach, all place the

13   constitution between you and the prosecution.

14        The entire purpose of criminal trials is to protect

15   people from the government, not from ourselves, and sometimes        10:44:09

16   we forget that.  So let me remind you that this all -- this

17   whole American experiment starts with objection to taxation

18   without representation, and we fought and won our freedom

19   because Brittain, England was not governing us with fairness.

20   There were constant executions, jails were full.  And in fact,        10:44:37

21   so many people were going to jail from England, they set up the

22   state of Georgia to be like Australia, to be a prisoner state.

23   They didn't have room to keep them all.  And that was a

24   wholesale attack on the citizens and their civil liberties.

25   That's why we had the revolution.        10:45:03

1       And since then throughout our history we have

2 thousands of men and now women dying in defense of those

3 constitutional protections. They are not to be taken lightly.

4 They are not technicalities. And one of those protections

5 guarantees that the defense doesn't have to prove anything in a   10:45:24

6 criminal matter. I wouldn't have done this, but I could have

7 said, I don't think the Court would allow it, I could have said

8 after we opened in early September: I am going to go out of

9 town. I will be back. Come in today and they are like, yeah,

10 they haven't proven it. We didn't do that. I have no burden,   10:45:45

11 zero, standing here, nor do my colleagues.

12       In fact, what you see with each of these defendants,

13 including Joye Vaught, is people cloaked in the armor and

14 bulletproof vest of the constitution. They have had that

15 protection throughout this trial and beyond it if your verdict   10:46:10

16 is not guilty, and those protections don't come off unless you

17 the jury take them off with a guilty verdict.

18       We don't know why things happen, but somehow against

19 all odds you're the ones chosen to be here and who have been

20 here for two months, and it seems random of all the people in   10:46:31

21 Maricopa County and beyond you end up here, but it's not a

22 coincidence. It's not a coincidence that you made it through

23 voir dire; that you sat through this trial with such patience,

24 and I can hazard a guess none of you came here thinking, super,

25 I get to be on a jury. I think only trial lawyers think that   10:46:57

1    way, but you did.  And I don't know why it worked out that way,
2    but I've watched you all through this trial.  I watched how
3    carefully you've paid attention and your concern day after day
4    about total strangers.  That's not what people do a lot of in
5    our culture.  It's not too often that people come together from          10:47:19
6    a place of caring and obligation.
7          And now you're called to be a protector of our
8    constitutional rights.  The presumption of innocence does not
9    evaporate when the evidence closes.  The government doesn't get
10   any inferences.  They don't have a right to a verdict, and for          10:47:45
11   those of you who believe the prosecution cannot rule out any of
12   the reasonable doubts that I've listed, and you may have your
13   own, you might have plenty others, now is the time for you to
14   hold fast to your convictions.
15         I am going to show you one final slide please, slide          10:48:08
16   19.  Ms. Ellig, slide 19.  Maybe.  I think we're having a --
17   sorry.  Thank you.
18         Throughout this trial I thought a lot about
19   George Orwell's writings.  He warned us about government
20   overreach, and the cynicism of this prosecution echoes this.          10:48:42
21   Here, what is up is down; the First Amendment is protected,
22   except it's not; what is disclosed is concealed; helping law
23   enforcement with 20,000 subpoenas, law enforcement conferences,
24   late night and early morning phone calls is not evidence of
25   joining a criminal conspiracy.          10:49:13

UNITED STATES DISTRICT COURT

1       I will leave you with one final example.  In the, it

2  was in the '80s, some of you might be too young to remember

3  this, but there were probably ten people, I am estimating right

4  now, who were poisoned and died by Tylenol.  And they

5  investigated and found out that someone had poisoned some of   10:49:44

6  the Tylenol pills.  And so Tylenol did the right thing and

7  recalled all the Tylenol.  Just send it in.  No questions

8  asked.  We can't risk any of these.  We don't know what's been

9  poisoned; just send it all back.  So here's what I'm asking you

10  to think about.  You've heard a lot of metaphors of reasonable   10:50:09

11  doubt, but I will leave you with this one.

12       Imagine it's a few years after the recall, and if your

13  household is like mine and sometimes lets things go out of

14  expiration in the medicine cabinet, and your beloved isn't

15  feeling well.  It's late at night, stores are closed, and you   10:50:27

16  get up and look for something to give your beloved and you find

17  the Tylenol in the medicine cabinet.  You don't know what lot

18  it is.  You're not quite sure where you bought it.  You don't

19  even know how many of these Tylenol capsules of the millions of

20  Tylenol capsules are poisoned ended up in what bottle.  Can you   10:50:52

21  take this Tylenol back to your beloved and say, "Here, honey,

22  this will make you feel better"?

23       My friends, that's reasonable doubt, and I ask you to

24  vote not guilty not only on behalf of Ms. Vaught, but on behalf

25  of each of the defendants here.  Thank you.   10:51:19

1    THE COURT:  Thank you, Ms. Bertrand.  Members of the

2  jury, and Juror No. 7, we are going to take a brief break and

3  that is to permit the government to switch out the computer.

4  Since we do have a virtual appearance of one of the jurors, we

5  need to switch gears and so on and so forth, and so we'll take          10:51:42

6  approximately a 15-minute break.  And again, just remember the

7  admonition not to come to any conclusions nor to discuss the

8  matter.

9    Juror No. 7, you may blank out your camera for the

10  duration and then we'll have you back in in about 15 minutes.          10:52:02

11    Please all rise for the jury.

12    (A recess was taken at 10:52 a.m.)

13    (Proceedings reconvened at 11:10 a.m.)

14    THE COURT:  All right.  Please be seated.  Do we have

15  Juror No. 7 on ready to come in?  All right.  Yes, there she          11:10:46

16  is, and we'll have the jury in.

17                    (Jury is present)

18    THE COURT:  All rise for the jury.  All right.  Please

19  be seated.  The record will reflect Juror No. 7 remotely, and

20  the jurors are present.                                                 11:12:25

21    MR. BERRY:  Thank you, Your Honor, may it please the

22  Court, counsel.  Ladies and gentlemen of the jury, there are

23  two sides to Backpage, what the defendants wanted you to

24  believe and what the evidence actually shows.  Each defendant

25  had a specific role in the conspiracy.  Everyone was a            11:12:45

UNITED STATES DISTRICT COURT

1    necessary piece to the puzzle.

2            As the Court has explained to you, this is the United

3    States' last opportunity to stand before you and explain to you

4    our theory of the case.  That's because we have the burden of

5    proof.  You've heard defense attorneys argue in front of you          11:13:07

6    now for about seven hours.  I'm going to respond to that and I

7    am going to try to do it in under an hour, so I want to zoom

8    out and talk to you about our theory of the case and some of

9    their defenses.  My vow to you is to not show you another

10   e-mail.  We're going to talk about this case in a different way      11:13:28

11   today.  So let's zoom out and talk about these charges.

12           There is a lot of evidence in the charges, but the

13   case is actually quite simple.  There are 51 counts focused on

14   how the defendants promoted prostitution, and there are 49

15   counts focused on how the defendants engaged in money               11:13:49

16   laundering of the illegal profits they made from promoting

17   prostitution.  All five defendants are charged in Counts 1

18   through 51.  We'll talk about the money laundering charges a

19   little bit later.

20           You have this chart up here.  It's on the slide now as      11:14:08

21   well.  We've printed it for you, so I am not going to spend a

22   ton of time on the slide, and I told you I am not going to show

23   you a bunch of e-mails.  What we have done with this chart is

24   to distill the case down into just a handful of exhibits that

25   we believe are the core exhibits that show each defendants'         11:14:30

1    knowledge of prostitution in this case.

2        I encourage you to write these exhibit numbers down.

3    They are going to be up here on this poster board throughout

4    the entirety of my presentation.  Keep in mind also that this

5    presentation and the one Mr. Rapp gave the other day will not          11:14:50

6    be available to you.

7        As I go through this, if there is anything that you

8    think will be helpful to you in your deliberations, I encourage

9    you to jot that down as we're going.  We're going to talk about

10   some specific jury instructions and I'm going to point out some       11:15:08

11   the page numbers on which you'll find it.

12        I don't expect to you write the instruction down, but

13   keep in mind you're not going to have all of the jury

14   instructions.  I don't know if you still have them today after

15   she read them the other day.  You'll have one copy of those          11:15:25

16   jury instructions that will help guide you in your

17   deliberation.  The chart is going to be up here the whole time

18   so if you don't get it from that slide, it will still be up

19   here for you.

20        What I want to talk about is the general defense          11:15:39

21   arguments.  They did it in seven hours.  I will try to do it in

22   under an hour, and I think I can do that because they touched

23   on a lot of the same things.  One of the things that they said

24   is, "Ladies and gentlemen of the jury, it's not illegal to make

25   money."  We're going to talk about that defense.          11:15:55

1      They talked about the defense of "I didn't know."

2  There is no sex act for money language on the face of the ad.

3  If you can't arrest, then you can't convict.  There is no

4  knowledge of any of these 50 specific ads.  We're going to talk

5  about that argument.                                               11:16:13

6      We're going to talk about what I refer to as the "But,

7  mom" defense.  "But, mom."  I will explain that to you and

8  we'll talk about that.

9      We're going to talk about the "It wasn't me" defense.

10     Finally, we're going to talk about good faith.  This        11:16:27

11  is the roadmap for where we are going to go for the next hour.

12     Let's start.  The defendants say, "Hey, it's not

13  illegal in the United States of America to make money."  We

14  haven't charged them with that.  There is no federal statute

15  that says it's illegal to make hundreds of millions of dollars.  11:16:46

16  That is not the charge.  That is not the crime.  They are not

17  charged with making money.  They are charged with how they made

18  money.  Money was the object of the conspiracy.  They are

19  charged with how they made money, and that was off the backs of

20  people engaged in illegal prostitution business enterprises.     11:17:07

21  So that defense is handled.

22     Let's talk about one that's going to take a little bit

23  more time, the "I didn't know" defense.  I want to point your

24  attention to a few instructions as we go along the way.  Like I

25  said, you might want to jot down the page number.  You're not    11:17:28

1    going to write down the entire instruction, but when you get

2    back there, I think the instructions that I point out to you

3    are going to be helpful to you in guiding your deliberations.

4    One of them says, "If you find an ad proposes an illegal

5    transaction, it is not protected by the First Amendment."          11:17:46

6        On that same page as part of that instruction it says,

7    "The First Amendment does not protect speech that proposes an

8    illegal transaction."  That's the question.  Does it propose an

9    illegal transaction?

10        Now, you may recall in opening statements and then, as      11:18:01

11    predicted, Mr. Feder also brought it up in closing arguments,

12    he talked about that example of, "Ladies and gentlemen of the

13    jury," he got up here in opening statements back in August now,

14    September, he said, "You know, one-night stand for a hundred

15    dollars, you're just not going to know.  You're just not going    11:18:20

16    to know whether these ads are sex ads for money."  Ladies and

17    gentlemen, here is an example of a nightstand for under a

18    hundred dollars.  Does this look anything like what we have

19    presented to you as being posted in the female escort section

20    of Backpage?  I submit to you the answer to that is clearly no,   11:18:39

21    because context matters.

22        You also heard him talk about, "Put it in the hole for

23    a hundred dollars."  This is the closest example I could come

24    up with on short notice.  Here some funny T-shirts that people

25    have done with similar type language.  Does that look anything    11:18:57

UNITED STATES DISTRICT COURT

42

1    like these ads?  The answer is obviously no.  We are not

2    putting up ads like that that are clearly ambiguous in that way

3    because context matters.  And for purposes of the record, I am

4    showing Exhibit 223 that is in evidence.

5         Here's the language from that ad.  Now, because                11:19:19

6    context matters, right, the defense is arguing, this language

7    is not a sex-act-for-money language on the face of it.  Well,

8    what if it said the very language Mr. Feder talked about, what

9    if it said, "You can put it in my hole" as opposed to those

10   funny T-shirt version that have a golf ball and cornhole game     11:19:45

11   on it?  Doesn't context matter?  Depending on the context, the

12   phrasing can mean something very different.  And in the context

13   that we presented these ads to you, it is clear and obvious

14   what they were for.

15        So let's go back to that.  Keep in mind that when          11:20:00

16   you're deliberating, this is a very formal environment; right?

17   I wear a suit and tie everyday.  We stand up here and speak.

18   We answer to the judge.  You're not allowed to speak.  We're

19   talking up here, very formal.  We stand when you come in.

20   There is so much formality here, but please keep in mind when     11:20:18

21   you go back in the deliberation room, reason and common sense

22   are not checked at the door.  That doesn't go out the window

23   just because we're formal in here.

24        You may recall in opening statement Ms. Bertrand

25   talked about that Arizona statute.  She talked about a           11:20:35

UNITED STATES DISTRICT COURT

1    different part of the Arizona statute today, but in opening

2    statement she talked about a particular Arizona statute and she

3    talked about the very specific language in that statute.  And I

4    submit to you that if this ad had that language, which I have

5    now put in there.  This is not from the ad.  This is me     11:20:56

6    manipulating it from the language she used from the Arizona

7    statute that says, "In exchange for money, I agree to let you

8    fondle and manipulate any part of my genitals, anus or breast

9    or penetrate into the vulva or anus."

10         This is the first and only time that the guy from     11:21:21

11    Texas has been told to slow, so I'll take it.

12         I submit to you that if it had this specific language,

13    the exact statutory language from the Arizona statute, the

14    defense would still argue there is no sex-act-for-money

15    language in here.  You don't have to be so literal.  You don't     11:21:40

16    have to be so literal.  They knew that this site was replete

17    with these ads, and they used coded language like GFE, which is

18    in this one, Greek, boococky.  It's the name of the game, the

19    coded language.  They knew the codes were sex for money and

20    they knew the codes were endless.  They knew the only way to     11:22:01

21    actually prevent the promotion of prostitution enterprises was

22    to do one thing, shut the site down, but they didn't want to do

23    that because of the object of the conspiracy, which was to make

24    money.

25         I want to turn your attention to page 5.  Page 5 is     11:22:20

44

1    part of the reasonable doubt standard, and it says, "It is not

2    required that the government prove guilt beyond all possible

3    doubt." And I submit to you that that's what the defense is

4    essentially arguing to you in one form or another; that we need

5    to prove it to this level that is beyond all possible doubt.          11:22:43

6    So keep this instruction in mind as you're evaluating the

7    evidence based upon reason and common sense.

8          Page 8 it says, "You are to consider both direct and

9    circumstantial evidence.  Either can be used to prove any

10   fact." So circumstantial evidence is one of those things that I      11:23:04

11   think people who are not lawyers often have an idea about.

12   It's important for you to set that idea aside and make sure you

13   listen to the Court's instructions on this.  So circumstantial

14   evidence is evidence that can be direct and circumstantial, and

15   in the next slide I will show you it says that they are equal        11:23:24

16   in weight.  So let's talk about what is the difference between

17   direct and circumstantial evidence.

18          Direct evidence is like this:  You leave here at the

19   end of the day.  You've been inside all day, you walk outside

20   and you see it's raining, okay.  That is direct evidence.  You       11:23:41

21   have seen it has rained.  Circumstantial evidence is you're

22   sitting in here, you've been sitting here all day, somebody

23   walks in the back door.  They walk in the back door and they

24   have an umbrella, and they shake the umbrella off and they push

25   water off.  Their hair looks a little bit damp, and you now          11:23:58

1  have circumstantial evidence that it's raining or just recently

2  rained just outside.

3       The Court tells you on page 8, further continuing on,

4  that "The law makes no distinction between weight to be given

5  to either direct or circumstantial evidence." They are of equal    11:24:18

6  weight, and that's important to keep in mind as the defense

7  says, "Well, on the face of the ad we just don't know."  The

8  circumstantial evidence is very clear and obvious.

9       Mr. Eisenberg talked about in his closing argument

10  about Grant Snyder saying that the ads did not provide direct    11:24:37

11  evidence of prostitution.  You may remember him talking about

12  that.  Well, remember he said it was suggestive, and so did

13  their expert.  That is essentially circumstantial evidence.

14  They are saying, "Yeah, it looks like prostitution."  It is

15  circumstantial evidence of prostitution.    11:24:54

16       MS. BERTRAND:  Objection; misstates the law.

17       THE COURT:  Overruled.

18       MR. BERRY:  As we're continuing on talking about

19  "didn't know," right, we're still in the category of the

20  defendants didn't know, one of the things I think you want to    11:25:12

21  focus on is in those e-mails that are listed here in the chart

22  that you've seen ad nauseam.  You've seen statements from each

23  of these defendants in one form or another.

24       For example, you have Mr. Brunst in Exhibit 120

25  talking about the plausible deniability.  Remember that's the    11:25:29

```
 1    presentation that he helps author and he travels around the
 2    country in an effort to sell Backpage in around 2011, I think,
 3    and in there he talks about how, "Look, we have a general
 4    classifieds ad site.  We have buy, sell, trade, we have jobs,
 5    we have tons of ads, a small number of our ads are over here in       11:25:54
 6    this adult escort category.  That gives us plausible
 7    deniability."
 8            MR. LINCENBERG:  Your Honor, I object.  This
 9    completely misstates the testimony.
10            THE COURT:  Well, overruled.  And again, members of        11:26:07
11    the jury, it is your memory that controls in terms of what the
12    testimony and evidence is so far, and these are only summation
13    arguments of counsel, which are not evidence.
14            Continue.
15            MR. BERRY:  Thank you, Your Honor.  So plausible          11:26:24
16    deniability, because even though 94 percent of that company is
17    making money off escort ads, off prostitution ads, he says,
18    "Look, we got all these other ads.  That gives us plausible
19    deniability."  That's the two sides of Backpage I started with,
20    which is what they want you to know and what was really true.       11:26:44
21            Keep in mind the sale of Backpage to Carl Ferrer was a
22    giant exercise in plausible deniability.  It was an intentional
23    attempt to create that extra layer.  Remember Mr. Cambria
24    talked about being a layer away?  That's trying to create that
25    extra layer, that extra plausible deniability.                    11:27:05
```

1       Now, let's pause here on Mr. Brunst for just a second.

2   You heard some back and forth essentially between Mr. Rapp,

3   Mr. Lincenberg about what Mr. Brunst's role was.  You heard

4   Mr. Lincenberg refer to him as a nonoperational CFO, whatever

5   that means.  You've heard him refer to as a bill collector, a        11:27:31

6   bag man.  Ladies and gentlemen, I am telling you, you can call

7   him bananas.  It doesn't matter what you call him.  What

8   matters is that he made millions off of Backpage.  94 percent

9   of Backpage revenue was from prostitution ads.  There was no

10  other evidence of other income for Brunst after they sell the       11:27:51

11  newspapers in January of 2013.

12      Think of it like this:  Can you imagine that a

13  6 percent owner of the Diamondbacks is sitting up in his

14  executive suite, and he looks down at this beautiful green

15  field and he sees nine guys go out on the field, and you see        11:28:12

16  thousands of people paying to come and watch them and he

17  doesn't know that he owns a baseball team?  Come on.

18      Another statement, Ms. Vaught.  Ms. Vaught, you saw on

19  that e-mail where she is reprimanding some of the moderators.

20  Remember that?  This is part of the distraction strategy.  They     11:28:36

21  respond to law enforcement subpoenas.  They say, "Here's the

22  stuff you asked for."  And oh, by the way, because the police

23  dog's nose is long and straight and only points in one

24  direction, they want to give it a little nudge.  They want to

25  give law enforcement's nose a little nudge and push it to other     11:28:53

1    sites.  "These other sites, they have these links too,

2    Mr. Officer.  But, hey, don't tell them about the Evil Empire,

3    the Naked City, because we own those too."  That is evidence of

4    what they are doing is illegal.  That is her knowledge that

5    there is prostitution on that site.                          11:29:16

6          Then you have Mr. Lacey, and he uses the oldest

7    profession, his own words, in a column that he's writing.

8    That's his acknowledgment that this site is about prostitution.

9          You have Mr. Spear in an e-mail talking about how they

10   struck a deal with TER, and everyone knows at this point what  11:29:35

11   The Erotic Review is about, reviews of prostitution.

12         And then you have Mr. Padilla, the companionship

13   e-mail.  Do you recall that was an e-mail where -- this is an

14   important point too to think about.  Remember the defense is:

15   I am just a guy.  I am just a little guy here.  I don't have   11:29:54

16   any control over policy and procedure.

17         Remember that e-mail?  That e-mail is about him

18   talking, debating, philosophizing about whether we should allow

19   the word "lactate" in the filter.  Should we allow "lactate" to

20   be in ads, because, you know, if someone is lactating, then    11:30:14

21   there is arguably an exchange of bodily fluids, and our whole

22   theory of the case, our plausible deniability is that this site

23   is really just about companionship.  Can we really make that

24   companionship argument if we allow an exchange of bodily fluids

25   like lactating, because what is the next step after that?      11:30:36

49

```
1   Something more obviously sex related.
2           Next the defendants talked about, well, you've heard
3   all these cops say, "If you can't arrest on this ad, well, then
4   you can't convict."  Ladies and gentlemen, that's a false
5   comparison, an absolutely false comparison that they have been     11:30:54
6   loving pushing on you.  Look at the instructions on page 39.
7   The instructions on page 39 say very clearly, "The United
8   States does not have to prove that the referenced states' laws
9   were actually violated, only that each defendant had the intent
10  to promote a prostitution business."  It is not necessary for      11:31:18
11  us to show that each one of those states' laws were actually
12  violated.
13          What else do you have, though, to show that those laws
14  were violated and that they were in fact promoting
15  prostitution?  We brought before you multiple witnesses.  We       11:31:38
16  brought you police officers and the victims who testified:
17  Hey, every single time, every single time when the individuals,
18  the women who testified said they posted an ad, something
19  happened.  And every time one of the cops made a call,
20  something happened.                                                11:32:00
21          And you saw that as an example in the CNN documentary.
22  And what was that?  All you had to do was go to Backpage
23  because they had cornered the market on prostitution
24  advertisement, go to the female escort section and post your
25  ad, and just make it look generally like the other ads.  And       11:32:17
```

1    what happens?  The phone start ringing within minutes.  Every

2    single witness that came forward said the same thing, within

3    minutes, and that's what you saw.

4           (Playing video, not taken down by the

5    Court Reporter.)                                          11:32:58

6           MR. BERRY:  Next, the defendants argue, well, they had

7    new knowledge of these specific 50 ads.  Ladies and gentlemen,

8    these ads are just a sample.  We're not going to charge them

9    with a million counts based upon the millions of ads.  That's

10   why there's a conspiracy charge covering the statute, covering   11:33:16

11   the 14-year life of the conspiracy.  What I'm not -- what I'm

12   not going to show you is a jury instruction says we must prove

13   that any defendant had specific knowledge of these particular

14   ads because it isn't in there.  We don't have to do that.  You

15   won't see that instruction.                               11:33:41

16          Page 30 of the instructions says, "Each defendant in

17   some significant manner associated himself or herself with the

18   purpose of promoting or facilitating the promotion of any

19   business enterprise involving prostitution."  That's on

20   page 30.  You may recall Mr. Lincenberg said, "You don't become  11:34:01

21   a conspirator merely by associating with other conspirators."

22   That's true, but that's not what happened here.

23          We didn't -- he brought two of his friends in here.

24   They clearly associated with him.  We didn't charge his friends

25   who merely associated with a conspirator.  We didn't charge     11:34:20

1   Mr. Lacey's friends that he paid $5,000 to who testified here.

2   We didn't charge them because they associated with Mr. Lacey.

3   We didn't charge Mr. Becker because he associated with

4   Mr. Lacey.  All of them associated with a conspirator.  But

5   what this instruction makes clear is that the if the defendant      11:34:42

6   associated himself with the purpose of promoting any business

7   enterprise involving prostitution, then he is guilty.

8        Page 30 helps you to understand what it means to

9   "promote" or "facilitate the promotion of," because we have

10  been throwing those phrases around.  It's in the statute.  The    11:35:06

11  instructions help you understand it.  What does it mean?  It

12  means helping someone commit a prostitution offense, and that's

13  what Backpage did.

14       You saw victims and police officers who came in here

15  and explained to you how it helped.  By creating a marketplace,   11:35:21

16  creating a forum where those ads could be posted, it helped

17  promote someone else committing a prostitution offense.  All

18  right.  So we've dealt with "I didn't know."

19       Now we have -- we will deal with this one very

20  quickly.  This is what I call the "But, mom" defense.  This is    11:35:39

21  the one where, think about it, if you have kids, if one of your

22  kids is doing some wrong thing, and you look at them and you

23  go, "Hey, knock that off."  And they go, "But mom, but dad,

24  he's doing it too."  That's the defense here; right?  You've

25  heard them talk about, well, Facebook, TikTok, Google, all        11:35:58

52

1    these other things.  That is not what you're here about to

2    evaluate and decide.  You are here to evaluate and decide the

3    facts in this case and this case only.

4         You also saw this false equivalency argument in

5    Mr. Cambria's cross-examination of Issac Luria.  He says,      11:36:14

6    "Priests molest children, so why are you not taking out a full

7    page ad in the New York Times against them?  You're only doing

8    it against Backpage."  It's an intent to distract you from

9    focusing on the wrong thing these defendants did.  One person

10   who committed a crime versus an entire business that committed   11:36:36

11   the same crime over and over again everyday for 14 years.

12        Then we have the "It wasn't me" defense.  You've got

13   the owner defendants, Lacey, Spear and Brunst, up on top

14   saying, "I am not down in the trenches.  I don't know what's

15   going on."  And then you have Padilla and Vaught underneath     11:37:05

16   going, "I am just a guy.  I am just a woman.  I am just working

17   here."  Who are they pointing at?  They are consistently

18   pointing to Carl Ferrer.

19        Carl Ferrer has come in here and he sat before you for

20   days, and we're going to talk about his testimony.  And he sat   11:37:21

21   there, he accepted responsibility for his actions, and he sat

22   here and he gave his testimony and he was cross-examined by

23   five defense attorneys about that.

24        So I want you to think about page 27 of the jury

25   instructions when you're thinking about this "It wasn't me"     11:37:39

UNITED STATES DISTRICT COURT

53

1   defense.  It says, "The Travel Act offense fell within the

2   scope of the unlawful agreement and could reasonably have been

3   foreseen to be a necessary or natural consequence of the

4   unlawful agreement." To the extent they are pointing at

5   Carl Ferrer and all the things he did, isn't it a natural          11:37:57

6   consequence of the agreement to have Backpage post these ads

7   that he would do what he did, and that links them to the chain

8   and makes them culpable as well?

9         Again, we did not charge every person who ever worked

10  at Backpage.  We charged the ones sitting over here who were       11:38:18

11  actively involved in making it an ongoing venture.  They were

12  each a necessary and important piece of the puzzle.

13        Page 26 of the jury instructions I also want you to

14  focus on and be aware of.  It says, "It is not a defense that a

15  person's participation in the conspiracy was minor or for a        11:38:41

16  short period of time." Now, you've heard at least three of them

17  get up here and say that you could arguably say they all made a

18  similar argument.  This applies to Vaught just as much as it

19  applies to Lacey or Brunst.  Remember, they are claiming to be

20  distant, minor, a layer away.  All of them were integral,          11:39:05

21  invested and intent on making this venture and conspiracy

22  successful.

23        And how was success defined?  The object of the

24  conspiracy was money, dollars.  And how did they make it?

25  94 percent of those dollars came from the female escort            11:39:25

54

1  section, which was prostitution.  What was the goal of anyone

2  who posted in the escort section?  Make the phone ring.

3       Mr. Rapp used the metaphor of an engine room.  That's

4  where Padilla and Vaught were.  Think of Backpage like a ship,

5  all right, it's a ship.  You might want to call it the Titanic,   11:39:48

6  it has gone down, but it's like a ship.  They aren't on top

7  steering, Padilla and Vaught aren't on top steering, but they

8  can feel the rough seas.  They know about the CNN

9  documentaries.  How can you work in a company and not be aware

10  that a major news organization has produced and aired a   11:40:07

11  40-minute documentary about all the things your company is

12  doing wrong and not be aware of it?  They can feel the rough

13  seas.  They know about that.  They know about the Attorney

14  Generals letters, and they know they are not on solid ground.

15       Then you have the captains of the ship, Lacey, Brunst,   11:40:24

16  Spear.  They are not in the engine room.  They are not down

17  there picking and choosing, "lactate" and "companion" and

18  "BBBJ," and all of those things, but they can feel the rough

19  seas too.  They can see the rocky shores, they can feel the

20  icebergs and see the sharks circling.  They know about all the   11:40:47

21  things people are saying about Backpage.

