## Case Nos. 24-5374, 24-5375, 24-5376

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL LACEY,
*Defendant-Appellant.*

---

*On Appeal from the United States District Court for the District of Arizona (Phoenix),*
*Case No. 2:18-cr-00422-DJH-1 • The Honorable Diane J. Humetewa, District Judge*

## APPELLANT'S OPENING BRIEF

PAUL JOHN CAMBRIA, JR.
**LIPSITZ GREEN SCIME CAMBRIA, LLP**
42 Delaware Avenue, Suite 300
Buffalo, NY 14202
Telephone: (716) 849-1333
pcambria@lglaw.com

ERIN MCCAMPBELL PARIS
**MAURICE WUTSCHER LLP**
50 Fountain Plaza Downtown, Suite 1400
Buffalo, NY 14202
Telephone: (716) 261-4703
eparis@mauricewutscher.com

*Attorneys for Defendant-Appellant Michael Lacey*

 

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................iv

PRELIMINARY STATEMENT ..........................................................1

JURISDICTIONAL STATEMENT ......................................................3

DETENTION STATUS.......................................................................3

ISSUES PRESENTED.........................................................................4

STANDARD OF REVIEW .................................................................5

STATEMENT OF THE CASE AND FACTS .......................................5

    I.    Backpage originates from within a newspaper company.....................5

    II.    Backpage was formed under the "business" side of the company ...............................................................................8

    III.    Lacey relies on others for information about Backpage ......................8

    IV.    Backpage faces a wave of criticism ...................................................10

    V.    Lacey's defense of Backpage was rooted in his First Amendment beliefs..............................................................12

    VI.    Courts recognize Backpage's First Amendment rights......................13

    VII.    Banking for Backpage and the Defendants becomes unstable ..........14

    VIII.    Lacey funds trust account located in Hungary to stabilize his banking .......................................................................16

PROCEDURAL HISTORY.................................................................20

    I.    The first trial ends in a mistrial ........................................................21

    II.    The new judge presides over the second trial with new rules............22

        A.    New pretrial rulings change the trajectory of the case ............22

        B.    Flawed rulings deprived Defendants of a fair trial ..................26

            1.    No money laundering charges were proven ..................26

i

          a.    Thai establishes that none of the attributes of the funds were concealed from the government ........................................................ 27

          b.    There was no proof of purpose or intent to conceal ............................................................... 29

          c.    There was no proof the funds were proceeds of Travel Act violations ........................ 29

      2.    The case against Lacey was based entirely on "notice" evidence ................................................ 31

      3.    No limitation was placed on child-sex trafficking evidence ......................................................... 34

      4.    Good faith evidence was precluded ............................... 37

      5.    Government witnesses were allowed to testify about things for which they had no foundation ............. 39

    C.    The verdict was the unreliable result of a flawed trial ............. 40

  III.    The District Court rules on Rule 29 motions ...................................... 41

  IV.    The Court sentences Lacey by inconsistently applying her own rulings ................................................................ 44

SUMMARY OF ARGUMENT ................................................ 48

ARGUMENT ................................................................ 50

  I.    None of the attributes of the funds were concealed from the government ....................................................... 50

  II.    There was no proof of intent to conceal ............................................. 52

    A.    The use of bank accounts with actual names is incompatible with an intent to conceal ...................................... 52

    B.    Lacey's stated intent to disclose and actual disclosure to the government was incompatible with an intent to conceal ...................................................................... 53

    C.    The only proof of Lacey's purpose for the transfer was to stabilize his banking and establish a trust for his sons ......... 56

ii

III.   There are no proceeds...........................................................57

    A.   The First Amendment required the tracing of
publishing revenue to the publication of ads outside of
the protections of the First Amendment and in violation
of the Travel Act, which did not occur .....................................57

    B.   There are no proceeds because no Travel Act violations
were proven at the time Backpage generated the funds ...........62

IV.   There was no proof that Lacey knew that the funds were
proceeds ..........................................................................63

V.   Erroneous evidentiary rulings deprived Appellants of a fair
trial..................................................................................64

    A.   Certain evidentiary rulings rose to the level of
constitutional error ....................................................64

    B.   Other categories of rulings were an abuse of discretion...........65

       1.   The admission of speculative testimony was an
abuse of discretion ..........................................65

       2.   The admission of child-sex trafficking evidence
was an abuse of discretion ................................67

       3.   The admission of notice evidence was an abuse
of discretion ....................................................67

    C.   These cumulative errors deprived Defendants of a fair
trial ...........................................................................69

VI.   Lacey joins in co-Appellants' issues raised on appeal.......................69

CONCLUSION ...................................................................................70

STATEMENT OF RELATED CASES ....................................................72

CERTIFICATE OF COMPLIANCE ........................................................73

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ................................................................67

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................................13

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015).......................................... *passim*

*Backpage.com, LLC v. Hoffman*,
2013 U.S. Dist. LEXIS 119811, *20-31 (D.N.J. Aug. 20, 2013) ........................13

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................. 13, 38

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972)...............................................2, 58

*Cuellar v. United States*,
553 U.S. 550 (2008) ................................................................49

*In re Winship*,
397 U.S. 358 (1970) ..................................................................5

*Kennedy v. Louisiana*,
554 U.S. 407 (2008) ................................................................67

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012)...................................7, 10, 11

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
523 F.3d 1051 (9th Cir. 2008)................................................68

*Sable Comms. of Cal. v. F.C.C.*,
492 U.S. 115 (1989)................................................................58

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021) ...................................................5

*United States v. Adefehinti*,
510 F.3d 319 (D.C. Cir. 2007) ...................................... 50, 53

*United States v. Bahamonde*,
445 F.3d 1225 (9th Cir. 2006)........................................ 64, 65

iv

*United States v. Bradley,*
    5 F.3d 1317 (9th Cir. 1993)................................................................67

*United States v. Caldwell,*
    560 F.3d 1214 (10th Cir. 2009)......................................................1, 50

*United States v. Enbry,*
    644 F. App'x 565 (6th Cir. 2016) ......................................................52

*United States v. Esterman,*
    324 F.3d 565 (7th Cir. 2003)........................................................ 52, 53

*United States v. Eubanks,*
    591 F.2d 513 (9th Cir. 1979)..............................................................66

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996)....................................................... 64, 69

*United States v. Gotti,*
    457 F. Supp. 2d 411 (S.D.N.Y. 2006) ...............................................55

*United States v. Johnson,*
    440 F.3d 1286 (11th Cir. 2006) ................................................... 50, 51

*United States v. Lichtenberg,*
    309 F. App'x 107 (9th Cir. 2009) ............................................... 57, 62

*United States v. Lloyd,*
    807 F.3d 1128 (9th Cir. 2015)............................................................69

*United States v. McGahee,*
    257 F.3d 520 (6th Cir. 2001)..............................................................52

*United States v. Olaniyi-Oke,*
    199 F.3d 767 (5th Cir. 1999)..............................................................50

*United States v. Orduno-Aguilera,*
    183 F.3d 1138 (9th Cir. 1999)..............................................................5

*United States v. Playboy Entm't Gr.,*
    529 U.S. 803 (2000) ......................................... 2, 58, 59, 60

*United States v. Rockelman,*
    49 F.3d 418 (8th Cir. 1995).................................................... 1, 54, 55

*United States v. Shoff,*
    151 F.3d 889 (8th Cir. 1998).............................................................50

*United States v. Stephenson*,
    183 F.3d 110 (2d. Cir. 1999)................................................................55

*United States v. Waters*,
    627 F.3d 345 (9th Cir. 2010)........................................................ 64, 66

**Statutes**

18 U.S.C. § 1952(b)(1)........................................................................31

18 U.S.C. § 1956.................................................................... 1, 50, 53

18 U.S.C. § 1956(a)(2)(B)(i)................................................................49

18 U.S.C. § 1957.................................................................... *passim*

18 U.S.C. § 3231...................................................................................3

18 U.S.C. § 3742...................................................................................3

28 U.S.C. § 1291...................................................................................3

47 U.S.C. § 230...................................................................................14

**Rules**

Fed. R. Crim. P. 29 ........................................................ 40, 41, 63, 66

Fed. R. Evid. 401 ...............................................................................67

Fed. R. Evid. 403 ...............................................................................67

Fed. R. Evid. 602 ........................................................................ 65, 66

**Other Authorities**

Carr, D., New York Times, *A Knock in the Night in Phoenix* (May 12, 2008),
    https://www.nytimes.com/2008/05/12/business/media/12.carr.html ....................7

IRS New Release (Mar. 21, 2022),
    https://www.irs.gov/newsroom/irs-reminds-holders-of-foreign-bank-and-
    financial-accounts-of-april-fbar-deadline........................................................20

Latonero, M., *Human Trafficking Online, The Role of Social Networking Sites
    and Online Classifieds*, USC Annenberg School for Communication &
    Journalism (Sept. 1, 2011),
    papers.ssrn.com/sol3/papers.cfm?abstract_id=2045851 ......................................11

## PRELIMINARY STATEMENT

Michael Lacey asks this Court to vacate his international concealment money laundering conviction. There is no case affirming a concealment money laundering conviction under circumstances like those here: (1) no concealment of the attributes of the funds; (2) a defendant who stated his intent to disclose the attributes of the funds to the government, before and after the charged transaction; (3) disclosure of the attributes of the funds to the government; and (4) the use of bank accounts in the defendant's name. Unsurprisingly, every court that has addressed a transparent transaction like this one has ruled that it is not chargeable as concealment money laundering. *See, e.g.*, *United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009). Likewise, every court that has addressed a defendant's disclosure has held that disclosure is incompatible with an intent to conceal. *See*, *e.g.*, *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995).

Lacey's conviction—like every money laundering conviction in this consolidated appeal—also has a more fundamental problem: none of the funds were proven to be "proceeds" of "specified unlawful activity" ("SUA") as required under 18 U.S.C. § 1956. Unlike a drug case, where the revenue-generating activity is always illegal, the economic activity at issue in this case was the operation of a website, www.backpage.com ("Backpage"), that published millions of instances of third-party speech in the form of classified ads, which is ***presumptively lawful***

1

***activity***. *See, e.g.*, *United States v. Playboy Entm't Gr.*, 529 U.S. 803, 817 (2000). The government tried its case as if this fundamental distinction did not exist and, in doing so, failed to prove that the website's revenues constituted proceeds of SUA.

Critically, because Backpage earned its revenues from charging small fees to publish presumptively-protected speech to its site, to prove the existence of "proceeds," the government had to prove that: (i) Backpage published "particular expressions" of third-party speech (*i.e.* particular ads written by website users) that fell "outside" of the First Amendment's "reach"; (ii) those ads constituted Travel Act violations (the only alleged SUA); and (iii) the funds in the money laundering counts were revenue Backpage earned from publishing those ads. *See Bursey v. United States*, 466 F.2d 1059, 1081-82 (9th Cir. 1972). As discussed in greater detail below, the government failed to overcome the presumption and admitted it made no attempt to trace the funds to Travel Act violations.

Moreover, even if the First Amendment's presumptions and tracing requirements were not at issue, the money laundering charges must be vacated because there is no proof of Travel Act violations occurring during the time period when the website generated the funds at issue. The only Travel Act violations that corresponded to that time period—Counts 19 through 51—resulted in acquittals. Further, the District Court ruled that the Travel Act conspiracy ended roughly one

year before the website generated the funds at issue. As a result, not only is there no proof of proceeds of SUA, there is no proof of SUA.

Lacey's sole conviction—an obvious anomaly under the law—is before this Court as the end-result of an experimental prosecution. The government charged Lacey and others (including co-Appellants Scott Spear and John Brunst) in a 100-count indictment arising out of their purported involvement with Backpage. Notwithstanding a trial infected by one prejudicial ruling after another, *fifty-one* of Lacey's charges either were acquitted or dismissed, laying bare the weakness of the government's case. As the foregoing will demonstrate, not only should Lacey's conviction be vacated, he never should have been charged.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## DETENTION STATUS

On November 21, 2024, this Court granted Lacey's motion for bail pending appeal. (Doc. 36.) On November 22, 2024, Lacey was released from custody, at which point he had served 71 days of his sentence. Subsequently, the District Court ordered house arrest as a condition of release, which remains in effect. (3-ER-583.)

