CA NO. 24-5374, 24-5375, 24-5376

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | DC NO. 2:18-cr-00422-DJH |
| Plaintiff-Appellee, | |
| v. | |
| JOHN BRUNST, SCOTT SPEAR, and MICHAEL LACEY, | |
| Defendants-Appellants. | |

**BRIEF OF THE FEDERAL PUBLIC DEFENDER FOR THE CENTRAL DISTRICT OF CALIFORNIA AND THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS ("NACDL") AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ARIZONA

HONORABLE DIANE J. HUMETAWA
United States District Judge

DONALD M. FALK
Schaerr Jaffe LLP
Four Embarcadero Center,
 Suite 1400
San Francisco, California 94111
Telephone: (415) 562-4942
Email: dfalk@schaerr-jaffe.com


Attorneys for NACDL

CUAUHTEMOC ORTEGA
Federal Public Defender
MARGARET A. FARRAND
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Email: Margaret_Farrand@fd.org

Attorneys for Amici Curiae

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.................................................................1

II.   THE SUPREME COURT'S RECENT RESISTANCE AGAINST
FEDERAL OVERPROSECUTION.................................5

    A.    The Supreme Court has Narrowly Construed Criminal
        Statutes to Require a Culpable Mens Rea.............................5

        1.   *Rehaif v. United States*, 588 U.S. 225 (2019): the
               federal felon-in-possession statute requires
               knowledge of the facts making the possession
               unlawful ........................................................................6

        2.   *Ruan v. United States*, 597 U.S. 450 (2022): the
               federal drug statute requires knowledge of the
               activity's unauthorized nature ....................................7

    B.    The Supreme Court has Narrowly Construed Criminal
        Statutes to Respect States' Enforcement Prerogatives
        and the First Amendment.......................................................8

        1.   *Counterman v. Colorado*, 600 U.S. 66 (2023): a
               threats statute requires at least a recklessness
               mens rea ........................................................................8

        2.   *United States v. Hansen*, 599 U.S. 762 (2023):
               "encourag[ing]" or "induc[ing]" narrowly
               incorporates common-law aiding and abetting .............9

        3.   *Snyder v. United States*, 603 U.S. 1 (2024): a federal
               gratuities statute covers only quid pro quo bribery ....11

        4.   *Fischer v. United States*, 603 U.S. 480 (2024): a
               federal obstruction statute covers only interference
               with evidence...............................................................12

# TABLE OF CONTENTS

**Page**

C.    The Supreme Court has Narrowly Construed Criminal Statutes to Avoid Open-Ended Liability Untethered to Historical Context ................................................................ 13

    1.    *Dubin v. United States*, 599 U.S. 110 (2023): the federal aggravated identity theft statute covers only uses "at the crux" of an underlying offense ................ 14

    2.    *Ciminelli v. United States*, 598 U.S. 306 (2023): the federal wire fraud statute does not cover deprivation of economically valuable information ...... 15

    3.    *Percoco v. United States*, 598 U.S. 319 (2023): federal honest services fraud does not cover any defendant who controls government officials .............. 16

III.    THE GOVERNMENT'S ATTEMPT TO DILUTE LONG-STANDING LIMITS ON TRAVEL ACT LIABILITY SHOULD BE REJECTED ............................................................ 16

A.    The Government's Interpretation of the Travel Act Would Contravene *Rehaif* and *Ruan* by Diluting the Culpable Mens Rea Aiding and Abetting Has Always Required ........ 17

    1.    Common-law aiding and abetting requires knowledge of the nature of the facilitated act ............. 18

    2.    The Travel Act incorporates common-law aiding and abetting doctrine's knowledge requirement ......... 20

    3.    The government's expansive interpretation would contravene congressional intent and common-law requirements for aiding and abetting .......................... 23

B.    The Government's Interpretation Would Impinge on States' Enforcement Prerogatives and Protected Speech .... 26

# TABLE OF CONTENTS

**Page**

    C.    The Government's Interpretation Would Create Open-Ended Liability Untethered to Historical Context..............30

IV. CONCLUSION .................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ...................................................................... 28

*Astoria Fed. Savings & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991) ...................................................................... 21

*Ciminelli v. United States,*
    598 U.S. 306 (2023) ................................................................. 15, 16

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ............................................................... 8, 9, 29

*Dubin v. United States,*
    599 U.S. 110 (2023) ................................................................. 14, 33

*Fischer v. United States,*
    603 U.S. 480 (2024) ................................................................. 12, 13

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009) ........................................................................ 5

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ................................................. 22, 24

*Liparota v. United States,*
    471 U.S. 419 (1985) ..................................................................... 5, 6

*M'Culloch v. Maryland,*
    17 U.S. 316 (1819) ........................................................................ 27

*McNally v. United States,*
    483 U.S. 350 (1987) ...................................................................... 15

*Morissette v. United States,*
    342 U.S. 246 (1952) ........................................................................ 5

*Percoco v. United States,*
    598 U.S. 319 (2023) ...................................................................... 16

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Rehaif v. United States,*
  588 U.S. 225 (2019) ................................................................. 5, 6, 23

*Rewis v. United States,*
  401 U.S. 808 (1971) ........................................................................ 27

*Rosemond v. United States,*
  572 U.S. 65 (2014) ............................................................... 18, 19, 20

*Ruan v. United States,*
  597 U.S. 450 (2022) ...................................................................... 5, 7

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
  604 U.S. ___; 2025 WL 1583281 (June 5, 2025) ........................ *passim*

*Snyder v. United States,*
  603 U.S. 1 (2024) ................................................................ 11, 12, 31

