CASE NO. 24-5374, 24-5375, 24-5376

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*,

v.

JOHN ("JED") BRUNST

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Arizona, the Honorable Diane J. Humetewa, Presiding
District Court Case No. 2:18-CR-00422-DJH

## APPELLANT JOHN BRUNST'S REPLY BRIEF

GARY S. LINCENBERG – STATE BAR NO. 123058
GOPI K. PANCHAPAKESAN – STATE BAR NO. 279586
MICHAEL C. LANDMAN – STATE BAR NO. 343327
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 CENTURY PARK EAST, 23RD FLOOR
LOS ANGELES, CALIFORNIA 90067-2561
TELEPHONE: (310) 201-2100

*Attorneys for Defendant-Appellant John ("Jed") Brunst*

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................1

II.   BRUNST IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON ALL COUNTS OF CONVICTION. ............................................................4

    A.    The Government Ignores Judge Brnovich's Pre-Trial Order Bounding the Travel Act Conspiracy......................................................4

    B.    The Money Laundering Convictions Must Be Reversed......................6

        1.    The Government Does Not Point to Evidence of SUA. .............6

        2.    Ferrer's Loan Payments Do Not Amount to Concealment..................................................................................7

        3.    There Was No Evidence of an Intent to Promote. ....................7

III.  THE DISTRICT COURT'S EVIDENTIARY DOUBLE STANDARD DEPRIVED BRUNST OF A FAIR TRIAL....................................................8

    A.    The Government's Case Centered on Hearsay "Notice" Evidence That Brunst Was Precluded from Countering.......................8

    B.    Brunst Was Precluded from Testifying to the Matters That Formed His Good Faith State of Mind................................................10

        1.    Testimony Regarding Brunst's Reliance on Court Decisions Would Have Undercut the Government's Narrative..................................................................................11

        2.    Brunst's Knowledge that Prior Government Investigations and Prosecutions Were Rejected Would Have Contradicted the Government's Evidence.......................15

        3.    Brunst Should Have Been Permitted to Testify to His Good Faith Reliance on the Involvement of Counsel...............16

            a.    The District Court Allowed the Government to Use Joint-Defense Privileges as a Sword and a Shield. ..............................................................................16

            b.    *McLennan* Does Not Support the District Court's Preclusion of Involvement-of-Counsel Evidence..........18

        4.    Precluding Brunst's Testimony Was Not Harmless Error........20

i

C. Brunst Was Deprived of the Right to Confront the Only Witness Against Him with Key Impeachment....................................22

    1. The Exclusion of Key Cross-Examination of Ferrer Violated the Confrontation Clause. .........................................22

        a. Ferrer's Prior Inconsistent Statements...........................24

        b. Responsive Letters to the State AGs .............................25

        c. References to the Communications Decency Act ..........26

        d. Attorney Communications and Prior Court Decisions......................................................................27

    2. The Government Misstates the Standard of Review. ...............29

IV. THE GOVERNMENT'S INVASION OF THE ATTORNEY-CLIENT PRIVILEGE REQUIRES REVERSAL. .........................................31

V. BRUNST WAS ERRONEOUSLY SENTENCED UNDER THE WRONG OFFENSE OF CONVICTION.......................................................33

VI. CONCLUSION.................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backpage.com, LLC v. Dart*
807 F.3d 229 (7th Cir. 2015) ...............................................................38

*Backpage.com, LLC v. McKenna*
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...........................................38

*Bisno v. United States*
299 F.2d 711 (9th Cir. 1961) ...............................................................38

*Chambers v. Mississippi*
410 U.S. 284 (1973)...............................................................................38

*Gill v. Ayers*
342 F.3d 911 (9th Cir. 2003) ...............................................................38

*Holley v. Yarborough*
568 F.3d 1091 (9th Cir. 2009) .............................................................38

*Kotteakos v. United States*
328 U.S. 750 (1946)................................................................................5

*Murdoch v. Castro*
365 F.3d 699 (9th Cir. 2004) ...............................................................38

*Nat'l Rifle Ass'n of Am. v. Vullo*
602 U.S. 175 (2024)...............................................................................38

*United States v. Adefehinti*
510 F.3d 319 (D.C. Cir. 2007)..............................................................38

*United States v. Crawford*
185 F.3d 1024 (9th Cir. 1999) .............................................................38

*United States v. Depue*
912 F.3d 1227 (9th Cir. 2019) .............................................................38

*United States v. Gallagher*
99 F.3d 329 (9th Cir. 1996) .................................................................38

*United States v. Gibson Specialty Co.*
   507 F.2d 446 (9th Cir. 1974) ........................................................................... 6

*United States v. Haischer*
   780 F.3d 1277 (9th Cir. 2015) ............................................................................ 38

*United States v. Huber*
   772 F.2d 585 (9th Cir. 1985) .............................................................................. 38

*United States v. Larson*
   495 F.3d 1094 (9th Cir. 2007) ............................................................................ 38

*United States v. Macias*
   789 F.3d 1011 (9th Cir. 2015) ............................................................................ 38

*United States v. Manske*
   186 F.3d 770 (7th Cir. 1999) .............................................................................. 38

*United States v. McEnry*
   659 F.3d 893 (9th Cir. 2011) .............................................................................. 38

*United States v. McLennan*
   563 F.2d 943 (9th Cir. 1977) .............................................................................. 38

*United States v. Palmer*
   3 F.3d 300 (9th Cir. 1993) .................................................................................. 38

*United States v. Singh*
   995 F.3d 1069 (9th Cir. 2021) ........................................................................ 5, 38

*United States v. Smith-Baltiher*
   424 F.3d 913 (9th Cir. 2005) .............................................................................. 38

*United States v. SpineFrontier, Inc.*
   160 F.4th 212 (1st Cir. 2025) .............................................................................. 38

*United States v. Summers*
   414 F.3d 1287 (10th Cir. 2005) .......................................................................... 38

## Statutes

18 U.S.C. § 1952 ................................................................................ *passim*

47 U.S.C. § 230 .................................................................................... 38

USSG
   § 2B.1.1 ...............................................................................................38
   § 2S1.1 ...............................................................................................38

## Other Authorities

Fed. R. Crim. P. 29...........................................................................4, 5

Fed. R. Evid. 106 ...............................................................................38