22       So when you're thinking about that, just because they

23  might appear minor as compared to one person or another doesn't

24  mean that you don't -- you can't find them guilty.

25       Page 21 is sort of the bookend to that, and it says,   11:41:03

55

1    "The punishment provided by law for this crime is for the Court

2    to decide." Each defendant played an important role in the

3    conspiracy, and even those who played a minor role are still

4    subject to accountability under the law.  That was the previous

5    instruction I showed you.  Punishment is not for you to                    11:41:22

6    consider.  It will be decided by her Honor.  So that gets rid

7    of "But, mom" and "It wasn't me" and it leaves us with "good

8    faith."

9         Page 47 talked to you about good faith.  I think each

10   of the defense attorneys mentioned it in some capacity or          11:41:42

11   another.  Good faith is defined as encompassing a belief or

12   opinion honestly held in an absence of malice or ill will.

13   What evidence do you have of each of the defendants' honestly-

14   held belief or opinion?  I submit to you, you don't have any

15   evidence.                                                                   11:42:07

16        Let's talk about what evidence there is that

17   demonstrates a lack of good faith, which is the government's

18   burden here.  First, you have them claiming, "Well, moderation,

19   that shows our good faith.  We were trying.  It was a tough

20   job, but we were really, really trying."                                    11:42:25

21        When I think of moderation, I think of a game called

22   Taboo.  It's a card game I play with my kids.  And if you've

23   never played it, it's pretty simple.  You have a card, you have

24   a word on it, and then you have five other words.  You're not

25   allowed to say that word.  Let's say the word is "baseball."               11:42:43

1    That's the card I am looking at.  You're my partner and I am

2    trying to get you to say the word "baseball."  I can't say the

3    word "baseball" and I can't say five other words like "sport"

4    or "pastime" or "pitcher" or "hitter," something like that.

5    Can't say that word.  Can't say those other words, but I still          11:43:01

6    need you to say "baseball."

7         So I come up with other words.  I think I can get you

8    to say it.  Maybe I say "Dbacks," "World Series," "Rangers."

9    Do you think you can figure out what that means?  Do you think

10   you can figure out what it is I'm trying to get you to say?          11:43:20

11   That's what moderation was.  It's take away these words over

12   here, but we've already cornered the market on prostitution

13   advertising.  So if we take away some of these words and we let

14   them put these kinds of pictures and these other kinds of

15   words, I think they are going to get it.          11:43:38

16        They are going to bring people together.  The

17   marketplace has been created by them and they know that.

18   Moderation is a game.  It's a joke.  It is not good faith.

19        Another piece of evidence of lack of good faith is

20   that whole distraction of law enforcement that I talked about          11:43:56

21   when I talked about the Evil Empire, Naked City link e-mail

22   that Ms. Vaught sent.  That attempt to distract law

23   enforcement, the long nose of the police dog, that is not good

24   faith.  That is them pushing away, distracting from them in

25   what they are doing in the 20,000 subpoenas that they received          11:44:16

57

1   over and over and over again telling them, "You have

2   prostitution on this site."

3       Next you have them hiring the Internet safety

4   consultant.  Do you remember Hemu?  They hired this guy.  He

5   gives them all this advice, tells them, "Here is how you can          11:44:35

6   help this out."  What do they do?  Put him on the shelf.  Why?

7   Because his most important suggestions that might have actually

8   accomplished something, and might have actually eliminated

9   prostitution advertising on their website would also do what?

10  It would reduce the object of the conspiracy, which was to make      11:44:52

11  money.

12      Same thing for the NGO suggestions.  They run all over

13  the country meeting with these NGO saying, "Oh, I really want

14  to hear your thoughts and feelings about this."  What do they

15  do?  They ignore it because it's really just a game.  It's just      11:45:09

16  a stall tactic.  It is malice and ill will.  It is a lack of

17  good faith about what they are doing.  They don't actually care

18  what the suggestions are.  They just want to keep making money.

19  It's basically the same dang thing as the slow dance with the

20  Attorney Generals, which is a line item in their budget.  How        11:45:30

21  can we slow dance the Attorney Generals?

22      Then you have this FBI award in 2011.  Well, this is

23  just the greatest evidence of good faith to them.  All right.

24  2011, you saw witness after witness say, "Did you know anything

25  about the relationship with The Erotic Review?  Did you know         11:45:46

```
1   anything about their aggregation policy?"

2           "No.  No.  No.  No.  No."

3           Do you seriously think that the FBI who handed out

4   this little certificate in 2011 understood the internal aspects

5   of this company?  They didn't.  It took until 2018 for us to

6   figure that out and put it together, and that's why we're here

7   now.

8           Another piece of evidence of the lack of good faith is

9   remember they are a legitimate company right up until they

10  start doing what?  They are like, "Well, we sent out e-mails

11  and things are heating up.  The AGs are circling.  Maybe we

12  should just stop regular e-mails and start using Proton Mail,"

13  because they know what they are doing is wrong, and they are

14  trying to reduce the ability to see the evidence of that.  I

15  submit to you that that is evidence of a lack of good faith.

16          Similarly, and perhaps most compellingly is the very

17  issue of The Erotic Review.  That is front and center of this

18  case to show lack of good faith.  They didn't tell anybody

19  about that.  I think you heard Mr. Ferrer testify the first

20  time he ever mentioned the relationship, and that's what is

21  important.  They want to make this big deal about, you think

22  the FBI, the most sophisticated law enforcement agency known to

23  mankind, didn't know about this website?  Of course they knew

24  about the website.  What they didn't know about was Backpage

25  was hiding, the other side of Backpage that they didn't want
```

11:46:03
11:46:27
11:46:47
11:47:08
11:47:26

59

1    you to see, which is the relationship, the internal formal

2    intentional relationship with this website that they were

3    creating, and that shows they had lack of good faith and that

4    they intentionally knew about the prostitution.

5           Other evidence of a lack of good faith, keep in mind,    11:47:42

6    is all of the shell companies and all of the movement around

7    the world, all of these different companies that are created in

8    different places.  You heard Mr. Lincenberg argue that banks

9    knew Backpage was affiliated with Website Tech and Ad Tech and

10   Camarillo and Medalist, but it took an investigation by the    11:48:02

11   criminal investigations division of the IRS to unpack all of

12   these complicated shell companies.

13          You saw absurd charts of companies.  Why is that

14   necessary?  Remember, for the first eight years of Backpage's

15   existence, Backpage was on the name of the bank account.  The   11:48:23

16   US Bank shut them down.  What did they start doing?  Well,

17   we're toxic, so what are we going to do?  And for the rest of

18   the life of the company they were engaged in financial

19   gymnastics opening shell company after shell company, from

20   Curacao to China.  That is not good faith.                      11:48:45

21          More importantly, that is precisely what it means to

22   conceal or disguise as the money laundering instructions tell

23   you.

24          Now, let's talk about some of the defense witnesses.

25   You have two character witnesses for Spear come in.  We ask     11:49:02

UNITED STATES DISTRICT COURT

1    them, "What do you know about Backpage?"  He answered,

2    "Nothing."  This goes to the issue of, what do you know, what

3    evidence is there in the record about what these defendants'

4    good faith is?  Their honestly-held belief or opinion.

5    Remember that jury instruction?  What do you actually have in          11:49:21

6    the record that you can point to?  He brought in two witnesses,

7    and both of them said, "I don't know.  Never really talked to

8    him about it."

9         How does your nearest and dearest, one of the guys who

10   has gone to three of your weddings, how do you not know what        11:49:37

11   his business is?  I submit to you it's because he didn't want

12   to talk about it because he knew what it was about and he

13   wasn't interested in sharing those details.

14        Same for Mr. Lacey.  Two former employees.  They each

15   got $5,000 checks, and both of them said, "I didn't really have    11:49:56

16   any knowledge of Backpage."

17        First of all, why not call a couple employees that

18   maybe you didn't throw $5,000 out?  And two, why not call

19   employees that know something about you and your company?  He

20   didn't.                                                            11:50:15

21        Same with his witness Mr. Becker.  Remember that

22   attorney testified he would not have done it knowing what he

23   knows now.  And remember Mr. Becker talked about his own

24   accounts were shut down for his dealings with Mr. Lacey because

25   he was so toxic, because Backpage was so toxic.  That's why        11:50:34

1    they were creating numerous shell companies in different

2    countries.

3          And then don't forget the expert Dr. Mehlman-Orozco,

4    the person who can't answer a straight yes or no question.

5    She -- it's basically her testimony that this website was a          11:50:53

6    hundred million dollar business based upon fake ads.  She

7    cannot be taken seriously, ladies and gentlemen.  She says she

8    doesn't know whether they were real ads or not, but you know.

9    You know because you heard the witnesses get on the stand and

10   say, people like Naiomy, Breahannah and Anya, and they told you    11:51:16

11   what they did for money.  You know that those were not fake

12   ads.

13         And finally, you have their witness Mr. Snyder, former

14   Minneapolis police officer, who is basically like the police

15   officers we brought before you who said, "I worked a lot of        11:51:37

16   Backpage cases.  They were all sex trafficking.  That's where

17   we went to make those kinds of cases."

18         Now, sticking with good faith for a moment here.

19   Page 43 of the jury instructions talks about Count 100.  You

20   heard Mr. Cambria argue this issue in some detail, and the         11:51:55

21   instruction tells you that if he knew the transportation was

22   designed, in whole or in part, to conceal or disguise, then he

23   can be found guilty.  Remember the evidence that that

24   transaction, he takes -- he tells his attorney to:  Take 16 and

25   a half million dollars from your account, don't have my name on    11:52:20

62

1    it 'cause I am toxic, send that 16 and a half million to

2    Hungary, don't put it in my account over there either, put it

3    in another name, and do it on January 3rd --

4            MR. CAMBRIA:  Object to that, Your Honor, that is not

5    the evidence.                                               11:52:35

6            THE COURT:  Well, the jury is the determinator of the

7    evidence at this juncture.  And again, what counsel say is not

8    evidence, but the objection is noted.

9            MR. BERRY:  This happens on January 3rd, 2017.  You

10   have two primary pieces of evidence about that.  Exhibit 1, I   11:52:52

11   didn't put it on the chart.  If you remember that one,

12   Exhibit 1 and the testimony of Lin Howard, the banker, the lady

13   that came in and testified that she had a similar conversation

14   to the e-mail where he is saying, "I want to hide some money

15   from the government."                                       11:53:11

16           Now, that happens in January of 2017, and you'll

17   recall the testimony evidence that there was some other stuff

18   happening around that time, and that was the Senate

19   investigation was going on, but some other stuff had been going

20   on for a long time, right, the investigation had been going on   11:53:26

21   for quite a while, including the CNN documentary, the New York

22   Times column, things like that.

23           Mr. Lacey had something rattling in his ears as well.

24   He had all of those pieces of evidence, notice letting him know

25   that things are getting rough.  Things are heating up, in the   11:53:47

UNITED STATES DISTRICT COURT

1    words of Mr. Brunst at one point.  And then he gets indicted in

2    April of 2018 and he goes on August of 2018, 18 months after

3    the crime has been committed.  The crime is complete on

4    January 3rd, 2017.  That's when you have to find that he had

5    the intent to transport this money designed in whole or in part    11:54:11

6    to conceal or disguise it.

7         But 18 months later, several months after he is

8    indicted, he says, "Hey, government, here's this little FBAR

9    thing.  By the way, I stuck 16 and a half million dollars over

10   in Hungary.  I've told you about it now," after the crime is    11:54:28

11   complete.

12        Let's balance the defense witnesses against the

13   prosecution witnesses.  You have insiders, Carl Ferrer,

14   Dan Hyer, and Jess Adams.  Let's talk about Carl Ferrer for a

15   second here.  Ladies and gentlemen, we are not asking you --    11:54:49

16   the defense got up here and made arguments about reasonable

17   doubt and reliance on a witness, and the most important is, and

18   they used some pretty outrageous examples.  We are not asking

19   you to look at Mr. Ferrer and say, if he told you that nana had

20   cancer and you got to amputate her limbs and cut out organs,    11:55:12

21   then you need to believe him.  That is not what we are saying,

22   ladies and gentlemen.  That's not what we are asking you.

23        First of all, Mr. Ferrer is not a doctor.  But you

24   know what he is?  A Ph.D. in prostitution advertising.  He is

25   an expert in what he got up here to talk about, and that you    11:55:29

1    can rely upon and believe.

2          We also brought you outsiders.  We built the wall.  We

3    started with the foundation of Carl Ferrer and we added witness

4    after witness after witness, brick after brick, and built the

5    wall that builds the house that contains this case and this          11:55:47

6    prosecution.  We brought you John Shehan from NCMEC, Brad Myles

7    from Polaris, Issac Luria from Auburn, the AMEX guy, and Lin

8    Howard from the bank.  We brought you multiple police officers

9    who all say essentially the same thing about what Backpage was

10   really about, and we brought you victims like Breahannah,           11:56:06

11   Naiomy, Anya, Astrid, Jessika, Jordan, Megan or Shanna who was

12   the sister of Cynthia, and Andrea.

13         Page 9 of the jury instructions.  People often forget

14   things or make mistakes in what they remember.  Again, you have

15   to use reason and common sense when you're deliberating.  It        11:56:28

16   was a 14-year conspiracy in which thousands of e-mails were

17   sent by and to Carl Ferrer.  The instructions tell you to

18   consider his testimony carefully and to look at the fact that

19   he's entered into a plea agreement.  We are not scared of that.

20   You should.  Keep in mind that he was trying to be reasonable.      11:56:46

21   Look at how he was cooperating.

22         Several times you heard him say in answers to

23   questions both from the prosecution and the defense, "I am not

24   sure."  If he didn't know, he didn't know, and he said that.

25   Sometimes he would say something, and you might recall he will      11:57:04

1    say, "Actually, would you mind if I corrected my testimony?"

2    He was trying to be conscientious.  You got to observe him for

3    days.  It wasn't like a 30-minute witness, right, he was up

4    there for days, and you got to observe his demeanor and assess

5    his credibility with your own eyes.                              11:57:22

6              You also have the victims.  The victims corroborated

7    with the ads, corroborated what they said.  The ads were for

8    prostitution, and they know because they were in the rooms

9    engaging in those sex acts for money.

10             You heard the police officers, and they corroborated  11:57:38

11   what Mr. Ferrer said.  They used countless investigation that

12   used Backpage that turned out to be prostitution.  You heard

13   from Dan Hyer and Jess Adams, they corroborated.  You saw 400

14   plus exhibits.  We didn't just put up a guy we pulled off the

15   street and said, "Hey, go point the finger at all these people  11:57:55

16   over here.  Here's what to say."  We anchored his testimony in

17   the exhibits.  It was built on the foundation of those

18   exhibits, and you have that to rely upon as corroboration.

19             You heard the defendants' own words in those e-mails.

20   You didn't hear a challenge to the authenticity of some of      11:58:13

21   those exhibits where their clients are saying something.  They

22   are not saying this is a made up e-mail; this is a bogus

23   e-mail.  They might have objected and didn't want it to come

24   in, but you don't have to consider it.  They didn't say, "Hey,

25   this isn't my client.  I don't know who this guy named Jed is.  11:58:30

UNITED STATES DISTRICT COURT

1    I don't know who this guy Lacey is."

2          Then I submit to you that in their cross-examination

3    of Mr. Ferrer, they also corroborated his statements.  Did you

4    notice how many times they got him to authenticate their

5    exhibits?  How many times they got him to say, "Isn't it true          11:58:46

6    that this was what was going on?"  They know he's a Ph.D. in

7    prostitution advertising because he was one of them.

8          Now, one of the arguments that Mr. Cambria made, both

9    in opening and closing is, "Hey, my guy, he's just an old time

10   newspaper guy."  Just an old time -- "There is a wall.  There          11:59:08

11   is a wall between the business side of the newspapers and the

12   editorial side, and my guy, he is on the editorial side, just

13   an old time newspaper guy."  Keep in mind, even if you buy

14   that, you can't buy that after January of 2013.  Why?  Because

15   then in January of 2013, Mr. Lacey and the other owner                 11:59:29

16   defendants sold all of their newspaper interests, sold them

17   all.

18         Note that Counts 2 through 51, the prostitution ads,

19   all take place after the sale of the newspaper.  When all of

20   those defendants, all of the owner defendants are exclusively          11:59:50

21   focused on Backpage, they are not distracted by all the 18

22   newspapers anymore.  They are focused on Backpage.  It's a

23   little silly to suggest that they didn't know what Backpage was

24   about from 2004 to 2012, but it is absolutely preposterous to

25   claim that once they sell the newspapers.                              12:00:12

1      You heard zero evidence of any other source of income

2  for these men.  And remember, even Mr. Lacey's own witness

3  comes in here and we cross-examine him and we point out how he

4  posted on Facebook once, they traded that legacy of newspapers

5  in for a chase for gold derived from prostitution.  That's not      12:00:30

6  our witness.  That's his witness.

7      Ladies and gentlemen, that old time newspaper guy went

8  away in 2013 because he chased gold that was derived from

9  prostitution on Backpage.

10      Page 25 of the instruction says, "An overt act does      12:00:52

11  not itself have to be unlawful.  The United States is not

12  required to prove that the defendant personally did one of the

13  overt acts." Here is the time line that shows some of those

14  overt acts.  Remember, it doesn't have to be an illegal event.

15  An e-mail is an overt act, and we have shown you countless      12:01:12

16  exhibits where each defendant committed an overt act, and more

17  than one overt act, e-mails they sent in furtherance of making

18  Backpage successful.

19      Mr. Cambria used the analogy of a person who owns

20  stock in General Motors.  Remember that?  Where he says, "Look,      12:01:36

21  my guy, he is just like somebody who owns stock in General

22  Motors.  He doesn't know what's going on."  Mr. Cambria

23  suggested that Lacey was like that, yet he's the individual who

24  met with all of the NGOs, authored that Backpage understood

25  document about oldest profession, and he's defending Backpage      12:01:59

68

1    publicly.  He's the captain of the ship.  His bank accounts are

2    getting shut down, as Becker testified, and he knows what's

3    going on.

4         All right.  I said we would get to money laundering.

5    We are here.  We are getting close to the end.  Money                    12:02:16

6    laundering is very simple, although it doesn't always work that

7    way.  Counts 53 to 62 are concealment money laundering.  It's

8    shown through the use of numerous shell companies that they

9    didn't need for the first eight years of Backpage's existence.

10        Count 63, there was that evidence that this was a            12:02:40

11   payment to a web developer in India to help develop nonadult

12   feeds, to help bolster that plausible deniability:  Hey, let's

13   get that developer and bring us a bunch of nonadult stuff so we

14   look like we are a general classifieds site.  Concealment isn't

15   necessary on Count 63.  And $10,000 threshold is also not               12:03:02

16   necessary.  I think that's the smallest one.  I think that's

17   like the 6000 dollar payment.  Keep in mind, you don't have to

18   show the 10,000 of concealment on those counts there, 63

19   through 68.

20        64 through 68 are international promotional money            12:03:19

21   laundering.  That's the money moving from Europe back to the

22   United States and put back into the Backpage business for

23   payroll purposes.  That's promoting the business.  That is

24   the --

25              MR. LINCENBERG:  Objection; there's zero evidence of          12:03:36

UNITED STATES DISTRICT COURT

69

1　that.

2　　　　　THE COURT:  Overruled, Mr. Lincenberg, and the jury

3　will use its memory of what the evidence is.

4　　　　　MR. BERRY:  Counts 69 to 99 are the transactional

5　money laundering, and there are various defendants that you see　　12:03:48

6　in the chart here.  I didn't put each one because sometimes

7　it's two of them; sometimes there's one of them, and you'll see

8　that in the verdict sheet as you go to deliberate.

9　　　　　All you need to show there is a monetary transaction

10　that involves $10,000 or more of Backpage money, and all of the　　12:04:03

11　evidence that you have about that comes in the form of

12　Quoc Thai's testimony, and it's all summarized very neatly in

13　Exhibit 1479.  1479 is the one with those charts, those

14　flowcharts of not Backpage company, shell company name, money

15　movement to another company, shell company, that's also not　　12:04:26

16　Backpage, but it's all Backpage money.

17　　　　　All right.  Page 2 of the instruction says, "Do not

18　allow yourself to be influenced by personal likes or dislikes,

19　sympathy, prejudice, fear, public opinion, or biases." Ladies

20　and gentlemen, this is not a case about personalities, but it　　12:04:49

21　is about people.  You can like defendant Lacey newsman legacy;

22　you can like his attorney, Mr. Cambria.  I like him.  But that

23　should not affect your evaluation of the evidence.

24　　　　　As I said in the beginning, there are two sides to

25　Backpage, the one the defendants wanted the world to believe,　　12:05:11

1   which they vigorously attempted to put out there for many

2   years, but then there's the inside of Backpage, which has been

3   revealed to you through the exhibits and testimony over the

4   course of this trial.

5           This case is not about money.  This case is about          12:05:30

6   people.  It's about defendants for sure, but it's also about

7   Jordan and Cynthia, Astrid, and the others.

8           Ladies and gentlemen, actions have consequences, and

9   this is the 50 ads in about 50 seconds.

10          Ladies and gentlemen, this is your opportunity to hold    12:06:29

11  these defendants accountable for the consequences of their

12  actions.  We ask that you find them guilty.  Thank you.

13          THE COURT:  All right.  Thank you, Mr. Berry.

14          Members of the jury, you've been through quite a lot

15  in a relatively short period of time when the parties rested    12:06:48

16  their case last week, and I read you voluminous instructions,

17  and we have now had an instance where we've had to release a

18  juror because of illness and we do now have a juror appearing

19  remotely for the same purpose.

20          I know that there are one or more of you who also are    12:07:14

21  not feeling 100 percent and we want to ensure that everyone

22  when they receive the case for official deliberations receive

23  it when they are feeling at their best, and so I have decided

24  at this juncture to recess the trial and to resume on Tuesday

25  morning when everyone will have hopefully an opportunity to     12:07:43

```
 1    take care of their health, take care of anyone who has any sort

 2    of illness.  It's flu season, of course, and we want to make

 3    sure that you're all at your very best when we hand you the

 4    case.

 5            There are some technical things that need to occur,          12:08:04

 6    not additional arguments, be assured, not additional

 7    instructions, but I do want to remind you of a couple of

 8    instructions before I hand you the case for deliberation.  And

 9    since we are not at that point yet, I'm going to remind you of

10    the admonition.                                                      12:08:25

11            It's critically important at this juncture that you

12    adhere to the admonition not to discuss the case, not to

13    conduct any research, not to discuss the case amongst your

14    family, your coworkers, amongst one another.  And you may, of

15    course, tell your coworkers, your employers, your family, that      12:08:48

16    the jury is -- the trial is suspended for the duration of the

17    week and that you are expected to return on Tuesday morning at

18    9:00 a.m.  You may tell them the schedule.  You may not tell

19    them anything about the case, however.  You may not, again,

20    come to conclusions.  You can't come to conclusions because you     12:09:12

21    don't have the instructions before you, and so please adhere to

22    the admonition.

23            I want to remind you that we've been at this, and you

24    know better than I, that you've been at this daily for a number

25    of weeks, and should any juror come into contact with any          12:09:31
```

```
 1   information, anyone who gives you information, though it might
 2   not be solicited, to report that contact immediately to the
 3   Court.  I need to be aware of it, and at this juncture it's
 4   very critical that we not jeopardize the proceedings because we
 5   could end up having to start all over again.                    12:09:54
 6              With that, I will expect you all to be here at
 7   9:00 a.m. promptly.  I'll have you in.  Again, we'll provide
 8   you with just some limited instruction and information and we
 9   will proceed in that way.
10              All right.  Now, with that, we will adjourn our       12:10:17
11   jurors, and please all rise as the jury leaves.
12              And Juror No. 7, you may disconnect.
13                     (Jury is not present.)
14              THE COURT:  All right.  Please be seated again.  Those
15   in the gallery, I ask you to remain just so that the jury can    12:10:58
16   leave uninterrupted from the building.
17              Let me just place on the record, I was correct in my
18   memory, Mr. Rapp, the statement that Ms. Bertrand put up was
19   indeed on page 32 of the instructions, so I just want to make
20   the record clear with regard to that.                           12:11:23
21              With regard to the issue of the forfeiture proceeding,
22   why don't we reconvene tomorrow at 10:00.  Again, I'm getting
23   through your briefing with regard to that.  I want to look at a
24   couple other matters.  I understand Mr. Panchapakesan is taking
25   that issue on for the defense.  I'll permit him to appear        12:11:47
```

1   remotely.  We have the Zoom link now capacity, so we'll use

2   that in that way.

3          Is there anything further to be taken up by the

4   government?

5          MR. KESSLER:  Your Honor, sorry --        12:12:02

6          MR. STONE:  No, Your Honor.

7          THE COURT:  All right.  Mr. Kessler.

8          MR. KESSLER:  I did not want to interrupt Mr. Berry's

9   closing rebuttal, but I want to make a record of Mr. Spear's

10   objection to a couple of things.        12:12:26

11          In discussing the character witnesses that the defense

12   called, Mr. Berry posited the question to the jury, why don't

13   they call somebody who knows something about, you know, the

14   defendants' involvement with Backpage, or something to that

15   effect.  I am paraphrasing.  It is improper for the prosecutor  12:12:54

16   to comment on any defendants' failure to call any witness.  We

17   don't have an obligation to present any witnesses, but if we

18   present some, that doesn't open the door to the government

19   suggesting that we should have called others.  Like the

20   government often says, the door doesn't swing both ways.  12:13:26

21          Additionally, that constitutes burden shifting, it

22   violates the defendants' Fifth Amendment rights, and there was

23   an additional comment that amounted to balancing the witnesses,

24   which is improper, where Mr. Berry pointed out how many

25   witnesses in how many different fields the government called to  12:13:57

1   testify and, look, the defense only called a smaller number.

2   That also violates the prohibition of the Fifth Amendment,

3   violates the government's burden of proof requirement, and is

4   improper burden shifting.

5           THE COURT:  Mr. Berry, do you wish to respond?          12:14:33

6           MR. BERRY:  Sure.  I don't think that that's quite

7   right what he's characterized.  I don't think I commented at

8   all about the number of witnesses and tried to balance that.

9   What I was trying to do was balance the quality and content of

10  what was presented.  The jury is certainly allowed, and it's   12:14:52

11  okay to let them know, "Hey, here's what they put up and here's

12  what we put up, and you can evaluate the content of that and

13  how it was corroborated."  That was in the context of me

14  talking about all of the witnesses that corroborated what

15  Mr. Ferrer said, which was a response to all of the defendants  12:15:11

16  castigating Mr.  Ferrer's veracity and truth.

17          About the issue of why didn't they call another

18  witness, that was not intended to say, "Hey, they should have

19  called anyone."  It was saying, if you're going to call this

20  person, why isn't it someone who knows something about what    12:15:34

21  this trial is about?  And that was the intent of what I was

22  saying.  The record will show what the record shows about what

23  I said about that, but that was certainly what I was trying to

24  articulate for the jury is why these two witnesses, who didn't

25  know anything about Backpage in the context of good faith, and  12:15:51

75

```
 1    what do you have in the record that evaluates that you can rely

 2    upon to evaluate their belief or honestly-held opinion

 3    regarding good faith?

 4          I was careful not to articulate or suggest that they

 5    needed to testify because they didn't need to.  That's obvious.    12:16:09

 6    I can't say that.  But once they put up two witnesses to say,

 7    "This is my guy; I know Mr. Spear," I think it was okay for me

 8    to comment on why is it that those are the two people that they

 9    called that don't know anything about Mr. Spear's involvement

10    with Backpage, and that was certainly my intent.                   12:16:28

11          THE COURT:  All right.  I will take a look at the

12    transcript of the argument and I'll make whatever -- if I need

13    to make a ruling, do that tomorrow in advance of our

14    discussions about the forfeiture issue.

15          MR. LINCENBERG:  Your Honor, I know there is a record       12:16:51

16    that an objection by one is for all, but I want to make clear

17    that we join in that objection.

18          THE COURT:  Certainly.

19          MS. BERTRAND:  Same for Ms. Vaught.

20          THE COURT:  And you might have noticed that I created      12:17:01

21    a new word for the -- they are the determinator, at a

22    presidential moment, I think, and you can quote me on that.

23    All right.

24          MR. FEDER:  One other thing to make a record.  The

25    closing brings to mind the Motion to Dismiss the unbounded       12:17:19
```

UNITED STATES DISTRICT COURT

1    conspiracy, and we just note that for the record, that they

2    opened it up to multiple conspiracies, which the Court did not

3    give an instruction on.