3

## ISSUES PRESENTED[1]

1.      Whether a transaction in which none of the attributes of the funds were concealed from the government can be charged as concealment money laundering?

2.      Whether a defendant's expressed intent to disclose a transaction to the government, use of bank accounts in his name, and actual disclosure to the government through the filing of government forms is compatible with an intent to conceal?

3.      Whether funds can be designated as "proceeds" for money laundering purposes when (a) the funds, which were not traced to any SUA, were revenue earned from an economic activity that is presumed lawful under the First Amendment, until proven otherwise; and (b) no SUA was proven at the time the revenue at issue was earned?

4.      Whether there can be proof of a defendant's knowledge that funds were "proceeds" of SUA when there was no SUA proven?

---

[1]     Lacey joins in the issues briefed by Spear ("Spear Br.") and Brunst ("Brunst Br.") (except for Brunst Br. Issue Seven concerning a sentencing issue unique to Brunst), because those issues apply equally to Lacey.  For brevity, Lacey will not restate or brief those issues, but, instead, incorporates them herein by reference.

5.     Whether erroneous evidentiary rulings deprived Defendants of a fair trial by, among other things, improperly swaying the jury?

## STANDARD OF REVIEW

The Due Process Clause requires the government to prove each element of a crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). This Court conducts *de novo* review of the denial of a motion for acquittal based on insufficiency of the evidence. *See United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139-40 (9th Cir. 1999).

This Court conducts an "independent examination of the whole record," or *de novo* review, of "constitutional facts" when determining whether a judgment was obtained in violation of the First Amendment. *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021).

## STATEMENT OF THE CASE AND FACTS

## I.     Backpage originates from within a newspaper company.

In 1970, Lacey founded an alternative newspaper, the *Phoenix New Times*. (3-ER-788.) Initially, it struggled financially, with Lacey even donating blood and plasma for cash to help keep it afloat. (3-ER-789.) Soon thereafter, James Larkin joined Lacey. (*Id.*) They agreed upon a corporate structure under which the newspaper thrived. (*Id.*) The newspaper would offer magazine-style articles,

published for free, with the company generating its revenue from advertising, including classified ads published on the back pages of the newspaper. (*Id*.)

Larkin, who had business acumen, would oversee the business side (*i.e.* revenue-generating side) of the newspaper as the Chief Executive Officer. (*Id*.; 34-ER-9551.) Lacey, a writer, would serve as the newspaper's Editor-in-Chief. (34-ER-9551; 40-ER-11305.) To protect the integrity of the journalism from financial considerations, these two sides of the newspaper ("business" and "editorial") would be kept separate, eventually even in separate buildings. (3-ER-789; 35-ER-9791; 43-ER-12098-12099.) Lacey could not tell Larkin how or how not to generate revenue, and Larkin could not tell Lacey what to publish.[2] (3-ER-789.) The newspaper sometimes "lost large, lucrative, national advertising accounts…because they wouldn't soften or sacrifice their principles or content even when they knew a given story…would cause their profit arrow to point south." (24-ER-6827.)

Nonetheless, the company flourished. (3-ER-789-791.) Under Larkin's supervision, the company expanded to other cities, ultimately operating a newspaper conglomerate of seventeen alternative weekly newspapers, including New York's *Village Voice*, under the name Village Voice Media Holdings, LLC ("VVMH"). (28-

---

[2] Within the media industry, this division used to be commonplace and was known as "separation of church and state." (3-ER-789.)

ER-8012.)  Amid this expansion, Spear joined the company as a Vice President, and Brunst as its Chief Financial Officer.  (*Id*.)

Lacey and his team of editors and journalists thrived, too, winning thousands of journalism awards, including a Pulitzer Prize.  (3-ER-789, 809-857.)

Central to the newspapers' success was an unwavering commitment to First Amendment speech and press rights, which Lacey did not abandon even when his liberty was at risk.  (3-ER-792-794.)  VVMH published hard-hitting articles on corruption, amongst coverage of local bands, restaurants, and venues.  (3-ER-792-793.)  VVMH's pursuit of cover stories routinely put it in the crosshairs of powerful people.  (3-ER-794.)

For example, Lacey and Larkin were arrested for publishing an article about unlawful subpoenas the then-Maricopa County Sheriff, Joe Arpaio, obtained to target the newspaper's online readers and their internet usage.  (*Id*.)  The Sheriff's violation of Lacey and Larkin's First Amendment speech and press rights was recognized by this Court in an *en banc* opinion, *see Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (*en banc*), and Lacey and Larkin's courageous stance on behalf of their readers' internet free speech rights made national headlines.  *See* Carr, D., New York Times, *A Knock in the Night in Phoenix* (May 12, 2008), available at: https://www.nytimes.com/2008/05/12/business/media/12.carr.html (last visited Mar.

7

12, 2025). Indeed, Lacey's unflinching commitment to the First Amendment rights of website operators and users was documented long before this prosecution.

## II. Backpage was formed under the "business" side of the company.

In the early 2000s, advertising shifted from print to online platforms. (47-ER-13422.) In 2004, an employee of VVMH, Carl Ferrer, met with Larkin and proposed that VVMH create a classified ad website like Craigslist. (34-ER-23.) Larkin authorized the project and gave Ferrer $50,000 to develop the website. (47-ER-13423-13424.) Ferrer launched Backpage, which operated as a subsidiary of VVMH and, like all of VVMH's subsidiaries, was overseen by Larkin. (28-ER-8012.)

## III. Lacey relies on others for information about Backpage.

Lacey took no part in, and had no knowledge of, Backpage's operations, such as the marketing and business growth strategies that the government claimed made Backpage into the internet's leading source of prostitution advertising. He was so out of the loop that he asked questions about "basic" operational information. (25-ER-7076-7077.) In 2010, six years after Backpage was created, Lacey had no idea if Backpage had any "guidelines" for its staff. (25-ER-7078.)

Lacking first-hand knowledge, Lacey relied on the representations of Ferrer and others with respect to Backpage's operations. (11-ER-2752-2758.) For example, Ferrer advised Lacey that Backpage had "100 staff members," known as moderators, who reviewed the website to "remov[e]" "illegal or harmful postings."

8

(25-ER-7090.)  Ferrer advised Lacey that the moderators' "priorities" were to:  "(1) deter, remove, and report bad postings and (2) help prosecute any child exploitation or human trafficking case."  (25-ER-7085.)

Ferrer's words and actions demonstrated to Lacey that Backpage was a partner to law enforcement in the fight against trafficking.  Ferrer advised that Backpage kept records on every ad posted to the website, which was costly, but provided law enforcement with "valuable personally identifiable information."  (25-ER-7088.) Ferrer advised that Backpage's response to law enforcement's requests for information was done as "expeditiously as possible," "often within the hour," and much faster than other websites. (25-ER-7089.)  Ferrer advised that Backpage aided law enforcement "in making the site as safe as possible."  (25-ER-7090.)  Ferrer had even testified as a government witness on numerous occasions.  (40-ER-11362.)

Due to these efforts, law enforcement agencies across the country praised Backpage's assistance.  (26-ER-7245-7479; 27-ER-7482-7519; 28-ER-8005-8010.) Among other accolades, law enforcement told Backpage that, with its "super-fast response" times (26-ER-7434), Backpage was:  "the best" (26-ER-7451); "fabulous" (25-ER-7417); "instrumental in helping" with prosecutions (26-ER-7367); and "truly an asset to" law enforcement (26-ER-7475).   Indeed, Ferrer received a commendation from the Director of the F.B.I.  (28-ER-8011.)

Ferrer and others followed the legal battles facing Craigslist. (35-ER-9809-9810.) In 2010, Craigslist shut down its adult advertising section due to pressure from various non-governmental organizations ("NGOs"), such as the National Association of Attorneys General ("NAAG"), which had repeatedly called for the closure of that website section by pointing to instances where prostitutes or traffickers had used it. (*Id*.) Craigslist posted a banner on that website section that said one word: "Censored." (47-ER-13518.) Afterwards, Ferrer advised Lacey that "[t]he pressure on Craig[slist] was not legal." (24-ER-6756.)

## IV. Backpage faces a wave of criticism.

After Craigslist shuttered its erotic services section, NGOs like NAAG, Auburn Theological Seminary ("Auburn"), and others began targeting Backpage. (24-ER-6745-6747; 37-ER-10341.) Backpage's representatives met with the NGOs to discuss internet safety. (36-ER-10177-10179.) Some NGOs called for closure of Backpage's adult advertising section, just like they had for Craigslist, by pointing to instances where prostitutes or traffickers had used the website. (24-ER-6745-6747.) Backpage made clear that it would work with NGOs and regulators to address internet safety concerns and even invited a dialogue on setting national best practices for internet safety. (24-ER-6824-6838.) However, Backpage would not agree to close the adult advertising section, which was a First Amendment protected forum for third parties to exchange information. (*Id*.; *see also* 3-ER-607-22.)

In 2011, Auburn placed a full-page ad in the *New York Times* asking Backpage to shut its adult section. (43-ER-12308.) Subsequently, Larkin, Lacey, and others traveled to New York to meet with Auburn. (37-ER-10343.) Auburn advocated that any website on which a single child was trafficked must shut down because "one child is too many." (37-ER-10352.) Lacey acknowledged that such a standard may be a good campaign slogan or "bumper sticker," but it was "not [a] realistic policy" for Backpage or any other website. (37-ER-10353.)[3]

Larkin addressed Auburn's concerns about instances of child-sex trafficking, informing Auburn about Backpage's content moderation process and cooperation with law enforcement. (43-ER-12325.) But Larkin, who oversaw Backpage, made clear that he would not shut down Backpage's adult advertising section because

---

[3]    Lacey understood that people used instrumentalities of communication, like postal services and cell phones, to commit crimes, and that those crimes would continue, regardless of the existence of phones or mail. (26-ER-7232.) He knew that no one, NGOs or otherwise, had suggested that cell phones or mail should be abolished to prevent crime. (*Id.*) He believed that a technology-based "solution" like that discussed in the "usc study" was a better approach than abolition. (25-ER-7095.) Indeed, "numerous studies" had asserted "that the internet and technology, not abolition, [were] the solution to rescuing kids." (27-ER-7240.)

In 2011, the USC Annenberg School for Communication & Journalism published an article summarizing the School's study of online human trafficking, concluding that instead of "singling out" websites for "intense scrutiny," law enforcement and NGOs should use the websites "to further the anti-trafficking goals of prevention, protection, and prosecution." *See* Latonero, M., *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg School for Communication & Journalism (Sept. 1, 2011), available at: papers.ssrn.com/sol3/papers.cfm?abstract_id=2045851 (last visited Apr. 4, 2025).

censoring or closing that section would implicate "free speech issues" and, at the same time, do nothing to help law enforcement investigate trafficking. (43-ER-12325, 12330.) VVMH's lawyers articulated that same view in letters responding to NAAG. (3-ER-607-622.)

## V. Lacey's defense of Backpage was rooted in his First Amendment beliefs.

On occasion, Lacey, a writer, was asked to defend Backpage. Lacey—who had already fought for internet free speech rights—asserted that censorship was not a solution for crime prevention:

> [A]ny time you have large numbers of people congregating in one place, you are going to have people who will attempt to game the system.
>
> However, Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. It certainly will not prevent the exploitation of teenagers. If anything, it will simply make it far more difficult for law enforcement to arrest and prosecute those who seek to harm children.
>
> For the very first time, the oldest profession in the world has transparency, record keeping and safeguards. Driving adult activity back into the shadows doesn't end the activity, it ends the safeguards.
>
> That's why we remain committed to the free exchange of information by our users. Millions of consenting adults should not be punished because a few seek to break the law.

> If someone overindulges in a bar, you don't ban alcohol. The bar does what it can: it adds more safety and security measures; it seeks law enforcement's help.
>
> We do the same.

(24-ER-6761-6762.)

Lacey's belief—that Backpage's operation of an online forum for the exchange of third-party speech was lawful even though there were instances where prostitutes or traffickers had used the website notwithstanding Backpage's prevention efforts and cooperation with law enforcement—is so cemented in this record that even the District Court acknowledged that Lacey had a ***"bona fide held belief that what [he was] doing was not illegal."*** (1-ER-110 (emphasis added).)