*Standefer v. United States,*
  447 U.S. 10 (1980) ........................................................................ 19

*Staples v. United States,*
  511 U.S. 600 (1994) ......................................................................... 5

*Twitter v. Taamneh,*
  598 U.S. 471 (2023) .................................................................. 22, 24

*United States v. Gibson Specialty Co.,*
  507 F.2d 446 (9th Cir. 1974) ....................................................... 2, 28

*United States v. Greer,*
  467 F.2d 1064 (7th Cir. 1972) ........................................................ 25

*United States v. Hansen,*
  599 U.S. 762 (2023) ................................................................. *passim*

*United States v. Lopez,*
  514 U.S. 549 (1995) ........................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Peoni,*
  100 F.2d 401 (2d Cir. 1938) ........................................................ 26, 32

*United States v. Wander,*
  601 F.2d 1251 (3d Cir. 1979) .............................................................. 27

*United States v. X-Citement Video, Inc.,*
  513 U.S. 64 (1994) ................................................................................. 5

*Woodhull Freedom Foundation v. United States,*
  72 F.4th 1286 (D.C. Cir. 2023) ......................................................... 20

**State Cases**

*People v. Mendoza,*
  18 Cal. 4th 1114 (1998) ...................................................................... 26

*Price v. United States,*
  985 A.2d 434 (D.C. Ct. App. 2009) ................................................... 26

*Smith v. State,*
  719 N.E. 2d 1289 (Ind. Ct. App. 1999) ............................................ 26

**United States Constitution and Federal Statutes**

U.S. CONST. amend. I ................................................................... *passim*

8 U.S.C. § 1324 ............................................................................... 9, 10

18 U.S.C. § 666 .................................................................................... 11

18 U.S.C. § 922 ...................................................................................... 6

18 U.S.C. § 1028A ............................................................................... 14

18 U.S.C. § 1343 ................................................................................. 15

18 U.S.C. § 1346 ........................................................................... 15, 16

18 U.S.C. § 1512 ........................................................................... 12, 13

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 1952 ............................................................... 2

21 U.S.C. § 841 ............................................................... 7

**Miscellaneous Sources**

Uniform Model Penal Code § 5.02(1) ...................................... 21

Wayne R. LaFave, SUBSTANTIVE CRIMINAL LAW (Oct. 2024),
     § 11.1 .................................................................. 21

## STATEMENT OF THE INTEREST OF AMICI CURIAE AND STATEMENT OF AUTHORITY TO FILE

The Office of the Federal Public Defender for the Central District of California (FPD-CDCA) represents indigent defendants in this Court. Because it serves as the institutional defender for indigent federal defendants in the Central District of California, it has an interest in all issues of federal criminal law and procedure. The FPD-CDCA also defends clients prosecuted on theories of accomplice liability and conspiracy, and for conduct that implicates issues involving the First Amendment. The outcome and reasoning in this case will significantly affect the ability of the FPD-CDCA to defend individuals prosecuted as accomplices and conspirators, and for conduct connected to speech and expression. Accordingly, it has a strong interest in the accurate and coherent development of the law in this area.

The National Association of Criminal Defense Lawyers (NACDL) is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958 and has a nationwide membership of many thousands of direct members and up to 40,000 attorneys in affiliate organizations. NACDL is dedicated to advancing the proper, efficient, and fair administration of justice. NACDL files many amicus briefs each year in this Court and

other federal and state courts, seeking to provide assistance in cases presenting issues important to criminal defendants, criminal defense lawyers, and the criminal legal system as a whole.

FPD-CDCA and NACDL affirm that no publicly held corporation owns stock in them; no counsel for either party authored this brief in whole or in part; and no party, party's counsel, person, or other entity contributed money to preparing this brief.

All parties have consented to this brief's filing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 13, 2025          By  */s/ Margaret A. Farrand*
                              MARGARET A. FARRAND
                              Deputy Federal Public Defenders
                              Attorneys for Amici Curiae

                              DONALD M. FALK
                              Schaerr Jaffe LLP
                              Attorneys for National Association of
                              Criminal Defense Lawyers

# I.   INTRODUCTION

Over its past several terms, the Supreme Court has increasingly resisted government attempts to expand federal criminal liability beyond clear and constitutional bounds. In case after case, it has jettisoned capacious proposed constructions of federal criminal statutes in favor of narrower readings that ensure fair notice, calibrate punishment to individual culpability, and respect federalism and states' role as the primary enforcers of criminal law. To achieve those goals the Court has robustly interpreted statutes' mens rea elements to guard against overprosecution of innocent, socially beneficial, and constitutionally protected acts. Just this month, a unanimous Court continued this line of decisions when it reaffirmed that, under criminal-law "principles of aiding and abetting," "a person may be responsible for a crime he has not personally carried out" only "if he deliberately helps another to complete its commission." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 604 U.S. ___, 144 S. Ct. ___, 2025 WL 1583281, at *4, 5 (June 5, 2025) (cleaned up).