U.S. Const. amend. I ...................................................................3, 4, 38

v

## I.  INTRODUCTION

The government's Answering Brief dances around Brunst's straightforward arguments for a judgment of acquittal.  First, as to the Travel Act conspiracy charge (Count One), the government does not dispute that the district court changed the rules of the game after the game was over.  *Pre-trial and when charging the jury*, the court ruled that the conspiracy must be limited and tied to the 50 Backpage advertisements charged in the substantive Travel Act counts— rulings that the government completely ignores in its brief.  2-ER-574.[1]  Brunst tried the case based on these clear rulings and was acquitted of the 50 substantive Travel Act counts.  *Post-trial*, however, the court ruled that this limitation was too "stringent" and the conspiracy was not "specifically tied to the 50 ads."  2-ER-298. This amounted to a post-trial constructive amendment of the indictment that rendered the conspiracy charge impermissibly boundless.  Nor was there sufficient proof of the charged 50-ad conspiracy; what the government characterizes as Brunst's work to "maximize [Backpage's] profits" (Gov't Answering Br. ["GAB"] at 102) falls well short of the Travel Act's demanding specific intent requirement.

---

[1]    "ER" refers to co-Appellant Spear's Excerpts of Record filed with his opening brief.  "BER" refers to Brunst's Excerpts of Record filed with his opening brief.  "SER" refers to the government's Excerpts of Record.  "BSER" refers to Brunst's Supplemental Excerpts of Record.

Second, the money laundering convictions (Counts 52-62 and 64-68) must be reversed for failure to prove specified unlawful activity ("SUA," *i.e.*, Travel Act violations). It is undisputed that all of the money laundering counts of conviction involved loan payments made in connection with the April 2015 seller-financed sale of Backpage, which terminated the alleged Travel Act conspiracy. Contrary to the government's suggestion, Brunst does not claim that his acquittal of the substantive Travel Act counts alone requires an acquittal of the corresponding money laundering charges. GAB at 112-13. Rather, the failure to prove *any SUA* tied to the subject wire transfers requires acquittal. Tellingly, the government does not point to any SUA in support of these charges. GAB at 112-15.

Brunst was also deprived of the right to cross-examine Carl Ferrer, the only witness against him, and testify in his own defense regarding his state of mind. The district judge consistently admitted the government's evidence that Appellants were on "notice" regarding the supposed illegality of Backpage's operations, while forbidding Brunst from presenting *counter*-notice evidence that negated his alleged criminal intent. Brunst's proffered counter-notice evidence included (i) federal court decisions holding that Backpage was operating lawfully, (ii) the involvement of counsel in Backpage's operations and non-privileged statements from counsel and other executives regarding the legality of Backpage's operations, and (iii) Brunst's open disclosures to financial institutions.

2

The district court applied a double standard regarding state-of-mind evidence. For example, while allowing the government to introduce evidence that State Attorneys General ("State AG") and other government officials threatened enforcement actions, the district court *precluded* cross-examination and Brunst's proffered testimony of Backpage's responses to these threats, the resolution of the threats, and court decisions rejecting the threats. And while allowing the government to present evidence regarding Backpage's legal strategies and the involvement of counsel in Backpage's operations to impugn Appellants' motives, the district *precluded* Brunst from testifying that the involvement of counsel contributed to his belief that he was performing his CFO duties in good faith. But rather than engage with the substance of these erroneous rulings, the government simply asserts that the district court made evidentiary calls that should be rubber-stamped. These errors require reversal with instructions that Brunst's proffered testimony and evidence of his good faith be admitted.

Brunst also joins in the arguments of his co-Appellants, as supported by amici, which require acquittal. As set forth in co-Appellant Spear's briefing, Brunst's convictions rest on the publishing of third-party speech without sufficient proof of scienter, violating both the First Amendment and criminal facilitation principles. And as set forth in co-Appellant Lacey's briefing, (i) all of the money laundering charges fail because the government did not establish SUA during the

3

relevant period, failed to establish that proceeds of SUA entered a stream of revenue that ultimately was deposited into Appellants' bank accounts, and failed to trace revenue from publishing activities to SUA in violation of the First Amendment; and (ii) the concealment money laundering charges fail because every attribute of the subject funds was disclosed.

## II. BRUNST IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON ALL COUNTS OF CONVICTION.

### A. The Government Ignores Judge Brnovich's Pre-Trial Order Bounding the Travel Act Conspiracy.

Brunst tried this case based on Judge Brnovich's pre-trial ruling limiting the scope of the Travel Act conspiracy to the 50 charged ads. 2-ER-574 ("Defendants' suggestion that the SI improperly indicts a 'boundless conspiracy' . . . is simply untrue . . . . They were indicted for facilitating (via publishing ads) on fifty distinct occasions . . . ."). Judge Humetewa so limited the conspiracy in her jury instructions. 2-ER-386. However, in an attempt to save the conspiracy conviction, Judge Humetewa's *post-trial* Rule 29 Order contradicted both the pre-trial ruling and jury instruction. 2-ER-298 ("[T]he conspiracy allegations were not specifically tied to the 50 ads"). The government does not—and cannot—dispute any of this.

As such, the district court's Rule 29 Order (1) constructively amended the indictment post-trial and (2) resulted in a conviction of an impermissible boundless conspiracy untethered to the 50 charged ads. Dkt. 93.1 (Brunst's Opening Brief ["AOB"]) at 55-57; *Kotteakos v. United States*, 328 U.S. 750, 775-76 (1946); *United States v. Singh*, 995 F.3d 1069, 1078-79 (9th Cir. 2021) (constructive amendment occurs where the district court "substantially altered" the scope of the charges); Dkt. 99.2 (FPD and NACDL Amicus Brief) at 30-33 (noting that the government's approach to conspiracy liability "obliterates defendants' ability to anticipate, understand, or meaningfully challenge the accusations against them.").[2]

Nor was there sufficient evidence of a 50-ad conspiracy. The government appears to argue that "making Backpage's Adult section profitable" and "sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money" was sufficient proof. GAB at 102. But the government's position that an individual can be found criminally liable for a third-party ad regardless of whether he knew about the nature of the ad before its posting would result in an interpretation of the Travel Act "plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express

---

[2]  The government concedes that the constructive amendment error ripened when the district court issued its Rule 29 Order. GAB at 104 n.13. The issue was thus properly presented on appeal.

mens rea requirement." *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); *see* Dkt. 99.2 at 30-33 ("Such amorphous liability would defy prediction, as website operators could be alleged to have intended somehow to promote illegal speech, then be held responsible for innumerable specific messages posted on their sites without their knowledge.").