4        In addition, Mr. Berry seemed to have tried to

5    disconnect the requirement that the ad, the overt acts connect          12:17:35

6    with 52 ads, not to any ad that was on Backpage.

7        THE COURT:  Well, my recollection, and I haven't

8    changed it based on the arguments, is that it's a continuing

9    conspiracy.  It just occurred in certain year time span, but

10   that it is not multiple conspiracies, and so I'll look at that          12:18:02

11   again and see if I come to some other determination, but your

12   argument is noted.

13       MR. CAMBRIA:  One other thing, Your Honor, please.

14   Since the jury has not started deliberating, we would renew our

15   objections to the charge and suggestions or request a charge,           12:18:22

16   but I note particularly we had asked that the First Amendment

17   instruction indicate that the "ad must necessarily propose an

18   illegal transaction," and in the rebuttal remarks here we had a

19   reference to "proposes an illegal transaction," which I think

20   is the -- is an example of why we wanted it to be clear that it         12:18:52

21   necessarily had to propose an illegal transaction on its face

22   statement -- state an illegal transaction on its face, and I'd

23   simply use the words that the government chose out of the

24   instructions as given about "proposes."

25       THE COURT:  The jury has orally instructed, and that               12:19:22

```
 1    is the instruction that they have been given.  And not only the

 2    government, but defense counsel have referred to that First

 3    Amendment instruction as it was given.  And so though your

 4    objection is noted and your request is noted, I am not going to

 5    change the instructions because they have been given, orally          12:19:41

 6    albeit, and because counsel have used them.

 7            And so in any event, is there anything more?

 8            MS. BERTRAND:  Your Honor --

 9            THE COURT:  All right.

10            MS. BERTRAND:  Your Honor, if I may, I will be very           12:19:57

11    quick, I just wanted to note for the record that Ms. Vaught's

12    Motion for Judgment of Acquittal the Court is pending, I just

13    want to make sure we're still on track with that, and also ask

14    that Ms. Vaught be excused from tomorrow's proceedings

15    regarding forfeiture.  She is not party to the forfeiture           12:20:16

16    matter.

17            THE COURT:  If you're waiving her presence, then

18    that's fine.  I will take that waiver.

19            MS. BERTRAND:  I would ask my presence be waived as

20    well.  There is not interest that Ms. Vaught has with the            12:20:27

21    forfeiture part of it.

22            THE COURT:  Well, let me check with the government

23    because while the indictment outlines the forfeiture, I don't

24    know specifically what properties and what assets belong to

25    whom, and so I want to make sure that that is your                    12:20:45
```

UNITED STATES DISTRICT COURT

78

1   understanding.

2           MS. BERTRAND:  Well, let's clean that up now because I

3   have been in this case for four years and I never understood

4   there to be an allegation against Ms. Vaught.

5           THE COURT:  Yes, it is important that we do so.          12:21:00

6           MR. STONE:  That's correct, Your Honor, the forfeiture

7   would just be against the three owners, Defendants Lacey, Spear

8   and Brunst.

9           THE COURT:  All right.  She may be excused and you may

10  be excused.                                                      12:21:10

11          MS. BERTRAND:  Okay.  Mr. Padilla and his lawyer may

12  want the same request.  I don't know.

13          MR. EISENBERG:  Well, Your Honor, there is a demand

14  for forfeiture pertaining to a property in which my client has

15  resided.  Now, listening to counsel here, maybe I have read     12:21:24

16  that wrong but --

17          THE COURT:  Well, they should know better than I, and

18  so maybe you need to get together with Mr. Stone and figure out

19  where that allegation came from or where it lays.  It's

20  critically important.                                            12:21:50

21          MR. STONE:  Yes, Your Honor, we will clear that up and

22  what we will do is we will submit this week a proposed form of

23  verdict for the forfeiture.  That will need to change depending

24  to the counts that the jury comes back on for conviction, but

25  we can submit that so that everybody understands this is what    12:22:09

UNITED STATES DISTRICT COURT

1   it will look like if, for example, the jury convicted on all

2   100 counts.

3          THE COURT:  In any event, whatever it is that your

4   understanding is, if you're not part of the proceeding,

5   Mr. Eisenberg, your client is not, then I would see no reason          12:22:26

6   why you would have to appear.

7          MR. EISENBERG:  I'll let your court know, Your Honor,

8   through your e-mail.

9          THE COURT:  Thank you.  I appreciate that.  All right.

10         MR. LINCENBERG:  Your Honor --                                   12:22:40

11         MR. EISENBERG:  Excuse me, sorry, Mr. Lincenberg.  I

12   think we all have Rule 29 motions for judgment.

13         THE COURT:  I am very well aware.

14         MR. EISENBERG:  I thank you.

15         MR. LINCENBERG:  Your Honor, may Mr. Brunst also              12:22:54

16   appear remotely for tomorrow's hearing?

17         THE COURT:  He can appear, I think, telephonically.

18         MR. LINCENBERG:  Telephonically.

19         THE COURT:  We'll have a line set up for that.  We can

20   do that, Liliana.                                                     12:23:06

21         Mr. Panchapakesan, if we're able to, I would prefer

22   him to be here remotely by video.  All right.

23         All right.  If there is nothing further, then we are

24   adjourned.

25         (Proceedings concluded at 12:23 p.m.)                          12:23:19

1

2

3

4                    **C E R T I F I C A T E**

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7     appointed and qualified to act as Official Court Reporter for

8     the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10    a full, true, and accurate transcript of all of that portion of

11    the proceedings contained herein, had in the above-entitled

12    cause on the date specified therein, and that said transcript

13    was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 2nd day of November,

15    2023.

16

17

18
                              s/Hilda E. Lopez_____
19                            HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25

**$**

**$10,000** [2] - 68:15, 69:10
**$13** [2] - 30:13
**$5,000** [3] - 51:1, 60:15, 60:18
**$500** [2] - 20:11

**'**

**'80s** [1] - 36:2

**1**

**1** [4] - 1:8, 38:17, 62:10, 62:12
**10,000** [1] - 68:18
**100** [3] - 61:19, 70:21, 79:2
**10:00** [1] - 72:22
**10:52** [1] - 37:12
**11** [3] - 7:8, 7:11, 26:12
**1155** [1] - 3:8
**11:10** [1] - 37:13
**11th** [1] - 2:10
**12** [2] - 10:6, 26:24
**120** [2] - 2:14, 45:24
**1200** [1] - 2:5
**1217** [1] - 24:20
**12:23** [1] - 79:25
**13** [2] - 9:25, 27:6
**1301** [1] - 2:10
**14** [2] - 28:11, 52:11
**14-year** [2] - 50:11, 64:16
**14202** [1] - 2:14
**1479** [2] - 69:13
**15** [2] - 28:16, 37:10
**15-minute** [1] - 37:6
**16** [4] - 28:25, 61:24, 62:1, 63:9
**160** [1] - 2:18
**17** [1] - 29:5
**171** [1] - 14:18
**1776** [1] - 33:8
**17th** [1] - 10:12
**18** [3] - 63:2, 63:7, 66:21
**1875** [1] - 3:3
**19** [2] - 35:16

**2**

**2** [3] - 6:22, 66:18, 69:17
**20,000** [2] - 23:20, 35:23, 56:25
**20005** [2] - 2:11

**2004** [1] - 66:24
**2011** [4] - 46:2, 57:22, 57:24, 58:4
**2012** [1] - 66:24
**2013** [4] - 47:11, 66:14, 66:15, 67:8
**2014** [1] - 24:3
**2017** [2] - 62:9, 62:16, 63:4
**2018** [3] - 58:5, 63:2
**2023** [2] - 1:8, 80:15
**21** [1] - 54:25
**210** [1] - 2:21
**223** [1] - 42:4
**23(B)(3** [1] - 7:8
**2300** [1] - 3:3
**25** [1] - 67:10
**26** [1] - 53:13
**27** [1] - 52:24
**2734** [1] - 3:12
**28** [1] - 1:16
**29** [1] - 79:12
**2930** [1] - 2:18
**2:18-cr-00422-DJH** [1] - 1:6
**2nd** [1] - 80:14

**3**

**30** [4] - 1:22, 50:16, 50:20, 51:8
**30-minute** [1] - 65:3
**30s** [1] - 15:24
**312** [1] - 1:21
**32** [1] - 72:19
**322-7256** [1] - 1:23
**3550** [1] - 3:8
**39** [2] - 49:6, 49:7
**3rd** [4] - 24:3, 62:3, 62:9, 63:4

**4**

**40** [1] - 2:5
**40-minute** [1] - 54:11
**400** [1] - 65:13
**401** [1] - 1:22
**42** [1] - 2:14
**43** [1] - 61:19
**47** [1] - 55:9
**49** [1] - 38:14

**5**

**5** [2] - 43:25
**50** [4] - 40:4, 50:7, 70:9
**500** [1] - 20:9
**51** [3] - 38:13, 38:18, 66:18

**52** [2] - 14:8, 76:6
**53** [1] - 68:7

**6**

**6** [1] - 47:13
**6000** [1] - 68:17
**602** [1] - 1:23
**62** [1] - 68:7
**6257** [1] - 24:1
**6258** [1] - 24:10
**63** [3] - 68:10, 68:15, 68:18
**64** [1] - 68:20
**6720** [1] - 2:21
**68** [2] - 68:19, 68:20
**69** [1] - 69:4

**7**

**7** [16] - 4:4, 4:7, 4:12, 4:18, 5:22, 6:20, 7:6, 8:1, 11:8, 11:25, 12:25, 37:2, 37:9, 37:15, 37:19, 72:12

**8**

**8** [2] - 44:8, 45:3
**85003-2151** [1] - 1:22
**85004** [1] - 2:6
**85012** [1] - 3:8
**85016** [1] - 2:18
**85252** [1] - 3:12
**85253** [1] - 2:21

**9**

**9** [1] - 64:13
**90067** [1] - 3:4
**902** [2] - 14:2, 14:3
**94** [3] - 46:16, 47:8, 53:25
**99** [1] - 69:4
**9:00** [2] - 71:18, 72:7
**9:01** [2] - 1:9, 4:3
**9:05** [1] - 6:14
**9:16** [1] - 6:15
**9:28** [1] - 12:20
**9:57** [1] - 12:21
**9th** [1] - 9:7

**A**

**a.m** [10] - 1:9, 4:3, 6:14, 6:15, 12:20, 12:21, 37:12, 37:13, 71:18, 72:7
**A.M** [1] - 1:16
**abandoning** [2] -

17:16
**Abbott** [1] - 14:12
**ability** [5] - 4:12, 6:25, 7:20, 14:25, 58:14
**able** [4] - 7:3, 10:11, 12:9, 79:21
**abolitionists** [1] - 16:24
**above-entitled** [1] - 80:11
**absence** [1] - 55:12
**absolutely** [2] - 49:5, 66:24
**absurd** [1] - 59:13
**abuse** [1] - 29:7
**accept** [2] - 13:22, 17:23
**accepted** [1] - 52:21
**accommodate** [1] - 11:22
**accompanied** [1] - 18:9
**accomplish** [1] - 23:4
**accomplished** [1] - 57:8
**account** [5] - 8:22, 20:17, 59:15, 61:25, 62:2
**accountability** [1] - 55:4
**accountable** [1] - 70:11
**accounts** [2] - 60:24, 68:1
**accurate** [1] - 80:10
**acknowledgment** [1] - 48:8
**Acquittal** [1] - 77:12
**act** [16] - 16:1, 22:7, 28:13, 40:2, 42:7, 43:14, 67:10, 67:15, 67:16, 67:17, 80:7
**Act** [2] - 21:16, 53:1
**action** [1] - 8:14
**actions** [3] - 52:21, 70:8, 70:12
**actively** [1] - 53:11
**actors** [1] - 22:8
**acts** [4] - 65:9, 67:13, 67:14, 76:5
**ad** [23] - 16:5, 22:8, 28:15, 28:21, 29:3, 29:16, 40:2, 41:4, 42:5, 43:4, 43:5, 45:7, 45:22, 46:4, 49:3, 49:18, 49:25, 52:7, 76:5, 76:6, 76:17
**Ad** [1] - 59:9
**Adams** [3] - 25:16,

63:14, 65:13
**added** [1] - 64:3
**addition** [3] - 14:13, 20:17, 76:4
**additional** [5] - 11:1, 11:7, 71:6, 73:23
**additionally** [1] - 73:21
**address** [2] - 11:7, 11:9
**adhere** [2] - 71:12, 71:21
**adjourn** [1] - 72:10
**adjourned** [1] - 79:24
**admonition** [6] - 8:5, 12:2, 37:7, 71:10, 71:12, 71:22
**adopt** [1] - 15:3
**ads** [38] - 22:6, 23:8, 23:15, 24:7, 24:13, 24:19, 30:24, 40:4, 41:16, 42:1, 42:2, 42:13, 43:17, 45:10, 46:5, 46:17, 46:18, 47:9, 48:20, 49:25, 50:7, 50:8, 50:9, 50:14, 51:16, 53:6, 61:6, 61:8, 61:12, 65:7, 66:18, 70:9, 76:6
**adult** [2] - 23:7, 46:6
**advance** [5] - 19:11, 21:11, 22:25, 25:22, 75:13
**advertisement** [1] - 49:24
**advertising** [4] - 56:13, 57:9, 63:24, 66:7
**advice** [1] - 57:5
**affect** [1] - 69:23
**affects** [1] - 31:7
**affiliated** [1] - 59:9
**afternoon** [1] - 7:4
**agency** [1] - 58:22
**agenda** [1] - 14:14
**aggregation** [1] - 58:1
**agree** [5] - 7:20, 21:17, 22:2, 27:12, 43:7
**agreement** [9] - 21:15, 21:18, 21:21, 21:24, 53:2, 53:4, 53:6, 64:19
**AGs** [1] - 58:11
**Aided** [1] - 1:24
**airbnb** [1] - 18:25
**aired** [1] - 54:10
**al** [1] - 1:9
**Alabama** [1] - 28:12

**albeit** [1] - 77:6
**allegation** [2] - 78:4, 78:19
**alleged** [1] - 27:10
**allow** [7] - 7:8, 34:7, 48:18, 48:19, 48:24, 69:18
**allowed** [5] - 22:18, 31:22, 42:18, 55:25, 74:10
**almost** [1] - 17:3
**Alternate** [1] - 6:22
**alternate** [5] - 4:17, 4:18, 5:3, 11:8, 11:20
**alternates** [3] - 8:7, 11:14, 12:4
**alternative** [1] - 7:5
**Amazon** [1] - 16:21
**ambiguous** [1] - 42:2
**Amendment** [19] - 13:15, 13:24, 14:19, 15:5, 15:6, 16:23, 33:4, 33:5, 33:9, 33:10, 33:11, 35:21, 41:5, 41:7, 73:22, 74:2, 76:16, 77:3
**America** [2] - 1:6, 40:13
**American** [1] - 33:17
**AMEX** [1] - 64:7
**amounted** [1] - 73:23
**amputate** [1] - 63:20
**analogy** [1] - 67:19
**anchored** [1] - 65:16
**Andrea** [1] - 64:12
**Andrew** [2] - 2:4, 3:6
**andrew.stone@ usdoj.gov** [1] - 2:7
**Angeles** [1] - 3:4
**angry** [1] - 10:21
**answer** [4] - 41:20, 42:1, 42:18, 61:4
**answered** [1] - 60:1
**answering** [1] - 23:19
**answers** [1] - 64:22
**antagonists** [1] - 33:3
**antiprostitution** [1] - 13:21
**anus** [2] - 43:8, 43:9
**Anya** [2] - 61:10, 64:11
**apologize** [2] - 20:18, 25:8
**appear** [8] - 4:12, 7:14, 8:1, 54:23, 72:25, 79:6, 79:16, 79:17
**appearance** [1] - 37:4
**appearing** [2] - 13:8,

70:18
**applies** [2] - 53:18, 53:19
**appointed** [1] - 80:7
**appreciate** [1] - 79:9
**approach** [1] - 8:3
**approved** [2] - 24:13, 24:14
**April** [2] - 24:3, 63:2
**arbiter** [1] - 29:12
**areas** [1] - 28:6
**arguably** [2] - 48:21, 53:17
**argue** [5] - 38:5, 43:14, 50:6, 59:8, 61:20
**arguing** [2] - 42:6, 44:4
**argument** [10] - 13:4, 16:16, 21:4, 40:5, 45:9, 48:24, 52:4, 53:18, 75:12, 76:12
**arguments** [12] - 4:15, 5:5, 6:21, 6:24, 12:1, 39:21, 41:11, 46:13, 63:16, 66:8, 71:6, 76:8
**ARIZONA** [1] - 1:3
**Arizona** [12] - 1:8, 1:22, 2:6, 29:6, 29:22, 42:25, 43:1, 43:2, 43:6, 43:13, 80:8, 80:14
**Arkansas** [2] - 29:1
**armor** [1] - 34:13
**arrest** [3] - 26:15, 40:3, 49:3
**articulate** [2] - 74:24, 75:4
**aside** [4] - 12:5, 12:6, 12:13, 44:12
**aspects** [1] - 58:4
**assess** [1] - 65:4
**assets** [1] - 77:24
**assisting** [2] - 23:20, 25:18
**associated** [7] - 50:17, 50:24, 50:25, 51:2, 51:3, 51:4, 51:6
**associating** [1] - 50:21
**assume** [2] - 28:6
**assumes** [1] - 26:13
**assured** [1] - 71:6
**Astrid** [2] - 64:11, 70:7
**attack** [1] - 33:24
**attempt** [2] - 46:23, 56:22
**attempted** [1] - 70:1

**attend** [1] - 9:19
**attention** [4] - 24:5, 35:3, 40:24, 43:25
**attentive** [3] - 6:4, 10:24, 11:2
**attorney** [3] - 60:22, 61:24, 69:22
**Attorney** [2] - 14:5, 14:12, 54:13, 57:20, 57:21
**attorney's** [1] - 20:17
**ATTORNEY'S** [1] - 2:3
**attorneys** [3] - 38:5, 52:23, 55:10
**Auburn** [2] - 14:14, 64:7
**August** [2] - 41:13, 63:2
**Austin** [1] - 2:10
**austin.berry2@ usdoj.gov** [1] - 2:11
**Australia** [1] - 33:22
**authenticate** [1] - 66:4
**authenticity** [1] - 65:20
**author** [1] - 46:1
**authored** [1] - 67:24
**available** [5] - 5:13, 12:11, 39:6
**Avenue** [4] - 2:5, 2:10, 2:14, 3:8
**award** [3] - 22:21, 22:24, 57:22
**aware** [5] - 53:14, 54:9, 54:12, 72:3, 79:13
**AZ** [4] - 2:18, 2:21, 3:8, 3:12

**B**

**Backpage** [56] - 14:1, 14:14, 14:21, 15:3, 16:16, 20:10, 20:13, 22:2, 22:14, 22:18, 23:7, 23:21, 30:13, 30:16, 37:23, 41:20, 46:2, 46:19, 46:21, 47:8, 47:9, 49:22, 51:13, 52:8, 53:6, 53:10, 54:4, 54:21, 58:24, 58:25, 59:9, 59:15, 60:1, 60:16, 60:25, 61:16, 64:9, 65:12, 66:21, 66:22, 66:23, 67:9, 67:18, 67:24, 67:25, 68:22, 69:10, 69:14, 69:16, 69:25, 70:2, 73:14, 74:25, 75:10, 76:6

**Backpage's** [5] - 13:22, 14:17, 14:18, 59:14, 68:9
**backs** [1] - 40:19
**bad** [8] - 22:7, 24:13, 24:22, 25:1, 25:4, 25:6
**bag** [1] - 47:6
**balance** [3] - 63:12, 74:8, 74:9
**balancing** [1] - 73:23
**ball** [2] - 27:3, 42:10
**bananas** [1] - 44:7
**bank** [3] - 59:15, 64:8, 68:1
**Bank** [1] - 59:16
**banker** [1] - 62:12
**banks** [1] - 59:8
**barely** [1] - 20:13
**baseball** [5] - 47:17, 55:25, 56:2, 56:3, 56:6
**based** [6] - 18:4, 32:10, 44:7, 50:9, 61:6, 76:8
**basis** [1] - 26:4
**basket** [1] - 18:20
**BBBJ** [1] - 54:18
**beautiful** [1] - 47:14
**became** [1] - 23:2
**Becker** [4] - 51:3, 60:21, 60:23, 68:2
**become** [1] - 50:20
**BEFORE** [1] - 1:13
**begin** [9] - 4:16, 4:21, 4:23, 6:25, 7:3, 8:7, 9:4, 9:8, 12:4
**beginning** [1] - 69:24
**behalf** [3] - 6:17, 36:24
**behind** [2] - 21:17, 29:16
**belief** [10] - 18:9, 31:21, 31:23, 32:1, 32:5, 32:18, 55:11, 55:14, 60:4, 75:2
**belong** [1] - 77:24
**beloved** [3] - 36:14, 36:16, 36:21
**benefits** [1] - 30:7
**Berry** [6] - 2:10, 70:13, 73:12, 73:24, 74:5, 76:4
**BERRY** [8] - 9:5, 37:21, 45:18, 46:15, 50:6, 62:9, 69:4, 74:6
**Berry's** [1] - 73:8
**BERTRAND** [21] - 3:11, 4:6, 4:24, 5:6,

5:8, 6:12, 9:21, 11:9, 11:11, 13:11, 21:7, 29:22, 30:2, 30:4, 45:16, 75:19, 77:8, 77:10, 77:19, 78:2, 78:11
**Bertrand** [5] - 3:11, 13:10, 37:1, 42:24, 72:18
**best** [6] - 8:14, 22:17, 27:21, 31:10, 70:23, 71:3
**bet** [1] - 20:1
**better** [7] - 8:3, 8:13, 9:3, 11:6, 36:22, 71:24, 78:17
**between** [7] - 21:15, 30:17, 33:13, 44:16, 45:4, 47:2, 66:11
**beyond** [5] - 17:10, 34:15, 34:21, 44:2, 44:5
**bf@federlawpa.com** [1] - 2:19
**biases** [1] - 69:19
**Biden** [1] - 14:10
**big** [6] - 23:11, 26:14, 27:14, 27:17, 33:4, 58:21
**bigger** [2] - 10:14, 18:22
**bill** [1] - 47:5
**Bill** [1] - 33:4
**BIRD** [1] - 3:1
**birthday** [1] - 21:19
**bit** [4] - 4:20, 38:19, 40:22, 44:25
**bizarre** [2] - 29:10, 29:13
**blank** [1] - 37:9
**blew** [1] - 18:7
**block** [3] - 18:18, 18:23
**blonde** [2] - 21:1, 21:8
**blowing** [1] - 8:12
**Blumenthal** [3] - 14:4, 14:9
**board** [1] - 39:3
**bodily** [2] - 48:21, 48:24
**bogus** [1] - 65:22
**bolster** [1] - 68:12
**boocococky** [1] - 43:18
**bookend** [1] - 54:25
**bottle** [1] - 36:20
**bought** [2] - 20:10, 36:18
**Box** [1] - 3:12
**BOXER** [1] - 3:1
**Brad** [1] - 64:6

**Breahannah** [2] - 61:10, 64:10
**break** [4] - 21:18, 21:21, 37:2, 37:6
**breast** [1] - 43:8
**brick** [2] - 64:4
**brief** [1] - 37:2
**briefing** [2] - 12:16, 72:23
**bring** [4] - 12:2, 12:18, 56:16, 68:13
**brings** [1] - 75:25
**Brittain** [1] - 33:19
**brought** [11] - 18:20, 41:11, 49:15, 49:16, 50:23, 60:6, 61:15, 64:2, 64:6, 64:8, 64:10
**Bruce** [1] - 2:17
**Brunst** [10] - 3:1, 45:24, 47:1, 47:10, 52:13, 53:19, 54:15, 63:1, 78:8, 79:15
**Brunst's** [1] - 47:3
**buddy** [2] - 18:21, 18:25
**budget** [1] - 57:20
**Buffalo** [1] - 2:14
**building** [1] - 72:16
**builds** [1] - 64:5
**built** [3] - 64:2, 64:4, 65:17
**bulletproof** [1] - 34:14
**bully** [2] - 31:23, 32:9
**bullying** [1] - 31:24
**bunch** [4] - 20:17, 20:19, 38:23, 68:13
**burden** [6] - 34:10, 38:4, 55:18, 73:21, 74:3, 74:4
**business** [10] - 40:20, 49:10, 50:19, 51:6, 52:10, 60:11, 61:6, 66:11, 68:22, 68:23
**buy** [4] - 15:24, 46:4, 66:13, 66:14