## VI. Courts recognize Backpage's First Amendment rights.

Amid calls to shut down Backpage through prosecution, several courts recognized Backpage's First Amendment right to publish third-party adult advertising. Three federal courts enjoined states from enforcing newly enacted criminal statutes targeting Backpage, uniformly recognizing Backpage's First Amendment right to publish adult ads, notwithstanding claims that numerous ads were associated with prostitution and trafficking. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 U.S. Dist. LEXIS 119811, *20-31 (D.N.J. Aug. 20, 2013).

Subsequently, the California Attorney General's Office brought a criminal complaint against Lacey, Larkin, and Ferrer, charging them with pimping based on Backpage's publication of user-generated ads in the escort section. (4-ER-992.) Twice the Court dismissed the pimping charges against them, rejecting the idea that a website operator could be prosecuted for publishing such third-party speech, even if the operator learned, after publication, that some escort ads posted to the website were placed by prostitutes or traffickers. (4-ER-990-1028.) Although the charges were dismissed under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), the Court expressly recognized that, in any prosecution like California's, "[t]he First Amendment is implicated." (4-ER-994.)

## VII. Banking for Backpage and the Defendants becomes unstable.

As efforts to shut down Backpage through criminal prosecutions were unsuccessful, some law enforcement officers began pressuring financial institutions to terminate Backpage and Appellants as customers. (38-ER-10716.) In 2015, Sheriff Tom Dart of Cook County, Illinois, sent threatening letters to Visa and Mastercard, resulting in both companies refusing to process credit card transactions for Backpage. (41-ER-11510-11511.) American Express also terminated its relationship with Backpage, not because Backpage was "doing anything illegal," but, instead, because of "reputational risk." (44-ER-12459.)

14

Backpage sued Sheriff Dart to stop his unlawful intimidation campaign with the support of numerous industry and civil rights organizations. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 229 (7th Cir. 2015) (listing Cato Institute, Reason Foundation, Dkt Liberty Project, Center for Democracy & Technology, Electronic Frontier Foundation, and Association of Alternative Newsmedia as amicus curiae).

In a unanimous opinion, authored by Judge Richard A. Posner, the Seventh Circuit held that Sheriff Dart's efforts to "crush" Backpage by demanding that credit card companies prohibit use of their cards on Backpage because "the ads might be for illegal sex-related products or services, such as prostitution" violated the First Amendment. *See id*. at 230 ("[A] public official who tries to shut down an avenue of expression of ideas and opinions…is violating the First Amendment."). Dart's conduct "violat[ed] the First Amendment unless there [was] ***no*** constitutionally protected speech in the ads on Backpage's website—and no one [was] claiming that." *Id*. at 231 (emphasis in original). Further, the Court recognized that many commercial sex activities advertised on Backpage were lawful economic activities, such as fetishism, phone sex, striptease performances, and dominatrix services. *See id*. at 234 ("[N]ot all advertisements for sex are advertisements for illegal sex.").

The Court also noted that, under the CDA, an "intermediary," such as Backpage, is not liable for the misdeeds of those posting content to a website, even if they know the content of what was posted, rejecting the idea that "a newspaper

that carries an advertisement for 'escort services' or 'massage parlors' aid[s] and abet[s] the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity." *Id*.

Despite this resounding victory, law enforcement continued to exert pressure on banking services, including the banks that held the Appellants' personal funds. As a result, Lacey's ability to bank became unstable, with bank after bank closing his accounts. (49-ER-13964.)

## VIII. Lacey funds trust account located in Hungary to stabilize his banking.

In early 2016, Lacey met with his estate-planning lawyer, John Becker, who already was in the process of preparing "basic estate planning documents" and "some planning for incapacity." (*Id*.) Lacey told Becker that banks had been closing his accounts. (*Id*.) Lacey wanted advice about how to stabilize his banking. (*Id*.) Becker suggested that Lacey consult an attorney with international estate planning experience who could advise on how to "keep [the accounts] open and from being closed." (*Id*.) Becker recommended Jacob Stein, an international estate planning lawyer located in Los Angeles. (49-ER-13965.)

Lacey's banking instability was a problem not just for Lacey, but for Becker too. Becker served as the trustee for Lacey's five grantor retained annuity trusts ("GRATs"), which were due to make distributions to Lacey. (49-ER-13967.) Becker worried that Lacey had "no place to put those funds in a domestic account." (*Id*.)

16

On July 29, 2016, Lacey emailed Becker indicating that he wanted to meet Stein. (24-ER-6707.) Lacey told Becker: "[T]o revisit for just a moment, *[I] am not interested in any tax avoidance.* I just want to put some assets in place where litigious parties, including government parties, cannot access my accounts." (*Id.* (emphasis added).) Lacey's "motivation" was "to place his monies in an account that won't be closed." (49-ER-14018.)

Subsequently, Lacey and Becker met with Stein. (49-ER-13965.) Stein advised them that "an appropriate way to solve the problem of domestic banks closing [Lacey's] accounts" was the "establishment of a trust in Hungary." (49-ER-13965-13966.) Becker advised Lacey about the Treasury Department's reporting requirements for offshore bank accounts and the requirement that Lacey report the trust income on his income tax returns. (49-ER-13966-13967.)

Upon the advice of Stein and Becker, Lacey authorized the formation of a Hungarian trust, with trust's assets to be deposited in a bank in Hungary. (49-ER-13966, 13975; 28-ER-7925-7943.) Lacey formed the trust "for the benefit of [his sons]." (28-ER-7929.) Lacey insisted that all reporting requirements and income tax filings be done correctly. (24-ER-6706-6707; 44-ER-12582.)

In November 2016, Lacey visited Arizona Bank & Trust to set up two new bank accounts to be able to pay bills. (44-ER-12579-12580.) He met with Lin Howard, a bank employee. (*Id.*) According to Howard, Lacey asked if she:

17

…knew how assets were seized and how assets were protected. He further went on to state that he had an attorney named John Becker who had indicated that there were some places around the world—and he mentioned the Cook Islands in which assets were protected from seizure and then he also mentioned Nevis Island….

He continued on by saying that ***he wanted to make it clear that he wasn't looking to avoid paying taxes, that he had [an accountant] he directed to make sure that all taxes were paid and no tax shelters were taken***, but he was looking to see about moving a percentage of his assets offshore in order to protect them from government seizure.

(44-ER-12582 (emphasis added).)

At trial, Howard testified that she was "shocked" by the conversation (44-ER-12584), but acknowledged that offshore investments were lawful. (44-ER-12588.) She further admitted that she had no knowledge about the formation or reporting requirements for lawful offshore investments and had no experience with international banking. (44-ER-12588-12589.) Instead, her career was limited to domestic retail banking. (44-ER-12576.)

Most importantly, she testified that it was clear that ***Lacey did not ask for help to conceal anything***. (44-ER-12593.) To the contrary, she testified that paying taxes on assets—like Lacey said he intended to do—was a form of disclosure to the government of those assets. (44-ER-12587-12588.) Further, there were no holds or liens on the money, which meant that he was free to transfer it. (44-ER-12590.)

18

Finally, she agreed that, if a foreign bank account was set up in accordance with the "rules" for such accounts, it would be a legal account. (44-ER-12591.)

On January 3, 2017, Becker wired $16.5 million to Hungary to fund the trust. (25-ER-7171.) To do so, he consolidated the GRATs into his IOLTA trust account, for the benefit of Lacey. (49-ER-13995.) He then transferred the consolidated funds to a Hungarian bank account for the trust. (*Id*.) Becker did not inform Lacey about the consolidation because he was the trustee of the GRATs, he had the authority to consolidate the funds into one account, and he thought that it would be most efficient to send one international wire rather than five. (49-ER-13995, 14028.) Becker testified that he could have written five checks to Lacey, to enable Lacey to send the funds himself, but Becker did not believe that Lacey had the ability to deposit the funds in a domestic account, which would have been necessary to wire the funds to Hungary. (49-ER-14028.)

A few weeks after Becker transferred the funds, Lacey emailed Becker asking: "[D]o you or [J]acob [S]tein do the ***reporting to govt on money that was moved***?" (24-ER-6706 (emphasis added).) That same day, Becker responded, indicating that Stein would receive information on the trust, which Lacey's accountants would use to prepare and file Lacey's first Report of Foreign Bank and Financial Accounts ("FBAR") with the Treasury Department. (24-ER-6705; 28-ER-8014.) FBARs are

an "annual disclosure" (49-ER-13983) that "puts the government on notice that a U.S. taxpayer has established a foreign account" (49-ER-13978).

On March 7, 2018, Becker, on his own initiative, requested an automatic extension of the April 15, 2018, deadline for filing the first FBAR. (49-ER-13976; 28-ER-7961-7962.)[4] On August 9, 2018, Lacey timely filed his first FBAR. (28-ER-7983-7997.) The FBAR identified Lacey as the "U.S. owner" of the funds, the name and address of the financial institution holding the funds, and the amount of the funds. (*Id.*) Becker advised Lacey that "all the legal procedures had been followed" and "complied with." (49-ER-13987-13988.) Becker testified that the formation and funding of the trust was a "solid transaction" that was "absolutely legal." (49-ER-14029.)

Lacey timely filed the initial FBAR, as well as each FBAR due in subsequent years. (*E.g.*, 28-ER-8001-8004.)

## PROCEDURAL HISTORY

On March 28, 2018, a grand jury issued an indictment, which then was superseded on July 25, 2018 ("Indictment"). (20-ER-5506-5601.) The Indictment

---

[4] This automatic extension is available each year to all FBAR filers even if not requested in advance like Becker did here. *See, e.g.*, IRS New Release (Mar. 21, 2022), available at: https://www.irs.gov/newsroom/irs-reminds-holders-of-foreign-bank-and-financial-accounts-of-april-fbar-deadline (last visited Apr. 10, 2025).

charged Lacey with 86 counts: conspiracy to violate the Travel Act; Travel Act violations; and various money laundering violations, including one count of international concealment money laundering ("Count 100") (*id*.), which is the subject of this appeal. The only alleged SUA was Travel Act violations. (20-ER-5549.)

## I.     The first trial ends in a mistrial.

On September 1, 2021, the trial began. (29-ER-8113.) Within days, the District Court declared a mistrial because the government repeatedly solicited evidence concerning child-sex trafficking—a charge no Defendant faced—in violation of the Court's rulings. (32-ER-8955-8956.) Defendants moved for dismissal under the Double Jeopardy Clause. (12-ER-3224-17-ER-4690.)

While that motion was pending, the District Court recused. (12-ER-3223.) A newly-assigned Judge denied the motion to dismiss (12-ER-3177-3193), which this Court affirmed on appeal (12-ER-3172-3176). Notably, at oral argument on the appeal, the Honorable Jay S. Bybee remarked: "You got the mistrial, ***so all of that evidence is going be excluded***." (Ninth Cir. Oral Argument Archive, Case No. 22-CR-10000, available at: ca9.uscourts.gov/media/video/?20220902/22-10000/ (at 6:55 (emphasis added).).

21

## II.    The new judge presides over the second trial with new rules.

On March 23, 2023, the District Court scheduled the second trial to begin on August 8, 2023.  (29-ER-8138.)

### A.    New pretrial rulings change the trajectory of the case.

On July 24, 2023, the District Court ruled on motions in limine, indicating that the case would be tried under a new set of rules.  (2-ER-525.)  First, Defendants now would be prohibited from "invok[ing] their First Amendment rights as a defense to the allegations."  (2-ER-532-533.)  This meant that, in this prosecution of Defendants based on Backpage's publication of third-party speech, the First Amendment would have no role, despite past court decisions expressly deciding that Backpage's publication of adult ads was protected by the First Amendment.

Second, Defendants now would be banned from presenting any evidence about any prior litigation, including judicial opinions recognizing Backpage's First Amendment rights as a publisher of third-party speech despite claims that prostitutes and traffickers had used the website, as well as any underlying court filings, including those of amici.  (2-ER-535.)  There would be no evidence about the very documents Defendants read and considered when making their subjective determinations about the lawfulness of Backpage's operation.  The ban even applied to this Court's opinion in *Lacey v. Arpaio*, which would have shown the jury that

Lacey had not conveniently concocted First Amendment beliefs for the trial, but, instead, had already risked incarceration to protect Internet free-speech rights.