This case presents yet another attempted statutory overreach, and another federal courts should reject. As Appellant Scott Spear's

Opening Brief ably explains, the federal Travel Act requires "intent to facilitate the promotion, management, establishment, or carrying on, of" a prohibited activity—a standard that incorporates the traditional elements of common-law aiding and abetting liability. Appellant Spear's Opening Brief at 39-43 (internal quotations omitted); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); 18 U.S.C. § 1952(a). But the government urges this Court to erode that common-law aiding and abetting standard into an amorphous quasi-conspiracy test, permitting defendants to be convicted of substantive Travel Act violations—even without knowing that any particular violation will occur, or what that violation consists of—so long as they intended to facilitate a particular *type* of unlawful conduct generally: in this case, speech promoting violations of state law. It also seeks to undermine traditional limits on conspiracy doctrine by decoupling conspiracy from any discernable objective, such that defendants could be convicted of conspiring to commit hypothetical offenses in the abstract, based on third parties' criminal acts of which the defendants knew nothing. These gaping expansions of accomplice liability and conspiracy threaten to subject operators of online speech platforms, like defendants here, to

2

criminal prosecution for any state law-infringing speech third parties might post on those operators' platforms, so long as a factfinder determines the operators intended to facilitate that general type of speech.

Amici urge this Court to reject that approach. The government's open-ended legal framework would permit concepts transplanted from traditional conspiracy doctrine—including an attenuated connection between the defendant's knowledge and the third-party act—to engulf what are substantively state-law crimes, trampling both common law and state law limits on accomplice liability and depriving defendants of notice in an area touching on the First Amendment. The government's theory also vitiates conspiracy doctrine: by eliminating any requirement that conspirators intend to bring about a particular illegal act, the government's proposed rule would eviscerate due process and prevent defendants from understanding or defending against criminal charges. Those outcomes threaten precisely the dangers the Supreme Court's recent criminal jurisprudence has condemned: overprosecution of unintentional conduct, incursions into sensitive state policy choices, threats to constitutionally-protected speech, and chilling of expression.

As advocates for individuals already subject to onerous criminal liability under state and federal law for crimes involving speech and expression, amici ask this Court to reject an approach that would further extend substantial Travel Act liability to indirect actors who lack knowledge of the substantive crime.

This brief traces the Supreme Court's recent trend of avoiding overcriminalization by robustly interpreting statutory mens rea requirements and narrowly construing the elements of federal criminal statutes. These decisions fall into several categories: precedents insisting that criminal defendants possess a culpable mens rea to avoid penalizing innocent or unknowing conduct; precedents interpreting federal criminal statutes narrowly to avoid encroaching on First Amendment-protected speech or states' police power; and precedents rejecting unbounded criminal liability untethered from historical context or fair notice. The brief then situates the government's overbroad theories of facilitation and conspiracy within these precedents to illustrate how these theories, too, must be rejected to avoid expanding the criminal law beyond clear, equitable, and Constitutional bounds.

## II.  THE SUPREME COURT'S RECENT RESISTANCE AGAINST FEDERAL OVERPROSECUTION

### A.  The Supreme Court has Narrowly Construed Criminal Statutes to Require a Culpable Mens Rea

In two recent decisions—*Rehaif v. United States*, 588 U.S. 225 (2019) and *Ruan v. United States*, 597 U.S. 450 (2022)—the Supreme Court has affirmed the necessity of culpable mens rea as a means of avoiding punishing innocent or socially-desirable conduct.[1] These cases seek to avoid "sweeping interpretation[s]" that would criminalize "broad range[s] of conduct" unlimited by culpable intent, absent clear

---

[1] *See also Flores-Figueroa v. United States,* 556 U.S. 646, 652-57 (2009) (construing the federal aggravated identity theft statute to require knowledge that a means of identification belongs to another person); *Staples v. United States*, 511 U.S. 600, 619 (1994) (construing a federal statute prohibiting possession of a machine gun without proper registration to require knowledge that the weapon has the characteristics that make it a machine gun); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72-73 (1994) (construing a federal statute prohibiting possession of child sexual exploitation material to require knowledge that the subjects are minors); *Liparota v. United States*, 471 U.S. 419, 427-30 (1985) (construing a federal statutory prohibition on unlawful possession of food stamps to require the defendant's knowledge that the possession is unlawful); *Morissette v. United States*, 342 U.S. 246, 263 (1952) (construing a federal conversion statute to require intent to convert the relevant property, despite the absence of any express intent element in the provision).

Congressional directives. *Liparota v. United States*, 471 U.S. 419, 427 (1985).

### 1. *Rehaif v. United States*, 588 U.S. 225 (2019): the federal felon-in-possession statute requires knowledge of the facts making the possession unlawful

In *Rehaif*, the Court limited the federal felon-in-possession statute, 18 U.S.C. § 922(g), to those who not only possess firearms with prior felony convictions but also know the facts rendering that possession illegal. Such a knowledge requirement, the Court held, "helps to separate wrongful from innocent acts." *Rehaif*, 588 U.S. at 232. So important is that limiting purpose that statutes are presumed to require a culpable mens rea "even where the most grammatical reading of the statute does not support one." *Id.* at 231 (internal citation and quotation omitted.) Even when the statute is silent, courts "start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 228-29 (cleaned up). The Court construed § 922(g)(1) to require scienter precisely because gun possession "can be entirely innocent." *Id.* at 232.

6

### 2. *Ruan v. United States*, 597 U.S. 450 (2022): the federal drug statute requires knowledge of the activity's unauthorized nature

The Court returned to this theme three terms ago in *Ruan,* 597 U.S. 450 (2022). *Ruan* involved 21 U.S.C. § 841, which makes it a federal crime, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." The element making the conduct wrongful was lack of "authoriz[ation]" for the drug manufacturing, distribution, or dispensing, but the statute did not clearly require that the defendant *know* his conduct was unauthorized. Nevertheless, "a lack of authorization is often what separates wrongfulness from innocence" under § 841; indeed, the public "*want[s]* doctors to prescribe" needed medications. *Id.* at 458-59 (emphasis added). The Court thus construed the "knowingly or intentionally" mens rea element to modify the "except as authorized" clause: a reading the Court deemed necessary "to separate wrongful from innocent [acts]." *Id.* at 459.