## B. The Money Laundering Convictions Must Be Reversed.

### 1. The Government Does Not Point to Evidence of SUA.

At trial, the government presented no evidence of any SUA underlying the charged wire transfers in the counts of conviction. Instead, the government obfuscates, stating the uncontroversial proposition that a defendant may be acquitted of the SUA, but convicted of money laundering. GAB 113. But the government does not dispute that (1) the Travel Act conspiracy terminated upon the sale of Backpage in April 2015, (2) there was no evidence of any Travel Act violations following the sale of Backpage, (3) each subject wire transfer was a *post-sale* loan payment from Ferrer to the sellers of Backpage, and (4) there was no evidence that any bank account holding proceeds from *pre-sale* ads formed the basis for the *post-sale* wire transfers. AOB at 36-38, 39-40, 58; GAB at 1, 22-23, 38 (footnote), 112; co-Appellant Lacey's AOB at 54-61. These undisputed facts require acquittal of all of the money laundering charges against Brunst.

## 2. Ferrer's Loan Payments Do Not Amount to Concealment.

With respect to Counts 53-62, there is no dispute that each of the concealment money laundering convictions is predicated on payments by Ferrer to purchase a business. AOB at 36-37; 38-ER-10838; 2-ER-292-93; GAB at 23. The loan payments were precisely the "transparent division or deposit of . . . proceeds" that the D.C. Circuit in *United States v. Adefehinti* found did not constitute concealment money laundering. 510 F.3d 319, 322 (D.C. Cir. 2007).[3]

As a fallback, the government argues that by "publicly distanc[ing] themselves from Backpage," Appellants engaged in concealment. GAB at 116. But the government cites no case supporting such an expansive reading of the concealment money laundering statute.

## 3. There Was No Evidence of an Intent to Promote.

With respect to Counts 64-68, the government argues that post-sale loan payments to Brunst and his co-Appellants containing Backpage proceeds established an intent to promote violations of the Travel Act. GAB at 121. This argument, however, is inconsistent with the district court's undisputed finding that Brunst lacked an intent to violate the Travel Act following the 2015 sale. 2-ER-

---

[3]    The government tries to distinguish the transactions in *Adefehinti*. GAB at 116. But the transactions in *Adefehinti*—which involved fake identities, straw buyers, and false loan applications—were far more complex and far less transparent than the loan payments here. 510 F.3d at 320-21.

7

319. It is also inconsistent with Judge Brnovich's ruling that "one cannot intend to promote/facilitate a business enterprise [*i.e.*, a pimping business] one does not know exists." The government does not dispute the lack of evidence that Brunst knew of any pimp's business. AOB at 62; 2-ER-576-77.

Nor does the government's claim that loan payments to the sellers of Backpage were *generally* "integral to the continued success of Backpage" establish the intent to promote *specified* unlawful activity, *i.e.*, Travel Act violations. GAB at 121.[4] That overbroad argument—which reduces to the false and unproven notion that every one of the millions of adult ads Backpage published amounts to a Travel Act violation—fails under the First Amendment for the reasons noted in co-Appellant Lacey's briefing. Lacey AOB at 54-59.

## III. THE DISTRICT COURT'S EVIDENTIARY DOUBLE STANDARD DEPRIVED BRUNST OF A FAIR TRIAL.

### A. The Government's Case Centered on Hearsay "Notice" Evidence That Brunst Was Precluded from Countering.

The government claims that Brunst had "notice" that wrongdoers were posting adult ads on Backpage to further their own crimes. Ferrer testified that

---

[4] To the extent there was insufficient evidence to support the concealment and promotional money laundering charges, the government does not dispute that the money laundering conspiracy charge (Count 52) fails as well.

such "notice" of illegality came from State AG letters, law enforcement subpoenas, a U.S. Senate investigation, and other investigations of Backpage regarding the purported presence of ads associated with illegal activity on the website. The government even had Ferrer read verbatim from threatening State AG letters. 35-ER-9725, 9707, 9809, 9815, 9885, 9907-08; 36-ER-10000, 10242, 10275; 24-ER-6745-47, 6763-6955; 25-ER-7099-7100, 7101-103; 37-10375, 10477; 38-ER-10847-51, 40-ER-11388.

"Notice" also supposedly came from the fact that some financial institutions—facing public pressure and unconstitutional political threats—eventually terminated Backpage as a customer. The government elicited from Ferrer general statements from credit card companies and financial institutions that Backpage's customers were involved in illegal activities. 37-ER-10530; 38-ER-10716.

The government points to these hearsay opinions as bases for the convictions. GAB at 16-20. The government does not dispute that the district court precluded Brunst from countering this supposed "notice" evidence. The government simply asserts that Brunst's counter-notice was irrelevant.

Before the first trial, Judge Brnovich acknowledged that the government's notice evidence would not be "probative to show that Defendants' business activities were actually illegal." BSER-5. But she allowed the evidence, reasoning

9

it showed "Defendants' knowledge of the legality of their operation." *Id.* Before the second trial, Judge Humetewa adopted this ruling. 12-ER-3165. In the first trial, Judge Brnovich indicated during opening statements—over the government's objections—that she would have *allowed* the defense to present its counter-notice evidence. 30-ER-8348-49, 8351-52, 8354-64, 8371-72. In the second trial, however, Judge Humetewa completely precluded the defense from doing so.

## B. Brunst Was Precluded from Testifying to the Matters That Formed His Good Faith State of Mind.

The government does not deny that Brunst had a constitutional right to testify as to his state of mind and that Brunst's good faith was a complete defense to all charges. GAB at 77. Yet the government simply asks this Court to rubber-stamp the district judge's denial of those rights.[5]

The government relies on *United States v. Gallagher*, 99 F.3d 329, 332 (9th Cir. 1996), for the uncontested proposition that a court may limit what a witness can say. GAB at 79, 81. But the circumstances of *Gallagher* only highlight that the district court here committed error in precluding Brunst's proffered testimony. In *Gallagher*, unlike here, the district court *permitted* the defendant to "present his

---

[5] Oddly, the government claims that Brunst does not "challenge the district court's evidentiary rulings" (GAB at 81), even though that is exactly what Brunst does. AOB at 51-54.