**C**

**CA** [1] - 3:4
**cabinet** [2] - 36:14, 36:17
**calendar** [1] - 8:20
**Camarillo** [1] - 59:10
**CAMBRIA** [3] - 2:13, 62:4, 76:13
**Cambria** [7] - 2:13, 46:23, 61:20, 66:8, 67:19, 67:22, 69:22
**Cambria's** [2] - 16:16,
52:5
**Camelback** [1] - 2:18
**camera** [1] - 37:9
**cancer** [1] - 63:20
**candy** [3] - 18:19, 19:1, 19:4
**cannot** [9] - 19:22, 28:6, 28:7, 30:11, 30:20, 32:12, 35:11, 61:7
**capacity** [2] - 55:10, 73:1
**capsules** [1] - 36:19, 36:20
**captain** [1] - 68:1
**captains** [1] - 54:15
**card** [3] - 55:22, 55:23, 56:1
**care** [3] - 57:17, 71:1
**careful** [2] - 30:14, 75:4
**carefully** [3] - 24:15, 35:3, 64:18
**caring** [1] - 35:6
**Carl** [19] - 19:15, 19:23, 20:9, 20:13, 21:9, 21:25, 22:19, 22:21, 22:22, 22:24, 30:17, 46:21, 52:18, 52:19, 53:5, 63:13, 63:14, 64:3, 64:17
**carry** [1] - 27:1
**case** [31] - 6:23, 7:2, 17:10, 17:13, 19:7, 19:8, 20:20, 21:23, 28:2, 38:4, 38:8, 38:10, 38:13, 38:24, 39:1, 48:22, 52:3, 58:18, 64:5, 69:20, 70:5, 70:16, 70:22, 71:4, 71:8, 71:12, 71:13, 71:19, 78:3
**cases** [4] - 31:8, 33:11, 61:16, 61:17
**castigating** [1] - 74:16
**catch** [2] - 30:24, 31:1
**catching** [4] - 22:7, 24:22, 25:4
**category** [2] - 45:19, 46:6
**center** [1] - 58:17
**Central** [2] - 2:5, 3:8
**Century** [1] - 3:3
**certain** [2] - 5:15, 76:9
**certainly** [10] - 9:14, 11:3, 22:22, 23:24, 29:15, 29:17, 74:10, 74:23, 75:10, 75:18
**certificate** [1] - 58:4
**certify** [1] - 80:6
**CERTIFY** [1] - 80:9
**CFO** [1] - 47:4
**chain** [1] - 53:7
**chair** [1] - 6:5
**challenge** [1] - 65:20
**Challenger** [1] - 18:7
**chance** [1] - 8:15
**change** [3] - 31:24, 77:5, 78:23
**changed** [1] - 76:8
**changing** [1] - 26:4
**character** [2] - 59:25, 73:11
**characterized** [1] - 74:7
**charge** [11] - 26:16, 40:16, 50:8, 50:10, 50:24, 50:25, 51:2, 51:3, 53:9, 76:15
**charged** [6] - 38:17, 40:14, 40:17, 40:19, 53:10
**charges** [3] - 38:11, 38:12, 38:18
**chart** [6] - 38:20, 38:23, 39:17, 45:21, 62:11, 69:6
**charts** [2] - 59:13, 69:13
**chase** [1] - 67:5
**chased** [1] - 67:8
**cheat** [1] - 27:4
**check** [2] - 19:4, 77:22
**checked** [1] - 42:22
**checks** [1] - 60:15
**children** [1] - 52:6
**chills** [1] - 13:16
**China** [1] - 59:20
**choose** [1] - 7:3
**choosing** [1] - 54:17
**chose** [1] - 76:23
**chosen** [2] - 4:18, 34:19
**Chris** [1] - 14:5
**circling** [2] - 54:20, 58:11
**circumstance** [1] - 11:19
**circumstances** [1] - 11:18
**circumstantial** [11] - 44:9, 44:10, 44:13, 44:14, 44:17, 44:21, 45:1, 45:5, 45:8, 45:13, 45:15
**citizens** [1] - 33:24
**City** [2] - 48:3, 56:21
**civil** [1] - 33:24
**clad** [1] - 29:9
**claim** [1] - 66:25
**claiming** [2] - 53:19, 55:18
**classifieds** [2] - 46:4, 68:14
**clean** [1] - 78:2
**clear** [12] - 8:14, 17:6, 21:16, 36:9, 32:20, 42:13, 45:8, 51:5, 72:20, 75:16, 76:20, 78:21
**clear-minded** [1] - 8:14
**clearer** [1] - 4:20
**clearly** [5] - 26:8, 41:20, 42:2, 49:7, 50:24
**client** [3] - 65:25, 78:14, 79:5
**clients** [1] - 65:21
**cloaked** [1] - 34:13
**close** [3] - 10:18, 15:18, 68:5
**closed** [1] - 36:15
**closes** [1] - 35:9
**closest** [1] - 41:23
**closing** [8] - 4:15, 6:21, 8:2, 41:11, 45:9, 66:9, 73:9, 75:25
**closings** [1] - 10:4
**clothes** [1] - 29:2
**CNN** [3] - 49:21, 54:8, 62:21
**coded** [3] - 15:19, 43:17, 43:19
**codes** [2] - 43:19, 43:20
**coincidence** [1] - 34:22
**colleagues** [3] - 25:24, 31:22, 34:11
**collector** [1] - 47:5
**Colleen** [4] - 24:2, 24:11, 24:12, 24:16
**Colleen's** [1] - 24:3
**column** [2] - 48:7, 62:22
**combined** [1] - 13:14
**coming** [2] - 26:4, 27:20
**commence** [2] - 4:3, 8:21
**comment** [3] - 73:16, 73:23, 75:8
**commented** [1] - 74:7
**commit** [2] - 21:15, 51:12
**committed** [4] - 52:10, 63:3, 67:16
**committing** [1] - 51:17
**common** [4] - 26:2, 42:21, 44:7, 64:15
**companies** [6] - 59:6, 59:7, 59:12, 59:13, 61:1, 68:8
**companion** [1] - 54:17
**companionship** [3] - 48:12, 48:23, 48:24
**company** [15] - 22:16, 23:6, 46:16, 54:9, 54:11, 58:5, 58:9, 59:18, 59:19, 60:19, 69:14, 69:15
**compare** [1] - 28:10
**compared** [1] - 54:23
**comparison** [2] - 49:5
**compellingly** [1] - 58:16
**complaints** [1] - 22:9
**complete** [4] - 8:4, 13:22, 63:3, 63:11
**completely** [1] - 46:9
**complicated** [1] - 59:12
**compromise** [1] - 31:21
**computer** [1] - 37:3
**Computer** [1] - 1:24
**Computer-Aided** [1] - 1:24
**conceal** [3] - 59:22, 61:22, 63:6
**concealed** [1] - 35:22
**concealment** [3] - 68:7, 68:14, 68:18
**concern** [5] - 9:5, 10:13, 10:14, 35:3
**concerns** [7] - 9:10, 9:20, 9:22, 9:25, 10:2, 10:17, 31:4
**conclude** [1] - 4:14
**concluded** [1] - 79:25
**conclusion** [1] - 5:17
**conclusions** [4] - 31:6, 37:7, 71:20
**concocted** [1] - 26:14
**condition** [1] - 5:22
**conduct** [5] - 15:10, 15:20, 23:9, 33:10, 71:13
**confer** [3] - 5:19, 5:21, 6:11
**conferences** [1] - 35:23
**confirmed** [1] - 25:9
**congratulate** [1] - 24:24
**connect** [2] - 12:9, 76:5
**conscientious** [2] -

30:15, 65:2
**consensus** [1] - 18:3
**consent** [1] - 33:7
**consequence** [2] - 53:3, 53:6
**consequences** [2] - 70:8, 70:11
**consider** [6] - 20:6, 31:5, 44:8, 55:6, 64:18, 65:24
**consistent** [3] - 11:12, 24:6, 26:21
**consistently** [1] - 52:17
**conspiracies** [2] - 76:2, 76:10
**conspiracy** [24] - 21:12, 21:20, 22:5, 23:2, 23:23, 25:19, 26:15, 27:1, 27:9, 30:8, 35:25, 37:25, 40:18, 43:23, 50:10, 50:11, 53:15, 53:21, 53:24, 55:3, 57:10, 64:16, 76:1, 76:9
**conspirator** [3] - 50:21, 50:25, 51:4
**conspirators** [2] - 27:7, 50:21
**conspire** [1] - 21:19
**conspired** [2] - 26:25, 27:8
**constant** [1] - 33:20
**constitute** [1] - 80:9
**constitutes** [1] - 73:21
**constitution** [3] - 32:25, 33:13, 34:14
**constitutional** [2] - 34:3, 35:8
**consultant** [1] - 57:4
**contact** [2] - 71:25, 72:2
**contained** [1] - 80:11
**contains** [1] - 64:5
**content** [2] - 74:9, 74:12
**context** [9] - 32:18, 41:21, 42:3, 42:6, 42:11, 42:12, 74:13, 74:25
**continue** [4] - 5:2, 6:3, 13:3, 46:14
**continuing** [4] - 9:17, 45:3, 45:18, 76:8
**contradict** [2] - 19:20, 31:6
**contradicted** [1] - 19:16
**contrary** [1] - 25:18
**control** [2] - 48:16,

80:13
**controls** [1] - 46:11
**convention** [1] - 25:10
**conventions** [1] - 25:12
**conversation** [1] - 62:13
**convict** [7] - 18:9, 31:11, 31:13, 32:5, 32:12, 40:3, 49:4
**convicted** [1] - 79:1
**conviction** [1] - 78:24
**convictions** [1] - 35:14
**cool** [1] - 18:14
**cooperating** [2] - 19:13, 64:21
**cooperators** [1] - 19:12
**cootie** [1] - 10:23
**cops** [2] - 49:3, 49:19
**copy** [1] - 39:15
**Corbin** [1] - 14:5
**core** [1] - 38:25
**cornered** [2] - 49:23, 56:12
**cornhole** [1] - 42:10
**correct** [2] - 72:17, 78:6
**corrected** [1] - 65:1
**correctly** [1] - 20:24
**corroborated** [7] - 65:6, 65:7, 65:10, 65:13, 66:3, 74:13, 74:14
**corroboration** [1] - 65:18
**costume** [2] - 29:10, 29:13
**counsel** [8] - 5:8, 11:23, 37:22, 46:13, 62:7, 77:2, 77:6, 78:15
**count** [3] - 18:2, 28:2, 68:10
**Count** [2] - 61:19, 68:15
**counter** [2] - 25:1, 30:12
**countless** [2] - 65:11, 67:15
**countries** [1] - 61:2
**country** [3] - 13:25, 46:2, 57:13
**Counts** [2] - 38:17, 66:18
**counts** [9] - 29:1, 38:13, 38:15, 50:9, 68:7, 68:18, 69:4, 78:24, 79:2

County [1] - 34:21
**couple** [10] - 8:6, 8:12, 12:3, 12:15, 17:2, 25:2, 60:17, 71:7, 72:24, 73:10
**course** [7] - 8:14, 9:3, 11:6, 58:23, 70:4, 71:2, 71:15
**COURT** [51] - 1:2, 4:5, 4:7, 5:1, 5:7, 5:10, 6:2, 6:8, 6:16, 7:12, 7:18, 7:22, 8:1, 8:25, 9:10, 10:24, 11:10, 11:17, 12:14, 12:22, 13:1, 21:5, 29:25, 30:3, 37:1, 37:14, 37:18, 45:17, 46:10, 62:6, 69:2, 70:13, 72:14, 73:7, 74:5, 75:11, 75:18, 75:20, 76:7, 76:25, 77:9, 77:17, 77:22, 78:5, 78:9, 78:17, 79:3, 79:9, 79:13, 79:17, 79:19
**court** [2] - 6:14, 79:7
**Court** [29] - 1:20, 1:24, 5:22, 5:24, 5:25, 6:22, 7:8, 7:9, 7:15, 7:16, 7:23, 7:24, 8:20, 8:22, 10:17, 19:10, 31:3, 32:17, 34:7, 37:22, 38:2, 45:3, 50:5, 55:1, 72:3, 76:2, 77:12, 80:7, 80:8
**Court's** [2] - 21:12, 44:13
**Courthouse** [1] - 1:21
**courtroom** [3] - 10:16, 11:4, 20:25
**COURTROOM** [1] - 6:13
**covering** [2] - 50:10
**COVID** [8] - 4:8, 5:15, 8:9, 8:15, 9:12, 9:16, 9:23, 31:4
**coworkers** [2] - 71:14, 71:15
**Craigslist** [2] - 23:11
**create** [2] - 46:23, 46:24
**created** [5] - 32:21, 32:23, 56:17, 59:7, 75:20
**creating** [4] - 51:15, 51:16, 59:3, 61:1
**credibility** [1] - 65:5
**crew** [1] - 24:24
**crime** [9] - 15:14,

21:20, 40:16, 52:10, 52:11, 55:1, 63:3, 63:10
**criminal** [9] - 15:10, 15:20, 23:9, 23:23, 33:11, 33:14, 34:6, 35:25, 59:11
**critical** [3] - 14:24, 17:3, 72:4
**critically** [2] - 71:11, 78:20
**cross** [4] - 52:5, 52:22, 66:2, 67:3
**cross-examination** [2] - 52:5, 66:2
**cross-examine** [1] - 67:3
**cross-examined** [1] - 52:22
**crusade** [1] - 13:21
**crusades** [1] - 13:18
**culpable** [1] - 53:8
**culture** [1] - 35:5
**Curacao** [1] - 59:20
**cure** [1] - 4:19
**cut** [2] - 20:15, 63:20
**cynicism** [1] - 35:20
**Cynthia** [2] - 64:12, 70:7

## D

**dad** [1] - 51:23
**daily** [2] - 26:4, 71:24
**damp** [1] - 44:25
**Dan** [5] - 22:10, 24:6, 26:21, 63:14, 65:13
**dance** [2] - 57:19, 57:21
**dang** [1] - 57:19
**dangerous** [1] - 13:19
**dark** [1] - 26:20
**date** [1] - 80:12
**DATED** [1] - 80:14
**DAVID** [1] - 3:7
**David** [1] - 3:7
**david@ deisenbergplc.com** [1] - 3:9
**DAY** [1] - 1:16
**days** [3] - 52:20, 65:3, 65:4
**Dbacks** [1] - 56:8
**DC** [1] - 2:11
**deal** [7] - 10:4, 16:20, 20:15, 27:17, 48:10, 51:19, 58:21
**dealings** [1] - 60:24
**deals** [1] - 23:14
**dealt** [1] - 51:18

**dearest** [1] - 60:9
**debating** [1] - 48:18
**decide** [5] - 19:17, 31:8, 52:2, 55:2
**decided** [3] - 11:11, 55:6, 70:23
**decides** [1] - 29:10
**Declaration** [1] - 32:24
**deductive** [1] - 21:3
**Defendant** [5] - 2:12, 2:16, 3:1, 3:6, 3:10
**defendant** [13] - 21:17, 23:2, 27:8, 30:6, 37:24, 49:9, 50:13, 50:16, 51:5, 55:2, 67:12, 67:16, 69:21
**defendants** [24] - 6:18, 7:13, 27:13, 34:12, 36:25, 37:23, 38:14, 38:15, 38:17, 40:12, 45:20, 45:23, 49:2, 50:6, 52:9, 52:13, 66:16, 66:20, 69:5, 69:25, 70:6, 70:11, 74:15
**Defendants** [2] - 1:10, 78:7
**defendants'** [7] - 38:25, 55:13, 60:3, 65:19, 73:14, 73:16, 73:22
**defending** [1] - 67:25
**defense** [32] - 11:11, 11:23, 34:2, 34:5, 38:5, 39:20, 39:25, 40:1, 40:7, 40:9, 40:21, 40:23, 42:6, 43:14, 44:3, 45:6, 48:14, 51:20, 51:24, 52:12, 52:23, 53:1, 53:14, 55:10, 59:24, 63:12, 63:16, 64:23, 72:25, 73:11, 74:1, 77:2
**defenses** [1] - 38:9
**defined** [2] - 53:23, 55:11
**definitions** [1] - 28:23
**Delaware** [1] - 2:14
**delayed** [1] - 9:11
**delaying** [1] - 9:6
**deliberate** [3] - 7:20, 31:3, 69:8
**deliberating** [3] - 42:16, 64:15, 76:14
**deliberation** [7] - 8:9, 9:18, 12:4, 32:6, 39:17, 42:21, 71:8

**deliberations** [16] - 4:16, 4:22, 4:23, 7:1, 7:3, 7:21, 8:8, 8:21, 9:4, 9:6, 9:8, 31:5, 31:24, 39:8, 41:3, 70:22

**demand** [1] - 78:13

**demanded** [1] - 28:1

**demands** [2] - 14:17, 15:4

**demeanor** [1] - 65:4

**democracy** [1] - 15:2

**demonstrates** [1] - 55:17

**deniability** [8] - 45:25, 46:7, 46:16, 46:19, 46:22, 46:25, 48:22, 68:12

**DEPARTMENT** [1] - 2:9

**dependent** [1] - 30:9

**DEPUTY** [1] - 6:13

**deputy** [1] - 11:4

**derived** [2] - 67:5, 67:8

**describe** [1] - 13:5

**designated** [1] - 6:22

**designating** [1] - 11:8

**designed** [3] - 22:4, 61:22, 63:5

**despite** [2] - 10:24, 13:23

**detail** [2] - 30:15, 61:20

**details** [1] - 60:13

**determination** [1] - 76:11

**determinator** [2] - 62:6, 75:21

**determine** [2] - 19:7, 19:8

**develop** [2] - 16:18, 68:11

**developer** [2] - 68:11, 68:13

**deviant** [1] - 28:13

**Diamondbacks** [1] - 47:13

**DIANE** [1] - 1:13

**died** [1] - 36:4

**difference** [1] - 44:16

**different** [15] - 11:18, 14:20, 17:14, 22:7, 28:10, 31:6, 32:12, 38:10, 42:12, 43:1, 59:7, 59:8, 61:1, 73:25

**differently** [1] - 31:9

**difficulty** [1] - 8:25

**diligent** [2] - 11:2,

23:19

**diminishing** [1] - 11:20

**dire** [2] - 17:2, 34:23

**direct** [7] - 44:8, 44:14, 44:17, 44:18, 44:20, 45:5, 45:10

**direction** [2] - 47:24, 80:13

**directly** [4] - 25:1, 25:18, 26:25, 27:8

**disclosed** [1] - 35:22

**disconnect** [2] - 72:12, 76:5

**discriminating** [1] - 28:18

**discuss** [5] - 5:11, 12:13, 37:7, 71:12, 71:13

**discussed** [1] - 26:1

**discussing** [1] - 73:11

**discussions** [1] - 75:14

**disguise** [3] - 59:22, 61:22, 63:6

**dislikes** [1] - 69:18

**Dismiss** [1] - 75:25

**displayed** [1] - 22:21

**distant** [1] - 53:20

**distill** [1] - 38:24

**distinction** [1] - 45:4

**distract** [2] - 52:8, 56:22

**distracted** [1] - 66:21

**distracting** [1] - 56:24

**distraction** [2] - 47:20, 56:20

**DISTRICT** [2] - 1:2, 1:3

**District** [2] - 80:8

**division** [1] - 59:11

**doctor** [1] - 63:23

**document** [1] - 67:25

**documentaries** [1] - 54:9

**documentary** [3] - 49:21, 54:11, 62:21

**dog** [1] - 56:23

**dog's** [1] - 47:23

**dollar** [2] - 61:6, 68:17

**dollars** [10] - 22:2, 30:25, 40:15, 41:15, 41:18, 41:23, 53:24, 53:25, 61:25, 63:9

**done** [6] - 18:18, 31:2, 34:6, 38:23, 41:25, 60:22

**door** [5] - 42:22, 44:23, 73:18, 73:20

**doubt** [49] - 17:10, 17:15, 17:22, 17:23,

17:24, 17:25, 18:2, 18:4, 18:5, 18:6, 18:10, 19:2, 19:9, 19:10, 19:18, 19:23, 21:13, 21:24, 22:20, 23:4, 23:5, 25:5, 25:7, 25:20, 26:9, 26:12, 26:13, 27:14, 27:15, 30:5, 30:11, 30:21, 31:12, 31:16, 31:19, 32:2, 32:10, 32:11, 32:13, 32:16, 36:11, 36:23, 44:1, 44:3, 44:5, 63:17

**doubts** [2] - 31:11, 35:12

**down** [27] - 7:11, 9:24, 9:25, 16:16, 18:18, 18:24, 24:4, 24:15, 24:23, 30:16, 35:21, 38:24, 39:2, 39:9, 39:12, 40:25, 41:1, 43:22, 47:14, 50:4, 52:14, 54:6, 54:16, 59:16, 60:24, 68:2

**Dr** [1] - 61:3

**draw** [2] - 16:14, 16:22

**dressed** [1] - 16:8

**DROOKS** [1] - 3:1

**drug** [1] - 10:2

**due** [1] - 33:10

**duly** [1] - 80:6

**duration** [2] - 37:10, 71:16

**during** [3] - 17:2, 26:16

**duty** [1] - 31:21

**dying** [1] - 34:2

## E

**e-mail** [13] - 38:10, 47:19, 48:9, 48:13, 48:17, 56:21, 62:14, 65:22, 65:23, 67:15, 79:8

**e-mails** [7] - 38:23, 45:21, 58:10, 58:12, 64:16, 65:19, 67:17

**early** [2] - 34:8, 35:24

**ears** [1] - 62:23

**East** [1] - 2:18

**eat** [1] - 18:18

**echoes** [1] - 35:20

**edge** [1] - 11:1

**edited** [2] - 24:7

**editorial** [2] - 66:12

**educated** [1] - 15:1

**effect** [3] - 15:18, 29:25, 73:15

**effort** [1] - 46:2

**efforts** [2] - 13:23, 31:10

**eight** [4] - 21:14, 26:9, 59:14, 68:9

**EISENBERG** [5] - 3:7, 78:13, 79:7, 79:11, 79:14

**Eisenberg** [3] - 3:7, 45:9, 79:5

**either** [4] - 20:14, 44:9, 45:5, 62:2

**election** [1] - 18:8

**eliminated** [1] - 57:8

**elite** [1] - 15:4

**Elizabeth** [1] - 1:21

**Ellig** [13] - 14:2, 14:7, 14:11, 17:1, 17:19, 19:11, 20:4, 22:25, 24:1, 25:22, 28:11, 28:16, 35:16

**emergencies** [1] - 23:19

**Empire** [2] - 48:2, 56:21

**employees** [4] - 20:14, 60:14, 60:17, 60:19

**employers** [1] - 71:15

**encompassing** [1] - 55:11

**encourage** [3] - 9:8, 39:2, 39:8

**end** [5] - 20:20, 34:21, 44:19, 68:5, 72:5

**ended** [2] - 10:12, 36:20

**endless** [1] - 43:20

**ends** [2] - 10:9, 32:14

**enforcement** [11] - 16:4, 25:9, 25:12, 25:18, 25:20, 35:23, 47:21, 56:20, 56:23, 58:22

**enforcement's** [1] - 47:25

**engage** [1] - 28:22

**engaged** [3] - 38:15, 40:20, 59:18

**engaging** [1] - 65:9

**engine** [4] - 22:14, 22:15, 54:3, 54:16

**England** [2] - 33:19, 33:21

**ensure** [1] - 70:21

**entered** [1] - 64:19

**enterprise** [3] - 30:9, 50:19, 51:7

**enterprises** [2] - 40:20, 43:21

**entire** [5] - 8:3, 30:9,

33:14, 41:1, 52:10

**entirely** [1] - 32:23

**entirety** [1] - 39:4

**entitled** [1] - 80:11

**entitlement** [1] - 13:13

**environment** [1] - 42:16

**equal** [2] - 44:15, 45:5

**equipment** [4] - 5:13, 12:8, 12:17

**equivalency** [1] - 52:4

**Eric** [1] - 2:20

**eric.kesslerlaw@ gmail.com** [1] - 2:22

**Erotic** [3] - 48:11, 57:25, 58:17

**escort** [6] - 41:19, 46:6, 46:17, 49:24, 53:25, 54:2

**especially** [3] - 22:3, 26:16, 32:16

**Esq** [12] - 2:3, 2:4, 2:4, 2:5, 2:10, 2:13, 2:17, 2:20, 3:2, 3:3, 3:7, 3:11

**ESQ** [1] - 3:11

**essence** [1] - 14:19

**essentially** [4] - 44:4, 45:13, 47:2, 64:9

**Estate** [1] - 14:23

**estimating** [1] - 36:3

**et** [1] - 1:9

**Europe** [1] - 68:21

**evaluate** [4] - 52:2, 74:12, 75:2

**evaluates** [1] - 75:1

**evaluating** [2] - 20:5, 44:6

**evaluation** [1] - 69:23

**evaporate** [1] - 35:9

**event** [7] - 5:1, 5:4, 5:14, 6:11, 67:14, 77:7, 79:3

**everyday** [5] - 23:15, 27:3, 27:21, 42:17, 52:11

**evidence** [51] - 19:15, 29:18, 31:9, 31:18, 35:9, 35:24, 37:24, 38:12, 42:4, 44:7, 44:9, 44:10, 44:14, 44:17, 44:18, 44:20, 44:21, 45:1, 45:5, 45:8, 45:11, 45:13, 45:15, 46:12, 46:13, 47:10, 48:3, 55:13, 55:15, 55:16, 56:19, 57:23, 58:8, 58:14, 58:15, 59:5, 60:3, 61:23, 62:5, 62:7,

62:8, 62:10, 62:17,
62:24, 67:1, 68:10,
68:25, 69:3, 69:11,
69:23
**Evil** [2] - 48:2, 56:21
**exact** [1] - 43:13
**exactly** [1] - 26:6
**examination** [2] -
52:5, 66:2
**examine** [1] - 67:3
**examined** [1] - 52:22
**example** [11] - 5:23,
18:11, 24:2, 36:1,
41:12, 41:17, 41:23,
45:24, 49:21, 76:20,
79:1
**examples** [2] - 18:11,
63:18
**except** [1] - 35:22
**exchange** [3] - 43:7,
48:21, 48:24
**exclusively** [1] - 66:20
**excuse** [4] - 7:10,
22:20, 23:4, 79:11
**excused** [4] - 11:16,
77:14, 78:9, 78:10
**executions** [1] - 33:20
**executive** [1] - 47:14
**exercise** [1] - 46:22
**exhibit** [2] - 24:20,
39:2
**Exhibit** [9] - 14:2,
14:8, 14:18, 24:1,
42:4, 45:24, 62:10,
62:12, 69:13
**exhibits** [9] - 38:24,
38:25, 65:14, 65:17,
65:18, 65:21, 66:5,
67:16, 70:3
**exist** [1] - 17:25
**existence** [2] - 59:15,
68:9
**exists** [2] - 32:11,
32:13
**exodus** [1] - 23:12
**expect** [4] - 15:15,
15:17, 39:12, 72:6
**expected** [1] - 71:17
**experience** [1] - 31:7
**experiment** [1] - 33:17
**expert** [2] - 45:13,
61:3, 63:25
**experts** [1] - 26:5
**expiration** [1] - 36:14
**explain** [2] - 38:3, 40:7
**explained** [2] - 38:2,
51:15
**explicitly** [2] - 15:9,
15:13
**exposed** [2] - 9:17,

9:23
**exposure** [1] - 9:18
**extent** [4] - 16:9, 20:6,
21:10, 53:4
**extra** [3] - 46:23, 46:25
**eye** [1] - 23:14
**eyes** [2] - 10:7, 65:5

## F

**face** [10] - 19:23,
28:15, 28:21, 29:3,
29:16, 40:2, 42:7,
45:7, 76:21, 76:22
**Facebook** [3] - 16:20,
51:25, 67:4
**facially** [1] - 16:10
**facilitate** [1] - 51:9
**facilitating** [1] - 50:18
**fact** [9] - 13:14, 16:15,
30:21, 31:16, 33:20,
34:12, 44:10, 49:14,
64:18
**facts** [1] - 52:3
**failure** [1] - 73:16
**fair** [2] - 17:4, 22:14
**fairness** [1] - 33:19
**faith** [23] - 27:22,
27:24, 40:10, 55:8,
55:9, 55:11, 55:17,
55:19, 56:18, 56:19,
56:24, 57:17, 57:23,
58:8, 58:15, 58:18,
59:3, 59:5, 59:20,
60:4, 61:18, 74:25,
75:3
**fake** [2] - 61:6, 61:11
**false** [3] - 49:4, 49:5,
52:4
**family** [3] - 9:25,
71:14, 71:15
**far** [1] - 46:12
**farm** [1] - 20:1
**fascinates** [1] - 29:6
**fast** [1] - 35:14
**fault** [1] - 10:7
**FBAR** [1] - 63:8
**FBI** [4] - 22:21, 57:22,
58:3, 58:22
**FCRR** [2] - 1:21, 80:19
**fear** [1] - 69:19
**featherweight** [2] -
18:6, 18:7
**FEDER** [5] - 2:17,
7:14, 7:19, 7:23,
75:24
**Feder** [4] - 2:17, 11:6,
41:11, 42:8
**federal** [1] - 40:14
**Feds** [1] - 26:15

**feeds** [1] - 68:12
**feelings** [1] - 57:14
**fell** [1] - 53:1
**fellow** [1] - 30:13
**female** [3] - 41:19,
49:24, 53:25
**Ferrer** [24] - 19:15,
20:5, 20:9, 20:13,
21:25, 22:5, 22:21,
26:13, 26:19, 30:17,
46:21, 52:18, 52:19,
53:5, 58:19, 63:13,
63:14, 63:19, 63:23,
64:3, 64:17, 65:11,
66:3, 74:15
**Ferrer's** [4] - 19:23,
21:9, 30:15, 74:16
**few** [3] - 7:11, 36:12,
40:24
**field** [2] - 47:15
**fields** [1] - 73:25
**Fifth** [3] - 33:10,
73:22, 74:2
**figure** [2] - 56:9,
56:10, 58:6, 78:18
**filter** [1] - 68:18
**final** [2] - 35:15, 36:1
**finally** [3] - 7:7, 40:10,
61:13
**financed** [1] - 20:12
**financial** [1] - 59:18
**fine** [1] - 77:18
**finger** [2] - 31:17,
65:15
**finish** [1] - 5:4
**fire** [1] - 24:18
**fired** [3] - 24:5, 24:6,
31:1
**firm** [1] - 18:9
**First** [12] - 13:15,
13:24, 14:19, 15:5,
15:6, 16:22, 33:4,
35:21, 41:5, 41:7,
76:16, 77:2
**first** [16] - 6:17, 9:22,
10:10, 15:24, 16:1,
18:12, 19:12, 19:18,
21:22, 43:10, 55:18,
58:19, 59:14, 60:17,
63:23, 68:9
**five** [6] - 8:22, 19:14,
38:17, 52:23, 55:24,
56:3
**five-day** [1] - 8:22
**fixes** [1] - 22:8
**flagellation** [1] - 29:8
**Floor** [1] - 2:10
**flowcharts** [1] - 69:14
**flu** [1] - 71:2
**fluids** [2] - 48:21,