Third, Defendants now would be barred from presenting any attorney letters or opinions (including non-privileged letters written to third parties) unless Defendants established the prerequisites for a jury instruction on advice of counsel (full disclosure, request of advice, receipt of advice, and reliance), and Defendants showed that the opinion to be introduced was related to "an ad listed in Counts 2-51" or "described" in the Indictment. (2-ER-536-537.) Because none of the Defendants had seen or known of any of the ads "listed" or "described" in the Indictment before issuance of the Indictment, it did not appear that they could assert a defense based on counsel's advice, even though attorneys had provided extensive advice on Backpage's operations and had specifically advised that the First Amendment precluded federal prosecution of Backpage, its employees, and its owners. (3-ER-678-686, 696-704.)

In contrast, the Court authorized the government to present troves of evidence untethered to ads "listed" or "described" in the Indictment. The government would be permitted to introduce evidence of child-sex trafficking, unrelated to the ads "listed" or "described" in the Indictment, on the basis that such evidence (*which had caused the first mistrial*) now was admissible as "proof of the entirety of the scope of the conspiracy." (2-ER-528.) This evidence also was purportedly relevant

23

because it provided Defendants with "notice…that the website was being used for illegal purposes" (*id*.), even though "notice" was insufficient, as a matter of law, for proof of the specific intent required for Travel Act violations (*see* Spear Br.).

Evidence about marketing strategies that ended years before the first "listed" ad was published would be admissible as proof of "how and why"—years later—website users "created" ads and the users' "intended purposes." (2-ER-530.) Evidence that Backpage gave discounts to advertising agents, referred to as "superposters," who purchased large volumes of ads for their clients, would be admissible even though none of the ads "listed" or "described" in the Indictment were purchased by so-called superposters. (2-ER-531.)

On July 27, 2023, the parties appeared for the Final Pretrial Conference. (11-ER-2848-3010.) Defendants sought clarification on inconsistencies in the rulings. For example, years ago, the prior Judge had ruled that many communications by lawyers were not privileged. (2-ER-546-549.) Based on that ruling, which was the law of the case, Defendants asserted that they should be permitted to introduce evidence of those non-privileged communications without, as the new Judge had ordered, waiving privilege. (11-ER-2894-2898.)

Defendants also sought clarification as to the admissibility of evidence unrelated to the fifty "listed" ads. On the one hand, it appeared that the Court ruled that attorney opinions on any topics other than the ads "listed" or "described" in the

Indictment were "irrelevant," while, on the other hand, the Court ruled that the government could present unlimited evidence of conduct unrelated to those ads. (11-ER-2899.) Defendants asserted that there should be one standard that applied equally to both sides. (11-ER-2899-2900.)

With respect to so-called "notice" evidence, Defendants explained that, under the Court's rulings, the jury would be told that various NGOs had told Backpage to stop publishing adult ads because prostitutes or traffickers had used the website, but the jury would not be told about the non-privileged attorney responses, which defended Backpage's constitutional right to publish adult advertising notwithstanding after-the-fact notice that prostitutes or traffickers had posted ads to the site. (11-ER-2903-2904.) Although Defendants had disputed the admissibility of "notice" evidence in various pleadings, here, the argument was one of fundamental fairness. If "notice" evidence were to be admitted at all, then, in fairness, the responses to that evidence, too, should be admitted. (*Id*.)

Finally, Defendants sought clarification as to whether they could isolate the relevant portions of prior judicial opinions addressing Backpage's First Amendment rights, redact the rest, and admit the isolated portions of those opinions, which had been central to each Defendant's subjective intent. (11-ER-2906.)

The District Court issued no further rulings, clarifying or otherwise, stating "my ruling is what my ruling is." (*Id*.)

25

Four days later, James Larkin killed himself. (11-ER-2847.)

On August 4, 2023, the Court held a status conference for the remaining Defendants, during which they moved for a continuance of the trial to ensure that they received a fair trial. (11-ER-2825-2846.) They sought to distance the trial from the prejudicial media coverage of Larkin's suicide, and to enable the defense to reorganize due to the loss of Larkin's three lawyers and the trial work that they would have carried on behalf of all Defendants. (11-ER-2829.) The District Court granted a brief continuance, moving the trial from August 8, 2023, to August 29, 2023. (11-ER-2839.)

### B.   Flawed rulings deprived Defendants of a fair trial.

On August 29, 2023, the trial commenced. (29-ER-8151.) The trial was notable for many reasons, five of which will be addressed herein.

### 1.   No money laundering charges were proven.

Quoc Thai, a special agent with I.R.S. Criminal Investigations and then a postal inspector, testified about his money laundering investigation. (45-ER-12838.) Thai's testimony and the charts he created that were admitted through him established that: (1) nothing was concealed from the government; and (2) none of the funds could be designated as "proceeds" of crime.

### a. Thai establishes that none of the attributes of the funds were concealed from the government.

Thai established that none of the attributes of the funds for the money laundering convictions were concealed from the government. Thai testified that Defendants sold Backpage to Ferrer in 2015 in a seller-financed deal. (45-ER-12930-12931, 12937; 46-ER-12973.) After this sale, Ferrer and his entities (Backpage, Website Technologies, and Ad Tech BV) made monthly loan payments to entities controlled by Defendants, which included Cereus Properties and Medalist Holdings, Inc. ("Medalist"). (38-ER-10699-10700, 10838.) Thai testified that all the payments from Ferrer and his entities to Defendants and their entities were sourced from Backpage revenue. (45-ER-12856; 53-ER-152850, 15082.) Thai prepared numerous charts—admitted at trial—that demonstrated the transparent flow of Backpage funds from Ferrer and his entities to Defendants. (25-ER-7171-7173.)

Thai's exhibits and testimony document the *disclosure* of Backpage revenue as the source of the funds in all charged transactions. For example, Exhibit 1481 shows Backpage revenue being distributed to an entity controlled by the Defendants, Medalist.. (25-ER-7173.) It then shows Backpage revenue as the "Total ***Reported Income***" of the Medalist stockholder/officers (Lacey, Larkin, Brunst, and Spear) for tax years 2013-2015. (*Id*. (emphasis added).) Thai testified that he used corporate

27

and individual tax records to conduct his investigation and to create this exhibit. (45-ER-12849, 12853, 12855; 46-ER-12976-12977.)

Notably, Thai's spreadsheet, prepared from the tax returns of Defendants and their entities, show that all of the "***Reported Income***" paid to Lacey, Brunst, and Spear was "Backpage revenue earned for that year." (45-ER-12856; 53-ER-15082 ("[T]he records show that the funds" held in "Website Tech" and "Cereus" bank accounts "c[a]me from Backpage.com.").) Thai then followed those "funds from Backpage"—that had been declared in tax returns—until they "ultimately land[ed] in the accounts of the [D]efendants." (45-ER-12857; 25-ER-7171.)

Further, Thai testified that each of the bank accounts holding Backpage revenue were properly titled in the actual names of the Defendants or the companies the Defendants controlled. (45-ER-12959-46-ER-12963.) None of the accounts were titled with fictitious names, which enabled Thai to ***identify*** the owner or controller of the funds, the amount of the funds, and the location of the funds. (25-ER-7171.)

Finally, with respect to Lacey's transfer of funds to a bank account in Hungary—the basis of Lacey's international ***concealment*** money laundering conviction—Thai conceded that, he "did not search for an FBAR at any time" (46-ER-12965), even though Thai knew that an FBAR was used "[t]o ***report*** the existence of a foreign bank account by the owner" to the government. (46-ER-12963

28

(emphasis added).)  Unconvincingly, Thai said he "didn't know" he could ask the Treasury Department for the FBAR as part of his investigation.  (46-ER-12967.)

### b.    There was no proof of purpose or intent to conceal.

Thai admitted that he did not know the purpose of any of the transfers for any of the money laundering counts.  (45-ER-12929, 12938.)

### c.    There was no proof the funds were proceeds of Travel Act violations.

Thai testified he did not trace the funds at issue to any particular ads.  (45-ER-12942.)  He also "didn't analyze any advertisements" during the investigation.  (45-ER-12951.)  This case was Thai's first investigation involving revenue from a website hosting third-party speech.  (45-ER-12947.)

Notwithstanding these admissions, Thai's own exhibit showed the importance of tracing in this case.  Exhibit 1480 showed that Backpage generated millions of dollars of revenue from the publication of non-adult ads for unquestionably lawful activities like automotive, jobs, rentals, musicians, and real estate (25-ER-7172), and the government presented no evidence that any non-adult ads were associated with unlawful activity.  Thus, Thai, himself, disproved the specious claim that all Backpage revenue was revenue from Travel Act violations.  (*Id*.)

Further, Thai's analysis of the revenue generated by the "adult entertainment" ad categories failed to distinguish between the revenue generated from ads

29

associated with lawful activities like stripping, strip clubs, phone sex, domination, and escorting, and any revenue from ads associated with illegal activities like prostitution. (*Id*.) But, even if Exhibit 1480 had made these distinctions, it quantified revenues for the wrong time period. Exhibit 1480 categorized revenue for ads posted to Backpage from 2010-2012. (25-ER-7172.) But Exhibit 1479 showed that the funds at issue in the money laundering counts were generated by the publication of ads to the website *four years later*, from December 31, 2015, to August 2016. (25-ER-7138-7171.) Thai conceded that he presented no analysis of revenue earned from December 31, 2015, to August 2016. (45-ER-12952.)

Finally, Thai did not distinguish between revenues generated by Backpage in the United States versus revenue generated by Backpage from ads placed overseas or from ads on websites other than Backpage. Notably, Ferrer testified that his transmission of funds from Website Technologies to entities controlled by Defendants included revenue generated from ads posted to Backpage *and* ads posted to another website, Crackr. (38-ER-10838.) Ferrer testified that Crackr operated in Australia (38-ER-10614), a country where prostitution is legal. Funds generated from ads published on Crackr in Australia, or on Backpage in overseas locations, could not be designated as "proceeds" of Travel Act violations because the Travel Act only applies to prostitution "in violation of the laws of the *State*" where the

prostitution occurred.  See 18 U.S.C. § 1952(b)(1) (emphasis added).  Yet, Thai did not distinguish these various categories of revenue.  (25-ER-7173.)

### 2. The case against Lacey was based entirely on "notice" evidence.

There was no evidence that Lacey was involved in Backpage's operations. A corporate organization chart showed that Lacey had no role in the oversight of any of the subsidiaries on the "business side" of VVMH, including Backpage.  (*Id*.) Backpage was in a different building from Lacey and the writers.  (35-ER-9791; 43-ER-12098-10299.)  Ferrer, the government's star witness, described Lacey as a "layer away" from Backpage's operations.  (40-ER-11307.)  Another member of Backpage's senior management—who worked at VVMH, beginning in its print advertising department in 1998, and then for thirteen years at Backpage—never met Lacey during his decades' long tenure at VVMH.  (48-ER-13680.)  There was no proof that Lacey saw any of the ads "listed" or "described" in the Indictment.  There was no proof Lacey ever had contact with any website user.

In the absence of this requisite proof, the government was allowed to present evidence to show that Lacey was on "notice" from politicians, ministers, and celebrities that prostitutes or traffickers had used the website.  Throughout the trial, the Court indicated that she viewed "notice" evidence as a permissible substitute for proof of the requisite specific intent.  (*E.g.*, 35-ER-9918.)  The government even

argued at closing that this "notice" evidence was sufficient to convict Lacey. (51-ER-14493-14494.)

As the trial progressed, the Court allowed the government to introduce "notice" evidence, even when the government failed to satisfy the most basic evidentiary rules, as if the fact that an exhibit was claimed to be admissible for "notice" meant that no other rules of evidence needed to be considered:

- A report prepared by AIM Group, entitled "Backpage replaces Craigslist as prostitution-ad leader," in which AIM Group claimed that Backpage had become "the new leader in prostitution advertising" was admitted. (26-ER-7184-86.) There was no proof that Lacey ever saw the report. The Court admitted it over objections for hearsay, foundation, relevance, prejudice, and others, instructing the jury that "the exhibit is not offered for the truth of the content." (35-ER-9887-9888.) Incredibly, the Court immediately allowed the government to ask Ferrer about "***the accuracy***" of information in "***this report***." (35-ER-9888 (emphasis added).) Defendants' objection to its clear use for the truth of the content was overruled. (35-ER-9890.)