7

**B.  The Supreme Court has Narrowly Construed Criminal Statutes to Respect States' Enforcement Prerogatives and the First Amendment**

The past few terms have also seen the Supreme Court narrowly interpret statutes to avoid incursions into state prerogatives or First Amendment-protected speech.

### 1. *Counterman v. Colorado*, 600 U.S. 66 (2023): a threats statute requires at least a recklessness mens rea

Two terms ago, in *Counterman v. Colorado*, 600 U.S. 66 (2023), the Court addressed a Colorado statute that proscribed threatening speech even when the defendant was not aware that the speech was threatening. The Court held that the First Amendment requires that the speaker act with at least recklessness as to the communication's threatening nature. In reaching that conclusion, the Court noted that First Amendment doctrine has long sought to avoid chilling lawful speech by requiring some mental-state component before prosecuting unprotected types of expression. For example, incitement requires intent to produce "imminent disorder"; defamation of public figures requires knowledge or reckless disregard of falsity; and obscenity requires at least awareness of the material's "character and nature." *Id.*

8

at 76-77. The same danger of "chill[ing] protected, non-threatening speech," *id.* at 72-73, existed in the true threats context, the Court held, as "self-censorship" might result if the statute did not require culpable intent. *Id.* at 75. "[C]ondition[ing] liability on the State's showing of a culpable mental state," the Court held, is "an important tool . . . to stop people from steering wide[ ] of the unlawful zone." *Id.* at 75 (internal citation and quotation omitted).

### 2. *United States v. Hansen*, 599 U.S. 762 (2023): "encourag[ing]" or "induc[ing]" narrowly incorporates common-law aiding and abetting

The Court took the same narrowing approach in another case that same term, *United States v. Hansen*, 599 U.S. 762 (2023), again to protect First Amendment concerns. *Hansen* construed 8 U.S.C. § 1324(a)(1)(A)(iv), which prohibits "encourag[ing] or induc[ing] an alien to" enter or remain in the United States unlawfully. The question was the breadth of "encourag[ing]" or "induc[ing]": *i.e.* whether Congress intended them as "terms of art referring to criminal solicitation and facilitation (thus capturing only a narrow band of speech) or instead as those terms are used in everyday conversation (thus encompassing a broader swath)." *Id.* at 771. The Court took the narrow approach,

holding § 1324(a)(1)(A)(iv) does not reach First Amendment-protected communications because it uses "encourage" and "induce" in their narrow "specialized criminal-law sense"—"as incorporating common-law liability for solicitation and facilitation," or aiding and abetting—instead of in their much broader everyday sense of mere advocacy. *Id.* at 774.

The Court also emphasized the mens rea requirement implicit in traditional concepts of aiding and abetting. Although the statute contained no express mental state element applicable to "encourag[ing] or induc[ing]," it held, "aiding and abetting implicitly carries a *mens rea* requirement—the defendant generally must *intend* to facilitate the commission of a crime," *id.* at 779; thus, § 1324(a)(1)(A)(iv)'s phrase "encourages or induces," which draws on the same common-law concepts, must incorporate that requirement too. Thus cabined by the narrow common-law meaning of aider and abettor liability, the Court held, § 1324(a)(1)(A)(iv) "reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law"—not to everyday advocacy or assistance protected by the First Amendment. *Id.* at 781-82.

### 3. *Snyder v. United States*, 603 U.S. 1 (2024): a federal gratuities statute covers only quid pro quo bribery

Just last term, the Court rejected yet another broad statutory construction in *Snyder v. United States*, 603 U.S. 1 (2024) to restrict the scope of 18 U.S.C. § 666(a)(1)(B). At issue was whether the statute criminalized only quid-pro-quo bribery or also after-the-fact gratuities like gift cards given to show appreciation for a past official act. The Court chose the former, narrow, construction to avoid creating "a vague and unfair trap for 19 million state and local officials" that could sweep in even innocuous thank-you gifts. *Id.* at 19. Broadly criminalizing gratuities under federal law, the Court held, would also offend federalism by disrupting state and local governments' policy decisions about "the permissible scope of the interactions between state officials and their constituents." *Id.* at 14 (internal citation and quotation marks omitted). And it would deprive citizens of fair notice as to what was prohibited, as even the government's broad reading was subject to vague "atextual exceptions." *Id.* at 15. The Court pointedly rejected the government's "familiar plea that federal prosecutors can be trusted not to enforce this statute against small-time violators," *id.* at 17, reiterating its previously-expressed maxim that "the Court cannot

11

construe a criminal statute on the assumption that the Government will use it responsibly." *Id.* (quoting *McDonnell v. United States*, 579 U.S. 550, 576 (2016)).

### 4. *Fischer v. United States*, 603 U.S. 480 (2024): a federal obstruction statute covers only interference with evidence

In still another case from last term, *Fischer v. United States*, the Court narrowly construed 18 U.S.C. § 1512(c)(2), which prohibits obstruction of official proceedings, as cabined to acts that impact the availability or integrity of evidence rather than all obstructive conduct. Section 1512(c), enacted as part of the Sarbanes-Oxley Act of 2002, includes two subsections: subsection (1), which penalizes anyone who corruptly "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," and subsection (2), which penalizes anyone who "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." 18 U.S.C. § 1512(c)(1), (2). The defense argued that subsection (c)(2) should be limited to acts of the same type prohibited by (c)(1)'s evidence-focused provision, while the government urged a broad

construction of (c)(2) that would encompass "all forms of obstructive conduct beyond [(c)(1)'s] focus on evidence impairment." *Id.* at 485.