10

theory of the case." 99 F.3d at 332. The court in *Gallagher* merely precluded the defendant from (i) taking the stand for a *second time* (against his attorney's advice) to provide what was concededly cumulative testimony, and (ii) "continu[ing] speaking" despite the lack of a pending question. *Id*. Here, by contrast, Brunst was categorically barred from testifying in his own defense to the relevant matters that formed his state of mind.

The trial record here shows that the district court wrongly precluded Brunst's proffered testimony demonstrating his good faith state of mind, specifically Brunst's reliance on: (1) court decisions upholding the legality of Backpage's business operations, (2) Backpage's successes defending against government investigations, and (3) the involvement of counsel in the company's operations.

### 1. Testimony Regarding Brunst's Reliance on Court Decisions Would Have Undercut the Government's Narrative.

Brunst proffered that he would testify how the federal court decisions in *Backpage v. McKenna* and *Backpage v. Dart* strongly influenced why he believed he was conducting his CFO duties in good faith. AOB at 10-12, 21-23. The government argues Brunst should not have been permitted to testify about court cases involving Backpage because they "did not involve any of the offenses charged here." GAB at 81. But while those cases did not involve the same ads or

11

offenses charged here, the First Amendment principles set forth in those decisions applied here and informed Brunst's state of mind. Further, the government's argument only highlights the double standard the district court imposed. None of the government's "notice" evidence that permeated its case—including the State AG threats, subpoenas, prostitution investigations, U.S. Senate's investigation, and claims of advocacy organizations—involved the ads or offenses charged here either. GAB at 82. What's sauce for the goose must be sauce for the gander: If generalized statements about uncharged ads or conduct are admissible to infer a guilty state of mind, then clearly court decisions rejecting those statements are relevant to refute that inference.

Specifically as to *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012), the government elicited testimony from Ferrer that Backpage fought governmental efforts in Washington State in 2011 to require age verification on the Backpage website. 25-ER-7099-100; 36-ER-10272-276. The government hammered this testimony in closing:

> They didn't do any age verification even though they are asked to do it. Too expensive . . . . Confronted by law enforcement and elected officials. Subpoenas, the National Association of Attorneys General, Mayor of Seattle, Seattle Police Department, United States Senate.

51-ER-14493

Far from addressing unrelated issues, *McKenna* was pivotal to the decision Backpage faced on age verification. There, the court enjoined the enforcement of

Washington's statute targeting Backpage, including its age verification component, *under the First Amendment*. AOB at 22-23; *McKenna*, 881 F. Supp. 2d at 1282 (finding that age verification "will likely chill protected speech"). In response to the government eliciting "notice" evidence about the age verification issue in Washington, Brunst sought to testify that the company did not implement age verification because of First Amendment concerns that were validated by a federal district court, *not* because of any intent to facilitate prostitution enterprises. AOB 22-23, 52-53. But the district court did not allow this testimony. AOB at 31-32.

Evidence regarding the basis for credit card terminations is no different. In its case-in-chief, the government put at issue (1) the "pressure" placed on the credit card companies to terminate Backpage as a merchant and (2) the steps Backpage took to address the terminations. AOB at 11-12, 21-23; 38-ER-10703. Brunst sought to testify that the credit card terminations were caused by "government coercion" from Sheriff Dart, rather than the credit card companies' supposed opinions about the legality of the website. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015); AOB at 21-23.

The government elicited testimony from Ferrer that Brunst wanted Ferrer to have a law firm send a demand letter to Bank Frick—one of Backpage's banks—to process payments in the aftermath of the 2015 credit card terminations. 38-ER-10827-28. Yet the district court did not permit the jury to hear that Brunst

13

instructed the law firm only after, and because of, the Seventh Circuit's ruling in *Dart*. Allowing the government testimony, but not the defense response, was a clear double standard.

Further, there is no support for the government's naked claim that these prior cases are irrelevant because there was a "sea change in the availability of evidence against Backpage" after 2013. GAB at 65 n.11. Notably, *Dart* was decided in 2015. And the appellate record in *Dart* contained the same type of evidence the government presented at trial here.[6] *See* Dkt. 43.1 at 11-13 (Brunst and Spear Reply in Support of Motion for Bail Pending Appeal). The government also presented extensive "notice" evidence from 2012 and earlier that required a response from Brunst regarding the contemporaneous counter-notice he received. AOB at 18-19; GAB at 16-18. Whatever evidence the government believed undermined Brunst's reliance on these cases could have been used by the government to cross-examine Brunst, but was not a reason to bar Brunst's proffered testimony.

---

[6] The Supreme Court recently cited *Dart* favorably. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190-191, 196-197 (2024). That the Northern District of Illinois sanctioned Backpage in 2019—following Ferrer's and Backpage's guilty pleas (and the indictment in this case)—is irrelevant to Brunst's state of mind during the time period of the alleged offense conduct. GAB at 65 n.11.

The government suggests that the counter-notice evidence Brunst sought to present created a risk of mini-trials. GAB at 81-82, 99. But that risk came from the district court allowing *the government* to introduce "notice" evidence that was untethered to the specific counts in the indictment. Once the district court created that risk, it could not then use the risk as an excuse to preclude Appellants from responding.

### 2. Brunst's Knowledge that Prior Government Investigations and Prosecutions Were Rejected Would Have Contradicted the Government's Evidence.

The government argues that the law enforcement threats against Backpage provided notice of illegality. GAB at 16-17 (Ferrer testifying he believed "they were next"). Brunst therefore should have been permitted to testify as to why such threats *were not* notice to him of illegality. AOB at 31, 52. For example, Ferrer informed the jury of a 2012 "prostitution investigation" of Backpage, testifying that it created "pressure regarding the website." 35-ER-9725. But the district judge refused to let the jury hear that the U.S. Attorney's Office for the Western District of Washington *declined* to bring charges in that matter. AOB at 31, 54; Dkt. 107.1 (FIRE Amicus Brief) at 9-11. Further, the State AG threats Ferrer testified about proved hollow, and when the California AG charged Ferrer, Lacey, and Larkin, a California state court dismissed the case. Dkt. 107.1 at 11-12. The

government does not deny that these rejections of the threats against Backpage would have been probative, exculpatory evidence as to Brunst's state of mind.