48:24
**focus** [2] - 45:21,
53:14
**focused** [5] - 25:4,
38:13, 38:15, 66:21,
66:22
**focusing** [1] - 52:9
**foggy** [1] - 5:24
**folks** [3] - 10:2, 10:20,
15:20
**follow** [5] - 17:4, 17:6,
17:8, 24:9, 26:3
**followed** [1] - 32:15
**following** [1] - 4:14
**fondle** [1] - 43:8
**FOR** [1] - 1:3
**force** [1] - 9:15
**foregoing** [1] - 80:9
**foregone** [1] - 5:17
**foreseen** [1] - 53:3
**forfeiture** [12] - 9:7,
12:5, 12:13, 72:21,
75:14, 77:15, 77:21,
77:23, 78:6, 78:14,
78:23
**forget** [2] - 33:16,
61:3, 64:13
**form** [4] - 44:4, 45:23,
69:11, 78:22
**formal** [4] - 42:16,
42:19, 42:23, 59:1
**formality** [1] - 42:20
**former** [2] - 60:14,
61:13
**forth** [6] - 5:25, 8:13,
9:13, 14:16, 37:5,
47:2
**forum** [1] - 51:16
**forward** [2] - 11:8,
50:2
**fought** [1] - 33:18
**foundation** [2] - 64:3,
65:17
**Founders** [2] - 33:2,
33:3
**four** [6] - 19:11, 19:25,
22:20, 22:21, 28:10,
78:3
**Fourth** [2] - 14:23,
33:9
**freedom** [1] - 33:18
**Friday** [2] - 8:24, 9:1
**friends** [4] - 36:23,
50:23, 50:24, 51:1
**frightening** [1] - 13:12
**front** [2] - 38:5, 58:17
**full** [3] - 33:20, 52:6,
80:10
**fully** [2] - 15:15, 15:17
**fun** [1] - 13:16

**function** [1] - 22:18
**funny** [2] - 41:24,
42:10
**FURTHER** [1] - 80:9
**furtherance** [1] -
67:17

## G

**gain** [2] - 30:12, 30:19
**gallery** [1] - 72:15
**game** [6] - 42:10,
43:18, 55:21, 55:22,
56:18, 57:15
**Gary** [1] - 3:3
**gathered** [1] - 5:24
**gears** [1] - 37:5
**general** [3] - 39:20,
46:3, 68:14
**General** [4] - 14:6,
14:12, 67:20, 67:21
**generally** [1] - 49:25
**Generals** [3] - 54:14,
57:20, 57:21
**genitals** [1] - 43:8
**gentlemen** [14] -
37:22, 39:24, 41:12,
41:17, 47:6, 49:4,
50:7, 61:7, 63:15,
63:22, 67:7, 69:20,
70:8, 70:10
**George** [1] - 35:19
**Georgia** [1] - 33:22
**GFE** [1] - 43:17
**giant** [1] - 46:22
**girl** [1] - 15:23
**given** [10] - 9:6, 16:2,
19:6, 24:9, 31:4,
45:4, 76:24, 77:1,
77:3, 77:5
**glaring** [1] - 10:21
**glincenberg@**
**birdmarella.com** [1]
- 3:5
**goal** [1] - 54:1
**God** [1] - 18:25
**God's** [1] - 30:19
**gold** [2] - 67:5, 67:8
**golf** [1] - 42:10
**goofy** [1] - 15:15
**Google** [1] - 51:25
**Gopi** [1] - 3:2
**governing** [1] - 33:19
**government** [35] -
6:17, 11:7, 14:25,
15:8, 15:17, 16:15,
17:7, 17:9, 20:1,
20:12, 20:20, 28:2,
30:5, 31:2, 32:20,
32:22, 32:23, 33:1,

33:2, 33:6, 33:10, 33:15, 35:9, 35:19, 37:3, 44:2, 62:15, 63:8, 73:4, 73:18, 73:20, 73:25, 76:23, 77:2, 77:22
**Government** [3] - 2:2, 2:9, 20:8
**government's** [6] - 8:4, 19:7, 33:12, 55:17, 74:3
**governs** [1] - 33:11
**gpanchapakesan@ birdmarella.com** [1] - 3:4
**Grant** [1] - 45:10
**great** [2] - 24:21, 24:22
**greatest** [1] - 57:23
**Greek** [1] - 43:18
**GREEN** [1] - 2:13
**green** [1] - 47:14
**Greg** [1] - 14:12
**ground** [3] - 20:13, 32:2, 54:14
**group** [3] - 22:16, 31:12, 32:9
**guarantees** [1] - 34:5
**guess** [3] - 10:18, 28:15, 34:24
**guessing** [1] - 21:7
**guide** [1] - 39:16
**guiding** [1] - 41:3
**guilt** [1] - 44:2
**guilty** [10] - 13:14, 31:12, 31:14, 34:16, 34:17, 36:24, 51:7, 54:24, 61:23, 70:12
**guy** [18] - 18:13, 20:23, 43:10, 48:15, 52:16, 57:4, 64:7, 65:14, 65:25, 66:1, 66:9, 66:10, 66:12, 66:13, 67:7, 67:21, 75:7
**guys** [5] - 25:1, 25:4, 25:6, 47:15, 60:9
**gymnastics** [1] - 59:19

## H

**hair** [1] - 44:25
**half** [7] - 9:1, 18:17, 18:18, 24:12, 61:25, 62:1, 63:9
**Halloween** [3] - 13:17, 18:13, 18:14
**hand** [2] - 71:3, 71:8
**handed** [1] - 58:3

**handful** [1] - 38:24
**handled** [1] - 40:21
**handling** [1] - 8:20
**happy** [1] - 25:3
**hard** [1] - 13:25
**hazard** [1] - 34:24
**head** [1] - 13:16
**health** [5] - 9:20, 10:4, 10:14, 10:25, 71:1
**hear** [6] - 6:16, 12:9, 13:8, 16:15, 57:14, 65:20
**heard** [26] - 6:23, 9:22, 14:15, 15:21, 19:15, 22:10, 25:16, 27:18, 36:10, 38:5, 41:22, 47:2, 47:3, 47:5, 49:2, 51:25, 53:16, 58:19, 59:8, 61:9, 61:20, 64:22, 65:10, 65:12, 65:19, 67:1
**hearing** [2] - 6:21, 79:16
**heart** [1] - 32:8
**heating** [2] - 58:11, 62:25
**held** [4] - 55:12, 55:14, 60:4, 75:2
**help** [8] - 16:12, 18:25, 23:3, 39:16, 51:11, 57:6, 68:11, 68:12
**helped** [4] - 25:9, 25:20, 51:15, 51:16
**helpful** [2] - 39:8, 41:3
**helping** [4] - 23:21, 25:15, 35:22, 51:12
**helps** [2] - 46:1, 51:8
**Hemanshu** [1] - 26:5
**Hemu** [1] - 57:4
**hereby** [1] - 80:6
**herein** [1] - 80:11
**herself** [1] - 50:17
**hide** [1] - 62:14
**hiding** [2] - 25:11, 58:25
**high** [2] - 17:11
**highway** [1] - 16:25
**Hilda** [1] - 1:21
**HILDA** [2] - 80:6, 80:19
**himself** [2] - 50:17, 51:6
**hired** [3] - 23:10, 23:16, 57:4
**hiring** [1] - 57:3
**history** [2] - 13:18, 34:1
**hitter** [1] - 56:4
**hold** [2] - 35:14, 70:10
**hole** [2] - 41:22, 42:9

**holiday** [1] - 8:24
**home** [11] - 10:4, 10:22, 11:4, 11:13, 11:15, 11:16, 18:20, 32:14, 33:7
**honest** [4] - 9:11, 31:20, 31:23, 32:1, 32:5, 32:18
**honestly** [4] - 55:12, 55:13, 60:4, 75:2
**honestly-held** [2] - 60:4, 75:2
**honesty** [1] - 32:8
**honey** [1] - 36:21
**Honor** [27] - 6:12, 6:19, 7:5, 7:7, 9:5, 9:22, 11:9, 12:12, 13:11, 15:16, 37:21, 46:8, 46:15, 55:6, 62:4, 73:5, 73:6, 75:15, 76:13, 77:8, 77:10, 78:6, 78:13, 78:21, 79:7, 79:10, 79:15
**HONORABLE** [1] - 1:13
**Hood** [1] - 14:5
**hook** [1] - 20:21
**hopefully** [1] - 70:25
**hour** [5] - 30:13, 38:7, 39:22, 40:11
**hours** [2] - 38:6, 39:21
**house** [1] - 64:5
**household** [1] - 36:13
**housekeeping** [1] - 12:3
**houses** [1] - 18:16
**Howard** [2] - 62:12, 64:8
**huge** [1] - 25:1
**human** [1] - 27:20
**HUMETEWA** [1] - 1:13
**hundred** [4] - 41:14, 41:18, 41:23, 61:6
**hundreds** [1] - 40:15
**Hungary** [2] - 62:2, 63:10
**hunting** [1] - 25:6
**hustle** [1] - 30:18
**Hyer** [6] - 20:6, 22:10, 24:6, 26:21, 63:14, 65:13

## I

**icebergs** [1] - 54:20
**idea** [6] - 5:2, 11:19, 16:6, 25:11, 44:11, 44:12
**ignore** [1] - 57:15

**Ill** [1] - 14:10
**ill** [2] - 55:12, 57:16
**illegal** [19] - 23:7, 23:8, 23:16, 24:19, 30:24, 38:16, 39:24, 40:13, 40:15, 40:20, 41:4, 41:8, 41:9, 48:4, 67:14, 76:18, 76:19, 76:21, 76:22
**Illinois** [1] - 14:6
**illness** [3] - 7:6, 70:18, 71:2
**imagine** [4] - 28:1, 33:8, 36:12, 47:12
**immediately** [1] - 72:2
**immune** [1] - 10:1
**immune-suppressing** [1] - 10:1
**impartial** [1] - 17:4
**imperfect** [2] - 22:17, 27:21
**important** [7] - 25:25, 30:5, 31:16, 32:4, 32:6, 33:9, 44:12, 45:6, 48:14, 53:12, 55:2, 57:7, 58:21, 63:17, 71:11, 78:5, 78:20
**importantly** [1] - 59:21
**impossible** [3] - 22:17, 27:21, 28:21
**improper** [5] - 21:4, 23:15, 73:15, 73:24, 74:4
**incentives** [1] - 24:8
**inch** [1] - 18:8
**include** [2] - 16:21, 17:9
**included** [1] - 29:23
**includes** [1] - 29:6
**including** [2] - 34:13, 62:21
**income** [2] - 47:10, 67:1
**inconsistent** [1] - 7:17
**incredibly** [2] - 13:18, 17:11
**indeed** [1] - 72:19
**Independence** [1] - 32:25
**India** [1] - 68:11
**indicate** [1] - 76:17
**indicated** [1] - 4:12
**indication** [1] - 23:16
**indicted** [2] - 63:1, 63:8
**indictment** [1] - 77:23
**indiscriminate** [2] - 28:17, 28:22

**individual** [1] - 67:23
**individuals** [2] - 5:16, 49:17
**infer** [2] - 28:5, 28:7
**inferences** [1] - 35:10
**influenced** [2] - 20:7, 69:18
**information** [7] - 5:22, 5:24, 5:25, 6:2, 72:1, 72:8
**innocence** [1] - 35:8
**innocent** [1] - 13:20
**inquire** [1] - 8:18
**inside** [2] - 44:19, 70:2
**insiders** [1] - 63:13
**insisting** [1] - 17:9
**instance** [1] - 70:17
**instructed** [2] - 17:9, 76:25
**instruction** [20] - 15:6, 17:20, 19:19, 39:12, 41:1, 41:6, 44:6, 50:12, 50:15, 51:5, 55:5, 60:5, 61:21, 67:10, 69:17, 72:8, 76:3, 76:17, 77:1, 77:3
**instructions** [3] - 8:6, 12:3, 19:6, 19:9, 19:13, 21:12, 28:3, 28:10, 28:14, 29:18, 29:21, 29:23, 29:24, 39:10, 39:14, 39:16, 40:24, 41:2, 44:13, 49:6, 49:7, 50:16, 51:11, 52:25, 53:13, 59:22, 61:19, 64:13, 64:17, 70:16, 71:7, 71:8, 71:21, 72:19, 76:24, 77:5
**integral** [1] - 53:20
**intend** [1] - 5:4
**intended** [2] - 23:3, 74:18
**intent** [6] - 49:9, 52:8, 53:21, 63:5, 74:21, 75:10
**intentional** [2] - 46:22, 59:2
**intentionally** [1] - 59:4
**intentioned** [1] - 13:19
**intercourse** [5] - 28:13, 28:17, 28:19, 28:22, 28:23
**interest** [2] - 26:2, 77:20
**interested** [1] - 60:13
**interests** [1] - 66:16
**internal** [2] - 58:4, 59:1

**international** [1] - 68:20
**Internet** [2] - 26:4, 57:3
**interrupt** [1] - 73:8
**interruption** [1] - 13:4
**invested** [2] - 22:2, 53:21
**investigated** [1] - 36:5
**investigation** [4] - 59:10, 62:19, 62:20, 65:11
**investigations** [1] - 59:11
**involved** [3] - 21:9, 27:7, 53:11
**involvement** [2] - 73:14, 75:9
**involves** [1] - 69:10
**involving** [2] - 50:19, 51:7
**IRS** [1] - 59:11
**Issac** [2] - 52:5, 64:7
**issue** [9] - 4:19, 12:6, 58:17, 60:2, 61:20, 72:21, 72:25, 74:17, 75:14
**issues** [3] - 7:19, 10:25, 12:13
**IT** [1] - 12:10
**item** [1] - 57:20
**items** [1] - 12:15
**itself** [1] - 67:11

## J

**jail** [1] - 33:21
**jails** [1] - 33:20
**January** [7] - 47:11, 62:3, 62:9, 62:16, 63:4, 66:14, 66:15
**Jed** [1] - 65:25
**Jeff** [1] - 25:16
**jeopardize** [1] - 72:4
**Jess** [2] - 63:14, 65:13
**Jessika** [1] - 64:11
**Jim** [1] - 14:5
**job** [13] - 22:17, 23:7, 23:19, 23:24, 24:21, 24:22, 24:25, 25:13, 25:17, 27:21, 27:22, 30:23, 55:20
**jobs** [1] - 46:4
**John** [2] - 3:1, 64:6
**join** [3] - 23:23, 27:16, 75:17
**joined** [9] - 13:2, 21:18, 21:21, 23:6, 25:19, 26:10, 27:10, 27:13, 30:8

**joining** [3] - 27:9, 30:19, 35:25
**joke** [1] - 56:18
**Jordan** [2] - 64:11, 70:7
**Joseph** [1] - 14:10
**jot** [2] - 39:9, 40:25
**JOY** [1] - 3:11
**Joy** [1] - 3:11
**joy@joybertrandlaw. com** [1] - 3:13
**Joyce** [1] - 20:24
**Joye** [2] - 3:10, 34:13
**Jr** [1] - 2:13
**judge** [3] - 19:6, 31:15, 42:18
**JUDGE** [1] - 1:13
**Judge** [1] - 8:18
**Judgment** [1] - 77:12
**judgment** [1] - 79:12
**jumped** [1] - 16:16
**juncture** [4] - 62:7, 70:24, 71:11, 72:3
**Juror** [16] - 4:4, 4:7, 4:12, 4:17, 5:22, 6:20, 7:5, 8:1, 11:8, 11:25, 12:25, 37:2, 37:9, 37:15, 37:19, 72:12
**juror** [24] - 4:7, 5:23, 5:24, 6:4, 6:6, 6:9, 7:10, 7:15, 7:16, 8:6, 10:6, 11:14, 11:15, 11:21, 11:22, 13:8, 17:22, 31:14, 32:4, 32:13, 70:18, 71:25
**juror's** [2] - 5:25, 31:10
**jurors** [16] - 4:9, 4:10, 4:17, 5:14, 6:3, 7:8, 9:2, 9:12, 9:15, 10:15, 11:13, 31:8, 31:25, 37:4, 37:20, 72:11
**Jury** [3] - 12:24, 37:17, 72:13
**jury** [53] - 4:16, 6:25, 8:3, 8:9, 9:7, 10:9, 10:11, 11:3, 11:15, 11:20, 12:1, 12:3, 12:19, 12:23, 13:2, 13:14, 14:7, 21:6, 29:20, 30:1, 32:15, 34:17, 34:25, 37:2, 37:11, 37:16, 37:18, 37:22, 39:10, 39:13, 39:16, 39:24, 41:13, 46:11, 50:12, 52:24, 53:13, 60:5, 61:19, 62:6, 64:13, 69:2,

70:14, 71:16, 72:11, 72:15, 73:12, 74:10, 74:24, 76:14, 76:25, 78:24, 79:1
**jus** [1] - 11:16
**JUSTICE** [1] - 2:9

## K

**keep** [16] - 10:7, 20:19, 33:23, 39:4, 39:13, 42:15, 42:20, 44:6, 45:6, 46:21, 57:18, 59:5, 64:20, 66:13, 68:17
**keeping** [2] - 20:17, 24:25
**kept** [1] - 26:22
**KESSLER** [3] - 2:20, 73:5, 73:8
**Kessler** [2] - 2:20, 73:7
**Kevin** [1] - 2:3
**kevin.rapp@usdoj. gov** [1] - 2:6
**keys** [1] - 18:16
**kids** [4] - 18:20, 51:21, 51:22, 55:22
**kind** [3] - 16:1, 22:3, 24:5
**kinds** [4] - 7:19, 56:14, 61:17
**knock** [1] - 51:23
**knocked** [1] - 24:14
**knowing** [3] - 23:3, 32:14, 60:22
**knowingly** [2] - 21:18, 25:19
**knowledge** [6] - 39:1, 40:4, 48:4, 50:7, 50:13, 60:16
**known** [2] - 26:8, 58:22
**knows** [7] - 16:19, 17:18, 48:10, 60:23, 68:2, 73:13, 74:20
**Koster** [1] - 14:5
**Kozinets** [1] - 2:4

## L

**L.L.C** [1] - 3:11
**L.L.P** [1] - 2:13
**Lacey** [16] - 1:9, 2:12, 48:6, 51:2, 51:4, 52:13, 53:19, 54:15, 60:14, 60:24, 62:23, 66:1, 66:15, 67:23, 69:21, 78:7
**Lacey's** [2] - 51:1,

67:2
**lack** [8] - 55:17, 56:19, 57:16, 58:8, 58:15, 58:18, 59:3, 59:5
**lactate** [3] - 48:19, 54:17
**lactating** [2] - 48:20, 48:25
**Ladies** [2] - 39:24, 41:12
**ladies** [12] - 37:22, 41:16, 47:6, 49:4, 50:7, 61:7, 63:15, 63:22, 67:7, 69:19, 70:8, 70:10
**lady** [2] - 29:14, 62:12
**language** [16] - 15:19, 16:10, 40:2, 41:25, 42:5, 42:6, 42:7, 42:8, 43:3, 43:4, 43:6, 43:12, 43:13, 43:15, 43:17, 43:19
**large** [1] - 8:10
**last** [9] - 6:5, 7:16, 10:19, 11:25, 18:17, 29:14, 30:21, 38:3, 70:16
**late** [2] - 35:24, 36:15
**laundering** [8] - 38:16, 38:18, 59:22, 68:4, 68:6, 68:7, 68:21, 69:5
**law** [25] - 16:4, 17:5, 17:7, 17:8, 21:19, 21:21, 25:9, 25:12, 25:18, 25:19, 25:20, 32:16, 32:19, 35:22, 35:23, 45:4, 45:16, 47:21, 47:25, 55:1, 55:4, 56:20, 56:22, 58:22
**LAW** [2] - 2:17, 2:20
**laws** [3] - 49:8, 49:11, 49:13
**lawyer** [1] - 78:11
**lawyers** [2] - 34:25, 44:11
**layer** [4] - 46:23, 46:24, 46:25, 53:20
**lays** [1] - 78:19
**lead** [3] - 16:12, 19:10, 21:12
**leaders** [1] - 13:22
**leaned** [1] - 13:25
**least** [7] - 6:23, 7:21, 15:4, 21:16, 23:3, 25:4, 53:16
**leave** [4] - 4:17, 5:3, 9:19, 36:1, 36:11, 44:18, 72:16

**leaves** [3] - 9:24, 55:7, 72:11
**left** [1] - 26:20
**legacy** [2] - 67:4, 69:21
**legal** [3] - 16:10, 28:6, 28:8
**legally** [1] - 22:18
**legitimate** [1] - 58:9
**leniency** [1] - 20:16
**less** [2] - 13:22, 30:17
**letter** [1] - 14:18
**letters** [1] - 54:14
**letting** [2] - 24:22, 62:24
**level** [2] - 28:1, 44:5
**liberties** [1] - 33:24
**licensed** [1] - 28:20
**lie** [4] - 19:20, 20:2, 20:10
**lied** [2] - 19:19, 20:1
**life** [3] - 32:3, 50:11, 59:18
**lightly** [1] - 34:3
**Liliana** [1] - 79:20
**limbs** [1] - 63:20
**limit** [1] - 33:11
**limited** [1] - 72:8
**limits** [1] - 33:9
**Lin** [2] - 62:12, 64:7
**LINCENBERG** [9] - 3:2, 5:21, 6:6, 46:8, 68:25, 75:15, 79:10, 79:15, 79:18
**Lincenberg** [7] - 3:3, 47:3, 47:4, 50:20, 59:8, 69:2, 79:11
**line** [6] - 16:14, 16:22, 30:23, 57:20, 67:13, 79:19
**link** [2] - 56:21, 73:1
**links** [2] - 48:1, 53:7
**LIPSITZ** [1] - 2:13
**Lisa** [1] - 14:5
**listed** [2] - 35:12, 45:21
**listen** [2] - 10:22, 44:13
**listening** [2] - 10:3, 78:15
**litany** [1] - 23:15
**literal** [2] - 43:15, 43:16
**lived** [1] - 18:15
**logic** [5] - 17:22, 17:24, 18:5, 32:11, 32:12
**logical** [1] - 17:25
**logistical** [2] - 7:19, 8:6

**Look** [3] - 46:3, 46:18, 67:20
**look** [21] - 12:15, 15:11, 16:5, 16:11, 18:25, 24:23, 36:16, 41:18, 41:25, 49:6, 49:25, 51:22, 63:19, 64:18, 64:21, 68:14, 72:23, 74:1, 75:11, 76:10, 79:1
**looked** [1] - 21:2
**looking** [4] - 15:13, 24:3, 28:19, 56:1
**looks** [3] - 44:25, 45:14, 47:14
**Lopez** [2] - 1:21, 80:18
**LOPEZ** [2] - 80:6, 80:19
**Los** [1] - 3:4
**lose** [1] - 9:24
**Louisiana** [2] - 28:17, 28:20
**loved** [2] - 18:13, 18:14
**loving** [1] - 49:6
**Luria** [2] - 52:5, 64:7

## M

**Madigan** [1] - 14:5
**Mail** [1] - 58:12
**mail** [13] - 38:10, 47:19, 48:9, 48:13, 48:17, 56:21, 62:14, 65:22, 65:23, 67:15, 79:8
**mails** [7] - 38:23, 45:21, 58:10, 58:12, 64:16, 65:19, 67:17
**major** [1] - 54:10
**malice** [2] - 55:12, 57:16
**man** [1] - 47:6
**manipulate** [1] - 43:8
**manipulating** [1] - 43:6
**mankind** [1] - 58:23
**manner** [1] - 50:17
**mantra** [1] - 17:4
**MARELLA** [1] - 3:1
**Margaret** [1] - 2:5
**margaret.perlmeter @usdoj.gov** [1] - 2:8
**Maricopa** [1] - 34:21
**market** [2] - 49:23, 56:12
**marketing** [4] - 22:10, 22:19, 26:22
**marketplace** [2] - 51:15, 56:17

**mask** [2] - 6:7, 6:8
**matter** [5] - 34:6, 37:8, 42:11, 47:7, 77:16
**matters** [6] - 26:2, 41:21, 42:3, 42:6, 47:8, 72:24
**mean** [14] - 7:16, 7:24, 8:25, 9:11, 9:23, 10:7, 15:5, 17:7, 18:2, 18:3, 25:10, 42:12, 51:11, 54:24
**means** [12] - 8:10, 15:10, 17:8, 17:21, 18:4, 28:3, 29:8, 47:5, 51:8, 51:12, 56:9, 59:21
**Medalist** [1] - 59:10
**medicine** [2] - 36:14, 36:17
**meet** [5] - 5:19, 5:21, 6:11, 15:11, 22:11
**meeting** [1] - 57:13
**Megan** [1] - 64:11
**Mehlman** [1] - 61:3
**Mehlman-Orozco** [1] - 61:3
**member** [2] - 10:1, 23:2
**members** [5] - 13:2, 13:3, 37:1, 46:10, 70:14
**memory** [3] - 46:11, 69:3, 72:18
**men** [2] - 34:2, 67:2
**mentioned** [4] - 8:11, 18:1, 55:10, 58:20
**merely** [2] - 50:21, 50:25
**met** [2] - 20:23, 67:24
**metaphor** [1] - 54:3
**metaphors** [1] - 36:10
**methods** [1] - 22:7
**methotrexate** [1] - 10:1
**mic** [1] - 15:15
**Michael** [2] - 1:9, 2:12
**might** [17] - 17:23, 28:5, 30:7, 32:1, 32:2, 35:13, 36:2, 40:25, 54:5, 54:23, 57:7, 57:8, 64:25, 65:23, 72:1, 75:20
**million** [8] - 20:9, 20:11, 50:9, 61:6, 61:25, 62:1, 63:9
**millions** [6] - 22:1, 30:25, 36:19, 40:15, 47:8, 50:9
**mind** [14] - 31:24, 39:4, 39:13, 42:15,

42:20, 44:6, 45:6, 46:21, 59:5, 64:20, 65:1, 66:13, 68:17, 75:25
**minded** [1] - 8:14
**mine** [1] - 36:13
**Minneapolis** [1] - 61:14
**minor** [4] - 53:15, 53:20, 54:23, 55:3
**minute** [2] - 25:7, 25:21
**minutes** [7] - 5:11, 5:20, 12:10, 12:18, 37:10, 50:1, 50:3
**missing** [2] - 24:4, 24:19
**misstates** [2] - 45:16, 46:9
**mistake** [1] - 13:24
**mistakes** [3] - 24:16, 27:18, 64:14
**moderate** [2] - 18:2, 26:3
**moderated** [1] - 24:7
**moderating** [1] - 26:2
**moderation** [14] - 22:2, 22:4, 22:9, 22:23, 25:4, 25:5, 25:17, 26:21, 27:19, 55:18, 55:21, 56:11, 56:18
**moderator** [2] - 29:4, 29:17
**moderators** [14] - 22:3, 22:6, 22:12, 23:11, 24:2, 24:8, 25:12, 26:20, 26:23, 27:20, 29:18, 30:14, 30:23, 47:19
**modern** [1] - 33:6
**molest** [1] - 52:6
**mom** [5] - 40:7, 51:20, 51:23, 55:7
**moment** [4] - 4:24, 12:5, 61:18, 75:22
**moments** [1] - 17:2
**Monday** [2] - 8:19, 9:3
**monetary** [1] - 69:9
**money** [39] - 20:16, 20:19, 20:20, 28:23, 28:19, 38:15, 38:18, 39:25, 40:2, 40:13, 40:17, 40:18, 40:19, 41:16, 42:7, 43:7, 43:14, 43:19, 43:24, 46:17, 53:24, 57:11, 57:18, 59:22, 61:11, 62:14, 63:5, 65:9, 68:4, 68:5, 68:7,

68:20, 68:21, 69:5, 69:10, 69:14, 69:16, 70:5
**month** [1] - 24:12
**months** [5] - 24:12, 34:20, 63:2, 63:7
**morning** [9] - 4:5, 4:6, 8:5, 10:3, 13:12, 18:12, 35:24, 70:25, 71:17
**most** [9] - 13:19, 13:25, 25:16, 30:4, 32:3, 57:7, 58:16, 58:22, 63:17
**Motion** [2] - 75:25, 77:12
**motions** [1] - 79:12
**Motors** [2] - 67:20, 67:22
**move** [9] - 17:1, 17:19, 19:14, 20:3, 21:14, 26:24, 28:16, 29:22, 30:2
**moved** [1] - 18:24
**movement** [2] - 59:6, 69:15
**moving** [1] - 68:21
**MR** [35] - 5:21, 6:6, 7:14, 7:19, 7:23, 8:18, 9:5, 12:12, 21:4, 29:20, 37:21, 45:18, 46:8, 46:15, 50:6, 62:4, 62:9, 68:25, 69:4, 73:5, 73:6, 73:8, 74:6, 75:15, 75:24, 76:13, 78:6, 78:13, 78:21, 79:7, 79:10, 79:11, 79:14, 79:15, 79:18
**MS** [21] - 4:6, 4:24, 5:6, 5:8, 6:12, 6:19, 9:21, 11:9, 11:11, 13:11, 21:7, 29:22, 30:2, 30:4, 45:16, 75:19, 77:8, 77:10, 77:19, 78:2, 78:11
**multiple** [5] - 9:10, 49:15, 64:8, 76:2, 76:10
**must** [10] - 17:23, 17:24, 22:24, 26:3, 26:7, 30:5, 30:6, 32:16, 50:12, 76:17
**mutual** [1] - 32:7
**Myles** [1] - 64:6
**MySpace** [1] - 16:20