- Over objections, the Court allowed admission of a second AIM Group report, Exhibit 1609a, which stated that Backpage earned "$17.5 million for online commercial-sex ads in 2010." (26-ER-7183; 35-

9892.) Again, Ferrer was allowed to testify about the accuracy of this report even though it was not admitted for the truth of its content. (*Id*.)

- A fax received at VVMH, purportedly from the Montgomery County Maryland Department of Police, stating that Backpage's publication of "countless" ads associated with prostitution or trafficking violated federal law. (25-ER-7105-7106.) There was no proof that Lacey ever saw this fax. There was no proof that the fax was from the Maryland Department of Police or whether anything in it was true. It was hearsay. It discussed trafficking with no connection to any count. It expressed a legal conclusion about the ultimate issue in the case. The Court overruled all objections stating only noting that "it was not offered for the truth." (35-ER-9897.)

- A letter from a group of State Attorney Generals telling an attorney for Backpage that "prostitution—including ads trafficking children—are rampant on the site." (24-ER-6745-6747.) There was no proof that Lacey ever saw this letter. The Court cautioned the jury that it was "not offered for the truth of the content in it." (35-ER-9910.) Yet, when denying a mistrial motion, the Court said it was admitted to prove "the knowledge of certain defendants as to what was going on on Backpage," *i.e.*, the truth of the matter asserted. (35-ER-9919

(emphasis added).)  Similarly, the Court said it was admissible because it put "defendants on notice" (35-ER-9918), but then, minutes later, said she never said it was admitted for "notice."  (35-ER-9919.)

- An email forwarding an article from the New York Times, entitled How Pimps Use the Web to Sell Girls, in which the author quoted others who had accused Backpage of becoming a "hub" for "pimps trying to sell girls," stating that Backpage earned millions "from prostitution advertising." (25-ER-7117-7119.)  It was hearsay on top of hearsay.  It discussed trafficking with no connection to any count.  It expressed a legal conclusion about the ultimate issue in the case.  The Court admitted it over these objections.  (37-ER-10366.)

### 3. No limitation was placed on child-sex trafficking evidence.

There were no limitations on the government's introduction of child-sex trafficking evidence, even though no Defendant faced such a charge and the age of an advertiser had no bearing on the Travel Act elements.  Exhibits discussing child-sex trafficking were admitted without regard to basic evidentiary rules.  For example, over objections, the government admitted an email through Ferrer which contained nothing but a link to a petition found on www.change.org, entitled "Tell Village Voice Media to Stop Child Sex Trafficking on Backpage." (25-ER-7104.)  It was a

prejudicial hearsay accusation from unidentified parties claiming that Backpage violated federal law. (35-ER-9893-9894). It was admitted, nonetheless. (*Id.*)

One morning, the government admitted 20 exhibits concerning child-sex trafficking, including one exhibit that had three references in the first paragraph. (37-ER-10290-10291.) The defense moved for a mistrial asserting that the prejudice of the evidence admitted that morning, alone, vastly exceeded the prejudice that caused the prior mistrial. (37-ER-10291-10294.) In denying a mistrial, the District Court refused to apply the mistrial standard from the first trial, stating that the first mistrial was nothing but "water under the bridge" concerning "different testimony." (37-ER-10294.) The Court then ruled that the age of a person featured in an ad was "relevant" and admissible to show the Defendants' "knowledge about whether or not indeed the ads that were placed on Backpage were prostitution ads" as long as the government "tie[d] each of these exhibits to some of the counts in the indictment." (37-ER-10296.)

Setting aside the obvious flaws in that evidentiary ruling (proof of age does not equal proof of Travel Act violation), the District Court did not even enforce this new rule. None of the 20 exhibits that prompted the mistrial motion related to any of the Travel Act charges.

The Court's failure to enforce this new rule continued throughout the trial. Incredibly, a minister was allowed to testify at length about child sex-trafficking,

including testimony about piles of children's shoes that his organization, Auburn, had placed outside VVMH's office to "symbolize" children trafficked on Backpage. (43-ER-12333-12334.) Defense counsel moved for a mistrial, asserting that this testimony, unconnected to any Travel Act counts, was "way beyond" what even this Court had said was permissible. (43-ER-12335-12336.) The Court denied the motion. (43-ER-12338.)

When the defense renewed the motion, the Court acknowledged the minister's "continued" use of "the phrase 'child prostitution.'" (44-ER-12438.) In the absence of proof tying the minister's testimony about piles of shoes "symboliz[ing]" trafficked children to any actual charges, the Court articulated yet another new and remarkable justification for this evidence—it was permissible because the minister was simply "putting forward his own beliefs." (44-ER-12439.)

Additionally, the Court claimed that *defense counsel* had opened the door to evidence on child-sex trafficking by asking the minister questions about it during cross-examination, and by previously admitting emails from law enforcement thanking Backpage for its help in rescuing children through counsel's cross-examination of Ferrer. (44-ER-12439-12440.) Defense counsel explained that counsel did not "inject" trafficking into the case, but, instead, when the topic "came up on direct" due to questions the government asked its witnesses, defense counsel had "to deal with it" to provide effective representation. (44-ER-12413.) The Court,

nonetheless, maintained that the denial of a mistrial was appropriate because ***defense counsel*** had opened the door.  (44-ER-12439.)

### 4.    Good faith evidence was precluded.

The Court precluded evidence of good faith.  First, there was an ever-shifting set of rules on attorney-related evidence.  At the outset, the Court prohibited defense counsel from using the word "lawyer." (34-ER-9467.)   Lacey's counsel was admonished for stating that Lacey relied, in good faith, on Ferrer, who had "attorneys advising him."  (34-ER-9432; 34-ER-9464.)   Further, defense counsel would be precluded from asking Ferrer about the fact that he had hired lawyers unless they established the prerequisites of an advice-of-counsel defense.  (34-ER-9475-9481.)

Initially, government counsel referred to Backpage's lawyers as "representatives" when questioning Ferrer.  (39-ER-10926.)  However, as the trial progressed, the government repeatedly opened the door to the admission of non-privileged attorney letters and emails, as well as the existence of lawyers, by soliciting testimony from Ferrer about Backpage's lawyers and admitting exhibits addressed to Backpage's lawyers through Ferrer.  (11-ER-2793-2795.)   When Defendants attempted to ask Ferrer about non-privileged responsive letters, the Court precluded all such questioning.  (*E.g.*, 40-ER-11182.)

Second, Defendants were precluded from presenting evidence about prior judicial rulings no matter how many times the government opened the door.  As

Defendants noted in a chart submitted to the Court, the government repeatedly solicited testimony about the facts that led to the *McKenna* case (relating to a newly enacted age verification law targeting Backpage) and to the *Dart* case (relating to a sheriff's harassment of Backpage's credit card processors). (11-ER-2790-2793.) Defendants, however, were prohibited from asking Ferrer about the existence of those cases, their underlying facts (such as a letter to Mastercard and VISA in response to Sheriff Dart's threats), or their outcomes. (41-ER-11511-11515.) Incredibly, the government admitted an exhibit through Ferrer that referenced Lacey's arrest by Sheriff Arpaio. (11-ER-6728.) But, when counsel sought to ask Ferrer about that portion of an ***admitted exhibit***, which accused Lacey of being a lawbreaker, the Court precluded all such questioning. (40-ER-11370-11371.)

Third, Defendants were precluded from testifying about the very things they considered when making their determinations that Backpage operated lawfully. (49-ER-13844-13874.) For example, Defendants could not testify about ***non-privileged*** attorney letters that they had read because they had ***not waived privilege as to those letters***. (49-ER-13844-13847.) Defendants even filed detailed proffers as to the statements and documents they had relied upon in making their determination that Backpage was a lawful operation (11-2752-2774), but they were precluded from telling their side of the story (49-ER-13844-13847).

### 5. Government witnesses were allowed to testify about things for which they had no foundation.

Although Defendants were precluded from testifying about statements and documents on which they relied in determining the legality of Backpage, government witnesses repeatedly were allowed to testify about things for which they had no knowledge. For example, over objections as to foundation, hearsay, and relevance, the government was allowed to admit email through Ferrer that Ferrer never received, for which he was not the document custodian, and that had nothing to do with the purported conspiracy, such as an email between Lacey and his ex-wife (37-ER-10393 (admitting 26-ER-7242)), an email between Lacey and his attorney, Becker (38-ER-10835 (admitting 24-ER-6705-6709)), and an email between Lacey and a journalist (37-ER-10367-10368 (admitting 26-ER-7240-41)).

Ferrer, a lay witness, was allowed to opine that photographs embedded in ads had been taken in hotels, even though the government did not establish that Ferrer had personal knowledge of the ads and the photos did not provide revealing information of any kind, such as a hotel logo or room service menu. (38-ER-10657-10658 (admitting 24-ER-6875-6880, 25-ER-6888-6896).)

The Court occasionally restrained the government, but then returned to giving it a free hand. For example, the Court precluded Ferrer from testifying about what he thought someone else meant when using the phrase "secretive hobby," because that called for "speculation as to what someone else intended when they wrote

something" (35-ER-9691-9692), but then immediately overruled an objection to the very same type of speculative testimony concerning what Ferrer thought the same person meant when using the term "independent provider" (*id*.).

Incredibly, Ferrer was allowed to opine that all ads in the "female escort" section—***millions of ads Ferrer had never seen and that the government did not show to Ferrer or the jury at trial***—for the lawful activities of escorting, massages, and dating were, instead, ads for illegal prostitution. (35-ER-9798-9799.) Ferrer ultimately conceded on cross examination that, with respect to the couple dozen of ads he was shown at trial, he was only making an "educated guess" that those facially lawful ads were for illegal prostitution (40-ER-11261-11262).

### C. The verdict was the unreliable result of a flawed trial.

At the conclusion of the government's case, Lacey and his co-Defendants moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"). (48-ER-13715-13756; 13779-13792.) The District Court declined to rule on the motions that day, but, instead, took them "under advisement." (48-ER-12792.) Consequently, in this case, in which the defense had been derailed by one inconsistent ruling after another (a few of which were discussed above), 49 money laundering charges would be sent to the jury, even though there was no proof of proceeds, no tracing, and proof of ***disclosure*** rather than ***concealment***.

On November 16, 2023, after several messages from the jury that it was deadlocked (53-ER-14973, 15053, 15170), and after an implicit and then explicit *Allen* instruction was given (53-ER-15053-15054), the jury announced its verdict. The jury acquitted Lacey of one count, convicted him of Count 100, and was unable to reach a verdict as to Lacey on his remaining 84 counts. (2-ER-411-454.)

Lacey subsequently filed written supplements to his oral Rule 29 motion. (7-ER-1783-1796; 5-ER-1303-1313.)

### III.    The District Court rules on Rule 29 motions.

In ruling on the outstanding Rule 29 motions, the Court ***acquitted Lacey of 50 counts***, for an overall total of 51 acquittals, but affirmed his sole conviction for Count 100. (1-ER-267-2-ER-350.)

The Court characterized the case against Lacey as "attenuated." (2-ER-301.) With respect to the conspiracy charge, for which the jury reached no verdict as to Lacey, the Court refused to dismiss this hung count because there was evidence in the record that:  (1) Lacey's newspapers began making less money by 2009; (2) Backpage's revenue was increasing; (3) a writer at one of the seventeen newspapers wrote a blog post about a website called The Erotic Review ("TER"), Backpage ads had links to TER, and TER contained "prostitution reviews;" (4) NGOs confronted Lacey and others about prostitution on Backpage; (5) Lacey gave the impression that he knew that prostitutes had used the website; and (6) Lacey was aware of media

41

coverage of incidents in which prostitutes or traffickers had used the website. (2-ER-301-302.) In other words, the Court viewed the so-called "notice" evidence, alone, sufficient to deny Lacey acquittal of the conspiracy count. (*Id*.)

The Court found "an insufficiency of trial evidence supporting a direct theory of liability for any of the Travel Act charges brought against [Lacey]," but ruled he could, nonetheless, be held liable under *Pinkerton* because he had been told by NGOs and others that prostitutes had used the website. (2-ER-309-310.) Here, again, "notice" evidence was the justification for denying Lacey acquittal of the Travel Act counts.

Nonetheless, the Court acquitted Lacey of Travel Act counts 19-51, for ads published to the website after the sale of Backpage to Ferrer in 2015, ruling that the conspiracy ended at the sale to Ferrer in 2015. (2-ER-318-19.) Thus, there was no proof of Travel Act violations (by Lacey or anyone else) after that point. (2-ER-318-319.)