The Court chose the narrow construction to avoid rendering subsection (c)(2) "so broad that it is inconsistent with the company it keeps." *Fischer*, 487 U.S. at 487 (internal citation and quotation omitted). The government's "novel interpretation," it said, "would criminalize a broad swath of prosaic conduct, exposing activists and lobbyists alike to decades in prison." *Id.* at 496. The First Amendment would also be vitiated, as "a peaceful protester could conceivably be charged under § 1512(c)(2) and face a 20-year sentence" while the government would be free to "prosecut[e] under (c)(2) any lobbying activity that 'influences' an official proceeding and is undertaken 'corruptly.'" *Id.* The Court rejected this vast reading of (c)(2) as "implausib[le]." *Id.*

## C. The Supreme Court has Narrowly Construed Criminal Statutes to Avoid Open-Ended Liability Untethered to Historical Context

In still a third category of recent decisions, the Court has refused government invitations to construe fraud statutes in an open-ended manner unmoored from their historical foundations.

13

### 1. *Dubin v. United States*, 599 U.S. 110 (2023): the federal aggravated identity theft statute covers only uses "at the crux" of an underlying offense

Two terms ago, in *Dubin v. United States*, 599 U.S. 110, 114 (2023) the Court rejected a "boundless interpretation" of the federal aggravated identity theft statute, 18 U.S.C. § 1028A, that would encompass any use of another person's identity to commit particular crimes. The Court instead limited the statute to offenses where the misuse "is at the crux of what makes the underlying offense criminal." *Id.* at 114. Citing the need for certainty, the Court noted that it had "traditionally exercised restraint in assessing the reach of a federal criminal statute . . . both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understan[d] of what the law intends to do if a certain line is passed." *Id.* at 129 (internal citation and quotations omitted).

**2.** ***Ciminelli v. United States*, 598 U.S. 306 (2023): the federal wire fraud statute does not cover deprivation of economically valuable information**

That same term, the Court narrowed the reach of the federal wire fraud statute in *Ciminelli v. United States*, 598 U.S. 306 (2023), by holding that the property interest required to support a wire fraud conviction under 18 U.S.C. § 1343 does not extend to the right not to be deprived of potentially valuable economic information. *Id.* at 317. The Court reasoned that after its prior decision in *McNally v. United States*, 483 U.S. 350 (1987) "put an end" to fraud convictions premised on a broad, open-ended array of non-traditional property interests, Congress responded by reviving only one of those intangible interests (of "honest services") in 18 U.S.C. § 1346. *Ciminelli*, 598 U.S. at 315. "Congress's reverberating silence about other [such] intangible interests," the Court held, "forecloses the expansion of the wire fraud statute to cover the intangible right to control" the disposition of one's property through the use of valuable economic information. *Id.* The Court also cited federalism, stating that the right-to-control theory "vastly expands federal jurisdiction without statutory authorization," enabling

15

"almost any deceptive act" to be criminalized, and wrongly extending federal jurisdiction to "a vast array of conduct traditionally policed by the States." *Id.* at 315-16 (internal citation and quotation omitted).

**3.** ***Percoco v. United States*, 598 U.S. 319 (2023): federal honest services fraud does not cover any defendant who controls government officials**

In still a third decision from the 2022 term, the Court rejected the notion that an honest services wire fraud conviction under 18 U.S.C. § 1346 can be sustained as to any private citizen who has a "special relationship" with the government so as to "dominat[e] and control[]" government business. *Percoco v. United States*, 598 U.S. 319, 322 (2023). Such a wide-open scope, the Court held, would create an "uncertain breadth that raises the due process concerns underlying the vagueness doctrine." *Id.* at 328-29.

## III. THE GOVERNMENT'S ATTEMPT TO DILUTE LONG-STANDING LIMITS ON TRAVEL ACT LIABILITY SHOULD BE REJECTED

The government's attempt to expand accomplice liability by diluting the Travel Act's mens rea requirement should be rejected in the same way—and for the same reasons—as the expansive statutory

interpretations the Supreme Court has disavowed in its last few terms. Its boundless interpretation of Travel Act conspiracy—eliminating any requirement of a contemplated criminal act—should be similarly rejected.

## A. The Government's Interpretation of the Travel Act Would Contravene *Rehaif* and *Ruan* by Diluting the Culpable Mens Rea Aiding and Abetting Has Always Required

Just as knowledge of an offense's wrongfulness is the touchtone of culpability, common law aider-and-abettor liability treats knowledge of the facilitated act as the prerequisite to liability equivalent to the principal actor's. The Travel Act contains no suggestion that Congress intended to deviate from that intent requirement; to the contrary, the terms "promote" and "facilitate" signal intent to incorporate the narrow common-law definition. Thus, just as *Rehaif* and *Ruan* sought to fulfill congressional intent by presuming that the pertinent crimes required knowledge of the facts making the conduct culpable, so should this Court honor Congress's intent in the Travel Act to incorporate common-law aiding and abetting doctrine's strict knowledge requirement.

### 1. Common-law aiding and abetting requires knowledge of the nature of the facilitated act

It is a fundamental principle of aiding and abetting that the aider and abettor must know the full nature of the crime he is assisting. At least three recent decisions reinforce this limit.