The district court made no secret about the double standard it applied. The court precluded Brunst from presenting this testimony because it purportedly would "open the door [to] litigation" that the government claimed was "contrary" to Brunst's proffered testimony. 49-ER-13850. But the court imposed no such standard on the government's "notice" evidence—like the credit card terminations and Backpage's decision not to implement age verification—despite "contrary" court rulings. And when the government opened the door to Brunst's reliance on these "contrary" court rulings, the district court shut it.

### 3. Brunst Should Have Been Permitted to Testify to His Good Faith Reliance on the Involvement of Counsel.

#### a. The District Court Allowed the Government to Use Joint-Defense Privileges as a Sword and a Shield.

Throughout its brief, the government takes inconsistent positions regarding the attorney-client privileges held by Appellants.

First, even though the government claims Brunst sought to testify about "privileged" attorney communications, it was the government that elicited this very same information during its pre-trial interviews of Ferrer and then claimed the communications were *not* privileged. AOB at 16-17, 31-33; 11-ER-2761; 2-ER-

16

545-548; 54-ER-15377 (government arguing that Ferrer's interview statements "cannot be privileged because they have not remained confidential" and "do not involve typical privileged material").[7]  When the government flipped positions at trial, Judge Humetewa followed suit, refusing to allow Brunst to testify to—and cross-examine Ferrer about—communications that Judge Brnovich previously ruled were not privileged.  12-ER-3082-83; 11-ER-2893-2902.[8]

Second, the government does not dispute that it presented as proof of Appellants' alleged criminal intent evidence regarding (i) the involvement of attorneys in Backpage's operations and (ii) Backpage's legal strategies.  AOB at 28.

Against this backdrop, the district court erred by precluding Brunst from rebutting this evidence with testimony about (i) his understanding of the good faith reasons for the involvement of counsel in Backpage's operations, and

---

[7]  Ferrer told the government during pre-trial interviews, among other things: (1) attorney Sam Fifer drafted a memo which "said that they could redact from ads, but don't add anything to the content" (55-ER-15517); (2) Don Moon, an attorney and company board member, said that there can only be potential criminal liability if one knows that the "specific ad" was to exchange sex for money (*id.*); and (3) "The feeling at the time was that the CDA gave Backpage all sorts of protection, so no concern voiced at this time would necessarily be an admission of what they would have described as criminal activity at that time."  (55-ER-15579.)

[8]  On appeal, the government flip-flops again when it argues that the privilege *was waived.*  GAB at 33, 122, 124.

17

(ii) undisputedly non-privileged matters, like a memo written by attorney Mark Sableman that Brunst shared with the Bank of Montreal (BMO) in response to the bank's inquiry. AOB at 27-29, 32. The Supreme Court has held that evidentiary rules cannot be "applied mechanistically to defeat the ends of justice" where "constitutional rights directly affecting the ascertainment of guilt are implicated." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Yet that is exactly what the district court did here by ignoring its prior rulings and the matters the government put at issue through Ferrer's testimony.

> **b.** **_McLennan_ Does Not Support the District Court's Preclusion of Involvement-of-Counsel Evidence.**

The government relies on *United States v. McLennan*, 563 F.2d 943, 945 (9th Cir. 1977), for the proposition that Brunst needed to meet the prerequisites of an advice of counsel defense before testifying about his reliance on the involvement of counsel. GAB at 73-75, 82-83. But *McLennan* addresses the evidentiary threshold for an advice-of-counsel jury instruction, not the admissibility of evidence regarding the involvement of counsel in support of a good faith defense. 563 F.2d at 946 (citing *Bisno v. United States*, 299 F.2d 711, 719-720 (9th Cir. 1961) ("While the foregoing may constitute some evidence of good faith, it falls short of the minimum proof required to justify an instruction relating to advice of counsel.")).

Brunst was a CFO who rarely dealt directly with the company's outside counsel. 11-ER-2761-62. Brunst did not seek an advice-of-counsel jury instruction. 49-ER-13854-57. Rather, Brunst sought to testify that he took comfort that he was performing his CFO duties in good faith because of the involvement of counsel, his review of outside counsel's communications with government officials and banks, statements from co-executives about counsel's advice, and court decisions that corroborated all of this. AOB at 31-32; 11-ER-2760-74; 49-ER-13844-75.

The First Circuit's recent decision in *United States v. SpineFrontier, Inc.*, 160 F.4th 212, 215 (1st Cir. 2025), makes clear that it was error to deny Brunst the right to so testify. *SpineFrontier* involved the prosecution of a spinal medical device company, its CFO, and other executives under the federal Anti-Kickback Statute. The CFO sought "to elicit evidence concerning the presence or involvement of SpineFrontier's counsel in the company's consulting program' and to 'argue that the presence or involvement of such attorneys . . . tends to show that [he] acted in good faith.'" *Id*. at 217. The district court held that the CFO could not do so without waiving the privilege. *Id*.

The First Circuit reversed. The court vacated the district court's privilege waiver order and distinguished between a traditional advice-of-counsel defense and an "involvement-of-counsel defense." 160 F.4th at 215. The First Circuit held that

19

if the CFO "were to argue only that he would be less likely to break the law intentionally based on SpineFrontier's decision to retain Strong & Hanni [law firm], a waiver finding would not be warranted because [CFO] Humad would not have revealed any privileged communication." *Id*. at 219. Likewise, here, Brunst sought to testify about the involvement of counsel in Backpage's compliance efforts and about various non-privileged matters, including a legal memo he sent to BMO to allow the bank to assess the legality of the business. AOB at 27-28, 31-32.

Permitting evidence of involvement of counsel is particularly critical where, as here, the defendant is a CFO who relied on other executives who dealt with counsel to inform him of the nature of communications with counsel. 11-ER-2761, 49-ER-13854-58.[9]

### 4. Precluding Brunst's Testimony Was Not Harmless Error.

Here, a defendant was precluded from putting on the core of his good faith defense. This amounts to structural error, obviating any harmless error review. 2-ER-409; *see United States v. Smith-Baltiher*, 424 F.3d 913, 922 (9th Cir. 2005)

---

[9]     The government is wrong to suggest that Brunst's counsel conceded that this testimony would have been barred by the hearsay rule. GAB at 83. Just as the government's notice evidence was all hearsay, Brunst's proffered testimony was hearsay counter-notice evidence relevant to his state of mind. 49-ER-13857; *see also McLennan*, 563 F.2d at 947 (attorney advice is relevant to "notice" the defendant received).