## N

**Naiomy** [2] - 61:10,

64:11
**Naked** [2] - 48:3, 56:21
**name** [7] - 20:24, 30:19, 43:18, 59:15, 61:25, 62:3, 69:14
**named** [1] - 65:25
**nana** [1] - 63:19
**national** [1] - 16:18
**natural** [3] - 28:13, 53:3, 53:5
**nauseam** [1] - 45:22
**NCMEC** [4] - 14:13, 14:18, 16:17, 64:6
**nearest** [1] - 60:9
**nearly** [2] - 22:16, 27:21
**neatly** [1] - 69:12
**necessarily** [2] - 76:17, 76:21
**necessary** [8] - 10:12, 38:1, 49:10, 53:3, 53:12, 59:14, 68:15, 68:16
**need** [18] - 12:8, 12:15, 14:24, 18:25, 19:1, 31:18, 37:5, 44:4, 56:6, 63:21, 68:9, 69:9, 71:5, 72:3, 75:5, 75:12, 78:18, 78:23
**needed** [1] - 75:5
**needs** [1] - 6:22
**neighborhood** [1] - 18:15
**neighbors** [1] - 18:16
**NESSIM** [1] - 3:1
**Nevada** [3] - 28:5, 28:7, 28:8
**never** [6] - 7:22, 20:23, 26:19, 55:23, 60:7, 78:3
**New** [2] - 2:10, 52:7, 62:21
**new** [3] - 26:3, 50:7, 75:21
**news** [1] - 54:10
**newsman** [1] - 69:21
**newspaper** [6] - 14:22, 66:10, 66:13, 66:16, 66:19, 67:7
**newspapers** [5] - 47:11, 66:11, 66:22, 66:25, 67:4
**next** [19] - 4:16, 6:9, 8:23, 9:6, 10:3, 10:19, 14:11, 21:2, 23:1, 23:5, 25:22, 25:23, 30:11, 40:11, 44:15, 48:25, 49:2,

50:6, 57:3
**NGO** [2] - 57:12, 57:13
**NGOs** [1] - 67:24
**Nigam** [1] - 26:5
**night** [4] - 29:14,
35:24, 36:15, 41:14
**nightstand** [1] - 41:17
**nine** [4] - 22:25, 26:13,
30:16, 47:15
**nonadult** [2] - 68:11,
68:13
**none** [3] - 23:18,
29:19, 34:24
**nonoperational** [1] -
47:4
**North** [2] - 2:5, 3:8
**nose** [3] - 47:23,
47:25, 56:23
**noses** [1] - 8:12
**note** [6] - 7:7, 27:22,
66:18, 76:1, 76:16,
77:11
**noted** [4] - 62:8,
76:12, 77:4
**nothing** [6] - 13:12,
13:22, 23:13, 30:12,
30:20, 79:23
**Nothing** [1] - 60:2
**notice** [5] - 13:23,
28:23, 41:24, 62:24,
66:4
**noticed** [2] - 10:6,
75:20
**November** [3] - 1:8,
10:12, 80:14
**nude** [1] - 29:9
**nudge** [2] - 47:24,
47:25
**number** [7] - 4:9, 9:2,
40:25, 46:5, 71:24,
74:1, 74:8
**numbers** [3] - 26:12,
39:2, 39:11
**numerous** [2] - 61:1,
68:8
**NW** [1] - 2:10
**NY** [1] - 2:14

**O**

**O'Connor** [1] - 1:21
**O-ring** [1] - 18:7
**oath** [4] - 19:16,
19:20, 31:13, 32:15
**obey** [1] - 32:15
**object** [8] - 11:11,
27:2, 40:18, 43:23,
46:8, 53:23, 57:10,
62:4
**objected** [1] - 65:23

**objection** [11] - 21:4,
21:5, 29:20, 33:17,
45:16, 62:8, 68:25,
73:10, 75:16, 75:17,
77:4
**objections** [1] - 76:15
**objects** [2] - 23:3,
27:2
**obligation** [2] - 35:6,
73:17
**observe** [2] - 65:2,
65:4
**obvious** [3] - 42:13,
45:8, 75:5
**obviously** [7] - 8:19,
9:12, 15:10, 15:19,
15:20, 42:1, 49:1
**occur** [3] - 9:14,
11:19, 71:5
**occurred** [4] - 21:6,
21:10, 22:5, 76:9
**occurring** [1] - 23:12
**occurs** [1] - 16:7
**odds** [1] - 34:19
**OF** [3] - 1:3, 1:15, 2:9
**offended** [1] - 13:24
**offense** [4] - 21:16,
51:12, 51:17, 53:1
**office** [1] - 22:21
**OFFICE** [3] - 2:3, 2:17,
2:20
**officer** [2] - 48:2,
61:14
**officers** [6] - 16:4,
49:16, 51:14, 61:15,
64:8, 65:10
**official** [1] - 70:22
**Official** [2] - 1:20, 80:7
**often** [4] - 35:5, 44:11,
64:13, 73:20
**old** [5] - 29:14, 66:9,
66:10, 66:13, 67:7
**oldest** [2] - 48:6,
67:25
**once** [6] - 7:2, 8:3,
15:11, 66:25, 67:4,
75:6
**one** [75] - 5:3, 5:18,
9:23, 9:24, 11:5,
11:14, 13:3, 14:9,
16:4, 17:18, 18:12,
21:16, 21:17, 22:7,
22:23, 23:1, 23:3,
23:5, 24:2, 24:6,
25:16, 25:23, 27:1,
27:10, 27:13, 29:6,
29:7, 30:17, 31:8,
32:7, 32:9, 33:4,
34:4, 35:15, 36:1,
36:11, 37:4, 39:5,

39:15, 39:23, 40:22,
41:4, 41:14, 43:18,
43:22, 44:4, 44:10,
45:20, 45:23, 47:23,
49:11, 49:19, 51:19,
51:21, 52:9, 54:23,
60:9, 62:11, 63:1,
66:7, 66:8, 67:12,
67:17, 68:16, 69:6,
69:7, 69:13, 69:25,
70:20, 71:14, 75:16,
75:24, 76:13
**one-night** [1] - 41:14
**one-tenth** [1] - 30:17
**ones** [4] - 24:14,
34:19, 53:10
**ongoing** [1] - 53:11
**OnlyFans** [1] - 16:21
**open** [2] - 10:7, 73:18
**opened** [2] - 34:8,
76:2
**opening** [7] - 18:1,
41:10, 41:13, 42:24,
43:1, 59:19, 66:9
**opinion** [6] - 32:18,
55:12, 55:14, 60:4,
69:19, 75:2
**opportunity** [6] - 4:25,
5:8, 5:10, 38:3,
70:10, 70:25
**opposed** [2] - 9:7,
42:9
**opposite** [2] - 30:22,
33:1
**opposition** [1] - 23:8
**orally** [2] - 76:25, 77:5
**organization** [1] -
54:10
**organs** [1] - 63:20
**oriented** [1] - 30:15
**Orozco** [1] - 61:3
**Orwell's** [1] - 35:19
**ourselves** [2] - 32:22,
33:15
**outlines** [1] - 77:23
**outrageous** [1] -
63:18
**outside** [2] - 44:19,
45:2
**outsiders** [1] - 64:2
**overcome** [1] - 19:8
**overlooked** [1] - 32:6
**overreach** [1] - 35:20
**overrule** [1] - 21:5
**overruled** [3] - 45:17,
46:10, 69:2
**overt** [7] - 67:10,
67:13, 67:14, 67:15,
67:16, 67:17, 76:5
**owed** [1] - 20:11

**own** [11] - 7:3, 7:14,
8:20, 9:20, 35:13,
48:3, 48:7, 60:23,
65:5, 65:19, 67:2
**owner** [4] - 47:13,
52:13, 66:15, 66:20
**owners** [1] - 78:7
**owns** [3] - 47:17,
67:19, 67:21

**P**

**P.A** [1] - 2:17
**P.C** [1] - 3:2
**P.L.C** [1] - 3:7
**p.m** [1] - 79:25
**P.O** [1] - 3:12
**Padilla** [7] - 3:6,
24:21, 48:12, 52:15,
54:4, 54:7, 78:11
**page** [26] - 14:3,
14:11, 15:9, 24:23,
39:11, 40:25, 41:6,
43:25, 44:8, 45:3,
49:6, 49:7, 50:16,
50:20, 51:8, 52:7,
52:24, 53:13, 54:25,
55:9, 61:19, 64:13,
67:10, 69:17, 72:19
**pages** [3] - 14:8, 28:3,
80:9
**paid** [2] - 35:3, 51:1
**pair** [2] - 15:24, 16:2
**Panchapakesan** [2] -
3:2, 72:24, 79:21
**panel** [1] - 4:22
**paramount** [1] - 10:14
**paraphrasing** [1] -
73:15
**Park** [1] - 3:3
**part** [16] - 14:21, 15:3,
23:10, 26:8, 28:8,
28:12, 32:5, 41:6,
43:1, 43:8, 44:1,
47:20, 61:22, 63:5,
77:21, 79:4
**participate** [6] - 6:3,
6:20, 15:2
**participation** [1] -
53:15
**particular** [3] - 13:15,
43:2, 50:13
**particularly** [2] - 33:8,
76:16
**parties** [4] - 7:9, 20:7,
20:8, 70:15
**partner** [1] - 56:1
**parts** [1] - 25:17
**party** [2] - 21:20,
77:15

**pastime** [1] - 56:4
**patently** [2] - 15:10,
23:8
**patience** [1] - 34:23
**Paul** [1] - 2:13
**pause** [1] - 47:1
**pay** [1] - 24:4
**paying** [1] - 47:16
**payment** [2] - 68:11,
68:17
**payroll** [2] - 20:14,
68:23
**pcambria@lglaw.**
**com** [1] - 2:15
**pending** [1] - 77:12
**penetrate** [1] - 43:9
**people** [38] - 7:24,
9:23, 10:19, 13:20,
14:12, 14:13, 14:21,
14:24, 19:3, 22:16,
27:4, 29:2, 31:9,
32:20, 32:21, 32:24,
32:25, 33:2, 33:15,
33:21, 34:13, 34:20,
35:4, 35:5, 36:3,
40:20, 41:24, 44:11,
47:16, 54:21, 56:16,
61:10, 64:13, 65:15,
69:21, 70:6, 75:8
**percent** [5] - 46:16,
47:8, 47:13, 53:25,
70:21
**perfect** [1] - 27:19
**perfection** [1] - 28:1
**perhaps** [1] - 58:16
**period** [4] - 8:16, 8:23,
53:16, 70:15
**PERLMETER** [1] -
6:19
**Perlmeter** [1] - 2:5
**permit** [2] - 37:3,
72:25
**person** [13] - 10:15,
10:19, 12:11, 15:11,
21:21, 29:9, 31:8,
52:9, 53:9, 54:23,
61:4, 67:19, 74:20
**person's** [1] - 53:15
**personal** [1] - 69:18
**personalities** [1] -
69:20
**personally** [2] - 32:15,
67:12
**persons** [1] - 21:15
**persuade** [1] - 31:10
**pertaining** [1] - 78:14
**pertains** [1] - 26:16
**Peter** [1] - 2:4
**peter.kozinets@**
**usdoj.gov** [1] - 2:7

**pets** [1] - 18:17
**Ph.D** [2] - 63:24, 66:6
**philosophizing** [1] - 48:18
**Phoenix** [6] - 1:8, 1:22, 2:6, 2:18, 3:8, 80:14
**phone** [3] - 35:24, 50:1, 54:2
**phrases** [1] - 51:10
**phrasing** [1] - 42:12
**pick** [1] - 20:25
**picking** [1] - 54:17
**pictures** [1] - 56:14
**piece** [4] - 38:1, 53:12, 56:19, 58:8
**pieces** [4] - 18:21, 19:5, 62:10, 62:24
**pills** [1] - 36:6
**Pinterest** [1] - 16:21
**pitcher** [1] - 56:4
**place** [6] - 21:22, 32:8, 33:12, 35:6, 66:19, 72:17
**places** [1] - 59:8
**placing** [1] - 23:24
**plain** [1] - 25:11
**Plaintiff** [1] - 1:7
**plan** [5] - 26:10, 26:11, 26:14, 26:15, 26:19
**plans** [1] - 27:12
**platforms** [3] - 14:20, 15:7, 16:19
**plausible** [8] - 45:25, 46:6, 46:15, 46:18, 46:22, 46:25, 48:22, 68:12
**play** [1] - 55:22
**played** [3] - 55:2, 55:3, 55:23
**playing** [1] - 27:3
**Playing** [1] - 50:4
**plea** [1] - 64:19
**plenty** [1] - 35:13
**plus** [1] - 65:14
**point** [15] - 5:2, 11:17, 15:12, 19:2, 19:19, 39:10, 40:23, 41:2, 48:10, 48:14, 60:6, 63:1, 65:15, 67:3, 71:9
**pointed** [1] - 73:24
**pointing** [3] - 52:17, 52:18, 53:4
**points** [2] - 9:21, 47:23
**poisoned** [4] - 36:4, 36:5, 36:9, 36:20
**Polaris** [2] - 14:14, 64:7

**police** [10] - 23:7, 23:19, 47:22, 49:16, 51:14, 56:23, 61:14, 64:8, 65:10
**policy** [2] - 48:16, 58:1
**politicians** [3] - 13:21, 13:25, 31:25
**pool** [2] - 10:23, 11:20
**poor** [1] - 10:2
**portion** [1] - 80:10
**posited** [1] - 73:12
**position** [2] - 7:23, 11:7
**positive** [2] - 4:8, 5:15
**possibility** [6] - 23:6, 25:14, 26:11, 26:18, 26:19, 27:23
**possible** [4] - 7:1, 31:20, 44:2, 44:5
**post** [2] - 49:24, 53:6
**posted** [5] - 41:19, 49:18, 51:16, 54:2, 67:4
**poster** [1] - 39:3
**potential** [2] - 4:19, 33:3
**power** [1] - 33:12
**powerful** [6] - 13:21, 13:25, 14:12, 14:13, 15:4, 32:3
**PowerPoint** [5] - 17:1, 17:19, 19:14, 20:3, 21:11
**powers** [1] - 21:3
**precisely** [1] - 59:21
**predict** [1] - 9:13
**predicted** [1] - 41:11
**prefer** [2] - 11:15, 79:21
**preference** [2] - 6:20, 6:24
**prejudice** [1] - 69:19
**Prepared** [1] - 1:24
**prepared** [2] - 4:13, 80:13
**preposterous** [1] - 66:24
**presence** [3] - 9:16, 77:17, 77:19
**present** [8] - 4:4, 8:9, 12:24, 37:17, 37:20, 72:13, 73:17, 73:18
**presentation** [3] - 39:4, 39:5, 46:1
**presented** [3] - 41:19, 42:13, 74:10
**presidential** [1] - 75:22
**press** [2] - 14:22, 14:23

**presume** [1] - 28:7
**presumed** [1] - 15:7
**presumption** [1] - 35:8
**pretty** [3] - 24:13, 55:23, 63:18
**prevent** [1] - 43:21
**previous** [1] - 55:4
**Priests** [1] - 52:6
**primary** [1] - 62:10
**printed** [1] - 38:21
**prisoner** [1] - 33:22
**problem** [1] - 19:21
**procedure** [1] - 48:16
**proceed** [6] - 8:17, 11:25, 12:7, 13:5, 13:10, 72:9
**proceeding** [2] - 72:21, 79:4
**PROCEEDINGS** [1] - 1:15
**proceedings** [3] - 72:4, 77:14, 80:11
**Proceedings** [6] - 1:24, 4:3, 6:15, 12:21, 37:13, 79:25
**process** [3] - 4:14, 27:20, 33:10
**produced** [1] - 54:10
**profession** [2] - 48:7, 67:25
**profits** [1] - 38:16
**prohibited** [1] - 33:6
**prohibition** [1] - 74:2
**prohibits** [1] - 16:23
**promote** [4] - 23:15, 49:10, 51:9, 51:17
**promoted** [1] - 38:14
**promoting** [5] - 38:16, 49:14, 50:18, 51:6, 68:23
**promotion** [4] - 23:9, 43:21, 50:18, 51:9
**promotional** [1] - 68:20
**prompt** [1] - 10:18
**promptly** [1] - 72:7
**proof** [2] - 38:5, 74:3
**properties** [1] - 77:24
**property** [1] - 78:14
**propose** [5] - 5:1, 15:13, 41:8, 76:17, 76:21
**proposed** [1] - 78:22
**proposes** [4] - 41:4, 41:7, 76:19, 76:24
**prosecution** [15] - 13:15, 13:16, 17:10, 17:17, 19:24, 22:13, 25:13, 28:4, 30:6,

33:13, 35:11, 35:20, 63:13, 64:6, 64:23
**prosecution's** [2] - 21:23, 26:6
**prosecutor** [3] - 13:13, 17:15, 73:15
**prosecutor's** [1] - 19:8
**prostitution** [36] - 28:3, 28:5, 28:12, 29:8, 38:14, 38:17, 39:1, 40:20, 43:21, 45:11, 45:14, 45:15, 46:17, 47:9, 48:5, 48:8, 48:11, 49:10, 49:15, 49:23, 50:19, 51:7, 51:12, 51:17, 54:1, 56:12, 57:2, 57:9, 59:4, 63:24, 65:8, 65:12, 66:7, 66:18, 67:5, 67:9
**protect** [2] - 33:14, 41:7
**protected** [3] - 15:8, 35:21, 41:5
**protecting** [1] - 15:7
**protection** [1] - 34:15
**protections** [5] - 14:19, 33:4, 34:3, 34:4, 34:16
**protector** [1] - 35:7
**Proton** [1] - 58:12
**prove** [11] - 17:10, 27:11, 29:7, 31:19, 34:5, 44:2, 44:5, 44:9, 49:8, 50:12, 67:12
**proven** [1] - 34:10
**provide** [2] - 45:10, 72:7
**provided** [1] - 55:1
**provocative** [1] - 16:9
**provocatively** [1] - 16:8
**public** [3] - 32:3, 32:17, 69:19
**publicly** [1] - 68:1
**publisher** [2] - 16:10, 16:13
**publishers** [1] - 14:20
**pulled** [2] - 29:23, 65:14
**pulling** [1] - 22:8
**punishment** [2] - 55:1, 55:5
**purpose** [5] - 17:12, 33:14, 50:18, 51:6, 70:19
**purposes** [2] - 42:3, 68:23

**push** [4] - 11:1, 31:23, 44:24, 47:25
**pushing** [3] - 14:14, 49:6, 56:24
**Put** [2] - 21:22, 41:22
**put** [19] - 11:7, 12:5, 31:17, 42:9, 43:5, 56:14, 57:6, 58:6, 62:2, 62:11, 65:14, 68:22, 69:6, 70:1, 72:18, 74:11, 74:12, 75:6
**putting** [1] - 42:2
**puzzle** [2] - 38:1, 53:12

**Q**

**qualified** [1] - 80:7
**quality** [1] - 74:9
**quarantine** [2] - 8:16, 8:22
**quartering** [1] - 33:7
**quarters** [1] - 24:23
**questionnaires** [1] - 10:10
**questions** [4] - 12:7, 17:3, 36:7, 64:23
**quick** [1] - 77:11
**quickly** [1] - 51:20
**quite** [6] - 33:1, 36:18, 38:13, 62:21, 70:14, 74:6
**Quoc** [1] - 69:12
**quote** [1] - 75:22

**R**

**rained** [2] - 44:21, 45:2
**raining** [2] - 44:20, 45:1
**raise** [1] - 10:17
**raised** [1] - 15:25
**raises** [1] - 9:21
**ran** [1] - 20:13
**random** [1] - 34:20
**range** [1] - 18:22
**Rangers** [1] - 56:8
**Rapp** [5] - 2:3, 39:5, 47:2, 54:3, 72:18
**RAPP** [3] - 8:18, 21:4, 29:20
**rather** [1] - 9:8
**rational** [6] - 15:1, 17:17, 22:22, 23:22, 26:18, 31:7
**rattling** [1] - 62:23
**reach** [1] - 33:12
**read** [6] - 17:20,

17:21, 24:15, 39:15, 70:16, 78:15
**reader** [1] - 15:13
**reading** [1] - 29:25
**ready** [1] - 37:15
**real** [2] - 26:18, 61:8
**reality** [1] - 27:18
**realize** [1] - 8:20
**really** [15] - 23:18, 25:2, 25:10, 25:24, 33:9, 46:20, 48:23, 55:20, 57:13, 57:15, 60:7, 60:15, 64:10
**reason** [13] - 4:21, 8:19, 14:22, 17:16, 17:22, 18:5, 27:6, 30:7, 31:7, 42:21, 44:7, 64:15, 79:5
**reasonable** [48] - 15:1, 17:10, 17:15, 17:22, 17:24, 17:25, 18:2, 18:4, 18:5, 18:6, 18:10, 19:2, 19:9, 19:10, 19:18, 19:23, 21:13, 21:24, 22:20, 22:22, 23:4, 23:5, 23:22, 25:5, 25:7, 25:20, 26:9, 26:12, 26:13, 27:15, 30:5, 30:11, 30:21, 31:5, 31:11, 31:12, 31:19, 32:1, 32:10, 32:11, 32:13, 32:16, 35:12, 36:10, 36:23, 44:1, 63:16, 64:20
**reasonably** [1] - 53:2
**reasoning** [1] - 21:3
**reasons** [1] - 20:9
**rebellion** [1] - 16:1
**rebuttal** [4] - 8:4, 15:18, 73:9, 76:18
**recalled** [1] - 36:7
**receive** [2] - 28:3, 70:22
**received** [3] - 12:15, 29:18, 56:25
**recently** [1] - 45:1
**recess** [4] - 6:14, 12:20, 37:12, 70:24
**recollection** [2] - 21:6, 76:7
**reconvene** [1] - 72:22
**reconvened** [2] - 6:15, 12:21, 37:13
**record** [16] - 20:25, 23:13, 37:19, 42:3, 60:3, 60:6, 72:17, 72:20, 73:9, 74:22, 75:1, 75:15, 75:24, 76:1, 77:11

**red** [3] - 15:23, 15:24, 15:25
**reduce** [2] - 57:10, 58:14
**refer** [3] - 40:6, 47:4, 47:5
**reference** [1] - 76:19
**referenced** [1] - 49:8
**referred** [2] - 22:13, 77:2
**reflect** [2] - 21:1, 37:19
**regard** [3] - 72:20, 72:21, 72:23
**regarding** [3] - 11:8, 75:3, 77:15
**regular** [2] - 14:21, 58:12
**regulate** [1] - 15:8
**related** [1] - 49:1
**relationship** [4] - 57:25, 58:20, 59:1, 59:2
**relatively** [1] - 70:15
**release** [5] - 5:3, 8:3, 11:21, 12:1, 70:17
**released** [1] - 11:22
**reliance** [1] - 63:17
**relieved** [1] - 9:19
**religious** [1] - 13:21
**rely** [2] - 64:1, 65:18, 75:1
**remain** [1] - 72:15
**remainder** [3] - 4:10, 8:2, 13:6
**remaining** [1] - 12:1
**remains** [1] - 4:22
**remarks** [1] - 76:18
**remember** [25] - 20:10, 20:23, 23:10, 36:2, 37:6, 45:11, 45:12, 45:25, 46:23, 47:20, 48:14, 48:17, 53:19, 57:4, 58:9, 59:14, 60:5, 60:21, 60:23, 61:23, 62:11, 64:14, 67:2, 67:14, 67:20
**remind** [6] - 8:6, 12:2, 33:16, 71:7, 71:9, 71:23
**remote** [1] - 7:21
**remotely** [6] - 8:2, 37:19, 70:19, 73:1, 79:16, 79:22
**removing** [1] - 25:1
**renew** [1] - 76:14
**rental** [1] - 18:24
**repeatedly** [1] - 17:5
**replete** [1] - 43:16

**report** [1] - 72:2
**Reported** [1] - 1:24
**Reporter** [4] - 1:20, 1:24, 50:5, 80:7
**REPORTER'S** [1] - 1:15
**reporting** [1] - 9:2
**representation** [1] - 33:18
**reprimanding** [1] - 47:19
**request** [5] - 11:23, 76:15, 77:4, 78:12
**required** [3] - 32:2, 44:2, 67:12
**requirement** [2] - 74:3, 76:5
**requires** [2] - 21:20, 28:12
**research** [1] - 71:13
**resided** [1] - 78:15
**respect** [1] - 32:7
**respond** [4] - 16:17, 38:6, 47:21, 74:5
**response** [4] - 14:17, 14:18, 23:20, 74:15
**responsibility** [1] - 52:21
**rest** [1] - 59:17
**rested** [1] - 70:15
**result** [1] - 13:20
**resume** [1] - 70:24
**return** [3] - 7:8, 8:5, 71:17
**revealed** [1] - 70:3
**revealing** [1] - 29:10
**revenue** [1] - 47:9
**Review** [3] - 48:11, 57:25, 58:17
**reviewing** [1] - 24:3
**reviews** [1] - 48:11
**revolution** [1] - 33:25
**rewarding** [1] - 25:17
**Rex** [1] - 29:14
**RHOW** [1] - 3:2
**Richard** [2] - 14:4, 14:9
**rid** [2] - 7:24, 55:6
**righteous** [1] - 27:25
**rights** [2] - 35:8, 73:22
**Rights** [1] - 33:4
**ring** [2] - 18:7, 54:2
**ringing** [1] - 50:1
**rise** [4] - 6:13, 37:11, 37:18, 72:11
**risk** [1] - 36:8
**RMR** [2] - 1:21, 80:19
**Road** [2] - 2:18, 2:21
**roadmap** [1] - 40:11

**Robert** [1] - 22:24
**rocky** [1] - 54:19
**role** [5] - 14:24, 37:25, 47:3, 55:2, 55:3
**room** [10] - 8:9, 8:10, 9:18, 22:14, 22:15, 24:15, 33:23, 42:21, 54:3, 54:16
**rooms** [1] - 65:8
**rough** [4] - 54:8, 54:12, 54:18, 62:25
**roughly** [1] - 12:10
**row** [1] - 6:5
**rude** [1] - 33:8
**rule** [5] - 17:17, 23:24, 27:23, 30:20, 35:11
**Rule** [2] - 7:7, 79:12
**ruled** [4] - 23:5, 25:14, 26:11, 31:20
**rules** [6] - 17:24, 24:9, 26:3, 26:4, 27:5
**ruling** [1] - 75:13
**run** [1] - 57:12

## S

**s/Hilda** [1] - 80:18
**sacred** [1] - 32:18
**sadomasochistic** [1] - 29:7
**safety** [2] - 26:5, 57:3
**salary** [1] - 30:18
**sale** [3] - 20:12, 46:21, 66:19
**sales** [1] - 22:9
**sample** [1] - 50:8
**Sandra** [1] - 1:21
**sat** [4] - 34:23, 52:19, 52:20, 52:21
**save** [1] - 22:1
**saw** [11] - 8:11, 25:9, 29:13, 47:18, 49:21, 50:3, 51:14, 52:4, 57:24, 59:13, 65:13
**scared** [1] - 64:19
**schedule** [2] - 7:3, 71:18
**scheme** [1] - 27:13
**schemes** [1] - 27:12
**SCIME** [1] - 2:13
**scope** [1] - 53:2
**Scott** [1] - 2:16
**Scottsdale** [3] - 2:21, 2:21, 3:12
**screened** [2] - 10:9, 10:11
**screw** [1] - 30:24
**search** [1] - 33:9
**seas** [3] - 54:8, 54:13, 54:19