The District Court acknowledged that the "Government made no attempt to trace" funds in any money laundering count to any particular Travel Act violations. (2-ER-334-335.) Consequently, the Court acquitted all charges brought under 18 U.S.C. § 1957 (Counts 69-99) because the government established nothing but "mere speculation" as to those funds being proceeds. (2-ER-335.) Yet the Court upheld all convictions under Section 1956, ruling that, notwithstanding the lack of

tracing, the jury could have "infer[red] that the funds were proceeds." (2-ER-323.) The District Court did not address the First Amendment problem with "infer[ring]" proceeds in the context of a prosecution for publishing third-party speech.

The Court upheld Count 100—Becker's January 3, 2017, transfer of funds from the United States to Hungary on Lacey's behalf (2-ER-327-333)—even though that ruling was irreconcilable with other rulings. First, the funds at issue were generated after the sale of Backpage to Ferrer in April 2015, with the first transfer of funds from Ferrer occurring on December 31, 2015. (25-ER-7171.) This was the post-sale period as to which the Court—in the same opinion—had ruled that no Travel Act violations were proven. (2-ER-318-319.)

Second, upholding the conviction for Count 100 was inconsistent with the Court's Section 1957 acquittals. Critically, the $16.5 million at issue in Count 100 was the subject of three other sets of charges brought under Section 1957, as the $16.5 million was also charged as Counts 88-92 (funds deposited into GRATs), 94-98 (consolidation of GRATs into IOLTA), and 99 (transfer from IOLTA to Hungarian bank account). (25-ER-7165-7169, 7171.) The Court acquitted these funds three times when the Court acquitted all Section 1957 charges on the basis that the government had presented nothing but "mere speculation" that those funds were proceeds. (2-ER-334-335.) It remains unclear how those very same funds—the

43

subjects of three sets of acquittals for failure to establish proceeds—could possibly support the Count 100 conviction, an inconsistency left unaddressed by the Court.

The District Court's rulings on the intent-to-conceal element were equally inconsistent. On the one hand, the District Court acknowledged both that it had instructed the jury that "concealment" meant "the act of preventing disclosure or refraining from disclosing" and that the government's "expert testified that he could follow the trail of funds with relevant *ease*." (2-ER-329 (emphasis added).) On the other hand, the Court found that the jury "could possibly have divined" the intent to conceal from Lacey's statement that he wanted to put some funds where the government "could not access them." (2-ER-330.) The Court acknowledged that the government "had not provided the Court with a case in which a defendant's intent to shield assets from government seizure" was sufficient to establish the requisite intent to conceal (*id*.), and such a finding would have been inconsistent with Lacey's stated intent to pay taxes, his filing of FBARs, and the Court's own jury instruction on "concealment," but the Court nonetheless upheld the conviction. (2-ER-331.)

## IV. The Court sentences Lacey by inconsistently applying her own rulings.

At the outset of the two-day sentencing, the Court issued several rulings. First, the Court reaffirmed that the conspiracy ended at the sale of Backpage to Ferrer in 2015. (1-ER-151.)

Second, the Court ruled that victim information concerning ads published to the website after the conspiracy ended in 2015 would not be considered. (1-ER-151-52.)

Third, the Court initially ruled that Lacey's crime of conviction—the international transfer of post-sale funds—would be subject to restitution. (1-ER-176.) This ruling—which meant that Lacey's act of transferring funds somehow harmed someone—was inconsistent with the Court's own prior ruling, that no Travel Act violations, let alone violations that harmed people, were proven during the period in which the funds were generated. (2-ER-318-319.) However, the Court ultimately reconsidered and ruled that restitution was not applicable to Count 100. (1-ER-13.)

Fourth, the Court initially said it would use the harm allegedly suffered by website users to calculate Lacey's Guidelines range for his money laundering conviction, rather than the loss-table method, even though, as counsel noted, there could be no victims (or harm) from Lacey's act of transferring funds generated after 2015. (1-ER-177-182.) The Court also intended to apply the victim-related enhancements to Lacey. (1-ER-183.) Then, later that day, the Court changed course, announcing that Lacey's Guidelines range for his money laundering conviction would be calculated using the loss-table method, and victim-related enhancements would not be applied because the sentence "must reflect the count of conviction."

45

(1-ER-194-196.)   The funds transferred—$16.5 million—would be treated as proceeds and applied to the loss table to increase his base offense level from 8 to 28 (1-ER-194), even though the Court had previously ruled, in essence, that no proceeds were possible because no Travel Act violations were proven during the time that the funds had been generated.  (2-ER-318-319.)[5]

The following day, the Court sentenced Lacey to 60 months of incarceration, a $3,000,000 fine, 36 months of supervised release, and other conditions of release. (1-ER-111-114.)

The Court provided several reasons for the sentence.  The Court justified incarceration because Lacey "had notice" of incidents where prostitutes or traffickers had used the website, but Lacey did not shut down the website.  (1-ER-104; 110 ("You were put on notice….You didn't [shut down].").)  The Court found that Lacey had "knowledge that the majority of Backpage's revenue came from the sale of…sex-for-money ads" (1-ER-104), even though the Court had previously

---

[5]   Additionally, the Court had previously acquitted charges relating to those same funds three times, including the transfer to Hungary, because those funds and that transaction were also charged under Section 1957.  (2-ER-334-335 (acquitting Lacey of Counts 88-92, 94-98, and 99 because the government had not established at least $10,000 of proceeds "beyond mere speculation").)  But the Court said the prior acquittals involving the same funds had no bearing on applying the loss table to Count 100's funds.  (1-ER-196.)  Further, the Court would not apply the new Guideline on acquitted conduct because it would not be in effect for two months. (1-ER-149.)

ruled that the government, itself, had not traced any of the funds to particular Travel Act violations (charged or uncharged) (2-ER-334-335), the government had not proven proceeds "beyond mere speculation," (*id*.), and no SUA (*i.e.* Travel Act violations) was proven during the time Backpage generated the funds at issue (2-ER-318-319). Moreover, this justification—knowledge of illegality—was impossible to square with the Court's finding the same day that Lacey had a "***bona fide held belief that what [he was] doing was not illegal***." (1-ER-110 (emphasis added).)

The Court ruled that the funds that Lacey transferred to Hungary were "illegal proceeds" because of "[a]ll of those Travel Act violations that your colleagues were convicted of." (1-ER-106.) But this finding was incompatible with the actual convictions, which related to ads published years earlier, between September 2013 and February 2015 (and which generated, at most, a few hundred dollars of revenue). (2-ER-411-420.) Moreover, the Court had already ruled that, at the time when the funds at issue were generated (December 2015 to August 2016), no Travel Act violations were proven. (2-ER-318-319; 1-ER-151.)

Finally, the Court said that the sentence took "into consideration the[] views" of the victims who testified at sentencing. (1-ER-107.) But this justification violated the own Court's ruling, made just the day before, that victims would not be considered at Lacey's sentencing. (1-ER-194-196.)

47

The District Court denied bail pending appeal. The Court found that neither Lacey nor his co-Defendants presented any "substantial issues" for appeal. (1-ER-131-132.) This ruling was surprising because the Court had previously found the exact opposite: "[T]here are substantial issues that have to be considered by the Ninth Circuit" that "may change the complexity" of the case. (5-ER-1295.) The Court gave Lacey two weeks to self-surrender. (1-ER-133.)

On September 3, 2024, Lacey timely filed his notice of appeal. (28-ER-8015-8017.) On September 11, 2024, Lacey self-surrendered and began serving his sentence. (29-ER-8204.) On November 21, 2024, this Court granted Lacey bail pending appeal. (Doc. 36.)

## SUMMARY OF ARGUMENT

This Court should vacate Lacey's sole count of conviction for international concealment money laundering. There are no cases from this Circuit or elsewhere upholding a conviction when the record shows that there was: (1) no concealment of any of the attributes of the funds, but instead, full disclosure; (2) no intent to conceal, but instead an expressed intent to reveal, both before and after the charged transaction occurred; (3) no proceeds proven; (4) no tracing of proceeds to the transaction at issue; and (5) no knowledge that the funds at issue were proceeds.

For an international concealment money laundering conviction, the government must prove beyond a reasonable doubt that the defendant transmitted

"funds from a place in the United States to…a place outside the United States…knowing that the…funds involved…represent the proceeds of some form of unlawful activity and knowing that such…transmission…is designed in whole or in part…to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [SUA]." 18 U.S.C. § 1956(a)(2)(B)(i).

In the lead case on international concealment money laundering, *Cuellar v. United States*, 553 U.S. 550 (2008), the Supreme Court reversed the defendant's conviction and provided baseline rules for such charges. *See id*. at 561-68. First, the "critical" movement of funds is the movement of funds from inside the United States to a foreign country. *Id*. at 562. Second, the Court defined the term "designed" to mean "purpose or plan, *i.e.* the intended aim of the transportation." *Id*. at 563. Third, in his concurrence, Justice Alito explained that the focus is whether the international movement of funds concealed attributes of the funds *from the government*, meaning "it would have been harder for *law enforcement authorities in this country*" to ascertain the attributes of the funds. *See id*. at 569 (Alito, J., concurring (emphasis added)).

Against this backdrop, Lacey never should have been charged. If his conviction stands, then any person who hires multiple lawyers, talks openly with bankers, holds funds in accounts in their own name, and discloses attributes of funds

to the government through tax filings and FBARs can be charged with concealment money laundering. For good reason, no court has ever endorsed such a charge.

## ARGUMENT

**I.   None of the attributes of the funds were concealed from the government.**

The "[e]vidence of concealment must be ***substantial***." *E.g., United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006). In contrast, this appeal asks a remarkable question: Whether a transaction involving ***no concealment whatsoever*** is chargeable under Section 1956? Clearly, the answer is no.

There is no known opinion that has ever upheld a concealment money laundering conviction when there was no concealment. Instead, every court that has addressed the issue has rejected the idea that money spending, alone, is chargeable. *See United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009) ("Money laundering requires more than simply writing a check with the proceeds….[Section] 1956 is not a 'money spending statute.'"); *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute…has no application to the transparent division or deposit of…proceeds."); *United States v. Olaniyi-Oke*, 199 F.3d 767, 771 (5th Cir. 1999) ("Money spending is not criminal."); *United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998) ("[T]he money laundering statute may not be so broadly construed that it becomes a 'money spending statute.'").

Here, everything was ***disclosed to the government***. The government knew the source and nature the funds because corporate and stockholder tax filings disclosed that the funds originated from Backpage. (45-ER-12856; 53-ER-15082; 25-ER-7173; 53-ER-15082.) Thai, the government's expert, then followed the flow of the funds with ease from Backpage and its affiliates all the way to the bank accounts of the individual Defendants, including Lacey, with all those accounts properly identifying the Defendants as the account holders or beneficiaries. (45-ER-12959-46-ER-12963; 25-ER-7138-7171.) On this basis, alone, this Court must vacate every concealment money laundering conviction in this case. *See, e.g.*, *Johnson*, 440 F.3d at 1290-94 (vacating five convictions because defendant's transfers from accounts he or his company controlled to his mother's bank account in Luxembourg "were simple and straightforward banking transactions, easily discovered through a cursory review" of bank records).

Importantly, Lacey's sole count of conviction included ***yet another level of disclosure to the government***—the timely filing of the FBARs, which disclosed the amount, location, and U.S. owner of the funds located in Hungary (28-ER-7983-7997)—funds that the government already knew originated from Backpage. Through these disclosures (corporate and stockholder tax filings, and the FBARs), ***Lacey told the government*** that his funds derived from Backpage and exactly how much and where those funds were.

51

**II.** **There was no proof of intent to conceal.**

    **A.** **The use of bank accounts with actual names is incompatible with an intent to conceal.**

Lacey and his co-Defendants transferred their funds to and from bank accounts bearing the actual corporate or individual names of the account holders (45-ER-12959-46-ER-12963; 25-ER-7138-7171)—actions incompatible with an intent to conceal. Courts have repeatedly held that the transfer of funds into accounts held in the name of a defendant defeats any claim of an intent to conceal. *See United States v. Esterman*, 324 F.3d 565, 571 (7th Cir. 2003) (vacating four convictions and concluding that the "government's proof" of concealment "fell short" because all the defendant did was "simply ma[ke] deposits into other bank accounts that were correctly identified"); *United States v. Enbry,* 644 F. App'x 565, 570 (6th Cir. 2016) (recognizing that there was no proof of "a ploy to disguise the nature, location, source, ownership, or control of the proceeds" when the defendant's "name was on the account"). Similarly, in *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), the Sixth Circuit vacated nine concealment money laundering convictions because defendant's issuance of checks from his company's bank account made payable to himself, to cash, or to his mortgage lender—which were easy to trace—did "not evidence a design to conceal the proceeds." *Id*. at 528.