In *Rosemond v. United States*, 572 U.S. 65 (2014), the Supreme Court explained that an aider and abettor must "intend[] to facilitate th[e] offense's commission," and "the intent must go to the specific and entire crime charged." *Id.* at 76. Thus, to aid and abet the crime of using a gun in furtherance of a drug crime (the offense at issue in *Rosemond*), aider and abettor liability requires that the person "knows that one of his confederates will carry a gun." *Id.* at 77. Only then does the aider and abettor have the necessary "full awareness of [the offense's] scope" to give rise to liability equivalent to the primary actor's. *Id.* at 77.

More recent decisions further explained those limits in applying criminal-law aiding-and-abetting principles to statutes imposing civil liability for assisting criminal conduct. In "establishing what counts as aiding and abetting and what does not," *Smith & Wesson*, 2025 WL 1583281, at *4, the Court made clear aiding-and-abetting requires intent as well as action. Quoting Learned Hand, the Court held that "an

18

aider and abettor must 'participate in' a crime 'as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Id.* at *5 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). Thus, "routine and general activity that happens on occasion to assist in a crime—in essence, 'incidentally'—is unlikely to count as aiding and abetting." *Id.* at *6. Under these principles, "an 'ordinary merchant[ ]' does not 'become liable' for all criminal 'misuse[s] of [his] goods,' even if he knows that in some fraction of cases misuse will occur." *Id.* (quoting *Twitter v. Taamneh*, 598 U.S. 471, 489 (2023)). And tellingly, the *Twitter* decision on which the Court relied involved the operation of an online platform, a context similar to the context here.

Just as mens rea provided a critical limitation on criminal liability in *Rehaif* and *Ruan*, the requirement of advance "full awareness" of the planned offense limits aiding and abetting doctrine. *Rosemond,* 572 U.S. at 77. In the same way that knowledge of the facts making conduct wrongful has traditionally been required for individual culpability, knowledge of the act facilitated has traditionally been required to render an accomplice equally culpable with the principle. *See Standefer v. United States*, 447 U.S. 10, 14-19 (1980) (the federal aiding and

abetting statute was enacted to erase common-law distinctions between principals and accessories, and ensure all participants in an offense would be treated as principals). It is only with full knowledge of the specific crime being aided that an individual properly "becomes responsible, in the typical way of aiders and abettors, for the conduct of others" and possesses the "knowledge that enables him to make the relevant legal (and indeed, moral) choice." *Rosemond*, 572 U.S. at 78.

## 2. The Travel Act incorporates common-law aiding and abetting doctrine's knowledge requirement

Just as the Supreme Court refused to presume that Congress intended to remove the limit that culpable mens rea provides for individual criminal punishment, this Court should not presume Congress intended the Travel Act to contradict traditional aiding and abetting doctrine by penalizing defendants for unanticipated third-party acts.

Critically, nothing in the Travel Act suggests Congressional intent to deviate from the traditional mens rea required for aiding and abetting liability. To the contrary, its references to "promot[ion]" and "facilitat[ion]" incorporate common-law aiding and abetting doctrine. *Woodhull Freedom Foundation v. United States*, 72 F.4th 1286, 1301

(D.C. Cir. 2023). Indeed, "promote" and "facilitate" are synonyms for common-law criminal facilitation, to which aiding and abetting is tantamount, *Hansen*, 599 U.S. at 771, and must be interpreted according to that narrow common-law meaning. *Id.* at 772-73 (discussing statutory verbs including "promote" as reflecting common-law understandings of criminal facilitation and aiding and abetting).

"Where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply" absent any contrary indication in the statute. *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). That is precisely the case here. As the Supreme Court recently held in *Hansen*, aiding and abetting traditionally "require[s] an intent to bring about *a particular unlawful act*," *Hansen*, 599 U.S. at 771 (emphasis added), not merely knowledge that one's acts may assist a particular *type* of future unlawful act such as, in this case, posting ads for prostitution. *Cf.* Wayne R. LaFave, SUBSTANTIVE CRIMINAL LAW (Oct. 2024), § 11.1, Solicitation (solicitation requires "intent that another person commit *a crime*") (emphasis added); Uniform Model Penal Code, § 5.02(1), Criminal Solicitation (defining "solicitation" as

21

"command[ing], encourag[ing] or request[ing] another person to engage in *specific conduct* that would constitute [a] crime or an attempt to commit [a] crime or would establish his complicity in its commission or attempted commission") (emphasis added).

As the Supreme Court recognized just last term, "aiding and abetting is inherently a rule of secondary liability for specific wrongful acts," not a rule imposing liability for aiding the primary actor generally. *Twitter*, 598 U.S. at 494; *cf. Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983) (civil aiding and abetting liability requires that the defendant aid and abet "a tortious act.") "[I]t is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Twitter*, 598 U.S. at 495 (discussing tort liability for aiding and abetting).[2] "It is possible for someone to aid and abet a broad

---

[2] Although people who aid and abet a tort can be liable for conduct that is a "foreseeable risk" of that tort, *Twitter*, 598 U.S. at 496, they must first be liable for aiding and abetting a particular "tort" in the first place, not merely making it easier for a particular category of future torts to be committed. *Id.* (aider and abetting liability requires that a defendant "consciously and culpably participated in a tortious act in such a way as to help make it succeed.") (cleaned up) (quoting *Nye v. Nissen*, 336 U.S. 613, 619 (1949)).

category of misconduct, but then his participation must be correspondingly 'pervasive, systemic, and culpable.'" *Smith & Wesson*, 2025 WL 1583281, at *6 (quoting *Twitter*, 598 U.S. at 502).