20

("[B]arring a defendant from presenting all evidence in support of a cognizable defense, or from challenging an element of the crime, is structural error."). "Having notified the court of his intent to introduce evidence challenging an element of the crime," Brunst "was entitled to present probative evidence to that effect. Denial of the opportunity to present his defense was, without more, sufficient to warrant reversal." *Id*.

Even under a harmless error review standard, however, this Court should reverse. *See United States v. Haischer*, 780 F.3d 1277, 1284 (9th Cir. 2015) (reversing wire fraud conviction, finding that the exclusion of a defendant's "main defense" to a "critical element of the government's case" is not harmless error); *Gill v. Ayers*, 342 F.3d 911, 922 (9th Cir. 2003) (error not harmless where "excluded testimony" is "central" to the defense).

The government claims that the error was cured because the district court would have permitted some, limited good faith testimony. GAB at 76-77. What the district court would have permitted, however, only highlights its errors. For example, the district court said it would have allowed Brunst to testify to "why banks withdrew work from Backpage," but precluded Brunst from testifying that the financial institutions faced threats from law enforcement officials like Sheriff Dart, which were later rebuked by the Seventh Circuit. GAB at 76. While saying that Brunst could testify to general statements by other executives regarding the

21

First Amendment, the district court precluded him from testifying that the executives were passing on statements from counsel.  GAB at 76-77.  And while saying that Brunst could testify about the views of auditors, the district court precluded him from testifying that he gained comfort because the auditors expressed their views after discussing legal issues with counsel.  49-ER-13856-58.

To testify with those handcuffs would have prevented the jury from receiving the evidence that showed why Brunst's beliefs were held *in good faith*.

### C. Brunst Was Deprived of the Right to Confront the Only Witness Against Him with Key Impeachment.

#### 1. The Exclusion of Key Cross-Examination of Ferrer Violated the Confrontation Clause.

The government trivializes the exclusion of cross-examination of Ferrer as involving a "handful of meritless objections."  GAB at 95.  On the contrary, the district court precluded the most important impeachment, namely: (1) prior statements by Ferrer directly contradicting his testimony, (2) exculpatory portions of Backpage's written responses to the State AG letters, even though Ferrer testified on direct examination that these written responses were inculpatory, (3) the company's reliance on the Communications Decency Act ("CDA") to inform its moderation practices, and (4) prior court decisions and attorney

22

communications stating that Backpage was operating lawfully. AOB at 19-31, 45-51.

The Government suggests that *United States v. Singh*, 995 F.3d 1069 (9th Cir. 2021), supports the district court's limitations on the cross-examination of Ferrer. GAB at 93-94. But *Singh* cuts the other way. There, the defendant was *permitted* to question a cooperating witness about his involvement in an unrelated murder-for-hire plot, but was precluded from introducing extrinsic evidence of the plot if the cooperator denied his role given that it was a "collateral matter." *Singh*, 995 F.3d at 1079-80. Here, by contrast, Brunst was categorically barred from cross-examining Ferrer about the very evidence that the government claimed provided notice of illegality.

Nor does the Government's quantity-over-quality argument in terms of the number of days of cross-examination of Ferrer hold water. GAB at 95. As set forth below, the district court's "complete ban" on critical areas of cross-examination "cut off an important avenue for the defendant to expose" Ferrer's "alleged bias and motive to testify as [he] did, leaving the jury short of potentially essential information." *United States v. Manske*, 186 F.3d 770, 778 (7th Cir. 1999) (reversing drug conspiracy charge under Confrontation Clause).

### a. Ferrer's Prior Inconsistent Statements

In a May 2017 e-mail, Ferrer made statements relating to the money

laundering allegations directly at odds with his trial testimony:

| Ferrer's Testimony (as summarized by the government) | Ferrer's Prior Inconsistent Statements |
|---|---|
| "The Defendants start funneling Backpage's transactions through innocuously named shell companies . . . . One such 'shell company' was Website Technologies." GAB at 19, 21. | "Website Technologies . . . is not a shell company." 1-BER-101. |
| "Brunst, Spear, Larkin, and Ferrer ultimately developed and implemented various financial strategies aimed at staying one step ahead of the banks and credit card companies." GAB at 20. | "You are not disguising your transaction when you fill out a contract, spend months getting contracts vetted by the acquiring banks/processor and attorneys. You cannot get a bank account without KYC. They have no evidence of fraudulent merchant bank applications." 1-BER-99. |
| "[T]he defendants and Ferrer worked 'to secure credit card processing from Europe.'" GAB at 20. | "You want a UK bank set up a UK company. This is not illegal." 1-BER-101. |
| The defendants also started "using [company] names, internet addresses, and billing descriptors that would not include the name 'Backpage.'" GAB at 20. | "Creating Billing Descriptors for new banks/processors . . . is not defrauding banks. You are expected to have a different billing descriptor when you set up a payment channel . . . Billing descriptors are approved and managed by acquiring bank. They are not controlled by the merchant." 1-BER-105-6. |

24

The district court permitted the inculpatory testimony but precluded the impeachment. Why exclude this obvious impeachment? The government offers only the palpably weak response that the e-mail from Ferrer was of "questionable authenticity" and a "privileged nature." GAB at 95. First, this was clearly an email from Ferrer (his statements were also made under the heading "CARL COMMENTS"). 1-BER-98-143. The government has never claimed otherwise, and the district court refused to allow questions that would have easily confirmed that these were Ferrer's statements. 41-ER-11476-82, 11637-40. Second, Ferrer waived his attorney-client privilege. 54-ER-15444-46. Third, the government does not dispute that if the Confrontation Clause and a privilege are at odds, the latter must yield to the former where, as here, the impeachment material went to critical issues in the case. AOB at 50; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004).[10]

### b. Responsive Letters to the State AGs

The government wrongly claims that the defense failed to offer a non-hearsay purpose for the admission of Backpage's responses to the State AG letters. GAB at 85; AOB at 24. Brunst offered that the responses were relevant to

---

[10] The district court's reasoning that Ferrer's statement was a "work in progress" and "not a statement under oath" are obviously not reasons to deny the admission of impeachment evidence. GAB at 90. These arguments go to weight, not admissibility.

his state of mind to counter the notion that the (hearsay) State AG letters constituted notice of illegality. SER-76-77.