**season** [1] - 71:2
**seated** [7] - 4:5, 6:16, 12:22, 13:1, 37:14, 37:19, 72:14
**second** [3] - 6:4, 47:1, 63:15
**Second** [1] - 33:5
**seconds** [1] - 70:9
**section** [5] - 23:7, 41:19, 49:24, 54:1, 54:2
**security** [1] - 26:5
**see** [15] - 13:2, 16:2, 30:22, 34:12, 44:20, 47:15, 50:15, 54:19, 54:20, 58:14, 59:1, 69:5, 69:7, 76:11, 79:5
**seeks** [1] - 13:15
**sees** [1] - 47:15
**seizure** [1] - 33:9
**select** [3] - 4:16, 8:7, 12:3
**selected** [1] - 4:21
**sell** [4] - 46:2, 46:4, 47:10, 66:25
**seller** [2] - 20:11, 20:12
**seller-financed** [1] - 20:12
**sellers** [1] - 20:21
**Seminary** [1] - 14:15
**senate** [1] - 14:16
**Senate** [1] - 62:18
**Senator** [1] - 14:4
**send** [3] - 36:7, 36:9, 62:1
**sending** [1] - 25:12
**sense** [6] - 5:14, 5:17, 9:18, 42:21, 44:7, 64:15
**sensor** [1] - 16:13
**sent** [5] - 11:13, 56:22, 58:10, 64:17, 67:17
**sentencing** [1] - 20:16
**separate** [2] - 19:13, 32:23
**separately** [1] - 26:22
**September** [2] - 34:8, 41:14
**Series** [2] - 18:8, 56:8
**seriously** [3] - 23:25, 58:3, 61:7
**SESSION** [1] - 1:16
**sessions** [1] - 31:25
**set** [7] - 10:10, 12:6, 12:8, 14:17, 33:21, 44:12, 79:19
**setting** [1] - 12:13
**seven** [7] - 21:11,

23:4, 25:7, 25:20, 28:3, 38:6, 39:21
**several** [2] - 63:7, 64:22
**sex** [10] - 23:8, 28:13, 40:2, 41:16, 42:7, 43:14, 43:19, 49:1, 61:16, 65:9
**sex-act-for-money** [2] - 42:7, 43:14
**sex-for-money** [1] - 23:8
**sexual** [5] - 28:13, 28:17, 28:18, 28:22, 28:23
**shake** [1] - 44:24
**Shanna** [1] - 64:11
**share** [1] - 32:11
**sharing** [1] - 60:13
**sharks** [1] - 54:20
**sheet** [1] - 69:8
**Shehan** [1] - 64:6
**shelf** [1] - 57:6
**shell** [8] - 59:6, 59:12, 59:19, 61:1, 68:8, 69:14, 69:15
**shenanigans** [2] - 21:10
**shifting** [2] - 73:21, 74:4
**ship** [5] - 54:4, 54:5, 54:6, 54:15, 68:1
**shirt** [1] - 42:10
**shirts** [1] - 41:24
**shoes** [3] - 15:23, 15:24, 15:25
**shores** [1] - 54:19
**short** [5] - 7:14, 8:23, 41:24, 53:16, 70:15
**show** [25] - 9:12, 14:2, 14:7, 14:8, 24:1, 24:10, 24:20, 28:11, 28:25, 29:5, 30:6, 31:22, 35:15, 38:9, 38:22, 38:25, 44:15, 49:11, 49:13, 50:12, 58:18, 68:18, 69:9, 74:22
**showed** [1] - 55:5
**showing** [1] - 42:4
**shown** [4] - 4:11, 26:25, 67:15, 68:8
**shows** [8] - 19:22, 22:2, 23:13, 37:24, 55:19, 59:3, 67:13, 74:22
**shut** [5] - 30:16, 43:22, 59:16, 60:24, 68:2
**shutdown** [1] - 13:23

**shuttle** [1] - 18:7
**sick** [2] - 10:8, 19:4
**side** [6] - 23:14, 30:18, 58:25, 66:11, 66:12
**sides** [3] - 37:23, 46:19, 69:24
**sight** [1] - 25:11
**signature** [2] - 14:3, 14:8
**signed** [2] - 9:1, 22:24
**significant** [1] - 50:17
**silly** [1] - 66:23
**similar** [3] - 41:25, 53:18, 62:13
**similarly** [1] - 58:16
**simple** [4] - 17:21, 38:13, 55:23, 68:6
**simply** [1] - 76:23
**single** [5] - 11:5, 18:8, 49:17, 50:2
**sister** [1] - 64:12
**sit** [2] - 10:3, 10:21
**site** [9] - 23:25, 43:16, 43:22, 46:4, 48:5, 48:8, 48:22, 57:2, 68:14
**sites** [2] - 48:1
**sits** [1] - 6:4
**sitting** [11] - 10:10, 10:15, 10:21, 10:25, 21:2, 21:8, 21:17, 44:22, 47:13, 53:10
**situated** [1] - 12:18
**situation** [1] - 9:15
**six** [4] - 20:3, 22:20, 23:4, 25:5
**Sixth** [1] - 33:10
**size** [2] - 18:1
**skin** [1] - 22:1
**slide** [23] - 17:1, 17:19, 19:11, 19:14, 20:3, 21:11, 21:14, 22:25, 23:1, 25:22, 26:24, 27:6, 28:11, 28:16, 28:25, 29:5, 35:15, 35:16, 38:20, 38:22, 39:18, 44:15
**slow** [5] - 24:4, 24:15, 43:11, 57:19, 57:21
**small** [1] - 46:5
**smaller** [1] - 74:1
**smallest** [1] - 68:16
**Snyder** [2] - 45:10, 61:13
**sold** [2] - 66:16
**solicited** [1] - 72:2
**solid** [1] - 54:14
**someone** [3] - 8:15, 21:19, 24:5, 24:16, 24:18, 25:19, 27:1,

28:21, 36:5, 48:20, 51:12, 51:17, 74:20
**sometimes** [6] - 26:4, 33:15, 36:13, 64:25, 69:6, 69:7
**somewhat** [1] - 21:1
**soon** [1] - 7:1
**sooner** [1] - 9:8
**sophisticated** [1] - 58:22
**sorry** [6] - 15:15, 23:1, 26:12, 35:17, 73:5, 79:11
**sort** [2] - 54:25, 71:1
**sorts** [1] - 9:14
**sound** [1] - 24:16
**source** [1] - 67:1
**space** [1] - 18:7
**span** [1] - 76:9
**Spc** [1] - 1:22
**speaker** [1] - 16:11
**Spear** [7] - 2:16, 48:9, 52:13, 54:16, 59:25, 75:7, 78:7
**Spear's** [2] - 73:9, 75:9
**specific** [7] - 37:25, 39:10, 40:4, 43:3, 43:12, 50:7, 50:13
**specifically** [1] - 77:24
**specified** [1] - 80:12
**speech** [6] - 14:20, 15:7, 15:9, 16:13, 41:7
**spend** [1] - 38:21
**spending** [1] - 30:25
**spite** [1] - 32:5
**spooky** [1] - 13:17
**sport** [1] - 56:3
**stall** [1] - 57:16
**stand** [6] - 32:2, 38:3, 41:14, 42:17, 42:19, 61:9
**standard** [3] - 17:11, 44:1
**standards** [1] - 16:18
**standing** [1] - 34:11
**start** [7] - 15:8, 40:12, 50:1, 58:10, 58:12, 59:16, 72:5
**started** [4] - 30:12, 46:19, 64:3, 76:14
**starts** [3] - 14:21, 25:10, 33:17
**state** [7] - 28:4, 28:5, 28:24, 33:22, 76:22
**statement** [5] - 42:24, 43:2, 47:18, 72:18, 76:22
**statements** [5] -

19:16, 41:10, 41:13, 45:22, 66:3
**STATES** [3] - 1:2, 2:3, 2:9
**states** [2] - 28:9, 28:10
**States** [11] - 1:6, 14:16, 14:23, 20:8, 32:21, 32:23, 40:13, 49:8, 67:11, 68:22, 80:8
**states'** [2] - 49:8, 49:11
**States'** [2] - 6:19, 38:3
**stating** [1] - 13:13
**statute** [9] - 40:14, 42:25, 43:1, 43:2, 43:3, 43:7, 43:13, 50:10, 51:10
**statutory** [1] - 43:13
**stay** [2] - 11:16, 27:3
**stays** [1] - 11:15
**steering** [2] - 54:7
**Stenographic** [1] - 1:24
**step** [1] - 48:25
**stepson** [1] - 18:13
**stick** [1] - 31:16
**sticking** [1] - 61:18
**still** [9] - 9:7, 18:5, 39:14, 39:18, 43:14, 45:19, 55:3, 56:5, 77:13
**stipulation** [1] - 7:9
**stock** [2] - 67:20, 67:21
**STONE** [4] - 12:12, 73:6, 78:6, 78:21
**stone** [1] - 78:18
**Stone** [1] - 2:4
**stop** [2] - 17:5, 58:12
**stores** [1] - 36:15
**story** [2] - 26:14, 27:19
**straight** [2] - 47:23, 61:4
**strangers** [1] - 35:4
**strategy** [1] - 47:20
**straws** [1] - 7:14
**Street** [1] - 1:22
**street** [2] - 18:24, 65:15
**stretch** [1] - 25:10
**stricken** [1] - 7:6
**strictly** [1] - 24:8
**strike** [1] - 7:16
**strong** [2] - 6:20, 6:24
**struck** [1] - 48:10
**stuck** [1] - 63:9
**stuff** [9] - 20:18, 20:19, 24:4, 24:22,

47:22, 62:17, 62:19, 68:13
**subject** [1] - 55:4
**submit** [12] - 17:15, 30:20, 41:20, 43:4, 43:12, 44:3, 55:14, 58:15, 60:11, 66:2, 78:22, 78:25
**submitted** [1] - 7:2
**subordinates** [1] - 22:23
**subpoenas** [4] - 23:20, 35:23, 47:21, 56:25
**success** [2] - 30:9, 53:23
**successful** [2] - 53:22, 67:18
**sudden** [1] - 18:23
**suggest** [5] - 4:14, 19:9, 19:18, 66:23, 75:4
**suggested** [2] - 7:22, 67:23
**suggesting** [1] - 73:19
**suggestions** [4] - 57:7, 57:12, 57:18, 76:15
**suggestive** [1] - 45:12
**suit** [1] - 42:17
**Suite** [7] - 1:21, 2:5, 2:14, 2:18, 2:21, 3:3, 3:8
**suite** [1] - 47:14
**summarized** [1] - 69:12
**summation** [4] - 5:4, 8:2, 13:4, 46:12
**summations** [1] - 11:1
**super** [1] - 34:24
**supposed** [1] - 29:2
**suppressing** [1] - 10:1
**surprise** [1] - 21:19
**suspended** [1] - 71:16
**sweatshop** [2] - 22:15, 27:2
**swing** [1] - 73:20
**switch** [2] - 37:3, 37:5
**sworn** [1] - 31:13
**sympathy** [1] - 69:19
**symptoms** [1] - 6:1
**system** [1] - 27:4

## T

**T-shirt** [1] - 42:10
**T-shirts** [1] - 41:24
**Taboo** [1] - 55:22
**tactic** [1] - 57:16
**talks** [3] - 30:23, 46:3,

61:19
**taught** [1] - 13:18
**taxation** [1] - 33:17
**team** [1] - 47:17
**Tech** [2] - 59:9
**technical** [1] - 71:5
**technicalities** [1] -
34:4
**telephonically** [2] -
79:17, 79:18
**ten** [7] - 5:11, 5:19,
12:10, 12:18, 23:1,
27:15, 36:3
**tenth** [1] - 30:17
**TER** [1] - 48:10
**terms** [3] - 10:8,
17:21, 46:11
**Terms** [1] - 27:5
**test** [2] - 5:12, 12:17
**tested** [3] - 4:8, 5:15,
12:8
**testified** [6] - 49:16,
49:18, 51:1, 60:22,
62:13, 68:2
**testify** [3] - 58:19,
74:1, 75:5
**testifying** [1] - 20:23
**testimony** [15] - 19:16,
20:5, 20:6, 46:9,
46:12, 52:20, 52:22,
61:5, 62:12, 62:17,
64:18, 65:1, 65:16,
69:12, 70:3
**Texas** [2] - 14:13,
43:11
**Thai's** [1] - 69:12
**THE** [52] - 1:3, 1:13,
4:5, 4:7, 5:1, 5:7,
5:10, 6:2, 6:8, 6:16,
7:12, 7:18, 7:22, 8:1,
8:25, 9:10, 10:24,
11:10, 11:17, 12:14,
12:22, 13:1, 21:5,
29:25, 30:3, 37:1,
37:14, 37:18, 45:17,
46:10, 62:6, 69:2,
70:13, 72:14, 73:7,
74:5, 75:11, 75:18,
75:20, 76:7, 76:25,
77:9, 77:17, 77:22,
78:5, 78:9, 78:17,
79:3, 79:9, 79:13,
79:17, 79:19
**themselves** [2] -
15:12, 19:20
**Theological** [1] -
14:15
**theory** [4] - 26:7, 38:4,
38:8, 48:22
**therein** [1] - 80:12

**they've** [2] - 10:24,
11:2
**thinking** [6] - 4:20,
12:12, 31:7, 34:24,
52:25, 54:22
**Third** [1] - 33:5
**thoughts** [1] - 57:14
**thousands** [3] - 34:2,
47:16, 64:16
**threatening** [1] -
24:18
**threatens** [1] - 31:14
**three** [9] - 17:19,
18:21, 19:5, 19:25,
24:23, 53:16, 60:10,
78:7
**three-quarters** [1] -
24:23
**threshold** [1] - 68:15
**throughout** [4] - 34:1,
34:15, 35:18, 39:3
**throw** [2] - 21:19,
60:18
**throwing** [1] - 51:10
**thumbs** [1] - 13:8
**tie** [1] - 42:17
**TikTok** [2] - 16:20,
51:25
**tiny** [1] - 18:4
**Titanic** [1] - 54:5
**today** [11] - 4:15, 4:17,
4:22, 5:5, 6:21, 9:24,
16:20, 34:9, 38:11,
39:14, 43:1
**together** [4] - 35:5,
56:16, 58:6, 78:18
**Tom** [1] - 14:5
**tomorrow** [5] - 12:14,
12:16, 72:22, 75:13
**tomorrow's** [2] -
77:14, 79:16
**ton** [1] - 38:22
**tons** [1] - 46:5
**took** [5] - 6:14, 23:24,
32:15, 58:5, 59:10
**top** [4] - 27:3, 52:13,
54:6, 54:7
**torture** [1] - 29:8
**total** [1] - 35:4
**touch** [1] - 29:1
**touched** [2] - 25:24,
39:22
**tough** [1] - 55:19
**town** [1] - 34:9
**toxic** [4] - 59:17,
60:25, 62:1
**track** [1] - 77:13
**trade** [1] - 46:4
**traded** [1] - 67:4
**trafficking** [1] - 61:16

**transaction** [11] -
16:6, 16:7, 41:5,
41:8, 41:9, 61:24,
69:9, 76:18, 76:19,
76:21, 76:22
**transactional** [1] -
69:4
**transcript** [3] - 75:12,
80:10, 80:12
**TRANSCRIPT** [1] -
1:15
**Transcript** [1] - 1:24
**Transcription** [1] -
1:24
**transform** [1] - 32:22
**transport** [1] - 63:5
**transportation** [1] -
61:21
**Travel** [2] - 21:16, 53:1
**travels** [1] - 46:1
**treat** [1] - 7:15
**treated** [2] - 7:16,
11:12
**treating** [2] - 18:22,
29:15
**tremendous** [1] -
24:25
**trenches** [1] - 52:14
**trial** [15] - 10:9, 13:6,
13:20, 17:3, 19:8,
32:14, 34:15, 34:23,
34:25, 35:2, 35:18,
70:4, 70:24, 71:16,
74:21
**TRIAL** [1] - 1:16
**trials** [1] - 33:14
**trick** [2] - 18:22, 29:15
**trick-or-treating** [2] -
18:22, 29:15
**tried** [2] - 74:8, 76:4
**troops** [1] - 33:7
**true** [7] - 17:23, 27:10,
30:22, 46:20, 50:22,
66:5, 80:10
**trust** [3] - 19:3, 19:22,
20:17
**trusted** [2] - 18:19
**truth** [1] - 74:16
**try** [3] - 32:4, 38:7,
39:21
**trying** [19] - 9:8, 11:21,
22:1, 27:3, 27:4,
27:5, 30:25, 46:24,
55:19, 55:20, 56:2,
56:10, 58:14, 64:20,
65:2, 74:9, 74:23
**Tuesday** [7] - 4:23,
8:5, 9:1, 9:4, 12:2,
70:24, 71:17
**turn** [2] - 13:15, 43:25

**turned** [1] - 65:12
**two** [30] - 5:14, 5:18,
7:24, 9:21, 11:1,
11:13, 11:25, 17:1,
17:3, 18:11, 19:12,
19:19, 21:7, 21:15,
22:10, 24:12, 34:20,
37:23, 46:19, 50:23,
59:25, 60:6, 60:14,
60:18, 62:10, 69:7,
69:24, 74:24, 75:6,
75:8
**Tylenol** [8] - 36:4,
36:6, 36:7, 36:17,
36:19, 36:20, 36:21
**type** [2] - 11:3, 41:25
**Tyrannosaurus** [1] -
29:14

# U

**U.S** [1] - 1:21
**ultimately** [1] - 14:15
**umbrella** [2] - 44:24
**unbounded** [1] -
75:25
**uncomfortable** [1] -
31:15
**under** [8] - 19:16,
19:20, 32:18, 38:7,
39:22, 41:17, 55:4,
80:13
**undercut** [1] - 22:4
**undergarments** [1] -
29:9
**underlies** [1] - 26:6
**underneath** [1] -
52:15
**understood** [4] -
22:18, 58:4, 67:24,
78:3
**undo** [1] - 26:22
**uninterrupted** [1] -
72:16
**UNITED** [3] - 1:2, 2:3,
2:9
**United** [13] - 1:6, 6:19,
14:16, 14:23, 20:8,
32:21, 32:22, 38:2,
40:13, 49:7, 67:11,
68:22, 80:8
**unlawful** [1] - 53:2,
53:4, 67:11
**unless** [1] - 34:16
**unnatural** [1] - 28:13
**unpack** [1] - 59:11
**up** [56] - 4:11, 9:1,
9:12, 10:12, 12:8,
13:8, 13:19, 15:17,
16:4, 16:16, 19:17,

19:24, 22:24, 24:25,
25:8, 30:14, 30:24,
32:17, 33:21, 34:21,
35:21, 36:16, 36:20,
38:20, 39:3, 39:17,
39:18, 41:11, 41:13,
41:24, 42:2, 42:17,
42:19, 47:13, 52:13,
53:17, 56:7, 58:9,
58:11, 62:25, 63:16,
63:25, 65:3, 65:14,
65:22, 72:5, 72:18,
73:3, 74:11, 74:12,
75:6, 76:2, 78:2,
78:21, 79:19
**US** [1] - 59:16
**user** [1] - 25:3
**uses** [2] - 16:9, 48:6

# V

**various** [3] - 10:25,
22:6, 69:5
**vary** [1] - 28:23
**Vaught** [37] - 3:10,
20:22, 21:1, 21:9,
21:23, 23:6, 23:10,
23:18, 23:23, 23:24,
24:2, 25:9, 25:14,
25:25, 26:7, 26:10,
26:17, 26:25, 27:6,
27:16, 27:22, 27:23,
30:4, 30:21, 34:13,
36:24, 47:18, 52:15,
53:18, 54:4, 54:7,
56:22, 75:19, 77:14,
77:20, 78:4
**Vaught's** [1] - 77:11
**venture** [1] - 53:11,
53:21
**veracity** [1] - 74:16
**verdict** [7] - 7:9,
13:14, 34:15, 34:17,
35:10, 69:8, 78:23
**version** [1] - 42:10
**versus** [1] - 52:10
**vest** [1] - 34:14
**via** [1] - 4:4
**victims** [5] - 49:16,
51:14, 64:10, 65:6
**video** [2] - 50:4, 79:22
**view** [1] - 11:25
**vigorously** [1] - 70:1
**violate** [2] - 25:19,
27:4
**violated** [4] - 15:5,
49:9, 49:12, 49:14
**violates** [3] - 73:22,
74:2, 74:3
**violations** [1] - 24:13

**virtual** [1] - 37:4
**virtually** [2] - 13:3, 13:8
**voir** [2] - 17:2, 34:23
**volume** [1] - 24:25
**voluminous** [1] - 70:16
**vote** [3] - 18:8, 31:14, 36:24
**voters** [1] - 15:1
**vow** [1] - 38:9
**vs** [1] - 1:8
**vulva** [1] - 43:9

## W

**wait** [1] - 10:20
**waived** [1] - 77:19
**waiver** [1] - 77:18
**waiving** [1] - 77:17
**walk** [2] - 44:19, 44:23
**walks** [1] - 44:23
**wall** [4] - 64:2, 64:5, 66:10, 66:11
**Walter** [1] - 2:20
**wants** [1] - 18:18
**warned** [1] - 35:19
**Washington** [2] - 1:22, 2:11
**watch** [1] - 47:16
**watched** [2] - 35:2
**water** [1] - 44:25
**wave** [1] - 23:11
**ways** [2] - 29:7, 73:20
**wear** [1] - 42:17
**wearing** [2] - 6:6, 6:8
**web** [1] - 68:11
**Website** [1] - 59:9
**website** [5] - 57:9, 58:23, 58:24, 59:2, 61:5
**weddings** [1] - 60:10
**week** [9] - 4:16, 8:23, 9:6, 9:12, 10:19, 70:16, 71:17, 78:22
**weeks** [3] - 19:25, 71:25
**weigh** [1] - 31:9
**weight** [5] - 18:6, 19:17, 44:16, 45:4, 45:6
**welcome** [1] - 13:1
**well-being** [1] - 10:15
**well-intentioned** [1] - 13:19
**West** [1] - 1:22
**whack** [1] - 27:3
**whack-a-ball** [1] - 27:3
**whole** [9] - 15:21,

26:14, 31:11, 33:17, 39:17, 48:21, 56:20, 61:22, 63:5
**wholesale** [2] - 15:4, 33:24
**whores** [1] - 15:25
**wider** [1] - 18:23
**willing** [1] - 6:3
**win** [1] - 30:10
**window** [1] - 42:22
**wink** [1] - 23:14
**wins** [1] - 30:10
**wish** [2] - 7:4, 74:5
**wishes** [2] - 6:17, 7:12
**witness** [18] - 19:15, 19:24, 19:25, 50:2, 57:24, 60:21, 61:13, 63:17, 64:3, 64:4, 65:3, 67:2, 67:6, 73:16, 74:18
**witnesses** [16] - 19:13, 49:15, 59:24, 59:25, 60:6, 61:9, 63:12, 63:13, 73:11, 73:17, 73:23, 73:25, 74:8, 74:14, 74:24, 75:6
**WOLPERT** [1] - 3:1
**woman** [1] - 52:16
**women** [4] - 15:21, 21:8, 34:2, 49:18
**won** [2] - 18:8, 33:18
**word** [10] - 19:22, 32:24, 48:19, 55:24, 55:25, 56:2, 56:3, 56:5, 75:21
**words** [13] - 27:8, 30:15, 48:7, 55:24, 56:3, 56:5, 56:7, 56:11, 56:13, 56:15, 63:1, 65:19, 76:23
**wore** [1] - 15:25
**world** [3] - 31:6, 59:7, 69:25
**World** [2] - 18:7, 56:8
**wrap** [1] - 13:19
**write** [3] - 39:2, 39:12, 41:1
**writing** [1] - 48:7
**writings** [1] - 35:19
**wrote** [1] - 15:11
**Wu** [1] - 2:5

## Y

**year** [2] - 30:25, 76:9
**years** [7] - 30:16, 36:12, 52:11, 59:14, 68:9, 70:2, 78:3
**yesterday** [7] - 6:7,

6:8, 9:24, 10:6, 11:18, 12:16, 29:12
**York** [3] - 2:10, 52:7, 62:21
**you's** [2] - 23:21
**young** [1] - 36:2
**yourself** [1] - 69:18

## Z

**zero** [3] - 34:11, 67:1, 68:25
**zoom** [2] - 38:7, 38:11
**Zoom** [4] - 4:4, 4:13, 12:25, 73:1

# EXHIBIT V

Bruce Feder (AZ Bar No. 004832)
**FEDER LAW OFFICE, P.A.**
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: 602.257.0135
bf@federlawpa.com
*Knapp Counsel for Scott Spear*

Eric W. Kessler, Esq. (AZ Bar No. 009158)
**KESSLER LAW GROUP**
9237 E. Via De Ventura
Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorneys for Scott Spear*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. CR18-00422-PHX-DJH-003 |
| Plaintiff, | **DEFENDANT SPEAR'S JOINDER TO DEFENDANT BRUNST'S MOTION TO SEEK ADMISSION OF BRUNST'S TESTIMONY RE: STATE OF MIND** |
| vs. | |
| Scott Spear, *et al*., | |
| Defendants. | *(Assigned to the Hon. Diane J. Humetewa)* |

Defendant Scott Spear hereby files his Joinder in Defendant Brunst's Motion to Seek Admission of Brunst's Testimony Re: State of Mind (Dkt. 1879). As it pertains to Mr. Spear, and similar to the information contained in the Brunst motion, the below information is some of the anticipated testimony he would assert regarding his good faith belief his actions/inactions from 2004-2018 were legal and protected by federal law:

1

- In 2004, Mr. Spear was assigned the responsibility for overseeing the Backpage.com website that Carl Ferrer had developed and was going to operate. This job was in addition to Mr. Spears's many other responsibilities as Executive Vice President of Village Voice Media.

- Backpage.com was designed to compete with Craigslist and to garner a share of the free online classified market that Craigslist dominated.

- Backpage (BP) and/or Village Voice Media (VVM) recognized the necessity. for professional legal advice in managing the operations and content of the site in accordance with current laws and regulations. They retained in-house lawyers Steve Suskin and Elizabeth McDougal and outside counsel, including but not limited to James Hemphill, Sam Fifer, Hemanshu Nigam, Mark Sableman, Don Moon, James Grant, and others to assist them in this work.

- The applicability and protections of the First amendment and the CDA Section 230 to the BP moderation procedures were the subject of many communications with Mr. Spear.

- For instance, in late 2009, VVMH in-house counsel Steve Suskin commissioned attorney Mark Sableman (a partner at Thompson Coburn in St. Louis where Mr. Sableman specializes in media and information technology law) to prepare a memorandum to assess the issue of whether Backpage's operations created liability for promoting prostitution. His 31 page memo relied heavily on the provisions of Section 230 and the First Amendment to the U.S. Constitution. His memo (and conclusion) is titled: "Why Village Voice Media's Backpage.com Service Does Not Create Liability for Promoting Prostitution."

- These lawyers talked to him, sent him emails with or without attachments, as well as other communications, discussing the propriety of the BP practices and/or suggesting changes to these practices including but not limited to aggregation and moderation, and the termination of business with and/or discontinuation of connection to The Erotic Review, William Mercer and others.

2

- Information about the *M.A., McKenna, Cooper, Hoffman, Dart* litigation, as well as the Washington Grand Jury investigation, and other Backpage and Craigslist litigation regarding their practices operating their respective sites, was sent to Mr. Spear, read by him, explained to him and/or known to him from reading reviews and other publications and websites, as were the California prosecutions of Ferrer, Lacey and Larkin and the PSI congressional investigation;

- Had Mr. Spear received information that the Backpage/Village Voice Media practices were illegal and/or not legally protected, he would have resigned. An example of this was the Washington state statute that was enjoined in the *McKenna* decision. There were discussions that if the injunctive relief litigation was unsuccessful, Backpage would be closed in the state of Washington and throughout the United States. As indicated in the *McKenna* decision, requiring a website to implement age verification of ad posters violates the First Amendment, and this was a reason that such practice was not implemented by BP; and

- When Mr. Spear became aware of the NAAG, NCMEC, Polaris, and Auburn Society assertions, as well as the media criticisms asserted in the present trial, he was further assured at the time by/from the above sources that these assertions and criticisms were not binding and were protected by the First Amendment and CDA Section 230 protections.