Moreover, as the District Court recognized, Thai, the "Government's expert," "testified that he could follow the trail of funds with…ease" (2-ER-331; 45-ER-

12959), which is an additional ground to vacate every concealment money laundering conviction in this case. *See Esterman*, 324 F.3d at 572 (reversing convictions where "prosecutors easily traced [defendant's] transfers from one account to the other"). Indeed, the D.C. Circuit has vacated concealment money laundering charges because:

> An observer who reads the endorsement on the initial check and studies the names and numbers on the subsequent deposit slips and checks could discern the money trail with ease. ***The record has no suggestion that the prosecutors and law enforcement agents had any difficulty doing so.***

*Adefehinti*, 510 F.3d at 323-24 (emphasis added).

The record makes it clear that neither Lacey nor any defendant was hiding his money—instead, they openly and conspicuously disclosed their relationship to their funds to the government and the world. To sustain their convictions would far exceed the bounds of Section 1956.

## B. Lacey's stated intent to disclose and actual disclosure to the government was incompatible with an intent to conceal.

This conviction is the only known case where a defendant stated his intent to disclose to more than one person (before and after the charged transaction), and then filed a disclosure with the government, but, nonetheless, was somehow charged and convicted of intending to conceal that same information from the government. Unsurprisingly, the courts that have addressed disclosures to the government (of a

much lesser quality than what was done here) have uniformly ruled that a defendant's disclosure of his relationship with proceeds (or an asset obtained with proceeds) in a filing or record is incompatible with an intent to conceal. *See*, *e.g.*, *Rockelman*, 49 F.3d at 422.

In *Rockelman*, the Eighth Circuit reversed a conviction for concealment money laundering on a factual record akin to this record. There, Rockelman purchased a cabin with cash from his drug trafficking. *See id.* at 422. He put title in the name of his company, his ownership of the company was a matter of public record, and "the bills of sale transferring the cabin first to Rockelman's company and then from the company to [his nephew] were on file at the county courthouse." *Id*. The Court found "Rockelman's conspicuous connection with the property" as documented in public records to be incompatible with an intent to conceal, ruling that the "[a]pplication of the money laundering statute to these facts would turn the money laundering statute into a money spending statute," which Congress never intended. *Id*. (quotations omitted).

In this case, Lacey's words and actions are incompatible with an intent to conceal. Both before and after the transfer to Hungary, Lacey expressed an intent to reveal attributes of the funds through payment of taxes and filing the required FBAR with the Treasury Department. (24-ER-6707; 44-ER-12582.) Just a few weeks after the transaction, he wrote to his attorney asking "***who is reporting to govt?***" (24-ER-

54

6706 (emphasis added).) Then, Lacey timely submitted to the government his initial FBAR and all subsequent FBARs. (28-ER-7983-7997.) Moreover, as discussed above, the FBAR was a disclosure on top of corporate and stockholder tax returns reporting Backpage as the source of the funds, as well as the transparent transfer of the funds between accounts in which Lacey was the owner or beneficiary.

Under these circumstances, this Court must vacate Lacey's conviction. *See Rockelman*, 49 F.3d at 422; *United States v. Stephenson*, 183 F.3d 110, 120-21 (2d. Cir. 1999) (reversing conviction because the title of the car that defendant purchased with proceeds was put in his name and this type of "open and notorious" purchase, as documented in a public record, was incompatible with an intent to conceal); *United States v. Gotti*, 457 F. Supp. 2d 411, 428 (S.D.N.Y. 2006) ("[I]t strains credulity for the Government to suggest that Gotti is somehow attempting to conceal" the source of the funds when the funds were obtained from the sale of a home and Gotti had previously admitted, as part of plea in a prior case, that the home was purchased with proceeds).

In sum, no court has recognized an intent to conceal under circumstances such as these. Doing so here would criminalize any transfer of funds regardless of the defendant's stated intent and actions. Congress did not intend Section 1956 to be weaponized this way. *See, e.g.*, *Rockelman*, 49 F.3d at 422.

### C.	The only proof of Lacey's purpose for the transfer was to stabilize his banking and establish a trust for his sons.

There is no proof that Lacey transferred the funds for the purpose of concealing the attributes of the funds from the government.  Thai, the government's only witness who testified about the transfer, admitted that he did not know the purpose of the transfer.  (45-ER-12929, 12938.)  In contrast, Becker testified that his "client's motivation" for forming and funding the Hungarian trust was "to place his monies in an account that won't be closed."  (49-ER-14018.)  The funds were placed in a trust with Lacey's sons as beneficiaries as part of Lacey's ongoing estate planning.  (49-ER-13964.)  This international transfer was necessary because law enforcement officers had visited Lacey's banks, banks had closed Lacey's accounts, Lacey had five annuities due for distribution, and Becker was concerned Lacey did not have a domestic bank that would accept deposit of the funds.  (49-ER-13967.)

Lacey's motivation was corroborated by his own words.  Lacey said that he sought to place his funds in an account at a bank where law enforcement could not interfere with his ability to access banking services.  (24-ER-6707; 44-ER-12582.)  Although the government has consistently claimed that these statements reflected an intent to conceal, the record belies this claim.  The intent to prevent the government from interfering with one's ability to access banking services is entirely different from an intent to *conceal* one's banking altogether from the government.  More importantly, even if this partial statement could somehow be twisted into an intent

to conceal, the full statement defeats any such attribution. In the same breath, Lacey expressed his intent to disclose the transaction to the government through the filing of tax returns, he said he had accountants at the ready to file those tax returns (44-ER-12582; 24-ER-6707), and he timely filed the required disclosure, including a letter indicating that no taxes were due. (28-ER-1983-7997; 7953.) Indeed, Howard, the bank employee who interacted with Lacey, testified that she did not understand Lacey to be asking for help concealing "anything" from the government. (44-ER-12593.) That is because, as even the Court came to understand, Lacey never thought that what he was doing was illegal. (1-ER-110.)

## III. There are no proceeds.

The government failed to establish that the funds at issue in the money laundering counts (more than $30 million), including the $16.5 million at issue in Count 100, were the proceeds of SUA. As a result, this Court must vacate Count 100, as well as every other money laundering conviction. *See United States v. Lichtenberg*, 309 F. App'x 107, 109 (9th Cir. 2009).

### A. The First Amendment required the tracing of publishing revenue to the publication of ads outside of the protections of the First Amendment and in violation of the Travel Act, which did not occur.

It is undisputed that the funds in this case were generated from Backpage's publication of third-party speech. (25-ER-7172.) Unlike funds generated from drug trafficking—an economic activity that is always illegal—the funds at issue in this case are revenue generated from an economic activity that is presumed to be lawful.

57

*Bursey*, 466 F.2d at 1081-82. As a result, the funds in the money laundering counts could not be claimed to be "proceeds" of SUA unless the government: (i) traced the funds to Backpage's publication of specific instances of speech that were proven to be outside the protections of the First Amendment; (ii) that also were Travel Act violations, meaning instances of the one alleged SUA in this case; and (iii) the amount of funds generated by such ads.

As this Court has recognized, "[a]ll speech, press, and associational relationships are presumptively protected by the First Amendment." *Bursey*, 466 F.2d at 1081-82; *accord Playboy*, 529 U.S. at 817. When the government claims that speech falls outside the First Amendment, "the burden rests on the Government to establish that the particular expressions…are outside [the First Amendment's] reach." *Bursey*, 466 F.2d at 1081-82. Indeed, it is always the case that the "the Government bears the burden of proving the constitutionality of its actions." *Playboy*, 529 U.S. at 816; *see id*. at 818 ("When First Amendment compliance is the point to be proved, the risk of non-persuasion—operative in all trials—must rest with the Government, not with the citizen.").

The Supreme Court has made it clear that "anecdotal evidence" and "conclusory statements" are insufficient as a matter of law. *See Playboy*, 529 U.S. at 819-20 (holding that "the Government must present more than anecdote and supposition"); *Sable Comms. of Cal. v. F.C.C.*, 492 U.S. 115, 129-30 (1989) (holding

that "conclusory statements" about the risk of minors accessing "dial-a-porn" messaging was insufficient to support government restriction on phone sex services).

Instead, the First Amendment requires a "careful assessment" of the government's proof. *Playboy*, 529 U.S. at 819. For example, in *Playboy*, the Supreme Court held that a few dozen instances of minors exposed to pornography on television due to signal bleed was insufficient proof for the bald claim that "39 million homes with 29.5 million children had the potential to be exposed" to pornography on television. *See id*. at 820 ("The Government presented no evidence on the number of households actually exposed to signal bleed and thus has not quantified the actual extent of the problem of signal bleed.").

In this case, the government utterly failed to meet its burden.

First, the record in this case makes it impossible to know whether the funds in the money laundering counts were generated by publishing instances of speech that fell outside the protections of the First Amendment or not. Backpage earned millions of dollars from ads published in non-adult categories, like "automotive," "jobs," "rentals," "musician," and "real estate," and non-controversial adult categories like "striptease," or "phone sex." (25-ER-7172.) Further, Backpage earned revenues from ads published to the Australian website Crackr, where prostitution is legal, which means that, even if an ad was for prostitution, it was not for illegal prostitution. The government made no attempt to prove that any of the ads in these

categories fell outside the protections of the First Amendment, which means that none of the revenue associated with the ads could possibly have been designated as "proceeds" of SUA.

Although the government claimed that **all** ads published to the escort, dating, and massage categories fell outside the protection of the First Amendment because those ads were, in reality, for illegal prostitution, its proof was "anecdotal" and "conclusory" at best, which was insufficient as a matter of law. *Playboy*, 529 U.S. at 819-20. At trial, Ferrer was shown a couple dozen ads from these categories. He made the "educated guess" that those ads were for illegal prostitution. (40-ER-11261-11262.) That "educated guess" was then used as a springboard to claim that millions of ads—***ads that neither Ferrer nor the jury had ever seen***—were for illegal prostitution. Because Ferrer never saw those millions of "particular expressions," there is no proof that the ads or the act of publishing them fell outside the protections of the First Amendment. Moreover, the government failed to overcome the presumption even with respect to the couple dozen ads Ferrer did review and testify about at trial. There is no case that allows the government to overcome the presumption based on "guesses," educated or otherwise. Consequently, because the government failed to provide proof that millions of adult ads fell outside the protections of the First Amendment, none of the revenue earned from publishing those ads can be designated as "proceeds."

60

Second, even if the government had established instances of speech that fell outside the protections of the First Amendment that also constituted Travel Act violations, there was no proof that any of the funds in the money laundering counts were generated by publishing those "particular expressions." Critically, even if this Court credits Ferrer's "educated guesses" as sufficient to establish Spear's Travel Act violations, the ads associated with those convictions generated approximately $175.00 in revenue for Backpage. Yet, Thai admitted that he did not trace that revenue, or any of the $33 million subject to the money laundering convictions (including Lacey's $16.5 million transferred to Hungary) *to any ads*, let alone the ads associated with Spear's convictions.

Notably, in acquitting all Section 1957 charges, the District Court recognized the government's failure to trace any funds to ads whose publication was outside the protections of the First Amendment and constituted Travel Act violations (2-ER-334-335), but nonetheless upheld the Section 1956 convictions at issue in this appeal on the basis that the jury could "infer" that the more than $30 million at issue in those counts was proceeds. (2-ER-323.) If the jury actually "infer[red]" more than $30 million in criminal proceeds from the $175.00 in revenues associated with Spear's Travel Act convictions, then both the jury and the District Court ignored the First Amendment's requirement that all speech must be presumed lawful unless and until the government proves that *specific instances* of speech are not.

61

For all these reasons, the government failed to establish that the funds in the money laundering counts were "proceeds" of SUA. There is no known case that allows the government to bypass fundamental First Amendment principles as was permitted here.