### 3. The government's expansive interpretation would contravene congressional intent and common-law requirements for aiding and abetting

The government's contention that Internet platform operators can be liable as aiders and abettors for third-party speech they have never seen fails *Hansen*'s "particular unlawful act" requirement because it fails to require knowledge or intent that any specific unlawful act will occur. It also contravenes *Rehaif*'s and *Ruan*'s presumption that Congress intends statutes to incorporate the level of mens rea required to ensure the defendant acts with culpability. *Rehaif*, 588 U.S. at 229 (courts apply "a presumption that criminal statutes require the degree of knowledge sufficient to make a person legally responsible for the consequences of his or her act or omission.") (cleaned up). Permitting a defendant to be held liable as a principal for a third party's conduct without knowledge of the third party's act would both effectively eliminate any culpability element and contravene the Travel Act's

23

indications that Congress intended to incorporate narrow common-law concepts of criminal facilitation.

The government's theory further contravenes congressional intent to incorporate common-law concepts into the Travel Act—and the principles underlying *Rehaif* and *Ruan*—because it blurs the doctrines of conspiracy and aiding and abetting: it would permit a defendant to be convicted as an aider and abettor absent either any knowledge of the particular illegal act being furthered *or* any agreement that that particular act would be committed. "There is a qualitative difference between proving an *agreement to participate* in a tortious line of conduct, and proving *knowing action* that substantially aids tortious conduct." *Halberstam*, 705 F.2d at 478 (emphasis added). Whereas conspiracy is limited by the requirement of an advance agreement to engage in illegal conduct—thus justifying a lesser standard of required foreknowledge of any particular act—aiding and abetting liability lacks that core limiting element. *Twitter*, 598 U.S. at 489-90 ("[U]nlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts.")

By lowering the bar for knowledge of the facilitated act to the attenuated connection sufficient for conspiracy, but without conspiracy's anchoring requirement of an actual agreement to violate the law, the government's concept of aiding and abetting would sweep more broadly than both conspiracy *and* common-law aiding and abetting. It would reach beyond the outer bounds of both those doctrines by extending to anyone who engages in individual conduct with knowledge that it makes future, unknown, illegal acts by others (who are not co-conspirators) more likely. This all-but-limitless approach is both untenable and unsupported: "[t]o allow a jury to infer an intent to aid in the commission of one offense from the demonstrated intent to aid in another earlier offense because the later crime is a foreseeable consequence of the earlier one, is to base criminal liability only on a showing of negligence rather than criminal intent." *United States v. Greer*, 467 F.2d 1064, 1069 (7th Cir. 1972). Indeed, as Judge Hand articulated in reasoning the Supreme Court adopted in *Smith & Wesson*, 2025 WL 1583281, at *5, 7, 9, aiding and abetting has "nothing whatever to do with the *probability* that the forbidden result w[ill] follow upon the accessory's conduct;" it requires the accomplice's actual

knowledge and purpose to "associate himself with the venture" and

"*seek by his action to make it succeed.*" *United States v. Peoni*, 100 F.2d

401, 402 (2nd Cir. 1938) (emphasis added). This Court should reject the

government's invitation to erode that standard.

## B. The Government's Interpretation Would Impinge on States' Enforcement Prerogatives and Protected Speech

The government's expansive reading of Travel Act aiding and

abetting liability also implicates the Supreme Court's concern in *Snyder*

and *Dubin* about expansive federal punishment disrespecting state

policy choices—specifically, narrower state conceptions of aiding and

abetting that require the defendant's knowledge of the facilitated act.[3]

This Court should reject that interpretation for the same reasons

*Snyder* and *Dubin* refused to interpret federal statutes as criminalizing

broad swaths of state-regulated conduct.

---

[3] *See, e.g., People v. Mendoza,* 18 Cal. 4th 1114, 1129 (1998) ("To be culpable, an aider and abettor must intend not only the act of encouraging and facilitating but also the *additional* criminal act the perpetrator commits"); *Price v. United States*, 985 A.2d 434, 438 (D.C. Ct. App. 2009) (aiding and abetting liability requires "specific intent" equal to that of the principal); *Smith v. State*, 719 N.E. 2d 1289, 1292 n.4 (Ind. Ct. App. 1999) ("A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense") (quoting I.C. § 35-41-2-4).

Our constitutional system limits Congress to "enumerated powers," *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819), while reserving "numerous and indefinite" powers to the States. *United States v. Lopez*, 514 U.S. 549, 552 (1995) (internal quotation marks omitted). Under this design it is states, not the federal government, that "possess primary authority for defining and enforcing the criminal law." *Id.* at 561 n.3 (internal citation and quotation omitted). Federal criminalization of "conduct already denounced as criminal by the States" affects "the sensitive relation between federal and state criminal jurisdiction" by "displac[ing] state policy choices." *Id.* at 557 (internal citation and quotation omitted).

Critically, Congress's purpose in passing the Travel Act was not to expand, supplant, or override state law. To the contrary, it sought to *reinforce* state law by preventing defendants from "avoid[ing] apprehension by local officials by travelling interstate." *United States v. Wander*, 601 F.2d 1251, 1257 (3d Cir. 1979).[4] "A reading of the Travel

---

[4] *See also Rewis v. United States*, 401 U.S. 808, 811 (1971) ("Legislative history of the Act is limited, but does reveal that § 1952 was aimed primarily at organized crime and, more

Act as broad as that urged by the prosecution [in this case] has the potential of altering sensitive federal-state relationships and could overextend limited federal police resources," by punishing remote actors with no foreknowledge of, or intent to promote, third parties' crimes. *Gibson*, 507 F.2d at 451. In that event, the Travel Act "would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express mens rea requirement." *Id.* at 449.