The government next argues that Brunst "was not generally precluded from cross-examining Ferrer about Backpage's responses to the State Attorneys General." GAB at 85. The record belies this claim. During Ferrer's direct examination, when the government sought to admit certain State AG letters, the defense objected on Rule 106 completeness grounds, seeking the admission of Backpage's responses. The district court responded, "You can do that when it's your turn." 35-ER-9820. Yet when the defense began to ask Ferrer about the responsive letters on cross-examination, the prosecutor objected to the questions because the letters were not in evidence. 40-ER-11182-83. The district court then sustained the government's hearsay objection and refused to admit the responsive letters or cross-examination about their exculpatory content. 40-ER-11182-83. This prevented Appellants from using the content of the responsive letters to impeach Ferrer's claim that the responsive letters misled the State AGs.

### c. References to the Communications Decency Act

The district judge barred the jury from seeing exhibits or hearing testimony that referenced the CDA because "[t]his is not a CDA case." GAB at 87; AOB at 25-27. Yet the government does not dispute that (i) the CDA informed how Backpage moderated content, (ii) the CDA barred the State AGs from taking any

26

enforcement action against Backpage, and (iii) executives, lawyers, and courts advised that both the First Amendment and the CDA protected Backpage's operations. AOB at 25-27; 1-BER-14, 78-80. The issue was not whether the CDA immunized Appellants from this prosecution. GAB at 72-73, 87. Rather, Backpage's extensive CDA compliance efforts were part of the broader picture that led Brunst to believe the executives overseeing Backpage's operations were acting in good faith. Had the shoe been on the other foot—had there been evidence that Backpage was acting outside of the CDA's safe harbors—the government undoubtedly would have sought to introduce such evidence as notice of illegality. Backpage's efforts to comply are equally relevant.

The government puzzlingly suggests that Appellants did not attempt to use the redacted portions of government exhibits that contained CDA references during cross-examination of Ferrer. GAB at 87 n.12. This suggestion ignores that the district court refused to let Appellants do so. AOB at 25-27; 2-BER-313-19; 2-ER-533-34; 37-ER-10377-79; 35-ER-9964-66; 38-ER-10618.

### d. Attorney Communications and Prior Court Decisions

In addition to erring in precluding Brunst from confronting Ferrer about the attorney communications discussed above (*supra* at 16-20), the district court erred in precluding cross-examination about Sheriff Dart's threats to financial

institutions that did business with Backpage, as well as the related litigation. AOB at 9-12, 15-17, 20-23, 45-51; 2-BER-343-48; 40-ER-11389-90.

The government claims Brunst was not "precluded from cross-examining Ferrer about Sheriff Dart." GAB at 88. The record disproves this. 41-ER-11512 (Brunst precluded from asking: "And in this time period your view of what Sheriff Dart was doing was starting a campaign against Backpage, correct?"), 41-ER-11513-16 (Brunst precluded from asking about a non-privileged letter Backpage's counsel sent to credit card companies regarding the unconstitutionality of Dart's actions), 41-ER-11516-17 ("MR. LINCENBERG: So the key point for me to understand is: Can I bring out that the response that was sent to Sheriff Dart was that . . . the business is operating lawfully because of the First Amendment? THE COURT: No."). No matter how the question was phrased to try to comply with the district court's restrictions, the defense was muzzled from confronting Ferrer about almost anything Dart-related. The district court even precluded the question to Ferrer: "[P]ost Dart did you gain any comfort in the legality of the credit card processing in the post-Dart setting?" 41-ER-11525-26. There can be no dispute that the Dart saga was the key inflection point regarding Backpage's dealings with financial institutions, yet Brunst was effectively barred from confronting Ferrer about it. 55-ER-15498-602 (Ferrer referenced "Dart" numerous times during his pre-trial interviews with the Government).

### 2. The Government Misstates the Standard of Review.

Because several "area[s] of inquiry" were barred, review here is *de novo*. *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007). Further, this error was structural, and not subject to harmless error review, because Ferrer was the only witness against Brunst and the precluded areas of cross-examination went to Brunst's alleged intent. *Smith-Baltiher*, 424 F.3d at 922. Even under a harmless error standard, however, this Court should reverse. *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009) (precluding key cross-examination of "central" witness "is not harmless error").

The government is also wrong that Brunst raises this Confrontation Clause challenge for the first time on appeal. GAB at 91-92. These areas of cross-examination were addressed and ruled on by the district court: (i) in connection with motions *in limine* (2-ER-533-535) and (ii) prior to and during the cross-examination of Ferrer (2-BER-341-73; 40-ER-11182-83, 11389-90; 41-11476-82, 11489-90, 11506-08, 11511-17, 11525-26, 11634-40); *see also* BSER-21 ("Ferrer, understandably, does not wish to be confronted with his prior inconsistent statements, but he cannot use privilege" to avoid cross-examination regarding the impeachment evidence); BSER-10-11 (arguing that the "Sixth Amendment's right of confrontation can override a witness' assertion of privilege"); SER-72

("Defendants file this brief to address certain rulings that restricted defense counsel's ability to let the jury hear the truth and impeach Ferrer.").

Appellants therefore unquestionably preserved this issue. *See United States v. Palmer*, 3 F.3d 300, 304 (9th Cir. 1993) ("[W]here the substance of an objection has been thoroughly explored and the trial court's ruling was explicit and definitive, the issue is preserved for appeal."); *United States v. Summers*, 414 F.3d 1287, 1298 (10th Cir. 2005). The cases the government cites regarding plain error are inapposite, as they concern the failure to object under the Confrontation Clause to the admission of testimonial hearsay from absent third-party witnesses. GAB at 92 (citing *United States v. Macias*, 789 F.3d 1011, 1017 (9th Cir. 2015) (concerning an affidavit from an absent border patrol agent)).