    In addition to his testimony, Mr. Spear would also anticipate calling as witnesses some or all of the above-named lawyers to discuss some of the information that was transmitted by them.

    If Mr. Spear will not be allowed to testify to what his intent was as it pertains to his work at Backpage, and his good faith belief that his actions/inactions were legal and protected by law, together with the bases upon which he relied for his good faith beliefs, he will be forced not to testify.

/ / /

/ / /

3

RESPECTFULLY SUBMITTED this 22nd day of October, 2023.

> **FEDER LAW OFFICE PA**
> **KESSLER LAW GROUP**
>
> *s/ Bruce Feder*
> *s/ Eric W. Kessler*
> Bruce Feder and Eric W. Kessler
> *Attorneys for Scott Spear*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HEMETEWA
United States District Court
Email: Hemetewa_chambers@azd.uscourts.gov

Erin E. McCampbell, emccampbell@lglaw.com
Paul J. Cambria, pcambria@lglaw.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
David S. Eisenberg, david@deisenbergplc.com
Joy Malby Bertrand**,** Joy.Bertrand@gmail.com
*Attorneys for Defendants*

Kevin Rapp Kevin.Rapp@usdoj.gov
Andrew Stone Andrew.Stone@usdoj.gov
Margaret Perlmeter Margaret.Perlmeter@usdoj.gov
Austin Berry berry2.austin@usdoj.gov
Peter Kozinets Peter.Kozinets@usdoj.gov
Daniel Boyle Daniel.Boyle2@usdoj.gov
*Attorneys for United States of America*

By: Eric W. Kessler.

4

# EXHIBIT W

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| United States of America, | ) | |
|---|---|---|
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | May 13, 2024 |
| Michael Lacey, et al. | ) | 3:45 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                          **A P P E A R A N C E S**

2

For the Government:
3       UNITED STATES ATTORNEY'S OFFICE
        By:  **Mr. Kevin M. Rapp, Esq.**
4            **Mr. Peter S. Kozinets, Esq.**
             **Mr. Andrew C. Stone, Esq.**
5            **Ms. Margaret Wu Perlmeter, Esq.**
        40 North Central Avenue, Suite 1200
6       Phoenix, Arizona 85004
        kevin.rapp@usdoj.gov
7       peter.kozinets@usdoj.gov
        andrew.stone@usdoj.gov
8       margaret.perlmeter@usdoj.gov

9

For the Defendant Michael Lacey:
10      LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
        By:  **Mr. Paul J. Cambria, Jr., Esq.**
11      **Ms. Eric McCampbell Paris** (Telephonic)
        42 Delaware Avenue, Suite 120
12      Buffalo, NY 14202
        pcambria@lglaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2               **P R O C E E D I N G S**

3

4      (Proceedings commence at 3:45 p.m.)

5            THE COURT:  All right.  Please be seated.

6            COURTROOM DEPUTY:  This is Case No. CR 18-422, United

7   States of America vs. Michael Lacey, on for status conference.

8            MR. STONE:  Good afternoon, Your Honor, Andy Stone,

9   Kevin Rapp, Peter Kozinets, and Peggy Perlmeter for the United

10  States.

11           THE COURT:  Good afternoon.

12           MR. CAMBRIA:  Good afternoon, Your Honor,

13  Paul Cambria, all alone, for Mr. Lacey.

14           THE COURT:  I don't think you're all alone.  I think

15  we're joined here by Erin McCampbell.  Is she on the line?

16           MR. CAMBRIA:  I hope so.  That would be great.  I

17  don't know.

18           THE COURT:  Ms. McCampbell, are you on the line?

19           MS. MCCAMPBELL:  Yes, I am here, Your Honor.

20           THE COURT:  You're not alone.

21           All right.  Before the Court is Mr. Cambria's request

22  for a status conference to determine or to, once again, put

23  forward to the Court a question about how we should proceed in

24  view of the pending sentencing and the counts on which the jury

25  did not return a verdict.

1          I have permitted the government an opportunity to

2     provide a response, and I just saw that Mr. Cambria yesterday

3     filed a reply.

4          Has the government seen that?

5          MR. STONE:  Yes, Your Honor.

6          THE COURT:  All right.  Does the government wish to

7     or, I'm sorry, Mr. Cambria, do you wish to put further argument

8     before the Court?

9          MR. CAMBRIA:  Just briefly, Your Honor, sure.

10         THE COURT:  Yes.  Please come forward.

11         MR. CAMBRIA:  Our position is that since the judgement

12    is not final, that the Ninth Circuit could not take the case.

13    And as a result of that, I think that the *King* case we cited

14    from the Ninth Circuit indicates there's a due process issue at

15    that point if there is a sentence and there isn't an immediate,

16    if you will, right to appeal.

17         In addition, we've tried this twice now, I -- I -- the

18    comments by the government at one point in one of their

19    submissions, they indicated that they thought that information,

20    if you will, from the Ninth Circuit would be valuable before a

21    retrial.  Your Honor in January made a similar statement that

22    there were issues and so on that could be fleshed out, if you

23    will, by the Ninth Circuit.

24         I think the only way for that to happen, I might note

25    that the last time we were in front of the Ninth Circuit they

5

1    were able to accept briefs and argument and come up with a

2    decision in somewhere around eight months, which was a very

3    prompt, if you will, handling of that situation.

4          We do know that defendants Brunst and Spear do have

5    the right to appeal immediately.  They will.  The issues that

6    they will raise will be very important in a retrial of

7    Mr. Lacey.  I just -- I -- I have -- I've already indicated

8    this for the record, I haven't yet been retained for a third

9    trial.  There's some issues with regard to that, possible

10    Monsanto issues and so on that we'll have to address if we go

11    forward.

12          The last thing that I'd like to see, and I think the

13    Court and the appellate court would agree, is for there to be

14    some kind of proceeding for Mr. Lacey, and then a different one

15    if there's a reversal with regard to Spear or Brunst.  There

16    should be at some point in time, if there is going to be a

17    retrial, there should be one and only one, and it should be

18    addressed with all of the information that we can glean from

19    the Ninth Circuit.

20          The only way we could do that would be to hold

21    Mr. Lacey's case in abeyance and have Spear and Brunst proceed

22    to appeal.  There will be issues that will be critical that

23    they would raise concerning things like jury instructions and

24    Jencks situations and so on, which would make a difference.  I

25    don't think any of us want a situation where we would go

6

1    forward with a trial and then there would be a decision in the

2    Ninth Circuit for Brunst and Spear, and it would have an impact

3    to require a fourth trial on behalf of Mr. Lacey.

4          I just think that for efficiency purposes it makes

5    sense to hear from the Ninth Circuit.  I know you mentioned the

6    value of that; the government mentioned the value of that in

7    some pleadings that they filed; I see the value of it, and I

8    think the Ninth Circuit would as well.  There are issues that

9    would be raised by Brunst and Spear that are common to

10   Mr. Lacey, and so they would give us some education on a third

11   trial if there was to be one.

12         I think as it currently stands, Your Honor, the case

13   is not one that the Ninth Circuit would take because of the

14   outstanding hung counts.  I know the government has suggested

15   otherwise, and they cite the *Abrams* case, but this isn't an

16   *Abrams* case situation.

17         Number one, here we don't have a severance of counts.

18   In the *Abrams* case, the way that played out the government

19   said:  Well, if we have an affirmance on this count, we are

20   going to forego all the rest of the other counts, which would

21   make it a final situation.  We don't have any such

22   representation in this case, and so it seems to me that the

23   other issue is, and this was in the *King* case in the Ninth

24   Circuit, where the Court said that unless there is an ability

25   to have an immediate appeal on a sentence, a due process issue

UNITED STATES DISTRICT COURT

1   is raised.

2          There was some dicta, if you will, in that case sort

3   of suggestive of something the government raised here, although

4   under *Abrams*, where in the *King* case there was a statement

5   about, well, if -- if there was an appeal and then they stayed

6   the execution in order to have the appeal, that perhaps would

7   give the Ninth Circuit jurisdiction.  But as the *King* court

8   laid out, that was just a hypothetical.  That wasn't the set of

9   facts in front of the Court at that time.

10          So all I'm trying to accomplish here for the Court,

11  for the Court of Appeals, for my client, for myself, is

12  whatever is going to happen next should be it, and I don't

13  think we should be in a situation where you pronounce a

14  sentence, we go to the Ninth Circuit, and they say:  We can't

15  take the case because there is no final judgement.

16          And if we look at all the cases we cited, *Berman* and

17  all the rest of them, we see that a final judgement means that

18  all of the counts have been disposed of by a resolution, a

19  decision, and that all there is left to do at that point is to

20  determine whether or not they are sufficient; and if so, what

21  the outcome is of the counts.  We don't have that here.  We

22  have several counts which the jury was hung on.

23          I suppose another variable, if you will, is if -- if

24  you sentence Mr. Lacey and -- and at that point stopped, if you

25  will, held the sentence in abeyance and granted appeal, then we

UNITED STATES DISTRICT COURT

8

1  would see what the Ninth Circuit says as far as jurisdiction is

2  concerned, and that would avoid the due process issue that was

3  raised in *King* where there's some kind of sentence imposed but

4  you have no right to an immediate appeal, and that's something

5  that I don't think should happen here.

6  So it seems to be the thing that makes the most sense

7  is to hear from the Ninth Circuit, as I indicated.  This Court

8  mentioned that; the government has mentioned that.  The

9  question is how does it get accomplished?  And I think the way

10  it gets accomplished is we hold off on sentencing Mr. Lacey,

11  the other two get sentenced, and appeal, and we look at the

12  outcome of that appeal and what impact it has on the case.

13  There are issues there that are common and critical.

14  There will be issues about Jencks; there will be issues about

15  instructions to the jury.  You remember it was sort of a

16  complicated First Amendment constellation there and there were

17  a number of objections made and so on.

18  THE COURT:  I guess -- let me stop you there.  I am

19  confused as to how the reviewing court makes any pronouncement

20  as to Mr. Lacey if everything is held in abeyance.

21  MR. CAMBRIA:  No.  Well, yes, there will be issues

22  common that he would raise as well.  For example, the jury

23  instructions.  That's one of them.  There is also the Jencks

24  issue that arose in that case as a result of the testimony, and

25  then later on revelation of information.  Those things are

1    common to all the defendants, and so they will all be there.

2    Will there be a judgement on Count 100, whether there is

3    concealment?  No, there wouldn't be, but there are enough other

4    areas that are critical and that would have an impact,

5    especially jury instructions in the First Amendment area.  You

6    know, that isn't something that pops up everyday.  And so the

7    courts have been in various places.  We think that some of the

8    instructions that were given were not in accord with the Ninth

9    Circuit and the law there, and so they would clearly be common.

10           Other issues about the issue of aiding and abetting, I

11   mean, there are lots of issues that would impact on Mr. Lacey's

12   case.  The only one not is Count 100, the concealment.

13           THE COURT:  All right.  Mr. Stone.

14           MR. STONE:  Thank you, Your Honor.  There is a lot of

15   agreement here, Your Honor.  Both parties think that it would

16   be more efficient to have the Ninth Circuit rule on these

17   issues before any retrial, and so really the only issue before

18   this Court right now is, what's the best procedure to get it

19   before the Ninth?

20           We just disagree with Mr. Cambria and Mr. Lacey's

21   position that he's -- his appellate rights can be argued when

22   he's not part of the appeal.  He needs to be part of the

23   appeal.  He can't let the other two carry the water for him

24   here, and that's supported by case law.  United States vs.

25   *Sehnal,* S-E-H-N-A-L, the 1991 opinion, that's on all fours with

1   this. The only issue is that they didn't bring up jurisdiction

2   at the Ninth, but it was a four-count trial, two counts hung,

3   two counts convicted. They went up on appeal with the two

4   counts unresolved, and the Ninth Circuit heard the arguments.

5   So there is two counts still pending before the trial court,

6   two counts of conviction. The defendant argued all of --

7   everything that he wanted to argue before the Ninth.

8          Now, the analysis in the *Abrams* case, which is that

9   Second Circuit opinion, really lays it all out and demonstrates

10  why this is such a good idea and why it's in accord with the

11  applicable statute with respect to it being a final judgement,

12  is that it just saves resources and time for the appellate

13  court to weigh in on some of these thorny issues before there

14  is any retrial.

15         We agree with Mr. Cambria here. If we had a trial in

16  August or October, another one, and then there was an appeal,

17  there could be something in that appeal that would require yet

18  another trial. So that's inefficient. I think everybody

19  agrees on that.

20         And the *King* case, which is post *Abrams*, cited *Abrams*

21  approvingly. In *King*, there was like a -- like a 50-count

22  indictment, I may be a little bit off on that, but there were a

23  number of counts, there was a plea to 15 or so of the counts,

24  and then a number of the counts were unresolved. There wasn't

25  like other pleas where you just dismiss it and you just go up

1 on the counts of conviction. They were resolved and left

2 before the trial court. And again, the Ninth Circuit heard the

3 appeal. There wasn't any issue with the jurisdiction there,

4 and that was when the government was arguing: Hey, this would

5 be a piecemeal appellate process, piecemeal review process, so

6 there is no final judgement. And the Court said: No, there

7 was a conviction here of certain counts and we are permitted

8 then to review those counts, and that is -- that is just

9 similar to this case.

10      So we propose that a sentencing hearing is scheduled.

11 We think it would be efficient for a sentencing to occur for

12 all three on the same date, and then Mr. Lacey would be able to

13 take his appeal up on Count 100. The other two defendants

14 certainly are going to appeal their counts of conviction, and

15 they have more. And then after the Ninth Circuit weighs in,

16 the United States will decide whether it's going to retry

17 Mr. Lacey at that point or just dismiss the remaining counts.

18      So that's a procedure that is permitted by law and we

19 think would be most efficient.

20      THE COURT: Mr. Cambria.

21      Oh, and I will correct the government. It was 42

22 counts.

23      MR. STONE: Thank you, Your Honor. I had it wrong.

24      THE COURT: And the individual pled guilty to 20 of

25 them.

1           Mr. Cambria.

2           MR. CAMBRIA:  We addressed the *Sehnal* case in footnote

3    4 where we indicate there that it involved counts as to which

4    there had been a conviction, and also counts which the jury had

5    hung.  The decision said nothing, however, about when the

6    defendant had been sentenced about the finality of the counts

7    of conviction or about the Ninth Circuit's jurisdiction to hear

8    an appeal of the counts of conviction.  So it isn't authority.

9    It wasn't raised.  It wasn't dealt with by the Court.

10          As far as any other reliance, for example, on *Abrams*,

11   et cetera, again, we had something there that we don't have

12   here, which is we had a representation by the government that

13   the case would be over if the appellate court affirmed on the

14   one count they would, the government, would dismiss the

15   remaining counts.  We have no such representation here.  This

16   isn't -- those facts are not the same.

17          And as far as *Abrams* being cited in the *King* case, the

18   Ninth Circuit, was never cited for the theory that we're

19   talking about here, which is whether or not under *Berman*, which

20   is a Supreme Court decision, there can be jurisdiction for an

21   appeal where there are a number of counts that are not

22   resolved.

23          We don't have a discrete severance here like we do in

24   the cases they refer to.  They are either severed because

25   somebody took a plea, or they are severed because the subject

1   matters are different.

2        Here, the counts are interrelated.  They are

3   intertwined.  They are not severable.  There was no motion for

4   severance.  There was no indication of severance on the part of

5   the government.  They tried it and alleged it in the indictment

6   all together intertwined.

7        So we don't have any of those distinguishing factors

8   in the cases where they say:  Oh, well, look here, they did an

9   appeal and there were hung counts, but nobody raised the issue

10  of jurisdiction, or there was a discrete severance and there

11  wasn't an intertwined situation.

12       *Berman* is -- it's as high as you need to get as far as

13  authority is concerned, and we're in a situation here where we

14  don't have a, if you will, finality on a number of counts and

15  you need that in order to have jurisdiction.

16       Now, can -- could the Court say:  Well, all right,

17  we're going to hold execution on the judgement and bail pending

18  appeal, file your Notice of Appeal, and let's see what the

19  Ninth Circuit does?  In that circumstance we wouldn't violate

20  due process.  In a situation where there was -- *King*

21  specifically dealt with a situation where somebody would be

22  sentenced but they would have no right to appeal.

23       And what we're saying is we don't see a right to

24  appeal at this point because there is no finality.  So that

25  means there's a due process problem unless there is some sort

1    of remedy, and the remedy would have to be, all right,

2    everything is stayed.  Let's see what the Ninth Circuit says as

3    far as jurisdiction.  I haven't seen a case that's done that,

4    but the cases that they cite, they have facts we don't have.

5         THE COURT:  Well, let me -- I am intrigued by this

6    footnote 3 in your reply.  You essentially say, "Alternatively,

7    the Court could sentence Mr. Lacey on Count 100 at the same

8    time his codefendants are sentenced," but this is the part that

9    I am curious about, "but the order or judgement addressing his

10   sentence would not be final and could not be executed."

11        Why?

12        MR. CAMBRIA:  Well, because he's entitled to a right

13   to appeal under the *King* case, and he would need to be able to

14   go through that right before it could be executed.

15        THE COURT:  Well, I think really, to me, looking at

16   all of these cases, in particular the *King* case, and then

17   looking at the reference in *Abrams*, although it's an

18   out-of-circuit case, and really looking at the statute of final

19   judgment, and 18 U.S.C. 3582 basically says a judgment of

20   conviction that includes a sentence is a final judgement for

21   all other purposes, which include appeals.

22        And I think that here in *King,* the Court does look at

23   the situation of the guilty plea on 20 counts and the remaining

24   outstanding charges and basically says that the final judgement

25   rule had not been violated despite the possibility that the

1  District Court jurisdiction over one of the severed cases was

2  concurrent with the appeals court over the other, and that's

3  more akin to what we have here, as is the, I don't know how you

4  say it, *Sehnal* case, which my good friend and former mentor

5  Judge Rosenblat handled.

6      And it seems to me if there is a continuing question

7  about whether or not the Ninth Circuit has the jurisdiction to

8  hear this particular matter, then this should be the case that

9  it does so to make those refinements.  I don't think there is a

10  necessity to do that.  Because here, I think, Mr. Cambria, as I

11  mentioned before, there are common issues.

12      So, for example, the jury convicted Mr. Spear of

13  conspiracy and the Travel Act offenses of which Mr. Lacey

14  remains charged, it convicted Mr. Brunst of certain money

15  laundering charges, of which Mr. Lacey remains charged, but the

16  jury did not make those findings as to Mr. Lacey.

17      So the post sentencing appeals on their convictions,

18  Spear and Brunst, could inform all the parties, including

19  Mr. Lacey, going forward.  So it may be that on appeal several

20  of those convictions are set aside or remanded back.

21      And it seems to me a better use, and I think it was

22  the *Abrams* case that basically observed that forcing trials

23  that may never be needed, impose expense and burden on the

24  prosecution and the defense, which is not a desirable result.

25      MR. CAMBRIA:  I don't know.

1          THE COURT:  So the Court, though, and I am sure the

2     government has considered this in its response, this Court

3     remains concerned about the age of the case, the attendant

4     effect on the witnesses and the testifying witness' memories,

5     certainly the status and age of all of the defendants, but --

6     and no, I haven't considered you, Mr. Cambria --

7          MR. CAMBRIA:  I'd volunteer.

8          THE COURT:  -- but I think that it makes better sense

9     to pursue the appeals, have the sentencing hearings, have the

10    imposition of sentence; in other words, a final judgement that

11    is appealable, in that way then the total package goes up to

12    the Ninth.  They will let us know what they think.

13         It's conceivable that they decide it comes back.  And

14    if it comes back, it comes back in total with possibly

15    Mr. Spear, Mr. Brunst, Mr. Lacey, and I think that's the better

16    way to use all of the parties' resources as well as not only

17    this court, but the reviewing court's resources.  And I don't

18    necessarily find that to be a due process violation because you

19    have a charge, a trial, a conviction and a sentence that is

20    then a final judgement, and appealable.

21         And even though Mr. Lacey's appeal may or may not

22    include, I don't know what the Ninth Circuit will permit you to

23    argue, it may or may not include the circumstances of those

24    hung -- those convictions for which Mr. Spear has now, and

25    Mr. Brunst, and at some point in time the government may come

1    back and say:  We're going to retry the case or we're not going

2    to retry the case.  I think it all depends on what happens at

3    the Ninth Circuit.

4            And I suspect that it will not be eight months when we

5    hear from them.  I suspect it will be longer.  And that to me

6    is the one thing that I hesitate about because the delay is not

7    desirable in any regard for any parties' position, including

8    the Court.

9            And so I think that's -- that's the better approach.

10   We will proceed to sentencing.  You can then take up the

11   appeal, and we'll wait to hear whatever the decision is from

12   the Ninth Circuit.

13           I'm going to vacate the placeholder trial date in

14   August.  You will also then know, Mr. Cambria, that to the

15   extent you need to file your Monsanto hearing, you'll have a

16   better idea of how you're going to pursue that, but that's how

17   we will proceed.

18           MR. CAMBRIA:  If I might.  The one thing that's of

19   concern, let's assume the following scenario:  There's a

20   sentence, we file an appeal.  And after briefing of whatever

21   time or whatever the schedule is for the Ninth Circuit, they

22   then say:  We can't hear this appeal because it wasn't final.

23           I think that causes a due process problem for my

24   client because he really had no right to appeal, as we had

25   said.  The only way that that might be alleviated is if this

18

1 Court grants bail pending appeal and stays the execution of the

2 sentence.

3      THE COURT: Well, that remains to be seen and we will

4 decide that at the sentencing hearing. I think, Mr. Cambria,

5 in looking at the briefing, I am -- I am convinced by the

6 pronouncement in *Abrams* as well, and even though it's a Second

7 Circuit case, but I also think the language in the *King* case,

8 as well as its reference back to the *Powell* decision, I think

9 all taken together, and the statutory term of final judgement,

10 puts the Court on solid ground in making this approach.

11      MR. CAMBRIA: The only thing that *Abrams* lacks,

12 however, this case lacks that *Abrams* had, was a discrete

13 representation by the government that certain charges would be

14 finally dismissed if an affirmance was granted, and so that was

15 the last chip in the finality situation. We don't have that

16 here.

17      And in the other cases, there was a pretrial severance

18 of counts, and we don't have that here either. So there is --

19 there is -- there are differences in those cases. And again,

20 I'm concerned that with -- if we're right and there is no right

21 of appeal at the moment because of the hung counts, that due

22 process is a problem if in some way he's incarcerated while he

23 is finding out, oh, after six months you don't have a right to

24 appeal. That doesn't help the witnesses that you're talking

25 about either. If there is that piece and it turns out that we

1    were right and they don't have jurisdiction, that's a further

2    delay put into the case, which wouldn't have to be.

3              THE COURT:  All right.

4              MR. CAMBRIA:  Thank you.

5              THE COURT:  Mr. Stone.

6              MR. STONE:  I want to attempt to ease Mr. Cambria's

7    concerns, although I am not sure I am going to be successful,

8    but the quote from the United States vs. *King*, which I think he

9    referenced, Your Honor, this is direct quote, "Because the

10   Court imposed sentence on Counts 24 through 42, *King* was

11   entitled to appeal the sentence despite the pending charges."

12             So too here.

13             MR. CAMBRIA:  That was the argument.  That was the

14   argument, and the Court went on to say, "but we didn't have to

15   address that here."

16             THE COURT:  Well, but I think, again, taken in

17   totality and looking at all of those cases, I think there is

18   jurisdiction for the Court to hear that appeal on the final

19   judgement once it's imposed.

20             Having made that determination, I want to address the

21   government's Motion to Continue the sentence.  And I did not

22   address it earlier, although the time that you requested for an

23   extension in which to file your response to objections has

24   past.  The reason that I'm hesitant to go along with the

25   motion, which asks me to have the sentence -- sentences of all

1    three individuals, Mr. Lacey, Mr. Spear, Mr. Brunst, occur on

2    one day, is for the following reason:  You, and I anticipated

3    that you would, have victim witness statements.  Given the

4    number of those who testified, I don't know how long that's

5    going to be.

6          Number two, I already have an 18-page filing of

7    objections by Mr. Brunst.  Every single one of those objections

8    this Court needs to address, and I tend to address those

9    objections and give counsel an opportunity to argue them again

10   at open hearing.

11         I suspect Mr. Cambria and Mr. Spear are going to file

12   similar lengthy objections.  In a trial day, I get perhaps six

13   and a half hours of an entire day, giving myself and my

14   courtroom staff a break, so I don't see the reality of having

15   all three sentences occur in one day unless you minimize the

16   number of people that come in for victim allocution, and unless

17   the defense counsel waives any oral argument of their

18   objections, and I don't foresee that happening.

19         So the best that I can do for your request to

20   accommodate those individuals, and I suspect, Mr. Spear, Brunst

21   and Lacey are going to have other people who wish to be heard

22   as well, the best that I can do is put them on a day and a

23   half.  So right now we have Mr. Spear, because of his counsel's

24   schedule, that sentence is occurring in July, and so we can add

25   one additional sentence on that day and then put the other in

1    the next morning.  I think that's realistic.  I don't know how

2    you foresee this going, but that's, I think, what I anticipate.

3            MR. RAPP:  I don't think from our perspective we were

4    under any illusion that the sentence with all of the argument

5    over objections and the allocution of the defendants would

6    happen on a single day.  We just figured we would start on

7    July 9th, we get what could be done, and I am sure the Court

8    would tell us what day we would come back, and just as long as

9    the victims can come in on one day and address the Court if

10   they so choose.

11           I think they are -- they would be under the

12   understanding that the imposition of sentencing might be on

13   another day, and if they want to come back for that they can,

14   but I don't think anybody was under any impression that all of

15   this would be accomplished on a single day.

16           THE COURT:  Well, so Mr. Lacey, I don't think you had

17   an objection to the Motion to Continue sentence; is that right?

18           MR. CAMBRIA:  No objection, Your Honor.  I have a

19   homicide case to try at the beginning of September, so I'm

20   going to be a busy boy.

21           THE COURT:  So no objection.  What I will do, my

22   courtroom deputy alerts me I have a full calendar the afternoon

23   of July the 9th, which Mr. Spear is currently set for.  So what

24   I will do is I will grant the Motion to Continue and extend the

25   government's motion, if they so need, in order to respond to

1   the objections.  We'll move those sentencing hearings to begin

2   on July the 10th and we'll hold over until the 11th of July.

3           Disregard what I just said.  July the 9th will remain

4   and we'll extend it to July the 10th, and I will issue a minute

5   entry with regard to that.

6           All right.  Anything further from the government?

7           MR. RAPP:  No, Your Honor.  Thank you.

8           Judge --

9           THE COURT:  Yes.  I will issue your extension for your

10  time to respond, and I will take the latter date.

11          MR. RAPP:  All right.  I appreciate that.  I just

12  wanted to draw your attention to footnote 1 in our filing.  I

13  am just reminded that counsel for Defendant Brunst have some

14  conflicts on July 10th through 12th, July 10th through the

15  12th, and then one of the other counsel has a California state

16  court appearance from July 26th to August 16th, and then the

17  10th through the 15th.  Both counsel have a problem with the

18  10th.

19          THE COURT:  Both --

20          MR. RAPP:  Mr. --

21          THE COURT:  Brunst counsel?

22          MR. RAPP:  Mr. Lincenberg and Mr. Panchapakesan.

23          THE COURT:  Well, we can -- what was the nature of

24  the -- but they are both available on July 9th; right?

25          MR. RAPP:  Yes.

23

```
 1              THE COURT:  We can begin with them on July 9th.

 2              MR. RAPP:  Very well.

 3              THE COURT:  All right.  Anything further then,

 4  Mr. Rapp?

 5              MR. RAPP:  No, Your Honor.  Thank you.

 6              THE COURT:  Mr. Cambria.

 7              MR. CAMBRIA:  No, Your Honor.  Thank you.

 8              THE COURT:  All right.  Thank you, counsel we will see

 9  you in July.

10       (Proceedings concluded at 4:24 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

24

1

2

3

4              **C E R T I F I C A T E**

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7     appointed and qualified to act as Official Court Reporter for

8     the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10    a full, true, and accurate transcript of all of that portion of

11    the proceedings contained herein, had in the above-entitled

12    cause on the date specified therein, and that said transcript

13    was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 17th day of May,

15    2024.

16

17

18
                              s/Hilda E. Lopez_____
19                            HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25