**B.    There are no proceeds because no Travel Act violations were proven at the time Backpage generated the funds.**

There is a second, independent basis for vacating all the money laundering convictions—no proof of Travel Act violations during the time that the website generated the funds at issue in the money laundering counts. The District Court ruled that the conspiracy to violate the Travel Act ended at the sale of Backpage to Ferrer in April 2015, and that no Travel Act violations were proven after that sale. (2-ER-318-319; 1-ER-151.) Critically, the funds in each of the money laundering convictions were revenue generated from ads published ***after the sale*** (December 2015-August 2016) (25-ER-7171), meaning the time when no Travel Act violations whatsoever were proven (2-ER-318-319; 1-ER-151). Because no Travel Act violations were proven at the time that these funds were generated, and the conspiracy ended roughly a year before, there is no basis to find that the funds were "proceeds" of Travel Act violations. Consequently, Lacey's Count 100, as well as all money laundering convictions, must be vacated. *See, e.g.*, *Lichtenberg*, 309 F. App'x at 109 (vacating money laundering convictions because there was no proof that the funds were proceeds).

**IV.  There was no proof that Lacey knew that the funds were proceeds.**

There also is insufficient proof that Lacey knew that the funds were proceeds of crime.  Because no Travel Act violations were proven at the time that the funds were generated in 2016 (2-ER-318-319), Lacey could not possibly have had knowledge that his funds were proceeds of Travel Act violations.  Lacey's lack of knowledge is yet another basis to vacate his 100 conviction.

Moreover, the entire case against Lacey was "notice" liability—a theory of liability that is incompatible with the First Amendment and criminal law *mens rea* principles.  (Spear Br. 38-80.)  Indeed, Lacey was not involved with Backpage's operations or growth strategies because he was purposefully segregated a "layer away" from all business-side activities of VVMH, including Backpage.  (28-ER-8012.)  He had no contact with any advertisers or any advance knowledge of any particular ad.  No witness or exhibit established otherwise.  In the absence of such proof, the District Court expressly relied on "notice" liability as the basis for both denying Lacey's Rule 29 motion and justifying his sentence.  (2-ER-301-302, 309-310; 1-ER-104, 110.)  But even if "notice" liability was chargeable, the Court's own finding defeats criminal intent under even that flawed theory of liability as the Court recognized that Lacey held a "bona fide held belief that what [he was] doing was not illegal."  (1-ER-110.)

**V.     Erroneous evidentiary rulings deprived Appellants of a fair trial.**

There were several erroneous evidentiary rulings, any one of which, on its own, deprived Appellants of a fair trial.  In light of the fact that the government intends to retry Lacey on his hung counts (29-ER-8189), clear guidance from this Court is critical.  Moreover, to the extent that any conviction survives the Appellants' other challenges, it should be reversed because the overall effect of these cumulative errors was unduly prejudicial.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

**A.     Certain evidentiary rulings rose to the level of constitutional error.**

This Court conducts *de novo* review of whether a district court's evidentiary rulings violated a defendant's constitutional rights.  *See United States v. Bahamonde*, 445 F.3d 1225, 1228 n.2 (9th Cir. 2006).  Two categories of rulings rose to the level of constitutional errors.

First, Lacey was precluded from testifying or presenting any evidence about the very statements and documents he relied upon when making his subjective determination about the lawfulness of Backpage's operations.  He was precluded from doing so even when the government opened the door.  As a result, the jury was "provided a one-sided picture of" Lacey that was unduly prejudicial.  *See United States v. Waters*, 627 F.3d 345, 357 (9th Cir. 2010).  Indeed, in the zeal to prevent any reference to prior litigation, the Court banned Lacey's counsel from asking

64

Ferrer about an admitted exhibit that accused Lacey of being a lawbreaker, simply because Sheriff Arpaio had made the hearsay accusation. The preclusion of good faith evidence, including questioning of Ferrer, also violated Lacey's rights under the Due Process and Confrontation Clauses. (Brunst Br. 51-62.)

Second, as discussed above, Ferrer was allowed to opine that millions of instances of speech that neither he nor the jury had ever seen, fell outside the protections of the First Amendment, which violated the First Amendment. (*See supra* Argument III.A.)

### B. Other categories of rulings were an abuse of discretion.

This Court reviews "for an abuse of discretion whether the district court erred by admitting or excluding evidence." *Bahamonde*, 445 F.3d 1225 at 1228 n.2.

### 1. The admission of speculative testimony was an abuse of discretion.

The District Court abused its discretion in admitting evidence and testimony for which there was no foundational knowledge whatsoever in violation of F.R.E. 602. For example, Ferrer was allowed to testify about private email exchanges between Lacey and his ex-wife, his lawyer, and a journalist without any personal knowledge about those communications. (37-ER-10367-68, 10393; 38-ER-10835.)[6]

---

[6] There is a second, independent reason that the admission of these emails was an abuse of discretion. The judge admitted them as coconspirator admissions (37-ER-10379-10385), but they ***did not include any statements in furtherance of a***

Ferrer was allowed to speculate about things for which he had no knowledge—like his opinions about ads he had never seen, his opinion that photographs in ads were taken in hotels, and his opinion on what the words that someone else had written meant (35-ER-9691-9692, 9798-9799; 38-ER-10657-10658), even though the Court had excluded similar evidence as "speculation" (35-ER-9692). Clearly, Ferrer's testimony did not satisfy the personal-knowledge requirement of F.R.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Moreover, the District Court allowed Ferrer's opinions about ads on the grounds that the government had sufficiently established that Ferrer knew what prostitution ads "looked like" (35-ER-9866), but speech does not lose its

---

*purported conspiracy*. None of Lacey's statements "induce[d] [the recipient] to join the conspiracy" or "assist[ed] the conspirators in achieving their objectives". *United States v. Eubanks*, 591 F.2d 513, 520-21 (9th Cir. 1979). Consequently, the District Court abused its discretion in admitting them. *See id.* Because the government's case against Lacey was so "attenuated" (2-ER-301), in that there was no basis for a "direct theory of liability for any of the Travel Act charges brought against [Lacey]" (2-ER-309), these rulings were highly prejudicial to Lacey.

In fact, the District Court cited one of these emails—in which Lacey discussed his support for the political movement to decriminalize prostitution—as a basis for denial of his Rule 29 motion. (2-ER-309.) Notably, this Court has expressed "discomfort" with the idea that a defendant's views about a movement would be admitted as probative of the defendant's participation in a crime. *See Waters*, 627 F.3d at 354-55. In any event, if the judge relied on this improperly admitted exhibit as proof of knowledge, there is no reason to think that the jury did otherwise.

constitutional protections because it "looks like" unprotected speech, *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("Protected speech does not become unprotected merely because it resembles the latter.").

### 2. The admission of child-sex trafficking evidence was an abuse of discretion.

Prejudice was built into the trial with the continuous admission of child-sex trafficking evidence, even though this Court had understood that such evidence would be excluded. Here, no Defendant faced sex-trafficking charges, which meant that this evidence was irrelevant under F.R.E. 401. Further, there is no allegation more prejudicial than an allegation of child sex abuse. *See Kennedy v. Louisiana*, 554 U.S. 407, 567 (2008) (Alito, J., dissenting) (recognizing that, "in the eyes of ordinary Americans…child rapists…are the epitome of moral depravity."). The nonstop admission of this irrelevant and unduly prejudicial evidence violated F.R.E. 403 and deprived Defendants of a fair trial. *See United States v. Bradley*, 5 F.3d 1317, 1319-22 (9th Cir. 1993) (reversing conspiracy to kill witness conviction because the government's presentation of an uncharged murder was "highly and unfairly prejudicial").

### 3. The admission of notice evidence was an abuse of discretion.

The admission of so-called "notice" evidence was an abuse of discretion. "Notice" is not relevant to the specific intent the government was required to prove concerning Appellants' publication of third-party speech. (Spear Br. 38-80.) The

67

Court even allowed parties, including unidentified parties posting anonymously on www.change.org, to accuse the Defendants of violating federal law (25-ER-7104-7106, 7117-7119)—the precise legal conclusion to be determined by the jury—even though it is well-settled that even credentialed experts "cannot give an opinion as to…an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008) (affirming exclusion of report that included "legal conclusions"). These unduly prejudicial exhibits were admitted regardless of whether there was any proof that Lacey had ever seen them.

The Court appeared to be confused by its own limitations on the evidence. For example, the Court allowed the government to admit two AIM Group reports (26-ER-7183-7186) "not…for the truth of the content," but then allowed the government to question Ferrer about "the accuracy" of the reports, over objections that the reports were being used for their truth (35-ER-9887-9892.) The same was true of the NAAG letters accusing Backpage of publishing ads for prostitution and child-sex trafficking. The Court allowed one such letter because it was "not offered for the truth" (35-ER-9910), but then moments later, stated that the document was relevant to "the knowledge of certain defendants *as to what was going on on Backpage*" (35-ER-9919 (emphasis added)). If even a seasoned jurist struggled to apply her own evidentiary rulings consistently, surely the jury was confused. As a

68

result, voluminous inadmissible and prejudicial hearsay evidence ostensibly offered for knowledge or notice was considered for its truth.

### C. These cumulative errors deprived Defendants of a fair trial.

Although any one of the errors discussed above was an abuse of discretion, the cumulative errors in this complex, multi-defendant trial constituted reversible error. As this Court has recognized, "the cumulative effect of errors may support reversal," especially in "cases where the government's case is weak." *United States v. Lloyd*, 807 F.3d 1128, 1168 (9th Cir. 2015). Here, the case against Lacey was "attenuated" (2-ER-301-302), at best. The erroneous rulings were incredibly prejudicial for the above-stated reasons. The record supports a finding that the jury was "swayed by the error[s]," *id*. at 1170, because even the Court misapplied its own limitations on the evidence. Under these circumstances, the cumulative errors were not harmless. *Id*. at 1169-70 (reversing convictions for cumulative error in complex multi-defendant case); *Frederick*, 78 F.3d at 1381 (reversing for cumulative errors when "the evidence against the defendant was not overwhelming").

## VI. Lacey joins in co-Appellants' issues raised on appeal.

Lacey joins in his co-Appellants issues raised on appeal (with the exception of Brunst Issue Seven) because those issues apply with equal force to Lacey. Lacey incorporates their briefs by reference as if fully stated herein.

## **CONCLUSION**

For all these reasons, Lacey respectfully requests that this Court vacate his conviction and order the District Court to enter an order of acquittal. Every court that has addressed concealment charges involving transparent money spending, bank accounts titled in a defendant's name (or the name of a defendant's corporation), or disclosures to the government has ruled that any one of those facts, alone, is fatal to concealment money laundering charges. This case involves all of that, plus something more—the defendant's own words—in which he repeatedly expressed an intent to pay taxes and file government disclosure forms, both before and after the transaction at issue—as well as a defendant who followed through and timely filed the disclosure forms. This conviction, which is an anomaly under the law, never should have been charged, and should be acquitted.

In addition to these shortcomings, there is nothing in the record to establish that the funds at issue were proceeds of SUA because the government failed to overcome the First Amendment presumption, made no effort to trace the funds to SUA, and, in fact, as the District Court recognized, established no SUA at the time that Backpage generated the funds at issue.

Finally, to the extent that this concealment money laundering conviction (with no concealment and no proceeds) is not vacated, Count 100 should be reversed. The

District Court's shifting and patently flawed evidentiary rulings distorted the evidence to such a degree that there can be no confidence in the jury's verdict.

Dated: June 10, 2025        **MAURICE WUTSCHER LLP**

By: /s/ Erin McCampbell Paris
Erin McCampbell Paris

*Attorneys for Defendant-Appellant*
*Michael Lacey*

## **CERTIFICATE OF RELATED CASES**

To the best of Appellant's knowledge, the following related cases are pending before this Court: *United States v. John Brunst*, 24-5374; *United States v. Scott Spear*, 24-5375. Appellant is aware of no other pending, related cases.

Dated: June 10, 2025        **MAURICE WUTSCHER LLP**

By: /s/ Erin McCampbell Paris
Erin McCampbell Paris

*Attorneys for Defendant-Appellant*
*Michael Lacey*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5374, 24-5375, 24-5376

I am the attorney or self-represented party.

**This brief contains** | 15,781 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Erin McCampbell Paris | **Date** | June 10, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      73      *Rev. 12/01/22*