Still worse, this infringement would abut categories of speech and conduct protected by the First Amendment, where overcriminalization concerns are at their peak. As the Supreme Court recently reaffirmed in *Hansen*, First Amendment doctrine must "provide[] breathing room for free expression" and guard against "would-be speakers remain[ing] silent," such that "society will lose their contributions to the 'marketplace of ideas.'" *Hansen*, 599 U.S. at 769-70; *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The [g]overnment may not suppress lawful speech as the means to suppress unlawful speech.

_____

specifically, at persons who reside in one State while operating or managing illegal activities located in another.")

28

Protected speech does not become unprotected merely because it resembles the latter.")

Convicting website operators of facilitating speech they never saw, and of whose content they were never aware, would severely chill lawful communication in the modern "marketplace of ideas" that is the Internet. As Appellant Spear's Opening Brief explains, publishing third party ads for lawful adult services is constitutionally protected. (Appellant Spear's Opening Brief at 47.) Criminalizing the publication of adult-oriented ads not only threatens to violate the First Amendment, but creates the danger that any ad posted on a website that is later determined to propose an illegal transaction—whether or not it explicitly or actually does—could result in criminal prosecution not only of the poster, but also of the website operators who provided the platform. The chilling effect will be certain and severe: website operators will be incentivized to screen all postings in advance, and refuse to post any ad that could possibly be construed to relate to prostitution. Advance culling and restriction of content, and suppression of speech falling on the protected side of the line—precisely the "self-censorship" the Supreme Court condemned in *Counterman*,

29

600 U.S. at 75—would be all but assured. Yet these deleterious effects are easily avoided by recognizing that the Travel Act facilitation offense, like aiding-and-abetting liability generally, does not reach providers of an online advertising platform merely because "some bad actors" use that platform for criminal purposes. *See Smith & Wesson*, 2025 WL 1583281, at *6 (quoting *Twitter*, 598 U.S. at 503).

## C. The Government's Interpretation Would Create Open-Ended Liability Untethered to Historical Context

Finally, the government's far-reaching conception of aiding and abetting and conspiracy would create precisely the amorphous and uncertain liability the Supreme Court recently rejected in *Snyder*, *Fisher*, *Dubin*, *Ciminelli*, and *Percoco*. If an Internet website operator can be prosecuted for third parties' illegal postings he never saw, the potential for liability will be vast, just like the potentially unbounded gratuities the Supreme Court refused to penalize in *Snyder*, the innumerable forms of obstruction it refused to penalize in *Fischer*, and the limitless types of property or influence it refused to engulf within the federal fraud statutes in *Ciminelli* and *Percoco*.

Such amorphous liability would defy prediction, as website operators could be alleged to have intended somehow to promote illegal

30

speech, then be held responsible for innumerable specific messages posted on their sites without their knowledge. *See Smith & Wesson*, 2025 WL 1583281, at *6 (rejecting similar theory of liability for gun manufacturers). What degree of intent suffices for liability, what degree of fit is required between that intent and the content of the posting, and what scope of prohibited speech can be attributed to the Internet platform would all be thrown open to speculation. It would be impossible to predict in advance what type of foreknowledge, or evidence of such foreknowledge, would suffice, or for what scope of conduct one could be held responsible. Prosecutorial discretion only exacerbates the problem, as—the Supreme Court acknowledged in *Snyder*—"the Court cannot construe a criminal statute on the assumption that the Government will use it responsibly." *Snyder,* 603 U.S. at 17 (cleaned up).

The same dangers are present as to conspiracy. As Appellant John Brunst's Opening Brief explains, due process requires that a criminal defendant "know what he is accused of so that he can prepare his defense, and be protected against another prosecution for the same offense." (Appellant Brunst's Opening Brief at 65) (quoting *United*

*States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997)). Permitting the government to charge defendants with conspiring to commit crimes in general, unconnected to any specific intended illegal act—while introducing into evidence innumerable illegal acts by third parties of which the defendants had no knowledge—obliterates defendants' ability to anticipate, understand, or meaningfully challenge the accusations against them.

The government's expansive approach also lacks any grounding in history or the common law. Just as the Supreme Court recently looked to historic sources to cabin liability for wire fraud in *Ciminelli* and *Percoco*, and aiding and abetting liability in *Hansen*, this Court should look to the limited common-law definition of aiding and abetting to inform the degree of foreknowledge needed to punish third-party Internet speech under the Travel Act. Mere knowledge that one's conduct creates a risk of future illegal conduct by others is inadequate for common-law aiding and abetting, *Hansen*, 599 U.S. at 771; *Smith & Wesson*, 2025 WL 1583281, at *5-8; *Peoni*, 100 F.2d at 402, and it should equally be rejected under the Travel Act. Merely creating the conditions in which another person may post illegal statements cannot,

in itself, satisfy the common law's strict requirement that one intentionally and purposely aid an illegal act with the intent to bring it about. This Court should affirm that Travel Act liability requires the high degree of knowledge the law has always demanded, both out of "deference to the prerogatives of Congress" and to ensure "fair warning . . . in language that the common world will understand." *Dubin*, 599 U.S. at 129 (cleaned up).

## IV. CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 13, 2025    By  */s/ Margaret A. Farrand*
MARGARET A. FARRAND
Deputy Federal Public Defender
Attorneys for Amici Curiae

DONALD M. FALK
Schaerr Jaffe LLP
Attorneys for National Association of
Criminal Defense Lawyers

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G), and 29(a)(5), I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 6,210 words.


DATED: June 13, 2025          */s/ Margaret A. Farrand*
                              MARGARET A. FARRAND