Even under a plain error standard, however, Brunst's convictions should be reversed. First, the district court's error was plain; it wholesale precluded critical areas of cross-examination, including Ferrer's prior inconsistent statements that directly contradicted his key testimony. Second, these errors affected Brunst's substantial rights, as Brunst could not confront on critical points the government's only witness against him. Third, these errors "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019); *see United States v. Huber*, 772 F.2d 585, 589 (9th Cir. 1985) (reversing conviction under Confrontation Clause for plain

30

error). As to each area of precluded cross-examination, the district court applied an evidentiary double standard. The district court admitted hearsay offered by the government to prove "notice," but precluded the responsive hearsay *counter-notice* offered by the defense. And statements that the district court previously ruled were *not privileged* became *privileged* when the defense sought to confront Ferrer with them.

## IV.   THE GOVERNMENT'S INVASION OF THE ATTORNEY-CLIENT PRIVILEGE REQUIRES REVERSAL.

The government does not dispute that (1) Appellants and Ferrer held joint privileges, (2) the government questioned Ferrer about advice provided by attorneys subject to those jointly-held privileges, (3) the government did so despite assuring the defense and the district court it was not doing so, and (4) the government elicited this information from Ferrer both before and after it unsuccessfully sought permission from the district court to invade privileged communications. AOB at 15-17; 54-ER-15488 ("Ferrer recalled working with [attorney] Ed McNally on the goal of keeping law enforcement happy to minimize the damage"); 55-ER-15497 ("Then [attorney] Liz McDougall stepped in and said: 'Why are you doing this? Don't edit ads. Stop the strip-out filter'"); 55-15503 ("[Attorney] Jim Grant wanted Backpage to discontinue accepting Bitcoin because of the optics and the apparent anonymity that it had."); 55-ER-15519 ("Ferrer took

31

it to [attorney] Dan Quigley and they decided to slow production of documents in the case."); 55-ER-15546-47 ("[Attorney] Andy Lorentz with Davis Wright Tremaine . . . wrote a memo on gift card payment solutions saying that there was nothing illegal about accepting gift cards."); 55-ER-15585 ("The good attorneys that suggested an exit strategy to the Backpage owners were fired"). On their face, these communications meet the elements required to establish their privileged nature. GAB at 127.

The prejudice in ruling that these communications were not privileged is manifest based on the nature of the case the government tried. The attorney advice the government elicited during its pre-trial interviews of Ferrer links directly to questions the prosecutors later asked Ferrer at trial and arguments the prosecutors made in opening and closing. AOB at 63-66. These attorney communications informed the government's theme that Backpage engaged in a "slow dance" legal strategy with state and federal officials. AOB at 24, 28, 63-66; GAB at 16-18. The government also elicited testimony from Ferrer that Backpage's retention of attorneys was a veneer to create the appearance of legality of the company's operations, because the attorneys' advice regarding moderation changes was ignored. AOB at 28.

Appellants were doubly disadvantaged by this government tactic because, as discussed above, they were precluded from rebutting this evidence by questioning

32

Ferrer about the exculpatory attorney advice he received and disclosed to the government unless they first waived a privilege that the court previously ruled did not exist. Due process demanded a remedy.[11]

## V.  BRUNST WAS ERRONEOUSLY SENTENCED UNDER THE WRONG OFFENSE OF CONVICTION.

The government's approach to the sentencing process was effectively a means to an end. Brunst objected to the Presentence Investigation Report's (PSR) initial offense level calculation of 43 because the PSR relied on the loss table in Sentencing Guidelines section 2B.1.1, rather than looking to the "offense level for the underlying offense from which the laundered funds were derived." 5-ER-1274-7; USSG, § 2S1.1(a)(1). In response to Brunst's objection, the PSR created pseudo-counts for the acquitted Travel Act counts to reach the same offense level. PSR at 39-43.

The government argues these acquittals are "relevant conduct." GAB at 133. But the offense level is dictated by the offense of conviction, not acquittal. *United States v. McEnry*, 659 F.3d 893, 897 (9th Cir. 2011) ("the crime of conviction . . . governs the selection of the appropriate guideline section"); *see also*

---

[11]  Brunst repeatedly preserved his request for an evidentiary hearing to further establish the privileged nature of the communications Ferrer disclosed to the government, as well as the associated prejudice. 54-15275-76, 15281, 15284-85, 15353, 15354, 15411.

*United States v. Crawford*, 185 F.3d 1024, 1026-28 (9th Cir. 1999) (reversing sentence where district court determined offense level based on an offense not charged).

The sentencing process is not intended to allow the government to backdoor a higher base offense level than the counts of conviction.[12] The government does not dispute that if Brunst is right, then the district court committed reversible error.[13]

## VI.    CONCLUSION

For the reasons discussed above and in the reply briefs of his co-Appellants, as supported by amici, Brunst is entitled to a judgment of acquittal on all counts of conviction. Alternatively, Brunst is entitled to reversal with instructions to the district court to admit the evidence that Brunst was precluded from presenting at trial. Reversal is further supported by the cumulative error in the district court's numerous erroneous rulings, which precluded Brunst from testifying in his own defense and cross-examining the only witness against him.

---

[12]    Indeed, the first trial ended in a mistrial because the government improperly introduced evidence of the trafficking of minors, evidence the government now claims supports a higher base offense level. Lacey AOB at 19.

[13]    The government appears to concede that the district court mistakenly double-counted the four-point leadership enhancement. AOB at 69.

DATED:  May 26, 2026          Respectfully submitted,

Gary S. Lincenberg
Gopi K. Panchapakesan
Michael C. Landman
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP


By:      */s/ Gary S. Lincenberg*
             Gary S. Lincenberg
             Attorneys for Defendant-Appellant John
             ("Jed") Brunst

35

## <u>CERTIFICATE OF RELATED CASES</u>

To the best of Appellant's knowledge, the following related cases are pending before this Court: *United States v. Scott Spear*, 24-5375; *United States v. Michael Lacey*, 24-5376.  Appellant is aware of no other pending, related cases.

DATED:  May 26, 2026

Gary S. Lincenberg
Gopi K. Panchapakesan
Michael C. Landman
BIRD, MARELLA, RHOW, LINCENBERG, DROOKS & NESSIM, LLP


By:  */s/ Gary S. Lincenberg*

Gary S. Lincenberg
Attorneys for Defendant-Appellant John ("Jed") Brunst

36

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**      24-5374, 24-5375, 24-5376

I am the attorney or self-represented party.

**This brief contains      7,489      words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ X ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**      */s/ Gary S. Lincenberg*      **Date**      May 26, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

37